Robert V. Prongay (SBN 270796)
 *rprongay@glancylaw.com*
Charles Linehan (SBN 307439)
 *clinehan@glancylaw.com*
Pavithra Rajesh (SBN 323055)
 *prajesh@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Attorneys for Plaintiff Michael J. Butala

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL J. BUTALA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> OWLET, INC. f/k/a SANDBRIDGE ACQUISITION CORPORATION, KURT WORKMAN, KATE SCOLNICK, KEN SUSLOW, DOMENICO DE SOLE, RAMEZ TOUBASSY, JAMIE WEINSTEIN, KRYSTAL KAHLER, and MICHAEL F. GOSS, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Michael J. Butala ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Owlet, Inc. ("Owlet" or the "Company") f/k/a Sandbridge Acquisition Corporation ("Sandbridge") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Owlet; and (c) review of other publicly available information concerning Owlet.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities: (a) that purchased or otherwise acquired Owlet securities between March 31, 2021 and October 4, 2021, inclusive (the "Class Period"); and/or (b) held Sandbridge common stock held as of June 1, 2021 and were eligible to vote at Sandbridge's special meeting on July 14, 2021. Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Sandbridge was a special purpose acquisition company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses.

3.     On July 15, 2021, Sandbridge combined with Owlet Baby Care Inc., a company that designs and sells products and services for parents to proactively monitor the health and wellness of their children, and the combined company was renamed Owlet (the "Business Combination").

4.     Owlet's flagship product is called Smart Sock, which is a baby monitor that allows parents to track an infant's oxygen levels, heart rate, and sleep trends in real time using the Owlet application.

5.     On October 4, 2021, Owlet revealed that it had received a warning letter from the U.S. Food and Drug Administration ("FDA"), which stated that "the Company's marketing of its Owlet Smart Sock product . . . renders [it] a medical device requiring premarket clearance or approval from FDA." Owlet has not obtained such clearance or approval. Moreover, the FDA "requests the Company cease commercial distribution of the Smart Sock for uses in measuring blood oxygen saturation and pulse rate where such metrics are intended to identify or diagnose desaturation and bradycardia using an alarm functionality to notify users that measurements are outside of preset values."

6.     On this news, Owlet's stock price fell $1.29, or 23%, to close at $4.19 per share on October 4, 2021, on unusually heavy trading volume. As a result, Sandbridge investors who could have voted against the Business Combination and redeemed their shares at $10.00 per share suffered a loss of $5.81 per share.

7.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Owlet was reasonably likely to be required to obtain marketing authorization for the Smart Sock because the FDA concluded it was a medical device; (2) that, as a result, Owlet was reasonably likely to cease commercial distribution of the Smart Sock in the U.S. until it obtained the requisite approval; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

9.      The claims asserted herein arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rules 10b-5 and 14a-4 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5 and 17 C.F.R. § 240.14a-4).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, Sandbridge's principal executive offices were located in this District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

13.     Plaintiff Michael J. Butala, as set forth in the accompanying certification, incorporated by reference herein, purchased Owlet securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant Owlet is incorporated under the laws of Delaware with its principal executive offices located in Lehi, Utah. Owlet's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "OWLT" and its

warrants trade under the symbol "OWLT WS." Prior to the Business Combination, the Company's Class A common stock traded under the symbol "SBG," and its redeemable warrants traded under the symbol "SBG WS." Also, prior to the Business Combination, the Company's principal executive offices were located in Los Angeles, California.

15.     Defendant Kurt Workman ("Workman") was the Company's Chief Executive Officer ("CEO") at all relevant times.

16.     Defendant Kate Scolnick ("Scolnick") was the Company's Chief Financial Officer ("CFO") at all relevant times.

17.     Defendants Workman and Scolnick (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

18.     Defendant Ken Suslow ("Suslow") was the Chairman of the Board of Directors of Sandbridge. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

19.     Defendant Domenico De Sole ("De Sole") was a director of Sandbridge at all relevant times. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

20.     Defendant Ramez Toubassy ("Toubassy") was a director of Sandbridge at all relevant times. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

21.     Defendant Jamie Weinstein ("Weinstein") was a director of Sandbridge at all relevant times. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

22.     Defendant Krystal Kahler ("Kahler") was a director of Sandbridge at all relevant times. She solicited and/or permitted the use of her name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

23.     Defendant Michael F. Goss ("Goss") was a director of Sandbridge at all relevant times. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

24.     Defendants Suslow, De Sole, Toubassy, Weinstein, Kahler, and Goss are collectively referred to herein as the "Sandbridge Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25.     Sandbridge was a special purpose acquisition company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses. It completed its initial public offering ("IPO") on or about September 14, 2020, selling 23 million units at $10.00 per unit. Each unit consists of one share

of Sandbridge Class A common stock and one-half of one public warrant of Sandbridge.

26.     Sandbridge had considerable discretion in identifying and consummating a business combination, subject to three general limitations imposed by the Amended and Restated Certificate of Incorporation dated September 14, 2020:

- *First*, Sandbridge must acquire a target business with a fair market value equal to at least 80% of the net assets held in the trust account following the IPO (excluding the deferred underwriting discounts and commissions and taxes payable on the interest earned on the trust account).

- *Second*, Sandbridge only had 24 months from the closing date of the IPO to complete a business combination, or else its corporate existence would cease, except for purposes of winding up its affairs and liquidating. Thus, Sandbridge was required to hold the approximately $230 million of proceeds from its IPO in a trust account, which were to be released only upon the consummation of a business combination or liquidation.

- *Third*, if Sandbridge's stockholders approved an amendment to the Certificate of Incorporation that would affect the substance or timing of Sandbridge's obligation to redeem 100% of the public shares if Sandbridge did not complete a business combination on time, Sandbridge was required to provide the holders of its public shares with the opportunity to redeem all or a portion of their public shares upon approval of any such amendment.

27.     On July 15, 2021, Sandbridge combined with Owlet Baby Care Inc., a company that designs and sells products and services for parents to proactively

monitor the health and wellness of their children, and the combined company was renamed Owlet (the "Business Combination").

28.    Owlet's flagship product is called Smart Sock, which is a baby monitor that allows parents to track an infant's oxygen levels, heart rate, and sleep trends in real time using the Owlet application.

## Materially False and Misleading
## Statements Issued During the Class Period

29.    The Class Period begins on March 31, 2021. On that day, Owlet filed its Registration Statement on Form S-1 in connection with the Business Combination. It stated that for the period ended December 31, 2020, Owlet recognized $71.128 million in revenue from sales in the United States and $4.275 million Internationally. It purported to warn that "the FDA . . . *may not agree* with that conclusion [that the Smart Sock is not a medical device] and *could* require us to obtain marketing authorization" to sell the Smart Sock:

> *If the FDA or any other governmental authority were to require clearance, approval, certification or other form of marketing authorization for the Owlet Smart Sock, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, we could be required to cease selling or recall the product pending receipt of such clearance, approval, certification or marketing authorization from the FDA or such other governmental authority, which can be a lengthy and time-consuming process, and we may also be subject to regulatory enforcement action.*

> We currently sell the Owlet Smart Sock, which we market for use by parents of healthy babies to provide peace of mind, and for which we have not sought or obtained any marketing authorization from the FDA or similar authorization, approval, or certification from any other governmental authority. In response to inquiries from the FDA and regulatory authorities in other jurisdictions regarding the marketing of the Owlet Smart Sock, we have communicated our belief that the Owlet Smart Sock is not a medical device and does not require marketing authorization from the FDA or approval/certification from such other regulatory authorities. *However, the FDA and certain regulatory authorities have expressed they may not agree with that conclusion and could require us to obtain marketing authorization (or approval/certification) to continue to sell the product.* Obtaining authorization to sell the Owlet Smart Sock as a medical device is a time-consuming and costly process and we may be precluded from selling the Owlet Smart Sock if we are required to obtain marketing

authorization. If granted, a marketing authorization could require conditions to sale, for example, a prescription requirement. ***If the FDA or other regulatory authorities require such marketing authorization (or approval/certification, respectively) for the Owlet Smart Sock***, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, ***we could be required to cease selling or recall the product in the corresponding jurisdiction pending receipt of marketing authorization*** (or approval/certification), which can be a lengthy and time-consuming process, and we may also be subject to regulatory enforcement action. In addition, we may be required to modify the product's functionality or limit our marketing claims for the product, whether or not we obtain such clearance, approval, certification or marketing authorization. In any such event, our business could be substantially harmed.

30.     On June 21, 2021, Owlet filed its proxy statement on Form 424b3 soliciting votes in favor of the Business Combination (the "Proxy Statement"). It stated that, for the period ended March 31, 2021, Owlet recorded $20.534 million revenue from sales in the United States and $1.377 million from sales Internationally. The Proxy Statement purported to warn that "the FDA . . . ha[s] expressed they do not agree with that conclusion [that the Smart Sock is not a medical device] and ***could*** require us to obtain marketing authorization" to sell the Smart Sock:

> ***If the FDA or any other governmental authority were to require clearance, approval, certification or other form of marketing authorization for the Owlet Smart Sock, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, we could be required to cease selling or recall the product pending receipt of such clearance, approval, certification or marketing authorization from the FDA or such other governmental authority, which can be a lengthy and time-consuming process, and we may also be subject to regulatory enforcement action.***

> We currently sell the Owlet Smart Sock, which we market for use by parents of healthy babies to provide peace of mind, and for which we have not sought or obtained any marketing authorization from the FDA or similar authorization, approval, or certification from any other governmental authority. In response to inquiries from the FDA and regulatory authorities in other jurisdictions regarding the marketing of the Owlet Smart Sock, we have communicated our belief that the Owlet Smart Sock is not a medical device and does not require marketing authorization from the FDA or approval/certification from such other regulatory authorities. ***However, the FDA and/or certain regulatory authorities have expressed they do not agree with that conclusion and could require us to obtain marketing authorization (or***

*approval/certification) to continue to sell the product.* For example, the Medicines and Healthcare products Regulatory Agency, the regulatory authority responsible for the UK medical device market, has asserted that the Owlet Smart Sock requires (CE mark) certification and subsequent registration as a medical device in the UK, but has indicated they will allow us to continue to market the Owlet Smart Sock until May 2022 without such certification or registration. Obtaining authorization to sell the Owlet Smart Sock as a medical device is a time-consuming and costly process and we may be precluded from selling the Owlet Smart Sock if we are required to obtain marketing authorization. If granted, a marketing authorization could require conditions to sale, for example, a prescription requirement. ***If the FDA or other regulatory authorities require such marketing authorization (or approval/certification, respectively) for the Owlet Smart Sock, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, we could be required to cease selling or recall the product in the corresponding jurisdiction pending receipt of marketing authorization (or approval/certification),*** which can be a lengthy and time-consuming process, and we may also be subject to regulatory enforcement action. In addition, we may be required to modify the product's functionality or limit our marketing claims for the product, whether or not we obtain such clearance, approval, certification or marketing authorization. In any such event, our business could be substantially harmed.

(First emphasis in original.)

31.    On August 12, 2021, Owlet announced its second quarter 2021 financial results in a press release, reporting revenue of $24.9 million and gross margin of 54.2%. The Company also reiterated its full year 2021 guidance of $107 million and gross margin of 54-55%.

32.    The above statements identified in ¶¶ 29-31 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that Owlet was reasonably likely to be required to obtain marketing authorization for the Smart Sock because the FDA concluded it was a medical device; (2) that, as a result, Owlet was reasonably likely to cease commercial distribution of the Smart Sock in the U.S. until it obtained the requisite approval; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**The Business Combination is Completed**

33.     On July 15, 2021, Owlet announced that it had completed the Business Combination in a press release that stated, in relevant part:

> Owlet, Inc. (NYSE: OWLT) ("Owlet" or the "Company"), a company building a connected and accessible nursery ecosystem that brings technology and vital data to modern parenting, today announced that it has completed its business combination with Sandbridge Acquisition Corporation. (NYSE: SBG) ("Sandbridge"), a special purpose acquisition company. The business combination and concurrent private placement, which were approved by Sandbridge's stockholders at its special meeting held on July 14, 2021, provide over $135 million to accelerate the Company's expansive product pipeline, deepen penetration, and expand globally.

**Disclosures at the End of the Class Period**

34.     On October 4, 2021, Owlet revealed that it had received a warning letter from the FDA, which stated that "the Company's marketing of its Owlet Smart Sock product . . . renders [it] a medical device requiring premarket clearance or approval from FDA." Specifically, in a Form 8-K filed with the SEC, Owlet stated:

> On October 1, 2021, Owlet, Inc. (the "Company") received a Warning Letter, dated October 1, 2021 (the "Warning Letter"), from the United States Food and Drug Administration ("FDA").
>
> The Warning Letter asserts that the Company's marketing of its Owlet Smart Sock product (the "Smart Sock") in the United States renders the Smart Sock a medical device requiring premarket clearance or approval from FDA, and ***that the Company has not obtained such clearance or approval in violation of the Federal, Food, Drug, and Cosmetic Act. The Warning Letter requests that the Company take prompt action to address the alleged violations. Among other things, the Warning Letter requests the Company cease commercial distribution of the Smart Sock*** for uses in measuring blood oxygen saturation and pulse rate where such metrics are intended to identify or diagnose desaturation and bradycardia using an alarm functionality to notify users that measurements are outside of preset values. The Warning Letter also identifies certain marketing claims that FDA believes render the Smart Sock a medical device.
>
> The Company intends to fully cooperate with FDA to resolve the Warning Letter, including through the pursuit of a marketing authorization application for uses of the Smart Sock identified as medical device uses. In addition, the Company plans to issue a timely response to FDA, and further engage with FDA, regarding modifications and marketing changes to the Smart Sock with the goal of enabling continued commercial distribution of a modified product prior to receipt of any such marketing authorization that may be granted. The Company cannot, however, give any assurances that FDA

will be satisfied with the Company's actions taken in response to the matters raised in the Warning Letter. The Company also cannot give any assurances as to the timing of the resolution of such matters.

35.     On this news, Owlet's stock price fell $1.29, or 23%, to close at $4.19 per share on October 4, 2021, on unusually heavy trading volume. As a result, Sandbridge investors who could have voted against the Business Combination and redeemed their shares at $10.00 per share suffered a loss of $5.81 per share.

36.     On October 25, 2021, Owlet stated that it had ceased distribution of the Smart Sock in the U.S. as of October 22, 2021. The Company stated that the "suspension is specific to shipments by the Company to customers and retailers in the United States, and operations in other countries remain unaffected."

## CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities: (a) that purchased or otherwise acquired Owlet securities between March 31, 2021 and October 4, 2021, inclusive; and/or (b) held Sandbridge common stock held as of June 1, 2021 and were eligible to vote at Sandbridge's special meeting on July 14, 2021, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

38.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Owlet's shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Owlet shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records

maintained by Owlet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

39.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

40.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

41.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Owlet; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

42.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

43.    The market for Owlet's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading

statements, and/or failures to disclose, Owlet's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Owlet's securities relying upon the integrity of the market price of the Company's securities and market information relating to Owlet, and have been damaged thereby.

44. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Owlet's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Owlet's business, operations, and prospects as alleged herein.

45. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Owlet's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## **LOSS CAUSATION**

46. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

47.     During the Class Period, Plaintiff and the Class purchased Owlet's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

48.     In addition to the decline in Owlet securities caused by the aforementioned corrective disclosure, Sandbridge shareholders who were eligible to vote on the Business Combination and/or exercise their conversion rights have also been damaged as a result of the materially false and/or misleading statements about Owlet's operations and financial results. Had the true financial condition and operations of Owlet been known, members of the Class eligible to vote on the Business Combination would have voted against the Business Combination and/or exercised their conversion rights and received $10.00 in cash per share of Sandbridge stock.

49.     It was foreseeable to Owlet, the Individual Defendants, and the Sandbridge Defendants that the false and/or misleading statements about, among others, the Smart Sock: (i) would cause those members of the Class that would have received $10.00 in cash per share of Sandbridge stock upon exercising conversion rights and/or upon liquidation to keep their stock in lieu of receiving $10.00 in cash per share; and (ii) eventually the disclosure of the information about Owlet's financial condition and operation resulted in those members of the Class owning shares worth substantially less than $10.00 per share.

50.     As a result, Owlet, the Individual Defendants, and the Sandbridge Defendants' conduct proximately caused foreseeable losses to those Plaintiffs and members of the Class.

## SCIENTER ALLEGATIONS

51.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name

of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Owlet, their control over, and/or receipt and/or modification of Owlet's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Owlet, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

52.    The market for Owlet's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Owlet's securities traded at artificially inflated prices during the Class Period. On August 13, 2021, the Company's share price closed at a Class Period high of $10.32 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Owlet's securities and market information relating to Owlet, and have been damaged thereby.

53.    During the Class Period, the artificial inflation of Owlet's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Owlet's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Owlet and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially

inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

54. At all relevant times, the market for Owlet's securities was an efficient market for the following reasons, among others:

(a) Owlet shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Owlet filed periodic public reports with the SEC and/or the NYSE;

(c) Owlet regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Owlet was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

55. As a result of the foregoing, the market for Owlet's securities promptly digested current information regarding Owlet from all publicly available sources and reflected such information in Owlet's share price. Under these circumstances, all purchasers of Owlet's securities during the Class Period suffered similar injury through their purchase of Owlet's securities at artificially inflated prices and a presumption of reliance applies.

56.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

57.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Owlet who knew that the statement was false when made.

**FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**

**Against All Defendants**

58.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Owlet's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

60.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Owlet's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

61.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Owlet's financial well-being and prospects, as specified herein.

62.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of

Owlet's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Owlet and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

63.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

64.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Owlet's financial well-being and prospects from the investing public and

supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

65.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Owlet's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Owlet's securities during the Class Period at artificially high prices and were damaged thereby.

66.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Owlet was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Owlet securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

67.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

68.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM

**Violation of Section 20(a) of The Exchange Act**

**Against the Individual Defendants**

69.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

70.     Individual Defendants acted as controlling persons of Owlet within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

71.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

72.     As set forth above, Owlet and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this

Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## THIRD CLAIM

### Violation of Section 14(a) of the Exchange Act

### Against Owlet, the Individual Defendants, and the Sandbridge Defendants

73.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74.     The claims set forth herein do not sound in fraud and are based on negligent conduct by the Defendants named herein (the "Section 14 Defendants").

75.     The Section 14 Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these Defendants solicited proxies from Plaintiff and other members of the Class by means of a proxy statement that, through Defendants' negligence, contained statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

76.     Plaintiff and other members of the Class were misled by the Section 14 Defendants' false and misleading statements and omissions, were denied the opportunity to make an informed decision in voting on the merger, and approved the merger without having been advised of material facts. Accordingly, Plaintiff and other members of the Class did not receive their fair share of the value of the assets and business of the combined entity, suffered damages when the Company's stock price decreased, and were prevented from benefiting from a value-maximizing transaction.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:  November 17, 2021         GLANCY PRONGAY & MURRAY LLP

By:   */s/ Pavithra Rajesh*
Robert V. Prongay
Charles Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  info@glancylaw.com

*Attorneys for Plaintiff Michael J. Butala*

## SWORN CERTIFICATION OF PLAINTIFF
## Owlet, Inc. (OWLT) SECURITIES LITIGATION

I, Michael J. Butala, certify that:

1.     I have reviewed the Complaint, adopt its allegations, and authorize its filing and/or the filing of a lead plaintiff motion on my behalf.

2.     I did not purchase the Owlet, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.     I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.     My transactions in Owlet, Inc. securities during the period set forth in the Complaint are as follows:

     (See attached transactions)

5.     I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6.     I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.


11/12/2021
_____
Date

_____
Michael J. Butala

**Michael J. Butala 's Transactions in Owlet, Inc. (OWLT)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 7/28/2021 | Bought | 50 | $9.5400 |