# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |
|---|
| IN RE LORDSTOWN MOTORS CORP. SECURITIES LITIGATION |

Case No. 4:21-cv-00616 (PAG)

**CLASS ACTION**

JURY TRIAL DEMANDED

**CONSOLIDATED AMENDED COMPLAINT**
**FOR VIOLATIONS OF THE**
**FEDERAL SECURITIES LAWS**

Exhibit B

Page 11

**TABLE OF CONTENTS**

| | | | Page |
|---|---|---|---|
| TABLE OF ABBREVIATIONS | | | 3 |
| I. | INTRODUCTION | | 2 |
| II. | JURISDICTION AND VENUE | | 13 |
| III. | PARTIES AND KEY PLAYERS | | 14 |
| | A. | Parties | 14 |
| | B. | Other Relevant Persons and Entities | 19 |
| IV. | SUBSTANTIVE ALLEGATIONS | | 19 |
| | A. | Early Background on Lordstown and DiamondPeak Holding Corp. | 19 |
| | B. | Defendants Mislead Investors as They Pitch and Close the Merger | 25 |
| | C. | The Misrepresentations Escalate After the Merger | 31 |
| | D. | The Truth Begins to Emerge | 38 |
| | | (1) The Truth About Lordstown's Order Book | 39 |
| | | (2) The Truth About Lordstown's Production Capabilities | 58 |
| | | (3) The Market Reaction to the Hindenburg Report | 62 |
| | E. | Lordstown Attempts a Clumsy Cover-Up as the Truth Continues to Emerge | 63 |
| V. | ADDITIONAL ALLEGATIONS | | 77 |
| | A. | False and Misleading Statements | 77 |
| | | (1) Statements Concerning Lordstown's Supposed Pre-Orders | 78 |
| | | (2) Statements Concerning Lordstown's Production Capabilities | 107 |
| | | (3) Defendants' Omissions of Information Required by Item 105 | 116 |
| | B. | Allegations of Scienter as to Certain Claims | 118 |
| | | (1) Motive and Circumstantial Evidence of Scienter | 119 |
| | | (2) Scienter as to Lordstown's Supposed Pre-Orders | 120 |

Exhibit B
Page 12

        (3)    Scienter as to Lordstown's Production Capabilities ............................... 127

        (4)    The "Resignations" and Conclusions of the Internal Investigation Support the Inference of Scienter ........................................................ 128

        (5)    The SEC and DOJ Investigations Support the Inference of Scienter ..... 128

        (6)    Both the Pre-Orders and Lordstown Production Capabilities Were Essential to the Company's Success ..................................................... 130

        (7)    Defendants' Other Illegality Supports the Inference of Scienter ........... 131

        (8)    Insider Stock Sales Support the Inference of Scienter ........................... 134

    C.    Transaction Causation — Reliance ................................................................ 135

    D.    Loss Causation ............................................................................................. 138

    E.    No Safe Harbor ............................................................................................ 142

VI.    CLASS ACTION ALLEGATIONS .............................................................. 143

VII.    COUNTS ........................................................................................................... 146

    A.    COUNT I: Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants Except Defendants Hamamoto, Schmidt, Brown, and Post .................................................................. 146

    B.    COUNT II: Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants Except Defendants Hamamoto, Schmidt, Brown, and Post ............................................................ 148

    C.    COUNT III: Violation of Section 14(a) of the Exchange Act Against Defendants LTM, Lordstown EV Corporation, Burns, Flannery, and Hamamoto ................ 150

    D.    COUNT IV: Violations of §20A of the Exchange Act Against Defendants Schmidt, Rodriguez, Brown, and Post ............................................................. 153

    E.    COUNT V: Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ................................................................................. 154

VIII.    PRAYER FOR RELIEF ................................................................................ 155

IX.    JURY DEMAND ............................................................................................. 156

ii

## TABLE OF ABBREVIATIONS

| Term or Terms | Definition[1] |
|---|---|
| Class | Defined herein |
| Class Period | The period from August 3, 2020, through July 2, 2021 |
| DiamondPeak | DiamondPeak Holding Corp. |
| DOJ | U.S Department of Justice |
| DPHC | DiamondPeak Holding Corp. The former ticker for Lordstown's Class A common stock |
| DPHCU | The ticker for units listed by Lordstown while the company was named DiamondPeak Holding Corp. |
| DPHCW | The ticker for warrants listed by Lordstown while the company was named DiamondPeak Holding Corp. |
| Endurance | The Endurance pickup truck that Lordstown was purportedly developing and marketing |
| Exchange Act | The Securities Exchange Act of 1934 |
| GM | General Motors |
| Hindenburg | Hindenburg Research |
| Hindenburg Report | The Report about Lordstown published by Hindenburg Research on March 12, 2021 |
| Item 105 Disclosure | The material factors that make an investment in the registrant or offering speculative or risky |
| Lead Plaintiff | George Troicky |
| Lordstown | The business purportedly engaged in the development and production of the Endurance pickup truck |
| Lordstown Options | Any publicly traded option to purchase or sell DPHC or LTM's class A common stock. |

---

[1] To the extent that the term is defined differently herein, the term should be interpreted broadly enough to carry both the meaning in this table and the meaning herein.

| Lordstown Securities | Lordstown Options and securities trading under the tickers DPHC, RIDE, DPHCW, RIDEW, and DPHCW |
| --- | --- |
| LOI | Letter of Intent |
| LTM | Lordstown Motors Corp. F/K/A DiamondPeak Holding Corp. |
| Merger | The merger between DiamondPeak Holding Corporation and Lordstown Motors Corp. |
| Merger Sub | DPL Merger Sub Corp. |
| Plaintiffs | George Troicky, Daniel Tavares, Globestar Systems Inc., and Ashith Pabbathi, and FNY Managed Accounts LLC, together |
| SEC | The U.S. Securities and Exchange Commission |
| RIDE | The ticker for Lordstown's Class A Common stock |
| SPAC | Special Purpose Acquisition Corporation |
| RIDEW | The ticker for warrants listed by Lordstown |
| Sponsor | DiamondPeak Sponsor LLC |
| Workhorse | Workhorse Group Inc. |
| §10(b) | Section 10(b) of the Exchange Act |
| §14(a) | Section 14(a) of the Exchange Act |
| §20(a) | Section 20(a) of the Exchange Act |

iv

Exhibit B

Page 15

Lead Plaintiff George Troicky ("Lead Plaintiff"), and additional named Plaintiffs Daniel Tavares, Globestar Systems Inc., Ashith Pabbathi, and FNY Managed Accounts LLC (together, "Plaintiffs") bring this consolidated complaint against Defendants Lordstown Motors Corp. F/K/A DiamondPeak Holding Corp. ("LTM"), Lordstown EV Corporation F/K/A Lordstown Motors Corp., Stephen S. Burns, Shane Brown, Caimin Flannery, David T. Hamamoto, Julio Rodriguez, Rich Schmidt, and Darren Post.

Plaintiffs allege the following upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which included: (a) review and analysis of public filings made with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, analyst reports, news articles, and other publications; (c) a review of interviews and other public statements by Defendants; (d) interviews with former employees of Defendants and Defendants' purported customers, business partners, and affiliates; (e) consultation with experts on the automotive industry; (f) review of court filings in other matters concerning Defendants and their current or former affiliates; and (g) review of information obtained through freedom of information requests, such as police reports. Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein that will be revealed through continued investigation and discovery.

As more fully stated herein, Plaintiffs brings this federal securities class action on behalf of themselves and all persons or entities who (a) purchased LTM's publicly traded warrants (Ticker: "RIDEW" and prior ticker: "DPHCW"), LTM's publicly traded units (Ticker: "DPHCU"), or any publicly traded option to purchase or sell LTM's Class A Common Stock, from August 3, 2020, through July 2, 2021, inclusive (the "Class Period"), and/or (b) held LTM's Class A Common Stock as of September 21, 2020.

1

## I.    INTRODUCTION

1.      This is a classic "fake it 'til you make it" fraud.  After being pushed out of his role as CEO of the previous company he had founded, Defendant Stephen S. Burns had an exciting opportunity.  He could buy a recently closed plant from General Motors ("GM") at a steep discount.  Burns hatched the idea to use the plant to manufacture a new electric pickup truck (the "Endurance") with an in-wheel "hub motor" design, which had never been used in automobiles.

2.      Burns formed a business ("Lordstown") and bought the plant from GM, but he still needed to raise the cash to develop and manufacture the truck.  To attract investments, Burns developed a *false and misleading,* but compelling, narrative about the fledgling company.  He touted a growing book of "pre-orders," which he claimed as evidence of demand for the vehicle.

3.      On November 14, 2019, Burns boasted to Ohio-politicians that the plant would enable Lordstown to be first to market, concluding: "First mover market, *we've already got pre-orders for these vehicles*."  On May 22, 2020, the *Detroit Free Press* reported that Burns claimed "well over several thousand" pre-orders and that he had said, "[t]he demand side is super strong, I am starting to worry we won't be able to make them fast enough."  At a June 2020 prototype unveiling event, featuring Vice President Mike Pence, Burns claimed, "our whole year, *our first year of production [is] already pre-sold*," and later in the event, Vice President Pence stated, "Steve actually told me that they've already *pre-sold* 14,000 additions of the . . . truck."

4.      After months of unsuccessfully trying to raise cash from private sources, Burns found a solution.  On August 3, 2020, he announced that Lordstown was jumping on the "SPAC" bandwagon, and that it would be taken public by merging (the "Merger") with DiamondPeak Holding Corporation ("DPHC" or "DiamondPeak"), a publicly traded shell company that held cash reserves.  To secure this funding, Burns would need to persuade shareholders of DPHC to

2

approve the Merger, and to do so, he doubled down on his false claims about Lordstown's supposed pre-orders.

5. **Touting Pre-Orders to Promote the Merger**. The Merger proxy materials stated that Lordstown had "***secured $1.4 billion of pre-orders***." The proxies claimed 27,000 pre-orders, "***from commercial fleet customers***" or "from fleet operators," which Defendants claimed would provide "revenue sufficient to cover 2021 production and into 2022" and represented "clear demand" for the truck. The narrative that these pre-orders were coming from fleets was important because it suggested they represented true demand from Lordstown's target market.

6. An investor slide deck published in the proxy materials repeated the claim of "~$1.4bn of Existing Pre-Orders" and listed logos of certain "Selected Pre-Order Customers." In the conference call presenting that slide deck, Defendant Burns referred to the "***significant*** pre-order activity," repeating the supposed numbers. During the call, Defendant Hamamoto (Chairman of the SPAC) stated that he had evaluated hundreds of companies on behalf of DPHC and that Lordstown stood out, noting that it had "attracted a clear lane of customers in the commercial fleet segment of the market, as evidenced by its $1.4 billion in pre-orders to-date." While promoting the Merger, Burns appeared on CNBC claiming "[w]e got 27,000 ***orders***." Burns even appeared with President Trump and nodded in agreement as the President, speaking about Lordstown's truck, told reporters: "I heard the ***sales*** are great."

7. The market believed the story. For example, BTIG published a report on October 12, 2020, recommending a buy rating, noting: "First Year of Production Sold Out." The analyst report commented on how they liked that the sales came from "fleet managers."

8. **Touting Production Capability Prior to the Merger**. In addition to touting the "pre-orders," Burns also spun a false story regarding the company's production capabilities. For

Exhibit B
Page 18

example, the proxy materials claimed the plant was "near production ready," required only "modest incremental investment," and that the plant "positions Lordstown to be first to market." More specifically, Defendants claimed production would begin in September 2021. Furthermore, the proxy materials also claimed that after the Merger Lordstown would have sufficient cash to both move through production and become "cash flow positive." Similarly, in an investor call, Defendant Hamamoto claimed that the Merger would "fully fund Lordstown's current business plan and position the company to achieve positive EBITDA and cash flow."

9.      **The Merger Is Approved; the Misrepresentations Continue**. On October 22, 2020, shareholders approved the Merger on the basis of these assurances. Following the Merger, Defendants continued to promote the company with these same misleading talking points.

10.     For example, on October 26, 2020, Burns rang the bell to open trading at NASDAQ and in his short remarks stated, "This brings the final chapter where we get the necessary resources to be able to bring [the] Endurance all the way to market . . . And we are on target to do that in September." That same day *The Detroit News* quoted Burns as saying the Merger provided the funding they needed to be "***assured***" they could begin production by September. In the same article he claimed 40,000 pre-orders and that he was "surprised" by the number and that now "he's got to" make them, emphasizing the veracity of the orders.

11.     On November 17, 2020, Burns appeared on CNBC's *Mad Money* with Jim Cramer. Defendant Burns claimed, "we've already got 50,000 pre-orders" and added "we sell to commercial fleets." Then Cramer asked how "solid" the orders were, suggesting "these people are not going to be walking away? They are committed?" and Burns responded:

> Right. Yeah. ***All of them***. When you order, I think our average order size is about 500 trucks at a time. And as most of them were signed by the CEOs of these large firms, and bringing in 500 electric vehicles into your fleet, it's not trivial. So you've got to plan all the charging and everything. ***So it's very serious orders***.

4

Exhibit B

Page 19

12. On November 16, 2020, Lordstown issued a press release claiming they were "on track" for the September 2021 date for production and "deliveries." The same press release claimed 50,000 reservations "***from commercial fleets***." The press release also stated that the 50,000 figure did not capture demand from any organization that was "not in [a] position to be able to place pre-orders," such as "federal, state and municipal governments."[2] In addition to being literally false, this statement conveyed that whatever the 50,000 figure represented, it was a degree of commitment that was serious enough that government organizations would not be able to participate.

13. That same day Burns reiterated these remarks in an interview hosted by the website *IPO Edge*: "50,000 pre-sales already, ***all from fleets***. That's just the commercial sector. Does not count military or police departments, municipalities, state vehicles, so really just to have that many commercial vehicles sold already is a big deal." Later in the interview he was asked where the demand was coming from, and Burns said: "the bulk of them, our average order is about 500 trucks ***per order***, so larger fleets," and referred to a recent "***order***" of 400 vehicles.

14. In a December 2, 2020, Credit Suisse event, Burns said "we sell to fleets" while claiming the "50,000 pre-orders" or "***almost $3 billion in pre-orders.***" When asked "how do you find these fleet buyers," Burns claimed, "it's almost all incoming." He reiterated that the number was "just on the commercial side" from "larger fleets," and not from governments.

15. On January 11, 2021, Lordstown issued a press release stating it was "on track for start of production in September" and claiming 100,000 pre-orders "from commercial fleets," concluding "I think you can see why we feel that we are about to revolutionize the pickup truck industry."

---

[2] Notably, government organizations cannot buy vehicles unless they are on an approved list.

16.     On February 6, 2021, Burns appeared on a popular investing YouTube channel and once again claimed 100,000 pre-orders, said that it did not include governmental organizations and promised, "those numbers are just commercial fleets."  The interviewer responded, "Yeah, jeez.  So that's *literally* just for fleets?" and Burns responded, "Yeah.  That's just commercial fleets."  In the same interview, Burns boasted of how serious the orders were, noting that they were "signed by the CEO . . .  or at least some C-suite person" and then claiming:

> *They take it very seriously.*  They've got to figure out how they're going to layer these electrics in there.  And the appetite for them to do that way early like that, a year out from some of them means they're trying to do their part to ensure this comes to market.  So *they're standing behind it and they're putting these pre-orders in.*  But I'd say it's much stickier than a consumer putting a hundred dollars down refundable down on a Cybertruck, let's say.  And I think these orders are very, very sticky because I know what it takes to get them, the education you have to do.  This isn't somebody again on a website, a hundred bucks, refundable with a credit card.  *This is a fleet.*  And fleets generally take their business very, very seriously.  So I think they're very sticky.

17.     **Defendants Continue to Mislead After Learning of the SEC Investigation**.
On February 17, 2021, Lordstown received an information inquiry from the SEC into the pre-orders issue.  Lordstown did not disclose the SEC investigation at the time, but has since admitted that the SEC's investigation "relates" to the allegations at issue in this action.  Even after Defendants learned of this SEC investigation, Burns continued to mislead investors.

18.     On February 18, 2021, Burns was interviewed on CNBC.  The opening segment for the TV spot noted the 100,000 supposed orders, which Burns did not correct.  He then reasserted that Lordstown was on track for the September production date and that they had "enough liquidity" to get there.

19.     On February 23, 2021, Burns was interviewed by Yahoo Finance.  He lauded the September production date.  He then stated: "Our initial foray is into fleets and *we have __pre-sold__*

6

*100,000 of these to various fleets across America*.  So, really a big appetite."  Later adding that the fleets "buy in big chunks" and make "very sticky orders."

20.     **The Truth Begins to Emerge**.  On March 12, 2021, renowned research firm, Hindenburg Research ("Hindenburg"), published a lengthy analysis of the company (the "Hindenburg Report"), which included information from interviews with Lordstown's supposed pre-order customers and Lordstown's former employees.

21.     The Hindenburg Report stated that "Lordstown's order book consists of fake or entirely non-binding orders, from customers that generally do not even have fleets of vehicles," and that "Burns sought to book orders, regardless of quality, purely as a tool to raise capital and confer legitimacy."  In addition, the Hindenburg Report disclosed how Lordstown had paid a third-party lucrative, per-truck commissions to obtain non-binding letters of intent ("LOIs"), and how in a case study posted to that third-party's website they had stated that Lordstown's fundraising was directly linked to pre-order generation — "the faster the pre-orders arrived, the greater **investors' confidence** would be in the company and the faster funds would flow in."

22.     Investigation of counsel has confirmed that the same sentiment was understood within Lordstown.  For example, CW-1, one of just a couple sales representatives at Lordstown, recalled a "fairly explicit" message that they needed to procure the reservations in order to get additional financing from investors.  CW-2, a high-level manager at Lordstown with detailed knowledge of Lordstown's sales practices, worked regularly with Defendants Burns and Flannery, and described the pre-orders as "pie in the sky" and stated that "all it was for" was to generate buzz.  CW-2 stated that, there was "zero" due diligence conducted on the ability of potential customers to support their orders "by design."  CW-2 explained that when it came to

7

securing letters of intent the only guideline provided to Lordstown's sales staff was to get "as many as possible in the shortest period of time."

23.     Just a few examples of the information disclosed by the Hindenburg Report are summarized below:

- Lordstown counted E Squared as making a massive 14,000 truck pre-order worth $735 million (more than the entirety of the cash Lordstown raised in the Merger), even though E Squared was a non-incorporated "doing business as" name for a 1-2 person operation, run out of a modest one-bedroom apartment, which did not operate a fleet or own trucks, and instead hoped to eventually serve as an intermediary to sell trucks, which E Squared's operator called a "brand new business."

- Lordstown counted Innervations LLC for a 1,000 truck pre-order, a self-described "influencer" business operated as a side hustle by two individuals with other jobs, which did not operate a fleet, or "get involved in the actual ordering," and instead sought to act as a promoter for Lordstown trucks, by hosting events.

- Lordstown listed Grid-X as a "Select Pre-Order Customer" in its Merger proxy, even though Grid-X was an internet cloud services company, and did not appear to operate a fleet or own trucks.  The Hindenburg Report stated that Grid-X's CEO had indicated they were "completely unaware" of the deal when asked about it and that the inquiry was "the first time" they had heard about it.

- Lordstown listed Duke Energy as a "Select Pre-Order Customer," based on years-stale letters of intent with Workhorse to buy an entirely different truck.

- Lordstown counted a 500 truck pre-order by Clean Fuels Ohio, even though it was a non-profit dedicated to educating on clean energy, not a fleet operator.  The non-profit said the deal was "promotional" and about "getting the word out," and was "really clear" with Lordstown about that fact.

- Lordstown counted Momentum Groups for a 900 truck pre-order in its Merger proxy, even though the group is not a fleet operator and instead hosted a webpage inviting others to sign up to pre-order the truck.

24.     Investigation of counsel has confirmed that Lordstown's supposed pre-order book was full of similar non-committal indications of interest from parties other than fleet managers.

25.     For example, Lordstown had booked pre-orders from both the City of Ravenna and the City of Lordstown.  The mayors of both cities confirmed that they had made no orders and had not even signed letters of interest.  In the words of the mayor of the City of Ravenna, he was "shocked" when he received a notice that he had made a commitment for approximately 20

8

Endurance trucks and there was "no way on God's green earth" that such an order would be within the city of 12,000's budget.

26. Lordstown claimed "Summit Petroleum" as one of its "Select Pre-Order Customers," including in the Merger proxy documents, but a company representative found it "interesting" that Lordstown would call the arrangement a pre-order, noting that their indication of interest had not listed any particular number of trucks and had done so as a "friend of a friend" type of deal. Auto-Flex was claimed by Lordstown in its pre-orders, despite the fact that it only acted as an intermediary for governmental fleets; a representative said that while he provided a "rough" estimate of the number of trucks by email, he never saw a price sheet or any other spec sheet for the truck.

27. The Hindenburg Report also detailed various facts showing that Lordstown's production capabilities had been overstated. For example, Lordstown was relying on a small Slovenian company to manufacture its hub motors, even though it appeared highly doubtful the supplier could manufacture the critical component at scale. Lordstown had experienced a fire while conducting an overnight test of its vehicle on public roads, and the vehicle was fully engulfed in flame, showcasing how far its vehicle was from production. The Hindenburg Report also cited a former employee's account of how critical development activity had not yet occurred, including specific testing activities that would take months to complete.

28. Counsel has also conferred with an automobile expert who explained that Defendants' assurances that it would produce the vehicle by September 2021 were unrealistic. The expert explained that even if Lordstown was developing an ordinary vehicle it could not launch production by September 2021, and that Lordstown's unique vehicle would take even longer than typical. This also meant that Lordstown's assurances that it had the resources needed

Exhibit B
Page 24

to become profitable without the need to raise additional capital were misleading, as they would not even begin substantial production within the stated time and would need to raise additional capital. Confidential witnesses confirm that even before the Merger closed Lordstown was already behind schedule.

29. **The Fallout From the Hindenburg Report**. Lordstown's stock opened down 20.95% upon the publication of the report as countless news organizations summarized its revelations. By the close of trading on March 12, 2021, Lordstown's market capitalization had decreased by nearly $500 million. Three days later, on March 15, 2021, Lordstown issued a press release asserting that production was still on track for September. Five days after the publication of the Hindenburg Report, during a conference call on March 17, 2021, Lordstown disclosed that the company was the subject of a SEC investigation.

30. On March 18, 2021, Burns appeared on CNBC and attempted a revisionist history, asserting he had never claimed the pre-orders he had touted just months earlier on the network were serious. Most incredibly – in direct contravention to many of his statements detailed herein – Burns claimed "[w]e've never said we had orders." He went on to absurdly claim that he had never said the pre-orders were "serious." Later that day, Jim Cramer exclaimed, "I had pressed him on Mad Money about how serious the orders were . . . and he said, they're very serious," adding, "So to me, **I thought it was like the prosecution rests**." Another reporter responded to Cramer noting Burns' claim that they never claimed orders, and Cramer responded: "***he point blank said the opposite to me*** . . . he said to me, our average order size is 500 trucks at a time and most of them are signed by the CEOs of these large firms. . . That's the core evidence . . . if we had to do like . . . stock market, CSI. Well, there you go."

10

31.     After the disclosure of the SEC investigation and after Defendant Burns' CNBC interview, in which he admitted that the pre-orders were not serious—albeit while dishonestly claiming he never had claimed otherwise—the market reacted sharply, with Lordstown's stock closing the day down 13.78% below its prior closing price, for a loss of market capitalization of over $300 million.

32.     **Lordstown Continues Declining as the Truth Continues to Emerge**.  On May 24, 2021, after market close, Lordstown released its First Quarter 2021 results, and disclosed that any production occurring in September would be at "limited capacity," slashing prior production guidance by 50%, and revealing that the company would need additional funding to ramp up production.  Lordstown's stock price fell 15.51% on this news.  On June 8, 2021, Lordstown released an amended 10-K, announcing a "going concern" notice disclosing that the company was facing insolvency and that to ramp up production the company may need "significant" capital.  This stood in stark contrast with the prior assurance that the company had sufficient capital, not just to launch full production, but also to achieve positive cash flows.  The amended 10-K also revealed that the company had "material weaknesses in internal control over financial reporting."  On this news, Lordstown's stock price fell to a daily low 20.86% below its prior closing price.

33.     On June 14, 2021, Lordstown released the results of its own internal investigation. The report admitted that there were "issues regarding the accuracy of certain statements regarding the Company's pre-orders."  It admitted that Lordstown had paid for pre-orders, that the company had misrepresented that orders came from fleets when they had not, corroborated specific allegations in the Hindenburg Report, and admitted that Lordstown had booked large

11

pre-orders from companies without resources to complete the orders, or booked orders that were "too vague or infirm to be appropriately included in the total number of pre-orders disclosed."

34. Concurrently with the release of the internal investigation report, Lordstown announced the "resignation" of CFO Rodriguez and CEO/Chairman Burns. Numerous facts strongly indicate that Rodriguez and Burns had been ousted for their fraud—including that Lordstown did not immediately announce replacements for these critical roles, and only recently named a new CEO. On the news disclosed on June 14, 2021, Lordstown's stock fell 18.84%.

35. On July 2, 2021, *The Wall Street Journal* reported that Lordstown was also under a Department of Justice investigation related to Defendants' disclosures regarding the pre-orders. Lordstown's stock price fell 10.82%.

36. Next, on August 11, 2021, Lordstown issued its Second Quarter 2021, results, disclosing that while vehicle "production" may begin in September, the regulatory approvals to sell the vehicle would not even be complete until at least December 2021, meaning that deliveries would not occur until at least 2022, and even then only to "selected early customers." On August 13, 2021, Lordstown filed a form 10-Q, which included a revised "going concern" notice indicating that despite recent fundraising (securing $400 million, about 60% of what Lordstown raised in the Merger) the company was still at risk of insolvency.

37. This action seeks to recover the losses investors suffered due to Defendants' misrepresentations and omissions. Lordstown's stock price reached a Class Period high of $31.57 on February 11, 2021, as a result of Defendants misrepresentations and omissions, as alleged herein. As the truth was partially revealed to the market, Lordstown's stock price fell to a Class Period low of $6.69.

12



Lordstown's Stock Price & Selected Events

## II. JURISDICTION AND VENUE

38. The claims asserted herein arise under and pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and certain rules promulgated by the SEC. Specifically, this Complaint asserts claims under: **(1)** Section 10(b) of the Exchange Act ("§10(b)") and Rule 10b-5 promulgated thereunder by the SEC, *see* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; **(2)** Section 14(a) of the Exchange Act ("§14(a)") and Rule 14a-9 promulgated thereunder by the SEC, *see* 15 U.S.C. § 78n(a); 17 C.F.R. §240.14a-9; and **(3)** Section 20(a) of the Exchange Act ("§20(a)"), *see* 15 U.S.C. § 78t(a)).

39. Venue is proper in this district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), Section 22 of the Securities Act (15 U.S.C. § 77v), and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged Securities Act and Exchange Act violations or the effects of the violations have occurred in this judicial district. Many of the acts charged herein, including the preparation and/or dissemination of materially false and misleading information,

13

occurred in substantial part in this judicial district. Defendant LTM's primary manufacturing facility and principal executive office is located in Lordstown Ohio, which is located in Trumbull County, Ohio.

40. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

41. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ, a national exchange within the United States.

## III.   PARTIES AND KEY PLAYERS

### A.   Parties

42. Lead Plaintiff George Troicky is and at all relevant times was a resident of Cleveland, Ohio. He invested in Lordstown common stock on his own behalf. He generates income through investments, including investments in commercial real estate, mainly warehouses and storage facilities. As set forth in the certification attached hereto as Exhibit B, Lead Plaintiff Troicky purchased LTM's Class A common stock during the Class Period.

43. Additional named Plaintiff Daniel Tavares is a resident of Ontario, Canada. Plaintiff Tavares is the Chairman of the Board of Directors of Plaintiff Globestar Systems Inc. As set forth in the certification attached hereto as Exhibit C, Plaintiff Tavares purchased LTM's Class A common stock during the Class Period.

44. Additional named Plaintiff Globestar Systems Inc. is a healthcare software company. The Chairman of Plaintiff Globestar Systems Inc. is Plaintiff Tavares. As set forth in

14

Exhibit B

Page 29

the certification attached hereto as Exhibit D, Plaintiff Globestar Systems Inc. purchased LTM's Class A common stock during the Class Period.

45. Additional named Plaintiff Ashith Pabbathi is a resident of Okemos, Michigan. Plaintiff Pabbathi's purchased LTM's Class A common stock during the Class Period ECF No. 23-2, which is incorporated by reference herein.

46. Additional named Plaintiff FNY Managed Accounts LLC is in the business of providing securities brokerage and investment services. As set forth in the certification attached hereto as Exhibit E, Plaintiff FNY Managed Accounts LLC purchased LTM's Class A common stock during the Class Period.

47. Defendant Lordstown Motors Corp. ("LTM") is a holding company that owns the Lordstown business, which is purportedly developing and planning to manufacture and sell a light duty electric truck known as the "Endurance." LTM's headquarters are located at 2300 Hallock Young Road, Lordstown, Ohio 44481. LTM is incorporated in Delaware. Prior to the Merger, LTM was named "DiamondPeak Holding Corp." ("DPHC" or "DiamondPeak") and references herein to DPHC refer to the pre-merger conduct of, or stock issued by, the entity now known as LTM.

48. Following the Merger, the entity previously known as DiamondPeak Holdings Corp. was renamed Lordstown Motors Corp. Following the Merger, the entity that was previously known as Lordstown Motors Corp., was renamed Lordstown EV Corporation and became a wholly owned subsidiary of DiamondPeak Holdings Corp. (which itself, as just stated, was renamed Lordstown Motors Corp.). Notably, Lordstown EV Corporation is the only business of the post-Merger LTM, and as such, explanations of the conduct of LTM or

Lordstown include conduct of LTM by way of its agent and subsidiary Lordstown EV Corporation.

49. DPHC was a SPAC formed for the purpose of acquiring a privately owned company to take that company public. Prior to the Merger, DPHC's Chairman and Chief Executive Officer was Defendant Hamamoto. After the Merger, the entity's Chairman and CEO was Defendant Burns, until his resignation. Certain of the claims alleged herein are based on conduct of the entity now known as Lordstown Motors Corp., when that entity was known as DiamondPeak Holding Company, and because any liability of that entity survived its name change, LTM remains liable for such conduct.

50. Prior to the Merger, DPHC (now LTM) issued a Class A common stock that traded on the NASDAQ under the ticker "DPHC." Following the Merger, the ticker of that Class A common stock was changed to "RIDE," and continues to trade on the NASDAQ. Prior to the Merger, DPHC (now LTM) listed warrants that were exercisable for shares of DPHC (now LTM)'s Class A common stock, and these warrants traded under the ticker ("DPHCW"). After the Merger, DPHC maintained the listing of those warrants (until all such warrants were redeemed or exercised), under the ticker "RIDEW." Prior to the Merger, DPHC (now LTM) listed units that were comprised of one share of its Class A common stock and 1/3 off a DPHCW warrant. Additionally, throughout the Class Period options based on the DPHC and LTM common stock, which provided the right to purchase or sell DPHC or LTM's Class A common stock, at a specific price, also publicly traded (all such options defined as "Lordstown Options"). The term "Lordstown Securities" is used to describe each security listed in his paragraph,

16

Exhibit B
Page 31

including those Lordstown Options and securities trading under the tickers DPHC, RIDE, DPHCW, RIDEW, and DPHCW.[3]

51.     Defendant Stephen S. Burns was Lordstown's Founder, CEO and the chairman of Lordstown's board.  Prior to founding Lordstown, Burns was CEO of Workhorse, which he founded.  According to his official biography on Lordstown's website, Burns' experience prior to founding Workhorse involved work on several startups, none of which are in the automotive industry.[4]  On June 14, 2021, Lordstown announced that Defendant Burns was resigning "[e]ffective immediately, pursuant to mutual agreements," and as explained herein, it is alleged that this resignation was a result of Burns' misstatements.

52.     Defendant Julio Rodriguez has served as Lordstown's Chief Financial Officer since September 2019.  Prior to working at Lordstown, Defendant Rodriguez served as the Chief Information Officer at Workhorse.  On June 14, 2021 Lordstown announced that Defendant Rodriguez was resigning "[e]ffective immediately, pursuant to mutual agreements," and as explained herein, it is alleged that this resignation was a result of Rodriguez' misstatements.

53.     Defendant Caimin Flannery was Lordstown's Vice President Business Development from October 2019 until October 2020, when he was promoted to Senior Vice President of Business Development.  Lordstown's presentations state that Defendant Flannery ran the sales team at Lordstown.  Prior to working at Lordstown, Defendant Flannery was an executive at Workhorse.  Lordstown's 10-K lists Defendant Flannery as one of its executive officers and states that he has a "long-standing working relationship with Mr. Burns."

---

[3] At any point in time, the Lordstown Securities reflected the price of Lordstown's Class A common stock, and thus any allegation herein regarding the price or change in price of the common stock was also reflected in the price or change in price of the other Lordstown Securities.

[4] Burns seems to have fed media outlets a narrative that he graduated from Ohio State University with a degree in electrical engineering.  However, attempts to verify his degree — through the National Student Clearinghouse — come back with an "unverified" status, suggesting that he did not receive such a degree.

17

54.     Defendant Shane Brown has served as Lordstown's Chief Production Officer since November 2020.

55.     Defendant Darren Post has served as Lordstown's Chief Engineer since November 2019. His public LinkedIn profile states that he was Responsible for executing all aspects of vehicle engineering and launch for the all new LMC Endurance plug-in battery electric pickup trucks. It also states that he was responsible for building the start-up company's engineering staff, infrastructure and capabilities to develop and launch their first and future vehicles.

56.     Defendant Rich Schmidt has served as Lordstown's President since November 2020, and prior to that, was Lordstown's Chief Production Officer since October 2019.

57.     Defendant David T. Hamamoto was the Chairman and Chief Executive Officer of DPHC. Previously, Defendant Hamamoto worked at Goldman Sachs for 14 years and served on the board of at least two other companies, including as chairman and chief executive officer of Northstar Realty Finance Corp., a New York-based real estate investment trust. Defendant Hamamoto signed the proxy statements soliciting investors of DPHC to approve the merger between a subsidiary of DPHC ("Merger Sub") and LTM, through which LTM would become a wholly-owned subsidiary of DPHC. Defendant Hamamoto was the controller of an entity that formed DiamondPeak Sponsor LLC, in a joint venture with affiliates of SilverPeak, and the Sponsor organized the creation and management of DPHC. Defendant Hamamoto, through his positions of Chairman and Chief Executive Officer of DPHC, was entrusted with identifying, evaluating, and acquiring a business with a real estate component or where the management team had significant expertise. In carrying out the acquisition plan, Defendant Hamamoto assured DPHC investors of his care, when DPHC stated that that it would undertake "comprehensive due diligence, thoughtful underwriting and deep strategic analysis, resulting in a thorough evaluation

18

of each investment opportunity."  In fact, DPHC expected Defendant Hamamoto to "leverage [his] longstanding relationships, network of industry connections and . . . uncover unique opportunities and support them with market expertise."

58.     Together, Defendants Burns, Rodriguez, Flannery, Brown, Post, Schmidt, and Hamamoto are referred to herein as the "Individual Defendants."

59.     The term "Lordstown" as used herein refers to the business purportedly engaged in the development and production of the Endurance pickup truck.  The terms LTM and DPHC refer to specific entities, whereas the term "Lordstown" is used to refer to the business enterprise at issue in this litigation that existed before the Merger and continued thereafter.

### B.     Other Relevant Persons and Entities

60.     DiamondPeak Sponsor LLC (the "Sponsor") was an entity incorporated in Delaware that was involved in the formation of DPHC.  It was an investment fund that was created as a joint venture between DHP SPAC Sponsor LLC, an entity owned by Defendant Hamamoto, and SP SPAC Sponsor LLP, an entity controlled by Silverpeak.

61.     Silverpeak is defined in SEC filings as a "platform of entities" and is associated with the formation and management of SPAC companies.  Silverpeak's principals are Kaushik Amin, Brett Bossung, and Mark A. Walsh.  Silverpeak controlled SP SPAC Sponsor LLP, which was one of two entities that formed the Sponsor through a joint venture.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Early Background on Lordstown and DiamondPeak Holding Corp.

62.     Defendant Burns founded Workhorse in 1998.  Workhorse primarily manufactured commercial delivery vehicles, such as vans used by mail delivery companies. While Workhorse utilized electric propulsion systems, its vehicles had relatively conventional drive systems powered by a BMW motor (*i.e.*, it did not use "hub motors," which are discussed

19

further herein).  Workhorse had at one point endeavored to produce an electric truck, but the proposed specifications of the Workhorse truck were vastly different from the truck Lordstown ultimately sought to develop, not only because it utilized an entirely different propulsion system, but also because Workhorse's truck was designed for a different maximum range in mind, utilized a range extender system and had many other design differences.

63.     As explained by industry publication *Electrive*, in an article published on March 13, 2020, Workhorse terminated its development of an electric pickup truck following Burns' departure from Workhorse.

64.     In November 2018, GM announced it was planning to close its manufacturing plant in Lordstown Ohio.  Prior to closing, the plant had produced the Chevrolet Cruze, a conventional internal combustion engine sedan.  The Lordstown plant was one of the largest auto manufacturing plants in the country and had produced nearly 300,000 vehicles in a single year prior to its closure.

65.     On January 18, 2019, DPHC filed an S-1 Registration Statement with the SEC and organized as a SPAC.  The purpose of a SPAC is to raise funds through an initial public offering, hold those funds in trust for a period of time while shopping for an acquisition target, and then merge with that acquisition target, effectively taking the target public.  DPHC, like most SPACs, had no businesses besides this fundraising, shopping, and acquisition.

66.     DPHC was led by Defendant Hamamoto.  It sought to raise $250 million through its IPO, which could be used to fund an acquisition or invest into an acquisition target.  At the time of the S-1 Registration Statement, it does not appear that DPHC had any intention of acquiring Lordstown.  At that time, it was reported that DPHC would be targeting an acquisition in the real estate industry.

67.     Burns formally resigned from Workhorse on January 30, 2019.  As is typical, this was technically a resignation, but the abrupt notice of his departure, which stated he was ending his role as CEO "effective immediately" suggests he was pushed out of the company.  According to the Hindenburg Report, former senior employees of Workhorse indicated that Burns was actually pushed out by the Board for wasting R&D money and missing deadlines.

68.     On March 4, 2019, DPHC completed its initial public offering ("IPO") and on March 18, 2019, DPHC reported selling additional shares and units, generating net proceeds of $280 million.

69.     The Lordstown plant was closed in March of 2019, and the plant closure led to the elimination of 4,200 jobs.  GM's decision brought significant political pressure upon GM, including tweets from President Donald Trump asking GM to "do something quickly" about the issue and suggesting that GM should reopen the plant "maybe in a different form or with a new owner, FAST!"

70.     In June of 2019, Defendant Burns formed Lordstown Motors Corp. and on August 2, 2019, *The Detroit News* reported that he was planning to acquire the Lordstown plant.  On September 25, 2019, the *Youngstown Ohio Business Journal* reported that negotiations for Burns' company to acquire the plant were ongoing and that Burns was planning to manufacture an electric pickup truck at the factory.  The article also indicated that the plant would be the headquarters for Burns' new company.

71.     In November 2019, GM agreed to sell the plant to Lordstown.  It was publicly reported that, as a component of that sale, GM loaned Lordstown $40 million to facilitate the purchase and retooling of the plant and county records indicate the purchase price for the plant and land was recorded at $20 million.

21

72.     On November 7, 2019, Workhorse disclosed in an SEC filing that it had licensed intellectual property relating to its abandoned electric truck project to Lordstown in exchange for certain royalty rights and a 10% stake in Lordstown.  This filing also stated that Lordstown would "endeavor" to complete a "capital raise" to retrofit the Lordstown plant and that, "upon completion" of that raise, Workhorse would "transfer its ~6,000 existing orders for [trucks] to [Lordstown], **subject to customer consent**."  As discussed herein, Lordstown boasted this book of orders, prior to any such capital raise and even though customer consent was not obtained.

73.     On November 14, 2019, Defendant Burns spoke with Ohio-based politicians about the Lordstown plant and boasted about the condition of the facility and how it would help the company be first to market in the electric pickup truck business.  During that event Burns exclaimed: "First mover market, **we've already got pre-orders for these vehicles**.  We know there's a strong demand."

74.     Generally speaking, (*i.e.*, according to the *Oxford English Dictionary*) a pre-order refers to "an order for an item that has not yet been made commercially available."  While a pre-order may not ultimately be binding, it is understood to represent a significant transaction, often accompanied by a deposit payment, evidencing a specific intent to buy the item.[5]

75.     On December 5, 2019, the sale of the plant to Lordstown from GM was closed. On December 23, 2019, industry publication *AutoBlog* reported that Lordstown was working to secure $300 million in financing to develop its electric pickup truck.  The article also reported that Burns was targeting April 2020 for the launch of preproduction vehicles and that the plant

---

[5] When the term "pre-order(s)" or similar phrases are used herein to refer to the purported pre-orders Lordstown had, that is a reference to Defendants' representation(s) claiming pre-orders.  Contrary to such representations, Lordstown did not have pre-orders, they had non-binding letters of intent for a portion of the purported pre-orders.  References herein to Lordstown's "order book," "pre-order book," or any similar phrase, refers to the purported pre-orders Lordstown was touting.

would begin producing trucks by the following November. The article also reported that the company was taking pre-orders for the vehicle upon a $100 deposit and that the purchase price would be $52,000. As noted in the article, this timeline would mean that Lordstown would bring the first electric pickup truck to market, which would provide it with a material strategic advantage. The article explained that the vehicle would use a unique "hub motor" design.

76.     Hub motors are electric motors incorporated into the wheel of a vehicle. They are currently used in scooters and certain other light vehicles, but they have not been used in the production of cars or trucks. As discussed herein, while the upside of the technology is substantial, the use of hub motors in a production vehicle poses huge hurdles in terms of durability and safety.

77.     On April 21, 2020, Defendant Burns published a letter to the public on Lordstown's website. He stated that the COVID-19 pandemic had delayed their production timeline. However, he also stated that they planned to unveil the Endurance pickup truck through a virtual event in the Summer of 2020. He also indicated that the company would begin distributing vehicles to customers in January 2021, writing: "We look forward to introducing you to the world's first-fully electric pickup truck this summer, and handing the keys to fleets across the country in January 2021." This amounted to a one-month delay from his prior target of December 2020.

78.     On April 30, 2020, Lordstown published a video touting the capabilities of the Lordstown plant. The video boasted that the plant was "very, very capable" and "very modern." He also downplayed the task of preparing the plant for production of the Endurance, stating "for us it's just reconfiguring" and added that "this plant has been perfect for us."

23

79.     On May 22, 2020, the *Detroit Free Press* published an article quoting Defendant Burns as boasting that Lordstown had secured "well over several thousand" pre-orders, even though the vehicle had yet to be formally unveiled.  The article further explained that Burns planned to unveil the truck in late June and that after that event, Burns expected to take pre-orders for all 20,000 pickups the automaker planned to produce in its first year of production. Burns was also quoted as saying, "The demand side is super strong, I am starting to worry we won't be able to make them fast enough."  According to the article, at that time, Lordstown employed about 70 people, nearly all engineers.  The article explained that Lordstown would be building its battery pack systems in-house, adding to the momentous challenge of bringing the vehicle to production.

80.     On June 25, 2020, Lordstown hosted an event unveiling of the Endurance.  At the event, Vice President Mike Pence sat in the pickup truck as the company rolled the vehicle on stage.  At that event, Defendant Burns claimed that their assembly line "enables high volume production" that "the plant itself is very, very capable," and that it was a "very automated line." He also continued to trumpet the supposed pre-orders that the company had secured, stating:

> *We started pre-selling.*  I think we have our whole year, ***our first year of production already*** *pre-sold* and we haven't even showed the vehicle yet.  If we get lucky, today we might get fivefold that people buying online once they see it.  So we're very excited.

81.     Vice President Mike Pence also spoke at the event, and recited Defendant Burns' false assertions that the company had "pre-sold" a large number of vehicles.  Vice President Pence stated: "Steve actually told me that they've already pre-sold 14,000 additions of the Lordstown Endurance truck."

24

**B.** **Defendants Mislead Investors as They Pitch and Close the Merger**

82. On August 1, 2020, DPHC and Lordstown entered into a Merger agreement, whereby DPHC would acquire Lordstown and take the company public. However, the Merger was contingent upon approval by DPHC shareholders. If approved, the deal would dilute existing holders of DPHC shares through the issuance of new shares. As part of the Merger, DPHC would offer new shares to Lordstown's pre-Merger shareholders, and would conduct a large private offering of securities to raise additional capital. With the cash DPHC had raised in its IPO and in the offerings taking place as part of the Merger, it was expected that the Merger would contribute $675 million in funding to Lordstown, including a $75 million investment from GM.

83. On August 3, 2020, Defendant Burns announced the Merger through his twitter account and DPHC filed certain materials with the SEC that same day. Those SEC materials were filed as "definitive proxy soliciting materials"—meaning that they were part of DPHC and Lordstown's formal attempt to solicit shareholders to vote in favor of the Merger.

84. Among the proxy materials filed by DPHC on August 3, 2020, was a press release issued jointly by Lordstown and DPHC. In that press release, Defendant Burns boasted: "Since its unveiling just over a month ago, the Endurance has been met with enthusiastic support, and to date, *we have <u>secured</u> $1.4 billion of pre-orders*." Later, the same press release stated that Lordstown had "received more than 27,000 pre-orders for the vehicle representing over $1.4 billion of potential revenue, primarily from commercial fleet customers."

85. The press release also stated that the Lordstown plant was "estimated to be capable of producing in excess of 600,000 electric vehicles annually, with only modest incremental investment," described the plant as "near production ready," and stated that the plant "positions Lordstown to be first to market." Similarly, an investor presentation prepared by

25

Exhibit B
Page 40

Lordstown and filed with the SEC by DPHC on August 3, 2020 stated that "Lordstown has already received ~27K orders (average order size of ~300 trucks) before the first vehicle has been produced, representing potential revenue sufficient to cover 2021 production and into 2022."

86. The proxy materials published on August 3, 2020, also included an "investor presentation" marketing Lordstown's business. That presentation disclosed that Lordstown would have "$675 million of cash to fund operations and growth" after the Merger, meaning that prior to the Merger the fledgling company had essentially no cash.

87. The investor presentation listed the logos of certain "Pre-Order Customers" and boasted of "~$1.4bn of Existing Pre-Orders." The presentation also stated that "Based on the excellent condition of the plant and equipment at the Lordstown Complex, LMC Projects ~$120 million of investment to retool the equipment for full production readiness." Incredibly, the presentation boasted that the "Capital Raise" of $675 million provided through the Merger and related transactions, were "expected to be sufficient to achieve cash flow positive." This was an amazing proposition for investors, as it meant that Lordstown would become profitable based just on the capital raised in the proposed transactions, and would not need to raise additional funds to achieve its ambitious production schedule. The same statement was reiterated in the financial section of the presentation, which stated, "No additional capital requirements expected between PIPE[6] and going to market, achieving positive cash-flow."

88. As part of the August 3, 2020 proxy materials, Defendants published an investor conference call transcript for an event that they held at 8:30am on August 3, 2020. At that event

---

[6] The term PIPE refers to "private investment in public equity," and as relevant here the PIPE investment that occurred as part of the transactions defined herein as the Merger, was additional capital raising that coincided with the formal merger between DPHC and LTM.

Defendant Hamamoto described how DPHC had "valuated hundreds of companies" on behalf of DPHC but that Lordstown stood out. Defendant Hamamoto stated that "Lordstown has attracted a clear lane of customers in the commercial fleet segment of the market, as evidenced by its 1.4 billion dollars of pre-orders to-date." He also stated that "This capital will fully fund Lordstown's current business plan and position the company to achieve positive EBITDA and cash flow."

89. Importantly, the reference to "fleets" has a clear meaning in the automotive industry. As explained by the industry publication Automotive Fleet, "to qualify as a fleet, a business must have purchased five vehicles in a year or have 15 total units in operation." Federal emission standards use a similar definition, defining fleets as "10 or more motor vehicles which are owned or operated by a single person." 42 U.S.C. § 7581.

90. During the same August 3, 2020 conference call, Defendant Burns stated that the plant was "estimated to be capable of producing in excess of 600,000 electric vehicles annually with only modest incremental investment." Defendant Burns again boasted of the pre-orders, stating that the company's partners had demonstrated their "confidence in this technology with significant pre-order activity." Defendant Burns followed that statement by claiming: "The Endurance was met with great excitement and acclaim, and we now have garnered significant demand with pre-orders totaling approximately 27,000 vehicles since inception, representing more than 1.4 billion dollars of potential revenue. We hear from many fleets who cannot wait to get their hands on the Endurance. The electric vehicle market is expected to grow significantly the next decade, underlying our expectations of selling more than 100,000 vehicles per year by 2024." Defendant Burns also mirrored Defendant Hamamoto's remarks stating that the "cash proceeds" from the Merger and related transactions, "will be used to fund production of the

27

Endurance and we do not expect that we will need any additional equity capital requirements to achieve positive cash-flow."

91.     Also on August 3, 2020, Defendant Burns appeared on CNBC and stated that "We got 27,000 *orders*.  We got customers really wanting the truck."  A transcript of this media appearance was published as "definitive proxy soliciting materials" through an SEC filing made by DPHC on August 5, 2020.

92.     On August 24, 2020, DPHC published a preliminary proxy statement with the SEC.  That document stated that "To date, Lordstown has received pre-orders from fleet operators to purchase approximately 27,000 Endurance vehicles."  That document also stated, "Lordstown anticipates it will be able to commence full production in 2021 with a target of 2,200 vehicles produced and sold in the year.  Lordstown currently has pre-orders from fleet operators to purchase 27,000 vehicles.  Although these pre-orders are nonbinding and did not require any deposit, Lordstown believes they demonstrate clear demand that will lead to binding orders once the Endurance is complete and potential customers are able to see firsthand the value that it offers."

93.     On September 17, 2020, Lordstown and DPHC hosted a virtual analyst event and filed the presentation used in that event as "definitive proxy soliciting materials" with the SEC.  That presentation included the same statements that were included in the presentation filed with the SEC on August 3, 2020.

94.     September 21, 2020 was the official "Record Date" for the Merger vote.  This meant that shareholders who held DPHC shares on that date would be entitled to vote on the Merger.

28

95.     On September 28, 2020, President Trump hosted Lordstown at an event at the Whitehouse, complete with a prototype of the Endurance outside the White House.  While Defendant Burns' remarks were primarily limited to answering a few questions posed by the President about the hub motor technology, even in this venue the false sales narrative resurfaced. Away from the microphone Burns could faintly be heard telling Trump that production would be starting in September and mentioning 30,000 trucks, presumably referring to the purported number of pre-orders, which were listed at 27,000 on the most recent proxy documents.  Then, in the formal remarks to the press, President Trump stated, talking about the Endurance, "I heard the sales are great," and Defendant Burns nodded repeatedly in agreement, without clarifying that any such "sales" were, at most, mere indications of interest.

96.     On October 8, 2020, DPHC published the final proxy statement soliciting shareholders for the Merger.  It contained many statements that were substantively the same as the statements that were previously described in the August 24, 2020, preliminary proxy.

97.     On October 12, 2020, securities analyst BTIG, published a report with a buy rating, that was substantially based on the company's supposed order book.  The report stated that Lordstown has the "First Year of Production Sold Out" and explained that "while the first Endurance pickup truck delivery is not scheduled until late 2021, 2022 targeted production (~30,000 units) is already sold out with over 40,000 pre-orders ($2B+ backlog) from established fleet customers."  The analyst report went on to explain that fleets focus on cost of ownership and stated" [t]hat is why we like management's decision to focus the Endurance on commercial fleets.  And with over 40,000 pre-orders for the Endurance across multiple fleet managers, management's focus on this segment of the pickup truck market looks to have already borne a lot of fruit with the first year of production already sold out."

98.    On October 22, 2020, the shareholder meeting was held to vote on the Merger. Approval of the Merger required majority support from the holders of DPHC Class A common stock that were entitled to vote.  A sufficient number of shareholders voted in favor of the Merger and the Merger was closed the following day.  As a result of the Merger closing, DPHC acquired Lordstown Motor Company and took control of it as a wholly owned subsidiary. DPHC was renamed Lordstown Motor Company and the former Lordstown Motor Company was renamed Lordstown EV Corporation.

99.    Just days later, on October 26, 2020, Defendant Burns appeared virtually at the NASDAQ to "ring the bell" to ceremonially mark Lordstown's inclusion on the exchange. Burns once again reiterated that the funding raised in the IPO would provide Lordstown sufficient capital to reach production and that they would be first to market, with a September 2021 launch.  Specifically, Defendant Burns stated: "This brings the final chapter where we get the necessary resources to be able to bring this Endurance all the way to market. . . .  We fully intend for this to be the first full-size electric pickup truck in the world, specifically in the US. And we are on target to do that in September."

100.    Also on October 26, 2020, *The Detroit News* published an article that included statements from Defendant Burns.  In that article, Burns reiterated the September production date and that the funding provided Lordstown the financial resources needed to reach that target, stating that the Merger "gives us the financial acumen to be able to get this done," and adding that "since we're in a race to be first, it was really important for us to get that funding, so that we could be **assured** of production by September."  The article also reiterated that Lordstown had 40,000 pre-orders and added that Burns was "surprised when he got up to 40,000 orders" and that "now he's got to make more vehicles faster than expected," further emphasizing the

30

Exhibit B
Page 45

supposed veracity of the orders, or pre-orders, in that it supposedly meant the "he's got to" produce a certain number of trucks.

### C. The Misrepresentations Escalate After the Merger

101. On November 12, 2020, Defendant LTM filed an S-1 Registration Statement with the SEC registering shares of its stock. That filing stated that "We currently have pre-orders primarily from fleet operators to purchase over 44,000 vehicles, which pre-orders are nonbinding and did not require any deposit. We expect to ramp up our sales and marketing efforts, which were limited prior to the Business Combination."

102. On November 16, 2020, Defendant LTM filed a Form 8-K with the SEC attaching a press release. The press release was titled: "Lordstown Motors Releases Business Updates; Remains on Track to Begin Production of the Lordstown Endurance in September 2021." The first line of the press release reiterated that Lordstown "remains on track to begin production of the Lordstown Endurance, the world's first full-size, all-electric pickup truck, in September 2021."

103. That same November 16, 2020, press release stated:

Lordstown Motors has received approximately 50,000 non-binding production reservations from commercial fleets for its Lordstown Endurance all-electric pickup truck, with an average order size of approximately 500 vehicles per fleet. This figure does not capture interest the company has received from organizations that are not in position to be able to place pre-orders, such as federal, state and municipal governments, and military fleets. Deliveries of the Lordstown Endurance are expected to begin in September 2021, with full production ramping up throughout 2022.

104. On November 16, 2020, Defendant Burns participated in an interview hosted by the investor website *IPO Edge*. He reiterated that the vehicle would be launched in September, stating: "Our first fully electric full size pickup truck, the Endurance, is coming out in September." He again boasted about the pre-order numbers, stating: "Today we announced a

31

Exhibit B
Page 46

couple big things.  A, demand, like you said, 50,000 pre-sales already, all from fleets.  That's just the commercial sector.  Does not count military or police departments, municipalities, state vehicles, so really just to have that many commercial vehicles sold already is a big deal."

105.    Throughout the November 16, 2020, interview Defendant Burns further emphasized that they were selling to fleets, commenting "These fleets buy on total cost of ownership," and adding "we're enjoying the pent up demand.  I don't know if it's going to be this aggressive all the time, but to a fleet operator that's getting 15 miles per gallon in a pickup truck . . . every thing's [else has] completely passed them by with all this electrification," and that "we just got an order for 400 vehicles from an agriculture company."  When the interviewer asked him: "talk about where that demand might be coming from?" Burns responded, "the bulk of them, our average order is about 500 trucks per order, so larger fleets." Later in the interview Defendant Burns again claimed Lordstown was selling to fleets, stating: "Almost everybody that comes out with an electric vehicle starts at a luxury price point, kind of like cell phones were when they first came out, and they say, 'We'll move down with volume,' But we wouldn't be able to get fleets to really buy that, not many fleets."

106.    On November 17, 2020, Defendant Burns appeared on the CNBC television program *Mad Money* with Jim Cramer.  In this interview, Defendant Burns brazenly misrepresented the orders and—under direct questioning from Cramer—falsely represented the order book.  The exchange was as follows:

> **Burns**: We sell to commercial fleets.  That's our first customer.  And like you said, we've already got 50,000 pre-orders.  And when you sell to fleets, we couldn't do what most EV companies are doing, where you come out with the luxury price point and move downstream.  A fleet guy would get fired for buying a luxury truck.  So we had to come out on par with the gas trucks pricing, and to do that, we had to invent a new drive train.  And that drive train had to be reasonably priced, but rough and tough enough, what people expect of a modern day pickup truck.  They think it should be able to climb a wall and haul and tow.  So we used hub motors, which

32

are, if you think of a Lime or a Bird scooter, right? There's no motor with a sprocket and a chain going to the back. The motor's in the wheel. And so we have very large versions of that. And as a result, we didn't just kind of make a pickup truck to compared to, let's say a Ford 150, we really feel it's better on almost every metric.

**Cramer**: It seems as if some of these orders, the 50,000 are from solid, Duke Energy, FirstEnergy. These people are not going to be walking away? They are committed?

**Burns**: *Right. Yeah. All of them. When you order, I think our average order size is about 500 trucks at a time. And as most of them were signed by the CEOs of these large firms, and bringing in 500 electric vehicles into your fleet, it's not trivial. So you've got to plan all the charging and everything. So it's very serious orders.*

\* \* \*

**Cramer**: All right. So we've got Ford coming in. Obviously we've got Tesla coming in. I've got a Rivian truck in front of me that looks pretty darn good. I mean, have we got room for everybody?

**Burns**: Well, first of all, I think everybody in America knows number one, number two, and number three best-selling vehicles in America are pickup trucks. So lots of room. We've picked a lane. So nobody else, although that seems pretty crowded, what you're discussing there. Nobody else has this lane where we're building a truck for fleets. A full-size, like the Rivian that you mentioned is not a full-size truck. The Tesla truck, reinventing it into the cyber truck. We feel that it's not really a work truck per se. Other three components of course will come out with electric trucks. But they're a little bit conflicted because they can't cannibalize their gasoline trucks. So they're going to be a little slower to market. And I don't think anybody's at our price point, right? So we really maniacally have kept the price low.

107. Defendant Burns participated in a conference call hosted by Credit Suisse on December 2, 2020. During this event Burns stated, "we sell to fleets," adding that fleets buy in big chunks and are easier to provide maintenance and service to because they allow the company more geographical focus, concluding, "that's why we like fleets." After that, he explained "[w]e have 50,000 pre-orders already well, well in advance of what we, what we thought we would have." Defendant Burns then launched into discussing the potential benefit of electric vehicles before concluding, "that's all pretty compelling to a fleet [so] that even though we're a new

33

Exhibit B
Page 48

[manufacturer], that carrot is so strong, that we've been able to garner almost $3 billion in pre-orders already."

108.    The Credit Suisse analyst hosting the event asked Burns "How do you, how do you find these, these fleet buyers?"  Defendant Burns responded:

> [I]t's been almost all incoming.  We're just starting to build out the sales team.  So we've been able to do again these 50,000, pre-orders just by incoming.  The pent up demand.  These fleets have watched all the electrification coming . . . and there's been nothing for them.  So the, the, the pent up demand, I don't know if it'll always be this robust, it's very, very strong.  And the 50,000 doesn't include state vehicles, municipal vehicles, police vehicles, military vehicles.  It's just, that's just on the commercial side.  And so we, you know, we just it's spread across all different disciplines.  Our average order is about 500 vehicles per order.  So that's larger fleets.

109.    On December 21, 2020, Lordstown filed another Form 8-K with the SEC boasting about the status of the pre-orders the company had secured and its supposed status toward production.  The sole purpose of this public filing was to publish the following sentence, "[Lordstown] has received 80,000 non-binding reservations for the Endurance to date.  The Company remains on track to begin production of the Endurance in September 2021."

110.    The next day, on December 22, 2020, securities analyst R.F. Lafferty Equity Research published a report on Lordstown with a "buy" rating.  The report noted the 80,000 pre-orders Lordstown was touting at the time as a leading point of focus, noting that it should provide a "steady revenue stream through 2022."  It recounted the supposed "average customer order" of approximately 500 vehicles.  Latching onto Defendant Burns' representations that the pre-orders had all been made by fleets, the report explained that the "company focuses on selling the Endurance directly to commercial fleet operators, bypassing the traditional OEM dealership sales model.  The direct sales model is similar to Tesla, where potential customers for the Endurance can place a pre-order on the company's website and pay a reserve fee."  Finally, the

34

Exhibit B
Page 49

report emphasized that Lordstown was less than one year away from production of the Endurance.

111.     On December 16, 2020, Lordstown issued a notice that it would be redeeming all outstanding publicly traded warrants (RIDEW) on January 15, 2021 for $0.0001—essentially nothing.  This meant that warrant holders would need to exercise the warrants by that date or they would become nearly worthless, and that Lordstown would be raising an additional amount of capital as these warrant holders purchased shares from the company through the warrant exercise.  This ultimately raised an additional $82 million in cash.[7]

112.     On January 11, 2021, Lordstown issued a press release providing a supposed update on its order procurement and production schedule.  The press release stated that they were "on track for start of production in September of this year."  The press release described Lordstown as a company "focused on the commercial fleet market" and stated it had received "more than 100,000 non-binding production reservations from commercial fleets for its Lordstown Endurance™ all-electric pickup truck, with an average order size of nearly 600 vehicles per fleet."  The press release also quoted Defendant Burns as stating:

> Receiving 100,000 pre-orders from commercial fleets for a truck like the Endurance is unprecedented in automotive history. . . .  Adding in the interest we have from federal, state, municipal and military fleets on top of that, I think you can see why we feel that we are about to revolutionize the pickup truck industry.

113.     On January 28, 2021, Lordstown issued a press release indicating that it had completed the first step in becoming authorized to sell vehicles to government fleets.  The press

---

[7] This is notable, in that, Lordstown later announced a going concern notice (even with this extra cash) notwithstanding the fact that it had previously claimed the IPO proceeds themselves provided sufficient capital to fund Lordstown's operations until it reached profitability.  It now appears that Lordstown foresaw that in the near-term it would (a) need additional capital and (b) its stock would be trading below the $11.50 strike price for the warrants.

35

release also quoted Defendant Burns as stating: "we remain on track to meet our September start-of-production timeline while continuing to see indicators of strong demand."

114. While the price of Lordstown's common stock was artificially inflated, Lordstown's insiders sold hundreds of thousands of shares of Lordstown common stock into the secondary market, as follows:

| Insider | Date | Price | Shares Sold | Total Proceeds |
|---|---|---|---|---|
| Defendant Schmidt | Feb. 2-3, 2021 | $25.23 | 211,512 | $5,336,530.00 |
| Defendant Brown | Feb. 2, 2021 | $24.63 | 19,008 | $468,183.00 |
| Defendant Post | Feb. 4, 2021 | $27.21 | 10,000 | $272,100.00 |
| Defendant Rodriguez | Feb. 4, 2021 | $27.00 | 9,300 | $251,100.00 |
| | | *Total* | *249,820* | *$6,327,913.00* |

115. On February 6, 2021, Defendant Burns appeared for an interview on the popular investment YouTube Channel "Jack Spencer Investing." Once again Burns falsely boasted about the number of pre-orders, in the following exchange:

> **Spencer**: So I remember, I think the first number we had from you guys was when the initial investor presentation came out with something around like 28,000. And then I remember it just kept going up and up and up. And it was just, it was immense.
>
> **Burns**: Yeah. Yeah. And again, all those numbers are just commercial fleets. That doesn't count municipality, state vehicles, federal vehicles, military vehicles, all those folks use a lot of pickup trucks. And most of them use them in a local fashion, so the range is perfect for them. So they can't do pre-orders. They're government entities. So that a hundred thousand that we've announced doesn't even count all that.
>
> **Spencer**: Yeah, jeez. So that's literally just for fleets?
>
> **Burns**: Yeah. That's just commercial fleets.
>
> **Spencer**: I don't think anybody's going to be upset to hear that piece of news though. That's awesome. And what's the average order at now? Was it 600, the latest one?

36

**Burns**: Yeah. That's on the commercial side.

**Spencer**: 600 on the commercial side. And would there be a few bigger names in there that you can share or would it be a lot of bits and pieces going on?

**Burns**: Well, I think we just shared a few of them. Like Duke Energy was a big one. ServPro was a big one. I think we're either going to give a list of them or name a few more key other ones, but right now we're trying to keep it as a big number. And for our purposes, the reason you do pre-orders, this business of tooling up, all the money you spend on tooling, you tool based on how many you're going to sell. And let's say it's a normal business and you get caught by surprise and people want your product more than you had planned to build. You find a way. In this business, it's a year lag time. You've got to plan a year ahead of time. And I think Musk invented this and it's really brilliant. Let's give them a good feel for what this vehicle is and ask them, "Would you order it if we make it for this price in this timeframe, and these specs?" And that lets us know. That appetite lets us know what to tool for. So we've been really surprised by these numbers. So we are then trying to prepare to build more than we originally had planned.

\* \* \*

**Burns**: Well, all I can tell you is these big ones, if a company to orders 600 pre-orders, that is signed by the CEO of that company all likelihood or at least some C-suite person. They take it very seriously. They've got to figure out how they're going to layer these electrics in there. And the appetite for them to do that way early like that, a year out from some of them means they're trying to do their part to ensure this comes to market. So they're standing behind it and they're putting these pre-orders in. But I'd say it's much stickier than a consumer putting a hundred dollars down refundable down on a Cybertruck, let's say. And I think these orders are very, very sticky because I know what it takes to get them, the education you have to do. This isn't somebody again on a website, a hundred bucks, refundable with a credit card. This is a fleet. And fleets generally take their business very, very seriously. So I think they're very sticky.

116. On February 18, 2021, Defendant Burns appeared on CNBC for an interview about Lordstown's production status. The opening segment for the television spot noted the 100,000 supposed orders. The interviewer then asked Burns "in terms of the September timeframe for full production of the Endurance Steve, do you have enough liquidity to get you to there from here?" Defendant Burns responded: "Yep. We've been really maniacal about that and we're on track."

117.    On February 23, 2021, Yahoo Finance hosted an interview with Defendant Burns where he continued to perpetuate the false narrative about the pre-orders and the Company's production progress.  He began the interview stating unequivocally "Production starts in September."  He also continued to falsely represent the company's pre-orders—after a direct question from the interviewer asking: "Steve, how many pre-orders do you have and who's ordering these trucks?" and Burns stated:

> Yeah.  We set out a fleet.  This is a full-size pickup truck, and as I think most people know, it's a favorite of consumers and of workers.  Our initial foray is into fleets and **we have pre-sold 100,000 of these to various fleets** across America.  So, really a big appetite.  You've got a fleet that's been using a 17 mile per gallon pickup truck for the last 30 years and we come out with one that gets the equivalent of 75 miles per gallon.  And it's just what we had hoped, a lot of pent up demand, a lot of excitement around it.  And you do these pre-orders to get a feel what to tool for.  In this business, tooling and all the costs associated with the automation required to bring these to market.  And so it gives you a good feel of what to tool for, what to build for, and we've been just really happy with 100,000 pre-orders.

* * *

> Commercial has a lot of benefits.  They buy in big chunks, very sticky orders, a lot of loyalty once you're good to them.  And consumer can be a little more fickle, and so for a new OEM with a new kind of vehicle, cutting our teeth on fleets that are very focused, they know exactly what they want their vehicles to do, they buy your vehicle only if it matches that definition.  So, by definition, you get a good fit and a happy customer.

**D.      The Truth Begins to Emerge**

118.    The truth about Lordstown began to emerge on March 12, 2021, when the renowned research firm, Hindenburg Research ("Hindenburg"), published a lengthy analysis of the company (the "Hindenburg Report").  Hindenburg specializes in forensic financial research and its website states that its most impactful research results from uncovering hard-to-find information from atypical sources.  This was no exception, as Hindenburg's Report included information from many interviews with Lordstown's purported customers and former employees of Workhorse and Lordstown, as well as information uncovered from other sources like freedom

38

of information law requests.[8] Investigation of counsel has corroborated the veracity and credibility of the Hindenburg Report. As detailed below, there were two main sets of allegations in the Hindenburg Report: (1) The Truth About Lordstown's Order Book; and (2) The Truth About Lordstown's Production Capabilities.

### (1) The Truth About Lordstown's Order Book

119. Despite nearly constantly touting the importance of having "pre-sold" a large volume of trucks to "fleets" representing billions of dollars in forthcoming revenue, these figures were vastly inflated, including by: (i) booking supposed pre-orders from supposed customers that had made no such pre-orders by any name whatsoever; (ii) booking pre-orders based on entirely non-binding LOIs, where Lordstown clearly knew the relationship was not representing actual demand; (iii) booking pre-orders from parties that could not possibly order the volume of trucks claimed by Lordstown, including by counting supposed pre-orders from non-fleet customers; and (iv) employing many other practices aimed at inflating the pre-order count. As explained herein, these practices were an effort by Lordstown and members of its management to deceive the investing public into believing that the Endurance—and the company—was on track to be an instant success.

### (i) *The Hindenburg Report*

120. The Hindenburg Report documented how Lordstown had repeatedly lauded the strength and seriousness of the pre-orders it allegedly had secured, when in fact these orders did not indicate true customer demand. For example, the Hindenburg Report stated:

> Our research has revealed that Lordstown's order book consists of fake or entirely non-binding orders, from customers that generally do not even have fleets of vehicles. According to former employees and business partners, CEO Steve Burns

---

[8] A copy of the Hindenburg Report is attached as Exhibit A to this complaint. It has been generated by copying the content of the Hindenburg Report from Hindenburg's website and has been modestly reformatted for readability in PDF form.

Exhibit B
Page 54

sought to book orders, regardless of quality, purely as a tool to raise capital and confer legitimacy. In addition, we show how, in desperation to claim there was demand for the proposed vehicle, he paid for customers to book valueless, non-binding pre-orders.

We detail conversations with Lordstown "customers" who were eager to explain that the letters of intent ("LOI"s) with the company were "promotional". Others assured us they were "not committed to anything" and that the pre-order commitment size recorded by Lordstown was "totally impossible." One CEO at a 'key' customer told us our outreach was the first he had heard of any arrangement with Lordstown.

121. The Hindenburg Report also quoted statements from former employees regarding the veracity of the order book. For example, one former sales representative explained "You're right to have some apprehension. I think the way it's being communicated especially to the media is probably not accurate." The former employee went on to explain, "I could commit to 100,000 pre-orders or reservations but I have no commitment, no financial commitment, no nothing. . . I hope they can get all 100,000 of them but I think that's extraordinarily unlikely."

122. The report gave numerous specific examples of the ways that Lordstown had inflated its order book, several of which are detailed in the following paragraphs.

123. The Hindenburg Report investigated a massive purported pre-order of 14,000 trucks that was announced on December 24, 2020, from a from a business called "E Squared Energy." This supposed pre-order represented almost 17.5% of the 80,000 total pre-orders Lordstown was touting at the time. At the $52,500 price point, this supposed pre-order represented $735 million in demand for Lordstown – *i.e.*, substantially more money than the company had raised in the Merger, and correspondingly substantially more cash than Lordstown had in its coffers.

124. As the Hindenburg Report detailed, E Squared's principal was an individual named Tim Grosse, and according to LinkedIn, E Squared had only one other employee. The other employee identifies as a "retired freelance energy consultant." The report explained that E

40

Squared was not an incorporated business, but merely a "doing business as" name given to Grosse's business. The business address for E Squared was registered to Grosse's apartment, which the Hindenburg Report explained was modest – with similar units in the building renting for just over $1,000 per month.

125.     The website for E Squared indicates that it is focused on advising companies on cutting energy costs through energy audits, LED lighting, and other power-saving means. The Hindenburg Report explained that there was no indication on E Squared's website that it had a fleet of trucks or even that it focuses on the electric vehicle space. Further, the Hindenburg Report detailed how, when asked whether E Squared operates a fleet, Grosse responded: "We don't operate a fleet but we provide the fleets. It's kind of a hybrid of a lease but it's not a lease" and then explained "It's a brand-new program we're offering. We've primarily been in the building sector."

126.     The Hindenburg Report also looked at Lordstown's supposed deal with Innervations LLC. On April 7, 2020, Lordstown announced a 1,000 truck order (worth $52.5 million at the price Lordstown was marketing the Endurance at), with Innervations. At the time, this was the largest order Lordstown had ever announced.

127.     The Hindenburg Report detailed that Innervations was incorporated four months prior to the announcement, and listed a virtual office as its address. The report explained that Innervations' corporate documents list two individuals – one a 2018 law school graduate who works full time at a software company and the other worked full time at an architecture design firm and runs a contracting firm out of his modest 2-bedroom home (valued by Zillow at $187,000).

128.    According to the Hindenburg Report, Innervations' website did not provide any indication that it operated vehicle fleets.  Instead, the report detailed that Innervations' role was primarily as a promoter, not as a purchaser.  It quoted Innervations' David Hein as explaining the business as follows:

> What we do is we host and support events with companies and then we invite Lordstown Motors to the event to show the product.  We just direct the company to Lordstown directly.  When they tell us they're interested in purchasing trucks that's what we do.  **We don't get involved in the actual ordering**.
>
> * * *
>
> We're influencers, our numbers, that's a very small number but what Innervations does is we promote the product…  We think we can influence.  Remember, we don't sell the truck, we just influence companies, and it's more on a broader spectrum.

129.    The Hindenburg Report explained that Lordstown had booked 40 trucks of pre-orders from the Catholic Cemeteries Association.  But the Hindenburg Report explained that this supposed pre-order customer, made clear to Lordstown that its interest was entirely premised on the non-binding nature of the order, stating "I'm not committed to anything, **not to buying a single vehicle**.  I committed to consider buying vehicles.  I'd have a lot of questions before I commit to anything."

130.    The Hindenburg Report also probed the supposed 500 truck pre-order secured by Lordstown from Clean Fuels Ohio, in March 2020.  However, as the report explained, Clean Fuels Ohio was a non-profit focused on educating fleet operators around Ohio and was merely planning to encourage purchases of trucks.  The report quoted the Executive Director of Clean Fuels Ohio as agreeing with that characterization and then adding: "It is really that, promotional and getting the word out.  And when we signed those letters of intent, we were really clear with them that that's what we would be doing, and they understood that and welcomed that."

42

131.   The Hindenburg Report explained that Lordstown had issued a public statement claiming the Momentum Groups had pre-ordered 900 Endurance trucks.  The Hindenburg Report further explained that Momentum Groups is a vehicle reseller that does not operate a fleet or purchase vehicles on its own behalf.  In fact, it explained that the Momentum Groups instead had launched a page on its website marketing the vehicle and trying to find actual customers for the Endurance.  Thus, this supposed "pre-order" did not represent any actual demand for the product, but merely that Momentum Group might be interested in buying trucks *if* it could find end-customers that did have an interest in buying the vehicle.

132.   The Hindenburg Report explained that Lordstown's September 17, 2020, investor presentation had listed "First Energy" as one of their "Select Pre-Order Customers," and explained that Lordstown had issued a public statement claiming that First Energy had pre-ordered 250 trucks, quoting one of First Energy's executives Dennis Chack.  By the time of the September 17, 2020, investor presentation, First Energy had been embroiled in a massive bribery scheme that had led to the Ohio Speaker of the House of Representatives being arrested and to Mr. Chack being fired.  While this did not *necessarily* mean the orders were fake, it certainly suggested that one of Lordstown's "key customers" lacked credibility.  It would have been even more doubtful that pre-orders by a fired executive terminated in the bribery scandal would convert into actual orders.

133.   The Hindenburg Report explained that Lordstown's September 17, 2020, investor presentation had listed Summit Petroleum Inc. as one of their "Select Pre-Order Customers." However, the report explained that Summit Petroleum was a small Ohio-based oil & gas exploration company with about 24 total employees.  Thus, the notion that they could produce a large number of orders was highly unlikely – as a company of that size would not be expected to

43

Exhibit B
Page 58

buy *even* 24 trucks. The Hindenburg Report quoted William Kinney, the president of Summit Petroleum, as stating "For us it's really just a look-see[.] I don't know enough about them to make an honest…We want to evaluate them on their merits. . . A friend of a friend is involved in [Lordstown] and asked us if we would consider it and we said we would and we are not locked in."

134. The Hindenburg Report explained that Lordstown's September 17, 2020, investor presentation had listed Grid-X as one of their "Select Pre-Order Customers," complete with a picture of the company's logo. However, the report explained, that Grid-X is an internet cloud services company. The report pointed out that Grid-X does not appear to own any fleet trucks according to department of transportation records, and a review of their website does not reveal that they perform any services requiring the use of trucks. The Hindenburg Report quoted the company's CEO, Jian Zhang, as stating, "I don't know anything about LMC or Lordstown Endurance pick-up" and as stating, "We are completely unaware of this. I heard of them from your inquiry message the first time."

135. The Hindenburg Report explained that Lordstown's September 17, 2020 investor presentation had listed Duke Energy as one of their "Select Pre-Order Customers," complete with a picture of the company's logo. The Hindenburg Report explained that former employees told them that this deal was essentially for show and done as a favor to CEO Steve Burns in order to aid in the capital raising process. In fact, the report published a copy of the letter of intent that Lordstown was using to claim the pre-orders. That LOI was between Duke Energy and Workhorse (not Lordstown), and firmly stated that there was no reservation payment, and no obligation to purchase, related to an entirely different vehicle than the one Lordstown was developing, the Workhorse LD1500 (a vehicle with a conventional electric engine, not hub

44

motors), and listed a different price than the one Lordstown was promoting.  Furthermore, the LOI was dated November 1, 2016, and called for trucks to be delivered (if actually ordered) over a two-year period, meaning there was no credible basis to claim that this LOI indicated interest as of September 2020 for delivery of an entirely different truck in September 2021 (or whenever thereafter Lordstown might actually produce vehicles).  The Hindenburg Report quoted Duke Energy's media spokesperson as saying they would need to "see the truck and kick the tires before we buy."

136.    The Hindenburg Report explained that Lordstown had also counted Ryder as having made pre-orders for 2,500 trucks.  However, the Hindenburg Report explained that, as with Duke Energy, former employees told them that this deal was essentially for show and done as a favor to CEO Steve Burns in order to aid in the capital raising process.  As with Duke Energy, the purported agreement with Ryder was actually a deal with Workhorse for an entirely different truck that had been penned back in early 2017.  Furthermore, the report noted that in a public interview Ryder explained that they were partnering with Workhorse to provide maintenance and service for the Ryder trucks.  Public documents do not show any similar agreement between Lordstown and Ryder, and Burns promised the maintenance and service relationship to Camping World – casting even greater doubt on the notion that Ryder's stale LOI with Workhorse was a meaningful indication of its demand for the Endurance.

137.    The Hindenburg Report explained that Lordstown had announced procuring pre-orders from Mike Albert Fleet Solutions, in a press release calling it a "major" step forward, and noted that it was the only deal announced by press release in January of 2021, when Lordstown's pre-order book supposedly jumped from 80,000 to 100,000.  The Hindenburg Report explained that this purported "pre-order" was actually merely an agreement to potentially place referrals.

The report quoted Nate Shadoin, Director of Sales at Mike Albert Fleet Solutions as explaining: "They (Lordstown) are an Ohio-based company and so are we (Mike Albert Fleet Solutions) and I have a personal relationship with some of the business development executives that are there. And we go out and talk to the same people and so they're talking to fleets and I'm talking to fleets. We refer business introductions and opportunities to each other."

138. The Hindenburg Report explained that, according to Lordstown documents reviewed by the report's author, Lordstown had recorded pre-orders of 15 vehicles from Frank Seman, the Mayor of the City of Ravenna. However, the report explained that when Mayor Seman was asked about the order, he explained:

> I was asked to write a letter of support to help get the plant repurposed and reopened to help provide more jobs for residents of Northeast Ohio. While we have an interest in the plant's success and this technology, we did not commit to the purchase of any vehicles. We are a small town. The commitment of that size is totally impossible.

139. Similarly, the Hindenburg Report noted that the same situation was true as to the City of Kent, where city manager Dave Ruller told the report's author that their city could potentially be in the market for 3 or 4 trucks subject to a formal bidding process, but not the 15 recorded by Lordstown as pre-orders. Mr. Ruller added, "We were happy to write that letter to show our support — and to help them finalize all their production financing — knowing that it is not an official bid document or purchase order so it is not legally binding us to buy something that hasn't even been produced yet beyond a prototype."

140. In addition to these specific examples, the Hindenburg Report also explained how many of the pre-orders that Workhorse had procured, which Lordstown had marketed as its own, were the result of commission-based sales efforts by a former Workhorse employee who had since sued the company for failure to pay those commissions. That employee was paid $30 commissions per truck for each pre-order obtained, even though the pre-orders were entirely

46

nonbinding. The complaint filed by that former employee stated that he had obtained the orders with Duke Energy, Clean Fuels Ohio, and Ryder under such arrangements.

141. The Hindenburg Report also explained that in early 2020, according to former employees, Defendant Burns was desperate to increase the number of pre-orders, regardless of quality and that he wanted to get to 10,000 pre-orders to secure better financing terms. Toward that end, the company hired an outside firm called Climb2Glory to procure additional pre-orders on a commission basis. Through this arrangement, the report explained, Lordstown would pay $50 commissions per truck for each LOI obtained.

**(ii)** *Investigation of Counsel*[9]

142. Investigation of counsel was able to confirm many of the claims in the Hindenburg Report and found the report to be reliable. Additionally, counsel has interviewed several of Lordstown's purported pre-order customers and former Lordstown employees and continues to find evidence that Lordstown misrepresented its supposed pre-order book.

143. CW-1 was a Manager at Lordstown in 2020. According to CW-1, he met several times a week with former Senior Vice President of Business Development Defendant Flannery and attended meetings with him as well.

144. According to CW-1, the executive team, including Chief Operating Officer John LaFleur, Defendant Flannery, and former CEO Defendant Burns, were all "very close," with each other and "like-minded." He noted that they had all worked together before working at Lordstown.

---

[9] Confidential witnesses ("CWs") are identified herein by number (CW-1, CW-2, etc.). All CWs are described in the masculine to protect their identities. Plaintiffs believe that the details of the responsibilities of the CWs contained herein are sufficient to satisfy the requirements of the PSLRA. However, Plaintiffs can provide additional specificity to the Court through an *in camera* submission.

47

145.    CW-1 explained that the internal sales team at Lordstown and Caimin Flannery had access to and could edit a shared Excel file that was used to keep track of letters of intent (LOIs)/pre-orders.  CW-1 explained that all the number of trucks listed in the LOI's figures were counted in the total pre-order number, regardless of the likelihood that a customer would even be able to fulfill them when the time came to do so.  CW-1 added that Lordstown "counted everything."

146.    According to CW-1, when Lordstown counted the total number of pre-orders, it included LOIs that had originally been obtained by Workhorse.  CW-1 continued to say that he did not recall any attempts being made to reconfirm LOI quantities with those companies that had signed LOIs with Workhorse prior to the formation of Lordstown.  CW-1 added that he did not experience any follow ups being made to customers that signed on with Lordstown either, though he did recall conversation about how they should eventually do so.

147.    CW-1 explained that he did not feel comfortable referring to the letters of intent (LOIs) signed by customers as pre-orders, or anything with the word "order" in them.  According to CW-1, he would refer to them instead as "reservations" given the non-binding nature of the agreements.  CW-1 recalled that the document that the supposed customers would sign made it very clear in bold text that the agreements were non-binding.

148.    CW-1 recalled the message from executives at Lordstown being "fairly explicit" that they needed to obtain these reservations in order to get additional financing from investors.  According to CW-1, Defendant Flannery expressed this sentiment to CW-1 directly in meetings that he attended.  According to CW-1, he had multiple conversations with Flannery per week and recalled conversations where Flannery explicitly made the point that the LOIs were for generating investment interest.  CW-1 continued to say that there was pressure to meet

48

benchmarks of pre-orders solely for Lordstown's investment timeline. CW-1 continued to say that Flannery regularly said that he had spoken with former CEO Steve Burns and provided him with updates about the pre-orders. CW-1 noted that he could not see how Burns would not have been aware of the practices surrounding the LOIs given his communications with Flannery who knew everything related to sales at that time.

149. According to CW-1, the letter of intent figures were not used to gauge market size or forecast the supplies that would be required to actually produce the vehicles, they were solely used by the company for the image that "we [Lordstown] have all these orders" and to lure investors. CW-1 added that he would be "shocked" if Defendant Burns was not aware of the nature of the pre-orders and the reasoning behind them (the need to generate buzz for investors), given how close Burns was with Flannery and LaFleur.

150. CW-1 recalled an instance on a call where CW-1 grew frustrated by the frivolous nature of the pre-orders and asked why Lordstown did not just open the phonebook and put a million orders for random people, implying that the orders they were obtaining were equally as meaningless. CW-1 described the LOIs as "not worth the paper they were written on." CW-1 continued to say that he had grown suspicious that customers were just being signed up without their consent. More specifically, CW-1 heard of two instances where significant pre-orders were obtained from one company that operated out of a P.O. box and another that operated out of an apartment that were particularly questionable to him and he recalled there was one customer based out of an apartment that had an LOI for over 10,000 vehicles.

151. CW-2 was a high-level manager at Lordstown who left pre-merger. CW-2 interacted with Defendants Burns and Flannery.

152. CW-2 recalled that Flannery was Burns' "right hand man" and that much of Lordstown's staff was comprised of people with personal connections to Burns, including

49

members of his family or his church.  As a result, according to CW-2 much of the senior staff was not qualified.  CW-2 added that much of the experience of working at Lordstown was a result of the "nature of Steve Burns."

153.    CW-2 explained that during his tenure Lordstown's sales team was comprised of Vice President of Business Development Caimin Flannery, a director of sales, and up to two sales representatives.  According to CW-2, Climb2Glory reported to Flannery and was paid a commission of $50 for each truck listed in a letter of intent and that the sales representatives were also financially incentivized to get as many LOIs as they could.

154.    CW-2 characterized Lordstown's pursuit of LOIs, which were marketed as Pre-Orders, as desperate, explaining that there was "nothing binding" about the agreements Lordstown was getting, which he described as "pie in the sky." According to CW-2, the "desperation" around reaching pre-order totals was fueled by the effort to get funding for Lordstown, adding that the purpose of the pre-orders was to generate buzz and that that was "all it was for." CW-2 advised that the pressure related to sales and the LOIs came directly from Flannery and Burns.

155.    According to CW-2, there was "zero" due diligence conducted on the ability of potential customers to support their orders based on existing fleet size "by design," adding that the company did not want to know, because they just wanted to get the signed letters.  CW-2 explained that when it came to securing letters of intent the only guideline provided to Lordstown's sales staff was to get "as many as possible in the shortest period of time." CW-2 continued to say that there were no instructions regarding what types of customer-leads to pursue.

156.     According to CW-2, Lordstown "counted everything," as pre-orders, including all the LOIs, even if the customer's ability to fulfill them was not apparent or even likely.  CW-2 continued to say that the "pressure" to continue to grow LOI numbers "100%" came from Burns and Flannery.  CW-2 explained that Burns "micromanaged every aspect" of Lordstown's business down to the "smallest minutia." CW-2 stated that he "talked with Steve frequently," and that Burns "knew every single order" that was counted as a Pre-Order, as well as the customers behind them.  CW-2 also recalled talking with a more senior employee at Lordstown about how the LOIs were "all smoke and mirrors."

157.     As an example of Burns' knowledge of the truth about the pre-orders, CW-2 recalled that one of the two sales associates had gotten a 1,000 truck LOI from Innervations LLC, but that someone had done a quick search and seen that it had no operating history and was a two-person operation run out of an apartment.  According to CW-2, Lordstown spokesperson Ryan Hallett had indicated that they should not publish a press release because of how weak the LOI was.  CW-2 explained that Hallett did not want to publicize the LOIs given how they were non-binding and given that everyone at Lordstown knew that all the big orders were "BS." Lead Counsel understands, from talking with CW-2, that a member of the sales team had called Burns to explain how sketchy the LOI with Innervations was, and has strongly advised Burns not to publish a press release about Innervations, but despite that warning Burns went ahead with publishing a press release and counted Innervations in the tally of pre-orders.

158.     With respect to particular supposed pre-order customers, Lordstown has engaged in a wide range of practices to exaggerate the size and strength of the order book.  A few such examples are listed below:

51

159.    **First**, Lordstown apparently counted the City of Ravenna among its supposed pre-order customers, as has been reported in news articles.  According to the Hindenburg Report, Lordstown's pre-order book counted 15 pre-orders from the City of Ravenna.  However, the city had not placed any pre-orders or even made an indication of interest regarding the vehicle.

160.    Lead Counsel spoke with the Mayor of the City of Ravenna.  The city has a population of just under 12,000 people.  The mayor recalled writing a letter of support for the Lordstown Motors' project, and the economic support it could provide to Lordstown and the surrounding area.

161.    The mayor explained that while he wrote a letter of support, he was "shocked" when he received a notice that he had made a commitment for approximately 20 Endurance trucks.  According to the mayor, there was "no way on God's green earth" that such an order would be within the City of Ravenna's budget.  The mayor noted that people in Ravenna are familiar with the city budget and would think "where the hell is the money coming from" regarding an order of this size.  According to the mayor, there is no deficit spending for cities in Ohio, so purchases need to be planned well in advance, like they had recently done with the acquisition of a $600,000 firetruck.

162.    He recalled a representative from Lordstown coming to confirm the order and that she "hemmed and hawed" when the mayor informed her that there was never any such order.  He explained that he thought that there was "something wrong" with the situation and that it seemed like a "scam." According to the mayor, the Lordstown representative finally admitted that there was indeed no order.  He added that no one from his office had ordered any trucks from Lordstown.

163. **Second**, just as with the City of Ravenna, Lordstown touted the city of Lordstown as having made indications of interest. However, the city had not made any sort of indication of interest with the company.

164. Lead Counsel spoke with the Mayor of Lordstown regarding the city's purported pre-orders of the Endurance truck. The mayor explained that while he did participate in brief conversations with representatives from Lordstown regarding the village's possible interest in purchasing Endurance trucks that no orders or pre-orders were made.

165. **Third**, Lordstown trumpeted "Summit Petroleum" as one if its "Select Pre-Order Customers," including in the Merger proxy documents. However, Summit had only provided a non-binding letter of intent, and believed that "pre-order" was an "interesting" term to describe the relationship. Summit did not even put in a LOI for a specific quantity of trucks.

166. Lead Counsel spoke with a representative of Summit Petroleum, an oil and gas company located in Twinsburg, Ohio. The representative recalled that he had spoken with a representative of Climb2Glory LLC and had said that he "would be interested" in looking at the Lordstown Endurance. He also recalled informing the Climb2Glory representative that he typically purchases 20 pickup trucks per year but did not place an order with Lordstown.

167. The representative of Summit Petroleum further stated that the phrase "pre-order" was an interesting term to use, since he had only signed a non-binding letter of intent. While on the call he pulled up the LOI and noted that it did not specify a quantity. He added that he signed the letter of intent as a "friend of a friend" type of deal to show support. The representative continued to say that he "definitely had not placed an order."

168. **Fourth**, Lordstown touted Auto-Flex Inc., as having provided letters of intent to buy trucks, as was reported in news articles. However, AutoFlex could not itself be considered a

53

"fleet" as it operates as an intermediary that assists governmental organizations in securing vehicles and only actually places orders once AutoFlex's customers order trucks. Accordingly, Defendant Burns' statements that Lordstown's pre-order tally did not include demand from governmental fleets was materially misleading.

169. Lead Counsel spoke with a representative of AutoFlex stated that he met with representatives of Lordstown at an industry event in 2020 and within six months of that meeting he had exchanged e-mails with a Lordstown sales representative and provided a "rough" number of potential trucks that he may want to purchase via e-mail, indicating that he may be interested in approximately 100 units within the first year of production. He explained that he never saw a price sheet, or other spec sheet about the truck, but believes the price would ultimately be approximately $50,000.

170. The representative of AutoFlex, explained that he was very upfront about his business model when talking with Lordstown which includes him purchasing vehicles to lease to customers only after a customer has requested the truck from him. He noted that "it's up to the customer" to place an order. He also explained that he felt his customers would be interested in Lordstown's truck, but that he had not received any specific indications from customers asking him to order Lordstown's truck for them. He added that fleet managers lean towards companies with an established track record, but that Lordstown's technology was interesting. The representative of AutoFlex stated that he has not received any updates from Lordstown regarding the status of production.

171. **Fifth**, according to the Hindenburg Report, Lordstown booked pre-orders based on non-binding indications of interest from an organization that purchases 2-4 trucks a year in total, where the would-be customer indicated that he may be interested in 40 trucks at some point in the future and over a stretch of many years.

54

Exhibit B

Page 69

172.    Lead Counsel spoke with a representative of Catholic Cemeteries Association – Diocese of Cleveland.  The representative explained that his organization has 60-70 vehicles and estimated that he purchases between two and four medium to light-duty trucks each year.  He had signed a document regarding his interest in the Endurance, but had made it "very clear" to the employee from Climb2Glory that he was dealing with that he was not prepared to commit to anything and that he "intended to take a hard look" at the Endurance before ordering anything.  The representative, said that he was told that the letter of intent was just a way to gauge interest and he wanted to support a new local business given that he was upset when GM departed.

173.    The representative of the Catholic Cemeteries Association noted the nonbinding letter of intent listed 40 trucks as a figure he might buy at some point in the future, but that he made clear at the time that this number represented an estimate of the number of trucks he might want over a stretch of many years, as he only buys a couple trucks a year in total.  He added that he did not have the ability to invest in 40 trucks all at once and that he "never would've signed the letter of intent if there was any commitment to buy any trucks at all."  The representative recalled the Climb2Glory employee telling him that the LOIs were non-binding and "don't worry."  The representative further recalled that he has not received any updates or follow-ups regarding the status of his letter of intent or production.

174.    **Sixth**, among the "pre-orders" that Lordstown supposedly received from Workhorse was an arrangement Workhorse had with the City of Orlando.  The City of Orlando had signed an LOI to buy 500 trucks from Workhorse, but that deal has long since lapsed and the City of Orlando has only verbally indicated it was interested in buying two trucks from Lordstown.

175.    Counsel spoke with a representative of the fleet management division for the City of Orlando, who had dealt with Workhorse in that capacity.  The representative confirmed that

55

Exhibit B
Page 70

he had signed a letter of intent regarding 500 trucks with Workhorse, based upon the contingency that the company would provide him with a prototype vehicle to pilot for three months first.

176.    The representative explained that Workhorse "went dark" and "fell off the earth" approximately two and a half to three years ago, at which time the company stopped returning his e-mails. According to the representative, around this time, his relationship with Workhorse "fell apart" as they missed their deadline to deliver the pilot vehicles and had stopped responding to him. He even recalled attending a trade show in Nashville, where he knew Workhorse had a booth, in hopes of contacting them, but nobody from the company showed up at the event.

177.    The representative of the fleet management division for the City of Orlando explained that he had communicated with a Lordstown salesperson regarding making a pre-order for the Endurance truck for approximately $52,000. He recalled receiving a "boiler plate" LOI for two trucks that he had not signed by a deadline set by the sales representative. However, he stated that his lot had hosted a "Central Florida Show and Tell" for Lordstown, which allowed fleet managers to test drive and view a prototype, and that after this event the Lordstown sales representative reached out to him "on behalf of management" to offer him the opportunity to sign for two trucks off the initial rollout and around March 2020 the representative verbally indicated he was interested in buying two trucks from Lordstown, but did not sign an LOI. The representative explained that he had not made any additional pre-orders with Lordstown since placing that initial order for two trucks.

178.    The representative explained that his LOI with Workhorse was separate and distinct from any order he would place with Lordstown. He stated that the trucks were different between the two companies and that any pre-order he had placed with Workhorse was not valid

56

as to Lordstown. He added that he had not discussed his pre-orders carrying over with representatives from either company.

179. **Seventh**, Lordstown touted a deal with Mike Albert Fleet Solutions, which stated that the deal called for "delivery of a significant quantity of the Lordstown Endurance pickup." While the number of trucks was not specified, Lordstown's book of supposed pre-orders jumped by 20,000 the month of the announcement, and no other major deals were announced that month. In fact, Lordstown only has non-binding LOIs with the company. Mike Albert Fleet Solutions operates as an intermediary for fleets, not as a purchaser, and as part of agreeing to the LOI the company made it "very clear" to Lordstown that it was just signing up for a "a chance to order vehicles," at a later date, when its customers actually placed orders.

180. Lead Counsel spoke with a representative of Mike Albert Fleet Solutions, who had held that position since at least 2016. The representative explained that Mike Albert Fleet Solutions buys and leases vehicles to customers, explaining that the company only actually places an order with a manufacturer once they have a customer placing an order with them. The representative explained that while he believed there may be customer demand for the Endurance, they did not have specific orders from customers for the vehicle.

181. The representative of Mike Albert Fleet Solutions explained that he has a relationship with some of the business development employees at Lordstown, since they occupy the same business circles and he "wanted to help." He detailed how Lordstown was looking for individuals to sign non-binding letters of intent, "just like [it was described] in the Hindenburg report."

182. The representative of Mike Albert Fleet Solutions indicated that prior to COVID the company had signed a LOI for a number of trucks and told Lordstown that if they have

57

customers who ultimately want the trucks they would order them. According to the representative, it was made "very clear" that the letter of intent was non-binding and was just "a chance to order vehicles" at a later date. The representative of Mike Albert Fleet Solutions explained that the discussion was framed as a "slow roll out" of possible orders over a two-year period.

183. **Eighth**, Lordstown had supposedly inherited a deal between Workhorse and the Southern California Public Power Authority, which was counted in Lordstown's pre-order book. However, the non-binding LOI that Workhorse had with this organization could not properly be counted as Lordstown pre-orders.

184. Lead Counsel spoke with a representative of the Southern California Public Power Authority. He explained that while they had signed a non-binding LOI from Workhorse Motors in February 2017 that expired in February 2020. He further explained that the LOI outlined tiers of discounts that would be provided based upon how many trucks were eventually purchased. The representative added that the LOI was signed by Burns in his former capacity as Workhorse's CEO.

185. The representative of the Southern California Public Power Authority explained that they had not had any dealings with Lordstown nor has he received any direct communications. He added that while he was not familiar with the Lordstown truck, Southern California Public Power Authority would not sign a similar LOI today, as now they would prefer to have the individual entities under the Southern California Public Power Authority sign their own LOIs.

### (2) The Truth About Lordstown's Production Capabilities

186. Despite routinely boasting that Lordstown would be "first to market," that it would be producing vehicles by September 2021, and that it would become profitable ("cash

58

flow positive") without the need to raise additional capital, in truth Lordstown was touting impossible production plans and omitting to disclose the enormous specific risks its business faced.

187. The Hindenburg Report explained that Lordstown had faced several production issues. Most prominently, it explained that on January 13, 2021, Lordstown had conducted overnight testing on a public road, and during this test their prototype caught on fire within about ten minutes and became fully engulfed in flame. This dramatic failure of their vehicle clearly evidenced that their production schedule was too ambitious, as they were not able to even safely drive their test vehicle at this time.

188. The Hindenburg Report also detailed how the supplier for Lordstown's primary component – the hub motor – was a small Slovenian company (Elaphe), indicating that Lordstown would not be likely to produce sufficient components for Lordstown to meet its production schedule. Specifically, the report quoted an employee who noted that the supplier was developing the capability of producing 100,000 hub motors a year, but was "far from that number." Even if Elaphe could produce 100,000 hub motors, this would only be enough for 25,000 vehicles, as each truck needed 4 hub motors.

189. The Hindenburg Report also detailed that in mid-January 2021 Lordstown had dramatically changed its production design, shifting from a plastic exterior to an aluminum one, further evidencing the lack of progress the company had made toward meeting its publicly touted development goal.

190. The Hindenburg Report also explained that a former Lordstown employee had explained that Lordstown had not completed necessary testing and validation for the vehicle, including (1) cold weather testing, which the Hindenburg Report explained typically takes three

months, but had not yet begun; (2) durability testing, which the Hindenburg Report explained typically takes 6 months of 24/7 testing; and (3) major testing required by the Federal Motor Vehicle Safety Standards.

191. As further evidence of Lordstown's unrealistic development targets, the Hindenburg Report noted that Burns had claimed the company would assemble battery packs inside the plant, however, the report stated that former employees explained that all the battery packs were being assembled by hand and that it would take 5-7 months to even receive the parts needed to manufacture the battery packs, not including installation, testing, and getting the equipment into production.

192. The Hindenburg Report also detailed that Lordstown was being sued by Karma automotive for allegedly secretly hiring its employees and taking its intellectual property, a lawsuit that could further delay Lordstown's ability to produce its vehicles.

193. Investigation by Lead Counsel has further confirmed that Lordstown had overstated its production capabilities. Lead Counsel consulted with an automotive industry expert with 40 years of experience including as a Senior Chief Engineer, decades of experience at GM, and expertise in developing and industrializing automobiles for global production and sale.

194. The expert explained that new vehicle launches take between 32 and 36 months to produce a fully developed and validated vehicle meeting all Safety requirements. Upon reviewing available information regarding the Endurance at the time of the Merger, he explained Lordstown could not have realistically launched a production vehicle by September 2021. He further explained that manufacturing steps including: (1) designing the vehicle body in a compliant fashion, which would take over a year; (2) fabrication and tuning of the components,

60

which would take over half a year; (3) tool delivery and assembly, which would take over a month; verification and vehicle validation, which would take about four months; and (4) tooling trial and certification, which would take almost 4 months. He further explained that these steps need to be performed sequentially (not simultaneously) and that at the time of the Merger, Lordstown appeared to be near the start of this process. Even if all this work had previously been done, a full validation of the vehicle would require two winters of testing to ensure that the vehicle dynamics and thermal management systems are operating the vehicle in safe manner.

195. The expert further explained that the fastest vehicle launch in the industry appears to have been by VinFast in Vietnam in 2019, and that process took 24 months, and was only capable of that quick timing due to the fact that VinFast's vehicle was essentially a localization of an existing BMW model with slight cosmetic modifications. In contrast, Lordstown was developing an entirely new vehicle which included an industry first in the hub motor technology.

196. Additionally, the notion that Lordstown had sufficient capital to complete production was premised on the unrealistic prospect of them launching the vehicle by September 2021. As would come to light shortly after the Hindenburg Report was published, Lordstown would not be able to meet this deadline and lacked the resources to produce their vehicle, contrary to their prior public assurances.

197. Additionally, interviews with Confidential Witnesses also confirm that Lordstown was not on schedule to meet its assurances that production would begin in September 2021.

198. CW-3 worked as an administrative assistant at a third-party contractor that provided services to Lordstown from within the Lordstown plant. He worked in that role from September 2020 to December 2020, and his responsibilities included taking down minutes for various meetings for Lordstown.

199.   CW-3 recalled taking down minutes for various meetings related to stamping and body and production.  He recalled one meeting on September 19, 2020, which was attended by Mike Wood (Information Technology Director), Michael Fabian (Director of Stamping Operations), John Ritter (current Director of Facilities and Central Maintenance at Lordstown) and others.  During this meeting it was said that "we [Lordstown] are running way behind" and Mike Wood said that software was "running severely behind."[10]

### (3)   The Market Reaction to the Hindenburg Report

200.   The market reaction to the Hindenburg Report was sharply negative, as it partially revealed that many of Defendants' prior positive statements about the company were false and omitted to disclose the truth about the company.

201.   The Hindenburg Report was published before markets opened on March 12, 2020. Lordstown's stock price closed at $17.71 on March 11, 2020 and opened at $14.00 on March 12, 2020, for a decline of 20.95%.  The stock recovered slightly by the close of markets on March 12, 2020, to a closing price of $14.78, but even at this price there was a 16.54% decline compared to the prior day's closing price.

202.   A multitude of news articles and media reports commented on the publication of the Hindenburg Report, further emphasizing its significance to investors.  Headlines of articles published on March 12, 2021 included: *Seeking Alpha*, "Lordstown Motors slides after

---

[10]  CW-3 detailed observing a series of bizarre activities at Lordstown including: (a) another employee being asked to duplicate a manufacturer's manual so that Lordstown could "rework it" and "make it Lordstown," even though the words "do not duplicate" were printed on the manual; (b) being told to have documents notarized on behalf of individuals who were not actually present to sign the document; (c) Director of Paint Operation at Lordstown Shane Brown setting up a hunting perch and actively baiting animals on the property, despite this being against Ohio law; (d) receiving directions to not hire older candidates or women as well as racial profiling candidates; and (e) discussion during a meeting about building Endurance trucks using a Silverado's frame, which he included in his notes, before he was instructed to erase it.

62

Hindenburg accuses it of 'fake orders;'" *The Motley Fool,* "Why Lordstown Motors Stock Is Crashing Today;" *Forbes*, "Lordstown Motors Stung By Short Seller's Accusations Electric Truckmaker Misled Investors;" *The New York Post*, "Lordstown Motors stock sinks after report calls pre-orders a 'mirage;'" *Tech Crunch*, "Lordstown Motors accused of faking EV truck pre-orders by short-seller firm Hindenburg Research;" *The Wall Street Journal*, "Short Seller Trains Sights on EV Startup Lordstown, Prompting Share Slide;" *Bloomberg*, "Lordstown Motors Sinks After Attack by Short That Hit Nikola."

        **E.**      **<u>Lordstown Attempts a Clumsy Cover-Up as the Truth Continues to Emerge</u>**

203.     On March 15, 2021, Lordstown issued a press release indicating that it was aware of the Hindenburg Report and that it would respond "in due time." The press release also asserted that Lordstown "remains on track for start of production of its Lordstown Endurance all electric pickup truck in September 2021."

204.     On March 17, 2021, after the close of trading, Lordstown issued a press release regarding its full year 2020 results. This report reiterated that the "Timeline to Start of Production (SoP) in September 2021 remains on track, with beta prototype build underway and the first beta vehicles to be ready by the end of March; vehicles to be sent for durability, crash, validation, and lighting testing with various partners and to early initial customers for feedback."

205.     During the conference call for Lordstown's full year 2020 results on March 17, 2020, which was held after the close of trading, Defendant Burns stated that the company had received an SEC inquiry and disclosed that the board had formed a special committee to review the matter. He stated, "We are aware of the short sellers' report and we have also received a request for information from the SEC and we are cooperating with that inquiry, in addition the board of directors has formed a special committee to review these matters."

63

Exhibit B<br>Page 78

206.    On March 18, 2021, before markets opened, Defendant Burns returned to CNBC to speak with Phil LeBeau of *Squawk Box* to address the allegations in the report. Throughout the interview, Defendant Burns unsuccessfully—and in stark contradiction of his previous *Mad Money* interview—tried to defend his statements. The exchange was as follows:

> **LeBeau**: Let's be clear here. The way that you have characterized your pre-orders or reservations in the past, I mean, you called these on CNBC "serious orders." Now, people would look at this and say, "If you have a company that's not putting down a deposit, that doesn't have a fleet, but basically are collecting letters of interest, are those truly 'serious orders?'"
>
> **Burns**: Well, no, we've been... Phil, we always been very clear, right? These are just what they're intended to be, right? These are non-binding letter intents. They're called pre-orders out in the kind of real world. So, always classified them for that. And we have a lot of those pre-orders. I think we have pre-orders directly from fleets. We have pre-orders from people that sell to fleets because that's the way fleets buy. Fleets don't buy. . . in general, they don't buy like consumers buy. They buy through intermediaries.
>
> And so all we've done is gone out and gauge interest because you've got a tool to build something like this in an automated fashion. We're going to build one of these every six minutes. We kind of have to know how to tool, and you've got to know about a year in front of your building.
>
> So that's what everybody uses pre-orders for. They are always, by definition, nonbinding, no money down. I mean, that's the nature of EV startups trying to gauge interest.
>
> **LeBeau**: I understand that, Steve, but some people would look at this and say, "Look, you were far more aggressive in characterizing those pre-orders as true commitments, that you have Company X, Y, Z, that has said, 'Sign us up for 5,000 or 6,000.'" Do you regret the way you characterize those reservations?
>
> **Burns**: Well, reservation... Phil, all I can tell you. I don't want to get into the specifics. All I can tell you is demand is robust. We've never said we had orders. We don't have a product yet. By definition, we can't have orders, right? So when you're early and you're years away from a product, in this case one year, and now, we're down to six months, so now that we have the betas. We are starting to be able to shore some of that up.
>
> But the pre-orders did exactly what they were supposed to do: gauge interest. Nobody knew if fleets would buy an electric pickup truck, right? It was completely unknown science, no data around it. So we queried them. We have very robust interest, and that's just what they are. They're letters of interest. You can't do any

64

more than that in this stage. So I don't think anybody thought that we had actual orders, right? That's just not the nature of this business.

207. Following the interview, later in the day Jim Cramer spoke on the issue commenting on his previous interview with Burns. His reaction is demonstrative of the feeling many investors had upon seeing the truth about Lordstown begin to emerge. He stated:

> Well, Nate Anderson of Hindenburg first put out a report when I was away. They talked about how Lordstown could have had some serious issues with the truth. And I found it gut wrenching because I had pressed Steve Burns when he was on the show and the CEO of Lordstown. I had pressed him on Mad Money about how serious the orders were for the company. And he said, they're very serious. He had signed letters with CEO. He could have easily said, look, they, we never know what's going to happen with orders, which is fine. He could have said that he did not say that. Well, this morning Phil LeBeau who is an amazing reporter, asked him point blank. And Burns said, I never said that they were serious. I don't know where he got that. So then we ran the tape of when Burns said it to me on Mad Money. So to me, **I thought it was like the prosecution rests**. You don't even need to have a discussion. You just listen to what he said to Phil. You listen to what he said to me, case closed you decide. I listened. And I just said, that is someone that is hard for me to trust. And that's where I come out.

208. The other CNBC reporter in the segment responded to Cramer stating: "the quote that really stood out for me from Burns himself was I don't think anybody thought we had actual orders to say that on television," to which Cramer responded:

> I know he point blank said the opposite to me. And you know, as I go through, I mean, there's, it was, I mean, I had, obviously I was frantically getting my people to cut the tape of when, when he was on Mad Money, but the quotes that would, that you know, that we were struck by were basically, let me see if I can just call some of them up. But, you know, we were, were struck by the fact that there was just simply no doubt in this man's mind, that things were, that the orders were serious and solid. And it, it was, it was quite, you know, one point he wrote, he said to me, our average order size—order size, order size—is 500 trucks at a time and most of them are signed by the CEOs of these large firms. Now, is that not saying we have serious orders? I'm asking is the order serious, give me any help, make me feel better about how serious the orders were. How about if you said, well, look, first of all, our average order size is 500 trucks at a time. And then I will also tell you, the most of them are signed by the CEOs of these large firms. That's how serious I am. Well, that's the evidence. That's the core evidence. I mean, if we had to do like, you know, stock market, I don't know, CSI. Well, there you go.

Exhibit B
Page 80

209.    Lordstown's stock closed on March 17, 2021, at $15.09 per share.  The Fourth Quarter 2021 results were published after markets closed on March 17, 2021, and Lordstown's conference call was also held after markets closed that day.  Defendant Burns' interview on *Squawk Box* was aired before markets opened on March 18, 2021.  The price of Lordstown's stock opened at $13.85, an 8.21% decline from the prior closing price.  During the day, Lordstown stock price continued to fall on this news, closing on March 18, 2021, at a price of $13.01—a decline of 13.78% from the prior closing price.

210.    On March 18, 2021, Morgan Stanley issued an analyst report slashing their price target for Lordstown by 33% on reduced expectations for their sales.

211.    On March 25, 2021, Lordstown published its 10-K annual report (which it would later be required to amend).  The document asserted that Lordstown would meet its previously stated production schedule.  Specifically, it stated: "We are targeting commencement of commercial production of the Endurance in September 2021 and initial sales starting in late 2021."

212.    Additionally, and critically, the 10-K disclosed that Lordstown had actually been notified of the SEC investigation almost a month before the Hindenburg Report was published.  The filing stated that "[o]n February 17, 2021, the company received a request from the SEC for the voluntary production of documents and information, including relating to the merger between DiamondPeak and Legacy Lordstown and pre-orders of vehicles.  The Company is responding to the SEC's requests and intends to cooperate with its inquiry."

213.    Similarly, the 10-K disclosed that the Lordstown was the subject of an SEC inquiry.  The 10-K stated that "on February 17, 2021, we received a request from the SEC for the voluntary production of documents and information, including relating to the merger between

66

DiamondPeak and Legacy Lordstown and pre-orders of vehicles." Notably, the 10-K followed this statement by describing two "***related***" class actions. It stated: "We are responding to the SEC's requests and intend to cooperate with its inquiry. Additionally, on March 18 and 19, 2021, two related putative class action lawsuits were filed against us and certain of our officers in the U.S. District Court for the Northern District of Ohio (Case Nos. 21-cv-616 and 21-cv-633)."

214. On May 24, 2021, Lordstown issued a press release announcing its First Quarter 2021 results. It reiterated that the "Timeline to Start of Production (SoP) in late-September 2021, which will be at limited capacity, remains on track." However, the company previewed that it was in truth facing production delays. Despite the fact that Lordstown became public and constantly promoted its production schedule even after COVID-19 had fully emerged as a global event, the company now vaguely blamed COVID-19 for production delays.

215. In the press release regarding the results, Lordstown stated, ""we do need additional capital to execute on our plans," and in the May 24, 2021 analyst call for Lordstown's First Quarter results, Defendant Burns stated "the pace of our production ramp will depend on our ability to secure additional funding," and similarly stated that "capital may limit our ability to make as many vehicles as we would like." Putting numbers on this point, Defendant Burns explained that Lordstown now planned to end the year with a mere $75-50 million of cash on hand, without additional financing, and that even meeting this expectation would require, "pursuing a conservative budget, reducing costs and delaying investments and the production would start" and that as a result, "in September would be at best 50% of the prior 2021 unit expectations."

216.     The May 24, 2020, press release was released after markets closed that day, and the analyst call was also held after markets closed.  As of the close of markets on May 24, 2020, Lordstown's stock price was $9.67, and the next day, the opening stock price was a mere $8.17—a decline of 15.51% from the prior closing price.  By the close of trading on May 25, 2021, Lordstown's stock price was at $8.95, which was still a decline of 7.45%, compared to the prior closing price.

217.     On May 27, 2021, Avise Analytics issued an analyst report questioning "Can Lordstown Motors Withstand The Latest Test Of Its Endurance" focusing on the Hindenburg Report, SEC investigation, and the company's "higher than expected forecasted expenses and lowering of the production forecast."  Similarly, on May 28, 2021, Deutsche Bank issued an analyst report recognizing that "Lordstown's business has so far been running quite differently than presented in its initial business plan."  The report explained "[o]n its 1Q earnings call this week, Lordstown guided for a 50% production cut this year without any additional financing, limiting its planned output to just ~1k units this year.  Therefore, we worry that Lordstown will be unable to get a strong enough foothold in the market in just a few short months before more well-established models enter the market."  Additionally, Morgan Stanley issued an analyst report, further slashing their price target for Lordstown by 33%, citing its "reduced forecast" and "need for outside capital."

218.     On June 8, 2021, Lordstown released an amended 10-K, disclosing that it was facing financial catastrophe.  The filing included a "going concern notice" stating that: "We require additional capital to implement our business plan, and it may not be available on acceptable terms, if at all, creating substantial doubt as to our ability to continue as a going concern."  In addition to revealing that Lordstown was on the brink of insolvency, the filing

stated that: "Our current budget only provides for limited commencement of production in 2021. Additional funding is needed for production in 2022 and beyond and to continue our ramp up to full commercial production. The amounts required may be significant."

219.    This "going concern notice" was obviously in stark contrast to Defendants' promises that the Merger provided adequate resources—not just to begin production of the Endurance, but to push production and sales forward to the point that the company would become cash flow positive and profitable.

220.    Additionally, the amended 10-K disclosed that the company had materially deficient internal controls. It stated that management had identified a "material weaknesses in internal control over financial reporting." Accompanying this disclosure was a notice that the company had developed a plan to remediate its reporting weaknesses.

221.    The amended 10-K also disclosed that Lordstown had received two subpoenas from the SEC and provided some additional details about the investigation. Specifically, the filing disclosed that: We have in the past been and may in the future be subject to, or become a party to, litigation, regulatory actions, and government investigations and inquiries. For example, we have received two subpoenas from the SEC for the production of documents and information, including relating to the Merger between DiamondPeak and Legacy Lordstown and pre-orders of vehicles. We are responding to the SEC's requests and are cooperating with its inquiry."

222.    The amended 10-K with the going concern notice and additional details about the SEC investigation was filed after the close of markets on June 8, 2021. As of the close of the market on June 8, 2021, Lordstown was trading at $11.22 a share, and at market open the next day, it was trading at $10.12—a 9.8% decline from the prior close. On June 9, 2021, the

69

Lordstown's stock price reached a daily low of $8.88, for a total decline of 20.86% compared to the prior closing price. However, on June 9, 2021, Lordstown issued a new statement that it was supposedly actively pursuing additional financing with several parties, and the share price increased on this news.

223. On June 8, 2021, RBC published an analyst report that advised that Lordstown would underperform. It focused on whether the fleet market will buy Lordstown's vehicles at levels claimed by the company, noting that the Hindenburg report had "placed increased scrutiny on RIDE's orders and management's credibility." On June 10, 2021, Morgan Stanley issued an analyst report focused on Lordstown's going concern notice. The report stated "The stock has reacted very negatively and, based on our discussions with clients, we are concerned that there has not been a greater level of consideration about the alternative use-cases for RIDE's assets." Put differently, Morgan Stanley was considering what would happen to Lordstown's assets if it were to go bankrupt, which emphasizes the dire nature of the situation.

224. On June 14, 2021, Lordstown issued a press release reporting the results of the company's internal investigation into the allegations in the Hindenburg Report. While the press release disclosed that the company was continuing to deny the Hindenburg Report's allegations regarding its production capabilities, it admitted that: "The investigation did, however, identify **issues regarding the accuracy of certain statements regarding the Company's pre-orders**."

225. The internal investigation report admitted that:

> In most instances, Lordstown Motors' pre-orders did not require a reservation or similar payment, though pre-orders submitted through a website portal required a refundable $100 payment. Lordstown Motors entered into an arrangement to pay one entity commissions for procuring pre-orders. That entity procured approximately 1,000 pre-orders and also assisted Lordstown Motors into entering into an important commercial relationship with a leading fleet management company.

70

226.    This disclosure conceded that Lordstown had paid a third-party to procure pre-orders, but itself was at odds with other publicly available information about that practice.  The third-party at issue was Climb2Glory, but Climb2Glory itself claimed to have generated 25% of Lordstown's pre-orders during a six-month period preceding March 2021, which starkly contradicts the company's claim that Climb2Glory had only procured 1,000 pre-orders.

227.    Most significantly, the internal investigation admitted that the company had made inaccurate statements regarding pre-orders.  The relevant portion of the internal investigation report is as follows:

> Lordstown Motors made periodic disclosures regarding pre-orders which were, in certain respects, **inaccurate**.
>
> Lordstown Motors has stated on several occasions that its pre-orders were from, or "primarily" from commercial fleets.  In fact, many pre-orders were obtained from (i) fleet management companies or other end users that indicated interest in purchasing Endurance trucks, similar to commercial fleets, and (ii) so-called "influencers" or other potential strategic partners that committed to attempt to secure pre-orders from other entities, but did not intend to purchase Endurance trucks directly.
>
> One entity that provided a large number of pre-orders does not appear to have the resources to complete large purchases of trucks.  Other entities provided commitments that appear too vague or infirm to be appropriately included in the total number of pre-orders disclosed.

228.    While these findings largely admitted to some of the misstatements alleged herein, Lordstown nevertheless tried to downplay the issue.  It emphasized the word "primarily," to imply that the language regarding pre-orders had typically been offset by qualifying language.  In fact, Defendant Burns' actual statements were far more emphatic.  *E.g.*, Burns: "50,000 pre-sales already, **all from fleets.**" (November 16, 2020); Burns: "**all** those numbers are just commercial fleets," Spencer: "that's **literally** just for fleets?" Burns: "Yeah.  That's just commercial fleets." (February 6, 2021); Burns: "Lordstown Motors has received approximately 50,000 non-binding production reservations **from commercial fleets** for its Lordstown

71

Endurance all-electric pickup truck" (November 16, 2020); Burns: "We sell to commercial fleets." (November 7, 2020); Burns: "more than 100,000 non-binding production reservations **from commercial fleets**" (January 11, 2021); Burns: "Our initial foray is into fleets and **we have pre-sold 100,000 of these to various fleets** across America." (February 23, 2021).

229.    Similarly, while Lordstown admitted that "[o]ne entity that provided a large number of pre-orders does not appear to have the resources to complete large purchases of trucks," it failed to disclose that many of Lordstown's other supposed customers—including several of those listed as "Selected Pre-Order Customers" in Defendants' pre-Merger investor deck and proxy materials—also were clearly not viable purchasers of any significant number of Endurance trucks.  Likewise, while the report of the special committee correctly stated: "Other entities provided commitments that appear too vague or infirm to be appropriately included in the total number of pre-orders disclosed," it failed to disclose that in many instances Lordstown was booking pre-orders from entities that had not made *any* indication of interest whatsoever, like the Mayor of City of Ravenna.

230.    Concurrently with the release of the internal investigation report, On June 14, 2021 Lordstown also issued a press release regarding the departures of Defendant Burns and Defendant Rodriguez.  The press release did not provide much detail explaining the sudden departure of the company's founder, CEO, and board Chairman and the departure of its CFO. Instead, it stated that the departures were being made "as the Company begins to transition from the R&D and early production phase to the commercial production phase of its business," which did not explain why that transition called for the immediate departure of key executives.

231.    The obvious truth was that Defendants Burns and Rodriguez had been pushed out for their roles in misrepresenting the business to the investing public.  This fact is all the more

obvious given that the company did not announce any long-term replacement for either executive – and instead left the CEO role vacant as former director Angela Strand took over as Executive Chairwoman and Becky Roof took over as "interim CFO." The notion that Defendants Burns and Rodriguez had departed as part of an orderly progression as the company transitioned to the "production phase" is completely belied by any common-sense inquiry, given that narrative would necessarily be predicated on the idea that other management would more effectively handle the new phase, whereas the company was not announcing any such new management. In fact, Lordstown operated without a CEO for more than two months, until August 26, 2021.

232. The news of the CEO and CFO "resignations" and the investigative report was released before markets opened on June 14, 2021. On the prior trading day, at the close of trading, Lordstown's stock price was $11.41. When markets opened on June 14, 2011, Lordstown's stock price was $9.39, a 17.7% decline of from the prior close. By the close of trading on June 14, 2021, Lordstown's stock price was $9.26—a staggering 18.84% decline from the prior close.

233. Before markets opened on June 14, 2021, *Seeking Alpha* wrote, "Lordstown Motors stock down 12% as CEO and CFO exit following board probe," and later in the day that publication wrote, "down sharply after this morning's bombshell double resignation of the electric truck maker's CEO and CFO. On top of that, an independent report found issues with the pre-order statements made by the company." That same day, *The Wall Street Journal* reported, "Lordstown Motors Executives Resign Amid Inaccurate Preorder Disclosures." *Bloomberg* reported, "Lordstown Motors Slumps Most Ever on CEO Exit, Misstatements."

234. Clearly worried about the sharp market reaction to the prior day's disclosures, on June 15, 2021, Lordstown made bizarre statements to the media. Defendant Schmidt claimed in

a media event that the company had "firm orders" for "two years" of production. This sent shares sharply upward. For example, *Reuters* reported that day, that Lordstown claimed it has that "has 'firm' and 'binding' orders for the first two years of production of its electric pickup truck . . . sending shares up 6.4%."

235. However, two days later, on June 17, 2021, Lordstown corrected this statement, noting that even by that date it did not have binding orders. That day *Reuters* wrote, "EV maker Lordstown backtracks to say it has no binding orders." Similarly, *The New York Times* reported that day that, "Lordstown Motors reverses itself again, telling SEC it has no 'binding' orders." In reporting on this correction, the *Detroit Tribune* noted that Executive Chairwoman Angela Strand had tried to rebuild confidence in her remarks two days prior, calling it a "new day," but that with this near immediate correction of continued misstatements, it appeared to be the "[s]hortest new day ever." The publication ZeroHedge, wrote ""Lordstown Motors Lied About "Binding" Orders, Again, Just One Day After Its CEO And CFO Resigned." That same day *Seeking Alpha* wrote, "Lordstown Motors tumbles after clarifying that it has no binding orders."

236. On July 2, 2021, *The Wall Street Journal* announced that Lordstown was under criminal investigation by the U.S. Department of Justice ("DOJ"). Citing people familiar with the matter, the article explained that the DOJ inquiry was being handled by the Manhattan U.S. Attorney's Office, *i.e.*, the office for the Southern District of New York. The article also quoted a Lordstown spokesperson, who stated that the company is committed to cooperating with any investigations and inquiries.

237. *The Wall Street Journal* article publishing this news was released mid-day on July 2, 2021. Lordstown stock price opened at $10.35 on July 2, 2021, and fell to $9.23 by close—a total same day decline of 10.8%.

74

238.    News coverage regarding revelation of the DOJ investigation was striking.  For example, on July 2, 2021, *Seeking Alpha* ran the headline, "Lordstown Motors stock falls sharply on report of DOJ probe."  That same day, CNBC wrote that the investigation was "sending shares of the embattled electric-vehicle start-up plunging."  Also that same day, *The Detroit News* ran the headline "Lordstown Motors' shares tank after WSJ reports DOJ investigation."  Similarly, *Bloomberg's* headline that day stated: "Lordstown Motors Tumbles as Justice Department Begins Probe."

239.    About two weeks later, on July 15, 2021, Lordstown disclosed additional details about the previously disclosed investigations it was facing.  Specifically, the filing disclosed that: "we have received two subpoenas from the SEC for the production of documents and information, including relating to the Merger between DiamondPeak and Legacy Lordstown and pre-orders of vehicles, and we have been informed by the U.S. Attorney's Office for the Southern District of New York that it is investigating these matters.  We have cooperated, and will continue to cooperate, with these and any other regulatory or governmental investigations and inquiries."

240.    The further revelation about the subject and status of the SEC and DOJ probes was widely covered in news articles.  For example, *Market Watch* wrote in a July 16, 2021, article that "The electric-truck startup says probe focuses on matter related to its reverse merger deal and preorders for Endurance."

241.    On July 26, 2021, Lordstown announced that it has secured a source of some additional financing for the company.  The technologies publication *TechCrunch* aptly published a July 26, 2021, article titled "Troubled EV company Lordstown Motors gets $400M lifeline in stock-sale agreement."

242. On August 11, 2021, Lordstown published a press release announcing its Second Quarter 2021 results. The press release regarding the results claimed that the company would "[b]egin[] limited vehicle production in late September," a far cry from its prior and repetitive disclosures that it would be in full production by September. Similarly, the press release stated that "production in 2021 will be limited to coincide with commercialization roadmap," which again contradicted the prior claims that the company would be in full production by September 2021.

243. Furthermore, in the August 11, 2021, press release, the company stated that it would not even "complete vehicle validation and regulatory approvals [until] December and January," meaning that while "limited" *production* might begin in September, meaningful vehicle sales would be delayed until well after then. Furthermore, even once the company began selling vehicles in 2022, it apparently was only expecting "selected early customers in Q1 in advance of commercial deliveries in early Q2."

244. On August 13, 2021, Lordstown filed a Form 10-Q about its previously released Second Quarter results. This filing reiterated much of the information disclosed two days prior. However, it notably also included a renewed "going concern" notice. The disclosure noted the capital raising activity that the company conducted the prior month, but concluded: "notwithstanding management's plans and efforts to date, there continues to be substantial doubt about our ability to continue as a going concern."

245. On August 26, 2021, Lordstown announced that—more than two months after the resignations of Defendants Burns and Rodriguez—it had finally selected a new CEO, Daniel Ninivaggi. Mr. Ninivaggi was previously an executive working at Carl Icahn's business Icahn

Enterprises, but who has not held a full-time job since August 2019, according to his LinkedIn profile.

## V. ADDITIONAL ALLEGATIONS

### A. False and Misleading Statements

246. Plaintiffs allege that the statements highlighted in ***bold and italics*** within this Section were materially false, misleading, and omitted to disclose material information. In some instances, graphical material is alleged to be false and misleading and no bold and italic text has been applied. As alleged herein, the false and misleading statements artificially inflated or artificially maintained the price of the Lordstown Securities. As described below, Defendants created an impression of a state of affairs related to the company's pre-orders and production capabilities that differed in a material way from the one that actually existed.

247. Each statement attributed to Defendant Burns prior to the close of the Merger was also made by Defendant Lordstown EV Corporation, which was known at the time as Lordstown Motor Corp., and each statement attributed to Defendant Burns after the close of the Merger, was also made by Defendant LTM, in both cases because he was speaking on behalf of the relevant entity as its CEO and chairman of its board. Each statement by Defendant Hamamoto was also made by Defendant LTM, which prior to the Merger closing was known as DPHC, because he was speaking as its CEO and the chairman of its Board. Each statement contained in a public filing, presentation, or press release issued by an entity was made by that entity. Throughout this Section, entities are referred to by their name at the time that the statement was made. The use of three asterisks in the middle of a quoted passage signifies the omission of a paragraph. That a statement is not included in this Section or marked as false and misleading in this Section does not imply its accuracy. The reference to a statement being "misleading" includes statements that are misleading due to the omission of truthful information.

77

### (1) Statements Concerning Lordstown's Supposed Pre-Orders

248.    Statements touting the number of pre-orders obtained by Lordstown were false and misleading for the following reasons, both together and individually: (a) Lordstown did not have any pre-orders and instead had non-binding letters of intent; (b) Lordstown counted pre-orders from entities that did not sign letters of intent to buy the Endurance, either because they had not signed any LOI at all or because they had signed a LOI with Workhorse to buy an entirely different truck and had not agreed to buy the Endurance; (c) Lordstown counted pre-orders from businesses that could not plausibly be expected to order the listed number of trucks; (d) Lordstown counted pre-orders from entities that merely operated as intermediaries for ultimate purchasers, or who had no such operations but sought to open such lines of business, even though such orders could not reasonably be counted as pre-orders, and even though Defendant Burns expressly claimed all orders were from "fleets," when such intermediaries do not own or operate fleets; (e) Lordstown counted pre-orders from LOIs obtained by Workhorse, even though the conditions precedent for Lordstown to receive such pre-orders had not been satisfied; and (e) Lordstown counted pre-orders from persons and entities that Lordstown knew or was reckless in not knowing did not intend to order Endurance trucks or the number of trucks Lordstown used in its count.  The number of pre-orders was material because it was a key fact broadcasted to investors, served as a signal of demand for the Endurance, served as a signal of expected future revenues, served as an indicator of industry opinions of Lordstown and the Endurance, and served as an indicator of the capabilities and success of Lordstown's sales and marketing functions.

249.    On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC that included a press release issued by Lordstown and DPHC, and this press release included statements made by Burns.  Thus, DPHC, Lordstown and Burns stated the following:

78

Exhibit B
Page 93

Steve Burns, Founder and Chief Executive Officer of Lordstown, commented, "We are thrilled with the opportunity to build Lordstown Motors into a top-tier electric truck company that is highly differentiated from the competition. We are uniquely positioned to be a leader in the industry, with our first vehicle, the revolutionary Lordstown Endurance. Our all-electric full-size pickup truck delivers the equivalent of 75 miles per gallon and has been systematically engineered and competitively priced specifically for the large commercial fleet market, which includes companies in manufacturing, contracting, utilities, transportation and delivery, and agriculture, among others. ***Since its unveiling just over a month ago, the Endurance has been met with enthusiastic support, and to date, we have secured $1.4 billion of pre-orders***. Our platform is rooted in sustainability, and the entire Lordstown team is committed to ensuring we contribute to a healthier planet for generations to come."

\* \* \*

***Lordstown unveiled the prototype of its flagship Endurance pickup truck on June 25, 2020, and to date, has received more than 27,000 pre-orders for the vehicle representing over $1.4 billion of potential revenue, primarily from commercial fleet customers.***

250. The statement(s) in the prior paragraph touted Lordstown's supposed pre-orders and therefore was false and misleading for the reasons set forth in paragraph 248. Furthermore, the statements were especially misleading because the use of the words "secured" and "received" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them. In addition, the statements were especially misleading by representing that the pre-orders came "primarily" from "commercial fleet customers," because it implied that Lordstown was receiving reliable orders representing true demand from its target market. This was untrue as the number of pre-orders was completely fabricated, and at a minimum, involved a significant number of fabricated orders from individuals and non-fleet organizations.

79

Exhibit B
Page 94

251.    On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC that included an investor presentation issued by Lordstown, and thus DPHC and Lordstown made the statements therein.  The presentation included the following graphic, which contains false and misleading statements:



252.    The statement(s) in the prior paragraph touted Lordstown's supposed pre-orders and therefore was false and misleading for the reasons set forth in paragraph 248.  Furthermore, it was especially misleading to boast that the pre-orders had come from a number of established companies when these pre-orders were highly fabricated.  For example, the purported pre-orders from "Selected Pre-Order Customer[]," Grid-X, were baseless as Grid-X had indicated they were "completely unaware" of the deal when asked about it, and that the inquiry was "the first time" they had heard about it.

253.    On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC that included an investor presentation issued by Lordstown.  The presentation included the following graphic, which contains false and misleading statements:

80

254.     The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248.  Furthermore, Defendants' claim that demand is "proven" was highly misleading as the basis for the purported demand was fabricated pre-orders.

255.     On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included an investor presentation issued by Lordstown.  The presentation stated: "*~$1.4bn of Existing Pre-Orders*."

256.     The statement in the prior paragraph touted Lordstown's supposed pre-orders and therefore was false and misleading for the reasons set forth in paragraph 248.  Furthermore, the statement was especially misleading because the use of the word "existing" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

257.     On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included an investor presentation issued by Lordstown.  Additionally, the following statement was also made by Defendant Flannery, because he provided or allowed his image to be

81

used in propagating the statement, in a way that conveyed his assent to the statement being made. The presentation included the following graphic, which contains false and misleading statements:



- Sales team run by Caimin, consists of internal and external representatives
- Marketing efforts are at an early stage, however existing pre-orders have been achieved with minimal marketing costs

Caimin Flannery

258. The statement in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. Furthermore, the statements were especially misleading because the use of the word "existing" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them. In addition, the statement that the pre-orders were "achieved with minimal marketing costs" is further misleading as it conveys that the pre-orders could be further increased once marketing is increased and because Lordstown had engaged in substantial and expensive marketing, including paying Climb2Glory lofty commissions to procure totally non-binding LOIs.

259. On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included an investor presentation issued by Lordstown. The presentation stated: "*Significant Pre-Orders Received*."

260. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore was false and misleading for the reasons set forth in paragraph 248. Furthermore, the statement was especially misleading because the use of the word "received" implied that the

pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign any LOI at all (binding or otherwise), or was clearly not in a position to order the number of trucks Lordstown was counting from them.

261.    On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included an investor presentation issued by Lordstown.  The presentation included the following graphic, which contains false and misleading statements:

> Lordstown has already received ~27k orders (average order size of ~300 trucks) before the first vehicle has been produced, representing potential revenue sufficient to cover 2021 production and into 2022

262.    The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248.  Furthermore, the statement that "Lordstown has *already received . . . orders*" was especially misleading because it implied that the pre-orders were concrete, when in reality, the purported "orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

263.    On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included a transcript of a conference call that Defendants Burns and Hamamoto participated in.  The following statement was uttered by Defendant Burns during that call:

> We are uniquely positioned as a leader in the pickup truck industry with the revolutionary Lordstown Endurance, an all-electric full-size pickup truck that delivers the equivalent of 75 miles per gallon, total EV range of 250 miles and a towing capacity of an impressive 7,500 pounds.  One of the most unique elements of the vehicle is its innovative in-wheel drive system, the first of its kind in a commercial vehicle.  Equipped with hub motors in each wheel, and seamlessly integrated with our software system, we are effectively able to deliver a motor and

83

mind in each wheel – benefiting efficiency of the vehicle and driver experience. This has long been sought after in the automotive industry, and we're excited to be the first to accomplish this major innovation. ***We appreciate the support by our world-class partners who are evidencing their confidence in this technology with significant pre-order activity.***

\* \* \*

We officially unveiled the Endurance in late-June. The Endurance was met with great excitement and acclaim, and ***we now have garnered significant demand with pre-orders totaling approximately 27,000 vehicles since inception, representing more than 1.4 billion dollars of potential revenue. We hear from many fleets who cannot wait to get their hands on the Endurance***. The electric vehicle market is expected to grow significantly the next decade, underlying our expectations of selling more than 100,000 vehicles per year by 2024.

264. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. Furthermore, the statement that Defendants "have garnered significant demand" is highly misleading as the basis for the purported demand was fabricated pre-orders. In addition, the statements were especially misleading by representing that "many fleets" "cannot wait to get their hands on the Endurance" because it implied that Lordstown was receiving reliable orders representing true demand from its target market. This was untrue as the number of pre-orders was completely fabricated, and at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations. Additionally, the reference to the "pre-order activity" as "significant" was false and misleading given that the pre-orders were non-binding and from sources that did not credibly evidence demand at the level Lordstown was claiming.

265. On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included a transcript of a conference call that Defendants Burns and Hamamoto participated in. The following statement was uttered by Defendant Hamamoto during that call:

The Lordstown Endurance is a full sized electric pick-up truck, which utilizes the revolutionary hub motor design that is expected to be the first electric pick-up truck to market. ***Lordstown has attracted a clear lane of customers in the commercial***

84

*fleet segment of the market, as evidenced by its $1.4 billion dollars of pre-orders to-date*, with a product that has a significant total cost of ownership advantage over competitors in both traditional and electric trucks, supports sustainable clean energy, and has a simple design that provides a robust, safe and stable ride.

266. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. Furthermore, the statements were especially misleading by representing that Lordstown had "a clear lane of customers in the commercial fleet segment of the market" because it implied that Lordstown was receiving reliable orders representing true demand from its target market. This was untrue as the number of pre-orders was completely fabricated, and at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

267. On August 3, 2020, after markets closed, Defendant Burns appeared for an interview on CNBC. During that interview, he stated: "*We got 27,000 orders. We got customers really really wanting the truck.*"

268. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. Furthermore, the statement that "*We got 27,000 orders*" is especially misleading because it implied that the pre-orders were concrete, when in reality, the purported "orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them. In addition, the statements were especially misleading by representing that "customers really really want[ed] the truck." This was not the case as the number of pre-orders was highly fabricated.

85

269. On August 5, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included a transcript of Defendant Burns' August 3, 2020, interview with CNBC. Thus, DPHC made the same false statements for the same reasons listed in paragraphs 268.

270. On August 24, 2020, before markets opened, DPHC filed proxy materials with the SEC. This material substantively began with a letter signed by Defendant Hamamoto encouraging shareholders to read the proxy materials and vote, and thus he and DPHC are makers of the following statement therein:

> To date, **Lordstown has received pre-orders from fleet operators to purchase approximately 27,000 Endurance vehicles.** These pre-orders are not binding and did not require any deposit, so there can be no assurance that Lordstown will successfully convert them into binding orders or sales. It is possible that a significant number of customers who submitted pre-orders may cancel or delay their pre-orders.

271. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. Furthermore, the statements were especially misleading because the use of the word "received" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them. In addition, the statements were especially misleading by representing that the pre-orders came "from fleet operators," because it implied that Lordstown was receiving reliable orders representing true demand from its target market. This was untrue as the number of pre-orders was completely fabricated, and at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

272.    On August 24, 2020, before markets opened, DPHC filed proxy materials with the SEC.  This material substantively began with a letter signed by Defendant Hamamoto encouraging shareholders to read the proxy materials and vote, and thus he made the following statement therein:

> Growing Sales.  If Lordstown is able to complete the foregoing actions consistent with expectations, Lordstown anticipates it will be able to commence full production in 2021 with a target of 2,200 vehicles produced and sold in the year. ***Lordstown currently has pre-orders from fleet operators to purchase 27,000 vehicles***.  Although these pre-orders are nonbinding and did not require any deposit, ***Lordstown believes they demonstrate clear demand that will lead to binding orders once the Endurance is complete and potential customers are able to see firsthand the value that it offers***.  As described in the Business Combination section above, Lordstown also expects to ramp up its sales and marketing efforts following the Business Combination, which have been limited to date.

273.    The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons in paragraph 248.  Furthermore, the statements were especially misleading because the use of the word "currently" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.  In addition, the statements were especially misleading by representing that the pre-orders came "from fleet operators," because it implied that Lordstown was receiving reliable orders representing true demand from its target market.  This was untrue as the number of pre-orders was completely fabricated, and at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

274.    On September 24, 2020, Lordstown participated in an event hosted by The Transportation and Innovation Partners, and a recording of the event was broadcast over the

87

internet.  During the event Defendant Flannery spoke on Defendant LTM's behalf.  While presenting the following graphic, Flannery stated, "*we have as was announced yesterday in the paper when the Endurance was shown at Columbus, Ohio that our estimates [are] that we have up to 40,000 pre-orders for the Endurance, which again reiterates the demand in the fleet area.  And these are some of the, the entities that have been working very closely with us.*"  The graphic Defendant Flannery referenced was as follows:



275.    The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248.  Furthermore, it was especially misleading to claim Defendants had been "working very closely with" several "Selected Pre-Order Customers," as, for example, Grid-X had indicated they were "completely unaware" of the deal when asked about it, and that the inquiry was "the first time" they had heard about it.

276.    On September 28, 2020, President Trump met with Defendant Burns and stated, referring to the Endurance, "*I heard the sales are great.*"  Defendant Burns stood next to President Trump, did not correct or modify this statement, and nodded repeatedly in agreement and thus can be deemed a maker of the statement uttered by President Trump, and/or made the statement of affirming President Trump's statement.  The event was broadcast by news services including C-SPAN.

88

277. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore was false and misleading for the reasons set forth in paragraph 248. Furthermore, the acknowledgment of "sales" was especially misleading because it, at a minimum, implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

278. On October 8, 2020, before markets opened, DPHC filed proxy materials with the SEC. These materials substantively began with a letter signed by Defendant Hamamoto encouraging shareholders to read the proxy materials and vote, and thus he made the following statement therein. Additionally, the proxy statement itself was signed by Defendant Hamamoto. The proxy materials stated:

> To date, Lordstown has **received pre-orders primarily from fleet operators to purchase over 38,000 Endurance vehicles**. These pre-orders are not binding and did not require any deposit, so there can be no assurance that Lordstown will successfully convert them into binding orders or sales. It is possible that a significant number of customers who submitted pre-orders may cancel or delay their pre-orders.

279. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. Furthermore, the statements were especially misleading because the use of the word "received" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or was clearly not in a position to order the number of trucks Lordstown was counting from them. In addition, the statements were especially misleading by representing that the pre-orders came "primarily from fleet

89

operators," because it implied that Lordstown was receiving reliable orders representing true

demand from its target market.  This was untrue as the number of pre-orders was completely

fabricated, and at a minimum, involved a significant number of made-up orders from individuals

and non-fleet organizations.

280.    On October 8, 2020, before markets opened, DPHC filed proxy materials with the

SEC.  This material substantively began with a letter signed by Defendant Hamamoto

encouraging shareholders to read the proxy materials and vote, and thus he made the following

statement therein.  Additionally, the proxy statement itself was signed by Defendant Hamamoto.

The proxy materials stated:

> Growing Sales.  If Lordstown is able to complete the foregoing actions consistent with expectations, Lordstown anticipates it will be able to commence full production in 2021 with a target of 2,200 vehicles produced and sold in the year. ***Lordstown currently has pre-orders primarily from fleet operators to purchase 38,000 vehicles.***  Although these pre-orders are nonbinding and did not require any deposit, ***Lordstown believes they demonstrate clear demand that will lead to binding orders once the Endurance is complete and potential customers are able to see firsthand the value that it offers.***  As described in the Business Combination section above, Lordstown also expects to ramp up its sales and marketing efforts following the Business Combination, which have been limited to date.

281.    The statements in the prior paragraph touted Lordstown's supposed pre-orders

and therefore were false and misleading for the reasons set forth in paragraph 248.  Furthermore,

the statements were especially misleading because the use of the word "currently" implied that

the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but

concrete and often, for example, were based on supposed deals where the persons or entities

signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position

to order the number of trucks Lordstown was counting from them.  In addition, the statements

were especially misleading by representing that the pre-orders came "primarily from fleet

operators," because it implied that Lordstown was receiving reliable orders representing true

90

demand from its target market. This was untrue as the number of pre-orders was completely fabricated, and at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

282. On October 26, 2020, during the trading day, *The Detroit News* published an article that included statements from Defendant Burns. The statements were not written as exact quotes from Burns, but conveyed his statements as follows:

> ***Burns was surprised when he got up to 40,000 orders. Now he's got to make more vehicles faster than expected, and he's hired about 200 folks to help make it happen, including former Tesla Inc. employees.***

283. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. Furthermore, that Defendant Burns stated he was "surprised" that Lordstown received 40,000 orders was highly misleading as it implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

284. On October 26, 2020, during the trading day, *The Detroit News* published a video of Burns discussing Lordstown. Defendant Burns stated: "Next September deliveries start. ***We have pre-sold 40,000 of them to fleet customers already and we expect that number to increase dramatically between now and then***."

285. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. Furthermore, the statements were especially misleading because the use of the word "*pre-sold*" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities

91

signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

286. On October 26, 2020, the Youngstown *Business Journal* published an article including statements by Defendant Burns. The article stated: "***Burns said the company has received 40,000 in pre-orders for The Endurance, which is targeted initially for the commercial fleet market.***" It also quoted Burns as saying, "***We didn't expect that much that quickly***," and as saying, "***It's just a pent-up demand. Fleets are bypassed by the electrification effort – there are a lot of passenger cars coming but nothing for fleets.***"

287. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. The statement was also misleading because it claimed the pre-orders were "just a pent-up demand," further implying the pre-orders were credible reflections of demand, when in fact they were highly fabricated, and reflected Lordstown's heavy use of marketing, including paying Climb2Glory hefty commissions to generate entirely non-binding orders, and when they reflected indications of interest between Workhorse and potential customers. Furthermore, the statements were especially misleading because the use of the word "received" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or was clearly not in a position to order the number of trucks Lordstown was counting from them.

288. On October 27, 2020, during the trading day, Defendant Burns participated in an interview on *Fox Business*. During that interview Burns was asked, "when can I actually buy

92

one?" and Burns responded: "***You can buy one now, but you can take delivery in September.***"

Later that day Defendant LTM's official Twitter account posted a link to that interview.

289.     The statement in the prior paragraph was false and misleading because, in the context of Defendants' repeated statements about the pre-order numbers it falsely conveyed to investors that those pre-orders represented people or companies "buy[ing]" the trucks, when in reality Lordstown was not selling any trucks at the time and was only gathering non-binding letters of intent.

290.     On November 12, 2020, after markets closed, Defendant LTM filed an S-1 Registration Statement with the SEC.  That filing stated: "***We currently have pre-orders primarily from fleet operators to purchase over 44,000 vehicles***, which pre-orders are nonbinding and did not require any deposit.  We expect to ramp up our sales and marketing efforts, which were limited prior to the Business Combination."

291.     The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248.  Furthermore, the statements were especially misleading because the use of the word "currently" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.  In addition, the statements were especially misleading by representing that the pre-orders came "primarily from fleet operators," because it implied that Lordstown was receiving reliable orders representing true demand from its target market.  This was untrue as the number of pre-orders was completely

93

fabricated, and at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

292. On November 16, 2020, before markets opened, Defendant LTM filed a Form 8-K with the SEC, attaching a press release. The press release stated:

> *Lordstown Motors has received approximately 50,000 non-binding production reservations from commercial fleets for its Lordstown Endurance all-electric pickup truck, with an average order size of approximately 500 vehicles per fleet. This figure does not capture interest the company has received from organizations that are not in position to be able to place pre-orders, such as federal, state and municipal governments, and military fleets.* Deliveries of the Lordstown Endurance are expected to begin in September 2021, with full production ramping up throughout 2022.

293. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. Furthermore, the statements were especially misleading because the statement, "received . . . production reservations from commercial fleets" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them. In addition, the statement that the 50,000 pre-order figure does not capture interest from others that are not in a position to place pre-orders is especially misleading because it implies that pre-orders could be even higher, when in reality, the "received" pre-orders were already highly fabricated.

294. On November 16, 2020, Defendant Burns participated in an interview hosted by the investor website *IPO Edge*. During the interview, Burns stated:

> Today we announced a couple big things. *Demand, like you said, 50,000 pre-sales already, all from fleets. That's just the commercial sector. Does not count military or police departments, municipalities, state vehicles, so really just to have that many commercial vehicles sold already is a big deal*.

94

Exhibit B
Page 109

295. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. Furthermore, the statements were especially misleading because the use of the word "*pre-sales*" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them. In addition, the statements were especially misleading by representing that the pre-orders came "all from fleets," because it implied that Lordstown was receiving reliable orders representing true demand from its target market. This was untrue as the number of pre-orders was completely fabricated, and at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations. Also, the statement that the 50,000 pre-order figure only represents the "commercial sector" and "[d]oes not count" other potential customers was wildly misleading as it implies that pre-orders could be even higher, when in reality, the "received" pre-orders were already highly fabricated.

296. On November 16, 2020, Defendant Burns participated in an interview hosted by the investor website *IPO Edge* and failed to correct the interviewer who confirmed the recent update of pre-orders was 50,000. The following is an excerpt of that interview:

> **Interviewer**: Well, let's talk about your product, the pickup truck that you mentioned, and the demand now. ***I think the last update was 40,000, so now we're hearing today it's up to 50,000***, which congratulations on all that. Where is the demand coming from?
>
> **Burns**: This is a full size truck. In pickup truck world, there's two classes, full size and mid size. Full size is what the Ford 150, the Silverado, and the Ram are. I think most people know that the Silverado, the Ram, and the 150 represent number one, number two, and number three best selling vehicles in America. If the number one, number two, and three best selling vehicles don't even have a mild hybrid, right and we're coming with a full electric, we're enjoying the pent up demand. I

95

don't know if it's going to be this aggressive all the time, but to a fleet operator that's getting 15 miles per gallon in a pickup truck, and they have to use a pickup truck for their vocation, and every thing's completely passed them by with all this electrification and all the sedans and SUVs coming out, but no work trucks, so it's coming from almost. We have to look, but we just got an order for 400 vehicles from an agriculture company. . . I think everybody has been behind a pickup truck in traffic and noticed all the different things people do with a pickup truck, so it's a best selling consumer vehicle, it's a best selling fleet vehicle, so it's just a natural that we would see this demand.

297. The statement(s) in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248.

298. On November 16, 2020, Defendant Burns participated in an interview hosted by the investor website *IPO Edge*. During the interview, Burns was asked if he could "talk about where that demand might be coming from," and Burns responded:

> ***We got everybody, the bulk of them, our average order is about 500 trucks per order, so larger fleets.*** But we have a landscaper with three trucks. Really, it's very... since we are on par, the initial purchase price is the same as if they'd bought a gas truck. They start making money on fuel and maintenance the first day. To a landscaper, it's significant. Really, they're even more in tune to it. What we were seeing is small businesses that use trucks, and you tell them, you start making a thousand dollars a month savings, it's significant.

299. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248.

300. On November 17, 2020, Burns appeared on the CNBC television program *Mad Money* with Jim Cramer. An excerpt of the interview is provided below:

> **Burns**: ***We sell to commercial fleets. That's our first customer. And like you said, we've already got 50,000 pre-orders. And when you sell to fleets, we couldn't do what most EV companies are doing, where you come out with the luxury price point and move downstream.*** A fleet guy would get fired for buying a luxury truck. So we had to come out on par with the gas trucks pricing, and to do that, we had to invent a new drive train. And that drive train had to be reasonably priced, but rough and tough enough, what people expect of a modern day pickup truck. They think it should be able to climb a wall and haul and tow. So we used hub motors, which are, if you think of a Lime or a Bird scooter, right? There's no motor with a sprocket and a chain going to the back. The motor's in the wheel. And so we have very large versions of that. And as a result, we didn't just kind of

96

make a pickup truck to compared to, let's say a Ford 150, we really feel it's better on almost every metric.

**Cramer**: It seems as if some of these orders, the 50,000 are from solid, Duke Energy, FirstEnergy. These people are not going to be walking away? They are committed?

**Burns**: *Right. Yeah. All of them. When you order, I think our average order size is about 500 trucks at a time. And as most of them were signed by the CEOs of these large firms, and bringing in 500 electric vehicles into your fleet, it's not trivial. So you've got to plan all the charging and everything. So it's very serious orders.*

301. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. Furthermore, the statements were especially misleading by representing that the pre-orders came from fleets because it implied that Lordstown was receiving reliable orders representing true demand from its target market. This was untrue as the number of pre-orders was completely fabricated, and at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

302. On December 2, 2020, during the trading day, Defendant Burns participated in a conference call hosted by Credit Suisse. During the conference call Burns stated:

*[W]e sell to fleets.* I learned this at my previous company at Workhorse fleets are in big chunks. They only buy if the duty cycle that need matches your duty cycles. So you get happy customers and you can kind of control your geographical layout to make sure you have support centers where they need them. So that's why we like fleets. *We have 50,000 pre-orders already well, well in advance of what we, what we thought we would have.* We compete mostly with internal combustion engine vehicles.

303. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. Furthermore, the statements were especially misleading because the statement that Lordstown has "50,000 pre-orders already well, well in advance of what we, what we thought we would have," implied that

97

the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but

concrete and often, for example, were based on supposed deals where the persons or entities

signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position

to order the number of trucks Lordstown was counting from them.  In addition, the statements

were especially misleading by representing that Lordstown "sell[s] to fleets," because it implied

that Lordstown was receiving reliable orders representing true demand from its target market.

This was untrue as the number of pre-orders was completely fabricated, and at a minimum,

involved a significant number of made-up orders from individuals and non-fleet organizations.

304.  On December 2, 2020, during the trading day, Defendant Burns participated in a

conference call hosted by Credit Suisse.  During the conference call a Credit Suisse analyst asked

Burns: "How do you, how do you find these, these fleet buyers?"  and Defendant Burns

responded:

> [I]t's been almost all incoming.  We're just starting to build out the sales team.  ***So we've been able to do, again, these 50,000, pre-orders just by incoming the pent up demand.***  These fleets have watched all the electrification coming . . . and there's been nothing for them.  So the, the, the pent up demand, I don't know if it'll always be this robust, it's very, very strong.  ***And the 50,000 doesn't include state vehicles, municipal vehicles, police vehicles, military vehicles.  It's just, that's just on the commercial side.  And so we, you know, we just it's spread across all different disciplines.  Our average order is about 500 vehicles per order.  So that's larger fleets.***

305.  The statements in the prior paragraph touted Lordstown's supposed pre-orders

and therefore were false and misleading for the reasons set forth in paragraph 248.  Furthermore,

the statement that the 50,000 pre-order figure only represents the "commercial side" and does not

include other potential customers is especially misleading as it implies that pre-orders could be

even higher, when in reality, the pre-orders were already highly fabricated.  The statement was

also misleading because it claimed the pre-orders were "almost all incoming," further implying

the pre-orders were credible reflections of demand, when in fact they were highly fabricated, and

98

reflected Lordstown's heavy use of marketing, including paying Climb2Glory hefty commissions to generate entirely non-binding orders, and when they reflected indications of interest between Workhorse and potential customers.

306.    On December 4, 2020, after markets closed, Lordstown filed a prospectus with the SEC.  The prospectus stated that: "*As of the date of this prospectus, we have received pre-orders primarily from fleet operators to purchase approximately 50,000 Endurance vehicles.*"

307.    The statement in the prior paragraph touted Lordstown's supposed pre-orders and therefore was false and misleading for the reasons in paragraph 348.  Furthermore, the statement was especially misleading because the use of the word "received" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.  In addition, the statements were especially misleading by representing that the pre-orders came "primarily from fleet operators," because it implied that Lordstown was receiving reliable orders representing true demand from its target market.  This was untrue as the number of pre-orders was completely fabricated, and at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

308.    On December 21, 2020, after markets closed, Defendant LTM filed a Form 8-K with the SEC.  This filing stated: "*[Lordstown] has received 80,000 non-binding reservations for the Endurance to date.*"

309.    The statement in the prior paragraph touted Lordstown's supposed pre-orders and therefore was false and misleading for the reasons set forth in paragraph 248.  Furthermore, the

statement was especially misleading because the use of the word "received" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

310. On December 21, 2020, while markets were open, Defendant LTM posted the following false and misleading message via its Twitter account:





311. The statement in the prior paragraph touted Lordstown's supposed pre-orders and therefore was false and misleading for the reasons set forth in paragraph 248. Furthermore, this statement was especially misleading because it referred to the 80,000 figure as a "milestone" signifying that it was an important metric, when in reality it did not meaningfully represent actual demand for the Endurance.

312. On January 11, 2021, before markets opened, Defendant LTM issued a press release that included the following statement, including statements attributed to Defendant Burns:

100

Lordstown Motors Corp. (Nasdaq: RIDE), ("Lordstown Motors"), an emerging OEM producing electric light duty trucks focused on the commercial fleet market, has ***received more than 100,000 non-binding production reservations from commercial fleets for its Lordstown Endurance™ all-electric pickup truck, with an average order size of nearly 600 vehicles per fleet.***

***"Receiving 100,000 pre-orders from commercial fleets for a truck like the Endurance is unprecedented in automotive history*,"** said Steve Burns, CEO of Lordstown Motors. "***Adding in the interest we have from federal, state, municipal and military fleets on top of that, I think you can see why we feel that we are about to revolutionize the pickup truck industry.***"

313. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. Furthermore, the statements were especially misleading because the use of the words "received" and "production reservations" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them. In addition, the statements were especially misleading by representing that the pre-orders came "from commercial fleets," because it implied that Lordstown was receiving reliable orders representing true demand from its target market. This was untrue as the number of pre-orders was completely fabricated, and at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations. Also, the statement conveys that the 100,000 pre-order figure does not include government fleets, which is wildly misleading as it implies that pre-orders could be even higher, when in reality, the "received" pre-orders were already highly fabricated.

314. On January 14, 2020, while markets were open, Defendant LTM posted the following false and misleading message via its Twitter account:



**Lordstown Motors** ✔ @LordstownM... · Jan 14 ···
After receiving more than 100,000 non-binding production reservations from commercial fleets, Lordstown advanced talks for U.S. retooling loan for EV truck factory. Read more from @Reuters below. #RideWithLordstown #Workforit

315. The statements in the prior paragraph was false and misleading because it claimed that Lordstown's had 100,000 reservations when in fact it was including within that number LOIs that had been made with parties to Workhorse, supposed reservations where no LOI existed at all, supposed reservations where the counter-party either was not plausibly in a position to order the stated number of trucks or where the counter-party had indicated they were unlikely to order the stated number of trucks. Furthermore, the statement was false and misleading because the statement claimed the "reservations" were from "fleets" when they were often from non-fleet organizations, including non-profits that did not operate fleets and intermediaries that did not operate fleets.

316. On January 28, 2021, before markets opened, Defendant LTM issued a press release stating: "[W]e remain on track to meet our September start-of-production timeline *while continuing to see indicators of strong demand.*"

317. The statement in the prior paragraph touted Lordstown's supposed pre-orders and therefore was false and misleading for the reasons set forth in paragraph 248. Furthermore, that Defendants claimed demand was "strong" was highly misleading, as the basis for the purported demand was fabricated pre-orders.

318. On February 6, 2021, while markets were open, Defendant Burns appeared for an interview on the popular investment YouTube Channel "Jack Spencer Investing." The following is an excerpt of that interview:

Exhibit B
Page 117

**Spencer**: So I remember, I think the first number we had from you guys was when the initial investor presentation came out with something around like 28,000. And then I remember it just kept going up and up and up. And it was just, it was immense.

**Burns**: *Yeah. Yeah. And again, all those numbers are just commercial fleets. That doesn't count municipality, state vehicles, federal vehicles, military vehicles, all those folks use a lot of pickup trucks. And most of them use them in a local fashion, so the range is perfect for them. So they can't do pre-orders. They're government entities. So that a hundred thousand that we've announced doesn't even count all that.*

**Spencer**: Yeah, jeez. So that's literally just for fleets?

**Burns**: *Yeah. That's just commercial fleets.*

**Spencer**: I don't think anybody's going to be upset to hear that piece of news though. That's awesome. And what's the average order at now? Was it 600, the latest one?

**Burns**: *Yeah. That's on the commercial side.*

**Spencer**: 600 on the commercial side. And would there be a few bigger names in there that you can share or would it be a lot of bits and pieces going on?

**Burns**: *Well, I think we just shared a few of them. Like Duke Energy was a big one. ServPro was a big one. I think we're either going to give a list of them or name a few more key other ones, but right now we're trying to keep it as a big number. And for our purposes, the reason you do pre-orders, this business of tooling up, all the money you spend on tooling, you tool based on how many you're going to sell.* And let's say it's a normal business and you get caught by surprise and people want your product more than you had planned to build. You find a way. In this business, it's a year lag time. You've got to plan a year ahead of time. And I think Musk invented this and it's really brilliant. Let's give them a good feel for what this vehicle is and ask them, "Would you order it if we make it for this price in this timeframe, and these specs?" And that lets us know. That appetite lets us know what to tool for. *So we've been really surprised by these numbers. So we are then trying to prepare to build more than we originally had planned.*

\* \* \*

**Burns**: Well, all I can tell you is these big ones, if a company to orders 600 pre-orders, that is signed by the CEO of that company all likelihood or at least some C-suite person. They take it very seriously. They've got to figure out how they're going to layer these electrics in there. And the appetite for them to do that way early like that, a year out from some of them means they're trying to do their part to ensure this comes to market. So they're standing behind it and they're putting

103

Exhibit B
Page 118

these pre-orders in. But I'd say it's much stickier than a consumer putting a hundred dollars down refundable down on a Cybertruck, let's say. *And I think these orders are very, very sticky because I know what it takes to get them, the education you have to do. This isn't somebody again on a website, a hundred bucks, refundable with a credit card. This is a fleet. And fleets generally take their business very, very seriously. So I think they're very sticky*.

319. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. Furthermore, the statements were especially misleading by characterizing the pre-orders as "very, very sticky," which implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them. In addition, the statements were especially misleading by representing that the pre-orders came entirely from "commercial fleets," because it implied that Lordstown was receiving reliable orders representing true demand from its target market. This was untrue as the number of pre-orders was completely fabricated, and at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations. Also, the statement conveys that the 100,000 pre-order figure does not include government fleets, which is wildly misleading as it implies that pre-orders could be even higher, when in reality, the "received" pre-orders were already highly fabricated.

320. On February 17, 2021, Lordstown hosted a news conference. During that conference, on behalf of Defendant LTM, Chris Kerzich, claimed: "*demand for the Endurance has been overwhelming. And so we have a really interesting market of, of the fleet commercial user. Right now we have over 100,000 pre-orders for the Endurance*."

104

Exhibit B
Page 119

321.    The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248.  Furthermore, the statements were especially misleading by representing that demand was "overwhelming" and from "fleet commercial user[s]" because it implied that Lordstown was receiving reliable orders representing true demand from its target market.  This was untrue as the number of pre-orders was completely fabricated, and at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

322.    On February 17, 2021, Lordstown hosted a news conference.  During that conference, on behalf of LTM, Chris Kerzich, claimed: "**as we stated earlier, we have overwhelming demand for commercial, from commercial users for this vehicle – over a hundred thousand pre-orders, uh, right now it's gonna take us a couple of years to fulfill that demand.  We are really trying to ramp up as fast as we can to, to meet the demand**."

323.    The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248.  Furthermore, the statements were especially misleading by representing that Lordstown had "overwhelming demand" from "commercial users" because it implied that Lordstown was receiving reliable orders representing true demand from its target market.  This was untrue as the number of pre-orders was completely fabricated, and at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

324.    On February 23, 2021, *Yahoo Finance* hosted an interview with Defendant Burns.  During the interview Defendant Burns was asked "how many pre-orders do you have and who's ordering these trucks?" and Burns responded:

> Yeah.  We set out a fleet.  This is a full-size pickup truck, and as I think most people know, it's a favorite of consumers and of workers.  ***Our initial foray is into fleets***

105

*and we have pre-sold 100,000 of these to various fleets across America. So, really a big appetite.* You've got a fleet that's been using a 17 mile per gallon pickup truck for the last 30 years and we come out with one that gets the equivalent of 75 miles per gallon. And it's just what we had hoped, a lot of pent up demand, a lot of excitement around it. And you do these pre-orders to get a feel what to tool for. In this business, tooling and all the costs associated with the automation required to bring these to market. *And so it gives you a good feel of what to tool for, what to build for, and we've been just really happy with 100,000 pre-orders.*

325.    The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248. Furthermore, the statements were especially misleading because the use of the word "pre-sold" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them. In addition, this statement was misleading because it claimed that the 100,000 orders came from fleets, when in reality they came from a variety of individuals and non-fleet organizations.

326.    On February 23, 2020, after markets closed, Defendant LTM posted a message to its Twitter account linking to the *Yahoo Finance* interview mentioned in paragraph 348. The false and misleading Twitter message was as follows:



106

327. The statement in the prior paragraph touted Lordstown's supposed pre-orders and therefore was false and misleading for the reasons set forth in paragraph 248. Furthermore, the statement was especially misleading because the use of the word "pre-sold" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" supporting the 100,000 figure were anything but concrete and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

**(2) Statements Concerning Lordstown's Production Capabilities**

328. Statements touting Lordstown's supposed production capabilities, including its ability to begin production in September 2021, were false and misleading, because Lordstown did not realistically have any hope of beginning the kind of production it was boasting during that time period. While Lordstown may literally manufacture some vehicles in that month, the statements conveyed that Lordstown would begin commercial production and begin delivering vehicles in that time period, but this omitted to disclose the present fact that doing so was unrealistic or impossible, given the development, manufacturing, and regulatory steps that the company would need to be complete by that time to begin commercial production. At the time of making these statements, Defendants omitted to disclose present facts about its current development, production, and regulatory progress that rendered its statements claiming production would begin in September materially incomplete and misleading. The lauded September production date was material to investors because it conveyed information about the status of Lordstown's production capabilities and regulatory process, and because it was highly relevant to when Lordstown would begin generating revenue and when it would become profitable.

329.    Statements claiming that Lordstown had (or, upon completion of the Merger, would have) the financial resources needed to begin production in September 2021 were false and misleading because Lordstown did not have the financial resources needed to begin production in that time frame.  Defendants failed to disclose specific information about the costs and expenses necessary to begin commercial production.  Information about whether Lordstown had the financial resources needed to begin production in September 2021 were material to investors because they conveyed important information about the status of Lordstown's production capabilities, conveyed important information about the risks that Lordstown would become insolvent or risk insolvency and need to issue a "going concern" notice,  conveyed important information about the risk to investors that their shares would be diluted or otherwise made less valuable through capital markets or other fundraising activity, and conveyed important information about the prospect and timeline over which Lordstown could be expected to generate revenue and positive cash flows.

330.    On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included a press release issued by Lordstown and DPHC.  The press release stated:

> *To accomplish Lordstown's mission, in November 2019 the company purchased the former General Motors Lordstown Assembly Plant, a 6.2 million square foot facility estimated to be capable of producing in excess of 600,000 electric vehicles annually, with only modest incremental investment.  Lordstown is believed to be one of the first electric vehicle manufacturers to acquire a near production ready plant.  The Lordstown complex provides Lordstown with critical flexibility and line-of-sight to production, immediate access to a well-trained and highly capable workforce in Ohio's Mahoning Valley, and positions Lordstown to be first to market.*

331.    The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs 328-29.

Exhibit B
Page 123

332.    On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included an investor presentation issued by Lordstown.  The presentation included the following graphic, which contains false and misleading statements:

> The Lordstown Complex transferred in a near production-ready state and capable of large annual production volume with only modest incremental investment

333.    The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore was false and misleading for the reasons stated in paragraphs 328-29. Specifically, it was especially misleading that Lordstown boasted the capabilities of the plant because it implied that the company could achieve its production timeline, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

334.    On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included an investor presentation issued by Defendant Lordstown, and thus DPHC and Lordstown made the statements therein.  The presentation included the following graphic, which contains false and misleading statements:

**Capital Structure**
- Lordstown will have $675mm of cash to fund operations and growth
- **No additional capital requirements expected between now and going to market to achieve positive cash flow**

335.    The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs 328-29. The statements were especially misleading because they claimed that in addition to having financial resources needs to begin production, Lordstown would also have resources to meet the much more challenging further step of operating profitably, *i.e.,* having positive cash flows.

109

336.    On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included an investor presentation issued by Lordstown.  The presentation stated: "***Based on the excellent condition of the plant and equipment at the Lordstown Complex, LMC Projects ~$120 million of investment to retool the equipment for full production readiness.***"

337.    The statement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore was false and misleading for the reasons stated in paragraphs 328-29. Specifically, it was especially misleading that Lordstown boasted the condition of the Plant because it implied that the company could achieve its production timeline, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

338.    On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included a transcript of an analyst call that Defendants Burns and Hamamoto participated in.  The following statement was uttered by Defendant Hamamoto during that call:

> Based on strong investor demand, the PIPE was upsized to 500 million dollars, anchored by GM as well as several long-term institutional investors, including Fidelity, BlackRock and Federated.  ***This capital will fully fund Lordstown's current business plan and position the company to achieve positive EBITDA and cash flow, and there are no cashing out shareholders.  Finally, we feel investors have the opportunity to buy into this exciting and high-growth company at a very compelling valuation, especially on a relative basis.***

339.    The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs 328-29. The statements were especially misleading because they claimed that in addition to having financial resources needs to begin production, Lordstown would also have resources to meet the much more challenging further step of operating profitably, *i.e.,* having positive cash flows.

110

340.    On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included a transcript of an analyst call that Defendants Burns and Hamamoto participated in.  The following statement was uttered by Defendant Hamamoto during that call:

> Through the combination of DiamondPeak cash in trust and the 500 million dollar PIPE investment we expect to add 675 million dollars to the pro-forma Balance Sheet.  ***The cash proceeds will be used to fund production of the Endurance and we do not expect that we will need any additional equity capital requirements to achieve positive cash-flow.  We expect to achieve breakeven or better EBITDA margins in 2022, our first full year of production, and eclipse 10 percent by 2024.***

341.    The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs 328-29. The statement was especially misleading because it claimed that in addition to having financial resources needs to begin production, Lordstown would also have resources to meet the much more challenging further step of operating profitably, *i.e.,* having positive cash flows.

342.    On October 26, 2020, after markets closed, Defendant Burns appeared on video to "ring the bell" at the NASDAQ.  He made the following statement: "***This brings the final chapter where we get the necessary resources to be able to bring [the] Endurance all the way to market. . . .  We fully intend for this to be the first full-size electric pickup truck in the world, specifically in the US.  And we are on target to do that in September***."

343.    The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs 328-29. Specifically, it was especially misleading that Lordstown boasted the capabilities of production because it implied that the company could achieve its production timeline, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

111

344. On October 26, 2020, after markets closed, LTM issued a press release stating, which quoted Defendant Burns as stating: "*We have a near production-ready plant and approximately $675 million in proceeds from this transaction, which is more than enough funding to get us through initial production*."

345. The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs 328-29. The statements were especially misleading because they claimed that Lordstown had the financial resources needed to begin production.

346. On October 26, 2020, during the trading day, *The Detroit News* published an article that included statements from Defendant Burns. A relevant passage quoting Defendant Burns was as follows:

> "*It gives us the financial acumen to be able to get this done*," Burns said of the merger, noting that he chose to go through a special purpose acquisition company rather than a traditional public offering because it's faster. "*Since we're in a race to be first, it was really important for us to get that funding, so that we could be assured of production by September*."

347. The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs 328-29.

348. On October 26, 2020, during the trading day, the Detroit News published a video of Defendant Burns discussing Lordstown. Burns stated: "*September deliveries start.* We have pre-sold 40,000 of them to fleet customers already and we expect that number to increase dramatically between now and then."

349. The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial

112

production, and therefore were false and misleading for the reasons stated in paragraphs 328-29. Specifically, it was especially misleading that Lordstown boasted that deliveries would start in September, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

350. On November 16, 2020, before markets opened, Defendant LTM filed a Form 8-K with the SEC, attaching a press release. The press release was titled: "Lordstown Motors Releases Business Updates; *Remains on Track to Begin Production of the Lordstown Endurance in September 2021*." The first line of the press release stated:

> Lordstown Motors Corp. (Nasdaq: RIDE), ("Lordstown Motors"), a leader in electric light duty trucks focused on the commercial fleet market, today announced recent commercial, operational and strategic developments, *as it remains on track to begin production of the Lordstown Endurance, the world's first full-size, all-electric pickup truck, in September 2021*.

351. The statement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore was false and misleading for the reasons stated in paragraphs 328-29. Specifically, it was especially misleading that Lordstown touted that the Endurance would be produced in in September 2021, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

352. On November 16, 2020, Defendant Burns participated in an interview hosted by the investor website *IPO Edge*. During the interview, Burns stated: "*Our first fully electric full size pickup truck, the Endurance, is coming out in September.*"

353. The statement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore was false and misleading for the reasons stated in paragraphs 328-29. Specifically, it was especially misleading that Lordstown boasted that the Endurance was

"coming out in September," when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

354. On December 21, 2020, after markets closed, Defendant LTM filed a Form 8-K with the SEC. This filing stated: "***The Company remains on track to begin production of the Endurance in September 2021***."

355. The statement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore, was false and misleading for the reasons stated in paragraphs 328-29. Specifically, it was especially misleading that Lordstown boasted that the Endurance would be produced in in September 2021, when in reality, Lordstown was unequipped to bring a truck to production by September 2021.

356. On January 11, 2021, before markets opened, LTM issued a press release that included the following statement:

> The Lordstown Endurance is a full-size, all-electric pickup that has a range of 250 miles, the equivalent of 600hp and can tow up to 7,500lbs. ***After successful prototype and Alpha builds, Lordstown is now building the first Beta Endurance vehicles and is on track for start of production in September of this year.*** The initial Endurance is a crew cab configuration with medium bed length, priced at $45,000 after federal rebate.

357. The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs 328-29. Specifically, it was especially misleading that Lordstown boasted that the Endurance would be produced in in September 2021, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

358.     On January 28, 2021, before markets opened, Defendant LTM issued a press release stating: "*[W]e remain on track to meet our September start-of-production timeline while continuing to see indicators of strong demand.*"[11]

359.     The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs 328-29. Specifically, it was especially misleading that Lordstown boasted that the Endurance would be produced in in September 2021, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

360.     On February 18, 2021, after markets closed, Defendant Burns appeared on CNBC for an interview.  The interviewer asked Burns "in terms of the September timeframe for full production of the Endurance Steve, do you have enough liquidity to get you to there from here?" Burns responded: "*Yep.  We've been really maniacal about that and we're on track*."

361.     The statement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore, was false and misleading for the reasons stated in paragraphs 328-29. Specifically, it was especially misleading that Lordstown boasted the capabilities of production because it implied that the company could achieve its production timeline, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

362.     On February 23, 2021, *Yahoo Finance* hosted an interview with Defendant Burns. During the interview Burns stated: "*Production starts in September.*"

---

[11] The statement concerning demand is also alleged to be false and misleading, but has not been highlighted in this sub-Section because it is addressed in Section V(A)(1).

363. The statement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore, was false and misleading for the reasons stated in paragraphs 328-29. Specifically, it was especially misleading that Lordstown boasted that the Endurance would be produced in in September 2021 when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

364. On March 17, 2021, after markets closed, Defendant LTM issued a press release that stated:

> "***Timeline to Start of Production (SoP) in September 2021 remains on track***, with beta prototype build underway and the first beta vehicles to be ready by the end of March; vehicles to be sent for durability, crash, validation, and lighting testing with various partners and to early initial customers for feedback."

365. The statement(s) in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore, was false and misleading for the reasons stated in paragraphs 328-29. Specifically, it was especially misleading that Lordstown boasted that the Endurance would be produced in in September 2021, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

### (3) Defendants' Omissions of Information Required by Item 105

366. The federal securities laws—in particular, Regulation S-K, Item 105 (17 C.F.R § 229.105)—require that certain public filings include a description of "the material factors that make an investment in the registrant or offering speculative or risky." ("Item 105 Disclosure"). These Item 105 Disclosures must be made in proxy statements, registration statements, and quarterly and annual reports.

367.    The failure to disclose the information required by Item 105 Disclosures is a material omission and actionable under §10(b) and §14(a).  The failure to disclose material risks is material to investors because this information helps investors to understand the company they are investing in, and the specific factors that make investment in that company risky.  Defendants provided certain generic risk language, but failed to adequately disclose the material risks that made investment in Lordstown risky.

368.    On August 24, 2020, before markets opened, DPHC published the following risk language in its proxy materials, which materials included a letter signed by Defendant Hamamoto:

> The design, manufacture and sale of vehicles is a capital intensive business. Although Lordstown anticipates that the funding from the Business Combination will provide sufficient capital to fund the completion of the Endurance and the retooling of the Lordstown Complex necessary to commence commercial production, Lordstown's business plan to design, produce, sell and service commercial electric pickup trucks, including the Endurance, is expected to require continued capital investment to fund operations, continue research and development and improve infrastructure.  Unlike established OEMs that have greater financial resources than Lordstown does, there can be no assurance that Lordstown will have access to the capital Lordstown needs on favorable terms when required or at all.  If Lordstown cannot raise additional funds when Lordstown needs them, Lordstown's financial condition and business could be materially adversely affected.

369.    This statement in the prior paragraph failed to disclose the risk that Lordstown would need significantly more capital than it was raising to even begin commercial production of the Endurance truck, and instead claimed that the Merger would provide sufficient capital to begin such production.  Lordstown failed to disclose the risk that it would lack sufficient capital to begin commercial production, because the money made available to Lordstown in the Merger was simply insufficient to begin production—even if no major unforeseen events occurred.  In other words, DPHC failed to disclose that Lordstown's purported production plan was unrealistic and simply did not provide sufficient capital to reach its goals.

117

370.  On October 8, 2020, after markets closed, DPHC published a proxy statement with the materially the same risk language listed in paragraph 368, and again failed to disclose the material risks identified in the paragraph 369.  That proxy statement was signed by Defendant Hamamoto and included a letter signed by Defendant Hamamoto.

371.  On November 12, 2020, after markets closed, Defendant LTM published a Registration Statement, with materially the same risk language listed in paragraph 368, and failed to disclose the material risks identified in the paragraph 369.  That proxy statement was signed by Defendant Hamamoto and included a letter signed by Defendant Hamamoto.

372.  On November 15, 2020, Defendant LTM published a quarterly report on Form 10-Q that incorporated by reference the same risk language listed in paragraph 368, and again failed to disclose the material risks identified in the paragraph 369.  That 10-Q was signed by Defendants Burns and Rodriguez.

373.  On December 1, 2020, Defendant LTM published an amended Registration Statement with materially the same risk language listed in paragraph 368, and again failed to disclose the material risks identified in the paragraph 369.  That amended Registration Statement was signed by Defendants Burns, Rodriguez, and Hamamoto.

374.  On December 4, 2020, after markets closed, Defendant LTM filed a prospectus with the SEC with materially the same risk language listed in paragraph 368 prior, and again failed to disclose the material risks identified in the paragraph 369.

**B.    Allegations of Scienter as to Certain Claims**

375.  The allegations in this Section allege scienter as to each Defendant, except Defendant Hamamoto.  The inference and conclusion that Defendants acted with scienter, *i.e.*, that they intended to mislead the investing public or were reckless as to the possibility of

118

misleading the investing public, is supported by the following facts. While organized into sub-Sections for readability, the following allegations of scienter are mutually corroborating.

### (1) Motive and Circumstantial Evidence of Scienter

376. From the moment Defendant Burns founded Lordstown, it had a very unique trajectory. Burns had been ousted from Workhorse and Lordstown offered him an opportunity to revive his career. Everything about Lordstown's business was predicated upon buying the Lordstown plant from GM, which was itself a unique opportunity likely only existing due to political pressure on GM to sell the plant — in the words of President Trump, GM was to "do something quickly."

377. Defendant Burns had the unique opportunity to buy the Lordstown plant, but it also posed huge challenges. The plant was one of the largest automotive plants in the country, and such plants are either on or off—they are not built for limited small batch production. This meant that Burns needed a business plan whereby he could sell the idea that the business would reach scale immediately.

378. At the same time, prior to the Merger, Burns had supposedly "endeavored" to find financing, but had failed to do so. He needed financing to convert the abandoned GM plant into something that could be useful to the nascent startup. Recall, at the time of the Merger, Lordstown had essentially no assets.

379. So Defendant Burns needed a narrative that would convince investors to approve the Merger so that he could get financing for the plant. The pre-order lie was the perfect solution. Burns could tell investors that Defendants had an innovative business idea, and a batch of customers ready to buy—the missing ingredient was just investor cash that could allow the company to meet a production schedule. Defendant Burns told investors that the only cash he

119

needed was what would be raised in the Merger, and that the company would start selling in less than a year. It was exactly the story Burns needed to tell to get investors to back his project.

380. Without Defendants' misrepresentations about the pre-order quantities and production capabilities of the business, the company likely would have failed. This unique motive—the motive to avoid the existential risk of insolvency by raising money under false premises in a take-public Merger—goes far beyond the ordinary motive of executives to manage a company profitably. This motive strengthens the inference of scienter—*i.e.*, the common-sense conclusion that Defendant Burns succumbed to this motive and defrauded investors is compelling, especially in conjunction with the other allegations of scienter alleged herein.

### (2) Scienter as to Lordstown's Supposed Pre-Orders

381. While the pre-orders were publicly described as a legitimate tool for Lordstown to assess the demand for its product, numerous facts demonstrate that the true purpose of developing the order book was to mislead investors about the value of the business.

382. **Defendants Used the Pre-Orders to Sell Lordstown to Investors.** Many facts show that Defendants viewed the gathering and lauding of pre-orders as a key tool to persuade investors to place a high value on Lordstown's stock. This fact directly indicates that Defendants understood the importance of the information to investors and the risk that investors would be misled if Defendants misrepresented those pre-orders. It also supports the inference that the now-admitted misrepresentations were either a deliberate effort to mislead investors or the product of a reckless indifference to the possibility of investors being so misled. Further, former employees of Lordstown establish that Defendants intentionally permitted the pre-order book to be inflated as part of their effort to induce investors to place a high value on the company.

383. While Lordstown did not publish the LOI form in any of their public filings, the form was published by the Hindenburg Report. Notably, while the form states in multiple ways

120

that the indication of interest is entirely non-binding and states that it does not require any sort of deposit payment, one of its very few concrete terms relates to publicity. The LOI states that the parties will "consider cooperating in drafting and release a press release" regarding the agreement. This indicates the direct connection between procuring the LOI's and advertising them to investors, which runs contrary to Burns' assertion that the LOIs were merely a tool to assess demand for the truck.

384. Lordstown relied heavily on third-party contractors from a company called Climb2Glory to procure supposed pre-orders. This was notable for several reasons – including because Burns had publicly claimed that the efforts to market the truck were "limited" at the time of the Merger, even though, by that time, they had already been relying heavily on Climb2Glory, who had been frantically "marketing" the Endurance since at least September 2020, well before the Merger. Contrary to Defendant Burns' repeated representations that pre-orders had "been almost all incoming" and the result of "pent up demand," in fact Lordstown's order book was dependent on its marketing effort, including the marketing efforts of Climb2Glory. Furthermore, it was peculiar to describe Lordstown's marketing effort as "limited" because Climb2Glory was being paid a commission of $50 per truck pre-order, a hefty sum for entirely non-binding orders, from a company that (at that time) had essentially no spare cash.

385. Climb2Glory published a case study on their website regarding the success of their marketing effort on Lordstown's behalf.[12] That case study makes clear that Climb2Glory was instructed by Lordstown as to the true purpose of running up the book of supposed orders. First, Climb2Glory notes that when they were hired, Lordstown "was in the middle of a

---

[12] This case study stayed on the Climb2Glory website until the Hindenburg Report surfaced and then was scrubbed from the internet, in an apparent attempt to hide the evidence; it does not appear that Climb2Glory has similarly deleted any of their case studies for other companies.

121

Exhibit B
Page 136

significant effort to raise funds to complete its preparations for full production." Then they directly state: "**Fundraising efforts** were **linked directly** to the generation of customer leads and Endurance pre-orders; the more pre-orders achieved, the greater the confidence levels of prospective investors." This same point is reiterated again later in the case study:

> Fundraising was directly linked to pre-order generation — the faster the pre-orders arrived, the greater **investors' confidence** would be in the company and the faster funds would flow in. When we met them, LMC's primary challenge was that it was not generating pre-orders fast enough. It needed to find a way to accelerate its pre-order capture process.

386. According to the Hindenburg Report, Climb2Glory reiterated this same sentiment—that the purpose of the pre-orders was to influence investor sentiment—during a phone interview. The Hindenburg report quotes Climb2Glory managing partner Pat Mangin, as stating:

> Because of the letters of intent from Climb2Glory and some marketing, Diamond Group came to the table and they did the reverse merger. So our role was to help influence and acquire interest that would lead to investment. That was Climb2Glory's role.

387. As detailed herein, Defendants routinely used their book of supposed pre-orders to market the company to investors, including in media appearances, proxy materials, other SEC filings, press release, and in various other events. For example, the pre-orders were prominently featured in the investor deck, filed as proxy materials, as a "Key Investment Highlight" given the supposed "[d]emand proven with pre-orders covering first year production" and with a flashy list of the logos showing "Selected Pre-Order Customers."

388. CW-1 recalled the message from executives at Lordstown being "fairly explicit" that they needed to obtain these reservations in order to get additional financing from investors. According to CW-1, Defendant Flannery expressed this sentiment to CW-1 directly in meetings that he attended. According to CW-1, he had multiple conversations with Flannery per week and

122

recalled conversations where Flannery explicitly made the point that the LOIs were for generating investment interest. CW-1 continued to say that there was pressure to meet benchmarks of pre-orders solely for Lordstown's investment timeline. CW-1 continued to say that Flannery regularly said that he had spoken with former CEO Steve Burns and provided him with updates about the pre-orders. CW-1 noted that he could not see how Burns would not have been aware of the practices surrounding the LOIs given his communications with Flannery who knew everything related to sales at that time.

389. CW-2 recalled that Flannery was Burns' "right hand man" and that much of Lordstown's staff was comprised of people with personal connections to Burns, including members of his family or his church. As a result, according to CW-2 much of the senior staff was not qualified. CW-2 added that much of the experience of working at Lordstown was a result of the "nature of Steve Burns."

390. CW-2 explained that during his tenure Lordstown's sales team was comprised of Vice President of Business Development Caimin Flannery, a director of sales, and up to two sales representatives. According to CW-2, Climb2Glory reported to Flannery and was paid a commission of $50 for each truck listed in a letter of intent and that the sales representatives were also financially incentivized to get as many LOIs as they could.

391. CW-2 characterized Lordstown's pursuit of LOIs, which were marketed as Pre-Orders, as desperate, explaining that there was "nothing binding" about the agreements Lordstown was getting, which he described as "pie in the sky." According to CW-2, the "desperation" around reaching pre-order totals was fueled by the effort to get funding for Lordstown, adding that the purpose of the pre-orders was to generate buzz and that that was "all

123

it was for." CW-2 advised that the pressure related to sales and the LOIs came directly from Flannery and Burns.

392.    According to CW-2, there was "zero" due diligence conducted on the ability of potential customers to support their orders based on existing fleet size "by design," adding that the company did not want to know, because they just wanted to get the signed letters.  CW-2 explained that when it came to securing letters of intent the only guideline provided to Lordstown's sales staff was to get "as many as possible in the shortest period of time." CW-2 continued to say that there were no instructions regarding what types of customer-leads to pursue.

393.    According to CW-2, Lordstown "counted everything," as pre-orders, including all the LOIs, even if the customer's ability to fulfill them was not apparent or even likely.  CW-2 continued to say that the "pressure" to continue to grow LOI numbers "100%" came from Burns and Flannery.  CW-2 explained that Burns "micromanaged every aspect" of Lordstown's business down to the "smallest minutia." CW-2 stated that he "talked with Steve frequently," and that Burns "knew every single order" that was counted as a Pre-Order, as well as the customers behind them.  CW-2 also recalled talking with a more senior employee at Lordstown about how the LOIs were "all smoke and mirrors."

394.    As an example of Burns' knowledge of the truth about the pre-orders, CW-2 recalled that one of the two sales associates had gotten a 1,000 truck LOI from Innervations LLC, but that someone had done a quick search and seen that it had no operating history and was a two-person operation run out of an apartment.  According to CW-2, Lordstown spokesperson Ryan Hallett had indicated that they should not publish a press release because of how weak the LOI was.  CW-2 explained that Hallett did not want to publicize the LOIs given how they were

124

Exhibit B
Page 139

non-binding and given that everyone at Lordstown knew that all the big orders were "BS." Lead

Counsel understands, from talking with CW-2, that a member of the sales team had called Burns

to explain how sketchy the LOI with Innervations was, and has strongly advised Burns not to

publish a press release about Innervations, but despite that warning Burns went ahead with

publishing a press release and counted Innervations in the tally of pre-orders.

395.    **Defendants blatantly misrepresented the pre-orders, in ways that further**

**demonstrate that their true motive was to mislead investors**.  While Lordstown occasionally

disclosed that the orders were "non-binding," Defendant Burns frequently described them in

much stronger terms, indicating his clear desire to exaggerate the veracity of the supposed

orders.  *E.g.*, Burns: "***our first year of production already <u>pre-sold.</u>***"  (June 25, 2020); Burns:

"the Endurance has been met with enthusiastic support, and to date, ***we have <u>secured</u> $1.4 billion***

***of pre-orders.***" (August 23, 2020); Burns: ***the pre-orders represent "over $1.4 billion of***

***potential revenue.***"  Lordstown Investor Presentation***: "Lordstown has already received ~27K***

***orders (average order size of ~300 trucks)."*** (August 3, 2020); Burns: ***"We got 27,000 <u>orders</u>.***

***We got customers really really wanting the truck."*** (August 5, 2020); President Trump, with

Burns agreeing, ***"the <u>sales</u> are great"*** (September 28, 2020); Burns: ***"to have that many***

***commercial vehicles sold already is a big deal."*** (November 16, 2020); Burns: ***"we just got an***

***order for 400 vehicles . . . our average order is about 500 trucks per order."*** (November 16,

2020); Burns: ***"average order size of nearly 600 vehicles per fleet."*** (January 11, 2021).

396.    **Defendant Burns' own admissions support scienter**.  There is no doubt that

Defendant Burns always knew that the company had neither "pre-sold" the trucks nor "secured

$1.4 billion in pre-orders," that the pre-orders were neither "orders" nor "sales," that the trucks

had not been "sold," and that the company did not have a 500 truck "order" or any specific

125

"order size." In fact, on March 18, 2021, Defendant Burns admitted that he always knew this after the Hindenburg Report surfaced, placidly claiming on CNBC that "all we've done is gone out and gauge interest," and "[w]e've never said we had orders." The now-clear attempt to trump-up the significance of the pre-orders, combined with the undisclosed truth about the order book, firmly shows Defendant Burns' true intent was to mislead investors about the order book and its significance.

397. Similarly, Defendants frequently claimed that various potential customers associated with the government were unable to make pre-orders. *E.g.*, Defendant Burns: "That doesn't count municipality, state vehicles, federal vehicles, military vehicle . . . they **can't** do pre-orders. They're government entities" (February 6, 2021); Lordstown: "This figure does not capture interest the company has received from organizations that are **not in position** to be able to place pre-orders." (November 16, 2020).

398. As a threshold issue, as explained herein, the pre-order figures that Defendants were boasting did in fact include supposed pre-orders from government entities. Therefore, these extremely specific statements by Defendant Burns clarifying where the orders were coming from were just brazenly false—and yet Burns spoke on the topic definitively. Furthermore, not only did these statements falsely convey that there was even greater demand than implied by Lordstown's present order book (because the book did not include all these supposed potential customers), but it also created a false picture regarding the certainty of the orders that had supposedly been procured. In other words, Defendant Burns was representing that the "pre-orders" were not mere indications of potential interest (which governmental organizations obviously **could** provide), but were instead something far more firm (which government organizations "could not" provide).

126

Exhibit B
Page 141

399.     Defendant Burns made specific statements about E Squared that evidence a brazen disregard for the truth.  As previously stated, Lordstown had counted 14,000 pre-orders from E Squared, even though it was a one-man operation run out of a modest apartment, with no fleet, and no history selling to fleets—despite the fact that this order meant that E Squared's supposed order would have been worth $735 million in revenue.  Even though E Squared had no operations that called for the use of multiple trucks (aside from the purported hope of one day leasing or selling trucks to potential customers), in the announcement for the pre-orders Burns stated that the arrangement "positions E Squared Energy to integrate sustainable energy systems into **every element of their business structure**."  This now-obvious chicanery evidences Burns' willingness to either deliberately mislead investors or to recklessly trumpet the pre-orders without concern for the truth.

400.     Defendant Burns also made statements claiming that he was knowledgeable about Lordstown's sale process.  For example, on February 6, 2021, Burns stated in an interview posted to YouTube that, "And I think these orders are very, very sticky because I know what it takes to get them."

### (3)     Scienter as to Lordstown's Production Capabilities

401.     In a now-eerie preview of his true intent, Defendant Burns disclosed to a room of media correspondence at an event hosted by the *Business Journal* in Youngstown Ohio on March 6, 2020, that "in a lot of ways **this whole business is like a kidnapping case**, and we have to show proof of life. . .  So we are doing little bits as we march toward production at the end of the year."

402.     This seems to have meaningfully summed up Defendant Burns' view of public disclosures.  He constantly provided "proof of life" updates to the market—not to accurately disclose the status of production, but to convince investors to put their confidence in him, despite

the fact that the company's schedule was unachievable and that such updated concealed massive risks and serious incidents at the company.

### (4) The "Resignations" and Conclusions of the Internal Investigation Support the Inference of Scienter

403. The resignations of Defendants Burns and Rodriguez support the inference of scienter based on the specific facts of this case. Both resignations occurred on the very day that the special committee of Lordstown's board of directors published their report finding that the company (which spoke through Defendants Burns and Rodriguez) had made misrepresentations. The timing of these resignations, especially in light of the fact that the company did not have replacements lined up, strongly supports the conclusion that these executives were pushed out for their misconduct. The fact that the insiders conducting and reviewing the investigation called for the immediate ouster of Defendants Burns and Rodriguez strongly suggests that additional evidence available within the company demonstrates that Defendants' misstatements were made with scienter. In fact, Lordstown Defendant Schmidt confirmed the obvious: that the resignations were at least partially a result of the internal investigation, which Schmidt explained at an event at the Automotive Press Association on June 15, 2021.

404. Additionally, Defendant Burns also resigned from his role as chairman of Lordstown's board of directors. This powerfully indicates that his resignation was not the result of any decision about his operational capabilities, but instead was the result of his misconduct.

### (5) The SEC and DOJ Investigations Support the Inference of Scienter

405. While the existence of government investigations is not *alone* sufficient to establish scienter, they do add support to the inference of scienter when combined with the other facts alleged herein.

128

406.    The fact that both the SEC and DOJ are investigating Defendants over the same conduct alleged in this Complaint supports the inference of scienter.  Prior to the announcement of an SEC investigation, the agency typically engages in fact finding to determine if the matter is sufficiently suspicious to warrant their attention.  That the SEC has been investigating Lordstown for many months, and began such investigation even before the Hindenburg Report was published, provides support for the inference of scienter.  Similarly, the DOJ investigation also supports the inference of scienter.  Defendants have admitted that the investigations relate to the same conduct at issue in this case.

407.    Most importantly, the SEC investigation demonstrates scienter in a far more direct sense as well.  On February 17, 2021, Lordstown received an SEC inquiry that it admits related to the same claims alleged in this action.  Defendants either knew of this inquiry or were reckless in not knowing of the inquiry, as management of a publicly traded company (especially one of this relatively modest size) would be reckless in not knowing of an SEC inquiry into the business' public disclosures.  Nevertheless, even after receiving this inquiry, Defendant Burns continued to make the same sort of false and misleading statements— including those statements that were found to be misrepresentations by the independent committee's investigation.  That Defendant Burns continued to make these misrepresentations after being put on notice by the SEC as to their possible illegality is nearly incontrovertible evidence of his scienter as to the statements made after February 17, 2021, and his willingness to continue to brazenly misrepresent the business even after receiving an SEC inquiry also strongly supports the inference of Defendants Burns' scienter more generally, including for the period before receipt of the SEC's inquiry.

**(6)     Both the Pre-Orders and Lordstown Production Capabilities Were Essential to the Company's Success**

408.    As described herein, the Endurance is Lordstown's only product, whereby the vast majority of Lordstown's revenue would be generated from sales of the Endurance once it reaches production.  As a result, and given that Lordstown was a pre-revenue company, its ability to (1) lock in Endurance purchasers (i.e., obtain "serious" real pre-orders) and (2) fulfill the pre-orders on time (*i.e.*, meet touted production deadlines) was immensely important to the financial success of Lordstown.

409.    Because the pre-orders and production capabilities for Endurance were core to the company's success, the materially false statements and omissions detailed herein could not have occurred without the Individual Defendants' knowledge and approval.

410.    Defendants frequently touted the importance of Lordstown's pre-orders, with, for example, Defendant Burns stating that the company's entire "first year of production [is] already pre-sold."  Further, Defendants frequently boasted of Lordstown's ability to be first to market and that it would be able to begin production of the Endurance by September 2021.

411.    Given the multitude of statements concerning the pre-orders and production capabilities during the Class Period, as well as its importance to the company's financial success, it is unreasonable to think that the Individual Defendants—who were responsible for tracking or reporting Lordstown's revenue—would be unaware of the financial significance and status of the Endurance.

412.    The Individual Defendants were highly sophisticated and in positions to know that their statements concerning both the pre-orders and production capabilities were false.  For example, Defendant Burns founded both Lordstown and Workhorse, the latter of which he founded in 1998, meaning that he has been significantly involved in the EV and automotive

130

industry for over 20 years.  CW-2 adds that Defendant Burns "micromanaged every aspect" of Lordstown's business down to the "smallest minutia."  Defendant Rodriguez was Lordstown's CFO since September 2019 and previously served as the CIO at Workhorse from August 2017 until August 2019.  Defendant Flannery was Lordstown's Vice President Business Development from October 2019 until October 2020, when he was promoted to Senior Vice President of Business Development.  Defendant Flannery ran the sales team at Lordstown and thus intimately involved in the purported pre-orders.  Prior to working at Lordstown, Defendant Flannery was an executive at Workhorse.  Defendant Hamamoto was the Chairman and Chief Executive Officer of DPHC, and signatory to the proxy statements soliciting investors of DPHC to approve the merger.  Defendant Hamamoto was actively involved in the evaluation of hundreds of companies, including Lordstown.

413.    The sophistication of the Individual Defendants strengthens the allegations of scienter, by undermining an exculpating explanation for the fraud.

**(7)    Defendants' Other Illegality Supports the Inference of Scienter**

414.    Despite its short operating history, Lordstown has been embroiled in several lawsuits (not including the suits consolidated into this action or the related breach of fiduciary duty litigation), that support the common-sense conclusion that the company's management acted without regard for the legality of their conduct.  Furthermore, Workhorse (from which Burns left just before founding Lordstown) has already paid a judgment resulting from a lawsuit related to its commissions owed to a sales employee who procured the very same supposed pre-orders that Lordstown touted to investors.  Additionally, the company has received notices from the NASDAQ threatening delisting due to delinquent filings and has publicly admitted that it had material weaknesses in its internal controls.

Exhibit B
Page 146

415.    **First**, in *Karma Automotive LLC v. Lordstown Motors Corp.*, Case No. 8:20-cv-02104 (C.D. Cal. filed Oct. 30, 2020), it is alleged that Lordstown engaged in shocking corporate espionage to steal the intellectual property of Karma Automotive LLC. The lawsuit alleges that Lordstown entered into an NDA to perform diligence on licensing Karma's automobile software system, but violated that agreement by poaching Karma employees who took the technology with them. The lawsuit attaches an email that Lordstown sent to a poached Karma employee's email address (at Karma), detailing the economic case for misappropriating the technology rather than licensing it; the email then calculated the potential lost revenue to Karma, a factor relevant to Lordstown's potential liability for the scheme. The suit also shows that Karma employees emailed confidential files to themselves, in violation of company policy, as they were being poached by Lordstown.

416.    While the Karma case is ongoing, the documentary evidence already submitted is exceptionally compelling. The evidence strongly suggests that Lordstown orchestrated a brazen scheme of corporate espionage to steal Karma's intellectual property and talent. The willingness of Lordstown to commit such a scheme strongly supports the inference that its management acted with disregard for the legality of their conduct, and that they acted with such disregard when making the misrepresentations and omissions at issue in this case.

417.    **Second**, *DTE Lordstown LLC v. Lordstown Motors Corp.*, Case No. 2020-cv-01245 (Ohio Trumbull Ct. C.P. filed Oct. 30, 2020), the company is being sued for delinquent utility bills. The suit alleges that Lordstown almost immediately fell behind on making utility payments, negotiated a payment plan, and then promptly failed to make payments under that plan. Ultimately the suit alleges that Lordstown owes the utility $2.5 million. While not all

breach of contract claims signify foul play, here, it appears Lordstown is simply brazenly refusing to pay what it owes, consistent with Defendants' general dereliction of legal duties.

418. **Third**, in *Esfeld v. Workhorse Group Inc.,* Case No. 2:17-cv-01923 (W.D. Wash. filed Dec. 27, 2017), a former sales employee of Workhorse (during Burns' tenure as CEO of Workhorse), alleges that he was not paid for commissions he was due for obtaining "pre-orders" for Workhorse's truck. These very same supposed pre-orders were then lauded by Lordstown. Workhorse paid a judgment on the case after Plaintiff filed a motion for summary judgment arguing, "Workhorse willfully failed to pay Mr. Esfeld the commissions it admits it owes." While the failure to pay commissions could be the result of legitimate dispute, here the stronger conclusion (given the judgment paid and many other corroborating facts) is that Burns simply has little regard for fulfilling legal obligations.

419. **Fourth**, on April 27, 2021, industry publication Transport Topics published an article titled, "Unpaid Taxes Another Troubling Sign for Lordstown Motors." The article explained that Lordstown has failed to pay $570,000 in property taxes due the prior month. Lordstown has purportedly now paid the outstanding tax bill. While a delinquent tax bill is not necessarily an indicium of misconduct, it takes on relevance in the context of Defendants' pattern of behavior.

420. **Fifth**, on June 4, 2021, Lordstown disclosed that it had received a delinquency notice from the NASDAQ for Lordstown's failure to timely file a form 10-Q quarterly report for the First Quarter of 2021. While this issue was subsequently addressed, it too suggests a striking failure on the part of Defendants to comply with even the most basic legal requirements.

421. **Sixth**, on June 8, 2021, Lordstown disclosed via amendment of its 10-K Annual Report for the fiscal year ended December 31, 2020, that the company had material weaknesses

in its internal controls.  Such weaknesses are a hallmark of fraud and weigh heavily in favor of Defendants' scienter, given the totality of the allegations in this Complaint.

422.  **Additionally**, Burns' previously company (Workhorse) has now been accused of similar misconduct related to the fabrication of pre-orders.  On September 1, 2021, *The Wall Street Journal* ran an article with the headline "SEC Is Investigating Electric Delivery-Truck Maker Workhorse."  The similar allegations and SEC investigation into Workhorse indicates that the misconduct at Lordstown represents a course of deceptive conduct by Burns and his associates.

### (8)  Insider Stock Sales Support the Inference of Scienter

423.  As part of the Merger, Defendant Burns agreed to a 2-year lockup, meaning that he could not sell his shares after the Merger.  Therefore, the absence of stock sales by Burns is not a relevant consideration when assessing his scienter.  However, many other key insiders at Lordstown did sell shares, which lends support for the conclusion that the true dire situation was evident to those within the company, which conclusion supports the inference of scienter.

424.  On June 21, 2021, *The Wall Street Journal* reported that "five top executives, including the company's president and its Defendant Rodriguez, sold more than $8 million in stock over three days in early February."  The article explained that "One of its executives, Chuan 'John' Vo, who oversees Lordstown Motors' propulsion division, sold almost all of his vested equity—99.3%—on Feb. 2, leaving him with 717 shares and proceeds of more than $2.5 million, the filings show."  Similarly, it reported that "President Rich Schmidt, a former Tesla Inc. manufacturing executive who joined the company in 2019, sold 39% of his vested equity over two days in February for $4.6 million."  The article also reported that there were insider sales in December as well.

134

Exhibit B
Page 149

425.    Additionally, the article explained that trading was suspicious for a number of reasons: (1) the trades were made shortly before the company posted negative news about its production, and shortly before the Hindenburg Report was published; (2) "The size of the stakes sold by some executives within months of the company going public are unusual;" (3) the trades did not appear to be made through pre-approved trading plans; and (4) the fact that a number of different executives all sold at around the same time is also "unusual."

### C.    Transaction Causation — Reliance

426.    To the extent that reliance or transaction causation is an element of the claims asserted herein, Plaintiffs and the Class are entitled to proceed due to the following doctrines.

427.    **First**, as to claims stemming from material misstatements and/or omissions in the Proxy statements, Plaintiffs and the Class establish transaction causation because the solicitation of DPHC shareholder's votes was an essential link in completing the Merger transaction.  Under *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970), where material misstatements or omissions are made in a proxy statement, and where shareholder votes were needed to complete the transaction at issue in that proxy statement, the solicitation of proxies with a deficient proxy statement itself satisfies the requirement of pleading transaction causation or reliance.

428.    **Second**, the Claims herein involve primarily omissions, insofar as Defendants omitted to disclose (1) the true nature of the pre-orders, (2) the true status of Lordstown's production capabilities, and (3) that their conduct throughout the Class Period was aimed at inflating Lordstown's stock price rather than accurately informing the market about the company.  Where claims, like these, involve primarily failures to disclose, the requirement of proving reliance is relieved, pursuant to the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

429.   **Third**, Defendants corrupted the market for Lordstown Securities through a course of conduct that misled the market as to the value of Lordstown securities, to the extent that these Defendants disrupted the integrity of the market for Lordstown securities.  Plaintiffs and the Class members are not required to provide further proof of reliance, pursuant to the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

430.   **Fourth**, Plaintiffs and the Class members are entitled to a presumption of reliance on the material misrepresentations and omissions alleged herein pursuant to the fraud-on-the-market theory:

(a)   Throughout the Class Period, LTMs stock (ticker: "RIDE" and former ticker "DPHC") met the requirements for listing on, and was traded on the NASDAQ, an informationally efficient market.

(b)   Throughout the Class Period, LTM's stock traded at high volumes.  Prior to the Merger, there were approximately 35 million shares of DPHC Class A common stock outstanding and average weekly trading volume was approximately 20 million.  After the Merger, there were more than 164 million shares of Lordstown common stock outstanding and the average weekly trading volume was typically over 40 million shares.

(c)   Throughout the Class Period, LTM's stock traded with a narrow bid-ask spread.  Before the Merger, the average bid-ask spread for DPHC's Class A common stock was low at around 8 cents per share and after the Merger, the average bid-ask spread for Lordstown's Class A common stock was around 3 cents per share.

(d)     Both before Merger and after the Merger, LTM's stock and Lordstown's common stock reached approximately $1 billion in market capitalization and retained a market capitalization of well above $500 million for much of the Class Period.

(e)     LTM's Stock was registered with the SEC, both before and after the Merger.  Throughout the Class Period, LTM (including when it was named DPHC) filed periodic reports with the SEC.

(f)     DPHC and Lordstown communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

(g)     The market reacted promptly to public information disseminated by and about Lordstown and DPHC.

(h)     Lordstown was covered by numerous securities analysts employed by major brokerage firms and during the Class Period at least seventeen analysts provided coverage of Lordstown.  Both DPHC and Lordstown were extensively covered by news media and investor publications throughout the Class Period.

(i)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Lordstown's stock and DPHC's stock; and

(j)     Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased DPHC stock and Lordstown stock

137

Exhibit B
Page 152

between the time Defendants misrepresented or failed to disclose material facts and the end of the Class Period.

431.     As a result of the foregoing, the market for LTM's stock promptly digested current information regarding or relevant to LTM from all publicly available sources and reflected such information in the stock prices.

     D.     **Loss Causation**

432.     During the Class Period, as detailed herein, Defendants' false representations and omissions of material facts about Lordstown's business caused the Lordstown Securities to trade at artificially inflated prices and deceived purchasers of the securities.

433.     As the Defendants' fraud and the previously-concealed, material, adverse information was revealed to the market, the price of Lordstown Securities fell precipitously. Defendants' false and misleading statements concealed material risks from the public, including the truth concerning demand for the Endurance, the true nature of the supposed pre-orders, as well as Lordstown's true production capabilities.  Through Defendants' and other public disclosures, the market became aware of these previously undisclosed risks and/or these risks materialized.  As a result, the price of Lordstown Securities fell precipitously.

434.     Lordstown's stock price reached a Class Period high of $31.57 on February 11, 2021, as a result of Defendants misrepresentations and omissions, as alleged herein.  As the truth was partially revealed to the market, Lordstown's stock price fell to a Class Period low of $6.69.

435.     As the previously-concealed, material, adverse information was revealed to the market and/or the previously undisclosed risks materialized, the price of Lordstown Securities fell precipitously.  In particular:

          (a)     On March 12, 2021, the Hindenburg Report was published, which partially revealed Defendants' fraud concerning the misleading nature of the publicly touted pre-

138

orders for the Endurance and the Lordstown's production capabilities. As a result, the price of Lordstown stock fell 16.54%, when measured close-to-close. However, the disclosures on March 12, 2021 did not reveal the full extent of Defendants' fraud, including the risks that Lordstown bore, given the extent of the fabricated pre-orders and insufficient production capabilities.

(b)      On March 17, 2021, after the close of trading, Lordstown issued a press release regarding its full year 2020 results and held a conference call, where Defendant Burns stated that Lordstown had received an SEC inquiry and disclosed that the board had formed a special committee to review the matters detailed in the short report. The next day, before the market opened, Defendant Burns went on CNBC to defend his prior pre-order statements, in an interview that was strongly criticized by commentators, such as Jim Cramer. As a result, the price of Lordstown stock fell 13.78%, measured close-to-close. However, the disclosures on March 17, 2021 and March 18, 2021 did not reveal the full extent of Defendants' fraud, including the risks that Lordstown bore, given the extent of the fabricated pre-orders and insufficient production capabilities.

(c)      On May 24, 2021, after market close, Lordstown released its First Quarter 2021 results, and disclosed that any production occurring in September would be at "limited capacity," slashing prior production guidance by 50%, and revealing that Lordstown would need additional funding to ramp up production. As a result, the price of Lordstown stock fell 7.45%, measured close-to-open. However, the disclosures on May 24, 2021 did not reveal the full extent of Defendants' fraud, including the risks that Lordstown bore, given the extent of the fabricated pre-orders and insufficient production capabilities.

139

(d)      On June 8, 2021, Lordstown released an amended 10-K, announcing a "going concern" notice, that may need "significant" capital to ramp up production, that the company had "material weaknesses in internal control over financial reporting," and additional information about the SEC investigation.  As a result, the price of Lordstown stock fell 20.86%, measured close-to-intraday low.[13]  However, the disclosures on June 8, 2021 did not reveal the full extent of Defendants' fraud, including the risks that Lordstown bore, given the extent of the fabricated pre-orders and insufficient production capabilities.

(e)      On June 14, 2021, Lordstown released the results of its own internal investigation, whereby admitting that there were "issues regarding the accuracy of certain statements regarding the Company's pre-orders."  The investigation results corroborated many allegations in the Hindenburg Report, including that Lordstown had paid for pre-orders, and that the company had misrepresented that the pre-orders came from fleets when they had not.  Concurrently with the release of the internal investigation report, Lordstown announced the "resignation" of CEO/Chairman Burns and CFO Rodriguez.  As a result, the price of Lordstown stock fell 18.84%, measured close-to-close.  However, the disclosures on June 14, 2021 still did not reveal the full extent of Defendants' fraud, including the risks that Lordstown bore, given the extent of the fabricated pre-orders and insufficient production capabilities.

(f)      On July 2, 2021, *The Wall Street Journal* reported that Lordstown was also under a DOJ investigation related to Defendants' disclosures regarding the pre-orders.  The DOJ investigation was a risk imposed by Lordstown as a result of Defendants' misrepresentations and the revelation of the investigation informed the market of the

---

[13] On June 9, 2021, Lordstown issued a new statement that it was supposedly actively pursuing additional financing with several parties, and the share price increased on this news.

Exhibit B
Page 155

manifestation of this risk, and further indicated the gravity of the misrepresentations to the market. As a result, the price of Lordstown stock fell 10.82%, measured close-to-close.

436. These price declines each removed artificial inflation from the price of Lordstown's common stock, causing real economic loss to investors who had purchased or otherwise acquired Lordstown Securities during the Class Period.

437. The decline in the price of Lordstown's Securities following these revelations and/or materializations of the risk was a direct result of the nature and extent of Defendants' misrepresentations being revealed to investors and the market and/or the previously undisclosed risks having materialized. The timing and magnitude of the price declines and reactions to the news, individually and collectively, negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or company-specific facts unrelated to Defendants' misrepresentations and omissions. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' misrepresentations and omissions, and course of conduct to artificially inflate and artificially maintain the price of Lordstown's common stock, and the subsequent material decline in the value of Lordstown's common stock when Defendants' prior misrepresentations, misleading half-truths, and other deceitful conduct were revealed.[14]

438. Additionally, investors in Lordstown's Class A common stock prior to the Merger, were entitled to redeem their securities in the Merger for a price approximately $10.15 at the time of the Merger. To the extent that any such investor sold their shares for less than that price, after the stock price declined due to the truth being revealed or partially known to the

---

[14] For the avoidance of doubt, it is not alleged that Defendant Hamamoto engaged in fraudulent conduct, but he did make material misrepresentations and omissions.

141

market, those investors suffered economic injury in being deprived of fulsome information that would have caused a reasonable investor to their redemption rights.

### E.    No Safe Harbor

439.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.  The statements at issue are not protected by the PSLRA's safe harbor or the common law bespeaks caution doctrine for a variety of reasons, including the following reasons.

440.    **First**, the statements and omissions alleged to be materially false and misleading relate to historical facts or then-existing conditions and, therefore, are not protected by the safe harbor.  **Second**, to the extent any of the false and misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.  **Third**, any purported forward-looking statements were not accompanied by meaningful cautionary language because risks that were warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized.  **Fourth**, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false or misleading.

441.    Additionally, the PSLRA safe harbor does not apply to any statements made by Defendants Burns or Flannery prior to the close of the Merger, because they were not acting on behalf of the issuer (here DPHC), and the safe harbor only applies to those acting on behalf of the issuer.  15 U.S.C. § 77z–2(a)(2).  The PSLRA safe harbor also does not apply to any statement made in connection with the Merger because (i) connected with the Merger was an offering of securities, and (ii) DPHC was a blank check company, and the safe harbor does not

142

apply to any statement made in connection with any securities offering by a blank check company. 15 U.S.C. § 77z–2(b)(1)(B). The PSLRA safe harbor also does not apply to any statements made in connection with the Merger, because the Merger functionally was an initial public offering of Lordstown and the safe harbor does not apply to statements made in connection with an initial public offering. 15 U.S.C. § 77z–2(b)(1)(E).

## VI.    CLASS ACTION ALLEGATIONS

442.    Plaintiffs brings this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons and entities that (a) purchased or otherwise acquired LTM's Class A Common Stock (ticker: "RIDE" and prior ticker: "DPHC"), LTM's publicly traded warrants (ticker: "RIDEW" and prior ticker: "DPHCW"), LTM's publicly traded units (ticker: "DPHCU"), or any publicly traded option to purchase or sell LTM's Class A Common Stock, from August 3, 2020 through July 2, 2021, inclusive (the "Class Period") and were damaged by the conduct alleged herein and/or (b) held LTM's Class A Common Stock (ticker: "DPHC") on September 21, 2020 and were damaged by the conduct alleged herein (altogether, the "Class").

443.    For the avoidance of doubt, the Class includes persons and entities that purchased or otherwise acquired publicly traded shares, warrants, or units, during the portion of the Class Period when LTM was known as DiamondPeak Holding Corp. For the further avoidance of doubt, the Class includes persons and entities that acquired LTM's Class A Common Stock during the Class Period through the acquisition of the units listed by LTM (while it was known as DiamondPeak), that were comprised of a share of LTM Class A common stock and a portion of a warrant, which units traded under the ticker "DPHCU"). For the further avoidance of doubt, the Class includes persons and entities that acquired LTM's Class A Common Stock during the

143

Class Period through the exercise of warrants (which traded under the tickers "DPHCW" and "RIDEW").

444. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of any entity Defendant; (iv) any company, firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) affiliates of any entity Defendant, including their employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person in (i)-(v) of this paragraph, in their capacities as such.

445. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, LTM had at least 164 million Class A common shares outstanding. Thus, the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

446. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, it is likely that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained either by Lordstown or by other customary means and may be notified of the pendency of this action by mail, using a form of notice as is customary in securities class actions.

447. Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' wrongful conduct in violation of the Exchange Act as alleged and complained of herein.

144

448.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

449.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, without limit:

(a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    whether Defendants' statements made to the investing public during the Class Period contained material misrepresentations;

(c)    whether Defendants' statements omitted material facts that Defendants had a duty to disclose;

(d)    whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)    whether Defendants knew or recklessly disregarded that their statements were materially false and misleading;

(f)    whether Defendants were negligent in issuing materially false and misleading statements or in omitting to disclose information;

(g)    whether Defendants engaged in a fraudulent scheme;

(h)    whether, Defendants' conduct artificially inflated and/or artificially maintained the price of Lordstown and/or DPHC's stock during the Class Period;

145

(i)     whether the Individual Defendants were controlling persons of DPHC or Lordstown;

(j)     whether the proxy materials were a substantial link in the completion of the Merger;

(k)     whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972); and

(l)     whether and to what extent the shareholders of Lordstown and DPHC suffered losses and/or experienced injury due to acts and omissions alleged herein.

450.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in maintaining this action as a class action.

## VII.    COUNTS

**A.      <u>COUNT I: Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants Except Defendants Hamamoto, Schmidt, Brown, and Post</u>**

451.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

452.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by the SEC against all Defendants except Defendant Hamamoto, Schmidt, Brown, and Post.

453. Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by the SEC.

454. Defendants made false and misleading statements of material facts, omitted to state material facts which they had an affirmative duty to disclose under the Exchange Act and SEC rules promulgated thereunder, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

455. Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class.

456. Defendants engaged in a fraudulent intent to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and artificially maintain the inflated price of Lordstown Securities including DPHC and Lordstown's Class A common stock; and (iii) cause Plaintiffs and members of the Class to purchase Lordstown Securities including DPHC and Lordstown's Class A common stock at artificially inflated prices.

457. Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and having prepared, approved, signed and/or disseminated

documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

458.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Lordstown Securities including DPHC and Lordstown's Class A common stock, Plaintiffs and the Class purchased Lordstown Securities including DPHC and Lordstown's Class A common stock at artificially inflated prices during the Class Period.  But for Defendants' fraud, Plaintiffs and the Class would not have bought DPHC's Class A common stock and Lordstown's Class A common stock at such artificially inflated prices.  By purchasing DPHC's Class A common stock and Lordstown's Class A common stock at these artificially inflated prices, Plaintiffs and the Class suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

459.    By virtue of the foregoing, Defendants are liable to Plaintiffs and the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

B.    **COUNT II: Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants Except Defendants Hamamoto, Schmidt, Brown, and Post**

460.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

461.    This Count is brought under Section 10(b) of the Exchange Act and the provisions of SEC Rule 10b-5(a) and (c) promulgated thereunder against all Defendants except Defendant Hamamoto, Schmidt, Brown, and Post.  Accordingly, Plaintiffs need not allege in this Count, nor prove in this case, that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

148

462.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially inflate and artificially maintain the market price of Lordstown Securities including DPHC's Class A common stock and Lordstown's Class A common stock; and (iii) cause Plaintiffs and Class members to purchase Lordstown Securities including DPHC's Class A common stock and Lordstown's Class A common stock at artificially inflated prices.

463.    Defendants' manipulative conduct included, but was not limited to, raising money on the false pretense that there was incredible demand for the Endurance truck and by painting a picture of the demand for that vehicle and scale of pre-orders that was inconsistent with reality; falsely representing the timeline and financial resources needed to produce the Endurance truck in a way that would turn Lordstown into a cash-flow positive company; and hiding material information from the public, such as the fact that Lordstown had experienced a massive fire when testing one of its prototype trucks.

464.    In furtherance of this unlawful plan, scheme, and course of conduct, Defendants employed devices, schemes, and artifices to defraud and manipulate, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a manipulation, fraud, and deceit upon Plaintiffs and the Class in connection with their purchases of Lordstown Securities including DPHC's Class A common stock and Lordstown's Class A common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

465.    Plaintiffs and the Class reasonably relied upon the integrity of the market in which Lordstown's stock traded.

466.     During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme. Had Plaintiffs and the Class known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Lordstown Securities including DPHC's Class A common stock and Lordstown's Class A common stock or if they had, would not have done so at the artificially inflated prices paid for such securities.

467.     As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Lordstown Securities including DPHC's Class A common stock and Lordstown's Class A common stock during the Class Period.

468.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of DPHC's Class A common stock and Lordstown's Class A common stock during the Class Period.

**C.     COUNT III: Violation of Section 14(a) of the Exchange Act Against Defendants LTM, Lordstown EV Corporation, Burns, Flannery, and Hamamoto**

469.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein, except that Plaintiffs expressly disclaim any allegations of fraud for purposes of these claims, including all allegations contained in Section V(B) above.

470.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make

150

the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

471.     Defendants prepared, reviewed, and/or disseminated the false and misleading Proxy Statements which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

472.     As stated herein, the Proxy Statements contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of § 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, which the Proxy Statements were essential links in the consummation of the Merger.

473.     Defendant Hamamoto acted negligently by signing, issuing, and disseminating the proxy materials because they contained the false and misleading statements alleged herein. Moreover, Defendant Hamamoto was the Chairman and Chief Executive Officer of DPHC, and owed investors a fiduciary duty by way of these roles.  Defendant Hamamoto acted negligently by unreasonably making the false and misleading statements alleged herein, given that there was not sufficient information capable of confirming the accuracy of these statements; in fact, readily available information that would be apparent from a reasonably diligent investigation into Lordstown demonstrates the inaccuracy of Defendant Hamamoto's statements, including the truth about the purported pre-orders that Lordstown claimed it had for the Endurance and information about Lordstown's production capabilities (or lack thereof).

474.     Defendant LTM acted negligently in issuing and disseminating the proxy materials because they contained the false and misleading statements alleged herein.  Defendant LTM acted through Defendant Hamamoto, and therefore is negligent to the same extent as Defendant Hamamoto.

475. Defendant Burns acted negligently in issuing and disseminating the proxy materials because they contained the false and misleading statements alleged herein. Defendant Burns was intimately familiar with Lordstown's business and directly made misrepresentations in the proxy materials.

476. Defendant Lordstown EV Corporation acted negligently in issuing and disseminating the proxy materials because they contained the false and misleading statements alleged herein, and Defendant Lordstown EV Corporation acted through Defendant Burns, meaning Defendant Lordstown EV Corporation was negligent to the same extent as Defendant Burns.

477. Defendant Flannery acted negligently in making statements contained within the proxy materials, insofar as he "made" and/or had ultimate control over statements by permitting false and misleading statements to appear next to his name and image and acted negligently in so allowing the proxy statements to be disseminated with such misleading statements to appear next to his name and image. Defendant Flannery directly oversaw Lordstown's sales efforts and was intimately familiar with the true condition of Lordstown's business and sales practices.

478. The written communications made by the Defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications are materially false and/or misleading and were provided in at least a negligent manner.

479. As a direct result of the Defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy Statements, Plaintiffs and members of the Class were deprived of their right to be presented with accurate proxy materials while asked to vote on the Merger, were caused to vote in favor of the Merger, were caused to not exercise their redemption rights.

152

480.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Statements that Defendants used to obtain shareholder approval of and thereby consummate the Merger, Lead Plaintiff and the Class have suffered damages and actual economic losses (*i.e.*, the difference between the inflated price those investors paid when purchasing DPHC stock and the true value of that stock once the inflation is removed).

481.     The omissions and false and misleading statements in the Proxy Statements are material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Proxy Statements and in other information reasonably available to shareholders.

482.     By reason of the misconduct detailed herein, the Defendants are liable pursuant to § 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

**D.     COUNT IV: Violations of §20A of the Exchange Act Against Defendants Schmidt, Rodriguez, Brown, and Post**

483.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.  As set forth in the paragraphs above, and as further set forth below, Defendants Schmidt, Rodriguez, Brown, and Post each committed underlying violations of Section 10(b) and SEC Rule 10b-5 promulgated thereunder by selling LTM's common stock while in possession of material nonpublic information about the Lordstown and, consequently, are liable to contemporaneous purchasers of that stock under Section 20A of the Exchange Act. *See* 15 U.S.C § 78t-1(a).

484.     Each of Defendants Schmidt, Rodriguez, Brown, and Post possessed material nonpublic information when they sold shares between February 2, 2021 and February 4, 2021.

In total, these Defendants collectively sold 249,820 shares of LTM's common stock for proceeds of $6,327,913.00.

485.   Defendants Schmidt, Rodriguez, Brown, and Post created, controlled and/or served in an executive capacity at Lordstown, possessed material nonpublic knowledge about Lordstown's operations that they knew or recklessly disregarded would cause the LTM's share price to fall when publicly disclosed, and cashed out of significant holdings at artificially inflated prices before the material nonpublic information was revealed.  These Defendants were able to sell their shares at prices of between $24.63 and $27.21 per share, as opposed to the price Lordstown would fall to following the revelation of the true condition of Lordstown and materialization of the undisclosed risks.

486.   Due to Defendants Schmidt, Rodriguez, Brown, and Post's conduct in selling shares while in possession of material nonpublic information, which is a violation of Section 10(b) and SEC Rule 10b5 promulgated thereunder, they are each liable under Section 20A of the Exchange Act to all Class members who purchased Lordstown's common stock at inflated prices contemporaneously with these sales, including Plaintiff FNY Managed Accounts LLC.

E.    **COUNT V: Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

487.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

488.   The Individual Defendants acted as controlling persons of LTM and DPHC within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements by and about DPHC and LTM, the Individual Defendants had the power to control the actions of those entities and their employees.

154

489. As alleged herein, the Individual Defendants managed DPHC and LTM and the wrongful conduct alleged herein, including the dissemination of false and misleading statements and omissions through formal corporate processes (such as SEC filings). Due to their involvement in this wrongful conduct, the Individual Defendants were culpable participants in the wrongdoing and securities violations alleged herein.

490. By reason of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act and are liable to Plaintiffs and the Class for damages suffered in connection with their sale or exchange of Lordstown securities during the Class Period.

## VIII. PRAYER FOR RELIEF

491. WHEREFORE, Plaintiffs respectfully pray for judgment against the Defendants as follows:

(a) Determining that this action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Labaton Sucharow as lead class counsel pursuant to Rule 23(g);

(b) Determining and declaring that Defendants violated the Exchange Act by reason of the acts, omissions and, status of control alleged herein;

(c) Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial, together with interest thereon;

(d) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by Lead Plaintiff's consulting and testifying expert witnesses; and

(e) Granting such other and further relief as the Court deems just and proper.

Exhibit B
Page 170

## IX. JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

[signatures on following page]

Exhibit B
Page 171

DATED:  September 10, 2021

**LABATON SUCHAROW LLP**

By: *Carol C. Villegas*

Carol C. Villegas (admitted *pro hac vice*)
David J. Schwartz (admitted *pro hac vice*)
Jake Bissell-Linsk (admitted *pro hac vice*)
140 Broadway, 34th Floor
New York, NY  10005
Telephone: (212) 907-0700
Email: cvillegas@labaton.com
Email: dschwartz@labaton.com
Email: jbissell-linsk@labaton.com

*Counsel for Lead Plaintiff*
*George Troicky and Lead*
*Counsel for the Class*

**THE SCHALL LAW FIRM**

Brian Schall (*pro hac vice* forthcoming)
Rina Restaino (*pro hac vice* forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, CA 60067
Telephone: (424) 303-1964
Email: brian@schallfirm.com
Email: rina@schallfirm.com

*Additional Counsel for Lead*
*Plaintiff George Troicky*

**HAGENS BERMAN SOBOL SHAPIRO LLP**

Steve W. Berman (admitted *pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Email: reed@hbsslaw.com
Email: ucasg@hbsslaw.com

Reed R. Kathrein (admitted *pro hac vice*)
Lucas Gilmore (admitted *pro hac vice*)
1301 Second Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Email: steve@hbsslaw.com

*Counsel for Additional Named Plaintiff Ashith*
*Pabbathi and Additional Counsel for the Class*
*Additional Counsel for the Class*

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim (admitted *pro hac vice*)
Laurence M. Rosen (admitted *pro hac vice*)
Daniel Tyre-Karp (admitted *pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: dtyrekarp@rosenlegal.com

*Counsel for Additional Named Plaintiffs*
*Daniel Tavares and Globestar Systems Inc.*
*and Additional Counsel for the Class*

[signatures continued on following page]

157

Exhibit B
Page 172

**ENTWISTLE & CAPPUCCI LLP**

Andrew J. Entwistle (admitted *Pro Hac Vice*)
Frost Bank Tower
401 Congress Avenue, Suite 1170
Austin, TX 78701
Telephone: (512) 710-5960
Email: aentwistle@entwistle-law.com

-and-

Robert N. Cappucci (admitted *Pro Hac Vice*)
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone: (212) 894-7200
Email: rcappucci@entwistle-law.com

***Attorneys for Plaintiff FNY***
***Managed Accounts LLC***
***and Additional Counsel for the Class***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 10, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Carol C. Villegas*
Carol C. Villegas

Exhibit B
Page 174