Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Charles Linehan (SBN 307439)
  *clinehan@glancylaw.com*
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff Movant*
*Casey McIntosh*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL J. BUTALA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> OWLET, INC. f/k/a SANDBRIDGE ACQUISITION CORPORATION, KURT WORKMAN, KATE SCOLNICK, KEN SUSLOW, DOMENICO DE SOLE, RAMEZ TOUBASSY, JAMIE WEINSTEIN, KRYSTAL KAHLER, and MICHAEL F. GOSS, <br><br> Defendants. | Case No. 2:21-cv-09016-FLA-JEM <br><br> **CASEY MCINTOSH'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF HIS MOTION FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD COUNSEL, AND IN RESPONSE TO THE COURT'S ORDER DATED SEPTEMBER 29, 2022 (Dkt. No. 55)** |

Lead Plaintiff Movant Casey McIntosh ("McIntosh") submits this memorandum of law in further support of his motion for appointment as lead plaintiff, and approval of lead counsel (Dkt. No. 21), and in response to the Court's Order dated September 29, 2022 (Dkt. No. 55, the "Order"). Section II, *infra*, addresses the Court's questions 3 – 6 in the Order, and Section III, *infra*, addresses the Court's questions 1 – 2 in the Order.

## I. INTRODUCTION

McIntosh is the presumptively most adequate plaintiff to be appointed as lead plaintiff because all movants concede that McIntosh has the largest financial interest in this action:

| Movant | LIFO Loss |
|---|---|
| McIntosh | $548,842.69 |
| Tweito | $8,717.09 |
| Simmons | $8,609.47 |
| Conant | $6,522.06 |

McIntosh has also made the required preliminary showing of his adequacy and typicality. As further explained herein, McIntosh purchased a total of 51,776 shares of OBC[1] in 2019 and 2020 on a private marketplace. McIntosh tried to sell approximately 30,303 of his OBC shares in December 2020, but the transaction was blocked by OBC's board. McIntosh did not try to sell any other OBC shares. Based on the Defendants' false and misleading statements, as alleged in this action, McIntosh consented to the business combination in writing on June 22, 2021 (during the class period) as an OBC shareholder and retained his OBC shares so that they would be converted into Owlet shares through the business combination. McIntosh's OBC shares were exchanged for Owlet shares at a 2.053 rate on July 16, 2021, whereby he received a total of 106,306 Owlet shares. Pursuant to the terms of the conversion, McIntosh is prohibited from selling his Owlet shares for a period of 18

---

[1] Capitalized terms herein are as defined in the Order.

months beginning on July 15, 2021. Owlet's share price has decline precipitously since the conversion. McIntosh acquired Owlet shares in reliance on Defendants false and misleading statements and has suffered financial harm. As such, he is typical of other class members and adequate to represent the class as lead plaintiff.

Since the presumption that McIntosh is the most adequate plaintiff has not been rebutted by the competing movants, he should be appointed as lead plaintiff, and no other movant is entitled to consideration. *See In re Cavanaugh*, 306 F.3d 726, 732 (9th Cir. 2002) ("So long as the plaintiff with the largest losses satisfies the typicality and adequacy requirements, he is entitled to lead plaintiff status . . . .").

Moreover, the creation of subclasses is not warranted at this stage. Courts throughout the country overwhelmingly reject proposals from competing movants to carve out subclasses over which they can be appointed as additional lead plaintiffs. Appointing additional lead plaintiffs at the outset multiplies the cost of litigation to the class and is contrary to the purpose of the PSLRA to prevent lawyer-driven litigation. Creation of subclasses is better addressed at class certification, if necessary, after the issues in the action have been clarified through any motions to dismiss and/or discovery. Moreover, there is substantial overlap between the Section 10(b) claimants and Section 14(a) claimants in this action. In particular, the Section 10(b) claims are based, in part, on allegations that Owlet published a false and misleading proxy statement prior to the business combination—which is also the basis of the Section 14(a) claim. As such the claimants' interests are overwhelmingly aligned. Finally, no competing movant has established a conflict among the claimants that would necessitate a subclass at this stage. As such, the single class of claimants in this action should not be divided into subclasses.

For these reasons, and as explained further below, McIntosh should be appointed as the sole lead plaintiff over the singular class.

## II. IT IS PREMATURE AT THIS STAGE TO DIVIDE THE CLASS INTO VARIOUS SUBCLASSES WITH THEIR OWN LEAD PLAINTIFFS

This section addresses the Court's questions 3 – 6 presented in the Court's Order at 12. In short—at this stage of the litigation, the class should not be divided into subclasses. There are common issues of fact and law between the Section 10(b) and Section 14(a) claims such that the action can be prosecuted by a single lead plaintiff, and, to the extent distinctions arise through the course of motion practice or discovery, they are better addressed at class certification. Counsel for McIntosh presently takes no position as to whether the class should be divided into subclasses at class certification and would prefer to preserve the issue for resolution at that time. A movant that lacks standing to assert a Section 14(a) claim may (and McIntosh does) satisfy the requirements of Rule 23 to the extent necessary to be appointed lead plaintiff of a class in which some members have Section 14(a) claims. The same is true for movants that lack standing to assert Section 10(b) claims.

### A. The Weight of Authority Rejects the Creation of Multiple Subclasses and Appointment of Multiple Lead Plaintiffs to Oversee Them at the Lead Plaintiff Appointment Stage

The weight of authority in this Circuit and throughout the country rejects the appointment of multiple lead plaintiffs to represent various subclasses. *See Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146, 1150-51 (N.D. Cal. 1999) (rejecting the "appointment of multiple lead plaintiffs" to represent different claims under different provisions of the Exchange Act and Securities Act, including claims under Sections 10(b) and 14(a)); *Pipefitters Loc. 522 & 633 Pension Tr. Fund v. JDS Uniphase Corp.*, No. 02-cv-1486, 2002 WL 35650215, at \*6 (N.D. Cal. Aug. 7, 2002) ("[T]he purposes of the PSLRA and considerations of judicial economy counsel against appointment of a separate lead plaintiff for the [Section 11 and Section 14(a)] 'niche' classes."); *In re Surebeam Corp. Sec. Litig.*, No. 03-cv-1721, 2004 WL 5159061, at \*9 (S.D. Cal. Jan. 5, 2004) ("the majority of courts have refused to appoint niche lead plaintiffs") (collecting cases); *Weinberg v. Atlas Air Worldwide*

*Holdings, Inc.*, 216 F.R.D. 248, 254 (S.D.N.Y. 2003) ("Designating multiple Lead Plaintiffs to represent each cause of action would fracture the litigation and 'obstruct any efficient and controlled progress.'") (quoting *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 451 (S.D. Tex. 2002)); *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 258 F.R.D. 260, 271 (S.D.N.Y. 2009) (rejecting the "proposed appointment [of a] niche plaintiff for the Section 14(a) class").

The caselaw rejecting appointment of multiple lead plaintiffs to represent different claims under the Exchange Act and Securities Act is particularly notable because both Acts have their own distinct provisions mandating the appointment of a lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3) (Section 21D(a)(3) of the Exchange Act); 15 U.S.C. § 77z-1(a)(3) (Section 27 of the Securities Act). Appointment of multiple lead plaintiffs is even less warranted here, where both claims (Section 10(b) and Section 14(a)) fall under the Exchange Act and are governed by one provision mandating the appointment of a "lead plaintiff." *See* 15 U.S.C. § 78u-4(a)(3).

Courts reject subclasses at this stage in part because appointing multiple lead plaintiffs and creating multiple subclasses at the outset defeats the purpose of the PSLRA—to minimize lawyer-driven litigation—and unnecessarily expands litigation costs at the expense of the class. *See Surebeam*, 2004 WL 5159061, at *9 ("appoint[ing] subclasses with separate lead plaintiffs" would "run counter to one of the stated purposes of the PSLRA which is to minimize costs; and to give control of the litigation to lead plaintiffs") (quoting *Greenberg v. Bear Stearns & Co.*, 80 F. Supp. 2d 65, 69-70 (E.D.N.Y. 2000)); *Bank of America*, 258 F.R.D. 260, 271 (appointing a lead plaintiff to oversee a Section 14(a) subclass "would add to the expense of the litigation, to the detriment of BofA shareholders"). Multiple lead plaintiffs and multiple lead counsel also creates the risk of generating conflict where none need exist. *See Aronson*, 79 F. Supp. 2d at 1151 ("Although each plaintiff undoubtedly has an interest in securing an outcome most favorable to its position, 'every warrior in this battle cannot be a general.'") (citation omitted).

**B.     Creation of Subclasses and Addition of Class Representatives Is Best Addressed at Class Certification, If Necessary**

Creation of subclasses and appointment of other class representatives should be addressed at class certification. *See Aronson*, 79 F. Supp. 2d at 1151 n.4 (niche plaintiffs may "rais[e] the same issues during the Rule 23 class certification process, where their concerns are much more germane"); *Bank of America*, 258 F.R.D. 260, 271 ("[w]hether subclasses are necessary . . . may be revisited [at class certification]"); *Irving Firemen's Relief & Ret. Fund v. Tesco PLC*, No. 14-cv-10020, 2015 WL 1345931, at *5 (S.D.N.Y. Mar. 19, 2015) ("'If certain class claims cannot be advanced because of standing . . . issues, this deficiency can be corrected [at the class certification stage] by the designation of other members of the purported class as named plaintiffs or class representatives.'") (quoting *Fishbury, Ltd. v. Connetics Corp.*, No. 06-cv-11496, 2006 WL 3711566, at *4 (S.D.N.Y. Dec. 14, 2006)).

Moreover, prior to class certification, the Defendants are expected to file a motion to dismiss. Resolution of the motion to dismiss or any discovery thereafter might impact the issues presented at class certification—including creating or eliminating a need for subclasses. Creating subclasses and appointing representatives to lead them at this early stage is premature.

**C.     McIntosh's Claims Are Typical of the Claims of Other Class Members and He Will Adequately Represent Their Claims Without Subclasses**

McIntosh's claims are typical of the claims of the class because, like all members of the class, his claims are based on allegations that the Defendants made false and/or misleading statements, and that he was injured when the truth became known.

In particular, here, the Section 10(b) and Section 14(a) claims substantially overlap. McIntosh's Section 10(b) claim is based, in part, on the allegation that Owlet's proxy statement, filed on June 21, 2021, was false and misleading. *See* Dkt. No. 1 (Complaint) at ¶¶ 30, 32. The allegation that the proxy statement was false and

misleading is also the basis of the Section 14(a) claim. *See id.* at ¶ 75. Moreover, any Section 10(b) claimant that purchased Owlet (then named "Sandridge") shares between March 31, 2021 and June 1, 2021, and held their shares through July 14, 2022, would also have a Section 14(a) claim.

Similarly, while McIntosh acquired his Owlet shares as a result of the business combination, his Section 10(b) claims are based on the same false statements and corrective disclosures as the claims of those individuals that purchased Owlet shares on the open market before or after the business combination. Moreover, as pointed out in McIntosh's reply memorandum, following the business combination, it appears that "81% of all outstanding Owlet shares were acquired in the same way that McIntosh acquired his shares." *See* Dkt. No. 50 at 5. Acquiring shares through the business combination is therefore not atypical.

While McIntosh's claims are not "identical" to all other class members' claims, that is not required to establish typicality at the lead plaintiff appointment stage. *See Tanne v. Autobytel, Inc.*, 226 F.R.D. 659, 667 (C.D. Cal. 2005) ("Under Rule 23's permissive standards, representative claims are typical if they are reasonably co-extensive with those of absent class members; they need not be substantially identical.") (citation, brackets, and internal quotation marks omitted). As such, McIntosh's claims are typical of the claims of other class members.

McIntosh is also adequate to represent the claims of the class. He is a software executive and has been managing his own investment portfolio for approximately 20 years. *See* Dkt. No. 22 at 9. He has also retained competent and experienced counsel with the resources and expertise necessary to efficiently and effectively prosecute this action. *Id.* McIntosh also submits a declaration herewith attesting to his adequacy. *See* Declaration of Charles H. Linehan, Ex. A (Declaration of Casey McIntosh), filed concurrently herewith. As such he has the incentive and ability, the typicality and adequacy, to represent the class.

**D.      No Competing Movant Has Established a Conflict that Necessitates the Creation of a Subclass or the Appointment of Additional Lead Plaintiffs**

No competing movant has established that there is a conflict between McIntosh's Section 10(b) claims and the claims of other Section 10(b) claimants or the Section 14(a) claimants. As such, the basis on which some courts allow subclasses at the lead plaintiff stage is not present here. *See Pipefitters,* 2002 WL 35650215, at *6 (rejecting a subclass and additional lead plaintiff because it "has not presented evidence that the presumptive lead plaintiff has an actual conflict of interest that would prevent it from vigorously pursuing claims under section 11 of the Securities Act or section 14 of the Exchange Act"); *Tanne v. Autobytel, Inc.*, 226 F.R.D. 659, 670 (C.D. Cal. 2005) (declining to appoint an additional Section 11 lead plaintiff in part because he "has not made any showing that a conflict of interest exists within the class"); *McKesson*, 79 F. Supp. 2d at 1150-51 (similar). Accordingly, no subclasses or additional lead plaintiffs are warranted at this stage of the litigation, and McIntosh alone should be appointed as lead plaintiff over the single class.

**III.    THE CIRCUMSTANCES BY WHICH MCINTOSH ACQUIRED HIS SHARES RENDER HIM ADEQUATE TO REPRESENT THE CLASS, AND SUFFICIENTLY TYPICAL OF OTHER CLASS MEMBERS**

This section addresses the Court's questions 1 – 2 presented in the Court's Order at 12.

McIntosh acquired Owlet shares in reliance on the Defendants' materially false and misleading statements as alleged in the Complaint, and was injured thereby. McIntosh purchased a total of 51,776 shares of OBC in 2019 and 2020 on a private marketplace called SharePost (now owned by Forge Global, Inc.). *See* Declaration of Casey McIntosh ¶ 3. The purchases required OBC board approval, which McIntosh received. *Id.* McIntosh tried to sell 30,303 of his OBC shares in December of 2020, but the transaction was not approved by the OBC board. *Id.* at ¶ 4. McIntosh did not try to sell any other OBC shares. *Id.* Thereafter, based on the false and misleading information provided by the Defendants, McIntosh consented to the business

combination in writing on June 22, 2021 (which falls within the Class Period) as an OBC shareholder, and retained his OBC shares so that they would be converted into Owlet shares through the business combination. *Id.* at ¶ 5. In the business combination, each share of OBC was converted into a right to receive approximately 2.053 shares of Owlet, which McIntosh fully exercised to acquire 106,306 shares of Owlet on July 16, 2021. *Id.* at ¶ 6. Following the conversion, pursuant to the terms of the conversion, McIntosh is prohibited from selling his shares for 18 months beginning on July 15, 2021.[2] *See* Business Combination Agreement by and Among Sandbridge Acquisition Corporation, Project Olympus Merger Sub, Inc., and Owlet Baby Care Inc. Dated as of February 15, 2021, p. 21.[3] Since his acquisition, Owlet's share price has declined precipitously.

McIntosh, like all Section 10(b) claimants, acquired shares of Owlet in reliance on Defendants' materially false and misleading statements regarding, among other things, the prospects of the business combination. Like all members of the class, the price of McIntosh's shares has declined in response to revelations of the truth regarding Defendants' misstatements. As such, McIntosh is typical of the class and adequate to represent the class.

## IV.    CONCLUSION

For these reasons, subclasses should not be created at this stage of the litigation, and McIntosh should be appointed as lead plaintiff.

---

[2] There are two exceptions to the lock-up which have not materialized because Owlet's share price has been too low. First, one-third of the shares subject to the lockup are released on the date on which the last reported sale price of Owlet common stock equals or exceeds $12.50 per share for any 20 trading days within any 30-trading day period commencing at least 240 days after of the merger. Second, an additional one-third of the shares subject to the lock-up release on the date on which the last reported sale price of Owlet common stock equals or exceeds $15.00 per share for any 20 trading days within any 30-trading day period commencing at least 240 days after closing this transaction.

[3] Available at https://www.sec.gov/Archives/edgar/data/1816708/000114036121004865/nt10020073x2_ex2-1.htm (last visited October 13, 2022).

DATED:  October 13, 2022

**GLANCY PRONGAY & MURRAY LLP**

By:  _s/ Charles H. Linehan_

Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  clinehan@glancylaw.com

_Counsel for Plaintiffs Casey McIntosh and Proposed Lead Counsel for the Class_

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007
Email: fcruz@frankcruzlaw.com

_Additional Counsel_

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On October 13, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 13, 2022, at Los Angeles, California.

*s/ Charles H. Linehan*
Charles H. Linehan