POMERANTZ LLP
Tamar A. Weinrib (*pro hac vice*)
600 Third Avenue, 20th floor
New York, New York 10016
Telephone: (646) 581-9973
taweinrib@pomlaw.com

*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL J. BUTALA, Individually and on Behalf of All Others Similarly Situated, | Case No.: 2:21-cv-09016-FLA-JEM |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| OWLET, INC. f/k/a SANDBRIDGE ACQUISITION CORPORATION, KURT WORKMAN, KATE SCOLNICK, KEN SUSLOW, RICHARD HENRY, DOMENICO DE SOLE, RAMEZ TOUBASSY, JAMIE WEINSTEIN, KRYSTAL KAHLER, and MICHAEL F. GOSS, | |
| Defendants. | |

AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

NATURE OF THE ACTION AND OVERVIEW ..........................................................1

JURISDICTION AND VENUE ................................................................................6

PARTIES.................................................................................................................6

CONFIDENTIAL WITNESSES ..............................................................................9

SUBSTANTIVE ALLEGATIONS .........................................................................10

    Background..................................................................................................10

        The De-SPAC Transaction..............................................................10

        Owlet's Flagship Smart Sock Device ..............................................13

        Defendants Flout FDA Regulations ................................................15

        Defendants Mislead Sandbridge Shareholders Eligible to Vote on the De-SPAC Merger ........................................................................21

        Defendants Had a Duty to Disclose that Owlet Marketed and Sold the Smart Sock in Contravention of FDA Regulations....................................25

        Executive Compensation.................................................................27

    Materially False and Misleading Statements in the Proxy Statements .................27

    The Business Combination is Completed.............................................................39

    The Truth Emerges .............................................................................................40

CLASS ACTION ALLEGATIONS.........................................................................45

LOSS CAUSATION ..............................................................................................47

NO SAFE HARBOR ..............................................................................................48

COUNT I ...............................................................................................................49

COUNT II..............................................................................................................50

PRAYER FOR RELIEF .........................................................................................52

JURY TRIAL DEMANDED ........................................................................................52

Lead Plaintiff Drew Conant ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Owlet, Inc. ("Owlet" or the "Company"), analyst reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that held Sandbridge common stock held as of June 1, 2021 and were eligible to vote at Sandbridge's special meeting on July 14, 2021. The Proxy Statement Defendants disseminated to solicit shareholder approval for the business combination of Sandbridge Acquisition Corporation with Owlet Baby Care Inc. contained numerous false and misleading statements in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a) respectively, and SEC Rule 14a-

9, 17 C.F.R. § 240.14a-9 ("Rule 14a-9"). These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

2. Sandbridge was a special purpose acquisition company ("SPAC"), a publicly traded blank check company, formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses. As a SPAC in search of a business to acquire, Sandbridge had no ongoing business operations.

3. On July 15, 2021, Sandbridge combined with Owlet Baby Care Inc., a company that designs and sells products and services for parents to proactively monitor the health and wellness of their children, via a "de-SPAC"[1] transaction, a type of reverse merger. The combined company was renamed Owlet (the "Business Combination" or "de-SPAC Merger").

4. Owlet's self-described flagship product at the time of the de-SPAC Merger was the Smart Sock, a baby monitor utilizing pulse oximetry sensors to track a baby's heart rate, oxygen levels, skin temperature, and sleep patterns. The Smart Sock, which earned the Company the majority of its revenues, was designed to provide continuous real time monitoring of vital signs (*i.e.,* oxygen saturation, and heart rate) in newborns via a pulse oximeter- embedded sock and to produce sleep reports for parents each morning.

AMENDED CLASS ACTION COMPLAINT

2

5.     The Smart Sock was meant to identify and alert parents to respiratory-driven infant health issues like desaturation (low blood oxygen levels) and bradycardia (a heart rate that's too slow), and to thus prevent SIDS (Sudden Infant Death Syndrome), the number one infant cause of death in the first 12 months, and respiratory issues, which are the number one reason for pediatric emergency room visits, resulting in over 92 million emergency room visits in a child's first four years.

*6.*     For five years preceding the de-SPAC Merger, the FDA had communicated to Owlet that the Smart Sock qualifies as a medical "device" under the Federal Food, Drug, and Cosmetic Act ("Act"), 21 U.S.C. § 321(h), because it is used to diagnose health conditions in babies.  Pursuant to the Act, before a company can sell a medical device it must seek pre-authorization from the FDA.  Nevertheless, despite clear admonitions from the FDA making clear to Owlet that the Smart Sock is a medical device, Owlet continued to market the Smart Sock without the requisite approvals in violation of FDA regulations.  Moreover, Defendants represented in the Proxy Statement they prepared and disseminated to solicit Sandbridge shareholders' approval of the de-SPAC Merger, that the Smart Sock is not a medical device ***and*** that Owlet had complied in all material respects with FDA regulations.  While the Proxy Statement noted that the FDA could potentially disagree with the Company's position, it did not disclose that the FDA had already been communicating that disagreement to Owlet *for years.*  Owlet's

---

[1] A "de-SPAC" transaction is a merger between a SPAC, a buying entity, and a target

egregious contravention of FDA regulations, raised the risk that the FDA would require Owlet to halt all marketing and distribution of the product to seek FDA approval. Moreover, the Sandbridge Board used projections prepared by Owlet management and included in the Proxy Statement as a basis for determining the fair value of the common stock and for recommending approval of the merger. Those projections, which forecast revenues skyrocketing from $75.2 million in 2020 to $1.06 billion in 2025, were based on the false premise that the FDA would permit the Company to continue to sell the Smart Sock, which Owlet made plain it relied upon "*for the majority of our revenue and expect[ed] to continue to do so for the foreseeable future.*"

7. On October 4, 2021, Owlet revealed that it had received a Warning Letter from the U.S. Food and Drug Administration ("FDA"), which stated that "the Company's marketing of its Owlet Smart Sock product . . . renders [it] a medical device requiring premarket clearance or approval from FDA." Owlet has not obtained such clearance or approval. Moreover, the FDA "requests the Company cease commercial distribution of the Smart Sock for uses in measuring blood oxygen saturation and pulse rate where such metrics are intended to identify or diagnose desaturation and bradycardia using an alarm functionality to notify users that measurements are outside of preset values."

private business.

AMENDED CLASS ACTION COMPLAINT
4

8. On this news, Owlet's stock price fell $1.29, or 23%, to close at $4.19 per share on October 4, 2021, on unusually heavy trading volume. As a result, Sandbridge investors who could have voted against the Business Combination and redeemed their shares at $10.00 per share suffered a loss of $5.81 per share.

9. In the Proxy Statements, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Owlet was reasonably likely to be required to obtain marketing authorization for the Smart Sock because the FDA concluded, and communicated to Owlet as early as 2016, that it was a medical device; (2) that Owlet thus marketed and sold the Smart Sock in violation of FDA regulations; (3) that, as a result, Owlet was reasonably likely to have to cease commercial distribution of the Smart Sock in the U.S., thus losing its main source of revenue; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

10. For the foregoing reasons, and as set forth below, Plaintiff and other Class members have suffered significant damages as a result of Defendants' violations of Sections 14(a) and 20(a) of the Exchange Act.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) because Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, Sandbridge's principal executive offices were located in this District.

14. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15. Lead Plaintiff Drew Conant, as set forth in his certification previously filed with this Court (Dkt. 19-3), incorporated by reference herein, held Sandbridge common stock as of June 1, 2021, was eligible to vote at Sandbridge's special meeting on July 14,

2021, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.   Defendant Owlet is incorporated under the laws of Delaware with its principal executive offices located in Lehi, Utah.  Owlet's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "OWLT" and its warrants trade under the symbol "OWLT WS."  Prior to the Business Combination, the Company's Class A common stock traded under the symbol "SBG," and its redeemable warrants traded under the symbol "SBG WS."  Also, prior to the Business Combination, the Company's principal executive offices were located in Los Angeles, California.

17.   Defendant Kurt Workman ("Workman") was the Company's Chief Executive Officer ("CEO") at all relevant times.

18.   Defendant Kate Scolnick ("Scolnick") was the Company's Chief Financial Officer ("CFO") at all relevant times.

19.   Defendants Workman and Scolnick, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Defendants Workman and Scolnick provided the information regarding Owlet contained in the Proxy Statements, and were provided with copies of the Proxy Statements alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to

prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, Defendants Workman and Scolnick knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. Defendants Workman and Scolnick are liable for the false statements pleaded herein.

20. Defendant Ken Suslow ("Suslow") was the Chairman of the Board of Directors of Sandbridge. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

21. Defendant Richard Henry ("Henry") was the Chief Financial Officer, Principal Financial and Accounting Officer of Sandbridge. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

22. Defendant Domenico De Sole ("De Sole") was a director of Sandbridge at all relevant times. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

23. Defendant Ramez Toubassy ("Toubassy") was a director of Sandbridge at all relevant times. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

AMENDED CLASS ACTION COMPLAINT
8

24. Defendant Jamie Weinstein ("Weinstein") was a director of Sandbridge at all relevant times. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

25. Defendant Krystal Kahler ("Kahler") was a director of Sandbridge at all relevant times. She solicited and/or permitted the use of her name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

26. Defendant Michael F. Goss ("Goss") was a director of Sandbridge at all relevant times. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

27. Defendants Workman, Scolnick, Suslow, De Sole, Toubassy, Weinstein, Kahler, Henry, and Goss are collectively referred to herein as the "Individual Defendants."

**Confidential Witnesses**

28. Confidential Witness ("CW") 1 worked as the Chief Brand Officers at Owlet from February 2019 to January 2021.

29. CW2 worked as a Product Marketing Manager at Owlet from September 2020 to April 2021.

30. CW3 worked at Owlet as a Senior Product Marketing Manager from July 2021 to March 2022.

AMENDED CLASS ACTION COMPLAINT
9

## SUBSTANTIVE ALLEGATIONS

### Background

### The De-SPAC Transaction

31.    A special purpose acquisitions company ("SPAC") is a form of reverse merger.  It is a shell company set up for the sole purpose of raising money through an IPO to eventually acquire another company.  A SPAC has no commercial operations, makes no products and does not sell anything. In fact, the SPAC's only assets are typically the money raised in its own IPO.  A company might choose to go public through a SPAC versus a traditional IPO because the process is quicker, with lower associated costs and *fewer extensive financial disclosure requirements*.  The main difference between a SPAC and a traditional reverse merger is that a SPAC shell company proactively seeks a target to acquire with the proceeds of its IPO.

32.    In recent years, SPACs have garnered a great deal of attention and concern among U.S. regulators and investors. With less regulatory vetting than traditional IPOs, the boom in SPACs puts investors at risk. Accordingly, the SEC has increased scrutiny of the sector – from SPAC marketing and fees to disclosures, conflicts of interest, and accounting treatment.

33.     John Coates, Acting Director, Division of Corporate Finance at the SEC stated the following on April 8, 2021 (emphasis added):

> The basics of a typical SPAC are complex, but can be simplified as follows.... It proceeds in two stages. In the first stage, it registers the offer and sale of redeemable securities for cash through a conventional underwriting, ... and places the proceeds in a trust for a future acquisition of a private operating company.
>
> In their second stage, SPACs complete a business combination transaction, in which the SPAC, the target (i.e., the private company to be acquired), or a new shell "holdco" issues equity to target owners, and sometimes to other investors. SPAC shareholders typically have a vote on the so-called "de-SPAC" transaction....
>
> Some ... practitioners and commentators have claimed that an advantage of SPACs over traditional IPOs is lesser securities law liability exposure for targets and the public company itself....
>
> *[But] any material misstatement in or omission from an effective Securities Act registration statement as part of a de-SPAC business combination is subject to Securities Act Section 11. Equally clear is that any material misstatement or omission in connection with a proxy solicitation is subject to liability under Exchange Act Section 14(a) and Rule 14a-9, under which courts and the Commission have generally applied a "negligence" standard.*

John Coates, *SPACs, IPOs and Liability Risk under the Securities Laws*, U.S. Sec. & Exch. Comm'n (Apr. 8, 2021), https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities- laws.

34.   The de-SPAC Merger structure has been harshly criticized as enabling fraud that financial journalists have wondered, pointedly, "*SPACs and fraud: [a] bug or a feature?*"[2]

35.   Sandbridge was a SPAC formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses.  It completed its initial public offering ("IPO") on or about September 14, 2020, selling 23 million units at $10.00 per unit.  Each unit consists of one share of Sandbridge Class A common stock and one-half of one public warrant of Sandbridge.

36.   Sandbridge had considerable discretion in identifying and consummating a business combination, but only had 24 months from the closing date of the IPO to complete a business combination, or else its corporate existence would cease, except for purposes of winding up its affairs and liquidating. Thus, Sandbridge was required to hold the approximately $230 million of proceeds from its IPO in a trust account, which were to be released only upon the consummation of a business combination or liquidation.

37.   On July 15, 2021, Sandbridge acquired Owlet Baby Care Inc., via a "de-SPAC" transaction, a type of reverse merger.  The combined company was renamed Owlet.

---

[2] *E.g.*, Andrew Ross Sorkin, et al., *SPACs on Trial: Charges Against the Founder of Nikola Cast a Shadow Over the Blank-Check Boom*, N.Y. Times, July 30, 2021.

AMENDED CLASS ACTION COMPLAINT
12

38.    The Proxy Statement that solicited shareholder approval of the de-SPAC Merger was an essential link in the accomplishment of the de-SPAC Merger. Indeed, the Proxy Statement made clear that without shareholder approval, Defendants could not effectuate the Business Combination:

> Sandbridge cannot complete the Business Combination unless Sandbridge's stockholders consent to the approval of the Business Combination Agreement and the transactions contemplated thereby. Sandbridge is sending you this proxy statement/prospectus to ask you to vote in favor of these and the other matters described in this proxy statement/prospectus.

39.    The Sandbridge Board did not obtain a third-party valuation or fairness opinion in connection with its determination to approve the Business Combination.  The Proxy Statement also made clear that shareholders "***should rely <u>only</u> on the information contained in this proxy statement/prospectus***."

### Owlet's Flagship Smart Sock Device

40.    Owlet designs and sells products and services for parents to proactively monitor the health and wellness of their children. Its self-described flagship product at the time of the de-SPAC Merger was the Smart Sock, which Owlet released in 2015. The Smart Sock was a baby monitor utilizing pulse oximetry sensors embedded in a sock to track a baby's heart rate, oxygen saturation, skin temperature, and sleep patterns. It monitored these vital signs continuously in real time and was designed to identify and alert parents to respiratory-driven infant health issues like desaturation (low blood oxygen levels) and bradycardia (a heart rate that's too slow), and to thus prevent SIDS

AMENDED CLASS ACTION COMPLAINT

(Sudden Infant Death Syndrome), the number one infant cause of death in the first 12 months, and respiratory issues, which are the number one reason for pediatric emergency room visits, resulting in over 92 million emergency room visits in a child's first four years. The Smart Sock also produced sleep reports for parents each morning. Owlet described the Smart Sock's diagnostic function in the Proxy Statement, explaining that, "If the baby's readings ever fall outside of preset zones, parents are notified through the Owlet application and a nearby base station that the baby may need attention." In other words, the Smart Sock alerted parents to potential events of desaturation and bradycardia.

41. Tigress Financial Company issued an analyst report on March 12, 2021 initiating coverage for Sandbridge with a "Buy" rating based on it's the expected de-SPAC Business Combination with Owlet. Tigress' rosy investment thesis, describing a positive outlook for the Company, emphasized Owlet's "initial and market-leading product, the Smart Sock," and described Owlet as therefore having an "industry-leading position." Similarly, Cowen initiated coverage on Owlet on July 26, 2021 with an "Outperform" rating and a $14.00 price target, based on the advantages of the Smart Sock over hospital pulse oximetry machines, that it was "disrupting the traditional baby monitoring, health and safety space," and because based on Owlet's then-current portfolio of Smart Sock products Cowen estimated a global total addressable market of

$19.5 billion which it expected would double to almost $40 billion by 2025 assuming the continuation of its existing lines and the addition of new products.

## Defendants Flout FDA Regulations

42.     Owlet has always marketed and sold its Smart Sock as a monitor that tracks baby's vital signs, such as heart rate and oxygen levels, and that alerts parents to potential health events when these vital signs leave preset zones.

43.     Under the Act, 21 U.S.C. § 321(h), the Smart Sock qualified as a "device" because it is:

> an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is… intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or intended to affect the structure or any function of the body of man or other animals…

44.     Indeed, Defendant Workman admitted in May 2013 when presenting a prototype of the Smart Sock during the International Business Machines Competition at Harvard University that the Smart Sock is a medical device when he stated during his presentation that the Smart Sock with the alarm feature was "a Class II[3] device . . . [b]ecause it's sounding an alarm." He further stated, "[a]larm plus pulse oximeter means

---

[3] Under the Medical Device Amendments of 1976 there are three difference classes of medical devices: a Class I medical device "does not present a potential unreasonable risk of illness or injury." 21 U.S.C. § 360c(a)(1)(A); a Class II medical devices represent a moderate to high level of risk to the patient or user. 21 U.S.C. § 360c(a)(1)(B); and a medical device is Class III if it is "purported or represented to be for a use in supporting

AMENDED CLASS ACTION COMPLAINT
15

that you need FDA clearance." When Owlet officially launched the Smart Sock in October 2015, the Company once again confirmed that the Smart Sock functioned as a medical device by explaining that its "sole purpose" was "to alert parents if their baby is not breathing or if the baby's heart rate is out of range," *i.e.* if their baby is having a medical event, and further touting that the "alert strategy was set by a team of pulse oximetry specialists, pediatricians, neonatologists and pulmonologists."

45. Further recognizing that the Smart Sock functioned as a medical device and needed to be manufactured accordingly, Owlet chose a manufacturer called Benchmark Electronics Inc., which specializes in medical devices. Among other unrelated markets (like defense and commercial aerospace), Benchmark operates in the ***medical technologies*** sector, explaining: "Your device deserves an experienced partner in medical engineering and manufacturing. Since our inception as a manufacturing subsidiary of a ***medical device company***, Benchmark leads the market."

46. While Owlet avoided using words like "device" or "diagnose" in marketing materials, its marketing message still consistently made clear that the Smart Sock is a device that tracks babies vital signs and alerts parents if the baby's heart rate or oxygen levels leave preset safe zones, *i.e.*, the Smart Sock was "intended for use in the diagnosis of disease or other conditions," including desaturation (low blood oxygen levels) and bradycardia (slower than normal heart rate).

or sustaining human life or for a use which is of substantial importance in preventing

AMENDED CLASS ACTION COMPLAINT
16

47. Owlet always marketed the Smart Sock this way on its website and at numerous mass retailers including Amazon, Walmart, and Target:

⇒ Amazon Web Site: https://www.amazon.com/Owlet Smart Sock 3

   o "Track the most important indicators of your baby's health–like oxygen level, heart rate, and total hours slept"

   o "If your baby's readings leave preset "safe" zones, the Smart Sock will immediately notify you that your baby needs your attention."

⇒ Owlet Sales: https://owletcare.com/

   o "We look at the best indicators of your baby's overall well-being and will proactively notify you if your baby may need you."

   o "Track heart rate, oxygen level, and sleep trends."

⇒ Walmart Sales: https://www.walmart.com/ip/Owlet-Smart-Sock-Baby-Monitor/167836816

   o "Owlet Smart Sock 2 Baby Monitor, Tracks Heart Rate & Oxygen"

   o "Rest easy knowing you'll receive proactive notifications via lights and sounds if your baby's oxygen level or heart rate leave preset zones"

   o "View real-time heart rate and oxygen level and receive notifications from any connected device using the Owlet app"

⇒ Target Sales: https://www.target.com/p/owlet-smart-sock-3-baby-monitor-with-oxygenheart-rate/-/A-83704325?preselect=79727730#lnk=same tab

   o "Owlet Smart Sock 3 Baby Monitor with Oxygen & Heart Rate"

   o "Tracks the baby's heart rate and oxygen level

impairment of human health." 21 U.S.C. § 360c(a)(1)(C).

AMENDED CLASS ACTION COMPLAINT

17

o Tells you when Baby needs you

o Measures how long and how well the baby slept

48.    ***The Act, however, states that a company cannot sell medical devices without marketing approval, clearance or authorization from the FDA***.  Defendants acknowledged their awareness of the relevant FDA regulations by comprehensively setting them forth in the Proxy Statement.

49.    There are multiple ways to obtain such authorization. A company like Owlet looking to market and sell a Class II device can make a 510(k) premarket submission to the FDA to demonstrate that the device to be marketed is as safe an effective, *i.e.*, substantially equivalent, to another legally marketed device.  The legally marketed device to which equivalence is drawn is known as the predicate device.  A device is substantially equivalent if, in comparison to a predicate device it has the same intended use and has the same technological characteristics, does not raise different questions of safety and effectiveness, and the information submitted to the FDA demonstrates that the device is as safe and effective as the legally marketed device. However, if the device is considered high risk, *i.e.*, Class III, the FDA requires a premarket approval ("PMA"), the most stringent type of premarket submission, which would require Owlet to provide valid scientific evidence demonstrating reasonable assurances of safety and effectiveness for the device's intended use.

50.     Defendants well knew that if a company fails to obtain authorization from the FDA to market and sell a device, the device is deemed "adulterated," under 21 U.S.C. § 351(f)(1)(B).   FDA regulations prohibit a company from introducing or delivering for introduction, an adulterated device into interstate commerce. *See* 21 U.S.C. § 331(a).

51.     Beginning as early as 2016, the FDA explicitly communicated to Owlet that the Smart Sock was a device under the definition of the Act.  ***Nevertheless, Owlet continued to market and sell the Smart Sock without FDA authorization***.[4]  The FDA warned Owlet again in 2017 that the Smart Sock was a medical device and that Owlet thus needed to seek the requisite FDA authorization.[5]

52.     Indeed, CW1, CW2 and CW3 all confirmed that the FDA had warned Owlet about how it marketed the Smart Sock years before the de-SPAC Merger. According to CW1, it was common knowledge that due to multiple admonitions from the FDA, including cautionary letters, Owlet had to be careful not to market Smart Sock as a medical device and that this would have been communicated to Sandbridge during

---

[4] 501(k) and PMA applications are publicly available on the FDA's website.  Plaintiff's search of this database revealed only one 501(k) application from Owlet.  Owlet filed this application on August 29, 2022 (almost a year after it stopped selling the Smart Sock) for the BabySat 3, a new version of a Smart Sock variant with similar functionality to the original Smart Sock, but which requires a prescription.   The database search did not reveal any PMA applications.

[5]   https://www.fox13now.com/news/fox-13-investigates/fox-13-investigates-how-owlet-smart-sock-went-from-a-parent-favorite-to-an-fda-warning ("FOX 13 obtained a report

the due diligence process preceding the de-SPAC Merger. CW2 corroborated that Owlet senior management instructed the marketing team not to outright refer to the Smart Sock as a medical device, but instead to describe its capabilities as a monitoring device that tracks vital signs. CW2 made clear that the Company paid close attention to user-generated content and influencers, and thus knew that based on Owlet's marketing message, the public perceived the Smart Sock as a medical device and Owlet did nothing to back away from that perception. As CW1 explained, the Smart Sock "was a pulse oximeter, which is a medical device."

53. In addition to the FDA's direct communications with Owlet making clear that the Smart Sock qualifies as a medical device, the FDA also issued industry wide guidance on August 22, 2018. First, in an article titled *Baby Products with SIDS Prevention Claims*, the FDA held that "[a] baby product is considered a medical device if claims to cure, treat, prevent, or reduce a disease or condition are made in the product's labeling, packaging, or advertising . . . ." Then in an article titled, *Information for Manufacturers of Baby Products*, the FDA directed that all manufacturers of baby products designed to prevent any disease or condition, (*e.g.* **the Smart Sock**), review their marketing "for any direct or implied claims to cure, treat, or prevent a disease or condition, including SIDS," and to immediately "stop marketing" the products until they "receive FDA clearance or approval." Despite these clear admonitions, both direct and

through the Freedom of Information Act showing that in 2017, the FDA concluded that

AMENDED CLASS ACTION COMPLAINT
20

industry wide, Owlet nevertheless continued marketing the Smart Sock without FDA approval.

### Defendants Mislead Sandbridge Shareholders Eligible to Vote on the De-SPAC Merger

54. The Proxy Statement Defendants issued to solicit shareholder approval of the de-SPAC Merger falsely states that the Smart Sock *is not* a medical device and that Owlet has complied with all relevant FDA regulations. The Proxy Statement did not reveal that, in fact, the FDA had been telling Owlet for years that the Smart Sock *is* a medical device and that the Company thus needed approval to market and sell the device pursuant to the Act. Owlet's failure to heed the FDA's regulations, warnings and industry guidance, raising a significant risk that the FDA would force Owlet to stop marketing and selling the Smart Sock, and Defendants' failure to disclose this material fact to Sandbridge shareholders solicited to vote on the Business Combination, is all the more egregious given the Company's recognition in the Proxy Statement that:

> *We currently rely on sales of our Owlet Smart Sock technologies and related products for the majority of our revenue and expect to continue to do so for the foreseeable future.*
>
> We are highly dependent upon the continued success and market acceptance of the Owlet Smart Sock and related technologies that serve as the basis of our primary product offerings.

55. Defendants made clear in both the preliminary Proxy Statement included in the Registration Statement, and the final Proxy Statement, that "the Owlet Smart Sock Owlet's sock was a medical device that needed FDA marketing approvals."

AMENDED CLASS ACTION COMPLAINT

continues to serve as…the compelling anchor of our ecosystem." In other words, customers would purchase the Smart Sock first, and then add other of Owlet's complementary solutions like the Owlet Cam or Owlet Dream Lab. Owlet ignored the FDA's clear edict that the Smart Sock was a medical device and did not seek the required FDA approvals under the Act (a process Owlet described in the Registration Statement as a "lengthy and time consuming process") so it could continue to sell its anchor and maintain its primary source of revenue.

56. Indeed, the Proxy Statement identified Owlet's ability to sell the Smart Sock going forward as a "key factor affecting our performance":

> Our growth will depend, in large part, on our continued ability to attract new customers with our existing products, including our anchor product, the Owlet Smart Sock.

57. Investors thus had a right to know about the material risk that Owlet would receive a Warning Letter from the FDA directing it to cease sales of the Smart Sock device, on which it was admittedly "highly dependent" for "the majority of our revenue" and which represented a key factor affecting Owlet's performance post-merger, due to Owlet's years-long flouting of FDA regulations and disregard of explicit communications from the FDA to Owlet stating that the FDA considered the Smart Sock a device under the Act.

58. Moreover, Owlet's success is tied directly to its reputation. Owlet acknowledged in the Proxy Statement that it faced reputational harm if the FDA were to

determine that the Smart Sock was a medical device, and that Owlet failed to comply with FDA regulations:

> If the FDA or other regulatory body determines that any of our products is a medical device that is not in compliance with applicable requirements and makes that determination public, or takes some other public action such as issuing a public enforcement action or instituting a recall, ***customers may react negatively and stop purchasing or recommending our products or services***.

59.    The Proxy Statement made clear that Owlet also faced another significant harm if it failed to obtain marketing authorization from the FDA for one of its products under the Act:

> [A] failure to obtain such marketing authorization by the FDA may have a negative impact on our ability to obtain any necessary certifications or marketing authorizations in foreign jurisdictions.

In other words, a failure to obtain authorization from the FDA for a medical device would not only hinder Owlet's ability to market and sell that device domestically but could also prevent Owlet from obtaining authorization to market and sell the device internationally.  Given that Owlet listed one of its growth strategies in the Proxy Statement as "successfully and meaningfully expand[ing] into new countries…and acquir[ing] additional market share globally, with heightened focus on Europe, Asia, and Latin America," Sandbridge shareholders had a right to know when deciding whether to redeem their shares for cash or approve the de-SPAC Business Combination that the FDA had told Owlet unequivocally for years that the Smart Sock qualified as a medical device requiring FDA marketing approval yet Owlet flouted FDA regulations anyway.

---

AMENDED CLASS ACTION COMPLAINT
23

60.    That Sandbridge had access to all material information regarding Owlet's flagship product is made clear by the Proxy Statement, which states that on November 7, 2020, Owlet granted data room access to Sandbridge.  Sandbridge had access to all of Owlet's due diligence documents in this virtual data room throughout the negotiation process leading to the signing of the Business Combination Agreement on February 15, 2021.  The Proxy Statement also stated that under the terms of the Business Combination Agreement:

> Sandbridge has conducted its own independent review and analysis of, and, based thereon, has formed an independent judgment concerning, the business, assets, condition, operations and prospects, of the Group Companies and has been furnished with or given access to such documents and information about the Group Companies as necessary to enable it to make an informed decision with respect to the execution, delivery and performance of the Business Combination Agreement, the ancillary documents thereto and the Transactions…

61.    The provisions of the Business Combination Agreement, included in the Proxy Statement, provided Sandbridge with access to Owlet's directors, officers, books and records, and made clear that Sandbridge in fact availed itself of that access to conduct an independent review and analysis of Owlet's business, assets, liabilities, condition, operations, and prospects:

> 4.21(a)
>
> Each Sandbridge Party, on its own behalf and on behalf of its Representatives, acknowledges, represents, warrants and agrees that (i) it has conducted its own independent review and analysis of, and, based thereon, has formed an independent judgment concerning, the business, assets, liabilities, condition, operations and prospects, of the Group Companies and

AMENDED CLASS ACTION COMPLAINT
24

(ii) it has been furnished with or given access to such documents and information about the Group Companies and their respective businesses and operations as it and its Representatives have deemed necessary to enable it to make an informed decision with respect to the execution, delivery and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby.

5.3(b)

From and after the date of this Agreement until the earlier of the Closing Date or the termination of this Agreement in accordance with its terms, upon reasonable advance written notice, the Company shall provide, or cause to be provided, to Sandbridge and its Representatives during normal business hours reasonable access to the directors, officers, books and records of the Group Companies (in a manner so as to not interfere with the normal business operations of the Group Companies)

62. As such, each Defendant negligently signed the Proxy Statement with the materially false and misleading statements contained therein, thus depriving Sandbridge shareholders of their right to make an informed decision whether to redeem their Sandbridge common stock for cash or whether to approve the de-SPAC Business Combination.

## Defendants Had a Duty to Disclose that Owlet Marketed and Sold the Smart Sock in Contravention of FDA Regulations

63. Pursuant to Item 303 of Regulation S-K, 17 C.F.R. § 229.303(ii), Defendants had an affirmative, independent duty to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." By failing to disclose: (1) that the FDA had communicated to Owlet since 2016 that the Smart Sock qualified as a medical device under the Act; (2) that the FDA

would therefore require Owlet to obtain marketing authorization; (3) that Owlet would therefore likely have cease commercial distribution of the Smart Sock in the U.S. until it obtained the requisite approval; and (4) that, as a result of the foregoing, Defendants' statements in the Proxy Statement about the Smart Sock, compliance with FDA regulations, and revenue growth/projections were materially misleading and/or lacked a reasonable basis, Defendants failed to satisfy this duty. These omissions rendered Defendants' statements materially false and/or misleading in violation of Item 303 of Regulation S-K.

64.    Pursuant to Item 105 of Regulation S-K, 17 C.F.R. § 229.105, Defendants had an affirmative, independent duty to disclose in the Proxy Statement the most significant risk factors that make the investment speculative or risky.

65.    By failing to disclose: (1) that the FDA had communicated to Owlet since 2016 that the Smart Sock qualified as a medical device under the Act; (2) that the FDA would therefore require Owlet to obtain marketing authorization; (3) that Owlet would therefore likely have cease commercial distribution of the Smart Sock in the U.S. until it obtained the requisite approval; and (4) that, as a result of the foregoing, Defendants' statements in the Proxy Statement about the Smart Sock, compliance with FDA regulations, and revenue growth/projections were materially misleading and/or lacked a reasonable basis, Defendants failed to satisfy this duty.

66.     Given the integrality of the Smart Sock to Owlet's business as its flagship product and the primary source of its revenue and expected revenue, the foregoing omissions posed a grave and very real threat to Owlet's business and made "the investment in the registrant or offering speculative or risky."

## Executive Compensation

67.     Following the Business Combination, Defendant Workman held 4,171,316 shares of Owlet common stock and Defendant Susan held 28,422,341 shares of Owlet common stock.  Moreover, for the year ended December 31, 2021, Defendant Workman received $1,764,178 in total compensation, including $1,396,976 in option awards and Defendant Skolnick received $2,318,381 in total compensation, including $1,154,018 in stock awards.  Defendants Workman and Skolnick retained their respective positions as CEO and CFO of Owlet following the de-SPAC Merger.

## Materially False and Misleading Statements in the Proxy Statements

68.     Defendants solicited shareholder approval for the de-SPAC Business Combination by filing a false and misleading Proxy with the SEC, dated June 21, 2021, that misled shareholders regarding the Company's future prospects and the value of Avalara's shares. Defendants also included in the Proxy in the Registration Statement filed on Form S-4 with the SEC on March 31, 2021.

69.     In the Registration Statement, signed by Defendants Suslow, Henry, De Sole, Goss, Kahler, Toubassy, and Weinstein, which integrated the preliminary proxy

statement soliciting shareholder votes for the Business Combination, Defendants told investors in no uncertain terms that the Smart Sock, from which it received "the majority of its revenue and expect[ed] to continue to do so for the foreseeable future," did not qualify as a medical device and that the Company therefore did not need to seek FDA approval to sell it to consumers.  In summarizing the risk factors facing the Company, the Registration Statement described the risk that the FDA would conclude that the Smart Sock is in fact a medical device and thus require Owlet to stop selling it as purely hypothetical:

> If the U.S. Food and Drug Administration ("FDA") or any other governmental authority were to require marketing authorization for the Owlet Smart Sock, or for any other product that Owlet sells and which Owlet does not believe requires such marketing authorization, Owlet could be required to cease selling or recall the product pending receipt of marketing authorization from the FDA or such other governmental authority, which can be a lengthy and time-consuming process, harm financial results and Owlet may also be subject to regulatory enforcement action.

70.    Expanding on this risk factor, the Registration Statement purported to warn that "the FDA . . . *may not agree* with that conclusion [that the Smart Sock is not a medical device] and *could* require us to obtain marketing authorization" to sell the Smart Sock:

> In response to inquiries from the FDA and regulatory authorities in other jurisdictions regarding the marketing of the Owlet Smart Sock, we have communicated our belief that the Owlet Smart Sock is not a medical device and does not require marketing authorization from the FDA or approval/certification from such other regulatory authorities. ***However, the FDA and certain regulatory authorities have expressed they may not agree with that conclusion and could require us to obtain marketing***

AMENDED CLASS ACTION COMPLAINT
28

*authorization (or approval/certification) to continue to sell the product.* Obtaining authorization to sell the Owlet Smart Sock as a medical device is a time-consuming and costly process and we may be precluded from selling the Owlet Smart Sock if we are required to obtain marketing authorization. If granted, a marketing authorization could require conditions to sale, for example, a prescription requirement. *If the FDA or other regulatory authorities require such marketing authorization (or approval/certification, respectively) for the Owlet Smart Sock*, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, *we could be required to cease selling or recall the product in the corresponding jurisdiction pending receipt of marketing authorization* (or approval/certification), which can be a lengthy and time-consuming process, and we may also be subject to regulatory enforcement action. In addition, we may be required to modify the product's functionality or limit our marketing claims for the product, whether or not we obtain such clearance, approval, certification or marketing authorization. In any such event, our business could be substantially harmed.

71. Defendants misled investors by describing the risk that the "FDA ***may*** not agree" that the Smart Sock is not a medical device as *theoretical* and not disclosing that in fact the FDA had already *confirmed* it ***did not*** agree with that conclusion. As far back as 2016 and in the years that ensued, the FDA communicated to Owlet "that the Owlet Smart Sock meets the definition of a device under the Act."

72. Even when describing a *Tachyarrhythmia Study* that touted the efficacy of the Smart Sock in diagnosing supraventricular tachycardia ("SVT"), the most common arrhythmia found in children, Defendants doubled down on their claim that the Smart Sock was not a medical device. After citing two large population-based studies that included over two thousand individuals each with a clinical diagnosis of SVT, and

estimating the prevalence of SVT in infants to be between 0.10% and 0.25%, the Registration Statement went on to say:

> While the studies did not specify the medical monitoring devices used in those studies, a clinical diagnosis of SVT is generally made using an electrocardiogram or Holter monitor. However, a study reviewed and approved by the Institutional Review Board at the Cleveland Clinic and published in The Journal of Pediatrics found *the cumulative incidence of tachyarrhythmia among infants using the Owlet Smart Sock to be higher than those previously reported clinically-diagnosed SVT rates.* The tachyarrhythmia study focused on episodes involving a heart rate of at least 240 beats per minute that lasted for more than 60 seconds.
>
> ***Although the Owlet Smart Sock is a consumer product and not a medical device***, study investigators were able to observe more than 202 million total hours of anonymized data from 100,949 babies born between February 2017 and February 2019 and monitored by the Owlet Smart Sock. The investigators identified 5,070 total suspected episodes of tachyarrhythmia in 2,508 infants, for a cumulative incidence of 2.5%.
>
> We believe this study is indicative of the potential power of our data set and could support the future development of products for which we may seek to obtain FDA and other regulatory agency authorization *for use in the detection of infant health issues*.

73.    By falsely stating in the Registration Statement that the Smart Sock is not a medical device, even while acknowledging that the Smart Sock is used to "diagnos[e] [] disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease," *the Act's very definition of a medical device*, and failing to disclose that the FDA had been telling Owlet for years that the Smart Sock is a medical device, Defendants misled investors.

74.     Moreover, the Registration Statement stated that the Sandbridge Board did not obtain a third-party valuation or fairness opinion in connection with its determination to approve the Business Combination but instead relied upon financial projections that were "prepared by, and are the responsibility of, Owlet's management."    The Registration Statement set forth those projections "with numerical specificity," and forecast revenues skyrocketing from $75.2 million in 2020 to $1.06 billion in 2025.

75.     While the Registration Statement cautioned that shareholders should not "place undue reliance on this information," it also made clear that the Sandbridge Board used "this information" to determine "the fair value of common stock," as a basis for stating that "the Business Combination was in the best interest of its stockholders," and as a basis for recommending that shareholders approve the merger. The projections, however, were both objectively and subjectively false.  Owlet senior management based the revenue projections on the false underlying premise that Owlet would continue to market and sell the Smart Sock, which Defendants made clear constituted "the majority of its revenue and expect[ed] to continue to do so for the foreseeable future."  However, the Registration Statement did not reveal that the FDA had made clear to Owlet since 2016 that the Smart Sock qualified as a medical device.    Defendants, having comprehensively set forth the applicable FDA regulations in the Registration Statement, and having been told by the FDA repeatedly that the Smart Sock is a medical device, knew the device was "adulterated" and that the FDA would ultimately insist that Owlet

cease any commercial distribution of the Smart Sock to obtain the required FDA approvals.

76. The Registration Statement further misled Sandbridge shareholders by representing that Owlet fully complied with applicable FDA regulations. Specifically, the Registration Statement stated that under the Business Combination Agreement, Owlet made representations and warranties regarding regulatory compliance, including that:

> Since January 1, 2018, all products developed, tested, investigated, produced, manufactured, labeled, stored, promoted, marketed, imported, exported, distributed, or sold by or on behalf of the Group Companies[6] have been, or are being, developed, tested, investigated, produced, manufactured, labeled, distributed, stored, promoted, marketed, imported, exported, distributed and sold *in compliance in all material respects with applicable FDA Laws…*
>
> ***
>
> the Company holds all material permits, including 501(k) clearances or premarket approvals required by applicable FDA Laws

77. The foregoing statements were false and misleading because Owlet did not promote, market and distribute the Smart Sock in compliance with applicable FDA laws and did not hold the necessary FDA clearance or approval to market the Smart Sock. FDA laws required that Owlet seek approval from the FDA prior to marketing and selling the Smart Sock because it qualified as a medical device, a fact the FDA communicated to Owlet as early as 2016. Owlet nevertheless consistently marketed the

Smart Sock as tracking babies' vital signs and alerting parents if blood oxygen saturation or pulse rates fell outside safe zones; *i.e.* the Smart Sock assisted parents in identifying and/or diagnosing instances of desaturation and bradycardia.

78.     On June 21, 2021, Owlet filed its Proxy Statement on Form 424b3 soliciting votes in favor of the Business Combination.  The Proxy Statement, like the preliminary proxy statement included in the Registrations Statement, purported to warn that regulatory agencies could disagree with Owlet's position that the Smart Sock is not a medical device and require authorization but only disclosed that, "the Medicines and Healthcare products Regulatory Agency, the regulatory authority responsible for the UK medical device market, has asserted that the Owlet Smart Sock requires (CE mark) certification and subsequent registration as a medical device in the UK."  The Proxy Statement did not reveal that the FDA had similarly also already communicated to Owlet as far back as 2016 that the Smart Sock is a medical device under the Act.  Specifically, the Proxy Statement stated:

> ***If the FDA or any other governmental authority were to require clearance, approval, certification or other form of marketing authorization for the Owlet Smart Sock, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, we could be required to cease selling or recall the product pending receipt of such clearance, approval, certification or marketing authorization from the FDA or such other governmental authority, which can be a lengthy and time-consuming process, and we may also be subject to regulatory enforcement action.***

[6] "Group Companies" refers to Owlet together with each of its subsidiaries.

AMENDED CLASS ACTION COMPLAINT

We currently sell the Owlet Smart Sock, which we market for use by parents of healthy babies to provide peace of mind, and for which we have not sought or obtained any marketing authorization from the FDA or similar authorization, approval, or certification from any other governmental authority. In response to inquiries from the FDA and regulatory authorities in other jurisdictions regarding the marketing of the Owlet Smart Sock, we have communicated our belief that the Owlet Smart Sock is not a medical device and does not require marketing authorization from the FDA or approval/certification from such other regulatory authorities. ***However, the FDA and/or certain regulatory authorities have expressed they do not agree with that conclusion and could require us to obtain marketing authorization (or approval/certification) to continue to sell the product. For example, the Medicines and Healthcare products Regulatory Agency, the regulatory authority responsible for the UK medical device market, has asserted that the Owlet Smart Sock requires (CE mark) certification and subsequent registration as a medical device in the UK, but has indicated they will allow us to continue to market the Owlet Smart Sock until May 2022 without such certification or registration.*** Obtaining authorization to sell the Owlet Smart Sock as a medical device is a time-consuming and costly process and we may be precluded from selling the Owlet Smart Sock if we are required to obtain marketing authorization. If granted, a marketing authorization could require conditions to sale, for example, a prescription requirement. ***If the FDA or other regulatory authorities require such marketing authorization (or approval/certification, respectively) for the Owlet Smart Sock, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, we could be required to cease selling or recall the product in the corresponding jurisdiction pending receipt of marketing authorization (or approval/certification),*** which can be a lengthy and time-consuming process, and we may also be subject to regulatory enforcement action. In addition, we may be required to modify the product's functionality or limit our marketing claims for the product, whether or not we obtain such clearance, approval, certification or marketing authorization. In any such event, our business could be substantially harmed.

(First emphasis in original.)

79.     The Proxy Statement misled investors by representing that the "FDA ***and/or*** certain regulatory authorities have expressed they do not agree" that the Smart Sock is

AMENDED CLASS ACTION COMPLAINT
34

not a medical device "and could require us to obtain marketing authorization," and then identifying the Medicines and Healthcare products Regulatory Agency as the ***only agency*** that communicated that disagreement with certitude, when in reality the FDA had also already communicated to Owlet "that the Owlet Smart Sock meets the definition of a device under the Act," since 2016, and that its marketing practices thus contravened FDA regulations.

80.    Moreover, the Proxy Statement once again described the tachyarrhythmia study in the same manner as in the initial proxy statement included in the Registration Statement, and reiterated that while a study reviewed and approved by the Institutional Review Board at the Cleveland Clinic and published in *The Journal of Pediatrics* reported the Smart Sock's role in diagnosing SVT and establishing an incidence of tachyarrhythmia in infants above previously reported clinically-diagnosed SVT rates, "***the Owlet Smart Sock is a consumer product and not a medical device***…"

81.    The foregoing statement misled Sandbridge shareholders by falsely stating that the Smart Sock is not a medical device, though clearly used to "diagnos[e] [] disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease," *the Act's very definition of a medical device*, and failing to disclose that the FDA had been telling Owlet for years that the Smart Sock is a medical device and that Owlet's marketing of the Smart Sock violated FDA regulations, and that Owlet thus faced a real

AMENDED CLASS ACTION COMPLAINT
35

risk that the FDA would direct Owlet to cease marketing and selling the Smart Sock until it obtained the necessary FDA authorizations.

82. Moreover, the Proxy Statement once again included the projections that Owlet senior management showing explosive revenue growth between 2020 and 2025. The Proxy Statement made clear that the Sandbridge Board did not obtain a third-party valuation or fairness opinion in connection with its determination to approve the Business Combination but instead relied upon these financial projections that were "prepared by, and are the responsibility of, Owlet's management." The Proxy Statement set forth those projections "with numerical specificity," and forecast revenues skyrocketing from $75.2 million in 2020 to $1.06 billion in 2025.

83. While the Proxy Statement cautioned that shareholders should not "place undue reliance on this information," it also made clear that the Sandbridge Board used "this information" to determine "the fair value of common stock," as a basis for stating that "the Business Combination was in the best interest of its stockholders," and as a basis for recommending that shareholders approve the merger. The projections, however, were both objectively and subjectively false. Owlet senior management based the revenue projections on the false underlying premise that Owlet would continue to market and sell the Smart Sock, which Defendants made clear constituted "the majority of its revenue and expect[ed] to continue to do so for the foreseeable future." However, the Proxy Statement did not reveal that the FDA had made clear to Owlet since 2016 that the

AMENDED CLASS ACTION COMPLAINT

36

Smart Sock qualified as a medical device. Defendants, having comprehensively set forth the applicable FDA regulations in the Proxy Statement, and having been told by the FDA repeatedly that the Smart Sock is a medical device, knew the device was "adulterated" and that the FDA would ultimately insist that Owlet cease any commercial distribution of the Smart Sock to obtain the required FDA approvals.

84. The Proxy Statement further misled Sandbridge shareholders by representing that Owlet complied with applicable FDA regulations. Specifically, the Proxy Statement stated that under the Business Combination Agreement, Owlet made representations and warranties regarding regulatory compliance, including that:

> Since January 1, 2018, all products developed, tested, investigated, produced, manufactured, labeled, stored, promoted, marketed, imported, exported, distributed, or sold by or on behalf of the Group Companies[7] have been, or are being, developed, tested, investigated, produced, manufactured, labeled, distributed, stored, promoted, marketed, imported, exported, distributed and sold *in compliance in all material respects with applicable FDA Laws*
>
> ***
>
> the Company holds all material permits, including 501(k) clearances or premarket approvals required by applicable FDA Laws

85. The foregoing statements were false and misleading because Owlet did not promote, market and distribute the Smart Sock in compliance with applicable FDA laws and did not hold the necessary FDA clearance or approval to market the Smart Sock. FDA laws required that Owlet seek approval from the FDA prior to marketing and

selling the Smart Sock because it qualified as a medical device, a fact the FDA communicated to Owlet as early as 2016. Owlet nevertheless consistently marketed the Smart Sock as tracking babies' vital signs and alerting parents if blood oxygen saturation or pulse rates fell outside safe zones; *i.e.* the Smart Sock assisted parents in identifying and/or diagnosing instances of desaturation and bradycardia.

86. The Proxy Statement went on to tout Owlet's revenue growth as a direct result of "substantial sales growth for the Owlet Smart Sock":

> Revenues increased by $7.0 million, or 47.3%, from $14.9 million for the three months ended March 31, 2020 to $21.9 million for the three months ended March 31, 2021. The increase was primarily due to a 40% increase in sales volume. ***The increase was primarily driven by substantial sales growth for the Owlet Smart Sock.*** Owlet Smart Sock sales to retailers and consumers for the Owlet Smart Sock increased grew 54% and 25%, respectively, from the three months ended March 31, 2020 to the three months ended March 31, 2021.

87. Though the revenue numbers reported may have been literally accurate, the foregoing statements in the Proxy Statement mislead Sandbridge shareholders by failing to disclose that Owlet faced a material risk of losing future revenue from the Smart Sock, the main source of its revenue and substantial growth driver, because it had been marketing and selling the Smart Sock in violation of the Act despite explicit admonitions form the FDA since 2016 that the Smart Sock qualified as a medical device given its role in identifying episodes of desaturation and bradycardia and thus required FDA authorization.

---

[7] "Group Companies" refers to Owlet together with each of its subsidiaries.

AMENDED CLASS ACTION COMPLAINT

38

88. The above statements set forth in the preliminary and final Proxy Statements, identified in ¶¶ 69-86, were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to Sandbridge shareholders: (1) that the FDA had communicated to Owlet since 2016 that the Smart Sock qualified as a medical device under the Act; (2) that the FDA would therefore require Owlet to obtain marketing authorization; (3) that Owlet would therefore likely have cease commercial distribution of the Smart Sock in the U.S. until it obtained the requisite approval; and (4) that, as a result of the foregoing, Defendants' statements in the Proxy Statement about the Smart Sock, compliance with FDA regulations, and revenue growth/projections were materially misleading and/or lacked a reasonable basis.

## The Business Combination is Completed

89. On July 15, 2021, Owlet announced that it had completed the Business Combination in a press release that stated, in relevant part:

> Owlet, Inc. (NYSE: OWLT) ("Owlet" or the "Company"), a company building a connected and accessible nursery ecosystem that brings technology and vital data to modern parenting, today announced that it has completed its business combination with Sandbridge Acquisition Corporation. (NYSE: SBG) ("Sandbridge"), a special purpose acquisition company. The business combination and concurrent private placement, which were approved by Sandbridge's stockholders at its special meeting held on July 14, 2021, provide over $135 million to accelerate the Company's expansive product pipeline, deepen penetration, and expand globally.

**The Truth Emerges**

90.    On October 4, 2021, Owlet revealed that it had received a Warning Letter from the FDA on October 1, 2021 concerning the "Owlet Smart Sock Family (version/generation 1, 2, 3, Smart Sock Plus, and co-packaged products (*e.g.,* Owlet Monitor Duo (Smart Sock + Camera), referred to herein as 'Owlet Smart Socks')."

91.    The FDA issues Warning Letters "only for violations of regulatory significance. Significant violations are those violations that may lead to enforcement action if not promptly and adequately corrected."

92.    The Warning Letter stated that Owlet violated the Act by marketing the Owlet Smart Socks "without marketing clearance or approval."

93.    The Warning Letter[8] described Owlet's violations of the Act as follows:

The United States Food and Drug Administration (FDA) has learned that ***your firm is marketing Owlet Smart Socks in the United States without marketing clearance or approval, in violation of the Federal Food, Drug, and Cosmetic Act (the Act)***.

Under section 201(h) of the Act, 21 U.S.C. § 321(h), these products are devices because they are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body. Products that measure blood oxygen saturation and pulse rate are devices when they are intended to identify (diagnose) desaturation and bradycardia and provide an alarm to notify users that measurements are outside preset values.

FDA has reviewed your firm's web site, multiple commercial websites, and your firm's responses to FDA correspondence and determined that the Owlet Smart Socks are offered for sale in the United States ***without marketing***

---

[8] Available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/owlet-baby-care-inc-616354-10052021

AMENDED CLASS ACTION COMPLAINT
40

***approval, clearance, or authorization from FDA***. Accordingly, ***your products are adulterated*** under section 501(f)(1)(B) of the Act, 21 U.S.C. § 351(f)(1)(B), because your firm does not have an approved application for premarket approval (PMA) in effect pursuant to section 515(a) of the Act, 21 U.S.C. § 360e(a), or an approved application for an investigational device exemption (IDE) under section 520(g) of the Act, 21 U.S.C. § 360j(g) for the device as described and marketed. ***The introduction or delivery for introduction of an adulterated or misbranded device into interstate commerce is prohibited under section 301(a) of the Act, 21 U.S.C. § 331(a)***.

94.     The Warning Letter also provided numerous examples (*i.e.*, a non-exhaustive list that "is not intended to be an all-inclusive list of the violations at your firm") of Owlet marketing the Smart Sock as a medical device in violation of the Act:

- Amazon Web Site: https://www.amazon.com/Owlet Smart Sock 3

  o "Track the most important indicators of your baby's health–like oxygen level, heart rate, and total hours slept"
  o "If your baby's readings leave preset "safe" zones, the Smart Sock will immediately notify you that your baby needs your attention."

- Owlet Sales: https://owletcare.com/

  o "We look at the best indicators of your baby's overall well-being and will proactively notify you if your baby may need you."
  o "Track heart rate, oxygen level, and sleep trends."

- Walmart Sales: https://www.walmart.com/ip/Owlet-Smart-Sock-Baby-Monitor/167836816

  o "Owlet Smart Sock 2 Baby Monitor, Tracks Heart Rate & Oxygen"
  o "Rest easy knowing you'll receive proactive notifications via lights and sounds if your baby's oxygen level or heart rate leave preset zones
  o View real-time heart rate and oxygen level and receive notifications from any connected device using the Owlet app

- Target Sales: https://www.target.com/p/owlet-smart-sock-3-baby-monitor-with-oxygenheart-rate/-/A-83704325?preselect=79727730#lnk=same tab

o "Owlet Smart Sock 3 Baby Monitor with Oxygen & Heart Rate"
o "Tracks the baby's heart rate and oxygen level
o Tells you when Baby needs you
o Measures how long and how well the baby slept

95. However, perhaps most shocking was the FDA's revelation that it had been telling Owlet since 2016 that the Smart Sock qualifies as a medical device under the Act, yet Owlet continued to market and sell the device without the required FDA authorizations:

> ***Since 2016, the FDA has corresponded with Owlet that the Owlet Smart Sock meets the definition of a device under the FD&C Act*** and does not fall under the compliance policy for low-risk products that promote a healthy lifestyle (General Wellness guidance).

96. As a consequence of Owlet's non-compliance with FDA regulations, the FDA insisted that Owlet cease marketing and selling the Smart Sock and warned of additional repercussions the Company may face:

> Our office requests that Owlet Baby Care, Inc. cease any activities that result in the adulteration of the Owlet Smart Sock (All versions and co-branded products), such as the commercial distribution of the device for the uses discussed above.

> Your firm should take prompt action to address any violations identified in this letter. Failure to adequately address this matter may result in regulatory action being initiated by the FDA, including, but not limited to, seizure, injunction, and civil money penalties.

> Other federal agencies may take your compliance with the FD&C Act and its implementing regulations into account when considering the award of federal contracts.

97.     In the Form 8-K Owlet filed with the SEC revealing its receipt of the Warning Letter and its contents, Owlet assured investors that:

> The Company intends to fully cooperate with FDA to resolve the Warning Letter, including through the pursuit of a marketing authorization application for uses of the Smart Sock identified as medical device uses. In addition, the Company plans to issue a timely response to FDA, and further engage with FDA, regarding modifications and marketing changes to the Smart Sock with the goal of enabling continued commercial distribution of a modified product prior to receipt of any such marketing authorization that may be granted.

(Emphasis added.)

98.     On this news, Owlet's stock price fell $1.29, or 23%, to close at $4.19 per share on October 4, 2021, on unusually heavy trading volume.  As a result, Sandbridge investors who could have voted against the Business Combination and redeemed their shares at $10.00 per share suffered a loss of $5.81 per share.

99.     Cowen issued an analyst report the same day explaining that the massive decline resulted from the disclosure of the Warning Letter and calling the news, "unexpected… given that versions of the Smart Sock have been on the market for the past 6 years."

100.   On October 25, 2021, Owlet stated that it had ceased distribution of the Smart Sock in the U.S. as of October 22, 2021.   The Company stated that the "suspension is specific to shipments by the Company to customers and retailers in the United States, and operations in other countries remain unaffected."   Despite its prior

AMENDED CLASS ACTION COMPLAINT
43

assurances, the Company never resumed commercial distribution of the Smart Sock with modifications or marketing changes.

101.   A few weeks later during the earnings call for the third quarter of 2021 held on November 10, 2021, Defendant Skolnick admitted that the Warning Letter, and the Company's required cessation of all sales of the Smart Sock, already impacted the Company negatively:

> As we head into Q4 2021, the domestic regulatory factors we are working through far Smart Sock products are created near-term headwinds for our product sales growth trajectory in the U.S.

102.   Moreover, the Company did not provide an update to 2021 guidance in light of the regulatory status of the Smart Sock and recent suspension of its distribution of the product.

103.   Then, during the earnings call for the fourth quarter of 2021 held on March 7, 2022, Defendant Skolnick stated:

> As a result, for the fourth quarter and year ended 2021, the company recorded a contra revenue adjustment of $23.2 million for received and anticipated returns on the Owlet Smart Sock and Owlet monitor duo products.
>
> ***
>
> The cessation of US Smart Sock and Duo sales and product returns however, resulted in total net negative revenues of $2.5 million for the fourth quarter 2021.

104.   Then, when the Company filed its Form 10-K for the year ended December 31, 2021, it stated in its Risk Factors that:

AMENDED CLASS ACTION COMPLAINT
44

Prior to receipt of the Warning Letter, we were dependent on sales of the Owlet Smart Sock in the U.S. for a majority of our revenue, and expected to continue to be dependent for the foreseeable future.

Then when describing the Warning Letter, the 10-K stated that:

The Company's results of operations for the fourth quarter and year-ended 2021 were substantially and negatively impacted due to the reduction of revenues for received and anticipated returns of Owlet Smart Sock and Owlet Monitor Duo product. For the quarter and year ended December 31, 2021, the Company recorded contra-revenue of $23.2 million and accrued returns of $20.1 million as of December 31, 2021.

105.   The negative reverberations continued when Owlet released its first quarter 2022 results on May 11, 2022, reporting a net loss of -$0.26 per share, which missed expectations by $0.11 and flat revenue of $21.5 million as compared to the same period the prior year. These negative results stemmed directly from the significant disruption Owlet experienced from having to pull its Smart Sock product at the end of 2021.

## CLASS ACTION ALLEGATIONS

106.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that held Sandbridge common stock held as of June 1, 2021 and were eligible to vote at Sandbridge's special meeting on July 14, 2021, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

107. This action is properly maintainable as a class action because:

(a)    the Class is so numerous that joinder of all members is impracticable. Per the S-4 Sandbridge filed with the SEC on March 31, 2021, there were 23,000,000 shares of Sandbridge common stock outstanding as of December 31, 2020, held by hundreds to thousands of individuals and entities throughout the country. The actual number of former public stockholders of Sandbridge will be ascertained through discovery;

(b)    there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

      i.   whether Defendants misrepresented material information in the Proxy in violation of Section 14(a) of the Exchange Act;

      ii.  whether the Defendants violated Section 20(a) of the Exchange Act; and

      iii. whether the Class suffered damages.

(c)    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

AMENDED CLASS ACTION COMPLAINT
46

(f)   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)   a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## LOSS CAUSATION

108.   Sandbridge shareholders who were eligible to vote on the Business Combination and/or exercise their conversion rights have been damaged as a result of the materially false and/or misleading statements in the Proxy Statements regarding the Smart Sock.  Had Sandbridge shareholders known that Owlet sold the Smart Sock, the main source of its revenue, in contravention of FDA regulations and in direct disregard of FDA communications to Owlet that the Smart Sock is a medical device, and that Owlet would thus have to cease all commercial distribution of the device, members of the Class eligible to vote on the Business Combination would have voted against the Business Combination and/or exercised their conversion rights and received $10.00 in cash per share of Sandbridge stock.

109.   It was foreseeable to Defendants that the false and/or misleading statements about the Smart Sock: (i) would cause those members of the Class that would have received $10.00 in cash per share of Sandbridge stock upon exercising conversion rights and/or upon liquidation to keep their stock in lieu of receiving $10.00 in cash per share; and (ii) eventually the disclosure that Owlet had been selling the Smart Sock in violation

of FDA regulations and would have to cease all commercial distribution of its flagship product that constituted its main source of revenue pursuant to a Warning Letter from the FDA resulted in those members of the Class owning shares worth substantially less than $10.00 per share.

110. As a result, Defendants' conduct proximately caused foreseeable losses to those Plaintiffs and members of the Class.

## **NO SAFE HARBOR**

111. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Owlet who knew that the statement was false when made.

## COUNT I

### Violations of Section 14(a) of the Exchange Act
### Against All Defendants

112. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

113. The claims set forth herein do not sound in fraud and are based on negligent conduct by the Defendants named herein.

114. Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that Defendants solicited proxies from Plaintiff and other members of the Class by means of a proxy statement that, through Defendants' negligence, contained statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

115. Plaintiff and other members of the Class were misled by the Section 14 Defendants' false and misleading statements and omissions, were denied the opportunity to make an informed decision in voting on the merger, and approved the merger without having been advised of material facts. Accordingly, Plaintiff and other members of the Class did not receive their fair share of the value of the assets and business of the

combined entity, suffered damages when the Company's stock price decreased, and were prevented from benefiting from a value-maximizing transaction.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

116. Plaintiff realleges the allegations set forth above as if fully set forth herein.

117. The Individual Defendants acted as controlling persons of Sandbridge and Owlet within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Sandbridge and Owlet, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false, misleading, and incomplete statements contained in the Proxy Statements filed with the SEC, the Individual Defendants had the power to influence and control – and did influence and control – directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially false, misleading, and incomplete.

118. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

119. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed

AMENDED CLASS ACTION COMPLAINT

to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the members of the Board to approve the Merger.

120.   In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and/or approving the Merger. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

121.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

122.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.,* the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 21, 2023                    Respectfully submitted,

**POMERANTZ LLP**

By: /s/ Tamar A. Weinrib
Tamar A. Weinrib (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (646) 581-9973
Facsimile: (917) 463-1044
taweinrib@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor

---

AMENDED CLASS ACTION COMPLAINT
52

Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

***Lead Counsel for Lead Plaintiff Drew Conant and the Section 14(a) Class***