**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94101
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

[Additional Counsel on signature page.]

*Counsel for Lead Plaintiff Dr. Thomas E. Tweito and*
*Lead Counsel for the Section 10(b) Class*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

MICHAEL J. BUTALA, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

OWLET, INC. f/k/a SANDBRIDGE ACQUISITION CORPORATION, and KURT WORKMAN,

Defendants.

Case No. 2:21-cv-09016 FLA (JEMx)

CLASS ACTION

**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Judge: Hon. Fernando L. Aenlle-Rocha

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 7

III. PARTIES ..... 7

A. Lead Plaintiff ..... 7

B. Defendants ..... 7

IV. REGULATORY BACKGROUND ..... 9

V. OVERVIEW OF DEFENDANTS' FRAUD ..... 12

A. Owlet Debuted the Smart Sock in a Limited Launch in August 2013 ..... 12

B. Owlet Launched the Smart Sock with the Alarm Feature Without Receiving FDA Clearance in October 2015 ..... 16

C. Pediatrician Backlash to Unregulated Baby Monitors like the Smart Sock Led Owlet to Double-Down on Its "Wellness" Claims ..... 22

D. Owlet Continued to Market and Sell the Smart Sock Without FDA Clearance in Contravention of New FDA Industry Guidance ..... 28

E. Owlet Decided to Go Public Via a de-SPAC Transaction ..... 31

F. Owlet Merged with Sandbridge to Become a Public Company ..... 33

G. The Pre-Merger Process ..... 34

H. Defendants Falsely Claim That the Smart Sock Was Not a Medical Device and That Owlet Was FDA-Compliant ..... 36

I. The Relevant Truth Is Revealed ..... 39

J. Relevant Post-Class Period Events ..... 41

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ..... 43

A. March 31, 2021 ..... 43

B. June 21, 2021 ..... 50

C. August 5, 2021 ..... 52

VII. ADDITIONAL ALLEGATIONS OF SCIENTER ........ 53

A. Before the Start of the Class Period, Defendants Had Admitted That the Smart Sock with an Alarm was Medical Device and The FDA Had Put Owlet on Notice That the Smart Sock Required FDA Authorization ........ 53

B. Owlet's Product Pipeline and Pivot to the Dream Sock Shortly After the FDA Warning Letter Was Issued Supports the Conclusion That Defendants Were Aware That the Smart Sock Was a Medical Device ........ 55

C. The Production and Sale of the Owlet Smart Sock Was Owlet's Core Operation ........ 56

VIII. LOSS CAUSATION ........ 57

IX. CLASS ACTION ALLEGATIONS ........ 61

X. A PRESUMPTION OF RELIANCE APPLIES ........ 63

XI. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY ........ 64

XII. CAUSES OF ACTION ........ 65

COUNT I Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants ........ 65

COUNT II Violation of Section 20(a) of the Exchange Act Against Defendant Workman ........ 66

XIII. PRAYER FOR RELIEF ........ 68

XIV. DEMAND FOR JURY TRIAL ........ 68

Lead Plaintiff Dr. Thomas E. Tweito, by and through Lead Plaintiff's counsel, brings this action individually and on behalf of all other persons and entities who purchased or otherwise acquired securities of Owlet, Inc. ("Owlet" or the "Company") between March 31, 2021 and October 4, 2021, both dates inclusive (the "Class Period"), and who were damaged thereby.

Lead Plaintiff alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters, including the investigation of Lead Plaintiff's counsel, which included, among other things, a review of Owlet's United States Securities Exchange Commission ("SEC") filings, wire and press releases published by Owlet, analyst reports and advisories about the Company, media reports concerning the Company, judicial filings, and other publicly available information. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION[1]

1. On July 15, 2021, Sandbridge Acquisition Corporation ("Sandbridge") combined with Owlet Baby Care Inc. to create Owlet. Before and after the merger, Owlet's primary (and at times only) product was the Smart Sock, a wearable monitor that tracked a baby's heart rate and oxygen levels and sounded an alarm if the baby's pulse or breathing fell below preset limits.

2. After winning the International Business Machines Competition ("IBMC") in May 2013, Owlet launched the Smart Sock to a limited group of interested customers via a crowd-funding campaign in August 2013. In the press release announcing the limited launch, Owlet confirmed that "[t]he Owlet Team [wa]s currently going through the FDA process to add an alarm . . . to the next version of the product" so that the Smart Sock could "notify[] parents of drops in heart rate or oxygen levels" to "prevent emergencies." In other words, adding the alarm and notification features to the Smart Sock made it a medical

[1] All emphasis is added and all internal citations, footnotes and quotation marks are omitted, unless otherwise noted.

device, the marketing and sale of which required U.S. Food and Drug Administration ("FDA") clearance under the Food, Drug, and Cosmetic Act (the "FD&C Act") following a successful 510(k) premarket application ("510(k)") submitted by Owlet. Ultimately, "[t]he Owlet Team expect[ed] to finish FDA clearance" for the Smart Sock "by 2015."

3. In order to achieve FDA clearance of the Smart Sock's alarm feature by 2015, Owlet needed to secure tens of millions of dollars in new funding from interested investors. But, the crowd-funding campaign raised less than $300,000; and, by April 2014, Owlet only had raised an additional $1.85 million in funding from investors. Stuck in a Catch-22, Owlet needed venture funding to obtain FDA clearance and launch the Smart Sock with the alarm feature, but could not secure the level of funding necessary to obtain FDA clearance without launching its flagship product to the public at large.

4. Then, in early 2015, the FDA announced that it would not require manufacturers to apply for FDA premarket clearance before selling "general wellness products."

5. According to the FDA, general wellness products are products (i) for which "the intended use" concerned "weight management, physical fitness, relaxation or stress management, mental acuity, self-esteem, sleep management, or sexual function" without referencing any particular disease or condition; or (ii) that were "intended to promote, track, and/or encourage choice(s), which, as part of a healthy lifestyle," may reduce the risk of chronic diseases or conditions where it is well understood that living a healthy lifestyle will reduce the risk or impact of such diseases or conditions.

6. By creating this exception, the FDA was "lift[ing] the burden of seeking FDA clearance . . . [f]or devices that the [FDA] view[ed] as low-risk."

7. Although the Smart Sock's alarm notified parents that their baby's heart rate and oxygen levels had fallen outside of a preset range, making it a device that provided a medical diagnosis, Owlet threw caution to the wind and launched the Smart Sock to the broader public in October 2015 as a general wellness product that did not require FDA

clearance. With this pivot, Owlet was able to raise $6 million in venture funding to support the launch of the Smart Sock, as well as another $40 million in 2017 and 2018.

8. In truth, Defendants were well aware that the inclusion of the alarm feature made the Smart Sock a medical device, as was evident from Owlet's marketing campaign with respect to these features. Indeed, Defendant Kurt Workman ("Workman") himself confirmed as much in May 2013, stating that the Smart Sock with the alarm feature was "a Class II device . . . [b]ecause it's sounding an alarm." He further stated, "[a]larm plus pulse oximeter means that you need FDA clearance."

9. Owlet subsequently confirmed in an October 2015 press release that "the sole purpose of the [Smart Sock] device [wa]s to alert parents if their baby is not breathing or if the baby's heart rate is out of range" and the "alert strategy was set by a team of pulse oximetry specialists, pediatricians, neonatologists and pulmonologists." Owlet likewise claimed on its blog that the Smart Sock gave parents "access to [their] baby's heart rate and oxygen levels" and that the Company "ha[d] strong initial evidence that [the Smart Sock] really can alert parents if, for some reason, their baby is unable to breathe."

10. As a result, in 2016, unbeknownst to consumers or Owlet's current or potential investors, the FDA told Owlet privately that the "***Smart Sock meets the definition of a device under the FD&C Act and does not fall under the compliance policy for low-risk products that promote a healthy lifestyle (General Wellness guidance)***." Despite this, Owlet did not stop selling the Smart Sock with the alarm feature and it did not modify its marketing of the product to comport with the general wellness product exception, preferring, instead, to capitalize on the explosive growth in sales of unregulated baby technology-based products.

11. At the same time, pediatricians began speaking out against products like the Smart Sock. For example, in November 2016, the American Academy of Pediatricians ("AAP") Sudden Infant Death Syndrome ("SIDS") Task Force recommended that parents avoid using "home cardiorespiratory monitors as a strategy to reduce the risk of SIDS" because "[t]he use of cardiorespiratory monitors has not been documented to decrease the

incidence of SIDS" and "[t]here are no data that other commercial devices that are designed to monitor infant vital signs reduce the risk of SIDS."

12. Thereafter, in January 2017, another group of pediatricians published a letter in the Journal of the American Medical Association ("JAMA"), confirming that "[t]here [wa]s no evidence that consumer infant physiologic monitors are life-saving and there is potential for harm if parents choose to use them." The JAMA letter specifically identified a video advertising piece in which Owlet's Chief Executive Officer ("CEO") and co-founder, Defendant Workman, stated, "We can't promise to prevent Sudden Infant Death Syndrome (SIDS) right now . . . but . . . we believe notifying parents when something's wrong maybe can help."

13. In response to this backlash, Owlet claimed that the Smart Sock was, in fact, a general wellness product, and comparable to other wearable technology like the Apple Watch or the Fitbit. It also publicized the fact that it had filed a 510(k) with the FDA for the Smart Sock in January 2017 that included so-called "accuracy" testing of the product. Nevertheless, and without receiving clearance from the FDA, Owlet launched the second version of the Smart Sock in March 2017. And while Owlet toned down some of its marketing with respect to the alarm feature, the second version of the Smart Sock included a new smart phone application, Connected Care, that took even greater advantage of the Smart Sock's pulse and oxygen level alarms.

14. Meanwhile, according to a 2017 report, the FDA once again privately informed Owlet that the Smart Sock was a medical device that required FDA approval before it could be sold and marketed in the U.S. And, once again, Owlet ignored the FDA and continued to market and sell the Smart Sock with the alarm feature as a general wellness product without the necessary FDA clearance.

15. On August 21, 2018, JAMA published a research letter titled *Accuracy of Pulse Oximetry-Based Home Baby Monitors* describing research that pediatricians had completed with respect to the Smart Sock, among other devices. According to the JAMA letter, "[a]ccuracy testing" of the commercially available products that were "not FDA-

regulated revealed concerning findings." Moreover, the JAMA letter explained that "[b]eyond their accuracy, other concerns about consumer monitor use include[d] the lack of medical indications for monitoring infants at home, the absence of FDA oversight, and the potential for unintended consequences."

16. The following day, August 22, 2018, the FDA issued industry-wide guidance stating that "[t]o date, the FDA has not cleared or approved any baby products to prevent or reduce the risk of SIDS" and recommending that all manufacturers review their marketing "for any direct or implied claims to cure, treat, or prevent a disease or condition, including SIDS," and to immediately stop marketing the products until they receive FDA clearance.

17. However, Owlet did not stop marketing and selling the Smart Sock in response to the FDA's guidance. It also did not disclose to consumers or current or future investors that the FDA already had informed the Company on at least two prior occasions that the Smart Sock was a medical device that required FDA clearance. And, incredibly, in mid-2020, Owlet launched the third version of the Smart Sock to consumers again without FDA clearance for the alarm feature.

18. By the fall of 2020, Owlet had been marketing and selling a medical device without FDA clearance for five years and had known for at least four of those years that the FDA believed that the Smart Sock was a medical device that needed premarket clearance. Accordingly, it was only a matter of time before the FDA took public action against Owlet and required it to stop selling the Smart Sock, drying up the Company's only source of revenue.

19. Owlet also had not successfully raised the amount of capital needed to conduct the necessary research and seek FDA clearance for the Smart Sock. Accordingly, Owlet turned to the public equity markets. However, because of the time, expense, and extensive disclosure requirements of the traditional initial public offering ("IPO") process, Owlet chose to become a public company by merging with Sandbridge, a special purpose

acquisition company ("SPAC"). Sandbridge had recently gone through an IPO with the express purpose of merging with a private company like Owlet.

20. On February 15, 2021, Sandbridge and Owlet announced the proposed merger that would result in Owlet taking over Sandbridge's ticker on the New York Stock Exchange ("NYSE"). The Class Period began thereafter when the registration statement concerning the proposed merger was filed with the SEC on Form S-4 ("Form S-4") on March 31, 2021.

21. In the Form S-4, Owlet claimed that the Smart Sock was "***not a medical device***" and therefore "***d[id] not require marketing authorization from the FDA***" even though it knew internally that the Smart Sock's alarm features made the product a medical device that indeed required FDA clearance before it could be marketed and sold in the U.S.

22. Likewise, the February 15, 2021 merger agreement between Sandbridge and Owlet Baby Care, Inc., which was signed by Defendant Workman and attached to the Form S-4 as an exhibit, claimed that Owlet "***holds all material Permits, including 510(k) clearances or premarket approvals required by applicable FDA Laws***." In reality, however, Defendants had recognized for years that the Smart Sock needed FDA clearance and the FDA had twice informed the Company that the product was not a general wellness product.

23. Owlet and Defendant Workman knew or were deliberately reckless in not knowing that these statements were materially false and misleading when made because they knew that the inclusion of the alarm feature in the Smart Sock launched in 2015 made it a medical device requiring FDA clearance and, by no later than 2016, that the Smart Sock was not a general wellness product and, as a result, needed to be authorized by the FDA under the FD&C Act before it could be marketed and sold in the U.S.

24. Investors only learned the relevant truth on October 4, 2021, when Owlet revealed that it had received a warning letter from the FDA regarding the marketing of the Smart Sock as a medical device without FDA clearance (the "Warning Letter"). In response to the Warning Letter, the Company's stock price declined 23% in a single trading day.

Ultimately, Owlet was forced to remove the Smart Sock from the market for more than two years while it sought FDA authorization to market and sell medical devices in the U.S.

## II. JURISDICTION AND VENUE

25. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

26. This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act (15 U.S.C. § 78aa). In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337.

27. Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b), because many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District. Additionally, Sandbridge's principal executive offices were located in this District.

28. In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

29. Lead Plaintiff Dr. Thomas E. Tweito is an individual investor who resides in Kansas. As set forth in the certification attached hereto as Exhibit A, and incorporated by reference herein, Dr. Tweito purchased or otherwise acquired Owlet common stock at artificially inflated prices during the Class Period, and has been damaged thereby.

### B. Defendants

30. Owlet is a Delaware corporation, with its principal executive offices in Lehi, Utah. Prior to its merger with Owlet Baby Care, Inc. on July 15, 2021, Owlet was a special

purpose acquisition company called Sandbridge. Unless otherwise specified herein, for allegations regarding events prior to July 15, 2021, "Owlet" shall also refer to Owlet Baby Care, Inc. Owlet is a technology company that is primarily engaged in manufacturing and selling products and services that proactively monitor an infant's health and wellness. The Company's common stock trades on the NYSE under the ticker symbol "OWLT" and Owlet warrants traded under the ticker symbol "OWLT WS."

31. Defendant Kurt Workman is a co-founder of Owlet. Workman served as CEO from the Company's founding in 2012 until December 2019. Following the merger with Sandbridge and during the Class Period, Workman served as the CEO and a member of the board of directors. Currently, Workman serves as Owlet's President, CEO, and a member of the board of directors.

32. As the CEO of the Company, Defendant Workman possessed the power and authority to control the contents of Owlet's reports to the SEC, press releases, and presentations to analysts and investors. Defendant Workman was directly involved in preparing, reviewing, and approving the Company's public statements and disclosures to the market. Defendant Workman was provided with copies of the Company's SEC filings, press releases, and presentations alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information, Defendant Workman knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the representations that were being made were then materially false and/or misleading.

33. Defendant Workman is liable as a direct participant in the wrongs complained of herein. In addition, Defendant Workman, by reason of his status as CEO and a member of the board of directors, was a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of his position of control, Defendant

Workman was able to and did, directly or indirectly, control the conduct of Owlet's business.

## IV. <u>REGULATORY BACKGROUND</u>

34. The FDA regulates medical devices pursuant to the FD&C Act. Section 201(h) of the FD&C Act, 21 U.S.C. § 321(h), defines a medical device as an "instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article" that is "intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease" or is "intended to affect the structure or any function of the body." The FDA regulates more than 190,000 distinct medical devices.

35. The Medical Device Amendments of 1976 (the "MDA") separates medical devices regulated under the FD&C Act into three different classes based on, among other things, the risk posed to the user. A Class I medical device "does not present a potential unreasonable risk of illness or injury." 21 U.S.C. § 360c(a)(1)(A). Class II medical devices represent a moderate to high level of risk to the patient or user. 21 U.S.C. § 360c(a)(1)(B). If a medical device is "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health" the MDA classifies the device as Class III. 21 U.S.C. § 360c(a)(1)(C).

36. In the first instance, the manufacturer of a product (here, Owlet) is responsible for determining if its product meets the definition of a medical device under Section 201(h) of the FD&C Act, and if so, for determining the appropriate classification for the product and if FDA authorization will be required to market the device in the U.S.

37. To determine if a product is a medical device within the definition of Section 201(h), the manufacturer must define the product's "intended use" and its "indications for use." A product's intended use is the general purpose or function that will appear on the label. A product's indications for use describe the condition or reasons for using a device, including a description of intended users.

38. The manufacturer also must determine if an appropriate product classification already exists for the product using the FDA Product Classification Database. According to the FDA, "[f]inding an existing classification that describes your product's intended use or design is a good indicator that it might be a medical device." For example, according to the FDA's Product Classification Database, a pulse oximeter—the precise technology the Smart Sock utilized to monitor a baby's heart rate and oxygen levels—is "a device used to transmit radiation at a known wavelength(s) through blood and to measure the blood oxygen saturation based on the amount of reflected or scattered radiation." 21 CFR § 870.2700. The FDA has classified pulse oximeters as Class II medical devices. Accordingly, Defendant Workman confirmed in 2013 that the Smart Sock with the alarm and notification features was a Class II medical device.

39. Manufacturers of most Class II medical devices must submit a 510(k) to the FDA before the device may be marketed in the U.S. While there is no standard form for a 510(k), 21 CFR 807.87 provides the information it must contain, including: the device name, the class of the device, proposed labels, and a 510(k) summary. The 510(k) must demonstrate that "the device to be marketed is as safe and effective, that is, substantially equivalent, to a legally marketed device."

40. Further, as part of the 510(k) process, manufacturers "must compare their device to one or more similar legally marketed devices," referred to as a predicate, and must support their claim that the device is "substantially equivalent." A company can demonstrate substantial equivalency by showing that the device has "the same intended use as the predicate" and that it has the "same technological characteristics (i.e., design, material, chemical composition, energy source)"; or, the company can show that the device has the same intended use as the predicate and if it does not have the same technological characteristics it must (i) not raise different questions of safety and effectiveness and (ii) the information submitted to the FDA must demonstrate the device is as safe and effective as the predicate.

41. Until the FDA provides an order declaring the device substantially equivalent, the device may not proceed to market. The FDA makes its determination within 90 days of the 510(k) submission, but the time for its review may be placed on hold if the FDA issues a request to the manufacturer for additional information because the 510(k) submission lacks information necessary for the FDA to complete its review.

42. The FDA, and in particular the Center for Devices and Radiological Health ("CDRH"), communicates with individual manufacturers, as well as different industry groups, via oral statements and written correspondence. One type of correspondence is known as a "Warning Letter." The FDA developed the Warning Letter "to correct violations of the statutes or regulations." The FDA issues Warning Letters "only for violations of regulatory significance. Significant violations are those violations that may lead to enforcement action if not promptly and adequately corrected."

43. According to the FDA, "[r]esponsible officials in positions of authority in regulated firms have a legal duty to implement whatever measures are necessary to ensure that their products, practices, processes, or other activities comply with the law." Moreover, "[u]nder the law such individuals are presumed to be fully aware of their responsibilities" and, as such, "responsible individuals should not assume that they would receive a Warning Letter, or other prior notice, before FDA initiates enforcement action" for violations. In fact, the "FDA is under no legal obligation to warn individuals or firms that they or their products are in violation of the law before taking enforcement action."

44. For its part, the CDRH issues "It Has Come to Our Attention Letters" when it "become[s] aware that regulated industry *may* be promoting a medical device product in a manner that potentially violates the [FD&C Act] and its implementing regulations." The "CDRH also issues letters to industry, which are intended to serve as communication . . . that inform industry broadly of issues related to specific devices or a class of devices."

45. With respect to baby products specifically, on October 17, 2011, the FDA sent a "Letter to Manufacturers Concerning SIDS Prevention Medical Claims for Baby Products," stating:

> The Food and Drug Administration (FDA) has learned that some manufacturers are continuing to market baby products that claim to prevent or reduce the risks of Sudden Infant Death Syndrome (SIDS) without FDA clearance or approval. Under section 201(h) of the Federal Food Drug & Cosmetic (FD&C) Act) and FDA's regulations, a baby product is considered a medical device when claims to cure, treat, prevent, or reduce a disease or condition, including SIDS, are made in the product's labeling, packaging, or advertising. Medical devices are regulated by the FDA.
>
> ***If your labeling, packaging, or advertising (including print and online) contains claims to prevent or reduce the risk of SIDS, you are in violation of the FD&C Act.***
>
> . . . .
>
> In order to comply with FDA regulations you must immediately:
>
> - Stop marketing your products with these claims until you have received FDA clearance or approval, or
> - Change your labeling, packaging, or advertising to remove all medical claims and ensure your products are not marketed as medical devices.

## V. <u>OVERVIEW OF DEFENDANTS' FRAUD</u>

### A. Owlet Debuted the Smart Sock in a Limited Launch in August 2013

46. In May 2013, six Brigham Young University students, including Defendant Workman, took first place in the IBMC at Harvard University with the Owlet Baby Monitor, a prototype of the Smart Sock. In a synopsis describing their entry in the IBMC, Workman and his fellow students stated:

> ***Our core product is a sock[] that alerts parents if their child stops breathing at night.*** It wirelessly relays vital signs, heart rate and oxygen saturation levels to the parents [sic] smart phone. It uses pulse oximetry, a common hospital technology that measures oxygen levels and heart rates through light. The

lungs are the last organ to develop and consequently many children have respiratory problems. In addition to respiratory problems, heart problems[,] and common illnesses, SIDS is a major concern for parents. Our monitor gives peace of mind to parents one heart beat at a time.

47. Workman and his team also gave a presentation at IBMC describing how they generated the idea for the Owlet Baby Monitor from pulse oximeters used in hospitals. For his part, Workman described how he and his team sought feedback from surveys, as well as observations in hospitals and at babies' homes before coalescing on a sock design. Workman also noted that his team only learned "later in the game that [they] ***needed FDA clearance***" for the monitor, and estimates of the time and expense to obtain FDA clearance led his team to consider whether they could go to market with a "more minimal and less risky" product to avoid "all that liability."

48. More specifically, Workman stated:

> ***What was holding us up was the alarm. Alarm plus pulse oximetry means that you need FDA clearance***. We thought, "well, what if we scratch the alarm. What could we do?'" We said, well, we'd have the same product that, you know, would still give you all these really cool things and we could play with that data in a lot of interesting ways, and maybe we could call it our "Infant Health Tracker."

49. Likewise, in response to a question from an IBMC judge, Workman confirmed that the Owlet Baby Monitor was "***a Class II device . . . [b]ecause it's sounding an alarm***. So an alarm means that we are giving advice to parents. We are saying, 'hey, there's something going on here.'" Workman also explained that the product's classification as a Class II device was required "since pulse oximetry has been around [and] there's so many devices already out there, predicate-wise, that's just how it is."

50. The specter of obtaining FDA authorization for the monitor with the alarm led Workman and his team to conduct additional consumer surveys, which confirmed that some

customers would buy the monitor without the alarm. But, Workman explained, his team was not "excited about" selling the monitor without the alarm:

> [I]n all honesty, maybe it's, it's kind of like why people hate to start with their crappy product first. Like to us it was so ugly, and we didn't even want to like test it. And the fact that people were wanting it – like we fought in the office a lot about whether or not to even go test or even try this non-alarm version because it wasn't, you know, it wasn't our flagship product and it wasn't [what] we were excited about . . . .

51. Yet, having found through their surveys that there was still a percentage of potential consumers interested in the "non-alarm version," Workman and his team decided to go ahead with "launching . . . the non-alarm health tracking version that doesn't need FDA [clearance] to lower risk" in the summer of 2013, "and then eventually, seven months later, launch with our flagship product that we know will be a hit." An IBMC judge separately sought to confirm that Workman and his team were "using this health monitoring product as a bridge to . . . your Class II device, and launch the product with the alarm," to which Workman responded, "Yeah, we'll start with [the health tracking device] and seven months later we'll launch our flagship product."

52. Based on their submission of the prototype Smart Sock to IBMC, Workman and his team received $25,000 and co-founded Owlet, which was later incorporated as Owlet Baby Care Inc. in February 2014.

53. Originally named the Vitals or Baby Monitor, Owlet publicly unveiled the Smart Sock without the alarm in a press release dated August 26, 2013 (the "August 26, 2013 Press Release"). According to the August 26, 2013 Press Release and the Owlet Baby Care website, the Smart Sock located the baby's "[h]eart rate and oxygen levels . . . using Owlet's proprietary, innovative four-sensor pulse oximeter," "check[ed] a child's vital statistics," and then "wirelessly transmit[ted] them to a web-enabled device," allowing parents to "check [their] child's blood-oxygen, skin temperature, and heart rate levels at any time, day or night." The Smart Sock also "gather[ed] [] data, analyze[d] it for abnormal

health patterns, determine[d] potential problems, and display[ed] [] information in a visually appealing format that can easily be shared with [a] pediatrician."

54. Owlet explained in the August 26, 2013 Press Release that Workman "first had the idea" for the Smart Sock "when caring for his twin cousins who were born prematurely" after another "cousin pass[ed] away from [SIDS]." Per Owlet, "there [wa]s nothing on the consumer market that c[ould] show parents their child's heart rate and oxygen levels." Moreover, hospital-grade devices were limited in scope and costly for new parents. As a result, the Smart Sock's "four sensors" and "nine different reading combinations" were "a vast improvement over current technology" that had "one combination of light and sensor." According to Defendant Workman as quoted in the August 26, 2013 Press Release, this innovation "offer[ed] peace of mind to parents at a financially feasible price."

55. Thus, with the Smart Sock, Owlet had "created the world's first baby 'smart sock' that transmit[ed] a child's heart rate, oxygen levels, skin temperature, sleep quality, and sleep position (rollover alerts) to a parent's smartphone or other internet-based device." The August 26, 2013 Press Release confirmed that individuals who participated in Owlet's crowd-funding campaign via Indiegogo could be one of the first consumers to receive a Smart Sock.

56. With respect to FDA clearance for the Smart Sock, the August 26, 2013 Press Release confirmed that forthcoming alarm and notification features would require FDA clearance before Owlet could launch these features to the broader public. More specifically, the August 26, 2013 Press Release stated that "[t]he Owlet Team [wa]s currently going through the FDA process to add an alarm, along with other features, to the next version of the product" which will take the Smart Sock "to a whole new level, notifying parents of drops in heart rate or oxygen levels, and helping to prevent emergencies."

57. Further, the August 26, 2013 Press Release quoted one of the Owlet co-founders as stating that "[t]he FDA process is a long and expensive one," and separately noted that "Owlet's FDA-cleared product could save hundreds of infant lives, in addition

to other great benefits in the medical sphere." The August 26, 2013 Press Release confirmed that "[t]he Owlet team expect[ed] to finish FDA clearance by 2015."

58. Responding to the August 26, 2013 Press Release, the media reported that the Smart Sock was "similar to but more advanced than the typical pulse rate device you might put your finger into in a doctor's office, with two light sources and two photo diodes to ensure good readings even with different-sized or growing infants." The media also confirmed that while the FDA "has yet to approve the alarm" feature of the Smart Sock, "the crowdfunding proceeds will go toward that process."

59. A 2014 article later reported that according to one of Owlet's co-founders, avoiding FDA regulation was precisely the motivation behind the Company's plan to remove the alarm feature from the Smart Sock launched as part of the crowd-funding effort. More specifically, "Owlet's cofounder Jacob Colvin explained that the alarm was removed so that it could be sold as an unregulated monitoring device."

### B. Owlet Launched the Smart Sock with the Alarm Feature Without Receiving FDA Clearance in October 2015

60. After launching the Smart Sock without the alarm in August 2013 to participants in its crowd-funding effort, Owlet continued to reassure consumers that "[t]he Owlet Team [wa]s . . . going through the FDA process to add an alarm, along with other features, to the next version of the product," thereby taking "the Owlet Vitals Monitor," also known as the Smart Sock, "to a whole new level, notifying parents of drops in heart rate or oxygen levels, and helping to prevent emergencies."

61. However, as one of Owlet's co-founders explained in the August 26, 2013 Press Release, "The FDA process is a long and expensive one" requiring significant financial support. According to the findings of a 2010 study surveying over 200 medical technology companies, "the average total cost for participants to bring a low- to moderate-risk 510(k) product from concept to clearance was approximately $31 million, with $24 million spent on FDA dependent and/or related activities." Adjusting for inflation between 2010 and 2020, this cost would have increased by approximately 20% to a total of

$37.2 million for Class II 510(k) devices. As a result, Owlet needed to secure tens of millions of dollars in new funding in order to achieve the necessary FDA clearance for the Smart Sock with the alert feature by 2015.

62. Owlet was facing a quintessential Catch-22. In order to attract more funding, it needed to make the "flagship" version of the Smart Sock with its core feature—the alarm function—available to the public. But, as it repeatedly stated publicly in 2013, the Company could not launch the Smart Sock with the alarm function without FDA clearance and Owlet could not complete that process without securing tens of millions of dollars in new funding.

63. Unsurprisingly, the funds that Owlet needed to seek FDA clearance for the Smart Sock by 2015 were not forthcoming. Indeed, after raising less than $300,000 via crowd-funding in 2013, Owlet raised an additional $1.85 million in April 2014—nowhere close to the funds the Company needed to achieve FDA clearance for the Smart Sock with the alarm feature, and certainly not by 2015.

64. Then, in early 2015, the FDA announced that it had "created a new category of devices—general wellness products" that the agency had decided to "exempt from regulation" via the issuance of draft guidance on January 20, 2015 titled *General Wellness: Policy for Low Risk Devices*. More specifically, the FDA stated that it no longer "intend[ed] to examine low-risk general wellness products . . . to determine whether they are devices within the meaning of section 201(h) of the [FD&C Act] . . . or, if they are devices, whether they comply with the FD&C Act's regulatory requirements for devices." The draft guidance became official in substantially the same form in July 2016 following a public comment period.

65. The guidance defined "general wellness products" "as products which . . . [a]re intended for only general wellness use . . . and [] present a very low risk to users' safety" and explained that the FDA's "general wellness policy" was not intended to "extend to devices that present inherent risks to a user's safety." For instance, "[i]f the product is invasive, involves an intervention or technology that may pose a risk to a user's safety if

device controls are not applied . . . raises novel questions of usability, or raises questions of biocompatibility, then the device is not covered by th[e draft] guidance."

66. To that end, the guidance defined the "scope" of the general wellness exception as "limited to certain products" that possessed (1) "[a]n intended use that relates to maintaining or encouraging a general state of health or a healthy activity or (2) an intended use that associates the role of healthy lifestyle with helping to reduce the risk or impact of certain chronic diseases or conditions." According to the guidance, in order to fall into the first category, "the intended use" of the product must not "include any reference or connection to diseases or conditions and only relate to weight management, physical fitness, relaxation or stress management, mental acuity, self-esteem, sleep management, or sexual function." Likewise, in order to fall into the second category, the product must be "intended to promote, track, and/or encourage choice(s), which . . . may either help to reduce the risk of, or help living well with, chronic diseases or conditions where it is well understood that the healthy lifestyle choice(s) may reduce the risk or impact of" those conditions. According to the draft guidance, examples of general wellness products include: "exercise equipment, audio recordings, mobile apps, video games, and other products that are typically available from retail establishments."

67. Described as "a boon to makers of apps and other products that help manage weight loss, fitness, stress, sleep, and other aspects of good health," the draft guidance's creation of a new category of devices was intended to "lift the burden of seeking FDA clearance and manufacturing products under agency quality rules" "[f]or devices that the [FDA] views as low-risk."

68. Owlet jumped at the chance to define the Smart Sock as a general wellness product and avoid having to raise and spend millions of dollars to achieve FDA clearance before it officially launched the Smart Sock with the alert feature to the wider public. For instance, Owlet stopped referring to the Smart Sock as a "Vitals Monitor," and instead focused on the "peace of mind and assurance" the Smart Sock provided to parents via "track[ing] a baby's breathing and heart rate."

69. With this pivot, Owlet was able to raise $6 million in venture funding in August 2015 in order to launch the Smart Sock with the alert feature but without FDA clearance in October 2015.

70. Owlet officially launched the Smart Sock with the alarm feature on or around October 21, 2015. The Smart Sock provided four alarms through the base station via “four colored lights and different audible alarms.” According to Owlet, a green light “means the Smart Sock is taking readings and they look good,” a blue light “means the Smart Sock is too far from the Base Station,” a yellow light “means that the Smart Sock can’t get a good read from your baby’s foot,” and a red light “mean[s] that heart rate or oxygen levels look problematic.”

71. Although Owlet sought to take advantage of the “general wellness product” exception to the FDA’s regulation of devices like the Smart Sock, it could not escape the fact that the alarm feature launched in October 2015 made the Smart Sock a Class II medical device and subject to FDA regulation.

72. Owlet also emphasized the more medical and diagnostic capabilities when it initially described and marketed the Smart Sock with the alarm feature. For example, while commenting on the wider launch of the Smart Sock in an October 21, 2015 press release, Owlet described the Smart Sock as:

> [A] unique device that leverages pulse oximetry, the same technology used in hospitals . . . to alert parents if their baby’s oxygen levels and heart rate are out of range and they are having difficulty breathing. With unintentional suffocation the leading cause of injury death among U.S. children under the age of one . . . . The Smart Sock allows “moms and dads [to] rest easy knowing they will be alerted if their baby is in distress.”

73. Further, with respect to the new “alert” functionality, Owlet stated that “[u]sing pulse oximetry, the same technology used in hospitals, the Owlet Smart Sock will send alerts, to the base station and via WiFi to a smartphone, if a baby were to stop breathing while sleeping.” Critically, Owlet confirmed in the October 2015 press release that “the sole

purpose of the [Smart Sock] device is to alert parents if their baby is not breathing or if the baby's heart rate is out of range." Moreover, per Owlet, the Smart Sock's "alert strategy was set by a team of pulse oximetry specialists, pediatricians, neonatologists and pulmonologists."

74. To support the October 2015 launch of the Smart Sock with the alert feature, Owlet posted on its blog an article authored by one of its co-founders titled "Big Announcement — Owlet is Changing Lives." The article stated, in relevant part:

> Andrew, Pia, and Easton. These are the names of the babies who were unable to breathe in the middle of the night, and their parents were alerted by the Owlet Monitor in time to intervene. Two of the children were turning blue when their mothers picked them up and stimulated them to start breathing again.
>
> This is our announcement to the world today: ***Owlet has strong initial evidence that it really can alert parents if, for some reason, their baby is unable to breathe***. We are also happy to announce that we are now taking Owlet out of private beta and making it available to the public.
>
> *Why is this such a big announcement?*
>
> Because this is a game changer for parents. You see, the second largest cause of infant death from one month to a year of age is suffocation, which usually occurs when the baby is sleeping. To put this in perspective, ***roughly 10x more infants pass away from suffocation than from car crashes every single year***. These accidental suffocations are real tragedies that occur every year . . . .
>
> . . . .
>
> At Owlet we focus on "what matters." We did not set out to build a "baby data tracker" or a "Fitbit for babies." We set out to try and solve a problem that matters to us as parents. . . . We built it because this work *matters*.
>
> . . . .

> ***This announcement matters because it lets people know there is a tool available for parents and it can actually alert them if their baby stops breathing.***

75. Throughout 2016, Owlet routinely touted the fact that the Smart Sock "us[ed] pulse oximetry, the same technology used in hospitals." For instance, in a February 18, 2016 blog post on the Company's website, Owlet described using the Smart Sock as "using hospital technology to watch over your little one." In a July 2016 blog post titled *How is Owlet Different Than Other Monitors*, Owlet stated:

> ***Owlet gives you access to your baby's heart rate and oxygen level.***
>
> For a lot of first-time parents, taking Baby home is a really stressful thought. Going from a hospital room with doctors, nurses, and modern medical technology to a very doctor-less, nurse-less, and medical technology-less home can be a bit of a shock. Owlet was actually invented because our founders wanted a baby monitor that didn't require stressing over. . . .
>
> Ultimately, they determined that a heart monitor . . . measures your baby's heart rate, and lets you know if the range looks like it is normal. A Pulse Oximeter measures the amount of oxygen in the blood, telling you how well your baby's respiratory system is working.

76. Owlet's press releases from August 2015 to June 2016 also repeatedly stated that the Smart Sock was "designed to send alerts" to parents "if a baby were to stop breathing while sleeping."

77. As a result, in 2016, the FDA began privately telling Owlet in written correspondence that the "Smart Sock meets the definition of a device under the FD&C Act and does not fall under the compliance policy for low-risk products that promote a healthy lifestyle (General Wellness guidance)."

78. Although this was consistent with Owlet's pre-2015 assertions regarding the alert notification for the Smart Sock (*see supra* § V.A) the Company did not stop selling the Smart Sock with the alert feature after receiving the FDA's correspondence. Owlet also

did not publicly disclose the fact that the FDA already had determined that Owlet could not use the general wellness product exception for the Smart Sock with the alarm feature and needed to seek FDA clearance in order to market and sell the Smart Sock in the U.S. And without any public action by the FDA to stop Owlet from marketing and selling a Class II medical device without FDA clearance, the Company continued to sell its product to consumers.

79. Owlet's decision to buck the FDA and launch the Smart Sock with the alarm feature in October 2015 without the regulator's blessing proved lucrative. The Company's Facebook video advertisements claiming that Owlet is #ThereWhenItMatters went viral, leading to millions of views and hundreds of thousands of likes and shares. In 2016, Owlet sold about 100,000 monitors. Additionally, within a year of publicly launching the Smart Sock with the alert feature (and without FDA clearance), Owlet raised an additional $15 million in venture funding.

### C. Pediatrician Backlash to Unregulated Baby Monitors like the Smart Sock Led Owlet to Double-Down on Its "Wellness" Claims

80. Despite the FDA's 2011 guidance for manufacturers of baby products (*see supra* ¶ 45) the market for unregulated baby technology-based products exploded following the Smart Sock's crowd-funded launch in 2013 and official launch in 2015. This led to backlash from the medical community. For instance, a U.S. News & World Report article reported that David King, a clinical lecturer of pediatrics at the University of Sheffield in England, stated that Owlet's Smart Sock is "more likely to prey on the fears of new parents" because the Company "claim[s] to help parents keep their babies safe." According to King, "[a] lot of the marketing around these devices [wa]s about the fact that they allow[ed] you to monitor your new baby and keep them safe."

81. This was true for the Smart Sock with the alarm feature. For example, Workman cited losing a baby cousin to SIDS as one of the motivating factors to develop the Smart Sock. Likewise, in March 2015 following a Smart Sock "pitch" at South by Southwest, Owlet told one media outlet that the Smart Sock "was able to detect sleep apnea

in a newborn infant." Further, in connection with the wider release of the first version of the Smart Sock with the alarm feature in October 2015, Owlet issued a press release titled *New Smart Monitor Alerted Mom When Her Baby Stopped Breathing; Owlet Baby Monitor now shipping after private beta release; company shares early success stories from real parents*. Additionally, in a January 4, 2016 Owlet press release, the Company noted that "[t]he reception among parents" of the Smart Sock with the alarm feature "has been incredible, with five families having been alerted by their monitor that their baby stopped breathing, allowing them to intervene."

82. King's criticism of products like the Smart Sock "stem[med] from the fact that even though manufacturers display[ed] small disclaimers on their websites saying the devices are not intended to prevent [SIDS], manufacturers admit fears over SIDS drive development, and many include the syndrome in their marketing materials." In the November 2014 U.S. News & World Report article, "King also call[ed] out the manufacturers of these products for skirting regulation by the [FDA]." According to the article, "[a]s they stand now, the products are not sold as medical devices, despite the fact that consumers see them that way, solely because they lack an alarm to alert parents if there is a change in vital signs." In his own November 2014 article, King questioned whether manufacturers like Owlet were being "completely transparent with their future customers," highlighting the risk that "the substantial amounts of money that parents pay for such devices might lull them into a false sense of security."

83. Similarly, the U.S. News & World Report article quoted a practicing pediatrician as saying that the "lack of regulation" by the FDA was "problematic." According to the pediatrician:

> If you're not making it a medical device, what's it for? Since it's not FDA-approved, we don't know how accurate it is at recording baby's vitals. These devices are catering to concerned parents, but I'm not sure what they're supposed to do beside show numbers that may or may not be correct.

84. In November 2016, the AAP released a policy statement titled *SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment* authored by the AAP's Task Force on Sudden Infant Death Syndrome. One of the "A-level Recommendations" made by the AAP SIDS task force was "not [to] use home cardiorespiratory monitors as a strategy to reduce the risk of SIDS" because "[t]he use of cardiorespiratory monitors has not been documented to decrease the incidence of SIDS" and "[t]here are no data that other commercial devices that are designed to monitor infant vital signs reduce the risk of SIDS."

85. In January 2017, a group of pediatricians, led by Dr. Christopher Bonafida, a doctor with the Children's Hospital of Philadelphia, published an article in the JAMA regarding "[a] new class of home baby monitor[s]" that use "[e]lectronic sensors attached to socks" to "continually check 'vitals' like breathing, pulse rate and oxygen levels" and "notify parents of any abnormalities via [a] smartphone." More specifically, the JAMA article concluded:

> Until these monitors have been thoroughly evaluated and guidelines for use have been established, the recommendations physicians should give to parents who ask about these products is simple. There is no evidence that consumer infant physiologic monitors are life-saving, and there is potential for harm if parents choose to use them.

86. When interviewed by media outlets about his research, Dr. Bonafida noted that "repeated false alarms from the monitors jangle parents' nerves and lead to unnecessary tests performed on babies." Dr. Bonafida further stated, "I worry about the unnecessary care and even potential harm to babies that can be associated with alarms from these devices . . . . There's not a role for these devices in the care of healthy infants."

87. The JAMA article also warned that "the manufacturers [of these devices] can avoid FDA medical device regulation" "[b]y not claiming that the monitors prevent sudden infant death syndrome (SIDS)." In a January 2017 Ars Technica piece discussing the JAMA article, the author noted that "[s]everal companies dance around the idea that the monitors

could even help prevent SIDS . . . because they have no basis to make such a claim; none of these consumer devices has been adequately tested and approved as medical devices by the [FDA].”

88. The JAMA article specifically called out Owlet for using “video advertising” for the Smart Sock that “mentions SIDS” and “hints the app may signal parents when something is wrong.” In the video cited in the JAMA article, Workman stated, “[w]e can’t promise to prevent Sudden Infant Death Syndrome (SIDS) right now . . . but . . . we believe notifying parents when something’s wrong maybe can help.”

89. Commenting on the JAMA article, Dr. Bonafida stated: “Innovation in the way we monitor kids is pretty valuable. . . . The problem is these companies have bypassed all of the steps that exist to really protect the public from harm from these devices.” Further, Dr. Bonafida noted that “[t]hese companies,” including Owlet, “have gone straight to the market . . . . [a]nd so the public actually doesn’t know anything about the accuracy of the devices or safety of these devices.” Dr. Bonafida opined that “he would like the FDA to step in and require studies that verify the accuracy and safety of the monitors.”

90. In a response to the JAMA article posted to its blog, Owlet attempted to make its case that the Smart Sock with the alarm feature launched in October 2013 was a general wellness product and not a Class II medical device that needed to be regulated by the FDA. Specifically, Owlet claimed that the Smart Sock with the alarm feature was comparable to other wearable technology that was not regulated by the FDA because it “uses similar technology, and delivers the same information, to that used in products like Apple Watch and Fitbit,” thereby directly contradicting assertions from October 2015 that the Smart Sock was not a “Fitbit for babies.”

91. Owlet also claimed that the Smart Sock allowed “parents [to] take a proactive approach to their baby’s health and wellness.” But Owlet was forced to admit that “false alarms” generated by the Smart Sock created “the risk [of] over diagnosis”—the very risk flagged by Dr. Bonafida and the kind of risk that made the general wellness product exception inapplicable to the Smart Sock with the alarm feature.

92. Nevertheless, Owlet ignored the public concerns raised by pediatricians and the FDA's non-public correspondence stating that Smart Sock needed to be regulated as a medical device and launched the second version of the Smart Sock along with the Connected Care health platform in March 2017 again without obtaining FDA clearance.

93. While Owlet appeared to "tone[] down" its promotional efforts, "switching 'alert' to 'notification,'" "swapping 'breathing' for 'heart rate and oxygen levels,'" and including a "disclaimer [that] note[d] that the product is not intended to 'cure, treat, or prevent any disease or health condition, including, but not limited to, Sudden Infant Death Syndrome (SIDS),'" it continued to tout the alarm feature of the Smart Sock. In particular, the Company specifically identified upgrades to the Smart Sock meant to "reduce false alarms." It also "amplif[ied] the voices of parents" who connected the Smart Sock to preventing risks like SIDS.

94. For instance, an October 2017 Forbes article titled *Owlet's Smart Sock Makes Millions Selling Parents Peace of Mind — But Doctors Are Unconvinced* began with an anecdote that Owlet shared on its blog and in Facebook advertisements in which a Smart Sock alarm alerted a parent that her baby had stopped breathing in his crib, with the grateful mother stating, "The doctors and nurses all agreed that the Owlet alarm helped . . . ." Likewise, in an interview with CNBC's On the Money, Defendant Workman described the Smart Sock with the alarm feature as follows: "It's called pulse oximetry . . . . So it's that little red light that they put on your finger in the hospital, and it just shines a light through the skin and can measure the heart rate and oxygen." According to an article related to the interview, "[s]hould the child's oxygen level or heart rate exceed an acceptable range, the base monitor sounds an alarm."

95. Owlet also shared on its website a blog post written by Dr. Ken Ward titled *Owlet Smart Sock: Pulse Oximetry in the Home*, advocating for use of the Smart Sock:

> In the decades I've worked in maternal and fetal medicine, I have sent at-risk babies home with hospital-grade monitors. Not only were the parents anxious and concerned for the well-being of their newborns but also worried

about using the monitor correctly. Unfortunately, the hospital-grade monitors were somewhat cumbersome; large in size with multiple cords attached, and required sensor pads to be attached via adhesive backs to small little feet. Too often, false alarms occurred due to the movements of the infant, which added to the parents' already anxious state.

The Owlet Smart Sock is a more reasonable monitor for the home setting. It has been extensively tested to validate the accuracy of the device against other oxygen and pulse monitors.

The design is more appropriate for home use.

It is impossible for the baby to become entangled in monitor cables since the sock uses a wireless sensor to communicate health information to the home base.

Risks for adhesive-related skin irritations and burns from pulse oximeters monitors are minimized. The sock uses sensors (similar to those used in Fitbit® or the Apple® Watch) that use considerably less power than hospital pulse oximeters which would virtually eliminate any risk of burning the baby.

The sock is held securely on the foot by straps, reducing the risk of skin irritations that can be caused by adhesives used with pulse oximeters.

False readings or false notifications are reduced because the Owlet Smart Sock can detect when the infant is moving. Owlet designed a system of notifications that differentiates between a displaced sensor and a significant decrease in a baby's heart rate. As a result, a very high rate, 99% of Owlet Smart Sock users, have used the device without ever receiving a false notification. This is great news since it reduces the risk of overdiagnosis due to misinformation.

96. The media coverage of Owlet's launch of the second version of the Smart Sock with the alarm feature echoed these sentiments. One outlet stated, "The core of the Owlet

Smart Sock 2 is the pulse oximetry sensor . . . . The sensor in the Smart Sock is just as sensitive as the corded versions used in the Emergency Room of your local hospital." Likewise, according to another outlet, "[t]he aim of the Connected Care platform is to help further identify underlying health issues."

97. Once again, the FDA privately concluded and informed Owlet that the Smart Sock was a medical device that needed FDA marketing approvals according to a 2017 report by a Utah-based FOX affiliate that obtained the FDA's communication to Owlet via a Freedom of Information Act ("FOIA") Request.

98. Although this was consistent with Owlet's pre-2015 assertions regarding the Smart Sock with the alarm feature (*see supra* § V.A) the Company did not stop selling the Smart Sock after receiving the FDA's position in 2017. Owlet also did not publicly disclose the fact that the FDA already had determined that Owlet could not use the general wellness product exception for the Smart Sock and needed to seek FDA clearance in order to market and sell the Smart Sock in the U.S.

99. Despite the FDA's clear correspondence, Owlet continued to market and sell its flagship Smart Sock with the alarm feature and, now, access to the Connected Care mobile platform without FDA clearance. As of October 2017, Owlet had sold 150,000 Smart Socks, produced $19 million in revenue in 2016, and projected $30 million in revenue in 2017. Owlet also closed its largest fundraising effort to date, securing $24 million in Series B investments in the Company in May 2018.

**D. Owlet Continued to Market and Sell the Smart Sock Without FDA Clearance in Contravention of New FDA Industry Guidance**

100. The drumbeat of concerns from the medical community with respect to the Smart Sock continued following the launch of the second version of the Smart Sock in March 2017. For example, in September 2017, Australian news outlets cited warnings from experts that the Smart Sock, among other products, "will not reduce the risk of their child dying from" SIDS prior to Owlet's launch in Australia. One Australian professor who had "extensively researched" the Smart Sock claimed that these products were "not able to be

as accurate as pulse oximetry in a hospital," and while "the warnings are there . . . to say that this is not a very useful device in terms of SIDS," those warnings were "very, very well hidden."

101. Nevertheless, the FDA did not publicize its correspondence with Owlet wherein the regulator stated that the Smart Sock was a medical device that needed to be regulated under the FD&C Act and Owlet continued to sell the Smart Sock without FDA clearance. By February 2018, Owlet reported that it had sold more than 250,000 units.

102. Although it did not publicly disclose the FDA's position, Owlet began to change the way it was describing the Smart Sock in an attempt to satisfy the general wellness product exception. For example, in 2018, the Company eliminated language it had used in some form since 2015 to tout the "pulse oximetry" technology and to describe the Smart Sock as "designed" to send "alerts" or "notifications"—i.e., "if a baby were to stop breathing while sleeping" or "if baby's heart rate or oxygen fall outside a preset range"—in favor of describing "Owlet's mission"—i.e., "to empower parents with the right information at the right time."

103. Then, on August 21, 2018, JAMA published a research letter titled *Accuracy of Pulse Oximetry-Based Home Baby Monitors*. The letter described research conducted by Dr. Bonafida, among others, comparing the Smart Sock and another commercially available products to a reference monitor in order to test the accuracy of the commercially available products in assessing heart rate and oxygen levels. According to the letter, "[a]ccuracy testing" of the commercially-available products that were "not FDA-regulated revealed concerning findings." Moreover, the letter explained that "[b]eyond their accuracy, other concerns about consumer monitor use include[d] the lack of medical indications for monitoring infants at home, the absence of FDA oversight, and the potential for unintended consequences."

104. During an interview with ABC's Good Morning America, Dr. Bonafida noted that he was "pretty shocked" by the results of the research conducted for the JAMA letter, explaining that "Parents are buying these [products] not just to tell them when things are

OK, but to tell them when something is wrong. . . . What we're showing is how these monitors are failing them to some degree." Likewise, in a Reuters article discussing the JAMA research letter, Dr. Bonafida confirmed that "[t]here are lots of reasons parents should probably not be using consumer vital sign monitors," including that "[t]here is no evidence that these monitors prevent SIDS." He further commented that "the issues with accuracy . . . make me concerned that the[se products] could not just be unhelpful but that they could also create problems," i.e., when a child is brought to the emergency room and receives unnecessary medical treatment based on a false alarm from the Smart Sock. (Ellipsis original.)

105. The next day, August 22, 2018, the FDA posted an article titled *Baby Products with SIDS Prevention Claims* on its website. According to the article, "[a] baby product is considered a medical device if claims to cure, treat, prevent, or reduce a disease or condition are made in the product's labeling, packaging, or advertising . . . ."

106. That same day, the FDA posted an article titled *Information for Manufacturers of Baby Products* on its website. That article stated that "[s]ome manufacturers may not be aware that marketing a baby product with claims to cure, treat, or prevent a disease or condition, including Sudden Infant Death Syndrome (SIDS), makes their product a medical device." The FDA further stated, "***To date, the FDA has not cleared or approved any baby products to prevent or reduce the risk of SIDS***." The FDA further recommended that manufacturers "review [their] current labeling, packaging, and advertising for any direct or implied claims to cure, treat, or prevent a disease or condition, including SIDS," and if these materials contained such claims, that manufacturers "stop marketing [their] products with these claims until you receive FDA clearance or approval; or [] change [their] labeling, packaging, or advertising to remove all medical claims and ensure your products are not marketed as medical devices."

107. Then, on September 12, 2018, Apple announced that its eponymous smartwatch had received FDA-clearance for a built-in electrocardiogram ("ECG"), "officially classifying" the Apple Watch "as a medical device capable of alerting its user to

abnormal heart rhythms." Notably, the FDA determined that the Apple Watch with the ECG functionality was a Class II device.

108. Despite the FDA's industry-wide public warning about products like the Smart Sock, and the fact that Apple sought and obtained clearance for its smartwatch's ECG functionally, Owlet did not stop marketing and selling the Smart Sock or publicly disclose the FDA's previously communicated position that the Smart Sock was a Class II medical device that needed to be cleared by the FDA before it could be marketed and sold in the U.S. In fact, Owlet continued to sell the Smart Sock to parents ostensibly as a low-risk, general wellness product.

109. According to an interview with Owlet's Chief Marketing Officer following the mid-2020 launch of Smart Sock 3, Owlet's "online revenues" had increased "3x from September [2019] to March [2020]" and "daily revenues" would soon increase by "3x" from what Owlet was recognizing "back in September [2019]."

**E. Owlet Decided to Go Public Via a de-SPAC Transaction**

110. Although Owlet had been marketing and selling the Smart Sock since October 2015 without FDA clearance, given the FDA's non-public position that the Smart Sock was not a general wellness product and needed to be regulated under the FD&C Act, the Company knew that it would have to obtain FDA clearance for its "anchor" or "flagship" product in order to avoid having to pull the product from the market.

111. But the funding necessary to successfully achieve FDA clearance for the Smart Sock remained elusive. While sales of the Smart Sock had grown considerably over the years, by early 2021, Owlet had yet to turn a profit and was subject to a going concern warning from its auditors. Moreover, it had taken Owlet five years to raise $48 million in funding, which it used to fund the launch of two versions of the Smart Sock. Owlet could not count on the FDA continuing to allow it to market and sell a Class II medical device without clearance for another five years. As a result, Owlet needed to quickly find a larger source of funds—it needed to gain access to the public equity markets.

112. However, becoming a public company is a long process that requires significant infrastructure (e.g., internal audit and accounting functions), as well as extensive due diligence and disclosure obligations, all of which is expensive and time-consuming, potentially taking 12-18 months. Small start-up companies, like Owlet, have another option to go public and receive a capital infusion—become a public company by merging with a special purpose acquisition company or SPAC, which can be completed in a much shorter time frame, approximately three to six months.

113. Also known as a "blank check" company, a SPAC is a publicly traded company created specifically to pool funds through an IPO for the purpose of completing an acquisition or other business combination with an existing company. To create a SPAC, founders—typically a group of private equity investors or a company formed by private equity investors—must invest the initial capital to recruit an investment bank to structure capital raising terms, prepare and file IPO documentation, and premarket the investment offering to interested investors.

114. Unlike an operating company that becomes public through a traditional IPO, a SPAC is a shell company when it becomes public. It does not have an underlying operating business and does not have assets other than cash and limited investments, including the proceeds from the IPO. Once capital is raised through the IPO, the sponsors then have a specified time period, typically between 18 and 24 months, in which to identify an appropriate target to complete the merger or acquisition.

115. Typically, common stockholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team. Thus, when the management team identifies a target, a merger proxy statement must be distributed to all SPAC stockholders, which includes the target company's complete audited financials and the terms of the proposed business combination. Because target companies are private entities wishing to go public, they generally have not published prior financial information. Investors in SPACs accordingly must depend on management to honestly provide accurate information about any contemplated transactions in their proxy solicitation materials.

### F. Owlet Merged with Sandbridge to Become a Public Company

116. On February 16, 2021, Owlet announced that it was merging with Sandbridge, a blank check company incorporated on June 23, 2020, as a Delaware corporation and formed for the purpose of effecting a merger or similar business combination.

117. Sandbridge was formed by its sponsor, which it defined as referring to Sandbridge Acquisition Holdings LLC ("Sandbridge Holdings"), a Delaware limited liability company affiliated with Sandbridge Capital, LLC ("Sandbridge Capital"); Ken Suslow ("Suslow"), Sandbridge's CEO and Chairman of the Board of Directors; Richard Henry ("Henry"), Sandbridge's Chief Financial Officer ("CFO"); and Joe Lamastra ("Lamastra"), Sandbridge's Chief Operating Officer. Sandbridge Capital is a global consumer investment firm that targets modern consumer brands, consumer-based technologies, beauty and personal care, luxury, and health and wellness. Sandbridge also identified as members of its sponsor private funds managed by Pacific Investment Management Company LLC ("PIMCO"), an investment management firm that focuses on fixed income management.

118. In July 2020, Sandbridge's sponsor purchased 5,750,000 founder shares for an aggregate purchase price of $25,000, or approximately $0.004 per share. Before this initial investment of $25,000 by the sponsor, Sandbridge had no assets.

119. Sandbridge's only three employees were Suslow, Henry, and Lamastra. Sandbridge's board was composed of Suslow, its Chairman; Domenico De Sole, Ramez Toubassy, and Jamie Weinstein. In addition, Sandbridge identified two "special advisors"—Tommy Hilfiger ("Hilfiger"), the iconic fashion designer, and also Lamastra's business and investing partner; and Bill Powers, a Founding Partner of Sandbridge Capital.

120. On September 14, 2020, the SEC declared Sandbridge's Form S-1 effective, and on the same day, Sandbridge filed a prospectus pursuant to Rule 424(b)(4) and completed its IPO, selling 23 million units at $10.00 per unit. Each unit consisted of one share of Sandbridge Class A common stock and one half of one public warrant of Sandbridge. Each whole warrant entitled the holder to purchase one share of Sandbridge

Class A common stock for $11.50 per share, subject to adjustment. The IPO generated total gross proceeds of $230 million.

121. The proceeds from the IPO were deposited in a trust account with the purpose of completing a business combination with a target company. According to Sandbridge's Amended and Restated Certificate of Incorporation dated September 14, 2020, it had to complete a business combination within 24 months of closing its IPO, or its corporate existence would cease, except for purposes of winding up its affairs and liquidating. In that circumstance, it would be required to redeem 100% of its public shares using the funds in the trust account.

122. Sandbridge disclosed to investors in its IPO that at the time of the IPO, it had not selected any business combination target, nor had anyone on its behalf engaged in any substantive discussions with a business combination target. It noted that "[w]hile we [Sandbridge] may pursue an initial business combination with a company in any sector, we intend to focus our search on the consumer sector and consumer-related businesses, which complements the expertise of our management team, directors and advisors."

**G. The Pre-Merger Process**

123. On February 15, 2021, Sandbridge entered into a business combination agreement ("Business Combination Agreement") with its wholly owned subsidiary, Project Olympus Merger Sub, Inc. ("Merger Sub"), and Owlet Baby Care Inc., pursuant to which Merger Sub merged with and into Owlet Baby Care Inc., as a wholly owned subsidiary of Sandbridge, while Sandbridge would change its name to Owlet.

124. The Sandbridge-Owlet merger was the result of an initial teleconference between Suslow and Lior Susan ("Susan"), who was a director of Owlet and a founding partner of one of Owlet's investors, Eclipse Ventures Fund I, L.P. and Eclipse Continuity Fund I, L.P. (collectively, "Eclipse"), on October 20, 2020, within a month of Sandbridge's IPO. Through the course of an email exchange the same day, the parties discussed next steps for a preliminary diligence review of Owlet's confidential materials. On October 28, 2020, Sandbridge submitted a draft, non-binding letter of intent to Owlet so that the Owlet

board could consider a business combination with Sandbridge, and by November 3, 2020, Sandbridge and Owlet had entered into a letter of intent regarding terms of the proposed transaction.

125. During November 2020 and December 2020, Sandbridge and its advisors reviewed due diligence documents that Owlet Baby Care Inc. provided in a virtual data room. On November 25, 2020, the parties exchanged an initial draft of the Business Combination Agreement. In late December 2020, Sandbridge and Owlet began to discuss with BofA Securities, Inc. ("BofA") and Citigroup a proposed $75 million private placement ("PIPE"). The Preliminary Proxy stated that the PIPE was "to support incremental growth initiatives identified in the diligence process." Representatives of Citigroup and BofA began contacting potential PIPE Investors on January 22, 2021, and until February 10, 2021, collected indications of interest from PIPE investors. On February 11, 2021, Suslow and Susan agreed to increase the size of the PIPE to $130 million.

126. The next day, Sandbridge's board unanimously approved the proposed business combination.

127. After Sandbridge and Owlet entered the definitive Business Combination Agreement on February 15, 2021, they issued a press release the next day announcing the Business Combination that was also filed by Sandbridge with the SEC pursuant to Rule 425 of the Securities Act. The press release, written by Susan, praised Owlet's development from its nascent days as "a startup headed by Kurt Workman, an engineer and entrepreneur." Following Workman's pitch made with his co-founders for "a monitoring sock for infants designed to measure heart rate and blood oxygen levels," Susan invested Eclipse's venture capital funding into the company.

128. Sandbridge filed its Proxy Statement for a Special Meeting of Sandbridge shareholders to vote on the proposed business combination with Owlet Baby Care Inc. The Special Meeting was held on July 14, 2021. The proposed business combination was adopted and closed the next day.

129. In advance of the Special Meeting, holders of 19,758,773 shares of Sandbridge Class A common stock exercised their right to redeem their shares for a full pro rata portion of the trust account. Accordingly, only $32.4 million remained in the trust account to fund the business combination. Sandbridge Class B common stock held by the sponsor and other Sandbridge insiders was automatically converted to 5,750,000 shares of Owlet common stock, of which 2,807,500 shares were subject to vesting under certain conditions. The PIPE investment was also consummated at closing, with private investors agreeing to subscribe for an aggregate of 13,000,000 newly-issued shares of Owlet common stock at a purchase price of $10.00 per share. Owlet common stock and warrants commenced trading on the NYSE under the symbols "OWLT" and "OWLT WS," respectively, on July 16, 2021.

### H. Defendants Falsely Claim That the Smart Sock Was Not a Medical Device and That Owlet Was FDA-Compliant

130. The Class Period begins on March 31, 2021, with the filing of the Form S-4 in connection with the merger of Sandbridge and Owlet.

131. The Form S-4 attached a copy of the Business Combination Agreement as Annex A. Defendant Workman, among others, signed the Business Combination Agreement on behalf of Owlet.

132. In a section titled "Regulatory Compliance," Defendants claimed that "since January 1, 2018, ***all products*** . . . ***marketed*** . . . ***[and] sold***" by Owlet "***have been, and are being*** . . . ***marketed*** . . . ***and sold in compliance in all material respects with applicable FDA Laws***." Defendants likewise claimed Owlet "***holds all material*** . . . ***510(k) clearances*** . . . ***required by applicable FDA Laws***" and that "[s]ince January 1, 2018," Owlet has "***not received any written notice or communication from any [g]overnmental [e]ntity***," including the FDA, "***asserting material noncompliance with any applicable FDA Law*** . . . or similar written letter or notice alleging noncompliance."

133. In reality, and unbeknownst to investors, Owlet was marketing and selling a Class II medical device—the Smart Sock with the alarm feature—without FDA clearance as a general wellness product, and had received written correspondence from the FDA in at

least 2016 and 2017 confirming that the FDA believed that the Smart Sock needed to be regulated. Defendants knew or were deliberately reckless in not knowing these facts given Defendant Workman's pre-2015 statements, as well as the receipt of the FDA correspondence in at least 2016 and 2017.

134. The body of the Form S-4 contained a section titled "Information Related to Owlet," with a preface reading: "Unless the context requires otherwise, references to 'Owlet,' 'we,' 'us,' 'our' and the 'company' in this section are to the business and operations of Owlet prior to the Business Combination and the business and operations of New Owlet following the Business Combination." Likewise, the "Risk Factors" identified in the Preliminary Proxy contained a preface that specified:

> [U]nless the context otherwise requires, all references in the subsections "—Risks Related to New Owlet's Business and Operations," "—Risks Related to New Owlet's Capital Requirements and Capital Structure," "—Risks Related to Owlet Becoming a Public Company," "—Risks Related to Regulation of New Owlet's Industry," "—Risks Related to New Owlet's Intellectual Property," and "—General Risk Factors Relating to New Owlet" to the "Company," "we," "us" or "our" refer to the business of Owlet and its subsidiary prior to the consummation of the Business Combination, which will be the business of New Owlet and its subsidiaries following the consummation of the Business Combination.

135. Owlet claimed in the Form S-4 that the Smart Sock was "a consumer product and ***not a medical device***" and therefore "***d[id] not require marketing authorization from the FDA***." The Company further stated that "the FDA . . . ***could*** require" Owlet "to obtain marketing authorization . . . to continue to sell the product" in the U.S.

136. Like the regulatory compliance assertions in the Business Combination Agreement, the statements in the body of the Form S-4 were materially false and misleading when made because, unbeknownst to investors, Owlet was marketing and selling a Class II medical device, the Smart Sock with the alarm feature, without FDA clearance as a general

wellness product and had received written correspondence from the FDA in at least 2016 and 2017 confirming that the FDA believed that the Smart Sock needed to be regulated as a medical device. Defendants knew or were deliberately reckless in not knowing these facts given Defendant Workman's pre-2015 statements, as well as the receipt of the FDA correspondence in at least 2016 and 2017.

137. Following the receipt of correspondence from the SEC, the Form S-4 was amended on May 28, 2021. In the Form S-4/A, Owlet disclosed that it had received correspondence from the UK Medicines and Healthcare products Regulatory Agency ("MHRA") stating that the Smart Sock "require[d] . . . registration as a medical device in the U.K." but the MHRA would allow Owlet "to continue to market the [] Smart Sock until May 2022 without such certification or registration."

138. Owlet, however, did not disclose that it had received communication from the FDA in at least 2016 and 2017 confirming that the FDA believed that the Smart Sock was, in fact, a medical device that needed to be authorized under the FD&C Act, leaving investors with the misleading impression that the Company's repeated assertion that the Smart Sock was "a consumer product ***and not a medical device***" requiring FDA clearance was, in fact, true. Moreover, Defendants knew or were deliberately reckless in not knowing these facts given Defendant Workman's pre-2015 statements, as well as the receipt of the FDA correspondence in at least 2016 and 2017.

139. Owlet repeated these statements on June 21, 2021, in its final Prospectus before the merger, which was filed with the SEC on Form 424(b)(3) and declared effective that same day. Owlet also repeated these statements in a Registration Statement signed by Defendant Workman and filed with the SEC on Form S-1 on August 5, 2021. On August 24, 2021, the Registration Statement became effective and included the resale by certain selling securityholders of 58,883,010 shares of common stock issued in connection with the merger, the resale of nearly 13 million shares of common stock issued in the PIPE investment, and the resale of up to 6,600,000 warrants issued in a private placement in connection with Sandbridge's IPO.

## I. The Relevant Truth Is Revealed

140. On October 4, 2021, in a Form 8-K filed with the SEC, Owlet informed investors that it had received a Warning Letter, dated October 1, 2021, from the FDA. In the Warning Letter, the FDA publicly revealed that, despite Owlet's assertions in the Form S-4 and Form 10-Q, the Smart Sock ***was a medical device*** because it was "intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body" and "[p]roducts that measure blood oxygen saturation and pulse rate are devices when they are intended to identify (diagnose) desaturation and bradycardia and provide an alarm to notify users that measurements are outside preset values."

141. The FDA also confirmed that it had "determined" that the Smart Sock had been "offered for sale in the United States without marketing approval, clearance, or authorization from [the] FDA" based on the FDA's review of Owlet's website, other commercial websites, and Owlet's "responses to FDA correspondence." The Warning Letter identified examples of marketing that supported its decision, including the following from the Owlet website: "We look at the best indicators of your baby's overall well-being and will proactively notify you if your baby may need you" and "[t]rack heart rate, oxygen level, and sleep trends."

142. The FDA further stated publicly for the first time in the Warning Letter that it "ha[d] corresponded with Owlet" "[s]ince 2016" that the Smart Sock "me[t] the definition of a device under the FD&C Act and does not fall under the compliance policy for low-risk products that promote a healthy lifestyle (General Wellness guidance)" and that Owlet's decision to market the Smart Sock in the U.S. was "without marketing clearance or approval" and was "in violation of the [FD&C] Act."

143. The FDA concluded the Warning Letter by requesting Owlet "cease any activities that result in the adulteration of the Owlet Smart Sock (All versions and co-branded products), such as the commercial distribution of the device for the uses discussed above."

144. In response to the Warning Letter, Owlet's Form 8-K outlined that the Company intended to "fully cooperate with FDA" and "pursu[e] . . . marketing authorization . . . for uses of the Smart Sock identified as medical device uses."

145. On the news that Owlet's flagship product could no longer be sold in the United States, the price of Owlet common stock fell $1.29, or ***23%***, in a single trading day on unusually heavy trading volume, dropping from $5.48 per share at close on October 1, 2021, to $4.19 at close on October 4, 2021.[2]

146. In a same-day analyst report, Cowen connected Owlet's stock price decline to the receipt of the Warning Letter, stating that "OWLT is trading down (~23% intraday) following an FDA Warning Letter around Smart Sock marketing." Cowen further highlighted the "***unexpected***" nature of the news, "given that versions of the Smart Sock have been on the market for the past 6 years and . . . ***the company has been in active and ongoing dialogue with the FDA around BabySat & OTC Smart Sock***."

147. Likewise, in BofA's same-day report following the news, the analyst announced it was "downgrading OWLT to Neutral from Buy." Predicting a six-month delay to get approval for the Smart Sock, BofA indicated that the downgrade was a direct consequence of the new "uncertainty associated with the FDA's warning letter and the risks it could pose to earnings and the company's long-term growth potential."

148. Media outlets also connected Owlet's stock price decline to receipt of the Warning Letter. On October 4, 2021, The Motley Fool released an article titled, *Why Owlet Stock Plunged 31.3% Today*, that stated: "Shares of baby health stock Owlet [] fell as much as 31.3% in trading early on Monday after the company got a warning letter from the [FDA] implying that the company is improperly marketing products." Similarly, in an article titled, *Baby Product Company Owlet's Stock Sinks After FDA Warning Letter Says It Didn't Get Proper Approval for Flagship Smart Sock Product*, MarketWatch attributed the significant

---

[2] Share prices cited herein are not adjusted for the Company's 1 for 14 reverse stock split in July 2023.

drop in Owlet's stock price to the receipt of the Warning Letter and its implications for sale of the Smart Sock in the near-term.

**J. Relevant Post-Class Period Events**

149. Three weeks after disclosing the receipt of the Warning Letter, on October 25, 2021, Owlet announced in a Form 8-K filed with the SEC that "[p]ursuant to the Warning Letter and in response to the request by FDA to cease distribution of the Smart Sock in the U.S., the Company has suspended distribution of the Smart Sock in the United States as of October 22, 2021." Owlet further stated that it intended to seek FDA authorization for "the features of the Smart Sock that FDA believes make the product a medical device," i.e., the alarm and notification features tied to the heart rate and oxygen level monitors Owlet launched without FDA clearance in October 2015.

150. On the same day, Cowen published an analyst report lowering its estimates for the 4Q2021 and the FY2022, stating: "While we originally believed that the FDA's requests could be satisfied through some more straightforward changes around marketing of Smart Sock, it appears that FDA's concerns could not be fully addressed within the 3-week time frame provided as some changes relate to alerts in the app."

151. In the October 25, 2021 Form 8-K, Owlet announced that it would be "developing a new sleep monitoring sock that it plans to sell as a consumer wellness product, which the Company believes does not present the same concerns that FDA has raised regarding the Smart Sock, based on differences in the functionality of and marketing claims for the new product." Known as the Dream Sock, this new "wellness" product was the Smart Sock without the alarm and live notification features tied to the pulse oximeter readings from the device.

152. During the 3Q2021 earnings call on November 10, 2021—the first earnings call following receipt of the Warning Letter—Defendant Workman explained that "[t]he Owlet Dream Sock will be designed to teach what to do and when to help little ones up to 18 months old and their parents sleep better" and "to empower parents to build better sleep

habits from day one." Workman further confirmed that Owlet had moved away from the core functionality of the Smart Sock to "focus on infant sleep" as a "wellness offering."

153. Following its rapid development, Owlet launched the Dream Sock in December 2021 to its partners and began distributing to consumers in January 2022. Unlike the Smart Sock, the Dream Sock was precisely marketed as a consumer wellness product and did not have the notification functionalities of its predecessor, which allowed Owlet to distribute the product without FDA clearance.

154. Nevertheless, Owlet was not able to compensate for the loss of Smart Sock sales. During its 4Q2021 Earnings Call on March 7, 2022, the Company announced devastating results for the quarter: "The cessation of U.S. Smart Sock and Duo sales and product returns, however, resulted in total net negative revenues of $2.5 million for the fourth quarter 2021 . . . and gross profit was negative $6 million."

155. In its March 25, 2022 Form 10-K filed with the SEC, Owlet reiterated the magnitude of the impact of the Warning Letter, stating in its Risk Factors that "[p]rior to receipt of the Warning Letter, we were dependent on sales of the Owlet Smart Sock in the U.S. for a majority of our revenue, and expected to continue to be dependent for the foreseeable future." The Company acknowledged:

> [Its] results of operations for the fourth quarter and year-ended 2021 were substantially and negatively impacted due to the reduction of revenues for received and anticipated returns of Owlet Smart Sock and Owlet Monitor Duo product. For the quarter and year ended December 31, 2021, the Company recorded contra-revenue of $23.2 million and accrued returns of $20.1 million as of December 31, 2021.

156. One year after receiving the Warning Letter, during its 3Q2022 earnings call on November 14, 2022, Owlet announced that it had only "recently aligned" with the FDA on a strategy for clearance for the Smart Sock. Defendant Workman announced:

> After multiple meetings with the FDA over the past 12 months regarding our Sock technology, we have recently aligned with FDA to submit a de novo

> application that will include both the display of heart rate and oxygen currently in the Dream Sock and additional opportunistic notification features as a software as a medical device. . . . We've completed a broad range of clinical studies to support these submissions and to further validate the accuracy and safety of our product.

157. It would not be until June 20, 2023, that Owlet announced in a press release that it had received clearance from the FDA to market its prescription monitor, BabySat.

158. Then, on November 9, 2023, Owlet announced "De Novo clearance" from the FDA for its Dream Sock product in an article titled *Owlet Achieves De Novo FDA-Clearance for Dream Sock—The First and Only Over-the-Counter, Medical Grade Pulse Oximeter Cleared for Infants*. The FDA-cleared Dream Sock, Owlet stated, will now "monitor and display Baby's Live Health Readings, including pulse rate and oxygen saturation level, and will provide Health Notifications, which will alert caregivers with lights and alarm sounds if their infant's readings fall outside of preset ranges."

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT[3]

### A. March 31, 2021

159. On March 31, 2021, Owlet, f/k/a Sandbridge, filed the Form S-4. The Business Combination Agreement, executed by Defendant Workman on behalf of Owlet, was attached to the Form S-4 as Annex A. In the section titled "Regulatory Compliance," Defendants made the following statements:

(a) "[S]ince January 1, 2018, ***all products*** . . . ***marketed*** . . . ***or sold by or on behalf of [Owlet] have been, and are being*** . . . ***marketed*** . . . ***and sold in compliance in all material respects with applicable FDA Laws***"

[3] In this Section, Lead Plaintiff has highlighted in ***bold and italics*** the portion of each statement that he alleges was materially false or misleading. Additional text is provided often for context, but that context can also contribute to the false and misleading nature of Defendants' statements.

(b) Owlet "***holds all material Permits, including 510(k) clearance or premarket approvals required by applicable FDA Laws***."

(c) "[T]o [Owlet's] knowledge, ***no Government Entity is considering*** . . . ***changing the marketing classification*** . . . ***of any of the Company Products in any material respect***."

(d) "Since January 1, 2018, [Owlet has] ***not received any written notice or communication from any Governmental Entity*** . . . ***alleging or asserting material noncompliance with any applicable FDA Law,*** any warning or untitled letter . . . ***or similar written letter or notice alleging noncompliance***."

(e) "[T]o the Company's knowledge***, there are no facts or circumstances reasonably likely to cause*** . . . ***(iii) a termination, seizure or suspension of the marketing or distribution (including for commercial, investigational or any other use) of any such product***, except in each case, that would not reasonably be expected to be material to [Owlet] taken as a whole."

160. The statements set forth in the above paragraph were materially false and misleading when made because the Smart Sock with the alarm feature was a Class II medical device that required FDA authorization before Owlet could market and sell it in the U.S.

161. More specifically, despite Defendants' assertion that all of Owlet's products were marketed and sold "in compliance in all material respects with applicable FDA Laws," Owlet was marketing and selling the Smart Sock as a general wellness product when it was a Class II medical device that required FDA premarket clearance. Thus, the Company was marketing and selling the Smart Sock without authorization in violation of the FD&C Act. Likewise, the FDA had previously provided Owlet with written correspondence stating that the Smart Sock was not a general wellness product and required FDA clearance, making Defendants' assertions that (i) "no Government Entity" was "considering . . . changing the marketing classification" of the Smart Sock, (ii) Owlet had not received any correspondence from the FDA "alleging noncompliance" with any applicable law, and (iii) there were "no

facts or circumstances reasonably likely to cause" the "suspension of the marketing or distribution" of the Smart Sock, materially false and misleading when made.

162. In a section titled "Clinical Research Involving Our Product," the Form S-4 stated that "***the Owlet Smart Sock is a consumer product and not a medical device***."

163. The statement set forth in the above paragraph was materially false and misleading when made because the Smart Sock with the alarm feature was not a consumer product, but a Class II medical device that required FDA authorization before Owlet could market and sell it in the U.S.

164. In a section titled "Risks Related to New Owlet's Business and Operations," the Form S-4 stated:

> We currently sell the Owlet Smart Sock, which we market for use by parents of healthy babies to provide peace of mind, and for which we have not sought or obtained any marketing authorization from the FDA or similar authorization, approval, or certification from any other governmental authority. In response to inquiries from the FDA and regulatory authorities in other jurisdictions regarding the marketing of the Owlet Smart Sock, we have communicated our belief that ***the Owlet Smart Sock is not a medical device and does not require marketing authorization from the FDA*** or approval/certification from such other regulatory authorities. However, ***the FDA*** and certain regulatory authorities have expressed they may not agree with that conclusion and ***could require us to obtain marketing authorization (or approval/certification) to continue to sell the product***. Obtaining authorization to sell the Owlet Smart Sock as a medical device is a time-consuming and costly process and ***we may be precluded from selling the Owlet Smart Sock if we are required to obtain marketing authorization***. If granted, a marketing authorization could require conditions to sale, for example, a prescription requirement. ***If the FDA or other regulatory authorities require such marketing authorization (or approval/certification,***

> ***respectively) for the Owlet Smart Sock***, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, ***we could be required to cease selling or recall the product in the corresponding jurisdiction pending receipt of marketing authorization (or approval/certification)***, which can be a lengthy and time-consuming process, and ***we may also be subject to regulatory enforcement action***. In addition, we may be required to modify the product's functionality or limit our marketing claims for the product, whether or not we obtain such clearance, approval, certification or marketing authorization. In any such event, our business could be substantially harmed.

165. The statement set forth in the above paragraph was materially false and misleading when made because the Smart Sock with the alarm feature was a Class II medical device that required FDA authorization before Owlet could market and sell it in the U.S.

166. More specifically, the assertion that the Smart Sock was "not a medical device" and did "not require marketing authorization" by the FDA was materially misleading because the FDA had informed Owlet in at least 2016 and 2017 that the Smart Sock with the alarm feature was a medical device, not a general wellness product, and that the Company would have to seek FDA clearance in order to continue to market and sell it in the U.S. Likewise, this statement is actionable because Defendants' assertion that the Smart Sock was "not a medical device" and did "not require marketing authorization" by the FDA was not true. This statement also is actionable because it was objectively false and because Owlet and Defendant Workman had no basis to believe that the Smart Sock with the alarm feature was not a medical device given Workman's statements prior to the October 2015 launch of the Smart Sock with the alarm feature, and the FDA's non-public correspondence and reports in at least 2016 and 2017 stating that the Smart Sock with the alarm feature was a medical device requiring FDA authorization before it could be marketed and sold in the U.S.

167. Additionally, by describing what "***could***" happen if the Smart Sock was a medical device and what Owlet "***may***" be required to do as a result, Defendants created the misleading impression that the FDA was not requiring Owlet to seek marketing authorization for the Smart Sock, when, in reality, the FDA already had communicated that the Smart Sock was a medical device requiring Owlet to seek marketing authorization under the FD&C Act.

168. The Form S-4 also stated the following:

> We are developing certain products, including the Owlet BabySat and Owlet OTC Smart Sock, that we believe will be regulated as medical devices, if approved. Certain other products we are developing, such as the Owlet Band, may also be regulated as medical devices. We currently sell the Owlet Smart Sock, which we market for use by parents of healthy babies to provide peace of mind, and for which we have not sought or obtained any marketing authorization from the FDA or any other governmental authority. In response to inquiries from the FDA and regulatory authorities in other jurisdictions regarding the marketing of the Owlet Smart Sock, we have communicated our belief that ***the Owlet Smart Sock is not a medical device and does not require marketing authorization from the FDA*** or clearance, approval, certification, or other authorization from such other regulatory authorities. However, ***the FDA*** and other regulatory authorities have expressed they may not agree with that conclusion and ***could require us to obtain such marketing authorization, clearance, approval, or certification to continue to sell the product***.
>
> . . . .
>
> The FDA's interpretations of its laws and regulations are subject to change. ***If the FDA*** changes its policy or ***concludes that the marketing of any of our products is not in accordance with current policies, regulations or statutory requirements***, or if the FDA changes its applicable policies or if changes are introduced to applicable laws or regulations, ***we may be required***

***to seek clearance or approval for these products through the 510(k), de novo or PMA processes, may not be permitted to continue marketing these products until marketing authorization is obtained, or may be the subject of regulatory enforcement actions***.

169. The statement set forth in the above paragraph was materially false and misleading when made because the Smart Sock with the alarm feature was not a consumer product, but a Class II medical device that required FDA authorization before Owlet could market and sell it in the U.S. More specifically, it was materially misleading to claim that the FDA may "require marketing authorization" for the Smart Sock when, in reality, the FDA already had told Owlet in at least 2016 and 2017 that the Smart Sock with the alarm feature was not a general wellness product but rather a medical device that required marketing authorization.

170. Likewise, it was materially misleading to claim that BabySat and OTC Sock were medical devices that required FDA clearance and the Smart Sock was not a medical device and could be sold as a consumer product without FDA authorization. As explained in Section VII.B. below, there were no material differences in the BabySat and OTC Sock, on the one hand, and the Smart Sock on the other, except for the fact that Owlet was seeking clearance for the former and selling the latter without FDA authorization. By highlighting the fact that it was seeking FDA authorization for other versions of the Smart Sock, Owlet created the misleading impression that it was in compliance with the FD&C Act when, in fact, it was not.

171. Additionally, by describing what "***could***" happen if the Smart Sock was a medical device and what Owlet "***may***" be required to do as a result, this statement created the misleading impression that the FDA was not requiring Owlet to seek marketing authorization for the Smart Sock, when, in reality, the FDA already had communicated that the Smart Sock was a medical device requiring Owlet to seek marketing authorization under the FD&C Act.

172. The Form S-4 likewise stated:

> ***If the U.S. Food and Drug Administration*** ("FDA") or any other governmental authority ***were to require marketing authorization for the Owlet Smart Sock***, or for any other product that Owlet sells and which Owlet does not believe requires such marketing authorization, ***Owlet could be required to cease selling or recall the product pending receipt of marketing authorization from the FDA*** or such other governmental authority, which can be a lengthy and time-consuming process, harm financial results and Owlet may also be subject to regulatory enforcement action.

173. The statement set forth in the above paragraph was materially false and misleading when made because the Smart Sock with the alarm feature was a Class II medical device that required FDA authorization before Owlet could market and sell it in the U.S. More specifically, it was materially misleading to claim that the FDA may "require marketing authorization" for the Smart Sock when, in reality, the FDA already had told Owlet in at least 2016 and 2017 that the Smart Sock with the alarm feature was not a general wellness product but rather a medical device that required marketing authorization.

174. Additionally, by describing what "***could***" happen if the Smart Sock was a medical device and what Owlet "***may***" be required to do as a result, this statement created the misleading impression that the FDA was not requiring Owlet to seek marketing authorization for the Smart Sock, when, in reality, the FDA already had communicated that the Smart Sock was a medical device requiring Owlet to seek marketing authorization under the FD&C Act.

175. The Form S-4 further stated:

> ***[A]ny failure, or perceived failure, by us, to comply with any federal***, state, or foreign ***laws or regulations governing our marketing activities could adversely affect our reputation, brand, and business***, and may result in claims, proceedings, or actions against us by governmental entities, consumers, suppliers or others or other liabilities or may require us to change our operations and/or cease using certain marketing strategies.

176. The statement set forth in the above paragraph was materially false and misleading when made because the Smart Sock with the alarm feature was a Class II medical device that required FDA authorization before Owlet could market and sell it in the U.S., and Owlet, by failing to receive such FDA authorization, was not in compliance with FDA regulations. More specifically, it was materially misleading to claim that "any failure[] or perceived failure . . . to comply" with federal law may affect Owlet's business when, in reality, the FDA already had told Owlet in at least 2016 and 2017 that the Smart Sock with the alarm feature was not a general wellness product but rather a medical device that required FDA marketing authorization.

177. Additionally, by describing what "***could***" happen if Owlet's marketing for its products, including the Smart Sock, did not comply with laws or regulations, including the FD&C Act, this statement created the misleading impression that Owlet's marketing currently was in compliance—or, at a minimum, perceived to be in compliance—with FDA regulations. In reality, the FDA already had communicated that the Smart Sock was a medical device and, as such, Owlet could not market or sell the Smart Sock in the U.S. until it received FDA authorization.

**B. June 21, 2021**

178. On June 21, 2021, Sandbridge Acquisition Corporation, in coordination with Owlet, filed a Preliminary Prospectus on Form 424(b)(3) (the "Form 424(b)(3)"). This Preliminary Prospectus incorporated the statements made in ¶¶ 159, 162, 164, 168, 172, 175 above, each of which was materially false and misleading when made for the reasons set forth above in ¶¶ 160-61, 163, 165-67, 169-71, 173-74, 176-77, respectively.

179. The Form 424(b)(3) also stated the following:

> We currently sell the Owlet Smart Sock, which we market for use by parents of healthy babies to provide peace of mind, and for which we have not sought or obtained any marketing authorization from the FDA or similar authorization, approval, or certification from any other governmental authority. In response to inquiries from the FDA and regulatory authorities in

other jurisdictions regarding the marketing of the Owlet Smart Sock, we have communicated our belief that ***the Owlet Smart Sock is not a medical device and does not require marketing authorization from the FDA*** or approval/certification from such other regulatory authorities. However, ***the FDA*** and/or certain regulatory authorities have expressed they do not agree with that conclusion and ***could require us to obtain marketing authorization (or approval/certification) to continue to sell the product***. For example, the Medicines and Healthcare products Regulatory Agency, the regulatory authority responsible for the UK medical device market, has asserted that the Owlet Smart Sock requires (CE mark) certification and subsequent registration as a medical device in the UK, but has indicated they will allow us to continue to market the Owlet Smart Sock until May 2022 without such certification or registration. Obtaining authorization to sell the Owlet Smart Sock as a medical device is a time-consuming and costly process and ***we may be precluded from selling the Owlet Smart Sock if we are required to obtain marketing authorization.*** If granted, a marketing authorization could require conditions to sale, for example, a prescription requirement. ***If the FDA or other regulatory authorities require such marketing authorization (or approval/certification, respectively) for the Owlet Smart Sock***, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, ***we could be required to cease selling or recall the product in the corresponding jurisdiction pending receipt of marketing authorization (or approval/certification)***, which can be a lengthy and time-consuming process, and ***we may also be subject to regulatory enforcement action***. In addition, we may be required to modify the product's functionality or limit our marketing claims for the product, whether or not we obtain such clearance, approval,

certification or marketing authorization. In any such event, our business could be substantially harmed.

180. The statement set forth in the above paragraph was materially false and misleading when made because the Smart Sock with the alarm feature was a Class II medical device that required FDA authorization before Owlet could market and sell it in the U.S.

181. More specifically, the assertion that the Smart Sock was "not a medical device" and did "not require marketing authorization" by the FDA was materially misleading because the FDA had informed Owlet in at least 2016 and 2017 that the Smart Sock with the alarm feature was a medical device, and that the Company would have to seek FDA clearance in order to continue to market and sell it in the U.S. Likewise, this statement is actionable because Defendants' assertion that the Smart Sock was "not a medical device" and did "not require marketing authorization" by the FDA was not true. This statement also is actionable because it was objectively false and because Owlet and Defendant Workman had no basis to believe that the Smart Sock with the alarm feature was not a medical device given Workman's statements prior to the October 2015 launch of the Smart Sock with the alarm feature, and the FDA's non-public correspondence and reports in at least 2016 and 2017 stating that the Smart Sock with the alarm feature was a medical device requiring FDA authorization before it could be marketed and sold in the U.S.

182. Additionally, by describing what "***could***" happen if the Smart Sock was a medical device and what Owlet "***may***" be required to do as a result, this statement created the misleading impression that the FDA was not requiring Owlet to seek marketing authorization for the Smart Sock, when, in reality, the FDA already had communicated that the Smart Sock was a medical device requiring Owlet to seek marketing authorization under the FD&C Act.

**C. August 5, 2021**

183. On August 5, 2021, Owlet filed a Registration Statement on Form S-1. The Registration Statement was signed by Defendant Workman. This Registration Statement

incorporated the statements made in ¶¶ 159, 162, 164, 168, 172, 175, 179 above, each of which was materially false and misleading when made for the reasons set forth above in ¶¶ 160-61, 163, 165-67, 169-71, 173-74, 176-77, 180-82, respectively.

## VII. ADDITIONAL ALLEGATIONS OF SCIENTER

184. Defendants were active and culpable participants in the fraud, as evidenced by their knowing or deliberately reckless issuance and/or control over the alleged materially misleading statements and omissions. As more fully alleged in Sections V.A–D, and V.H–I above, the facts, when viewed holistically and together with the other allegations in this Complaint, give rise to a strong inference that, prior to and throughout the Class Period, Defendants knew, or were deliberately reckless in not knowing, that the statements identified in Section VI above, were misleading to investors at the time they were made.

185. In addition to the facts set forth above, including in Sections V.A–D, V.H–I above, Defendants' scienter is evidenced further by the following facts:

### A. Before the Start of the Class Period, Defendants Had Admitted That the Smart Sock with an Alarm was Medical Device and The FDA Had Put Owlet on Notice That the Smart Sock Required FDA Authorization

186. Defendants' knowledge of Owlet's need to secure FDA approval for the Smart Sock with the alarm feature is readily established through private communications between Owlet and the FDA, as well as Defendants' own admissions, leading up to and during the Class Period. In fact, Defendants' knowledge in this regard can be shown as early as 2013—more than eight years before the start of the Class Period.

187. It was at this time that Owlet unveiled the initial prototype for the Smart Sock in an IBMC presentation at Harvard. During this presentation, Defendant Workman specifically discussed the need to obtain FDA approval for the Smart Sock's alarm feature, stating: "What was holding us up was the alarm. ***Alarm plus pulse oximetry means that you need FDA clearance***." The workaround at this time was simple—Owlet released its first version of the Smart Sock without the notification feature. Defendant Workman, however, immediately voiced displeasure with having to bring a dumbed-down version of

its flagship product to market. As a result, Owlet told the public that the initial version was a bridge to an impending, FDA-approved version of the Smart Sock, stating that it was "currently going through the FDA process to add an alarm . . . to the next version of the product," so that it could "notify[] parents of drops in heart rate and oxygen levels" and "help[] to prevent emergencies."

188. But Owlet never received such approval. Instead, after the FDA in 2015 created a new category of devices—general wellness products—that did not require FDA approval, Owlet again sought to circumvent the FDA approval requirement by bringing to market a version of the Smart Sock with the alarm feature but marketed it as a general wellness product. These efforts did not convince the FDA. In a 2016 private written correspondence, the FDA explicitly informed Owlet that the "Smart Sock meets the definition of a device under the FD&C Act and does not fall under the compliance policy for low-risk products that promote a healthy lifestyle (General Wellness guidance)."

189. Then, in 2017, after Owlet launched an updated version of the Smart Sock, the FDA again voiced concern over the Company's sale of an unapproved medical device. In a 2017 report received by a Utah-based FOX affiliate pursuant to a FOIA Request, the FDA again explicitly told Owlet that the Smart Sock was a medical device that needed FDA marketing approval. This was followed by public industry-wide guidance issued by the FDA in 2018 that again highlighted that the marketing of baby products that have not received FDA approval as being able to "prevent . . . SIDS," among other conditions, must be stopped immediately.

190. Further, the FDA's communications with Owlet did not cease during the Class Period. Instead, as Defendants themselves highlighted in discussions with analyst Cowen on October 4, 2021, ***Owlet had been "in active dialogue with the FDA for many years***, including around pre-submission process for BabySat, initial discussions for the OTC Sock, as well as refining product claims for Smart Sock."

191. In sum, Defendant Workman's 2013 admission that inclusion of the notification feature in Owlet's Smart Sock product would require FDA approval, the FDA's

repeated communications to Owlet in 2016, 2017, and 2018 explicitly informing the Company of the need to obtain marketing approval for the Sock, and the Company's "active dialogue with the FDA" during the Class Period supports the strong inference that, throughout the Class Period, Defendants knew, or were deliberately reckless in not knowing, that the statements identified in Section VI above were misleading to investors at the time they were made.

### B. Owlet's Product Pipeline and Pivot to the Dream Sock Shortly After the FDA Warning Letter Was Issued Supports the Conclusion That Defendants Were Aware That the Smart Sock Was a Medical Device

192. Referred to as its "[m]onitoring [p]ipeline," during the Class Period, Owlet was in the process of developing a number of spin-offs of its flagship Smart Sock. These products, which Owlet called "[v]ersions" of the Sock, included (i) the Smart Sock Plus; (ii) the Over-the-Counter "OTC" Smart Sock; and (iii) BabySat. Each served the same function as the Smart Sock—they read a baby's oxygen levels, heart rate, and sleep trends, and further provided notifications and alarms to parents when their baby's readings left preset zones—but had minimally altered functionalities.

193. For instance, the Smart Sock Plus was designed for children of a wider age range than the original Sock. Similarly, the OTC Sock was able to "integrate with various telehealth platforms" when the original Sock was not. Notably, from the outset of the development process for these products, Owlet refused to sell them in the U.S. and recognized that they would "require marketing authorization from the FDA prior to commercialization." That Defendants were so readily aware of the need to seek FDA approval for these substantially similar products indicates that Defendants either knew, or were deliberately reckless in not knowing, that the Smart Sock required FDA approval as well.

194. Further supporting this inference, almost immediately after the FDA Warning Letter was issued, Owlet quickly revamped its product and introduced the "Dream Sock," which fit within the FDA's general wellness exemption by removing the live notification

and alarm features of the Sock and ceasing its marketing of this functionality. This is exactly what the Company had done years earlier to avoid FDA scrutiny when they first launched the Smart Sock (*see supra* § V.A). Defendants' ability to quickly launch a new product that circumvented FDA regulations in the same way the first version of the Smart Sock had eight years earlier indicates that, in the period in between, Defendants either knew, or were deliberately reckless in not knowing, that the product required FDA clearance with the notification and alarm features intact.

### C. The Production and Sale of the Owlet Smart Sock Was Owlet's Core Operation

195. The production and sale of the Smart Sock was the Company's core operation and profit engine before and throughout the Class Period. In earnings calls and SEC filings, Defendants explicitly highlighted this fact, telling investors that the Smart Sock was the Company's main revenue driver and essential to the Company's continued viability. In a press release issued on July 15, 2021, and filed with the SEC as an exhibit to a Form 8-K, Owlet touted its "bestselling flagship product, the Owlet Smart Sock baby monitor" that used "proprietary and innovative pulse-oximetry technology." The Company also referred to the Smart Sock as its "anchor product" in its Form 10-Q filed with the SEC on August 16, 2021. Later, in its March 25, 2022 Form 10-K filed with the SEC, Owlet stated that, "[p]rior to receipt of the Warning Letter, ***we were dependent on sales of the Owlet Smart Sock in the U.S. for a majority of our revenue***." Similarly, in Owlet's risk discloses incorporated by reference in its August 16, 2021 Form 10-Q, the Company stated that it was "***highly dependent upon the continued success and market acceptance of the Owlet Smart Sock***" and that ***its "business could be substantially harmed" if the FDA or other governmental agency required marketing authorization for the product***. Likewise, during Owlet's Q2 2021 Earnings Call, CFO Kate Scolnick stated that the Company's revenue growth for the quarter was "***driven primarily***" by sales of its Smart Sock and Monitor "combination product."

196. Further underscoring the essential nature of the Smart Sock to Owlet's business, following the cessation of distribution of the Smart Sock on October 25, 2021, Owlet reported devastating fourth quarter 2021 losses. In totality, as a result of "received and anticipated returns of Owlet Smart Sock and Owlet Monitor Duo product . . . the Company recorded contra-revenue of $23.2 million and accrued returns of $20.1 million as of December 31, 2021." These problems were not solved by the launch of the Dream Sock either. Owlet's quarterly revenues have yet to recover to pre-Warning Letter levels, with Dream Sock sales and total revenues in 2022 and 2023 lagging behind prior Smart Sock totals.

## VIII. LOSS CAUSATION

197. As a result of Defendants' materially false and misleading statements, omissions of material facts, and fraudulent course of conduct, Owlet's publicly traded securities traded at artificially inflated prices during the Class Period. Relying on the integrity of the market price for Owlet securities and public information related to Owlet, Lead Plaintiff and other Class members purchased or otherwise acquired Owlet securities at prices that incorporated and reflected Defendants' misrepresentations and omissions of material facts alleged herein. As a result of their purchases of Owlet securities during the Class Period at artificially inflated prices and the removal of that inflation upon the disclosures set forth below, Lead Plaintiff and the Class suffered economic losses (i.e., damages) under the federal securities laws.

198. Defendants' false and misleading statements, material omissions, and deceptive course of conduct had their intended effect, directly and proximately causing Owlet securities to trade at artificially inflated prices during the Class Period, closing as high as $10.32. Those misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of Owlet securities served to maintain the price of Owlet securities at an artificially inflated level.

199. Absent Defendants' misrepresentations and omissions of material fact, Lead Plaintiff and other Class members would not have purchased or otherwise acquired their

Owlet securities at the artificially inflated prices at which they traded. It was entirely foreseeable to Defendants that misrepresenting and concealing material facts from the public would artificially inflate the price of Owlet securities and/or maintain artificial inflation in Owlet's stock price. The economic losses (i.e., damages suffered by Lead Plaintiff and other members of the Class) were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's securities and/or maintained artificial inflation in Owlet's stock price, and the subsequent significant decline in the value of the Company's securities when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misrepresentations and omissions materialized.

200. Lead Plaintiff and other Class members suffered actual economic loss and were damaged when the material facts and/or the foreseeable risks concealed or obscured by Defendants' misrepresentations and omissions were revealed and/or materialized through the disclosure of new information concerning Owlet on October 4, 2021. As alleged in this Section, the disclosure of the relevant truth and/or materialization of the foreseeable risks concealed by Defendants' fraud directly and proximately caused foreseeable declines in the price of Owlet securities by removing the artificial inflation in the price of Owlet securities that resulted from Defendants' fraud. The timing and magnitude of the declines in the price of Owlet securities, as detailed herein, negate any inference that the loss suffered by Lead Plaintiff and other members of the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraudulent conduct.

201. On October 4, 2021, Owlet disclosed that it had received a Warning Letter from the FDA based on the Company's marketing of the Smart Sock as a medical device without FDA marketing clearance or approval. In a Form 8-K filed with the SEC, the Company revealed that the FDA ordered Owlet to cease commercial distribution of the Smart Sock:

> The Warning Letter asserts that ***the Company's marketing of its Owlet Smart Sock product (the "Smart Sock") in the United States renders the***

> ***Smart Sock a medical device requiring premarket clearance or approval from FDA, and that the Company has not obtained such clearance or approval*** in violation of the Federal, Food, Drug, and Cosmetic Act. The Warning Letter requests that the Company take prompt action to address the alleged violations. ***Among other things, the Warning Letter requests the Company cease commercial distribution of the Smart Sock*** for uses in measuring blood oxygen saturation and pulse rate where such metrics are intended to identify or diagnose desaturation and bradycardia using an alarm functionality to notify users that measurements are outside of preset values. The Warning Letter also identifies certain marketing claims that FDA believes render the Smart Sock a medical device.

202. Owlet further revealed in the Form 8-K that it would pursue the proper marketing authorization from the FDA for the Smart Sock, but could not provide any assurances regarding the FDA's approval or the timing needed to resolve the issue:

> ***The Company intends to fully cooperate with FDA to resolve the Warning Letter, including through the pursuit of a marketing authorization application for uses of the Smart Sock identified as medical device uses***. In addition, the Company plans to issue a timely response to FDA, and further engage with FDA, regarding modifications and marketing changes to the Smart Sock with the goal of enabling continued commercial distribution of a modified product prior to receipt of any such marketing authorization that may be granted. ***The Company cannot, however, give any assurances that FDA will be satisfied with the Company's actions taken in response to the matters raised in the Warning Letter. The Company also cannot give any assurances as to the timing of the resolution of such matters***.

203. The Amended Warning Letter dated October 5, 2021, more specifically explained that "[p]roducts that measure blood oxygen saturation and pulse rate are devices when they are intended to identify (diagnose) desaturation and bradycardia and provide an

alarm to notify users that measurements are outside preset values." The Warning Letter cited a lengthy list of examples of Owlet's marketing that violated the FD&C.

204. The Warning Letter exposed that the regulatory actions taken by the FDA were not a surprise to Owlet as the Company's talks with the FDA about the marketing of the Smart Sock had been ongoing *for five years*: "Since 2016, the FDA has corresponded with Owlet that the Owlet Smart Sock meets the definition of a device under the FD&C Act and does not fall under the compliance policy for low-risk products that promote a healthy lifestyle (General Wellness guidance)."

205. As a result of Owlet's staggering disclosure that its flagship product could no longer be sold, Owlet's stock price rapidly declined by $1.29, or 23%, in a single trading day to close at $4.19 per share on October 4, 2021, on unusually heavy trading volume.

206. Market analysts following Owlet directly connected the stock price drop to the Company's announcement that it received a Warning Letter. On October 4, 2021, Cowen reported that "OWLT is trading down (~23% intraday) following an FDA Warning Letter around Smart Sock marketing."

207. Moreover, Cowen analysts expressed shock at the news that Owlet received a Warning Letter, stating: "This news comes unexpected to us, given that versions of the Smart Sock have been on the market for the past 6 years, and that the company has been in active and ongoing dialogue with the FDA around BabySat & OTC Smart Sock."

208. On the same day, BofA, "We are downgrading OWLT to Neutral from Buy following news that the FDA sent the company a warning letter." The report cited the "increased uncertainty associated with the FDA's warning letter" as the reason for the downgrade.

209. Contemporaneously, media outlets also connected the stock price decline to the Warning Letter. In an article titled *Owlet Stock Sinks on FDA Warning Letter for Smart Sock Baby Monitor*, Seeking Alpha reported on October 4, 2021 that "Owlet [] has lost more than a fifth of value after the company disclosed that the FDA has issued a warning letter on marketing practices related to Smart Sock in the U.S."

210. On October 4, 2021, MarketWatch reported in an article titled *Baby Product Company Owlet's Stock Sinks After FDA Warning Letter Says It Didn't Get Proper Approval for Flagship Smart Sock Product* that "Owlet Inc. stock sank more than 23% on Monday after the maker of smart baby products revealed in a filing that it received a warning letter from the Food and Drug Administration regarding its flagship Smart Sock product."

211. Just a few weeks later, on October 25, 2021, Owlet announced that it had suspended distribution of the Smart Sock on October 22, 2021. Citing its October 4, 2021 reporting, BofA analysts on October 25, 2021 stated that they would maintain the Neutral rating of the Company stock due to the uncertainty following the Warning Letter: "Recall, we lowered estimates in response to the warning letter and we aren't making any adjustments here as we await further comments from the company and FDA."

## IX. CLASS ACTION ALLEGATIONS

212. Lead Plaintiff brings this action on his own behalf and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities who, during the Class Period, purchased or otherwise acquired Owlet securities and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Owlet, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

213. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. On July 16, 2021, Owlet's common stock began actively trading on the NYSE (an open and efficient market) under the symbol "OWLT." As of March 16, 2022, Owlet had approximately 113 million shares of common stock outstanding. Record owners and the other Class members may be

identified from records maintained by Owlet and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

214. Lead Plaintiff's claims are typical of the claims of the other Class members, as all Class members were similarly affected by Defendants' wrongful conduct in violation of federal laws that is complained of herein.

215. Lead Plaintiff will fairly and adequately protect the interests of the other Class members and has retained competent counsel experienced in prosecuting class actions and securities litigation.

216. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are: (i) whether Defendants violated the federal securities laws by their acts and omissions as alleged herein; (ii) whether Defendants' statements to the investing public during the Class Period contained material misrepresentations and/or omitted material facts; (iii) whether and to what extent the market price of Owlet's securities was artificially inflated during the Class Period due to the material misrepresentations and omissions alleged herein; (iv) whether Owlet and Defendant Workman acted with the requisite level of scienter; (v) whether Defendant Workman was a controlling person of the Company; and (vi) whether members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

217. A class action is also superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to seek redress for the wrongful conduct alleged herein. Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## X. A PRESUMPTION OF RELIANCE APPLIES

218. At all relevant times, the market for Owlet's securities was efficient for the following reasons, among others:

a. Owlet's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, Owlet filed periodic reports with the SEC;

c. Owlet regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Owlet was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

219. As a result of the foregoing, the market for Owlet securities reasonably promptly digested current information regarding Owlet from all publicly available sources and reflected such information in the price of Owlet securities. Purchasers and acquirers of Owlet securities during the Class Period suffered similar injury through their purchases and acquisitions of Owlet securities at artificially inflated prices, and a presumption of reliance applies.

220. Further, at all relevant times, Lead Plaintiff and other Class members relied on Defendants to timely disclose material information as required by law. Lead Plaintiff and other Class members would not have purchased or otherwise acquired Owlet securities at artificially inflated prices if Defendants had timely disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Lead Plaintiff and other

Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XI. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY

221. The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein. Most, if not all, of the statements complained of herein were not forward-looking statements. Rather, they were either: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) mixed statements of present and/or historical facts and future intent; and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

222. To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

223. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, or portion thereof, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, Defendants knew the statement was false and/or misleading, did not actually believe the statements, had no reasonable basis for the statements, and/or were aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## XII. CAUSES OF ACTION

### COUNT I

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

224. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

225. This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class, against all Defendants.

226. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause economic harm to Lead Plaintiff and other members of the Class.

227. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers and acquirers of the Company's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

228. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

229. During the Class Period, Defendants made the false and misleading statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were

made, not misleading. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Owlet's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

230. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased or acquired Owlet securities and were harmed when the truth about Owlet negatively impacted the price of those securities. Lead Plaintiff and other Class members would not have purchased or acquired Owlet securities at the prices they paid or at which they acquired them, or at all, had they been aware of the truth about Owlet.

231. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered harm in connection with their respective purchases or acquisitions of the Company's securities during the Class Period.

232. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against Defendant Workman

233. Lead Plaintiff repeats, incorporates, and reallege each and every allegation set forth above as if fully set forth herein.

234. This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and all other members of the Class, against Defendant Workman.

235. As alleged above, the Company and Defendant Workman violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by making materially false and misleading statements and/or omissions of material fact in connection with the purchase or sale of Owlet's securities and by participating in a fraudulent scheme

and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter, and the Company is charged with the knowledge and scienter of Defendant Workman who knew of or acted with deliberate reckless disregard of the falsity of the Company's and/or Defendant Workman's statements alleged herein to have been materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made, and the fraudulent nature of the Company's and Defendant Workman's scheme during the Class Period.

236. As set forth above, Defendant Workman was a controlling person of the Company during the Class Period due to, among other things, his senior position with the Company and his direct involvement in the Company's day-to-day operations, including his power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same. As such, Defendant Workman had regular access to nonpublic information about Owlet's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings or meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

237. By virtue of the foregoing, Defendant Workman had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of their public statements with respect to Owlet's operations.

238. Defendant Workman was a culpable participant in the Company's fraud alleged herein, by acting knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased or otherwise acquired the Company's securities during the Class Period.

239. By reason of the foregoing, Defendant Workman is liable to Lead Plaintiff and the members of the Class as a controlling person of the Company in violation of Section 20(a) of the Exchange Act.

## XIII. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff respectfully prays for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Kessler Topaz Meltzer & Check, LLP and Robbins Geller Rudman and Dowd, LLP as class counsel pursuant to Rule 23(g);

B. Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C. Awarding compensatory damages and equitable relief in favor of Lead Plaintiff and other members of the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

D. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E. Granting such other and further relief as the Court may deem just and proper.

## XIV. DEMAND FOR JURY TRIAL

Lead Plaintiff hereby demands a trial by jury.

Dated: December 22, 2023

**KESSLER TOPAZ MELTZER & CHECK, LLP**

*/s/ Jennifer L. Joost*
JENNIFER L. JOOST (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94101
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Lead Plaintiff Dr. Thomas E. Tweito and Lead Counsel for the Section 10(b) Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
DEBRA J. WYMAN (Bar No. 190812)
debraw@rgrdlaw.com
ASHLEY M. PRICE (Bar No. 281797)
aprice@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

*Additional Counsel for the Section 10(b) Class*

**THE SCHALL LAW FIRM**
BRIAN J. SCHALL (Bar No. 290685)
brian@schallfirm.com
1880 Century Park E, Suite 404
Los Angeles, CA 90067-1604
Telephone: (310) 301-3335
Facsimile: (310) 388-0192

*Additional Counsel*