POMERANTZ LLP
Tamar A. Weinrib
600 Third Avenue, 20th floor
New York, New York 10016
Telephone: (646) 581-9973
taweinrib@pomlaw.com

*Lead Counsel for Lead Plaintiff Drew Conant and the Section 14(a) Class*

*Additional Counsel on Signature Page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| MICHAEL J. BUTALA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>OWLET, INC. f/k/a SANDBRIDGE ACQUISITION CORPORATION, KURT WORKMAN, KATE SCOLNICK, KEN SUSLOW, RICHARD HENRY, DOMENICO DE SOLE, RAMEZ TOUBASSY, JAMIE WEINSTEIN, KRYSTAL KAHLER, and MICHAEL F. GOSS,<br><br>Defendants. | Case No.: 2:21-cv-09016-FLA-JEM<br><br>**AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>CLASS ACTION</u>**<br><br>Hon. Fernando L. Aenlle-Rocha |

# TABLE OF CONTENTS


NATURE OF THE ACTION AND OVERVIEW ..... 1

JURISDICTION AND VENUE ..... 6

PARTIES ..... 6

Confidential Witnesses ..... 9

SUBSTANTIVE ALLEGATIONS ..... 10

Background ..... 10

The De-SPAC Transaction ..... 10

Owlet's Flagship Smart Sock Device ..... 13

Defendants Flout FDA Regulations ..... 15

Defendants Misled Sandbridge Shareholders Eligible to Vote on the De-SPAC Merger ..... 33

Defendants Had a Duty to Disclose that Owlet Marketed and Sold the Smart Sock in Contravention of FDA Regulations ..... 38

Executive Compensation ..... 40

Materially False and Misleading Statements in the Proxy Statements ..... 40

The Business Combination is Completed ..... 52

The Truth Emerges ..... 52

CLASS ACTION ALLEGATIONS ..... 58

LOSS CAUSATION ..... 59

NO SAFE HARBOR ..... 61

COUNT I ..... 61

COUNT II ..... 62

PRAYER FOR RELIEF ..... 64

JURY TRIAL DEMANDED .......... 65

Lead Plaintiff Drew Conant ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Owlet, Inc. ("Owlet" or the "Company"), communications with former employees, analyst reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that held Sandbridge common stock held as of June 1, 2021 and were eligible to vote at Sandbridge's special meeting on July 14, 2021. The Proxy Statement Defendants disseminated to solicit shareholder approval for the business combination of Sandbridge Acquisition Corporation with Owlet Baby Care Inc., contained numerous false and misleading statements in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a) respectively, and SEC Rule 14a-

9, 17 C.F.R. § 240.14a-9 ("Rule 14a-9"). These claims arise from Defendants' negligence, and do not assert that Defendants acted with scienter.

2. Sandbridge was a special purpose acquisition company ("SPAC"), a publicly traded shell, or "blank check," company formed for the sole purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses. As a SPAC in search of a business to acquire, Sandbridge had no ongoing business operations.

3. On July 15, 2021, Sandbridge combined with Owlet Baby Care Inc., a company that designs and sells products and services for parents to proactively monitor the health and wellness of their children, via a "de-SPAC"[1] transaction, a type of reverse merger. The combined company was renamed Owlet (the "Business Combination" or "de-SPAC Merger").

4. Owlet's self-described flagship product at the time of the de-SPAC Merger was the Smart Sock, a baby monitor utilizing pulse oximetry sensors to track a baby's heart rate, oxygen levels, skin temperature, and sleep patterns. The Smart Sock, which earned the Company the majority of its revenues, was designed to provide continuous real time monitoring of vital signs (*i.e.*, oxygen saturation, and heart rate) in newborns

[1] A "de-SPAC" transaction is a merger between a SPAC, a buying entity, and a target private business.

via a pulse oximeter-embedded sock and to produce sleep reports for parents each morning.

5. The Smart Sock was meant to identify and alert parents to respiratory-driven infant health issues like desaturation (low blood oxygen levels) and bradycardia (a heart rate that's too slow), and to thus prevent SIDS (Sudden Infant Death Syndrome), the number one infant cause of death in the first 12 months, and respiratory issues, which are the number one reason for pediatric emergency room visits, resulting in over 92 million emergency room visits in a child's first four years.

6. For five years preceding the de-SPAC Merger, the U.S. Food and Drug Administration ("FDA") had communicated to Owlet that the Smart Sock qualifies as a medical "device" under the Food, Drug, and Cosmetic Act (the "Act"), 21 U.S.C. § 321(h), because it is used to diagnose health conditions in babies. Pursuant to the Act, before a company can sell a medical device it must seek pre-authorization from the FDA. Nevertheless, despite clear admonitions from the FDA to Owlet that the Smart Sock is a medical device, Owlet continued to market the Smart Sock without the requisite approvals in violation of FDA regulations. Moreover, Defendants represented in the Proxy Statement they prepared and disseminated to solicit Sandbridge shareholders' approval of the de-SPAC Merger, that the Smart Sock is not a medical device ***and*** that Owlet had complied in all material respects with FDA regulations. While the Proxy Statement noted that the FDA could potentially disagree with the Company's position, it

did not disclose that the FDA had already communicated that disagreement to Owlet *for years*. Owlet's egregious contravention of FDA regulations raised the risk that the FDA would require Owlet to halt all marketing and distribution of the product and obtain marketing authorization or approval from the FDA. Moreover, the Sandbridge Board used projections prepared by Owlet management and included in the Proxy Statement as a basis for determining the fair value of the common stock and for recommending approval of the merger. Those projections, which forecast revenues skyrocketing from $75.2 million in 2020 to $1.06 billion in 2025, were based on the false premise that the FDA would permit the Company to continue to sell the Smart Sock, which Owlet made plain it relied upon "***for the majority of our revenue and expect[ed] to continue to do so for the foreseeable future.***"

7. On October 4, 2021, Owlet revealed that it had received a warning letter from the FDA on October 1, 2021 (the "Warning Letter"), which stated that "the Company's marketing of its Owlet Smart Sock product . . . renders [it] a medical device requiring premarket clearance or approval from FDA." Owlet had not obtained such clearance or approval. Moreover, the FDA "requests the Company cease commercial distribution of the Smart Sock for uses in measuring blood oxygen saturation and pulse rate where such metrics are intended to identify or diagnose desaturation and bradycardia using an alarm functionality to notify users that measurements are outside of preset values."

8. On this news, Owlet's stock price fell $1.29, or 23%, to close at $4.19 per share on October 4, 2021, on unusually heavy trading volume. As a result, Sandbridge investors who could have voted against the Business Combination and redeemed their shares at $10.00 per share suffered a loss of $5.81 per share.

9. In the Company's Proxy Statements, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Owlet was reasonably likely to be required to obtain marketing authorization for the Smart Sock because the FDA concluded, and communicated to Owlet as early as 2016, that it was a medical device; (2) that Owlet thus marketed and sold the Smart Sock in violation of FDA regulations; (3) that, as a result, Owlet was reasonably likely to have to cease commercial distribution of the Smart Sock in the U.S., thus losing its main source of revenue; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

10. For the foregoing reasons, and as set forth below, Plaintiff and other Class members have suffered significant damages as a result of Defendants' violations of Sections 14(a) and 20(a) of the Exchange Act.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) because Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, Sandbridge's principal executive offices were located in this District.

14. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15. Lead Plaintiff Drew Conant, as set forth in his certification previously filed with this Court (Dkt. 19-3), incorporated by reference herein, held Sandbridge common stock as of June 1, 2021, was eligible to vote at Sandbridge's special meeting on July 14,

2021, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16. Defendant Owlet is incorporated under the laws of Delaware with its principal executive offices located in Lehi, Utah. Owlet's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "OWLT" and its warrants trade under the symbol "OWLT WS." Prior to the Business Combination, the Company's Class A common stock traded under the symbol "SBG," and its redeemable warrants traded under the symbol "SBG WS." Also, prior to the Business Combination, the Company's principal executive offices were located in Los Angeles, California.

17. Defendant Kurt Workman ("Workman") was the Company's Chief Executive Officer ("CEO") at all relevant times.

18. Defendant Kate Scolnick ("Scolnick") was the Company's Chief Financial Officer ("CFO") at all relevant times.

19. Defendants Workman and Scolnick, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Defendants Workman and Scolnick provided the information regarding Owlet contained in the Proxy Statements, and were provided with copies of the Proxy Statements alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to

prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, Defendants Workman and Scolnick knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. Defendants Workman and Scolnick are liable for the false statements pleaded herein.

20. Defendant Ken Suslow ("Suslow") was the Chairman of the Board of Directors of Sandbridge. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

21. Defendant Richard Henry ("Henry") was the Chief Financial Officer, Principal Financial and Accounting Officer of Sandbridge. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

22. Defendant Domenico De Sole ("De Sole") was a director of Sandbridge at all relevant times. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

23. Defendant Ramez Toubassy ("Toubassy") was a director of Sandbridge at all relevant times. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

24. Defendant Jamie Weinstein ("Weinstein") was a director of Sandbridge at all relevant times. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

25. Defendant Krystal Kahler ("Kahler") was a director of Sandbridge at all relevant times. She solicited and/or permitted the use of her name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

26. Defendant Michael F. Goss ("Goss") was a director of Sandbridge at all relevant times. He solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

27. Defendants Workman, Scolnick, Suslow, De Sole, Toubassy, Weinstein, Kahler, Henry, and Goss are collectively referred to herein as the "Individual Defendants."

## Confidential Witnesses[2]

28. Confidential Witness ("CW") 1 worked as the Chief Brand Officer at Owlet from February 2019 to January 2021.

---

[2] Certain of the confidential witnesses described herein who held job titles unique to them requested that a description of their position rather than their precise title be used herein for fear of retaliation. *See Cohen v. Kitov Pharm. Holdings, Ltd.*, 2018 U.S. Dist. LEXIS 45676, at *25 (S.D.N.Y. Mar. 20, 2018) (crediting CW allegations though the complaint generically described them as "former consultants of Kitov with knowledge of the clinical trial results" because "any more detailed description in this case likely would reveal the identity of the source"). Nevertheless, the descriptive information provided regarding each CWs role at Owlet sufficiently sets forth a basis for their knowledge as to the facts contained in statements attributed to them herein. To the extent the Court requires additional descriptive information to credit the statements attributed to any CW, Plaintiffs will provide a document containing such information for *in camera review*.

29. CW2 worked as a Product Marketing Manager at Owlet from September 2020 to April 2021.

30. CW3 worked at Owlet as a Senior Product Marketing Manager from July 2021 to March 2022.

31. CW4 worked as a member of Owlet's Product Team from April 2021 to June 2022.

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

### **The De-SPAC Transaction**

32. A special purpose acquisition company ("SPAC") is a form of reverse merger. It is a shell company set up for the sole purpose of raising money through an IPO to eventually acquire another company. A SPAC has no commercial operations, makes no products and does not sell anything. In fact, the SPAC's only assets are typically the money raised in its own IPO. A company might choose to go public through a SPAC versus a traditional IPO because the process is quicker, with lower associated costs and *fewer extensive financial disclosure requirements*. The main difference between a SPAC and a traditional reverse merger is that a SPAC shell company proactively seeks a target to acquire with the proceeds of its IPO.

33. In recent years, SPACs have garnered a great deal of attention and concern among U.S. regulators and investors. With less regulatory vetting than traditional IPOs,

the boom in SPACs puts investors at risk. Accordingly, the SEC has increased scrutiny of the sector—from SPAC marketing and fees to disclosures, conflicts of interest, and accounting treatment.

34. John Coates, Acting Director, Division of Corporate Finance at the SEC stated the following on April 8, 2021:

> The basics of a typical SPAC are complex, but can be simplified as follows.... It proceeds in two stages. In the first stage, it registers the offer and sale of redeemable securities for cash through a conventional underwriting, ... and places the proceeds in a trust for a future acquisition of a private operating company.
>
> In their second stage, SPACs complete a business combination transaction, in which the SPAC, the target (i.e., the private company to be acquired), or a new shell "holdco" issues equity to target owners, and sometimes to other investors. SPAC shareholders typically have a vote on the so-called "de-SPAC" transaction....
>
> Some ... practitioners and commentators have claimed that an advantage of SPACs over traditional IPOs is lesser securities law liability exposure for targets and the public company itself....
>
> ***[But] any material misstatement in or omission from an effective Securities Act registration statement as part of a de-SPAC business combination is subject to Securities Act Section 11. Equally clear is that any material misstatement or omission in connection with a proxy solicitation is subject to liability under Exchange Act Section 14(a) and Rule 14a-9, under which courts and the Commission have generally applied a "negligence" standard.***

John Coates, *SPACs, IPOs and Liability Risk under the Securities Laws*, U.S. Sec. & Exch. Comm'n (Apr. 8, 2021), https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities- laws. (Emphasis added).

35. The de-SPAC Merger structure has been harshly criticized as enabling fraud that financial journalists have wondered, pointedly, "***SPACs and fraud: [a] bug or a feature?***"[3]

36. Sandbridge was a SPAC formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses. It completed its initial public offering ("IPO") on or about September 14, 2020, selling 23 million units at $10.00 per unit. Each unit consists of one share of Sandbridge Class A common stock and one-half of one public warrant of Sandbridge.

37. Sandbridge had considerable discretion in identifying and consummating a business combination, but only had 24 months from the closing date of the IPO to complete a business combination, or else its corporate existence would cease, except for purposes of winding up its affairs and liquidating. Thus, Sandbridge was required to hold the approximately $230 million of proceeds from its IPO in a trust account, which were to be released only upon the consummation of a business combination or liquidation.

38. On July 15, 2021, Sandbridge acquired Owlet Baby Care Inc., via a "de-SPAC" transaction, a type of reverse merger. The combined company was renamed Owlet.

---

[3] *E.g.*, Andrew Ross Sorkin, et al., *SPACs on Trial: Charges Against the Founder of Nikola Cast a Shadow Over the Blank-Check Boom*, N.Y. Times, July 30, 2021.

39. The Proxy Statement that solicited shareholder approval of the de-SPAC Merger was an essential link in the accomplishment of the de-SPAC Merger. Indeed, the Proxy Statement made clear that without shareholder approval, Defendants could not effectuate the Business Combination:

> Sandbridge cannot complete the Business Combination unless Sandbridge's stockholders consent to the approval of the Business Combination Agreement and the transactions contemplated thereby. Sandbridge is sending you this proxy statement/prospectus to ask you to vote in favor of these and the other matters described in this proxy statement/prospectus.

40. The Sandbridge Board did not obtain a third-party valuation or fairness opinion in connection with its determination to approve the Business Combination. The Proxy Statement also made clear that shareholders "***should rely <u>only</u> on the information contained in this proxy statement/prospectus***."

**<u>Owlet's Flagship Smart Sock Device</u>**

41. Owlet designs and sells products and services for parents to proactively monitor the health and wellness of their children. Its self-described flagship product at the time of the de-SPAC Merger was the Smart Sock, which Owlet released in 2015. The Smart Sock was a baby monitor utilizing pulse oximetry sensors embedded in a sock to track a baby's heart rate, oxygen saturation, skin temperature, and sleep patterns. It monitored these vital signs continuously in real time and was designed to identify and alert parents to respiratory-driven infant health issues like desaturation (low blood oxygen levels) and bradycardia (a heart rate that's too slow), and to thus prevent SIDS

(Sudden Infant Death Syndrome), the number one infant cause of death in the first 12 months, and respiratory issues, which are the number one reason for pediatric emergency room visits, resulting in over 92 million emergency room visits in a child's first four years. The Smart Sock also produced sleep reports for parents each morning. Owlet described the Smart Sock's diagnostic function in the Proxy Statement, explaining that, "If the baby's readings ever fall outside of preset zones, parents are notified through the Owlet application and a nearby base station that the baby may need attention." In other words, the Smart Sock alerted parents to potential events of desaturation and bradycardia.

42. Tigress Financial Company issued an analyst report on March 12, 2021 initiating coverage for Sandbridge with a "Buy" rating based on the expected de-SPAC Business Combination with Owlet. Tigress' rosy investment thesis, describing a positive outlook for the Company, emphasized Owlet's "initial and market-leading product, the Smart Sock," and described Owlet as therefore having an "industry-leading position." Similarly, Cowen initiated coverage on Owlet on July 26, 2021 with an "Outperform" rating and a $14.00 price target, based on the advantages of the Smart Sock over hospital pulse oximetry machines, that it was "disrupting the traditional baby monitoring, health and safety space," and because based on Owlet's then-current portfolio of Smart Sock products Cowen estimated a global total addressable market of $19.5 billion which it

expected would double to almost $40 billion by 2025 assuming the continuation of its existing lines and the addition of new products.

**Defendants Flout FDA Regulations**

43. Owlet has always marketed and sold its Smart Sock as a monitor that tracks babies' vital signs, such as heart rate and oxygen levels, and alerts parents to potential health events when these vital signs leave preset zones.

44. Under the Act, 21 U.S.C. § 321(h), the Smart Sock qualified as a "device" because it is:

> an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is… intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or intended to affect the structure or any function of the body of man or other animals….

45. In May 2013, six Brigham Young University students, including Defendant Workman, took first place in the International Business Model Competition ("IBMC") at Harvard University with the Owlet Baby Monitor, a prototype of the Smart Sock. Throughout the IBMC presentation, Defendant Workman repeatedly admitted that the Smart Sock *is* a medical device.[4] Specifically, when asked whether the Smart Sock was classified as a Class I, II or III[5] device, Defendant Workman confirmed that the Smart

---

[4] A video recording and transcript of Owlet's presentation at the 2013 IBMC is available online at https://youtu.be/f-8v_RgwGe0?si=FJValyjK4rU3KaBz.

[5] Under the Medical Device Amendments of 1976 there are three different classes of medical devices: a Class I medical device "does not present a potential unreasonable risk

Sock with the alarm feature was "***a Class II device . . . [b]ecause it's sounding an alarm***. So an alarm means that we are giving advice to parents. We are saying, 'hey, there's something going on here.'" Workman explained that the product's classification as a Class II device was required "since pulse oximetry has been around [and] there's so many devices already out there, predicate-wise, that's just how it is."

46. Likewise, Workman further stated, that ***"[a]larm plus pulse oximetry means that you need FDA clearance***." Workman clarified that his team only learned "later in the game that [they] needed FDA clearance" for the Owlet Baby Monitor, and internal projections of the time and expense to obtain FDA approval led his team to consider whether they could go to market with a "more minimal and less risky" product to avoid "all that liability."

47. The risks surrounding FDA approval for the monitor with the alarm led Workman and his team to conduct additional consumer surveys, which confirmed that some customers would buy the monitor without the alarm. However, Workman expressed that his team was not "excited about" selling the monitor without the alarm, noting that there was a lot of internal conflict over "whether or not to even go test or

---

of illness or injury." 21 U.S.C. § 360c(a)(1)(A); a Class II medical device represents a "moderate to high level of risk to the patient or user." 21 U.S.C. § 360c(a)(1)(B); and a medical device is Class III if it is "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health." 21 U.S.C. § 360c(a)(1)(C).

even try this non-alarm version because it wasn't, you know, it wasn't our flagship product and it wasn't [what] we were excited about."

48. Yet, after finding that surveys showed there was still a percentage of potential consumers interested in the "non-alarm version," Workman stated that his team decided to go ahead with "launching . . . the non-alarm health tracking version that doesn't need FDA [clearance] to lower risk" in the summer of 2013, "and then eventually, seven months later, launch with our flagship product that we know will be a hit." An IBMC judge separately sought to confirm that Workman and his team were "using this health monitoring product as a bridge to . . . your Class II device, and launch the product with the alarm," to which Workman responded, "Yeah, we'll start with [the health tracking device] and seven months later we'll launch our flagship product."

49. Workman and his team received an award of $25,000 for their submission of the prototype Smart Sock to IBMC and co-founded Owlet, which was later incorporated as Owlet Baby Care Inc. in February 2014.

50. Originally named the Vitals or Baby Monitor, Owlet publicly unveiled the Smart Sock without the alarm in a press release dated August 26, 2013 (the "August 26, 2013 Press Release"). According to the August 26, 2013 Press Release and the Owlet Baby Care website, the Smart Sock located the baby's "[h]eart rate and oxygen levels . . . using Owlet's proprietary, innovative four-sensor pulse oximeter," "check[ed] a child's vital statistics," and then "wirelessly transmit[ted] them to a web-enabled device,"

allowing parents to "check [their] child's blood-oxygen, skin temperature, and heart rate levels at any time, day or night." The Smart Sock also "gather[ed] [] data, analyze[d] it for abnormal health patterns, determine[d] potential problems, and display[ed] [] information in a visually appealing format that can easily be shared with [a] pediatrician."

51. Owlet's August 26, 2013 Press Release explained that Workman "first had the idea" for the Smart Sock "when caring for his twin cousins who were born prematurely" after another "cousin pass[ed] away from [SIDS]." Per Owlet, "there [wa]s nothing on the consumer market that c[ould] show parents their child's heart rate and oxygen levels." Moreover, hospital-grade devices were limited in scope and costly for new parents. As a result, the Smart Sock's "four sensors" and "nine different reading combinations" were "a vast improvement over current technology" that had "one combination of light and sensor." According to Defendant Workman, as quoted in the August 26, 2013 Press Release, this innovation "offer[ed] peace of mind to parents at a financially feasible price."

52. Thus, with the Smart Sock, Owlet had "created the world's first baby 'smart sock' that transmit[ed] a child's heart rate, oxygen levels, skin temperature, sleep quality, and sleep position (rollover alerts) to a parent's smartphone or other internet-based device." The August 26, 2013 Press Release confirmed that individuals who

participated in Owlet's crowd-funding campaign via Indiegogo could be one of the first consumers to receive a Smart Sock.

53. With respect to FDA clearance for the Smart Sock, the August 26, 2013 Press Release confirmed that forthcoming alarm and notification features would require FDA clearance before Owlet could launch these features to the broader public. More specifically, the August 26, 2013 Press Release stated that "[t]he Owlet Team is currently going through the FDA process to add an alarm, along with other features, to the next version of the product" which will take the Smart Sock "to a whole new level, notifying parents of drops in heart rate or oxygen levels, and helping to prevent emergencies."

54. Following the Company's announcements in its August 26, 2013 Press Release, an article published by VentureBeat that same day reported that the Smart Sock "include[d] a four-sensors pulse oximeter, which allows the device to measure skin temperature and heart rate simply via a built-in light," and was "similar to but more advanced than the typical pulse rate device you might put your finger into in a doctor's office, with two light sources and two photo diodes to ensure good readings even with different-sized or growing infants."[6] The article also confirmed that while the FDA "has

---

[6] John Koetsier, *This Sock Tells You Your Baby's Heart Rate, Sleep Position, Oxygen Levels, and Temperature*, VENTUREBEAT, August 26, 2023, https://venturebeat.com/business/this-high-tech-sock-tells-you-your-babys-heart-rate-sleep-position-oxygen-levels-and-temperature/.

yet to approve the alarm" feature of the Smart Sock, "the crowdfunding proceeds will go toward that process."[7]

55. A 2014 medical journal publication later reported that, according to one of Owlet's co-founders, avoiding FDA regulation was precisely the motivation behind the Company's plan to remove the alarm feature from the Smart Sock launched as part of the crowd-funding effort. Specifically, the publication stated that "Owlet's cofounder Jacob Colvin explained that the alarm was removed so that it could be sold as an unregulated monitoring device."[8]

56. In fact, earlier versions of the Company's website accessed via the Wayback Machine Archive online demonstrate that, as of April 2013, the Owlet Baby Monitor, a prototype of the Smart Sock, was explicitly marketed as a medical device prior to launch[9]:

[7] Owlet later turned to Fundable's fundraising platform in 2014 to raise additional funds towards that process, advertising its Smart Sock as "an innovative new wearable technology device." *See* Owlet Fundable Startup Fundraising Platform, https://www.fundable.com/owlet.

[8] David King, *Marketing wearable home baby monitors: real peace of mind?*, BMJ PUBLISHING GROUP, November 18, 2014, https://time.com/wp-content/uploads/2014/11/babymonitors.pdf.

[9] Owlet, Frequently Asked Questions, https://web.archive.org/web/20130402222901/http://owletcare.com/ (accessed April 2, 2013, via the Wayback Machine Archive).

► **How does Owlet Baby Monitor work?**

There are two essential parts of this device:
(1) the sock, which the baby wears, and
(2) the relay device, which displays vital sign information and sounds an alarm if there are any irregularities with the vital signs being monitored (heart-rate and blood-oxygen levels).

An optional third part of this device is the customer's smartphone. The relay can convey the monitored information to the smartphone so that the customer has a more mobile option for staying connected.

► **When will it be available?**

Late 2013

► **What is pulse oximetry?**

Pulse oximetry is a well-known, non-invasive method used in hospitals around the world to monitor vital signs. The technology uses a small light to evaluate heart rate and blood oxygen levels.

► **Will it wake my baby?**

If you place the relay device in a different room, it should not wake your child.

57. By the same token, Owlet executives described the Smart Sock as a medical device in earlier interviews with media outlets. For example, in a pre-launch interview with the Center for Data Innovation on February 19, 2014, Owlet co-founder Jacob Colvin described the Smart Sock as a "device" and likened its revolutionary components to a much smaller version of "that same technology . . . of pulse oximeters currently found in hospitals."[10]

58. Then, in early 2015, the FDA announced that it had "created a new category of devices—general wellness products" that the agency had decided to "exempt from regulation" via the issuance of draft guidance on January 20, 2015 titled *General Wellness: Policy for Low Risk Devices*. More specifically, the FDA stated that it no

[10] Travis Korte, *5 Q's for Wearable Health Expert Jacob Colvin*, CENTER FOR DATA INNOVATION, February 19, 2014, https://datainnovation.org/2014/02/5-qs-for-wearable-

longer "intend[ed] to examine low-risk general wellness products . . . to determine whether they are devices within the meaning of section 201(h) of the [Act] . . . or, if they are devices, whether they comply with the [] Act's regulatory requirements for devices." The draft guidance became official in substantially the same form in July 2016 following a public comment period.

59. This new guidance from the FDA was a pivotal moment for Owlet's plans to bring to market the diagnostic Smart Sock that they always wanted. By the Company's own admissions in 2013 and 2014, Owlet knew that if they wanted to bring the product to market with the alarm feature, they would need to seek the requisite FDA clearance for Class II medical devices. But when the FDA later issued guidance in 2015 that "wellness" products were exempt from such regulation, Owlet saw it as an opportunity to skirt FDA regulations applying to medical devices and market the Smart Sock even ***with*** the alarm feature as a "wellness" product. However, no amount of adjustment to the verbiage in Owlet's marketing materials could change the fact the Smart Sock still met the criteria for a medical device under the Act.

60. Owlet jumped at the chance to define the Smart Sock as a general wellness product and avoid having to obtain prior authorization from the FDA before it officially launched the Smart Sock with the alert feature to the wider public. For instance, Owlet stopped referring to the Smart Sock as a "Vitals Monitor," and instead focused on the

---

health-expert-jacob-colvin/.

"peace of mind and assurance" the Smart Sock provided to parents via "track[ing] a baby's breathing and heart rate."

61. When Owlet officially launched the Smart Sock in October 2015, and despite any attempts to rebrand the Smart Sock as a "wellness" product exempt from regulation, the Company still reaffirmed that the Smart Sock functioned as a medical device by explaining that its "sole purpose" was "to alert parents if their baby is not breathing or if the baby's heart rate is out of range," *i.e.* if their baby is having a medical event, and further touted that the "alert strategy was set by a team of pulse oximetry specialists, pediatricians, neonatologists and pulmonologists."

62. Further recognizing that the Smart Sock functioned as a medical device and needed to be manufactured accordingly, Owlet chose a manufacturer called Benchmark Electronics Inc., which specializes in medical devices. Among other unrelated markets (like defense and commercial aerospace), Benchmark operates in the ***medical technologies*** sector, explaining: "Your device deserves an experienced partner in medical engineering and manufacturing. Since our inception as a manufacturing subsidiary of a ***medical device company***, Benchmark leads the market."

63. While Owlet largely avoided using words like "device" or "diagnose" in later marketing materials following the launch of the Smart Sock in 2015, its marketing message still consistently made clear that the Smart Sock is a device that tracks babies vital signs and alerts parents if the baby's heart rate or oxygen levels leave preset safe

zones, *i.e.*, the Smart Sock was "intended for use in the diagnosis of disease or other conditions," including desaturation (low blood oxygen levels) and bradycardia (slower than normal heart rate).

64. Owlet always marketed the Smart Sock this way on its website and at numerous mass retailers including Amazon, Walmart, and Target:

⇒ Amazon Web Site: https://www.amazon.com/Owlet Smart Sock 3

- "Track the most important indicators of your baby's health–like oxygen level, heart rate, and total hours slept"
- "If your baby's readings leave preset "safe" zones, the Smart Sock will immediately notify you that your baby needs your attention"

⇒ Owlet Sales: https://owletcare.com/

- "We look at the best indicators of your baby's overall well-being and will proactively notify you if your baby may need you"
- "Track heart rate, oxygen level, and sleep trends"

⇒ Walmart Sales: https://www.walmart.com/ip/Owlet-Smart-Sock-Baby-Monitor/167836816

- "Owlet Smart Sock 2 Baby Monitor, Tracks Heart Rate & Oxygen"
- "Rest easy knowing you'll receive proactive notifications via lights and sounds if your baby's oxygen level or heart rate leave preset zones"
- "View real-time heart rate and oxygen level and receive notifications from any connected device using the Owlet app"

⇒ Target Sales: https://www.target.com/p/owlet-smart-sock-3-baby-monitor-with-oxygenheart-rate/-/A-83704325?preselect=79727730#lnk=same tab

- "Owlet Smart Sock 3 Baby Monitor with Oxygen & Heart Rate"
- "Tracks the baby's heart rate and oxygen level"
- "Tells you when Baby needs you"
- "Measures how long and how well the baby slept"

65. Likewise, years after the launch of the Smart Sock, Jacob Colvin unambiguously described the product as the Company's "sock device" in an interview on January 28, 2019, stating, "You look at the traditional baby monitor, and it doesn't measure a baby's breathing or heart rate. You look at hospital devices for infants, and they're all wired up. We wanted our ***sock device*** to be completely wireless and accurate when measuring a child's actual wellbeing."[11]

66. ***The Act, however, states that a company cannot sell medical devices without marketing approval, clearance or authorization from the FDA***. Defendants acknowledged their awareness of the relevant FDA regulations by comprehensively setting them forth in the Proxy Statement.

67. There are multiple ways to obtain such authorization. A company like Owlet looking to market and sell a Class II device can make a 510(k) premarket submission to the FDA to demonstrate that the device to be marketed is as safe and effective, *i.e.*, substantially equivalent, to another legally marketed device. The legally

marketed device to which equivalence is drawn is known as the predicate device. A device is substantially equivalent if, in comparison to a predicate device, it has the same intended use and has the same technological characteristics, does not raise different questions of safety and effectiveness, and the information submitted to the FDA demonstrates that the device is as safe and effective as the legally marketed device. However, if the device is considered high risk, *i.e.*, Class III, the FDA requires a premarket approval ("PMA"), the most stringent type of premarket submission, which would require Owlet to provide valid scientific evidence demonstrating reasonable assurances of safety and effectiveness for the device's intended use.

68. Defendants well knew that if a company fails to obtain authorization from the FDA to market and sell a device, the device is deemed "adulterated," under 21 U.S.C. § 351(f)(1)(B). FDA regulations prohibit a company from introducing or delivering for introduction, an adulterated device into interstate commerce. *See* 21 U.S.C. § 331(a).

69. Although Owlet sought to take advantage of the "general wellness product" exception to the FDA's regulation of devices like the Smart Sock, it could not escape the fact that the alarm feature launched in October 2015 made the Smart Sock a Class II medical device and subject to FDA regulation.

---

[11] Annie May Noonan, *Could this impact product help babies sleep safer" Words from the "Next Billion-Dollar Startup,"* REAL BUSINESS, Jan. 28, 2019, https://realbusiness.co.uk/owlet-baby-care-cot-death-prevention.

70. Indeed, beginning in as early as 2016, the FDA explicitly communicated to Owlet that the Smart Sock was a device under the definition of the Act. ***Nevertheless, Owlet continued to market and sell the Smart Sock with the alarm feature without FDA authorization***.

71. During that time, pediatricians also began speaking out against products like the Smart Sock. For example, in November 2016, the American Academy of Pediatricians ("AAP") Sudden Infant Death Syndrome ("SIDS") Task Force recommended that parents avoid using "home cardiorespiratory monitors as a strategy to reduce the risk of SIDS" because "[t]he use of cardiorespiratory monitors has not been documented to decrease the incidence of SIDS" and "[t]here are no data that other commercial devices that are designed to monitor infant vital signs reduce the risk of SIDS."

72. Similarly, in January 2017, another group of pediatricians published a letter in the Journal of the American Medical Association ("JAMA"), confirming that "[t]here [wa]s no evidence that consumer infant physiologic monitors are life-saving and there is potential for harm if parents choose to use them." The JAMA letter specifically identified a video advertising piece in which Owlet CEO Defendant Workman, stated, "We can't promise to prevent Sudden Infant Death Syndrome (SIDS) right now . . . but . . . we believe notifying parents when something's wrong maybe can help."

73. In response to this negative reaction from the medical community, Owlet claimed that the Smart Sock was, in fact, a general wellness product. Nevertheless, and without receiving clearance from the FDA, Owlet launched the second version of the Smart Sock in March 2017. And while Owlet toned down some of its marketing with respect to the alarm feature, the second version of the Smart Sock included a new smart phone application, Connected Care, that took even greater advantage of the Smart Sock's pulse and oxygen level alarms.

74. According to a 2017 report, the FDA once again warned Owlet that the Smart Sock was a medical device and that Owlet thus needed to seek the requisite FDA authorization before it could be sold and marketed in the U.S. Yet, Owlet again ignored the FDA's explicit warnings and continued to market and sell the Smart Sock with the alarm feature without the necessary FDA clearance.[12]

75. Given these prior communications from the FDA that the Smart Sock classified as a "device" under the Act which required prior authorization from the FDA to market and sell the product, the risk that Owlet would receive a Warning Letter from the FDA directing it to cease sales of the Smart Sock device was immediate and material, as former employees have acknowledged. During CW1's time at Owlet, prior to its merger with Sandbridge in July 2021, CW1 stated that the Company knew that the

[12] https://www.fox13now.com/news/fox-13-investigates/fox-13-investigates-how-owlet-smart-sock-went-from-a-parent-favorite-to-an-fda-warning ("FOX 13 obtained a report through the Freedom of Information Act showing that in 2017, the FDA concluded that

FDA had concerns about how Owlet was presenting its Smart Sock product to the public. Specifically, CW1 confirmed that Owlet "knew they had to be careful" about how they marketed their Smart Sock product, and as such, CW1 stated that employees were explicitly told by Company leadership to market the Smart Sock carefully "because the FDA had already filed a complaint." In addition to receiving this direction from Company leadership directly, CW1 further stated that it was "an ongoing, constant discussion at the company" that they had to be "very careful about the claims" they made about the Smart Sock.

76. CW2 further confirmed that Owlet knew it had to be careful about how it marketed its Smart Sock product, and CW2 stated that Owlet knew it needed FDA approval and authorization for its use as a medical device prior to and after CW2's employment. CW2's role was part of Owlet's marketing team for Owlet's products, including the Smart Sock. CW2 was responsible for figuring out how to take Owlet's products to market, what type of web content needed to be generated, what kind of advertising campaign would be most effective, "how to actually sell it," according to CW2. CW2 stated that the Company's position was "we want Smart Sock to be sold in every hospital," that Owlet knew it needed to get FDA clearance and until then, Owlet was going to be "doing business as usual," which CW2 explained meant that Owlet was going to continue being careful not to market the Smart Sock as a medical device. CW2

Owlet's sock was a medical device that needed FDA marketing approvals.").

stated "that was how we were always instructed," adding that the instruction came "from the top down." CW2 learned of the Company's position and direction on marketing the Smart Sock from discussions in quarterly meetings, along with the Company's intent for Smart Sock to ultimately be sold inside hospitals to parents of newborns and for it to be covered by insurance, which was only possible if it was deemed a medical device, according to CW2. In addition to the quarterly meetings, CW2 learned that Owlet knew it needed FDA approval to market the Smart Sock as a medical device even prior to 2020 from conversations during monthly business reviews with Michael Abbott and Kurt Workman. CW2 added that Workman would occasionally join Marketing Team meetings and Company-wide meetings where he would reiterate to employees that Owlet had known from its communications with the FDA that obtaining medical device authorization was required to market and sell the Smart Sock with the alarm feature.

77. CW3 confirmed the accounts of CW1 and CW2. CW3 stated that upon being hired just before Owlet and Sandbridge merged, CW3 was immediately briefed by two senior leaders, Liz Teran, Senior Director of Product Marketing, and Jane Putnam, Vice President of Communications, about how the Company was changing its positioning on Smart Sock away from safety to more parental peace of mind. CW3 confirmed that Smart Sock was one of the devices under CW3's purview as Senior Product Marketing Manager. CW3's role was to assist in the Company's express need to change its positioning in the marketing language for Smart Sock away from "safety" to

more "peace of mind" and to make sure this strategy was clearly communicated to shareholders. CW3 stated that after the FDA's Warning Letter arrived on October 1, 2021, Owlet instructed CW3 to remove any language regarding "monitoring blood oxygen saturation" from Smart Sock's marketing materials across all marketing channels including Owlet's website.

78. CW4 confirmed through discussions with Company employees that Owlet knew it had to get FDA approval for the Smart Sock as a medical device prior to the FDA's Warning Letter on October 1, 2021. CW4 reported to Owlet managers Abhi Bhatt, SVP of Product; Allison McKeever, Director–Insights and Research; and Janelle Seegmiller, VP of Product Management. CW4's role at the Company was to help with Owlet's education programs for its products users. CW4 confirmed that Owlet conveyed to its staff that they had been and were in communication with the FDA about the Smart Sock's regulatory status. CW4 further stated that Owlet's employees including CW4 were always told that executives and leadership had been in communication with the FDA throughout the process of starting the Company, and that Owlet knew down the line they would need to get full FDA approval to sell Smart Sock as a medical device. Jim Fidacaro, SVP and General Manager of Healthcare at Owlet, was the lead person overseeing the Smart Sock products and updated employees on its status at companywide meetings, according to CW4. CW4 confirmed that during these meetings, Fidacaro would speak about the Company's interactions with the FDA and the

Company's knowledge of obtaining approval for the Smart Sock as a medical device. According to CW4, when the FDA issued its October 1, 2021 Warning Letter, the Company's leadership did not appear to be shocked, but they were disappointed. CW4 confirmed that as far as the FDA was concerned, the Smart Sock's alarm to alert parents of a potential medical problem technically made the Smart Sock a diagnostic tool, which in turn meant the product was a medical device. After the FDA Warning Letter, Owlet immediately pivoted to providing a baby sock to the market that would not be considered a medical device by the FDA, CW4 said.

79. Indeed, CW1, CW2, CW3 and CW4 all confirmed that the FDA had warned Owlet about how it marketed the Smart Sock years before the de-SPAC Merger. According to CW1, it was common knowledge that due to multiple admonitions from the FDA, including cautionary letters, Owlet had to be careful not to market Smart Sock as a medical device and that this would have been communicated to Sandbridge during the due diligence process preceding the de-SPAC Merger. CW2 corroborated that Owlet senior management instructed the marketing team not to outright refer to the Smart Sock as a medical device, but instead to describe its capabilities as a monitoring device that tracks vital signs. CW2 made clear that the Company paid close attention to user-generated content and influencers, and thus knew that based on Owlet's marketing message, the public perceived the Smart Sock as a medical device and Owlet did nothing

to back away from that perception. As CW1 explained, the Smart Sock "was a pulse oximeter, which is a medical device."

80. In addition to the FDA's direct communications with Owlet making clear that the Smart Sock qualifies as a medical device, the FDA also issued industry wide guidance on August 22, 2018. First, in an article titled *Baby Products with SIDS Prevention Claims*, the FDA held that "[a] baby product is considered a medical device if claims to cure, treat, prevent, or reduce a disease or condition are made in the product's labeling, packaging, or advertising . . . ." Then in an article titled, *Information for Manufacturers of Baby Products*, the FDA directed that all manufacturers of baby products designed to prevent any disease or condition, (*e.g.* ***the Smart Sock***), review their marketing "for any direct or implied claims to cure, treat, or prevent a disease or condition, including SIDS," and to immediately "stop marketing" the products until they "receive FDA clearance or approval." Despite these clear admonitions, both direct and industry wide, Owlet nevertheless continued marketing the Smart Sock without FDA approval.

**<u>Defendants Misled Sandbridge Shareholders Eligible to Vote on the De-SPAC Merger</u>**

81. The Proxy Statement Defendants issued to solicit shareholder approval of the de-SPAC Merger falsely states that the Smart Sock ***is not*** a medical device and that Owlet has complied with all relevant FDA regulations. The Proxy Statement did not reveal that, in fact, the FDA had been telling Owlet for years that the Smart Sock ***is*** a

medical device and that the Company thus needed approval to market and sell the device pursuant to the Act. Owlet's failure to heed the FDA's regulations, warnings and industry guidance, raising a significant risk that the FDA would force Owlet to stop marketing and selling the Smart Sock, and Defendants' failure to disclose this material fact to Sandbridge shareholders solicited to vote on the Business Combination, is all the more egregious given the Company's recognition in the Proxy Statement that:

> ***We currently rely on sales of our Owlet Smart Sock technologies and related products for the majority of our revenue and expect to continue to do so for the foreseeable future.***
>
> We are highly dependent upon the continued success and market acceptance of the Owlet Smart Sock and related technologies that serve as the basis of our primary product offerings.

82. Defendants made clear in both the preliminary Proxy Statement included in the registration statement concerning the proposed merger was filed with the SEC on Form S-4 on March 31, 2021 (the "Registration Statement"), and the final Proxy Statement filed with the SEC on June 21, 2021, that "the Owlet Smart Sock continues to serve as…the compelling anchor of our ecosystem." In other words, customers would purchase the Smart Sock first, and then add other of Owlet's complementary solutions like the Owlet Cam or Owlet Dream Lab. Owlet ignored the FDA's clear edict that the Smart Sock was a medical device and did not seek the required FDA approvals under the Act (a process Owlet described in the Registration Statement as a "lengthy and time

consuming process") so it could continue to sell its anchor and maintain its primary source of revenue.

83. Indeed, the Proxy Statement identified Owlet's ability to sell the Smart Sock going forward as a "key factor affecting our performance," stating:

> Our growth will depend, in large part, on our continued ability to attract new customers with our existing products, including our anchor product, the Owlet Smart Sock.

84. Investors thus had a right to know about the material risk that Owlet would receive a Warning Letter from the FDA directing it to cease sales of the Smart Sock device, on which it was admittedly "highly dependent" for "the majority of our revenue" and which represented a key factor affecting Owlet's performance post-merger, due to Owlet's years-long flouting of FDA regulations and disregard of explicit communications from the FDA to Owlet stating that the FDA considered the Smart Sock a device under the Act.

85. Moreover, Owlet's success is tied directly to its reputation. Owlet acknowledged in the Proxy Statement that it faced reputational harm if the FDA were to determine that the Smart Sock was a medical device, and that Owlet failed to comply with FDA regulations:

> If the FDA or other regulatory body determines that any of our products is a medical device that is not in compliance with applicable requirements and makes that determination public, or takes some other public action such as issuing a public enforcement action or instituting a recall, ***customers may react negatively and stop purchasing or recommending our products or services***.

86. The Proxy Statement made clear that Owlet also faced another significant harm if it failed to obtain marketing authorization from the FDA for one of its products under the Act:

> [A] failure to obtain such marketing authorization by the FDA may have a negative impact on our ability to obtain any necessary certifications or marketing authorizations in foreign jurisdictions.

In other words, a failure to obtain authorization from the FDA for a medical device would not only hinder Owlet's ability to market and sell that device domestically but could also prevent Owlet from obtaining authorization to market and sell the device internationally. Given that Owlet listed one of its growth strategies in the Proxy Statement as "successfully and meaningfully expand[ing] into new countries…and acquir[ing] additional market share globally, with heightened focus on Europe, Asia, and Latin America," Sandbridge shareholders had a right to know when deciding whether to redeem their shares for cash or approve the de-SPAC Business Combination that the FDA had told Owlet unequivocally for years that the Smart Sock qualified as a medical device requiring FDA marketing approval yet Owlet flouted FDA regulations anyway.

87. That Sandbridge had access to all material information regarding Owlet's flagship product is made clear by the Proxy Statement, which states that on November 7, 2020, Owlet granted data room access to Sandbridge. Sandbridge had access to all of Owlet's due diligence documents in this virtual data room throughout the negotiation process leading to the signing of the Business Combination Agreement on February 15,

2021. The Proxy Statement also stated that under the terms of the Business Combination Agreement:

> Sandbridge has conducted its own independent review and analysis of, and, based thereon, has formed an independent judgment concerning, the business, assets, condition, operations and prospects, of the Group Companies and has been furnished with or given access to such documents and information about the Group Companies as necessary to enable it to make an informed decision with respect to the execution, delivery and performance of the Business Combination Agreement, the ancillary documents thereto and the Transactions….

88. The provisions of the Business Combination Agreement, included in the Proxy Statement, provided Sandbridge with access to Owlet's directors, officers, books and records, and made clear that Sandbridge in fact availed itself of that access to conduct an independent review and analysis of Owlet's business, assets, liabilities, condition, operations, and prospects:

> 4.21(a)
>
> Each Sandbridge Party, on its own behalf and on behalf of its Representatives, acknowledges, represents, warrants and agrees that (i) it has conducted its own independent review and analysis of, and, based thereon, has formed an independent judgment concerning, the business, assets, liabilities, condition, operations and prospects, of the Group Companies and (ii) it has been furnished with or given access to such documents and information about the Group Companies and their respective businesses and operations as it and its Representatives have deemed necessary to enable it to make an informed decision with respect to the execution, delivery and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby.
>
> 5.3(b)

> From and after the date of this Agreement until the earlier of the Closing Date or the termination of this Agreement in accordance with its terms, upon reasonable advance written notice, the Company shall provide, or cause to be provided, to Sandbridge and its Representatives during normal business hours reasonable access to the directors, officers, books and records of the Group Companies (in a manner so as to not interfere with the normal business operations of the Group Companies).

89. As such, each Defendant negligently signed the Proxy Statement with the materially false and misleading statements contained therein, thus depriving Sandbridge shareholders of their right to make an informed decision whether to redeem their Sandbridge common stock for cash or whether to approve the de-SPAC Business Combination.

**Defendants Had a Duty to Disclose that Owlet Marketed and Sold the Smart Sock in Contravention of FDA Regulations**

90. Pursuant to Item 303 of Regulation S-K, 17 C.F.R. § 229.303(ii), Defendants had an affirmative, independent duty to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." By failing to disclose: (1) that the FDA had communicated to Owlet since 2016 that the Smart Sock qualified as a medical device under the Act; (2) that the FDA would therefore require Owlet to obtain marketing authorization; (3) that Owlet would likely have to cease commercial distribution of the Smart Sock in the U.S. until it obtained the requisite approval; and (4) that, as a result of the foregoing, Defendants' statements in the Proxy Statement about the Smart Sock, compliance with FDA

regulations, and revenue growth/projections were materially misleading and/or lacked a reasonable basis, Defendants failed to satisfy this duty. These omissions rendered Defendants' statements materially false and/or misleading in violation of Item 303 of Regulation S-K.

91. Pursuant to Item 105 of Regulation S-K, 17 C.F.R. § 229.105, Defendants had an affirmative, independent duty to disclose in the Proxy Statement the most significant risk factors that make the investment speculative or risky.

92. By failing to disclose: (1) that the FDA had communicated to Owlet since 2016 that the Smart Sock qualified as a medical device under the Act; (2) that the FDA would therefore require Owlet to obtain marketing authorization; (3) that Owlet would likely have to cease commercial distribution of the Smart Sock in the U.S. until it obtained the requisite approval; and (4) that, as a result of the foregoing, Defendants' statements in the Proxy Statement about the Smart Sock, compliance with FDA regulations, and revenue growth/projections were materially misleading and/or lacked a reasonable basis, Defendants failed to satisfy this duty.

93. Given the integrality of the Smart Sock to Owlet's business as its flagship product and the primary source of its revenue and expected revenue, the foregoing omissions posed a grave and very real threat to Owlet's business and made "the investment in the registrant or offering speculative or risky."

**Executive Compensation**

94. Following the Business Combination, Defendant Workman held 4,171,316 shares of Owlet common stock and Defendant Scolnick held 28,422,341 shares of Owlet common stock. Moreover, for the year ended December 31, 2021, Defendant Workman received $1,764,178 in total compensation, including $1,396,976 in option awards, and Defendant Scolnick received $2,318,381 in total compensation, including $1,154,018 in stock awards. Defendants Workman and Scolnick retained their respective positions as CEO and CFO of Owlet following the de-SPAC Merger.

**Materially False and Misleading Statements in the Proxy Statements**

95. Defendants solicited shareholder approval for the de-SPAC Business Combination by filing a false and misleading Proxy Statement with the SEC, dated June 21, 2021, that misled shareholders regarding the Company's future prospects and the value of Sandbridge's shares. Defendants also included the Proxy Statement in its Registration Statement filed on Form S-4 with the SEC on March 31, 2021.

96. In the Registration Statement, signed by Defendants Suslow, Henry, De Sole, Goss, Kahler, Toubassy, and Weinstein, which integrated the preliminary proxy statement soliciting shareholder votes for the Business Combination, Defendants told investors in no uncertain terms that the Smart Sock, from which it received "the majority of its revenue and expect[ed] to continue to do so for the foreseeable future," did not qualify as a medical device and that the Company therefore did not need to seek FDA

approval to sell it to consumers. In summarizing the risk factors facing the Company, the Registration Statement described the risk that the FDA would conclude that the Smart Sock is in fact a medical device and thus require Owlet to stop selling it as purely hypothetical:

> If the U.S. Food and Drug Administration ("FDA") or any other governmental authority were to require marketing authorization for the Owlet Smart Sock, or for any other product that Owlet sells and which Owlet does not believe requires such marketing authorization, Owlet could be required to cease selling or recall the product pending receipt of marketing authorization from the FDA or such other governmental authority, which can be a lengthy and time-consuming process, harm financial results and Owlet may also be subject to regulatory enforcement action.

97. Expanding on this risk factor, the Registration Statement purported to warn that "the FDA . . . ***may not agree*** with that conclusion [that the Smart Sock is not a medical device] and ***could*** require us to obtain marketing authorization" to sell the Smart Sock:

> In response to inquiries from the FDA and regulatory authorities in other jurisdictions regarding the marketing of the Owlet Smart Sock, we have communicated our belief that the Owlet Smart Sock is not a medical device and does not require marketing authorization from the FDA or approval/certification from such other regulatory authorities. ***However, the FDA and certain regulatory authorities have expressed they may not agree with that conclusion and could require us to obtain marketing authorization (or approval/certification) to continue to sell the product.*** Obtaining authorization to sell the Owlet Smart Sock as a medical device is a time-consuming and costly process and we may be precluded from selling the Owlet Smart Sock if we are required to obtain marketing authorization. If granted, a marketing authorization could require conditions to sale, for example, a prescription requirement. ***If the FDA or other regulatory authorities require such marketing authorization (or approval/certification, respectively) for the Owlet Smart Sock***, or for any

> other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, ***we could be required to cease selling or recall the product in the corresponding jurisdiction pending receipt of marketing authorization*** (or approval/certification), which can be a lengthy and time-consuming process, and we may also be subject to regulatory enforcement action. In addition, we may be required to modify the product's functionality or limit our marketing claims for the product, whether or not we obtain such clearance, approval, certification or marketing authorization. In any such event, our business could be substantially harmed.

98. Defendants misled investors by describing the risk that the "FDA ***may*** not agree" that the Smart Sock is not a medical device as *theoretical* and not disclosing that the FDA had in fact already *confirmed* it ***did not*** agree with that conclusion. As far back as 2016 and in the years that ensued, the FDA communicated to Owlet "that the Owlet Smart Sock meets the definition of a device under the Act."

99. Even when describing a *Tachyarrhythmia Study* that touted the efficacy of the Smart Sock in diagnosing supraventricular tachycardia ("SVT"), the most common arrhythmia found in children, Defendants doubled down on their claim that the Smart Sock was not a medical device. After citing two large population-based studies that included over two thousand individuals each with a clinical diagnosis of SVT, and estimating the prevalence of SVT in infants to be between 0.10% and 0.25%, the Registration Statement went on to say:

> While the studies did not specify the medical monitoring devices used in those studies, a clinical diagnosis of SVT is generally made using an electrocardiogram or Holter monitor. However, a study reviewed and approved by the Institutional Review Board at the Cleveland Clinic and published in The Journal of Pediatrics found *the cumulative incidence of*

> *tachyarrhythmia among infants using the Owlet Smart Sock to be higher than those previously reported clinically-diagnosed SVT rates.* The tachyarrhythmia study focused on episodes involving a heart rate of at least 240 beats per minute that lasted for more than 60 seconds.
>
> ***Although the Owlet Smart Sock is a consumer product <u>and not a medical device</u>***, study investigators were able to observe more than 202 million total hours of anonymized data from 100,949 babies born between February 2017 and February 2019 and monitored by the Owlet Smart Sock. The investigators identified 5,070 total suspected episodes of tachyarrhythmia in 2,508 infants, for a cumulative incidence of 2.5%.
>
> We believe this study is indicative of the potential power of our data set and could support the future development of products for which we may seek to obtain FDA and other regulatory agency authorization *for use in the detection of infant health issues*.

100. By falsely stating in the Registration Statement that the Smart Sock is not a medical device, even while acknowledging that the Smart Sock is used to "diagnos[e] [] disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease," *the Act's very definition of a medical device*, and failing to disclose that the FDA had been telling Owlet for years that the Smart Sock is a medical device, Defendants misled investors.

101. Moreover, the Registration Statement stated that the Sandbridge Board did not obtain a third-party valuation or fairness opinion in connection with its determination to approve the Business Combination but instead relied upon financial projections that were "prepared by, and are the responsibility of, Owlet's management." The Registration Statement set forth those projections "with numerical specificity," and forecast revenues skyrocketing from $75.2 million in 2020 to $1.06 billion in 2025.

102. While the Registration Statement cautioned that shareholders should not "place undue reliance on this information," it also made clear that the Sandbridge Board used "this information" to determine "the fair value of common stock," as a basis for stating that "the Business Combination was in the best interest of its stockholders," and as a basis for recommending that shareholders approve the merger. The projections, however, were both objectively and subjectively false. Owlet senior management based the revenue projections on the false underlying premise that Owlet would continue to market and sell the Smart Sock, which Defendants made clear constituted "the majority of its revenue and expect[ed] to continue to do so for the foreseeable future." However, the Registration Statement did not reveal that the FDA had made clear to Owlet since 2016 that the Smart Sock qualified as a medical device. Defendants, having comprehensively set forth the applicable FDA regulations in the Registration Statement, and having been repeatedly told by the FDA that the Smart Sock is a medical device, knew the device was "adulterated" and that the FDA would ultimately insist that Owlet cease any commercial distribution of the Smart Sock to obtain the required FDA approvals.

103. The Registration Statement further misled Sandbridge shareholders by representing that Owlet fully complied with applicable FDA regulations. Specifically, the Registration Statement stated that under the Business Combination Agreement,

Owlet made representations and warranties regarding regulatory compliance, including that:

> Since January 1, 2018, all products developed, tested, investigated, produced, manufactured, labeled, stored, promoted, marketed, imported, exported, distributed, or sold by or on behalf of the Group Companies have been, or are being, developed, tested, investigated, produced, manufactured, labeled, distributed, stored, promoted, marketed, imported, exported, distributed and sold ***in compliance in all material respects with applicable FDA Laws…***
>
> ***
>
> the Company holds all material permits, including 501(k) clearances or premarket approvals required by applicable FDA Laws.

104. The foregoing statements were false and misleading because Owlet did not promote, market and distribute the Smart Sock in compliance with applicable FDA laws and did not hold the necessary FDA clearance or approval to market the Smart Sock. FDA laws required that Owlet seek approval from the FDA prior to marketing and selling the Smart Sock because it qualified as a medical device, a fact the FDA communicated to Owlet as early as 2016. Owlet nevertheless consistently marketed the Smart Sock as tracking babies' vital signs and alerting parents if blood oxygen saturation or pulse rates fell outside safe zones; *i.e.* the Smart Sock assisted parents in identifying and/or diagnosing instances of desaturation and bradycardia.

105. On June 21, 2021, Owlet filed its proxy statement (the "Proxy Statement") on Form 424B3 soliciting votes in favor of the Business Combination. The Proxy Statement, like the preliminary proxy statement included in the Registration Statement,

purported to warn that regulatory agencies could disagree with Owlet's position that the Smart Sock is not a medical device and require authorization but only disclosed that, "the Medicines and Healthcare products Regulatory Agency, the regulatory authority responsible for the UK medical device market, has asserted that the Owlet Smart Sock requires (CE mark) certification and subsequent registration as a medical device in the UK." The Proxy Statement did not reveal that the FDA had also communicated to Owlet since 2016 that the Smart Sock is a medical device that requires marketing authorization in the U.S. under the Act. Specifically, the Proxy Statement stated:

> ***If the FDA or any other governmental authority were to require clearance, approval, certification or other form of marketing authorization for the Owlet Smart Sock, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, we could be required to cease selling or recall the product pending receipt of such clearance, approval, certification or marketing authorization from the FDA or such other governmental authority, which can be a lengthy and time-consuming process, and we may also be subject to regulatory enforcement action.***
>
> We currently sell the Owlet Smart Sock, which we market for use by parents of healthy babies to provide peace of mind, and for which we have not sought or obtained any marketing authorization from the FDA or similar authorization, approval, or certification from any other governmental authority. In response to inquiries from the FDA and regulatory authorities in other jurisdictions regarding the marketing of the Owlet Smart Sock, we have communicated our belief that the Owlet Smart Sock is not a medical device and does not require marketing authorization from the FDA or approval/certification from such other regulatory authorities. ***However, the FDA <u>and/or</u> certain regulatory authorities have expressed they do not agree with that conclusion and could require us to obtain marketing authorization (or approval/certification) to continue to sell the product. For example, the Medicines and Healthcare products Regulatory Agency, the regulatory authority responsible for the UK medical device market, has***

> ***asserted that the Owlet Smart Sock requires (CE mark) certification and subsequent registration as a medical device in the UK, but has indicated they will allow us to continue to market the Owlet Smart Sock until May 2022 without such certification or registration.*** Obtaining authorization to sell the Owlet Smart Sock as a medical device is a time-consuming and costly process and we may be precluded from selling the Owlet Smart Sock if we are required to obtain marketing authorization. If granted, a marketing authorization could require conditions to sale, for example, a prescription requirement. ***If the FDA or other regulatory authorities require such marketing authorization (or approval/certification, respectively) for the Owlet Smart Sock, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, we could be required to cease selling or recall the product in the corresponding jurisdiction pending receipt of marketing authorization (or approval/certification),*** which can be a lengthy and time-consuming process, and we may also be subject to regulatory enforcement action. In addition, we may be required to modify the product's functionality or limit our marketing claims for the product, whether or not we obtain such clearance, approval, certification or marketing authorization. In any such event, our business could be substantially harmed.

(First emphasis in original).

106. The Proxy Statement misled investors by representing that the "FDA ***<u>and/or</u>*** certain regulatory authorities have expressed they do not agree" that the Smart Sock is not a medical device "and could require us to obtain marketing authorization," and then identifying the Medicines and Healthcare products Regulatory Agency as the ***<u>only agency</u>*** to communicate that disagreement with certitude, when in reality, as early as 2016, the FDA had also communicated to Owlet with certainty "that the Owlet Smart Sock meets the definition of a device under the Act" and that its marketing practices thus contravened FDA regulations.

107. Moreover, the Proxy Statement once again described the tachyarrhythmia study in the same manner as in the initial proxy statement included in the Registration Statement, and reiterated that despite a study, reviewed and approved by the Institutional Review Board at the Cleveland Clinic and published in *The Journal of Pediatrics*, on the Smart Sock's role in diagnosing SVT and establishing an incidence of tachyarrhythmia in infants above previously reported clinically-diagnosed SVT rates, "***the Owlet Smart Sock is a consumer product and <u>not a medical device</u>***…."

108. The foregoing statement misled Sandbridge shareholders by falsely stating that the Smart Sock is not a medical device, though clearly used to "diagnos[e] [] disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease," *the Act's very definition of a medical device*, and failing to disclose that the FDA expressly told Owlet for years that the Smart Sock is a medical device and that Owlet's marketing of the Smart Sock violated FDA regulations, and that the Company thus faced a real risk that the FDA would direct Owlet to cease its marketing and selling of the Smart Sock until Owlet obtained the necessary FDA authorizations.

109. Moreover, the Proxy Statement once again included the projections prepared by Owlet senior management that projected explosive revenue growth between 2020 and 2025. The Proxy Statement made clear that the Sandbridge Board did not obtain a third-party valuation or fairness opinion in connection with its determination to approve the Business Combination but instead relied upon these financial projections

that were "prepared by, and are the responsibility of, Owlet's management." The Proxy Statement set forth those projections "with numerical specificity," and forecast revenues skyrocketing from $75.2 million in 2020 to $1.06 billion in 2025.

110. While the Proxy Statement cautioned that shareholders should not "place undue reliance on this information," it also made clear that the Sandbridge Board used "this information" to determine "the fair value of common stock," as a basis for stating that "the Business Combination was in the best interest of its stockholders," and as a basis for recommending that shareholders approve the merger. The projections, however, were both objectively and subjectively false. Owlet senior management based the revenue projections on the false underlying premise that Owlet would continue to market and sell the Smart Sock, which Defendants made clear constituted "the majority of its revenue and expect[ed] to continue to do so for the foreseeable future." However, the Proxy Statement did not reveal that the FDA had made clear to Owlet since 2016 that the Smart Sock qualified as a medical device. Defendants, having comprehensively set forth the applicable FDA regulations in the Proxy Statement, and having been repeatedly told by the FDA that the Smart Sock is a medical device, knew the device was "adulterated" and that the FDA would ultimately insist that Owlet cease any commercial distribution of the Smart Sock to obtain the required FDA approvals.

111. The Proxy Statement further misled Sandbridge shareholders by representing that Owlet complied with applicable FDA regulations. Specifically, the

Proxy Statement stated that under the Business Combination Agreement, Owlet made representations and warranties regarding regulatory compliance, including that:

> Since January 1, 2018, all products developed, tested, investigated, produced, manufactured, labeled, stored, promoted, marketed, imported, exported, distributed, or sold by or on behalf of the Group Companies[13] have been, or are being, developed, tested, investigated, produced, manufactured, labeled, distributed, stored, promoted, marketed, imported, exported, distributed and sold ***in compliance in all material respects with applicable FDA Laws…***
>
> ***
>
> the Company holds all material permits, including 501(k) clearances or premarket approvals required by applicable FDA Laws.

112. The foregoing statements were false and misleading because Owlet did not promote, market and distribute the Smart Sock in compliance with applicable FDA laws and did not hold the necessary FDA clearance or approval to market the Smart Sock. FDA laws required that Owlet seek approval from the FDA prior to marketing and selling the Smart Sock because it qualified as a medical device, a fact the FDA communicated to Owlet as early as 2016. Owlet nevertheless consistently marketed the Smart Sock as tracking babies' vital signs and alerting parents if blood oxygen saturation or pulse rates fell outside safe zones; *i.e.* the Smart Sock assisted parents in identifying and/or diagnosing instances of desaturation and bradycardia.

[13] "Group Companies" refers to Owlet together with each of its subsidiaries.

113. The Proxy Statement went on to tout Owlet's revenue growth as a direct result of "substantial sales growth for the Owlet Smart Sock":

> Revenues increased by $7.0 million, or 47.3%, from $14.9 million for the three months ended March 31, 2020 to $21.9 million for the three months ended March 31, 2021. The increase was primarily due to a 40% increase in sales volume. ***The increase was primarily driven by substantial sales growth for the Owlet Smart Sock.*** Owlet Smart Sock sales to retailers and consumers for the Owlet Smart Sock increased grew 54% and 25%, respectively, from the three months ended March 31, 2020 to the three months ended March 31, 2021.

114. Though the revenue numbers reported may have been literally accurate, the foregoing statements in the Proxy Statement misled Sandbridge shareholders by failing to disclose that Owlet faced a material risk of losing future revenue from the Smart Sock, the main source of its revenue and substantial growth driver, because it had been marketing and selling the Smart Sock in violation of the Act despite explicit admonitions form the FDA since 2016 that the Smart Sock qualified as a medical device given its role in identifying episodes of desaturation and bradycardia and thus required FDA authorization.

115. The above statements set forth in the preliminary and final Proxy Statements, identified in ¶¶ 96-113, were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to Sandbridge shareholders: (1) that the FDA had communicated to Owlet since 2016 that the Smart Sock qualified as a medical device under the Act; (2) that the FDA would therefore require Owlet to obtain

marketing authorization; (3) that Owlet would have to cease commercial distribution of the Smart Sock in the U.S. until it obtained the requisite approval; and (4) that, as a result of the foregoing, Defendants' statements in the Proxy Statement about the Smart Sock, compliance with FDA regulations, and revenue growth/projections were materially misleading and/or lacked a reasonable basis.

**The Business Combination is Completed**

116. On July 15, 2021, Owlet announced that it had completed the Business Combination in a press release that stated, in relevant part:

> Owlet, Inc. (NYSE: OWLT) ("Owlet" or the "Company"), a company building a connected and accessible nursery ecosystem that brings technology and vital data to modern parenting, today announced that it has completed its business combination with Sandbridge Acquisition Corporation. (NYSE: SBG) ("Sandbridge"), a special purpose acquisition company. The business combination and concurrent private placement, which were approved by Sandbridge's stockholders at its special meeting held on July 14, 2021, provide over $135 million to accelerate the Company's expansive product pipeline, deepen penetration, and expand globally.

**The Truth Emerges**

117. On October 4, 2021, Owlet revealed that it had received a Warning Letter from the FDA on October 1, 2021 concerning the "Owlet Smart Sock Family (version/generation 1, 2, 3, Smart Sock Plus, and co-packaged products (*e.g.*, Owlet Monitor Duo (Smart Sock + Camera), referred to herein as 'Owlet Smart Socks')."

118. The FDA issues Warning Letters "only for violations of regulatory significance. Significant violations are those violations that may lead to enforcement action if not promptly and adequately corrected."

119. The Warning Letter stated that Owlet violated the Act by marketing the Owlet Smart Socks "without marketing clearance or approval."

120. The Warning Letter[14] described Owlet's violations of the Act as follows:

> The United States Food and Drug Administration (FDA) has learned that ***your firm is marketing Owlet Smart Socks in the United States without marketing clearance or approval, in violation of the Federal Food, Drug, and Cosmetic Act (the Act)***.
>
> Under section 201(h) of the Act, 21 U.S.C. § 321(h), these products are devices because they are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body. Products that measure blood oxygen saturation and pulse rate are devices when they are intended to identify (diagnose) desaturation and bradycardia and provide an alarm to notify users that measurements are outside preset values.
>
> FDA has reviewed your firm's web site, multiple commercial websites, and your firm's responses to FDA correspondence and determined that the Owlet Smart Socks are offered for sale in the United States ***without marketing approval, clearance, or authorization from FDA***. Accordingly, ***your products are adulterated*** under section 501(f)(1)(B) of the Act, 21 U.S.C. § 351(f)(1)(B), because your firm does not have an approved application for premarket approval (PMA) in effect pursuant to section 515(a) of the Act, 21 U.S.C. § 360e(a), or an approved application for an investigational device exemption (IDE) under section 520(g) of the Act, 21 U.S.C. § 360j(g) for the device as described and marketed. ***The introduction or delivery for introduction of an adulterated or misbranded device into interstate***

[14] Available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/owlet-baby-care-inc-616354-10052021.

***commerce is prohibited under section 301(a) of the Act, 21 U.S.C. § 331(a)***.

121. The Warning Letter also provided numerous examples (*i.e.*, a non-exhaustive list that "is not intended to be an all-inclusive list of the violations at your firm") of Owlet marketing the Smart Sock as a medical device in violation of the Act:

- Amazon Web Site: https://www.amazon.com/Owlet Smart Sock 3
  - o "Track the most important indicators of your baby's health–like oxygen level, heart rate, and total hours slept"
  - o "If your baby's readings leave preset "safe" zones, the Smart Sock will immediately notify you that your baby needs your attention"
- Owlet Sales: https://owletcare.com/
  - o "We look at the best indicators of your baby's overall well-being and will proactively notify you if your baby may need you"
  - o "Track heart rate, oxygen level, and sleep trends"
- Walmart Sales: https://www.walmart.com/ip/Owlet-Smart-Sock-Baby-Monitor/167836816
  - o "Owlet Smart Sock 2 Baby Monitor, Tracks Heart Rate & Oxygen"
  - o "Rest easy knowing you'll receive proactive notifications via lights and sounds if your baby's oxygen level or heart rate leave preset zones"
  - o "View real-time heart rate and oxygen level and receive notifications from any connected device using the Owlet app"
- Target Sales: https://www.target.com/p/owlet-smart-sock-3-baby-monitor-with-oxygenheart-rate/-/A-83704325?preselect=79727730#lnk=same tab
  - o "Owlet Smart Sock 3 Baby Monitor with Oxygen & Heart Rate"
  - o "Tracks the baby's heart rate and oxygen level"
  - o "Tells you when Baby needs you"
  - o "Measures how long and how well the baby slept"

122. Most shocking in the Warning Letter was the FDA's revelation that it had been telling Owlet since 2016 that the Smart Sock qualifies as a medical device under

the Act, yet Owlet continued to market and sell the device without the required FDA authorizations:

> ***Since 2016*, the FDA has corresponded with Owlet that the Owlet Smart Sock meets the definition of a device under the FD&C Act** and does not fall under the compliance policy for low-risk products that promote a healthy lifestyle (General Wellness guidance).

123. As a consequence of Owlet's non-compliance with FDA regulations, the FDA insisted that Owlet cease marketing and selling the Smart Sock and warned of additional repercussions the Company may face:

> Our office requests that Owlet Baby Care, Inc. cease any activities that result in the adulteration of the Owlet Smart Sock (All versions and co-branded products), such as the commercial distribution of the device for the uses discussed above.
>
> Your firm should take prompt action to address any violations identified in this letter. Failure to adequately address this matter may result in regulatory action being initiated by the FDA, including, but not limited to, seizure, injunction, and civil money penalties.
>
> Other federal agencies may take your compliance with the FD&C Act and its implementing regulations into account when considering the award of federal contracts.

124. In its Form 8-K filed with the SEC revealing Owlet's receipt of the Warning Letter from the FDA, Owlet assured investors that:

> The Company intends to fully cooperate with FDA to resolve the Warning Letter, including through the pursuit of a marketing authorization application for uses of the Smart Sock identified as medical device uses. In addition, the Company plans to issue a timely response to FDA, and further engage with FDA, regarding modifications and marketing changes to the Smart Sock with the goal of enabling continued commercial distribution of a modified

product prior to receipt of any such marketing authorization that may be granted.

125. On this news, Owlet's stock price fell $1.29, or 23%, to close at $4.19 per share on October 4, 2021, on unusually heavy trading volume. As a result, Sandbridge investors who could have voted against the Business Combination and redeemed their shares at $10.00 per share suffered a loss of $5.81 per share.

126. Cowen issued an analyst report the same day explaining that the massive decline resulted from the Company's disclosure of the Warning Letter from the FDA and calling the news, "unexpected… given that versions of the Smart Sock have been on the market for the past 6 years."

127. On October 25, 2021, Owlet announced that it had ceased distribution of the Smart Sock in the U.S. as of October 22, 2021. The Company stated that the "suspension is specific to shipments by the Company to customers and retailers in the United States, and operations in other countries remain unaffected." Despite its prior assurances, the Company never resumed commercial distribution of the Smart Sock with modifications or marketing changes.

128. A few weeks later during an earnings call for the third quarter of 2021 held on November 10, 2021, Defendant Scolnick admitted that the FDA's Warning Letter, and the Company's required cessation of all sales of the Smart Sock, already impacted the Company negatively:

> As we head into Q4 2021, the domestic regulatory factors we are working through far Smart Sock products are created near-term headwinds for our product sales growth trajectory in the U.S.

129. Moreover, the Company did not provide an update to its 2021 guidance in light of the Smart Sock's regulatory status and recent suspension of its distribution of the product.

130. Then, during an earnings call for the fourth quarter of 2021 held on March 7, 2022, Defendant Scolnick stated:

> As a result, for the fourth quarter and year ended 2021, the company recorded a contra revenue adjustment of $23.2 million for received and anticipated returns on the Owlet Smart Sock and Owlet monitor duo products.
>
> ***
>
> The cessation of US Smart Sock and Duo sales and product returns however, resulted in total net negative revenues of $2.5 million for the fourth quarter 2021.

131. When the Company later filed its Form 10-K for the year ended December 31, 2021, it stated in its Risk Factors that:

> Prior to receipt of the Warning Letter, we were dependent on sales of the Owlet Smart Sock in the U.S. for a majority of our revenue, and expected to continue to be dependent for the foreseeable future.

Following receipt of the Warning Letter, the Company's 10-K stated that:

> The Company's results of operations for the fourth quarter and year-ended 2021 were substantially and negatively impacted due to the reduction of revenues for received and anticipated returns of Owlet Smart Sock and Owlet Monitor Duo product. For the quarter and year ended December 31, 2021, the Company recorded contra-revenue of $23.2 million and accrued returns of $20.1 million as of December 31, 2021.

132. The negative reverberations continued when Owlet released its first quarter 2022 results on May 11, 2022, reporting a net loss of -$0.26 per share, which missed expectations by $0.11 and flat revenue of $21.5 million as compared to the same period the prior year. These negative results stemmed directly from the significant disruption Owlet experienced from having to pull its Smart Sock product off the market at the end of 2021.

**CLASS ACTION ALLEGATIONS**

133. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that held Sandbridge common stock held as of June 1, 2021 and were eligible to vote at Sandbridge's special meeting on July 14, 2021, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

134. This action is properly maintainable as a class action because:

(a) the Class is so numerous that joinder of all members is impracticable. Per the S-4 Sandbridge filed with the SEC on March 31, 2021, there were 23,000,000 shares of Sandbridge common stock outstanding as of December 31, 2020, held by hundreds to thousands of individuals and entities throughout the country. The actual

number of former public stockholders of Sandbridge will be ascertained through discovery;

(b) there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i. whether Defendants misrepresented material information in the Proxy in violation of Section 14(a) of the Exchange Act;

ii. whether the Defendants violated Section 20(a) of the Exchange Act; and

iii. whether the Class suffered damages.

(c) Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d) Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f) Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## **LOSS CAUSATION**

135. Sandbridge shareholders who were eligible to vote on the Business

Combination and/or exercise their conversion rights have been damaged as a result of the materially false and/or misleading statements in the Proxy Statements regarding the Smart Sock. Had Sandbridge shareholders known that Owlet sold the Smart Sock, the main source of its revenue, in contravention of FDA regulations and in direct disregard of FDA communications to Owlet that the Smart Sock is a medical device, and that Owlet would thus have to cease all commercial distribution of the device, members of the Class eligible to vote on the Business Combination would have voted against the Business Combination and/or exercised their conversion rights and received $10.00 in cash per share of Sandbridge stock.

136. It was foreseeable to Defendants that the false and/or misleading statements about the Smart Sock: (i) would cause those members of the Class that would have received $10.00 in cash per share of Sandbridge stock upon exercising conversion rights and/or upon liquidation to keep their stock in lieu of receiving $10.00 in cash per share; and (ii) the eventual disclosure that Owlet had been selling the Smart Sock in violation of FDA regulations and would have to cease all commercial distribution of its flagship product that constituted its main source of revenue pursuant to a Warning Letter from the FDA resulted in those members of the Class owning shares worth substantially less than $10.00 per share.

137. As a result, Defendants' conduct proximately caused foreseeable losses to Plaintiff and members of the Class.

## NO SAFE HARBOR

138. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Owlet who knew that the statement was false when made.

## COUNT I

**Violations of Section 14(a) of the Exchange Act**
**Against All Defendants**

139. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

140. The claims set forth herein do not sound in fraud and are based on negligent conduct by the Defendants named herein.

141. Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that Defendants solicited proxies from Plaintiff and other members of the Class by means of a proxy statement that, through Defendants' negligence, contained statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

142. Plaintiff and other members of the Class were misled by Defendants' false and misleading statements and omissions in violation of Section 14, were denied the opportunity to make an informed decision in voting on the merger, and approved the merger without having been advised of material facts. Accordingly, Plaintiff and other members of the Class did not receive their fair share of the value of the assets and business of the combined entity, suffered damages when the Company's stock price decreased, and were prevented from benefiting from a value-maximizing transaction.

## COUNT II

### Violations of Section 20(a) of the Exchange Act (Against the Individual Defendants)

143. Plaintiff realleges the allegations set forth above as if fully set forth herein.

144. The Individual Defendants acted as controlling persons of Sandbridge and Owlet within the meaning of Section 20(a) of the Exchange Act as alleged herein. By

virtue of their positions as officers and/or directors of Sandbridge and Owlet, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false, misleading, and incomplete statements contained in the Proxy Statements filed with the SEC, the Individual Defendants had the power to influence and control—and did influence and control—directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially false, misleading, and incomplete.

145. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

146. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the members of the Board to approve the Merger.

147. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and/or

approving the Merger. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

148. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

149. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.*, the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a

result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: December 22, 2023

Respectfully submitted,

**POMERANTZ LLP**

By: /s/ Tamar A. Weinrib
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (646) 581-9973
Facsimile: (917) 463-1044
taweinrib@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

***Lead Counsel for Lead Plaintiff Drew Conant and the Section 14(a) Class***