LATHAM & WATKINS LLP
   Colleen C. Smith (CA Bar No. 231216)
      *colleen.smith@lw.com*
12670 High Bluff Drive
San Diego, CA 92130
Telephone: +1.858.523.5400
Facsimile: +1.858.523.5450

   Meryn C. N. Grant (CA Bar No. 291315)
      *meryn.grant@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071-1560
Telephone: +1.213.485.1234
Facsimile: +1.213.891.8763

   Michele D. Johnson (CA Bar No. 198298)
      *michele.johnson@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626-1925
Telephone: +1.714.540.1235
Facsimile: +1.714.755.8290

*Attorneys for Defendants Owlet, Inc. f/k/a*
*Sandbridge Acquisition Corporation, Kurt*
*Workman, and Kate Scolnick*

*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| MICHAEL J. BUTALA, Individually and on Behalf of All Others Similarly Situated,<br><br>                   Plaintiff,<br><br>v.<br><br>OWLET, INC. f/k/a SANDBRIDGE ACQUISITION CORPORATION, KURT WORKMAN, KATE SCOLNICK, KEN SUSLOW, RICHARD HENRY, DOMENICO DE SOLE, RAMEZ TOUBASSY, JAMIE WEINSTEIN, KRYSTAL KAHLER, and MICHAEL F. GOSS,<br><br>                   Defendants. | Case No. 2:21-cv-09016-FLA-JEM<br><br>**OWLET DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S 14(a) COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date:  May 31, 2024<br>Time:                1:30 P.M.<br>Ctrm:               6B<br>Judge:              Hon. Fernando L. Aenlle-Rocha<br><br>Complaint Filed: December 22, 2023 |

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on May 31, 2024, at 1:30 P.M., or as soon thereafter as the matter may be heard before the Honorable Fernando L. Aenlle-Rocha in the United States District Court for the Central District of California, in the First Street Courthouse, Courtroom 6B, located at 350 W. 1st Street, Los Angeles, CA 90012, Defendants Owlet, Inc. f/k/a Sandbridge Acquisition Corporation, Kurt Workman, and Kate Scolnick (the "Owlet Defendants") will and hereby do move the Court for an order dismissing Plaintiff's Consolidated Complaint for Violations of the Federal Securities Laws (the "Motion").

Defendants respectfully submit this Motion pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act (PSLRA) on the ground that Plaintiff has failed adequately to plead violations of Section 14(a) or Section 20(a) of the Exchange Act.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which commenced via electronic mail on or before January 31, 2024, and continued through February 7, 2024, via electronic mail, telephone, and Zoom.

This Motion is based on the accompanying Memorandum of Points and Authorities, all pleadings and papers filed in this action, and such additional papers and argument as may be presented at or in connection with the hearing on this Motion.

Dated:  February 9, 2024

Respectfully submitted,

LATHAM & WATKINS LLP

By: */s/ Colleen C. Smith*
Colleen C. Smith
  *colleen.smith@lw.com*
Meryn C. N. Grant
  *meryn.grant@lw.com*
Michele D. Johnson
  *michele.johnson@lw.com*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DEFS.' MOTION
TO DISMISS PL.'S 14(a) COMPLAINT
Case No. 2:21-cv-09016-FLA-JEM

*Attorneys for Defendants Owlet, Inc. f/k/a Sandbridge Acquisition Corporation, Kurt Workman, and Kate Scolnick*

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................................... 1

II.   BACKGROUND ..................................................................................................... 2

      A.    Owlet Is a Pioneering Technology Company for Parents ................... 2

      B.    The FDA's Regulation of Medical Devices ........................................ 2

      C.    The FDA's General Wellness Products Guidance .............................. 3

      D.    A Product's Regulatory Status Turns on Its "Intended Use" ................................................................................................ 4

      E.    The FDA's Communications With Regulated Industry .................... 4

      F.    Owlet Reasonably Viewed the Smart Sock as a "General Wellness Product" ............................................................................. 5

      G.    The FDA Communicates With Owlet ................................................ 6

      H.    Owlet and Sandbridge Decide to Merge ........................................... 7

      I.    Owlet Cautions Investors That There Was Uncertainty About the Smart Sock's Regulatory Status ...................................... 7

      J.    The FDA Issues a Warning Letter .................................................... 9

III.  ARGUMENT ........................................................................................................ 9

      A.    Legal Standards ................................................................................ 9

      B.    The Challenged Statements are Not False or Misleading ................ 10

            1.    Statements that the FDA May Disagree with Owlet's Assessment of the Smart Sock Were Not False or Misleading ............................................................ 10

            2.    Statements that Owlet Believed the Smart Sock Was Not a Medical Device Were Not False or Misleading ...................................................................... 14

                  a.    The Statements Explaining Owlet's View that the Smart Sock Was Not a Medical Device Are Opinion Statements. ................................. 14

                  b.    The Challenged Statements Were Not False or Misleading Under *Omnicare*. ............................... 15

                        (1)    Plaintiffs Fail to Plead Subjective Falsity. ............................................................ 15

         (2)    Plaintiffs Fail to Plead Omission Liability. .................................................... 18

C.     Plaintiff's Section 20(a) Claims Fail .................................................. 21

IV.    CONCLUSION ............................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Buckman Co. v. Plaintiffs' Legal Committee,*
531 U.S. 341 (2001) ............................................................................................... 3, 15

*City of Coral Springs Officers' Ret. Plan v. Farfetch Ltd.,*
565 F. Supp. 3d 478 (S.D.N.Y. 2021) ........................................................................ 19

*City of Dearborn Heights v. Align Tech., Inc.,*
856 F.3d 605 (9th Cir. 2017) ........................................................... 13, 14, 16, 18

*City of Hialeah Employees' Ret. Sys. v. FEI Co.,*
289 F. Supp. 3d 1162 (D. Or. 2018) ......................................................................... 20

*Desaigoudar v. Meyercord,*
223 F.3d 1020 (9th Cir. 2000) ............................................................................ 9, 10

*Ikeda v. Baidu, Inc.,*
2021 WL 1299046 (N.D. Cal. Apr. 7, 2021) ............................................................ 19

*In re Arrowhead Pharms., Inc. Sec. Litig.,*
2017 WL 5635422 (C.D. Cal. 2017) .......................................................................... 12

*In re Atossa Genetics Sec. Litig.,*
868 F.3d 784 (9th Cir. 2017) ............................................................................. 12, 15

*In re Finjan Holdings, Inc.,*
58 F.4th 1048 (9th Cir. 2023) .................................................................................... 14

*In re NVIDIA Corp. Secs. Litig.,*
768 F.3d 1046 (9th Cir. 2014) ................................................................................... 13

*In re Philip Morris Int'l Inc. Sec. Litig.,*
89 F.4th 408 (2d Cir. 2023) ....................................................................................... 15

*In re Rigel Pharms., Inc. Secs. Litig.,*
697 F.3d 869 (2012) ................................................................................................... 21

*In re Sanofi Secs. Litig.,*
87 F. Supp. 3d 510 (S.D.N.Y. 2015) .................................................................. 12, 14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

iii

DEFS.' MOTION
TO DISMISS PL.'S 14(a) COMPLAINT
Case No. 2:21-cv-09016-FLA-JEM

*In re Velti PLC Sec. Litig.*,
  2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) ........................................................ 16

*In re Worlds of Wonder Sec. Litig.*,
  814 F. Supp. 850 (N.D. Cal. 1993) ...................................................................... 2

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ............................................................................................. 19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ...................................................................................*passim*

*Phoenix Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*,
  2023 WL 5748359 (N.D. Ill. Sept. 6, 2023) ....................................................... 13

*Pino v. Cardone Capital, LLC*,
  2023 WL 7800138 (C.D. Cal. Oct. 4, 2023) ....................................................... 16

*Plevy v. Haggerty*,
  38 F. Supp. 2d 816 (C.D. Cal. 1998) .................................................................. 19

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994) ............................................................................... 20

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ............................................................................... 12

*TSC Industries, Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ........................................................................................... 10

*United States v. Bowen*,
  172 F.3d 682 (9th Cir. 1999) .......................................................................... 4, 17

## STATUTES

15 U.S.C.
  § 78n(a)(1) ........................................................................................................... 9
  § 78u-5(c)(1) ...................................................................................................... 20

21 U.S.C.
   § 321(h)............................................................................................................2
   § 321(h)(1)(A)-(C)..........................................................................................4
   § 360(j)(1)(B)(i)..............................................................................................4
   § 360c(a)(1) ....................................................................................................3
   § 360j(o) .........................................................................................................4

## REGULATIONS

17 C.F.R.
   § 229.303(ii) .................................................................................................13
   § 240.10b-5(b) ..............................................................................................19
   § 240.14a-9(a)................................................................................................9

FDA, *General Wellness: Policy for Low Risk Devices*, 80 Fed. Reg.
   2712 (2015)............................................................................................3, 4, 5

FDA, *Regulations Regarding "Intended Uses,"* 86 Fed. Reg. 41383
   (2021)......................................................................................4, 11, 16, 17

## OTHER AUTHORITIES

FDA, *Letters to Industry*, https://www.fda.gov/medical-
   devices/industry-medical-devices/letters-industry ...................................4, 5, 11

FDA, *Pulse Oximeter Accuracy and Limitations*,
   https://www.fda.gov/medical-devices/safety-
   communications/pulse-oximeter-accuracy-and-limitations-fda-
   safety-communication ...............................................................................17

FDA, *Regulatory Procedures Manual*,
   https://www.fda.gov/media/71878/download .........................................4, 5, 11

## I.    INTRODUCTION

Owlet, Inc., is a pioneering technology company that has developed a series of products providing data and insights to help parents take care of their babies.  This case involves the company's original product, the Smart Sock, which Owlet Baby Care, Inc. (Owlet's legal predecessor), launched in 2015.  In 2016, Owlet received an inquiry from the FDA indicating the agency's view that the Smart Sock may qualify as a "medical device" under the Federal Food, Drug, and Cosmetic Act ("FDCA").  In response, Owlet changed its marketing in a good faith attempt to clarify that the Smart Sock's "intended use" was not medical and that, therefore, the product did not require marketing authorization as a "medical device."  The company also expressly disclosed to investors that although it believed the Smart Sock was not a medical device, the FDA may ultimately disagree.  Owlet continued to market the Smart Sock for six years but stopped immediately upon receiving notice from the FDA in October 2021 that the agency had concluded the Smart Sock qualifies as a medical device.

The two complaints before this Court—one arising under Section 10(b) of the Exchange Act (the "10(b) Complaint") and the other under Section 14(a) of the Exchange Act (the "14(a) Complaint")—argue that this conduct violated the securities laws.[1]  Both Plaintiffs claim that Owlet misled the investing public because the company failed to speculate that the FDA would ultimately require marketing authorization of the Smart Sock.  But the securities laws require no such thing.

Instead, as public filings show and both complaints admit, Owlet repeatedly disclosed to investors the risks associated with its regulatory assessment of the Smart Sock.  In public filings leading up to Owlet's merger with Sandbridge Acquisition Corporation ("Sandbridge"), which executed a reverse merger with Owlet in July

---

[1] The two complaints at issue in this case significantly overlap in their respective allegations.  As a result, each Memorandum of Points and Authorities in support of the Motions to Dismiss is largely similar in its recitation of the background and the key arguments concerning falsity, as described in Sections I, II, and III.A and III.B.  Section III.C is distinct.

2021, Owlet explained its "belief" that the Smart Sock did not meet the definition of a medical device and therefore did not require marketing authorization.  And it noted that the FDA and other regulatory authorities had inquired about the Smart Sock and had expressed that they may in the future disagree with Owlet's assessment.  Investors were thus fully on notice that the FDA might disagree with Owlet's good faith assessment of the Smart Sock.  Because the securities laws are not designed to "provide insurance against risks that were disclosed to investors at the time they purchased the securities," *In re Worlds of Wonder Sec. Litig.*, 814 F. Supp. 850, 873 (N.D. Cal. 1993), both complaints can and should be dismissed for failing to plead that Defendants made any false or misleading statements.

## II.    BACKGROUND

### A.    Owlet Is a Pioneering Technology Company for Parents

Owlet is a technology company that sells data-driven products for modern parenting.  10(b) Compl. ¶ 30; 14(a) Compl. ¶ 3.[2]  In 2013, Kurt Workman and five other Brigham Young University students invented the Smart Sock, a wearable monitor for babies capable of tracking heart rate and oxygen levels.  10(b) Compl. ¶ 46; 14(a) Compl. ¶¶ 41, 45.  The next year, Workman co-founded Owlet to bring the Smart Sock to market.  10(b) Compl. ¶ 52; 14(a) Compl. ¶ 49.

### B.    The FDA's Regulation of Medical Devices

The FDA regulates medical devices under the FDCA.  10(b) Compl. ¶ 34; 14(a) Compl. ¶ 6.  The FDCA defines a medical device to include any "instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article" that, among other things, is "intended for use in the diagnosis of disease or conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals"; or "intended to affect the structure of any function of the body of man or other animals."  21 U.S.C. § 321(h); *see also* 10(b)

---

[2] Because the 14(a) Complaint and 10(b) Complaint largely overlap, Defendants cite both Complaints for the Court's convenience.

Compl. ¶ 34; 14(a) Compl. ¶ 44. There are different "classifications" of medical devices, which are defined as Class I, II, or III, depending on their risk profile. *See* 21 U.S.C. § 360c(a)(1); *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 344 (2001); 10(b) Compl. ¶ 35; 14(a) Compl. ¶ 45. Those classifications dictate regulatory requirements that apply to a product, including whether a product requires FDA authorization before being marketed.

### C. The FDA's General Wellness Products Guidance

In 2015, after Owlet launched its original Smart Sock, the FDA issued draft guidance explaining that the agency will exercise enforcement discretion for certain kinds of low-risk "general wellness product[s]" that could otherwise qualify as medical devices.[3]  10(b) Compl. ¶ 64; 14(a) Compl. ¶ 58; *see* FDA, *General Wellness: Policy for Low Risk Devices*, 80 Fed. Reg. 2712, 2713 (2015).[4] To qualify as a "general wellness product," a product must be both "intended for only general wellness use" and "present a very low risk to users' safety." FDA, *General Wellness*, at 2713. For such products, the FDA stated that it will no longer "examine" them "to determine whether they are [medical] devices," or "whether they comply with the [FDCA's] regulatory requirements for [medical] devices." *Id.*[5]

Two kinds of products are "intended for only general wellness use" under the guidelines, including devices with an intended use related to, among other things, "sleep management." FDA, *General Wellness*, at 2713; 10(b) Compl. ¶ 66. The general wellness category is broad, covering devices intended for use related to "weight management" and "physical fitness," as well, like some use cases of an Apple Watch or a Fitbit. FDA, *General Wellness*, at 2713.

---

[3] The FDA finalized its guidance on low-risk general wellness devices in 2016.

[4] All exhibits are appended to the Declaration of Colleen C. Smith and are designated "Ex. __."

[5] The guidance does not distinguish between what kinds of products are subject to the FDA's enforcement discretion and what kinds do not qualify as medical devices in the first place. *See id.*

**D.      A Product's Regulatory Status Turns on Its "Intended Use"**

Critically, both the FDCA's definition of a medical device and the FDA's guidance concerning "general wellness products" turn on a product's "intended use." 21 U.S.C. §§ 321(h)(1)(A)–(C), 360j(o); FDA, *General Wellness*, at 2713; *see also United States v. Bowen*, 172 F.3d 682, 686 (9th Cir. 1999).

The FDA determines the "intended use" of a product based primarily on how it is marketed.  One important source is a product's "labeling"—the written or graphical material that a manufacturer distributes along with a product.  *See* 21 U.S.C. § 360(j)(1)(B)(i); 10(b) Compl. ¶ 37; 14(a) Compl. ¶ 80.  Beyond the labeling, the FDA looks to other content, like "promotional material, advertising, and any other relevant source."  FDA, *Regulations Regarding "Intended Uses,"* 86 Fed. Reg. 41383, 41386 (2021).  Because "intended use" is the touchstone, two products with the same physical characteristics or technological capabilities may be classified differently depending on how they are marketed and promoted.

**E.      The FDA's Communications With Regulated Industry**

When the FDA suspects that a product may be marketed as a medical device without a required authorization, it can raise this inquiry with a manufacturer by issuing a so-called "It Has Come to Our Attention" letter.  *See* FDA, *Letters to Industry*, https://www.fda.gov/medical-devices/industry-medical-devices/letters-industry.  The agency sends such letters when it "become[s] aware that regulated industry *may* be promoting a medical device product in a manner that potentially violates the [FDCA]."  *Id.*  An "It Has Come to Our Attention" letter serves as an "early communication to gather additional information," is "not intended to communicate that FDA is considering an enforcement action," and commences communication with a company about the status of a product.  *Id.*

Conversely, when the FDA has identified a "violation[] of regulatory significance"—meaning a violation that "may lead to enforcement action if not promptly and adequately corrected"—the agency issues a Warning Letter.  FDA,

*Regulatory Procedures Manual*, https://www.fda.gov/media/71878/download, at 3. Warning Letters "communicate[] the agency's position on a matter," *id.* at 4, and are "posted on FDA.gov to permit the public to obtain a copy directly."  FDA, *Letters to Industry, supra*.  A Warning Letter thus reflects—in contrast to an "It Has Come to Our Attention" letter—the agency's *conclusion* as to whether a product is being marketed in compliance with the FDCA.

### F.   Owlet Reasonably Viewed the Smart Sock as a "General Wellness Product"

The Smart Sock used pulse oximetry—a technology that measures oxygen levels and heart rates via a light sensor, much like an Apple Watch or a Fitbit—to track a baby's sleep and health.   10(b) Compl. ¶¶ 46, 90; 14(a) Compl. ¶ 4.   It included an audible alarm to notify parents to certain changes in those figures.  10(b) Compl. ¶ 70; 14(a) Compl. ¶ 53.

Owlet's marketing "define[d] the Smart Sock as a general wellness product." 14(a) Compl. ¶ 60.  In the company's view, the Smart Sock fit within that category because its intended use was to promote a healthy lifestyle by aiding in "sleep management" and not to treat a disease or a condition.  10(b) Compl. ¶¶ 66, 68; *see also* 14(a) Compl. ¶ 4.  The Smart Sock was designed to improve the sleep of parents of healthy infants.  10(b) Compl. ¶¶ 55, 152; 14(a) Compl. ¶¶ 4, 41.  Because the Smart Sock could monitor a baby's heart rate and oxygen levels and sound an alarm if those figures fell outside a preset range, parents could have comfort that they would no longer need to wake up throughout the night to check on their baby— reducing their sleeplessness.  10(b) Compl. ¶¶ 72, 141; 14(a) Compl. ¶ 41; *see also* FDA, *General Wellness*, at 2713 (explaining that low-risk products intended to promote "sleep management" could qualify as "general wellness products").  Accordingly, its website stated that the Smart Sock is "[u]p all night so you don't

have to be."  Ex. 1, Owlet Webpage, Dec. 25, 2014, https://owletcare.com.[6]  And Owlet touted that the Smart Sock promotes "more sleep" and "less stress."  *Id.*

### G.    The FDA Communicates With Owlet

In 2016, the FDA sent Owlet an "It Has Come to Our Attention" letter cautioning about the Smart Sock's marketing.  10(b) Compl. ¶¶ 77, 101; 14(a) Compl. ¶ 70.[7]  It explained the FDA's tentative view that "the Smart Sock *appears* to meet the definition of a device as that term is defined in the [FDCA]."  Ex. 2, Letter from FDA to Kurt Workman, Jan. 5, 2016  (emphasis added).  And the letter invited Owlet to respond to the agency and open up a dialogue concerning the Smart Sock, noting that "[i]f you do not believe that you are required to obtain FDA clearance or approval for the Owlet Smart Sock, please provide us with the basis for that determination."  *Id.*

Owlet attempted to address the FDA's concerns by modifying its marketing of the Smart Sock to make clear that the product was intended to facilitate peace of mind and sleep for parents of healthy infants, not to diagnose illness or prevent a health condition.  *See* 10(b) Compl. ¶¶ 151-52.  For example, it switched from characterizing the alarm feature from an "alert" to a "notification" and added a disclaimer that the Smart Sock was "not intended to cure, treat, or prevent any disease or health condition."  10(b) Compl. ¶ 93; *see also* 14(a) Compl. ¶ 73.  Owlet also added a page to its website making clear that the "notification thresholds on the Smart Sock are not as stringent as a medical monitor" and warning users not to "use the Smart Sock as a diagnostic tool."  Ex. 3, Owlet Disclaimer, Feb. 19, 2019, https://owletcare.com/pages/owlet-disclaimer.  Owlet compared the Smart Sock to certain features of the Apple Watch, Fitbit, or Masimo Stork baby monitor—other

---

[6] The Court may take judicial notice of materials on Owlet's website.  *See* Request for Incorporation by Reference and Judicial Notice in Support of Owlet Defendants' Motion to Dismiss Plaintiff's Section 14(a) Complaint (hereinafter "Request for Notice").

[7] The Complaint incorporates by reference the FDA's 2016 communication with Owlet.  *See* Request for Notice.

low-risk general wellness products that used technology to track heart rate. 10(b) Compl. ¶¶ 5, 90, 95.

Owlet only strengthened its disclaimers over time. By February 2021, a pop-up window on the Smart Sock webpage noted that the "Smart Sock is an information gathering product for use with healthy babies only." Ex. 4, Owlet Smart Sock Disclaimer Pop-Up, Feb. 19, 2019, https://owletcare.com/products/owlet-smart-sock. The pop-up directed readers to a disclaimer, which cautioned in bold text: **"WARNING: The Smart Sock is not a medical device."** Ex. 5, Owlet Disclaimer, Feb. 5, 2021, https://owletcare.com/pages/owlet-disclaimer. It admonished that the Smart Sock "is not intended for use as a medical device or to replace a medical device." *Id.*

Following these changes in Owlet's marketing and for nearly six years after the FDA sent its 2016 letter, the FDA did not order or otherwise request that Owlet cease sales or marketing of the Smart Sock.

### H. Owlet and Sandbridge Decide to Merge

In June 2020, Sandbridge incorporated as a Special Purpose Acquisition Company or "SPAC." 10(b) Compl. ¶¶ 19, 116; 14(a) Compl. ¶ 36. Sandbridge raised $230 million through an initial public offering, which it held in trust for the purpose of merging with another company. 10(b) Compl. ¶ 120; 14(a) Compl. ¶ 37. Following a unanimous vote by Sandbridge's board, Owlet and Sandbridge agreed to merge in February 2021. 10(b) Compl. ¶ 123; 14(a) Compl. ¶¶ 87, 146.

### I. Owlet Cautions Investors That There Was Uncertainty About the Smart Sock's Regulatory Status

After reaching an agreement to merge with Sandbridge, Owlet issued a registration statement (the S-4), on March 31, 2021. 10(b) Compl. ¶ 20; 14(a) Compl. ¶ 82. That filing included a Preliminary Proxy Statement soliciting shareholder approval for the Business Combination (the "Preliminary Proxy"), which outlined certain disclosures by Owlet regarding the uncertain regulatory status

of the Smart Sock. 10(b) Compl. ¶¶ 20–21, 164; 14(a) Compl. ¶ 97. The company explained that, "in response" to such inquiries, it had "communicated [its] belief that the Owlet Smart Sock is not a medical device" and that it therefore "does not require marketing authorization from the FDA." 10(b) Compl. ¶ 164; 14(a) Compl. ¶ 97. But Owlet explicitly stated that the FDA had said it may not agree with Owlet's assessment: "[T]he FDA and certain regulatory authorities *have expressed* they *may not agree* with that conclusion and could require us to obtain marketing authorization (or approval/certification) to continue to sell the product." *Id.* (emphasis added).

Just a few weeks after the S-4 was filed, the company received a letter from the Medicines and Healthcare products Regulatory Agency, a UK-based authority, indicating the agency's conclusion that products like the Smart Sock require marketing authorization but permitting Owlet to continue selling the sock for another year. 10(b) Compl. ¶ 179; 14(a) Compl. ¶ 105.

Owlet and Sandbridge subsequently issued a Proxy Statement soliciting votes for the merger on June 21, 2021 (the "Final Proxy" and together with the Preliminary Proxy, the "Proxies"), and included the language from the Preliminary Proxy regarding Owlet's belief that the Smart Sock did not qualify as a medical device. *Id.* This time, the company updated its risk disclosure to reflect the communication from the UK agency: "[T]he FDA and/or certain regulatory authorities have expressed *they do not agree* with that conclusion and could require us to obtain such marketing authorization (or approval/certification) to continue to sell the product." *Id.*

Owlet also highlighted the stakes for the company, cautioning that if the FDA were to conclude that the Smart Sock qualifies as a medical device, Owlet "may be precluded from selling" the Smart Sock, and that it may even have to "recall the product." *Id.* Owlet told investors that it might well "be subject to regulatory enforcement action" by the FDA and warned that its "business could be substantially harmed." *Id.*

Following a vote by Sandbridge shareholders in favor of the merger, Owlet

and Sandbridge completed the merger on July 15, 2021 via a reverse merger known as a "de-SPAC" (the "Business Combination"), and Owlet, Inc. common stock began trading on the New York Stock Exchange.  10(b) Compl. ¶ 1; 14(a) Compl. ¶ 116.

### J.   The FDA Issues a Warning Letter

On Friday, October 1, 2021—over six years after the Smart Sock was first marketed and sold—the FDA issued a "Warning Letter," stating the agency's conclusion that the Smart Sock qualifies as a "Class II medical device" under the FDCA.  10(b) Compl. ¶ 140; 14(a) Compl. ¶ 117.  Owlet disclosed its receipt of the Warning Letter to the investing public on the next business day, Monday, October 4, 2021.  10(b) Compl. ¶ 201; 14(a) Compl. ¶ 117.  It filed a Form 8-K with the SEC, outlining that it intended to "fully cooperate" with the FDA by stopping sales of the Smart Sock, in line with the FDA's goal of achieving "prompt and voluntary compliance" through the issuance of Warning Letters.  FDA, *Letters to Industry*; *see also* 10(b) Compl. ¶¶ 144, 149; 14(a) Compl. ¶ 124.  Following Owlet's disclosure of the FDA's Warning Letter, its stock price dropped 23%.  10(b) Compl. ¶¶ 205–06; 14(a) Compl. ¶ 125.  As the 10(b) Complaint concedes, Owlet later sought and received FDA marketing authorization for a product it named the Dream Sock, which—like the Smart Sock—provides real-time data about a baby's heart rate and oxygen levels and alerts parents via an alarm if those figures fall outside a preset range.  10(b) Compl. ¶¶ 151, 158.

## III.   ARGUMENT

### A.   Legal Standards

The Section 14(a) Complaint must identify a proxy statement "that contains either (1) a false or misleading declaration of material fact, or (2) an omission of material fact that makes any portion of the statement misleading." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000); *see also* 15 U.S.C. § 78n(a)(1); 17 C.F.R. § 240.14a-9(a).  Plaintiff must also "demonstrate that the misstatement or

omission was made with the requisite level of culpability and that it was an essential link in the accomplishment of the proposed transaction." *Desaigoudar*, 223 F.3d at 1022; *see also TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 444 (1976).

### B. The Challenged Statements are Not False or Misleading

Although the Complaints in this case concern two different provisions of the Exchange Act, they both allege that the same two broad categories of statements violate the securities laws.

The first category concerns six statements relating to Owlet's representation that the FDA "may" disagree with its regulatory assessment that the Smart Sock qualified as a consumer product instead of a medical device. Plaintiffs contend those risk disclosures were false because the FDA had already concluded the opposite. But Plaintiffs misunderstand the regulatory framework, which shows that Owlet's risk disclosures were entirely accurate. The second category concerns seven statements relating to Owlet's belief that the Smart Sock did not qualify as a medical device. Those statements are not actionable, either. They represented Owlet's *opinion* about the regulatory status of its product, and Plaintiffs fail to plead facts showing that Owlet did not sincerely believe its opinion, nor that Owlet omitted facts rendering its belief misleading. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).

### 1. Statements that the FDA May Disagree with Owlet's Assessment of the Smart Sock Were Not False or Misleading

Plaintiffs contend that Owlet misled investors (1) by disclosing in its S-4 that the FDA "may not agree" with its assessment of the Smart Sock, 10(b) Compl. ¶¶ 164, 168; 14(a) Compl. ¶¶ 97–98, and (2) by disclosing in its Proxy Statement, filed nearly three months later, that the "FDA and/or certain regulatory authorities" had stated "they do not agree" with Owlet's view. 10(b) Compl. ¶ 179; 14(a) Compl. ¶¶ 105–06; *see* App'x A. In Plaintiffs' telling, Owlet misled investors because the FDA had "already communicated that the Smart Sock was a medical device." 10(b)

Compl. ¶¶ 167, 173; *see also* 14(a) Compl. ¶ 98 ("[T]he FDA had in fact already *confirmed* it *did not* agree.").

These statements are not actionable. As Plaintiffs seem to acknowledge, the only way that Owlet's "FDA may" statements could be false or misleading is if those early communications meant that the FDA had *definitively* found that the Smart Sock required marketing authorization. But, as the FDA's own guidance makes clear, that is not what pre-Warning Letter communications entail. *See* Section II.E. It is only Warning Letters that signal "violations of regulatory significance," FDA, *Letters to Industry*, and "communicate[] the agency's position on a matter," FDA, *Regulatory Procedures*, at 3. By contrast, pre-Warning Letter communications—like an "It Has Come to Our Attention" letter—are far from definitive. An It Has Come to Our Attention letter is sent when the agency believes a manufacturer "*may* be promoting a medical device product in a manner that potentially violates the [FDCA]." FDA, *Letters to Industry*. Such letters are intended as "early communications," the purpose of which are to gather additional information, not to end all debate. *Id.* In that way, pre-Warning Letter communications open up a channel of communication with a manufacturer and represent only the FDA's tentative views regarding a given product.

The It Has Come to Our Attention letter that Owlet received from the FDA in 2016 confirms as much. The letter invited Owlet to *correspond* with the FDA so that it could explain its position, stating that Owlet could "provide [the FDA] with the basis for" the company's assessment that the Smart Sock did not qualify as a medical device. Ex. 2 at 1. A manufacturer in response can do exactly what Owlet did here: advocate for its position in correspondence with the FDA and modify its "promotional material" and "advertising" to make clear that a product's intended use does not qualify it as a medical device. FDA, *"Intended Uses,"* 86 Fed. Reg. at 41386. Indeed, even Plaintiffs characterize the FDA's 2016 communication with Owlet as part of a "dialogue"—*i.e.*, a process by which Owlet and the FDA

correspond about a product and its marketing in order to *avoid* a classification that requires marketing authorization. 10(b) Compl. ¶¶ 146, 190, 191, 207; 14(a) Compl. ¶¶ 75–79.

Plaintiffs allege that Owlet also received a communication in 2017 from the FDA classifying the Smart Sock as a medical device. But they offer only conclusory allegations and do not even identify the document to which they refer. Instead, Plaintiffs point to a 2021 FOX report. 10(b) Compl. ¶ 97; 14(a) Compl. ¶ 74. The only document cited in the FOX report is an internal agency communication—nowhere does the FOX report show that the FDA communicated *anything* to Owlet, much less anything definitive regarding the regulatory status of the Smart Sock. Nor could it have, because, as Plaintiffs acknowledge, the FDA did not send a Warning Letter embodying a definitive assessment until 2021.

Nor was Owlet under any independent obligation to disclose interim FDA communications issued before the agency sent a Warning Letter. Investors appreciate that manufacturers of products and the FDA frequently "engage[] in a dialogue." *Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016). As the Ninth Circuit has recognized, manufacturers are "not obligated to disclose each and every step" they take "when interacting with regulators." *In re Atossa Genetics Sec. Litig.*, 868 F.3d 784, 800 (9th Cir. 2017); *see also In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422, at *6 (C.D. Cal. 2017); *In re Sanofi Secs. Litig.*, 87 F. Supp. 3d 510, 542 (S.D.N.Y. 2015) (reasoning that "interim FDA feedback is not material").

In short, Owlet's risk disclosures accurately represented the regulatory status of the Smart Sock and are not actionable under the securities laws as a result.

Based on the same theory, the Complaints challenge Owlet's disclosure that *if* the FDA "were to require marketing authorization for the Owlet Smart Sock . . . Owlet could be required to cease selling or recall the product." 10(b) Compl. ¶ 172; 14(a) Compl. ¶ 96. Plaintiffs contend that statement was false or misleading because the FDA had already concluded that the Smart Sock qualified as a medical device.

But as explained above, that theory does not accord with the FDA's well-established regulatory process and its 2016 It Has Come to Our Attention letter to Owlet.

The Section 14(a) Complaint also challenges Owlet's statement that "the FDA and/or certain regulatory authorities have expressed they do not agree with" Owlet's assessment of the Smart Sock.  14(a) Compl. ¶ 105.  Plaintiff's theory is that because Owlet specifically disclosed details regarding communications from the UK regulatory agency, Owlet misleadingly implied that the FDA *had not* expressed such disagreement.  This argument is absurd.  An accurate disclosure about the status of the UK agency does not imply that the FDA had reached a contrary view.  To the contrary:  By grouping the FDA and the UK agency together, Owlet indicated the possibility that the FDA would reach a similar adverse determination.  And Owlet explicitly disclosed elsewhere that the FDA "ha[d] expressed they may not agree with" its "conclusion" regarding the Smart Sock.  *Id.* ¶ 97.  A reasonable investor, viewing Owlet's fulsome disclosures "fairly and in context," *City of Dearborn Heights v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (quotations omitted), would not have been confused.

The Section 14(a) Complaint also contends that Owlet had a duty to disclose "any known trends or uncertainties" that "will have a material favorable or unfavorable impact" on "sales."  14(a) Compl. ¶ 90 (citing Item 303 of Regulation S-K, *see* 17 C.F.R. § 229.303(ii)).  But the Ninth Circuit has held "that Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5."  *In re NVIDIA Corp. Secs. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014).[8]  The same should hold for Section 14(a).  And even if Item 303 *could* give rise to a Section 14(a) claim, the underlying omission must still be "material."  *Phoenix Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, 2023 WL 5748359, at *13–14 (N.D. Ill. Sept. 6, 2023)

---

[8] This issue is currently before the Supreme Court in *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, No. 22-1165, a case that was argued on January 16, 2024. The Court need not await a decision in *Macquarie* to conclude that Plaintiff cannot prevail on his claim because the underlying omission was not material.

(holding that Item 303 can give rise to liability under Section 14(a), but only "*if* the omission is material"). As explained above, "interim FDA feedback is not material." *In re Sanofi*, 87 F. Supp. 3d at 541.

### 2. Statements that Owlet Believed the Smart Sock Was Not a Medical Device Were Not False or Misleading

The Complaints both allege that Owlet made false and misleading statements by asserting its opinion that the Smart Sock did not qualify "medical device." 10(b) Compl. ¶¶ 159, 162, 164, 168, 179; 14(a) Compl. ¶¶ 99, 103, 105, 107, 111; *see* Appx. A. But it is black-letter law that "an investor cannot state a claim by alleging only that an opinion was wrong." *Omnicare*, 575 U.S. at 194. Instead, opinion statements are actionable under the securities laws in only "three . . . special circumstances: subjective falsity, embedded statements of fact, and misleading omissions." *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1055 (9th Cir. 2023).

Subjective falsity requires a showing both that a "belief is objectively untrue," *Dearborn Heights*, 856 F.3d at 616, and also that "the speaker did not hold the belief she professed," *Omnicare*, 575 U.S. at 186. An embedded statement of fact requires that the defendant made "a statement of fact contained within an opinion statement" that is "materially misleading." *Dearborn Heights*, 856 F.3d at 616. And where a plaintiff claims that a defendant misled by omission, the plaintiff must allege "facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194. That is "no small task for an investor." *Id.* The Complaints do not come close to pleading a misleading opinion statement under these exacting standards.

### a. The Statements Explaining Owlet's View that the Smart Sock Was Not a Medical Device Are Opinion Statements

There is no serious dispute that statements communicating Owlet's view that the Smart Sock was "not a medical device" are statements of opinion. A statement

is considered an opinion when it is "inherently subjective" and thus necessarily entails "some lack of certainty." *Omnicare*, 575 U.S. at 186–87. The statement that the Smart Sock qualified as a "consumer product and not a medical device," 10(b) Compl. ¶ 135; 14(a) Compl. ¶ 99, conveyed Owlet's view that it *believed* the product satisfied certain regulatory criteria. *Buckman Co.*, 531 U.S. at 344 (explaining that determining whether a product qualifies as medical device is a complex factual and legal judgment).

Many of the challenged statements expressly used the word "belief" to describe Owlet's view that the Smart Sock did not qualify as a medical device. 10(b) Compl. ¶¶ 164, 168, 179; 14(a) Compl. ¶¶ 97, 105. But even where Owlet stated simply that the "Smart Sock is . . . not a medical device," *see* 10(b) Compl. ¶ 162; 14(a) Compl. ¶ 99, such statements still qualify as opinions. "[L]anguage like 'we believe' or 'we think' is *sufficient*—not *necessary*—to render a statement one of opinion rather than fact." *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023). Other statements count as opinions too, such as "where a statement expresses an 'inherently subjective . . . assessment.'" *Id.* (quoting *Omnicare*, 575 U.S. at 186)). Owlet's statement regarding the Smart Sock comfortably fits within that framework. *See In re Atossa Genetics Sec. Litig.*, 868 F.3d at 801 (finding the statement "FDA clearance risk has been achieved" to be opinion because it reflected the "speaker's personal definition of 'achieved,' was not "easily verifiable" based on "past event[s]," and not "black and white").

### b. The Challenged Statements Were Not False or Misleading Under *Omnicare*

Plaintiffs cannot satisfy any of the three narrow categories of false or misleading opinion statements actionable under *Omnicare*.

### (1) Plaintiffs Fail to Plead Subjective Falsity

First and foremost, the Section 14(a) complaint cannot state a claim based on Owlet's alleged subjective falsity, because the Complaint stipulates that "[t]he

claims set forth herein do not sound in fraud and are based *on negligent conduct* by the Defendants named herein." 14(a) Compl. ¶ 140 (emphasis added); *see also id.* ¶ 1. As a result, Plaintiff "cannot"—as a matter of law—"plead subjective falsity." *Pino v. Cardone Capital, LLC*, 2023 WL 7800138, at *6 (C.D. Cal. Oct. 4, 2023); *In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *18 (N.D. Cal. Oct. 1, 2015) (holding that plaintiffs cannot plead subjective falsity while disclaiming that a complaint sounds in fraud).

But even if that were not the case, both Complaints fail to allege that Owlet "did not hold the belief" that the Smart Sock qualified as a general wellness product, rather than as a medical device. *Dearborn Heights*, 856 F.3d at 615–16 (quotations omitted).

As Plaintiffs admit, Owlet consistently maintained that the Smart Sock fell within the general wellness framework that the FDA established in 2015. 10(b) Compl. ¶¶ 7, 13, 68, 71; 14(a) Compl. ¶¶ 69, 73. And Owlet actively positioned the Smart Sock within the general wellness guidelines by updating its marketing for the product. 10(b) Compl. ¶ 102; 14(a) Compl. ¶¶ 59–60. Following the FDA's initial communications with the company, Owlet changed certain claims it made about the Smart Sock, cognizant that a product's "intended use" turns in large part on a manufacturer's "promotional claims" and "advertising." *See* FDA, *"Intended Uses,"* at 41383. These actions are fully consistent with the company's sincere belief that the Smart Sock was, in fact, a general wellness product and not a medical device. And the Complaints allege nothing in Owlet's conduct that evinces any secret belief that the Smart Sock qualified as a medical device.

The Complaints rely on a smattering of allegations they say show that Owlet actually believed the Smart Sock was a medical device. None are persuasive.

First, Plaintiffs dwell on the Smart Sock's technological capabilities, like pulse oximetry and its alarm feature. 10(b) Compl. ¶¶ 73, 75, 96; 14(a) Compl. ¶¶ 4, 41–42, 45–46, 79. But that misunderstands how the FDA determines whether a

product qualifies as a medical device. The FDA's determination does not turn on the product's inherent characteristics. Instead, as the Ninth Circuit has explained, "whether a product is a device turns solely on the product's intended use." *Bowen*, 172 F.3d at 686 (characterizing "intended use of the product" as the "only question" that matters). And intended use turns on a manufacturer's "promotional claims" and "advertising." FDA, *"Intended Uses,"* at 41383. Owlet understood as much and consistently marketed the Smart Sock as a wellness product designed to aid in sleep management, and not as a medical device intended to treat diseases or conditions.

Owlet's view was far from extraordinary. Because intended use is the touchstone, the FDA has explained that some pulse oximeters are medical devices that require marketing authorization, while others are consumer general wellness products. Prescription pulse oximeters, for instance, are "reviewed by the FDA" and are intended for use in "hospitals and doctors' offices." FDA, *Pulse Oximeter Accuracy and Limitations*, https://www.fda.gov/medical-devices/safety-communications/pulse-oximeter-accuracy-and-limitations-fda-safety-communication. Over-the-counter pulse oximeters, on the other hand, may be "sold as . . . general wellness . . . products" and if not "intended for medical purposes, . . . they do not undergo FDA review." *Id.* The simple fact that the Smart Sock used pulse oximetry technology (or had an alarm feature) therefore says nothing about whether Owlet sincerely believed it qualified as a general wellness product based on its intended use.

Second, the Complaints rely on statements Workman made in 2013—two years *before* the FDA even created the general wellness category—to contend that Owlet understood the Smart Sock qualified as a medical device and not a general wellness product. *See* 10(b) Compl. ¶¶ 8, 38, 47–49, 51, 133, 138, 166, 181, 187, 191; 14(a) Compl. ¶¶ 45, 48, 56. But Workman's statements in 2013 are in no way probative of his or Owlet's views during the class period. Even if Workman believed FDA marketing authorization was required in 2013—and the Complaints allege no

such thing—Owlet believed the Smart Sock fell within the FDA's 2015 general wellness guidance.

Third, the Section 14(a) Complaint relies on statements by multiple confidential witnesses within Owlet, which it claims show that the company knew the Smart Sock qualified as a medical device. *See* 14(a) Compl. ¶¶ 75–79. But none of the statements remotely suggests that Owlet subjectively believed that the Smart Sock would be deemed a medical device—only that there was a *risk* the FDA would ultimately reach that conclusion. For instance, CW1 alleges that Owlet "knew that the FDA had concerns" about the marketing of the Smart Sock, 14(a) Compl. ¶ 75; "knew [Owlet] had to be careful" about how it sold the product, *id.* ¶¶ 75–76; and noted that the Smart Sock's regulatory status was "an ongoing, constant discussion at the company," *id.* ¶ 75. The other CW allegations are similar. *See id.* ¶ 76 (CW2 alleges Owlet knew it had to be "careful" in its marketing); ¶ 77 (CW3 alleges Owlet positioned the product as promoting "peace of mind"); ¶ 78 (CW4 says Owlet conveyed to staff that it was communicating with the FDA). These statements thus only *undercut* Plaintiff's claims. They highlight that Owlet was seeking to align its marketing in a way that would *avoid* a finding by the FDA that the Smart Sock was a medical device. None of that would have made any sense if Owlet in fact *knew* that the Smart Sock counted as such a device, or was being marketed as such.

### (2)   Plaintiffs Fail to Plead Omission Liability

Nor can Plaintiffs premise their claims on the theory that Owlet failed to disclose material information undercutting its opinion that the Smart Sock qualified as a general wellness product rather than as a medical device.

An omission theory requires Plaintiffs to show that Owlet omitted "facts going to the basis for the issuer's opinion" that makes the opinion misleading to a "reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194; *see also Dearborn Heights*, 856 F.3d at 615. An opinion statement is not misleading simply because the issuer "knows, but fails to disclose, some fact cutting

the other way." *Omnicare*, 575 U.S. at 189.  The securities laws "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45 (2011).  Instead, they require disclosure instead "only when necessary 'to make . . . [the affirmative] statements made, in the light of the circumstances under which they were made, not misleading.'"  *Id.* (quoting 17 C.F.R. § 240.10b-5(b)).

Owlet did not omit any information that would render misleading its opinion that the Smart Sock qualified as a general wellness product.  To the contrary, the company expressly disclosed—time and again—that the FDA may ultimately disagree with its legal opinion concerning the Smart Sock. *See supra* Section III.B.1. Its risk disclosures made explicit that "the FDA" had "expressed" that it "may not agree" with Owlet's opinion regarding the Smart Sock.  10(b) Compl. ¶ 164; 14(a) Compl. ¶ 97.  And when the UK regulatory agency proffered its view, Owlet updated its disclosures to say certain regulatory authorities "do not agree" with the company's assessment.  10(b) Compl. ¶ 179; 14(a) Compl. ¶ 105.

Reasonable investors "understand[] a statement of opinion in its full context," *Omnicare*, 575 U.S. at 190, and cannot hold a company liable where it "expressly disclosed precisely what Plaintiffs' claim it was trying to hide."  *City of Coral Springs Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 493 (S.D.N.Y. 2021).  Owlet here provided ample context so that a reasonable investor would understand that Owlet's belief about the Smart Sock did not prohibit the FDA from ultimately reaching a different conclusion.  *See Ikeda v. Baidu, Inc.*, 2021 WL 1299046, *10–11 (N.D. Cal. Apr. 7, 2021) (finding statements about legal compliance not actionable because the company warned that its opinion was contingent upon changing circumstances); *see also Plevy v. Haggerty*, 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998) ("[W]here a company's filings contain abundant and specific disclosures regarding the risks facing the company, as opposed to terse, generic statements, the investing public is on notice of these risks and cannot be

heard to complain that the risks were masked as mere contingencies.").

The Section 14(a) Complaint also challenges alleged omissions in Owlet's financial reporting.  It contends that the company's financial projections were unreasonably rosy because they relied on the "underlying premise that Owlet would continue to market and sell the Smart Sock."  14(a) Compl. ¶ 110.  Again, this simply repackages Plaintiffs' argument that Owlet should have known the Smart Sock was a medical device and would be regulated as such.  In any event, these financial projection statements are protected under the PSLRA's safe-harbor for forward-looking statements.  The projections were expressly "identified as a forward-looking statement" and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."   15 U.S.C. § 78u-5(c)(1); *see City of Hialeah Employees' Ret. Sys. v. FEI Co.*, 289 F. Supp. 3d 1162, 1171 (D. Or. 2018) (extending safe harbor to "[c]laims under Section 14(a)"); *see* Ex. 6, at 104 (identifying statements as "forward-looking" and cautioning investors to review risk factors).

The Section 14(a) Complaint also challenges the historical revenue numbers Owlet provided as part of the Proxy Statement, contending that although the "revenue numbers reported may have been literally accurate," Owlet failed to disclose risks associated with continued sales of the Smart Sock.  14(a) Compl. ¶ 113–14.  This argument makes no sense.  A company is fully entitled to report accurate past or present sales figures without including speculative, negative commentary about how those sales might decline in the future.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129–30 (2d Cir. 1994) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.").

### C.  Plaintiff's Section 20(a) Claims Fail

Because Plaintiff fails to state a Section 14(a) claim, his Section 20(a) control person claims fail as well. *See In re Rigel Pharms., Inc. Secs. Litig.*, 697 F.3d 869, 886 (2012).

## IV.  CONCLUSION

The court should grant Owlet Defendants' motion to dismiss.

Dated:  February 9, 2024

Respectfully submitted,

LATHAM & WATKINS LLP

By: */s/ Colleen C. Smith*
Colleen C. Smith
  *colleen.smith@lw.com*
Meryn C. N. Grant
  *meryn.grant@lw.com*
Michele D. Johnson
  *michele.johnson@lw.com*

*Attorneys for Defendants Owlet, Inc. f/k/a Sandbridge Acquisition Corporation, Kurt Workman, and Kate Scolnick*

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Owlet, Inc. ("Owlet"), Kurt Workman, and Kate Scolnick, certifies that this brief contains 6,859 words, which complies with the word limit of L.R. 11-6.1.

Dated: February 9, 2024          */s/ Colleen C. Smith*
                                 Colleen C. Smith