# EXHIBIT 7

Exhibit 7
Page 600

**As filed with the United States Securities and Exchange Commission on March 31, 2021.**

Registration No: 333-

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM S-4**

REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

**SANDBRIDGE ACQUISITION CORPORATION**
(Exact name of registrant as specified in its charter)

| **Delaware** | **6770** | **85-1615012** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**1999 Avenue of the Stars, Suite 2088**
**Los Angeles, CA 90067**
**(424) 221-5743**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Ken Suslow, Chief Executive Officer**
**Sandbridge Acquisition Corporation**
**1999 Avenue of the Stars, Suite 2088**
**Los Angeles, CA 90067**
**(424) 221-5743**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| | |
|---|---|
| **Emily Oldshue** | **Benjamin Potter** |
| **Christopher Comeau** | **Ryan Maierson** |
| **Ropes & Gray LLP** | **Drew Capurro** |
| **Prudential Tower** | **Latham & Watkins LLP** |
| **800 Boylston Street** | **140 Scott Drive** |
| **Boston, Massachusetts 02199** | **Menlo Park, California 94025** |
| **Telephone: (617) 951-7000** | **Telephone: (650) 328-4600** |

**Approximate date of commencement of proposed sale to the public**: As soon as practicable after this registration statement becomes effective and all other conditions to the transactions contemplated by the Business Combination Agreement described in the included proxy statement/prospectus have been satisfied or waived.

If the securities being registered on this Form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| ☐ | Large accelerated filer | ☐ | Accelerated filer |
| ☒ | Non-accelerated filer | ☒ | Smaller reporting company |
| | | ☒ | Emerging growth company |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer) ☐

Exchange Act Rule 14d-1(d) (Cross-Border Third-Party Tender Offer) ☐

**CALCULATION OF REGISTRATION FEE**

| **Title of Each Class of Securities to be Registered** | **Amount to be Registered** | **Proposed Maximum Offering Price Per Share** | **Proposed Maximum Aggregate Offering Price(3)** | **Amount of Registration Fee(4)** |
|---|---|---|---|---|
| Class A common stock, par value $0.0001 per share(1)(2) | 44,116,721 | $9.91 | $437,196,705.11 | $47,698.16 |

(1) Pursuant to Rule 416(a) of the Securities Act of 1933, as amended (the "Securities Act"), there are also being registered an indeterminable number of additional securities as may be issued to prevent dilution resulting from share sub-divisions, share dividends or similar transactions.

(2) Based on the maximum number of shares of Class A common stock, par value $0.0001 per share ("Sandbridge Class A common stock" or "New Owlet common stock"), of the registrant ("Sandbridge") estimated to be issued in connection with the business combination described herein (the "Business Combination") other than to stockholders of Owlet Baby Care Inc. ("Owlet") who have voted for the approval of the Business Combination prior to the date hereof. This number is based on the product of (a) the sum of (i) 5,608,844, the aggregate number of shares of common stock, par value $0.0001 per share, of Owlet outstanding as of March 22, 2021, (ii) 11,167,137, the aggregate number of shares of preferred stock, par value $0.0001 per share, of Owlet, outstanding as of March 22, 2021, (iii) 892,456, the aggregate number of shares of Owlet common stock issuable upon the cashless exercise of the Owlet warrants outstanding as of March 22, 2021 and, (iv) 695,107, the aggregate number of shares of Owlet preferred stock issuable upon the conversion of the Owlet convertible promissory notes outstanding as of March 22, 2021, and (v) 3,153,776, the aggregate number of shares of Owlet common stock issuable upon the cash exercise of Owlet options outstanding as of March 22, 2021, and (b) an estimated Exchange Ratio (as defined herein) of 2.050.

(3) Pursuant to Rules 457(c) and 457(f)(1) promulgated under the Securities Act and solely for the purpose of calculating the registration fee, the proposed maximum aggregate offering price is calculated as the product of 44,116,721 shares of Sandbridge Class A common stock and (ii) $9.91, the average of the high and low trading prices of Sandbridge Class A common stock on March 24, 2021 (within five business days prior to the date of this Registration Statement).

(4) Calculated pursuant to Rule 457 under the Securities Act by multiplying the proposed maximum aggregate offering price of securities to be registered by 0.0001091.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until the registration statement shall become effective on such date as the SEC, acting pursuant to said Section 8(a), may determine.**

Exhibit 7

Page 601

Exhibit 7
Page 602

**The information in this preliminary proxy statement/prospectus is not complete and may be changed. These securities may not be issued until the registration statement filed with the U.S. Securities and Exchange Commission is effective. This preliminary prospectus statement/prospectus is not an offer to sell these securities and does not constitute the solicitation of an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**PRELIMINARY - SUBJECT TO COMPLETION DATED MARCH 31, 2021**

**PROXY STATEMENT FOR**
**SPECIAL MEETING OF**
**SANDBRIDGE ACQUISITION CORPORATION**

**PROSPECTUS FOR**
**44,116,721 SHARES OF CLASS A COMMON STOCK**
**OF**
**SANDBRIDGE ACQUISITION CORPORATION**
**(WHICH WILL BE RENAMED "OWLET, INC."**
**IN CONNECTION WITH THE BUSINESS COMBINATION DESCRIBED HEREIN)**

On February 12, 2021, the board of directors of Sandbridge Acquisition Corporation, a Delaware corporation ("Sandbridge," "we," "us" or "our"), unanimously approved a business combination agreement, dated February 15, 2021, by and among Sandbridge, Project Olympus Merger Sub, Inc., a Delaware corporation and wholly owned subsidiary of Sandbridge ("Merger Sub"), and Owlet Baby Care Inc. ("Owlet") (as it may be amended and/or restated from time to time, the "Business Combination Agreement"). If the Business Combination Agreement is approved by Sandbridge's stockholders and the transactions under the Business Combination Agreement are consummated, Merger Sub will merge with and into Owlet (the "Merger"), with Owlet surviving the Merger as a wholly owned subsidiary of Sandbridge. In addition, upon the effectiveness of the Proposed Charter (as defined below), Sandbridge will be renamed "Owlet, Inc." and is referred to herein as "New Owlet" following the consummation (the "Closing") of the transactions described below (collectively, the "Business Combination").

As described in this proxy statement/prospectus, Sandbridge's stockholders are being asked to consider and vote upon the Business Combination and the other proposals set forth herein.

As a consequence of the Business Combination, each share of Sandbridge Class B common stock that is issued and outstanding as of immediately prior to the effective time of the Merger (the "Effective Time") will convert, on a one-for-one basis, into a share of New Owlet Class A common stock ("New Owlet common stock"). The Business Combination will have no effect on the Sandbridge Class A common stock that is issued and outstanding as of immediately prior to the Effective Time, which will continue to remain outstanding.

As a consequence of the Merger, at the Effective Time, and as further described in this proxy statement/prospectus, (i) each share of Owlet capital stock (as defined herein) that is issued and outstanding immediately prior to the Effective Time will become the right to receive the number of shares of New Owlet common stock equal to the Exchange Ratio (as defined herein); (ii) each option to purchase shares of Owlet common stock, whether vested or unvested, that is outstanding and unexercised as of immediately prior to the Effective Time will be assumed by New Owlet and will automatically become an option (vested or unvested, as applicable) to purchase a number of shares of New Owlet common stock equal to the number of shares of Owlet common stock subject to such option immediately prior to the Effective Time multiplied by the Exchange Ratio, rounded down to the nearest whole share, at an exercise price per share equal to the exercise price per share of such option immediately prior to the Effective Time divided by the Exchange Ratio, rounded up to the nearest whole cent, except that, subject to certain limitations, holders of vested options may instead elect to receive a cash payment in lieu of assumption of a portion of their vested options; and (iii) each share of Owlet common stock that is subject to a risk of forfeiture or right of repurchase at the original purchase price as of immediately prior to the Effective Time shall be subject to the same risk of forfeiture or right of repurchase (proportionally adjusted to reflect the Exchange Ratio) which risk of forfeiture or right of repurchase shall lapse in accordance with the same vesting schedule as that of the Owlet Restricted Stock.

In addition, Sandbridge will file the proposed amended and restated certificate of incorporation to be adopted by Sandbridge pursuant to the proposals set forth herein (the "Proposed Charter") with the Secretary of State of the State of Delaware, such Proposed Charter to be effective simultaneous with the Effective Time.

In addition, concurrently with the execution of the Business Combination Agreement, Sandbridge entered into subscription agreements (the "Subscription Agreements") with certain investors (the "PIPE Investors"), pursuant to which the PIPE Investors have agreed to purchase, immediately prior to the Closing, an aggregate of 13,000,000 shares of Sandbridge Class A common stock at a purchase price of $10.00 per share (the "PIPE Financing").

The total maximum number of shares of New Owlet common stock expected to be outstanding immediately following the Closing is approximately 132,216,363, assuming no redemptions, comprising (i) 90,466,363 shares of New Owlet common stock issued to Owlet stockholders in the Merger, (ii) 13,000,000 shares of New Owlet common stock issued in connection with the Closing to the PIPE Investors pursuant to the PIPE Financing, (iii) 5,750,000 shares of New Owlet common stock issued to holders of shares of Sandbridge Class B common stock outstanding at the Effective Time, 2,807,500 shares of which will be subject to vesting following the Effective Time, and (iv) 23,000,000 shares of New Owlet common stock to be held by holders of shares of Sandbridge Class A common stock outstanding at the Effective Time. Holders of shares of Owlet capital stock are expected to hold, in the aggregate, approximately 68.4% of the issued and outstanding shares of New Owlet common stock and approximately 68.4% of the combined voting power of New Owlet immediately following the Closing, in each case assuming no redemptions. If the actual facts are different than these assumptions, the ownership percentages in New Owlet will be different.

Sandbridge's units, Class A common stock and public warrants are publicly traded on the New York Stock Exchange ("NYSE") under the symbols "SBG.U," "SBG" and "SBG WT," respectively. Sandbridge intends to apply to list the New Owlet common stock and public warrants on the NYSE under the symbols "OWLT" and "OWLT WS," respectively, upon the Closing. New Owlet will not have units traded following the Closing.

Sandbridge will hold a special meeting of stockholders (the "Special Meeting") to consider matters relating to the Business Combination. Sandbridge cannot complete the Business Combination unless Sandbridge's stockholders consent to the approval of the Business Combination Agreement and the transactions contemplated thereby. Sandbridge is sending you this proxy statement/prospectus to ask you to vote in favor of these and the other matters described in this proxy statement/prospectus.

In connection with our initial public offering, our initial stockholders and our other directors and officers at the time of our initial public offering entered into a letter agreement to vote their shares in favor of the Business Combination Proposal and the other Transaction Proposals (as defined herein) being presented at the Special Meeting, all of which are unanimously recommended by the Sandbridge Board. The shares held by Sandbridge Acquisition Holdings LLC (the "Sponsor"), our other initial stockholders and our other directors and officers and the PIMCO private funds that are obligated to vote in favor of the Business Combination represent approximately 27% of the voting power of Sandbridge.

Unless adjourned, the Special Meeting of the holders of Sandbridge will be held at          , New York City time, on          , 2021, in virtual format.

This proxy statement/prospectus provides you with detailed information about the Business Combination. It also contains or references information about Sandbridge and New Owlet and certain related matters. Please read this proxy statement/prospectus carefully. In particular, you should read the section titled "*Risk Factors*" beginning on page 34 for a discussion of the risks you should consider in evaluating the Business Combination and how it will affect you.

If you have any questions or need assistance voting your common stock, please contact Okapi Partners LLC, our proxy solicitor ("Okapi"), by calling toll-free at (844) 343-2623. Banks and brokers can call collect at (212) 297-0720, or by emailing info@okapipartners.com. This notice of Special Meeting is and the proxy statement/prospectus relating to the Business Combination will be available at www.virtualshareholdermeeting.com/SBG2021SM.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the Business Combination or the other transactions contemplated thereby, as described in this proxy statement/prospectus, or passed upon the adequacy or accuracy of the disclosure in this proxy statement/prospectus. Any representation to the contrary is a criminal offense.

This proxy statement/prospectus is dated          , 2021, and is first being mailed to stockholders of Sandbridge on or about          , 2021.

Exhibit 7
Page 603

**SANDBRIDGE ACQUISITION CORPORATION**
**1999 Avenue of the Stars, Suite 2088**
**Los Angeles, CA 90067**

**NOTICE OF SPECIAL MEETING OF STOCKHOLDERS**
**TO BE HELD ON            , 2021**

TO THE STOCKHOLDERS OF SANDBRIDGE ACQUISITION CORPORATION:

NOTICE IS HEREBY GIVEN that a special meeting (the "Special Meeting") of the stockholders of Sandbridge Acquisition Corporation, a Delaware corporation ("Sandbridge," "we," "us" or "our"), will be held at          , New York City time, on                    , 2021, in virtual format. You are cordially invited to attend the Special Meeting, which will be held for the following purposes:

(a) **Proposal No. 1 - The Business Combination Proposal** - to consider and vote upon a proposal to approve the business combination agreement, dated as of February 15, 2021 (as may be amended and/or restated from time to time, the "Business Combination Agreement"), by and among Sandbridge, Project Olympus Merger Sub, Inc., a Delaware corporation and a wholly owned subsidiary of Sandbridge ("Merger Sub"), and Owlet Baby Care Inc., a Delaware corporation ("Owlet"), and the transactions contemplated thereby, pursuant to which Merger Sub will merge with and into Owlet (the "Merger") with Owlet surviving the Merger as a wholly owned subsidiary of Sandbridge (the transactions contemplated by the Business Combination Agreement, the "Business Combination" and such proposal, the "Business Combination Proposal");

(b) **Proposal No. 2 - The Charter Amendment Proposal, including the Advisory Charter Amendment Proposals** - to consider and vote upon a proposal to approve, assuming the Business Combination Proposal is approved and adopted, the proposed amended and restated certificate of incorporation of Sandbridge (the "Proposed Charter"), which will replace Sandbridge's amended and restated certificate of incorporation, dated September 14, 2020 (the "Current Charter"), and which will be in effect as of the Effective Time (we refer to such proposal as the "Charter Amendment Proposal"); and to consider and vote upon separate proposals to approve, on a non-binding advisory basis, the following material differences between the Proposed Charter and the Current Charter, which are being presented in accordance with the requirements of the Securities and Exchange Commission (the "SEC") as six separate sub-proposals (we refer to such proposals as the "Advisory Charter Amendment Proposals");

(i) **Advisory Charter Amendment Proposal A** – Under the Proposed Charter, New Owlet will be authorized to issue 1,100,000,000 shares of capital stock, consisting of (i) 1,000,000,000 shares of New Owlet common stock, par value $0.0001 per share and (ii) 100,000,000 shares of undesignated preferred stock, par value $0.0001 per share, as opposed to the Current Charter, which authorizes Sandbridge to issue 111,000,000 shares of capital stock, consisting of (a) 110,000,000 shares of common stock, including 100,000,000 shares of Sandbridge Class A common stock, par value $0.0001 per share, and 10,000,000 shares of Sandbridge Class B common stock, par value $0.0001 per share, and (b) 1,000,000 shares of Sandbridge preferred stock, par value $0.0001 per share;

(ii) **Advisory Charter Amendment Proposal B** – Under the Proposed Charter, New Owlet will remove the provisions regarding New Owlet not being governed by Section 203 of the DGCL relating to takeovers by interested stockholders;

(iii) **Advisory Charter Amendment Proposal C** –Under the Proposed Charter, in addition to any vote required by Delaware law, Part B of Article IV, Article V, Article VI, Article VII, Article VIII and Article IX of the Proposed Charter may be amended only by the affirmative vote of the holders of at least two-thirds of the total voting power of the then outstanding shares of stock of New Owlet entitled to vote thereon, voting together as a single class;

(iv) **Advisory Charter Amendment Proposal D** – Under the Proposed Charter, directors can be removed only for cause and only by the affirmative vote of the holders of at least a two-thirds of the outstanding shares entitled to vote at an election of directors;

(v) **Advisory Charter Amendment Proposal E** – Under the Proposed Charter, the New Owlet Board is expressly authorized to adopt, alter, amend or repeal the Bylaws in accordance with Delaware law; provided that, in addition to any vote required by Delaware law, the adoption, amendment or repeal of

Exhibit 7
Page 604

the Bylaws by New Owlet stockholders will require the affirmative vote of the holders of at least two-thirds of the voting power of all of the then outstanding shares of voting stock of New Owlet entitled to vote generally in an election of directors;

(vi) **Advisory Charter Amendment Proposal F** – to provide for certain additional changes, including, among other things, (i) changing the corporate name from "Sandbridge Acquisition Corporation" to "Owlet, Inc.", and (ii) removing certain provisions related to Sandbridge's status as a blank check company that will no longer be applicable upon consummation of the Business Combination, all of which the Sandbridge Board believes is necessary to adequately address the needs of New Owlet after the Business Combination;

(c) **Proposal No. 3 - The NYSE Proposal** – to consider and vote upon a proposal to approve, assuming the Business Combination Proposal and the Charter Amendment Proposal are approved and adopted, for the purposes of complying with the applicable listing rules of the New York Stock Exchange (the "NYSE"), the issuance of (i) 13,000,000 shares of Sandbridge Class A common stock to certain investors (the "PIPE Investors") pursuant to subscription agreements (the "Subscription Agreements") immediately prior to the Closing, plus any additional shares issued pursuant to Subscription Agreements we may enter into prior to Closing, and (ii) an aggregate of up to 102,500,000 shares of New Owlet common stock to existing Owlet equityholders pursuant to the terms of the Business Combination Agreement (we refer to this proposal as the "NYSE Proposal");

(d) **Proposal No. 4 - The Incentive Award Plan Proposal** - to consider and vote upon a proposal to approve, assuming the Business Combination Proposal, the Charter Amendment Proposal and the NYSE Proposal are approved and adopted, the Owlet, Inc. 2021 Incentive Award Plan (the "New Owlet Incentive Award Plan"), a copy of which is attached to this proxy statement/prospectus as Annex D, including the authorization of the initial share reserve under the New Owlet Incentive Award Plan (the "Incentive Award Plan Proposal"), including with respect to the number of shares that may be issued pursuant to the exercise of incentive stock options granted;

(e) **Proposal No. 5 - The ESPP Proposal** - to consider and vote upon a proposal to approve, assuming the Business Combination Proposal, the Charter Amendment Proposal, the NYSE Proposal and the Incentive Award Plan Proposal are approved and adopted, the Owlet, Inc. 2021 Employee Stock Purchase Plan (the "New Owlet ESPP"), a copy of which is attached to this proxy statement/prospectus as Annex E, including the authorization of the initial share reserve under the New Owlet ESPP (the "ESPP Proposal");

(f) **Proposal No. 6 - The Adjournment Proposal** - to consider and vote upon a proposal to approve the adjournment of the Special Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies if, based upon the tabulated vote at the time of the Special Meeting, any of the Business Combination Proposal, the Charter Amendment Proposal, the NYSE Proposal, the Incentive Award Plan Proposal and the ESPP Proposal (collectively, the "Required Transaction Proposals") would not be duly approved and adopted by our stockholders or we determine that one or more of the closing conditions under the Business Combination Agreement is not satisfied or waived (we refer to this proposal as the "Adjournment Proposal" and the Adjournment Proposal, collectively with the Required Transaction Proposals, the "Transaction Proposals").

Only holders of record of Sandbridge common stock at the close of business on          , 2021 are entitled to notice of and to vote and have their votes counted at the Special Meeting and any further adjournments or postponements of the Special Meeting.

We will provide you with the proxy statement/prospectus and a proxy card in connection with the solicitation of proxies to be voted at the Special Meeting and at any adjournment or postponement of the Special Meeting. Whether or not you plan to attend the Special Meeting, we urge you to read, when available, the proxy statement/prospectus (and any documents incorporated into the proxy statement/prospectus by reference) carefully. Please pay particular attention to the section titled "*Risk Factors*."

Exhibit 7
Page 605

After careful consideration, the Sandbridge Board has determined that each of the Business Combination Proposal, the Charter Amendment Proposal, including the Advisory Charter Amendment Proposals, the NYSE Proposal, the Incentive Award Plan Proposal, the ESPP Proposal, and the Adjournment Proposal are in the best interests of Sandbridge and its stockholders and unanimously recommends that you vote or give instruction to vote "**FOR**" each of those proposals.

The existence of financial and personal interests of Sandbridge's directors or officers may result in a conflict of interest on the part of one or more of the directors or officers between what they may believe is in the best interests of Sandbridge and its stockholders and what they may believe is best for himself or themselves in determining to recommend that stockholders vote for the proposals. For instance, ownership of founder shares by Ramez Toubassy, Domenico De Sole and Michael F. Goss, our independent directors, may create a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate an initial business combination, and in determining the terms on which we are willing to consummate such a transaction. See the section titled "*The Business Combination Proposal—Interests of Sandbridge's Directors and Officers in the Business Combination*" in the proxy statement/prospectus for a further discussion.

Under the Business Combination Agreement, the approval of the Required Transaction Proposals presented at the Special Meeting is a condition to the Closing. The adoption of each Required Transaction Proposal is conditioned on the approval of all of the Required Transaction Proposals. If our stockholders do not approve each of the Required Transaction Proposals, the Business Combination may not be consummated. The Adjournment Proposal is not conditioned on the approval of any other proposal.

In connection with the execution of the Business Combination Agreement, the Sponsor and certain initial stockholders, directors and officers entered into a Sponsor Letter Agreement pursuant to which the Sponsor and each other holder of founder shares has agreed, among other things, (a) to appear at the Special Meeting or otherwise cause its shares to be counted as present for the purpose of establishing quorum; (b) to vote (or execute a written consent), or cause to be voted (or consent to be granted) any Sandbridge common stock and founder shares owned by it, him or her at such special meeting in person, or by proxy, in favor of the Business Combination and the adoption of the Business Combination Agreement and the transactions contemplated thereby; (c) to vote (or execute a written consent) or cause to be voted (or consent to be granted) any Sandbridge common stock or founder shares owned by it, him or her at such special meeting in person, or by proxy, against any alternative business combination or any action that would reasonably be expected to materially impede, interfere with, delay, postpone or adversely affect the Business Combination or any of the related transactions or result in a breach of any covenant, representation or warranty or other obligation or agreement of Sandbridge under the Business Combination Agreement or the Sponsor under the Sponsor Letter Agreement and (d) not redeem any shares of founder shares owned by it, him or her in connection with the stockholder approval. Pursuant to the Sponsor Letter Agreement, a percentage of New Owlet common stock held by the Sponsor will be subject to certain time and performance-based vesting provisions. For additional information, see "*Related Agreements — Sponsor Letter Agreement*."

Pursuant to the Current Charter, a holder of public shares (a "public stockholder") may request that Sandbridge redeem all or a portion of its public shares for cash if the Business Combination is consummated. As a public stockholder, and assuming the Business Combination is consummated, you will be entitled to receive cash for any public shares to be redeemed only if you:

(i)   (a) hold public shares or (b) hold public shares through units and you elect to separate your units into the underlying public shares and public warrants prior to exercising your redemption rights with respect to the public shares; and

(ii)   prior to            , New York City time, on            , 2021, (a) submit a written request, including the legal name, telephone number and address of the beneficial owner of the shares for which redemption is requested, to Continental Stock Transfer & Trust Company, Sandbridge's transfer agent (the "Transfer Agent"), that Sandbridge redeem your public shares for cash and (b) deliver your public shares to the Transfer Agent, physically or electronically through The Depository Trust Company ("DTC").

Holders of units must elect to separate the underlying public shares and public warrants prior to exercising redemption rights with respect to the public shares. If holders hold their units in an account at a brokerage firm or bank, holders must notify their broker or bank that they elect to separate the units into the underlying public

Exhibit 7
Page 606

shares and public warrants, or if a holder holds units registered in its own name, the holder must contact the Transfer Agent directly and instruct it to do so. Public stockholders may elect to redeem all or a portion of their public shares even if they vote for the Business Combination Proposal. If the Business Combination is not consummated, the public shares will not be redeemed for cash. If the Business Combination is consummated and a public stockholder properly exercises its right to redeem its public shares and timely delivers its shares to the Transfer Agent, we will redeem each public share for a per share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account established in connection with our initial public offering (the "Trust Account"), calculated as of two business days prior to the Closing, including interest earned on the funds held in the Trust Account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares. For illustrative purposes, as of December 31, 2020, this would have amounted to approximately $10.00 per public share. If a public stockholder exercises its redemption rights, then it will be exchanging its redeemed public shares for cash and will no longer own such shares. Any request to redeem public shares, once made, may be withdrawn at any time until the deadline for submitting redemption requests and thereafter, with our consent, until the consummation of the Business Combination (the "Closing"). If a holder of a public share delivers its shares in connection with an election to redeem and subsequently decides prior to the deadline for submitting redemption requests not to elect to exercise such rights, it may simply request that Sandbridge instruct the Transfer Agent to return the shares (physically or electronically). The holder can make such request by contacting the Transfer Agent at the address or email address listed in this proxy statement/prospectus. See "*The Special Meeting—Redemption Rights*" in the proxy statement/prospectus for a detailed description of the procedures to be followed if you wish to redeem your public shares for cash.

Notwithstanding the foregoing, a holder of public shares, together with any affiliate of such public stockholder or any other person with whom such public stockholder is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), will be restricted from redeeming its public shares with respect to more than an aggregate of 15% of the public shares. Accordingly, if a public stockholder, alone or acting in concert or as a group, seeks to redeem more than 15% of the public shares, then any such shares in excess of that 15% limit would not be redeemed for cash.

In addition, concurrently with the execution of the Business Combination Agreement, Sandbridge entered into Subscription Agreements with the PIPE Investors, pursuant to which the PIPE Investors have agreed to purchase, immediately prior to the Closing, an aggregate of 13,000,000 shares of Sandbridge Class A common stock at a purchase price of $10.00 per share (the "PIPE Financing").

The total maximum number of shares of New Owlet common stock expected to be outstanding immediately following the Closing is approximately 132,216,363, assuming no redemptions, comprising (i) 90,466,363 shares of New Owlet common stock issued to Owlet equityholders in the Merger, (ii) 13,000,000 shares of New Owlet common stock issued in connection with the Closing to the PIPE Investors pursuant to the PIPE Financing, (iii) 5,750,000 shares of New Owlet common stock issued to holders of shares of Sandbridge Class B common stock outstanding at the Effective Time, 2,807,500 shares of which will be subject to vesting following the Effective Time, and (iv) 23,000,000 shares of New Owlet common stock to be held by holders of shares of Sandbridge Class A common stock outstanding at the Effective Time.

All Sandbridge stockholders are cordially invited to attend the Special Meeting, which will be held in virtual format. You will not be able to physically attend the Special Meeting. To ensure your representation at the Special Meeting, however, you are urged to complete, sign, date and return the proxy card accompanying the proxy statement/prospectus as soon as possible or submit your proxy by following the instructions contained on your proxy card. If you are a stockholder of record holding shares of Sandbridge Class A common stock or Sandbridge Class B common stock, you may also cast your vote at the Special Meeting electronically by visiting www.virtualshareholdermeeting.com/SBG2021SM. If your shares are held in an account at a brokerage firm or bank, you must instruct your broker or bank on how to vote your shares or, if you wish to attend the Special Meeting and vote electronically, obtain a proxy from your broker or bank. The Charter Amendment Proposal requires the affirmative vote of the holders of (i) at least a majority of the outstanding shares of Sandbridge Class B common stock, voting separately as a single class, and (ii) a majority of the outstanding shares of Sandbridge common stock entitled to vote thereon, voting together as a single class. Accordingly, if you do not vote or do not instruct your broker or bank how to vote, an abstention from voting or a broker non-vote will have the same effect as a vote against the Charter Amendment Proposal. Along with the Charter Proposal, the NYSE considers abstentions as "votes cast," therefore for purposes of approval, abstentions will also be

Exhibit 7
Page 607

TABLE OF CONTENTS

considered as votes against the Business Combination Proposal, the NYSE Proposal, the Incentive Award Plan Proposal and the ESPP Proposal. However, if you do not vote or do not instruct your broker or bank how to vote, it will have no effect on the Adjournment Proposal.

Your vote is important regardless of the number of shares you own. Whether you plan to attend the Special Meeting or not, please sign, date and return the proxy card accompanying the proxy statement/prospectus as soon as possible in the envelope provided or submit your proxy by following the instructions contained on your proxy card. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker to ensure that votes related to the shares you beneficially own are properly counted.

If you have any questions or need assistance voting your common stock, please contact Okapi Partners LLC, our proxy solicitor ("Okapi"), by calling toll-free at (844) 343-2623. Banks and brokers can call collect at (212) 297-0720, or by emailing info@okapipartners.com. This notice of Special Meeting is and the proxy statement/prospectus relating to the Business Combination will be available at www.virtualshareholdermeeting.com/SBG2021SM.

Thank you for your participation. We look forward to your continued support.

, 2021

**IF YOU RETURN YOUR PROXY CARD WITHOUT AN INDICATION OF HOW YOU WISH TO VOTE, YOUR SHARES WILL BE VOTED IN FAVOR OF EACH OF THE PROPOSALS. TO EXERCISE YOUR REDEMPTION RIGHTS, YOU MUST (I) IF YOU HOLD SHARES OF SANDBRIDGE CLASS A COMMON STOCK THROUGH UNITS, ELECT TO SEPARATE YOUR UNITS INTO THE UNDERLYING SHARES OF SANDBRIDGE CLASS A COMMON STOCK AND PUBLIC WARRANTS PRIOR TO EXERCISING YOUR REDEMPTION RIGHTS WITH RESPECT TO THE PUBLIC SHARES, (II) SUBMIT A WRITTEN REQUEST, INCLUDING THE LEGAL NAME, TELEPHONE NUMBER AND ADDRESS OF THE BENEFICIAL OWNER OF THE SHARES FOR WHICH REDEMPTION IS REQUESTED, TO THE TRANSFER AGENT THAT YOUR PUBLIC SHARES BE REDEEMED FOR CASH AND (III) DELIVER YOUR SHARES OF SANDBRIDGE CLASS A COMMON STOCK TO THE TRANSFER AGENT, PHYSICALLY OR ELECTRONICALLY USING THE DTC'S DWAC (DEPOSIT WITHDRAWAL AT CUSTODIAN) SYSTEM, IN EACH CASE, IN ACCORDANCE WITH THE PROCEDURES AND DEADLINES DESCRIBED IN THE PROXY STATEMENT/PROSPECTUS. IF THE BUSINESS COMBINATION IS NOT CONSUMMATED, THEN THE PUBLIC SHARES WILL NOT BE REDEEMED FOR CASH. IF YOU HOLD THE SHARES IN STREET NAME, YOU WILL NEED TO INSTRUCT THE ACCOUNT EXECUTIVE AT YOUR BANK OR BROKER TO WITHDRAW THE SHARES FROM YOUR ACCOUNT IN ORDER TO EXERCISE YOUR REDEMPTION RIGHTS. SEE "THE SPECIAL MEETING - REDEMPTION RIGHTS" IN THIS PROXY STATEMENT/PROSPECTUS FOR MORE SPECIFIC INSTRUCTIONS.**

Exhibit 7
Page 608

## TABLE OF CONTENTS

| | |
|---|---|
| ADDITIONAL INFORMATION | iii |
| SELECTED DEFINITIONS | iv |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | viii |
| QUESTIONS AND ANSWERS FOR STOCKHOLDERS OF SANDBRIDGE | 1 |
| SUMMARY OF THE PROXY STATEMENT/PROSPECTUS | 14 |
| SUMMARY HISTORICAL FINANCIAL INFORMATION OF SANDBRIDGE | 28 |
| SUMMARY HISTORICAL FINANCIAL INFORMATION OF OWLET | 29 |
| SUMMARY UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 30 |
| COMPARATIVE PER SHARE DATA | 31 |
| MARKET PRICE, TICKER SYMBOL AND DIVIDEND INFORMATION | 33 |
| RISK FACTORS | 34 |
| INFORMATION ABOUT THE PARTIES TO THE BUSINESS COMBINATION | 85 |
| THE SPECIAL MEETING | 86 |
| THE BUSINESS COMBINATION PROPOSAL | 93 |
| THE BUSINESS COMBINATION AGREEMENT | 106 |
| RELATED AGREEMENTS | 125 |
| THE CHARTER AMENDMENT PROPOSAL | 127 |
| THE ADVISORY CHARTER AMENDMENT PROPOSALS | 129 |
| THE NYSE PROPOSAL | 133 |
| THE INCENTIVE AWARD PLAN PROPOSAL | 134 |
| THE ESPP PROPOSAL | 141 |
| THE ADJOURNMENT PROPOSAL | 145 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 146 |
| OTHER INFORMATION RELATED TO SANDBRIDGE | 156 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF SANDBRIDGE | 164 |
| INFORMATION RELATED TO OWLET | 167 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF OWLET | 186 |
| DESCRIPTION OF NEW OWLET SECURITIES | 201 |
| SECURITIES ACT RESTRICTIONS ON RESALE OF NEW OWLET COMMON STOCK | 212 |
| COMPARISON OF STOCKHOLDER RIGHTS | 213 |
| BENEFICIAL OWNERSHIP OF SECURITIES | 223 |
| NEW OWLET MANAGEMENT AFTER THE BUSINESS COMBINATION | 226 |
| EXECUTIVE AND DIRECTOR COMPENSATION OF OWLET | 232 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 235 |
| LEGAL MATTERS | 239 |
| EXPERTS | 239 |
| CHANGE IN INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 239 |
| DELIVERY OF DOCUMENTS TO STOCKHOLDERS | 239 |
| CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS | 241 |
| STOCKHOLDER PROPOSALS AND NOMINATIONS | 247 |
| STOCKHOLDER COMMUNICATIONS | 248 |
| WHERE YOU CAN FIND MORE INFORMATION | 249 |
| INDEX TO FINANCIAL STATEMENTS | F-1 |
| ANNEX A – BUSINESS COMBINATION AGREEMENT | A-1 |
| ANNEX B – FORM OF SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF OWLET, INC. | B-1 |
| ANNEX C – FORM OF AMENDED AND RESTATED BYLAWS OF OWLET, INC. | C-1 |

Exhibit 7
Page 609

ANNEX D – FORM OF OWLET, INC. 2021 INCENTIVE AWARD PLAN                                    D-1

ANNEX E – FORM OF OWLET, INC. 2021 EMPLOYEE STOCK PURCHASE PLAN                            E-1

ANNEX F – FORM OF SPONSOR LETTER AGREEMENT                                                 F-1

i

Exhibit 7
Page 610

TABLE OF CONTENTS

**ABOUT THIS DOCUMENT**

This document, which forms part of a registration statement on Form S-4 filed with the SEC by Sandbridge, constitutes a prospectus of Sandbridge under Section 5 of the Securities Act of 1933, as amended (the "Securities Act"), with respect to the shares of common stock of Sandbridge to be issued to Owlet's stockholders under the Business Combination Agreement. This document also constitutes a proxy statement of Sandbridge under Section 14(a) of the Exchange Act.

You should rely only on the information contained in this proxy statement/prospectus. No one has been authorized to provide you with information that is different from that contained in this proxy statement/prospectus. This proxy statement/prospectus is dated as of the date set forth on the cover hereof. You should not assume that the information contained in this proxy statement/prospectus is accurate as of any date other than that date. Neither the mailing of this proxy statement/prospectus to Sandbridge stockholders nor the issuance by Sandbridge of its common stock in connection with the Business Combination will create any implication to the contrary.

Information contained in this proxy statement/prospectus regarding Sandbridge has been provided by Sandbridge and information contained in this proxy statement/prospectus regarding Owlet has been provided by Owlet.

This proxy statement/prospectus does not constitute an offer to sell or a solicitation of an offer to buy any securities, or the solicitation of a proxy, in any jurisdiction to or from any person to whom it is unlawful to make any such offer or solicitation in such jurisdiction.

**MARKET AND INDUSTRY DATA**

This proxy statement/prospectus contains market and industry data and forecasts that Owlet and Sandbridge have derived from independent consultants, publicly available information, various industry publications, other published industry sources, surveys and studies conducted by third parties and Owlet's internal data and estimates. Sandbridge and Owlet believe this information is reliable as of the applicable date of its publication, however, neither Sandbridge nor Owlet has independently verified the accuracy or completeness of the information included in or assumptions relied on in these third-party publications. The industry in which Owlet operates is subject to a high degree of uncertainty and risk due to a variety of factors, including those described in the section entitled "*Risk Factors.*" These and other factors could cause results to differ materially from the results Sandbridge and Owlet anticipate. Sandbridge is liable for the information provided in this proxy statement/prospectus.

ii

Exhibit 7
Page 611

**ADDITIONAL INFORMATION**

This proxy statement/prospectus incorporates important business and financial information about Sandbridge from other documents that are not included in or delivered with this proxy statement/prospectus. This information is available for you to review through the SEC's website at www.sec.gov. You can also obtain the documents incorporated by reference into this proxy statement/prospectus free of charge by requesting them in writing or by telephone from the appropriate company at the following address and telephone number:

Sandbridge Acquisition Corporation
1999 Avenue of the Stars, Suite 2088
Los Angeles, CA 90067
Telephone: (424) 221-5743
Attention: Corporate Secretary

or

Okapi Partners LLC
1212 Avenue of the Americas, 24th Floor
New York, New York 10036
Telephone: (844) 343-2623 (toll-free)
(banks and brokers can call collect at (212) 297-0720)
Email: info@okapipartners.com

To obtain timely delivery, Sandbridge stockholders must request the materials no later than five business days prior to the Special Meeting.

You also may obtain additional proxy cards and other information related to the proxy solicitation by contacting the appropriate contact listed above. You will not be charged for any of these documents that you request.

For a more detailed description of the information incorporated by reference in this proxy statement/prospectus and how you may obtain it, see the section titled "*Where You Can Find More Information*."

**TRADEMARKS**

This document contains references to trademarks, trade names and service marks belonging to other entities. Solely for convenience, trademarks, trade names and service marks referred to in this proxy statement/prospectus may appear without the ® or TM symbols, but such references are not intended to indicate, in any way, that the applicable licensor will not assert, to the fullest extent under applicable law, its rights to these trademarks and trade names. We do not intend our use or display of other companies' trade names, trademarks or service marks to imply a relationship with, or endorsement or sponsorship of us by, any other companies.

Exhibit 7
Page 612

**SELECTED DEFINITIONS**

*Unless otherwise stated or unless the context otherwise requires, the terms "we," "us," "our" and "Sandbridge"
refer to Sandbridge Acquisition Corporation, and the terms "New Owlet," "combined company" and "post-combination
company" refer to Owlet, Inc. and its subsidiaries following the consummation of the Business Combination.*

In this document:

"*Aggregate Fully Diluted Company Shares*" means, without duplication, (a) the aggregate number of shares of
Owlet capital stock that are (i) issued and outstanding immediately prior to the Effective Time or (ii) issuable upon the
exercise of Owlet options (whether or not then vested or exercisable) or upon the settlement of Owlet Restricted Stock
or other equity-based awards, minus (b) the Owlet treasury shares outstanding immediately prior to the Effective Time,
minus (c) a number of shares equal to (A) the aggregate exercise price of the Owlet options described in clause
(ii) above divided by (B) the Per Share Merger Consideration; provided, that any Owlet option with an exercise price
equal to or greater than the Per Share Merger Consideration shall not be counted for purposes of determining the
number of Aggregate Fully Diluted Company Shares.

"*Aggregate Merger Consideration*" means a number of shares of Sandbridge common stock equal to the quotient
obtained by dividing (i) the Base Purchase Price by (ii) $10.00.

"*Available Sandbridge Cash*" means the amount of cash available in the Trust Account following the Special
Meeting, after deducting (i) the amounts payable, if any, to the public stockholders pursuant to the Sandbridge
Stockholder Redemption, (ii) any deferred underwriting commissions being held in the Trust Account, and (iii) the
Sandbridge Transaction Expenses.

"*Base Purchase Price*" means $1,000,000,000.

"*Business Combination*" means the transactions contemplated by the Business Combination Agreement, including
the merger of Merger Sub with and into Owlet, pursuant to which (i) Owlet survives the Merger as a wholly owned
subsidiary of New Owlet, (ii) each share of Owlet capital stock (as defined herein) that is issued and outstanding
immediately prior to the Effective Time will become the right to receive the number of shares of New Owlet common
stock equal to the Exchange Ratio; (iii) each option to purchase shares of Owlet common stock, whether vested or
unvested, that is not a Cash Elected Option and is outstanding and unexercised as of immediately prior to the Effective
Time will be assumed by New Owlet and will automatically become an option (vested or unvested, as applicable) to
purchase a number of shares of New Owlet common stock equal to the number of shares of Owlet common stock
subject to such option immediately prior to the Effective Time multiplied by the Exchange Ratio, rounded down to the
nearest whole share, at an exercise price per share equal to the exercise price per share of such option immediately
prior to the Effective Time divided by the Exchange Ratio, rounded up to the nearest whole cent; (iv) subject to certain
limitations, each Cash Elected Option that is issued and outstanding immediately prior to the Effective Time shall be
cancelled and converted into the right to receive the Cash Election Consideration and (v) each share of Owlet common
stock that is subject to a risk of forfeiture or right of repurchase at the original purchase price as of immediately prior to
the Effective Time shall be subject to the same risk of forfeiture or right of repurchase (proportionately adjusted to
reflect the Exchange Ratio) which risk of forfeiture or right of repurchase shall lapse in accordance with the same
vesting schedule as that of the Owlet Restricted Stock.

"*Business Combination Agreement*" means that Business Combination Agreement, dated as of February 15, 2021,
by and among Sandbridge, Merger Sub and Owlet.

"*Cash Elected Option*" means a vested option (or portion thereof) with respect to which the holder has made an
election to receive a cash payment in lieu of the assumption of such option (or portion).

"*Cash Election Consideration*" means an amount in cash equal to (a) the Exchange Ratio multiplied by $10.00
minus (b) the exercise price applicable to the share of Owlet capital stock underlying such Cash Elected Option.

"*Closing*" means the closing of the transactions contemplated by the Business Combination Agreement.

"*Closing Date*" means the closing date of the Business Combination.

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended.

iv

Exhibit 7
Page 613

"*Current Charter*" means Sandbridge's amended and restated certificate of incorporation, dated September 14, 2020.

"*DGCL*" means the General Corporation Law of the State of Delaware.

"*DTC*" means The Depository Trust Company.

"*Eclipse*" means, collectively, Eclipse Ventures Fund I, L.P. and Eclipse Continuity Fund I, L.P.

"*Effective Time*" means, with respect to the Merger, the time on the Closing Date at which the Merger becomes effective.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Exchange Ratio*" means the quotient obtained by dividing (a) the number of shares constituting the Aggregate Merger Consideration, by (b) the number of Aggregate Fully Diluted Company Shares.

"*FASB*" means the Financial Accounting Standards Board.

"*founder shares*" means the shares of Sandbridge Class B common stock held by Sponsor and the shares of Sandbridge Class A common stock that will be issued to the Sponsor upon the conversion of such shares of Sandbridge Class B common stock at the Closing in accordance with the Current Charter.

"*GAAP*" means United States generally accepted accounting principles.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules and regulations promulgated thereunder.

"*initial public offering*" means Sandbridge's initial public offering, consummated on September 17, 2020, through the sale of an aggregate of 23,000,000 units at $10.00 per unit.

"*initial stockholders*" means the Sponsor and Domenico De Sole, Ramez Toubassy, Michael F. Goss, and Tommy Hilfiger.

"*Investment Company Act*" means the Investment Company Act of 1940, as amended.

"*JOBS Act*" means the Jumpstart Our Business Startups Act of 2012.

"*Merger*" means the merger of Merger Sub with and into Owlet.

"*Merger Sub*" means Project Olympus Merger Sub, Inc., a Delaware corporation and wholly owned subsidiary of Sandbridge.

"*Minimum Available Sandbridge Cash Amount*" means the Available Sandbridge Cash being equal to or greater than $140 million.

"*New Owlet*" means Owlet, Inc., a Delaware corporation (which, prior to the Closing, was known as Sandbridge Acquisition Corporation).

"*New Owlet Board*" means the board of directors of New Owlet.

"*New Owlet Bylaws*" means the bylaws of New Owlet to be adopted pursuant to the Business Combination Agreement.

"*New Owlet common stock*" means the shares of Class A common stock, par value $0.0001 per share, of New Owlet.

"*New Owlet Incentive Award Plan*" means the Owlet, Inc. 2021 Incentive Award Plan, to be approved and adopted by the Sandbridge stockholders pursuant to the Incentive Award Plan Proposal at the Special Meeting.

"*New Owlet ESPP*" means the Owlet, Inc. 2021 Employee Stock Purchase Plan, to be approved and adopted by the Sandbridge stockholders pursuant to the ESPP Proposal at the Special Meeting.

"*New Owlet Management*" means the management of New Owlet following the Closing.

"*NYSE*" means The New York Stock Exchange.

Exhibit 7
Page 614

"*Okapi*" means Okapi Partners LLC, proxy solicitor for Sandbridge.

"*Owlet*" means Owlet Baby Care Inc., a Delaware corporation.

"*Owlet Board*" means the board of directors of Owlet.

"*Owlet capital stock*" means the shares of Owlet capital stock outstanding prior to the Business Combination, comprised of the Owlet common stock, the Owlet Series A preferred stock, the Owlet Series A-1 preferred stock, the Owlet Series B preferred stock, the Owlet Series B-1 preferred stock and each other class or series of capital stock of Owlet (including preferred stock).

"*Owlet common stock*" means the common stock, par value $0.0001 per share, of Owlet.

"*Owlet option*" means, as of any determination time, each option to purchase shares of Owlet common stock that is outstanding and unexercised.

"*Owlet Restricted Stock*" means such shares of Owlet common stock that, as of immediately prior to the Effective Time, were subject to a risk of forfeiture or right of repurchase at the original purchase price as of immediately prior to the Effective Time.

"*Owlet Series A preferred stock*" means the Series A preferred stock, par value $0.0001 per share, of Owlet.

"*Owlet Series A-1 preferred stock*" means the Series A-1 preferred stock, par value $0.0001 per share, of Owlet.

"*Owlet Series B preferred stock*" means the Series B preferred stock, par value $0.0001 per share, of Owlet.

"*Owlet Series B-1 preferred stock*" means the Series B-1 preferred stock, par value $0.0001 per share, of Owlet.

"*Owlet stockholder*" means each holder of Owlet capital stock as of any determination time prior to the Effective Time.

"*Per Share Merger Consideration*" means the product obtained by multiplying (i) the Exchange Ratio by (ii) $10.00.

"*PIMCO private funds*" are to the members of our Sponsor that are affiliated with Pacific Investment Management Company LLC, collectively.

"*PIPE Financing*" means the issuance of an aggregate of 13,000,000 shares of Sandbridge Class A common stock pursuant to Subscription Agreements to the PIPE Investors immediately prior to the Closing, at a purchase price of $10.00 per share, which include 200,000 shares to be purchased by the PIMCO private funds and certain investors specified by the Sponsor.

"*PIPE Investors*" means the investors who are party to the Subscription Agreements.

"*private placement warrants*" means the 6,600,000 warrants issued to our Sponsor concurrently with Sandbridge's initial public offering, each of which is exercisable for one share of Sandbridge Class A common stock subject to certain restrictions on transfer.

"*Proposed Charter*" means the proposed amended and restated certificate of incorporation to be adopted by Sandbridge pursuant to the Charter Amendment Proposal (which, as of and after the Effective Time, will operate as the amended and restated certificate of incorporation of New Owlet), a copy of which is attached as Annex B to this proxy statement/prospectus.

"*public shares*" means shares of Sandbridge Class A common stock included in the units issued in Sandbridge's initial public offering.

"*public stockholders*" means the holders of public shares.

"*public warrants*" means the warrants included in the units issued in the initial public offering, each of which is exercisable for one share of Sandbridge Class A common stock, in accordance with its terms.

"*Registration Rights Agreement*" means the amended and restated registration rights agreement to be entered into as of the Closing by and among New Owlet, the Sponsor, certain affiliates of the Sponsor, and certain stockholders of Owlet.

vi

Exhibit 7
Page 615

"*Required Transaction Proposals*" mean, collectively, the Business Combination Proposal, the Charter Amendment Proposal, the NYSE Proposal, the Incentive Award Plan Proposal and the ESPP Proposal.

"*Sandbridge*" means Sandbridge Acquisition Corporation, a Delaware corporation (which, as a consequence of the adoption of the Proposed Charter, will be renamed Owlet, Inc.).

"*Sandbridge Board*" means the board of directors of Sandbridge.

"*Sandbridge Capital*" means Sandbridge Capital Management, LLC, an affiliate of the Sponsor.

"*Sandbridge Class A common stock*" means the shares of Class A common stock, par value $0.0001 per share, of Sandbridge.

"*Sandbridge Class B common stock*" means the shares of Class B common stock, par value $0.0001 per share, of Sandbridge.

"*Sandbridge common stock*" means, collectively, the Sandbridge Class A common stock and Sandbridge Class B common stock.

"*Sandbridge fund*" means the member of our sponsor that is affiliated with Sandbridge Capital, LLC;

"*Sandbridge Parties*" means, together, Sandbridge and Merger Sub.

"*Sandbridge Transaction Expenses*" means any fees, expenses and disbursements incurred by or on behalf of Sandbridge or Merger Sub for outside counsel, agents, advisors, consultants, experts, financial advisors and other service providers engaged by or on behalf of Sandbridge or Merger Sub in connection with the transactions contemplated by this Business Combination Agreement and related agreements.

"*Sarbanes-Oxley Act*" means the Sarbanes-Oxley Act of 2002.

"*SEC*" means the United States Securities and Exchange Commission.

"*Securities Act*" means the U.S. Securities Act of 1933, as amended.

"*Special Meeting*" means the special meeting of the Sandbridge stockholders to consider matters relating to the Business Combination, to be held at          New York City time, on         , 2021, in virtual format.

"*Sponsor*" means Sandbridge Acquisition Holdings LLC, a Delaware limited liability company.

"*Stockholders Agreement*" means the stockholders agreement, to be entered into as of the Closing, by and among New Owlet and Eclipse.

"*Subscription Agreements*" means the subscription agreements, each dated as of February 15, 2021, by and between Sandbridge and the PIPE Investors, pursuant to which Sandbridge has agreed to issue an aggregate of 13,000,000 shares of Sandbridge Class A common stock to the PIPE Investors immediately prior to the Closing at a purchase price of $10.00 per share.

"*Surviving Company*" means the surviving corporation resulting from the Merger.

"*Termination Date*" means July 31, 2021.

"*Transactions*" means the Business Combination and the other transactions contemplated in the Business Combination Agreement.

"*Transaction Proposals*" mean, collectively with the Required Transaction Proposals and the Adjournment Proposal.

"*Transfer Agent*" means Continental Stock Transfer & Trust Company.

"*Trust Account*" means the Trust Account of Sandbridge that holds the proceeds from Sandbridge's initial public offering and the private placement of the private placement warrants.

"*Trust Agreement*" means that certain Investment Management Trust Agreement, dated as of September 14, 2020, between Sandbridge and the Trustee.

"*Trustee*" means Continental Stock Transfer & Trust Company.

"*Units*" means the units of Sandbridge, each consisting of one share of Sandbridge Class A common stock and one-half (1/2) of one public warrant of Sandbridge.

vii

Exhibit 7
Page 616

TABLE OF CONTENTS

### CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This proxy statement/prospectus includes forward-looking statements regarding, among other things, the plans, strategies and prospects, both business and financial, of Sandbridge and Owlet. These statements are based on the beliefs and assumptions of the respective management teams of Sandbridge and Owlet. Although Sandbridge and Owlet believe that their respective plans, intentions and expectations reflected in or suggested by these forward-looking statements are reasonable, neither Sandbridge nor Owlet can assure you that either will achieve or realize these plans, intentions or expectations. Forward-looking statements are inherently subject to risks, uncertainties and assumptions. Generally, statements that are not historical facts, including statements concerning possible or assumed future actions, business strategies, events or results of operations, are forward-looking statements. These statements may be preceded by, followed by or include the words "believes," "estimates," "expects," "projects," "forecasts," "may," "will," "should," "seeks," "plans," "scheduled," "anticipates" or "intends" or similar expressions.

The forward-looking statements contained in this proxy statement/prospectus are based on current expectations and beliefs concerning future developments and their potential effects on us and/or Owlet. There can be no assurance that future developments affecting us and/or Owlet will be those that we and/or the Owlet have anticipated. These forward-looking statements involve a number of risks, uncertainties (some of which are beyond our control or the control of Owlet) or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. Before any shareholder grants its proxy or instructs how its vote should be cast or vote on the proposals to be put to the special meeting, such stockholder should be aware that the occurrence of the events described in the "*Risk Factors*" section and elsewhere in this proxy statement/prospectus may adversely affect us. These risks and uncertainties include, but are not limited to, the following risks, uncertainties and other factors:

- the ability of Sandbridge and Owlet to meet the closing conditions in the Business Combination Agreement, including the receipt of approval by the stockholders of Sandbridge of the Required Transaction Proposals and the availability of an aggregate cash amount of at least $140 million available at Closing from the Trust Account;

- the occurrence of any event, change or other circumstances, including the outcome of any legal proceedings that may be instituted against Sandbridge and Owlet following the announcement of the Business Combination Agreement and the transactions contemplated therein, that could give rise to the termination of the Business Combination Agreement or could otherwise cause the transactions contemplated therein to fail to close;

- the ability to obtain or maintain the listing of New Owlet common stock on the NYSE, as applicable, following the Business Combination;

- the risk that the proposed Business Combination disrupts current plans and operations of Owlet as a result of the announcement and consummation of the Business Combination;

- the ability to recognize the anticipated benefits of the Business Combination, which may be affected by, among other things, competition and the ability of New Owlet to grow and manage growth profitably and retain its key employees;

- costs related to the proposed Business Combination;

- changes in applicable laws or regulations;

- the ability of New Owlet to raise financing in the future;

- the success, cost and timing of Owlet's and New Owlet's product development activities;

- the potential attributes and benefits of Owlet's and New Owlet's products and services;

- Owlet's and New Owlet's ability to obtain and maintain regulatory approval for Owlet's or New Owlet's products, and any related restrictions and limitations of any approved product;

- Owlet's and New Owlet's estimates regarding expenses, future revenue, capital requirements and needs for additional financing;

- Owlet's and New Owlet's financial performance;

viii

Exhibit 7
Page 617

- the impact of the COVID-19 pandemic on Owlet's and New Owlet's business, including on the ability of Sandbridge and Owlet to consummate the Business Combination; and

- other factors detailed under the section titled "*Risk Factors*" and elsewhere in this proxy statement/prospectus.

Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. Some of these risks and uncertainties may in the future be amplified by the COVID-19 outbreak and there may be additional risks that we consider immaterial or which are unknown. It is not possible to predict or identify all such risks. Neither we nor Owlet undertake any obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

ix

Exhibit 7
Page 618

TABLE OF CONTENTS

**QUESTIONS AND ANSWERS FOR STOCKHOLDERS OF SANDBRIDGE**

*The following are answers to certain questions that you may have regarding the Business Combination and the Special Meeting. Sandbridge urges you to read carefully the remainder of this document because the information in this section may not provide all the information that might be important to you in determining how to vote. Additional important information is also contained in the appendices to, and the documents incorporated by reference in, this proxy statement/prospectus.*

**Q:    Why am I receiving this proxy statement/prospectus?**

A:    Sandbridge is proposing to consummate the Business Combination with Owlet. Sandbridge, Merger Sub and Owlet have entered into the Business Combination Agreement, the terms of which are described in this proxy statement/prospectus. A copy of the Business Combination Agreement is attached hereto as Annex A. Sandbridge urges its stockholders to read the Business Combination Agreement in its entirety.

Sandbridge is holding a Special Meeting to obtain the approval of Sandbridge stockholders of the Business Combination Agreement. Sandbridge stockholders will also be asked to vote on certain other matters described in this proxy statement/prospectus at the Special Meeting and to approve the adjournment of the Special Meeting, if necessary or appropriate, to solicit additional proxies in the event there are not sufficient votes at the time of the Special Meeting to approve the Business Combination Agreement and thereby approve the Business Combination.

**THE VOTE OF SANDBRIDGE STOCKHOLDERS IS IMPORTANT. SANDBRIDGE STOCKHOLDERS ARE URGED TO SUBMIT THEIR PROXIES AS SOON AS POSSIBLE AFTER CAREFULLY REVIEWING THIS PROXY STATEMENT/PROSPECTUS AND CAREFULLY CONSIDERING EACH OF THE PROPOSALS BEING PRESENTED AT THE MEETING.**

**Q:    Why is Sandbridge proposing the Business Combination?**

A:    Sandbridge was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or other similar business combination.

Based on its due diligence investigations of Owlet and the industries in which it operates, including the financial and other information provided by Owlet in the course of Sandbridge's due diligence investigations, the Sandbridge Board believes that the Business Combination with Owlet is in the best interests of Sandbridge and its stockholders and presents an opportunity to increase stockholder value. However, there can be no assurances of this.

Although the Sandbridge Board believes that the Business Combination with Owlet presents a unique business combination opportunity and is in the best interests of Sandbridge and its stockholders, the Sandbridge Board did consider certain potentially material negative factors in arriving at that conclusion. See "*The Business Combination Proposal - Sandbridge's Board of Directors' Reasons for the Approval of the Business Combination*" for a discussion of the factors considered by the Sandbridge Board in making its decision.

**Q:    When and where will the Special Meeting take place?**

A:    The Special Meeting will be held on            , 2021, at          local time, via live webcast at the following address: www.virtualshareholdermeeting.com/SBG2021SM, or such other date, time and place to which such meeting may be adjourned or postponed, to consider and vote upon the proposals. To participate in the Special Meeting, a Sandbridge stockholder of record will need the 16-digit control number included on their proxy card or instructions that accompanied their proxy materials, if applicable, or to obtain a proxy form from their broker, bank or other nominee. The Special Meeting webcast will begin promptly at        , New York City time. Sandbridge stockholders are encouraged to access the Special Meeting prior to the start time. If you encounter any difficulties accessing the virtual meeting or during the meeting time, please call the technical support number that will be posted on the virtual meeting login page.

1

Exhibit 7
Page 619

TABLE OF CONTENTS

**Q:** **What matters will be considered at the Special Meeting?**

**A:** The Sandbridge stockholders will be asked to consider and vote on the following proposals:

- The Business Combination Proposal, which is a proposal to approve the Business Combination Agreement and approve the Business Combination;

- The Charter Amendment Proposal, which is a proposal to approve, assuming the Business Combination Proposal is approved and adopted, the Proposed Charter, which will replace the Current Charter, including the proposals to approve, on a non-binding advisory basis and as required by applicable SEC guidance, certain material differences between the Current Charter and the Proposed Charter (the "Advisory Charter Amendment Proposals");

- The NYSE Proposal, which is a proposal to approve, assuming the Business Combination Proposal and the Charter Amendment Proposal are approved and adopted, for the purposes of complying with the applicable listing rules of the NYSE, the issuance of (i) 13,000,000 shares of Sandbridge Class A common stock to the PIPE Investors in the PIPE Financing, plus any additional shares pursuant to Subscription Agreements we may enter into prior to Closing, and (ii) an aggregate of up to 102,500,000 shares of New Owlet common stock to existing Owlet equityholders pursuant to the terms of the Business Combination Agreement;

- The Incentive Award Plan Proposal, which is a proposal to approve, assuming the Business Combination Proposal, the Charter Amendment Proposal and the NYSE Proposal are approved and adopted, the New Owlet Incentive Award Plan;

- The ESPP Proposal, which is a proposal to approve, assuming the Business Combination Proposal, the Charter Amendment Proposal, the NYSE Proposal and the New Owlet Incentive Award Plan are approved and adopted, the New Owlet ESPP; and

- The Adjournment Proposal, which is a proposal to approve the adjournment of the Special Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies if, based upon the tabulated vote at the time of the Special Meeting, any of the Required Transaction Proposals would not be duly approved and adopted by our stockholders or we determine that one or more of the closing conditions under the Business Combination Agreement is not satisfied or waived.

**Q:** **Is my vote important?**

**A:** Yes. The Business Combination cannot be completed unless the Business Combination Proposal receives the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon and the other Required Transaction Proposals achieve the necessary vote outlined below. Only Sandbridge stockholders as of the close of business on            , 2021, the record date for the Special Meeting, are entitled to vote at the Special Meeting. The Sandbridge Board unanimously recommends that such Sandbridge stockholders vote "**FOR**" the approval of the Business Combination Proposal, "**FOR**" the approval of the Charter Amendment Proposal, including, on an advisory basis, the Advisory Charter Amendment Proposals, "**FOR**" the approval of the NYSE Proposal, "**FOR**" the approval of the Incentive Award Plan Proposal, "**FOR**" the approval of the ESPP Proposal, and "**FOR**" the approval of the Adjournment Proposal.

**Q:** **If my shares are held in "street name" by my bank, brokerage firm or other nominee, will my bank, brokerage firm or other nominee automatically vote those shares for me?**

**A:** No. If your shares are held in a stock brokerage account or by a bank or other nominee, you are considered the "beneficial holder" of the shares held for you in what is known as "street name." If this is the case, this proxy statement/prospectus may have been forwarded to you by your brokerage firm, bank or other nominee, or its agent. As the beneficial holder, you also have the right to direct your broker, bank or other nominee as to how to vote your shares. If you do not provide voting instructions to your broker on a particular proposal on which your broker does not have discretionary authority to vote, your shares will not be voted on that proposal. This is called a "broker non-vote." Abstentions and broker non-votes will count as present for the purposes of establishing a quorum. If you decide to vote, you should provide instructions

2

Exhibit 7
Page 620

TABLE OF CONTENTS

to your broker, bank or other nominee on how to vote in accordance with the information and procedures provided to you by your broker, bank or other nominee. Alternatively, you may vote by telephone or over the Internet as instructed by your broker, bank or other nominee. "Street name" stockholders who wish to vote at the Special Meeting will need the 16-digit meeting control number included on the instructions that accompanied your proxy materials, if applicable, or to obtain a proxy form from your broker, bank or other nominee.

**Q:    What Sandbridge stockholder vote is required for the approval of each proposal brought before the Special Meeting? What will happen if I fail to vote or abstain from voting on each proposal?**

A:    *The Business Combination Proposal.* Approval of the Business Combination Proposal requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. In connection with our initial public offering, our initial stockholders and our other directors and officers at the time of our initial public offering entered into a letter agreement to vote their founder shares and any public shares acquired by them during or after the initial public offering in favor of the Business Combination Proposal and the other Transaction Proposals being presented at the Special Meeting, all of which are unanimously recommended by the Sandbridge Board. The shares held by our Sponsor, our other initial stockholders and our other directors and officers that are obligated to vote in favor of the Business Combination represent approximately 27% of the voting power of Sandbridge. Abstentions will be treated as votes against this proposal.

*The Charter Amendment Proposal.* Approval of the Charter Amendment Proposal requires the affirmative vote of the holders of (i) at least a majority of the outstanding shares of Sandbridge Class B common stock, voting separately as a single class, and (ii) a majority of the outstanding shares of Sandbridge common stock entitled to vote thereon, voting together as a single class. Abstentions and broker non-votes will be treated as votes against this proposal.

*The Advisory Charter Amendment Proposals.* Approval of each of the Advisory Charter Amendment Proposals, each of which is a non-binding vote, requires the affirmative vote of a majority of the votes cast by the Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. Abstentions and broker non-votes have no effect on the outcome of the proposal.

*The NYSE Proposal.* Approval of the NYSE Proposal requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. Abstentions will be treated as votes against this proposal.

*The Incentive Award Plan Proposal.* Approval of the Incentive Award Plan Proposal requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. Abstentions will be treated as votes against this proposal.

*The ESPP Proposal.* Approval of the ESPP requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. Abstentions will be treated as votes against this proposal.

*The Adjournment Proposal.* Approval of the Adjournment Proposal requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. The failure to vote, abstentions and broker non-votes have no effect on the outcome of the proposal.

**Q:    What will Owlet's equityholders receive in connection with the Business Combination?**

A:    As a consequence of the Merger, at the Effective Time, (i) each share of Owlet capital stock (as defined herein) that is issued and outstanding immediately prior to the Effective Time will become the right to receive the number of shares of New Owlet common stock equal to the Exchange Ratio; (ii) each option to purchase shares of Owlet common stock, whether vested or unvested, that is outstanding and unexercised as

3

Exhibit 7
Page 621

TABLE OF CONTENTS

of immediately prior to the Effective Time will be assumed by New Owlet and will automatically become an option (vested or unvested, as applicable) to purchase a number of shares of New Owlet common stock equal to the number of shares of Owlet common stock subject to such option immediately prior to the Effective Time multiplied by the Exchange Ratio, rounded down to the nearest whole share, at an exercise price per share equal to the exercise price per share of such option immediately prior to the Effective Time divided by the Exchange Ratio, rounded up to the nearest whole cent, except that, subject to limitations, holders of vested options may instead elect to receive a cash payment in lieu of assumption of a portion of their vested options (subject to certain caps); and (iii) each share of Owlet common stock that is subject to a risk of forfeiture or right of repurchase at the original purchase price as of immediately prior to the Effective Time shall be subject to the same risk of forfeiture or right of repurchase (proportionately adjusted to reflect the Exchange Ratio) which risk of forfeiture or right of repurchase shall lapse in accordance with the same vesting schedule as that of the Owlet Restricted Stock.

**Q:** **What voting power will current Sandbridge stockholders and Owlet stockholders hold in New Owlet immediately after the consummation of the Business Combination?**

**A:** It is anticipated that, upon completion of the Business Combination, the voting power in New Owlet will be as set forth in the table below:

|  | No Redemption (Shares) | % | Maximum Redemption (Shares) | % |
|---|---|---|---|---|
| Owlet equityholders[1] | 90,466,363 | 68.4% | 90,466,363 | 72.2% |
| Sandbridge's public stockholders | 23,000,000 | 17.4% | 16,000,000 | 12.8% |
| Sponsor & related parties[2] | 5,750,000 | 4.4% | 5,750,000 | 4.6% |
| PIPE Investors | 13,000,000 | 9.8% | 13,000,000 | 10.4% |
| **Pro Forma New Owlet Common Stock at Closing** | 132,216,363 | 100% | 125,216,363 | 100% |

(1)    Excludes 9,533,637 shares of New Owlet common stock underlying outstanding New Owlet option awards on a net exercise basis.

(2)    Represents the shares of New Owlet common stock the Sponsor and the independent directors and an advisor of Sandbridge will receive upon conversion of the Sandbridge Class B common stock at Closing. Of such shares, 2,807,500 shares of New Owlet common stock will be outstanding following the Closing but will remain subject to price-based performance vesting terms as described in the Sponsor Letter Agreement.

**Q:** **What happens to the funds deposited in the Trust Account after consummation of the Business Combination?**

**A:** A total of $230 million, including approximately $8.05 million of underwriters' deferred discount and approximately $4.6 million of the proceeds of the sale of the private placement warrants, was placed in the Trust Account and is maintained by Continental Stock Transfer & Trust Company, acting as trustee. As of December 31, 2020, there were investments and cash held in the Trust Account of $230,053,249. These funds will not be released until the earlier of Closing or the redemption of our public shares if we are unable to complete an initial business combination by September 17, 2022, during any stockholder-approved extension period, although we may withdraw the interest earned on the funds held in the Trust Account to pay franchise and income taxes. Upon the Closing of the Business Combination, the funds remaining in the Trust Account will be released and, together with the proceeds of the PIPE Financing, if any, will remain on the balance sheet of New Owlet.

**Q:** **What happens if a substantial number of the public stockholders vote in favor of the Business Combination Proposal and exercise their redemption right?**

**A:** Sandbridge stockholders who vote in favor of the Business Combination may also nevertheless exercise their redemption rights. Accordingly, the Business Combination may be consummated even though the funds available from the Trust Account and the number of public stockholders are reduced as a result of redemptions by public stockholders. The consummation of the Business Combination is conditioned upon, among other things, Sandbridge having an aggregate cash amount of at least $140 million available at Closing from the Trust Account, after certain fees and expenses (the "Available Sandbridge Cash," and such condition to the consummation of the Business Combination, the "Minimum Available Sandbridge Cash Amount" (though this condition may be waived by Owlet)). In addition, with fewer public shares and public stockholders, the trading market for New Owlet common stock may be less liquid than it otherwise would

4

Exhibit 7
Page 622

have been, and New Owlet may not be able to meet the listing standards for the NYSE or another national securities exchange. In addition, with less funds available from the Trust Account, the working capital infusion from the Trust Account into New Owlet's business will be reduced. As a result, the proceeds will be greater in the event that no public stockholders exercise redemption rights with respect to their public shares for a pro rata portion of the Trust Account as opposed to the scenario in which Sandbridge's public stockholders exercise the maximum allowed redemption rights.

**Q: What amendments will be made to the Current Charter?**

A: We are asking Sandbridge stockholders to approve the Proposed Charter that will be effective upon the consummation of the Business Combination. The Proposed Charter provides for various changes that the Sandbridge Board believes are necessary to address the needs of the post-combination company, including, among other things: (i) the change of Sandbridge's name to "Owlet, Inc."; (ii) the increase of the total number of authorized shares of all classes of capital stock, par value of $0.0001 per share, from 111,000,000 shares to 1,100,000,000 shares, consisting of 1,000,000,000 shares of Class A common stock and 100,000,000 shares of undesignated preferred stock, par value $0.0001 per share; (iii) changes to the required vote to amend the charter and bylaws; and (iv) the elimination of certain provisions specific to Sandbridge's status as a blank check company.

Pursuant to Delaware law and the Current Charter, Sandbridge is required to submit the Charter Amendment Proposal to Sandbridge's stockholders for approval. For additional information, see the section titled "*The Charter Amendment Proposal*."

**Q: Did the Sandbridge Board obtain a third-party valuation or fairness opinion in determining whether or not to proceed with the Business Combination?**

A: No. The Sandbridge Board did not obtain a third-party valuation or fairness opinion in connection with its determination to approve the Business Combination. However, Sandbridge's management, the members of the Sandbridge Board and the other representatives of Sandbridge have substantial experience in evaluating the operating and financial merits of companies similar to Owlet and reviewed certain financial information of Owlet and compared it to certain publicly traded companies, selected based on the experience and the professional judgment of Sandbridge's management team, which enabled them to make the necessary analyses and determinations regarding the Business Combination. Accordingly, investors will be relying solely on the judgment of the Sandbridge Board in valuing Owlet's business and assuming the risk that the Sandbridge Board may not have properly valued such business.

**Q: Do I have redemption rights?**

A: If you are a public stockholder, you have the right to request that Sandbridge redeem all or a portion of your public shares for cash, provided that you follow the procedures and deadlines described elsewhere in this proxy statement/prospectus under the heading "*The Special Meeting - Redemption Rights*." Public stockholders may elect to redeem all or a portion of their public shares even if they vote for the Business Combination Proposal. We sometimes refer to these rights to elect to redeem all or a portion of the public shares into a pro rata portion of the cash held in the Trust Account as "redemption rights." If you wish to exercise your redemption rights, please see the answer to the question: "How do I exercise my redemption rights?"

Notwithstanding the foregoing, a public stockholder, together with any affiliate of such public stockholder or any other person with whom such public stockholder is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Exchange Act), will be restricted from redeeming its public shares with respect to more than an aggregate of 15% of the public shares. Accordingly, if a public stockholder, alone or acting in concert or as a group, seeks to redeem more than 15% of the public shares, then any such shares in excess of that 15% limit would not be redeemed for cash.

**Q: How do I exercise my redemption rights?**

A: If you are a public shareholder and wish to exercise your right to redeem your public shares, you must:

(i) (a) hold public shares, or (b) if you hold public shares through units, you elect to separate your units into the underlying public shares and public warrants prior to exercising your redemption rights with respect to the public shares;

5

Exhibit 7
Page 623

(ii) prior to            p.m., New York City time, on            , 2021, (a) submit a written request, including the legal name, telephone number and address of the beneficial owner of the shares for which redemption is requested, to Continental Stock Transfer & Trust Company, Sandbridge's transfer agent (the "Transfer Agent") that Sandbridge redeem your public shares for cash and (b) deliver your public shares to the Transfer Agent, physically or electronically through The Depository Trust Company ("DTC").

The address of the Transfer Agent is listed under the question "*Whom do I call if I have questions about the Special Meeting or the Business Combination?*" below.

**Holders of units must elect to separate the units into the underlying public shares and public warrants prior to exercising redemption rights with respect to the public shares. If holders hold their units in an account at a brokerage firm or bank, holders must notify their broker or bank that they elect to separate the units into the underlying public shares and public warrants, or if a holder holds units registered in its own name, the holder must contact Continental Stock Transfer & Trust Company, our transfer agent, directly and instruct them to do so.**

Any public stockholder will be entitled to request that their public shares be redeemed for a per share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, including interest earned on the funds held in the Trust Account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares. For illustrative purposes, as of December 31, 2021, this would have amounted to approximately $10.00 per public share. However, the proceeds deposited in the Trust Account could become subject to the claims of our creditors, if any, which could have priority over the claims of our public stockholders, regardless of whether such public stockholders vote for or against the Business Combination Proposal. Therefore, the per share distribution from the Trust Account in such a situation may be less than originally anticipated due to such claims. Your vote on any proposal other than the Business Combination Proposal will have no impact on the amount you will receive upon exercise of your redemption rights. It is anticipated that the funds to be distributed to public stockholders electing to redeem their public shares will be distributed promptly after the consummation of the Business Combination.

If you are a holder of public shares, you may exercise your redemption rights by submitting your request in writing to the Transfer Agent at the address listed under the question "*Whom do I call if I have questions about the Special Meeting or the Business Combination?*" below.

Any request for redemption, once made by a holder of public shares, may be withdrawn at any time up to the deadline for submitting redemption requests, which is            , 2021 (two business days prior to the date of the Special Meeting), and thereafter, with our consent, until the Closing. If you deliver your shares for redemption to the Transfer Agent and later decide prior to the deadline for submitting redemption requests not to elect redemption, you may request that Sandbridge instruct the Transfer Agent to return the shares to you (physically or electronically). You may make such request by contacting the Transfer Agent at the telephone number or address listed at the end of this section.

Any corrected or changed written exercise of redemption rights must be received by Sandbridge's Corporate Secretary prior to the deadline for submitting redemption requests. No request for redemption will be honored unless the holder's stock has been delivered (either physically or electronically) to the Transfer Agent by            , New York City time, on            , 2021.

If you are a holder of public shares and you exercise your redemption rights, it will not result in the loss of any Sandbridge warrants that you may hold.

**Q:  If I am a holder of units, can I exercise redemption rights with respect to my units?**

A:  No. Holders of outstanding units must first elect to separate the units into the underlying public shares and public warrants prior to exercising redemption rights with respect to the public shares. If you hold your units in an account at a brokerage firm or bank, you must notify your broker or bank that you elect to separate the units into the underlying public shares and public warrants, or if you hold units registered in your own name, you must contact the Transfer Agent directly and instruct them to do so. If you fail to cause your units to be separated and delivered to the Transfer Agent by            , 2021, you will not be able to exercise your redemption rights with respect to your public shares.

6

Exhibit 7
Page 624

TABLE OF CONTENTS

**Q:  What are the U.S. federal income tax consequences of exercising my redemption rights?**

A:  The U.S. federal income tax consequences of exercising your redemption rights depend on your particular facts and circumstances. It is possible that you may be treated as selling your public shares for cash and, as a result, recognize capital gain or capital loss. It is also possible that the redemption may be treated as a distribution for U.S. federal income tax purposes depending on the amount of public shares that you own or are deemed to own (including through the ownership of New Owlet warrants). For a more complete discussion of the U.S. federal income tax considerations of an exercise of redemption rights, see "*Certain Material U.S. Federal Income Tax Considerations*."

**THE TAX CONSEQUENCES OF EXERCISING YOUR REDEMPTION RIGHTS WILL DEPEND ON THE FACTS OF YOUR OWN SITUATION. YOU SHOULD CONSULT YOUR OWN TAX ADVISOR AS TO THE SPECIFIC TAX CONSEQUENCES OF THE EXERCISE OF REDEMPTION RIGHTS TO YOU IN YOUR PARTICULAR CIRCUMSTANCES.**

**Q:  How does the Sandbridge Board recommend that I vote?**

A:  The Sandbridge Board recommends that the Sandbridge stockholders vote "**FOR**" the approval of the Business Combination Proposal, "**FOR**" the approval of the Charter Amendment Proposal, including the Advisory Charter Amendment Proposals, "**FOR**" the approval of the NYSE Proposal, "**FOR**" the approval of the Incentive Award Plan Proposal, "**FOR**" for the approval of the ESPP Proposal and "**FOR**" the approval of the Adjournment Proposal. For more information regarding how the Sandbridge Board recommends that Sandbridge stockholders vote, see the section titled "*The Business Combination Proposal - Sandbridge's Board of Directors' Reasons for the Approval of the Business Combination*."

**Q:  How do our Sponsor and the other initial stockholders intend to vote their shares?**

A:  In connection with our initial public offering, our initial stockholders and our other directors and officers at the time of our initial public offering entered into a letter agreement to vote their founder shares, as well as any public shares purchased by them during or after our initial public offering, in favor of the Business Combination Proposal and the other Transaction Proposals, all of which are unanimously recommended by the Sandbridge Board, being presented at the Special Meeting. These stockholders collectively own approximately 27% of our issued and outstanding shares of common stock.

**Q:  May our Sponsor and the other initial stockholders purchase public shares or warrants prior to the Special Meeting?**

A:  At any time prior to the Special Meeting, during a period when they are not in possession of any material nonpublic information regarding Sandbridge or its securities, the initial stockholders, Owlet and/or their respective affiliates may purchase shares and/or warrants from investors, or they may enter into transactions with such investors and others to provide them with incentives to acquire public shares, vote their public shares in favor of the Business Combination Proposal or not redeem their public shares. The purpose of any such transaction could be to (i) vote such shares in favor of the Business Combination and thereby increase the likelihood of the consummation of the Business Combination or (ii) increase the likelihood that the Minimum Available Sandbridge Cash Amount is satisfied. Any such stock purchases and other transactions may thereby increase the likelihood that the Business Combination is consummated. While the exact nature of any such incentives has not been determined as of the date of this proxy statement/prospectus, they might include, without limitation, arrangements to protect such investors or holders against potential loss in value of their shares, including the granting of put options and the transfer to such investors or holders of shares or rights owned by Sandbridge's initial stockholders for nominal value.

Entering into any such arrangements may have a depressive effect on public shares. For example, as a result of these arrangements, an investor or holder may have the ability to effectively purchase shares at a price lower than market and may therefore be more likely to sell the shares it owns, either prior to or immediately after the Special Meeting.

If such transactions are effected, the consequence could be to cause the Business Combination to be completed in circumstances where it might not otherwise have occurred. Purchases of a significant number of public shares by the persons described above could allow them to exert more influence over the approval

7

Exhibit 7
Page 625

TABLE OF CONTENTS

of the proposals to be presented at the Special Meeting and would likely increase the chances that such proposals would be approved. Such purchases also would likely reduce the number of redemptions of our public shares in connection with the Business Combination, making it more likely that we would satisfy the Minimum Available Sandbridge Cash Amount closing condition. As of the date of this proxy statement/prospectus, there are no such agreements or arrangements. Sandbridge will file a Current Report on Form 8-K to disclose any arrangements entered into or significant purchases made by any of the aforementioned persons that would affect the vote on the proposals to be voted on at the Special Meeting or which include a contractual waiver of redemption rights.

**Q:    Who is entitled to vote at the Special Meeting?**

A:    The Sandbridge Board has fixed          , 2021 as the record date for the Special Meeting. All holders of record of Sandbridge common stock as of the close of business on the record date are entitled to receive notice of, and to vote at, the Special Meeting, provided that those shares remain outstanding on the date of the Special Meeting. Physical attendance at the Special Meeting is not required to vote. See the question "*How can I vote my shares without attending the Special Meeting?*" below for instructions on how to vote your Sandbridge common stock without attending the Special Meeting.

**Q:    How many votes do I have?**

A:    Each Sandbridge stockholder of record is entitled to one vote for each share of Sandbridge common stock held by such holder as of the close of business on the record date. As of the close of business on          , 2021, the record date for the Special Meeting, there were          outstanding shares of Sandbridge common stock.

**Q:    What constitutes a quorum for the Special Meeting?**

A:    A quorum is the minimum number of stockholders necessary to hold a valid meeting.

A quorum will exist at the Special Meeting with respect to each matter to be considered at the Special Meeting if the holders of shares of outstanding Sandbridge common stock representing a majority of the voting power of all outstanding shares of capital stock of Sandbridge entitled to vote at the Special Meeting as of the record date are present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting. All shares represented by proxy are counted as present for purposes of establishing a quorum. Abstentions and broker non-votes will count as present for the purposes of establishing a quorum.

**Q:    What is Owlet?**

A:    Owlet Baby Care Inc. was founded on a commitment to designing and selling products and services that empower parents with technology and data to proactively monitor the health and wellness of their children from conception to kindergarten. Owlet's ecosystem of connected smart products, which currently includes its flagship Owlet Smart Sock, the Owlet Cam and Owlet Dream Lab, is helping to transform modern parenting by bringing simplified child monitoring solutions in-home so parents can rest easier. The Owlet Smart Sock is intended for use by healthy infants of up to 18 months of age. The Owlet Cam can be used by parents to help monitor children of any age. Owlet Dream Lab is an interactive online platform that assists families in building healthy sleep habits with their babies of up to 12 months in age.

**Q:    What will happen to my shares of Sandbridge common stock as a result of the Business Combination?**

A:    If the Business Combination is completed, each share of Sandbridge Class B common stock that is issued and outstanding as of immediately prior to the Effective Time will be converted, on a one-for-one basis, into a share of New Owlet common stock. The Business Combination will have no effect on Sandbridge Class A common stock that is issued and outstanding as of immediately prior to the Effective Time, which will continue to remain outstanding. See the section titled "*The Business Combination Proposal - Consideration to the Owlet Stockholders*."

**Q:    Where will the New Owlet common stock that Sandbridge stockholders receive in the Business Combination be publicly traded?**

A:    Assuming the Business Combination is completed, the shares of New Owlet common stock (including the

8

Exhibit 7
Page 626

shares of New Owlet common stock issued in connection with the Business Combination) will be listed and traded on the NYSE under the ticker symbol "OWLT" and the public warrants will be listed and traded on the NYSE under the ticker symbol "OWLT WS."

**Q:    What happens if the Business Combination is not completed?**

A:    If the Business Combination Agreement is not approved by the Sandbridge stockholders or if the Business Combination is not completed for any other reason by July 31, 2021, then we will seek to consummate an alternative initial business combination prior to September 17, 2022, or during any stockholder-approved extension period. If we do not consummate an initial business combination by September 17, 2022, or during any stockholder-approved extension period, we will cease all operations except for the purpose of winding up and redeem our public shares and liquidate the Trust Account, in which case our public stockholders may only receive approximately $10.00 per share and our warrants will expire worthless.

**Q:    How can I attend and vote my shares at the Special Meeting**

A:    Shares of Sandbridge common stock held directly in your name as the stockholder of record of such shares as of the close of business on            , 2021, the record date, may be voted electronically at the Special Meeting. If you choose to attend the Special Meeting, you will need to visit www.virtualshareholdermeeting.com/SBG2021SM and enter the control number found on your proxy card, voting instruction form or notice you previously received. You may vote during the Special Meeting by following instructions available on the meeting website during the meeting. The Special Meeting starts at            , New York City time. We encourage you to allow ample time for online check-in, which will open at            , New York City time. Please have your 16-digit control number to join the Special Meeting webcast. Instructions on who can attend and participate via the Internet, including how to demonstrate proof of stock ownership, are posted at www.proxyvote.com

**Q:    How can I vote my shares without attending the Special Meeting?**

A:    If you are a stockholder of record of Sandbridge as of the close of business on            , 2021, the record date, you may submit your proxy before the Special Meeting in any of the following ways, if available:

•    *Vote by Mail*: by signing, dating and returning the enclosed proxy card;

•    *Vote by Internet*: visit http://www.proxyvote.com, 24 hours a day, seven days a week, until 11:59 p.m. New York City time on            , 2021 (have your proxy card in hand when you visit the website);

•    Vote by Phone: by calling toll-free (within the U.S. or Canada) 1-800-690-6903, until 11:59 p.m. New York City time on            , 2021 (have your proxy card in hand when you call); or

•    Vote at the Special Meeting: by casting your vote at the Special Meeting via the Special Meeting website. Any stockholder of record as of the close of business on            , the record date, can attend the Special Meeting webcast by visiting: www.virtualshareholdermeeting.com/SBG2021SM, where such stockholders may vote during the Special Meeting. The Special Meeting starts at            , New York City time. We encourage you to allow ample time for online check-in, which will open at            , New York City time. Please have your 16-digit control number to join the Special Meeting webcast.

If your shares are held in "street name" through a broker, bank or other nominee, your broker, bank or other nominee will send you separate instructions describing the procedure for voting your shares. Simply complete, sign and date your voting instruction card and return it in the postage-paid envelope provided to ensure that your vote is counted. Alternatively, you may vote by telephone or over the Internet as instructed by your broker, bank or other nominee. "Street name" stockholders who wish to vote at the Special Meeting will need the 16-digit control number included on the instructions that accompanied your proxy materials, if applicable, or to obtain a proxy form from your broker, bank or other nominee.

9

Exhibit 7
Page 627

TABLE OF CONTENTS

**Q:**   **What is a proxy?**

**A:**   A proxy is a legal designation of another person to vote the stock you own. If you are a stockholder of record of Sandbridge common stock as of the close of business on the record date, and you vote by telephone, by Internet or by signing, dating and returning your proxy card in the enclosed postage-paid envelope, you designate two of Sandbridge's officers as your proxies at the Special Meeting, each with full power to act without the other and with full power of substitution. These two officers are Ken Suslow and Richard Henry.

**Q:**   **What is the difference between holding shares as a stockholder of record and as a beneficial owner?**

**A:**   If your shares of Sandbridge common stock are registered directly in your name with the Transfer Agent, you are considered the stockholder of record with respect to those shares, and access to proxy materials is being provided directly to you. If your shares are held in a stock brokerage account or by a bank or other nominee, then you are considered the beneficial owner of those shares, which are considered to be held in street name. Access to proxy materials is being provided to you by your broker, bank or other nominee who is considered the stockholder of record with respect to those shares.

*Direct holders (stockholders of record)*. For shares of Sandbridge common stock held directly by you, please complete, sign, date and return each proxy card (or cast your vote by telephone or Internet as provided on each proxy card) or otherwise follow the voting instructions provided in this proxy statement/prospectus in order to ensure that all of your shares of Sandbridge common stock are voted.

*Shares in "street name."* For Sandbridge common stock held in "street name" through a bank, brokerage firm or other nominee, you should follow the procedures provided by your bank, brokerage firm or other nominee to vote your shares.

**Q:**   **If a Sandbridge stockholder gives a proxy, how will the Sandbridge common stock covered by the proxy be voted?**

**A:**   If you provide a proxy by returning the applicable enclosed proxy card, the individuals named on the enclosed proxy card will vote your Sandbridge common stock in the way that you indicate when providing your proxy in respect of the Sandbridge common stock you hold. When completing the proxy card, you may specify whether your Sandbridge common stock should be voted "**FOR**" or "**AGAINST**", or should be abstained from voting on, all, some or none of the specific items of business to come before the Special Meeting.

**Q:**   **How will my Sandbridge common stock be voted if I return a blank proxy?**

**A:**   If you sign, date and return your proxy and do not indicate how you want your Sandbridge common stock to be voted, then your Sandbridge common stock will be voted "**FOR**" the approval of the Business Combination Proposal, "**FOR**" the approval of the Charter Amendment Proposal, including the Advisory Charter Amendment Proposals, "**FOR**" the approval of the NYSE Proposal, "**FOR**" the approval of the Incentive Award Plan Proposal, "**FOR**" for the approval of the ESPP Proposal and "**FOR**" the approval of the Adjournment Proposal.

**Q:**   **Can I change my vote after I have submitted my proxy?**

**A:**   Yes. If you are a stockholder of record of Sandbridge common stock as of the close of business on the record date, you can change or revoke your proxy before it is voted at the meeting in one of the following ways:

•   submit a new proxy card bearing a later date;

•   give written notice of your revocation to Sandbridge's Corporate Secretary, which notice must be received by Sandbridge's Corporate Secretary prior to the vote at the Special Meeting; or

•   vote electronically at the Special Meeting by visiting www.virtualshareholdermeeting.com/SBG2021SM and entering the control number found on your proxy card, voting instruction form or notice you previously received. Please note that your attendance at the Special Meeting will not alone serve to revoke your proxy.

10

Exhibit 7
Page 628

TABLE OF CONTENTS

Any proxy that you submitted may also be revoked by submitting a new proxy by mail, or online or by telephone, not later than 11:59 p.m. New York City time on            , 2021. If your shares are held in "street name" by your broker, bank or another nominee as of the close of business on the record date, you must follow the instructions of your broker, bank or other nominee to revoke or change your voting instructions.

**Q:   Where can I find the voting results of the Special Meeting?**

A:   The preliminary voting results are expected to be announced at the Special Meeting. In addition, within four business days following certification of the final voting results, Sandbridge will file the final voting results of its Special Meeting with the SEC in a Current Report on Form 8-K.

**Q:   Are Sandbridge stockholders able to exercise dissenters' rights or appraisal rights with respect to the matters being voted upon at the Special Meeting?**

A:   No. Sandbridge stockholders are not entitled to exercise dissenters' rights or appraisal rights under Delaware law in connection with the Business Combination. Dissenters' rights or appraisal rights are unavailable under Delaware law in connection with the Business Combination to holders of Sandbridge Class A common stock because it is currently listed on a national securities exchange and such holders are not receiving any consideration. Holders of Sandbridge Class A common stock may vote against the Business Combination Proposal or redeem their shares of Sandbridge Class A common stock if they are not in favor of the approval of the Business Combination Agreement or the Business Combination. Dissenters' rights or appraisal rights are unavailable under Delaware law in connection with the Business Combination to holders of Sandbridge Class B common stock because they have agreed to vote in favor of the Business Combination.

**Q:   Are there any risks that I should consider as a Sandbridge stockholder in deciding how to vote or whether to exercise my redemption rights?**

A:   Yes. You should read and carefully consider the risk factors set forth in the section titled "*Risk Factors*" in this proxy statement/prospectus. You also should read and carefully consider the risk factors of Sandbridge and Owlet contained in the documents that are incorporated by reference herein.

**Q:   What happens if I sell my Sandbridge common stock before the Special Meeting?**

A:   The record date for Sandbridge stockholders entitled to vote at the Special Meeting is earlier than the date of the Special Meeting. If you transfer your shares of Sandbridge common stock before the record date, you will not be entitled to vote at the Special Meeting. If you transfer your shares of Sandbridge common stock after the record date but before the Special Meeting, you will, unless special arrangements are made, retain your right to vote at the Special Meeting but will transfer the right to hold New Owlet common stock to the person to whom you transfer your Sandbridge common stock.

**Q:   What are the material U.S. federal income tax consequences of the Business Combination to me?**

A:   Certain material U.S. federal income tax considerations that may be relevant to you in respect of the Business Combination are discussed in more detail in the section titled "Certain Material U.S. Federal Income Tax Considerations." The discussion of the U.S. federal income tax consequences contained in this proxy statement/prospectus is intended to provide only a general discussion and is not a complete analysis or description of all of the U.S. federal income tax considerations that are applicable to you in respect of the Business Combination, nor does it address any tax considerations arising under U.S. state or local or non-U.S. tax laws.

THE TAX CONSEQUENCES OF THE BUSINESS COMBINATION WILL DEPEND ON THE FACTS OF YOUR OWN SITUATION. YOU SHOULD CONSULT YOUR OWN TAX ADVISOR AS TO THE SPECIFIC TAX CONSEQUENCES OF THE BUSINESS COMBINATION TO YOU IN YOUR PARTICULAR CIRCUMSTANCES.

**Q:   When is the Business Combination expected to be completed?**

A:   Subject to the satisfaction or waiver of the Closing conditions described in the section titled "*The Business Combination Agreement - Conditions to Closing of the Business Combination*," including the approval of the

11

Exhibit 7
Page 629

TABLE OF CONTENTS

Business Combination Agreement by the Sandbridge stockholders at the Special Meeting, the Business Combination is expected to close in the second quarter of 2021. However, it is possible that factors outside the control of both Sandbridge and Owlet could result in the Business Combination being completed at a later time, or not being completed at all.

**Q:  Who will solicit and pay the cost of soliciting proxies?**

A:  Sandbridge has engaged a professional proxy solicitation firm, Okapi Partners LLC ("Okapi"), to assist in soliciting proxies for the Special Meeting. Sandbridge has agreed to pay Okapi a fee for such services, which it expects will be approximately $20,000. In addition, Sandbridge will reimburse Okapi for reasonable out-of-pocket expenses and will indemnify Okapi and its affiliates against certain claims, liabilities, losses, damages and expenses. Sandbridge will also reimburse banks, brokers and other custodians, nominees and fiduciaries representing beneficial owners of our common stock for their expenses in forwarding soliciting materials to beneficial owners of our common stock and in obtaining voting instructions from those owners. Sandbridge's management team may also solicit proxies by telephone, by facsimile, by mail, on the Internet or in person. They will not be paid any additional amounts for soliciting proxies.

**Q:  What are the conditions to completion of the Business Combination?**

A:  The consummation of the Business Combination is conditioned upon the following non-waivable conditions: (i) the approval by our stockholders of the Required Transaction Proposals and the approval by Owlet's stockholders of the Business Combination Agreement and related transactions being obtained; (ii) the applicable waiting period under the HSR Act relating to the Business Combination having expired or been terminated; (iii) after giving effect to the Transactions, Sandbridge having at least $5,000,001 of net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) immediately after the Effective Time; (iv) the absence of any legal restraint or prohibition preventing consummation of the Business Combination; and (v) this proxy statement/registration statement having been declared effective by the SEC.

The consummation of the Business Combination is also conditioned upon the following waivable conditions: (i) the truth and correctness of each party's representations and warranties made in the Business Combination Agreement (subject to waiver by the other party); (ii) each party's compliance with the covenants in the Business Combination Agreement (subject to waiver by the other party); (iii) the delivery to each party by the other party of certificates, the Registration Rights Agreement and the Stockholders Agreement (subject to waiver by the other party); and (iv) immediately following the Effective Time, Sandbridge having satisfied any applicable continuing listing requirements of the NYSE (subject to waiver by agreement of both parties). In addition, the consummation of the Business Combination is conditioned upon satisfaction of the Minimum Available Sandbridge Cash Amount, which condition is waivable by Owlet, and the absence of any Company Material Adverse Effect, which condition is waivable by Sandbridge. Therefore, unless these conditions are validly waived by the applicable parties to the Business Combination Agreement, the Business Combination Agreement could terminate and the Business Combination may not be consummated.

**Q:  What should I do if I receive more than one set of voting materials?**

A:  Stockholders may receive more than one set of voting materials, including multiple copies of this proxy statement/prospectus and multiple proxy cards or voting instruction cards. For example, if you hold your shares in more than one brokerage account, you will receive a separate voting instruction card for each brokerage account in which you hold shares. If you are a holder of record and your shares are registered in more than one name, you will receive more than one proxy card. Please complete, sign, date and return each proxy card and voting instruction card that you receive in order to cast a vote with respect to all of your shares of Sandbridge common stock.

**Q:  Whom do I call if I have questions about the Special Meeting or the Business Combination?**

A:  If you have questions about the Special Meeting or the Business Combination, or desire additional copies of this proxy statement/prospectus or additional proxies, you may contact:

12

Exhibit 7
Page 630

TABLE OF CONTENTS

Okapi Partners LLC
1212 Avenue of the Americas, 24th Floor
New York, New York 10036
Tel: (844) 343-2623. (toll-free)

Banks and brokers call collect: (212) 297-0720
E-mail: info@okapipartners.com

You also may obtain additional information about Sandbridge from documents filed with the SEC by following the instructions in the section titled "*Where You Can Find More Information*." If you are a holder of public shares and you intend to seek redemption of your shares, you will need to deliver your public shares (either physically or electronically) to Continental Stock Transfer & Trust Company, Sandbridge's Transfer Agent, at the address below prior to ___ p.m., New York City time, on ___, 2021. If you have questions regarding the certification of your position or delivery of your stock, please contact:

Mark Zimkind
Continental Stock Transfer & Trust Company
1 State Street Plaza, 30th Floor
New York, New York 10004
E-mail: mzimkind@continentalstock.com

13

Exhibit 7
Page 631

TABLE OF CONTENTS

## SUMMARY OF THE PROXY STATEMENT/PROSPECTUS

*This summary highlights selected information from this proxy statement/prospectus and does not contain all of the information that may be important to you. You should read this entire document and its annexes and the other documents to which we refer before you decide how to vote with respect to the proposals to be considered and voted on at the Special Meeting.*

### Information About the Parties to the Business Combination

#### *Sandbridge*

1999 Avenue of the Stars, Suite 2088
Los Angeles, CA 90067
(424) 221-5743

Sandbridge Acquisition Corporation is a blank check company whose business purpose is to effect a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination.

#### *Owlet*

2500 Executive Parkway, Suite 500
Lehi, Utah 84043
(844) 334-5330

Owlet Baby Care Inc. designs and sells products and services based on a commitment to empower parents with technology and data to proactively monitor the health and wellness of their children from conception to kindergarten. Owlet's ecosystem of connected smart products, including its flagship Owlet Smart Sock, is helping to transform modern parenting by bringing simplified child monitoring solutions in-home so parents can rest easier.

#### *Merger Sub*

c/o Sandbridge Acquisition Corporation
1999 Avenue of the Stars, Suite 2088
Los Angeles, CA 90067
(424) 221-5743

Project Olympus Merger Sub, Inc. is a Delaware corporation and wholly-owned subsidiary of Sandbridge Acquisition Corporation formed for the purpose of effecting the Business Combination.

### The Business Combination and the Business Combination Agreement

As discussed in this proxy statement/prospectus, Sandbridge is asking its stockholders to approve the Business Combination Agreement and approve the Business Combination, pursuant to which, among other things, on the date of Closing, Merger Sub will merge with and into Owlet, with Owlet as the surviving corporation in the Business Combination and, after giving effect to such Business Combination, Owlet will be a wholly-owned subsidiary of Sandbridge. As a consequence of the Business Combination Agreement, at the Effective Time, each share of Sandbridge Class B common stock that is issued and outstanding as of immediately prior to the Effective Time will be converted, on a one-for-one basis, into a share of New Owlet common stock. The Business Combination will have no effect on the Sandbridge Class A common stock that is issued and outstanding as of immediately prior to the Effective Time, which will continue to remain outstanding. As a consequence of the Merger, at the Effective Time, (i) each share of Owlet capital stock (as defined herein) that is issued and outstanding immediately prior to the Effective Time will become the right to receive the number of shares of New Owlet common stock equal to the Exchange Ratio; (ii) each option to purchase shares of Owlet common stock, whether vested or unvested, that is not a Cash Elected Option and is outstanding and unexercised as of immediately prior to the Effective Time will be assumed by New Owlet and will automatically become an option (vested or unvested, as applicable) to purchase a number of shares of New Owlet common stock equal to the number of shares of Owlet common stock subject to such option immediately prior to the Effective Time multiplied by the Exchange Ratio, rounded down to the nearest whole share, at an exercise price per share equal to the exercise price per share of such option immediately prior to the Effective Time divided by the Exchange

Exhibit 7
Page 632

TABLE OF CONTENTS

Ratio, rounded up to the nearest whole cent; (iii) subject to certain limitations, each Cash Elected Option that is issued and outstanding immediately prior to the Effective Time shall be cancelled and converted into the right to receive the Cash Election Consideration; and (iv) each share of Owlet common stock that is subject to a risk of forfeiture or right of repurchase at the original purchase price as of immediately prior to the Effective Time shall be subject to the same risk of forfeiture or right of repurchase (proportionately adjusted to reflect the Exchange Ratio) which risk of forfeiture or right of repurchase shall lapse in accordance with the same vesting schedule as that of the Owlet Restricted Stock.

After consideration of the reasons identified and discussed in the section titled "*The Business Combination Proposal - Sandbridge's Board of Directors' Reasons for the Approval of the Business Combination*," the Sandbridge Board concluded that the Business Combination met all of the requirements disclosed in the prospectus for Sandbridge's initial public offering, including that the aggregate fair market value of the proposed Business Combination was at least 80% of the net assets held in the Trust Account. For more information about the transactions contemplated by the Business Combination Agreement, see "*The Business Combination Proposal*."

**Structure of the Business Combination**

Pursuant to the Business Combination Agreement, Merger Sub will merge with and into Owlet, with Owlet surviving the Business Combination. Upon consummation of the Business Combination, Owlet will be a wholly-owned subsidiary of Sandbridge. In addition, Sandbridge will file the Proposed Charter with the Secretary of State of the State of Delaware, such Proposed Charter to be effective simultaneous with the Effective Time.

The following is a depiction of Owlet's organizational structure before the consummation of the Business Combination:



15

Exhibit 7
Page 633

The following is a depiction of Owlet's organizational structure after the consummation of the Business Combination, with the percentages of ownership reflected assuming no redemptions by Sandbridge's public stockholders:



(1)    Represents the shares of New Owlet common stock the Sponsor and the independent directors and an advisor of Sandbridge will receive upon conversion of the Sandbridge Class B common stock at Closing. Of such shares, 2,807,500 shares of New Owlet common stock will be outstanding following the Closing but will remain subject to price-based performance vesting terms as described in the Sponsor Letter Agreement.

(2)    Excludes 9,533,637 shares of New Owlet common stock underlying outstanding New Owlet option awards on a net exercise basis.

**Consideration to the Owlet Stockholders in the Business Combination**

As a consequence of the Merger, at the Effective Time, (i) each share of Owlet capital stock (as defined herein) that is issued and outstanding immediately prior to the Effective Time will become the right to receive the number of shares of New Owlet common stock equal to the Exchange Ratio; (ii) each option to purchase shares of Owlet common stock, whether vested or unvested, that is not a Cash Elected Option and is outstanding and unexercised as of immediately prior to the Effective Time will be assumed by New Owlet and will automatically become an option (vested or unvested, as applicable) to purchase a number of shares of New Owlet common stock equal to the number of shares of Owlet common stock subject to such option immediately prior to the Effective Time multiplied by the Exchange Ratio, rounded down to the nearest whole share, at an exercise price per share equal to the exercise price per share of such option immediately prior to the Effective Time divided by the Exchange Ratio, rounded up to the nearest whole cent; (iii) subject to certain limitations, each Cash Election Option that is issued and outstanding immediately prior to the Effective Time shall be cancelled and converted into the right to receive the Cash Election Consideration; and (iv) each share of Owlet common stock that is subject to a risk of forfeiture or right of repurchase at the original purchase price as of immediately prior to the Effective Time shall be subject to the same risk of forfeiture or right of repurchase (proportionately adjusted to reflect the Exchange Ratio) which risk of forfeiture or right of repurchase shall lapse in accordance with the same vesting schedule as that of the Owlet Restricted Stock. For further details, see "*The Business Combination Proposal - Consideration to the Owlet Stockholders.*"

16

Exhibit 7
Page 634

**The PIPE Financing**

Sandbridge entered into Subscription Agreements with the PIPE Investors, pursuant to which, among other things, Sandbridge agreed to issue and sell in a private placement an aggregate of 13,000,000 shares of Sandbridge Class A common stock to the PIPE Investors for $10.00 per share immediately prior to the Closing.

**Certain Agreements Related to the Business Combination Agreement**

*Subscription Agreements*

Concurrently with the execution of the Business Combination Agreement, Sandbridge has entered into Subscription Agreements, dated as of February 15, 2021, with each of the PIPE Investors, pursuant to which the PIPE Investors have agreed to subscribe for and purchase, and Sandbridge has agreed to issue and sell to the PIPE Investors, immediately prior to the Closing, an aggregate of 13,000,000 shares of Sandbridge Class A common stock at a price of $10.00 per share, for aggregate gross proceeds of $130 million. The shares of Sandbridge Class A common stock to be issued pursuant to the Subscription Agreements have not been registered under the Securities Act in reliance upon the exemption provided in Section 4(a)(2) and/or Regulation D of the Securities Act. Sandbridge will grant the PIPE Investors certain registration rights in connection with the PIPE Financing. The PIPE Financing is contingent upon, among other things, the substantially concurrent Closing of the Business Combination.

*Sponsor Letter Agreement*

In connection with the execution of the Business Combination Agreement, the Sponsor and certain initial stockholders, directors and officers entered into a Sponsor Letter Agreement , attached hereto as Annex F, pursuant to which the Sponsor and each other holder of founder shares has agreed, among other things, (a) to appear at the Special Meeting or otherwise cause its shares to be counted as present for the purpose of establishing quorum; (b) to vote (or execute a written consent), or cause to be voted (or consent to be granted) any Sandbridge common stock and founder shares owned by it, him or her at such special meeting in person, or by proxy, in favor of the Business Combination and the adoption of the Business Combination Agreement and the transactions contemplated thereby; (c) to vote (or execute a written consent) or cause to be voted (or consent to be granted) any Sandbridge common stock or founder shares owned by it, him or her at such special meeting in person, or by proxy, against any alternative business combination or any action that would reasonably be expected to materially impede, interfere with, delay, postpone or adversely affect the Business Combination or any of the related transactions or result in a breach of any covenant, representation or warranty or other obligation or agreement of Sandbridge under the Business Combination Agreement or the Sponsor under the Sponsor Letter Agreement and (d) not redeem any shares of founder shares owned by it, him or her in connection with the stockholder approval. Pursuant to the Sponsor Letter Agreement, a percentage of Sandbridge Class A common stock held by the Sponsor shall be subject to certain time and performance-based vesting provisions. For additional information, see "*Related Agreements — Sponsor Letter Agreement*."

*Amended and Restated Registration Rights Agreement*

In connection with the Business Combination, New Owlet and certain Sponsor equityholders and certain holders of Owlet capital stock (the "Holders") will enter into the Amended and Restated Registration Rights Agreement at Closing.

Pursuant to the terms of the Amended and Restated Registration Rights Agreement, New Owlet will be obligated to file a registration statement to register the resale of certain securities of the New Owlet held by the Holders. In addition, subject to certain requirements and customary conditions, including with regard to the number of demand rights that may be exercised, the Holders may demand at any time or from time to time, to sell all or any portion of their registrable securities in an underwritten offering so long as the total offering price is reasonably expected to exceed $50 million. The Amended and Restated Registration Rights Agreement will also provide the Holders with "piggy-back" registration rights, subject to certain requirements and customary conditions.

For more information about the Amended and Restated Registration Rights Agreement, see "*Related Agreements — Amended and Restated Registration Rights Agreement*."

17

Exhibit 7
Page 635

TABLE OF CONTENTS

*Stockholders Agreement*

In connection with the Closing, New Owlet and Eclipse will enter into a Stockholders Agreement to provide for certain governance rights and address certain governance matters relating to New Owlet. The Business Combination Agreement provides for, among other things, the size and composition of the initial board of directors of New Owlet upon the Closing, which will initially consist of a classified board of up to nine directors. The Stockholders Agreement will provide Eclipse with certain nomination rights until Eclipse beneficially owns less than 10% of the outstanding common stock of New Owlet, and that Lior Susan will serve as Chairperson of the New Owlet Board.

For more information about the Stockholders Agreement, see "*Related Agreements — Stockholders Agreement*."

**Special Meeting of Sandbridge Stockholders and the Proposals**

The Special Meeting will convene on            , 2021 at       , New York City time, in virtual format. Stockholders may attend, vote and examine the list of Sandbridge stockholders entitled to vote at the Special Meeting by visiting www.virtualshareholdermeeting.com/SBG2021SM and entering the control number found on their proxy card, voting instruction form or notice they previously received. The purpose of the Special Meeting is to consider and vote on the Business Combination Proposal, the Charter Amendment Proposal, including the Advisory Charter Amendment Proposals, the NYSE Proposal, the Incentive Award Plan Proposal, the ESPP Proposal and the Adjournment Proposal.

Approval of the Required Transaction Proposals is a condition to the obligation of Sandbridge to complete the Business Combination.

Only holders of record of issued and outstanding Sandbridge common stock as of the close of business on          , 2021, the record date for the Special Meeting, are entitled to notice of, and to vote at, the Special Meeting or any adjournment or postponement of the Special Meeting. You may cast one vote for each share of Sandbridge common stock that you owned as of the close of business on the record date.

A quorum of stockholders is necessary to hold a valid meeting. A quorum will exist at the Special Meeting with respect to each matter to be considered at the Special Meeting if the holders of shares of outstanding capital stock of Sandbridge representing of a majority of the voting power of all outstanding shares of capital stock of Sandbridge entitled to vote at the Special Meeting as of the record date are present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting. All shares represented by proxy are counted as present for purposes of establishing a quorum. Abstentions and broker non-votes will count as present for the purposes of establishing a quorum.

Approval of the Business Combination Proposal requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. Abstentions will be treated as votes against this proposal.

Approval of the Charter Amendment Proposal requires the affirmative vote of the holders of (i) at least a majority of the outstanding shares of Sandbridge Class B common stock, voting separately as a single class, and (ii) a majority of the outstanding shares of Sandbridge common stock entitled to vote thereon, voting together as a single class. Abstentions and broker non-votes will be treated as votes against this proposal.

Approval of each of the Advisory Charter Amendment Proposals, each of which is a non-binding vote, requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. Abstentions and broker non-votes have no effect on the outcome of the proposal.

Approval of the NYSE Proposal requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. Broker non-votes have no effect on the outcome of the proposal but, abstentions will be treated as votes against this proposal.

Approval of the Incentive Award Plan Proposal requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. Broker non-votes have no effect on the outcome of the proposal but, for purposes of NYSE rules, abstentions will have the same effect as votes against this proposal.

Exhibit 7
Page 636

Approval of the ESPP Proposal requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. Broker non-votes have no effect on the outcome of the proposal but, for purposes of NYSE rules, abstentions will have the same effect as votes against this proposal.

Approval of the Adjournment Proposal requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon regardless of whether a quorum is present. Abstentions and broker non-votes have no effect on the outcome of the proposal.

**Recommendation of Sandbridge's Board of Directors**

The Sandbridge Board has unanimously determined that the Business Combination is in the best interests of, and advisable to, the Sandbridge stockholders and recommends that the Sandbridge stockholders adopt the Business Combination Agreement and approve the Business Combination. The Sandbridge Board made its determination after consultation with Sandbridge's legal and financial advisors and consideration of a number of factors.

The Sandbridge Board recommends that you vote "**FOR**" the approval of the Business Combination Proposal, "**FOR**" the approval of the Charter Amendment Proposal, including the Advisory Charter Amendment Proposals, "**FOR**" the approval of the NYSE Proposal, "**FOR**" the approval of the Incentive Award Plan Proposal, "**FOR**" the approval of the ESPP Proposal and "**FOR**" the approval of the Adjournment Proposal.

For more information about the Sandbridge Board's recommendation and the proposals, see "*The Special Meeting - Vote Required and Sandbridge Board Recommendation*" and "*The Business Combination Proposal - Sandbridge's Board of Directors' Reasons for the Approval of the Business Combination*."

**Regulatory Approvals**

The Business Combination is subject to the expiration or termination of the waiting period (or any extension thereof) applicable under the HSR Act.

**Conditions to the Completion of the Business Combination**

The consummation of the Business Combination is conditioned upon the following non-waivable conditions: (i) the approval by our stockholders of the Required Transaction Proposals and the approval by Owlet's stockholders of the Business Combination Agreement and related transactions being obtained; (ii) the applicable waiting period under the HSR Act relating to the Business Combination having expired or been terminated; (iii) after giving effect to the Transactions, Sandbridge having at least $5,000,001 of net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) immediately after the Effective Time; (iv) the absence of any legal restraint or prohibition preventing consummation of the Business Combination; and (v) this proxy statement/registration statement having been declared effective by the SEC.

The consummation of the Business Combination is also conditioned upon the following waivable conditions: (i) the truth and correctness of each party's representations and warranties made in the Business Combination Agreement (subject to waiver by the other party); (ii) compliance with the covenants in the Business Combination Agreement (subject to waiver by the other party); (iii) the delivery by the other party of certificates, the Registration Rights Agreement and the Stockholders Agreement (subject to waiver by the other party); and (iv) immediately following the Effective Time, Sandbridge having satisfied any applicable continuing listing requirements of the NYSE (subject to waiver by agreement of both parties). In addition, the consummation of the Business Combination is conditioned upon satisfaction of the Minimum Available Sandbridge Cash Amount, which condition is waivable by Owlet, and the absence of any Company Material Adverse Effect, which condition is waivable by Sandbridge. Therefore, unless these conditions are waived, as permissible, by the applicable parties to the Business Combination Agreement, the Business Combination Agreement could terminate and the Business Combination may not be consummated.

For further details, see "*The Business Combination Agreement - Conditions to Closing of the Business Combination*."

19

Exhibit 7
Page 637

**Termination**

The Business Combination Agreement may be terminated under certain customary and limited circumstances at any time prior to the Closing, including, among others, the following:

- by the mutual written consent of Sandbridge and Owlet;

- by Sandbridge, subject to certain exceptions, if any of the representations or warranties made by Owlet are not true and correct or if Owlet fails to perform any of its respective covenants or agreements under the Business Combination Agreement (including an obligation to consummate the Closing) such that certain conditions to the obligations of Sandbridge, as described in the section titled "*The Business Combination Agreement - Conditions to Closing of the Business Combination*" below could not be satisfied and the breach (or breaches) of such representations or warranties or failure (or failures) to perform such covenants or agreements is (or are) not cured or cannot be cured within the earlier of (i) thirty (30) days after written notice thereof, and (ii) the Termination Date;

- by Owlet, subject to certain exceptions, if any of the representations or warranties made by the Sandbridge Parties are not true and correct or if any Sandbridge Party fails to perform any of its covenants or agreements under the Business Combination Agreement (including an obligation to consummate the Closing) such that the condition to the obligations of Owlet, as described in the section titled "*The Business Combination Agreement - Conditions to Closing of the Business Combination*" below could not be satisfied and the breach (or breaches) of such representations or warranties or failure (or failures) to perform such covenants or agreements is (or are) not cured or cannot be cured within the earlier of (i) thirty (30) days after written notice thereof, and (ii) the Termination Date;

- by either Sandbridge or Owlet,

  - if the transactions contemplated by the Business Combination Agreement have not been consummated on or prior to the Termination Date, unless the breach of any covenants or obligations under the Business Combination Agreement by the party seeking to terminate proximately caused the failure to consummate the transactions contemplated by the Business Combination Agreement;

  - if any governmental entity has issued an order or taken any other action permanently enjoining, restraining or otherwise prohibiting the transactions contemplated by the Business Combination Agreement and such order or other action has become final and nonappealable;

  - if the approval of the Required Transaction Proposals are not obtained at the Special Meeting (including any adjournment thereof); and

- by Sandbridge, if Owlet does not deliver, or cause to be delivered to Sandbridge, the Owlet stockholder written consent when required under the Business Combination Agreement.

**Redemption Rights**

Pursuant to the Current Charter, a public stockholder may request that Sandbridge redeem all or a portion of their public shares for cash if the Business Combination is consummated. You will be entitled to receive cash for any public shares to be redeemed only if you:

- (a) hold public shares or (b) hold public shares through units and you elect to separate your units into the underlying public shares and public warrants prior to exercising your redemption rights with respect to the public shares; and

- prior to          p.m., New York City time, on                , 2021, (a) submit a written request, including the legal name, telephone number and address of the beneficial owner of the shares for which redemption is requested, to the Transfer Agent that Sandbridge redeem your public shares for cash and (b) deliver your public shares to the Transfer Agent, physically or electronically through DTC.

As noted above, holders of units must elect to separate the underlying public shares and public warrants prior to exercising redemption rights with respect to the public shares. Holders may instruct their broker to do so, or if a holder holds units registered in its own name, the holder must contact the Transfer Agent directly and instruct them to do so. Public stockholders may elect to redeem all or a portion of their public shares even if

20

Exhibit 7
Page 638

they vote for the Business Combination Proposal. If the Business Combination is not consummated, the public shares will not be redeemed for cash. If a public stockholder properly exercises its right to redeem its public shares and timely delivers its public shares to the Transfer Agent, Sandbridge will redeem such public shares upon the Closing for a per share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, calculated as of two business days prior to the consummation of the Business Combination, including interest earned on the funds held in the Trust Account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares. If a public stockholder exercises its redemption rights, then it will be exchanging its redeemed public shares for cash and will no longer own such shares. See "*The Special Meeting - Redemption Rights*" for a detailed description of the procedures to be followed if you wish to redeem your public shares for cash.

Notwithstanding the foregoing, a holder of public shares, together with any affiliate of such public stockholder or any other person with whom such public stockholder is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Exchange Act), will be restricted from redeeming its public shares with respect to more than an aggregate of 15% of the public shares. Accordingly, if a public stockholder, alone or acting in concert or as a group, seeks to redeem more than 15% of the public shares, then any such shares in excess of that 15% limit would not be redeemed for cash.

Holders of our warrants will not have redemption rights with respect to the warrants.

**No Delaware Appraisal Rights For Holders of Sandbridge Common Stock**

Appraisal rights are statutory rights under the DGCL that enable stockholders who object to certain extraordinary transactions to demand that the corporation pay such stockholders the fair value of their shares instead of receiving the consideration offered to stockholders in connection with the extraordinary transaction. However, appraisal rights are not available in all circumstances. Appraisal rights are not available to Sandbridge stockholders or warrant holders in connection with the Business Combination.

**Proxy Solicitation**

Proxies may be solicited by mail, telephone or in person. Sandbridge has engaged Okapi to assist in the solicitation of proxies. If a stockholder grants a proxy, it may still vote its shares at the Special Meeting if it revokes its proxy before the Special Meeting. A stockholder also may change its vote by submitting a later-dated proxy as described in the section titled "*The Special Meeting - Revoking Your Proxy.*"

**Interests of Sandbridge's Directors and Officers in the Business Combination**

When you consider the recommendation of the Sandbridge Board in favor of approval of the Business Combination Proposal, you should keep in mind that Sandbridge's initial stockholders, including its directors and officers, have interests in such proposal that are different from, or in addition to, those of Sandbridge stockholders and warrant holders generally. These interests include, among other things, the interests listed below:

- If we are unable to complete our initial business combination by September 17, 2022, or during any stockholder-approved extension period, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than 10 business days thereafter, redeem 100% of the public shares, at a per share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, including interest earned on the funds held in the Trust Account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under the DGCL to provide for claims of creditors and the requirements of other applicable law.

- There will be no liquidating distributions from the Trust Account with respect to our founder shares if we fail to complete our initial business combination by September 17, 2022, or during any stockholder-approved extension period. Our Sponsor purchased the founder shares prior to our initial

21

Exhibit 7
Page 639

TABLE OF CONTENTS

public offering for an aggregate purchase price of $25,000, or approximately $0.004 per share and, in August 2020, transferred 40,000 founder shares to Mr. De Sole, 25,000 founder shares to Mr. Toubassy and 30,000 founder shares to Mr. Hilfiger and in October 2020, transferred 40,000 founder shares to Mr. Goss. Upon the Closing, such founder shares will remain outstanding, subject to certain restrictions on transfer. Ownership of founder shares by Mr. Toubassy, Mr. De Sole and Mr. Goss, our independent directors, may create a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate an initial business combination, and in determining the terms on which we are willing to consummate such a transaction.

- In connection with the closing of our initial public offering, we consummated the sale of 6,600,000 private placement warrants at a price of $1.00 per warrant in a private placement to our Sponsor. The warrants are each exercisable commencing the later of 30 days following the Closing and 12 months from the closing of our initial public offering, which occurred on September 17, 2020, for one share of Sandbridge Class A common stock at $11.50 per share. If we do not consummate a business combination transaction by September 17, 2022, or during any stockholder-approved extension period, then the proceeds from the sale of the private placement warrants will be part of the liquidating distribution to the public stockholders and the warrants held by our Sponsor will be worthless. The warrants held by our Sponsor had an aggregate market value of approximately $11.8 million based upon the closing price of $1.79 per public warrant on the NYSE on February 12, 2021. Upon the Closing, the private placement warrants will become 6,600,000 warrants to purchase shares of New Owlet common stock at an exercise price of $11.50 per share, subject to certain contractual restrictions on transfer.

- Our initial stockholders, including certain of our officers and directors, will lose their entire investment in us if we do not complete an initial business combination by September 17, 2022, or during any stockholder-approved extension period, including their initial investment in the founder shares and their at-risk capital, for which the Sponsor received 6,600,000 private placement warrants at a price of $1.00 per warrant. Our initial stockholders, officers and directors own an aggregate of 5,750,000 founder shares, which were purchased prior to our initial public offering for an aggregate purchase price of $25,000, or approximately $0.004 per share.

- Concurrently with the execution of the Business Combination Agreement, Sandbridge entered into the Subscription Agreements with the PIPE Investors, pursuant to which the PIPE Investors have agreed to purchase, immediately prior to the Closing, an aggregate of 13,000,000 shares of Sandbridge Class A common stock at a purchase price of $10.00 per share. The PIPE Investors include the PIMCO private funds and certain other investors designated by our Sponsor.

- Certain of our officers and directors are expected to continue to serve as directors of New Owlet after the Closing. As such, in the future they may receive cash fees, stock options or stock awards that the New Owlet Board determines to pay to its directors.

- In order to protect the amounts held in the Trust Account, the Sponsor has agreed that it will be liable to us if and to the extent any claims by a third party for services rendered or products sold to us, or a prospective target business with which we have entered into a written letter of intent, confidentiality or similar agreement or business combination agreement, reduce the amount of funds in the Trust Account to below (1) $10.00 per public share or (2) the actual amount per public share held in the Trust Account as of the date of the liquidation of the Trust Account, if less than $10.00 per share due to reductions in the value of the trust assets, less taxes payable, provided that such liability will not apply to any claims by a third party or prospective target business who executed a waiver of any and all rights to the monies held in the trust account (whether or not such waiver is enforceable) nor will it apply to any claims under our indemnity of the underwriters of Sandbridge's initial public offering against certain liabilities, including liabilities under the Securities Act.

- Following the consummation of the Business Combination, we will continue to indemnify our existing directors and officers and will maintain a directors' and officers' liability insurance policy.

- Upon the Closing, subject to the terms and conditions of the Business Combination Agreement, our Sponsor, our officers and directors and any of their respective affiliates may be entitled to reimbursement for any reasonable out-of-pocket expenses related to identifying, investigating,

22

Exhibit 7
Page 640

negotiating and completing an initial business combination, and repayment of any other loans, if any, and on such terms as to be determined by Sandbridge from time to time, made by our Sponsor or certain of our officers and directors to finance transaction costs in connection with an intended initial business combination. None of the Sponsor, our directors and officers or any of their respective affiliates have incurred any out-of-pocket expenses.

At any time prior to the Special Meeting, during a period when they are not then aware of any material nonpublic information regarding Sandbridge or its securities, the initial stockholders, Owlet and/or its affiliates may purchase shares and/or warrants from investors, or they may enter into transactions with such investors and others to provide them with incentives to acquire public shares, vote their public shares in favor of the Business Combination Proposal or not redeem their public shares. The purpose of any such transaction could be to (i) vote such shares in favor of the Business Combination and thereby increase the likelihood of obtaining stockholder approval of the Business Combination or (ii) increase the likelihood that the Minimum Available Sandbridge Cash Amount is satisfied. Any such stock purchases and other transactions may thereby increase the likelihood of obtaining stockholder approval of the Business Combination. This may result in the completion of the Business Combination in a way that may not otherwise have been possible. While the exact nature of any such incentives has not been determined as of the date of this proxy statement/prospectus, they might include, without limitation, arrangements to protect such investors or holders against potential loss in value of their shares, including the granting of put options and the transfer to such investors or holders of shares or rights owned by Sandbridge's initial stockholders for nominal value.

Entering into any such arrangements may have a depressive effect on the market price of the outstanding shares of Sandbridge Class A common stock. For example, as a result of these arrangements, an investor or holder may have the ability to effectively purchase shares at a price lower than market and may therefore be more likely to sell the shares it owns, either prior to or immediately after the Special Meeting.

If such transactions are effected, the consequence could be to cause the Business Combination to be approved in circumstances where such approval could not otherwise be obtained. Purchases of shares by the persons described above would allow them to exert more influence over the approval of the proposals to be presented at the Special Meeting and would likely increase the chances that such proposals would be approved. As of the date of this proxy statement/prospectus, there have been no such discussions and no agreements to such effect have been entered into with any such investor or holder.

The existence of financial and personal interests of the Sandbridge directors or officers may result in a conflict of interest on the part of one or more of them between what such director or officer may believe is best for Sandbridge and what he may believe is best for him in determining whether or not to grant a waiver in a specific situation. For instance, ownership of founder shares by Mr. Toubassy, Mr. De Sole and Mr. Goss, our independent directors, may create a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate an initial business combination, and in determining the terms on which we are willing to consummate such a transaction. See "*Risk Factors*" and "*The Business Combination Proposal - Interests of Sandbridge's Directors and Officers in the Business Combination*" for a further discussion of this and other risks.

**Stock Exchange Listing**

Sandbridge's units, Class A common stock and public warrants are publicly traded on the NYSE under the symbols "SBG.U", "SBG" and "SBG WS", respectively. Sandbridge intends to apply to list the New Owlet common stock and public warrants on the NYSE under the symbols "OWLT" and "OWLT WS", respectively, upon the Closing of the Business Combination. New Owlet will not have units traded following the Closing.

23

Exhibit 7
Page 641

**Sources and Uses of Funds for the Business Combination**

The following table summarizes the sources and uses for funding the Transactions. Where actual amounts are not known or knowable, the figures below represent Owlet's good faith estimate of such amounts assuming a Closing as of January 31, 2021.

| (in millions) | Assuming No Redemptions of Public Shares | Assuming Maximum Redemptions of Public Shares(1) |
|---|---|---|
| **Sources** | | |
| Owlet Rollover Equity | $1,000.0 | $1,000.0 |
| Proceeds from Trust Account | 230.0 | 160.0 |
| Founder Shares(2) | 29.4 | 29.4 |
| PIPE Investors | 130.0 | 130.0 |
| **Total Sources** | **$1,389.4** | **$1,319.4** |
| **Uses** | | |
| Equity Consideration to Existing Investors | $1,000.0 | $1,000.0 |
| Cash to Balance Sheet | 325.0 | 255.0 |
| Founder Shares | 29.4 | 29.4 |
| Estimated Transaction Fees & Expenses(3) | 35.0 | 35.0 |
| **Total Uses** | **$1,389.4** | **$1,319.4** |

(1) These numbers assume that the Minimum Available Sandbridge Cash Amount is not waived.

(2) Excludes 2,807,500 shares of New Owlet common stock that will be outstanding following the Closing but will remain subject to price-based performance vesting terms as described in the Sponsor Letter Agreement.

(3) Consists of $8.05 million in deferred underwriting commissions from Sandbridge's initial public offering, $4.23 million in placement agent fees in connection with the PIPE Investment, $8 million in Owlet financial advisory fees, $6.5 million in legal fees, $2.22 million in accounting fees, and an estimated $6 million in miscellaneous fees and expenses, including consulting fees, proxy solicitation fees, SEC registration fees, printing fees and audit fees.

**Anticipated Accounting Treatment**

The Business Combination will be accounted for as a reverse recapitalization in accordance with GAAP. Under this method of accounting, Sandbridge will be treated as the "acquired" company for accounting purposes and the Business Combination will be treated as the equivalent of Owlet issuing stock for the net assets of Sandbridge, accompanied by a recapitalization. The net assets of Sandbridge will be stated at historical cost, with no goodwill or other intangible assets recorded.

Owlet has been determined to be the accounting acquirer based on evaluation of the following facts and circumstances under both the no and maximum redemption scenarios:

- Owlet stockholders will have the largest voting interest in the post-combination company;

- the board of directors of the post-combination company will have up to nine members, and Owlet will have the ability to nominate the majority of the members of the board of directors;

- Owlet management will continue to hold executive management roles for the post-combination company and be responsible for the day-to-day operations;

- the post-combination company will assume the Owlet name;

- the post-combination company will maintain the current Owlet headquarters; and

- the intended strategy of the post-combination entity will continue Owlet's current strategy of product development and market penetration.

The preponderance of evidence as described above is indicative that Owlet is the accounting acquirer in the Business Combination. Accordingly, for accounting purposes, the financial statements of the post-combination company will represent a continuation of the financial statements of Owlet with the acquisition being treated as the equivalent of Owlet issuing stock for the net assets of Sandbridge, accompanied by a recapitalization. The net assets of Sandbridge will be stated at historical cost, with no goodwill or other intangible assets recorded.

Exhibit 7

Page 642

Exhibit 7
Page 643

TABLE OF CONTENTS

**Comparison of Stockholders' Rights**

Following the consummation of the Business Combination, the rights of Sandbridge stockholders who become New Owlet stockholders in the Business Combination will no longer be governed by the Current Charter and Sandbridge's Bylaws and instead will be governed by the Proposed Charter and New Owlet Bylaws. See "Comparison of Stockholders' Rights."

**Summary of Risk Factors**

In evaluating the proposals to be presented at the Special Meeting, a Sandbridge stockholder should carefully read this proxy statement/prospectus and especially consider the factors discussed in the section titled "Risk Factors."

Some of the risks related to Owlet's business and industry are summarized below. References in the summary below to "Owlet" generally refer to Owlet in the present tense or New Owlet from and after the Business Combination.

- Owlet has a limited operating history and has grown significantly in a short period of time. Owlet needs to continue to increase the size of its organization and, if unable to manage its growth effectively, Owlet's business could be materially and adversely affected.

- Owlet has a history of net losses and may not achieve or maintain profitability in the future.

- If the U.S. Food and Drug Administration ("FDA") or any other governmental authority were to require marketing authorization for the Owlet Smart Sock, or for any other product that Owlet sells and which Owlet does not believe requires such marketing authorization, Owlet could be required to cease selling or recall the product pending receipt of marketing authorization from the FDA or such other governmental authority, which can be a lengthy and time-consuming process, harm financial results and Owlet may also be subject to regulatory enforcement action.

- Owlet is required to obtain and maintain marketing authorizations from the FDA for any products intended to be and/or classified as medical device products in the United States, which can be a lengthy and time-consuming process, and a failure to do so on a timely basis, or at all, could severely harm Owlet's business.

- Owlet currently relies on sales of its Owlet Smart Sock technologies and related products for the majority of its revenue and expects to continue to do so for the foreseeable future.

- A substantial portion of Owlet sales comes through a limited number of channel partners and resellers.

- Owlet currently relies on a single manufacturer for the assembly of the Owlet Smart Sock and a single manufacturer for the assembly of the Owlet Cam and expects to rely on limited manufacturers for future products. If Owlet encounters manufacturing problems or delays, Owlet may be unable to promptly transition to alternative manufacturers and its ability to generate revenue will be limited.

- If Owlet is unable to obtain key materials and components from sole or limited source suppliers, Owlet will not be able to deliver its products to customers.

- If Owlet is unable to adequately protect its intellectual property rights, or if Owlet is accused of infringing on the intellectual property rights of others, its competitive position could be harmed or Owlet could be required to incur significant expenses to enforce or defend its rights or to pay damages.

- Owlet relies significantly on information technology ("IT") and any failure, inadequacy, interruption or security lapse of that technology, including any cybersecurity incidents, could lead to misappropriation of confidential or otherwise protected information and harm Owlet's business and its ability to operate our business effectively.

- Owlet faces the risk of product liability claims and the amount of insurance coverage held now or in the future may not be adequate to cover all liabilities Owlet might incur.

- Increased expansion into international markets will expose Owlet to additional business, political, regulatory, operational, financial and economic risks.

25

Exhibit 7
Page 644

TABLE OF CONTENTS

- Owlet may be required to obtain and maintain regulatory authorizations in order to commercialize its products in international markets, and failure to obtain regulatory authorizations in relevant foreign jurisdictions may prevent Owlet from marketing medical device products abroad.

- Customer or third-party complaints or negative reviews or publicity about Owlet or its products and services could harm Owlet's reputation and brand.

- Some of Owlet's products and services are in development or have been recently introduced into the market and may not achieve market acceptance, which could limit Owlet's growth and adversely affect its business, financial condition and results of operations.

- Owlet may acquire other businesses or form other joint ventures or make investments in other companies or technologies but has no experience in doing so. These types of transactions could negatively affect Owlet's operating results, dilute its stockholders' ownership, increase debt or lead to significant expense or lose focus on core operations.

- We have identified material weaknesses in our internal control over financial reporting and we may identify additional material weaknesses in the future or otherwise fail to maintain effective internal control over financial reporting, which may result in material misstatements of our consolidated financial statements or cause us to fail to meet our periodic reporting obligations or cause our access to the capital markets to be impaired.

- We may need to raise additional capital in the future in order to execute our strategic plan following the Business Combination and related transactions, which may not be available on terms acceptable to us, or at all.

- Owlet's business, financial condition, results of operations and growth may be impacted by the effects of the COVID-19 pandemic.

- Following the Business Combination, Owlet will incur increased costs and become subject to additional regulations and requirements as a result of becoming a public company.

**Emerging Growth Company**

Sandbridge is an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act, and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies, including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. Immediately following the Business Combination, we expect that New Owlet will continue to be an emerging growth company.

Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a registration statement under the Securities Act declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable. We have elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of New Owlet's financial statements with those of another public company that is not an emerging growth company or is an emerging growth company that has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

We will remain an emerging growth company until the earlier of: (i) the last day of the fiscal year (a) following the fifth anniversary of the closing of Sandbridge's initial public offering, (b) in which we have total annual gross revenue of at least $1.07 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our common equity that is held by non-affiliates exceeds $700 million as of the last business day of its most recently completed second fiscal quarter; and (ii) the date on which we have issued

26

Exhibit 7
Page 645

TABLE OF CONTENTS

more than $1.00 billion in non-convertible debt securities during the prior three-year period. References herein to "emerging growth company" have the meaning associated with it in the JOBS Act.

**Smaller Reporting Company**

Additionally, we are a "smaller reporting company" as defined in Item 10(f)(1) of Regulation S-K. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company until the last day of the fiscal year in which (i) the market value of our Class A common stock held by non-affiliates exceeds $250 million as of the prior June 30, or (ii) our annual revenues exceeded $100 million during such completed fiscal year and the market value of our Class A common stock held by non-affiliates exceeds $700 million as of the prior June 30.

27

Exhibit 7
Page 646

TABLE OF CONTENTS

### SUMMARY HISTORICAL FINANCIAL INFORMATION OF SANDBRIDGE

The following table sets forth summary selected historical financial information of Sandbridge for the periods and as of the dates indicated.

Sandbridge's statement of operations data for the period from June 23, 2020 (inception) to December 31, 2020 and balance sheet data as of December 31, 2020 is derived from Sandbridge's audited financial statements included elsewhere in this proxy statement/prospectus.

The following selected historical financial information should be read together with Sandbridge's financial statements and accompanying notes and "*Management's Discussion and Analysis of Financial Condition and Results of Operations of Sandbridge*" appearing elsewhere in this proxy statement/prospectus. The selected historical financial information in this section is not intended to replace Sandbridge's financial statements and the related notes thereto.

| Statement of Operations Data: | Period from June 23, 2020 (inception) Through December 31 2020 |
|---|---|
| General and administrative expenses | $ 480,436 |
| Net loss | $ (427,187) |
| Weighted average shares outstanding of Class A redeemable common stock | 23,000,000 |
| Basic and diluted income per share, Class A redeemable common stock | $ — |
| Weighted average shares outstanding of Class A and Class B non-redeemable common stock | 5,435,083 |
| Basic and diluted net loss per share, Class B non-redeemable common stock | $ (0.08) |

| Condensed Balance Sheet Data (at period end) | December 31, 2020 |
|---|---|
| Total Assets | $231,614,335 |
| Total Liabilities | $ 315,328 |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 1,175,100 shares issued and outstanding (excluding 21,824,900 shares subject to possible redemption) | 118 |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 5,750,000 shares issued and outstanding | 575 |
| Total Stockholders' Equity | $ 5,000,007 |

| Cash Flow Data | Period from June 23, 2020 (inception) Through December 31, 2020 |
|---|---|
| Net cash used in operating activities | $ (455,960) |
| Net cash used in investing activities | $(230,000,000) |
| Net cash provided by financing activities | $ 231,743,194 |

28

Exhibit 7
Page 647

**SUMMARY HISTORICAL FINANCIAL INFORMATION OF OWLET**

The following table shows selected historical financial information of Owlet for the periods and as of the dates indicated.

The selected historical consolidated statements of operations data and historical consolidated statements of cash flow data of Owlet for the years ended December 31, 2020 and December 31, 2019 and the historical consolidated balance sheet data as of December 31, 2020 and December 31, 2019 are derived from Owlet's audited consolidated financial statements included elsewhere in this proxy statement/prospectus.

The financial information contained in this section relates to Owlet, prior to and without giving pro forma effect to the impact of the Business Combination and, as a result, the results reflected in this section may not be indicative of the results of the post-combination company going forward. See "*Selected Unaudited Pro Forma Condensed Combined Financial Information*" included elsewhere in this proxy statement/prospectus.

Additionally, the following selected historical financial information should be read together with the consolidated financial statements and accompanying notes and "*Management's Discussion and Analysis of Financial Condition and Results of Operations of Owlet*" appearing elsewhere in this proxy statement/prospectus. The selected historical financial information in this section is not intended to replace Owlet's consolidated financial statements and the related notes. Owlet's historical results are not necessarily indicative of the results that may be expected in the future.

| (in thousands, except share and per share numbers) | Year Ended December 31, 2020 | Year Ended December 31, 2019 |
|---|---|---|
| Consolidated Statement of Operations data: | | |
| Revenues | $ 75,403 | $ 49,801 |
| Cost of revenues | 39,526 | 26,897 |
| Gross profit | 35,877 | 22,904 |
| Total operating expenses | 42,868 | 39,954 |
| Operating loss | (6,991) | (17,050) |
| Net loss | $ (10,521) | $ (17,851) |
| Net loss per share attributable to common stockholders, basic and diluted | $ (0.98) | $ (1.76) |
| Weighted-average number of shares outstanding used to compute net loss per share attributable to common stockholders, basic and diluted | 10,693,984 | 10,132,242 |

| (in thousands) | As of December 31, 2020 | As of December 31, 2019 |
|---|---|---|
| Consolidated Balance Sheet data: | | |
| Total assets | $ 40,118 | $ 28,200 |
| Total liabilities | 60,939 | 39,914 |
| Redeemable convertible preferred stock | 47,188 | 47,188 |
| Additional paid-in capital | 3,708 | 2,294 |
| Accumulated deficit | (71,718) | (61,197) |
| Total stockholders' deficit | (68,009) | $(58,902) |

| | Year Ended December 31, 2020 | Year Ended December 31, 2019 |
|---|---|---|
| Consolidated Cash Flow data: | | |
| Net cash used in operating activities | $ (129) | $(16,061) |
| Net cash used in investing activities | (1,056) | (1,959) |
| Net cash provided by financing activities | 6,458 | 12,455 |
| Net change in cash and cash equivalents | $ 5,273 | $ (5,565) |

Exhibit 7
Page 648

**SUMMARY UNAUDITED PRO FORMA
CONDENSED COMBINED FINANCIAL INFORMATION**

The following summary unaudited pro forma condensed combined financial information for the year ended December 31, 2020 combines the historical balance sheet of Sandbridge and the historical balance sheet of Owlet on a pro forma basis as if the Business Combination and related transactions, summarized below, had been consummated on December 31, 2020. The unaudited pro forma condensed combined statements of operations for the year ended December 31, 2020 combine the historical statements of operations of Sandbridge and Owlet for such periods on a pro forma basis as if the Business Combination and related transactions, summarized below, had been consummated on January 1, 2020, the beginning of the earliest period presented. The summary unaudited pro forma condensed combined financial information has been derived from and should be read in conjunction with the unaudited pro forma condensed combined financial information, including the notes thereto, which is included in this proxy statement/prospectus under the section titled "*Unaudited Pro Forma Condensed Combined Financial Information*".

The unaudited pro forma condensed combined financial information has been prepared to illustrate the effect of the Business Combination and has been prepared for informational purposes only. The unaudited pro forma condensed combined statement of operations is not necessarily indicative of what the actual results of operations would have been had the Business Combination taken place on the date indicated, nor are they indicative of the future consolidated results of operations of the post-combination company. The transaction accounting adjustments are based on the information currently available. Actual results may differ materially from the assumptions within the accompanying unaudited pro forma condensed combined financial information.

The historical consolidated financial information has been adjusted to give pro forma effect to the following events that are related and/or directly attributable to the Business Combination. The unaudited pro forma condensed combined financial information has been prepared using the assumptions below with respect to the potential redemption of Sandbridge's Class A common stock into cash:

- **Assuming No Redemptions**: This presentation assumes that no public stockholders of Sandbridge exercise redemption rights with respect to their public shares for a pro rata share of the funds in the Trust Account.

- **Assuming Maximum Redemptions:** This presentation assumes 7,000,000 of the public shares are redeemed for their pro rata share of the funds in Trust Account for aggregate redemption payments of $70.0 million. The Business Combination Agreement includes as a condition to closing the Business Combination that, at the Closing, Sandbridge will have a minimum of $140.0 million in cash comprising the cash held in the Trust Account after deducting (x) amounts payable for Sandbridge share redemptions and (y) deferred underwriting commissions held in the Trust Account and Sandbridge's expenses incurred in connection with the transactions contemplated by the Business Combination Agreement and Sandbridge's operations (such commissions and expenses estimated to be $20.0 million), but excluding the PIPE Investment Amount actually received by Sandbridge prior to or substantially concurrent with the Closing. This scenario is based on satisfaction of the Minimum Available Sandbridge Cash Amount condition.

The following summarizes the pro forma shares of New Owlet common stock issued and outstanding immediately after the Business Combination:

| | No Redemption (Shares) | % | Maximum Redemption (Shares) | % |
|---|---|---|---|---|
| Owlet equityholders(1) | 90,466,363 | 68.4% | 90,466,363 | 72.2% |
| Sandbridge's public stockholders | 23,000,000 | 17.4% | 16,000,000 | 12.8% |
| Sponsor & related parties(2) | 5,750,000 | 4.4% | 5,750,000 | 4.6% |
| PIPE Investors | 13,000,000 | 9.8% | 13,000,000 | 10.4% |
| **Pro Forma New Owlet Common Stock at Closing** | 132,216,363 | 100% | 125,216,363 | 100% |

(1)    Excludes 9,533,637 shares of New Owlet common stock underlying outstanding New Owlet option awards on a net exercise basis.

(2)    Represents the shares of New Owlet common stock the Sponsor and the independent directors and an advisor of Sandbridge will receive upon conversion of the Sandbridge Class B common stock at Closing. Of such shares, 2,807,500 shares of New Owlet common stock will be outstanding following the Closing but will remain subject to price-based performance vesting terms as described in the Sponsor Letter Agreement.

30

Exhibit 7
Page 649

**COMPARATIVE PER SHARE DATA**

The following tables set forth:

- historical per share information of Sandbridge for the period from June 23, 2020 (inception) through December 31, 2020;

- historical per share information of Owlet for the year ended December 31, 2020; and

- unaudited pro forma per share information of the combined company for the year ended December 31, 2020 after giving effect to the Business Combination, assuming two redemption scenarios as follows:

  - **Assuming No Redemptions**: This presentation assumes that no public stockholders of Sandbridge exercise redemption rights with respect to their public shares for a pro rata share of the funds in the Trust Account.

  - **Assuming Maximum Redemptions**: This presentation assumes that 7,000,000 of the public shares are redeemed for their pro rata share of the funds in the Trust Account for aggregate redemption payments of $70.0 million. The Business Combination Agreement includes as a condition to closing the Business Combination that, at the Closing, Sandbridge will have a minimum of $140.0 million in cash generated from the cash held in the Trust Account after deducting (x) amounts payable for Sandbridge share redemptions and (y) deferred underwriting commissions held in the Trust Account and Sandbridge's expenses incurred in connection with the transactions contemplated by the Business Combination Agreement and Sandbridge's operations (such commissions and expenses estimated to be $20.0 million), and disregarding the PIPE Investment Amount actually received by Sandbridge prior to or substantially concurrent with the Closing. This scenario is based on satisfaction of the Minimum Available Sandbridge Cash Amount Condition.

The following tables should be read in conjunction with the summary historical consolidated financial information included elsewhere in this proxy statement/prospectus, and the historical consolidated financial statements of Sandbridge and Owlet and the related notes thereto that are included elsewhere in this proxy statement/prospectus. The unaudited Sandbridge and Owlet pro forma combined per share information is derived from, and should be read in conjunction with, the unaudited pro forma condensed combined financial information and the related notes thereto included elsewhere in this proxy statement/prospectus.

The unaudited pro forma combined net income per share information below does not purport to represent the actual results of operations that would have occurred had the companies been combined during the periods presented, nor does it purport to represent the actual results of operations for any future date or period. The unaudited pro forma combined book value per share information below does not purport to represent what the value of Sandbridge and Owlet would have been had the companies been combined during the periods presented.

| | Historical | | Pro Forma Combined | | Equivalent Pro Forma Combined | |
| --- | --- | --- | --- | --- | --- | --- |
| | Sandbridge | Owlet | No redemption scenario | Maximum redemption scenario | No redemption scenario | Maximum redemption scenario |
| **For the Year Ended December 31, 2020** | | | | | | |
| Book value per share - basic and diluted Class A redeemable common stock(1a) | $  0.22 | $  6.36 | $  2.27 | $  1.86 | $  3.49 | $  2.71 |
| Book value per share of Class A and B non-redeemable common stock(1b) | 0.92 | — | | | | |
| Net loss per share - basic and diluted(2a) | (0.00) | (0.98) | (0.06) | (0.07) | (0.10) | (0.10) |
| Net loss per share – basic and diluted Class A and B non-redeemable common stock(2b) | (0.08) | — | | | | |
| Weighted average shares outstanding – basic and diluted Class A redeemable common stock | 23,000,000 | 10,693,984 | 138,942,500 | 131,942,500 | 90,466,363 | 90,466,363 |
| Weighted average shares outstanding – basic and diluted Class A and Class B redeemable common stock | 5,435,083 | | | | | |
| Cash dividends declared per share | — | — | — | — | — | — |

(1a) Book value per share is calculated as total equity divided by: Sandbridge Class A redeemable common stock outstanding at December 31, 2020; and Owlet common stock outstanding at December 31, 2020 and pro forma information.

31

Exhibit 7

Page 650

TABLE OF CONTENTS

(1b)  Book value per share is calculated as total equity divided by: Sandbridge Class A and Class B non-redeemable common stock outstanding at December 31, 2020.

(2a)  Net loss per share is based on: weighted average number of shares of Sandbridge Class A redeemable common stock outstanding for the period from June 23, 2020 (inception) through December 31, 2020; and weighted average number of shares of Owlet common stock outstanding for the year ended December 31, 2020 and the pro forma information.

(2b)  Net loss per share is based on: weighted average number of shares of Sandbridge Class A and Class B non-redeemable common stock outstanding for the period from June 23, 2020 (inception) through December 31, 2020.

32

Exhibit 7
Page 651

TABLE OF CONTENTS

### MARKET PRICE, TICKER SYMBOL AND DIVIDEND INFORMATION

**Sandbridge**

*Market Price and Ticker Symbol*

Sandbridge's units, Class A common stock and public warrants are currently listed on the NYSE under the symbols "SBG.U", "SBG" and "SBG WS", respectively.

The closing price of the units, Sandbridge Class A common stock and public warrants on February 12, 2021, the last trading day before announcement of the execution of the Business Combination Agreement, was $11.41, $10.59 and $1.79, respectively. As of          , 2021, the record date for the Special Meeting, the closing price for each unit, Class A common stock and public warrant was $         , $         and $         , respectively.

*Holders*

As of December 31, 2020, there was one holder of record of our units, one holder of record of Sandbridge Class A common stock, five holders of record of Sandbridge Class B common stock and two holders of record of our public warrants. The number of holders of record does not include a substantially greater number of "street name" holders or beneficial holders whose units, Sandbridge Class A common stock and public warrants are held of record by banks, brokers and other financial institutions.

*Dividend Policy*

Sandbridge has not paid any cash dividends on Sandbridge common stock to date and does not intend to pay any cash dividends prior to the completion of the Business Combination. The payment of cash dividends in the future will be dependent upon New Owlet's revenue and earnings, if any, capital requirements and general financial condition subsequent to completion of the Business Combination. The payment of any cash dividends subsequent to the Business Combination will be within the discretion of New Owlet's board of directors at such time.

**Owlet**

There is no public market for shares of Owlet securities.

33

Exhibit 7
Page 652

TABLE OF CONTENTS

## RISK FACTORS

*We have identified the following risks and uncertainties that may have a material adverse effect on our business, financial condition, results of operations or reputation. The risks described below are not the only risks we face. Additional risks not presently known to us or that we currently believe are not material may also significantly affect our business, financial condition, results of operations or reputation. Our business could be harmed by any of these risks. In assessing these risks, you should also refer to the other information contained in this proxy statement/prospectus, including our consolidated financial statements and related notes.*

### Risks Related to Sandbridge's Business and to New Owlet's Business Following the Business Combination

*Unless the context otherwise requires, any reference in the below sections of this proxy statement/prospectus to the "we," "us" or "our" refers to Sandbridge and its consolidated subsidiaries prior to the consummation of the Business Combination and to New Owlet and its consolidated subsidiaries following the Business Combination. Additionally, unless the context otherwise requires, all references in the subsections "—Risks Related to New Owlet's Business and Operations," "—Risks Related to New Owlet's Capital Requirements and Capital Structure," "—Risks Related to Owlet Becoming a Public Company," "—Risks Related to Regulation of New Owlet's Industry," "—Risks Related to New Owlet's Intellectual Property," and "—General Risk Factors Relating to New Owlet" to the "Company," "we," "us" or "our" refer to the business of Owlet and its subsidiary prior to the consummation of the Business Combination, which will be the business of New Owlet and its subsidiaries following the consummation of the Business Combination. The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and accompanying notes, and other financial information included elsewhere within this proxy statement/prospectus. This discussion includes forward-looking information regarding our business, results of operations and cash flows and contractual obligations and arrangements that involves risks, uncertainties and assumptions. Our actual results may differ materially from any future results expressed or implied by such forward-looking statements as a result of various factors, including, but not limited to, those discussed in the sections of this proxy statement/prospectus entitled "Cautionary Note Regarding Forward-Looking Statements" and "Management's Discussion and Analysis of Financial Condition and Results of Operations of Sandbridge."*

### Risks Related to New Owlet's Business and Operations

***We have a limited operating history and have grown significantly in a short period of time. We will need to continue to increase the size of our organization and, if we fail to manage our growth effectively, our business could be materially and adversely affected.***

We were organized in 2014 and began selling our Owlet Smart Sock in 2015 and our Owlet Cam in 2018. Accordingly, we have a limited operating history, which makes an evaluation of our future prospects difficult. Our operating results have fluctuated in the past, and we expect our future quarterly and annual operating results to fluctuate as we focus on increasing the demand for our products and services. We may need to make business decisions that could adversely affect our operating results, such as modifications to our pricing strategy, business structure or operations.

In addition, we have experienced recent rapid growth and anticipate further growth, although the COVID-19 pandemic may substantially impact our future growth. For example, our revenue increased from $49.8 million for the year ended December 31, 2019 to $75.4 million for the year ended December 31, 2020. The number of our full-time employees increased from 99 as of December 31, 2019 to 111 as of December 31, 2020.

This growth has placed significant demands on our management, financial, operational, technological and at the time of other resources, and we expect that our growth will continue to place significant demands on our management and other resources and will require us to continue developing and improving our operational, financial and other internal controls. Our need to effectively execute our growth strategy requires that we:

- manage our commercial operations effectively;
- identify, recruit, retain, incentivize and integrate additional employees;
- provide adequate training and supervision to maintain our high quality standards and preserve our culture and values;
- manage our internal development and operational efforts effectively while carrying out our contractual obligations to third parties; and
- continue to improve our operational, financial and management controls, reports systems and procedures.

34

Exhibit 7
Page 653

Continued growth increases the challenges involved in addressing these goals in a cost-effective or timely manner, or at all. If we do not effectively manage our growth, we may not be able to execute on our business plan, respond to competitive pressures, take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, which could have a material adverse effect on our business, financial condition and results of operations.

We are highly dependent on our senior management, other key officers, our engineers and field sales team, and may be increasingly dependent on sales representatives and clinical specialists for the sale of any medical devices we may market, if approved. We face significant competition for talent from other healthcare, technology and high-growth companies, which include both large enterprises and privately-held companies. To attract top talent, we have had to offer, and believe we will need to continue to offer, highly competitive compensation packages before we can validate the productivity of those employees. In addition, we may not be able to hire new employees quickly enough to meet our needs and fluctuations in the price of our common stock may make it more difficult or costly to use equity compensation to motivate, incentivize and retain our employees.

***We currently rely on sales of our Owlet Smart Sock technologies and related products for the majority of our revenue and expect to continue to do so for the foreseeable future.***

We are highly dependent upon the continued success and market acceptance of the Owlet Smart Sock and related technologies that serve as the basis of our primary product offerings. Continued market acceptance will depend upon our continuing to provide evidence that our products and services add value in care-giving activities. If caregivers do not prefer our Owlet Smart Sock over competing products and services, they may not buy our products and services in sufficient quantities to enable us to generate revenue growth from the sale of these products and services.

***If the FDA or any other governmental authority were to require clearance, approval, certification or other form of marketing authorization for the Owlet Smart Sock, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, we could be required to cease selling or recall the product pending receipt of such clearance, approval, certification or marketing authorization from the FDA or such other governmental authority, which can be a lengthy and time-consuming process, and we may also be subject to regulatory enforcement action.***

We currently sell the Owlet Smart Sock, which we market for use by parents of healthy babies to provide peace of mind, and for which we have not sought or obtained any marketing authorization from the FDA or similar authorization, approval, or certification from any other governmental authority. In response to inquiries from the FDA and regulatory authorities in other jurisdictions regarding the marketing of the Owlet Smart Sock, we have communicated our belief that the Owlet Smart Sock is not a medical device and does not require marketing authorization from the FDA or approval/certification from such other regulatory authorities. However, the FDA and certain regulatory authorities have expressed they may not agree with that conclusion and could require us to obtain marketing authorization (or approval/certification) to continue to sell the product. Obtaining authorization to sell the Owlet Smart Sock as a medical device is a time-consuming and costly process and we may be precluded from selling the Owlet Smart Sock if we are required to obtain marketing authorization. If granted, a marketing authorization could require conditions to sale, for example, a prescription requirement. If the FDA or other regulatory authorities require such marketing authorization (or approval/certification, respectively) for the Owlet Smart Sock, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, we could be required to cease selling or recall the product in the corresponding jurisdiction pending receipt of marketing authorization (or approval/certification), which can be a lengthy and time-consuming process, and we may also be subject to regulatory enforcement action. In addition, we may be required to modify the product's functionality or limit our marketing claims for the product, whether or not we obtain such clearance, approval, certification or marketing authorization. In any such event, our business could be substantially harmed.

***We currently rely on a single manufacturer for the assembly of our Owlet Smart Sock and a single manufacturer for the assembly of our Owlet Cam. We will likely rely on single manufacturers for future products we may develop. If we encounter manufacturing problems or delays, we may be unable to promptly transition to alternative manufacturers and our ability to generate revenue will be limited.***

We have no manufacturing capabilities of our own. We currently rely on a single manufacturer located in Thailand, Benchmark, for the manufacture of our Owlet Smart Sock. Additionally, we currently rely on a separate single manufacturer located in China, Shenzhen Aoni Electronic, for the manufacture of our Owlet Cam.

35

Exhibit 7
Page 654

TABLE OF CONTENTS

We expect to rely on limited manufacturers for future products we may develop. For example, we have relied upon and expect to continue to rely upon a single manufacturer for the supply of the Owlet Band, a product that we are developing and may commercially launch in the future. For us to be successful, our contract manufacturers must be able to provide us with products in substantial quantities, in compliance with regulatory requirements, in accordance with agreed upon specifications, at acceptable costs and on a timely basis. While our existing manufacturers have generally met our demand requirements on a timely basis in the past, their ability and willingness to continue to do so going forward may be limited for several reasons, including our relative importance as a customer of each manufacturer or their respective ability to provide assembly services to manufacture our products, which may be affected by the COVID-19 pandemic or other natural or man-made disasters. Earthquakes are of particular significance since some of their facilities are located in earthquake-prone areas. We are also vulnerable to damage from other types of disasters, including power loss, attacks from extremist or terrorist organizations, epidemics, communication failures, fire, floods and similar events. Furthermore, our manufacturing agreements can be terminated by our contract manufacturers without cause by giving us prior notice of six months or less. The facilities and the manufacturing equipment used to produce our products would be difficult to replace and could require substantial time to repair if significant damage were to result from any of these occurrences. An interruption in our commercial operations could occur if we encounter delays or difficulties in securing these manufactured products for any reason and we cannot obtain an acceptable substitute.

Any transition to a new contract manufacturer, or any transition of products between existing manufacturers, could be time-consuming and expensive, may result in interruptions in our operations and product delivery, could affect the performance specifications of our products, could require that we modify the design of our products, or could require clearance or approval by the FDA depending on the nature of the product and the changes associated with the transition to the new manufacturer. If we are required to change a contract manufacturer, we will be required to verify that the new manufacturer maintains facilities, procedures and operations that comply with our quality standards and applicable regulatory requirements, which could further impede our ability to manufacture our products in a timely manner. We may not be able to identify and engage alternative contract manufacturers on similar terms or without delay. Furthermore, our contract manufacturers could require us to move to a different production facility. The occurrence of any of these events could harm our ability to meet the demand for our products in a timely and cost-effective manner, which could have a material adverse effect on our business, financial condition and results of operations.

The manufacture of our products is complex and requires the integration of a number of components from several sources of supply. Our contract manufacturers must manufacture and assemble these complex products in commercial quantities in compliance with regulatory requirements and at an acceptable cost. Our products, in particular the Owlet Smart Sock, require significant expertise to manufacture, and our contract manufacturers may encounter difficulties in scaling up production of our products, including problems with quality control and assurance, component supply shortages, increased costs, shortages of qualified personnel, the long lead time required to develop additional facilities for purposes of testing our products or difficulties associated with compliance with local, state, federal and foreign regulatory requirements. Manufacturing or quality control problems may arise in connection with the scale-up of the manufacture of our products. If we are unable to obtain a sufficient supply of product, maintain control over product quality and cost or otherwise adapt to anticipated growth, or if we underestimate growth, we may not have the capability to satisfy market demand, and our business and reputation in the marketplace will suffer. Conversely, if demand for our products decreases, we may have excess inventory, which could result in inventory write-offs that would have a material adverse effect on our business, financial condition and results of operations. We may also encounter defects in materials or workmanship, which could lead to a failure to adhere to regulatory requirements. Any defects could delay operations at our contract manufacturers' facilities, lead to regulatory fines or halt or discontinue manufacturing indefinitely. Any of these outcomes could have a material adverse effect on our business, financial condition and results of operations.

***If we are unable to obtain key materials and components from sole or limited source suppliers, we will not be able to deliver our products to customers.***

We are currently devoting substantial resources to the development of new or advanced products, such as the Owlet BabySat, the Owlet Over-the-Counter ("OTC") Smart Sock and Owlet Band, and services, such as the development of our software platform, and intend to continue to do so. However, we may not be able to complete development on a timely basis, or at all. In addition, some of our products in development, such as the

36

Exhibit 7
Page 655

TABLE OF CONTENTS

Owlet BabySat, Owlet OTC Smart Sock and Owlet Band, may be regulated by the FDA or foreign regulatory agencies as medical devices, which may require marketing authorization clearance from applicable regulatory authorities, including marketing authorization from the FDA, prior to commercialization. New products and services, particularly those needing to meet FDA or other regulatory standards, may have higher manufacturing costs than legacy products and services, which could negatively impact our gross margins and operating results during these stages, without guarantees we will be able to successfully commercialize any such products.

If we successfully develop such products and services, we must still successfully manage their introductions to the market. Products and services that are not well-received by the market may lead to excess inventory and discounting of our existing products and services. Inventory levels in excess of consumer demand may result in inventory write-downs or write-offs and the sale of inventory at discounted prices may affect our gross margin and could impair the strength of our brand. Reserves and write-downs for rebates, promotions and excess inventory are recorded based on our forecast of future demand. Actual future demand could be less than our forecast, which may result in additional reserves and write-downs in the future, or actual demand could be stronger than our forecast, which may result in increased shipping costs and a reduction to previously recorded reserves and write-downs in the future and increase the volatility of our operating results.

Introductions of new or advanced products and services could also adversely impact the sales of our existing products and services to consumers. For instance, the introduction or announcement of new or advanced products and services may shorten the life cycle of our existing products or reduce demand, thereby reducing any benefits of successful product or service introductions and potentially leading to challenges in managing write-downs or write-offs of inventory of existing products and services.

We have in the past experienced challenges managing the inventory of our products, which has led and may in the future lead to increased shipping costs for air freight in order to fulfill customer orders in a timely manner, which has affected our gross margin and could impair the strength of our brand.

***Adapting our production capacities to evolving patterns of demand is expensive, time-consuming and subject to significant uncertainties. We may not be able to adequately predict consumer trends and may be unable to adjust our production in a timely manner.***

We market our products directly to consumers in the United States and a select number of international countries. If demand increases, we will be required to increase production proportionally. Adapting to changes in demand inherently lags behind the actual changes because it takes time to identify the change the market is undergoing and to implement any measures taken as a result. Finally, capacity adjustments are inherently risky because there is imperfect information, and market trends may rapidly intensify, ebb or even reverse. We have in the past not always been, and may in the future not be, able to accurately or timely predict trends in demand and consumer behavior or to take appropriate measures to mitigate risks and exploit opportunities resulting from such trends. Any inability in the future to identify or to adequately and effectively react to changes in demand could have a material adverse effect on our business, financial condition and results of operations.

***Some of our products and services are in development or have been recently introduced into the market and may not achieve market acceptance, which could limit our growth and adversely affect our business, financial condition and results of operations.***

Our portfolio of products and services continues to expand, and we are investing significant resources to enter into, and in some cases create, new markets for these products and services. We are continuing to invest in sales and marketing resources to achieve market acceptance of these products and services, but our technologies may not achieve general market acceptance.

The degree of market acceptance of these products and services will depend on a number of factors, including:

- perceived benefits from our products and services;

- perceived cost effectiveness of our products and services;

- perceived safety and effectiveness of our products and services;

- our ability to obtain any required marketing authorizations for our products and services and the label requirements of any approvals we may obtain;

37

Exhibit 7
Page 656

TABLE OF CONTENTS

- reimbursement available through government and private healthcare programs for using some of our products and services; and

- introduction and acceptance of competing products and services or technologies.

If our products and services do not gain market acceptance or if our customers prefer our competitors' products and services, our potential revenue growth would be limited, which would adversely affect our business, financial condition and results of operations.

***If we are unable to successfully develop and effectively manage the introduction of new products and services, our business may be adversely affected.***

We must successfully manage introductions of new or advanced products, such as the Owlet BabySat, Owlet OTC Smart Sock and Owlet Band, and services, such as the development of our software platform. Development of new products and services requires the expenditure of considerable time and resources, but we may not be able to successfully develop and introduce such products on a timely basis, or at all. Products and services that are not well-received by the market may lead to excess inventory and discounting of our existing products and services. Inventory levels in excess of consumer demand may result in inventory write-downs or write-offs and the sale of inventory at discounted prices, may affect our gross margin and could impair the strength of our brand. Reserves and write-downs for rebates, promotions and excess inventory are recorded based on our forecast of future demand. Actual future demand could be less than our forecast, which may result in additional reserves and write-downs in the future, or actual demand could be stronger than our forecast, which may result in increased shipping costs and a reduction to previously recorded reserves and write-downs in the future and increase the volatility of our operating results.

Introductions of new or advanced products and services could also adversely impact the sales of our existing products and services to consumers. For instance, the introduction or announcement of new or advanced products and services may shorten the life cycle of our existing products or reduce demand, thereby reducing any benefits of successful product or service introductions and potentially leading to challenges in managing write-downs or write-offs of inventory of existing products and services. In addition, some of our products, such as the Owlet BabySat, Owlet OTC Smart Sock and Owlet Band, may be regulated by the FDA or foreign regulatory agencies as medical devices, which may require marketing authorization or clearance from the FDA or other applicable agency prior to commercialization. New products and services, particularly those needing to meet FDA or other regulatory standards, may have higher manufacturing costs than legacy products and services, which could negatively impact our gross margins and operating results. Accordingly, if we fail to effectively manage introductions of new or advanced products and services, our business may be adversely affected.

We have in the past experienced challenges managing the inventory of our products, which has led and may in the future lead to increased shipping costs for air freight in order to fulfill customer orders in a timely manner, which has affected our gross margin and could impair the strength of our brand.

***A substantial portion of our sales comes through a limited number of retailers.***

Historically, we have relied on a limited number of retailers for a substantial portion of our total sales. For example, sales through our top five retail customers represented 60.1% of our revenue for the year ended December 31, 2020. These retailers work with us on a non-exclusive basis. If we are unable to establish, maintain or grow these relationships over time, or if these relationships grow more slowly than we anticipate, we are likely to fail to recover these costs and our operating results will suffer. The loss of any significant retail customer, whether or not related to our business or our products or services, could have an impact on the growth rate of our revenue as we work to obtain new retail customers or replacement relationships. Contracts with retailers may typically be terminated or renegotiated before their term expires for various reasons, subject to certain conditions. For example, after a specified period, certain of our contracts are terminable for convenience by such retailers, subject to a notice period. Additionally, certain contracts may be terminated immediately by the retailer if we go bankrupt or if we fail to comply with certain specified laws. Any renegotiation of the commercial agreements may result in less favorable economic terms for us. Retailers may also consolidate their operations, reducing the overall number of locations in which they sell our products and services. Historically, we have had retail customers declare bankruptcy and stop operations, negatively affecting our sales and business.

In order to grow our business, we anticipate that we will continue to depend on our relationships with third parties, including our retailers. Identifying retailers, and negotiating and documenting relationships with them,

38

Exhibit 7
Page 657

TABLE OF CONTENTS

requires significant time and resources. Our competitors may be effective in providing incentives to third parties to favor their products or services. If we are unsuccessful in establishing, or maintaining or strengthening our relationships with third parties, our ability to compete in the marketplace or to grow our revenue could be impaired and our results of operations may suffer. Even if we are successful, these relationships may not result in increased customer use of our services or increased revenue.

***The size and expected growth of our addressable market has not been established with precision and may be smaller than we estimate.***

Our estimates of the addressable market for our current products and services and future products and services are based on a number of internal and third-party estimates and assumptions, including birth rate, income levels and demographic profiles. While we believe our assumptions and the data underlying our estimates are reasonable, these assumptions and estimates may not be correct. In addition, the statements in this proxy statement/prospectus relating to, among other things, the expected growth in the market for baby products and services are based on a number of internal and third-party estimates and assumptions and may prove to be inaccurate. For example, although we expect that the number of births will continue to increase, those trends could shift and the number of births could decrease. Furthermore, even if the birth rate increases as we expect, technological or medical advances could provide alternatives to our products and services and reduce demand. As a result, our estimates of the addressable market for our current or future products and services may prove to be incorrect. If the actual number of consumers who would benefit from our products and services, the price at which we can sell future products and services or the addressable market for our products and services is smaller than we estimate, it could have a material adverse effect on our business, financial condition and results of operations.

***We spend significant amounts on advertising and other marketing campaigns to acquire new customers, which may not be successful or cost effective.***

We market our products and services through a mix of digital and traditional marketing channels. These include paid search, digital display advertising, email marketing, affiliate marketing, and select print advertising. We also leverage our database of prospects and customers to further drive customer acquisition and referrals. We spend significant amounts on advertising and other marketing campaigns to acquire new customers, and we expect our marketing expenses to increase in the future as we continue to spend significant amounts to acquire new customers and increase awareness of our products and services. While we seek to structure our marketing campaigns in the manner that we believe is most likely to encourage consumers to use our products and services, we may fail to identify marketing opportunities that satisfy our anticipated return on marketing spend as we scale our investments in marketing, accurately predict customer acquisition, or fully understand or estimate the conditions and behaviors that drive consumer behavior. Further, state, federal and foreign laws and regulations governing the privacy and security of personal information are evolving rapidly and could impact our ability to identify and market to potential and existing customers. If federal, state, or local laws governing our marketing activities become more restrictive or are interpreted by governmental authorities to prohibit or limit these activities, our ability to attract new customers and retain customers would be affected and our business could be materially harmed. In addition, any failure, or perceived failure, by us, to comply with any federal, state, or foreign laws or regulations governing our marketing activities could adversely affect our reputation, brand, and business, and may result in claims, proceedings, or actions against us by governmental entities, consumers, suppliers or others or other liabilities or may require us to change our operations and/or cease using certain marketing strategies. If any of our marketing campaigns prove less successful than anticipated in attracting new customers, we may not be able to adequately recover our marketing spend, and our rate of customer acquisition may fail to meet market expectations, either of which could have a material adverse effect on our business, financial condition and results of operations. Our marketing efforts may not result in increased sales of our products and services.

Further, web and mobile browser developers, such as Apple, Microsoft or Google, have implemented and may continue to implement changes, including requiring additional user permissions, in their browser or device operating system that impair our ability to measure and improve the effectiveness of advertising of our products and services. Such changes include limiting the use of first-party and third-party cookies and related tracking technologies, such as mobile advertising identifiers, and other changes that limit our ability to collect information that allows us to attribute consumer actions on advertisers' websites to the effectiveness of advertising campaigns

39

Exhibit 7
Page 658

TABLE OF CONTENTS

run by us. For example, Apple launched its Intelligent Tracking Prevention ("ITP") feature in its Safari browser. ITP blocks some or all third-party cookies by default on mobile and desktop and ITP has become increasingly restrictive over time. Apple's related Privacy-Preserving Ad Click attribution, intended to preserve some of the functionality lost with ITP, would limit cross-site and cross-device attribution, prevent measurement outside a narrowly-defined attribution window, and prevent ad re-targeting and optimization. Similarly, Google recently announced that it plans to stop supporting third-party cookies in its Google Chrome browser. Further, Apple announced certain changes, including introducing an AppTrackingTransparency framework that will limit the ability of mobile applications to request an iOS device's advertising identifier and may also affect our ability to track consumer actions.

In addition, we believe that building a strong brand and developing and achieving broad awareness of our brand is critical to achieving market success. If any of our brand-building activities prove less successful than anticipated in attracting new customers, we may not be able to recover our brand-building spend, and our rate of customer acquisition may fail to meet market expectations, either of which could have a material adverse effect on our business, financial condition and results of operations. There can be no assurance that our brand-building efforts will result in increased sales of our products and services.

### *If we are unable to continue to drive consumers to our website, it could adversely affect our revenue.*

Many consumers find our website by searching for baby products and services through internet search engines or from word-of-mouth and personal recommendations. A critical factor in attracting visitors to our website is how prominently we are displayed in response to search queries. Accordingly, we use search engine marketing as a means to provide a significant portion of our customer acquisition. Search engine marketing includes both paid website visitor acquisition on a cost-per-click basis and visitor acquisition on an unpaid basis, often referred to as organic or algorithmic search.

One method we employ to acquire visitors via organic search is commonly known as search engine optimization ("SEO"). SEO involves developing our website in a way that enables the website to rank high for search queries for which our website's content may be relevant. We also rely heavily on favorable recommendations from our existing customers to help drive traffic to our website. If our website is listed less prominently or fails to appear in search result listings for any reason, it is likely that we will attract fewer visitors to our website, which could adversely affect our revenue.

### *Our success depends substantially on our reputation and brand, which could be harmed by customer or third-party complaints or negative reviews or publicity about our company or our products and services.*

Our success is dependent in large part upon our ability to maintain and enhance our reputation and brand. Brand value can be severely damaged even by isolated incidents, particularly if the incidents receive considerable negative publicity or result in litigation. Some of these incidents may relate to actions taken (or not taken) with respect to social, environmental, and community outreach initiatives, the personal conduct of individuals actually, or perceived to be associated, with our brand, and our growth or rebranding strategies. We are heavily dependent on customers who use our products and services, in particular our Owlet Smart Sock, to provide good reviews and word-of-mouth recommendations to contribute to the growth of our brand and reputation. Customers who are dissatisfied with their experiences with our products and services or services may post negative reviews. We may also be the subject of blog, forum or other media postings that include statements that create negative publicity. If the FDA or other regulatory body determines that any of our products is a medical device that is not in compliance with applicable requirements and makes that determination public, or takes some other public action such as issuing a public enforcement action or instituting a recall, customers may react negatively and stop purchasing or recommending our products or services. Any negative reviews or publicity, whether real or perceived, disseminated by word-of-mouth, by the general media, by electronic or social networking means or by other methods, could harm our reputation and brand and could severely diminish consumer confidence in our products and services.

40

Exhibit 7
Page 659

TABLE OF CONTENTS

***Operations in international markets will expose us to additional business, political, regulatory, operational, financial and economic risks.***

Further expanding our business to attract customers in countries other than the United States is a key element of our long-term business strategy. International operations expose us and our representatives, agents and distributors to risks inherent in operating in foreign jurisdictions, and such exposure will increase as our international presence and activities increase. These risks include:

- the imposition of additional U.S. and foreign governmental controls or regulations;

- the imposition of costly and lengthy new export licensing requirements;

- the imposition of requirements to maintain data and the processing of that data on servers located within the United States or in foreign countries;

- a shortage of high-quality employees, sales people and distributors;

- the loss of any key personnel that possess proprietary knowledge, or who are otherwise important to our success in certain international markets;

- changes in duties and tariffs, license obligations and other non-tariff barriers to trade;

- the imposition of new trade restrictions;

- the imposition of restrictions on the activities of foreign agents, representatives and distributors;

- compliance with or changes in foreign tax laws, regulations and requirements and economic and trade sanctions programs;

- evolution in regulatory landscapes, such as on account of the United Kingdom ("UK") leaving the European Union ("EU"), and uncertainties that arise from such evolution;

- pricing pressure;

- changes in foreign currency exchange rates;

- laws and business practices favoring local companies;

- political instability and actual or anticipated military or political conflicts;

- financial and civil unrest worldwide;

- outbreaks of illnesses, pandemics or other local or global health issues;

- natural or man-made disasters;

- the inability to collect amounts paid by foreign government customers to our appointed foreign agents;

- longer payment cycles, increased credit risk and different collection remedies with respect to receivables; and

- difficulties in enforcing or defending intellectual property rights.

In addition, we purchase a portion of our raw materials and components from international sources. The sale and shipment of our products and services across international borders, as well as the purchase of materials and components from international sources, subject us to extensive U.S. and foreign governmental trade regulations, including those related to conflict minerals. Compliance with such regulations is costly and we could be exposed to potentially significant penalties if we are found not to be in compliance with such regulations. Any failure to comply with applicable legal and regulatory obligations could impact us in a variety of ways that include, but are not limited to, significant criminal, civil and administrative penalties, including imprisonment of individuals, fines and penalties, denial of export privileges, seizure of shipments, restrictions on certain business activities, and exclusion or debarment from government contracting. Also, the failure to comply with applicable legal and regulatory obligations could result in the disruption of our shipping, manufacturing and sales activities. Any material decrease in our international sales would adversely affect our business, financial condition and results of operations.

41

Exhibit 7
Page 660

In June 2016, the UK held a referendum pursuant to which voters elected to leave the EU, commonly referred to as Brexit. The UK formally withdrew from the EU and ratified a trade and cooperation agreement governing its future relationship with the EU. The agreement, which is being applied provisionally from January 1, 2021 until it is ratified by the European Parliament and the Council of the European Union, addresses trade, economic arrangements, law enforcement, judicial cooperation and a governance framework including procedures for dispute resolution, among other things. Because the agreement merely sets forth a framework in many respects and will require complex additional bilateral negotiations between the UK and the EU as both parties continue to work on the rules for implementation, significant political and economic uncertainty remains about how the precise terms of the relationship between the parties will differ from the terms before withdrawal. Brexit has created additional uncertainties that may ultimately result in new regulatory costs and challenges for medical device companies and increased restrictions on imports and exports throughout Europe, which could adversely affect our ability to conduct and expand our operations in Europe and which may have an adverse effect on our business, financial condition and results of operations. Additionally, Brexit may increase the possibility that other countries may decide to leave the EU in the future.

***We face and expect to face increasing competition from other companies, many of which have substantially greater resources than we do. If we do not successfully develop and commercialize enhanced or new products and services that remain competitive with products and services or alternative technologies developed by others, we could lose revenue opportunities and customers, and our ability to grow our business would be impaired, adversely affecting our financial condition and results of operations.***

We expect the industry in which we operate will continue to evolve and may be significantly affected by new product introductions and other market activities of industry participants. Certain potential competitors have substantially greater capital resources, larger product portfolios, larger user bases, larger sales forces and greater geographic presence, and have built relationships with retailers and distributors that may be more effective than ours. Our products and services face additional competition from companies developing products and services for use with third-party monitoring systems, as well as from companies that currently market similar products and services of their own, and may face further pressure from technology companies that have not historically operated in our industry.

Continuing technological advances and new product introductions within the home-use childcare electronics and service industry place our products and services at risk of obsolescence. Our long-term success depends upon the development and successful commercialization of new products and services, new or improved technologies and additional applications for our existing technologies, including products or applications that may be subject to the oversight of the FDA or comparable foreign regulatory authorities and could require marketing authorization by the FDA or similar approval from comparable foreign regulatory authorities. The research and development process is time-consuming and costly and may not result in products and services or applications that we can successfully commercialize.

If we do not successfully adapt our products and services and applications, we could lose revenue opportunities and customers. Furthermore, in the event any of our products is regulated as a medical device and obtains marketing authorization from the FDA or similar approval from comparable foreign regulatory authorities, one or more of our competitors may develop products that compete. For example, in the U.S., if any of our products is regulated as a medical device and obtains 510(k) clearance, competitors may develop products that the FDA determines are substantially equivalent to our products and may use our products as predicate devices to obtain regulatory clearances for their competing products.

***We rely significantly on IT and any failure, inadequacy, interruption or security lapse of that technology, including any cybersecurity incidents, could harm our business and our ability to operate our business effectively.***

Increased global cybersecurity vulnerabilities, cybersecurity threats, and sophisticated and targeted cybersecurity attacks pose a risk to the security of our systems and networks, including the confidentiality, availability and integrity of any underlying information and data, and those of our users, customers, partners, suppliers and third-party service providers. Attacks upon IT systems are increasing in their frequency, levels of persistence, sophistication and intensity, and are being conducted by sophisticated and organized groups and individuals with a wide range of motives and expertise. As a result of the COVID-19 pandemic, we may also face increased cybersecurity risks due to our reliance on internet technology and the number of our employees

42

Exhibit 7
Page 661

TABLE OF CONTENTS

who are working remotely, which may create additional opportunities for cybercriminals to exploit vulnerabilities. Cybersecurity attacks in particular are evolving and because the techniques used to obtain unauthorized access to, or to sabotage, systems change frequently and often are not recognized until launched against a target, we may be unable to anticipate these techniques or implement adequate preventative measures. We may also experience security breaches that may remain undetected for an extended period. If such an event were to occur and cause interruptions in our operations, it could result in a material disruption of our development programs and our business operations due to a loss of our trade secrets and confidential information, negative publicity and damage to our reputation, loss of customers, loss of or delay in market acceptance of our products and services, loss of competitive position, loss of revenue or liability for damages or other similar disruptions. As a result, there can be no assurance that our protective measures will prevent or detect security breaches that could have a significant impact on our business, reputation, financial condition and results of operations.

Our ability to effectively manage and maintain our internal business information, and to ship products and provide services to customers and invoice them on a timely basis, depends significantly on our enterprise resource planning system and other information systems. Portions of our IT systems may experience interruptions, delays or cessations of service or produce errors in connection with ongoing systems implementation work. In addition, interfaces between our products and services and our customers' computer networks could provide additional opportunities for cybersecurity attacks on us and our customers. The failure of these systems to operate or integrate effectively with other internal, customer, supplier or third-party service provider systems and to protect the underlying IT system and data integrity, including from cyberattacks, intrusions or other breaches or unauthorized access of these systems, or any failure by us to remediate any such attacks or breaches, may also result in damage to our reputation or competitiveness, delays in product fulfillment and reduced efficiency of our operations, and could require significant capital investments to remediate any such failure, problem or breach, all of which could adversely affect our business, financial condition and results of operations.

***Any disruption of service at our third-party data and call centers or other cloud infrastructure services could interrupt or delay our ability to deliver our services to our customers.***

Because our products and services are used by caregivers to monitor infants, it is critical that our products and services be accessible without interruption or degradation of performance. Customers may become dissatisfied by any system failure that interrupts our ability to provide our services to them. Sustained or repeated system failures would reduce the attractiveness of our products or services to customers. Moreover, negative publicity arising from these types of disruptions could damage our reputation and may adversely impact use of our products and services.

We currently host our products and services, serve our customers and support our operations in the United States primarily from third-party data and call centers and other cloud-based services. For example, we rely on cloud services and bespoke software services provided by Ayla Networks for our Owlet Smart Sock product to support the transfer of data to the cloud and back to us and the user. Additionally, we rely on the data transfer services of ThroughTek to enable video viewing access for the Owlet Cam. We do not have control over the operations of the services or the facilities of any of those providers. These facilities are vulnerable to damage or interruption from earthquakes, hurricanes, floods, fires, cyber security attacks, terrorist attacks, power losses, telecommunications failures and similar events. The occurrence of a natural disaster or an act of terrorism, a decision to close the facilities without adequate notice, or other unanticipated problems could result in lengthy interruptions in our services. The facilities also could be subject to break-ins, computer viruses, sabotage, intentional acts of vandalism and other misconduct. We may not be able to easily switch our cloud operations to another cloud provider if there are disruptions or interference with such providers.

None of our third-party cloud-based providers has an obligation to renew their agreements with us on commercially reasonable terms, or at all. If we are unable to renew our agreements with these providers on commercially reasonable terms, if our agreements with our providers are prematurely terminated, or if in the future we add additional cloud-based providers, we may experience costs or downtime in connection with the transfer to, or the addition of, new providers. If these providers were to increase the cost of their services, we may have to increase the price of our products and services, and our operating results may be materially adversely affected.

43

Exhibit 7
Page 662

TABLE OF CONTENTS

***We are subject to a number of risks related to the credit extended by our manufacturing providers.***

Our manufacturers extend credit to us and may revoke that credit. We use that credit to scale operations and increase production of our products. If our manufacturers revoke our credit, it could adversely affect our ability to meet demand for our products and adversely affect our business, financial condition and results of operations.

***We are subject to a number of risks related to the credit card and debit card payments we accept.***

We accept payments through credit and debit card transactions. For credit and debit card payments, we pay interchange and other fees, which may increase over time. An increase in those fees may require us to increase the prices we charge and would increase our operating expenses, either of which could have a material adverse effect on our business, financial condition and results of operations.

If we or our processing vendors fail to maintain adequate systems for the authorization and processing of credit and debit card transactions, it could cause one or more of the major credit card companies to disallow our continued use of their payment products. In addition, if these systems fail to work properly and, as a result, we do not charge our customers' credit or debit cards on a timely basis, or at all, it could have a material adverse effect on our business, financial condition and results of operations.

The payment methods that we offer also subject us to potential fraud and theft by criminals, who are becoming increasingly more sophisticated in exploiting weaknesses that may exist in the payment systems. If we fail to comply with applicable rules or requirements for the payment methods we accept, or if payment-related data is compromised due to a breach, we may be liable for significant costs incurred by payment card issuing banks and other third parties or subject to fines and higher transaction fees, or our ability to accept or facilitate certain types of payments may be impaired. In addition, our customers could lose confidence in certain payment types, which may result in a shift to other payment types or potential changes to our payment systems that may result in higher costs. If we fail to adequately control fraudulent credit card transactions, we may face civil liability, diminished public perception of our security measures and significantly higher card-related costs, each of which could have a material adverse effect on our business, financial condition and results of operations.

We are also subject to payment card association operating rules, certification requirements and rules governing electronic funds transfers, which could change or be reinterpreted to make it more difficult for us to comply. We are subject to the Payment Card Industry Data Security Standard ("PCI DSS") issued by the PCI Council, which includes guidelines with regard to the security policies and practices we should adopt regarding the physical and electronic storage, processing and transmission of cardholder data. Compliance with the PCI DSS and implementing related procedures, technology and information security measures requires significant resources and ongoing attention, and any security incident involving cardholder data could subject us to significant penalties and liability. Failure to comply with this standard may violate payment card association operating rules, federal and state laws and regulations and the terms of our contracts with payment processors. Any failure to comply fully also may subject us to fines, penalties, damages and civil liability, and may result in the loss of our ability to accept credit and debit card payments. Further, there is no guarantee that such compliance will prevent illegal or improper use of our payment systems or the theft, loss or misuse of data pertaining to credit and debit cards, cardholders and transactions.

If we are unable to maintain our chargeback rate or refund rates at acceptable levels, our processing vendor may increase our transaction fees or terminate its relationship with us. Any increases in our credit and debit card fees could harm our results of operations, particularly if we elect not to raise our rates for our products and services to offset the increase. The termination of our ability to process payments on any major credit or debit card would significantly impair our ability to operate our business.

**Risks Related to New Owlet's Capital Requirements and Capital Structure**

***We have a history of net losses, and we may not achieve or maintain profitability in the future.***

We have incurred net losses since inception. For the years ended December 31, 2019 and 2020, we incurred net losses of $17.9 million and $10.5 million, respectively. As a result of our ongoing losses, as of December 31, 2020, we had an accumulated deficit of $71.7 million. Since inception, we have spent significant funds on organizational and start-up activities, to recruit key managers and employees, to develop our products, services and connected nursery ecosystem, to develop our manufacturing know-how and customer support resources and for research and development. The net losses we incur may fluctuate significantly from quarter to quarter and may increase as a result of the COVID-19 pandemic.

44

Exhibit 7
Page 663

TABLE OF CONTENTS

We have encountered and will continue to encounter risks and difficulties frequently experienced by growing companies in rapidly changing industries, including increasing expenses as we continue to grow our business. We expect our operating expenses to increase significantly over the next several years as we continue to hire additional personnel, expand our operations and infrastructure, and continue to develop and expand our products and services. In addition to the expected costs to grow our business, we also expect to incur additional legal, accounting, and other expenses as a newly public company. These investments may be more costly than we expect, and if we do not achieve the benefits anticipated from these investments, or if the realization of these benefits is delayed, they may not result in increased revenue or growth in our business. If our growth rate were to decline significantly or become negative, it could adversely affect our financial condition and results of operations. If we are not able to achieve or maintain positive cash flow in the long term, we may require additional financing, which may not be available on favorable terms or at all or which would be dilutive to our stockholders. If we are unable to successfully address these risks and challenges as we encounter them, our business, results of operations, and financial condition would be adversely affected. Our failure to achieve or maintain profitability could negatively impact the value of our common stock.

***We may need to raise additional capital in the future in order to execute our strategic plan following the Business Combination and related transactions, which may not be available on terms acceptable to us, or at all.***

We have experienced recurring losses from operations and negative cash flows from operations, and we expect to continue operating at a loss for the foreseeable future. As of December 31, 2020, we had an accumulated deficit of $71.7 million and cash and cash equivalents of $17.0 million, and, as a result, at the time of issuance of our consolidated financial statements for the year ended December 31, 2020, we concluded that there was substantial doubt about our ability to continue as a going concern for a period of 12 months. We will need to finance operations through generation of additional revenues as well as through raising additional debt or equity financing. There can be no assurance that we will be able to obtain additional debt or equity financing on terms acceptable to us, if at all, or that we will generate sufficient future revenues.

Even if the Business Combination is consummated as contemplated, we may need additional funding to fund our operations, but additional funds may not be available to us on acceptable terms on a timely basis, if at all. We may seek funds through borrowings or through additional rounds of financing, including private or public equity or debt offerings, or by other means. Our future capital requirements will depend on many factors, including:

- the timing, receipt and amount of sales from our current and future products and services;

- the cost of manufacturing, either ourselves or through third party manufacturers, our products and services;

- the cost and timing of expanding our sales, marketing and distribution capabilities;

- the terms and timing of any other partnership, licensing and other arrangements that we may establish;

- the costs and timing of securing regulatory approvals;

- any product liability or other lawsuits related to our current or future products and services;

- the expenses needed to attract, hire and retain skilled personnel;

- the costs associated with being a public company;

- the duration and severity of the COVID-19 pandemic and its impact on our business and financial markets generally;

- the costs involved in preparing, filing, prosecuting, maintaining, defending and enforcing our intellectual property portfolio; and

- the extent to which we acquire or invest in businesses, products or technologies.

If we raise additional funds through further issuances of equity or convertible debt securities, our existing stockholders could suffer significant dilution, and any new equity securities we issue could have rights, preferences, and privileges superior to those of holders of our common stock. If we are unable to obtain adequate financing or financing on terms satisfactory to us, when we require it, our ability to continue to pursue our

45

Exhibit 7
Page 664

business objectives and to respond to business opportunities, challenges, or unforeseen circumstances could be significantly limited, and our business, financial condition and results of operations could be materially adversely affected. We also could be required to seek funds through arrangements with partners or others that may require us to relinquish rights or jointly own some aspects of our technologies, products or services that we would otherwise pursue on our own.

***Our loan and security agreement contains certain covenants and restrictions that may limit our flexibility in operating our business and any failure to satisfy those covenants and restrictions could adversely affect our business and financial condition.***

Our loan and security agreement with Silicon Valley Bank ("SVB") contains various affirmative and negative covenants and restrictions that limit our ability to engage in specific types of transactions, including:

- conveying, selling, leasing, transferring, or otherwise disposing of certain assets;

- consolidating, merging, selling or otherwise disposing of all or substantially all of our assets or acquiring all or substantially all of the capital stock or property of another person;

- incurring specified types of additional indebtedness (including guarantees or other contingent obligations); and

- paying dividends on, repurchasing or making distributions in respect of any capital stock or making other restricted payments, subject to specified exceptions.

In addition, under the loan and security agreement, we are required to satisfy and maintain certain financial ratios, including financial maintenance covenants. We obtained a waiver from SVB for a failure to maintain compliance with a financial covenant as of December 31, 2020, but cannot make assurances we will be able to satisfy these requirements in the future or, if we fail to satisfy these requirements, that will be able to negotiate a waiver or amendment with SVB as we have in the past. A breach of any of these ratios or covenants, including as a result of events beyond our control, would result in a default under the loan and security agreement. Upon the occurrence of an event of default, SVB could elect to declare all amounts outstanding under the loan and security agreement immediately due and payable, terminate all commitments to extend further credit and pursue legal remedies for recovery, all of which could adversely affect our business and financial condition. As of December 31, 2020, $10.0 million in aggregate principal amount was outstanding under the loan. See Note 9 to our accompanying consolidated financial statements included in this proxy statement/prospectus.

***Discontinuation, reform or replacement of the "Prime Rate," as calculated and published by The Wall Street Journal, and other benchmark rates, or uncertainty related to the potential for any of the foregoing, may adversely affect our business.***

Regulators have suggested reforming or replacing certain benchmark rates, and the discontinuation, reform or replacement of the Prime Rate or any other benchmark rates may have an unpredictable impact on contractual mechanics in the credit markets or cause disruption to the broader financial markets. Uncertainty as to the nature of such potential discontinuation, reform or replacement may also negatively impact interest expense related to borrowings under our loan and security agreement. Borrowings under our loan and security agreement bear interest either at the Prime Rate, or, if unavailable, at the rate announced by SVB as its prime rate in effect at its principal office in the State of California. We may in the future pursue amendments to our loan and security agreement to provide for a transition mechanism or other reference rate if the Prime Rate were discontinued, but we may not be able to reach agreement with our Lender on any such amendments. As a result, additional financing to replace any then-outstanding Prime Rate-based debt may be unavailable, more expensive or restricted by the terms of such outstanding indebtedness.

***Changes in tax laws, including as a result of the 2020 United States presidential and congressional elections, may impact our future financial position and results of operations.***

New income, sales, use or other tax laws, statutes, rules, regulations or ordinances could be enacted at any time, or interpreted, changed, modified or applied adversely to us, any of which could adversely affect our business operations and financial performance. In particular, the recent presidential and congressional elections in the United States could result in significant changes in, and uncertainty with respect to, tax legislation, regulation and government policy directly affecting our business or indirectly affecting us because of impacts on our

46

Exhibit 7
Page 665

TABLE OF CONTENTS

customers and suppliers. For example, the United States government may enact significant changes to the taxation of business entities including, among others, an increase in the corporate income tax rate, an increase in the tax rate applicable to the global intangible low-taxed income and elimination of certain exemptions, and the imposition of minimum taxes or surtaxes on certain types of income. No specific United States tax legislation has been proposed at this time and the likelihood of these changes being enacted or implemented is unclear. We are currently unable to predict whether such changes will occur and, if so, the ultimate impact on our business. To the extent that such changes have a negative impact on us, our suppliers or our customers, including as a result of related uncertainty, these changes may materially and adversely affect our business, financial condition, results of operations and cash flows.

In addition, as we expand our business internationally, the application and implementation of existing, new or future international laws regarding indirect taxes (such as a Value Added Tax) could materially and adversely affect our business, financial condition and results of operations.

***The applicability of sales, use and other tax laws or regulations on our business is uncertain. Adverse tax laws or regulations could be enacted or existing laws could be applied to us or our customers, which could subject us to additional tax liabilities and related interest and penalties, increase the costs of our products and adversely impact our business.***

State, local and foreign tax jurisdictions have differing rules and regulations governing sales, use, value-added and other taxes, and these rules and regulations can be complex and are subject to varying interpretations that may change over time. Existing tax laws, statutes, rules, regulations, or ordinances could be interpreted, changed, modified, or applied adversely to us (possibly with retroactive effect).

One or more states, countries or other jurisdictions may seek to impose sales, use, value added or other tax collection obligations on us, including for past sales. A successful assertion by a state, country or other jurisdiction that we should have been or should be collecting additional sales, use, value added or other taxes on our products could, among other things, result in substantial tax liabilities for past sales, create significant administrative burdens for us, or otherwise harm our business, results of operations, and financial condition.

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.***

We have incurred substantial net operating losses ("NOLs") since inception, and we may not achieve profitability in the future. U.S. federal and certain state NOLs generated in taxable years beginning after December 31, 2017 are not subject to expiration. U.S. federal NOLs generally may not be carried back to prior taxable years except that, under the Coronavirus Aid, Relief and Economic Security (CARES) Act, U.S. federal NOLs generated in 2018, 2019 and 2020 may be carried back to each of the five taxable years preceding the taxable year in which the loss arises. Additionally, for taxable years beginning after December 31, 2020, the deductibility of U.S. federal NOLs is limited to 80% of our taxable income in such taxable year. NOLs generated in tax years before 2018 may still be used to offset future taxable income without regard to the 80% limitation, although they have the potential to expire without being utilized if we do not achieve profitability in the future. However, under the rules of Sections 382 and 383 of the Internal Revenue Code of 1986, as amended (the "Code"), if a corporation undergoes an "ownership change," generally defined as a greater than 50 percentage point change (by value) in its equity ownership over a rolling three-year period, the corporation's ability to use its pre-change NOLs and other pre-change tax attributes to offset its post-change taxable income or taxes may be limited. The applicable rules generally operate by focusing on changes in ownership among stockholders considered by the rules as owning, directly or indirectly, 5% or more of the stock of a corporation, as well as changes in ownership arising from new issuances of stock by the corporation. If finalized, Treasury Regulations currently proposed under Section 382 of the Code may further limit our ability to utilize our pre-change NOLs or other pre-change tax attributes if we undergo a future ownership change. We could experience one or more ownership changes in the future, including in connection with this Business Combination and as a result of future changes in our stock ownership, some of which may be outside our control. As a result, if we earn net taxable income, our ability to use our pre-change NOL carryforwards to offset post-change taxable income may be subject to limitations. For these reasons, we may not be able to utilize a material portion of our NOLs and other tax attributes, which could adversely affect our future cash flows.

47

Exhibit 7
Page 666

TABLE OF CONTENTS

**Risks Related to Owlet Becoming a Public Company**

***We have identified material weaknesses in our internal control over financial reporting and we may identify additional material weaknesses in the future or otherwise fail to maintain effective internal control over financial reporting, which may result in material misstatements of our consolidated financial statements or cause us to fail to meet our periodic reporting obligations or cause our access to the capital markets to be impaired.***

In connection with the reissuance of our consolidated financial statements as of and for the fiscal year ended December 31, 2019, we identified material weaknesses in our internal control over financial reporting. The identified material weaknesses in our internal control over financial reporting continue to exist as of December 31, 2020.

We did not design and maintain an effective control environment commensurate with our financial reporting requirements. Specifically, we did not maintain a sufficient complement of personnel with an appropriate degree of internal controls and accounting knowledge, experience, and training commensurate with our accounting and financial reporting requirements. This material weakness contributed to the following additional material weaknesses:

- We did not design and maintain effective controls over the segregation of duties related to journal entries. Specifically, certain personnel have the ability to both create and post journal entries within the Company's general ledger system. This material weakness did not result in any adjustments to the consolidated financial statements.

- We did not design and maintain effective controls over the accounting for convertible preferred stock and related preferred stock warrant arrangements. Further, we did not design and maintain effective controls to verify the completeness and accuracy of sales returns and accrued sales tax. Each of these material weaknesses resulted in material adjustments to several account balances and disclosures in the consolidated financial statements as of and for the year ended December 31, 2019.

- We did not design and maintain effective controls over IT general controls for information systems that are relevant to the preparation of our consolidated financial statements. Specifically, we did not design and maintain (i) program change management controls to ensure that IT program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately, (ii) user access controls to ensure appropriate segregation of duties and that adequately restrict user and privileged access to financial applications, programs, and data to appropriate Company personnel, (iii) computer operations controls to ensure that critical batch jobs are monitored, and data backups are authorized and monitored, and (iv) testing and approval controls for program development to ensure that new software development is aligned with business and IT requirements. This material weakness did not result in any adjustments to the consolidated financial statements.

Additionally, each of the material weaknesses described above could result in a misstatement of one or more account balances or disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.

We have not begun an implementation plan to remediate these material weaknesses. Once we begin an implementation plan, the remediation measures will be ongoing, and although not all inclusive, we expect the remediation measures to include hiring additional accounting and financial reporting personnel and implementing additional policies, procedures and controls, all of which will result in future costs for the Company.

To address these material weaknesses, we plan to take actions to improve our IT general controls, segregation of duties controls, period-end financial reporting controls, and journal entry controls. However, the material weaknesses will not be considered remediated until our remediation plan has been fully implemented, the applicable controls operate for a sufficient period of time, and we have concluded, through testing, that the newly implemented and enhanced controls are operating effectively. At this time, we cannot predict the success of such efforts or the outcome of our assessment of the remediation efforts. Our efforts may not remediate these material weaknesses in our internal control over financial reporting, or that additional material weaknesses will not be identified in the future. Our failure to implement and maintain effective internal control over financial reporting could result in errors in our consolidated financial statements that could result in a restatement of our

48

Exhibit 7
Page 667

TABLE OF CONTENTS

consolidated financial statements, and could cause us to fail to meet our reporting obligations, any of which could diminish investor confidence in us and cause a decline in the price of our common stock. Additionally, ineffective internal controls could expose us to an increased risk of financial reporting fraud and the misappropriation of assets and subject us to potential delisting from the stock exchange on which we list or to other regulatory investigations and civil or criminal sanctions.

As a public company, we will be required pursuant to Section 404(a) of the Sarbanes-Oxley Act to furnish a report by management on, among other things, the effectiveness of our internal control over financial reporting for each annual report on Form 10-K to be filed with the SEC. This assessment will need to include disclosure of any material weaknesses identified by our management in internal control over financial reporting. Once we cease to be an emerging growth company, our independent registered public accounting firm will also be required, pursuant to Section 404(b) of the Sarbanes-Oxley Act, to attest to the effectiveness of our internal control over financial reporting in each annual report on Form 10-K to be filed with the SEC. We will be required to disclose material changes made in our internal control over financial reporting on a quarterly basis. Failure to comply with the Sarbanes-Oxley Act could potentially subject us to sanctions or investigations by the SEC, the stock exchange on which our securities are listed or other regulatory authorities, which would require additional financial and management resources. We have begun the costly and challenging process of compiling the system and processing documentation necessary to perform the evaluation needed to comply with Section 404, but we may not be able to complete our evaluation, testing and any required remediation in a timely fashion.

***Following the Business Combination, we will qualify as an "emerging growth company" and a "smaller reporting company," and the reduced public company reporting requirements applicable to emerging growth companies and smaller reporting companies may make our common stock less attractive to investors.***

Following the Business Combination, we will qualify as an "emerging growth company," as defined in the JOBS Act. For so long as we remain an emerging growth company, we are permitted and plan to rely on exemptions from certain disclosure requirements that are applicable to public companies that are not emerging growth companies. These provisions include, but are not limited to: being permitted to have only two years of audited financial statements and only two years of related selected financial data and management's discussion and analysis of financial condition and results of operations disclosure; an exemption from compliance with the auditor attestation requirement in the assessment of our internal control over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act; not being required to comply with any requirement that may be adopted by the Public Company Accounting Oversight Board ("PCAOB") regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements; reduced disclosure obligations regarding executive compensation arrangements in our periodic reports, registration statements and proxy statements; and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. In addition, the JOBS Act permits emerging growth companies to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public companies. We intend to take advantage of the exemptions discussed above. As a result, the information we provide will be different than the information that is available with respect to other public companies.

We will remain an emerging growth company until the earliest of (i) the end of the fiscal year following the fifth anniversary of the closing of Sandbridge's initial public offering, (ii) the first fiscal year after our annual gross revenue exceed $1.07 billion, (iii) the date on which we have, during the immediately preceding three-year period, issued more than $1.00 billion in non-convertible debt securities, or (iv) the end of any fiscal year in which the market value of our common stock held by non-affiliates exceeds $700 million as of the end of the second quarter of that fiscal year.

Following the Business Combination, we will also be a "smaller reporting company" as defined in the Exchange Act. We may continue to be a smaller reporting company even after we are no longer an emerging growth company, which would allow us to take advantage of many of the same exemptions available to emerging growth companies, including not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act and reduced disclosure obligations regarding executive compensation. We will be able to take advantage of these scaled disclosures for so long as our voting and non-voting common

49

Exhibit 7
Page 668

TABLE OF CONTENTS

stock held by non-affiliates is less than $250.0 million measured on the last business day of our second fiscal quarter, or our annual revenue is less than $100.0 million during the most recently completed fiscal year and our voting and non-voting common stock held by non-affiliates is less than $700.0 million measured on the last business day of our second fiscal quarter.

We cannot predict whether investors will find our common stock less attractive if we rely on these exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock, and the market price of our common stock may be more volatile.

***Following the Business Combination, we will incur increased costs and become subject to additional regulations and requirements as a result of becoming a public company.***

As a public company, we will incur significant legal, accounting and other expenses that we have not incurred as a private company, including costs associated with public company reporting requirements. We also have incurred and will continue to incur costs associated with the Sarbanes-Oxley Act, and related rules implemented by the SEC and the exchange on which our securities are listed. The expenses generally incurred by public companies for reporting and corporate governance purposes have been increasing.

We expect these rules and regulations to increase our legal and financial compliance costs and to make some activities more time-consuming and costly, although we are currently unable to estimate these costs with any degree of certainty. These laws and regulations also could make it more difficult or costly for us to obtain certain types of insurance, including director and officer liability insurance, and we may be forced to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. These laws and regulations could also make it more difficult for us to attract and retain qualified persons to serve on our board of directors, on our board committees or as our executive officers. Furthermore, if we are unable to satisfy our obligations as a public company, we could be subject to delisting of our common stock, fines, sanctions, other regulatory action and potentially civil litigation.

**Risks Related to Regulation of New Owlet's Industry and Products**

***We are required to obtain and maintain marketing authorizations from the FDA for medical device products in the U.S., which can be a lengthy and time-consuming process, and a failure to do so on a timely basis, or at all, could severely harm our business.***

We are developing certain products, including the Owlet BabySat and Owlet OTC Smart Sock, that we believe will be regulated as medical devices, if approved. Certain other products we are developing, such as the Owlet Band, may also be regulated as medical devices. We currently sell the Owlet Smart Sock, which we market for use by parents of healthy babies to provide peace of mind, and for which we have not sought or obtained any marketing authorization from the FDA or any other governmental authority. In response to inquiries from the FDA and regulatory authorities in other jurisdictions regarding the marketing of the Owlet Smart Sock, we have communicated our belief that the Owlet Smart Sock is not a medical device and does not require marketing authorization from the FDA or clearance, approval, certification, or other authorization from such other regulatory authorities. However, the FDA and other regulatory authorities have expressed they may not agree with that conclusion and could require us to obtain such marketing authorization, clearance, approval, or certification to continue to sell the product.

Medical devices are subject to extensive regulation in the United States by local government, state government and the federal government, including by the FDA. The FDA regulates virtually all aspects of a medical device's design, development, testing, manufacturing, labeling, storage, record keeping, reporting, sale, promotion, distribution and shipping. In the United States, unless an exemption applies, any medical device that we seek to market in the U.S. must first undergo the FDA's premarket review pursuant to the Federal Food, Drug, and Cosmetic Act ("FDCA"), and must receive the FDA's marketing authorization either via clearance of a 510(k) premarket notification, de novo classification, or approval of a premarket approval ("PMA") application, depending on the type of device. In the 510(k) clearance process, before a device may be marketed, the FDA must determine that a proposed device is "substantially equivalent" to a legally-marketed "predicate" device. To be "substantially equivalent," the proposed device must have the same intended use as the predicate device, and either have the same technological characteristics as the predicate device or have different technological characteristics and not raise different questions of safety or effectiveness than the predicate device. Clinical data are sometimes required to support substantial equivalence.

50

Exhibit 7
Page 669

**TABLE OF CONTENTS**

In the PMA process, the FDA must determine that a proposed device is safe and effective for its intended use based, in part, on extensive data, including, but not limited to, technical, pre-clinical, clinical trial, manufacturing and labeling data. The PMA process is typically required for devices that are deemed to pose the greatest risk, such as life-sustaining, life-supporting or implantable devices. However, some devices are automatically subject to the PMA pathway regardless of the level of risk they pose because they have not previously been classified into a lower risk class by the FDA. Manufacturers of these devices may request that the FDA review such devices in accordance with the de novo classification procedure, which allows a manufacturer whose novel device would otherwise require the submission and approval of a PMA prior to marketing to request down-classification of the device on the basis that the device presents low or moderate risk. If the FDA agrees with the down classification, the applicant will then receive authorization to market the device. This device can then be used as a predicate device for future 510(k) submissions.

Modifications to products that are approved through a PMA application may require FDA approval. Similarly, certain modifications made to products cleared through a 510(k) premarket notification or de novo classification may require a new 510(k) clearance. The PMA approval, de novo classification, and the 510(k) clearance process can be expensive, lengthy and uncertain. The FDA's 510(k) clearance process usually takes from three to 12 months, but can last longer. The process of obtaining a PMA is much more costly and uncertain than the 510(k) clearance process and generally takes from one to three years, or even longer, from the time the application is filed with the FDA. In addition, a PMA and de novo classification generally require the performance of one or more clinical trials, and a 510(k) clearance sometimes requires clinical data to support clearance. Despite the time, effort and cost, any particular device may not be authorized for marketing by the FDA. Any delay or failure to obtain necessary marketing authorizations could harm our business.

Even if marketing authorization is granted, such marketing authorization may be limited to only certain indications for use. Medical devices may be marketed only for the indications of use for which they are authorized. Additionally, the FDA might not grant marketing authorizations on a timely basis, if at all, for products or new uses of existing products that are regulated as medical devices and that are determined to require such marketing authorization. In addition, even if FDA marketing authorization is obtained, if safety or effectiveness problems are later identified with any medical device products, we may need to initiate a product recall.

To support any submissions to the FDA seeking marketing authorizations, we may be required to conduct clinical testing of our product candidates. Such clinical testing must be conducted in compliance with FDA requirements pertaining to research with human subjects. Among other requirements, we must obtain informed consent from study subjects and approval by institutional review boards before such studies may begin. We must also comply with other FDA requirements such as monitoring, record-keeping, reporting and the submission of information regarding certain clinical trials to a public database maintained by the National Institutes of Health. In addition, if the study involves a significant risk device, we are required to obtain the FDA's approval of the study under an Investigational Device Exemption ("IDE"). Compliance with these requirements can require significant time and resources. If the FDA determines that we have not complied with such requirements, the FDA may refuse to consider the data to support our submissions seeking marketing authorization or may initiate enforcement actions.

Moreover, clinical testing is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process. The results of preclinical studies and early clinical trials may not be predictive of the results of later-stage clinical trials. Product candidates in later stages of clinical trials may fail to show the desired safety and efficacy traits despite having progressed through preclinical studies and initial clinical trials. A number of companies have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier trials. Our future clinical trial results may not be successful. We may also be delayed in our clinical trials, including as related to, among other things: obtaining authorization to initiate clinical trials; reaching agreement on acceptable terms with vendors, clinical trial sites, and contract research organizations; obtaining institutional review board ("IRB") approvals, recruiting subjects and having them complete the study; experiencing deviations from clinical trial protocols; and adding new clinical sites. We could encounter delays if a clinical trial is suspended or terminated due to a number of factors, including failure to conduct the clinical trial in accordance with regulatory requirements or our clinical protocols, inspection of the clinical trial operations or trial site by the FDA or other regulatory authorities resulting in the imposition of a clinical hold, unforeseen

Exhibit 7
Page 670

TABLE OF CONTENTS

safety issues or adverse side effects, failure to demonstrate a benefit from using a drug, changes in governmental regulations or administrative actions or lack of adequate funding to continue the clinical trial. If we experience delays in the completion of, or termination of, any clinical trial of our medical device products we seek to develop, the commercial prospects of our proposed products will be harmed, and our ability to generate product revenues from any of these products will be delayed. In addition, any delays in completing our clinical trials will increase our costs, slow down our product development and jeopardize our ability to generate product sales and revenues.

The FDA's interpretations of its laws and regulations are subject to change. If the FDA changes its policy or concludes that the marketing of any of our products is not in accordance with current policies, regulations or statutory requirements, or if the FDA changes its applicable policies or if changes are introduced to applicable laws or regulations, we may be required to seek clearance or approval for these products through the 510(k), *de novo* or PMA processes, may not be permitted to continue marketing these products until marketing authorization is obtained, or may be the subject of regulatory enforcement actions.

***We have relied and expect to continue to rely on third parties to conduct our nonclinical and clinical studies and perform other tasks for us. If these third parties do not successfully carry out their contractual duties, meet expected deadlines, or comply with regulatory requirements, we may not be able to obtain marketing authorization for or commercialize our medical device products and our business could be substantially harmed.***

We have relied upon and plan to continue to rely upon third parties for execution of our nonclinical and clinical studies, and we control only certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our studies is conducted in accordance with the applicable protocol, legal, regulatory, and scientific standards and our reliance on third parties does not relieve us of our regulatory responsibilities. We and our third party contractors are required to comply with Good Clinical Practice requirements, or GCPs, and Good Laboratory Practice requirements, or GLPs, which are regulations and guidelines enforced by the FDA and other regulatory authorities for the conduct of clinical and nonclinical studies, respectively. Regulatory authorities enforce these regulations through periodic inspections of study sponsors, principal investigators, study sites, and other contractors. If we or any of our third party contractors fail to comply with applicable regulations, the data generated in our studies may be deemed unreliable and the FDA and other regulatory authorities may require us to perform additional nonclinical and clinical studies before issuing any clearances, approvals, certifications or marketing authorizations for any medical device products we seek to market. Upon inspection by a given regulatory authority, such regulatory authority may determine that our clinical studies do not comply with GCP regulations. Our or our third party contractors' failure to comply with these regulations may require us to repeat clinical studies, which would delay or prevent any required clearance, approval, certification or marketing authorization from being granted.

If any of our relationships with these third parties terminate, we may not be able to enter into arrangements with alternative third parties or do so on commercially reasonable terms. In addition, our contractors are not our employees, and except for remedies available to us under our agreements with them, we cannot control whether or not they devote sufficient time and resources to our development programs. If these third parties do not successfully carry out their contractual duties or obligations or meet expected deadlines, if they need to be replaced or if the quality or accuracy of the data they obtain is compromised due to the failure to adhere to our protocols, regulatory requirements, or for other reasons, our studies may be extended, delayed, or terminated and we may not be able to obtain clearances, approvals, certifications or marketing authorizations for or successfully commercialize our proposed medical device products. Third parties may also generate higher costs than anticipated. As a result, our results of operations and the commercial prospects for our proposed products would be harmed, our costs could increase, and our ability to generate revenue could be delayed.

***We rely on third parties to manufacture our products. Failure of those third parties to provide us with sufficient quantities of our products, in compliance with applicable regulatory requirements, or to do so at acceptable quality levels or prices could adversely impact our business.***

We do not currently have nor do we plan to acquire the infrastructure or capability internally to completely manufacture our commercial products or our development-stage products, and we lack the resources and the capability to manufacture any of our current or future products in the future. We do not control the manufacturing process of, and are completely dependent on, our contract manufacturing partners for compliance

52

Exhibit 7
Page 671

TABLE OF CONTENTS

with applicable regulatory requirements for any medical device products we seek to market. For example, the FDA requires adherence to current good manufacturing practice requirements for medical devices, known as the Quality System Regulation, or QSR. If our contract manufacturers cannot successfully manufacture material that conforms to our specifications and the strict regulatory requirements of the FDA or others, our products may not be able to be lawfully marketed. In addition, we have no control over the ability of our contract manufacturers to maintain adequate quality control, quality assurance and qualified personnel. If the FDA or a comparable foreign regulatory authority does not consider these facilities adequate for the manufacture of our products, we may need to find alternative manufacturing facilities, which would significantly impact our ability to develop, obtain clearance, approval, certification or marketing authorization for or market any medical device products we may seek to develop.

We rely on third-party manufacturers to purchase from third-party suppliers the materials necessary to produce our products. There are a limited number of suppliers for raw materials that are used in the manufacture of our products and that we anticipate will be able to supply materials for the production of our future products, and there may be a need to assess alternate suppliers to prevent a possible disruption of the manufacture of the materials. We do not have any control over the process or timing of the acquisition of these raw materials by our manufacturers. If our manufacturers or we are unable to purchase these raw materials, the commercial launch of any medical device products we may seek to develop would be delayed or there would be a shortage in supply, which would impair our ability to generate revenues from the sale of such products, if authorized for marketing.

We expect to continue to depend on third-party contract manufacturers for the foreseeable future. We have not entered into long-term agreements with our current contract manufacturers or with any alternate suppliers, and we may be unable to enter into such an agreement or do so on commercially reasonable terms.

***Regulatory reforms may impact our ability to develop and commercialize our products and services and technologies.***

From time to time, legislation is drafted and introduced that could significantly change the regulatory frameworks governing our products and services.

In addition, regulations and guidance are often revised or reinterpreted by the government agency in ways that may significantly affect our business or products and services. We cannot predict the impact on our business of any legislation, regulations, or reinterpretations thereof that may be enacted or adopted in the future. However, future regulatory changes could make it more difficult for us to obtain or maintain any necessary marketing authorization for our products and services, or to develop and commercialize future medical devices and technologies.

***We may be required to obtain and maintain regulatory authorizations or approvals/certifications in order to commercialize our products in international markets. Failure to obtain regulatory authorizations or approvals/certifications in relevant foreign jurisdictions may prevent us from marketing medical device products abroad.***

We currently market and intend to continue to market our products and services internationally. We expect certain of our pipeline products to be regulated as medical devices, and we have received communications from foreign regulatory authorities inquiring as to the regulatory status of our Owlet Smart Sock, and whether such product is regulated as a medical device in such jurisdictions. Outside of the U.S., we can generally market a medical device only if we receive a certification by an independent regulatory body (in the European Economic Area ("EEA")) or a marketing authorization from other foreign regulatory authorities (and meet certain pre-marketing requirements) and, in some cases, pricing approval, from the appropriate regulatory authorities. The path to market varies among international jurisdictions and may require additional or different product testing than required to obtain FDA marketing authorization. We may be unable to obtain foreign certifications or marketing authorizations on a timely basis, if at all, and we may also incur significant costs in attempting to obtain foreign certifications or marketing authorizations.

In addition, marketing authorization by the FDA does not ensure certifications or marketing authorizations by foreign regulatory authorities. However, a failure to obtain such marketing authorization by the FDA may have a negative impact on our ability to obtain any necessary certifications or marketing authorizations in foreign jurisdictions. Moreover, certifications or marketing authorizations from one foreign regulatory authority does not ensure marketing authorization by any other foreign regulatory authority or by the FDA. If we fail to receive

53

Exhibit 7
Page 672

**TABLE OF CONTENTS**

necessary certifications or marketing authorizations to commercialize our products in foreign jurisdictions on a timely basis, or at all, or if we later lose such certifications or marketing authorizations, our business, financial condition and results of operations could be adversely affected. Furthermore, foreign regulatory requirements may change from time to time, which could adversely affect our ability to market new products and services, or continue to market existing products and services, internationally.

***Promotion of any medical devices using claims that are off-label, unsubstantiated, false or misleading could subject us to substantial penalties.***

Obtaining FDA marketing authorization would permit us to promote the subject medical device only for the specific use(s) cleared or approved by the FDA. Use of a medical device outside its cleared or approved indications is known as "off-label" use. Although physicians may use any medical devices we market off-label because the FDA does not restrict or regulate a physician's choice of treatment within the practice of medicine, we are prohibited from marketing or promoting any medical devices for off-label use. While we may pursue FDA marketing authorizations for certain indications for any medical devices we seek to market, the FDA may deny those requests, require additional expensive clinical data to support any additional indications or impose limitations on the intended use of any authorized product as a condition of marketing authorization. If the FDA determines that our products were promoted for off-label use, or that false, misleading or inadequately substantiated promotional claims have been made by us or our commercial partners, it could request that we or our commercial partners modify those promotional materials or take regulatory or enforcement actions, including the issuance of an untitled letter or warning letter, injunction, seizure, civil fine and criminal penalties. While certain U.S. courts have held that truthful, non-misleading, off-label information is protected under the First Amendment under certain circumstances, the FDA continues to take the position that off-label promotion is subject to enforcement action.

It is also possible that other federal, state or foreign enforcement authorities may take action if they consider our communications, including promotional or training materials, to constitute promotion of an uncleared, uncertified or unapproved use of a medical device. If not successfully defended, enforcement actions related to off-label promotion could result in significant fines or penalties under other statutory authorities, such as laws prohibiting false claims for reimbursement. In any such event, our reputation could be damaged, adoption of our products could be impaired and we could be subject to extensive fines and penalties.

Additionally, we must have adequate substantiation for the claims we make for our products and services. If any of our claims are determined to be false, misleading or deceptive, our products and services could be considered misbranded under the FDCA or in violation of the Federal Trade Commission Act. We could also face lawsuits from our competitors under the Lanham Act alleging that our marketing materials are false or misleading.

Foreign jurisdictions have their own laws and regulations concerning medical device approval, certification or marketing authorization, including communications, claims and promotional or training materials surrounding those medical devices. Failure to comply with those laws and regulations could result in actions against us, including fines, penalties and exclusion from the market. Any such actions could adversely affect our ability to market new products and services or continue to market existing products and services in those jurisdictions.

***If we or our suppliers fail to comply with ongoing regulatory requirements, or if we experience unanticipated problems with our products and services, these products and services could be subject to restrictions or withdrawal from the market. Our actual or perceived failure to comply with such obligations could harm our business, and changes in such regulations or laws could require us to modify our products and services or marketing or advertising efforts.***

Our products and services, along with the manufacturing processes, labeling and promotional activities for our products and services, may be subject to continual review by the FDA, the U.S. Federal Trade Commission ("FTC"), the U.S. Consumer Product Safety Commission ("CPSC") or other regulatory bodies, including their counterparts in international jurisdictions, depending on the product and whether such product is a medical device.

Failure by us or one of our suppliers to comply with statutes and regulations administered by any of these regulatory bodies that are applicable to any medical devices we market, or with any applicable statutes and regulations administered by other regulatory bodies, could result in, among other things, any of the following:

54

Exhibit 7
Page 673

TABLE OF CONTENTS

- warning letters or untitled letters issued by the FDA or FTC and their counterparts in international jurisdictions;

- litigation, fines, civil penalties, in rem forfeiture proceedings, injunctions, consent decrees and criminal prosecution;

- import alerts and holds;

- unanticipated expenditures to address or defend such actions;

- delays in clearing or approving, or refusal to clear or approve, our products, where applicable;

- withdrawals or suspensions of clearance or approval of our products or those of our third-party suppliers by the FDA or other regulatory bodies, where applicable;

- product recalls or seizures;

- adverse publicity;

- orders for device repair, replacement or refund;

- interruptions of production or inability to export to certain foreign countries; and

- operating restrictions.

If any of these items were to occur, it would harm our reputation and adversely affect our business, financial condition and results of operations.

***Changes in and failures to comply with U.S. and foreign privacy and data protection laws, regulations and standards may adversely affect our business, operations and financial performance.***

The global data protection landscape is rapidly evolving, and we are or may become subject to numerous state, federal and foreign laws, requirements and regulations governing the collection, use, disclosure, retention, and security of health-related and other personal information, including information we collect about children and infants, their parents and other consumers who purchase our products and services, as well as information that we may now or in the future collect in connection with clinical trials in the U.S. and abroad. Implementation standards and enforcement practices are likely to remain uncertain for the foreseeable future, and we cannot yet determine the impact future laws, regulations, standards, or perception of their requirements may have on our business. This evolution may create uncertainty in our business, affect our ability to operate in certain jurisdictions or to collect, store, transfer, use and share personal information, necessitate the acceptance of more onerous obligations in our contracts, result in liability or impose additional costs on us. The cost of compliance with these laws, regulations and standards is high and is likely to increase in the future. Any failure or perceived failure by us to comply with federal, state or foreign laws or regulations, our internal policies and procedures, or our contracts governing our processing of personal information could result in negative publicity, government investigations and enforcement actions, claims by third parties and damage to our reputation, any of which could have a material adverse effect on our operations, financial performance and business.

As our operations and business grow, we may become subject to or affected by new or additional data protection laws and regulations and face increased scrutiny or attention from regulatory authorities. In the U.S., the Health Insurance Portability and Accountability Act ("HIPAA") imposes, among other things, certain standards relating to the privacy, security, transmission and breach reporting of individually identifiable health information.

Certain states have also adopted comparable privacy and security laws and regulations, some of which may be more stringent than HIPAA. Such laws and regulations will be subject to interpretation by various courts and other governmental authorities, thus creating potentially complex compliance issues for us and our future customers and strategic partners.

In addition, California enacted the California Consumer Privacy Act ("CCPA") on June 28, 2018, which took effect on January 1, 2020. The CCPA creates individual privacy rights for California consumers and increases the privacy and security obligations of entities handling certain personal data. The CCPA provides for civil penalties for violations, as well as a private right of action for data breaches that is expected to increase data breach litigation. The CCPA may increase our compliance costs and potential liability, and many similar laws have been proposed at the federal level and in other states. Further, the California Privacy Rights Act ("CPRA") recently passed in California. The CPRA will impose additional data protection obligations on

55

Exhibit 7
Page 674

TABLE OF CONTENTS

covered businesses, including additional consumer rights processes, limitations on data uses, new audit requirements for higher risk data, and opt outs for certain uses of sensitive data. It will also create a new California data protection agency authorized to issue substantive regulations and could result in increased privacy and information security enforcement. The majority of the provisions will go into effect on January 1, 2023, and additional compliance investment and potential business process changes may be required. In the event that we are subject to or affected by HIPAA, the CCPA, the CPRA or other domestic privacy and data protection laws, any liability from failure to comply with the requirements of these laws could adversely affect our financial condition.

We are also or may become subject to rapidly evolving data protection laws, rules and regulations in foreign jurisdictions. For example, the European Union General Data Protection Regulation ("GDPR") went into effect in May 2018 and imposes strict requirements for processing the personal data of individuals within the EEA. The GDPR imposes strict obligations on the ability to process health-related and other personal data of individuals within the EEA, including in relation to use, collection, analysis, and transfer (including cross-border transfer) of such personal data. The law is also developing rapidly and, in July 2020, the Court of Justice of the EU limited how organizations could lawfully transfer personal data from the EEA to the U.S. In addition, EU and EEA Member States may impose further obligations relating to the processing of genetic, biometric or health data, which could further add to our compliance costs and limit how we process this information. Companies that must comply with the GDPR face increased compliance obligations and risk, including more robust regulatory enforcement of data protection requirements and potential fines for noncompliance of up to €20 million or 4% of the annual global revenues of the noncompliant company, whichever is greater. Further, from January 1, 2021, companies have to comply with the GDPR and also the UK GDPR ("UK GDPR"), which, together with the amended United Kingdom Data Protection Act 2018, retains the GDPR in UK national law. The UK GDPR mirrors the fines under the GDPR, e.g. fines up to the greater of €20 million (£17.5 million) or 4% of global turnover. The relationship between the UK and the EU in relation to certain aspects of data protection law remains unclear, and it is unclear how UK data protection laws and regulations will develop in the medium to longer term, and how data transfers to and from the UK will be regulated in the long term. Currently there is a four to six-month grace period agreed in the EU and United Kingdom Trade and Cooperation Agreement, ending June 30, 2021 at the latest, whilst the parties discuss an adequacy decision. However, it is not clear whether (and when) an adequacy decision may be granted by the European Commission enabling data transfers from EU member states to the UK long term without additional measures. These changes may lead to additional costs and increase our overall risk exposure. Furthermore, other international jurisdictions, including Singapore, South Korea, China, Brazil, Mexico and Australia, have also implemented laws relating to data privacy and protection.

Although we work to comply with applicable laws, regulations and standards, our contractual obligations and other legal obligations, these requirements are evolving and may be modified, interpreted and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another or other legal obligations with which we must comply. Any failure or perceived failure by us or our employees, representatives, contractors, consultants, collaborators, or other third parties to comply with such requirements or adequately address privacy and security concerns, even if unfounded, could result in additional cost and liability to us, damage our reputation, and adversely affect our business and results of operations.

***To the extent we market any medical devices or other healthcare products and services, our relationships with customers, physicians and third-party payors may be subject, directly or indirectly, to federal and state healthcare fraud and abuse laws, false claims laws, and other healthcare laws and regulations. If we or our employees, independent contractors, consultants, commercial partners, or vendors violate these laws, we could face substantial penalties.***

To the extent we market any medical devices or other healthcare products and services, our relationships with customers, physicians, and third-party payors may be subject, directly or indirectly, to federal and state healthcare fraud and abuse laws, false claims laws, and other healthcare laws and regulations. These laws may impact, among other things, our proposed and future sales, marketing, and education programs. In particular, the promotion, sales and marketing of healthcare items and services is subject to extensive laws and regulations designed to prevent fraud, kickbacks, self-dealing, and other abusive practices. These laws and regulations may restrict or prohibit a wide range of pricing, discounting, marketing and promotion, sales commission, customer incentive, and other business arrangements. We may also be subject to federal, state and foreign laws governing the privacy and security of identifiable patient information. The U.S. healthcare laws and regulations that may affect our ability to operate include, but are not limited to:

56

Exhibit 7
Page 675

- the federal Anti-Kickback Statute, which prohibits, among other things, any person or entity from knowingly and willfully offering, paying, soliciting or receiving any remuneration, directly or indirectly, overtly or covertly, in cash or in kind, to induce, or in return for, the purchasing, leasing, ordering or arranging for the purchase, lease, or order of any item or service reimbursable under Medicare, Medicaid or other federal healthcare programs. The term "remuneration" has been broadly interpreted to include anything of value. A person or entity does not have to have actual knowledge of this statute or specific intent to violate it to have committed a violation;

- federal civil and criminal false claims laws, including the federal civil False Claims Act, and civil monetary penalty laws, which prohibit, among other things, individuals or entities from knowingly presenting, or causing to be presented, claims for payment or approval from Medicare, Medicaid, or other federal government programs that are false or fraudulent or knowingly making a false statement to improperly avoid, decrease or conceal an obligation to pay money to the federal government, including federal healthcare programs. In addition, the government may assert that claim includes items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the false claims statute;

- HIPAA, which created new federal civil and criminal statutes that prohibit knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program or obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any healthcare benefit program, including private third-party payors and knowingly and willfully falsifying, concealing or covering up by any trick, scheme or device, a material fact or making any materially false, fictitious or fraudulent statements in connection with the delivery of, or payment for, healthcare benefits, items or services. Similar to the federal Anti-Kickback Statute, a person or entity does not have to have actual knowledge of this statute or specific intent to violate it to have committed a violation;

- the federal Physician Payments Sunshine Act, which requires certain manufacturers of drugs, devices, biologicals and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) to report annually to CMS information related to payments or other transfers of value made to physicians, as defined by such law, certain other healthcare providers beginning in 2022 and teaching hospitals, as well as ownership and investment interests held by physicians and their immediate family members;

- federal consumer protection and unfair competition laws, which broadly regulate marketplace activities and activities that potentially harm consumers; and

- state and foreign equivalents of each of the healthcare laws described above, some of which may be broader in scope.

Because of the breadth of these laws and the narrowness of the statutory exceptions and regulatory safe harbors available, it is possible that some of our business activities, or any arrangements with physicians, could be subject to challenge under one or more of such laws. It is not always possible to identify and deter employee misconduct or business noncompliance, and the precautions we take to detect and prevent inappropriate conduct may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to be in compliance with such laws or regulations. Efforts to ensure that our business arrangements will comply with applicable healthcare laws may involve substantial costs. It is possible that governmental and enforcement authorities will conclude that our business practices may not comply with current or future statutes, regulations or case law interpreting applicable fraud and abuse or other healthcare laws and regulations. If we or our employees, independent contractors, consultants, commercial partners and vendors violate these laws, we may be subject to investigations, enforcement actions or significant penalties, including the imposition of significant civil, criminal and administrative penalties, damages, disgorgement, monetary fines, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal healthcare programs, contractual damages, reputational harm, diminished profits and future earnings, additional reporting requirements or oversight if we become subject to a corporate integrity agreement or similar agreement to resolve allegations of non-compliance with these laws, and curtailment of our operations, any of which could adversely affect our ability to operate our business and our results of operations. In addition, any regulatory approvals (as applicable) and commercialization of our products

57

Exhibit 7
Page 676

TABLE OF CONTENTS

outside the United States will also likely subject us to foreign equivalents of the healthcare laws mentioned above, among other foreign laws. Any action against us for violation of these laws, even if we successfully defend against such action, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business.

***Expanding our commercial strategy based on third-party payor coverage and reimbursement may not be successful and will subject us to new risks, including, without limitation, changes in third-party payor coding, coverage and reimbursement rates for our products that obtain FDA authorization which could affect the adoption of such products and negatively impact our future revenue.***

With respect to our current products, including the Owlet Smart Sock, Owlet Cam and Owlet Dream Lab, we utilize a direct-to-consumer model where consumers purchase our products directly from us or one of our retailers. Currently, these products are not covered or reimbursed by any third-party payor. We are actively developing a strategy to enable healthcare providers to obtain reimbursement for products for which we successfully obtain FDA authorization, including the Owlet BabySat, or the services associated with such products. However, this new strategy may not be successful as payors may refuse to provide coverage and reimbursement for these products even if we obtain FDA authorization.

In the United States, healthcare providers who may purchase these products generally rely on third-party payors, including Medicare, Medicaid and private health insurance plans, to pay for all or a portion of the cost of our products. To contain costs of new technologies, governmental healthcare programs and third-party payors are increasingly scrutinizing new and existing medical devices by requiring extensive evidence of favorable clinical outcomes. To the extent we market any medical devices, are successful in obtaining FDA marketing authorization to the extent applicable, and third-party payors determine that our products are medically necessary and clinically effective, the resulting reimbursement payment rates might not be adequate or may require co-payments that patients find unacceptably high. Third-party payors regularly update reimbursement amounts and may also revise the methodologies from time to time used to determine reimbursement amounts. This includes routine updates to payments to physicians for services provided. These updates could directly impact the demand for our products. Although we believe that healthcare providers may be able to bill third-party payors using existing Current Procedural Terminology ("CPT") codes for the remote monitoring of patients using products for which we obtain FDA authorization, including the initial set-up and patient education on the use of such products, their inability to obtain adequate reimbursement from third-party payors may adversely affect our business.

In addition, foreign jurisdictions have their own unique healthcare systems and regulation regimes that differ substantially from the U.S. and other international markets. Successfully navigating those regimes will require significant resources and may ultimately be unsuccessful. As a result, our financial performance could be harmed, our costs could increase, and our ability to generate revenue could be delayed.

Given the evolving nature of the healthcare industry and on-going healthcare cost reforms, the likelihood of success of our new commercial strategy is, and will continue to be, subject to changes in the level of third-party payor coverage and reimbursement for these products and services.

***Legislative and regulatory changes in the healthcare industry could have a negative impact on our financial performance. Furthermore, our business, financial condition, results of operations and cash flows could be significantly and adversely affected by healthcare reform legislation in the U.S. or in potential key international markets.***

Changes in the healthcare industry in the U.S. and abroad could adversely affect the demand for our potential medical devices and the way in which we conduct our business. For example, the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act (collectively, the "ACA"), enacted in 2010, required most individuals to have health insurance, established new regulations on health plans, created insurance-pooling mechanisms and reduced Medicare spending on services provided by hospitals and other providers. Since its enactment, there have been legislative, executive and judicial challenges to certain aspects of the ACA, and the constitutionality of the ACA is currently under review by the U.S. Supreme Court.

Any medical devices we market and related business activities would be subject to rigorous regulation by the FDA and other federal, state and international governmental authorities. These authorities and members of Congress have been increasing their scrutiny over the medical device industry. In recent years, Congress, the

Exhibit 7
Page 677

TABLE OF CONTENTS

Department of Justice, the Office of Inspector General of the Department of Health and Human Services, and the Department of Defense have issued subpoenas and other requests for information to medical device manufacturers, primarily related to financial arrangements with healthcare providers, regulatory compliance and marketing and product promotional practices. Furthermore, certain state governments have enacted legislation to limit or increase transparency of interactions with healthcare providers, pursuant to which we are required by law to disclose payments and other transfers of value to healthcare providers licensed by certain states.

We anticipate that the government will continue to scrutinize the medical device industry closely, and any new regulations or statutory provisions could result in delays or increased costs during the periods of product development, clinical trials and regulatory review and marketing authorization, as applicable, as well as increased costs to assure compliance.

In Europe, the Medical Devices Regulation (2017/745 or "MDR"), which is directly applicable in all EEA Member States without the need for adoption of EEA Member State laws implementing them is intended to establish a uniform, transparent, predictable and sustainable regulatory framework across the EEA for medical devices and ensure a high level of safety and health while supporting innovation, among other things. The MDR was due to become applicable in May 2020, but in light of COVID-19, the European Parliament and the Council of the EU adopted a proposal in April 2020 to extend the transitional period of the MDR until May 26, 2021. However, devices lawfully placed on the market pursuant to the existing EU Medical Devices Directive prior to May 26, 2021 may generally continue to be made available on the market or put into service until May 26, 2025. Once applicable, the new regulations will among other things:

- strengthen the rules on placing devices on the market and reinforce surveillance once they are available;

- establish explicit provisions on manufacturers' responsibilities for the follow-up of the quality, performance and safety of devices placed on the market;

- improve the traceability of medical devices throughout the supply chain to the end-user or patient through a unique identification number;

- set up a central database to provide patients, healthcare professionals and the public with comprehensive information on products available in the EU; and

- strengthen the rules for the assessment of certain high-risk devices, such as implants, which may have to undergo an additional check by experts before they are placed on the market.

These modifications are likely to have an effect on the way we conduct our business in the EEA. For example, as a result of the transition towards the new regime, notified body review times have lengthened, and product future introductions or modifications could be delayed or canceled, which could adversely affect our ability to grow our business and our future products.

***Our employees, consultants, sales agents, distributors and other commercial partners may engage in misconduct or other improper activities, including non-compliance with regulatory standards and requirements.***

We are exposed to the risk that our employees, consultants, sales agents, distributors and other commercial partners may engage in fraudulent or illegal activity. Misconduct by these parties could include intentional, reckless or negligent conduct or other unauthorized activities that violate the regulations of the FDA and other U.S. healthcare regulators, as well as non-U.S. regulators, including those laws requiring the reporting of true, complete and accurate information to such regulators, manufacturing standards, healthcare fraud and abuse laws and regulations in the United States and abroad or laws that require the true, complete and accurate reporting of financial information or data. In particular, sales, marketing and business arrangements in the healthcare industry, including the sale of medical devices, are subject to extensive laws and regulations intended to prevent fraud, misconduct, kickbacks, self-dealing and other abusive practices. These laws and regulations may restrict or prohibit a wide range of pricing, discounting, marketing and promotion, sales commission, customer incentive programs and other business arrangements. It is not always possible to identify and deter misconduct by our employees, sales agencies, distributors and other third parties, and the precautions we take to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to comply with these laws or regulations. If any such actions are instituted against us and we are not successful in defending ourselves or

59

Exhibit 7
Page 678

TABLE OF CONTENTS

asserting our rights, those actions could result in the imposition of significant fines or other sanctions, including the imposition of civil, criminal and administrative penalties, damages, monetary fines, possible exclusion from participation in government healthcare programs, contractual damages, reputational harm, diminished profits and future earnings and curtailment of operations. Whether or not we are successful in defending against such actions or investigations, we could incur substantial costs, including legal fees, and divert the attention of management in defending ourselves against any of these claims or investigations.

***We may be subject to regulatory reporting requirements if our products and services cause or contribute to a death or serious injury or malfunction in a way that would likely cause or contribute to a death or serious injury, or in certain other scenarios, and we may need to initiate voluntary corrective actions such as the recall of our products.***

Regulatory agencies in many countries require us to report potential safety issues with our products and services under a variety of circumstances. For example, the FDA's Medical Device Reporting regulations require that for any medical device we market, we report when we become aware of information that reasonably suggests that the product may have caused or contributed to a death or serious injury, or has malfunctioned in a way that, if the malfunction were to recur, would likely cause or contribute to a death or serious injury. We may fail to report adverse events of which we become aware within the prescribed timeframe. We may also fail to recognize that we have become aware of a reportable adverse event, especially if it is not reported to us as an adverse event or if it is an adverse event that is unexpected or removed in time from the use of the implant system. If we fail to comply with our reporting obligations, the FDA could take action, including warning letters, untitled letters, administrative actions, criminal prosecution, imposition of civil monetary penalties, revocation of our device clearance, seizure of our products or delay in clearance of future products. Similarly, under the CPSC consumer product reporting requirements, we are required to report to the CPSC any incident in which a CPSC-regulated product of ours creates an unreasonable risk of serious injury or death, contains a defect which could create a substantial product hazard, fails to comply with an applicable consumer product safety rule, or fails to comply with any other rule, regulation, standard or ban enforced by the CPSC. In addition, all manufacturers placing medical devices on the market in the EEA are legally required to immediately report any serious or potentially serious incidents involving products produced or sold by the manufacturer to the relevant authority in those jurisdictions where any such incident occurred. As to general consumer products, where manufacturers and distributors know or ought to know that a product that they have placed on the market poses risks to the consumer that are incompatible with the general safety requirements, they shall immediately inform the relevant authority in the relevant jurisdictions. The FDA, CPSC and similar foreign regulatory authorities have the authority to require the recall of our commercialized products under certain circumstances and depending on the type of product. For example, the FDA must find that there is a reasonable probability that a medical device would cause serious adverse health consequences or death in order to require a recall. The standard for ordering a mandatory recall may be different for each regulatory agency and in foreign jurisdictions. In addition, manufacturers may, under their own initiative, correct or remove a marketed product for any reason and under any circumstance, which may constitute a recall if the product violates applicable laws. A government-mandated or voluntary recall by us or by one of our distributors could occur as a result of component failures, manufacturing errors, design or labeling defects or other deficiencies and issues.

We may initiate certain field actions, such as a correction or removal of our products in the future. Any correction or removal initiated by us to reduce a health risk posed by a medical device, or to remedy a regulatory violation caused by the device that may present a risk to health, must be reported to the FDA. Other regulatory authorities may have similar reporting requirements. If the regulatory agency subsequently determines that a report was required for a correction or removal of our products that we did not believe required a report, we could be subject to enforcement actions.

Any recalls of our products or enforcement actions would divert managerial and financial resources and could have an adverse effect on our financial condition and results of operations. In addition, given our dependence upon consumer perceptions, any negative publicity associated with any recalls could materially and adversely affect our business, financial condition, results of operations and growth prospects.

***We face the risk of product liability claims and the amount of insurance coverage we hold now or in the future may not be adequate to cover all liabilities we might incur.***

Our products are predominantly used in the home and expose us to product liability claims and product recalls, including, but not limited to, those that may arise from off-label use, malfunctions, design flaws or

60

Exhibit 7
Page 679

TABLE OF CONTENTS

manufacturing defects related to our products or the use of our products with incompatible components or systems. In addition, as we continue to expand our product portfolio, we may enter or create new markets, including consumer markets, which may expose us to additional product liability risks. Any such product liability claims may include allegations of defects in manufacturing, defects in design, a failure to warn of dangers inherent in the product, negligence, strict liability and a breach of warranty. Claims could also be asserted under state consumer protection acts. If we cannot successfully defend ourselves against product liability claims, we may incur substantial liabilities or be required to limit commercialization of our products. Even successful defense would require significant financial and management resources. Regardless of the merits or eventual outcome, liability claims may result in decreased demand for our current or future products, injury to our reputation, costs to defend the related litigation, a diversion of management's time and our resources, substantial monetary awards to customers, regulatory investigations, product recalls, withdrawals or labeling, marketing or promotional restrictions, loss of revenue, and the inability to sell our current or any future products.

Our product liability insurance may not be sufficient to cover any or all damages for product liability claims that may be brought against us in the future. Furthermore, we may not be able to obtain or maintain insurance in the future at satisfactory rates or in adequate amounts to protect us against any product liability claims. Additionally, the laws and regulations regarding product liability are constantly evolving, both through the passage of new legislation at the state and federal levels and through new interpretations of existing legislation. As the legal and regulatory landscape surrounding product liability change, we may become exposed to greater liability than currently anticipated.

***We may incur environmental and personal injury liabilities related to certain hazardous materials used in our operations.***

Certain manufacturing processes for our products may involve the storage, use, generation and disposal of certain hazardous materials and wastes, including lead, silicone adhesives, solder and solder paste, sealants, epoxies and various solvents such as methyl ethyl ketone, acetone and isopropyl alcohol. As a result, we are subject to certain environmental laws, as well as certain other laws and regulations, which restrict the materials that can be used in our products or in our manufacturing processes. For example, products that we sell in Europe are subject to regulation in the EU markets under the Restriction of the Use of Hazardous Substances Directive ("RoHS"). RoHS prohibits companies from selling products that contain certain hazardous materials in EU Member States. In addition, the EU's Registration, Evaluation, Authorization, and Restriction of Chemicals Regulation also restricts substances of very high concern in products. Compliance with such regulations may be costly and, therefore, we may incur significant costs to comply with these laws and regulations.

In addition, new environmental laws may further affect how we manufacture our products, how we use, generate or dispose of hazardous materials and waste, or further affect what materials can be used in our products. Any required changes to our operations may increase our manufacturing costs, detrimentally impact the performance of our products, add greater testing lead-times for product introductions or have other similar effects.

In connection with our research and manufacturing activities, we use, and our employees may be exposed to, materials that are hazardous to human health, safety or the environment. The risk of accidental injury to our employees or contamination from these materials cannot be eliminated, and we could be held liable for any resulting damages, the related liability for which could exceed our reserves. We do not specifically insure against environmental liabilities. If an enforcement action were to occur, our reputation and our business and financial condition may be harmed, even if we were to prevail or settle the action on terms favorable to us.

***Changes to government immigration regulations may materially affect our workforce and limit our supply of qualified professionals, or increase our cost of securing workers.***

We recruit professionals on a global basis and must comply with the immigration laws in the countries in which we operate, including the U.S. Some of our employees are working under Owlet-sponsored temporary work visas, including H1-B visas. Statutory law limits the number of new H1-B temporary work permit petitions that may be approved in a fiscal year. Furthermore, there is a possibility that the current U.S. immigration visa program may be significantly overhauled, and the number of H1-B visas available, as well as the process to

61

Exhibit 7
Page 680

TABLE OF CONTENTS

obtain them, may be subject to significant change. Any resulting changes to this visa program could impact our ability to recruit, hire and retain qualified skilled personnel. If we are unable to obtain work visas in sufficient quantities or at a sufficient rate for a significant period of time, our business, operating results and financial condition could be adversely affected.

### Risks Related to New Owlet's Intellectual Property

***Our success depends in part on our proprietary technology, and if we are unable to obtain, maintain or successfully enforce our intellectual property rights, the commercial value of our products and services will be adversely affected, our competitive position may be harmed and we may be unable to operate our business profitably.***

Our intellectual property includes the content of our website, our software code, our unregistered copyrights, our registered and unregistered trademarks, and our patents and patent applications. Our success and ability to compete depend in part on our ability to maintain and enforce existing intellectual property and to obtain, maintain and enforce further intellectual property protection for our products and services, both in the United States and in other countries. We attempt to protect our intellectual property rights through a combination of patent, trademark, copyright and trade secret laws, as well as licensing agreements and third-party and employee confidentiality and assignment agreements. Our intellectual property rights could also be challenged, invalidated, infringed or circumvented, or may not be sufficient to permit us to take advantage of current market trends or to otherwise provide competitive advantages. If we are unable to adequately protect our intellectual property rights or if they are challenged or otherwise prove ineffective, we may be required to undertake costly product redesign efforts or discontinue certain products, or our competitive position may be harmed. As of December 31, 2020, we had 33 issued patents (with numerous others pending) and 38 registered trademarks.

We rely on our portfolio of issued and pending patent applications in the United States and other countries to protect our intellectual property and our competitive position. However, the patent positions of technology-based companies may involve complex legal and factual questions, and, therefore, the scope, validity and enforceability of any patent claims that we may obtain cannot be predicted with certainty. Accordingly, we cannot provide any assurances that any of our issued patents have, or that any of our currently pending or future patent applications that mature into issued patents will include, claims with a scope sufficient to protect our products and services. Our pending and future patent applications may not result in the issuance of patents or, if issued, may not issue in a form that will be advantageous to us. While we generally apply for patents in those countries where we intend to make, have made, use or sell patented products and services, we may not accurately predict all of the countries where patent protection will ultimately be desirable. If we fail to timely file for a patent, we may be precluded from doing so at a later date. Additionally, any patents issued to us may be challenged, narrowed, invalidated, held unenforceable or circumvented, or may not be sufficiently broad to prevent third parties from producing competing products and services similar in design to our products and services.

In recent years, the U.S. Supreme Court has ruled on several patent cases and several laws have been enacted that, in certain situations, potentially narrow the scope of patent protection available and weaken the rights of patent owners. We may not be successful in securing additional patents on commercially desirable improvements, that such additional patents will adequately protect our innovations or offset the effect of expiring patents, or that competitors will not be able to design around our patents. In addition, third parties may challenge our issued patents through procedures such as Inter-Partes Review ("IPR"). In many IPR challenges, the U.S. Patent and Trademark Office ("PTO") cancels or significantly narrows issued patent claims. IPR challenges could increase the uncertainties and costs associated with the maintenance, enforcement and defense of our issued and future patents and could have a material adverse effect on our business, financial condition and results of operations.

We also utilize unpatented proprietary technology and know-how and often rely on confidentiality agreements and intellectual property assignment agreements with our employees, independent distributors and consultants to protect and transfer to us such unpatented proprietary technology and know-how. However, such agreements may not be enforceable or may not provide meaningful protection for our proprietary information in the event of unauthorized use or disclosure or other breaches of the agreements, or in the event that our competitors discover or independently develop similar or identical designs or other proprietary information.

62

Exhibit 7
Page 681

We rely on the use of common law copyrights with respect to the code, algorithms and trade secrets in our business and our products and services. Common law copyrights provide less protection than registered copyrights. Copyrights, common law or registered, do not generally prevent others from independently developing the same or similar code, algorithms or trade secrets, so our copyrights would not offer protection against our competitors to the extent they are able to independently generate similar code, algorithms or trade secrets as our own. Loss of rights in our copyrights could adversely affect our business, financial condition and results of operations.

We rely on the use of registered and common law trademarks with respect to the brand names of some of our products and services. Common law trademarks provide less protection than registered trademarks. If a third party were to register trademarks similar to our unregistered trademarks in a given jurisdiction, particularly outside the United States, our ability to continue using our unregistered trademarks in the applicable jurisdiction could be substantially restricted and we may be subject to potentially costly and burdensome claims for trademark infringement. Loss of rights in our trademarks could adversely affect our business, financial condition and results of operations.

***If our trademarks and trade names are not adequately protected, we may not be able to build name recognition in our markets of interest and our competitive position may be harmed.***

We rely on our trademarks, logos, and trade names to distinguish our products and services from the products and services of our competitors, and have registered or applied to register many of these trademarks. There can be no assurance that our trademark applications will be approved. While we generally apply for trademarks in those countries where we intend to sell our products and services, we may not accurately predict all of the countries where registered trademarks will be desirable. We may also fail to register appropriate localized versions of our trademarks. If we fail to timely file for a trademark application in a country, we may be precluded from doing so at a later date and our ability to sell products and services using our existing brands in such countries could ultimately be restricted. Third parties may also oppose our trademark applications or otherwise challenge our use of the trademarks. In the event that our trademarks are successfully challenged, we could be forced to rebrand our products and services, which could result in loss of brand recognition, and could require us to devote resources to advertising and marketing new brands. Further, there can be no assurance that competitors will not infringe our trademarks or that we will have adequate resources to enforce our trademarks or will be successful in enforcing our trademarks. If competitors or other third parties use similar trademarks for similar products and services, the value and recognition of our brand and trademarks may be diluted or diminished.

We also license third parties to use our trademarks. In an effort to preserve our trademark rights, we enter into license agreements with these third parties, which govern the use of our trademarks and require our licensees to abide by quality control standards with respect to the goods and services that they provide under our trademarks.

Although we make efforts to monitor the use of our trademarks by our licensees, there can be no assurance that these efforts will be sufficient to ensure that our licensees abide by the terms of their licenses. In the event that our licensees fail to do so, our trademark rights could be diluted. Any of the foregoing could have a material adverse effect on our competitive position, business, financial condition, results of operations, and prospects.

***We rely on third-party technology solutions, including software and software services, to support our IT infrastructure and in our products and services.***

Both our IT infrastructure and our products and services leverage third-party technology solutions, software and software services. While much of this third-party technology is commercially available, off-the-shelf technology procured on standard terms and conditions, we cannot be assured that the applicable vendors will continue to make this third-party technology available on the same terms and conditions. Because this technology has been integrated into our operations and may have been configured for our specific needs, replacement of such technology could result in substantial delay, additional costs, and possible business interruptions. In addition, if third-party vendors, including any cloud service providers, were to experience unplanned downtime, delays or other similar issues, our products, services and internal operations could be significantly and adversely impacted.

63

Exhibit 7
Page 682

TABLE OF CONTENTS

***Increased use of social media could create or amplify the effects of negative publicity and adversely affect sales and operating results.***

As part of our marketing efforts, we rely on search engine marketing and social media platforms to attract and retain customers. These efforts may not be successful, and pose a variety of other risks, including the improper disclosure of proprietary information, the posting of negative comments about our brand, the exposure of personally identifiable information, fraud, use of out of date information or failure to comply with regulations regarding such practices. Negative or false commentary about us or our products or services may be posted on social media platforms and may harm our reputation or business and social media has also given users the ability to more effectively organize collective actions, such as boycotts, which could be taken against us or our products or services. Customers value readily available information and often act on such information without affording us an opportunity for redress or correction. The inappropriate use of social media vehicles, including a failure to abide by applicable laws and regulations, in the use of social media by us or our influencers, employees, contractors, suppliers, customers or other third parties associated or perceived to be associated with us could increase our costs, lead to litigation, fines or regulatory action or result in negative publicity that could damage our reputation. The occurrence of any such developments could have an adverse effect on our business results.

In addition, events reported in the media, including social media, whether or not accurate or involving us or our products or services, could create or amplify negative publicity for us or for the industry or market segments in which we operate. These and other types of social media risks could reduce demand for products and services offered by us and/or shift consumer preferences to competitors and could result in a decrease in customer demand for our products and services.

***If we fail to execute enforceable invention assignment and confidentiality agreements with our employees and contractors involved in the development of intellectual property or are unable to protect the confidentiality of our trade secrets, the value of our products and services and our business and competitive position could be harmed.***

In addition to patent protection, we also rely on protection of copyrights, trade secrets, know-how and confidential and proprietary information. We generally enter into confidentiality and invention assignment agreements with our employees, consultants and third parties upon their commencement of a relationship with us. However, we may not enter into such agreements with all employees, consultants and third parties who have been involved in the development of our intellectual property and such agreements may not be enforceable in accordance with the terms in every jurisdiction where such employees, consultants or third parties reside or are employed. In addition, these agreements may not provide meaningful protection against the unauthorized use or disclosure of our trade secrets or other confidential information, and adequate remedies may not exist if unauthorized use or disclosure were to occur. The exposure of our trade secrets and other proprietary information would impair our competitive advantages and could have a material adverse effect on our business, financial condition and results of operations. In particular, a failure to protect our proprietary rights may allow competitors to copy our technology, which could adversely affect our pricing and market share. Further, other parties may independently develop substantially equivalent know-how and technology.

In addition to contractual measures, we try to protect the confidential nature of our proprietary information using commonly accepted physical and technological security measures. Such measures may not, for example, in the case of misappropriation of a trade secret by an employee or third party with authorized access, provide adequate protection for our proprietary information. Our security measures may not prevent an employee or consultant from misappropriating our trade secrets and providing them to a competitor, and recourse we take against such misconduct may not provide an adequate remedy to protect our interests fully. Unauthorized parties may also attempt to copy or reverse engineer certain aspects of our products and services that we consider proprietary and a trade secret. Enforcing a claim that a party illegally disclosed or misappropriated a trade secret can be difficult, expensive and time-consuming, and the outcome is unpredictable. Even though we use commonly accepted security measures, trade secret violations are often a matter of state law, and the criteria for protection of trade secrets can vary among different jurisdictions. In addition, trade secrets may be independently developed by others in a manner that could prevent legal recourse by us. We also have agreements with our employees, consultants and third parties that obligate them to assign their inventions to us, however these agreements may not be self-executing, not all employees or consultants may enter into such agreements, or employees or consultants may breach or violate the terms of these agreements, and we may not have adequate remedies for any such breach or violation. If any of our intellectual property or confidential or proprietary

64

Exhibit 7
Page 683

TABLE OF CONTENTS

information, such as our trade secrets, were to be disclosed or misappropriated, or if any such information was independently developed by a competitor, it could have a material adverse effect on our competitive position, business, financial condition, results of operations, and prospects.

### The laws of foreign countries may not adequately protect our intellectual property rights.

Intellectual property protection laws in foreign jurisdictions differ substantially from those in the U.S. If we fail to apply for intellectual property protection in foreign jurisdictions, or if we cannot adequately protect our intellectual property rights in these foreign jurisdictions, our competitors may be able to compete more effectively against us, which could adversely affect our competitive position, as well as our business, financial condition and results of operations.

### If third parties claim that we infringe their intellectual property rights, we may incur liabilities and costs and may have to redesign or discontinue selling certain products and services.

Searching for existing third-party intellectual property rights and evaluating its applicability to our products and services can be a costly and time-consuming process. Such searches and evaluation may not reveal important intellectual property and our competitors may also have filed for patent protection, which may not be publicly-available information, or claimed trademark rights that have not been revealed through our searches. We may not undertake such searches and evaluation of third-party intellectual property rights and, as a result, may not be aware of intellectual property rights that could be asserted against our products or services. In addition, some of our employees were previously employed at other consumer product, medical device and Internet of Things/smart device companies. We may be subject to claims that our employees have disclosed, or that we have used, trade secrets or other proprietary information of our employees' former employers. Our efforts to identify and avoid infringing on third parties' intellectual property rights may not always be successful. Any claims of patent or other intellectual property infringement against us, even those without merit, could:

- be expensive and time-consuming to defend and result in payment of significant damages to third parties;

- force us to stop making or selling products and services that incorporate the intellectual property;

- require us to redesign, reengineer or rebrand our products and services, product candidates and technologies;

- require us to enter into royalty agreements that would increase the costs of our products and services;

- require us to indemnify third parties pursuant to contracts in which we have agreed to provide indemnification for intellectual property infringement claims;

- divert the attention of our management and other key employees; and

- result in our customers or potential customers deferring or limiting their purchase or use of the affected products and services impacted by the claims until the claims are resolved;

any of which could have a material adverse effect on our business, financial condition and results of operations. In addition, new patents obtained by our competitors could threaten the continued commercialization of our products and services in the market even after they have already been introduced.

### We may become involved in lawsuits to protect or enforce our intellectual property, which could be expensive, time consuming and unsuccessful.

Third parties, including our competitors, could be infringing, misappropriating or otherwise violating our intellectual property rights. We do not regularly conduct monitoring for unauthorized use at this time. From time to time, we seek to analyze our competitors' products and services, or seek to enforce our rights against potential infringement, misappropriation or violation of our intellectual property. However, the steps we have taken, or take in the future, to protect our proprietary rights may not be adequate to enforce our rights as against such infringement, misappropriation or violation of our intellectual property. We may not be able to detect unauthorized use of, or take appropriate steps to enforce, our intellectual property rights. Any inability to meaningfully enforce our intellectual property rights could harm our ability to compete and reduce demand for our products and services.

65

Exhibit 7
Page 684

TABLE OF CONTENTS

We believe some of the new market entrants in our industry, including some of the world's largest technology companies, may in the future infringe our intellectual property, and we may be required to engage in litigation to protect or enforce our intellectual property rights. An adverse result in any litigation proceeding could harm our business. In any lawsuit we bring to enforce our intellectual property rights, a court may refuse to stop the other party from using the technology at issue on grounds that our intellectual property rights do not cover the technology or actions in question. If we initiate legal proceedings against a third party to enforce a patent covering a product, the defendant could counterclaim that such patent is invalid or unenforceable. In patent litigation in the United States, defendant counterclaims alleging invalidity or unenforceability are commonplace.

Grounds for a validity challenge could be an alleged failure to meet any of several statutory requirements, including lack of novelty, obviousness, or non-enablement. Grounds for an unenforceability assertion could be an allegation that someone connected with prosecution of the patent withheld relevant information from the PTO, or made a misleading statement, during prosecution. Mechanisms for such challenges include re-examination, post-grant review, IPR, interference proceedings, derivation proceedings, and equivalent proceedings in foreign jurisdictions (e.g., opposition proceedings). Such proceedings could result in the revocation of, cancellation of, or amendment to our patents in such a way that they no longer cover our products and services, or any future products and services that we may develop.

The outcome following legal assertions of invalidity and unenforceability is unpredictable. With respect to the validity question, for example, we cannot be certain that there is no invalidating prior art, of which we and the patent examiner were unaware during prosecution. If a third party were to prevail on a legal assertion of invalidity or unenforceability, we would lose at least part, and perhaps all, of the patent protection on our products and services. Such a loss of patent protection would have a material adverse impact on our business, financial condition, results of operations, and prospects.

Because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during litigation. There could also be public announcements of the results of hearing, motions, or other interim developments. If securities analysts or investors perceive these results to be negative, it could have a material adverse effect on the price of shares of our common stock. Even if we ultimately prevail, a court may decide not to grant an injunction against further infringing activity and instead award only monetary damages, which may not be an adequate remedy. Furthermore, the monetary cost of such litigation and the diversion of the attention of our management could outweigh any benefit we receive as a result of the proceedings. Uncertainties resulting from the initiation and continuation of patent litigation or other proceedings could have a material adverse effect on our business.

***We may be subject to claims that we or our employees have misappropriated the intellectual property of a third party, including trade secrets or know-how, or are in breach of non-competition or non-solicitation agreements with our competitors and third parties may claim an ownership interest in intellectual property we regard as our own.***

Many of our employees and consultants were previously employed at or engaged by other companies, including our competitors or potential competitors. Some of these employees, consultants and contractors may have executed proprietary rights, non-disclosure and non-competition agreements in connection with such previous employment. Although we try to ensure that our employees and consultants do not use the intellectual property, proprietary information, know-how or trade secrets of others in their work for us, we may be subject to claims that we or these individuals have, inadvertently or otherwise, misappropriated the intellectual property or disclosed the alleged trade secrets or other proprietary information, of these former employers, competitors or other third parties. Additionally, we may be subject to claims from third parties challenging our ownership interest in or inventorship of intellectual property we regard as our own, based on claims that our agreements with employees or consultants obligating them to assign intellectual property to us are ineffective or in conflict with prior or competing contractual obligations to assign inventions to another employer, to a former employer, or to another person or entity. Litigation may be necessary to defend against claims, and it may be necessary or we may desire to enter into a license to settle any such claim; however, there can be no assurance that we would be able to obtain a license on commercially reasonable terms, if at all. If our defense to those claims fails, in addition to paying monetary damages or a settlement payment, a court could prohibit us from using technologies, features or other intellectual property that are essential to our products and services, if such technologies or

66

Exhibit 7
Page 685

TABLE OF CONTENTS

features are found to incorporate or be derived from the trade secrets or other proprietary information of the former employers. An inability to incorporate technologies, features or other intellectual property that are important or essential to our products and services could have a material adverse effect on our business and competitive position, and may prevent us from selling our products and services. In addition, we may lose valuable intellectual property rights or personnel. Even if we are successful in defending against these claims, litigation could result in substantial costs and could be a distraction to management. Any litigation or the threat thereof may adversely affect our ability to hire employees or contract with independent sales representatives. A loss of key personnel or their work product could hamper or prevent our ability to commercialize our products and services, which could materially and adversely affect our business, financial condition, operating results, cash flows and prospects.

***Our proprietary software may not operate properly, which could damage our reputation, give rise to claims against us, or divert application of our resources from other purposes, any of which could harm our business and operating results.***

Proprietary software and hardware development is time-consuming, expensive and complex, and may involve unforeseen difficulties. We may encounter technical obstacles, and it is possible that we discover additional problems or design defects that prevent our proprietary software from operating properly. We have experienced product design issues in the past and continue to work to address those and anticipate additional concerns. If our services do not function reliably, malfunction, or fail to achieve customer expectations in terms of performance, customers could assert liability claims against us or attempt to cancel their contracts with us. This could damage our reputation and impair our ability to attract or maintain customers.

The software underlying our products and services is highly complex and may contain undetected errors or vulnerabilities, some of which may only be discovered after our products and services have been used by our customers. Any real or perceived errors, failures, bugs or other vulnerabilities discovered in our products or services could result in negative publicity and damage to our reputation, loss of customers, loss of or delay in market acceptance of our products and services, loss of competitive position, loss of revenue or liability for damages, fines or regulatory actions, overpayments or underpayments, any of which could harm our enrollment rates. Similarly, any real or perceived errors, failures, design flaws or defects in our devices could have similar negative results. In such an event, we may be required or may choose to expend additional resources in order to help correct the problem. Such efforts could be costly, or ultimately unsuccessful. Even if we are successful at remediating issues, we may experience damage to our reputation and brand. There can be no assurance that provisions typically included in our agreements with partners that attempt to limit our exposure to claims would be enforceable or adequate or would otherwise protect us from liabilities or damages with respect to any particular claim. Even if unsuccessful, a claim brought against us by any customers or partners would likely be time-consuming and costly to defend and could seriously damage our reputation and brand.

**General Risk Factors Relating to New Owlet**

***Our business, financial condition, results of operations and growth may be impacted by the effects of the COVID-19 pandemic.***

The COVID-19 pandemic may negatively impact our operations and revenues and overall financial condition by harming the ability or willingness of customers to pay for our products and services due to macro-economic conditions resulting from the pandemic or the operations of manufacturers, suppliers and other third parties with which we do business. These challenges will likely continue for the duration of the pandemic, which is uncertain, and the macro-economic effects of the pandemic will likely continue far beyond the duration of the pandemic.

Numerous state and local jurisdictions have imposed, and others in the future may impose, "shelter-in-place" orders, quarantines, executive orders and similar government orders and restrictions for their residents to control the spread of COVID-19. Although the governor of Utah, where our headquarters are located, has not issued any "shelter-in-place" or "stay at home" orders, such orders could be instituted as the COVID-19 pandemic continues or worsens. We have taken a number of precautionary measures to manage our resources and mitigate the adverse impact of the pandemic, which is intended to help minimize the risk to our employees, customers, and the communities in which we operate. Employees at our headquarters and certain other employees have been asked to work from home where possible, with only limited access given to employees to

67

Exhibit 7
Page 686

TABLE OF CONTENTS

work in the office when necessary. For roles that require employees to be on-site, we are providing protective equipment, practicing social distancing and increasing sanitizing standards. As the COVID-19 pandemic continues, other potential disruptions may include delays by applicable state or federal regulatory bodies in processing potential submissions to that regulatory body, delays in product development efforts and additional government requirements or other incremental mitigation efforts that may further impact our capacity to manufacture, sell and support the use of our Owlet technologies. In addition, even after "shelter-in-place" orders, quarantines, executive orders and similar government orders and restrictions for their residents to control the spread of COVID-19 are lifted, we may continue to experience disruptions to our business.

While the potential economic impact brought by and the duration of COVID-19 may be difficult to assess or predict, the widespread pandemic has resulted in, and may continue to result in, significant disruption of global financial markets, affecting our ability to access capital, which could in the future negatively affect our liquidity. In addition, a recession or market correction resulting from the spread of COVID-19 could materially affect our business and the value of our common stock. The COVID-19 pandemic has also resulted in a significant increase in unemployment in the United States which may continue even after the pandemic subsides. The occurrence of any such events may lead to reduced disposable income which could adversely affect the number of our products and services sold after the pandemic has subsided. Further, although we have experienced growth in our sales volume during the COVID-19 pandemic, this and any other favorable impacts we have experienced in connection with the pandemic may subside, and the ultimate effect of COVID-19 on our sales volume and other results of operations could differ substantially from our expectations and our experience to date.

***We are involved, and may become involved in the future, in disputes and other legal or regulatory proceedings that, if adversely decided or settled, could materially and adversely affect our business, financial condition and results of operations.***

We are, and may in the future become, party to litigation, regulatory proceedings or other disputes. In general, claims made by or against us in disputes and other legal or regulatory proceedings can be expensive and time-consuming to bring or defend against, requiring us to expend significant resources and divert the efforts and attention of our management and other personnel from our business operations. These potential claims may include but are not limited to personal injury and class action lawsuits, intellectual property claims and regulatory investigations relating to the advertising and promotional claims about our products and services and employee claims against us based on, among other things, discrimination, harassment or wrongful termination. Any one of these claims, even those without merit, may divert our financial and management resources that would otherwise be used to benefit the future performance of our operations. Any adverse determination against us in these proceedings, or even the allegations contained in the claims, regardless of whether they are ultimately found to be without merit, may also result in settlements, injunctions or damages that could have a material adverse effect on our business, financial condition and results of operations.

***Changing laws and increasingly complex corporate governance and public disclosure requirements could have an adverse effect on our business and operating results.***

Changing laws, regulations and standards relating to corporate governance and public disclosure and new regulations issued by the SEC and the NYSE have and will create additional compliance requirements for us following the Business Combination. For example, the Dodd-Frank Act includes provisions regarding, among other things, advisory votes on named executive officer compensation and "conflict minerals" reporting. Complying with these rules and regulations has increased and will increase our legal and financial compliance costs, make some activities more difficult, time-consuming or costly and increase demand on our systems and resources. As a result, management's attention may be diverted from other business concerns, which could adversely affect our business, financial condition and results of operations. We may also need to hire additional employees or engage outside consultants to comply with these requirements, which will increase our costs and expenses. To maintain high standards of corporate governance and public disclosure, we have invested in, and intend to continue to invest in, reasonably necessary resources to comply with evolving standards.

In addition, stockholder litigation surrounding executive compensation and disclosure of executive compensation has increased with the passage of the Dodd-Frank Act. Furthermore, our stockholders may not continue to approve our advisory vote on named executive officer compensation that is required to be voted on by our stockholders annually pursuant to the Dodd-Frank Act. If we are involved in a lawsuit related to compensation matters or any other matters not covered by our directors' and officers' liability insurance, we may

68

Exhibit 7
Page 687

TABLE OF CONTENTS

incur significant expenses in defending against such lawsuits, or be subject to significant fines or required to take significant remedial actions, each of which could adversely affect our business, financial condition and results of operations.

***Changes in the regulation of the internet could adversely affect our business.***

Laws, rules and regulations governing internet communications, advertising and e-commerce are dynamic, and the extent of future government regulation is uncertain. Federal and state regulations govern various aspects of our online business, including intellectual property ownership and infringement, trade secrets, the distribution of electronic communications, marketing and advertising, user privacy and data security, search engines and internet tracking technologies. Governmental authorities continue to evaluate the privacy implications inherent in the use of third-party "cookies" and other methods of online tracking for behavioral advertising and other purposes. In the U.S., federal and state governments have enacted, and may in the future enact, legislation or regulations impacting the ability of companies and individuals to engage in these activities, such as by regulating the level of consumer notice and consent required before a company can employ cookies or other electronic tracking tools or the use of data gathered with such tools. Additionally, some providers of consumer devices and web browsers have implemented, or announced plans to implement, limits on behavioral or targeted advertising and/or means to make it easier for internet users to prevent the placement of cookies or to block other tracking technologies, which could, if widely adopted, result in the decreased effectiveness or use of third-party cookies and other methods of online tracking, targeting or re-targeting. The regulation of the use of these cookies and other current online tracking and advertising practices or a loss in our ability to make effective use of services that employ such technologies could increase our costs of operations and limit our ability to acquire new consumers on cost-effective terms and consequently, materially and adversely affect our business, financial condition and results of operations. Further, in the EU and the UK, regulators are increasingly focusing on compliance with requirements in the online behavioral advertising ecosystem, and current national laws that implement the ePrivacy Directive are highly likely to be replaced by an EU regulation known as the ePrivacy Regulation, which will significantly increase fines for non-compliance. In the EU and the UK, informed consent is required for the placement of a cookie or similar technologies on a user's device and for direct electronic marketing. The GDPR also imposes conditions on obtaining valid consent, such as a prohibition on pre-checked consents and a requirement to ensure separate consents are sought for each type of cookie or similar technology. While the text of the ePrivacy Regulation is still under development, a recent European court decision and regulators' recent guidance are driving increased attention to cookies and tracking technologies. If regulators start to enforce the strict approach in recent guidance, this could lead to substantial costs, require significant systems changes, limit the effectiveness of our marketing activities, divert the attention of our technology personnel, adversely affect our margins, increase costs and subject us to additional liabilities.

Future taxation on the use of the internet or e-commerce transactions could also be imposed. Existing or future regulation or taxation could increase our operating expenses and expose us to significant liabilities. To the extent any such regulations require us to take actions that negatively impact us, they could have a material adverse effect on our business, financial condition and results of operations.

***The price of New Owlet common stock and warrants may be volatile.***

Upon consummation of the Business Combination, the price of New Owlet common stock, as well as New Owlet warrants, may fluctuate due to a variety of factors, including:

- actual or anticipated fluctuations in our operating results or future prospects;

- our announcements or our competitors' announcements of new products and services;

- the public's reaction to our press releases, our other public announcements and our filings with the SEC;

- strategic actions by us or our competitors, such as acquisitions or restructurings;

- new laws or regulations or new interpretations of existing laws or regulations applicable to our business;

- changes in accounting standards, policies, guidance, interpretations or principles;

- changes in our growth rates or our competitors' growth rates;

69

Exhibit 7
Page 688

TABLE OF CONTENTS

- developments regarding our patents or proprietary rights or those of our competitors;

- ongoing legal proceedings;

- commencement of, or involvement in, litigation involving the combined company;

- our inability to raise additional capital as needed;

- changes in our capital structure, such as future issuances of securities or the incurrence of new or additional debt;

- the volume of shares of New Owlet common stock available for public sale;

- additions and departures of key personnel;

- concerns or allegations as to the safety or efficacy of our products and services;

- sales of stock by us or members of our management team, our board of directors or certain significant stockholders;

- changes in stock market analyst recommendations or earnings estimates regarding our stock, other comparable companies or our industry generally; and

- changes in financial markets or general economic conditions, including the effects of recession or slow economic growth in the U.S. and abroad, interest rates, fuel prices, international currency fluctuations, corruption, political instability, acts of war or terrorism, and the COVID-19 pandemic or other public health crises.

These market and industry factors may materially reduce the market price of New Owlet common stock and warrants regardless of the operating performance of New Owlet.

***If securities or industry analysts do not publish research or reports about our business, or if they issue an adverse or misleading opinion regarding our stock, our stock price and trading volume could decline.***

The trading market for our common stock will be influenced by the research and reports that industry or securities analysts publish about us or our business. We do not currently have and may never obtain research coverage by securities and industry analysts. If no or few securities or industry analysts commence coverage of us, the trading price for our stock would be negatively impacted. In the event we obtain securities or industry analyst coverage, if any of the analysts who cover us issue an adverse or misleading opinion regarding us, our business model, our intellectual property or our stock performance, or if our operating results fail to meet the expectations of analysts, our stock price would likely decline. If one or more of these analysts cease coverage of us or fail to publish reports on us regularly, we could lose visibility in the financial markets, which in turn could cause our stock price or trading volume to decline.

***Concentration of ownership among our existing directors, executive officers and principal stockholders may prevent new investors from influencing significant corporate decisions.***

Following the consummation of the Business Combination, the New Owlet directors and executive officers and their affiliates, in the aggregate, will beneficially own approximately 25.3% of our outstanding stock, assuming no redemptions by holders of Sandbridge's public shares, or 26.7% of our outstanding stock, assuming maximum redemptions by holders of Sandbridge's public shares as described elsewhere in this proxy statement/prospectus. Subject to any fiduciary duties owed to our other stockholders under Delaware law, these stockholders may be able to exercise significant influence over matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions, and will have some control over our management and policies. Some of these persons or entities may have interests that are different from yours. For example, these stockholders may support proposals and actions with which you may disagree or which are not in your best interests. The concentration of ownership could delay or prevent a change in control of us, or otherwise discourage a potential acquirer from attempting to obtain control of us, which in turn could reduce the price of our stock.

In addition, these stockholders could use their voting influence to maintain our existing management and directors in office or support or reject other management and Board proposals that are subject to stockholder approval, such as amendments to our employee stock plans and approvals of significant financing transactions.

70

Exhibit 7
Page 689

TABLE OF CONTENTS

***We may acquire other businesses or form other joint ventures or make investments in other companies or technologies that could negatively affect our operating results, dilute our stockholders' ownership, increase our debt or cause us to incur significant expense.***

We may pursue acquisitions of businesses and assets. We also may pursue strategic alliances and additional joint ventures that leverage our technology and industry experience to expand our offerings or distribution. We have no experience with acquiring other companies and limited experience with forming strategic partnerships. We may not be able to find suitable partners or acquisition candidates, and we may not be able to complete such transactions on favorable terms, if at all. If we make any acquisitions, we may not be able to integrate these acquisitions successfully into our existing business, and we could assume unknown or contingent liabilities. Any future acquisitions also could result in the incurrence of debt, contingent liabilities or future write-offs of intangible assets or goodwill, any of which could have a material adverse effect on our financial condition, results of operations and cash flows. Integration of an acquired company also may disrupt ongoing operations and require management resources that we would otherwise focus on developing our existing business. We may experience losses related to investments in other companies, which could have a material negative effect on our results of operations and financial condition. We may not realize the anticipated benefits of any acquisition, technology license, strategic alliance or joint venture. To finance any acquisitions or joint ventures, we may choose to issue shares of our common stock as consideration, which would dilute the ownership of our stockholders. Additional funds may not be available on terms that are favorable to us, or at all. If the price of our common stock is low or volatile, we may not be able to acquire other companies or fund a joint venture project using our stock as consideration.

We also expect to continue to carry out internal strategic initiatives that we believe are necessary to grow our revenues and expand our business, both in the U.S. and abroad. For example, we have continued to invest in international expansion programs designed to increase our worldwide presence and take advantage of market expansion opportunities around the world. Although we believe our investments in these initiatives continue to be in the long-term best interests of Owlet and our stockholders, there are no assurances that such initiatives will yield favorable results for us. Accordingly, if these initiatives are not successful, our business, financial condition and results of operations could be adversely affected.

If these risks materialize, our stock price could be materially adversely affected. Any difficulties in the integration of acquired businesses or unexpected penalties, liabilities or asset impairments in connection with such acquisitions or investments could have a material adverse effect on our business, financial condition and results of operations.

***Because we do not anticipate paying any cash dividends on our capital stock in the foreseeable future, capital appreciation, if any, will be your sole source of gain.***

We have never declared or paid cash dividends on our capital stock. We currently intend to retain all of our future earnings, if any, to finance the growth and development of our business. In addition, under certain circumstances, our loan and security agreement and any future debt or preferred securities or future debt agreements we may enter may preclude us from paying dividends. As a result, capital appreciation, if any, of our common stock will be your sole source of gain for the foreseeable future.

***Our corporate documents and Delaware law contain provisions that could discourage, delay or prevent a change in control of our company, prevent attempts to replace or remove current management and reduce the market price of our stock.***

Following the consummation of the Business Combination, provisions in our Proposed Charter and New Owlet Bylaws may discourage, delay or prevent a merger or acquisition involving us that our stockholders may consider favorable. For example, our Proposed Charter and New Owlet Bylaws, if approved by Sandbridge's stockholders at the Special Meeting, will authorize our Board to issue up to 100 million shares of New Owlet Preferred Stock. As a result, without further stockholder approval, our Board will have the authority to attach special rights, including voting and dividend rights, to this preferred stock, including pursuant to a stockholder rights plan. With these rights, preferred stockholders could make it more difficult for a third-party to acquire us. In addition, our Proposed Charter and New Owlet Bylaws, subject to the Stockholders Agreement, will provide for a staggered Board, whereby directors serve for three-year terms, with one-third of the directors coming up for reelection each year. A staggered Board will make it more difficult for a third-party to obtain control of our Board through a proxy contest, which may be a necessary step in an acquisition of us that is not favored by our Board.

71

Exhibit 7
Page 690

We will also be subject to anti-takeover provisions under the DGCL. Under these provisions, if anyone becomes an "interested stockholder," we may not enter into a "business combination" with that person for three years without special approval, which could discourage a third-party from making a takeover offer and could delay or prevent a change in control of us. For purposes of these provisions, an "interested stockholder" generally means someone owning 15% or more of our outstanding voting stock or an affiliate of ours that owned 15% or more of our outstanding voting stock during the past three years, subject to certain exceptions as described in the DGCL.

***The New Owlet Bylaws will provide that the state or federal courts located within the State of Delaware are the exclusive forum for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.***

Following the consummation of the Business Combination, the New Owlet Bylaws will provide that the state or federal courts located within the State of Delaware are the sole and exclusive forum for: (i) any derivative action, suit or proceeding brought on our behalf, (ii) any action, suit or proceeding asserting a claim of breach of fiduciary duty owed by any of our directors, officers or stockholders to our stockholders, (iii) any action, suit or proceeding asserting a claim against us arising pursuant to any provision of the DGCL, the New Owlet Bylaws, or (iv) any action, suit or proceeding asserting a claim governed by the internal affairs doctrine. However, this choice of forum provision does not apply to (a) actions in which the Court of Chancery in the State of Delaware concludes that an indispensable party is not subject to the jurisdiction of Delaware courts, or (b) actions in which a federal court has assumed exclusive jurisdiction to a proceeding. This choice of forum provision is not intended to apply to any actions brought under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. As a result, the exclusive forum provision will not apply to suits brought to enforce any duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. The New Owlet Bylaws will also provide that the federal district courts of the United States of America will be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended (the Securities Act). This choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers or other employees or stockholders, which may discourage such lawsuits against us and our directors, officers and other employees or stockholders.

Furthermore, the enforceability of similar choice of forum provisions in other companies' certificates of incorporation has been challenged in legal proceedings, and it is possible that a court could find these types of provisions to be inapplicable or unenforceable. If a court were to find the choice of forum provision in our second amended and restated bylaws to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could adversely affect our business, financial condition and results of operations.

**Risk Factors Relating to Sandbridge and the Business Combination**

***Directors and officers of Sandbridge have potential conflicts of interest in recommending that stockholders vote in favor of approval of the Business Combination and approval of the other proposals described in this proxy statement/prospectus.***

When considering the recommendation of the Sandbridge Board that the Sandbridge stockholders vote in favor of approval of the Business Combination, Sandbridge stockholders should be aware that Sandbridge's initial stockholders, including its directors and officers, have interests in the Business Combination that may be different from, or in addition to, the interests of Sandbridge stockholders and warrant holders generally. These interests include, among other things, the interests listed below:

• If we are unable to complete our initial business combination by September 17, 2022, or during any stockholder-approved extension period, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than 10 business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account including interest earned on the funds held in the Trust Account and not previously released to Sandbridge to pay its tax obligations (less up to $100,000 of interest to pay

72

Exhibit 7
Page 691

TABLE OF CONTENTS

dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), and (iii) as promptly as reasonably possible following such redemption, subject to the approval of Sandbridge's remaining stockholders and Sandbridge's board of directors, dissolve and liquidate, subject in each case to Sandbridge's obligations under the DGCL to provide for claims of creditors and the requirements of other applicable law.

- There will be no liquidating distributions from the Trust Account with respect to our founder shares held by our Sponsor if we fail to complete our initial business combination by September 17, 2022, or during any stockholder-approved extension period. Our Sponsor purchased the founder shares prior to our initial public offering for an aggregate purchase price of $25,000, or approximately $0.004 per share and, in August 2020, transferred 40,000 founder shares to Mr. De Sole, 25,000 founder shares to Mr. Toubassy and 30,000 founder shares to Mr. Hilfiger and in October 2020, transferred 40,000 founder shares to Mr. Goss. Upon the Closing, such founder shares will remain outstanding, subject to certain restrictions on transfer. However, if our Sponsor acquires public shares in and after the initial public offering, such public shares will be entitled to liquidating distributions from the Trust Account if Sandbridge fails to complete a business combination.

- In connection with the closing of our initial public offering, we consummated the sale of 6,600,000 private placement warrants at a price of $1.00 per warrant in a private placement to our Sponsor. The warrants are each exercisable commencing the later of 30 days following the Closing of the Business Combination or 12 months from the closing of our initial public offering, which occurred on September 17, 2020, for one share of Sandbridge Class A common stock at $11.50 per share. If we do not consummate a business combination transaction by September 17, 2022, or during any stockholder-approved extension period, then there will be no redemption rights or liquidating distributions with respect to Sandbridge's warrants, which will expire worthless.

- Our initial stockholders, officers and directors will lose their entire investment in us if we do not complete an initial business combination by September 17, 2022, or during any stockholder-approved extension period. All of the founder shares will be worthless if we do not complete an initial business combination. Our initial stockholders have entered into a letter agreement with us pursuant to which they have agreed to vote any shares owed by them in favor of a proposed initial business combination and to waive their redemption rights in respect to their founder shares and public shares in connection with the completion of our initial business combination and certain amendments to our Current Charter.

- In connection with the Business Combination Agreement, Sandbridge entered into Subscription Agreements with the PIPE Investors, pursuant to which such PIPE Investors have agreed to purchase, at the Closing immediately following the Effective Time, an aggregate of 13,000,000 shares of Sandbridge Class A common stock at a purchase price of $10.00 per share.

- Certain of our officers and directors are expected to continue to serve as directors of New Owlet after the Closing. As such, in the future they may receive cash fees, stock options or stock awards that the New Owlet Board determines to pay to its directors.

- In order to protect the amounts held in the Trust Account, the Sponsor has agreed that it will be liable to us if and to the extent any claims by a third party for services rendered or products sold to us, or a prospective target business with which we have entered into a written letter of intent, confidentiality or similar agreement or business combination agreement, reduce the amount of funds in the Trust Account to below (1) $10.00 per public share or (2) the actual amount per public share held in the Trust Account as of the date of the liquidation of the Trust Account, if less than $10.00 per share due to reductions in the value of the trust assets, less taxes payable, provided that such liability will not apply to any claims by a third party or prospective target business who executed a waiver of any and all rights to the monies held in the Trust Account (whether or not such waiver is enforceable) nor will it apply to any claims under our indemnity of the underwriters of Sandbridge's initial public offering against certain liabilities, including liabilities under the Securities Act.

- Following the consummation of the Business Combination, we will continue to indemnify our existing directors and officers and will maintain a directors' and officers' liability insurance policy.

73

Exhibit 7
Page 692

The existence of financial and personal interests of the Sandbridge officers or directors and entities affiliated with them may have influenced their decision to approve the Business Combination. You should consider these interests when evaluating the Business Combination and the recommendation of the Sandbridge Board to vote in favor of the Business Combination Proposal and other proposals to be presented to the stockholders.

***Certain officers and directors of Sandbridge also participate in arrangements that may provide them with other interests in the Business Combination that are different from yours.***

Certain officers and directors of Sandbridge also participate in arrangements that may provide them with other interests in the Business Combination that are different from yours. Sandbridge's officers and directors collectively have made an aggregate average investment per founder share of $0.004. Our officers and directors will lose their entire investment if a business combination is not approved during the period provided in our amended and restated certificate of incorporation. The officers' and directors' significantly lower investment per share in their founder shares may result in a difference between a transaction that increases the value of the officers' and directors' investment and a transaction that increases the value of the public stockholders' investment. In addition, a transaction that increases the value of the public stockholders' investment will increase the investments of our officers and directors because of the comparatively low purchase price at which their initial investment was made.

***Sandbridge's initial stockholders and its other directors and officers at the time of its initial public offering have agreed to vote in favor of the Business Combination, regardless of how our public stockholders vote.***

Our initial stockholders and our other directors and officers as of the time of our initial public offering have agreed, pursuant to the terms of a letter agreement entered into with us, to vote their founder shares and any public shares held by them in favor of the initial business combination. As of the date of this proxy statement/prospectus, the Sponsor, our other initial stockholders and our other directors and officers and the PIMCO private funds own approximately 27% of our issued and outstanding shares. Accordingly, it is more likely that the necessary stockholder approval for the Business Combination will be received than would be the case if our initial stockholders had agreed to vote their shares in accordance with the majority of the votes cast by our public stockholders.

***Neither the Sandbridge Board nor any committee thereof obtained a third-party valuation in determining whether or not to pursue the Business Combination.***

Neither the Sandbridge Board nor any committee thereof obtained an opinion from an independent investment bank that is a member of the Financial Industry Regulatory Authority, Inc. or from an independent accounting firm that the price that Sandbridge is paying for Owlet is fair to Sandbridge from a financial point of view. Neither the Sandbridge Board nor any committee thereof obtained a third party valuation in connection with the Business Combination. In analyzing the Business Combination, the Sandbridge Board and management conducted due diligence on Owlet and researched the industry in which Owlet operates. The Sandbridge Board reviewed, among other things, financial due diligence materials prepared by Sandbridge management and professional advisors, including trading multiples and other valuation metrics for comparable companies, certain financial projections of Owlet and the various factors that may cause the company to miss or exceed its projections and the financial terms set forth in the Business Combination Agreement, and concluded that the Business Combination was in the best interest of its stockholders. Accordingly, investors will be relying solely on the judgment of the Sandbridge Board and management in valuing Owlet, and the Sandbridge Board and management may not have properly valued Owlet's business. The lack of a third-party valuation may also lead an increased number of stockholders to vote against the Business Combination or demand redemption of their shares, which could potentially impact our ability to consummate the Business Combination.

***Sandbridge's initial stockholders, directors, officers, advisors and their affiliates may elect to purchase shares or public warrants from public stockholders, which may influence a vote on the Business Combination and reduce the public "float" of our common stock.***

Sandbridge's initial stockholders, directors, officers, advisors or any of their affiliates may purchase shares and/or warrants from investors, or they may enter into transactions with such investors and others to provide them with incentives to acquire public shares, vote their public shares in favor of the Business Combination Proposal or not redeem their public shares. The purpose of any such transaction could be to (i) vote such shares

74

Exhibit 7
Page 693

TABLE OF CONTENTS

in favor of the Business Combination and thereby increase the likelihood of obtaining stockholder approval of the Business Combination or (ii) increase the likelihood that the Minimum Available Sandbridge Cash Amount is satisfied. Any such stock purchases and other transactions may thereby increase the likelihood of obtaining stockholder approval of the Business Combination. This may result in the completion of the Business Combination in a way that may not otherwise have been possible. While the exact nature of any such incentives has not been determined as of the date of this proxy statement/prospectus, they might include, without limitation, arrangements to protect such investors or holders against potential loss in value of their shares, including the granting of put options and the transfer to such investors or holders of shares or rights owned by Sandbridge's initial stockholders for nominal value. However, other than as expressly stated herein, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. None of the funds in the Trust Account will be used to purchase shares or public warrants in such transactions.

Entering into any such arrangements may have a depressive effect on public shares. For example, as a result of these arrangements, an investor or holder may have the ability to effectively purchase shares at a price lower than market and may therefore be more likely to sell the shares it owns, either prior to or immediately after the Special Meeting.

If such transactions are effected, the consequence could be to cause the Business Combination to be approved in circumstances where such approval could not otherwise be obtained. Purchases of public shares by the persons described above would allow them to exert more influence over the approval of the proposals to be presented at the Special Meeting and would likely increase the chances that such proposals would be approved. In addition, if such purchases are made, the public "float" of our common stock or warrants may be reduced and the number of beneficial holders of our securities may be reduced, possibly making it difficult to maintain or obtain the quotation, listing or trading of our securities on a national securities exchange.

***New Owlet's securities may not be listed on a national securities exchange after the Business Combination, which could limit investors' ability to make transactions in New Owlet's securities and subject New Owlet to additional trading restrictions.***

Sandbridge intends to apply to have the New Owlet Class A common stock listed on the NYSE after the Closing of the Business Combination. New Owlet will be required to meet the initial listing requirements to be listed, including having a minimum number of public stockholders. New Owlet may not be able to meet those initial listing requirements. Even if New Owlet's securities are so listed, New Owlet may be unable to maintain the listing of its securities in the future. If New Owlet fails to meet the initial listing requirements and the NYSE does not list its securities and the related closing condition is waived by the parties, New Owlet could face significant material adverse consequences, including:

- a limited availability of market quotations for its securities;

- a limited amount of news and analyst coverage for the company; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

In addition, even if New Owlet's securities are listed as of the Closing of the Business Combination, New Owlet may be unable to maintain the listing of its securities in the future.

***Sandbridge's outstanding warrants will become exercisable for New Owlet Class A common stock upon the later of the first anniversary of Sandbridge's initial public offering and the 30th day following the Business Combination. The exercise of these outstanding warrants will increase the number of shares eligible for future resale in the public market and result in dilution to our stockholders.***

Following the Business Combination, there will be 11,500,000 outstanding public warrants to purchase 11,500,000 shares of New Owlet common stock at an exercise price of $11.50 per share, which warrants will become exercisable commencing the later of 30 days following the Closing and 12 months from the closing of our initial public offering, which occurred on September 17, 2020. In addition, subject to certain contractual restrictions on transfer, there will be 6,600,000 private placement warrants outstanding exercisable for 6,600,000 shares of New Owlet common stock at an exercise price of $11.50 per share. In certain circumstances, the public warrants and private placement warrants may be exercised on a cashless basis. To the extent such warrants are exercised, additional shares of New Owlet common stock will be issued, which will result in

75

Exhibit 7
Page 694

TABLE OF CONTENTS

dilution to the holders of New Owlet common stock and increase the number of shares eligible for resale in the public market. Sales of substantial numbers of such shares in the public market could adversely affect the market price of New Owlet common stock, the impact of which is increased as the value of our stock price increases.

***We may redeem your unexpired warrants prior to their exercise at a time that is disadvantageous to you, thereby making your warrants worthless.***

New Owlet will have the ability to redeem outstanding public warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, provided that the last report sales price of New Owlet common stock equals or exceeds $18.00 per share for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date on which we give proper notice of redemption and provided certain other conditions are met. If and when the warrants become redeemable by New Owlet, New Owlet may exercise the redemption right even if it is unable to register or qualify the underlying securities for sale under all applicable state securities laws. Redemption of the outstanding warrants could force holders to (i) exercise the warrants and pay the exercise price therefor at a time when it may be disadvantageous to do so, (ii) sell the warrants at the then-current market price when the holder might otherwise wish to hold onto such warrants or (iii) accept the nominal redemption price which, at the time the outstanding warrants are called for redemption, is likely to be substantially less than the market value of the warrants. None of the private placement warrants will be redeemable by us so long as they are held by their initial purchasers or their permitted transferees.

In addition, New Owlet may redeem your warrants after they become exercisable for a number of shares of New Owlet common stock determined based on the redemption date and the fair market value of New Owlet common stock. Any such redemption may have similar consequences to a cash redemption described above. In addition, such redemption may occur at a time when the warrants are "out-of-the-money," in which case you would lose any potential embedded value from a subsequent increase in the value of our common stock had your warrants remained outstanding.

***Even if we consummate the Business Combination, there can be no assurance that the warrants will be in the money at the time they become exercisable, which is the later of the first anniversary of our initial public offering and the 30th day following the Closing of the Business Combination, and they may expire worthless.***

The exercise price for the outstanding warrants is $11.50 per share of New Owlet Class A common stock. There can be no assurance that the warrants will be in the money following the time they become exercisable, which is the later of the first anniversary of our initial public offering and the 30th day following the Closing of the Business Combination, and prior to their expiration, and as such, the warrants may expire worthless.

***Our stockholders will experience immediate dilution as a consequence of the issuance of shares of New Owlet common stock in the Transactions. Having a minority share position may reduce the influence that our current stockholders have on the management of New Owlet.***

Assuming that no public stockholders exercise their redemption rights in connection with the Business Combination, immediately after the consummation of the Business Combination, Sandbridge's public stockholders will hold 23,000,000 shares of New Owlet common stock, or approximately 17.6% of the outstanding Class A common stock representing 17.6% of the voting power following the Business Combination.

There are currently outstanding an aggregate of 18,100,000 warrants to acquire shares of Sandbridge Class A common stock, which comprise 6,600,000 private placement warrants held by Sandbridge's Sponsor at the time of Sandbridge's initial public offering and 11,500,000 public warrants. Each of Sandbridge's outstanding whole warrants is exercisable commencing the later of 30 days following the Closing and 12 months from the closing of our initial public offering, which occurred on September 17, 2020, for one share of Sandbridge Class A common stock in accordance with its terms, subject to certain restrictions on transfer. Therefore, as of the date of this proxy statement/prospectus, if we assume that each outstanding whole warrant is exercised and one share of Sandbridge Class A common stock is issued as a result of such exercise, with payment of the exercise price of $11.50 per share, our fully diluted capital stock would increase by a total of 18,100,000 shares, with approximately $208.15 million paid to us to exercise the warrants.

Exhibit 7
Page 695

TABLE OF CONTENTS

***Subsequent to the consummation of the Business Combination, we may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and stock price, which could cause you to lose some or all of your investment.***

Although Sandbridge has conducted due diligence on Owlet and New Owlet, Sandbridge cannot assure you that this diligence revealed all material issues that may be present in its business, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of Sandbridge's or New Owlet's control will not later arise. As a result, New Owlet may incur additional costs and expenses and may be forced to later write-down or write-off assets, restructure its operations or incur impairment or other charges that could result in losses. Even if the due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with our preliminary risk analysis. Even though these charges may be non-cash items and not have an immediate impact on our liquidity, the fact that New Owlet reports charges of this nature could contribute to negative market perceptions about New Owlet or its securities. In addition, charges of this nature may cause New Owlet to violate net worth or other covenants to which it may be subject. Accordingly, any Sandbridge stockholders or warrant holders could suffer a reduction in the value of their securities.

***If the benefits of the Business Combination do not meet the expectations of investors or securities analysts, the market price of our securities may decline.***

If the benefits of the Business Combination do not meet the expectations of investors or securities analysts, the market price of Sandbridge's securities prior to the Closing may decline. The market values of Sandbridge's securities at the time of the Business Combination may vary significantly from their prices on the date the Business Combination Agreement was executed, the date of this proxy statement/prospectus, or the date on which Sandbridge stockholders vote on the Business Combination. The number of shares to be issued pursuant to the Business Combination Agreement is based on an estimated Exchange Ratio of 2.050 shares of New Owlet common stock per share of Owlet common stock and will not be adjusted to reflect any changes in the market price of Sandbridge Class A common stock.

In addition, following the release of cash from the Trust Account in connection with the Closing, fluctuations in the price of New Owlet's securities could contribute to the loss of all or part of your investment. Prior to the Business Combination, there has not been a liquid public market for the stock of Owlet and trading in the shares of Sandbridge Class A common stock has not been active. Accordingly, the valuation ascribed to Owlet in the Business Combination may not be indicative of the price that will prevail in the trading market following the Business Combination. If an active market for our securities develops and continues, the trading price of New Owlet securities following the Business Combination could be volatile and subject to wide fluctuations in response to various factors, some of which are beyond our control. Any of the factors listed below could have a material adverse effect on your investment in our securities and New Owlet securities may trade at prices significantly below the price you paid for them. In such circumstances, the trading price of our securities may not recover and may experience a further decline.

Factors affecting the trading price of New Owlet's securities may include:

- actual or anticipated fluctuations in New Owlet's quarterly financial results or the quarterly financial results of companies perceived to be similar to New Owlet;

- changes in the market's expectations about New Owlet's operating results;

- success of competitors;

- operating results failing to meet the expectations of securities analysts or investors in a particular period;

- changes in financial estimates and recommendations by securities analysts concerning New Owlet or the industry in which New Owlet operates in general;

- operating and stock price performance of other companies that investors deem comparable to New Owlet;

- ability to market existing, new and next generation products and services on a timely basis;

Exhibit 7
Page 696

TABLE OF CONTENTS

- changes in laws and regulations affecting New Owlet's business or of the regulatory status of New Owlet's products;

- commencement of, or involvement in, litigation or regulatory enforcement action involving New Owlet;

- changes in New Owlet's capital structure, such as future issuances of securities or the incurrence of additional debt;

- the volume of shares of New Owlet Class A common stock available for public sale;

- any major change in New Owlet's board or management or to key personnel;

- sales of substantial amounts of New Owlet Class A common stock by our or New Owlet's directors, executive officers or significant stockholders or the perception that such sales could occur;

- any material and adverse impact of the COVID-19 pandemic on the markets and the broader global economy; and

- general economic and political conditions such as recessions, interest rates, fuel prices, international currency fluctuations and acts of war or terrorism.

Broad market and industry factors may materially harm the market price of our securities irrespective of our operating performance. The stock market in general, and the NYSE specifically, have experienced extreme volatility that has often been unrelated to the operating performance of particular companies. As a result of this volatility, you may not be able to sell your securities at or above the price at which it was acquired. A loss of investor confidence in the market for the stocks of other companies which investors perceive to be similar to New Owlet could depress our stock price regardless of our business, prospects, financial conditions or results of operations. A decline in the market price of our securities also could adversely affect our ability to issue additional securities and our ability to obtain additional financing in the future.

***Sandbridge may be the target of securities class action and derivative lawsuits that could result in substantial costs and may delay or prevent the Business Combination from being completed.***

Securities class action lawsuits and derivative lawsuits are often brought against public companies that have entered into business combination agreements. Even if the lawsuits are without merit, defending against these claims can result in substantial costs and divert management time and resources. An adverse judgment could result in monetary damages, which could have a negative impact on Sandbridge's liquidity and financial condition. Additionally, if a plaintiff is successful in obtaining an injunction prohibiting completion of the Business Combination, then that injunction may delay or prevent the Business Combination from being completed, which may adversely affect Sandbridge or Owlet or, if the Business Combination is completed but delayed, New Owlet's business, financial position and results of operations.

***Citigroup has a financial interest in Sandbridge completing a business combination that will result in the payment of the deferred underwriting commission to the underwriters of the initial public offering, including Citigroup.***

Sandbridge consummated its initial public offering on September 17, 2020. Citigroup acted as a joint book-running manager of the initial public offering and as a representative of the underwriters of the initial public offering. Upon consummation of the Business Combination, the underwriters of the initial public offering are entitled to $8,050,000 of deferred underwriting commission, of which Citigroup is entitled to $3,823,750. The underwriters of the initial public offering have agreed to waive their rights to the deferred underwriting commission held in the Trust Account in the event Sandbridge does not complete an initial business combination within the Combination Period. Accordingly, if the Business Combination with Owlet, or any other initial business combination, is not consummated within the Combination Period and Sandbridge is therefore required to be liquidated, the underwriters of the initial public offering, including Citigroup, will not receive any of the deferred underwriting commission and such funds will be returned to Sandbridge's public shareholders upon its liquidation. Citi is also entitled to fee of 1.625% of the gross proceeds upon consummation of the PIPE Investment, as compensation for its role as placement agent for the PIPE Investment. Based on an anticipated PIPE Investment of $130 million, Citigroup's fee will be $2,112,500.

Citigroup is engaged by Sandbridge as capital markets advisor to Sandbridge. Sandbridge decided to retain Citigroup as Sandbridge's capital markets advisor based primarily on (i) Citigroup's extensive knowledge, strong

78

Exhibit 7
Page 697

market position and positive reputation in equity capital markets (and particularly with respect to special purpose acquisition company vehicles), (ii) Citigroup's experienced and capable investment banking team and (iii) Citigroup's existing relationship with Sandbridge, including Citigroup's previous role acting as joint book-running manager of Sandbridge's initial public offering.

In connection with the Business Combination, Citigroup conducted a review of information provided to it by Sandbridge, Sponsor and Owlet, including financial forecasts and estimates in relation to Owlet. Citigroup presented discussion materials to Sandbridge's Board for the information and assistance of the Sandbridge Board in connection with the Sandbridge Board's consideration of the Business Combination. Citigroup did not make, and neither its review of the information provided to it by Sandbridge, Sponsor and Owlet nor the discussion with Sandbridge's Board constituted, a recommendation to the Sandbridge Board with respect to the Business Combination or any other matter. The Sandbridge Board, in recommending the Business Combination and in recommending that shareholders vote in favor of approval of the Business Combination Agreement, considered a number of factors, including the discussion materials presented to them by Citigroup.

In considering approval of the Business Combination, the stockholders of Sandbridge and Owlet should consider the role of Citigroup in light of its financial interests in the Business Combination.

***Following the Closing of the Business Combination, Sandbridge will not have any right to make damage claims against Owlet or Owlet's stockholders for the breach of any representation, warranty or covenant made by Owlet in the Business Combination Agreement.***

The Business Combination Agreement provides that the representations, warranties and covenants of the parties contained therein terminate at the Effective Time, except for those covenants that by their terms expressly contemplate performance after the Effective Time as well as the representations and warranties of Owlet and Sandbridge regarding investigation and exclusivity of representations and warranties. Accordingly, no claim for breach of any such representation, warranty, agreement or covenant, detrimental reliance or other right or remedy may be brought with respect thereto after the Effective Time, except for covenants to be performed in whole or in part after the Effective Time. As a result, Sandbridge will have no remedy available to it if the Business Combination is consummated and it is later revealed that, at the time of the Business Combination, there was a breach of any of the representations, warranties and covenants made by Owlet prior to the Effective Time.

***Our ability to successfully effect the Business Combination and to be successful thereafter will be dependent upon the efforts of key personnel of New Owlet, some of whom may be from Sandbridge and Owlet, and some of whom may join New Owlet following the Business Combination. The loss of key personnel or the hiring of ineffective personnel after the Business Combination could negatively impact the operations and profitability of New Owlet.***

Our ability to successfully effect the Business Combination and be successful thereafter will be dependent upon the efforts of our key personnel. Although some of Sandbridge's key personnel may remain with New Owlet in advisory positions following the Business Combination, we expect Owlet's current management to remain in place. We cannot assure you that we will be successful in integrating and retaining such key personnel, or in identifying and recruiting additional key individuals we determine may be necessary following the Business Combination.

***New Owlet's actual financial position and results of operations may differ materially from the unaudited pro forma financial information included in this proxy statement/prospectus.***

The unaudited pro forma condensed combined financial information included in this proxy statement/prospectus is presented for illustrative purposes only and is not necessarily indicative of what New Owlet's actual financial position or results of operations would have been had the Business Combination been completed on the dates indicated. Accordingly, such pro forma financial information may not be indicative of New Owlet's future operating or financial performance and New Owlet's actual financial condition and results of operations may vary materially from our pro forma results of operations and balance sheet contained elsewhere in this proxy statement/prospectus, including as a result of such assumptions not being accurate. Additionally, the final acquisition accounting adjustments could differ materially from the unaudited transaction accounting adjustments presented in this proxy statement/prospectus. Any increase or decrease in the fair value of the assets acquired and liabilities assumed, as compared to the information shown herein, could also change the portion of

79

Exhibit 7
Page 698

the purchase consideration allocable to goodwill and could impact the operating results of New Owlet following the Business Combination due to differences in the allocation of the purchase consideration, depreciation and amortization related to some of these assets and liabilities. See "*Unaudited Pro Forma Condensed Combined Financial Information*" for more information.

***There can be no assurance that the New Owlet Class A common stock issued in connection with the Business Combination will be approved for listing on the NYSE, or that we will be able to comply with the continued listing standards of the NYSE.***

New Owlet Class A common stock and warrants are expected to be listed on the NYSE following the Business Combination. New Owlet's continued eligibility for listing may depend on the number of our shares that are redeemed. If, after the Business Combination, the NYSE delists New Owlet Class A common stock from trading on its exchange for failure to meet the listing standards, we and our stockholders could face significant material adverse consequences including:

- a limited availability of market quotations for our securities;

- a determination that New Owlet Class A common stock is a "penny stock," which will require brokers trading in New Owlet Class A common stock to adhere to more stringent rules, possibly resulting in a reduced level of trading activity in the secondary trading market for New Owlet common stock;

- a limited amount of analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

***If third parties bring claims against us, the proceeds held in the Trust Account could be reduced and the per share redemption amount received by stockholders may be less than $10.00 per share (which was the offering price in our initial public offering).***

Our placing of funds in the Trust Account may not protect those funds from third-party claims against us. Although we will seek to have all vendors, service providers (other than our independent registered public accounting firm), prospective target businesses and other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to any monies held in the Trust Account for the benefit of our public stockholders, such parties may not execute such agreements, or even if they execute such agreements they may not be prevented from bringing claims against the Trust Account, including, but not limited to, fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain an advantage with respect to a claim against our assets, including the funds held in the Trust Account. If any third party refuses to execute an agreement waiving such claims to the monies held in the Trust Account, our management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third party that has not executed a waiver if management believes that such third party's engagement would be significantly more beneficial to us than any alternative.

Examples of possible instances where we may engage a third party that refuses to execute a waiver include the engagement of a third party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver. In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with us and will not seek recourse against the Trust Account for any reason. Upon redemption of our public shares, if we are unable to complete the Business Combination within the prescribed time frame, or upon the exercise of a redemption right in connection with the Business Combination, we will be required to provide for payment of claims of creditors that were not waived that may be brought against us within the ten years following redemption. Accordingly, the per share redemption amount received by public stockholders could be less than the $10.00 per share initially held in the Trust Account, due to claims of such creditors. We have not independently verified whether the Sponsor has sufficient funds to satisfy its indemnity obligations to us and believe that the Sponsor's only assets are securities of Sandbridge and, therefore, the Sponsor may not be able to satisfy those obligations. We have not asked the Sponsor to reserve for such obligations. As a result, if any such claims were successfully made against the Trust Account, the funds available for the Business Combination and redemptions could be reduced to less than $10.00 per public share. In such

80

Exhibit 7
Page 699

event, we may not be able to complete the Business Combination, and you would receive such lesser amount per public share in connection with any redemption of your public shares. None of our officers or directors will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

***Our directors may decide not to enforce the indemnification obligations of our Sponsor, resulting in a reduction in the amount of funds in the Trust Account available for distribution to our public stockholders.***

Our Sponsor has agreed that it will be liable to us if and to the extent any claims by a third party for services rendered or products sold to us, or a prospective target business with which we have discussed entering into a transaction agreement, reduce the amount of funds in the Trust Account to below (i) $10.00 per public share and (ii) such lesser amount per public share held in the Trust Account as of the date of the liquidation of the Trust Account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay franchise and income taxes, except as to any claims by a third party who executed a waiver of any and all rights to seek access to the Trust Account and except as to any claims under our indemnity of the underwriters of our initial public offering against certain liabilities, including liabilities under the Securities Act. Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, our Sponsor will not be responsible to the extent of any liability for such third party claims. While we currently expect that our independent directors would take legal action on our behalf against the Sponsor to enforce its indemnification obligations to us, it is possible that our independent directors in exercising their business judgment and subject to their fiduciary duties may choose not to do so in certain instances. If our independent directors choose not to enforce these indemnification obligations, the amount of funds in the Trust Account available for distribution to our public stockholders may be reduced below $10.00 per share.

***If, before distributing the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the claims of creditors in such proceeding may have priority over the claims of our stockholders and the per share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.***

If, before distributing the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the proceeds held in the Trust Account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our stockholders. To the extent any bankruptcy claims deplete the Trust Account, the per share amount that would otherwise be received by our stockholders in connection with our liquidation would be reduced.

***If, after we distribute the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, a bankruptcy court may seek to recover such proceeds, and the members of the Sandbridge Board may be viewed as having breached their fiduciary duties to our creditors, thereby exposing members of the Sandbridge Board and us to claims of punitive damages.***

The Current Charter states that we must complete our initial business combination by September 17, 2022. If we have not completed an initial business combination by then (or such later date as our stockholders may approve in accordance with the Current Charter), we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than 10 business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account including interest earned on the funds held in the Trust Account and not previously released to us to pay our tax obligations (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. In such case, our public stockholders may only receive approximately $10.00 per share and our warrants will expire worthless.

If, after we distribute the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received

81

Exhibit 7
Page 700

by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover some or all amounts received by our stockholders. In addition, the Sandbridge Board may be viewed as having breached its fiduciary duty to our creditors and/or having acted in bad faith by paying public stockholders from the Trust Account prior to addressing the claims of creditors, thereby exposing itself and us to claims of punitive damages.

***Our stockholders may be held liable for claims by third parties against us to the extent of distributions received by them upon redemption of their shares.***

Our stockholders may be held liable for claims by third parties against us to the extent of distributions received by them upon redemption of their shares. Under the DGCL, stockholders may be held liable for claims by third parties against a corporation to the extent of distributions received by them in a dissolution. The pro rata portion of our Trust Account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our initial business combination within 24 months from the closing of our initial public offering may be considered a liquidating distribution under Delaware law. If a corporation complies with certain procedures set forth in Section 280 of the DGCL intended to ensure that it makes reasonable provision for all claims against it, including a 60-day notice period during which any third-party claims can be brought against the corporation, a 90-day period during which the corporation may reject any claims brought, and an additional 150-day waiting period before any liquidating distributions are made to stockholders, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would be barred after the third anniversary of the dissolution. However, it is our intention to redeem our public shares as soon as reasonably possible following the 24th month from the closing of our initial public offering in the event we do not complete our initial business combination and, therefore, we do not intend to comply with those procedures.

Because we do not intend to comply with Section 280, Section 281(b) of the DGCL requires us to adopt a plan, based on facts known to us at such time that will provide for our payment of all existing and pending claims or claims that may be potentially brought against us within the 10 years following our dissolution. However, because we are a blank check company, rather than an operating company, and our operations are limited to searching for prospective target businesses to acquire, the only likely claims to arise would be from our vendors (such as lawyers, investment bankers, consultants, etc.) or prospective target businesses. If our plan of distribution complies with Section 281(b) of the DGCL, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would likely be barred after the third anniversary of the dissolution.

We cannot assure you that we will properly assess all claims that may be potentially brought against us. As such, our stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of our stockholders may extend beyond the third anniversary of such date. Furthermore, if the pro rata portion of our Trust Account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our initial business combination within 24 months from the closing of our initial public offering is not considered a liquidating distribution under Delaware law and such redemption distribution is deemed to be unlawful, then pursuant to Section 174 of the DGCL, the statute of limitations for claims of creditors could then be six years after the unlawful redemption distribution, instead of three years, as in the case of a liquidating distribution.

***If our stockholders fail to comply with the redemption requirements specified in this proxy statement/prospectus, they will not be entitled to redeem their shares of Sandbridge Class A common stock for a pro rata portion of the Trust Account.***

Holders of public shares are not required to affirmatively vote against the Business Combination Proposal in order to exercise their rights to redeem their shares for a pro rata portion of the Trust Account. In order to exercise their redemption rights, they are required to submit a request in writing and deliver their stock (either physically or electronically) to the Transfer Agent by              , New York City time, on              , 2021. Stockholders electing to redeem their shares will receive their pro rata portion of the funds held in the Trust Account, including interest earned on the funds held in the Trust Account and not previously released to us to pay our franchise and income taxes, calculated as of two business days prior to the anticipated consummation of the Business Combination.

82

Exhibit 7
Page 701

***The ability of Sandbridge stockholders to exercise redemption rights with respect to a large number of shares could increase the probability that the Business Combination would be unsuccessful and that stockholders would have to wait for liquidation in order to redeem their stock.***

At the time we entered into the Business Combination Agreement and related agreements for the Business Combination, we did not know how many stockholders would exercise their redemption rights, and therefore we structured the Business Combination based on our expectations as to the number of shares that will be submitted for redemption. The Business Combination Agreement requires us to have at least $140 million of aggregate cash proceeds available for release to Sandbridge from the Trust Account in connection with the transactions contemplated by the Business Combination Agreement (after giving effect to any redemptions of public shares, if any, and Sandbridge Transaction Expenses). The above considerations may limit our ability to complete the Business Combination or optimize our capital structure.

***If you or a "group" of stockholders of which you are a part are deemed to hold in excess of 15% of the Sandbridge Class A common stock, you (or, if a member of such a group, all of the members of such group in the aggregate) will lose the ability to redeem all such shares in excess of 15% of Sandbridge Class A common stock.***

A public stockholder, together with any of his, her or its affiliates or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming its shares with respect to more than an aggregate of 15% of the Sandbridge Class A common stock, or the "Excess Shares," without Sandbridge's prior consent. However, the stockholders' ability to vote all of their shares (including Excess Shares) for or against the Business Combination will not be restricted. Your inability to redeem the Excess Shares will reduce your influence over Sandbridge's ability to consummate the Business Combination and you could suffer a material loss on your investment in Sandbridge if you sell such Excess Shares in open market transactions. Additionally, you will not receive redemption distributions with respect to such Excess Shares if Sandbridge consummates the Business Combination. As a result, you will continue to hold that number of shares exceeding 15% of the Class A common stock and, in order to dispose of such Excess Shares, would be required to sell your stock in open market transactions, potentially at a loss.

***Sandbridge may complete the Business Combination even if a substantial majority of Sandbridge's stockholders do not agree.***

Sandbridge may be able to complete the Business Combination even though a substantial majority of public stockholders do not agree with the transaction and have redeemed their shares or have entered into privately negotiated agreements to sell their shares to the Sponsor, officers, directors, advisors or any of their affiliates. Sandbridge will file or submit a Current Report on Form 8-K to disclose any material arrangements entered into or significant purchases made by any of the aforementioned persons that would affect the vote on the proposals to be put to the Special Meeting or the redemption threshold. Any such report will include descriptions of any arrangements entered into or significant purchases by any of the aforementioned persons. In the event the aggregate cash consideration we would be required to pay for all shares of Sandbridge common stock that are validly submitted for redemption plus any amount required to satisfy the Minimum Available Sandbridge Cash Amount pursuant to the terms of the Business Combination Agreement exceeds the aggregate amount of cash available to us, we will not complete the Business Combination or redeem any shares, all shares of common stock submitted for redemption will be returned to the holders thereof, and we instead may search for an alternate business combination.

***The Business Combination is subject to conditions, including certain conditions that may not be satisfied on a timely basis, if at all.***

The completion of the Business Combination is subject to a number of conditions. The completion of the Business Combination is subject to risks, including the risk that approval of the Business Combination by Sandbridge stockholders is not obtained or that there are not sufficient funds in the Trust Account, in each case subject to certain terms specified in the Business Combination Agreement (as described under "*The Business Combination Agreement – Conditions to Closing*"), or that other Closing conditions are not satisfied. If Sandbridge does not complete the Business Combination, Sandbridge could be subject to several risks, including:

• the parties may be liable for damages to one another under the terms and conditions of the Business Combination Agreement;

83

Exhibit 7
Page 702

TABLE OF CONTENTS

- negative reactions from the financial markets, including declines in the price of Sandbridge Class A common stock due to the fact that current prices may reflect a market assumption that the Business Combination will be completed; and

- the attention of our management will have been diverted to the Business Combination rather than the pursuit of other opportunities in respect of an initial business combination.

***The exercise of Sandbridge's directors' and executive officers' discretion in agreeing to changes or waivers in the terms of the Business Combination may result in a conflict of interest when determining whether such changes to the terms of the Business Combination or waivers of conditions are appropriate and in Sandbridge's stockholders' best interest.***

In the period leading up to the Closing of the Business Combination, events may occur that, pursuant to the Business Combination Agreement, would require Sandbridge to agree to amend the Business Combination Agreement, to consent to certain actions taken by Owlet or to waive rights that Sandbridge is entitled to under the Business Combination Agreement. Such events could arise because of changes in the course of Owlet's business, a request by Owlet to undertake actions that would otherwise be prohibited by the terms of the Business Combination Agreement or the occurrence of other events that would entitle Sandbridge to terminate the Business Combination Agreement. In any of such circumstances, it would be at Sandbridge's discretion, acting through the Sandbridge Board, to grant its consent or waive those rights. The existence of financial and personal interests of one or more of the directors or officers described in the preceding risk factors may result in a conflict of interest on the part of such director(s) or officer(s) between what he or they may believe is best for Sandbridge and its stockholders and what he or they may believe is best for himself or themselves in determining whether or not to take the requested action. For example, members of the Sandbridge Board hold founders shares, which were transferred to them by our Sponsor in August 2020 and which our Sponsor purchased for approximately $0.004 per share prior to our initial public offering. As of the date of this proxy statement/prospectus, Sandbridge does not believe there will be any changes or waivers that Sandbridge's directors and executive officers would be likely to make after stockholder approval of the Business Combination Proposal has been obtained. While certain changes could be made without further stockholder approval, Sandbridge will circulate a new or amended proxy statement/prospectus and resolicit Sandbridge's stockholders if changes to the terms of the transaction that would have a material impact on its stockholders are required prior to the vote on the Business Combination Proposal.

***Sandbridge may waive one or more of the conditions to the consummation of the Transactions without stockholder approval.***

Sandbridge may determine to waive, in whole or in part, one or more of the conditions to its obligation to consummate the Transactions, to the extent permitted by applicable law. If Sandbridge waives the satisfaction of a material condition to the consummation of the Transactions, Sandbridge will evaluate the appropriate facts and circumstances at that time and re-solicit stockholder approvals of the Business Combination Proposal if required to do so by applicable law or the rules of the NYSE. In some cases, if the Sandbridge Board determines that such waiver or its effect on Sandbridge's stockholders does not rise to the level of materiality that would require re-solicitation of proxies pursuant to applicable law or the rules of the NYSE, the consequence of such waiver would be that Sandbridge would complete the Transactions without seeking further stockholder approval.

For example, it is a condition to Sandbridge's obligations to close the Business Combination that Owlet will have performed and complied in all material respects with the covenants and agreements required to be performed or complied with by Owlet under the Business Combination Agreement. However, if the Sandbridge Board determines that a given breach by Owlet of this obligation does not rise to the level of materiality that would require re-solicitation of proxies, then the Sandbridge Board may elect to waive that condition and close the Business Combination. Any determination to waive any condition to its obligations to consummate the Transactions or as to re-soliciting Sandbridge stockholder approval or amending the proxy statement/prospectus as a result of a waiver will be made by the Sandbridge Board at the time of such waiver based on the facts and circumstances as they exist at that time.

84

Exhibit 7
Page 703

TABLE OF CONTENTS

**INFORMATION ABOUT THE PARTIES TO THE BUSINESS COMBINATION**

**Sandbridge**

Sandbridge is a blank check company whose business purpose is to effect a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination. For more information regarding Sandbridge, see "*Other Information Related to Sandbridge.*"

**Merger Sub**

Merger Sub is a wholly-owned subsidiary of Sandbridge formed solely for the purpose of effecting the Business Combination. Merger Sub was incorporated under the DGCL on February 10, 2021. Merger Sub owns no material assets and does not operate any business.

**Owlet**

Owlet Baby Care Inc. designs and sells products and services based on a commitment to empower parents with technology and data to proactively monitor the health and wellness of their children from conception to kindergarten. Owlet's ecosystem of connected smart products, including its flagship Owlet Smart Sock, is helping to transform modern parenting by bringing simplified child monitoring solutions in-home so parents can rest easier. For more information regarding Owlet, see "*Information Related to Owlet.*"

85

Exhibit 7
Page 704

**THE SPECIAL MEETING**

**Overview**

This proxy statement/prospectus is being provided to Sandbridge stockholders as part of a solicitation of proxies by the Sandbridge Board for use at the Special Meeting to be convened on            , 2021 and at any adjournments or postponements of such meeting. This proxy statement/prospectus is being furnished to Sandbridge stockholders on or about            , 2021. In addition, this proxy statement/prospectus constitutes a prospectus for New Owlet in connection with the issuance by New Owlet of New Owlet common stock to be delivered to Owlet's stockholders in connection with the Business Combination.

**Date, Time and Place of the Special Meeting**

The Special Meeting will be held at            a.m., New York City time, on            , 2021. Stockholders may attend, vote and examine the list of Sandbridge stockholders entitled to vote at the Special Meeting by visiting www.virtualshareholdermeeting.com/SBG2021SM and entering the control number found on their proxy card, voting instruction form or notice they previously received. In light of public health concerns regarding the ongoing COVID-19 pandemic, the Special Meeting will be held in a virtual meeting format only. You will not be able to attend the Special Meeting physically. Sandbridge stockholders are encouraged to access the Special Meeting prior to the start time. If you encounter any difficulties accessing the Special Meeting or during the meeting time, please call the technical support number that will be posted on the Special Meeting login page.

**Proposals**

At the Special Meeting, Sandbridge stockholders will vote upon:

- the Business Combination Proposal;

- the Charter Amendment Proposal, including the Advisory Charter Amendment Proposals;

- the NYSE Proposal;

- the Incentive Award Plan Proposal;

- the ESPP Proposal; and

- the Adjournment Proposal.

**SANDBRIDGE'S BOARD OF DIRECTORS HAS UNANIMOUSLY DETERMINED THAT THE BUSINESS COMBINATION PROPOSAL AND THE OTHER PROPOSALS TO BE PRESENTED AT THE SPECIAL MEETING ARE IN THE BEST INTERESTS OF AND ADVISABLE TO THE SANDBRIDGE STOCKHOLDERS AND RECOMMENDS THAT YOU VOTE "FOR" EACH OF THE PROPOSALS DESCRIBED ABOVE.**

**Record Date; Outstanding Shares; Shares Entitled to Vote**

Sandbridge has fixed the close of business on            , 2021 as the "record date" for determining which Sandbridge stockholders are entitled to notice of and to attend and vote at the Special Meeting. As of the close of business on            , 2021, the record date for the Special Meeting, there were            shares of Sandbridge common stock outstanding and entitled to vote. Each share of Sandbridge common stock is entitled to one vote per share at the Special Meeting, of which 23,000,000 are shares of Sandbridge Class A common stock and 5,750,000 are shares of Sandbridge Class B common stock held by our Sponsor and the other initial stockholders.

**Quorum**

A quorum of Sandbridge stockholders is necessary to hold a valid meeting. A quorum will exist at the Special Meeting with respect to each matter to be considered at the Special Meeting if the holders of shares of outstanding Sandbridge common stock representing a majority of the voting power of all outstanding shares of capital stock of Sandbridge entitled to vote at the Special Meeting are present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting. All shares represented by proxy are counted as present for purposes of establishing a quorum. Abstentions and broker non-votes will count as present for the purposes of establishing a quorum.

86

Exhibit 7
Page 705

TABLE OF CONTENTS

**Vote Required and Sandbridge Board Recommendation**

*The Business Combination Proposal*

Sandbridge stockholders are being asked to consider and vote on a proposal to approve the Business Combination Agreement and thereby approve the Business Combination. You should carefully read this proxy statement/prospectus in its entirety for more detailed information concerning the Business Combination. In particular, your attention is directed to the full text of the Business Combination Agreement, which is attached as Annex A to this proxy statement/prospectus.

Approval of the Business Combination Proposal requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. The Business Combination cannot be completed unless the Business Combination Proposal is approved. Stockholders of Sandbridge Class A common stock and stockholders of Sandbridge Class B common stock will vote together as a single class on all matters submitted to a vote of our stockholders, except with respect to the Charter Amendment Proposal and as required by law. The failure to vote, and broker non-votes have no effect on the outcome of the proposal. Abstentions will be treated as votes against this proposal.

**SANDBRIDGE'S BOARD OF DIRECTORS RECOMMENDS THAT YOU VOTE "<u>FOR</u>" THE BUSINESS COMBINATION PROPOSAL.**

*The Charter Amendment Proposal*

Approval of the Charter Amendment Proposal requires the affirmative vote of the holders of (i) at least a majority of the outstanding shares of Sandbridge Class B common stock, voting separately as a single class, and (ii) a majority of the outstanding shares of Sandbridge common stock entitled to vote thereon, voting together as a single class.

**SANDBRIDGE'S BOARD OF DIRECTORS RECOMMENDS THAT YOU VOTE "<u>FOR</u>" THE CHARTER AMENDMENT PROPOSAL.**

*The Advisory Charter Amendment Proposals*

Approval of each of the Advisory Charter Amendment Proposals, each of which is a non-binding advisory vote, requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. Abstentions and broker non-votes have no effect on the outcome of the proposal.

**SANDBRIDGE'S BOARD OF DIRECTORS RECOMMENDS THAT YOU VOTE "<u>FOR</u>" THE ADVISORY CHARTER AMENDMENT PROPOSALS.**

*The NYSE Proposal*

Approval of the NYSE Proposal requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. The failure to vote and broker non-votes have no effect on the outcome of the proposal but, for purposes of NYSE rules, abstentions will have the same effect as votes against this proposal.

**SANDBRIDGE'S BOARD OF DIRECTORS RECOMMENDS THAT YOU VOTE "<u>FOR</u>" THE NYSE PROPOSAL.**

*The Incentive Award Plan Proposal*

Approval of the Incentive Award Plan Proposal requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. The failure to vote and broker non-votes have no effect on the outcome of the proposal but, for purposes of NYSE rules, abstentions will have the same effect as votes against this proposal.

87

Exhibit 7
Page 706

TABLE OF CONTENTS

**SANDBRIDGE'S BOARD OF DIRECTORS RECOMMENDS THAT YOU VOTE "FOR" THE INCENTIVE AWARD PLAN PROPOSAL.**

*The ESPP Proposal*

Approval of the ESPP Proposal requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. The failure to vote and broker non-votes have no effect on the outcome of the proposal but, for purposes of NYSE rules, abstentions will have the same effect as votes against this proposal.

**SANDBRIDGE'S BOARD OF DIRECTORS RECOMMENDS THAT YOU VOTE "FOR" THE ESPP PROPOSAL.**

*The Adjournment Proposal*

If the chairman of the Special Meeting does not adjourn the Special Meeting, Sandbridge stockholders may be asked to vote on a proposal to adjourn the Special Meeting, or any postponement thereof, to another time or place if necessary or appropriate (i) due to the absence of a quorum at the Special Meeting, (ii) to prevent a violation of applicable law, (iii) to provide to Sandbridge stockholders any supplement or amendment to this proxy statement/prospectus and/or (iv) to solicit additional proxies if Sandbridge reasonably determines that it is advisable or necessary to do so in order to obtain Sandbridge stockholder approval of the Business Combination Agreement and approval of the Business Combination.

Approval of the Adjournment Proposal requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon regardless of whether a quorum is present. The failure to vote, abstentions and broker non-votes have no effect on the outcome of the proposal.

**SANDBRIDGE'S BOARD OF DIRECTORS RECOMMENDS THAT YOU VOTE "FOR" THE ADJOURNMENT PROPOSAL.**

**Voting Your Shares**

Sandbridge stockholders may vote electronically at the Special Meeting by visiting www.virtualshareholdermeeting.com/SBG2021SM or by proxy. To participate in the Special Meeting, you will need the 16-digit control number included on your proxy card or instructions that accompanied your proxy materials, if applicable, or to obtain a proxy form from your broker, bank or other nominee. The Special Meeting webcast will begin promptly at          a.m., New York City time. Sandbridge stockholders are encouraged to access the Special Meeting prior to the start time. Online check-in will begin at          a.m., New York City time, and Sandbridge stockholders should allow ample time for the check-in procedures. If you encounter any difficulties accessing the virtual meeting or during the meeting time, please call the technical support number that will be posted on the virtual meeting login page. Sandbridge recommends that you submit your proxy even if you plan to attend the Special Meeting. If you vote by proxy, you may change your vote by submitting a later dated proxy before the deadline or by voting electronically at the Special Meeting.

If your shares of Sandbridge common stock are owned directly in your name with the Transfer Agent, Continental Stock Transfer & Trust Company, you are considered, with respect to those shares, the "stockholder of record." If your shares are held in a stock brokerage account or by a bank or other nominee or intermediary, you are considered the beneficial owner of shares held in "street name" and are considered a "non-record (beneficial) stockholder."

If you are a Sandbridge stockholder of record you may use the enclosed proxy card to tell the persons named as proxies how to vote your shares. If you properly complete, sign and date your proxy card, your shares will be voted in accordance with your instructions. In addition, you may also submit your proxy before the Special Meeting by visiting http://www.proxyvote.com, 24 hours a day, seven days a week, until          p.m. New York City time on          , 2021 (have your proxy card in hand when you visit the website) or by calling toll-free (within the U.S. or Canada) 1-800-690-6903 until 11:59 p.m. New York City time on          , 2021 (have your proxy card in hand when you call). The named proxies will vote all shares at the meeting for which

88

Exhibit 7
Page 707

proxies have been properly submitted and not revoked. If you sign and return your proxy card but do not mark your card to tell the proxies how to vote, your shares will be voted "**FOR**" the proposals to adopt the Business Combination Agreement and the other proposals presented at the Special Meeting.

Your shares will be counted for purposes of determining a quorum if you vote:

• by submitting a properly executed proxy card or voting instruction form by mail, by Internet or by phone; or

• electronically at the Special Meeting.

Abstentions will be counted for determining whether a quorum is present for the Special Meeting.

Voting instructions are printed on the proxy card or voting information form you received. Either method of submitting a proxy will enable your shares to be represented and voted at the Special Meeting.

**Voting Shares Held in Street Name**

If your shares of Sandbridge common stock are held in an account through a broker, bank or other nominee or intermediary, you must instruct the broker, bank or other nominee how to vote your shares by following the instructions that the broker, bank or other nominee provides you along with this proxy statement/prospectus. Your broker, bank or other nominee may have an earlier deadline by which you must provide instructions to it as to how to vote your Sandbridge common stock, so you should read carefully the materials provided to you by your broker, bank or other nominee or intermediary.

If you do not provide voting instructions to your bank, broker or other nominee or intermediary, your shares will not be voted on any proposal on which your bank, broker or other nominee does not have discretionary authority to vote. In these cases, the bank, broker or other nominee or intermediary will not be able to vote your shares on those matters for which specific authorization is required. Brokers do not generally have discretionary authority to vote on any of the proposals.

Broker non-votes are shares held by a broker, bank or other nominee or intermediary that are present or represented by proxy at the Special Meeting, but with respect to which the broker, bank or other nominee or intermediary is not instructed by the beneficial owner of such shares how to vote on a particular proposal and the broker does not generally have voting power on such proposal. Because brokers, banks and other nominees or intermediaries do not generally have discretionary voting with respect to any of the proposals, if a beneficial owner of Sandbridge common stock held in "street name" does not give voting instructions to the broker, bank or other nominee for any proposal, then those shares will not be present or represented by proxy at the Special Meeting.

Alternatively, you may vote by telephone or over the Internet as instructed by your broker, bank or other nominee. "Street name" stockholders who wish to vote at the Special Meeting will need the 16-digit control number included on the instructions that accompanied your proxy materials, if applicable, or to obtain a proxy form from your broker, bank or other nominee.

**Revoking Your Proxy**

If you are a Sandbridge stockholder of record, you may revoke your proxy at any time before it is voted at the Special Meeting by:

• timely delivering a written revocation letter to the Corporate Secretary of Sandbridge;

• signing and returning by mail a proxy card with a later date so that it is received prior to the Special Meeting; or

• attending the Special Meeting and voting electronically by visiting the website established for that purpose at www.virtualshareholdermeeting.com/SBG2021SM and entering the control number found on your proxy card, voting instruction form or notice you previously received. Attendance at the Special Meeting will not, in and of itself, revoke a proxy.

If you are a non-record (beneficial) Sandbridge stockholder, you should follow the instructions of your bank, broker or other nominee regarding the revocation of proxies.

Exhibit 7
Page 708

TABLE OF CONTENTS

**Stock Ownership and Voting by Sandbridge's Officers and Directors**

As of        , 2021, the record date for the Special Meeting, the Sandbridge directors and officers and their affiliates had the right to vote approximately          shares of Sandbridge common stock, representing approximately      % of the shares of Sandbridge common stock then outstanding and entitled to vote at the meeting. Sandbridge's initial stockholders (consisting of the Sponsor, Domenico De Sole, Ramez Toubassy, and Michael Goss) and our other directors and officers at the time of our initial public offering have entered into a letter agreement with us to vote "**FOR**" the approval of the Business Combination Proposal, "**FOR**" the approval of the Charter Amendment Proposal, including the Advisory Charter Amendment Proposals, "**FOR**" the approval of the NYSE Proposal, "**FOR**" the approval of the Incentive Award Plan Proposal, "**FOR**" the approval of the ESPP Proposal and "**FOR**" the approval of the Adjournment Proposal, in accordance with the recommendation of the Sandbridge Board.

**Redemption Rights**

Public stockholders may seek to redeem the public shares that they hold, regardless of whether they vote for or against the proposed Business Combination or do not vote at the Special Meeting. Any public stockholder may request redemption of their public shares for a per share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, calculated as of two business days prior to the consummation of the Business Combination, including interest earned on the funds held in the Trust Account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares. If a holder properly seeks redemption as described in this section and the Business Combination is consummated, the holder will no longer own these shares following the Business Combination.

Notwithstanding the foregoing, a public stockholder, together with any affiliate of such holder or any other person with whom such holder is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Exchange Act) will be restricted from seeking redemption rights with respect to 15% or more of the shares of the public shares. Accordingly, if a public stockholder, alone or acting in concert or as a group, seeks to redeem more than 15% of the public shares, then any such shares in excess of that 15% limit would not be redeemed for cash.

Sandbridge's initial stockholders will not have redemption rights with respect to any shares of Sandbridge common stock owned by them, directly or indirectly.

You will be entitled to receive cash for any public shares to be redeemed only if you:

- (a) hold public shares or (b) hold public shares through units and you elect to separate your units into the underlying public shares and public warrants prior to exercising your redemption rights with respect to the public shares; and

- prior to          , New York City time, on         , 2021, (a) submit a written request, including the legal name, telephone number and address of the beneficial owner of the shares for which redemption is requested, to the Transfer Agent that Sandbridge redeem your public shares for cash and (b) deliver your public shares to the Transfer Agent, physically or electronically through the DTC.

If you hold the shares in street name, you will have to coordinate with your broker to have your shares certificated or delivered electronically. Public shares that have not been tendered (either physically or electronically) in accordance with these procedures will not be redeemed for cash. There is a nominal cost associated with this tendering process and the act of certificating the shares or delivering them through the DWAC system. The Transfer Agent will typically charge the tendering broker $80 and it would be up to the broker whether or not to pass this cost on to the redeeming public stockholder. In the event the proposed Business Combination is not consummated, this may result in an additional cost to stockholders for the return of their public shares.

Holders of units must elect to separate the underlying public shares and public warrants prior to exercising redemption rights with respect to the public shares. If holders hold their units in an account at a brokerage firm or bank, holders must directly notify their broker or bank that they elect to separate the units into the underlying public shares and public warrants, or if a holder holds units registered in its own name, the holder must contact the Transfer Agent, and instruct them to do so.

90

Exhibit 7
Page 709

TABLE OF CONTENTS

Any request to redeem public shares, once made, may be withdrawn at any time until the deadline for submitting redemption requests and thereafter, with Sandbridge's consent, until the Closing. Furthermore, if a holder of a public share delivers its certificate in connection with an election of its redemption and subsequently decides prior to the deadline for submitting redemption requests not to elect to exercise such rights, it may simply request that Sandbridge instruct the Transfer Agent to return the certificate (physically or electronically). The holder can make such request by contacting the Transfer Agent, at the address or email address listed in this proxy statement/prospectus.

If the Business Combination is not approved or completed for any reason, then public stockholders who elected to exercise their redemption rights will not be entitled to redeem their shares. In such case, Sandbridge will promptly return any public shares previously delivered by public holders.

For illustrative purposes, the cash held in the Trust Account on December 31, 2020 was $230.0 million, or approximately $10 per public share. Prior to exercising redemption rights, public stockholders should verify the market price of shares of Sandbridge Class A common stock as they may receive higher proceeds from the sale of their Sandbridge Class A common stock in the public market than from exercising their redemption rights if the market price per share is higher than the redemption price. Sandbridge cannot assure its stockholders that they will be able to sell their Sandbridge Class A common stock in the open market, even if the market price per share is higher than the redemption price stated above, as there may not be sufficient liquidity in its securities when its stockholders wish to sell their shares.

If a public stockholder exercises its redemption rights, then it will be exchanging its redeemed public shares for cash and will no longer own those public shares. You will be entitled to receive cash for your public shares only if you properly exercise your right to redeem your public shares and deliver your shares of Sandbridge common stock (either physically or electronically) to the Transfer Agent, in each case prior to          , New York City time, on          , 2021, the deadline for submitting redemption requests, and the Business Combination is consummated.

Immediately following the Closing, New Owlet will pay public stockholders who properly exercised their redemption rights in respect of their public shares.

### Appraisal Rights

Neither Sandbridge stockholders nor Sandbridge warrant holders have appraisal rights in connection with the Business Combination under the DGCL.

### Potential Purchases of Shares and/or Public Warrants

At any time prior to the Special Meeting, during a period when they are not then aware of any material nonpublic information regarding Sandbridge or its securities, the initial stockholders, Owlet and/or its affiliates may purchase shares and/or warrants from investors, or they may enter into transactions with such investors and others to provide them with incentives to acquire public shares, vote their public shares in favor of the Business Combination Proposal or not redeem their public shares. The purpose of any such transaction could be to (i) vote such shares in favor of the Business Combination and thereby increase the likelihood of obtaining stockholder approval of the Business Combination or (ii) increase the likelihood that the Aggregate Transaction Proceeds Condition is satisfied. Any such stock purchases and other transactions may thereby increase the likelihood of obtaining stockholder approval of the Business Combination. This may result in the completion of the Business Combination in a way that may not otherwise have been possible. While the exact nature of any such incentives has not been determined as of the date of this proxy statement/prospectus, they might include, without limitation, arrangements to protect such investors or holders against potential loss in value of their shares, including the granting of put options and the transfer to such investors or holders of shares or rights owned by Sandbridge's initial stockholders for nominal value.

### Costs of Solicitation

Sandbridge will bear the cost of soliciting proxies from Sandbridge stockholders.

Sandbridge will solicit proxies by mail. In addition, the directors, officers and employees of Sandbridge may solicit proxies from Sandbridge stockholders by telephone, electronic communication, or in person, but will not receive any additional compensation for their services. Sandbridge will make arrangements with brokerage

91

Exhibit 7
Page 710

houses and other custodians, nominees, and fiduciaries representing beneficial owners of shares of Sandbridge common stock for their expenses in forwarding proxy solicitation materials to the beneficial owners of shares of Sandbridge common stock held of record by those persons and will reimburse them for their reasonable out-of-pocket expenses incurred in forwarding such proxy solicitation materials.

Sandbridge has engaged a professional proxy solicitation firm, Okapi, to assist in soliciting proxies for the Special Meeting. Sandbridge has agreed to pay Okapi a fee for such services, which it expects will be approximately $20,000. In addition, Sandbridge will reimburse Okapi for reasonable out-of-pocket expenses and will indemnify Okapi and its affiliates against certain claims, liabilities, losses, damages and expenses.

**Other Business**

Sandbridge is not aware of any other business to be acted upon at the Special Meeting. If, however, other matters are properly brought before the Special Meeting, the proxies will have discretion to vote or act on those matters according to their best judgment and they intend to vote the shares as the Sandbridge Board may recommend.

**Attendance**

Only Sandbridge stockholders on the record date or persons holding a written proxy for any stockholder or account of Sandbridge as of the record date may attend the Special Meeting. The Special Meeting will be held in a virtual meeting format only at www.virtualshareholdermeeting.com/SBG2021SM. You will not be able to attend the Special Meeting physically. To participate in the Special Meeting, you will need the 16-digit control number included on your proxy card or instructions that accompanied your proxy materials, if applicable, or to obtain a proxy form from your broker, bank or other nominee. The Special Meeting webcast will begin promptly at          a.m., New York City time. Sandbridge stockholders are encouraged to access the Special Meeting prior to the start time. Online check-in will begin at          a.m., New York City time, and Sandbridge stockholders should allow ample time for the check-in procedures. If you encounter any difficulties accessing the virtual meeting or during the meeting time, please call the technical support number that will be posted on the virtual meeting login page.

**Assistance**

If you need assistance in completing your proxy card or have questions regarding the Special Meeting, please contact Okapi, the proxy solicitation agent for Sandbridge, by calling toll-free at (844) 343-2623. Banks and brokers can call collect at (212) 297-0720, or by emailing info@okapipartners.com.

92

Exhibit 7
Page 711

**TABLE OF CONTENTS**

### THE BUSINESS COMBINATION PROPOSAL

The Sandbridge stockholders are being asked to approve the Business Combination Agreement and the transactions contemplated thereby, including the Business Combination. All Sandbridge stockholders should read carefully this proxy statement/prospectus in its entirety for more detailed information concerning the Business Combination Agreement, which is attached as Annex A to this proxy statement/prospectus. You are urged to read carefully the Business Combination Agreement in its entirety before voting on this proposal.

Sandbridge may consummate the Business Combination only if all of the Required Transaction Proposals are approved by the Sandbridge stockholders present in person or represented by proxy at the Special Meeting and entitled to vote thereon.

### Structure of the Business Combination

Pursuant to the Business Combination Agreement, Merger Sub will merge with and into Owlet, with Owlet surviving the Merger. Upon consummation of the foregoing transactions, Owlet will be the wholly-owned subsidiary of Sandbridge, which will be known as Owlet, Inc. and referred to herein as New Owlet. In addition, New Owlet will amend and restate the Current Charter to be the Proposed Charter, as described in the section of this proxy statement/prospectus titled "*Description of New Owlet Securities.*"

### Consideration to the Owlet Stockholders

As a consequence of the Merger, at the Effective Time, (i) each share of Owlet capital stock (as defined herein) that is issued and outstanding immediately prior to the Effective Time will become the right to receive the number of shares of New Owlet common stock equal to the Exchange Ratio; (ii) each option to purchase shares of Owlet common stock, whether vested or unvested, that is not a Cash Elected Option and is outstanding and unexercised as of immediately prior to the Effective Time will be assumed by New Owlet and will automatically become an option (vested or unvested, as applicable) to purchase a number of shares of New Owlet common stock equal to the number of shares of Owlet common stock subject to such option immediately prior to the Effective Time multiplied by the Exchange Ratio, rounded down to the nearest whole share, at an exercise price per share equal to the exercise price per share of such option immediately prior to the Effective Time divided by the Exchange Ratio, rounded up to the nearest whole cent; (iii) subject to certain limitations, each Cash Elected Option that is issued and outstanding immediately prior to the Effective Time shall be cancelled and converted into the right to receive the Cash Election Consideration; and (iv) each share of Owlet common stock that is subject to a risk of forfeiture or right of repurchase at the original purchase price as of immediately prior to the Effective Time shall be subject to the same risk of forfeiture or right of repurchase (proportionately adjusted to reflect the Exchange Ratio) which risk of forfeiture or right of repurchase shall lapse in accordance with the same vesting schedule as that of the Owlet Restricted Stock.

### The PIPE Financing

In connection with the execution of the Business Combination Agreement, Sandbridge entered into Subscription Agreements with the PIPE Investors, pursuant to which, among other things, Sandbridge agreed to issue and sell in private placements an aggregate of 13,000,000 shares of Sandbridge Class A common stock to the PIPE Investors for $10.00 per share immediately prior to the Closing.

### Background of the Business Combination

The terms of the Business Combination are the result of negotiations between the representatives of Sandbridge and Owlet. The following is a brief description of the background of these negotiations and the resulting Business Combination.

Sandbridge is a blank check company incorporated in Delaware on June 23, 2020 and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. Our intention was to utilize our management team's global network of relationships with brand operators and owners to identify and execute an initial business combination.

On June 26, 2020, prior to the consummation of our initial public offering, our Sponsor purchased 5,750,000 founder shares of our Class B common stock for an aggregate purchase price of $25,000, or

93

Exhibit 7
Page 712

approximately $0.004 per share. In August 2020, our Sponsor transferred 40,000 founder shares to Mr. De Sole, 25,000 founder shares to Mr. Toubassy, and 30,000 founder shares to Mr. Hilfiger and in October 2020, transferred 40,000 founder shares to Mr. Goss, for a total of 135,000 founder shares.

On September 17, 2020, we consummated our initial public offering of 23,000,000 units, with each unit consisting of one share of Class A common stock and one-half (1/2) of one warrant. The units were sold at an offering price of $10.00 per unit, generating total gross proceeds of $230,000,000. In connection with the consummation of our initial public offering, including the underwriters' elections to exercise their over-allotment option in relation thereto, we consummated private sales of an aggregate of 6,600,000 private placement warrants to our Sponsor, each exercisable to purchase one share of Sandbridge Class A common stock at an exercise price of $11.50 per share, at a price of $1.00 per warrant, generating gross proceeds of approximately $6,600,000.

Prior to the consummation of our initial public offering, neither Sandbridge nor anyone on its behalf engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with Sandbridge.

After our initial public offering, our directors and officers, at the direction of the board of directors, commenced an active search for prospective businesses or assets to acquire in our initial business combination.

In evaluating potential businesses and assets to acquire, Sandbridge, together with its advisory partner Citigroup, generally surveyed the landscape of potential acquisition opportunities based on its knowledge of, and familiarity with, the M&A marketplace. In the prospectus for our initial public offering, we identified general criteria and guidelines we believed would be important in evaluating a prospective target, including, businesses that we believe (i) have a thematically aligned modern business model, (ii) are a beneficiary of accelerated digital and omni-channel transformation, (iii) have an importantly differentiated offering, (iv) have a strong enduring brand positioned for growth, (v) have a solid leadership team that can benefit from our team's knowledge of the consumer sector and proven track record of operational expertise, and (vi) offer an attractive risk/reward return opportunity for our stockholders.

Representatives of Sandbridge were contacted by, and representatives of Sandbridge contacted, numerous individuals, financial advisors and other entities who offered to present ideas for business combination opportunities. Sandbridge was contacted by a variety of sources, including over 10 investment banks in addition to direct contacts with founders of businesses focused on consumer end-markets, tech-enabled consumer platforms, luxury brands, and direct-to-consumer platforms, among many others.

Sandbridge considered businesses that it believed demonstrated both current robust financial performance as well as the opportunity for significant long-term growth with a distinct competitive advantage within a large addressable market. In the process that led to identifying Owlet as an attractive investment opportunity, Sandbridge's management team reviewed over 250 potential target businesses, evaluated over 50 potential business combination targets, and made contact with representatives of over 20 such potential combination targets to discuss the potential for a business combination transaction. Sandbridge entered into eight nondisclosure agreements and, for those potential business combination targets, Sandbridge performed financial and industry due diligence and held meetings with the management teams as the potential targets. Sandbridge delivered initial drafts of letters of intent to four companies, including Owlet. Sandbridge ultimately determined to not proceed with its other potential acquisition opportunities because Sandbridge concluded either that the target business or the terms of a potential business combination would not be suitable for Sandbridge.

The following is a brief description of the background of the negotiations between Sandbridge and Owlet and summarizes the key meetings and events that led to the signing of the Business Combination Agreement. The following chronology does not purport to catalogue every conversation among the parties to the Business Combination Agreement or their representatives.

On October 20, 2020, a teleconference was held between Ken Suslow, Sandbridge's Chief Executive Officer and Lior Susan, a director of Owlet and founding partner of Eclipse, which manages an investment fund that is an investor in Owlet, to discuss the prospect of a business combination with Sandbridge. During the meeting, Mr. Susan provided Sandbridge non-confidential information regarding Owlet's business and operations.

After the meeting on October 20, 2020, Sandbridge and Owlet exchanged multiple emails during which they discussed the next steps toward a potential transaction and the ability for Sandbridge to begin a preliminary diligence review of confidential Owlet materials.

94

Exhibit 7
Page 713

TABLE OF CONTENTS

On October 25, 2020, Sandbridge and Owlet executed a Mutual Nondisclosure Agreement.

On October 27, 2020, Mr. Suslow and Mr. Susan met in person, with Richard Henry, Sandbridge's Chief Financial Officer, Domenico De Sole, an independent director of Sandbridge, and Michael Abbott, Owlet's President, joining virtually. Mr. Abbott shared an overview of Owlet and its performance, and the parties discussed initial diligence questions. During the meeting, Sandbridge highlighted the benefit of partnering with a global consumer platform like Sandbridge to provide access to its global network to strengthen Owlet's brand capabilities and growth potential. Owlet and Sandbridge discussed the benefits of combining Owlet's technology innovation with Sandbridge's global brand expertise, and how this partnership provided a strategically more compelling long-term proposition for Owlet as compared to a typical initial public offering.

On October 27, 2020, after the meeting, Sandbridge and Owlet exchanged multiple emails discussing next steps and decided that the next step would be for Sandbridge to submit a letter of intent ("LOI") so that the Owlet board could consider a business combination with Sandbridge, and that the Company would provide Sandbridge with more detailed due diligence.

On October 28, 2020, Sandbridge submitted a draft, non-binding letter of intent to the Owlet team. This initial draft of the LOI included that the initial enterprise valuation with respect to the Owlet business was $1.21 billion (assuming approximately $210 million of net proceeds from Sandbridge's trust account), consistent with Sandbridge management's evaluation of the business. The LOI stated that all terms were subject to ongoing due diligence by the parties and contemplated proposed lock-up terms, corporate governance terms and transaction consideration.

On October 29, 2020, the Sandbridge Board considered its top business combination targets, including Owlet, at its quarterly board meeting. After discussion, the Board was supportive of pursuit of the Owlet opportunity and believed that Owlet demonstrated a combination of high growth and profitability potential within a large addressable market that made Owlet a strong potential target and warranted further discussions and dialogue. On the same day, Mr. Suslow and Mr. Susan held a teleconference to negotiate various terms of the LOI and to discuss the company valuation and market positioning strategy. Sandbridge provided an illustrative valuation model to Owlet.

On October 31, 2020, Mr. Susan contacted Mr. Suslow to discuss the additional value that Sandbridge believed it and its team could bring to the transaction in the international space. Owlet indicated that it would provide Sandbridge with a counterproposal to the proposal set forth in the Sandbridge LOI.

On November 1, 2020, the Owlet team provided Mr. Suslow and Mr. Henry with a proposed revised LOI. Among the topics proposed to be changed from the Sandbridge proposal were the minimum cash closing condition, the lock-up terms and the terms of exclusivity. The term sheet also included provisions for a portion of the founder shares held by the Sponsor to be subject to an earnout.

From November 1, 2020 through November 3, 2020, representatives of Sandbridge and representatives of Owlet traded multiple revised drafts of the LOI and negotiated several points, including (i) consideration holdbacks and indemnity for breaches of representations, warranties, and covenants, (ii) the amount of the minimum cash closing condition, (iii) the inclusion of a sponsor earn-out to better align shareholder interests, (iv) the lock-up for both the Sponsor and the existing Owlet stockholders to further align shareholder interests, and (v) the length of the exclusivity period and carve-outs to the exclusivity provisions.

Sandbridge and Owlet entered into a LOI on November 3, 2020. The LOI provided for an estimated fully diluted pro forma equity valuation of Owlet of $1.288 billion (determined by taking into account (i) approximately 78% of the transaction value as rollover equity, (ii) cash and cash equivalents held by Owlet, and (iii) pro forma cash and cash equivalents to the combined company in connection with the proposed transaction, including the application of up to $210 million of expected net proceeds from Sandbridge's trust account). The LOI provided for a minimum cash closing condition of $140 million, performance-based vesting of one-half of the founder shares held by the Sponsor, with 25% of the Sponsor's founder shares vesting upon achievement of a $12.50 stock price threshold and 25% of such shares vesting upon achievement of a $15.00 stock price threshold and an 18-month lockup of shares issued to Owlet stockholders as well as founder shares held by the Sponsor. The LOI also included exclusivity restrictions on Sandbridge and Owlet, prohibiting them from soliciting, initiating, knowingly encouraging or entering into any agreement with third parties in connection with an alternative transaction or business combination during the exclusivity period.

95

Exhibit 7
Page 714

TABLE OF CONTENTS

On November 7, 2020, Owlet granted data room access to Sandbridge; Ropes & Gray LLP ("Ropes"), counsel to Sandbridge; Citigroup Global Markets Inc. ("Citigroup"), capital markets advisor to Sandbridge; and KPMG LLP ("KPMG"), which had been engaged by Sandbridge to perform financial and tax due diligence review of Owlet and its business operations.

On November 12, 2020, a management meeting was held via teleconference, where members of management from Sandbridge and Owlet, and representatives of Ropes and Latham & Watkins LLP ("Latham"), counsel to Owlet attended. During this meeting, the members of Owlet's management team presented an investor presentation regarding Owlet and its business operations, including financial information, historic and projected revenues and profits, views on competitive positioning, market opportunity, product roadmap, and background on the Owlet management team, together with a general overview of the emerging telehealth opportunity. In addition, members of Owlet's management team responded to questions from Sandbridge.

Throughout November 2020 and December 2020, representatives from Sandbridge and its advisors at Citigroup, KPMG and Ropes continued to review documents provided in a virtual data room opened by Owlet. In addition, during this period, Ropes sent multiple due diligence request lists to Latham and Owlet.

On November 25, 2020, Ropes provided an initial draft of the Business Combination Agreement to Latham.

Latham provided a revised draft of the Business Combination Agreement to Ropes on December 8, 2020, along with initial drafts of the post-closing organizational documents, the Registration Rights Agreement and the Sponsor Letter Agreement. Throughout the remainder of December 2020, January 2021 and until February 15, 2021, Ropes and Latham exchanged a series of drafts of these and other documents governing the terms and conditions of the proposed business combination and held a series of telephone and video conferences to negotiate the terms of the proposed business combination.

On December 21, 2020, the Sandbridge Board met with Citigroup to discuss the proposed business combination with Owlet. The Board discussed and considered a variety of topics relating to Owlet, including market analysis, valuation and transaction terms.

In late December, Owlet and Sandbridge began to discuss with BofA Securities, Inc. ("BofA") and Citigroup a proposed $75 million private placement ("PIPE") to support incremental growth initiatives identified in the diligence process. Representatives of Sandbridge and the Company held several discussions regarding the size of the PIPE, the timing for the process of marketing the PIPE and which investors to approach. The amount of $75 million was initially selected as an appropriate size for the PIPE, to balance maximizing growth opportunities while minimizing dilution given the Company's capital efficiency.

On December 30, 2020, Mr. Suslow met with Mr. Susan to discuss the potential transaction, including valuation, the financial model, the PIPE process, management, process and timing.

On January 5, 2021, Ropes provided Latham with an initial draft of the PIPE Subscription Agreement, and Latham provided a revised draft on January 10, 2021. Paul Hastings LLP, counsel to Citigroup and BofA ("Paul Hastings"), provided comments to the Subscription Agreement on January 16, 2021. The parties agreed on the form of the Subscription Agreement on January 19, 2021, and on January 29, 2021, the form of Subscription Agreement was made available for review by potential PIPE Investors.

Throughout early January 2021, Sandbridge and Company representatives held several discussions regarding the revised forecast model, which was finalized for PIPE meetings on January 23, 2021.

On January 17, 2021, Sandbridge entered into a letter agreement with BofA and Citigroup, engaging them as placement agents for the PIPE.

On January 19, 2021, the Board convened to discuss the Owlet progress, including key diligence findings, timing and the PIPE process. The Board unanimously approved continuing to proceed with the PIPE process and the proposed business combination.

Beginning on January 22, 2021, representatives of Citigroup and BofA, on behalf of Sandbridge, began contacting a number of potential PIPE Investors, each of whom agreed to maintain the confidentiality of the information received pursuant to customary "wall-cross" confidentiality and non-use acknowledgements, to discuss Owlet, the proposed business combination and the potential PIPE Investment, and to determine such investors' potential interest in participating in the PIPE Investment.

Exhibit 7
Page 715

TABLE OF CONTENTS

From January 25, 2021 and until February 10, 2021, representatives of Sandbridge, Owlet, Citigroup and BofA participated in various virtual meetings with prospective participants in the PIPE Investment. During this period of time, Sandbridge and Owlet, together with BofA and Citigroup, collected indications of interest from PIPE investors, and Ropes and Latham negotiated the form of the Subscription Agreement with prospective PIPE Investors. On February 10, 2021, Mr. Suslow and Mr. Susan met with representatives from Citigroup and BofA to discuss considerations for increasing the size of the PIPE based on strong investor demand. On February 11, 2021, Mr. Suslow and Mr. Susan met and agreed it was in the company's best interest to increase the size of the PIPE to $130 million in light of the numerous opportunities for the company to deploy the incremental capital into growth initiatives. On February 15, 2020, the PIPE investors executed Subscription Agreements, subject to the execution of the business combination agreement. See "*Proposal No. 1—The Business Combination Proposal—Related Agreements—Subscription Agreements*" for additional information.

On February 12, 2021, the Sandbridge Board convened to consider the proposed transaction. After discussion, the Sandbridge independent directors and entire Board each unanimously resolved to approve the proposed business combination with Owlet and the PIPE on the terms and conditions set forth in the PIPE Subscription Agreements and the Business Combination Agreement. The Sandbridge Board determined that the Business Combination Agreement, the Business Combination and the transactions contemplated thereby, were advisable, fair to, and in the best interests of Sandbridge and its stockholders.

On February 15, 2021, the parties entered into the definitive Business Combination Agreement and Sandbridge entered into the Subscription Agreements for the PIPE Financing. On February 16, 2021, Sandbridge and Owlet issued a press release announcing the Business Combination.

**Sandbridge Board's Reasons for Approval of the Business Combination**

Sandbridge was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses. The Sandbridge Board sought to do this by utilizing the networks and industry experience of both the Sponsor and the Sandbridge Board and management to identify, acquire and operate one or more businesses. The members of the Sandbridge Board and management have significant transactional experience, particularly in the consumer sector.

In approving the combination, the Sandbridge Board decided not to obtain a fairness opinion. The officers and directors of Sandbridge have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and background, together with the experience of their representatives, enabled them to make the necessary analyses and determinations regarding the Business Combination.

The Sandbridge Board considered a number of reasons pertaining to the Business Combination as generally supporting its decision to enter into the Business Combination Agreement and the transactions contemplated thereby, including, but not limited to, the following: Owlet's strategic focus on building out its tech-enabled connected nursery ecosystem, its technology and data-driven competitive moat, its proprietary and highly differentiated suite of products and services, strong consumer trust and brand strength, its strong organic growth and financial performance, the experience of the management team, the prudent financial management of the business, and more generally the market opportunity across the digital health, consumer tech and high growth consumer markets. Importantly, the Sandbridge Board understood the significant partnership benefit from combining Sandbridge management's brand experience with Owlet's wellness capabilities. More specifically, the Sandbridge Board took into consideration the following reasons or made the following determinations, as applicable:

- *Owlet satisfies a number of acquisition criteria that Sandbridge had established to evaluate prospective business combination targets*. The Sandbridge Board determined that Owlet satisfies a number of the criteria and guidelines that Sandbridge established at its initial public offering, including its thematically aligned modern business model, its future differentiated product offerings and technology, its organic growth potential, its experienced management team, and the potential to benefit from Sandbridge's knowledge of the consumer sector and industry experience.

- *Reasonableness of Aggregate Consideration*. Following a review of the financial data provided to Sandbridge, including Owlet's historical financial statements and certain unaudited prospective financial

97

Exhibit 7
Page 716

information, as well as Sandbridge's due diligence review of the Owlet business, the Sandbridge Board considered the aggregate consideration to be paid and determined that the aggregate consideration was reasonable in light of such data and financial information.

- **Business and Financial Condition and Prospects**. After conducting due diligence, the Sandbridge Board and Sandbridge management had knowledge of, and were familiar with, Owlet's business, financial condition, results of operations and future growth prospects. The Sandbridge Board considered the results of the due diligence review of Owlet's business, including its plan for a comprehensive ecosystem of offerings related to baby care, its ability to enhance, extend and expand its platform, as well as the legal due diligence performed by Ropes & Gray LLP, the findings from the financial and tax due diligence performed by KPMG LLP and the financial due diligence and valuation analysis conducted by Sandbridge's management in collaboration with its advisors.

- **Post-Combination Board of Directors**. The Sandbridge Board considered the fact that the board of directors of New Owlet would be an independent board of directors (rather than one controlled by the former stockholders of Owlet).

- **Experienced, Proven and Committed Management Team**. The Sandbridge Board considered the fact that New Owlet will be led by the senior management team of Owlet, which has a proven track record of operational excellence, financial performance, growth and ongoing capabilities for innovation. The Sandbridge Board also believed that the willingness of Owlet's management team to both roll over their equity stake, as well as to agree to prohibitions on the transfer of those shares for 18 months following the consummation of the Transactions (subject to early release as to certain shares upon achievement of share price performance thresholds), reflected management's belief in and commitment to Owlet's continued growth following the consummation of the Transactions. For additional information, see "*Management of Owlet Following the Business Combination*."

- **Other Alternatives**. Sandbridge raised $230.0 million in September 2020 with the objective of consummating an attractive business combination. Since that time, as more fully described in "*Proposal No. 1—The Business Combination Proposal—Background of the Transactions*", Sandbridge has evaluated a number of businesses but has been most impressed by the Owlet business. The Sandbridge Board believed that, among available alternatives and based upon the Transaction's terms and the financial analysis, that the Transactions create the best available opportunity to maximize value for Sandbridge stockholders.

- **Terms of the Business Combination Agreement and the Related Agreements**. The Sandbridge Board considered the key terms and conditions of the Business Combination Agreement and the related agreements and the transactions contemplated thereby, including the business combination, each party's representations, warranties and covenants, the conditions to each party's obligation and the termination provisions as well as the strong commitment by both Owlet and Sandbridge to complete the Transactions.

- **Independent Director Role**. The Sandbridge Board is comprised of a majority of independent directors who are not affiliated with the Sponsor or its affiliates. In connection with the Transaction, Sandbridge's independent directors, Domenico De Sole, Ramez Toubassy and Mike Goss, considered the proposed terms of the Transactions and offered guidance to members of Sandbridge's management team as they negotiated the terms of the Transactions on Sandbridge's behalf. Each of Sandbridge's independent directors approved Sandbridge's entry into the Business Combination Agreement and the related agreements and the transactions contemplated thereby, including the Transactions. Ownership of founder shares by Mr. Toubassy, Mr. De Sole and Mr. Goss, our independent directors, may create a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate an initial business combination, and in determining the terms on which we are willing to consummate such a transaction.

The Sandbridge Board also considered a variety of uncertainties and risks and other potentially negative factors concerning the Business Combination, including, but not limited to, the following:

- **Macroeconomic Risks**. Macroeconomic uncertainty, including the potential impact of the COVID-19 pandemic, and the effects they could have on the combined company's financial performance.

98

Exhibit 7
Page 717

TABLE OF CONTENTS

- ***Benefits May Not Be Achieved***. The risk that the potential benefits of the Business Combination may not be fully achieved or may not be achieved within the expected timeframe.

- ***Growth Initiatives May Not Be Achieved***. The risk that the growth initiatives may not be fully achieved or may not be achieved within the expected timeframe.

- ***No Third-Party Valuation***. The risk that Sandbridge did not obtain a third-party valuation or fairness opinion in connection with the Business Combination.

- ***Exclusivity*** The fact that the Business Combination Agreement includes an exclusivity provision that prohibits Sandbridge from soliciting other business combination proposals, which restricts Sandbridge's ability, so long as the Business Combination Agreement is in effect, to consider other potential business combinations.

- ***Liquidation***. The risks and costs to Sandbridge if the business combination is not completed, including the risk of diverting management focus and resources from other businesses combination opportunities, which could result in Sandbridge being unable to effect a business combination within the completion window and force Sandbridge to liquidate.

- ***Stockholder Vote and Redemptions***. The risk that Sandbridge's stockholders may not support the proposed Business Combination and may not approve the proposals at the special meeting; and additionally, the risk that Sandbridge's stockholders may exercise their redemption rights in connection with the transaction.

- ***Closing Conditions***. The fact that completion of the Business Combination is conditioned on the satisfaction of certain closing conditions that are not within Sandbridge's control, such as (i) the approval by our stockholders of the Required Transaction Proposals being obtained; (ii) the approval of the Business Combination Agreement and related transactions by Owlet stockholders; (iii) the applicable waiting period under the HSR Act relating to the Business Combination Agreement having expired or been terminated; (iv) Sandbridge having at least $5,000,001 of net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) immediately after the Effective Time; (v) satisfaction of the Minimum Available Sandbridge Cash Amount; (vi) the truth and correctness of Owlet's representations made in the Business Combination Agreement; (vii) Owlet's compliance with the covenants in the Business Combination Agreement; (viii) the absence of a Company material Adverse Effect; (ix) the delivery by Owlet of certificates, the Registration Rights Agreement and the Stockholders Agreement; (x) immediately following the Effective Time, Sandbridge having satisfied any applicable continuing listing requirements of the NYSE; (xi) this proxy statement/prospectus becoming effective in accordance with the provisions of the Securities Act, no stop order suspending the effectiveness of this proxy statement/prospectus being issued by the SEC and no proceeding seeking such a stop order being threatened or initiated by the SEC and remaining pending; and (xii) no order or law issued by any court of competent jurisdiction or other governmental entity or other legal restraint or prohibition preventing the consummation of the Business Combination being in effect.

- ***Sandbridge Stockholders Not Holding a Majority Position in Owlet*** The fact that Sandbridge stockholders will not hold a majority position in Owlet following the Business Combination, which may reduce the influence that Sandbridge's current stockholders have on the management of Sandbridge.

- ***Litigation***. The possibility of litigation challenging the Business Combination or that an adverse judgment granting permanent injunctive relief could indefinitely enjoin consummation of the Business Combination.

- ***Fees and Expenses***. The fees and expenses associated with completing the Business Combination.

- ***Other Risks***. Various other risks associated with the business of Owlet, as described in the section entitled "*Risk Factors*" appearing elsewhere in this proxy statement/prospectus.

In addition to the reasons described above, the Sandbridge Board also considered that certain of the officers and directors of Sandbridge may have interests in the Business Combination as individuals that are in addition to, and that may be different from, the interests of Sandbridge's stockholders. Sandbridge's independent directors

99

Exhibit 7
Page 718

TABLE OF CONTENTS

reviewed and considered these interests during the negotiation of the Business Combination and in evaluating and approving, as members of the Sandbridge Board, the Business Combination Agreement and the transactions contemplated therein, including the Business Combination.

The Sandbridge Board concluded that the potential benefits that it expects Sandbridge and its stockholders to achieve as a result of the Business Combination outweighs the potentially negative reasons associated with the Business Combination. Accordingly, the Sandbridge Board determined that the Business Combination Agreement, the Business Combination and the transactions contemplated thereby, were advisable, fair to, and in the best interests of, Sandbridge and its stockholders.

*Certain Projected Financial Information of Owlet*

Owlet does not as a matter of course make public projections as to future sales, earnings, or other results. However, the management of Owlet has prepared and provided to Sandbridge's Board the prospective financial information set forth below (the "Projections") in connection with its consideration of the potential business combination.

The Projections were developed by Owlet's management team, with consideration given to the following material estimates and hypothetical assumptions:

- Owlet's planned expansion of its current product portfolio;

- Owlet's ability to obtain marketing authorization by the FDA or other regulatory authorities for products that require such authorization or clearance;

- successful development of additional hardware and software products and healthcare products that leverage Owlet's connected nursery ecosystem and increase potential customer lifetime value;

- Owlet's plans to increase its international sales, especially in continental Europe, Asia and Latin America;

- an assumed growth in retailer penetration, including increasing from 3,500 retail locations to 5,000 retail locations in the United States by the end of 2022;

- an assumed continued increase in gross margins driven by expected improvements in cost structure, a shift in product mix more heavily weighted towards software and telehealth offerings, and the deployment of a direct-to-consumer distribution strategy internationally; and

- expected hiring plans across the company and expected operating expenses, including increases in costs due to becoming a public company.

The Projections were prepared solely for internal use and not with a view toward public disclosure or toward complying with GAAP, the published guidelines of the SEC regarding projections or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. The Projections were prepared by Owlet. Information provided by Owlet does not constitute any representation, estimate or projection of any other party. The Projections included in this document have been prepared by, and are the responsibility of, Owlet's management. PricewaterhouseCoopers LLP has not audited, reviewed, examined, compiled nor applied agreed-upon procedures with respect to the accompanying Projections and, accordingly, PricewaterhouseCoopers LLP does not express an opinion or any other form of assurance with respect thereto. The PricewaterhouseCoopers LLP report included in this document relates to Owlet's previously issued financial statements. It does not extend to the Projections and should not be read to do so. Furthermore, the Projections do not take into account any circumstances or events occurring after the date they were prepared, which was February 10, 2021. Nonetheless, a summary of the Projections is provided in this proxy statement/prospectus because the Projections were made available to Sandbridge. The inclusion of the Projections in this proxy statement/prospectus should not be regarded as an indication that Sandbridge, Sandbridge's Board, or their respective affiliates, advisors or other representatives considered, or now considers, such Projections necessarily to be predictive of actual future results or to support or fail to support your decision whether to vote for or against the Business Combination Proposal. No person has made or makes any representation or warranty to any Sandbridge stockholder regarding the information included in these Projections. The Projections are not fact and should not be relied upon as being necessarily indicative of future results, and readers of this proxy statement/prospectus are cautioned not to place undue reliance on this information. The Projections should not be viewed as public guidance.

100

Exhibit 7
Page 719

| (dollars in millions) | Revenues | Gross Margin | EBITDA Margin |
|---|---|---|---|
| 2020 | $ 75.2 | 47.5% | (11.3)% |
| 2021 | $ 107.2 | 53.7% | (24.5)% |
| 2022 | $ 174.7 | 54.7% | (15.2)% |
| 2023 | $ 316.4 | 55.4% | (4.1)% |
| 2024 | $ 581.4 | 56.3% | 9.5% |
| 2025 | $1,064.5 | 56.3% | 15.8% |

While presented with numerical specificity, the Projections are forward-looking and reflect numerous estimates and assumptions including, but not limited to, future industry performance under various industry scenarios as well as assumptions for competition, general business, economic, market and financial conditions and matters specific to the businesses of Owlet, all of which are difficult to predict and many of which are beyond the preparing parties' control including, among other things, the matters described in the sections entitled "*Cautionary Note Regarding Forward-Looking Statements*" and "*Risk Factors*."

The future financial results of Owlet may differ materially from those expressed in the Projections due to factors beyond either of their ability to control or predict. The Projections are not included in this proxy statement/prospectus in order to induce any Owlet stockholders to vote in favor of any of the proposals at the special meeting.

We encourage you to review the financial statements of Owlet included in this proxy statement/prospectus, as well as the financial information in the sections entitled *"Selected Historical Consolidated Financial Information of Owlet"*, and *"Unaudited Pro Forma Combined Financial Information"* in this proxy statement/prospectus and to not rely on any single financial measure.

Neither Sandbridge nor Owlet or any of their respective affiliates intends to, and, except to the extent required by applicable law, each of them expressly disclaims any obligation to, update, revise or correct the Projections to reflect circumstances existing or arising after the date such Projections were generated or to reflect the occurrence of future events, even in the event that any or all of the assumptions underlying the Projections are shown to be in error or any of the Projections otherwise would not be realized.

**Regulatory Approvals**

The Business Combination is subject to the expiration or termination of the waiting period (or any extension thereof) applicable under the HSR Act.

**Satisfaction of 80% Test**

After consideration of the factors identified and discussed in the section titled "*The Business Combination Proposal – Sandbridge's Board of Directors Reasons for the Approval of the Business Combination*," the Sandbridge Board concluded that the Business Combination met all of the requirements disclosed in the prospectus for its initial public offering with respect to Sandbridge's initial business combination, including that the Business Combination had a fair market value of at least 80% of the balance of the net assets held in the Trust Account (net of amounts disbursed to management for taxes payable and excluding the amount of any deferred underwriting commissions) at the time of execution of the Business Combination Agreement.

As of the date of the execution of the Business Combination Agreement, the balance of the funds in the trust account was approximately $230 million and 80% thereof represents approximately $184 million. The Sandbridge Board determined that Owlet's enterprise value was $1,074 million (comprised of an equity value of $1,389 million and net cash of $315), thus satisfying the 80% test.

In reaching this determination, the Sandbridge Board concluded that it was appropriate to base such valuation in part on qualitative factors such as competitive positioning, product pipeline and addressable market opportunity, as well as quantitative factors such as Owlet's historical growth rate and its potential for future growth in sales volume and revenue. In evaluating such qualitative and quantitative factors, such as competitive positioning, the Sandbridge Board relied on input from Sandbridge management based on due diligence regarding Owlet's results and prospects, third-party market data and reports that it deemed instructive in evaluating such factors and its own analyses based on the significant experience of the members of the Sandbridge Board in valuing consumer brand companies.

Exhibit 7
Page 720

TABLE OF CONTENTS

The Sandbridge Board believes that the financial skills and background of its members and of management qualify the Sandbridge Board to conclude that the acquisition of Owlet met the 80% requirement.

**Interests of Sandbridge's Directors and Officers in the Business Combination**

In considering the recommendation of the Sandbridge Board in favor of approval of the Business Combination Proposal, it should be noted that Sandbridge's initial stockholders, including its directors and officers, have interests in the Business Combination that are different from, or in addition to, those of Sandbridge stockholders and warrant holders generally. These interests include, among other things, the interests listed below:

- If we are unable to complete our initial business combination by September 17, 2022, or during any stockholder-approved extension period, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than 10 business days thereafter, redeem 100% of the public shares, at a per share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, including interest earned on the funds held in the Trust Account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, liquidate and dissolve, subject in each case to our obligations under the DGCL to provide for claims of creditors and the requirements of other applicable law.

- There will be no liquidating distributions from the Trust Account with respect to our founder shares if we fail to complete our initial business combination by September 17, 2022, or during any stockholder-approved extension period. Our Sponsor purchased the founder shares prior to our initial public offering for an aggregate purchase price of $25,000 and, in August 2020, transferred 40,000 founder shares to Mr. De Sole, 25,000 founder shares to Mr. Toubassy and 30,000 founder shares to Mr. Hilfiger and in October 2020, transferred 40,000 founder shares to Michael Goss. Upon the Closing, such founder shares will remain outstanding, subject to certain restrictions on transfer.

- In connection with the closing of our initial public offering, we consummated the sale of 6,600,000 private placement warrants at a price of $1.00 per warrant in a private placement to our Sponsor. The warrants are each exercisable commencing on the later of 30 days following the Closing and 12 months from the closing of our initial public offering, which occurred on September 17, 2020, for one share of Sandbridge Class A common stock at $11.50 per share. If we do not consummate a business combination transaction by September 17, 2022, then the proceeds from the sale of the private placement warrants will be part of the liquidating distribution to the public stockholders and the warrants held by our Sponsor will be worthless. The warrants held by our Sponsor had an aggregate market value of approximately $11.8 million based upon the closing price of $1.79 per public warrant on the NYSE on February 12, 2021. Upon the Closing, the private placement warrants will become 6,600,000 warrants to purchase shares of New Owlet common stock at an exercise price of $11.50 per share, subject to certain restrictions on transfer.

- Our initial stockholders, officers and directors will lose their entire investment in us if we do not complete an initial business combination by September 17, 2022, or during any stockholder-approved extension period, including their initial investment in the founder shares and their at-risk capital, for which the Sponsor received 6,600,000 private placement warrants at a price of $1.00 per warrant. Our initial stockholders, officers and directors own an aggregate of 5,750,000 founder shares, which were purchased prior to our initial public offering for an aggregate purchase price of $25,000, or approximately $0.004 per share.

- Certain of our officers and directors may continue to serve as directors of New Owlet after the Closing. As such, in the future they may receive cash fees, stock options or stock awards that the New Owlet Board determines to pay to its directors.

- Concurrently with the execution of the Business Combination Agreement, Sandbridge entered into the Subscription Agreements with the PIPE Investors, pursuant to which the PIPE Investors have agreed to

102

Exhibit 7
Page 721

purchase, immediately prior to the Closing, an aggregate of 13,000,000 shares of Sandbridge Class A common stock at a purchase price of $10.00 per share. The PIPE Investors include the PIMCO private funds and certain other investors designated by our Sponsor.

- In order to protect the amounts held in the Trust Account, the Sponsor has agreed that it will be liable to us if and to the extent any claims by a third party for services rendered or products sold to us, or a prospective target business with which we have entered into a written letter of intent, confidentiality or similar agreement or business combination agreement, reduce the amount of funds in the Trust Account to below (1) $10.00 per public share or (2) the actual amount per public share held in the Trust Account as of the date of the liquidation of the Trust Account, if less than $10.00 per share due to reductions in the value of the trust assets, less taxes payable, provided that such liability will not apply to any claims by a third party or prospective target business who executed a waiver of any and all rights to the monies held in the trust account (whether or not such waiver is enforceable) nor will it apply to any claims under our indemnity of the underwriters of Sandbridge's initial public offering against certain liabilities, including liabilities under the Securities Act.

- Following the consummation of the Business Combination, we will continue to indemnify our existing directors and officers and will maintain a directors' and officers' liability insurance policy.

- Upon the Closing, subject to the terms and conditions of the Business Combination Agreement, our Sponsor, our officers and directors and any of their respective affiliates may be entitled to reimbursement for any reasonable out-of-pocket expenses related to identifying, investigating, negotiating and completing an initial business combination, and repayment of any other loans, if any, and on such terms as to be determined by Sandbridge from time to time, made by our Sponsor or certain of our officers and directors to finance transaction costs in connection with an intended initial business combination.

**Sources and Uses of Funds for the Business Combination**

The following table summarizes the sources and uses for funding the Transactions. Where actual amounts are not known or knowable, the figures below represent Owlet's good faith estimate of such amounts assuming a Closing as of January 31, 2021.

| (in millions) | Assuming No Redemptions of Public Shares | Assuming Maximum Redemptions of Public Shares[1] |
|---|---|---|
| **Sources** | | |
| Owlet Rollover Equity | $1,000.0 | $1,000.0 |
| Proceeds from Trust Account | 230.0 | 160.0 |
| Founder Shares[2] | 29.4 | 29.4 |
| PIPE Investors | 130.0 | 130.0 |
| **Total Sources** | **$1,389.4** | **$1,319.4** |
| **Uses** | | |
| Equity Consideration to Existing Investors | $1,000.0 | $1,000.0 |
| Cash to Balance Sheet | 325.0 | 255.0 |
| Founder Shares | 29.4 | 29.4 |
| Estimated Transaction Fees & Expenses[3] | 35.0 | 35.0 |
| **Total Uses** | **$1,389.4** | **$1,319.4** |

(1) These numbers assume that the Minimum Available Sandbridge Cash Amount is not waived.

(2) Excludes 2,807,500 shares of New Owlet common stock that will be outstanding following the Closing but will remain subject to price-based performance vesting terms as described in the Sponsor Letter Agreement.

(3) Consists of $8.05 million in deferred underwriting commissions from Sandbridge's initial public offering, $4.23 million in placement agent fees in connection with the PIPE Investment, $8 million in Owlet financial advisory fees, $6.5 million in legal fees, $2.22 million in accounting fees, and an estimated $6 million in miscellaneous fees and expenses, including consulting fees, proxy solicitation fees, SEC registration fees, printing fees and audit fees.

103

Exhibit 7
Page 722

**Directors and Executive Officers of New Owlet After the Business Combination**

Subject to the occurrence of the Closing and any limitation with respect to any specific individual imposed under applicable laws and the listing requirements of the NYSE, effective as of the Closing, Sandbridge will take all actions necessary or appropriate to cause the New Owlet Board to consist of up to nine (9) directors comprised of the persons identified by Sandbridge and Owlet pursuant to the Business Combination Agreement and the Stockholders Agreement. On the Closing Date, Sandbridge shall enter into customary indemnification agreements reasonably satisfactory to Owlet with the individuals to be elected as members of the New Owlet Board, which indemnification agreements shall continue to be effective immediately following the Closing.

Except as otherwise directed in writing by Owlet, and conditioned upon the occurrence of the Closing, Sandbridge will take all actions necessary or appropriate (including securing resignations or removals and making such appointments as are necessary) to cause the persons identified by Owlet to be the officers of New Owlet (and holding the same titles as held at Owlet) until the earlier of their resignation or removal or until their respective successors are duly appointed.

After the Effective Time (a) the governing documents of Merger Sub will be the governing documents of the Surviving Company, and the name of the Surviving Company will be "Owlet, Inc."; and (b) at the Effective Time, the directors and officers identified by Sandbridge and Owlet pursuant to the Business Combination Agreement will be the initial directors and officers of the Surviving Company, each to hold office in accordance with the governing documents of the Surviving Company until such director's or officer's successor is duly elected or appointed and qualified, or until the earlier of their death, resignation or removal.

**Stock Exchange Listing**

Sandbridge's units, Class A common stock and public warrants are publicly traded on the NYSE under the symbols "SBG.U", "SBG" and "SBG WS", respectively. Sandbridge intends to apply to list the New Owlet common stock and public warrants on the NYSE under the symbols "OWLT" and "OWLT WS", respectively, upon the Closing of the Business Combination. New Owlet will not have units traded following the Closing of the Business Combination.

**Anticipated Accounting Treatment**

The Business Combination will be accounted for as a reverse recapitalization in accordance with GAAP. Under this method of accounting, Sandbridge will be treated as the "acquired" company for accounting purposes and the business combination will be treated as the equivalent of Owlet issuing stock for the net assets of Sandbridge, accompanied by a recapitalization. The net assets of Sandbridge will be stated at historical cost, with no goodwill or other intangible assets recorded.

Owlet has been determined to be the accounting acquirer based on evaluation of the following facts and circumstances under both the no and maximum redemption scenarios:

- Owlet stockholders will have the largest voting interest in the post-combination company;

- the board of directors of the post-combination company will have up to nine members, and Owlet will have the ability to nominate the majority of the members of the board of directors;

- Owlet management will continue to hold executive management roles for the post-combination company and be responsible for the day-to-day operations;

- the post-combination company will assume the Owlet name;

- the post-combination company will maintain the current Owlet headquarters; and

- the intended strategy of the post-combination entity will continue Owlet's current strategy of product development and market penetration.

The preponderance of evidence as described above is indicative that Owlet is the accounting acquirer in the Business Combination. Accordingly, for accounting purposes, the financial statements of the post-combination company will represent a continuation of the financial statements of Owlet with the acquisition being treated as the equivalent of Owlet issuing stock for the net assets of Sandbridge, accompanied by a recapitalization. The net assets of Sandbridge will be stated at historical cost, with no goodwill or other intangible assets recorded.

104

Exhibit 7
Page 723

TABLE OF CONTENTS

**Vote Required for Approval**

This Business Combination Proposal (and consequently, the Business Combination Agreement and the transactions contemplated thereby, including the Business Combination) will be approved and adopted only with the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. Broker non-votes have no effect on the outcome of the proposal, but abstentions will be treated as votes against this proposal.

The Business Combination is conditioned upon the approval of the Business Combination Proposal, subject to the terms of the Business Combination Agreement. If the Business Combination Proposal is not approved, the other proposals (except the Adjournment Proposal, as described below) will not be presented to the Sandbridge stockholders for a vote.

The Sponsor, Mr. De Sole, Mr. Toubassy and Mr. Goss, the PIMCO private funds, along with Sandbridge's directors and officers as of the time of its initial public offering, have agreed to vote the founder shares and any public shares owned by them in favor of the Business Combination Proposal. See "*Related Agreements – Sponsor Letter Agreement*" for more information.

**Recommendation of the Sandbridge Board of Directors**

**THE SANDBRIDGE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT SANDBRIDGE STOCKHOLDERS VOTE "<u>FOR</u>" THE APPROVAL OF THE BUSINESS COMBINATION PROPOSAL.**

The existence of financial and personal interests of Sandbridge's directors or officers may result in a conflict of interest on the part of such director(s) or officer(s) between what they may believe is in the best interests of Sandbridge and its stockholders and what they may believe is best for himself or themselves in determining to recommend that stockholders vote for the proposals. For instance, ownership of founder shares by Mr. Toubassy, Mr. De Sole and Mr. Goss, our independent directors, may create a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate an initial business combination, and in determining the terms on which we are willing to consummate such a transaction. See "*The Business Combination Proposal – Interests of Sandbridge's Directors and Officers in the Business Combination*" for a further discussion.

105

Exhibit 7
Page 724

TABLE OF CONTENTS

## THE BUSINESS COMBINATION AGREEMENT

### Overview

We are asking our stockholders to adopt and approve the Business Combination Agreement, certain related agreements and the transactions contemplated thereby (including the Merger). Sandbridge stockholders should read carefully this proxy statement/prospectus in its entirety for more detailed information concerning the Business Combination Agreement, which is attached as Annex A to this proxy statement/prospectus and is incorporated herein by reference, and the transactions contemplated thereby. Please see "*The Business Combination Agreement*" below for additional information and a summary of certain terms of the Business Combination Agreement. We urge you to read carefully the Business Combination Agreement in its entirety before voting on this proposal.

Because we are holding a stockholder vote on the Business Combination, we may consummate the Business Combination only if it is approved by the affirmative vote of at least a majority of the votes of shares of Sandbridge common stock present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon.

### The Business Combination Agreement

This subsection of the proxy statement/prospectus describes the material provisions of the Business Combination Agreement, but does not purport to describe all of the terms of the Business Combination Agreement. The following summary is qualified in its entirety by reference to the complete text of the Business Combination Agreement, which is attached as Annex A to this proxy statement/prospectus. You are urged to read the Business Combination Agreement in its entirety because it is the primary legal document that governs the Business Combination.

The Business Combination Agreement contains representations, warranties and covenants that the respective parties made to each other as of the date of the Business Combination Agreement or other specific dates as provided for in the Business Combination Agreement. The assertions embodied in those representations, warranties and covenants were made for purposes of the contract among the respective parties and are subject to important qualifications and limitations agreed to by the parties in connection with negotiating the Business Combination Agreement. The representations, warranties and covenants in the Business Combination Agreement are also modified in part by the underlying disclosure schedules (the "Disclosure Schedules"), which are not filed publicly and which are subject to a contractual standard of materiality different from that generally applicable to stockholders and were used for the purpose of allocating risk among the parties rather than establishing matters as facts. We do not believe that the Disclosure Schedules contain information that is material to an investment decision. Additionally, the representations and warranties of the parties to the Business Combination Agreement may or may not have been accurate as of any specific date and do not purport to be accurate as of the date of this proxy statement/prospectus. Accordingly, no person should rely on the representations and warranties in the Business Combination Agreement or the summaries thereof in this proxy statement/prospectus as characterizations of the actual state of facts about Sandbridge, the Sponsor, Owlet or any other matter.

On February 15, 2021, Sandbridge, Merger Sub and Owlet entered into the Business Combination Agreement, which provides for, among other things, the following:

(a) on the Closing Date prior to the Effective Time, the governing documents of Sandbridge will be amended and restated and become the Proposed Charter and the New Owlet Bylaws as described in this proxy statement/prospectus and Sandbridge's name will be changed to "Owlet, Inc.";

(b) on the Closing Date, the parties to the Business Combination Agreement will cause a certificate of merger to be executed and filed with the Secretary of State of the State of Delaware, pursuant to which Merger Sub will merge with and into Owlet at the Effective Time, with Owlet as the surviving corporation in the Business Combination and, after giving effect to the Merger, Owlet will be a wholly-owned subsidiary of Sandbridge;

(c) as a consequence of the Merger, at the Effective Time, the governing documents of Merger Sub will be the governing documents of the surviving company;

106

Exhibit 7
Page 725

(d) as a consequence of the Merger, at of the Effective Time, the directors and officers of the surviving company will be the individuals designated by schedule to the Business Combination Agreement, each to hold office in accordance with the governing documents of the surviving company, until such director's or officer's successor is duly elected or appointed and qualified, or until the earlier of their death, resignation or removal;

(e) as a consequence of the Merger, at of the Effective Time, each share of Sandbridge Class B common stock will be canceled and extinguished and converted into one share of Sandbridge Class A common stock;

(f) as a consequence of the Merger, as of the Effective Time, each share of capital stock of Merger Sub issued and outstanding immediately prior to the Effective Time will be cancelled and extinguished and converted into one share of Owlet capital stock equal to the Exchange Ratio;

(f) as a consequence of the Merger, at the Effective Time, each share of Owlet capital stock that is issued and outstanding immediately prior to the Effective Time will be canceled and extinguished and converted into the right to receive the number of shares of New Owlet common stock equal to the Exchange Ratio;

(g) as a consequence of the Merger, at the Effective Time, each share of Owlet capital stock held prior to the Effective Time as treasury stock shall be automatically canceled and extinguished;

(h) as a consequence of the Merger, at the Effective Time, each option to purchase shares of Owlet common stock, whether vested or unvested, that is not a Cash Elected Option and is outstanding and unexercised as of immediately prior to the Effective Time will be assumed by New Owlet and will automatically become an option (vested or unvested, as applicable) to purchase a number of shares of New Owlet common stock equal to the number of shares of Owlet common stock subject to such option immediately prior to the Effective Time multiplied by the Exchange Ratio, rounded down to the nearest whole share, at an exercise price per share equal to the exercise price per share of such option immediately prior to the Effective Time divided by the Exchange Ratio, rounded up to the nearest whole cent. Subject to certain limitations, each Cash Elected Option that is issued and outstanding immediately prior to the Effective Time shall be cancelled and converted into the right to receive the Cash Election Consideration.

In connection with the Business Combination, certain related agreements have been, or will be entered into on or prior to the Closing of the Business Combination, including the Subscription Agreements, the Registration Rights Agreement, the Stockholders Agreement and the Sponsor Letter Agreement. See "*Related Agreements*" for more information.

**Effect of the Business Combination on Existing Sandbridge Equity**

The Business Combination will result in, among other things, the following, each of which will occur at or immediately prior to the Effective Time, by virtue of the Merger and without any action on the part of any party:

• the governing documents of Sandbridge will be amended and restated and become the Proposed Charter and New Owlet Bylaws as described in this proxy statement/prospectus and Sandbridge's name will change to "Owlet, Inc.";

• each share of Sandbridge Class B common stock that is issued and outstanding as of immediately prior to the Effective Time will be converted, on a one-for-one basis, into a share of Sandbridge Class A common stock.

The Business Combination will have no effect on Sandbridge Class A common stock that is issued and outstanding as of immediately prior to the Effective Time, which will continue to remain outstanding.

**Consideration to Owlet Equityholders in the Business Combination**

As a consequence of the Merger, at the Effective Time, (i) each share of Owlet capital stock (as defined herein) that is issued and outstanding immediately prior to the Effective Time will become the right to receive the number of shares of New Owlet common stock equal to the Exchange Ratio; (ii) each Owlet option to purchase shares of Owlet common stock that is outstanding and unexercised as of immediately prior to the

107

Exhibit 7
Page 726

Effective Time that is not a Cash Elected Option shall be cancelled and converted into an option to purchase New Owlet Class A common stock upon substantially the same terms and conditions as are in effect with respect to such Owlet option immediately prior to the Effective Time, including with respect to vesting, expiration and forfeiture provisions; (iii) subject to certain limitations, each Cash Elected Option that is issued and outstanding immediately prior to the Effective Time shall be cancelled and converted into the right to receive the Cash Election Consideration; and (iv) each share of Owlet common stock that is subject to a risk of forfeiture or right of repurchase at the original purchase price as of immediately prior to the Effective Time shall be subject to the same risk of forfeiture or right of repurchase which risk of forfeiture or right of repurchase shall lapse in accordance with the same vesting schedule as that of the Owlet Restricted Stock.

**Closing and Effective Time of the Business Combination**

The Closing is required to take place electronically by exchange of the closing deliverables as promptly as reasonably practicable, but in no event later than the third business day following the satisfaction (or, to the extent permitted by applicable law, waiver) of the conditions described below under "- *Conditions to Closing of the Business Combination*," (other than those conditions that by their nature are to be satisfied at the Closing, but subject to satisfaction or waiver of such conditions) or at such other place, date and/or time as Sandbridge and Owlet may agree in writing.

**Conditions to Closing of the Business Combination**

***Conditions to Each Party's Obligations***

The respective obligations of each party to the Business Combination Agreement to consummate the transactions contemplated by the Business Combination are subject to the satisfaction of the following conditions:

• the applicable waiting period under the HSR Act relating to the Business Combination having expired or been terminated;

• no order or law issued by any court of competent jurisdiction or other governmental entity or other legal restraint or prohibition preventing the consummation of the Business Combination being in effect;

• the approval and adoption of the Business Combination Agreement and approval of the Merger and such other transactions by the affirmative vote or written consent of the holders of a majority of the outstanding shares of Owlet common stock and Owlet preferred stock (voting on an as converted to Owlet common stock basis) voting together as a single class and the affirmative vote or written consent of the holders of a majority of the outstanding shares of Owlet preferred stock (voting together as a single class on an as converted to Owlet common stock basis) having been obtained;

• the approval of each Required Transaction Proposal by the affirmative vote of the holders of the requisite number of shares of Sandbridge common stock entitled to vote thereon, whether in person or by proxy at the Special Meeting (or any adjournment thereof), in accordance with the governing documents of Sandbridge and applicable law, having been obtained;

• subject to waiver upon the agreement of Sandbridge and Owlet, immediately following the Effective Time, Sandbridge's satisfaction of any applicable continuing listing requirements of the NYSE and the absence of any notice of non-compliance therewith that has not been cured or would not be cured at or immediately following the Effective Time;

• this proxy statement/prospectus becoming effective in accordance with the provisions of the Securities Act, no stop order suspending the effectiveness of this proxy statement/prospectus being issued by the SEC and no proceeding seeking such a stop order being threatened or initiated by the SEC and remaining pending; and

• after giving effect to the transactions contemplated by the Business Combination Agreement, Sandbridge having at least $5,000,001 of net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) immediately after the Effective Time.

108

Exhibit 7
Page 727

*Other Conditions to the Obligations of the Sandbridge Parties*

The obligations of the Sandbridge Parties to consummate the transactions contemplated by the Business Combination Agreement are subject to the satisfaction of the following further conditions:

- unless waived by Sandbridge (on behalf of itself and the other Sandbridge Parties), the representations and warranties of Owlet regarding the organization and qualification of Owlet and its subsidiaries, certain representations and warranties regarding the capitalization of Owlet, the representations and warranties of Owlet regarding the authority of Owlet to execute and deliver the Business Combination Agreement and each of the related documents thereto to which it is or will be a party and to consummate the transactions contemplated by the Business Combination Agreement, and the representations of Owlet regarding brokers fees being true and correct (without giving effect to any limitation of "materiality" or "Owlet Material Adverse Effect" (as defined below) or any similar limitation as set forth in the Business Combination Agreement) in all material respects as of the Closing Date as though made on and as of such date (or, if given as of an earlier date, as of such earlier date);

- unless waived by Sandbridge (on behalf of itself and the other Sandbridge Parties), the other representations and warranties of Owlet being true and correct (without giving effect to any limitation as to "materiality" or "Owlet Material Adverse Effect" or any similar limitation as set forth in the Business Combination Agreement) in all respects as of the Closing Date as though made on and as of such date (or, if given as of an earlier date, as of such earlier date), except where the failure of such representations and warranties to be true and correct, taken as a whole, does not cause an Owlet Material Adverse Effect;

- unless waived by Sandbridge (on behalf of itself and the other Sandbridge Parties), Owlet having performed and complied in all material respects with the covenants and agreements required to be performed or complied with by it under the Business Combination Agreement at or prior to the Closing;

- unless waived by Sandbridge (on behalf of itself and the other Sandbridge Parties), since the date of the Business Combination Agreement, no Owlet Material Adverse Effect has occurred that is continuing; and

- unless waived by Sandbridge (on behalf of itself and the other Sandbridge Parties), Sandbridge must have received, at or prior to the Closing, (i) a certificate duly executed by an authorized officer of Owlet, dated as of the Closing Date, confirming that the conditions set forth in the first four bullet points in this section have been satisfied (ii) the Registration Rights Agreement, duly executed by the Owlet stockholders party thereto; and (iii) the Stockholders Agreement, duly executed by the Owlet stockholders party thereto.

*Other Conditions to the Obligations of Owlet*

The obligations of Owlet to consummate the transactions contemplated by the Business Combination Agreement are subject to the satisfaction of the following further conditions:

- unless waived by Owlet, the representations and warranties regarding the organization and qualification of the Sandbridge Parties, the authority of Sandbridge to execute and deliver the Business Combination Agreement and each of the related documents thereto to which it is or will be a party and to consummate the transactions contemplated thereby, and certain representations and warranties regarding the capitalization of the Sandbridge Parties, broker fees, and the intended tax treatment of the Business Combination being true and correct, in all material respects, as of the Closing Date, as though made on and as of the Closing Date (or, if given as of an earlier date, as of such earlier date);

- unless waived by Owlet, the other representations and warranties of the Sandbridge Parties being true and correct (without giving effect to any limitation of "materiality" or "Sandbridge Material Adverse Effect" (as defined below) or any similar limitation set forth in the Business Combination Agreement) in all respects as of the Closing Date, as though made on and as of such date, except where the failure of such representations and warranties to be true and correct, taken as a whole, does not cause a Sandbridge Material Adverse Effect;

109

Exhibit 7
Page 728

- unless waived by Owlet, the Sandbridge Parties having performed and complied in all material respects with the covenants and agreements required to be performed or complied with by them under the Business Combination Agreement at or prior to the Closing;

- unless waived by Owlet, the Available Sandbridge Cash being equal to or greater than $140 million;

- unless waived by Owlet, Owlet must have received, at or prior to the Closing, (i) a certificate executed by an authorized officer of Sandbridge, dated as of the Closing Date, confirming that the conditions set forth in the first four bullet points of this section have been satisfied and (ii) the Registration Rights Agreement duly executed by Sandbridge and Sponsor.

**Representations and Warranties**

The Business Combination Agreement contains representations, warranties and covenants that the respective parties made to each other as of the date of the Business Combination Agreement or other specific dates as provided for in the Business Combination Agreement. The assertions embodied in those representations, warranties and covenants were made for purposes of the contract among the respective parties and are subject to important qualifications and limitations agreed to by the parties in connection with negotiating the Business Combination Agreement. The representations, warranties and covenants in the Business Combination Agreement are also modified in part by the Disclosure Schedules, which are not filed publicly and which are subject to a contractual standard of materiality different from that generally applicable to stockholders and were used for the purpose of allocating risk among the parties rather than establishing matters as facts. We do not believe that the Disclosure Schedules contain information that is material to an investment decision. Additionally, the representations and warranties of the parties to the Business Combination Agreement may or may not have been accurate as of any specific date and do not purport to be accurate as of the date of this proxy statement/prospectus. Accordingly, no person should rely on the representations and warranties in the Business Combination Agreement or the summaries thereof in this proxy statement/prospectus as characterizations of the actual state of facts about Sandbridge, the Sponsor, Owlet or any other matter.

To the extent that specific material facts exist that contradict the representations, warranties, and covenants in the Business Combination Agreement, we will provide corrective disclosure in this proxy statement/prospectus. Furthermore, if subsequent information concerning the subject matter of the representations, warranties, and covenants in the Business Combination Agreement may or may not be fully reflected in our public disclosures, our public disclosures will include any material information necessary to provide our stockholders with a materially complete understanding of the Business Combination Agreement disclosures.

Under the Business Combination Agreement, Owlet made customary representations and warranties to Sandbridge relating to, among other things:

- organization and qualification, including that Owlet and each of its subsidiaries (together, the "Group Companies") is a corporation, limited liability company or other applicable business entity duly organized or formed, as applicable, validly existing and in good standing under the laws of its jurisdiction of formation or organization, is in good standing in each jurisdiction in which such qualification or licensing is necessary except where the failure to be so duly qualified or licensed would not have an Owlet Material Adverse Effect, and the governing documents are in full force and effect, and no Group Company is in breach or violation of its governing documents;

- capitalization, including that, among other things, (i) the number and class or series (as applicable) of all Owlet capital stock issued and outstanding and the identity of the persons that are the record and beneficial owners thereof are as set forth in the Disclosure Schedules to the Business Combination Agreement, (ii) all of the outstanding Owlet capital stock and other equity interests (a) have been duly authorized and validly issued, are fully paid and non-assessable, (b) were not issued in violation of Owlet's governing documents or the Company Stockholders Agreements or any other contract to which Owlet is a party or bound, (c) were not issued in violation of any preemptive rights, call option, right of first refusal or first offer, subscription rights, transfer restrictions or similar rights of any person, and (d) have been offered, sold and issued in compliance with applicable law, including the federal securities laws, and (iii) except as identified in or issued pursuant to the Business Combination Agreement, Owlet has no outstanding (a) equity appreciation, phantom equity or profit participation rights or (b) options, restricted stock, phantom stock, warrants, purchase rights, subscription rights,

110

Exhibit 7
Page 729

conversion rights, exchange rights, calls, puts, rights of first refusal or first offer or other contracts that could require Owlet to issue, sell or otherwise cause to become outstanding or acquire, repurchase or redeem any Owlet capital stock or securities convertible into or exchangeable for Owlet capital stock, and (iv) all outstanding Owlet common stock and other equity interests are free and clear of all liens;

• authority, including that Owlet has the requisite power and authority to execute and deliver the Business Combination Agreement and each related ancillary document thereto to which it is or will be a party, to perform its obligations thereunder and to consummate the transactions contemplated thereby;

• financial statements and absence of undisclosed liabilities, including that, among others, (i) the financial statements of the Group Companies (a) were prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated, (b) fairly present, in all material respects, the financial position, results of operations and cash flows of the Group Companies as of the date thereof and for the period indicated therein and (c) where applicable, were prepared in accordance with the standards of the PCAOB, and comply in all material respects with the applicable accounting requirements and with the rules and regulations of the SEC, the Exchange Act and the Securities Act in effect as of the respective dates thereof, (ii) except for liabilities incurred in the ordinary course of business since December 31, 2020, liabilities incurred in connection with the negotiation, preparation or execution of the Business Combination Agreement or any ancillary documents or the performance of the Company's obligations thereunder, liabilities that have been disclosed to Sandbridge or liabilities that are not, individually or in the aggregate, material to the Group Companies, taken as a whole, no Group Company has any liabilities of the type required to be set forth on a balance sheet in accordance with GAAP, (iii) the Group Companies (a) have established and maintain systems of internal accounting controls and (b) maintain and, for all periods covered by the financial statements, have maintained books and records of the Group Companies in the ordinary course of business that are accurate and complete; and (iv) no Group Company has received any written complaint or allegation asserting that there is a "significant deficiency" or "material weakness" in internal controls over financial reporting, to the Company's knowledge, or fraud involving management or other employees who have a significant role in the internal controls over financial reporting of the Group Companies;

• other than as described in the Business Combination Agreement and as would not have an Owlet Material Adverse Effect (with the exception of clause (ii)(a) below), (i) no consent, approval or authorization of, or designation, declaration or filing with, any governmental entity is required on the part of Owlet with respect to Owlet's execution, delivery or performance of its obligations under the Business Combination Agreement or the ancillary documents thereto, and (ii) neither the execution, delivery or performance by Owlet of the Business Combination Agreement nor the Ancillary Documents nor the consummation by Owlet of the transactions contemplated thereby will, directly or indirectly (a) result in any breach of any provision of Owlet's governing documents, (b) result in a violation or breach of, or constitute a default or give rise to any right of termination, modification, suspension, revocation or acceleration under, any of the terms, conditions or provisions of any contract to which Owlet is a party, (c) violate, or constitute a breach under, any order or applicable law to which any Group Company or any of its properties or assets are bound or (d) result in the creation of any lien upon any of the assets or properties (other than any liens permitted under the Business Combination Agreement) of any Group Company;

• permits, including that each of the Group Companies has all permits that are required to own, lease or operate its properties or assets and to conduct its business except where the failure to hold the same would not result in an Owlet Material Adverse Effect;

• material contracts, (i) including, among others, any contract (a) that relates to indebtedness in excess of $1 million or the placing of a lien on any material assets or properties of any Group Company, (b) under which any Group Company is a lessor or lessee or holds or operates or permits any third party to hold or operate any tangible property for which the aggregate annual rental payments equal or exceed $100,000, (c) that is a joint venture, profit-sharing, partnership or other similar agreement which requires or could reasonably be expected to require aggregate payments to or from any Group Company in excess of $1 million over the life of such contract, (d) that limits or purports to limit in any material respect the freedom of any Group Company to engage or compete in any line of business or any person or to sell, manufacture, develop, commercialize, test or research products or contains

111

Exhibit 7
Page 730

TABLE OF CONTENTS

exclusivity provisions or obligations, (e) requiring any future capital commitment or capital expenditure in excess of $250,000 annually or $625,000 over the life of the agreement, (f) requiring any Group Company to guarantee the liabilities of any person or under which the liabilities of any Group Company are guaranteed, in each case in excess of $50,000, (g) under which any Group Company has, directly or indirectly, made or agreed to make any loan, advance or other assignment of payment or made any capital contribution to, or investment in, any person in excess of $100,000, (h) any collective bargaining agreement or other contract with any labor union, labor organization, works counsel, employee delegate, representative or other employee collective group, (i) governing the terms of the employment, engagement or services of any current director, manager, officer, employee, individual independent contractor or other service provider of a Group Company whose annual base salary (or, in the case of an independent contractor, annual base compensation) is in excess of $200,000, or providing for any success, change of control, retention, transaction bonus or other similar payment or amount due or payable to any person as a result of or in connection with the Business Combination Agreement or the transactions contemplated thereby, (j) for the disposition of any portion of the assets or business of any Group Company or for the acquisition by any Group Company of the assets or business of any other person, or under which any Group Company has any continuing obligation with respect to an "earn-out," contingent purchase price or deferred payment obligation in excess of $100,000, (k) any settlement, conciliation or other similar contract in excess of $500,000, with a governmental entity or imposes or is reasonably likely to impose, at any time in the future, any material, non-monetary obligations of any Group Company, or (l) the performance of which requires either annual payments to or from any Group Company in excess of $1 million or aggregate payments to or from any Group Company in excess of $5 million over the life of the agreement and, in each case, that is not terminable without penalty upon less than thirty (30) days' notice, and that each material contract is valid and binding on the applicable Group Company and, to the knowledge of Owlet, the counterparty thereto, and is in full force and effect, and that each of Owlet and its subsidiaries, as applicable, and, to the knowledge of Owlet, the counterparties thereto, are not in material breach of or default under any such material contract;

- the absence of certain changes or events, including that, since December 31, 2020 and ended on the date of the Business Combination Agreement, no Owlet Material Adverse Event has occurred and, except as expressly contemplated by the Business Combination Agreement, any Ancillary Document or in connection with the transactions contemplated thereby, that (i) Owlet has conducted its business in the ordinary course in all material respects and (ii) no Group Company has taken any action that would require the consent of Sandbridge if such action were taken on or after the date of the Business Combination Agreement without the consent of Sandbridge;

- litigation, including that, as of the date of the Business Combination Agreement, there is (and since December 31, 2018 there has been) no proceeding pending or, to Owlet's knowledge, threatened against any Group Company that, if adversely decided or resolved, has been or would reasonably be expected to be, individually or in the aggregate, material to Owlet or its subsidiaries, taken as a whole;

- compliance with applicable laws;

- employee benefit plans (as defined in the Business Combination Agreement), including that, among others, (i) each employee benefit plan has been maintained, funded, operated and administered in all material respects in accordance with its terms and with applicable laws and none of the Group Companies or, to the Company's knowledge, any other person, is in material breach of, or default under, any employee plan, (ii) each employee benefit plan that is intended to be qualified under Section 401(a) of the Code has timely received a favorable determination or opinion or advisory letter from the Internal Revenue Service, (iii) as of the date of the Business Combination Agreement, there are no pending or, to Owlet's knowledge, threatened claims or proceedings with respect to any employee benefit plan (other than routine claims for benefits), (iv) all material contributions, distributions, reimbursements and premium payments that are due have been timely made with respect to each employee benefit plan, (v) no employee benefit plan is, and no Group Company or any ERISA Affiliate (as defined in the Business Combination Agreement) of any Group Company has maintained, sponsored, participated in, contributed to or been required to contribute to, or otherwise has any liability with respect to or under, a multiemployer plan, a defined benefit plan, a multiple employer

112

Exhibit 7
Page 731

plan or a multiple employer welfare arrangement, (vi) no Group Company has an obligation to provide or has any liability in respect of any retiree or post-termination health or life insurance benefits other than pursuant to COBRA or similar law, and (vii) the execution and delivery of the Business Combination Agreement and the consummation of the transactions contemplated thereby will not materially (a) result in any payment or benefit becoming due to or result in the forgiveness of any indebtedness of any current or former director, manager, officer, employee, individual independent contractor or other service provider, (b) increase the amount or value of any compensation or benefits payable to any such person, (c) result in the acceleration of the time of payment or vesting, or trigger any payment or funding of any compensation or benefits to any such person, or (d) impose any restrictions or limitations on any of the Group Companies' rights to amend or terminate any employee benefit plan;

• environmental matters;

• intellectual property, including that, among others, (i) as of the date of the Business Combination Agreement, all necessary fees and filings with respect to any material Company Registered Intellectual Property (as defined in the Business Combination Agreement) have been timely submitted to the relevant authority necessary to maintain such material Company Registered Intellectual Property and that there are no material proceedings pending or, to Owlet's knowledge, threatened relating to any of the Company Registered Intellectual Property, (ii) that a Group Company exclusively owns all right, title and interest in and to all material Company Owned Intellectual Property (as defined in the Business Combination Agreement) free and clear of all liens or obligations to others (other than liens permitted under the Business Combination Agreement), (iii) the Company Owned Intellectual Property and the Company Licensed Intellectual Property (as defined in the Business Combination Agreement), to the knowledge of Owlet, constitutes all of the intellectual property used or held for use by the Group Companies in the operation of their respective businesses and, to Owlet's knowledge, all intellectual property necessary and sufficient to enable the Group Companies to conduct their respective businesses as currently conducted in all material respects, (iv) each Group Company's employees and independent contractors who independently or jointly contributed to or otherwise participated in the development of any material Company Owned Intellectual Property have agreed have assigned or have agreed to a present assignment to such Group Company of all intellectual property rights authored, invented or otherwise developed in the course of such person's employment or other engagement, (v) each Group Company has taken reasonable steps to safeguard and maintain the secrecy of any trade secrets, know-how and other confidential information owned by the Group Companies, (vi) none of the Company Owned Intellectual Property is subject to any outstanding order restricting the use, sale, transfer, licensing or exploitation thereof by Owlet or any of its subsidiaries, (vii) to the knowledge of Owlet, neither the conduct of the business of Group Companies nor any of their products that are currently complete and are offered, marketed, licensed, provided, sold distributed or otherwise exploited by any of them infringes, constitutes or results from an unauthorized use or misappropriation of or otherwise violates any intellectual property rights of any person, except as is and would not reasonably be expected to be, individually or in the aggregate, material to the Group Companies, taken as a whole, and (viii) since December 31, 2018, there has been no material proceeding pending nor has any Group Company received any written communications (a) alleging that any such entity has infringed, misappropriated or otherwise violated any intellectual property rights of another person or (b) challenging the validity, enforceability, use or exclusive ownership of any Company Owned Intellectual Property;

• labor matters, including that, among others, (i) for the past three years, the Group Companies have complied with, and are currently in compliance with, in all material respects, all applicable laws with respect to employment and employment practices, (ii) for the past three years, (a) none of the Group Companies has or has had any material liability for any arrears or wages or other compensation for services, or any material liability for any payment to any trust or other fund governed by or maintained by any governmental entity with respect to unemployment compensation benefits, social security, social insurances or other benefits or obligations for any employees of any Group Company and (b) the Group Companies have withheld all amounts required by applicable law or by agreement to be withheld from wages, salaries and other payments to employees or independent contractors or other service providers, except as has not and would not reasonably be expected to result in material liability

113

Exhibit 7
Page 732

to the Group Companies, (iii) no Group Company is a party to or bound by any collective bargaining agreements or other agreements with any labor organization, labor union or similar association nor, to the knowledge of Owlet, is there any duty on the part of any Group Company to bargain with any labor union, labor organization or similar association, (iv) since December 31, 2018, there has been no actual or, to Owlet's knowledge, threatened unfair labor practice charges or other material labor disputes against or affecting any Group Company, (v) to Owlet's knowledge, since December 31, 2018, there have been no labor organizing activities with respect to any employees of any Group Company; (vi) no employee layoff, facility closure or shutdown or other similar event has occurred within the last twelve (12) months or is currently contemplated, planned or announced, including as a result of COVID-19 or otherwise; and (vii) no current executive, key employee or group of employees has given notice of termination of employment or otherwise disclosed plans to terminate employment within 12 months;

•    insurance;

•    tax matters;

•    except as described in the Disclosure Schedules, none of the Group Companies has incurred or will incur any liability for any brokerage, finder's fee or other fee or commission in connection with the Business Combination;

•    real and personal property;

•    transactions with affiliates, including that no related party owns any interest in any material asset used in any Group Company's business or owes any material amount to, or is owed any material amount by, any Group Company (other than as permitted in accordance with the terms of the Business Combination Agreement);

•    data privacy and security, including that (i) each Group Company has implemented written policies relating to the processing of personal data as and to the extent required by applicable privacy laws, (ii) for the past three years Owlet has not received written notice of any pending proceedings, nor have there been any material proceedings against any Group Company initiated alleging that any processing of personal data by or on behalf of a Group Company is in violation of any applicable privacy law or data security policy, and (iii) for the past three years, (a) there has been no unauthorized access, use or disclosure of personal data in the possession or control of any Group Company and (b) there have been no unauthorized intrusions or breaches of security into any Group Company systems, except as would not have an Owlet Material Adverse Effect;

•    compliance with international trade and anti-corruption laws;

•    none of the information supplied by or on behalf of the Group Companies expressly for inclusion or incorporation by reference prior to the Closing in any filing made with any governmental authority, this proxy statement/prospectus or in the mailings or other distributions to Sandbridge's stockholders and/or prospective investors will contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading;

•    regulatory compliance, including, among others, that (i) since January 1, 2018, all products developed, tested, investigated, produced, manufactured, labeled, stored, promoted, marketed, imported, exported, distributed, or sold by or on behalf of the Group Companies have been, or are being, developed, tested, investigated, produced, manufactured, labeled, distributed, stored, promoted, marketed, imported, exported, distributed and sold in compliance in all material respects with applicable FDA Laws, (ii) the Company holds all material permits, including 501(k) clearances or premarket approvals required by applicable FDA Laws, (iii) there are no proceedings pending, or to Owlet's knowledge, threatened in writing by or on behalf of the FDA or any other governmental entity that has jurisdiction over the operations of any Group Company alleging material noncompliance with applicable Laws, (iv) since January 1, 2018, no product distributed or sold by or on behalf of the Group Companies has been seized, detained, withdrawn, voluntarily or involuntarily recalled or subject to a suspension of manufacturing and, to Owlet's knowledge, there are no facts or circumstances reasonably likely to cause (a) a withdrawal, recall, field notification, field correction, safety alert, termination, seizure,

114

Exhibit 7
Page 733

denial, detention, or suspension of the manufacturing, marketing or distribution of any such product, (b) a change in marketing or labeling of any such product or (c) a termination, seizure or suspension of the marketing or distribution of any such product, except, in each case, as would not be reasonably expected to be material to the Group Companies taken as a whole, and (v) any studies, tests and preclinical and clinical trials conducted by or on behalf of the Group Companies were, and, if ongoing, are being conducted in accordance with applicable laws;

• product warranties and product liability, including that, among others, (i) there are no claims or other proceedings threatened or that have been submitted or asserted relating to breach of any guarantee, warranty or indemnity relating to the products of the Group Companies, (ii) to Owlet's knowledge, there is no material design defect, nor any failure to warn, with respect to any of the products of the Group Companies, and (iii) there are no claims or other proceedings pending or threatened alleging that the Group Companies have any liability arising out of or relating to any claimed injury or damage to individuals or property as a result of any products of the Group Companies, except, in each case, as would not be reasonably expected to have a Company Material Adverse Effect; and

• investigation, including that, among others, (i) Owlet, on its own behalf and on behalf of its representatives, acknowledges and agrees that (a) it has conducted its own independent review and analysis of, and, based thereon, has formed an independent judgment concerning, the business, assets, and liabilities of, the Sandbridge Parties, (ii) it has been given access to such documents and information about the Sandbridge Parties and their respective businesses and operations as are necessary to enable it to make an informed decision with respect to the execution, delivery and performance of the Business Combination, (iii) in entering into the Business Combination Agreement and the ancillary documents thereto to which it is or will be a party, Owlet has relied solely on its own investigation and analysis and the representations and warranties expressly set forth in Article 4 of the Business Combination Agreement and in the ancillary documents thereto and no other representations or warranties of any Sandbridge Party, either express or implied, and (iv) Owlet, on its own behalf and on behalf of its representatives, acknowledges, and agrees that, except for the representations and warranties expressly set forth in Article 4 of the Business Combination Agreement and in the ancillary documents thereto to which it is or will be a party, none of the Sandbridge Parties or any other person makes or has made any representation or warranty, either express or implied, in connection with or related to the Business Combination Agreement, the ancillary documents thereto or the transactions contemplated thereby.

Under the Business Combination Agreement, the Sandbridge Parties made customary representations and warranties to Owlet relating to, among other things:

• organization and qualification, including that each Sandbridge Party is a corporation, limited liability company or other applicable business entity duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation;

• each Sandbridge Party has the requisite power and authority to execute and deliver the Business Combination Agreement and each of the ancillary documents thereto to which it is or will be a party and to consummate the Transactions;

• other than as described in the Business Combination Agreement, (i) no consent, approval or authorization of, or designation, declaration or filing with, any governmental entity is required on the part of a Sandbridge Party with respect to the execution, delivery or performance of its obligations under the Business Combination Agreement or the ancillary documents thereto to which it is or will be party or the consummation of the Transactions, and (ii) neither the execution, delivery or performance by a Sandbridge Party of the Business Combination Agreement nor the ancillary documents thereto nor the consummation by any Sandbridge Party of the transactions will, directly or indirectly (a) result in any breach of any provision of the governing documents of a Sandbridge Party, (b) result in a violation or breach of, or constitute a default or give rise to any right of termination, modification, or acceleration under any contract to which a Sandbridge Party is a party, (c) violate, or constitute a breach under, any order or applicable law to which any Sandbridge Party or any of its properties or assets are bound or (d) result in the creation of any lien upon any of the assets or properties (other than liens permitted under the Business Combination Agreement) of a Sandbridge Party;

115

Exhibit 7
Page 734

- except as described in the Disclosure Schedules, none of the Sandbridge Parties has incurred or will incur any liability for any brokerage, finder's fee or other fee or commission in connection with the Transactions;

- none of the information supplied or to be supplied by or on behalf of either Sandbridge Party expressly for inclusion or incorporation by reference prior to the Closing in this proxy statement/prospectus will, when this proxy statement/prospectus is declared effective or mailed to Sandbridge's investors or at the time of the Special Meeting, and in the case of any amendment thereto, at the time of such amendment, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading;

- capitalization, including that (i) all outstanding equity securities of Sandbridge have been duly authorized and validly issued, are fully paid and non-assessable, were not issued in violation of the governing documents of Sandbridge, and were not issued in violation of and are not subject to any preemptive rights, call option, right of first refusal, subscription rights, transfer restrictions or similar rights of any person, (ii) on the Closing Date and immediately after the Closing and the closings under all of the Subscription Agreements have occurred, the authorized amount of its capital stock and the amount issued and outstanding will be as set forth in the Business Combination Agreement, based on the assumptions described therein, (iii) except as mutually agreed by Owlet and Sandbridge, there are no outstanding (a) equity appreciation, phantom equity or profit participation rights or (b) options, restricted stock, phantom stock, warrants, purchase rights, subscription rights, conversion rights, exchange rights, calls, puts, rights of first refusal or first offer or other contracts that could require Sandbridge to, and Sandbridge has no obligation to, issue, sell, acquire, repurchase or redeem any equity securities or securities convertible into or exchangeable for equity securities of Sandbridge, (iv) the equity securities of Merger Sub outstanding as of the date of the Business Combination Agreement have been duly authorized, validly issued and are fully paid and nonassessable, and were issued in compliance in all material respects with applicable law and not in breach or violation of any preemptive rights or contract to which Merger Sub is a party or bound, (v) all of the outstanding equity securities of Merger Sub are owned directly by Sandbridge free and clear of all liens, and (vi) as of the date of the Business Combination Agreement, Sandbridge has no subsidiaries other than Merger Sub and does not own, directly or indirectly, any equity securities in any person other than Merger Sub;

- SEC filings, including that (i) Sandbridge has timely filed or furnished all statements, forms, reports and documents required to be filed or furnished by it with the SEC, (ii) each such filing or information furnished, as of its respective date, complied and will comply, in all material respects with the applicable requirements of the federal securities laws and did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made or will be made, as applicable, not misleading, and (iii) as of the date of the Business Combination Agreement, there are no outstanding or unresolved comments in comment letters received from the SEC with respect to such filings or furnished information;

- the Trust Account, including that, as of the date of the Business Combination Agreement, (i) the Trust Account has a specified balance and the funds held in the Trust Account are invested in United States "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act or in money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act, (ii) the funds held in the Trust Account are held in trust by Continental pursuant to the Trust Agreement, (iii) Sandbridge has performed all material obligations required to be performed by it under the Trust Agreement, (iv) there are no claims or proceedings pending with respect to the Trust Account, and (v) since September 14, 2020, Sandbridge has not released any money from the Trust Account (other than interest income earned on the funds held in the Trust Account as permitted by the Trust Agreement);

- transactions with affiliates, including that no related party owns any interest in any material asset used in the business of Sandbridge, possesses, directly or indirectly, any material financial interest in, or is a director or executive officer of, any person which is a material client, supplier, customer, lessor or lessee of Sandbridge or owes any material amount to, or is owed material any amount by, Sandbridge;

116

Exhibit 7
Page 735

TABLE OF CONTENTS

- litigation, including that, there is no proceeding pending or, to Sandbridge's knowledge, threatened against or involving any Sandbridge Party that, if adversely decided or resolved, would be material to the Sandbridge Parties, taken as a whole;

- compliance with applicable laws;

- business activities, including that (i) since its incorporation, Sandbridge has not conducted any business activities other than activities (a) in connection with its incorporation or continuing corporate existence, (b) directed toward the accomplishment of a business combination, or (c) those that are administrative, ministerial or otherwise immaterial in nature, and (ii) Merger Sub was organized solely for the purpose of entering into the Business Combination Agreement, the ancillary documents thereto and consummating the Transactions and has not engaged in any business activities other than as contemplated by the Business Combination Agreement;

- the investment company act;

- internal controls, listing and financial statements, including that, among others, (i) except as is not required in reliance on exemptions from various reporting requirements by virtue of Sandbridge's status as an "emerging growth company" or "smaller reporting company", since its initial public offering, (ii) Sandbridge has not taken any action prohibited by Section 402 of the Sarbanes-Oxley Act, (iii) since its initial public offering, Sandbridge has complied in all material respects with all applicable listing and corporate governance rules and regulations of the NYSE, (iv) the Sandbridge SEC reports contain true and complete copies of the applicable Sandbridge financial statements, (v) Sandbridge has established and maintains systems of internal accounting controls that are designed to provide, in all material respects, reasonable assurance that (a) all transactions are executed in accordance with management's authorization and (b) all transactions are recorded as necessary to permit preparation or proper and accurate financial statements in accordance with GAAP, (vi) since its incorporation, Sandbridge has not received any written complaint, allegation, assertion or claim that there is (a) a "significant deficiency" in the internal controls over financial reporting of Sandbridge to Sandbridge's knowledge, (b) a "material weakness" in the internal controls over financial report of Sandbridge to Sandbridge's knowledge or (c) fraud, whether or not material, that involves management or other employees of Sandbridge who have a significant role in the internal controls over financial reporting of Sandbridge, (vii) except as disclosed in filings with the SEC, neither Sandbridge nor Merger Sub have any material indebtedness, (viii) there are no outstanding loans or other extensions of credit made by Sandbridge to any executive officer, and (ix) the books and records of Sandbridge have been, and are being, maintained in all material respects in accordance with GAAP and any other applicable legal and accounting requirements;

- absence of changes;

- with certain exceptions, that none of the Sandbridge Parties has any liabilities of the type required to be set forth on a balance sheet in accordance with GAAP;

- tax matters;

- that, in issuing the Sandbridge Class A common stock pursuant to the Business Combination Agreement, neither Sandbridge nor, to Sandbridge's knowledge, anyone acting on its behalf has offered to sell Sandbridge Class A common stock by any form of general solicitation or advertising;

- compliance with international trade and anti-corruption laws;

- that Sandbridge has provided true and correct copies of each of the Subscription Agreements to Owlet on or prior to the date of the Business Combination Agreement; and

- investigation, including that (i) Sandbridge has conducted its own independent review and analysis of, and, based thereon, has formed an independent judgment concerning, the business, assets, condition, operations and prospects, of the Group Companies and has been furnished with or given access to such documents and information about the Group Companies as necessary to enable it to make an informed decision with respect to the execution, delivery and performance of the Business Combination Agreement, the ancillary documents thereto and the Transactions, and (ii) each Sandbridge Party has relied solely on its own investigation and analysis and the representations and warranties set forth in

117

Exhibit 7
Page 736

the Business Combination Agreement and in the ancillary documents thereto and that none of Owlet, Owlet's affiliates or any other person has made any representations or warranties, either express or implied, in connection with or related to the Business Combination Agreement, the ancillary documents thereto or the Transactions.

**Material Adverse Effect**

Under the Business Combination Agreement, certain representations and warranties of Owlet and Sandbridge are qualified in whole or in part by materiality thresholds. In addition, certain representations and warranties of Owlet and Sandbridge are qualified in whole or in part by a material adverse effect standard for purposes of determining whether a breach of such representations and warranties has occurred.

Pursuant to the Business Combination Agreement, an "Owlet Material Adverse Effect" means any change, event, effect or occurrence that, individually or in the aggregate with any other change, event, effect or occurrence, has had or would reasonably be expected to have a material adverse effect on (a) the business, results of operations or financial condition of Owlet and its subsidiaries, taken as a whole, or (b) the ability of Owlet to consummate the Business Combination in accordance with the terms of the Business Combination Agreement; provided, however, that, in the case of clause (a), none of the following will be taken into account in determining whether an Owlet Material Adverse Effect has occurred or is reasonably likely to occur: any adverse change, event, effect or occurrence arising after the date of the Business Combination Agreement from or related to (i) general business or economic conditions in or affecting the United States, or changes therein, or the global economy generally, (ii) any national or international political or social conditions in the United States or any other country, including the engagement by the United States or any other country in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence in any place of any military or terrorist attack, sabotage or cyberterrorism, (iii) changes in conditions of the financial, banking, capital or securities markets generally in the United States or any other country or region in the world, or changes therein, including changes in interest rates in the United States or any other country and changes in exchange rates for the currencies of any countries, (iv) changes in any applicable laws, (v) any change, event, effect or occurrence that is generally applicable to the industries or markets in which Owlet or any of its subsidiaries operates, (vi) the execution or public announcement of the Business Combination Agreement or the pendency or consummation of the transactions contemplated by the Business Combination Agreement, including the impact thereof on the relationships, contractual or otherwise, of Owlet or any of its subsidiaries with employees, customers, investors, contractors, lenders, suppliers, vendors, partners, licensors, licensees, payors or other third parties related thereto (provided that the exception in this clause (vi) will not apply to the representations and warranties set forth in Section 3.5(b) of the Business Combination Agreement to the extent that its purpose is to address the consequences resulting from the public announcement or pendency or consummation of the transactions contemplated by the Business Combination Agreement or the condition set forth in Section 6.2(a) of the Business Combination Agreement to the extent it relates to such representations and warranties), (vii) any failure by Owlet or any of its subsidiaries to meet, or changes to, any internal or published budgets, projections, forecasts, estimates or predictions (although the underlying facts and circumstances resulting in such failure may be taken into account to the extent not otherwise excluded from this definition pursuant to clauses (i) through (vi) or (viii)), or (viii) any hurricane, tornado, flood, earthquake, tsunami, natural disaster, mudslides, wild fires, epidemics, pandemics (including COVID-19) or quarantines, acts of God or other natural disasters or comparable events in the United States or any other country or region in the world, or any escalation of the foregoing; provided, however, that any change, event, effect or occurrence resulting from a matter described in any of the foregoing clauses (i) through (v) or (viii) may be taken into account in determining whether an Owlet Material Adverse Effect has occurred or is reasonably likely to occur to the extent such change, event, effect or occurrence has a disproportionate adverse effect on Owlet or any of its subsidiaries, taken as a whole, relative to other participants operating in the industries or markets in which Owlet or any of its subsidiaries operate.

Under the Business Combination Agreement, certain representations and warranties of the Sandbridge Parties are qualified in whole or in part by a material adverse effect standard for purposes of determining whether a breach of such representations and warranties has occurred. Pursuant to the Business Combination Agreement, a "Sandbridge Material Adverse Effect" means any change, event, effect or occurrence that, individually or in the aggregate with any other change, event, effect or occurrence, has had or would reasonably be expected to have a material adverse effect on the ability of any Sandbridge Party to consummate the Merger in accordance with the terms of this Agreement.

118

Exhibit 7
Page 737

**Covenants of the Parties**

*Covenants of Owlet*

Owlet made certain covenants under the Business Combination Agreement, including, among others, the following:

- Subject to certain exceptions or as consented to in writing by Sandbridge (such consent not to be unreasonably withheld, conditioned or delayed), prior to the Closing, Owlet will, and will cause its subsidiaries to, use commercially reasonable efforts to operate the business of Owlet and its subsidiaries in the ordinary course in all material respects and use commercially reasonable efforts to maintain and preserve intact in all material respects the business organization, assets, properties and material business relations of Owlet and its subsidiaries, taken as a whole.

- Subject to certain exceptions, prior to the Closing, Owlet will not, and will cause its subsidiaries not to, do any of the following without Sandbridge's consent (such consent not to be unreasonably withheld, conditioned or delayed):

  - declare, set aside, make or pay a dividend on, or make any other distribution or payment in respect of, any equity securities of Owlet or its subsidiaries, or repurchase any outstanding equity securities of Owlet or any of its subsidiaries, other than dividends or distributions, declared, set aside, or paid by any of Owlet's subsidiaries to Owlet or any subsidiary that is, directly or indirectly, wholly owned by Owlet;

  - (A) merge, consolidate, combine or amalgamate with any person, or (B) purchase or otherwise acquire any business entity or organization;

  - adopt any amendments, supplements, restatements or modifications to any governing documents of Owlet or any subsidiary, or to the Stockholders Agreement;

  - dispose of or subject to a lien any equity securities of Owlet or its subsidiaries or issue any options or other rights, agreements, arrangements or commitments obligating Owlet or any of its subsidiaries to issue, deliver or sell any equity securities of Owlet or its subsidiaries, other than the issuance of shares of the applicable class of Owlet capital stock upon the exercise or settlement of any Owlet options outstanding on the date of the Business Combination Agreement, or the promise or grant of certain restricted stock units or options in connection with the hiring, promotion or retention of employees, consultants or advisors, consistent with past practice with respect to up to 1,000,000 shares in the aggregate;

  - enter into, renew, modify or revise any Company Related Party Transaction (as defined in the Business Combination Agreement);

  - incur, create or assume any indebtedness other than ordinary course trade payables;

  - make any loans, advances or capital contributions to, or guarantees for the benefit of, or any investments in, any person, other than (A) intercompany loans or capital contributions between Owlet and its wholly-owned subsidiaries and (B) the reimbursement of expenses in the ordinary course of business;

  - other than as required under any existing employee benefit plan or in order to comply with applicable law, (A) materially amend or modify, or adopt, establish, enter into or terminate any employee benefit plan, other than offer letters with new hires or to adjust compensation or terms as permitted by the Business Combination Agreement, (B) grant to any director, manager, officer, employee, individual independent contractor or other service provider of Owlet or its subsidiaries any bonus, incentive, severance, termination pay, or similar payment or increase the compensation or benefits payable to any current or former director, manager, officer, employee, individual independent contractor or other service provider of Owlet or its subsidiaries, other than increases in base compensation for non-officer employees with an annual base cash compensation less than a certain threshold in the ordinary course of business consistent with past practice and other than merit, promotion or other salary adjustments in accordance with the Company's budget, (C) take any action to accelerate any payment, right to payment, or benefit, or the funding of any payment, right to payment or benefit, payable or to become payable to any current or former director,

119

Exhibit 7
Page 738

manager, officer, employee, individual independent contractor or other service provider of Owlet or any subsidiary, (D) hire, engage or terminate the employment or engagement of any director, manager, officer, employee, individual independent contractor or other service provider, in accordance with the Company's hiring plan and other than other than any non-officer employee with an annual base cash compensation of less than a certain threshold in the ordinary course of business consistent with past practice and terminations for cause, (E) waive or release any noncompetition, non-solicitation, no-hire, nondisclosure or other restrictive covenant obligation of any current or former director, manager, officer, employee, individual independent contractor or other service provider of Owlet or any subsidiary, (F) promise, commit or agree to do any of the foregoing, or make any communications or commitments regarding any compensation or benefits following the Effective Time;

- negotiate, enter into, amend or extend any contract with any labor union, labor organization, works council, employee delegate, representative or other employee collective group;

- make, change or revoke any material tax election, enter into any material tax closing agreement or enter into or settle any material tax claim or assessment, or consent to any extension or waiver of the limitation period applicable to or relating to any material tax claim assessment, other than any such extension or waiver obtained in the ordinary course of business;

- enter into any settlement, conciliation or similar contract that involves payment in excess of a certain threshold or that imposes any material non-monetary obligations on Owlet or any of its subsidiaries;

- authorize, recommend, propose or announce an intention to adopt, or otherwise effect, a plan of complete or partial liquidation, dissolution, restructuring, recapitalization, reorganization or similar transaction involving Owlet or any of its subsidiaries;

- make any material changes to the methods of accounting of Owlet or any of its subsidiaries, other than changes that are made in accordance with PCAOB standards;

- enter into any contract providing for the payment of any brokerage fee, finders' fee or other commission in connection with the transactions contemplated by the Business Combination Agreement;

- enter into, amend, modify or terminate, or waive any material contract of the type described in certain sections of the Business Combination Agreement;

- exclusively license, sell, assign, transfer, abandon, allow to lapse or otherwise dispose of any Intellectual Property Rights (as defined in the Business Combination Agreement) material to the operation of the Group Companies' business; amend, modify, terminate, or waive any material benefit or right under, certain scheduled contracts that are material to the operation of the Owlet's business (excluding, for the avoidance of doubt, any expiration or extension or automatic renewal of any such Contract pursuant to its terms or in the ordinary course of business); or enter into any Contract under which any Group Company is limited in any material respect in its ability to use or enforce any material Company Owned Intellectual Property, excluding non-exclusive licenses granted in the ordinary course of business; or

- enter into any agreement to take or cause to be taken any of the foregoing actions.

- Owlet shall use its reasonable best efforts to obtain promptly, and in any event no later than 24 hours following the execution of the Business Combination Agreement, the Owlet stockholder written consent.

- Subject to certain exceptions, prior to the Closing, Owlet will purchase a "tail" policy providing directors' and officers' liability insurance coverage for the benefit of certain Owlet directors and officers with respect to matters occurring on or prior to the Closing for a period of six (6) years following Closing.

- Subject to certain exceptions, prior to the Closing or termination of the Business Combination Agreement in accordance with its terms, Owlet will not, and will cause its subsidiaries and its and their

120

Exhibit 7
Page 739

respective representatives not to, directly or indirectly: (i) solicit, initiate, encourage, facilitate, discuss or negotiate, directly or indirectly, any inquiry, proposal or offer with respect to a Company Acquisition Proposal (as defined in the Business Combination Agreement); (ii) furnish or disclose any non-public information to any person in connection with, or that could reasonably be expected to lead to, a Company Acquisition Proposal; (iii) enter into any contract or other arrangement or understanding regarding a Company Acquisition Proposal; (iv) prepare or take any steps in connection with a public offering of any equity securities of Owlet or its subsidiaries (or any affiliate or successor of Owlet or its subsidiaries); or (v) otherwise cooperate in any way with, or assist or participate in, or knowingly facilitate or encourage any effort or attempt by any person to do or seek to do any of the foregoing.

### *Covenants of Sandbridge*

Sandbridge made certain covenants under the Business Combination Agreement, including, among others, the following:

- Subject to certain exceptions, including as contemplated by the Business Combination Agreement and the Ancillary Documents or as consented to in writing by Owlet, prior to the Closing, Sandbridge will not, and will cause its subsidiaries not to, do any of the following:

  - adopt any amendments, supplements, restatements or modifications to the Sandbridge trust agreement, warrant agreement or the governing documents of any Sandbridge Party or any of its subsidiaries;

  - declare, set aside, make or pay any dividends on or make any other distribution or payment in respect of, or repurchase, redeem or otherwise acquire any outstanding, any outstanding equity securities of Sandbridge or any subsidiary;

  - split, combine or reclassify any of its capital stock or other equity securities or issue any other security in respect of, in lieu of or in substitution for shares of its capital stock;

  - incur, create or assume any indebtedness or other liability (including any incurrence, creation or assumption of any indebtedness under any contract with the Sponsor or any of its affiliates);

  - make any loans or advances to, or capital contributions in, any other person, other than to, or in, Sandbridge or any of its subsidiaries;

  - issue any equity securities of Sandbridge or any of its subsidiaries or grant any additional options, warrants or stock appreciation rights with respect to equity securities of the foregoing of Sandbridge or any of its subsidiaries;

  - enter into, renew, modify or revise any Sandbridge related party transaction;

  - engage in any activities or business, other than activities or business (i) in connection with or incident or related to such person's organization, incorporation or formation, as applicable, or continuing corporate (or similar) existence, (ii) contemplated by, or incident or related to, the Business Combination Agreement, any ancillary document thereto, the performance of covenants or agreements thereunder or the consummation of the transactions contemplated thereby or (iii) those that are administrative or ministerial and immaterial in nature;

  - make, change or revoke any material tax election, enter into any material tax closing agreement, enter into or settle any material tax claim or assessment or consent to any extension or waiver of the limitation period applicable to or relating to any material tax claim or assessment, other than any such extension or waiver obtained in the ordinary course of business;

  - authorize, recommend, propose or announce an intention to adopt a plan of complete or partial liquidation or dissolution; and

  - enter into any contract providing for the payment of any brokerage fee, finders' fee or other commission in connection with the transactions contemplated by the Business Combination Agreement; and

  - enter into any contract to take or cause to be taken the foregoing actions.

121

Exhibit 7
Page 740

- As promptly as reasonably practicable following the effectiveness of the registration statement of which this proxy statement/prospectus forms a part, Sandbridge will duly give notice of and use its reasonable best efforts to duly convene and hold the Special Meeting to approve the Required Transaction Proposals.

- Sandbridge will use its reasonable best efforts to cause Sandbridge to satisfy all applicable listing requirements of the NYSE.

- Subject to certain exceptions, prior to the Closing or termination of the Business Combination Agreement in accordance with its terms, the Sandbridge Parties will not, and will cause their representatives not to, directly or indirectly: (i) solicit, initiate, encourage (including by means of furnishing or disclosing information), facilitate, discuss or negotiate, directly or indirectly, any inquiry, proposal or offer (written or oral) with respect to a Sandbridge Acquisition Proposal (as defined in the Business Combination Agreement); (ii) furnish or disclose any non-public information to any person in connection with, or that could reasonably be expected to lead to, a Sandbridge Acquisition Proposal; (iii) enter into any contract or other arrangement or understanding regarding a Sandbridge Acquisition Proposal; (iv) prepare or take any steps in connection with an offering of any securities of Sandbridge (or any affiliate or successor of Sandbridge); or (v) otherwise cooperate in any way with, or assist or participate in, or knowingly facilitate or encourage any effort or attempt by any person to do or seek to do any of the foregoing.

### Mutual Covenants of the Parties

The parties made certain covenants under the Business Combination Agreement, including, among others, the following:

- using reasonable best efforts to take, or cause to be taken, all actions and do, or causing to be done, all things reasonably necessary to consummate the Business Combination, including the satisfaction, but not the waiver, of the closing conditions to the Business Combination Agreement and the execution of each ancillary document thereto;

- using reasonable best efforts to obtain, file with or deliver to, as applicable, any consents of any Governmental Entities or other third parties necessary, proper or advisable to consummate the Business Combination, including all filings to be made under the HSR Act;

- subject to certain exceptions, notifying the other party in writing promptly after learning of any stockholder demands or other stockholder proceedings relating to the Business Combination Agreement, any ancillary document or any matters relating thereto and reasonably cooperating with one another in connection therewith;

- keeping certain information confidential in accordance with the existing non-disclosure agreements;

- refraining from making public announcements regarding the transactions without the written consent of the other party;

- using reasonable best efforts to cause the Merger to be treated as transactions that qualify under Section 351(a) of the Code, or to cause the Merger to be treated as a "reorganization" within the meaning of Section 368(a) of the Code or otherwise use commercially reasonable efforts to restructure the Merger to so qualify; and

- cooperate in connection with certain tax matters and filings.

In addition, Sandbridge and Owlet agreed that Sandbridge and Owlet will prepare and mutually agree upon, and Sandbridge will file with the SEC, the registration statement on Form S-4 relating to the Business Combination of which this proxy statement/prospectus forms a part.

### Board of Directors

Sandbridge will take all such action within its power as may be necessary or appropriate such that, immediately after the Effective Time, (i) the New Owlet Board will consist of up to nine (9) directors, (ii) the members of the New Owlet Board will include the two (2) individuals, in the classes indicated, designated by Sandbridge, at least one of whom shall be an "independent" director for purposes of NYSE, and up to seven (7)

122

Exhibit 7
Page 741

individuals, in the classes indicated, designated by Owlet pursuant to the Business Combination Agreement; (iii) the individuals identified pursuant to the Business Combination Agreement shall serve on the committees assigned to them, and (iv) the individuals identified pursuant to the Business Combination Agreement will become the officers of New Owlet.

**Survival of Representations, Warranties and Covenants**

The representations, warranties, agreements and covenants (to the extent such agreements or covenants contemplates or requires performance at or prior to the Effective Time) in the Business Combination Agreement terminate at the Effective Time, except for the covenants and agreements that expressly contemplate performance after the Effective Time.

**Termination**

The Business Combination Agreement may be terminated under certain customary and limited circumstances at any time prior to the Closing, including, among others, the following:

- by the mutual written consent of Sandbridge and Owlet;

- by Sandbridge, subject to certain exceptions, if any of the representations or warranties made by Owlet are not true and correct or if Owlet fails to perform any of its respective covenants or agreements under the Business Combination Agreement (including an obligation to consummate the Closing) such that certain conditions to the obligations of Sandbridge, as described in the section titled "*The Business Combination Agreement - Conditions to Closing of the Business Combination*" above could not be satisfied and the breach (or breaches) of such representations or warranties or failure (or failures) to perform such covenants or agreements is (or are) not cured or cannot be cured within the earlier of (i) thirty (30) days after written notice thereof, and (ii) the Termination Date;

- by Owlet, subject to certain exceptions, if any of the representations or warranties made by the Sandbridge Parties are not true and correct or if any Sandbridge Party fails to perform any of its covenants or agreements under the Business Combination Agreement (including an obligation to consummate the Closing) such that the condition to the obligations of Owlet, as described in the section titled "*The Business Combination Agreement - Conditions to Closing of the Business Combination*" above could not be satisfied and the breach (or breaches) of such representations or warranties or failure (or failures) to perform such covenants or agreements is (or are) not cured or cannot be cured within the earlier of (i) thirty (30) days after written notice thereof, and (ii) the Termination Date;

- by either Sandbridge or Owlet,

    - if the transactions contemplated by the Business Combination Agreement have not been consummated on or prior to the Termination Date, unless the breach of any covenants or obligations under the Business Combination Agreement by the party seeking to terminate proximately caused the failure to consummate the transactions contemplated by the Business Combination Agreement;

    - if any governmental entity has issued an order or taken any other action permanently enjoining, restraining or otherwise prohibiting the transactions contemplated by the Business Combination Agreement and such order or other action has become final and nonappealable;

    - if the approval of the Required Transaction Proposals are not obtained at the Special Meeting (including any adjournment thereof); and

- by Sandbridge, if Owlet does not deliver, or cause to be delivered to Sandbridge, the Owlet stockholder written consent when required under the Business Combination Agreement.

**Expenses**

Except as otherwise set forth in the Business Combination Agreement, all fees and expenses incurred in connection with the Business Combination Agreement, the Ancillary Documents and the transactions contemplated thereby, including the fees and disbursements of counsel, financial advisors and accountants, will

123

Exhibit 7
Page 742

TABLE OF CONTENTS

be paid by the party incurring such fees or expenses; provided that, if the Closing occurs, then Sandbridge shall pay, or cause to be paid, upon consummation of the Merger and release of proceeds from the Trust Account, (i) all fees and disbursements of outside counsel to Owlet incurred in connection with the transactions contemplated by the Business Combination Agreement (including the PIPE Investment) and the Ancillary Documents and (ii) the fees and expenses of any other agents, advisors, consultants, experts, financial advisors and other service providers engaged by Owlet in connection with the transactions contemplated by the Business Combination Agreement and the Ancillary Documents. On the Closing Date following the Closing, Sandbridge will pay, or cause to be paid, all fees, expenses and disbursements incurred by or on behalf of Sandbridge of Merger Sub for outside counsel, agents, advisors, consultants, experts, financial advisors and other service providers engaged on or behalf of Sandbridge or Merger Sub in connection with the transactions contemplated by the Business Combination Agreement and the Ancillary Documents or otherwise in connection with Sandbridge's operations.

**Governing Law**

The Business Combination Agreement is governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of Delaware.

**Amendments**

The Business Combination Agreement may be amended or modified only by a written agreement executed and delivered by Sandbridge and Owlet.

124

Exhibit 7
Page 743

**RELATED AGREEMENTS**

*This section describes certain additional agreements entered into or to be entered into pursuant to the Business Combination Agreement, but does not purport to describe all of the terms thereof. The following summary is qualified in its entirety by reference to the complete text of each of the agreements. The form of Registration Rights Agreement, the form of Subscription Agreement, the form of Stockholders Agreement are attached hereto as Exhibit F, Exhibit G and Exhibit H, respectively, to the Business Combination Agreement, which is attached hereto as Annex A. The form of Sponsor Letter Agreement has been filed as an exhibit to the registration statement of which this proxy statement/prospectus forms a part. You are urged to read such agreements in their entirety prior to voting on the proposals presented at the Special Meeting.*

**Subscription Agreements**

Concurrently with the execution of the Business Combination Agreement, Sandbridge has entered into the Subscription Agreements, dated as of February 15, 2021, with each of the PIPE Investors, pursuant to which the PIPE Investors have agreed to subscribe for and purchase, and Sandbridge has agreed to issue and sell to the PIPE Investors, immediately prior to the Closing, an aggregate of 13 million shares of Sandbridge Class A common stock at a price of $10.00 per share, for aggregate gross proceeds of $130 million. The shares of Sandbridge Class A common stock to be issued pursuant to the Subscription Agreements have not been registered under the Securities Act in reliance upon the exemption provided in Section 4(a)(2) and/or Regulation D of the Securities Act. Sandbridge will grant the PIPE Investors certain registration rights in connection with the PIPE Financing. The PIPE Financing is contingent upon, among other things, the substantially concurrent Closing of the Business Combination.

**Amended and Restated Registration Rights Agreement**

At the Closing, New Owlet, the initial stockholders, including the Sponsor (the "Sponsor Equityholders") and certain holders of Owlet capital stock (the "Owlet Equityholders" and together with the Sponsor Equityholders, the "Holders") intend to enter into the Amended and Restated Registration Rights Agreement (the "Amended and Restated Registration Rights Agreement"), pursuant to which, among other things, the Sponsor Equityholders and the Owlet Equityholders will be granted certain registration rights with respect to their respective shares of New Owlet common stock, in each case, on the terms and subject to the conditions therein. New Owlet will be obligated to file a registration statement to register the resale of certain securities of New Owlet held by the Holders. In addition, subject to certain requirements and customary conditions, including with regard to the number of demand rights that may be exercised, the Holders may demand at any time or from time to time, to sell all or any portion of their registrable securities in an underwritten offering so long as the total offering price is reasonably expected to exceed $50 million. The Amended and Restated Registration Rights Agreement will also provide the Holders with "piggy-back" registration rights, subject to certain requirements and customary conditions.

All fees, costs and expenses of underwritten registrations will be borne by New Owlet and all incremental selling expenses relating to such registrations, including underwriting discounts and selling commissions, brokerage fees and underwriter marketing costs and all reasonable fees and expenses of any legal counsel representing the holders will be borne by the holders of the registrable securities being registered. The Amended and Restated Registration Rights Agreement contains customary cross-indemnification provisions, under which New Owlet is obtained to indemnify holders of registrable securities in the event of material misstatements or omissions in the registration statement attributable to New Owlet, and holders of registrable securities are obligated to indemnify New Owlet for material misstatements or omissions attributable to them.

Pursuant to the Amended and Restated Registration Rights Agreement, the securities of New Owlet will cease to be registrable securities upon the earlier of (i) the date as of which all of the registrable securities have been sold pursuant to an effective registration statement, (ii) the date as of which such securities shall have been otherwise transferred, new certificates for such securities not bearing a legend restricting further transfer shall have been delivered to New Owlet and subsequent public distribution of such securities shall not require registration under the Securities Act, (iii) the date as of which such securities have ceased to be outstanding, (iv) the date as of which the holders of all such registrable securities are permitted to sell the registrable securities without registration pursuant to Rule 144 under the Securities Act (but with no volume or manner of sale restrictions or limitations) and (v) when such securities have been sold to, or through, a broker, dealer or underwriter in a public distribution or other public securities transaction.

125

Exhibit 7
Page 744

**Sponsor Letter Agreement**

Concurrently with the execution of the Business Combination Agreement, the Sponsor, the PIMCO private funds, the Sandbridge fund (the "Investors") Ken Suslow, Richard Henry, Joe Lamastra, Domenico De Sole, Ramez Toubassy, Jamie Weinstein, Krystal Kahler, Michael F. Goss, and Tommy Hilfiger (the "Insiders"), Sandbridge and New Owlet entered into a sponsor letter agreement (the "Sponsor Letter Agreement"), pursuant to which the Sponsor has and Insiders agreed to, among other things, (a) appear at the Special Meeting or otherwise cause its shares to be counted as present for the purpose of establishing quorum; (b) vote (or execute a written consent), or cause to be voted (or consent to be granted) any Sandbridge common stock and founder shares owned by it, him or her at such special meeting in person, or by proxy, in favor of the Business Combination and the adoption of the Business Combination Agreement and the transactions contemplated thereby; (c) vote (or execute a written consent) or cause to be voted (or consent to be granted) any Sandbridge common stock or founder shares owned by it, him or her at such special meeting in person, or by proxy, against any alternative business combination or any action that would reasonably be expected to materially impede, interfere with, delay, postpone or adversely affect the Business Combination or any of the related transactions or result in a breach of any covenant, representation or warranty or other obligation or agreement of Sandbridge under the Business Combination Agreement or the Sponsor under the Sponsor Letter Agreement and (d) not redeem any shares of founder shares owned by it, him or her in connection with the stockholder approval. Pursuant to the Sponsor Letter Agreement, a percentage of Sandbridge Class A common stock held by the Sponsor shall be subject to certain time and performance-based vesting provisions.

With certain exceptions, the Sponsor agreed that it will not transfer any founder shares or private placement warrants (or shares of Common Stock issued or issuable upon the exercise of private placement warrants) until 18 months after the Closing (the "Lock-up Period"). The Sponsor Agreement also provides that 50% of the founder shares beneficially owned by the Sponsor as of the Closing shall not be subject to vesting and shall convert to shares of common stock in accordance with the Current Charter. The remaining 50% of the founder shares beneficially owned by the Sponsor shall convert to shares of common stock in accordance with the terms of the Current Charter of Sandbridge and be subject to the following vesting terms: (i) 25% of the founder shares beneficially owned by the Sponsor as of the Closing shall vest at such time as a $12.50 stock price level is achieved and (ii) the remaining 25% of the founder shares beneficially owned by the Sponsor as of the Closing shall vest at such time as a $15.00 stock price level is achieved, in each case, on or before the fifth anniversary of the Closing of the Business Combination. The "stock price level" will be considered achieved only (a) when the closing price of a share of New Owlet common stock on the NYSE is greater than or equal to the applicable price for any 20 trading days within a 30 trading day period or (b) the price per share of New Owlet common stock paid in a Sandbridge Sale is greater than or equal to the applicable price. Founder shares subject to vesting pursuant to the above terms that do not vest in accordance with such terms shall be forfeited.

The Sponsor Agreement will terminate on the earlier of (a) the consummation of a Sandbridge Sale and (b) if earlier, the latest to occur of (i) the earlier of (x) the achievement of a $15.00 stock price level and (y) the fifth anniversary of the closing of the Business Combination and (ii) the expiration of the Lock-up Period.

**Stockholders Agreement**

Contemporaneously with the Closing, New Owlet and certain stockholders of Owlet will enter into the Stockholders Agreement, which will be effective upon the Closing and will provide for the following terms and other customary terms and conditions:

- *Eclipse Nomination Rights*. From Closing of the Business Combination Agreement and until such time as Eclipse beneficially owns less than 10% of the Owlet common stock: (i) Eclipse will be entitled to nominate one director for election upon sufficient written notice to the Company; and (ii) if Eclipse makes a nomination, New Owlet shall include such director as a nominee for election as a director at the applicable New Owlet stockholders meeting and recommend to the New Owlet stockholders that such Eclipse director be elected as a director at such New Owlet stockholder meeting.

- *Chairperson*. Lior Susan shall serve as Chairperson of the New Owlet Board at Closing.

*Indemnification; Reimbursement of Expenses; D&O Insurance*. As promptly as practicable following the Closing, New Owlet shall enter into an indemnification agreement with each director. In addition, New Owlet shall purchase and maintain directors' and officers' liability insurance covering each director, and reimburse each director for all reasonable and documented out-of-pocket expenses incurred in connection with their attendance at meetings.

126

Exhibit 7
Page 745

**THE CHARTER AMENDMENT PROPOSAL**

**Overview**

In connection with the Business Combination, Sandbridge is asking its stockholders to approve the adoption of the Proposed Charter, in the form attached hereto as Annex B. If the Business Combination and the Charter Amendment Proposal are approved, the Proposed Charter would replace the Current Charter.

The Charter Amendment Proposal is conditioned on the approval of the Business Combination Proposal and the other Required Transaction Proposals. Therefore, if the Business Combination Proposal is not approved, the Charter Amendment Proposal will have no effect, even if approved by the Sandbridge stockholders. It is a condition to the completion of the Business Combination that the Charter Amendment Proposal be approved.

**Comparison of Current Charter to Proposed Charter**

The following is a summary of the key changes effected by the Proposed Charter relative to the Current Charter. This summary is qualified in its entirety by reference to the full text of the Proposed Charter, a copy of which is included as Annex B.

- change Sandbridge's name to "Owlet, Inc.";

- increase the total number of authorized shares of all classes of capital stock, par value of $0.0001 per share, from 111,000,000 shares, consisting of 110,000,000 shares of common stock, including 100,000,000 shares of Class A common stock, and 10,000,000 shares of Class B common stock, and 1,000,000 shares of preferred stock, to 1,100,000,000 shares, consisting of 1,000,000,000 shares of Class A common stock, par value $0.0001 per share, and 100,000,000 shares of preferred stock, par value $0.0001 per share;

- to remove the provision renouncing the corporate opportunity doctrine;

- to require the vote of at least two-thirds of the voting power of the outstanding shares of capital stock to amend or repeal certain provisions of the Proposed Charter;

- to require the vote of at least two-thirds of the voting power of the outstanding shares of capital stock, rather than a simple majority, to remove a director from office;

- to require the vote of at least two-thirds of the voting power of the outstanding shares of capital stock to adopt, amend or repeal the Proposed Bylaws; and

- eliminate certain provisions specific to Sandbridge's status as a blank check company.

**Reasons for the Approval of the Charter Amendment Proposal**

In the judgment of the Sandbridge Board, the Proposed Charter is necessary to address the needs of the post-combination company. In particular:

- the greater number of authorized shares of capital stock is desirable for New Owlet to have sufficient shares to complete the Business Combination and have additional authorized shares for financing its business, for acquiring other businesses, for forming strategic partnerships and alliances and for stock dividends and stock splits; and

- the provisions that relate to the operation of Sandbridge as a blank check company prior to the consummation of its initial business combination will not be applicable to New Owlet (such as the obligation to dissolve and liquidate if a business combination is not consummated in a certain period of time).

**Vote Required for Approval**

Approval of the Charter Amendment Proposal requires the affirmative vote of the holders of (i) at least a majority of the outstanding shares of Sandbridge Class B common stock, voting separately as a single class, and (ii) a majority of the outstanding shares of Sandbridge common stock entitled to vote thereon, voting together as a single class.

127

Exhibit 7
Page 746

**Recommendation of the Sandbridge Board of Directors**

**THE SANDBRIDGE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT SANDBRIDGE STOCKHOLDERS VOTE "<u>FOR</u>" THE APPROVAL OF THE CHARTER AMENDMENT PROPOSAL.**

The existence of financial and personal interests of one or more of Sandbridge's directors or officers may result in a conflict of interest on the part of such director(s) or officer(s) between what they may believe is in the best interests of Sandbridge and its stockholders and what they may believe is best for himself or themselves in determining to recommend that stockholders vote for the proposals. For instance, ownership of founder shares by Mr. Toubassy, Mr. De Sole and Mr. Goss, our independent directors, may create a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate an initial business combination, and in determining the terms on which we are willing to consummate such a transaction. See "*The Business Combination Proposal – Interests of Sandbridge's Directors and Officers in the Business Combination*" for a further discussion.

128

Exhibit 7
Page 747

TABLE OF CONTENTS

**THE ADVISORY CHARTER AMENDMENT PROPOSALS**

### Overview

In connection with the Business Combination, Sandbridge is asking its stockholders to vote upon, on a non-binding advisory basis, proposals to approve certain governance provisions contained in the Proposed Charter. This separate vote is not otherwise required by Delaware law separate and apart from the Charter Amendment Proposal but, pursuant to SEC guidance, Sandbridge is required to submit these provisions to its stockholders separately for approval, allowing stockholders the opportunity to present their separate views on important governance provisions. However, the stockholder votes regarding these proposals are advisory votes, and are not binding on Sandbridge or the Sandbridge Board (separate and apart from the approval of the Charter Amendment Proposal). In the judgment of the Sandbridge Board, these provisions are necessary to adequately address the needs of the post-combination company. Furthermore, the Business Combination is not conditioned on the separate approval of the Advisory Charter Amendment Proposals (separate and apart from approval of the Charter Amendment Proposal).

### Advisory Charter Amendment Proposals

| Advisory Charter Amendment Proposal | Sandbridge Current Charter/Bylaws | Proposed Charter/Bylaws |
|---|---|---|
| *Advisory Proposal A – Changes in Authorized Capital Stock* | Under the Current Charter, Sandbridge is currently authorized to issue 111,000,000 shares of capital stock, consisting of (a) 110,000,000 shares of common stock, including 100,000,000 shares of Sandbridge Class A common stock, par value $0.0001 per share, and 10,000,000 shares of Sandbridge Class B common stock, par value $0.0001 per share, and (b) 1,000,000 shares of preferred stock, par value $0.0001 per share. | Under the Proposed Charter, New Owlet will be authorized to issue 1,100,000,000 shares of capital stock, consisting of (i) 1,000,000,000 shares of New Owlet Class A common stock, par value $0.0001 per share, and (ii) 100,000,000 shares of preferred stock, par value $0.0001 per share. |
| *Advisory Proposal B – Takeovers by Interested Stockholders* | Under the Current Charter, Sandbridge elects not to be governed by Section 203 of the DGCL relating to takeovers by interested stockholders but has other similar restrictions regarding takeovers by interested stockholders. | Under the Proposed Charter, New Owlet would be governed by Section 203 of the DGCL. |
| *Advisory Proposal C – Required Vote to Amend the Charter* | The Current Charter provides that the Current Charter may be amended in accordance with Delaware law; *provided that*, (i) as long as any shares of class B common stock remain outstanding, Sandbridge will not amend the Current Charter if such amendment would alter the rights of the class B common stock without the prior vote or written consent of the holders of a majority of the shares of class B common stock then | Under the Proposed Charter, in addition to any vote required by Delaware law, the Proposed Charter requires the affirmative vote of at least two-thirds (66 and 2/3%) of the voting power of the outstanding shares to amend, alter, repeal or rescind Part B of Article IV, Article V, Article VI, Article VII, Article VIII and Article IX. |

129

Exhibit 7
Page 748

TABLE OF CONTENTS

| Advisory Charter Amendment Proposal | Sandbridge Current Charter/Bylaws | Proposed Charter/Bylaws |
|---|---|---|
| | outstanding, voting separately as a single class, (ii) prior to the closing of an initial business combination, any amendment to the Current Charter that would alter or change the provisions relating to director elections may only be amended by a resolution passed by holders of a majority of the shares of outstanding class B common stock, and (iii) prior to an initial business combination, any amendment to the Current Charter that would alter or change the provisions relating to an initial business combination requires the affirmative vote of the holders of at least 65% of all common stock then outstanding. | |
| *Advisory Proposal D – Required Vote to Remove Directors* | The Current Charter permits the removal of a director only for cause and only by the affirmative vote of the holders of at least a majority of the outstanding shares entitled to vote at an election of directors, voting together as a single class. | The Proposed Charter permits the removal of a director only for cause and only by the affirmative vote of the holders of at least two-thirds (66 and 2/3%) of the outstanding shares entitled to vote at an election of directors. |
| *Advisory Proposal E – Required Vote to Amend the Bylaws* | Under the Current Charter, the Sandbridge Board is expressly authorized to adopt, alter, amend or repeal the Bylaws by the affirmative vote of a majority of the Sandbridge Board. The Bylaws may also be adopted, amended, altered or repealed by the affirmative vote of at least a majority of the voting power of all of the then outstanding shares of capital stock of Sandbridge entitled to vote generally in the election of directors, voting together as a single class. | Under the Proposed Charter, the New Owlet Board is expressly authorized to adopt, alter, amend or repeal the Bylaws in accordance with Delaware law; *provided that*, in addition to any vote required by Delaware law, the adoption, amendment or repeal of the Bylaws by New Owlet stockholders will require the affirmative vote of the holders of at least two-thirds of the voting power of all of the then outstanding shares of voting stock of New Owlet entitled to vote generally in an election of directors. |
| *Advisory Proposal F – Other Changes In Connection With Adoption of the Proposed Organizational Documents* | The Current Charter includes provisions related to Sandbridge's status as a blank check company prior to the consummation of a business combination. | The Current Charter does not include such provisions related to Sandbridge's status as a blank check company, which no longer will apply upon consummation of the Business Combination, as Sandbridge will cease to be a blank check company at such time. |

130

Exhibit 7
Page 749

**Reasons for Approval of the Advisory Charter Amendment Proposals**

*Advisory Charter Amendment Proposal A – Changes in Authorized Capital Stock*

The Proposed Charter is intended to provide adequate authorized capital stock to (i) accommodate the issuance of shares of New Owlet Class A common stock as part of the consideration in the Business Combination and (ii) provide flexibility for future issuances of shares of New Owlet stock if determined by the New Owlet Board to be in the best interests of New Owlet after the consummation of the Business Combination without incurring the risk, delay and potential expense incident to obtaining stockholder approval for a particular issuance.

*Advisory Charter Amendment Proposal B – Corporate Opportunity Doctrine Waiver*

The Sandbridge Board believes that the removal of the corporate opportunity doctrine provisions ensures that directors, officers and controlling stockholders may not to take advantage of opportunities beneficial to New Owlet for themselves without first disclosing the opportunity to New Owlet and giving the New Owlet Board the opportunity to pursue or decline the opportunity on behalf of New Owlet.

*Advisory Charter Amendment Proposal C – Required Vote to Amend the Charter*

The Sandbridge Board believes that it is important to require a supermajority vote of the total voting power of the then outstanding shares of New Owlet stock, voting together as a single class, in order to amend provisions in the Proposed Charter.

*Advisory Charter Amendment Proposal D – Removal of Directors*

The Sandbridge Board believes that increasing the percentage of voting power required to remove a director from office is a prudent corporate governance measure to reduce the possibility that a relatively small number of stockholders could seek to implement a sudden and opportunistic change in control of the New Owlet Board without the support of the then incumbent board of directors. These changes will enhance the likelihood of continuity and stability in the composition of the New Owlet Board, avoid costly takeover battles, reduce the New Owlet Board's vulnerability to a hostile change of control and enhance the ability of the New Owlet Board to maximize shareholder value in connection with any unsolicited offer to acquire New Owlet.

*Advisory Charter Amendment Proposal E – Required Vote to Amend the Bylaws*

The Sandbridge Board believes that the supermajority voting requirement described in Advisory Charter Amendment Proposal C is appropriate to protect all stockholders of New Owlet. The Sandbridge Board is cognizant of the potential for certain stockholders to hold a substantial beneficial ownership of shares of common stock following the Business Combination. The Sandbridge Board further believes that going forward, a supermajority voting requirement encourages any person seeking control of New Owlet to negotiate with the New Owlet Board to reach terms that are appropriate for all stockholders.

*Advisory Charter Amendment Proposal F – Other Changes In Connection With Adoption of the Proposed Organizational Documents*

The Proposed Charter will not contain provisions related to a blank check company (including those related to operation of the trust account, winding up of Sandbridge's operations should Sandbridge not complete a business combination by a specified date, and other such blank check-specific provisions as are present in the Current Charter) because following the consummation of the Merger, New Owlet, will not be a blank check company.

**Vote Required for Approval**

Approval of each of the Advisory Charter Amendment Proposals, each of which is a non-binding vote, requires the affirmative vote of a majority of the votes cast by Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon. Abstentions and broker non-votes have no effect on the outcome of the proposal.

131

Exhibit 7
Page 750

TABLE OF CONTENTS

**Recommendation of the Sandbridge Board of Directors**

**THE SANDBRIDGE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT SANDBRIDGE STOCKHOLDERS VOTE "<u>FOR</u>" THE APPROVAL OF EACH OF THE ADVISORY CHARTER AMENDMENT PROPOSALS.**

The existence of financial and personal interests of one or more of Sandbridge's directors or officers may result in a conflict of interest on the part of such director(s) or officer(s) between what they may believe is in the best interests of Sandbridge and its stockholders and what they may believe is best for himself or themselves in determining to recommend that stockholders vote for the proposals. For instance, ownership of founder shares by Mr. Toubassy, Mr. De Sole and Mr. Goss, our independent directors, may create a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate an initial business combination, and in determining the terms on which we are willing to consummate such a transaction. See "*The Business Combination Proposal – Interests of Sandbridge's Directors and Officers in the Business Combination*" for a further discussion.

132

Exhibit 7
Page 751

TABLE OF CONTENTS

**THE NYSE PROPOSAL**

In connection with the Business Combination, we intend to effect the issuance of shares of New Owlet common stock to the stockholders of Owlet pursuant to the Transactions.

**Why Sandbridge Needs Stockholder Approval**

We are seeking stockholder approval in order to comply with Rule 312.03 of the NYSE Listed Company Manual.

Under Rule 312.03 of the NYSE Listed Company Manual, stockholder approval is required prior to the issuance of shares of common stock in certain circumstances, including if the number of shares of common stock to be issued to acquire a business is, or will be upon issuance, equal to or in excess of 20% of the number of shares of common stock outstanding before the issuance. The maximum aggregate number of shares of common stock issuable pursuant to the Transactions will represent more than 20% of the number of shares of Sandbridge common stock outstanding before such issuance and could result in a change of control of Sandbridge. As a result, stockholder approval of the issuance of shares of common stock pursuant to the Transactions is required under the NYSE regulations.

In connection with the Transactions, the Company may issue (i) 13,000,000 shares of Sandbridge Class A common stock to the PIPE Investors, and (ii) an aggregate of up to 102,500,000 shares of New Owlet common stock to existing Owlet equityholders pursuant to the terms of the Business Combination Agreement, in each case assuming a Closing Date of January 31, 2021.

**Vote Required for Approval**

If the Business Combination Proposal is not approved, the NYSE Proposal will not be presented at the Special Meeting. The approval of the NYSE Proposal requires the affirmative vote of a majority of the votes cast by the Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon.

Failure to submit a proxy at the Special Meeting or a broker non-vote will have no effect on the NYSE Proposal. However, the NYSE considers abstentions as "votes cast" and, therefore, abstentions will have the same effect as votes against this proposal.

The Business Combination is conditioned upon the approval of the NYSE Proposal, subject to the terms of the Business Combination Agreement. Notwithstanding the approval of the NYSE Proposal, if the Business Combination is not consummated for any reason, the actions contemplated by the NYSE Proposal will not be effected.

Sandbridge's Sponsor and our directors and officers have agreed to vote the founder shares and any public shares owned by them in favor of the NYSE Proposal. See "*Related Agreements – Sponsor Letter Agreement*" for more information.

**Recommendation of the Sandbridge Board of Directors**

**THE SANDBRIDGE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT SANDBRIDGE STOCKHOLDERS VOTE "<u>FOR</u>" THE APPROVAL OF THE NYSE PROPOSAL.**

The existence of financial and personal interests of one or more of Sandbridge's directors or officers may result in a conflict of interest on the part of such director(s) or officer(s) between what they may believe is in the best interests of Sandbridge and its stockholders and what they may believe is best for himself or themselves in determining to recommend that stockholders vote for the proposals. For instance, ownership of founder shares by Mr. Toubassy, Mr. De Sole and Mr. Goss, our independent directors, may create a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate an initial business combination, and in determining the terms on which we are willing to consummate such a transaction. See "*The Business Combination Proposal – Interests of Sandbridge's Directors and Officers in the Business Combination*" for a further discussion.

Exhibit 7
Page 752

**THE INCENTIVE AWARD PLAN PROPOSAL**

Sandbridge is asking its stockholders to approve by ordinary resolution the Owlet, Inc. 2021 Incentive Award Plan (the "2021 Plan") and the material terms thereunder. The Sandbridge board of directors approved the 2021 Plan, prior to the Sandbridge special meeting, subject to shareholder approval at the Sandbridge special meeting. The 2021 Plan became effective as of the date it was adopted by the Sandbridge board of directors, subject to approval by the Sandbridge stockholders.

The 2021 Plan is described in more detail below. A copy of the 2021 Plan is attached to this proxy statement/prospectus as Annex D.

**The 2021 Plan**

The principal purpose of the 2021 Plan is to attract, retain and motivate selected employees, consultants and directors through the granting of stock-based compensation awards and cash-based performance bonus awards. Equity awards and equity-linked compensatory opportunities are intended to motivate high levels of performance and align the interests of directors, employees and consultants with those of stockholders by giving directors, employees and consultants the perspective of an owner with an equity or equity-linked stake in our company and providing a means of recognizing their contributions to our success. The Sandbridge board of directors believes that equity awards are necessary for Owlet to remain competitive in its industry and are essential to recruiting and retaining the highly qualified employees.

**Summary of the 2021 Plan**

This section summarizes certain principal features of the 2021 Plan. The summary is qualified in its entirety by reference to the complete text of the 2021 Plan.

**Eligibility and Administration**

Options, restricted stock units and other stock-based and cash-based awards under the 2021 Plan may be granted to individuals who are then our officers, employees or consultants or are the officers, employees or consultants of certain of our subsidiaries. Such awards also may be granted to our directors. Only employees of our company or certain of our subsidiaries may be granted incentive stock options, or ISOs. Following the Business Combination, New Owlet is expected to have approximately        employees,        consultants and non-employee directors who will be eligible to receive awards under the 2021 Plan.

The compensation committee of our board of directors is expected to administer the 2021 Plan unless our board of directors assumes authority for administration. The 2021 Plan provides that the board or compensation committee may delegate its authority to grant awards to employees other than executive officers and certain senior executives of the company to a committee consisting of one or more members of our board of directors or one or more of our officers.

Subject to the terms and conditions of the 2021 Plan, the administrator has the authority to select the persons to whom awards are to be made, to determine the number of shares to be subject to awards and the terms and conditions of awards, and to make all other determinations and to take all other actions necessary or advisable for the administration of the 2021 Plan. The administrator is also authorized to adopt, amend or rescind rules relating to administration of the 2021 Plan. Our board of directors may at any time remove the compensation committee as the administrator and revest in itself the authority to administer the 2021 Plan.

**Shares Available for Awards**

Under the 2021 Plan,        shares of our common stock will be initially reserved for issuance pursuant to a variety of stock-based compensation awards, including stock options, stock appreciation rights, or SARs, restricted stock awards, restricted stock unit awards, performance bonus awards, performance stock unit awards, dividend equivalents, or other stock or cash based awards. The number of shares of common stock initially reserved for issuance or transfer pursuant to awards under the 2021 Plan will be increased by (i) the number of shares of common stock represented by awards outstanding under the Owlet Baby Care Inc. 2014 Incentive Award Plan, as amended, that become available for issuance under the counting provisions described below following the effective date (up to shares in the aggregate) and (ii) an annual increase on the first day of each fiscal year beginning in 2022 and ending in 2031, equal to the lesser of (A) 5% of the shares of common stock

134

Exhibit 7
Page 753

outstanding (on an as converted basis) on the last day of the immediately preceding fiscal year and (B) such smaller number of shares of common stock as determined by our board of directors or applicable committee; provided, however, that no more than        shares of common stock may be issued upon the exercise of incentive stock options.

The following counting provisions will be in effect for the share reserve under the 2021 Plan:

- to the extent that an award terminates, expires or lapses for any reason or an award is settled in cash without the delivery of shares, any shares subject to the award at such time will be available for future grants under the 2021 Plan;

- to the extent shares are tendered or withheld to satisfy the grant, exercise price or tax withholding obligation with respect to any award under the 2021 Plan, such tendered or withheld shares will be available for future grants under the 2021 Plan;

- to the extent shares subject to stock appreciation rights are not issued in connection with the stock settlement of stock appreciation rights on exercise thereof, such shares will be available for future grants under the 2021 Plan;

- the payment of dividend equivalents in cash in conjunction with any outstanding awards will not be counted against the shares available for issuance under the 2021 Plan; and

- to the extent permitted by applicable law or any exchange rule, shares issued in assumption of, or in substitution for, any outstanding awards of any entity acquired in any form of combination by us or any of our subsidiaries will not be counted against the shares available for issuance under the 2021 Plan.

The 2021 Plan also provides that the sum of the grant date fair value of all equity-based awards and the maximum that may become payable pursuant to a cash-based award to any individual for services as a non-employee director during any calendar year may not exceed $1,000,000.

**Types of Awards**

The 2021 Plan provides that the administrator may grant or issue stock options, SARs, restricted stock, restricted stock units, performance bonus awards, performance stock units, other stock- or cash-based awards and dividend equivalents, or any combination thereof. Each award will be set forth in a separate agreement with the person receiving the award and will indicate the type, terms and conditions of the award.

- *Nonstatutory Stock Options*, or NSOs, provide for the right to purchase shares of our common stock at a specified price that may not be less than fair market value on the date of grant, and usually will become exercisable (at the discretion of the administrator) in one or more installments after the grant date, subject to the participant's continued employment or service with us and/or subject to the satisfaction of corporate performance targets and individual performance targets established by the administrator. NSOs may be granted for any term specified by the administrator that does not exceed ten years.

- *Incentive Stock Options*, or ISOs, will be designed in a manner intended to comply with the provisions of Section 422 of the Code and will be subject to specified restrictions contained in the Code. Among such restrictions, ISOs must have an exercise price of not less than the fair market value of a share of common stock on the date of grant, may only be granted to employees, and must not be exercisable after a period of ten years measured from the date of grant. In the case of an ISO granted to an individual who owns (or is deemed to own) at least 10% of the total combined voting power of all classes of our capital stock, the 2021 Plan provides that the exercise price must be at least 110% of the fair market value of a share of common stock on the date of grant and the ISO must not be exercisable after a period of five years measured from the date of grant.

- *Restricted Stock* may be granted to any eligible individual and made subject to such restrictions as may be determined by the administrator. Restricted stock, typically, may be forfeited for no consideration or repurchased by us at the original purchase price if the conditions or restrictions on vesting are not met. In general, restricted stock may not be sold or otherwise transferred until restrictions are removed or

135

Exhibit 7
Page 754

expire. Holders of restricted stock, unlike recipients of options, will have voting rights and will have the right to receive dividends, if any, prior to the time when the restrictions lapse, however, dividends will not be released until restrictions are removed or expire.

- *Restricted Stock Units* may be awarded to any eligible individual, typically without payment of consideration, but subject to vesting conditions based on continued employment or service or on performance criteria established by the administrator. Like restricted stock, restricted stock units may not be sold, or otherwise transferred or hypothecated, until vesting conditions are removed or expire. Unlike restricted stock, stock underlying restricted stock units will not be issued until the restricted stock units have vested, and recipients of restricted stock units generally will have no voting or dividend rights prior to the time when vesting conditions are satisfied.

- *Stock Appreciation Rights*, or SARs, may be granted in connection with stock options or other awards, or separately. SARs granted in connection with stock options or other awards typically will provide for payments to the holder based upon increases in the price of our common stock over a set exercise price. The exercise price of any SAR granted under the 2021 Plan must be at least 100% of the fair market value of a share of our common stock on the date of grant. SARs under the 2021 Plan will be settled in cash or shares of our common stock, or in a combination of both, at the election of the administrator.

- *Performance Bonus Awards and Performance Stock Units* are denominated in cash or shares/unit equivalents, respectively, and may be linked to one or more performance or other criteria as determined by the administrator.

- *Other Stock or Cash Based Awards* are awards of cash, fully vested shares of our common stock and other awards valued wholly or partially by referring to, or otherwise based on, shares of our common stock. Other stock or cash based awards may be granted to participants and may also be available as a payment form in the settlement of other awards, as standalone payments and as payment in lieu of base salary, bonus, fees or other cash compensation otherwise payable to any individual who is eligible to receive awards. The administrator will determine the terms and conditions of other stock or cash based awards, which may include vesting conditions based on continued service, performance and/or other conditions.

- *Dividend Equivalents* represent the right to receive the equivalent value of dividends paid on shares of our common stock and may be granted alone or in tandem with awards other than stock options or SARs. Dividend equivalents are converted to cash or shares by such formula and such time as determined by the administrator. Cash dividends will not reduce the number of shares available for issuance under the 2021 Plan. In addition, dividend equivalents with respect to an award subject to vesting will either (i) to the extent permitted by applicable law, not be paid or credited or (ii) be accumulated and subject to vesting to the same extent as the related award.

Any award may be granted as a performance award, meaning that the award will be subject to vesting and/or payment based on the attainment of specified performance goals.

**Equity Restructuring; Corporate Transactions; Change in Control**

In the event of any stock dividend or other distribution, stock split, reverse stock split, reorganization, combination or exchange of shares, merger, consolidation, split-up, spin-off, recapitalization, repurchase or any other corporate event affecting the number of outstanding shares of our common stock or the share price of our common stock that would require adjustments to the 2021 Plan or any awards under the 2021 Plan in order to prevent the dilution or enlargement of the potential benefits intended to be made available thereunder, the administrator will make appropriate, proportionate adjustments to: (i) the aggregate number and type of shares subject to the 2021 Plan; (ii) the number and kind of shares subject to outstanding awards and terms and conditions of outstanding awards (including, without limitation, any applicable performance targets or criteria with respect to such awards); and (iii) the grant or exercise price per share of any outstanding awards under the 2021 Plan.

In the event of certain corporate transactions, including a Change in Control, the administrator may provide for the cancellation of awards for an amount in cash or other property equal to the amount that would have been obtained upon the exercise or settlement of the vested portion of the applicable award; that awards will vest and

136

Exhibit 7
Page 755

become exercisable; that awards will be assumed or substituted for, with appropriate adjustments, by the successor or a parent or subsidiary thereof; that awards will be adjusted or replaced with other rights or property; or that awards will terminate and cannot vest after the applicable event.

In the event of a Change in Control, unless the administrator elects to terminate an award in exchange for cash, rights or property or cause an award to become fully vested and exercisable prior to the Change in Control, the award will continue or be assumed and, if the successor refuses to assume or substitute for the award, the administrator shall cause the award to become fully vested and exercisable prior to the transaction and, to the extent unexercised upon the consummation of the transaction, to terminate in exchange for cash, rights or other property.

### Amendment and Termination

The administrator may terminate, amend or modify the 2021 Plan at any time and from time to time. However, we must generally obtain shareholder approval to the extent required by applicable law, rule or regulation (including any applicable stock exchange rule) and must obtain participant consent in certain circumstances. Notwithstanding the foregoing, an option may be amended to reduce the per share exercise price below the per share exercise price of such option on the grant date and options may be granted in exchange for, or in connection with, the cancellation or surrender of options having a higher per share exercise price without receiving additional shareholder approval.

No incentive stock options may be granted pursuant to the 2021 Plan after the tenth anniversary of the effective date of the 2021 Plan, and no additional annual share increases to the 2021 Plan's aggregate share limit will occur from and after such anniversary. Any award that is outstanding on the termination date of the 2021 Plan will remain in force according to the terms of the 2021 Plan and the applicable award agreement.

### Foreign Participants, Claw-back Provisions, Transferability and Participant Payments

The plan administrator may modify awards granted to participants who are foreign nationals or employed outside the United States or establish subplans or procedures to address differences in laws, rules, regulations or customs of such foreign jurisdictions. All awards will be subject to any company claw-back policy as set forth in such claw-back policy or the applicable award agreement. Except as the plan administrator may determine or provide in an award agreement, awards under the 2021 Plan are generally non-transferrable, except by will or the laws of descent and distribution, or, subject to the plan administrator's consent, pursuant to a domestic relations order, and are generally exercisable only by the participant. With regard to tax withholding obligations arising in connection with awards under the 2021 Plan, and exercise price obligations arising in connection with the exercise of stock options under the 2021 Plan, the plan administrator may, in its discretion, accept cash, wire transfer or check, shares of common stock that meet specified conditions, a promissory note, a "market sell order," such other consideration as the plan administrator deems suitable or any combination of the foregoing.

### United States Federal Income Tax Consequences

The following summary is based on an analysis of the Code as currently in effect, existing laws, judicial decisions, administrative rulings, regulations and proposed regulations, all of which are subject to change. Moreover, the following is only a summary of United States federal income tax consequences. Actual tax consequences to participants in the 2021 Plan may be either more or less favorable than those described below depending on the participants' particular circumstances. State and local tax consequences may in some cases differ from the U.S. federal income tax consequences. The following summary of the income tax consequences in respect of the 2021 Plan is for general information only. Interested parties should consult their own advisors as to the specific tax consequences of their awards, including the applicability and effect of state, local and foreign laws.

### Incentive Stock Options

No income will be recognized by a participant for United States federal income tax purposes upon the grant or exercise of an incentive stock option under the 2021 Plan. The basis of shares transferred to a participant upon exercise of an incentive stock option is the price paid for the shares. If the participant holds the shares for at least one year after the transfer of the shares to the participant and two years after the grant of the option, the participant generally will recognize capital gain or loss upon sale of the shares received upon exercise equal to

137

Exhibit 7
Page 756

the difference between the amount realized on the sale and the basis of the stock. Generally, if the shares are not held for that period, the participant will recognize ordinary income upon disposition in an amount equal to the excess of the fair market value of the shares on the date of exercise over the amount paid for the shares, or if less (and if the disposition is a transaction in which loss, if any, will be recognized), the gain on disposition. Any additional gain realized by the participant upon the disposition will be a capital gain. The excess of the fair market value of shares received upon the exercise of an incentive stock option over the option price for the shares is an item of adjustment for the participant for purposes of the alternative minimum tax. Therefore, although no income is recognized upon exercise of an incentive stock option, a participant may be subject to alternative minimum tax as a result of the exercise.

**Nonstatutory Stock Options**

No income is expected to be recognized by a participant for United States federal income tax purposes upon the grant of a nonstatutory stock option. Upon exercise of a nonstatutory stock option, the participant will recognize ordinary income in an amount equal to the excess of the fair market value of the shares on the date of exercise over the amount paid for the shares. Income recognized upon the exercise of a nonstatutory stock option will be considered compensation subject to withholding at the time the income is recognized, and, therefore, the participant's employer must make the necessary arrangements with the participant to ensure that the amount of the tax required to be withheld is available for payment. Nonstatutory stock options are designed to provide the employer with a deduction equal to the amount of ordinary income recognized by the participant at the time of the recognition by the participant, subject to the deduction limitations described below.

**Stock Appreciation Rights**

There is expected to be no United States federal income tax consequences to either the participant or the employer upon the grant of SARs. Generally, the participant will recognize ordinary income subject to withholding upon the receipt of payment pursuant to SARs in an amount equal to the aggregate amount of cash and the fair market value of any common stock received. Subject to the deduction limitations described below, the employer generally will be entitled to a corresponding tax deduction equal to the amount includible in the participant's income.

**Restricted Stock**

If the restrictions on an award of shares of restricted stock are of a nature that the shares are both subject to a substantial risk of forfeiture and are not freely transferable (within the meaning of Section 83 of the Code), the participant will not recognize income for United States federal income tax purposes at the time of the award unless the participant affirmatively elects to include the fair market value of the shares of restricted stock on the date of the award, less any amount paid for the shares, in gross income for the year of the award pursuant to Section 83(b) of the Code. In the absence of this election, the participant will be required to include in income for United States federal income tax purposes on the date the shares either become freely transferable or are no longer subject to a substantial risk of forfeiture (within the meaning of Section 83 of the Code), the fair market value of the shares of restricted stock on such date, less any amount paid for the shares. The employer will be entitled to a deduction at the time of income recognition to the participant in an amount equal to the amount the participant is required to include in income with respect to the shares, subject to the deduction limitations described below. If a Section 83(b) election is made within 30 days after the date the restricted stock is received, the participant will recognize ordinary income at the time of the receipt of the restricted stock, and the employer will be entitled to a corresponding deduction, equal to the fair market value of the shares at the time, less the amount paid, if any, by the participant for the restricted stock. If a Section 83(b) election is made, no additional income will be recognized by the participant upon the lapse of restrictions on the restricted stock, but, if the restricted stock is subsequently forfeited, the participant may not deduct the income that was recognized pursuant to the Section 83(b) election at the time of the receipt of the restricted stock.

Dividends paid to a participant holding restricted stock before the expiration of the restriction period will be additional compensation taxable as ordinary income to the participant subject to withholding, unless the participant made an election under Section 83(b) of the Code. Subject to the deduction limitations described below, the employer generally will be entitled to a corresponding tax deduction equal to the dividends includible in the participant's income as compensation. If the participant has made a Section 83(b) election, the dividends will be dividend income, rather than additional compensation, to the participant.

138

Exhibit 7
Page 757

If the restrictions on an award of restricted stock are not of a nature that the shares are both subject to a substantial risk of forfeiture and not freely transferable, within the meaning of Section 83 of the Code, the participant will recognize ordinary income for United States federal income tax purposes at the time of the transfer of the shares in an amount equal to the fair market value of the shares of restricted stock on the date of the transfer, less any amount paid therefor. The employer will be entitled to a deduction at that time in an amount equal to the amount the participant is required to include in income with respect to the restricted shares, subject to the deduction limitations described below.

**Restricted Stock Units**

There generally will be no United States federal income tax consequences to either the participant or the employer upon the grant of restricted stock units. Generally, the participant will recognize ordinary income subject to withholding upon the receipt of cash and/or transfer of shares of common stock in payment of the restricted stock units in an amount equal to the aggregate of the cash received and the fair market value of the common stock so transferred. Subject to the deduction limitations described below, the employer generally will be entitled to a corresponding tax deduction equal to the amount includible in the participant's income.

Generally, a participant will recognize ordinary income subject to withholding upon the payment of any dividend equivalents paid with respect to an award in an amount equal to the cash and the fair market value of any common stock the participant receives. Subject to the deduction limitations described below, the employer generally will be entitled to a corresponding tax deduction equal to the amount includible in the participant's income.

**Stock Awards**

If a participant receives a stock award in lieu of a cash payment that would otherwise have been made, the participant generally will be taxed as if the cash payment has been received, and the employer will have a deduction in the same amount.

**Limitation on the Employer's Compensation Deduction**

Section 162(m) of the Code limits the deduction certain employers may take for otherwise deductible compensation payable to certain executive officers of the employer to the extent the compensation paid to such an officer for the year exceeds $1 million.

**Excess Parachute Payments**

Section 280G of the Code limits the deduction that the employer may take for otherwise deductible compensation payable to certain individuals if the compensation constitutes an "excess parachute payment." Excess parachute payments arise from payments made to disqualified individuals that are in the nature of compensation and are contingent on changes in ownership or control of the employer or certain affiliates. Accelerated vesting or payment of awards under the 2021 Plan upon a change in ownership or control of the employer or its affiliates could result in excess parachute payments. In addition to the deduction limitation applicable to the employer, a disqualified individual receiving an excess parachute payment is subject to a 20% excise tax on the amount thereof.

**Application of Section 409A of the Code**

Section 409A of the Code imposes an additional 20% tax and interest on an individual receiving nonstatutory deferred compensation under a plan that fails to satisfy certain requirements. For purposes of Section 409A, "non-qualified deferred compensation" includes equity-based incentive programs, including some stock options, stock appreciation rights and RSU programs. Generally speaking, Section 409A does not apply to incentive stock options, non-discounted nonstatutory stock options and stock appreciation rights if no deferral is provided beyond exercise, or restricted stock.

The awards made pursuant to the 2021 Plan are expected to be designed in a manner intended to comply with the requirements of Section 409A of the Code to the extent the awards granted under the 2021 Plan are not exempt from coverage. However, if the 2021 Plan fails to comply with Section 409A in operation, a participant could be subject to the additional taxes and interest.

139

Exhibit 7
Page 758

State, local and foreign tax consequences may in some cases differ from the United States federal income tax consequences described above. The foregoing summary of the United States federal income tax consequences in respect of the 2021 Plan is for general information only. Interested parties should consult their own advisors as to specific tax consequences of their awards.

The 2021 Plan is not subject to the Employee Retirement Income Security Act of 1974, as amended, and is not intended to be qualified under Section 401(a) of the Code.

**New Plan Benefits**

Grants under the 2021 Plan will be made at the discretion of the plan administrator and are not currently determinable. The value of the awards granted under the 2021 Plan will depend on a number of factors, including the fair market value of the common stock on future dates, the exercise decisions made by the participants and the extent to which any applicable performance goals necessary for vesting or payment are achieved.

**Interests of Certain Persons in this Proposal**

Sandbridge's directors and executive officers may be considered to have an interest in the approval of the 2021 Plan because they may in the future receive awards under the 2021 Plan. Nevertheless, the board of directors believes that it is important to provide incentives and rewards for superior performance and the retention of executive officers and experienced directors by adopting the 2021 Plan.

**Resolution**

The full text of the resolution to be passed is as follows:

"**RESOLVED**, as an ordinary resolution, that the Company's adoption of Owlet, Inc. 2021 Incentive Award Plan and any form award agreements thereunder, be approved, ratified and confirmed in all respects."

**Vote Required for Approval**

If the Business Combination Proposal is not approved, the Incentive Award Plan Proposal will not be presented at the Special Meeting. The approval of the Incentive Award Plan Proposal requires the affirmative vote of a majority of the votes cast by the Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon.

**Board's Recommendation**

**THE SANDBRIDGE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT THE SANDBRIDGE STOCKHOLDERS VOTE "FOR" THE APPROVAL OF THE INCENTIVE AWARD PLAN PROPOSAL.**

140

Exhibit 7
Page 759

**THE ESPP PROPOSAL**

**Overview**

Sandbridge is asking its stockholders to approve by ordinary resolution and adopt the Owlet, Inc. 2021 Employee Stock Purchase Plan (the "ESPP") and the material terms thereunder. The Sandbridge board of directors approved the ESPP, prior to the Sandbridge special meeting, subject to stockholder approval at the Sandbridge special meeting. The ESPP became effective as of the date it was adopted by the Sandbridge board of directors, subject to approval by Sandbridge stockholders.

The ESPP is described in more detail below. A copy of the ESPP is attached to this proxy statement/prospectus as Annex E.

**The ESPP**

The ESPP is designed to allow eligible employees of Owlet to purchase shares of Owlet common stock with their accumulated payroll deductions. The ESPP is divided into two components: the "Section 423 Component" and the "Non-Section 423 Component". The Section 423 Component is intended to qualify under Section 423 of the Code. The Non-Section 423 Component is not intended to qualify under Section 423 of the Code and will be used to grant stock options to certain non-U.S. employees and certain U.S. employees who are employed by certain of our subsidiaries which are not corporations. The material terms of the ESPP are summarized below. The purpose of the ESPP is to assist such employees in acquiring a stock ownership interest in Owlet, to help such employees provide for their future security and to encourage such employees to remain in the employment of Owlet. The Sandbridge board of directors believes that equity awards are necessary to remain competitive in its industry and are essential to recruiting and retaining the highly qualified employees who help us meet our goals.

**Summary of the ESPP**

This section summarizes certain principal features of the ESPP. The summary is qualified in its entirety by reference to the complete text of the ESPP.

**Administration**

Subject to the terms and conditions of the ESPP, our compensation committee will administer the ESPP. Our compensation committee can delegate administrative tasks under the ESPP to the services of an agent and/or employees to assist in the administration of the ESPP. The administrator will have the discretionary authority to administer and interpret the ESPP. Interpretations and constructions of the administrator of any provision of the ESPP or of any rights thereunder will be conclusive and binding on all persons. We will bear all expenses and liabilities incurred by the ESPP administration.

**Shares Available for Awards**

The maximum number of shares of our common stock which will be authorized for sale under the ESPP is equal to the sum of (a)        shares of common stock and (b) an annual increase on the first day of each year beginning in 2022 and ending in 2031, equal to the lesser of (i) 1% of the shares of common stock outstanding (on an as converted basis) on the last day of the immediately preceding fiscal year and (ii) such number of shares of common stock as determined by our board of directors; provided, however, no more than        shares of our common stock may be issued under the ESPP. The shares reserved for issuance under the ESPP may be authorized but unissued shares or reacquired shares.

**Eligibility**

Employees eligible to participate in the ESPP for a given offering period generally include employees who are employed by us or one of our designated subsidiaries on the first day of the offering period, or the enrollment date. Our employees (and, if applicable, any employees of our subsidiaries) who customarily work less than five months in a calendar year or are customarily scheduled to work less than 20 hours per week will not be eligible to participate in the ESPP. Finally, an employee who owns (or is deemed to own through attribution) 5% or more of the combined voting power or value of all our classes of stock or of one of our subsidiaries will not be allowed to participate in the ESPP.

141

Exhibit 7
Page 760

**Participation**

Employees will enroll under the ESPP by completing a payroll deduction form permitting the deduction from their compensation of at least 1% of their compensation but not more than 15% of their compensation. Such payroll deductions may be expressed as either a whole number percentage or a fixed dollar amount, and the accumulated deductions will be applied to the purchase of shares on each purchase date.

**Offering**

Under the ESPP, participants are offered the option to purchase shares of our common stock at a discount during a series of successive offering periods, the duration and timing of which will be determined by the ESPP administrator. However, in no event may an offering period be longer than 27 months in length.

The option purchase price will be the lower of 85% of the closing trading price per share of our common stock on the first trading date of an offering period in which a participant is enrolled or 85% of the closing trading price per share on the purchase date.

Unless a participant has previously canceled his or her participation in the ESPP before the purchase date, the participant will be deemed to have exercised his or her option in full as of each purchase date. Upon exercise, the participant will purchase the number of whole shares that his or her accumulated payroll deductions will buy at the option purchase price, subject to the participation limitations listed above.

A participant may cancel his or her payroll deduction authorization at any time prior to the end of the offering period. Upon cancellation, the participant will have the option to either (i) receive a refund of the participant's account balance in cash without interest or (ii) exercise the participant's option for the current offering period for the maximum number of shares of common stock on the applicable purchase date, with the remaining account balance refunded in cash without interest. Following at least one payroll deduction, a participant may also decrease (but not increase) his or her payroll deduction authorization once during any offering period. If a participant wants to increase or decrease the rate of payroll withholding, he or she may do so effective for the next offering period by submitting a new form before the offering period for which such change is to be effective.

A participant may not assign, transfer, pledge or otherwise dispose of (other than by will or the laws of descent and distribution) payroll deductions credited to a participant's account or any rights to exercise an option or to receive shares of our common stock under the ESPP, and during a participant's lifetime, options in the ESPP shall be exercisable only by such participant. Any such attempt at assignment, transfer, pledge or other disposition will not be given effect.

**Adjustments**

In the event of any increase or decrease in the number of issued shares of our common stock resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the common stock, or any other increase or decrease in the number of shares of common stock effected without receipt of consideration by us, we will proportionately adjust the aggregate number of shares of our common stock offered under the ESPP, the number and price of shares which any participant has elected to purchase under the ESPP and the maximum number of shares which a participant may elect to purchase in any single offering period. If there is a proposal to dissolve or liquidate us, then the ESPP will terminate immediately prior to the consummation of such proposed dissolution or liquidation, and any offering period then in progress will be shortened by setting a new purchase date to take place before the date of our dissolution or liquidation. We will notify each participant of such change in writing at least ten business days prior to the new exercise date. If we undergo a merger with or into another corporation or sell all or substantially all of our assets, each outstanding option will be assumed or an equivalent option substituted by the successor corporation or the parent or subsidiary of the successor corporation. If the successor corporation refuses to assume the outstanding options or substitute equivalent options, then any offering period then in progress will be shortened by setting a new purchase date to take place before the date of our proposed sale or merger. We will notify each participant of such change in writing at least ten business days prior to the new exercise date.

142

Exhibit 7
Page 761

**Amendment and Termination**

Our board of directors may amend, suspend or terminate the ESPP at any time. However, the board of directors may not amend the ESPP without obtaining shareholder approval within 12 months before or after such amendment to the extent required by applicable laws.

**Material United States Federal Income Tax Consequences**

The following is a general summary under current law of the principal United States federal income tax consequences related to the purchase of shares under the ESPP. This summary deals with the general federal income tax principles that apply and is provided only for general information. Some kinds of taxes, such as state, local and foreign income taxes and federal employment taxes, are not discussed. As such, tax consequences for employees participating in the Non-Section 423 Component of the ESPP are not discussed. This summary is not intended as tax advice to participants, who should consult their own tax advisors.

The Section 423 Component of the ESPP, and the right of participants to make purchases thereunder, is intended to qualify under the provisions of Section 423 of the Code. Under the applicable Code provisions, assuming it so qualifies, no income will be taxable to a participant until the sale or other disposition of the shares purchased under the ESPP. This means that an eligible employee will not recognize taxable income on the date the employee is granted an option under the ESPP. In addition, the employee will not recognize taxable income upon the purchase of shares. Upon such sale or disposition, the participant generally will be subject to tax in an amount that depends upon the length of time such shares are held by the participant prior to disposing of them. If the shares are sold or disposed of more than two years from the date of grant and more than one year from the date of purchase, or if the participant dies while holding the shares, the participant (or his or her estate) will recognize ordinary income measured as the lesser of (i) the excess of the fair market value of the shares at the time of such sale or disposition (or death) over the purchase price or (ii) an amount equal to the applicable discount from the fair market value of the shares as of the date of grant. Any additional gain will be treated as long-term capital gain. If the shares are held for the holding periods described above but are sold for a price that is less than the purchase price, there is no ordinary income and the participating employee has a long-term capital loss for the difference between the sale price and the purchase price.

If the shares are sold or otherwise disposed of before the expiration of the holding periods described above, the participant will recognize ordinary income generally measured as the excess of the fair market value of the shares on the date the shares are purchased over the purchase price and Owlet will be entitled to a tax deduction for compensation expense in the amount of ordinary income recognized by the employee. Any additional gain or loss on such sale or disposition will be long-term or short-term capital gain or loss, depending on how long the shares were held following the date they were purchased by the participant prior to disposing of them. If the shares are sold or otherwise disposed of before the expiration of the holding periods described above but are sold for a price that is less than the purchase price, the participant will recognize ordinary income equal to the excess of the fair market value of the shares on the date of purchase over the purchase price (and Owlet will be entitled to a corresponding deduction), but the participant generally will be able to report a capital loss equal to the difference between the sales price of the shares and the fair market value of the shares on the date of purchase.

**Interests of Certain Persons in this Proposal**

Sandbridge's executive officers may be considered to have an interest in the approval of the ESPP because they may in the future receive awards under the ESPP. Nevertheless, the board of directors believes that it is important to provide incentives and rewards for superior performance and the retention of executive officers by adopting the ESPP.

**Resolution**

The full text of the resolution to be passed is as follows:

"**RESOLVED**, as an ordinary resolution, that the Company's adoption of the Owlet, Inc. 2021 Employee Stock Purchase Plan be approved, ratified and confirmed in all respects."

**Vote Required for Approval**

If the Business Combination Proposal is not approved, the ESPP Proposal will not be presented at the Special Meeting. The approval of the ESPP Proposal requires the affirmative vote of a majority of the votes cast

143

Exhibit 7
Page 762

TABLE OF CONTENTS

by the Sandbridge stockholders present in person (which would include presence at a virtual meeting) or represented by proxy at the Special Meeting and entitled to vote thereon.

**Board's Recommendation**

  **THE SANDBRIDGE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT THE SANDBRIDGE STOCKHOLDERS VOTE "FOR" THE APPROVAL OF THE ESPP PROPOSAL.**

144

Exhibit 7
Page 763

## THE ADJOURNMENT PROPOSAL

**Overview**

The Adjournment Proposal, if adopted, will allow the Sandbridge's Board to adjourn the Special Meeting to a later date or dates, if necessary, to permit further solicitation of proxies if, based upon the tabulated vote at the time of the Special Meeting, there are insufficient votes for the approval of the Business Combination Proposal, the Charter Amendment Proposal, the NYSE Proposal, the Incentive Award Plan Proposal or the ESPP Proposal, or if holders of Sandbridge Class A common stock have elected to redeem an amount of Sandbridge Class A common stock such that Sandbridge would have less than $5,000,001 of net tangible assets or that the Aggregate Transaction Proceeds Condition would not be satisfied. In no event will the Sandbridge Board adjourn the Special Meeting or consummate the Business Combination beyond the date by which it may properly do so under the Current Charter and Delaware law.

**Consequences if the Adjournment Proposal is Not Approved**

If the Adjournment Proposal is not approved by Sandbridge's stockholders, the Sandbridge Board may not be able to adjourn the Special Meeting to a later date in the event that there are insufficient votes for the approval of the Business Combination Proposal, the Charter Amendment Proposal, the NYSE Proposal, the Incentive Award Plan Proposal or the ESPP Proposal, or if holders of Sandbridge Class A common stock have elected to redeem an amount of Sandbridge Class A common stock such that Sandbridge would have less than $5,000,001 of net tangible assets or that the Aggregate Transaction Proceeds Condition would not be satisfied, and may be unable to consummate the Business Combination. If we do not consummate the Business Combination and fail to complete an initial business combination by September 17, 2022 or during any stockholder-approved extension period (subject to the requirements of law), we will be required to dissolve and liquidate our Trust Account by returning the then remaining funds in such account to the public stockholders.

**Vote Required for Approval**

The approval of the Adjournment Proposal requires the affirmative vote of a majority of the votes cast by the Sandbridge stockholders present in person or represented by proxy at the Special Meeting and entitled to vote thereon, regardless of whether a quorum is present.

Failure to submit a proxy or to vote in person at the Special Meeting, an abstention from voting or a broker non-vote will have no effect on the Adjournment Proposal.

The Required Transaction Proposals are not conditioned upon the approval of the Adjournment Proposal.

The Sponsor and our directors and officers have agreed to vote the founder shares and any public shares owned by them in favor of the Adjournment Proposal (if necessary). See "*Related Agreements - Sponsor Letter Agreement*" for more information.

**Recommendation of the Sandbridge Board of Directors**

**THE SANDBRIDGE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT SANDBRIDGE STOCKHOLDERS VOTE "<u>FOR</u>" THE APPROVAL OF THE ADJOURNMENT PROPOSAL.**

The existence of financial and personal interests of one or more of Sandbridge's directors or officers may result in a conflict of interest on the part of such director(s) or officer(s) between what they may believe is in the best interests of Sandbridge and its stockholders and what they may believe is best for himself or themselves in determining to recommend that stockholders vote for the proposals. For instance, ownership of founder shares by Mr. Toubassy, Mr. De Sole and Mr. Goss, our independent directors, may create a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate an initial business combination, and in determining the terms on which we are willing to consummate such a transaction. See "*The Business Combination Proposal – Interests of Sandbridge's Directors and Officers in the Business Combination*" for a further discussion.

145

Exhibit 7
Page 764

**UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION**

Sandbridge is providing the following unaudited pro forma condensed combined financial information to aid you in your analysis of the financial aspects of the Business Combination. The following unaudited pro forma condensed combined financial information presents the combination of the financial information of Sandbridge and Owlet Baby Care Inc. ("Owlet") adjusted to give effect to the Business Combination and related transactions. The following unaudited pro forma condensed combined financial information has been prepared in accordance with Article 11 of Regulation S-X, as amended by the final rule, Release No. 33-10786 'Amendments to Financial Disclosure about Acquired and Disposed Businesses.' Defined terms included below have the same meaning as terms defined and included elsewhere in this proxy statement/prospectus.

The historical financial information of Sandbridge was derived from the financial statements of Sandbridge as of December 31, 2020 and for the period from June 23, 2020 (inception) to December 31, 2020, respectively, which are included elsewhere in this proxy statement/prospectus. The historical financial information of Owlet was derived from the consolidated financial statements of Owlet as of and for the year ended December 31, 2020, which are included elsewhere in this proxy statement/prospectus. This information should be read together with Sandbridge's and Owlet's financial statements and related notes, the sections titled *Management's Discussion and Analysis of Financial Condition and Results of Operations of Sandbridge,* and *Management's Discussion and Analysis of Financial Condition and Results of Operations of Owlet* and other financial information included elsewhere in this proxy statement/prospectus.

The Business Combination will be accounted for as a reverse recapitalization, in accordance with accounting principles generally accepted in the United States ("U.S. GAAP"). Under the guidance in ASC 805, Sandbridge is expected to be treated as the "acquired" company for financial reporting purposes. Accordingly, the Business Combination will be treated as the equivalent of Owlet issuing stock for the net assets of Sandbridge, accompanied by a recapitalization whereby no goodwill or other intangible assets are recorded. Operations prior to the Business Combination will be those of Owlet.

Owlet expects to be the accounting acquirer based on evaluation of the following facts and circumstances under both the no and maximum redemption scenarios:

•    Owlet stockholders will have the largest voting interest in the post-combination company;

•    the board of directors of the post-combination company will have up to nine members, and Owlet will have the ability to nominate the majority of the members of the board of directors;

•    Owlet management will continue to hold executive management roles for the post-combination company and be responsible for the day-to-day operations;

•    the post-combination company will assume the Owlet name;

•    the post-combination company will maintain the current Owlet headquarters; and

•    the intended strategy of the post-combination entity will continue Owlet's current strategy of product development and market penetration.

The unaudited pro forma condensed combined balance sheet as of December 31, 2020 combines the historical audited balance sheet of Sandbridge and the historical consolidated audited balance sheet of Owlet on a pro forma basis as if the Business Combination and related transactions, summarized below, had been consummated on December 31, 2020. The unaudited pro forma condensed combined statement of operations for the year ended December 31, 2020 combines the historical audited statement of operations of Sandbridge for the period from its inception on June 23, 2020 to December 31, 2020 and the historical consolidated audited statement of operations of Owlet for the year ended December 31, 2020 on a pro forma basis as if the Business Combination and related transactions, summarized below, had been consummated on January 1, 2020, the beginning of the earliest period presented.

The unaudited pro forma condensed combined financial information is for informational purposes only. They do not purport to indicate the results that would have been obtained had the Business Combination and related transactions actually been completed on the assumed date or for the periods presented, or which may be realized in the future. The transaction accounting adjustments are based on the information currently available and the assumptions and estimates underlying the transaction accounting adjustments are described in the accompanying notes. Actual results may differ materially from the assumptions within the accompanying unaudited pro forma

146

Exhibit 7
Page 765

condensed combined financial information. Owlet will incur additional costs after the Business Combination in order to satisfy its obligations as an SEC reporting public company.

**Description of the Business Combination**

On February 15, 2021 Owlet entered into the Business Combination Agreement with Sandbridge and Project Olympus Merger Sub, Inc. ("Merger Sub"). Pursuant to the Business Combination Agreement, Merger Sub will merge with and into Owlet, with Owlet surviving the Merger. Owlet will become a wholly owned subsidiary of Sandbridge and Sandbridge will immediately be renamed "Owlet, Inc." Upon the consummation of the Business Combination, Owlet's equityholders will receive or have the right to receive shares of New Owlet common stock at a deemed value of $10.00 per share after giving effect to the Exchange Ratio based on the terms of the Business Combination Agreement. Accordingly, an estimated 90,466,363 shares of New Owlet common stock will be immediately issued and outstanding, based on Owlet's capital stock (including Owlet convertible notes and warrants on an as converted net-exercise basis, as applicable) balance as of March 22, 2021, and an estimated 11,171,429 shares will be reserved for the potential future issuance of New Owlet common stock upon the exercise of Owlet stock options based on the following transactions contemplated by the Business Combination Agreement:

- the cancellation of each issued and outstanding share of Owlet common stock (including shares of Owlet common stock resulting from the deemed conversion of Owlet redeemable convertible preferred stock and outstanding unvested restricted shares of Owlet common stock) and the conversion into the right to receive a number of shares of New Owlet common stock shares equal to the Exchange Ratio;

- the assumed net share settlement of all outstanding Owlet warrants in accordance with their respective terms into the right to receive a number of shares of New Owlet common stock equal to the Exchange Ratio; and

- the conversion of all outstanding Owlet options into options exercisable for shares of New Owlet common stock with the same terms except for the number of shares exercisable and the exercise price, each of which will be adjusted using the Exchange Ratio, and assuming no cash elections by holders of Owlet options.

The unaudited pro forma condensed combined financial information has been prepared using the assumptions below with respect to the potential redemption by Sandbridge's public stockholders of shares of Sandbridge's public shares for cash equal to their pro rata share of the aggregate amount on deposit (as of two business days prior to the Closing Date) in the Trust Account:

- **Assuming No Redemption:** This presentation assumes that no public stockholders of Sandbridge exercise redemption rights with respect to their public shares for a pro rata share of the funds in the Trust Account.

- **Assuming Maximum Redemption:** This presentation assumes 7,000,000 of the public shares are redeemed for their pro rata share of the funds in Trust Account for aggregate redemption payments of $70.0 million. The Business Combination Agreement includes as a condition to closing the Business Combination that, at the Closing, Sandbridge will have a minimum of $140.0 million in cash comprising the cash held in the Trust Account after deducting (x) amounts payable for Sandbridge share redemptions and (y) deferred underwriting commissions held in the Trust Account and Sandbridge's expenses incurred in connection with the transactions contemplated by the Business Combination Agreement and Sandbridge's operations (such commissions and expenses estimated to be $20.0 million), but excluding the PIPE Investment Amount actually received by Sandbridge prior to or substantially concurrent with the Closing. This scenario is based on satisfaction of the Minimum Available Sandbridge Cash Amount condition.

**Other Related Events in Connection with the Business Combination**

Other related events that are contemplated to take place in connection with the Business Combination are summarized below:

- The issuance and sale of 13,000,000 shares of Sandbridge common stock at a purchase price of $10.00 per share for an aggregate purchase price of $130.0 million pursuant to the PIPE Investment; and

- Of the shares of Sandbridge Class A common stock beneficially owned by the Sponsor as of the Closing, 1,403,750 shares will vest at such time as a $12.50 stock price level is achieved and 1,403,750 will vest at such time as a $15.00 stock price level is achieved, in each case, on or before the fifth

147

Exhibit 7
Page 766

anniversary of the Closing of the Business Combination. The "stock price level" will be considered achieved only (a) when the closing price of a share of New Owlet common stock on the NYSE is greater than or equal to the applicable price for any 20 trading days within a 30 trading day period or (b) the price per share of New Owlet common stock paid in a Sandbridge Sale is greater than or equal to the applicable price. Founder shares subject to vesting pursuant to the above terms that do not vest in accordance with such terms shall be forfeited. As the vesting event has not yet been achieved, these shares of Sandbridge Class A common stock, which will be issued and outstanding, are treated as contingently recallable in the pro forma financial information.

• The accounting treatment of the shares of New Owlet common stock beneficially owned by the Sponsor but subject to vesting is being evaluated to assess if they qualify as equity classified instruments or liability classified instruments, including evaluating if the vesting events include events or adjustments that are not considered indexed to the fair value of the New Owlet common stock. The accounting for the private placement warrants is also being evaluated to assess if they qualify as equity classified instruments or liability classified instruments. If either of these arrangements are required to be accounted for as liabilities, then the shares that are subject to vesting and the Private Placement Warrants will be recognized as liabilities at fair value upon the Closing and remeasured to fair value at each balance sheet date in future reporting periods with changes in fair value recorded in the New Owlet consolidated statement of operations. We expect to finalize our assessment of the accounting treatment prior to the Closing.

The following summarizes the pro forma shares of New Owlet common stock issued and outstanding immediately after the Business Combination:

| | No Redemption (Shares) | % | Maximum Redemption (Shares) | % |
|---|---|---|---|---|
| Owlet equityholders[1] | 90,466,363 | 68.4% | 90,466,363 | 72.2% |
| Sandbridge's public stockholders | 23,000,000 | 17.4% | 16,000,000 | 12.8% |
| Sponsor & related parties[2] | 5,750,000 | 4.4% | 5,750,000 | 4.6% |
| PIPE Investors | 13,000,000 | 9.8% | 13,000,000 | 10.4% |
| **Pro Forma New Owlet Common Stock at Closing** | 132,216,363 | 100% | 125,216,363 | 100% |

(1) Excludes 9,533,637 shares of New Owlet common stock underlying outstanding New Owlet option awards on a net exercise basis.

(2) Represents the shares of New Owlet common stock the Sponsor and the independent directors and an advisor of Sandbridge will receive upon conversion of the Sandbridge Class B common stock at Closing. Of such shares, 2,807,500 shares of New Owlet common stock will be outstanding following the Closing but will remain subject to price-based performance vesting terms as described in the Sponsor Letter Agreement.

148

Exhibit 7
Page 767

**Unaudited Pro Forma Condensed Combined Balance Sheet**
**As of December 31, 2020**
**(in thousands)**

| | Sandbridge (historical) | Owlet Baby Care Inc. (historical) | Assuming No Redemptions | | | Assuming Maximum Redemptions | | |
|---|---|---|---|---|---|---|---|---|
| | | | Transaction Accounting Adjustments | | Pro Forma Combined | Transaction Accounting Adjustments | | Pro Forma Combined |
| **Assets** | | | | | | | | |
| **Current assets:** | | | | | | | | |
| **Cash and cash equivalents** | $ 1,287 | $17,009 | $ 230,053 | (1) | | $ 230,053 | (1) | |
| | | | 130,000 | (2) | | 130,000 | (2) | |
| | | | (35,000) | (3) | 343,349 | (35,000) | (3) | |
| | | | | | | (70,000) | (4b) | 273,349 |
| **Accounts receivable, net** | | 10,525 | | | 10,525 | | | 10,525 |
| **Inventory** | | 7,912 | | | 7,912 | | | 7,912 |
| **Prepaid expenses and other current assets** | 274 | 2,168 | (522) | (3) | 1,920 | (522) | (3) | 1,920 |
| **Total current assets** | 1,561 | 37,614 | 324,531 | | 363,706 | 254,531 | | 293,706 |
| **Cash and marketable securities held in trust account** | 230,053 | | (230,053) | (1) | — | (230,053) | (1) | — |
| **Property and equipment, net** | | 1,718 | | | 1,718 | | | 1,718 |
| **Intangible assets, net** | | 605 | | | 605 | | | 605 |
| **Other noncurrent assets** | | 181 | | | 181 | | | 181 |
| **Total assets** | $231,614 | $40,118 | $ 94,478 | | $366,210 | $ 24,478 | | $296,210 |
| **Liabilities, Redeemable convertible Preferred Stock, and Stockholder' Deficit** | | | | | | | | |
| **Current liabilities:** | | | | | | | | |
| **Accounts payable** | | 16,379 | (522) | (3) | 15,857 | (522) | (3) | 15,857 |
| **Accrued and other expenses** | 315 | 10,592 | | | 10,907 | | | 10,907 |
| **Deferred revenues** | | 1,643 | | | 1,643 | | | 1,643 |
| **Line of credit** | | 9,700 | | | 9,700 | | | 9,700 |
| **Related party convertible notes payable, current portion** | | 6,934 | (6,934) | (7) | — | (6,934) | (7) | — |
| **Long-term debt, current portion** | | 2,024 | | | 2,024 | | | 2,024 |
| **Total current liabilities** | 315 | 47,272 | (7,456) | | 40,131 | (7,456) | | 40,131 |
| **Deferred rent, net of current portion** | | 322 | | | 322 | | | 322 |
| **Long-term deferred revenues, net of current portion** | | 159 | | | 159 | | | 159 |
| **Long-term debt, net of current portion** | | 10,180 | | | 10,180 | | | 10,180 |
| **Preferred stock warrant liability** | | 2,993 | (2,993) | (8) | — | (2,993) | (8) | — |

149

Exhibit 7
Page 768

| | Sandbridge (historical) | Owlet Baby Care Inc. (historical) | Assuming No Redemptions — Transaction Accounting Adjustments | | Pro Forma Combined | Assuming Maximum Redemptions — Transaction Accounting Adjustments | | Pro Forma Combined |
|---|---|---|---|---|---|---|---|---|
| Other long-term liabilities | | 13 | | | 13 | | | 13 |
| Deferred underwriting fee payable | 8,050 | | (8,050) | (3) | — | (8,050) | (3) | — |
| **Total liabilities** | $ 8,365 | $ 60,939 | $ (18,499) | | $ 50,805 | $ (18,499) | | $ 50,805 |
| **Commitments and contingencies** | | | | | | | | |
| **Redeemable convertible Series A and Series A-1 preferred stock** | | 23,652 | (23,652) | (9) | — | (23,652) | (9) | — |
| **Redeemable convertible Series B and Series B-1 preferred stock** | | 23,536 | (23,536) | (9) | — | (23,536) | (9) | — |
| Class A common stock subject to redemption | 218,249 | | (218,249) | (4a) | — | (218,249) | (4a) | — |
| **Stockholders' equity (deficit)** | | | | | | | | |
| **Class A Common Stock** | | 1 | 1 | (2) | | 1 | (2) | |
| | | | 2 | (4a) | | 2 | (4a) | |
| | | | 10 | (5) | | 10 | (5) | |
| | | | 1 | (11) | | 1 | (11) | |
| | | | (9) | (10) | 6 | (9) | (10) | |
| | | | | | | (1) | (4b) | 5 |
| Class B Common Stock | 1 | | (1) | (11) | — | (1) | (11) | — |
| **Additional paid-in capital** | 5,426 | 3,708 | 129,999 | (2) | | 129,999 | (2) | |
| | | | (12,225) | (3) | | (12,225) | (3) | |
| | | | 218,247 | (4a) | | 218,247 | (4a) | |
| | | | (10) | (5) | | (10) | (5) | |
| | | | (427) | (6) | | (427) | (6) | |
| | | | 6,934 | (7) | | 6,934 | (7) | |
| | | | 2,993 | (8) | | 2,993 | (8) | |
| | | | 1,000,000 | (10) | | 1,000,000 | (10) | |
| | | | (999,991) | (10) | | (999,991) | (10) | |
| | | | 47,188 | (9) | 401,842 | 47,188 | (9) | |
| | | | | | | (69,999) | (4b) | 331,843 |
| **Accumulated deficit** | (427) | (71,718) | 427 | (6) | | 427 | (6) | |
| | | | (14,725) | (3) | (86,443) | (14,725) | (3) | (86,443) |
| **Total stockholders' equity (deficit)** | $ 5,000 | $(68,009) | $ 378,414 | | $315,405 | $ 308,415 | | $245,400 |
| **Total liabilities, redeemable convertible preferred stock, and stockholders' equity (deficit)** | $231,614 | $ 40,118 | $ 94,478 | | $366,210 | $ 24,478 | | $296,210 |

150

Exhibit 7
Page 769

TABLE OF CONTENTS

**Unaudited Pro Forma Condensed Combined Statement of Operations**
**For the Year Ended December 31, 2020**
**(in thousands, except per share amounts)**

| | Inception to December 31, 2020 | For the Year Ended December 31, 2020 | For the Year Ended December 31, 2020 | | For the Year Ended December 31, 2020 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Sandbridge (historical) | Owlet Baby Care Inc. (historical) | Transaction Accounting Adjustments (Assuming No Redemption) | Pro Forma Combined (Assuming No Redemption) | Transaction Accounting Adjustments (Assuming Maximum Redemption) | Pro Forma Combined (Assuming Maximum Redemption) |
| Revenues | | $ 75,403 | | $ 75,403 | | $ 75,403 |
| Cost of revenues | | 39,526 | | 39,526 | | 39,526 |
| Gross profit | | 35,877 | | 35,877 | | 35,877 |
| Operating expenses: | | | | | | |
| General and administrative | 480 | 13,140 | | 13,620 | | 13,620 |
| Sales and marketing | | 19,263 | | 19,263 | | 19,263 |
| Research and development | | 10,465 | | 10,465 | | 10,465 |
| Total operating expenses | 480 | 42,868 | | 43,348 | | 43,348 |
| Operating loss | (480) | (6,991) | | (7,471) | | (7,471) |
| Other income (expense): | | | | | | |
| Interest expense | | (1,420) | 434 (2A) | (986) | 434 (2A) | (986) |
| Interest income | | 38 | | 38 | | 38 |
| Preferred stock mark to market | | (1,952) | 1,952 (3A) | — | 1,952 (3A) | — |
| Other expenses, net | 53 | (176) | (53) (1A) | (176) | (53) (1A) | (176) |
| Total other income (expense), net | 53 | (3,510) | 2,333 | (1,124) | 2,333 | (1,124) |
| Loss before income tax provision | (427) | (10,501) | 2,333 | (8,595) | 2,333 | (8,595) |
| Income tax provision | | (20) | — (4A) | (20) | — (4A) | (20) |
| Net loss | $ (427) | $ (10,521) | $ 2,333 | $ (8,615) | $ 2,333 | $ (8,615) |
| Net loss per share attributable to common stockholders, Class A redeemable common stock, basic and diluted | $ — | $ (0.98) | $ — | $ (0.06) | | $ (0.06) |
| Net loss per share attributable to common stockholders, Class A and Class B non-redeemable common stock, basic and diluted | $ (0.08) | — | — | — | — | — |
| Weighted-average | | | | | | |

Exhibit 7
Page 770

| | | | | | | |
|---|---|---|---|---|---|---|
| number of shares outstanding of Class A redeemable common stock used to compute net loss per share attributable to common stockholders, basic and diluted | 23,000,000 | 10,693,984 | 110,192,500 | 138,942,500 | (7,000,000) | 131,942,500 |

151

Exhibit 7
Page 771

| | Inception to December 31, 2020 | For the Year Ended December 31, 2020 | For the Year Ended December 31, 2020 | | For the Year Ended December 31, 2020 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Sandbridge (historical) | Owlet Baby Care Inc. (historical) | Transaction Accounting Adjustments (Assuming No Redemption) | Pro Forma Combined (Assuming No Redemption) | Transaction Accounting Adjustments (Assuming Maximum Redemption) | Pro Forma Combined (Assuming Maximum Redemption) |
| **Weighted-average number of shares outstanding of Class A and Class B non-redeemable common stock used to compute net loss per share attributable to common stockholders, basic and diluted** | 5,435,083 | — | — | — | — | — |

152

Exhibit 7
Page 772

**Notes To Unaudited Pro Forma Condensed Combined Financial Information**

**1.    Basis of Presentation**

The Business Combination is expected to be accounted for as a reverse recapitalization in accordance with U.S. GAAP. Under the guidance in ASC 805, Sandbridge is expected to be treated as the "acquired" company for financial reporting purposes. Accordingly, the Business Combination will be treated as the equivalent of Owlet issuing stock for the net assets of Sandbridge, accompanied by a recapitalization whereby no goodwill or other intangible assets are recorded. Operations prior to the Business Combination will be those of Owlet.

The unaudited pro forma condensed combined balance sheet as of December 31, 2020 assumes that the Business Combination and related transactions occurred on December 31, 2020. The unaudited pro forma condensed combined statement of operations for the year ended December 31, 2020 reflects pro forma effect of the Business Combination and related transactions as if they had been completed on January 1, 2020. These periods are presented on the basis of Owlet as the accounting acquirer.

The transaction accounting adjustments reflecting the consummation of the Business Combination are based on certain currently available information and certain assumptions and methodologies that Sandbridge believes are reasonable under the circumstances. The unaudited transaction accounting adjustments, which are described in the accompanying notes, may be revised as additional information becomes available and is evaluated. Therefore, it is likely that the actual adjustments will differ from the transaction accounting adjustments and it is possible the difference may be material. Sandbridge believes that its assumptions and methodologies provide a reasonable basis for presenting all of the significant effects of the Business Combination based on information available to management at this time and that the transaction accounting adjustments give appropriate effect to those assumptions and are properly applied in the unaudited pro forma condensed combined financial information.

The unaudited pro forma condensed combined financial information does not give effect to any anticipated synergies, operating efficiencies, tax savings, or cost savings that may be associated with the Business Combination.

The unaudited pro forma condensed combined financial information is not necessarily indicative of what the actual results of operations and financial position would have been had the Business Combination taken place on the dates indicated, nor are they indicative of the future consolidated results of operations or financial position of the post-combination company. They should be read in conjunction with the historical financial statements and notes thereto of Sandbridge and Owlet.

The unaudited pro forma condensed combined financial information has been prepared in accordance with Article 11 of Regulation S-X as amended by the final rule, Release No. 33-10786 "Amendments to Financial Disclosures about Acquired and Disposed Businesses." Release No. 33-10786 replaces the existing transaction accounting adjustment criteria with simplified requirements to depict the accounting for the transaction ("Transaction Accounting Adjustments"), operations and financial position of the registrant as an autonomous entity ("Autonomous Entity Adjustments") and present the reasonably estimable synergies and other transaction effects that have occurred or are reasonably expected to occur ("Management's Adjustments"). Sandbridge has elected not to present Management's Adjustments in the unaudited pro forma condensed combined financial information. Sandbridge and Owlet have not had any historical relationship prior to the Business Combination. Accordingly, no transaction accounting adjustments were required to eliminate activities between the companies.

**2.    Accounting Policies**

Upon consummation of the Business Combination, management of New Owlet will perform a comprehensive review of the two entities' accounting policies, including the accounting for the Sponsor Private Placement Warrants. As a result of the review, management may identify differences between the accounting policies of the two entities which, when conformed, could have a material impact on the financial statements of the post-combination company.

The pro forma combined provision for income taxes does not necessarily reflect the amounts that would have resulted had the post-combination company filed consolidated income tax returns during the periods presented.

153

Exhibit 7
Page 773

The pro forma basic and diluted earnings per share amounts presented in the unaudited pro forma condensed combined statement of operations are based upon the number of Owlet's shares outstanding, assuming the Business Combination and related transactions occurred on January 1, 2020.

**3.   Adjustments to Unaudited Pro Forma Condensed Combined Financial Information**

The unaudited pro forma condensed combined financial information has been prepared to illustrate the effect of the Business Combination and related transactions and has been prepared for informational purposes only.

Sandbridge and Owlet did not have any historical relationship prior to the Business Combination. Accordingly, no Transaction Accounting Adjustments were required to eliminate activities between the companies.

The pro forma notes and adjustments, based on preliminary estimates that could change materially as additional information is obtained, are as follows:

***Adjustments to Unaudited Pro Forma Condensed Combined Balance Sheet as of December 31, 2020***

The adjustments included in the unaudited pro forma condensed combined balance sheet as of December 31, 2020 are as follows:

(1)   Reflects the release of $230.1 million of cash held in Sandbridge's Trust Account to cash and cash equivalents.

(2)   Reflects cash proceeds from the concurrent Private Placement in the amount of $130.0 million, consisting of 13,000,000 shares of New Owlet common stock with a par value of $0.0001, and corresponding offset to additional-paid-in-capital.

(3)   Reflects an adjustment of $35.0 million to reduce cash for transaction costs expected to be incurred by Sandbridge and Owlet in relation to the Business Combination and Private Placement, including advisory, banking, printing, legal and accounting services. $14.7 million was recorded to accumulated deficit as part of the Business Combination, $8.1 million was deferred related to underwriting commissions, and the remaining $12.2 million was determined to be equity issuance costs and offset to additional-paid-in-capital. In addition, adjustment reflects the elimination of $0.5 million in capitalized transaction costs, reflected in prepaid and other current assets.

(4a)   Reflects the reclassification of Sandbridge's common stock subject to possible redemption into permanent equity when no stockholders exercise their redemption rights.

(4b)   Reflects the reclassification of Sandbridge's common stock to possible redemption into permanent equity when maximum shares are subject to redemption.

(5)   Reflects the recapitalization of Owlet through issuance of common stock based on an Exchange Ratio of 2.050 shares of New Owlet common stock per share of Owlet common stock.

(6)   Reflects the elimination of Sandbridge's historical accumulated deficit and a reduction to Sandbridge's additional-paid-in-capital related to the excess of the merger consideration over the net monetary assets of Sandbridge.

(7)   Reflects the conversion of all of Owlet's convertible promissory notes outstanding in the aggregate amount of $6.9 million, consisting of $6.5 million in principal and $0.4 million in accrued interest, to common stock and additional paid in capital.

(8)   Reflects the derecognition of the preferred stock warrant liability, as well as a corresponding increase to additional-paid-in-capital to reflect the conversion of all outstanding warrants to purchase shares of Owlet's redeemable convertible preferred stock becoming warrants to purchase shares of New Owlet common stock.

(9)   Reflects the derecognition of the redeemable convertible preferred stock, as well as a corresponding increase to additional-paid-in-capital to reflect the conversion of all outstanding preferred stock to Owlet common stock.

(10)   Reflects merger consideration of $1.0 billion paid via the issuance of shares of common stock of Sandbridge valued at $10.00 per share issued to consummate the Business Combination, in exchange for outstanding shares of Owlet common stock.

(11)   Reflects the reclassification of Class B Sandbridge Common Stock to Class A Common Stock of New Owlet.

154

Exhibit 7
Page 774

*Adjustments to Unaudited Pro Forma Condensed Combined Statement of Operations for the Year Ended December 31, 2020*

The unaudited pro forma condensed combined statement of operations include Transaction Accounting Adjustments. Sandbridge and Owlet did not have any historical relationship prior to the Business Combination. Accordingly, no Transaction Accounting Adjustments were required to eliminate activities between the companies.

The pro forma basic and diluted earnings per share amounts presented in the unaudited pro forma condensed combined statement of operations and comprehensive loss are based upon the number of shares outstanding at the closing of the Business Combination, assuming the Business Combination occurred on January 1, 2020.

The Transaction Accounting Adjustments included in the unaudited pro forma condensed combined statement of operations for the year ended December 31, 2020 are as follows:

(1A) Elimination of interest income on the trust account.

(2A) Reflects the elimination of interest expense and debt discount amortization on Owlet's convertible debt.

(3A) Elimination of the change in the fair value of warrants.

(4A) Reflects the net impact on income taxes resulting from an income tax provision attributable to application of the blended statutory tax rate of 0.23% to the adjustment related to reduction of interest expense incurred on Owlet debt, offset by the impact on the pro forma valuation allowance.

**4.    Loss per Share**

Represents the net loss per share calculated using the historical weighted average shares outstanding, and the issuance of additional shares in connection with the Business Combination and related transactions, assuming the shares were outstanding since January 1, 2020. As the Business Combination and related transactions are being reflected as if they had occurred at the beginning of the period presented, the calculation of weighted average shares outstanding for basic and diluted net loss per share assumes that the shares issuable relating to the Business Combination have been outstanding for the entire period presented. Holders of Owlet common stock will receive shares of New Owlet common stock in an amount determined by application of the Exchange Ratio. In the maximum redemption scenario, this calculation eliminates 7.0 million of the public shares for the entire period.

Basic and diluted net loss per share attributable to common stockholders is presented in conformity with the two-class method required for participating securities. The 2,807,500 shares of New Owlet common stock beneficially owned by the Sponsor but subject to vesting are participating securities that contractually entitle the holders of such shares to participate in nonforfeitable dividends but does not contractually obligate the holders of such shares to participate in losses. The unaudited pro forma condensed combined statement of operations reflects a net loss for the period presented and, accordingly, no loss amounts have been allocated to such shares. These shares have also been excluded from basic and diluted pro forma net loss per share attributable to common stockholders as such shares of New Owlet common stock are contingently recallable until the vesting events have occurred.

The unaudited pro forma condensed combined financial information has been prepared assuming two alternative levels of redemption by Sandbridge's public stockholders of shares of Sandbridge Class A common stock for cash equal to their pro rata share of the aggregate amount on deposit (as of two business days prior to the Closing) in the trust account as of December 31, 2020:

| (in thousands, except share and per share amounts) | Assuming No Redemption | Assuming Maximum Redemption |
|---|---|---|
| Pro forma net loss | (8,615) | (8,615) |
| Weighted average shares outstanding of common stock[1] | 138,942,500 | 131,942,500 |
| Net loss per share (Basic and Diluted) attributable to common stockholders | $       (0.06) | $        (0.07) |

(1)    Excludes 2,807,500 shares of New Owlet common stock that the Sponsor and the independent directors and an advisor of Sandbridge will receive upon conversion of Sandbridge Class B common stock at Closing that will remain subject to price-based performance vesting terms as described in the Sponsor Letter Agreement.

Exhibit 7
Page 775

**OTHER INFORMATION RELATED TO SANDBRIDGE**

### Introduction

Sandbridge is a blank check company incorporated on June 23, 2020 as a Delaware corporation and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination. Prior to executing the Business Combination Agreement, Sandbridge's efforts were limited to organizational activities, completion of its initial public offering and the evaluation of possible business combinations.

### Initial Public Offering

Sandbridge has neither engaged in any operations nor generated any revenue to date. Based on Sandbridge's business activities, Sandbridge is a "shell company" as defined under the Exchange Act because it has no operations and nominal assets consisting almost entirely of cash.

On September 17, 2020, Sandbridge consummated its initial public offering of 23,000,000 units, including 3,000,000 units sold to the underwriters upon the underwriters' election to partially exercise their over-allotment option. Each unit consists of one share of Sandbridge Class A common stock and one half of one public warrant. Each whole warrant entitles the holder thereof to purchase one share of Sandbridge Class A common stock for $11.50 per share, subject to adjustment. The units were sold at an offering price of $10.00 per unit, generating total gross proceeds, before expenses, of $230,000,000. Prior to the consummation of the initial public offering, on June 26, 2020, the Sponsor purchased 5,750,000 shares of Sandbridge Class B common stock for an aggregate purchase price of $25,000, or approximately $0.004 per share. In August 2020, the Sponsor transferred 40,000 founder shares to Mr. De Sole, 25,000 founder shares to Mr. Toubassy, Sandbridge's director nominees, and 30,000 founder shares to Mr. Hilfiger and in October 2020, transferred 40,000 founder shares to Mr. Goss, resulting in the Sponsor holding 5,615,000 founder shares. The number of founder shares issued was determined based on the expectation that the initial public offering would be a maximum of 23,000,000 units and therefore that such founder shares would represent, on an as-converted basis, 20% of the outstanding shares of Sandbridge Class A common stock under the initial public offering.

In connection with the initial public offering, including the underwriters' elections to exercise their over-allotment option in relation thereto, Sandbridge consummated private sales of an aggregate of 6,600,000 private placement warrants, each exercisable to purchase one share of Sandbridge Class A common stock at an exercise price of $11.50 per share, to the Sponsor at a price of $1.00 per warrant, generating total gross proceeds of approximately $6,600,000. The private placement warrants are identical to the warrants included in the units sold in the initial public offering, except that, so long as they are held by their initial purchasers or their permitted transferees, (i) they will not be redeemable by Sandbridge, (ii) they (including the shares of Sandbridge Class A common stock issuable upon exercise of these warrants) may not, subject to certain limited exceptions, be transferred, assigned or sold until 30 days after Sandbridge completes its initial business combination, (iii) they may be exercised by the holders on a cashless basis and (iv) they (including the shares of common stock issuable upon exercise of these warrants) will be entitled to registration rights.

Following the initial public offering, including the underwriters' elections to exercise their over-allotment option in relation thereto, and the sale of the private placement warrants, $230,000,000 was placed in a Trust Account maintained by Continental Stock Transfer & Trust Company, acting as trustee. Except for the withdrawal of interest to pay franchise and income taxes, the Current Charter provides that none of the funds held in trust will be released from the Trust Account until the earliest of (i) the completion of an initial business combination; (ii) the redemption of any public shares properly tendered in connection with a stockholder vote to amend the Current Charter to modify the substance or timing of Sandbridge's obligation to allow redemption in connection with its initial business combination or to redeem 100% of its public shares if it does not complete its initial business combination within 24 months from the closing of the initial public offering or with respect to any other provision relating to stockholders' rights or pre-initial business combination activity or (iii) the redemption of 100% of the public shares if Sandbridge is unable to complete an initial business combination within 24 months from the closing of Sandbridge's initial public offering. The proceeds held in the Trust Account may only be invested in United States "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act of 1940, as amended (the "Investment Company Act"), having a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act which invest only in direct U.S. government treasury obligations.

The net proceeds deposited into the Trust Account remain on deposit in the Trust Account earning interest. As of December 31, 2020, there was $230,053,249 in investments and cash held in the Trust Account.

156

Exhibit 7
Page 776

**Fair Market Value of Owlet's Business**

Sandbridge's initial business combination must occur with one or more operating businesses or assets that together have an aggregate fair market value equal to at least 80% of the assets held in the Trust Account (excluding the amount of any deferred underwriting commissions and net of amounts disbursed to management for taxes payable) at the time of signing a definitive agreement to enter into the Business Combination. Sandbridge will not complete a business combination unless it acquires a controlling interest in a target company or is otherwise not required to register as an investment company under the Investment Company Act. The Sandbridge Board determined that this test was met in connection with the proposed Business Combination.

**PIMCO Private Funds Consent Right**

In connection with Sandbridge's initial public offering, Sandbridge agreed that it would not enter into a definitive agreement regarding an initial business combination without the prior written consent of the Sandbridge fund and the PIMCO private funds. Each of the Sandbridge fund and the PIMCO private funds have consented to our entry into the Business Combination Agreement.

**Voting Restrictions in Connection with Stockholder Meeting**

In connection with the execution of the Business Combination Agreement, the Sponsor and certain initial stockholders, directors and officers entered into a Sponsor Letter Agreement pursuant to which the Sponsor and each other holder of founder shares has agreed, among other things, (a) to appear at the Special Meeting or otherwise cause its shares to be counted as present for the purpose of establishing quorum; (b) to vote (or execute a written consent), or cause to be voted (or consent to be granted) any Sandbridge common stock and founder shares owned by it, him or her at such special meeting in person, or by proxy, in favor of the Business Combination and the adoption of the Business Combination Agreement and the transactions contemplated thereby; (d) to vote (or execute a written consent) or cause to be voted (or consent to be granted) any Sandbridge common stock or founder shares owned by it, him or her at such special meeting in person, or by proxy, against any alternative business combination or any action that would reasonably be expected to materially impede, interfere with, delay, postpone or adversely affect the Business Combination or any of the related transactions or result in a breach of any covenant, representation or warranty or other obligation or agreement of Sandbridge under the Business Combination Agreement or the Sponsor under the Sponsor Letter Agreement and (e) not redeem any shares of founder shares owned by it, him or her in connection with the stockholder approval. Pursuant to the Sponsor Letter Agreement, a percentage of Sandbridge Class A common stock held by the Sponsor shall be subject to certain time and performance-based vesting provisions. For additional information, see "*Related Agreements — Sponsor Letter Agreement*."

At any time prior to the Special Meeting, during a period when they are not then aware of any material nonpublic information regarding Sandbridge or its securities, the initial stockholders, Owlet and/or its affiliates may purchase shares and/or warrants from investors, or they may enter into transactions with such investors and others to provide them with incentives to acquire public shares, vote their public shares in favor of the Business Combination Proposal or not redeem their public shares. The purpose of any such transaction could be to (i) vote such shares in favor of the Business Combination and thereby increase the likelihood of obtaining stockholder approval of the Business Combination, or (ii) increase the likelihood that the Minimum Available Sandbridge Cash Amount is satisfied. Any such stock purchases and other transactions may thereby increase the likelihood of obtaining stockholder approval of the Business Combination. This may result in the completion of the Business Combination in a way that may not otherwise have been possible. While the exact nature of any such incentives has not been determined as of the date of this proxy statement/prospectus, they might include, without limitation, arrangements to protect such investors or holders against potential loss in value of their shares, including the granting of put options and the transfer to such investors or holders of shares or rights owned by Sandbridge's initial stockholders for nominal value.

**Liquidation if No Business Combination**

Sandbridge has until September 17, 2022, or during any stockholder-approved extension period to complete an initial business combination. If it is unable to complete its initial business combination by that date (or such later date as its stockholders may approve in accordance with the Current Charter), Sandbridge will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than 10 business days thereafter, redeem 100% of the public shares, at a per share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, including interest earned on the funds held in the Trust Account and not previously

Exhibit 7
Page 777

released to it to pay its franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any) and (iii) as promptly as reasonably possible following such redemption, subject to the approval of Sandbridge's remaining stockholders and its board of directors, liquidate and dissolve, subject, in each case, to Sandbridge's obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. There will be no redemption rights or liquidating distributions with respect to the private placement warrants, which will expire worthless if Sandbridge fails to complete its initial business combination by September 17, 2022, or during any stockholder-approved extension period.

In connection with the execution of the Business Combination Agreement, the Sponsor and initial stockholders and its other directors and officers as of the time of the initial public offering have entered into the Sponsor Letter Agreement, pursuant to which they have waived their rights to liquidating distributions from the Trust Account with respect to their founder shares.

The Sponsor and Sandbridge's officers and directors have also agreed, pursuant to a written agreement with Sandbridge, that they will not propose any amendment to the Current Charter that would affect the substance or timing of Sandbridge's obligation to redeem 100% of the public shares if it does not complete its initial business combination by September 17, 2022 or with respect to any other provisions relating to stockholders' rights or pre-initial business combination activity, unless Sandbridge provides its public stockholders with the opportunity to redeem their public shares upon approval of any such amendment at a per share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, including interest earned on the funds held in the Trust Account and not previously released to Sandbridge to pay its franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares. However, Sandbridge may not redeem the public shares in an amount that would cause its net tangible assets to be less than $5,000,001 (so that it is not subject to the SEC's "penny stock" rules).

Sandbridge expects that all costs and expenses associated with implementing its plan of dissolution, as well as payments to any creditors, will be funded from amounts remaining out of the approximately $1,000,000 of proceeds held outside the Trust Account, although it cannot assure you that there will be sufficient funds for such purpose. However, if those funds are not sufficient to cover the costs and expenses associated with implementing the plan of dissolution, to the extent that there is any interest accrued in the Trust Account not required to pay its taxes, Sandbridge may request the trustee to release to it an additional amount of up to $100,000 of such accrued interest to pay those costs and expenses.

If Sandbridge was to expend all of the net proceeds of its initial public offering, other than the proceeds deposited in the Trust Account, and without taking into account interest, if any, earned on the Trust Account, the per-share redemption amount received by stockholders upon its dissolution would be approximately $10.00. The proceeds deposited in the Trust Account could, however, become subject to the claims of its creditors, which would have higher priority than the claims of its public stockholders. Sandbridge cannot assure you that the actual per-share redemption amount received by stockholders will not be substantially less than $10.00. Under Section 281(b) of the DGCL, Sandbridge's plan of dissolution must provide for all claims against it to be paid in full or make provision for payments to be made in full, as applicable, if there are sufficient assets. These claims must be paid or provided for before it makes any distribution of its remaining assets to Sandbridge's stockholders. While Sandbridge intends to pay such amounts, if any, it cannot assure you that it will have funds sufficient to pay or provide for all creditors' claims.

Although Sandbridge will seek to have all vendors, service providers (other than its independent registered public accounting firm), prospective target businesses and other entities with which it does business execute agreements with it waiving any right, title, interest or claim of any kind in or to any monies held in the Trust Account for the benefit of its public stockholders, there is no guarantee that they will execute such agreements or even if they execute such agreements that they would be prevented from bringing claims against the Trust Account including but not limited to fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain an advantage with respect to a claim against Sandbridge's assets, including the funds held in the Trust Account. If any third party refuses to execute an agreement waiving such claims to the monies held in the Trust Account, Sandbridge's management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third party that has not executed a waiver if management believes that such third party's engagement

158

Exhibit 7
Page 778

TABLE OF CONTENTS

would be significantly more beneficial to Sandbridge than any alternative. Examples of possible instances where Sandbridge may engage a third party that refuses to execute a waiver include the engagement of a third-party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver. As of the date of this proxy statement/prospectus, Sandbridge is not a party to any agreement that does not contain such a waiver. In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with Sandbridge and will not seek recourse against the Trust Account for any reason. In order to protect the amounts held in the Trust Account, the Sponsor has agreed that it will be liable to Sandbridge if and to the extent any claims by a third party (other than its independent registered accounting firm) for services rendered or products sold to Sandbridge, or a prospective target business with which Sandbridge has discussed entering into a transaction agreement, reduce the amount of funds in the Trust Account to below (i) $10.00 per public share; or (ii) such lesser amount per public share held in the Trust Account as of the date of the liquidation of the Trust Account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay Sandbridge's franchise and income taxes, except as to any claims by a third party or prospective target business who executed a waiver of any and all rights to seek access to the Trust Account and except as to any claims under Sandbridge's indemnity of the underwriters of its initial public offering against certain liabilities, including liabilities under the Securities Act. Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, the Sponsor will not be responsible to the extent of any liability for such third party claims. Sandbridge has not independently verified whether the Sponsor has sufficient funds to satisfy its indemnity obligations and Sandbridge believes that the Sponsor's only assets are Sandbridge's securities. Therefore, Sandbridge cannot assure you that the Sponsor would be able to satisfy those obligations. As a result, if any such claims were successfully made against the Trust Account, the funds available for the Business Combination and redemptions could be reduced to less than $10.00 per public share. In such event, Sandbridge may not be able to complete the Business Combination, and Sandbridge's public stockholders would receive such lesser amount per share in connection with any redemption of their public shares. None of Sandbridge's officers or directors will indemnify Sandbridge for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

In the event that the proceeds in the Trust Account are reduced below (i) $10.00 per public share; or (ii) such lesser amount per public share held in the Trust Account as of the date of the liquidation of the Trust Account, due to reductions in the value of the trust assets, in each case net of the amount of interest which may be withdrawn to pay its franchise and income taxes, and the Sponsor asserts that it is unable to satisfy its indemnification obligations or that it has no indemnification obligations related to a particular claim, Sandbridge's independent directors would determine whether to take legal action against the Sponsor to enforce its indemnification obligations. While Sandbridge currently expects that its independent directors would take legal action on its behalf against the Sponsor to enforce its indemnification obligations to Sandbridge, it is possible that Sandbridge's independent directors in exercising their business judgment and subject to their fiduciary duties may choose not to do so in certain instances. Accordingly, Sandbridge cannot assure you that due to claims of creditors the actual value of the per-share redemption price will not be substantially less than $10.00 per share.

Sandbridge will seek to reduce the possibility that the Sponsor will have to indemnify the Trust Account due to claims of creditors by endeavoring to have all vendors, service providers (other than its independent registered public accounting firm), prospective target businesses and other entities with which it does business execute agreements with Sandbridge waiving any right, title, interest or claim of any kind in or to monies held in the Trust Account. The Sponsor will also not be liable as to any claims under Sandbridge's indemnity of the underwriters of its initial public offering against certain liabilities, including liabilities under the Securities Act. Sandbridge has access to up to approximately $500,000 held outside the Trust Account with which it may pay any such potential claims (including costs and expenses incurred in connection with its liquidation, currently estimated to be no more than approximately $100,000). In the event that Sandbridge liquidates, and it is subsequently determined that the reserve for claims and liabilities is insufficient, stockholders who received funds from the Trust Account could be liable for claims made by creditors.

If Sandbridge files a bankruptcy petition or an involuntary bankruptcy petition is filed against it that is not dismissed, the proceeds held in the Trust Account could be subject to applicable bankruptcy law, and may be included in its bankruptcy estate and subject to the claims of third parties with priority over the claims of Sandbridge's

159

Exhibit 7
Page 779

stockholders. To the extent any bankruptcy claims deplete the Trust Account, Sandbridge cannot assure you it will be able to return $10.00 per share to its public stockholders. Additionally, if Sandbridge files a bankruptcy petition or an involuntary bankruptcy petition is filed against Sandbridge that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover some or all amounts received by Sandbridge's stockholders. Furthermore, the Sandbridge Board may be viewed as having breached its fiduciary duty to Sandbridge's creditors and/or may have acted in bad faith, and thereby exposing itself and the company to claims of punitive damages, by paying public stockholders from the Trust Account prior to addressing the claims of creditors. Sandbridge cannot assure you that claims will not be brought against it for these reasons.

Sandbridge's public stockholders will be entitled to receive funds from the Trust Account only upon the earliest to occur of (i) the completion of Sandbridge's initial business combination, and then only in connection with those shares of Sandbridge Class A common stock that such stockholder properly elected to redeem; (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend the Current Charter to modify the substance or timing of Sandbridge's obligation to allow redemption in connection with its initial business combination or to redeem 100% of its public shares if it does not complete its initial business combination within 24 months from the closing of its initial public offering or with respect to any other provision relating to stockholders' rights or pre-initial business combination activity; or (iii) in the event of the redemption of the public shares if Sandbridge does not complete its initial business combination by May 26, 2022. In no other circumstances will a stockholder have any right or interest of any kind to or in the Trust Account. In the event Sandbridge seeks stockholder approval in connection with an initial business combination, a stockholder's voting in connection with the Business Combination alone will not result in a stockholder's redeeming its shares to Sandbridge for an applicable pro rata share of the Trust Account. Such stockholder must have also exercised its redemption rights described above. These provisions of the Current Charter, like all provisions of the Current Charter, may be amended with a stockholder vote.

## Properties

Sandbridge currently maintains its executive offices at 1999 Avenue of the Stars, Suite 2088, Los Angeles, CA 90067. The cost for this space is included in the $10,000 per month, until our initial business combination or our liquidation fee that Sandbridge pays an affiliate of the Sponsor for office space, utilities, administrative and support services. Sandbridge considers its current office space adequate for its current operations.

## Employees

Sandbridge currently has three executive officers. These individuals are not obligated to devote any specific number of hours to Sandbridge's matters but they intend to devote as much of their time as they deem necessary to Sandbridge's affairs until it has completed an initial business combination. The amount of time they will devote in any time period will vary based on whether a target business has been selected for an initial business combination and the stage of the Business Combination process it is in. Sandbridge does not intend to have any full-time employees prior to the completion of its initial business combination.

## Directors and Executive Officers

Sandbridge's directors and executive officers are as follows:

| Name | Age | Position |
|------|-----|----------|
| Ken Suslow | 50 | Chairman of the Board of Directors and Chief Executive Officer |
| Richard Henry | 39 | Chief Financial Officer |
| Joe Lamastra | 59 | Chief Operating Officer |
| Domenico De Sole | 77 | Director |
| Ramez Toubassy | 48 | Director |
| Jamie Weinstein | 44 | Director |
| Krystal Kahler | 38 | Director |
| Michael F. Goss | 61 | Director |

160

Exhibit 7
Page 780

TABLE OF CONTENTS

*Ken Suslow* is our Chief Executive Officer and the Chairman of our board of directors. Mr. Suslow has served in these roles since our inception. Mr. Suslow is Founding Managing Partner at Sandbridge Capital, where he chairs the Investment Committee. Mr. Suslow has led Sandbridge Capital's investments since its inception in 2013, including the majority buyout of Thom Browne, in which Sandbridge Capital fully divested its ownership position through a strategic sale to Ermenegildo Zegna Group. Mr. Suslow also led Sandbridge Capital's investments in Rossignol, The RealReal, Farfetch and Youth To The People, among others. Mr. Suslow also serves as Chief Executive Officer and Chairman of the board of directors of Sandbridge X2 Corp. Prior to co-founding Sandbridge Capital, Mr. Suslow was Managing Director at The Strand Partners, the Los Angeles-based family office vehicle for William C. Powers, where Mr. Suslow advised and led investments in privately held consumer companies. Mr. Suslow serves on the boards of Hydrow, Inc., Youth To The People, Peach & Lily, Inc., and ILIA, Inc., is a Board Advisor to Rossignol's apparel division and is the former Chairman of Thom Browne. Mr. Suslow has a B.A. from Pomona College and an M.B.A. from the Stanford Graduate School of Business. We believe that Mr. Suslow's significant experience managing a global consumer private equity fund, analyzing investments and advising companies in the consumer space make him well qualified to serve as a member of our board of directors.

*Richard Henry* is our Chief Financial Officer. Mr. Henry has served in this role since our inception. Mr. Henry is a Principal at Sandbridge Capital, where he is responsible for analyzing and executing new transactions. He is also active in monitoring the Sandbridge Consumer Funds' existing portfolio investments. Mr. Henry also serves as Chief Financial Officer of Sandbridge X2 Corp. Prior to joining Sandbridge Capital, Mr. Henry was a Vice President with Credit Suisse in their Los Angeles and Asia coverage offices, where his responsibilities included originating, structuring and executing capital markets and M&A transactions. Previously, he was an analyst at Genesis Capital, an Atlanta-based investment and merchant banking firm. During his investment banking tenure, Mr. Henry executed a range of strategic transactions with a focus on the consumer sector. He currently serves on the boards of Mountain Origin Designs LLC ("Stio") and BackJoy Orthotics LLC ("BackJoy") and is a board observer for Youth to the People. Mr. Henry graduated from the University of Georgia with a B.B.A. in Finance. We believe that Mr. De Sole is well qualified to serve as a member of our board of directors based on his extensive background in the consumer and retail sectors, along with his broad leadership and operational experience.

*Joe Lamastra* is our Chief Operating Officer. Mr. Lamastra has served in this role since our inception. Mr. Lamastra is Founding Managing Partner at Sandbridge Capital and a member of its Investment Committee. Mr. Lamastra also serves as Chief Operating Officer of Sandbridge X2 Corp. Since 1998, he also served as the Chief Executive Officer of T Capital Management, LLC, a private investment firm where he is a business and investing partner with Tommy Hilfiger. Mr. Lamastra was active in the 1992 initial public offering of Tommy Hilfiger Corporation ("THC") on the NYSE, the 1998 $1.1 billion acquisition of Apparel International Holdings Ltd by THC, the 2006 acquisition of THC by Apax Partners and the 2010 sale of THC to PVH Corp. for approximately $3.0 billion. Prior to 1998, Mr. Lamastra was a partner and attorney at the law firm Graham Curtin P.A., where he specialized in mergers and acquisitions, tax and corporate transactions. Mr. Lamastra started his career as a Financial Analyst with The Amerivest Group. He also worked for Touche Ross & Company (now Deloitte) in its Tax Department concentrating on mergers, acquisitions, real estate, and other corporate transactions. Mr. Lamastra was also a member on the board of Thom Browne and on the Villanova University School of Business Dean's Advisory Board. He currently serves on the University's Provost Board. Mr. Lamastra has a J.D. from Seton Hall Law School and a B.S. in Finance from Villanova University.

*Domenico De Sole* is on our board of directors. Mr. De Sole has served in this role since our inception. Mr. De Sole is the co-founder of luxury retailer Tom Ford International, LLC and has been the Chairman of its board of directors since its formation in 2005. During this time, Mr. De Sole also advised TPG Capital Advisors, LLC in connection with the repositioning and sale of Bally International AG. From 1984 to 1994, Mr. De Sole served as President and Chief Executive Officer of Gucci America and, from 1994 to 2004, he served as the President and Chief Executive Officer of Gucci Group, a company he helped transform from an almost bankrupt monobrand company into one of the largest and most profitable luxury groups in the world, which included brands such as Bottega Veneta, Yves Saint Laurent, Balenciaga, Stella McCartney, Alexander McQueen and Sergio Rossi. Previously, Mr. De Sole practiced law at the firm Patton, Boggs and Blow. Mr. De Sole has served on numerous public and private company boards of directors, including his current roles as Chairman of Tom Ford International, LLC and a director of Sandbridge X2 Corp. and Pirelli & C. S.p.A.. He formerly served as Chairman of Sotheby's, lead independent director of Telecom Italia S.p.A. and a director of Acamar Partners

161

Exhibit 7
Page 781

TABLE OF CONTENTS

Acquisition Corp., Condé Nast, Bausch & Lomb Incorporated, Delta Airlines, Inc., Gap, Inc., Newell Brands Inc. and Procter & Gamble. Mr. De Sole has been nominated to serve on the board of directors of Acamar Partners Acquisition Corp. II and Brimstone Acquisition Holdings Corp. Mr. De Sole graduated from the University of Rome with a law degree and received an L.L.M. from Harvard Law School where he served as a member of the Dean's Advisory Board.

*Ramez Toubassy* is on our board of directors. Mr. Toubassy has served in this role since our inception. Mr. Toubassy has served as President, Brands of Gordon Brothers, a global advisory, restructuring and investment firm, since May 2016, focusing on the acquisition, turnaround and sale of intellectual property assets, as well as providing valuation expertise for brand appraisals. Prior to joining Gordon Brothers, from April 2014 to May 2016, Mr. Toubassy was the Founding Partner of Blast-Off Brands, where he was involved in several branding and licensing projects, including serving as the Interim President of the Life is Good lifestyle brand and as the exclusive global licensing agent for Kodak. Before forming Blast-Off Brands, Mr. Toubassy spent over a decade leading Brand Sense Partners, LLC, a top global branding and licensing agency, most of that time serving as its President and Chief Executive Officer. At Brand Sense, Mr. Toubassy worked with a variety of notable brands, and also drove brand acquisition and operational efforts. Previously, Mr. Toubassy held various business development and licensing, principal and advisory roles at Indian Motorcycle International, LLC, Evolution Global Partners, Deutsche Bank and PricewaterhouseCoopers. Mr. Toubassy also serves on the board of directors of Sandbridge X2 Corp. Mr. Toubassy has a B.A. in economics from Pomona College and an M.B.A. from the Stanford Graduate School of Business. Mr. Toubassy is a member of the Young Presidents' Organization.

*Jamie Weinstein* is on our board of directors. Mr. Weinstein has served in this role since our inception. Mr. Weinstein has been a managing director, portfolio manager and head of corporate special situations at PIMCO, focusing on PIMCO's opportunistic and alternative strategies within corporate credit since September 2019. Prior to joining PIMCO in 2019, Mr. Weinstein worked for Kohlberg Kravis Roberts & Co. ("KKR") as a portfolio manager for the firm's special situations funds and portfolios, which he managed since their inception in 2009. Mr. Weinstein was also a member of KKR's special situations, real estate, and India NBFC investment committees and the KKR credit portfolio management committee. Previously, Mr. Weinstein was a portfolio manager with responsibility across KKR's credit strategies. Prior to joining KKR, Mr. Weinstein was with Tishman Speyer Properties as director of acquisitions for Northern California and at Boston Consulting Group as a consultant. Mr. Weinstein serves on the boards of Sandbridge X2 Corp., Climate Change Crisis Real Impact Solutions I Acquisition Corporation, Climate Real Impact Solutions II Acquisition Corporation, Freedom Acquisition I Corporation and Capstar Special Purpose Acquisition Corp. Mr. Weinstein has been nominated to serve on the board of Climate Real Impact Solutions III Acquisition Corporation. Mr. Weinstein received an M.B.A. from the Stanford Graduate School of Business in 2002 and a B.S. in Civil Engineering and Operations Research from Princeton University in 1998.

*Krystal Kahler*, CFA is on our board of directors. Ms. Kahler has served in this role since October 2020. Ms. Kahler is a senior cross-asset securities analyst focused on fundamental and special situation investments. She is currently a credit and equity Portfolio Manager at PIMCO focused on the Consumer Goods and Retail sectors. Previously, she was the Senior Consumer Analyst at Water Island Capital and a Senior Analyst at Arrowgrass Capital Partners. Prior to joining Arrowgrass Capital Partners, Ms. Kahler was the Consumer/Retail Sector head at Advent Capital, where she worked for seven years. Ms. Kahler has a B.S. in Finance from San Diego State University.

*Michael F. Goss* is on our board of directors. Mr. Goss has served in this role since October 2020. Mr. Goss is the founder, Chairman and Chief Executive Officer of Brimstone Acquisition Holdings Corp. From January 2020 until December 2020, Mr. Goss was Chief Financial Officer of Condé Nast, a global media company producing leading print, digital, video and social brands internationally. Prior to joining Condé Nast, Mr. Goss was Executive Vice President and Chief Financial Officer of Sotheby's, Inc. from March 2016 until October 2019. Mr. Goss also served in various senior management capacities at Bain Capital, LLC ("Bain Capital") for 13 years until December 2013, beginning in 2001 as Managing Director and Chief Financial Officer and assuming the additional role of Chief Operating Officer in 2004. Prior to joining Bain Capital, Mr. Goss was Executive Vice President and Chief Financial Officer of Digitas Inc., a global Internet professional services firm, which he helped take public in March 2000. Mr. Goss serves as the Lead Director and is the Chairman of the audit committee of Element Solutions Inc. Mr. Goss graduated from Kansas State University with a B.A. in economics in 1981 and received an MBA with Distinction from Harvard Business School in 1986.

162

Exhibit 7
Page 782

**Board Observers**

*Dan Degtyar,* who serves as PIMCO's board observer, is an Executive Vice President, portfolio manager and senior analyst for PIMCO's Global Credit Opportunity Strategy, where he focuses on credit relative value opportunities and special situations. Prior to joining PIMCO, Mr. Degtyar was a senior analyst at Beach Point Capital, a private equity associate at Ares Management and an investment banking associate at Credit Suisse. Mr. Degtyar is a CFA charterholder with 14 years of investment experience and holds an undergraduate degree in business economics from the University of California, Los Angeles. Mr. Degtyar has no employment, consulting fee or other similar compensation arrangements with us.

*Richard Henry,* is our Chief Financial Officer, and serves as Sandbridge Capital's board observer. Although he serves as an officer, Mr. Henry has no employment, consulting fee or other similar compensation arrangements with us. Please see Mr. Henry's biographical information above.

**Executive Compensation and Director Compensation**

None of Sandbridge's executive officers or directors has received any cash compensation for services rendered to Sandbridge. We have agreed to pay an affiliate of our Sponsor a total of $10,000 per month, until our initial business combination or our liquidation, for office space, utilities, administrative and support services provided to members of our management team. Our Sponsor, executive officers and directors, or any of their respective affiliates will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf, such as identifying potential target businesses and performing due diligence on suitable business combinations. Our audit committee will review on a quarterly basis all payments that were made to our Sponsor, executive officers or directors, or our or their affiliates.

**Number and Terms of Office of Officers and Directors**

The Sandbridge Board consists of six members, with the directors divided into three classes with only one class of directors being elected in each year and each class (except for those directors appointed prior to our first annual meeting of stockholders) serving a three-year term. In accordance with the NYSE corporate governance requirements, Sandbridge is not required to hold an annual meeting until one year after its first fiscal year end following its listing on the NYSE. The term of office of the first class of directors, consisting of Mr. Toubassy and Mr. Goss will expire at our first annual meeting of stockholders. The term of office of the second class of directors, consisting of Domenico De Sole and Krystal Kahler, will expire at the second annual meeting of stockholders. The term of office of the third class of directors, consisting of Ken Suslow and Jamie Weinstein, will expire at the third annual meeting of stockholders.

Sandbridge's officers are appointed by the Sandbridge Board and serve at the discretion of the Sandbridge Board, rather than for specific terms of office. The Sandbridge Board is authorized to appoint officers as it deems appropriate pursuant to Sandbridge's Bylaws. Sandbridge's Bylaws provide that our officers may consist of a Chairman of the Board, Chief Executive Officer, Chief Financial Officer, Vice Presidents, Secretary, Treasurer, Assistant Secretaries and such other offices as may be determined by the Sandbridge Board.

**Director Independence**

The rules of the NYSE require that a majority of the Sandbridge Board be independent. An "independent director" is defined generally as a person who, in the opinion of the company's board of directors, has no material relationship with the listed company (either directly or as a partner, stockholder or officer of an organization that has a relationship with the company). The Sandbridge Board has determined that each of Mr. De Sole, Mr. Toubassy and Mr. Goss are "independent directors" as defined in the rules of the NYSE and applicable SEC rules.

**Legal Proceedings**

None.

**Periodic Reporting and Audited Financial Statements**

Sandbridge has registered its securities under the Exchange Act and has reporting obligations, including the requirement to file annual and quarterly reports with the SEC. In accordance with the requirements of the Exchange Act, Sandbridge's annual reports contain consolidated financial statements audited and reported on by Sandbridge's independent registered public accounting firm.

163

Exhibit 7
Page 783

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
## AND RESULTS OF OPERATIONS OF SANDBRIDGE

*The following discussion and analysis of the financial condition and results of operations of Sandbridge Acquisition Corporation (for purposes of this section, "Sandbridge," "we," "us" and "our") should be read in conjunction with the financial statements and related notes of Sandbridge included elsewhere in this proxy statement/prospectus. This discussion contains forward-looking statements reflecting our current expectations, estimates and assumptions concerning events and financial trends that may affect our future operating results or financial position. Actual results and the timing of events may differ materially from those contained in these forward-looking statements due to a number of factors, including those discussed in the sections entitled "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements" appearing elsewhere in this proxy statement/prospectus.*

### Overview

We are a blank check company incorporated as a Delaware corporation on June 23, 2020 and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination. In connection with our initial public offering, we consummated the private sale of an aggregate of 6,600,000 warrants, each exercisable to purchase one share of Class A common stock, par value $0.0001 per share, at $11.50 per share, to our Sponsor at a price of $1.00 per warrant, generating gross proceeds, before expenses, of approximately $6,600,000. We intend to consummate the Business Combination using cash from the proceeds of our initial public offering that closed on September 17, 2020, the PIPE Financing, and from additional issuances of, if any, our equity and our debt, or a combination of cash, equity and debt.

At December 31, 2020, we held cash of $1,287,234, current liabilities of $315,328 and deferred underwriting compensation of $8,050,000. Further, we expect to continue to incur significant costs in the pursuit of our acquisition plans. We cannot assure you that our plans to complete the Business Combination will be successful.

### Agreement for Business Combination

On February 15, 2021, we entered into the Business Combination Agreement with Merger Sub and Owlet. If the Business Combination is consummated, Merger Sub will merge with and into Owlet with Owlet surviving the Merger as a wholly owned subsidiary of Sandbridge. In addition, in connection with and following the consummation of the Business Combination, Sandbridge will be renamed "Owlet, Inc." and is referred to herein as "New Owlet" as of the time following such change of name.

Owlet Baby Care Inc. designs and sells products and services based on a commitment to empower parents with technology and data to proactively monitor the health and wellness of their children from conception to kindergarten. Owlet's ecosystem of connected smart products, including its flagship Smart Sock, is helping to transform modern parenting by bringing simplified child monitoring solutions in-home so parents can rest easier.

As a consequence of the Business Combination, at the Effective Time, each share of Sandbridge Class B common stock that is issued and outstanding as of immediately prior to the Effective Time will be converted, on a one-for-one basis, into a share of New Owlet common stock. The Business Combination will have no effect on Sandbridge Class A common stock that is issued and outstanding as of immediately prior to the Effective Time, which will continue to remain outstanding.

As a consequence of the Merger, at the Effective Time, (i) each share of Owlet capital stock (as defined herein) that is issued and outstanding immediately prior to the Effective Time will become the right to receive the number of shares of New Owlet common stock equal to the Exchange Ratio; (ii) each option to purchase shares of Owlet common stock, whether vested or unvested, that is outstanding and unexercised as of immediately prior to the Effective Time will be assumed by New Owlet and will automatically become an option (vested or unvested, as applicable) to purchase a number of shares of New Owlet common stock equal to the number of shares of Owlet common stock subject to such option immediately prior to the Effective Time multiplied by the Exchange Ratio, rounded down to the nearest whole share, at an exercise price per share equal to the exercise price per share of such option immediately prior to the Effective Time divided by the Exchange Ratio, rounded up to the nearest whole cent, except that, subject to certain limitations, holders of vested options may instead elect to receive a cash payment in lieu of assumption of a portion of their vested options; and (iii) each share of Owlet common stock that is subject to a risk of forfeiture or right of repurchase at the original purchase price as of immediately prior to the Effective Time shall be

164

Exhibit 7
Page 784

TABLE OF CONTENTS

subject to the same risk of forfeiture or right of repurchase (proportionately adjusted to reflect the Exchange Ratio) which risk of forfeiture or right of repurchase shall lapse in accordance with the same vesting schedule as that of the Owlet Restricted Stock. The Business Combination also calls for additional agreements, including, among others, the Subscription Agreements, the Registration Rights Agreement, the Stockholders Agreement, the Sponsor Letter Agreement, as described elsewhere in this proxy statement/prospectus.

### Results of Operations

For the period from June 23, 2020 (inception) through December 31, 2020, we had a net loss of $427,187, which consists of operating costs of $480,436 offset by interest income on marketable securities held in the Trust Account of $53,249. Through December 31, 2020, our efforts have been limited to organizational activities, activities relating to our initial public offering, activities relating to identifying and evaluating prospective acquisition candidates and activities relating to general corporate matters. We have not generated any revenue, other than interest income earned on the proceeds held in the Trust Account. As of December 31, 2020, $230,053,249 was held in the Trust Account (including $8,050,000 of deferred underwriting discounts and commissions) and we had cash outside of the Trust Account of $1,287,234 available for working capital purposes.

Except for the withdrawal of interest to pay Sandbridge's franchise and income tax obligations, the Current Charter provides that none of the funds held in trust will be released from the Trust Account until the earliest of (i) the completion of an initial business combination; (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend the Current Charter to modify the substance or timing of Sandbridge's obligation to allow redemption in connection with its initial business combination or to redeem 100% of its public shares if it does not complete its initial business combination within 24 months from the closing of the initial public offering or with respect to any other provision relating to stockholders' rights or pre-initial business combination activity or (iii) the redemption of 100% of the public shares if Sandbridge is unable to complete a Business Combination by September 17, 2022. Through December 31, 2020, we have not withdrawn any funds from interest earned on the trust proceeds. Other than the deferred underwriting discounts and commissions, no amounts are payable to the underwriters of the initial public offering in the event of a business combination. Citigroup has agreed to waive its rights to deferred underwriting commissions held in the Trust Account in the event Sandbridge does not consummate a Business Combination within the Combination Period, in which case such amounts will be included with the funds held in the Trust Account that will be available to fund the redemption of the public shares. In the event of such distribution, it is possible that the per share value of the residual assets remaining available for distribution (including Trust Account assets) will be less than the Initial Public Offering price per Unit in the proposed offering.

We have also agreed to pay an affiliate of the Sponsor a total of $10,000 per month, until our initial business combination or our liquidation, for office space, utilities, administrative and support services provided to members of our management team. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees. For the period from June 23, 2020 (inception) through December 31, 2020, Sandbridge incurred and paid $40,000 under this agreement.

### Going Concern Considerations and Capital Resources

For the period from June 23, 2020 (inception) through December 31, 2020, we had a net loss of $427,187, which consists of operating costs of $480,436, offset by interest income on marketable securities held in the Trust Account of $53,249.

We do not currently believe we will need to raise additional funds in order to meet the expenditures required for operating our business. However, if our estimate of the costs of identifying a target business, undertaking in-depth due diligence and negotiating our initial business combination are less than the actual amount necessary to do so, we may have insufficient funds available to operate our business prior to our initial Business Combination.

As indicated in the accompanying financial statements, at December 31, 2020, we had outside of trust cash in the amount of $1,287,234 and is available for working capital purposes.

### Off-Balance Sheet Financing Arrangements

We have no obligations, assets or liabilities that would be considered off-balance sheet arrangements. We do not participate in transactions that create relationships with unconsolidated entities or financial partnerships, often referred to as variable interest entities, which would have been established for the purpose of facilitating off-balance sheet arrangements.

165

Exhibit 7
Page 785

TABLE OF CONTENTS

We have not entered into any off-balance sheet financing arrangements, established any special purpose entities, guaranteed any debt or commitments of other entities, or entered into any non-financial agreements involving assets.

**Contractual Obligations**

We do not have any long-term debt, capital lease obligations, operating lease obligations or long-term liabilities other than an administrative agreement to pay an affiliate of the Sponsor a total of $10,000 per month, until our initial business combination or our liquidation, for office space, utilities, administrative and support services provided to members of our management team, from the date of closing of our initial public offering. Upon completion of a business combination or our liquidation, we will cease paying these monthly fees.

**Critical Accounting Policies and Estimates**

The preparation of financial statements and related disclosures in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements, and income and expenses during the periods reported. Actual results could materially differ from those estimates. We have identified the following critical accounting policies:

***Common Stock Subject to Possible Redemption***

We account for Sandbridge Class A common stock subject to possible redemption in accordance with the guidance in Accounting Standards Codification ("ASC") Topic 480 "Distinguishing Liabilities from Equity." Sandbridge Class A common stock subject to mandatory redemption is classified as a liability instrument and is measured at fair value. Conditionally redeemable common stock (including common stock that features redemption rights that are either within the control of the holder or subject to redemption upon the occurrence of uncertain events not solely within our control) is classified as temporary equity. At all other times, common stock is classified as stockholders' equity. Sandbridge Class A common stock features certain redemption rights that are considered to be outside of our control and subject to occurrence of uncertain future events. Accordingly, at December 31, 2020, the 21,824,900 shares of Sandbridge Class A common stock subject to possible redemption are presented as temporary equity, outside of the stockholders' equity section of Sandbridge's condensed balance sheet.

***Net Income (Loss) per Common Share***

We apply the two-class method in calculating earnings per share. Net income (loss) per common share, basic and diluted for Sandbridge Class A common stock is calculated by dividing the interest earned on the Trust Account, net of applicable taxes, by the weighted average number of shares of Sandbridge Class A common stock outstanding for the periods. We have not considered the effect of the warrants sold in the initial public offering (including the over-allotment) and private placement warrants to purchase approximately 11,500,000 and 6,600,000 shares of Sandbridge Class A common stock, respectively, in the calculation of diluted income (loss) per share, since the exercise of such warrants are contingent upon the occurrence of future events and the inclusion of such warrants would be anti-dilutive.

The Sandbridge statement of operations includes a presentation of income (loss) per share for common shares subject to possible redemption in a manner similar to the two-class method of income per share. Net income per common share, basic and diluted, for Class A redeemable common stock is calculated by dividing the interest income earned on the Trust Account of $53,249 for the period from June 23, 2020 (inception) through December 31, 2020 (net of applicable franchise and income taxes, limited to interest income, of $53,249 for the period from June 23, 2020 (inception) through December 31, 2020), by the weighted average number of Class A redeemable common stock since original issuance. Net loss per common share, basic and diluted, for Class B non-redeemable common stock is calculated by dividing the net income, less income attributable to Class A redeemable common stock, by the weighted average number of Class B non-redeemable common stock outstanding for the period. Class B non-redeemable common stock includes the founder shares as these shares do not have any redemption features and do not participate in the income earned on the Trust Account.

**Recent Accounting Pronouncements**

Sandbridge management does not believe that any recently issued, but not yet effective, accounting pronouncements, if currently adopted, would have a material effect on Sandbridge's financial statements.

166

Exhibit 7
Page 786

TABLE OF CONTENTS

## INFORMATION RELATED TO OWLET

*Unless the context requires otherwise, references to "Owlet," "we," "us," "our" and the "company" in this section are to the business and operations of Owlet prior to the Business Combination and the business and operations of New Owlet following the Business Combination.*

### We Are Owlet

Becoming a parent is a life-changing milestone. New mothers and fathers become caregivers overnight and share the same primary concerns of sleep, safety, and sickness. Parents, who are increasingly older and busier, assume the roles of doctor, dietitian, and sleep trainer. In many cases, parents receive minimal guidance, counseling, or affirmation of how well they are caring for their newborn, which often leads to increased anxiety and feelings worry. As a result, parents lose on average 44 nights of sleep during the first year of an infant's life. Furthermore, the first years of life are the most expensive for healthcare with over 92 million well, sick, and emergency room visits annually in the United States.

Enter Owlet. Our mission is to empower parents with the right information at the right time, to give them more peace of mind and help them find more joy in the journey of parenting. Our digital parenting platform aims to give parents real-time data and insights to help parents feel calmer and more confident. We believe that every parent deserves peace of mind and the opportunity to feel their well-rested best. We also believe that every child deserves to live a long, happy, and healthy life, and we are working to develop products to help facilitate that. Our ecosystem of digital parenting solutions, including our connected anchor product, the Owlet Smart Sock, is helping to transform modern parenting by providing parents data-driven insights into their children's well-being in the comfort of their own home. We believe that by developing in-home pediatric monitoring and analytics technologies, we can not only provide parents with peace of mind about their children, but also create future applications that have the potential to decrease infant death due to Sudden Unexplained Infant Death (SUID) and Sudden Infant Death Syndrome (SIDS) and opportunistically detect infant ailments such as respiratory syncytial virus (RSV) and supraventricular tachycardia (SVT).

With Owlet, parents can better navigate the journey of parenthood, rest easier and have greater peace of mind. Based on the United Nations global population estimates of children aged zero to five and prices of our current products and our estimates for prices of products in development, we estimate the total addressable market for our existing products to be $21 billion, and that the total addressable market for our existing and pipeline products will reach an estimated $81 billion by 2025. We believe the opportunity ahead of us is significant, and that increased parental engagement in childcare, the consumerization of pulse oximetry, and telehealth adoption are key trends accelerating growth in our target markets.

### Our Story, Our Culture

Kurt Workman, Jordan Monroe, Zack Bomsta, and Jake Colvin founded Owlet because they wanted access to real-time data to give them peace of mind as new parents. Infant monitoring solutions were highly fragmented and provided limited real-time awareness, leading to a less-than-optimal solution for concerned parents. There was also no product on the market available for parents to track a baby's sleep patterns, oxygen levels, and heart rate at home. Our founders' love for their children inspired them to launch Owlet in 2012 and create the Owlet Smart Sock, which was first sold in 2015.

Since our founding, we have established a culture based on innovation and operational excellence, resulting in highly innovative and award-winning products. Our collaborative culture and emphasis on disruption and innovation has led to numerous design and innovation awards and baby industry awards.

We believe our innovation and operational excellence stems directly from the diversity in our community and our common commitment to equity, inclusion, and equal access to healthcare. As of December 31, 2020, over 40% of our employees were women and over 20% were from minority groups.

### Our Platform

Our purpose-built, growing suite of connected digital parenting products and services is designed to help parents know more about their children and gain peace of mind in their roles as caregivers. The Owlet Smart Sock is intended for use by healthy infants of up to 18 months of age, and the Owlet Cam can be used by parents to help monitor children of any age. Owlet Dream Lab is an interactive online platform that assists

167

Exhibit 7
Page 787

families in building healthy sleep habits with their babies of up to 12 months in age. We have developed deep and enduring relationships with our users and brand advocates around the world. These relationships continue to grow and develop as a result of our novel product and software additions to our connected ecosystem, feature enhancements, multi-channel distribution, and marketing efforts.

Research, development, and product innovation are core to our business, and we believe provide us competitive advantages. Our intellectual property portfolio of 33 issued patents (with numerous others pending) and 38 registered trademarks provides a strong backbone to our connected ecosystem and brand. We have developed or otherwise own the rights to technology from the backend data to the user interface that allows us to control the user experience for our current products and plan to advance that technology for products in development. From designing innovative and groundbreaking products to employing sophisticated software with proprietary algorithms and backend support, we believe we have built a strong competitive moat and early-mover advantage over potential competition in the connected nursery field. We have a vast infant data set with over 850,000 babies monitored since the launch of the Owlet Smart Sock. We currently monitor approximately nine billion heartbeats per day and our large and growing body of data leads to stronger insights and allows us to develop better products and services, which we believe in turn leads to happier users and drives product purchases.

We believe our innovations translate to a better parenting experience. For example, as part of a survey we conducted in May 2017 of 5,125 parents whose children were using the Owlet Smart Sock, 96% of respondents reported reduced anxiety and 94% reported better sleep after using the Owlet Smart Sock (as published in *Global Pediatric Health*). That confidence is further shown by the one-and-a-half million downloads of our application. On average, parents whose children wear an Owlet Smart Sock open our application with a daily frequency rivaling that of various social media platforms.

In order to make our products and services easy to find and purchase, as of December 31, 2020, over 3,500 global and national retail stores sold our products. These channels are complemented by sales on Amazon.com and other online retail sites as well as our direct-to-consumer channel on our website. Through this domain, we connect directly with our users, offer education on products and software, and gain valuable feedback from our users.

We believe demand for our innovative products is evidenced by our strong financial performance. We grew revenues from $49.8 million in 2019 to $75.4 million in 2020, representing growth of 51.4%. Over the same period, gross profit grew from $22.9 million to $35.9 million, representing growth of 56.6%, net loss improved from $(17.9) million to $(10.5) million, and EBITDA improved from $(16.6) million to $(8.2) million.

**Superior Solutions for Parenting**

Through our existing platform and future development pipeline of products and services designed to span from conception to kindergarten, we are committed to changing what it means to be a parent in the modern age. Through innovative hardware and software solutions utilizing proprietary algorithms, we give parents access to information about their children's sleep patterns, oxygen levels, and heart rates, in addition to the ability to see and hear their children wherever they may be. These offerings are designed to complement parents' intuition, leading to a more joyful parenting experience.

**Existing Offerings**

• **Smart Sock** – The award-winning Owlet Smart Sock is the first baby monitor to track an infant's oxygen levels, heart rate, and sleep trends. The Owlet Smart Sock allows parents to view their baby's heart rate and oxygen readings in real time from the Owlet application. If the baby's readings ever fall outside of preset zones, parents are notified through the Owlet application and a nearby base station that the baby may need attention.

• **Cam** – The Owlet Cam turns any smartphone into a baby monitor, allowing parents to hear and see everything that is most important to them from anywhere in high-definition clarity. The Owlet Cam includes a wide-angle view, sound and motion notifications, and background audio to ensure parents never miss a moment. The Owlet Cam streams secure, encrypted video to parents' own private accounts on the Owlet application.

168

Exhibit 7
Page 788

- **Monitor Duo** – The Owlet Monitor Duo offers the intelligence of our award-winning Smart Sock paired with the Owlet Cam. It is the first smart baby monitor that combines the ability to track a baby's heart rate, oxygen levels, and sleep trends with high-definition video, offering parents the most complete picture of their baby's sleep and well-being.

- **Dream Lab** – Owlet Dream Lab is an interactive online platform that assists families in building healthy sleep habits with their babies of up to 12 months in age. Designed in partnership with pediatric sleep experts, Owlet Dream Lab offers personalized step-by-step sleep plans, video tutorials, and access to twice-weekly webinars for live support.

In addition to our existing offerings, we believe our pipeline of products and software services in development will provide us an opportunity to increase our total addressable market and customer lifetime value. We are designing these pipeline offerings to complement our existing suite of solutions and create a more connected and comprehensive digital parenting ecosystem.

**Monitoring Pipeline**

- **Smart Sock Variants**

  - Smart Sock Plus – The Owlet Smart Sock Plus utilizes the same technology as the Owlet Smart Sock and is designed to grow with children, from newborn to five years. Through an expanded fabric sock set, the Owlet Smart Sock Plus would allow families to track oxygen levels, heart rates, and sleep trends for an age range that is three times larger than that of the existing Owlet Smart Sock.

  - BabySat – Based on the Owlet Smart Sock, the Owlet BabySat is under development as a medical device that would, if authorized by the FDA, be sold for prescription use only. The Owlet BabySat is designed to utilize various telehealth platforms and is intended specifically for babies with diagnosed illnesses and health conditions. We have submitted a premarket notification to the FDA seeking 510(k) clearance of the Owlet BabySat. In January 2021, the FDA informed us that additional data would be needed to support 510(k) clearance for the product. We plan to engage with the FDA to obtain feedback on a proposed study design to generate such data to support a resubmission of our application for 510(k) clearance.

  - Over-the-Counter "OTC" Smart Sock – The Owlet OTC Smart Sock is under development as a medical device that would be sold over-the-counter at retailers without a prescription. The Owlet OTC Smart Sock is designed to integrate with various telehealth platforms and preemptively screen for health conditions in babies with no existing medical or health issues. We anticipate that the Owlet OTC Smart Sock will require marketing authorization from the FDA prior to commercialization.

  - Band – The Owlet Band is under development and designed for pregnant women between 24 to 40 weeks of gestation. The Owlet Band is intended to use safe and passive electrocardiogram sensors to allow expectant mothers to safely track their own sleep patterns and heart rate, in addition to tracking their baby's heartbeat. Expectant parents will be able to view collected data in the Owlet pregnancy application as well as hear their baby's heartbeat. For expectant mothers who often go weeks or months without insight into their pregnancy or their baby's well-being, the Owlet Band is being developed to offer a deeper connection and reassurance to pregnant women at home. We anticipate that the Owlet Band may require marketing authorization from the FDA prior to commercialization.

**Connected Ecosystem Pipeline**

We plan to complement our monitoring pipeline with our connected ecosystem pipeline to create a more unified digital parenting experience. We believe our strong brand and platform provide a strong position to develop adjacent products. For example, although we do not yet have prototypes for such products, we plan to develop the Owlet Soothe, a white noise machine designed to create a more relaxing bedroom environment; the Owlet Smart Bed, which would connect with the Owlet Smart Sock to understand a baby's sleep cycles and would utilize automated motion technology to lull babies back to sleep when they wake up; and the Owlet Humidifier, which would integrate with the Owlet OTC Smart Sock to automatically turn on when respiratory

169

Exhibit 7
Page 789

sickness symptoms are detected or when the room falls below a certain humidity threshold. As we develop additional products, we believe parents will increasingly rely on our connected ecosystem for digital parenting solutions.

**Platform Pipeline**

As we expand our connected ecosystem, we will continue to develop our platform products and services in order to bring additional solutions into the home. Owlet aims to integrate with leading telehealth providers who can share infant sleep and health data with medical professionals. We believe obtaining FDA marketing authorization for our Owlet OTC Smart Sock, Owlet BabySat, and Owlet Band products will allow us to develop a native Owlet telehealth platform and directly engage medical professionals to provide an end-to-end digital healthcare solution for our customers. To further our commitment to parents and their children from conception to kindergarten, we plan to continue to explore new potential products and services that make parents' and their children's lives less stressful and more meaningful.

**Our Market Opportunity**

Based on the United Nations global population estimates of children aged zero to five and prices of our current products and our estimates for prices of products in development, we estimate the total addressable market for our current and pipeline products will reach an estimated $81 billion by 2025. We believe the following trends are supporting the expected growth of our market opportunity:

**Healthcare Moves Home**. There has been a paradigm shift in how people prefer to receive healthcare services. In the COVID-affected world, there is a heightened focus on bespoke in-home health and wellness solutions. Individuals are increasingly looking to expand their healthcare options beyond a traditional clinical setting. As a result, patients are rapidly adopting telehealth and virtual care services in place of traditional healthcare alternatives. Although some companies such as AmWell, Livongo, and TelaDoc are addressing this need, the market is still in its infancy with substantial growth ahead. In addition, as connected devices propel the consumerization of healthcare through clinical screenings like detection of irregular heartbeat, demand for digital home monitoring continues to build. Digital health has expanded beyond doctor visits to include applications that are customized for individuals and their specific needs – moving healthcare from being reactive to proactive. We intend to take advantage of this trend and empower parents with the tools and data to provide proactive care for their children.

**Ubiquity of Biometrics.** With pulse oximeters gaining popularity as tools used to track fitness and general wellness, approximately 92 million people are expected to use pulse oximeters on a daily basis by 2022. Consequently, reliance on data becomes routine and even expected. We believe that parents want data about their children and our suite of products and services has the potential to service that demand.

**Parenting Gets Upgraded.** Parents are simultaneously more engaged in caregiving and more reliant upon technology than ever before. We believe this trend widens our market opportunity and that early tech adopters are more likely than slower tech adopters to own an Owlet Smart Sock. We expect this trend to continue and positively affect Owlet's future products and services.

**Our Growth Strategies**

We are excited to expand Owlet's footprint, and we plan to implement the following strategies to accelerate our growth:

**Leverage Brand Awareness & Grow Distribution to Increase Penetration.** We intend to continue our efforts to become one of the most recognizable brand names in the digital parenting category. We believe becoming a recognizable brand helps our offerings stand out in a highly fragmented market of legacy companies lacking a category leader. We see ample room for growth as our existing product suite is in the beginning phase of market penetration. We plan to leverage our paid and organic marketing efforts across social media, display advertising, and email marketing to boost top-of-mind awareness and acquire new users at a sustainable cost. In order to bring Owlet to more families, we plan to focus on increasing retailer penetration to 5,000 retail locations by the end of 2022, from an existing penetration of 3,500 retail locations.

**Adding New Data-Driven Products to Expand the Digital Parenting Ecosystem.** We are building a platform with the goal to be parents' go-to brand in the areas of sleep, safety, and sickness, from conception

170

Exhibit 7
Page 790

TABLE OF CONTENTS

through kindergarten. Our goal is to continue adding products and services at a regular cadence in order to create a digital parenting ecosystem that works together to create a holistic experience for families and leverages the strength of our brand. We believe our robust pipeline of hardware product candidates, including the Owlet Soothe, Owlet Smart Bed and Owlet Humidifier, as well as the development of our software and services, will provide us additional opportunities to sell new products to our existing users, while the Owlet Smart Sock continues to serve as our 'must-have' product and the compelling anchor of our ecosystem.

**Invest in Clinical Research and Pursue FDA Marketing Authorization to Potentially Open the Door to Coverage and Reimbursement and Telehealth.** We plan to grow into the medical and telehealth markets by pursuing FDA marketing authorization of certain products and continuing to invest in clinical research, as exemplified by our recent tachyarrhythmia study published in *The Journal of Pediatrics*. If we are successful in obtaining marketing authorization from the FDA for the Owlet BabySat, we believe we could build further credibility for our platform with the medical community and help open new medical channels and markets. We are developing the Owlet OTC Smart Sock as Owlet's medical-grade, over-the-counter version of the Owlet Smart Sock for healthy babies with no underlying medical conditions, and we expect to pursue an expanded intended use and marketing claims, which we believe could lead to further market penetration. We believe that FDA marketing authorization for either of these products would help open the door to expanded services.

**Leverage Brand to Expand into New Markets.** While our existing primary market is the United States, our goal is to continue to use our operating knowledge to successfully and meaningfully expand into new countries. We plan to capitalize on our expansive and growing ecosystem of offerings and acquire additional market share globally, with heightened focus on Europe, Asia, and Latin America. Initially, we expect to utilize our existing online channels to facilitate geographic expansion. As our retail penetration increases and brand awareness grows outside of the United States, we intend to further leverage retail channels and locations to ensure efficient and strategic global customer acquisition.

**Growth through Acquisitions.** We intend to further deepen our position as a leader in the digital parenting category by opportunistically pursuing acquisitions of companies, platforms, and technologies that would be accretive and complementary to our existing ecosystem and vision. We plan to seek opportunities, particularly healthcare and software-based services, to expand our technological capabilities and product and service offerings to provide incremental value to our users. We believe our digital parenting ecosystem provides a strong foundation to integrate prospective targets and consolidate a fragmented field of products, further bolstering our market reach and growth trajectory.

**Our Competitive Advantages**

We believe the following strengths differentiate us from potential competitors and will be the main drivers for our continued success:

**Early-Mover Advantage.** We are one of the first businesses to connect the nursery through different technologies that work together. Since launching in 2012 and releasing the Owlet Smart Sock in 2015, we have been a disruptor in the digital parenting space. This head start has allowed us to successfully develop a miniaturized biometric monitor, ship the first Smart Sock to customers in 2015, complete clinical trials, and amass a large and growing body of biometric data.

**Connected Ecosystem Platform**. Our connected ecosystem of digital parenting products and services is designed to create a cohesive user experience for parenting. Because we offer a suite of complementary solutions, customers often choose to purchase multiple offerings, beginning with the Owlet Smart Sock as an anchor and adding the Owlet Cam or Owlet Dream Lab. As we continue to introduce new products and services to fully support parents and children through additional stages of development, we anticipate that our users will continue to adopt and purchase these new products.

**Proprietary Data Advantage**. Our early-mover advantage in the connected nursery field has afforded us a large and growing infant dataset. This is supported by the 1.5 million parents who have downloaded our application, the 250,000 users per day who are opening our application (as of January 12, 2021), the nine billion heartbeats that we monitor daily, and the over 850,000 babies that have been monitored since the launch of the Owlet Smart Sock. The data from our connected product suite informs our algorithms to reduce inaccuracies and improve user experience. We are also exploring the potential for use of these data to provide unique predictive insights into future potential illnesses and complications as we seek to develop and pursue regulatory

171

Exhibit 7
Page 791

authorizations for our medical-grade product solutions. As our proprietary dataset continues to expand, we expect that any such insights will continue to improve, thereby allowing us to develop even better products and services.

**Complementary Technologies**. We leverage complementary technologies to provide real-time feedback, analytics, and insights. Our products feature proprietary, low-power biometric monitoring while maintaining extremely low noise and enabling high quality measurements. We employ multiple patented sensors with superior placement in the best locations for infants – the feet. Our algorithms drive accurate biometric readings and have reduced the nuisance alarm rate to a fraction of prior rates. Our products are purpose-built and parent-friendly. Our sleek, comfortable monitors wirelessly transmit reliable, real-time data to users via our application. Together, the combination of our hardware and software is intended to provide parents with peace of mind without disturbing the infant.

**Design Features Optimized for In-Home Digital Health**. Medical care delivery options have changed dramatically in recent years. Patients and providers are increasingly relying on remote delivery options to supplement or entirely replace care in a clinical setting. We believe we are well positioned to take advantage of these trends through future healthcare products and services optimized for remote usage. We anticipate that product candidates in our pipeline, if successfully developed, authorized by the applicable regulatory bodies, and commercialized, may enable parents and medical providers to easily monitor maternal and infant health data remotely on smart devices via our proprietary application. Our current products are uniquely positioned in the consumer and technology industries, with proprietary features that appeal to users and may enable us to grow into healthcare applications. Additionally, because our products and services are mission-critical, we focus on quality and reliability from the earliest stages of research and development, through the supply chain, to the end-user. We invest heavily in ensuring that our products can withstand daily use. From inception, our products are consciously designed and rigorously tested, which translates to a superior in-home monitoring experience.

**Robust Multi-channel Distribution Strategy**. We have made Owlet products accessible to users around the world. Retail customers are currently able to purchase Owlet either directly online at our website, on Amazon or in-store at over 3,500 retail locations such as buybuyBaby, Target, and Best Buy. Our large and growing distribution footprint allows users to select the channel that is most convenient to them. Additionally, current Owlet products are Health Savings Account (HSA) and Flexible Savings Account (FSA) approved.

**Passionate and Experienced Management Team**. Our Company was founded by family-focused individuals with an ability to 'think big'. In addition to being mission-driven, our leadership team has experience in healthcare, software, product, and technology at companies including Specialized, Vivint Smart Home, Under Armour, Amazon, and United Healthcare, with a combined over 100 years of professional experience.

## Our Users

The majority of our users are millennials, a brand-conscious and technological savvy generation, with annual income of $50,000 or more. These parents are more likely to be early technology adopters and have a high affinity towards actionable insight to care for their children. This is evidenced by the one-and-a-half million downloads of the Owlet application and increasing social media engagement across our multiple platforms.

## Research and Development

We are committed to ongoing research and development, which is responsible for the design, operation, and quality of our products. As of December 31, 2020, our research and development organization included individuals with expertise in fields including engineering, product design, clinical science, consumer electronics, and embedded software design. Our technical capabilities and commitment to innovation have allowed us to deliver significant product enhancements on a rapid development timeline, which we believe has helped us to support a compelling new product roadmap.

Our current research and development efforts are focused on developing an expanded ecosystem, with a wider range of products and services for the connected nursery, including telehealth and medical devices that can be utilized by parents from conception to kindergarten, and future expansion into international markets.

## Clinical Research Involving Our Products

We have invested and plan to continue to invest in research projects involving our products. We continue to work on generating safety and efficacy data for our products for medical uses, to help support the pursuit of marketing authorizations by the FDA and other regulatory agency marketing authorizations or other clearances or

172

Exhibit 7
Page 792

certifications. If we obtain FDA or other regulatory agency marketing authorization, clearance or certification for our medical devices, we believe the opportunity for parents to use our telehealth platform increases and coverage and reimbursement from third-party payors for providers prescribing our authorized, cleared or certified products become possible.

*Tachyarrhythmia Study*

Supraventricular tachycardia ("SVT") is the most common arrhythmia found in children, accounting for roughly 97% of all tachyarrhythmia, or rapid heart rate, in infants. Two large, population-based studies that included a total of 2,021 and 2,848 individuals with a clinical diagnosis of SVT, respectively, previously estimated the prevalence of SVT in infants to be between 0.10% and 0.25%. While the studies did not specify the medical monitoring devices used in those studies, a clinical diagnosis of SVT is generally made using an electrocardiogram or Holter monitor. However, a study reviewed and approved by the Institutional Review Board at the Cleveland Clinic and published in *The Journal of Pediatrics* found the cumulative incidence of tachyarrhythmia among infants using the Owlet Smart Sock to be higher than those previously reported clinically-diagnosed SVT rates. The tachyarrhythmia study focused on episodes involving a heart rate of at least 240 beats per minute that lasted for more than 60 seconds.

Although the Owlet Smart Sock is a consumer product and not a medical device, study investigators were able to observe more than 202 million total hours of anonymized data from 100,949 babies born between February 2017 and February 2019 and monitored by the Owlet Smart Sock. The investigators identified 5,070 total suspected episodes of tachyarrhythmia in 2,508 infants, for a cumulative incidence of 2.5%.

We believe this study is indicative of the potential power of our data set and could support the future development of products for which we may seek to obtain FDA and other regulatory agency authorization for use in the detection of infant health issues.

**Competition**

Historically, baby monitors and nursery products have been fragmented product categories with multiple players and limited brand loyalty, and have integrated limited amounts of technology and data into the caregiver's experience. However, we expect the industry in which we operate will continue to evolve and may be significantly affected by new product introductions and other market activities of industry participants. Certain potential competitors have substantially greater capital resources, larger product portfolios, larger user bases, larger sales forces and greater geographic presence, and have built relationships with retailers and distributors that may be more effective than ours. Our products and services face additional competition from companies developing products and services for use with third-party monitoring systems, as well as from companies that currently market similar products and services of their own, and may face further pressure from technology companies that have not historically operated in our industry.

Continuing technological advances and new product introductions within the home-use childcare electronics and service industry place our products and services at risk of obsolescence. Our long-term success depends upon the development and successful commercialization of new products and services, new or improved technologies and additional applications for our existing technologies, including products or applications that may be subject to the oversight of the FDA or comparable foreign regulatory authorities and could require marketing authorization by the FDA or similar approval from comparable foreign regulatory authorities. The research and development process is time-consuming and costly and may not result in products and services or applications that we can successfully commercialize.

We believe that the primary competitive factors in our market are:

- product quality and performance, including the size, quality, comfort, battery life, reliability, connectivity of the device to the application and/or monitor, and accuracy of algorithm, with regards to both false negatives and false positives;

- customer purchasing experience;

- pricing;

- product support and service;

- effective marketing and education;

173

Exhibit 7
Page 793

- brand recognition;

- breadth and depth of offerings;

- greater market penetration;

- technological innovation, product enhancements and speed of innovation; and

- sales and distribution capabilities.

We believe our ability to continue to compete effectively in our industry will also depend in part on our ability to respond more quickly and effectively than our peers to new or changing opportunities, technologies, regulatory standards or customer requirements. We anticipate that we will face increased competition in the future as existing companies and competitors develop new or improved products and distribution strategies and as new companies enter the market with new technologies and distribution strategies. Increased competition in the future could adversely affect our revenue, revenue growth rate, margins and market share.

## Manufacturing

We rely on several third-party suppliers for single source components used in our devices, including the WiFi chips, microcontrollers, batteries, accelerometers, temperature sensors, plastics and circuit boards.

We follow strict quality guidelines, including a detailed risk-based audit plan following our ISO 9001 quality policy that dictates how often and to what degree we audit our suppliers. We check all quality, regulatory, and safety standards for products that our contract manufacturers make. We deploy a robust manufacturer and supplier selection process including site audits, tooling design and setup quotes, open book pricing, quality specifications, and vendor guides. The Owlet Smart Sock is currently manufactured at ISO 13485 (medical-grade) manufacturing sites to support the future transition of our products to FDA compliant lines. We believe that third-party facilities will be adequate to meet our current and anticipated manufacturing needs. We do not currently plan to manufacture our Owlet Smart Sock, Owlet Cam or any related components ourselves.

### *Manufacturing Services Agreement with Benchmark Electronics*

In October 2017, we entered into a manufacturing services agreement with Benchmark Electronics, Inc. ("Benchmark"), pursuant to which Benchmark provides us certain manufacturing and related services for the production of our Smart Sock out of its facilities in Thailand, including procuring materials and assembling and testing finished products.

The initial term of the agreement expired in October 2018, but the term of the agreement automatically extends for additional one-year periods until either we or Benchmark provide notice of non-renewal at least 90 days prior to the end of the then-current term or extension. Among other things, either party may terminate the agreement for convenience upon 90-day notice, in the case of Owlet, or 180 day notice, in the case of Benchmark, to the other party. Either party may also terminate the agreement under certain other customary conditions, including for uncured breaches of the agreement or if the other party if the other party materials breaches the agreement or in the event of the other party's insolvency.

In connection with the services provided under the agreement, we have agreed to indemnify Benchmark against certain claims, including infringement of third-party intellectual property rights and noncompliance of our products with safety or other regulations. We are also entitled to customary indemnification rights, subject to certain caps.

### *Manufacturing Services Agreement with Aoni*

In June 2018, we entered into a manufacturing and supply agreement with Shenzhen Aoni Electronic Co., Ltd ("Aoni"), pursuant to which Aoni provides certain manufacturing and related services for the production of our Owlet Cam product, including procuring materials and assembling and packaging finished products.

Following the expiration of the initial term of the agreement in June 2019, we extended the agreement through June 2021. We have the right to terminate the agreement, without cause, upon six months' prior written notice to Aoni. Additionally, either party may terminate the agreement under certain other customary conditions, including for uncured breaches of the agreement or in the event of the other party's insolvency.

174

Exhibit 7
Page 794

TABLE OF CONTENTS

In connection with the services provided under the agreement, Aoni has agreed to indemnify us against certain claims and liabilities, including claims arising in connection with product defects, breach of the agreement, negligence and violations of applicable law.

**Government Regulation**

Certain of our products and our operations could be subject to extensive regulation by the U.S. Food and Drug Administration, or FDA, and other federal and state authorities in the United States, as well as comparable authorities in foreign jurisdictions. For example, certain of our products may be subject to regulation as medical devices in the United States under the Federal Food, Drug, and Cosmetic Act, or FDCA, as implemented and enforced by the FDA.

**United States Regulation**

The FDA regulates the development, design, non-clinical and clinical research, manufacturing, safety, efficacy, labeling, packaging, storage, installation, servicing, recordkeeping, premarket clearance or approval, adverse event reporting, advertising, promotion, marketing and distribution, and import and export of medical devices to ensure that medical devices distributed domestically are safe and effective for their intended uses and otherwise meet the requirements of the FDCA.

*FDA Premarket Clearance and Approval Requirements*

Unless an exemption applies, each medical device commercially distributed in the United States requires either FDA clearance of a premarket notification submitted under Section 510(k) of the FDCA, or approval of a premarket approval application, or PMA. Under the FDCA, medical devices are classified into one of three classes—Class I, Class II or Class III—depending on the degree of risk associated with each medical device and the extent of manufacturer and regulatory control needed to ensure its safety and effectiveness. Class I includes devices with the lowest risk to the patient and are those for which safety and effectiveness can be assured by adherence to the FDA's General Controls for medical devices, which include compliance with the applicable portions of the Quality System Regulation, or QSR, facility registration and product listing, reporting of adverse medical events, and truthful and non-misleading labeling, advertising, and promotional materials. Class II devices are subject to the FDA's General Controls, and special controls as deemed necessary by the FDA to ensure the safety and effectiveness of the device. These special controls can include performance standards, post-market surveillance, patient registries and FDA guidance documents.

While most Class I devices are exempt from the 510(k) premarket notification requirement, manufacturers of most Class II devices are required to submit to the FDA a premarket notification under Section 510(k) of the FDCA requesting permission to commercially distribute the device. The FDA's permission to commercially distribute a device subject to a 510(k) premarket notification is generally known as 510(k) clearance. Devices deemed by the FDA to pose the greatest risks, such as life sustaining, life supporting or some implantable devices, or devices that have a new intended use, or use advanced technology that is not substantially equivalent to that of a legally marketed device, are placed in Class III, requiring approval of a PMA. Some pre-amendment devices are unclassified, but are subject to FDA's premarket notification and clearance process in order to be commercially distributed.

*510(k) Clearance Marketing Pathway*

To obtain 510(k) clearance, we must submit to the FDA a premarket notification submission demonstrating that the proposed device is "substantially equivalent" to a legally marketed predicate device. A predicate device is a legally marketed device that is not subject to premarket approval, i.e., a device that was legally marketed prior to May 28, 1976 (pre-amendments device) and for which a PMA is not required, a device that has been reclassified from Class III to Class II or I, or a device that was found substantially equivalent through the 510(k) process. The FDA's 510(k) clearance process usually takes from three to twelve months, but may take longer. The FDA may require additional information, including clinical data, to make a determination regarding substantial equivalence. In addition, FDA collects user fees for certain medical device submissions and annual fees and for medical device establishments. For fiscal year 2021, the standard user fee for a 510(k) premarket notification submission is $12,432.

If the FDA agrees that the device is substantially equivalent to a predicate device currently on the market, it will grant 510(k) clearance to commercially market the device. If the FDA determines that the device is "not

175

Exhibit 7
Page 795

TABLE OF CONTENTS

substantially equivalent" to a previously cleared device, the device is automatically designated as a Class III device. The device sponsor must then fulfill more rigorous PMA requirements, or can request a risk-based classification determination for the device in accordance with the "*de novo*" process, which is a route to market for novel medical devices that are low to moderate risk and are not substantially equivalent to a predicate device.

After a device receives 510(k) clearance, any modification that could significantly affect its safety or effectiveness, or that would constitute a major change or modification in its intended use, will require a new 510(k) clearance or, depending on the modification, PMA approval. The FDA requires each manufacturer to determine whether the proposed change requires submission of a 510(k) or a PMA in the first instance, but the FDA can review any such decision and disagree with a manufacturer's determination. If the FDA disagrees with a manufacturer's determination, the FDA can require the manufacturer to cease marketing and/or request the recall of the modified device until such marketing authorization has been granted. Also, in these circumstances, the manufacturer may be subject to significant regulatory fines or penalties.

Over the last several years, the FDA has proposed reforms to its 510(k) clearance process, and such proposals could include increased requirements for clinical data and a longer review period, or could make it more difficult for manufacturers to utilize the 510(k) clearance process for their products. For example, in November 2018, FDA officials announced steps that the FDA intended to take to modernize the 510(k) pathway. Among other things, the FDA announced that it planned to develop proposals to drive manufacturers utilizing the 510(k) pathway toward the use of newer predicates. These proposals included plans to potentially sunset certain older devices that were used as predicates under the 510(k) clearance pathway, and to potentially publish a list of devices that have been cleared on the basis of demonstrated substantial equivalence to predicate devices that are more than 10 years old. These proposals have not yet been finalized or adopted, although the FDA may work with Congress to implement such proposals through legislation.

More recently, in September 2019, the FDA issued revised final guidance describing an optional "safety and performance based" premarket review pathway for manufacturers of "certain, well-understood device types" to demonstrate substantial equivalence under the 510(k) clearance pathway by showing that such device meets objective safety and performance criteria established by the FDA, thereby obviating the need for manufacturers to compare the safety and performance of their medical devices to specific predicate devices in the clearance process. The FDA has developed and maintains a list device types appropriate for the "safety and performance based" pathway and continues to develop product-specific guidance documents that identify the performance criteria for each such device type, as well as the testing methods recommended in the guidance documents, where feasible.

*PMA Approval Pathway*

Class III devices require PMA approval before they can be marketed, although some pre-amendment Class III devices for which FDA has not yet required a PMA are cleared through the 510(k) process. The PMA process is more demanding than the 510(k) premarket notification process. In a PMA, the manufacturer must demonstrate that the device is safe and effective, and the PMA must be supported by extensive data, including data from preclinical studies and human clinical trials. The PMA must also contain a full description of the device and its components, a full description of the methods, facilities, and controls used for manufacturing, and proposed labeling. Following receipt of a PMA, the FDA determines whether the application is sufficiently complete to permit a substantive review. If the FDA accepts the application for review, it has 180 days under the FDCA to complete its review of a PMA, although in practice, the FDA's review often takes significantly longer, and can take up to several years. An advisory panel of experts from outside the FDA may be convened to review and evaluate the application and provide recommendations to the FDA as to the approvability of the device. The FDA may or may not accept the panel's recommendation. In addition, the FDA will generally conduct a pre-approval inspection of the applicant or its third-party manufacturers' or suppliers' manufacturing facility or facilities to ensure compliance with the QSR. PMA applications are also subject to the payment of user fees, which for fiscal year 2021 includes a standard application fee of $365,657.

The FDA will approve the new device for commercial distribution if it determines that the data and information in the PMA constitute valid scientific evidence and that there is reasonable assurance that the device is safe and effective for its intended use(s). The FDA may approve a PMA with post-approval conditions intended to ensure the safety and effectiveness of the device, including, among other things, restrictions on labeling, promotion, sale and distribution, and collection of long-term follow-up data from patients in the clinical study that supported PMA approval or requirements to conduct additional clinical studies post-approval. The FDA may condition PMA approval

176

Exhibit 7
Page 796

on some form of post-market surveillance when deemed necessary to protect the public health or to provide additional safety and efficacy data for the device in a larger population or for a longer period of use. In such cases, the manufacturer might be required to follow certain patient groups for a number of years and to make periodic reports to the FDA on the clinical status of those patients. Failure to comply with the conditions of approval can result in material adverse enforcement action, including withdrawal of the approval.

Certain changes to an approved device, such as changes in manufacturing facilities, methods, or quality control procedures, or changes in the design performance specifications, which affect the safety or effectiveness of the device, require submission of a PMA supplement. PMA supplements often require submission of the same type of information as a PMA, except that the supplement is limited to information needed to support any changes from the device covered by the original PMA and may not require as extensive clinical data or the convening of an advisory panel. Certain other changes to an approved device require the submission of a new PMA, such as when the design change causes a different intended use, mode of operation, and technical basis of operation, or when the design change is so significant that a new generation of the device will be developed, and the data that were submitted with the original PMA are not applicable for the change in demonstrating a reasonable assurance of safety and effectiveness.

*De Novo Classification*

Medical device types that the FDA has not previously classified as Class I, II, or III are automatically classified into Class III regardless of the level of risk they pose. The Food and Drug Administration Modernization Act of 1997 established a new route to market for low to moderate risk medical devices that are automatically placed into Class III due to the absence of a predicate device, called the "Request for Evaluation of Automatic Class III Designation," or the *de novo* classification procedure. This procedure allows a manufacturer whose novel device is automatically classified into Class III to request down-classification of its medical device into Class I or Class II on the basis that the device presents low or moderate risk, rather than requiring the submission and approval of a PMA application. Prior to the enactment of the Food and Drug Administration Safety and Innovation Act, or FDASIA, in July 2012, a medical device could only be eligible for *de novo* classification if the manufacturer first submitted a 510(k) premarket notification and received a determination from the FDA that the device was not substantially equivalent. FDASIA streamlined the *de novo* classification pathway by permitting manufacturers to request *de novo* classification directly without first submitting a 510(k) premarket notification to the FDA and receiving a not substantially equivalent determination.

*Clinical Trials*

Clinical trials are almost always required to support a PMA and *de novo* classification and are sometimes required to support a 510(k) submission. All clinical investigations of devices to determine safety and effectiveness must be conducted in accordance with the FDA's investigational device exemption, or IDE, regulations which govern investigational device labeling, prohibit promotion of the investigational device, and specify an array of recordkeeping, reporting and monitoring responsibilities of study sponsors and study investigators. If the device presents a "significant risk" to human health, as defined by the FDA, the FDA requires the device sponsor to submit an IDE application to the FDA, which must become effective prior to commencing human clinical trials. If the device under evaluation does not present a significant risk to human health, then the device sponsor is not required to submit an IDE application to the FDA before initiating human clinical trials, but must still comply with abbreviated IDE requirements when conducting such trials. A significant risk device is one that presents a potential for serious risk to the health, safety or welfare of a patient and either is implanted, used in supporting or sustaining human life, substantially important in diagnosing, curing, mitigating or treating disease or otherwise preventing impairment of human health, or otherwise presents a potential for serious risk to a subject. An IDE application must be supported by appropriate data, such as animal and laboratory test results, showing that it is safe to test the device in humans and that the testing protocol is scientifically sound. The IDE will automatically become effective 30 days after receipt by the FDA unless the FDA notifies the company that the investigation may not begin. If the FDA determines that there are deficiencies or other concerns with an IDE for which it requires modification, the FDA may permit a clinical trial to proceed under a conditional approval.

Regardless of the degree of risk presented by the medical device, clinical studies must be approved by, and conducted under the oversight of, an Institutional Review Board, or IRB, for each clinical site. The IRB is responsible for the initial and continuing review of the IDE, and may impose additional requirements for the

177

Exhibit 7
Page 797

TABLE OF CONTENTS

conduct of the study. If an IDE application is approved by the FDA and one or more IRBs, human clinical trials may begin at a specific number of investigational sites with a specific number of patients, as approved by the FDA. If the device presents a non-significant risk to the patient, a sponsor may begin the clinical trial after obtaining approval for the trial by one or more IRBs without separate approval from the FDA, but must still follow abbreviated IDE requirements, such as monitoring the investigation, ensuring that the investigators obtain informed consent, and complying with labeling and record-keeping requirements. In some cases, an IDE supplement must be submitted to, and approved by, the FDA before a sponsor or investigator may make a change to the investigational plan that may affect its scientific soundness, study plan or the rights, safety or welfare of human subjects.

During a study, the sponsor is required to comply with the applicable FDA requirements, including, for example, trial monitoring, selecting clinical investigators and providing them with the investigational plan, ensuring IRB review, adverse event reporting, record keeping and prohibitions on the promotion of investigational devices or on making safety or effectiveness claims for them. The clinical investigators in the clinical study are also subject to FDA's regulations and must obtain patient informed consent, rigorously follow the investigational plan and study protocol, control the disposition of the investigational device, and comply with all reporting and recordkeeping requirements. Additionally, after a trial begins, we, the FDA or the IRB could suspend or terminate a clinical trial at any time for various reasons, including a belief that the risks to study subjects outweigh the anticipated benefits.

*Post-market Regulation*

After a device is cleared or approved for marketing, numerous and pervasive regulatory requirements continue to apply. These include:

- establishment registration and device listing with the FDA;

- QSR requirements, which require manufacturers, including third-party manufacturers, to follow stringent design, testing, control, documentation and other quality assurance procedures during all aspects of the design and manufacturing process;

- labeling regulations and FDA prohibitions against the promotion of investigational products, or the promotion of "off-label" uses of cleared or approved products;

- requirements related to promotional activities;

- clearance or approval of product modifications to 510(k)-cleared devices that could significantly affect safety or effectiveness or that would constitute a major change in intended use of one of our cleared devices, or approval of certain modifications to PMA-approved devices;

- medical device reporting regulations, which require that a manufacturer report to the FDA if a device it markets may have caused or contributed to a death or serious injury, or has malfunctioned and the device or a similar device that it markets would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur;

- correction, removal and recall reporting regulations, which require that manufacturers report to the FDA field corrections and product recalls or removals if undertaken to reduce a risk to health posed by the device or to remedy a violation of the FDCA that may present a risk to health;

- the FDA's recall authority, whereby the agency can order device manufacturers to recall from the market a product that is in violation of governing laws and regulations; and

- post-market surveillance activities and regulations, which apply when deemed by the FDA to be necessary to protect the public health or to provide additional safety and effectiveness data for the device.

Manufacturing processes for medical devices are required to comply with the applicable portions of the QSR, which cover the methods and the facilities and controls for the design, manufacture, testing, production, processes, controls, quality assurance, labeling, packaging, distribution, installation and servicing of finished devices intended for human use. The QSR also requires, among other things, maintenance of a device master file, device history file, and complaint files. As a manufacturer, we are subject to periodic scheduled and unscheduled inspections by the FDA. Failure to maintain compliance with the QSR requirements could result in the shut-down of, or restrictions on, manufacturing operations and the recall or seizure of marketed products. The discovery of previously unknown

178

Exhibit 7
Page 798

problems with any marketed products, including unanticipated adverse events or adverse events of increasing severity or frequency, whether resulting from the use of the device within the scope of its clearance or approval, or off-label by a physician in the practice of medicine, could result in restrictions on the device, including the removal of the product from the market or voluntary or mandatory device recalls.

The FDA has broad regulatory compliance and enforcement powers. If the FDA determines that a manufacturer has failed to comply with applicable regulatory requirements, it can take a variety of compliance or enforcement actions, which may result in any of the following sanctions:

- warning letters, untitled letters, fines, injunctions, consent decrees and civil penalties;

- recalls, withdrawals, or administrative detention or seizure of our products;

- operating restrictions or partial suspension or total shutdown of production;

- refusing or delaying requests for 510(k) clearance or PMA approvals of new products or modified products;

- withdrawing 510(k) clearances or PMA approvals that have already been granted;

- refusal to grant export approvals for our products; or

- criminal prosecution.

**Foreign Government Regulation**

In addition to U.S. regulations, we are subject to a variety of foreign government regulations applicable to general consumer products and medical devices.

*Regulation of General Consumer Products*

In the EEA, consumer products must comply with the General Product Safety Directive No 2001/95/EC. This Directive covers all products intended for consumers or likely to be used by consumers, placed onto the EEA market, unless a specific product safety regulation applies. The General Product Safety Directive provides safety and conformity requirements as well as post-market surveillance obligations for manufacturers and importers. Manufacturers must undertake and document a conformity assessment that covers the risks and risk categories associated with the product. The recommended method of undertaking such an assessment is through the application of voluntary European Harmonized Standards, but other options are available, such as using European Commission guidelines and using product safety codes of good practice. The required conformity assessment consists of a self-assessment with no requirement to involve a third party. Manufacturers also have the obligation to report to the national competent authorities of the different EEA Member States any risks to the consumer that are incompatible with the general safety requirements. The Directive further imposes other obligations such as collecting information related to use of products after they have been made available to consumers.

Additional regulations may apply to our products and impose further requirements, including the possible application of EU Regulation No 1007/2011 on textile products, which imposes specific labeling and marking requirements. In addition, we may also need to comply with requirements set forth by RoHs Directive No 2011/65/EU, which imposes specific restrictions on the use of hazardous substances in electrical and electronic equipment, and/or the Registration, Evaluation, Authorization, and Restriction of Chemicals ("REACH") Regulation (EU) No 1907/2006, which restricts substances of very high concern and imposes substance registration requirements.

Contrary to EU regulations (which are directly applicable in all EEA Member States), directives must be implemented by individual Member States and may be applied in a way that is not always uniform across the EEA. In addition, Member States determine the penalties applicable to infringements of the national provisions adopted pursuant to the General Product Safety Directive and other directives and shall take all measures necessary to ensure that they are implemented. Additional national requirements may be applicable to our products, as well.

*Regulation of Medical Devices*

There is currently no premarket government review of medical devices in the EEA. However, all medical devices placed on the market in the EEA must meet the relevant essential requirements laid down in Annex I of Directive 93/42/EEC concerning medical devices, referred to as the "Medical Devices Directive" or "MDD."

179

Exhibit 7
Page 799

TABLE OF CONTENTS

The most fundamental essential requirement is that a medical device must be designed and manufactured in such a way that it will not compromise the clinical condition or safety of patients, or the safety and health of users and others. In addition, the device must achieve the performance intended by the manufacturer and be designed, manufactured, and packaged in a suitable manner. The European Commission has adopted various standards applicable to medical devices. These include standards governing common requirements, such as safety of medical electrical equipment and product standards for certain types of medical devices. There are also harmonized standards relating to design and manufacture. While not mandatory, compliance with these standards is viewed as the easiest way to satisfy the essential requirements as a practical matter. Compliance with a standard developed to implement an essential requirement also creates a rebuttable presumption that the device satisfies that essential requirement.

To demonstrate compliance with the essential requirements laid down in Annex I to the Medical Devices Directive, medical device manufacturers must undergo a conformity assessment procedure, which varies according to the type of medical device and its risk classification. Conformity assessment procedures require an assessment of available clinical evidence, literature data for the product, and post-market experience in respect of similar products already marketed. Except for low-risk medical devices (Class I non-sterile, non-measuring devices), where the manufacturer can self-declare the conformity of its products with the essential requirements (except for any parts which relate to sterility or metrology), a conformity assessment procedure requires the intervention of a Notified Body. Notified Bodies are organizations designated by an EU country to assess the conformity of certain products before being placed on the market. These bodies carry out tasks related to conformity assessment procedures set out in the legislation and typically audit and examine a product's technical dossiers and the manufacturers' quality system. If satisfied that the relevant product conforms to the relevant essential requirements, the Notified Body issues a certificate of conformity, which the manufacturer uses as a basis for its own declaration of conformity. The manufacturer may then apply the CE Mark to the device, which allows the device to be placed on the market throughout the EEA. Once the product has been placed on the market in the EEA, the manufacturer must comply with requirements for reporting incidents and field safety corrective actions associated with the medical device.

In order to demonstrate safety and efficacy for their medical devices, manufacturers must conduct clinical investigations in accordance with the requirements of the MDD and applicable European and International Organization for Standardization standards, as implemented or adopted in the EEA Member States. Clinical investigations for medical devices usually require the approval of an ethics review board and approval by or notification to the national regulatory authorities. Both regulators and ethics committees also require the submission of serious adverse event reports during a study and may request a copy of the final study report.

On May 25, 2017, the new MDR entered into force, which repeals and notably replaces the EU MDD. Unlike directives, which must be implemented into the national laws of the EEA Member States, regulations are directly applicable in all EEA Member States without the need for adoption of EEA Member State laws implementing them, and are intended to eliminate current differences in the regulation of medical devices among EEA Member States. The MDR, among other things, was intended to establish a uniform, transparent, predictable, and sustainable regulatory framework across the EEA for medical devices and ensure a high level of safety and health while supporting innovation. The MDR was due to become applicable in May 2021, but in light of COVID-19, on April 23, 2020, the European Parliament and the Council of the EU adopted a proposal to extend the transitional period of the MDR by one year, i.e. until May 26, 2021. However, devices lawfully placed on the market pursuant to the MDD prior to May 26, 2021 may generally continue to be made available on the market or put into service until May 26, 2025. Once applicable, the new regulations will among other things:

- strengthen the rules on placing devices on the market and reinforce surveillance once they are available;

- establish explicit provisions on manufacturers' responsibilities for the follow-up of the quality, performance, and safety of devices placed on the market;

- improve the traceability of medical devices throughout the supply chain to the end-user or patient through a unique identification number;

- set up a central database to provide patients, healthcare professionals, and the public with comprehensive information on products available in the EU;

180

Exhibit 7
Page 800

- strengthen the rules for the assessment of certain high-risk devices, such as implants, which may have to undergo an additional check by experts before they are placed on the market.

Following the end of the "Brexit" Transition Period, from January 1, 2021 onwards, the Medicines and Healthcare Products Regulatory Agency ("MHRA") will be responsible for the UK medical device market. The new regulations will require medical devices to be registered with the agency (but manufacturers will be given a grace period of four to 12 months to comply with the new registration process). Manufacturers based outside the UK will need to appoint a UK Responsible Person to register devices with the MHRA in line with the grace periods. By July 1, 2023, in the UK (England, Scotland, and Wales), all medical devices will require a UKCA (UK Conformity Assessed) mark but CE marks issued by EU notified bodies will remain valid until this date. However, UKCA marking alone will not be recognized in the EU. The rules for placing medical devices on the Northern Ireland market will differ from those in the UK.

Similarly, we are subject to regulations and product registration requirements in many foreign countries in which we may sell our products, including in the areas of:

- design, development, manufacturing, and testing;

- product standards;

- product safety;

- product safety reporting;

- marketing, sales, and distribution;

- packaging and storage requirements;

- labeling requirements;

- content and language of instructions for use;

- record keeping procedures;

- advertising and promotion;

- recalls and field corrective actions;

- import and export restrictions; and

- tariff regulations, duties, and tax requirements;

We may also become subject to the following additional requirements in many foreign countries in which we may sell future medical devices, including in the areas of:

- clinical testing;

- post-market surveillance, including reporting of deaths or serious injuries and malfunctions that, if they were to recur, could lead to death or serious injury;

- registration for reimbursement; and

- necessity of testing performed in country by distributors for licensees.

**Other Healthcare Laws and Regulations**

*Other Healthcare Laws*

Medical device manufacturers are subject to additional healthcare regulation and enforcement by the federal government and by authorities in the states and foreign jurisdictions in which they conduct their business and may constrain the financial arrangements and relationships through which we research, as well as, sell, market and distribute any products for which we obtain marketing approval. Such laws include, without limitation, federal and state anti-kickback, fraud and abuse, false claims, and physician and other healthcare provider payment transparency laws and regulations. If their operations are found to be in violation of any of such laws or any other governmental regulations that apply, they may be subject to penalties, including, without limitation, administrative, civil and criminal penalties, damages, fines, disgorgement, the curtailment or restructuring of operations, integrity oversight and reporting obligations, exclusion from participation in federal and state healthcare programs and imprisonment.

181

Exhibit 7
Page 801

TABLE OF CONTENTS

*Coverage and Reimbursement*

Sales of any product that we may develop and for which we may obtain marketing authorization from the FDA and/or comparable foreign regulatory authorities depend, in part, on the extent to which such product will be covered by third-party payors, such as federal, state, and foreign government healthcare programs, commercial insurance and managed healthcare organizations, and the level of reimbursement for such product by third-party payors. Even though a new product may have been cleared or otherwise authorized for commercial distribution by the FDA, we may find limited demand for the product unless and until reimbursement approval has been obtained from governmental and private third-party payors.

Decisions regarding the extent of coverage and amount of reimbursement to be provided are made on a plan-by-plan basis. These third-party payors are increasingly reducing reimbursements for medical devices and services. In addition, the U.S. government, state legislatures and foreign governments have continued implementing cost-containment programs, including price controls, restrictions on coverage and reimbursement and requirements for substitution of generic products. Adoption of price controls and cost-containment measures, and adoption of more restrictive policies in jurisdictions with existing controls and measures, could further limit sales of any product. Decreases in third-party reimbursement for any product or a decision by a third-party payor not to cover the product or the services associated with the product could reduce physician usage and patient demand for the product and also have a material adverse effect on sales.

*Healthcare Reform*

The United States and some foreign jurisdictions are considering or have enacted a number of legislative and regulatory proposals to change the healthcare system in ways that could affect our ability to sell our products that obtain marketing authorization from the FDA and/or comparable foreign regulatory authorities profitably. Among policy makers and payors in the United States and elsewhere, there is significant interest in promoting changes in healthcare systems with the stated goals of containing healthcare costs, improving quality or expanding access. Current and future legislative proposals to further reform healthcare or reduce healthcare costs may limit coverage of or lower reimbursement for the services associated with the use of our products. The cost containment measures that payors and providers are instituting and the effect of any healthcare reform initiative implemented in the future could impact our revenue from the sale of our products.

In the United States, the implementation of the Affordable Care Act, or ACA, for example, has changed healthcare financing and delivery by both governmental and private insurers substantially, and affected medical device manufacturers significantly. The ACA included, among other things, incentives to programs that increase the federal government's comparative effectiveness research, and implemented payment system reforms including a national pilot program on payment bundling to encourage hospitals, physicians and other providers to improve the coordination, quality and efficiency of certain healthcare services through bundled payment models. Additionally, the ACA expanded eligibility criteria for Medicaid programs and created a new Patient-Centered Outcomes Research Institute to oversee, identify priorities in, and conduct comparative clinical effectiveness research, along with funding for such research. Since its enactment, there have been executive, judicial and Congressional challenges to certain aspects of the ACA. The U.S. Supreme Court is currently reviewing the constitutionality of the ACA in its entirety.

In addition, other legislative changes have been proposed and adopted since the ACA was enacted. For example, the Budget Control Act of 2011, among other things, reduced Medicare payments to providers by 2% per fiscal year, effective on April 1, 2013 and, due to subsequent legislative amendments to the statute, will remain in effect through 2030, with the exception of a temporary suspension from May 1, 2020 through March 31, 2021, unless additional Congressional action is taken. Additionally, the American Taxpayer Relief Act of 2012, among other things, reduced Medicare payments to several providers, including hospitals, and increased the statute of limitations period for the government to recover overpayments to providers from three to five years. The Medicare Access and CHIP Reauthorization Act of 2015 repealed the formula by which Medicare made annual payment adjustments to physicians and replaced the former formula with fixed annual updates and a new system of incentive payments, which began in 2019, that are based on various performance measures and physicians' participation in alternative payment models, such as accountable care organizations.

We expect additional state and federal healthcare reform measures to be adopted in the future, any of which could limit the amounts that federal and state governments will pay for healthcare products and services, which could result in reduced demand for our products for which we obtain marketing authorization or additional pricing pressure.

182

Exhibit 7
Page 802

TABLE OF CONTENTS

*Data Privacy and Security*

Numerous state, federal and foreign laws, including consumer protection laws and regulations, govern the collection, dissemination, use, access to, confidentiality and security of personal information, including health-related information. In the United States, numerous federal and state laws and regulations, including data breach notification laws, health information privacy and security laws, including HIPAA, and federal and state consumer protection laws and regulations (e.g., Section 5 of the FTC Act), that govern the collection, use, disclosure, and protection of health-related and other personal information could apply to our operations or the operations of our partners. In addition, certain state and non-U.S. laws, such as the CCPA and the GDPR, govern the privacy and security of personal data, including health-related data in certain circumstances, some of which are more stringent than HIPAA and many of which differ from each other in significant ways and may not have the same effect, thus complicating compliance efforts. Failure to comply with these laws, where applicable, can result in the imposition of significant civil and/or criminal penalties and private litigation. Privacy and security laws, regulations, and other obligations are constantly evolving, may conflict with each other to complicate compliance efforts, and can result in investigations, proceedings, or actions that lead to significant civil and/or criminal penalties and restrictions on data processing.

*Telemedicine*

We intend to develop and market telehealth/telemedicine services internationally and may be subject to additional regulations and requirements governing such services. The provision of telemedicine services, which are considered healthcare services, is not regulated or harmonized at EU/EEA level and we would therefore need to comply with individual regulations in each EEA Member State as well as other foreign jurisdictions.

*Other Foreign Healthcare Laws*

The advertising and promotion of both consumer products and medical devices is subject to EU directives concerning misleading and comparative advertising and unfair commercial practices and specific EEA Member State legislation governing the advertising and promotion of these respective products.

EEA Member State laws related to the advertising and promotion of medical devices, which vary between jurisdictions, may limit or restrict the advertising and promotion of our products to the general public and may impose limitations on our promotional activities with healthcare professionals.

Many EEA Member States have adopted specific anti-gift statutes that further limit commercial practices for medical devices, in particular vis-à-vis healthcare professionals and organizations. Additionally, there has been a recent trend of increased regulation of payments and transfers of value provided to healthcare professionals or entities.

In addition, many EEA Member States have adopted national "Sunshine Acts" which impose reporting and transparency requirements (often on an annual basis) similar to the requirements in the U.S., on medical device manufacturers. Certain foreign countries also mandate implementation of commercial compliance programs, impose restrictions on device manufacturer marketing practices and require tracking and reporting of gifts, compensation, and other remuneration to healthcare professionals and entities.

*Anti-Bribery and Corruption Laws*

We may also be subject to similar anticorruption legislation implemented in Europe through EU Member State laws and under the Organization for Economic Co-operation and Development's Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

**Intellectual Property**

Since inception, we have been methodical around our intellectual property strategy. We rely on a combination of patent, copyright, trademark and trade secret laws and confidentiality and invention assignment agreements to protect our intellectual property rights. As of December 31, 2020, we had 33 issued patents (with numerous others pending) and 38 registered trademarks. Our patents include utility patents covering technology ranging from placement of electrodes to the base of the baby monitor. We have foreign patents and patent applications pending in the EU, Australia, Canada, and China. Our issued patents with claims generally directed to an infant sock comprised of a sensing device in a sleeve in the sock and a strap are expected to expire in the United States 2032 and in China in 2035. Our issued patents with claims generally directed to placement of

183

Exhibit 7
Page 803

fabric electrodes and assembly of such are each expected to expire in the United States, the EU, Australia, China and Canada in 2038. Pending applications in the aforementioned countries will have expiration dates between 2034 and 2040. We continually review our development efforts to assess the existence and patentability of new intellectual property.

Our pending patent applications may not result in issued patents, and we cannot assure you that any current or subsequently issued patents will protect our intellectual property rights. Third parties may challenge certain patents issued to us as invalid, may independently develop similar or competing technologies or may design around any of our patents. We cannot be certain that any of the steps we have taken will prevent the misappropriation of our intellectual property, particularly in foreign countries where the laws may not protect our proprietary rights in these countries as fully as in the United States.

As of December 31, 2020, we had 38 trademark registrations and seven pending trademark applications worldwide. In addition, we have registered domain names for websites that we use in our business, such as www.owletcare.com.

**Ayla Subscription Agreement**

In May 2014, we entered into a subscription agreement with Ayla Networks, Inc. ("Ayla"), pursuant to which Ayla has granted us a non-exclusive, royalty free license to certain cloud services and product software used in our Smart Sock product and to support the transfer of data to the cloud and back to Owlet and the customer.

The initial term of the agreement expired in December 2015, but we have extended the term of the agreement until January 1, 2022. We may terminate the agreement at any time. Additionally, either party may terminate the agreement upon 30 days' notice if the other party materially breaches the agreement.

Under the agreement, we have agreed to indemnify Ayla against certain claims arising in connection with or breach of the agreement or our use, or misuse, of the services provided by Ayla under the agreement. We are also entitled to indemnification from Ayla under certain scenarios arising from third-party claims of intellectual property infringement by Ayla.

In connection with the subscription agreement, we also entered into a data processing agreement with Ayla, pursuant to which Ayla has agreed to implement appropriate data security measures and treat all personal data as strictly confidential.

*Service and License Agreement with ThroughTek*

In January 2018, we entered into a service and license agreement with ThroughTek Co., Ltd. ("TUTK"), pursuant to which TUTK has granted us a non-exclusive, royalty free license to its "Kalay" platform. TUTK provides the data transfer services from the Owlet Cam to the Owlet application so users can view the video feed.

Under the agreement, we paid an initial license fee of $25,000 plus a low-single digit dollar amount per device license fee to access TUTK's services ("UID"). The UID cost per unit is subject to change at any time by our mutual agreement, but shall not increase by more than a low single-digit percentage per year. We also pay certain negotiated services fees to TUTK, which are also subject to a low single digit percentage increase.

The initial term of the agreement expired in January 2021, but automatically renewed for an additional one-year period. The agreement will continue to renew for one-year periods, unless terminated by us or TUTK at least 90 days prior to the end of the then-current renewal period. Among other things, either party may terminate the agreement under certain customary conditions, including for non-payment, uncured breaches of the agreement or in the event of the other party's insolvency.

In connection with the services provided under the agreement, we and TUTK have agreed to mutually indemnify the other party against certain claims resulting from infringement of third-party intellectual property.

**Environmental Matters**

Our operations, properties and products are subject to a variety of U.S. and foreign environmental laws and regulations governing, among other things, air emissions, wastewater discharges, management and disposal of hazardous and non-hazardous materials and waste and remediation of releases of hazardous materials. We

184

Exhibit 7
Page 804

believe, based on current information that we are in material compliance with environmental laws and regulations applicable to us. However, our failure to comply with present and future requirements under these laws and regulations, or environmental contamination or releases of hazardous materials on our leased premises, as well as through disposal of our products, could cause us to incur substantial costs, including clean-up costs, personal injury and property damage claims, fines and penalties, costs to redesign our products or upgrade our facilities and legal costs, or require us to curtail our operations, any of which could seriously harm our business.

### Facilities

Our corporate headquarters are located in Lehi, Utah, where we lease approximately 120,000 square feet of office, research and development, engineering and laboratory space pursuant to a lease agreement that is scheduled to expire on July 31, 2024. We believe that our existing facilities are adequate to meet our business requirements for the near-term, and that additional space will be available on commercially reasonable terms, if required.

### Employees

As of December 31, 2020, we had 112 full-time employees. None of our employees is represented by a labor union, and we consider our employee relations to be good. Our human capital resources objectives include, as applicable, identifying, recruiting, retaining, incentivizing and integrating our existing and additional employees. The principal purposes of our equity incentive plans are to attract, retain and motivate selected employees, consultants and directors through the granting of stock-based compensation awards and cash-based performance bonus awards.

### Legal Proceedings

We are not currently a party to any material legal proceedings. However, in the ordinary course of business we face various claims brought by third parties, and we may, from time to time, make claims or take legal actions to assert our rights, including intellectual property rights as well as claims relating to employment matters and the safety or efficacy of our products. Any of these claims could subject us to costly litigation, and, while we generally believe that we have adequate insurance to cover many different types of liabilities, our insurance carriers may deny coverage, may be inadequately capitalized to pay on valid claims, or our policy limits may be inadequate to fully satisfy any damage awards or settlements. If this were to happen, the payment of any such awards could have a material adverse effect on our business, financial condition and results of operations. Additionally, any such claims, whether or not successful, could damage our reputation and business.

185

Exhibit 7
Page 805

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF OWLET**

*The following discussion should be read in conjunction with the sections titled "Unaudited Pro Forma Condensed Combined Financial Information," "Summary Historical Financial Information of Owlet," "Information About Owlet" and the consolidated financial statements and related notes thereto included elsewhere in this proxy statement/prospectus.*

*The following discussion contains forward-looking statements that reflect future plans, estimates, beliefs and expected performance. The forward-looking statements are dependent upon events, risks and uncertainties that may be outside of Owlet's control. Owlet's actual results could differ materially from those discussed in these forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those identified below and those discussed in the sections titled "Risk Factors — Risks Related to Owlet's Business and Industry" and "Cautionary Note Regarding Forward-Looking Statements" included elsewhere in this proxy statement/prospectus. Owlet does not undertake any obligation to publicly update any forward-looking statements except as otherwise required by applicable law.*

*Unless the context otherwise requires, all references in this section to "we," "our," "us" or "Owlet" refer to the business of Owlet Baby Care Inc. and its subsidiary prior to the consummation of the Business Combination, which will be the business of Owlet, Inc. and its subsidiaries following the consummation of the Business Combination.*

**Overview**

Our mission is to empower parents with the right information at the right time, to give them more peace of mind and help them find more joy in the journey of parenting. Our digital parenting platform aims to give parents real-time data and insights to help parents feel calmer and more confident. We believe that every parent deserves peace of mind and the opportunity to feel their well-rested best. We also believe that every child deserves to live a long, happy, and healthy life, and we are working to develop products to help facilitate that belief. Our diversified and connected portfolio of products currently includes the award-winning Owlet Smart Sock, the first baby monitor to track an infant's oxygen levels, heart rate, and sleep trends; the Owlet Cam, which turns any smartphone into a baby monitor with high-definition clarity; the Owlet Monitor Duo, which offers the intelligence of the Owlet Smart Sock paired with the Owlet Cam; and Owlet Dream Lab, an interactive online program designed to be a parent's guide to building healthy sleep habits for their infants.

Since our inception, we have been engaged in developing and marketing our products and content. We have incurred net operating losses and have generated negative cash flows from operations in every year since our inception. As of December 31, 2020 and December 31, 2019, we had an accumulated deficit of $71.7 million and $61.2 million, respectively. Since our inception, we have funded our operations primarily with proceeds from the issuances of convertible preferred stock, borrowings under our loan facilities, issuances of related party convertible notes, and sales of our products and services.

**Key Factors Affecting Our Performance**

We believe that the growth and future success of our business depends on many factors. While we believe that each of these factors present significant opportunities for our business, each factor also poses risks and challenges that we must successfully address in order to sustain our growth and continue to improve our results of operations.

*Penetration with Existing Products*

Our growth will depend, in large part, on our continued ability to attract new customers with our existing products, including our anchor product, the Owlet Smart Sock. While we see ample room for additional market penetration for our existing products, if we are unable to acquire new customers in a cost-effective and efficient manner, our financial performance may be impacted. We plan to bring existing Owlet products to more families and further improve our market position by growing distribution with existing and new retailers and by leveraging our brand and marketing efforts. However, changes in consumer taste, sentiment for our brand, or the regulatory environment in jurisdictions in which we sell our products could impact our ability to attract new customers.

Exhibit 7
Page 806

*Expanding the Digital Parenting Ecosystem*

Our growth will also be reliant upon our ability to introduce new and innovative products that will drive organic growth. We plan to continue adding connected products and content that drive our mission of empowering parents with the right information at the right time. We expect that the expansion of our connected ecosystem of offerings will allow us to deepen our relationships with existing customers through increased lifetime value and create additional efficiencies for our customer acquisition efforts. We expect that these future offerings, and especially future software solutions, will be an important component of our ability to continue to improve our gross profit as a percentage of revenues in the future. Should we be unable to expand our suite of hardware and software solutions, our financial performance and customer lifetime value may be negatively impacted.

*Medical Devices & Telehealth Opportunities*

We are developing two variations of the Owlet Smart Sock, the Owlet BabySat and the Owlet OTC Smart Sock, as medical devices that would require marketing authorization from the U.S. Food and Drug Administration ("FDA") before they could be sold in the United States, as well as the Owlet Band, a pregnancy band with certain features that may require marketing authorization from the FDA. If we are able to obtain FDA marketing authorization for our Owlet BabySat, Owlet OTC Smart Sock and Owlet Band products, we believe that these products will allow us to directly engage medical professionals to share infant sleep and health data, and provide an end-to-end digital healthcare solution for our customers. We have made and continue to make substantial investments in clinical research and in seeking FDA marketing authorization to potentially allow for third-party payor coverage and reimbursement and telehealth opportunities. Our potential future medical device offerings are being designed to build credibility and deepen market penetration. Our future telehealth offerings would be designed to make home care easier for parents and physicians alike. While we believe the combination of these two initiatives, if successful, would further strengthen our position in our industry, the success of these initiatives is largely predicated upon receiving FDA marketing authorization.

*International Expansion*

While the United States is currently our primary market, we plan to leverage our connected ecosystem of offerings to acquire market share globally, with a heightened focus on Europe, Asia, and Latin America. We intend to continue to invest in our supply chain to support our international expansion efforts; however, should we underestimate or overestimate demand in new geographical markets, we may experience inefficiencies in our supply chain or other areas of our business, which could result in financial losses. Additionally, expanded global reach may expose us to additional foreign currency risk, international taxes and tariffs, legal obligations, additional operational costs and other challenges.

**Recent Developments**

*Impact of COVID-19*

There continues to be worldwide impact from the novel coronavirus ("COVID-19") pandemic. The impact of COVID-19 includes changes in consumer and business behavior, pandemic fears, market downturns, and restrictions on business and individual activities, which have created significant volatility in the global economy that has led to reduced economic activity. The full extent to which the COVID-19 pandemic will directly or indirectly impact our cash flow, business, financial condition, results of operations and prospects will depend on future developments that are uncertain.

As a result of the COVID-19 pandemic, we temporarily limited access to our headquarters and encouraged our employees and contractors to work remotely, where possible, in accordance with local public health recommendations, each of which represented a significant change in how we operate our business. In light of the pandemic, we expect to continue to take actions as may be required or recommended by government authorities or as we determine are in the best interest of our employees.

We have experienced relatively minor impacts on our inventory availability and delivery capacity since the outbreak, neither of which has materially impacted our ability to service our customers. We continue to work with our existing manufacturing, logistics and other supply chain partners to build key processes to ensure that our ability to service our customers is not significantly disrupted. Ongoing actions to bolster key aspects of the

187

Exhibit 7
Page 807

supply chain to support our continued growth include geographically diversifying manufacturing operations to ensure adequate manufacturing capacity and to shorten transit times, implementing alternative order fulfillment options to reduce warehousing costs, developing contingency plans for unexpected third-party manufacturing disruptions, and increasing headcount dedicated to managing and optimizing supply chain processes.

*Business Combination and Public Company Costs*

On February 15, 2021, Owlet entered into the Business Combination Agreement, whereby Merger Sub will merge with and into Owlet, with Owlet surviving the Merger. Owlet will become a wholly owned subsidiary of Sandbridge and Sandbridge will immediately be renamed "Owlet, Inc."

Following the consummation of the Business Combination, we will become an SEC-registered and New York Stock Exchange ("NYSE") listed company, which will require us to hire additional staff and implement processes and procedures to address public company regulatory requirements and customary practices. We expect to incur additional annual expenses for, among other things, directors' and officers' liability insurance, director fees and additional internal and external accounting, legal and administrative resources and fees.

**Non-GAAP Measures**

We prepare and present our consolidated financial statements in accordance with accounting principles generally accepted in the United States ("U.S. GAAP"). However, management uses earnings before interest, tax, depreciation, and amortization ("EBITDA") as a key measure to understand and evaluate our core operating performance and trends, to prepare and approve our annual budget and to develop short- and long-term operational plans. Accordingly, we believe that EBITDA provides useful information to investors and others in understanding and evaluating our operating results in the same manner as our management and board of directors.

EBITDA is not prepared in accordance with U.S. GAAP, and should not be considered in isolation from, or as an alternative to, measures prepared in accordance with U.S. GAAP. In addition, EBITDA is not based on any comprehensive set of accounting rules or principles. As a non-U.S. GAAP financial measure, EBITDA has limitations in that it does not reflect all of the amounts associated with our results of operations as determined in accordance with U.S. GAAP. Some of these limitations are:

- EBITDA does not reflect interest expense, or the cash requirements necessary to service interest or principal payments on our debt;

- EBITDA does not reflect the amounts we paid in taxes or other components of our tax expense;

- EBITDA does not reflect our cash expenditures or future requirements for capital expenditures or contractual commitments;

- EBITDA does not reflect changes in, or cash requirements for, our working capital needs;

- although depreciation and amortization are non-cash charges, the assets being depreciated and amortized often will have to be replaced in the future, and EBITDA does not reflect any cash requirements for such replacements; and

- other companies may use adjusted EBITDA, or measures labeled similarly to EBITDA, which may be calculated differently and limit its usefulness as a comparative measure.

Because of these limitations, EBITDA should be considered alongside, and not in lieu of, our other financial performance measures, including our financial results presented in accordance with U.S. GAAP.

The following table presents a reconciliation of net loss to EBITDA (in thousands):

|  | Years ended December 31, | |
|---|---|---|
|  | **2020** | **2019** |
| Net loss | $(10,521) | $(17,851) |
| Income tax provision | 20 | — |
| Interest expense | 1,420 | 973 |
| Interest income | (38) | (279) |

188

Exhibit 7
Page 808

TABLE OF CONTENTS

| | Years ended December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Depreciation and amortization | 873 | 544 |
| EBITDA | $(8,246) | $(16,613) |

**Components of Operating Results**

*Revenues*

We recognize revenue from the following sources: (1) products, (2) mobile applications, and (3) content. Revenues are recognized when control of goods and services is transferred to customers in an amount that reflects the consideration expected to be received by us in exchange for those goods and services. Approximately 97% of our revenues for the year ended December 31, 2020 were derived from product sales.

*Cost of Revenues*

Cost of revenues consists of product costs, including contract manufacturing, shipping and handling, depreciation of tooling and manufacturing equipment, warranty replacement, fulfillment costs, warehousing, hosting, and reserves for excess and obsolete inventory.

*Operating Expenses*

**General and Administrative.** General and administrative expenses consist primarily of salaries, benefits, stock-based compensation, and bonuses for finance and accounting, legal, human resources and administrative executives and employees; third-party legal, accounting, and other professional services; corporate travel and entertainment; depreciation and amortization of property and equipment; and facilities rent.

We expect that our general and administrative expenses will increase in future periods compared to periods prior to the Business Combination as a result of additional costs related to being a public company, including Exchange Act reporting expenses; expenses associated with Sarbanes-Oxley compliance; incremental independent auditor fees; incremental legal fees; investor relations expenses; registrar and transfer agent fees; incremental director and officer liability insurance costs; and director compensation. We also anticipate that we will experience an increase in general and administrative expenses compared to the year ended December 31, 2020 as a result of more ordinary course activities that have been suspended or limited during the COVID-19 pandemic.

**Sales and Marketing.** Sales and marketing expenses consist primarily of salaries, commissions, benefits, stock-based compensation, commissions, and bonuses for sales and marketing employees and contractors; third-party marketing expenses such as social media and search engine marketing; email marketing and print marketing.

**Research and Development.** Research and development expenses consist primarily of salaries, benefits, stock-based compensation, and bonuses for employees and contractors engaged in the design, development, maintenance and testing of our products and platforms.

*Other Income (Expense)*

**Interest Expense.** Interest expense consists primarily of interest incurred on our outstanding borrowings and amortization of the associated deferred financing costs.

**Interest Income.** Interest income consists of interest earned on our money market account.

**Preferred Stock Mark to Market Adjustment.** Preferred stock mark to market adjustment consists of adjustments made to mark to market the preferred stock warrants liability.

**Other Income (Expense), Net.** Other income (expense), net includes our net gain (loss) on foreign exchange transactions, loss on extinguishment of debt, and sublease income.

**Income Tax Provision.** Income tax provision consists primarily of U.S. federal and state income taxes related to the tax jurisdictions in which we conduct business.

189

Exhibit 7
Page 809

## Results of Operations

The following table sets forth our results of operations (in thousands):

|  | Year Ended December 31, 2020 | Year Ended December 31, 2019 |
|---|---|---|
| Revenues | $ 75,403 | $ 49,801 |
| Cost of revenues | 39,526 | 26,897 |
| Gross profit | 35,877 | 22,904 |
| Operating expenses: | | |
| General and administrative | 13,140 | 14,020 |
| Sales and marketing | 19,263 | 15,323 |
| Research and development | 10,465 | 10,611 |
| Total operating expenses | 42,868 | 39,954 |
| Operating loss | (6,991) | (17,050) |
| Other income (expense): | | |
| Interest expense | (1,420) | (973) |
| Interest income | 38 | 279 |
| Preferred stock mark to market adjustment | (1,952) | (251) |
| Other income (expense), net | (176) | 144 |
| Total other expense, net | (3,510) | (801) |
| Loss before income tax provision | (10,501) | (17,851) |
| Income tax provision | (20) | — |
| Net loss | $(10,521) | $(17,851) |

### Comparison of the Years Ended December 31, 2020 and December 31, 2019

A discussion regarding our results of operations for 2020 compared to 2019 is presented below.

#### *Revenues*

| (dollars in thousands) | Years Ended December 31, | | Change | |
|---|---|---|---|---|
|  | 2020 | 2019 | $ | % |
| Revenues | $75,403 | $49,801 | $25,602 | 51.4% |

Revenues increased $25.6 million, or 51.4%, from $49.8 million for the year ended December 31, 2019 to $75.4 million for the year ended December 31, 2020. The increase was primarily due to a 49% increase in sales volume. The increase was primarily driven by substantial sales growth for the Owlet Monitor Duo. Sales to retailers and consumers for the Owlet Monitor Duo increased 101% and 46%, respectively, from the year ended December 31, 2019 to the year ended December 31, 2020. Sales to retailers and consumers for our Owlet Smart Sock also contributed to our revenue growth. Owlet Smart Sock sales to retailers and consumers grew 51% and 18%, respectively, from the year ended December 31, 2019 to the year ended December 31, 2020.

#### *Cost of Revenues and Gross Profit*

| (dollars in thousands) | Years Ended December 31, | | Change | |
|---|---|---|---|---|
|  | 2020 | 2019 | $ | % |
| Cost of revenues | $39,526 | $26,897 | $12,629 | 47.0% |
| Gross profit | $35,877 | $22,904 | $12,973 | 56.6% |
| Gross margin | 47.6% | 46.0% | | |

Cost of revenues increased $12.6 million, or 47.0%, from $26.9 million for the year ended December 31, 2019 to $39.5 million for the year ended December 31, 2020. The increase was primarily due to an increase in sales volume of 49%. Gross margin increased to 47.6% for 2020 from 46.0% for 2019. The increase in gross margin was primarily due to a decrease in discounts provided to customers as part of a shift in overall market strategy and a decrease in fulfillment shipping costs per order for the year ended December 31, 2020.

Exhibit 7
Page 810

Exhibit 7
Page 811

*General and Administrative*

| (dollars in thousands) | Years Ended December 31, | | Change | |
| | 2020 | 2019 | $ | % |
|---|---|---|---|---|
| General and administrative | $13,140 | $14,020 | $(880) | (6.3)% |

General and administrative expense decreased $0.9 million, or 6.3%, from $14.0 million for the year ended December 31, 2019 to $13.1 million for the year ended December 31, 2020. During the year ended December 31, 2020, we decreased our discretionary spending as a precautionary response to COVID-19. We expect general and administrative expense to increase in future periods as we begin to resume ordinary course activities that have been suspended or limited during COVID-19, incur additional headcount costs to support our continued growth, and incur other costs related to being a public company.

*Sales and Marketing*

| (dollars in thousands) | Years Ended December 31, | | Change | |
| | 2020 | 2019 | $ | % |
|---|---|---|---|---|
| Sales and marketing | $19,263 | $15,323 | $3,940 | 25.7% |

Sales and marketing expense increased $3.9 million, or 25.7%, from $15.3 million for the year ended December 31, 2019 to $19.3 million for the year ended December 31, 2020. The increase was primarily driven by increases in digital advertising spend, payroll-related expenses from additional sales and marketing headcount, stock-based compensation primarily from an increase in our valuation, and in-store advertising expenses. Sales and marketing expense decreased to 25.5% as a percentage of revenues for the year ended December 31, 2020 from 30.8% as a percentage of revenues for the year ended December 31, 2019, primarily as a result of changes in marketing strategies, including strategy changes resulting from COVID-19. We expect sales and marketing expense to increase in future periods as we drive sales growth through new and existing marketing initiatives and expansion into additional international markets.

*Research and Development*

| (dollars in thousands) | Years Ended December 31, | | Change | |
| | 2020 | 2019 | $ | % |
|---|---|---|---|---|
| Research and development | $10,465 | $10,611 | $(146) | (1.4)% |

Research and development expense remained relatively constant at $10.5 million for the year ended December 31, 2020 compared to $10.6 million for the year ended December 31, 2019. Research and development expense decreased to 13.9% as a percentage of revenue for the year ended December 31, 2020 from 21.3% as a percentage of revenue for the year ended December 31, 2019. During the year ended December 31, 2020, we decreased our discretionary spending as a precautionary measure due to economic uncertainty resulting from the COVID-19 pandemic. We anticipate making significant investments in the development of our monitoring pipeline, including Smart Sock variants, in future periods and expect our research and development expenses to increase.

*Other Income (Expense)*

| (dollars in thousands) | Years Ended December 31, | | Change | |
| | 2020 | 2019 | $ | % |
|---|---|---|---|---|
| Interest expense | $(1,420) | $(973) | $ (447) | 45.9% |
| Interest income | $ 38 | $ 279 | $ (241) | (86.4)% |
| Preferred stock mark to market adjustment | $(1,952) | $(251) | $(1,701) | 677.7% |
| Other income (expense), net | $ (176) | $ 144 | $ (320) | (222.2)% |

Interest expense increased by $0.4 million, or 45.9%, from $1.0 million for the year ended December 31, 2019 to $1.4 million for the year ended December 31, 2020. The increase was due primarily to a higher average balance on our line of credit and an increase in the interest rate on our term note payable. Interest income decreased by $0.2 million, or 86.4%, from $0.3 million for the year ended December 31, 2019 to $0.1 million for the year ended December 31, 2020, due to a lower yield on our money market account. The preferred stock

191

Exhibit 7
Page 812

mark to market adjustment related to our preferred stock warrant liability increased $1.7 million, or 677.7%, from $0.3 million for the year ended December 31, 2019 to $2.0 million for the year ended December 31, 2020. The increase in the preferred stock warrant liability was primarily due to a higher fair market value of our preferred stock, which principally resulted from the letter of intent received from Sandbridge Acquisition Corporation. Other income (expense), net decreased $0.3 million, or (222.2)%, from $0.1 million in other income for the year ended December 31, 2019 to $(0.2) million in other expense for the year ended December 31, 2020. The decrease in other income (expense), net was primarily due to a loss on extinguishment of debt incurred during the year ended December 31, 2020.

### Income Tax Provision

| (dollars in thousands) | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | $ | % |
| Income tax provision | $    20 | $    — | $    20 | 100.0% |
| Effective tax rate | (0.19)% | 0.0% | | |
| Valuation allowance | $(15,818) | $(13,839) | $(1,979) | (14.3)% |

Income tax provision remained relatively constant for the years ended December 31, 2020 and December 31, 2019. Our effective tax rate was approximately 0.2% and 0.0% for the years ended December 31, 2020 and December 31, 2019, respectively, due to a full valuation allowance recorded to offset our deferred tax assets.

The valuation allowance increased $2.0 million, or 14.3%, from $13.8 million for the year ended December 31, 2019 to $15.8 million for the year ended December 31, 2020. The change in our valuation allowance for the year ended December 31, 2020 was primarily due to an increase in interest expense limitations and an increase in net operating loss carryforwards.

## Liquidity and Capital Resources

Leading up to the proposed Business Combination, we have funded our operations primarily with proceeds from issuances of our convertible preferred stock, borrowings under our loan facilities, issuances of convertible promissory notes, and sales of our products and services. As of December 31, 2020 and December 31, 2019, we had cash and cash equivalents of $17.0 million and $11.7 million, respectively.

### Funding Requirements

Since inception, we have generated recurring losses which have resulted in an accumulated deficit of $71.7 million and $61.2 million as of December 31, 2020 and December 31, 2019, respectively, and expect to incur additional losses in the future. As a result of our history of losses and negative cash flows from operations, and because our plans to obtain additional capital have not been completed at the time of the issuance of our consolidated financial statements, substantial doubt exists about our ability to continue as a going concern within one year after the date that our consolidated financial statements are available to be issued, March 30, 2022. We believe the cash we expect to obtain from the Business Combination and PIPE Investment, if consummated, together with cash we expect to generate from future operations, would be sufficient to meet our working capital and capital expenditure requirements for a period of at least twelve months from the date of this proxy statement/prospectus. However, we are still in the growth stage of our business and expect to continue to make substantial investments in our business, including in the expansion of our product portfolio and in our research and development, sales and marketing teams, in addition to incurring additional costs as a result of being a public company. There can be no assurance that we will be able to obtain additional debt or equity financing on terms acceptable to us, if at all, or that we will generate sufficient future revenues. Failure to secure additional funding may require us to modify, delay, or abandon some of our planned future expansion or development, or to otherwise enact operating cost reductions available to management, which could have a material adverse effect on our business, operating results, financial condition, and ability to achieve our intended business objectives.

### Loan and Security Agreement with Silicon Valley Bank

We had an amended and restated loan and security agreement with Silicon Valley Bank ("SVB") as of December 31, 2020 (the "A&R LSA"), which we entered into on April 22, 2020, and which replaced the loan and security agreement that was in place as of December 31, 2019 (the "Original LSA"). These agreements provided us with both a line of credit (the "SVB Revolver") and a term loan (the "Term Loan").

Exhibit 7
Page 813

TABLE OF CONTENTS

Our borrowing capacity under the SVB Revolver was $12.5 million and $10.0 million as of December 31, 2020 and December 31, 2019, respectively. As of December 31, 2020, the SVB Revolver bore interest at an annual rate equal to (i) the greater of the bank's prime rate plus 0.75%, or 5.5% when a streamline period is in effect and (ii) the greater of the bank's prime rate plus 1.25%, or 6.0% at all other times. As of December 31, 2019, the SVB Revolver bore interest at an annual rate equal to (i) the greater of the bank's prime rate plus 0.75%, or 5.75% when a streamline period is in effect and (ii) the greater of the bank's prime rate plus 1.25%, or 6.25% at all other times. Each streamline period commences the first day of the month following a written report of our liquidity and ends the first day after we fail to maintain a required cash and cash availability streamline threshold, provided no event of default has occurred and is continuing. If an event of default has occurred and is continuing, SVB may maintain our streamline status at its discretion. The required cash and cash availability streamline threshold was $7.0 million and $6.0 million as of December 31, 2020 and December 31, 2019, respectively, and we were within a streamline period as of both December 31, 2020 and December 31, 2019. The actual interest rate on the SVB Revolver was 5.5% and 5.75% as of December 31, 2020 and December 31, 2019, respectively. The SVB Revolver is subject to renewal and is scheduled to mature on April 22, 2022.

As of December 31, 2019, our Term Note had an aggregate principal balance of $7.0 million, and an interest rate equal to the greater of the prime rate plus 1.00%, or 6.00%. As of December 31, 2019, our Term Note required interest-only payments through April 30, 2020, followed by 30 equal monthly payments of principal beginning on May 1, 2020. On April 22, 2020, we amended our Term Note, which allowed us to borrow an additional $1.0 million at closing, extended the interest-only period through April 30, 2021, and modified the interest rate to be the greater of the bank's prime rate plus 4.50%, or 7.50%. The amendment also included a provision to further extend the interest-only period through October 31, 2021 and allow us to borrow an additional $2.0 million if we achieved a specified gross profit milestone for the year ended December 31, 2020. On September 22, 2020, we further amended our Term Note to change the repayment term from 36 consecutive equal monthly payments of principal to 30 consecutive equal monthly payments of principal beginning on November 1, 2021 and modified the interest rate to the greater of the bank's prime rate plus 3.50%, or 6.50%. We achieved our gross profit milestone and borrowed $2.0 million in December 2020. The Term Note had an aggregate principal balance of $10.0 million as of December 31, 2020. The Term Note matures on April 1, 2024.

The Original LSA and the A&R LSA both required that we meet certain financial covenants. Under the Original LSA, in effect as of December 31, 2019, the financial covenants included the satisfaction of both a maximum cumulative trailing 3-month loss threshold (based on a calculation of EBITDA, plus stock-based compensation expense) and a minimum cash and cash availability requirement. We were in compliance with these financial covenants as of December 31, 2019. Under the A&R LSA, in effect as of December 31, 2020, the financial covenant required the satisfaction of a maximum year-to-date loss threshold (based on a calculation of EBITDA, plus stock-based compensation expense and loss on extinguishment of debt). We were not in compliance with this financial covenant as of December 31, 2020. On March 10, 2021, we amended the A&R LSA (as amended, the "LSA") to, among other things, waive the existing default and waive any rights and remedies against the Company with respect to the existing default, which includes the financial covenant noncompliance, consent to the merger (see Note 18), and amendments to other provisions of the loan agreement. The amended LSA also set forth new financial covenants, including a requirement to maintain cash and cash availability of at least $6.0 million as of the last day of each month beginning on March 31, 2021, a requirement to complete a qualifying liquidity event with aggregate new net proceeds of at least $50.0 million in cash on or before May 31, 2021, and a requirement to agree to terms with SVB on a 2021 EBITDA covenant no later than July 15, 2021.

Our borrowings under the LSA are secured by substantially all of our current and future assets.

### Paycheck Protection Program Loan

In April 2020, we applied for and received proceeds from the U.S. Small Business Administration ("SBA") Paycheck Protection Program ("PPP") in the amount of $2.1 million, with SVB as lender for the loan (the "PPP Loan"), under the Federal Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"). The PPP Loan was considered necessary to support our ongoing operations due to economic uncertainty at the time resulting from the COVID-19 pandemic and reduced access to alternative sources of liquidity.

The PPP Loan accrues interest on the outstanding principal at a rate of 1.0% per annum and is subject to the terms and conditions applicable to loans administered by the SBA. The term of the PPP Loan is two years,

Exhibit 7
Page 814

unless payment is required sooner in connection with an event of default under the PPP Loan. To the extent the PPP Loan amount is not forgiven under the PPP, we are obligated to make equal monthly payments of principal and interest for eight months beginning September 22, 2021, until the maturity date of April 22, 2022.

The CARES Act and the PPP provide a mechanism for forgiveness of up to the full amount borrowed. Under the PPP, we applied for forgiveness for all of the PPP Loan. However, the SBA has not made a decision related to our application for forgiveness. We expect substantially all of the PPP Loan to be forgiven by the SBA.

As of December 31, 2020, $10.0 million, $9.7 million, and $2.1 million in aggregate principal amount was outstanding under the Term Note, the SVB Revolver, and the PPP Loan, respectively.

### *Related Party Convertible Promissory Notes*

During the year ended December 31, 2019, we issued $6.5 million in related party convertible promissory notes. The convertible promissory notes bear interest at 5.00% per annum and all outstanding principal and accrued interest is due on the earlier of August 9, 2021 or upon the closing of a change of control, as defined in the convertible note agreements. If a change of control occurs prior to August 9, 2021, and the notes have not already converted, the holders of the convertible promissory notes will receive all outstanding principal and interest plus an amount equal to 100% of the original principal amount. The convertible promissory notes cannot be prepaid without the consent of the majority holders and will automatically convert to shares of our convertible preferred stock at 80% of the convertible preferred stock price per share upon a qualified preferred stock equity financing round of at least $15.0 million, excluding the conversion value of the notes. If we were to sell convertible preferred stock in an equity financing round of less than $15.0 million, the holders of the convertible promissory notes could elect to convert their notes to shares of our convertible preferred stock at 80% of the preferred stock price per share. The convertible promissory notes are subordinated to the SVB Revolver and the Term Note.

The convertible promissory notes were amended in February 2021 to allow the notes to either: (i) automatically convert into shares of our convertible preferred stock immediately prior to the consummation of the Business Combination at a conversion price equal to the price per share applicable to our most recent equity financing at the conversion date (which was $3.1546 as of the issuance date of these financial statements) and in turn convert into shares of New Owlet common stock as part of the Business Combination or (ii), at a holder's election, trigger the repayment in cash of the outstanding principal and accrued interest at the consummation of the Business Combination.

### *Cash Flows*

The following table summarizes our cash flow (in thousands):

| | Year Ended December 31, 2020 | Year Ended December 31, 2019 |
|---|---|---|
| Net cash provided by (used in) operating activities | $ (129) | $(16,061) |
| Net cash provided by (used in) investing activities | (1,056) | (1,959) |
| Net cash provided by (used in) financing activities | 6,458 | 12,455 |
| Net change in cash and cash equivalents | $ 5,273 | $ (5,565) |

### *Operating Activities*

Our cash flows from operating activities are significantly affected by the growth of our business. Our operating cash flows are also affected by our working capital needs to support growth in personnel-related expenditures and fluctuations in accounts payable and other current assets and liabilities.

For the year ended December 31, 2020, net cash used in operating activities was $0.1 million, primarily driven by our net loss of $10.5 million, offset by changes in working capital of $5.7 million and non-cash charges of $4.7 million.

For the year ended December 31, 2019, net cash used in operating activities was $16.0 million, primarily driven by our net loss of $17.9 million and changes in working capital of $0.2 million, partially offset by non-cash charges of $1.7 million.

194

Exhibit 7
Page 815

*Investing Activities*

We continue to experience negative cash flows from investing activities as we expand our business and build our infrastructure. Cash flows from investing activities primarily relate to capital expenditures to support our growth. Net cash used in investing activities is expected to continue to increase substantially as we expand our business through new products and new geographic markets.

For the year ended December 31, 2020, net cash used in investing activities decreased to $1.1 million from $2.0 million for the year ended December 31, 2019. The majority of our capital expenditures for the year ended December 31, 2019 related to equipment for the product launch of a new version of the Owlet Smart Sock, which occurred during the year ended December 31, 2020, and the anticipated launch of the Owlet Band; therefore, we had fewer capital investments during the year ended December 31, 2020. We expect our capital expenditures to grow in future periods, primarily driven by investments to expand our production capabilities to additional factories in other geographical locations, as well as investments in tooling and equipment to manufacture new products.

*Financing Activities*

For the year ended December 31, 2020, net cash provided by financing activities was $6.5 million, primarily driven by gross draws of $12.3 million on our line of credit, the issuance of an additional $3.0 million in long-term debt, and proceeds of $2.1 million from our PPP Loan, partially offset by gross payments of $11.3 million on our line of credit.

For the year ended December 31, 2019, net cash provided by financing activities was $12.5 million, primarily driven by gross draws of $7.9 million on our line of credit, the issuance of $6.5 million in related party convertible promissory notes, and the issuance of an additional $2.0 million in long-term debt, partially offset by gross payments of $4.2 million on our line of credit.

**Off-Balance Sheet Arrangements**

We did not have any off-balance sheet arrangements as of December 31, 2020 and December 31, 2019.

**Indemnification**

In the ordinary course of business, we enter into agreements that may include indemnification provisions. Pursuant to such agreements, we may indemnify, hold harmless, and defend an indemnified party for losses suffered or incurred by the indemnified party. Some of the provisions will limit losses to those arising from third-party actions. In some cases, the indemnification will continue after the termination of the agreement. The maximum potential amount of future payments we could be required to make under these provisions is not determinable. We have never incurred material costs to defend lawsuits or settle claims related to these indemnification provisions.

In connection with the consummation of the Business Combination, we intend to enter into indemnification agreements with our directors and officers that may require us to indemnify our directors and officers against liabilities that may arise by reason of their status or service as directors or officers to the fullest extent permitted by Delaware corporate law. We currently have directors' and officers' insurance coverage that reduces our exposure and enables us to recover a portion of any future amounts paid. We believe the estimated fair value of these indemnification agreements in excess of applicable insurance coverage is immaterial.

**Critical Accounting Policies and Estimates**

Our consolidated financial statements have been prepared in accordance with U.S. GAAP. The preparation of our consolidated financial statements requires the use of estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the financial statements, as well as the reported expenses incurred during the reporting periods. Our estimates are based on historical experience and various other factors that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources.

Actual results may differ from these estimates under different assumptions or conditions. We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to more significant areas involving management's judgment and estimates.

Exhibit 7
Page 816

While our significant accounting policies are described in the notes to the consolidated financial statements including in this proxy statement/prospectus, we believe that the following accounting policies are most critical to understanding the financial condition and historical and future results of operations:

### Revenue Recognition

We generate substantially all of our revenues from the sale of products, primarily the Owlet Smart Sock, Owlet Cam, and Owlet Monitor Duo. Revenues are recognized when control of goods and services is transferred to customers at the transaction price, an amount that reflects the consideration expected to be received by us in exchange for those goods and services. The transaction price is calculated as selling price less our estimate of variable consideration, including future returns, volume rebates, and sales incentives related to current period sales.

*Arrangements with Multiple Performance Obligations*

We enter into contracts that have multiple performance obligations. Determining whether products and services are considered separate performance obligations that should be accounted for separately requires significant judgment. Product sales include three separate performance obligations which function independently or with readily available other goods and services. The first performance obligation is the delivery of hardware and embedded firmware essential to the functionality of the hardware. Embedded firmware allows the hardware to recognize inputs to the hardware and provide appropriate outputs. The second performance obligation is the implied right to connect the downloadable mobile application, provided free of charge, to the hardware, which enables users to view and access real-time data outputs. The third performance obligation is the implied right to receive, on a when-and-if-available basis, future unspecified application upgrades, added features, and bug fixes relating to the product's essential firmware.

We allocate the transaction price to each performance obligation based on a relative standalone selling price ("SSP"). Our process for determining the SSP considers multiple factors, including an adjusted market assessment and consumer behaviors, and varies depending on the facts and circumstances of each performance obligation. Revenues allocated to the delivery of the hardware and embedded firmware essential to the functionality of the hardware represent substantially all of the arrangement consideration and reflect our best estimate of the selling price if it was sold regularly on a stand-alone basis. SSP for the mobile application connection and upgrade rights are estimated based on relevant market and consumer data.

Revenues are recognized at the time the related performance obligation is satisfied by transferring control of the promised good or service to a customer. Revenues allocated to the hardware and embedded firmware are recognized at the time of product delivery, provided the other conditions for revenue recognition have been met. This generally occurs upon delivery of the product to a third-party carrier. Revenues allocated to the implied right to access the mobile application and the implied right to receive, on a when-and-if-available basis, future unspecified application upgrades, added features, and bug fixes, are recognized on a straight-line basis over the estimated usage period of the underlying hardware product. The usage period is estimated based on historical user activity and ranges from 10 to 27 months.

We record revenues net of sales tax and variable consideration such as discounts and customer returns. Payment is typically due within 90 days or less from shipment of the product. We record estimated reductions to revenue in the form of variable consideration for customer sales programs, returns, and incentive offerings including rebates, markdowns, promotions, and volume-based incentives.

Consideration payable to a customer, such as cooperative advertising and pricing promotions to retailers and distributors, is recorded as a reduction to revenue and an accrued liability unless we receive a distinct benefit in exchange for credits claimed and can reasonably estimate the fair value of the distinct benefit received. Deferred revenues represent advance payments received from customers prior to performance by us. Sales taxes collected from customers which are remitted to governmental authorities are not included in revenues and are reflected as a liability in the accompanying consolidated balance sheets.

*Sales Returns, Rebates, Discounts, and Allowances*

Our contract liabilities include promises to provide customers rights of return, which range from 15 to 30 days from product activation and from 15 to 45 days from product purchase as of December 31, 2020 and December 31, 2019, respectively, as well as promises to issue discounts and provide rebates or allowances to

196

Exhibit 7
Page 817

certain retail channel customers if specified conditions are met. Revenues are reduced in the accompanying consolidated statements of operations for anticipated sales returns, discounts, and allowances, based on our analysis of historical sales returns and contractual discounts and allowances. Expected returns, as well as estimated discounts and allowances that have been earned but not yet honored or paid out, are included in accrued and other expenses in the accompanying balance sheets. Actual returns may vary from estimates if we experience a change in actual sales returns or exchange patterns due to unanticipated changes in products or competitive pressures.

Sales return rates have been sufficiently predictable to allow us to estimate expected future returns. We review the actual returns as a percentage of sales to determine the historical rate of return. The historical rate of return is used as a basis for estimating future returns based on current sales. The sales return estimate can be affected by the release of new products or changes to sales channels. Actual returns may vary from estimates if we experience a change in actual sales returns or exchange patterns due to unanticipated changes in products or competitive pressures.

Sales rebates, discounts, and allowances provided to our customers have been sufficiently predictable to allow us to estimate expected future discounts and allowances. Discounts and allowances are estimable based on existing and expected promotional programs and contractual terms in place at the time of sale. New promotional programs or changes to existing promotional programs could impact the estimated sales rebates, discounts, and allowances.

The estimates and assumptions used to reserve for rights of return, rebates, discounts, and allowances have been accurate in all material respects and have not materially changed in the past.

*Warranty Reserves*

Our products include an assurance-type limited warranty. The estimated warranty costs, which are expensed at the time of sale and included in cost of revenues, are based on the results of historical trends and warranty claim rates incurred and are adjusted for any current or expected trends as appropriate. The warranty reserve estimate can be affected by the release of new products or updates which could have failure rates that differ from historical products. We regularly assess and adjust the estimate of accrued warranty claims by updating claims rates for actual trends and projected claim costs.

### Determination of the Fair Value of Common Stock

As there has been no public market for our common stock to date, the estimated fair value of our common stock has been determined by our board of directors as of the date of each option grant with input from management, considering our most recently available third-party valuation of common stock, and our board of directors' assessment of additional objective and subjective factors that it believed were relevant and which may have changed from the date of the most recent valuation through the date of the grant. We believe that the board of directors has the relevant experience and expertise to determine fair value of our common stock. Third-party valuations were performed in accordance with the guidance outlined in the American Institute of Certified Public Accountants' Accounting and Valuation Guide, *Valuation of Privately-Held-Company Equity Securities Issued as Compensation*. Management has considered numerous factors in determining the best estimate of fair value of our common stock, including the following:

- valuation performed by un-related third-party specialists;

- our operating results, financial position and capital resources;

- our stage of development and current business conditions and projections, including the introduction of new products;

- the lack of marketability of our common stock;

- the hiring of key personnel and the experience of our management;

- the likelihood of achieving a liquidity event, such as an initial public offering or a sale of our company given the prevailing market conditions;

- the nature and history of our business;

- industry trends and the competitive environment;

197

Exhibit 7
Page 818

- illiquidity of stock-based awards involving securities in a private company; and

- the overall economic, regulatory, and capital market conditions.

The assumptions underlying these valuations were highly complex and subjective and represented management's best estimates, which involved inherent uncertainties and the application of management's judgment. As a result, if we had used significantly different assumptions or estimates, the fair value of our common stock and our stock-based compensation expense could be materially different.

Once a public trading market for our common stock has been established, such as after the Business Combination, it will no longer be necessary for our board of directors to estimate the fair value of our common stock in connection with our accounting for granted stock options and other such awards we may grant, as the fair value of our common stock will be determined based on the quoted market price of our common stock. Future expense amounts for any particular period could be affected by changes in our assumptions or market conditions.

### Stock-based Compensation Expense

We classify stock-based awards granted in exchange for services as equity awards. Stock-based compensation expense related to awards to employees and non-employees is measured at the grant date based on the fair value of the award. The calculation of the stock-based compensation is based on the Black-Scholes valuation model, which requires significant estimates including the expected volatility of our common stock, expected dividend yield, option term and risk-free rate. We derive our volatility from the average historical stock volatilities of peer public companies over a period equivalent to the expected term of the awards. As our historical share option exercise experience does not provide a reasonable basis upon which to estimate the expected term, we estimate the expected term using the simplified method based on the vesting and contractual terms of the award. Under the simplified method, the expected term is equal to the average of the stock-based award's weighted average vesting period and its contractual term. The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant. Expected dividend yield is 0.0% as we do not anticipate paying dividends on our common stock for the foreseeable future.

The fair value of each stock option award granted was estimated on the date of grant using the Black-Scholes option pricing model with the following assumptions for the years ended December 31:

|  | 2020 | 2019 |
|---|---|---|
| Risk-free interest rate | 0.46% - 0.51% | 1.57% - 2.53% |
| Expected volatility | 63.38% - 64.04% | 54.29% - 55.03% |
| Expected dividend yield | 0.00% | 0.00% |
| Expected term of options (in years) | 6.00 | 5.00 - 6.25 |

### Preferred Stock Warrant Liability

We classify warrants to purchase shares of our redeemable convertible preferred stock as a liability on our consolidated balance sheets as each warrant is a free-standing instrument that may require us to transfer consideration upon exercise. Each warrant is initially recorded at fair value upon issuance, net of issuance costs, using the Black-Scholes option pricing model, and is subsequently re-measured to fair value at each subsequent balance sheet date. Changes in fair value of warrants are recognized as a component of preferred stock mark to market adjustment in the consolidated statements of operations. We will continue to adjust the liability for changes in fair value until the earlier of the exercise or expiration of the warrants.

The Black-Scholes valuation model requires significant estimates including the expected volatility of our common stock, expected dividend yield, option term and risk-free rate. We derive our volatility from the average historical stock volatilities of peer public companies over a period equivalent to the expected term of the awards. As our historical share option exercise experience does not provide a reasonable basis upon which to estimate the expected term, we estimate the expected term using the simplified method based on the vesting and contractual terms of the award. Under the simplified method, the expected term is equal to the average of the stock-based award's weighted average vesting period and its contractual term. The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant. Expected dividend yield is 0.0% as we do not anticipate paying dividends on our common stock for the foreseeable future.

198

Exhibit 7
Page 819

We utilized the Black-Scholes options pricing model and the assumptions in the following table to determine the fair value on the date of grant of the warrants issued for the years ended December 31:

|  | 2020 | 2019 |
|---|---|---|
| Expected term (in years) | 9.67 - 10.00 | 9.67 - 10.00 |
| Risk-free interest rate | 0.63% - 3.14% | 2.06% - 3.14% |
| Expected volatility | 50.00% - 55.00% | 50.00% - 55.00% |
| Expected dividend yield | 0.00% | 0.00% |
| Exercise price | $1.30 - $1.59 | $1.30 - $1.59 |
| Stock price | $1.30 - $1.59 | $1.30 - $1.59 |

### Income Taxes

We account for income taxes using the asset and liability method. We recognize deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements or tax returns. Deferred tax assets and liabilities are determined based on the difference between the financial statement and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse.

In evaluating the ability to recover our deferred income tax assets, we consider all available positive and negative evidence, including our operating results, ongoing tax planning and forecasts of future taxable income on a jurisdiction-by-jurisdiction basis. In the event we determine that we would be able to realize our deferred tax assets in the future in excess of their net recorded amount, we would make an adjustment to the valuation allowance that would reduce the provision for income taxes. Conversely, in the event that all or part of the net deferred tax assets are determined to not be realizable in the future, an adjustment to the valuation allowance would be charged to earnings in the period when such a determination is made. As of December 31, 2020 and December 31, 2019, we recorded a full valuation allowance on our deferred tax assets.

Uncertain tax positions are recorded when it is more likely than not that a given tax position would not be sustained upon examination by taxing authorities. Based on positions taken in our tax filings, we concluded that there are no significant uncertain tax positions requiring disclosure as of December 31, 2020 and December 31, 2019, and that there are no material amounts of unrecognized tax benefits. Our policy for recording interest and penalties related to income taxes, including uncertain tax positions, is to record such items as a component of the provision for income taxes.

### Recent Accounting Pronouncements

See Note 1, "*Description of Organization and Summary of Significant Accounting Policies*," in the notes to our consolidated financial statements included in this proxy statement/prospectus for a full description of recent accounting pronouncements, including expected dates of adoption and estimated effects on results of operations and financial condition.

### Quantitative and Qualitative Disclosures about Market Risk

We are exposed to market risks in the ordinary course of our business. Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily the result of interest rate fluctuations and credit risk.

### Interest Rate Risk

As discussed above, the Term Note, as amended on September 22, 2020, had an interest rate of the greater of either the prime rate plus 3.5%, or 6.5% as of December 31, 2020. During the year ended December 31, 2020, the prime rate did not exceed 5.0%. We have not been exposed to material risk due to fluctuations in interest rates. A hypothetical 10% change in interest rates would not result in a material impact on our consolidated financial statements.

### Credit Risk

Financial instruments that potentially subject us to concentration of credit risk consist of cash and cash equivalents and accounts receivable. Substantially all of our cash and cash equivalents are deposited in accounts

199

Exhibit 7
Page 820

at one financial institution, and account balances may at times exceed federally insured limits. We believe that we are not exposed to significant credit risk due to the financial strength of the depository institution in which the cash is held.

Our accounts receivable is derived from customers located primarily in the United States. We routinely assess the creditworthiness of our customers and have only experienced significant credit losses related to receivables from individual customers when a national retailer filed for bankruptcy in September 2017. We continuously monitor customer payments and maintain an allowance for doubtful accounts based on our assessment of various factors including age of the receivable balances, historical experience and any other conditions that may affect customers' ability to pay.

### *Emerging Growth Company Status*

Following the Business Combination, we will qualify as an emerging growth company ("EGC") as defined in the Jumpstart our Business Startups ("JOBS") Act. The JOBS Act permits companies with EGC status to take advantage of an extended transition period to comply with new or revised accounting standards, delaying the adoption of these accounting standards until they would apply to private companies. Following the Business Combination, we intend to use this extended transition period to enable us to comply with new or revised accounting standards that have different effective dates for public and private companies until the earlier of the date we (i) are no longer an EGC or (ii) affirmatively and irrevocably opt out of the extended transition period provided in the JOBS Act. As a result, our consolidated financial statements may not be comparable to companies that comply with the new or revised accounting standards as of public company effective dates.

In addition, we intend to rely on the other exemptions and reduced reporting requirements provided by the JOBS Act. Subject to certain conditions set forth in the JOBS Act, if, as an EGC, we intend to rely on such exemptions following the Business Combination, we will not be required to, among other things: (i) provide an auditor's attestation report on our system of internal control over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act; (ii) provide all of the compensation disclosures that may be required of non-EGCs under the Dodd-Frank Wall Street Reform and Consumer Protection Act; (iii) comply with the requirements of the Public Company Accounting Oversight Board regarding the communication of critical audit matters in the auditor's report on the consolidated financial statements (auditor discussion and analysis); and (iv) disclose certain executive compensation-related items such as the correlation between executive compensation and performance and comparisons of the Chief Executive Officer's compensation to median employee compensation.

Following the Business Combination, we will remain an EGC under the JOBS Act until the earliest of (i) December 31, 2025, (ii) the last date of our fiscal year in which we have total annual gross revenues of at least $1.07 billion, (iii) the date on which we are deemed to be a "large accelerated filer" under the rules of the SEC, or (iv) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the previous three years.

200

Exhibit 7
Page 821

TABLE OF CONTENTS

## DESCRIPTION OF NEW OWLET SECURITIES

*The following summary of certain provisions of New Owlet securities does not purport to be complete and is subject to the Proposed Charter, the New Owlet Bylaws and the provisions of applicable law. Copies of the Proposed Charter and the New Owlet Bylaws are attached to this proxy statement/prospectus as Annex B and Annex C, respectively. In this section, "we", "our", the "Company" or "New Owlet" generally refers to New Owlet from and after the Business Combination.*

### Authorized Capitalization

#### General

The total amount of our authorized capital stock consists of 1,000,000,000 shares of New Owlet common stock and 100,000,000 shares of New Owlet preferred stock. We expect to have approximately 130,764,371 shares of New Owlet common stock outstanding immediately after the consummation of the Business Combination and related transactions, assuming that none of the outstanding shares of Sandbridge Class A common stock are redeemed in connection with the Business Combination. No shares of New Owlet preferred stock will be issued or outstanding immediately after the Business Combination.

The following summary describes all material provisions of our capital stock. We urge you to read the Proposed Charter and the New Owlet Bylaws (copies of which are attached to this proxy statement/prospectus as Annex B and Annex C, respectively).

### New Owlet Common Stock

#### Voting Rights

Each holder of New Owlet common stock will be entitled to one vote for each share of New Owlet common stock held of record by such holder on all matters voted upon by our stockholders, provided, however, that, except as otherwise required in the Proposed Charter or by applicable law, the holders of New Owlet common stock will not be entitled to vote on any amendment to our Proposed Charter that relates solely to the terms of one or more outstanding series of New Owlet preferred stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to our Proposed Charter (including any certificate of designation relating to any series of New Owlet preferred stock) or pursuant to the DGCL.

#### Dividend Rights

Subject to any other provisions of the Proposed Charter, as it may be amended from time to time, holders of shares of New Owlet common stock will be entitled to receive ratably, in proportion to the number of shares of New Owlet common stock held by them, such dividends and other distributions in cash, stock or property of New Owlet when, as and if declared thereon by the New Owlet Board from time to time out of assets or funds of New Owlet legally available therefor.

#### Rights upon Liquidation

Subject to the rights of holders of New Owlet preferred stock, in the event of any liquidation, dissolution or winding up of our affairs, whether voluntary or involuntary, after payment or provision for payment of our debts and any other payments required by law and amounts payable upon shares of New Owlet preferred stock ranking senior to the shares of New Owlet common stock upon such dissolution, liquidation or winding up, if any, New Owlet's remaining net assets will be distributed to the holders of shares of New Owlet common stock upon such dissolution, liquidation or winding up, pro rata on a per share basis.

#### Other Rights

No holder of shares of New Owlet common stock will be entitled to preemptive or subscription rights contained in the Proposed Charter or in the New Owlet Bylaws. There are no redemption or sinking fund provisions applicable to the New Owlet common stock. The rights, preferences and privileges of holders of the New Owlet common stock will be subject to those of the holders of any shares of the New Owlet preferred stock that New Owlet may issue in the future.

201

Exhibit 7
Page 822

*Lock-Up*

The holders of New Owlet common stock issued as consideration pursuant to the Business Combination or to directors, officers and employees of New Owlet upon settlement or exercise of stock options or other equity awards outstanding as of immediately prior to the closing of the Business Combination (collectively, the "Lock-up Shares") may not transfer, subject to certain limited exceptions, any Lock-up Shares for 18 months after the consummation of the Business Combination.

**Preferred Stock**

The New Owlet Board has the authority to issue shares of preferred stock from time to time on terms it may determine, to divide shares of preferred stock into one or more series and to fix the designations, preferences, privileges, and restrictions of preferred stock, including dividend rights, conversion rights, voting rights, terms of redemption, liquidation preference and the number of shares constituting any series or the designation of any series to the fullest extent permitted by the DGCL. The issuance of New Owlet preferred stock could have the effect of decreasing the trading price of New Owlet common stock, restricting dividends on the capital stock of New Owlet, diluting the voting power of the New Owlet common stock, impairing the liquidation rights of the capital stock of New Owlet, or delaying or preventing a change in control of New Owlet.

**Election of Directors and Vacancies**

Subject to the rights of the holders of any series of Preferred Stock to elect additional directors under specified circumstances and the terms and conditions of the Stockholders Agreement and the Business Combination Agreement, the number of directors of the New Owlet Board shall be fixed solely and exclusively by resolution duly adopted from time to time by the New Owlet Board. The New Owlet Board will be divided into three classes, designated Class I, II and III, with Class I consisting of three directors and first up for re-election in 2022, Class II consisting of three directors and first up for re-election in 2023, and Class III consisting of three directors and first up for re-election in 2024. Each class of directors will be elected by the New Owlet stockholders every three years. The Stockholders Agreement will also provide that, for so long as Eclipse holds at least 10.0% of the outstanding New Owlet common stock, New Owlet will include the nominee selected by Eclipse as a director nominee in New Owlet's proxy statement for its annual meeting each time directors from the class to which such nominee is assigned are up for election.

Under the New Owlet Bylaws, at all meetings of stockholders called for the election of directors, a plurality of the votes properly cast will be sufficient to elect such directors to the New Owlet Board.

Except as the DGCL or the Stockholders Agreement may otherwise require and subject to the rights, if any, of the holders of any series of New Owlet preferred stock, in the interim between annual meetings of stockholders or special meetings of stockholders called for the election of directors and/or the removal of one or more directors and the filling of any vacancy in that connection, newly created directorships and any vacancies on the New Owlet Board, including unfilled vacancies resulting from the removal of directors, may be filled only by the affirmative vote of a majority of the remaining directors then in office, even though less than a quorum, or by a sole remaining director. All directors will hold office until the expiration of their respective terms of office and until their successors will have been elected and qualified. A director elected or appointed to fill a vacancy resulting from the death, resignation or removal of a director or a newly created directorship will serve for the remainder of the full term of the class of directors in which the new directorship was created or the vacancy occurred and until his or her successor will have been elected and qualified.

Subject to the Stockholders Agreement and the rights, if any, of any series of New Owlet preferred stock, any director may be removed from office only with cause and only by the affirmative vote of the holders of at least two-thirds of the outstanding voting stock (as defined below) of New Owlet then entitled to vote at an election of directors. Subject to the terms and conditions of the Stockholders Agreement, in case the New Owlet Board or any one or more directors should be so removed, new directors may be elected at the same time for the unexpired portion of the full term of the director or directors so removed.

In addition to the powers and authorities hereinbefore or by statute expressly conferred upon them, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by New Owlet, subject, nevertheless, to the provisions of the DGCL, the Proposed Charter and to any

202

Exhibit 7
Page 823

New Owlet Bylaws adopted and in effect from time to time; provided, however, that no Bylaw so adopted will invalidate any prior act of the directors which would have been valid if such Bylaw had not been adopted.

Notwithstanding the foregoing provisions, any director elected pursuant to the right, if any, of the holders of New Owlet preferred stock to elect additional directors under specified circumstances will serve for such term or terms and pursuant to such other provisions as specified in the relevant certificate of designations related to the New Owlet preferred stock.

For more information on the Stockholders Agreement, see "*Business Combination Proposal—Related Agreements—Stockholders Agreement.*"

**Quorum**

The holders of a majority of the voting power of the capital stock issued and outstanding and entitled to vote threat, present in person or represented by proxy, will constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise required by law or provided by the Proposed Charter. If, however, such quorum will not be present or represented at any meeting of the stockholders, the holders of a majority of the voting power present in person or represented by proxy, will have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum will be present or represented. At such adjourned meeting at which a quorum will be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting will be given to each stockholder entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

**Anti-takeover Effects of the Proposed Charter and the New Owlet Bylaws**

The Proposed Charter and the New Owlet Bylaws contain provisions that may delay, defer or discourage another party from acquiring control of us. We expect that these provisions, which are summarized below, will discourage coercive takeover practices or inadequate takeover bids. These provisions are also designed to encourage persons seeking to acquire control of us to first negotiate with the board of directors, which we believe may result in an improvement of the terms of any such acquisition in favor of our stockholders. However, they also give the board of directors the power to discourage acquisitions that some stockholders may favor.

*Classified Board of Directors*

As indicated above, the Proposed Charter provides that the New Owlet Board will be divided into three classes of directors, with each class of directors being elected by the New Owlet stockholders every three years. The classification of directors will have the effect of making it more difficult for stockholders to change the composition of the New Owlet Board.

*Authorized but Unissued Capital Stock*

Delaware law does not require stockholder approval for any issuance of authorized shares. However, the listing requirements of NYSE, which would apply if and so long as the New Owlet common stock (or units or warrants) remains listed on NYSE, require stockholder approval of certain issuances equal to or exceeding 20% of the then outstanding voting power or then outstanding number of shares of New Owlet common stock. Additional shares that may be issued in the future may be used for a variety of corporate purposes, including future public offerings, to raise additional capital or to facilitate acquisitions.

One of the effects of the existence of unissued and unreserved common stock may be to enable the New Owlet Board to issue shares to persons friendly to current management, which issuance could render more difficult or discourage an attempt to obtain control of New Owlet by means of a merger, tender offer, proxy contest or otherwise and thereby protect the continuity of management and possibly deprive stockholders of opportunities to sell their shares of New Owlet common stock at prices higher than prevailing market prices.

*Special Meeting, Action by Written Consent and Advance Notice Requirements for Stockholder Proposals*

Unless otherwise required by law, and subject to the rights, if any, of the holders of any series of New Owlet preferred stock, special meetings of the stockholders of New Owlet, for any purpose or purposes, may be called only by or at the direction of (i) a majority of the New Owlet Board, (ii) the chairperson of the New

203

Exhibit 7
Page 824

Owlet Board, (iii) the Chief Executive Officer or (iv) the President. Unless otherwise required by law, written notice of a special meeting of stockholders, stating the time, place and purpose or purposes thereof, shall be given to each stockholder entitled to vote at such meeting, not less than 10 or more than 60 days before the date fixed for the meeting. Business transacted at any special meeting of stockholders will be limited to the purposes stated in the notice.

In addition, the New Owlet Bylaws require advance notice procedures for stockholder proposals to be brought before an annual meeting of the stockholders, including the nomination of directors. Stockholders at an annual meeting may only consider the proposals specified in the notice of meeting or brought before the meeting by or at the direction of the board of directors, or by a stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has delivered a timely written notice in proper form to our secretary, of the stockholder's intention to bring such business before the meeting.

These provisions could have the effect of delaying until the next stockholder meeting any stockholder actions, even if such actions are favored by the holders of a majority of our outstanding voting securities.

### *Amendment to Charter and Bylaws*

The DGCL provides generally that the affirmative vote of a majority of the outstanding stock entitled to vote on amendments to a corporation's certificate of incorporation or bylaws is required to approve such amendment, unless a corporation's certificate of incorporation or bylaws, as the case may be, requires a greater percentage.

The Proposed Charter will provide that the following provisions therein may be amended, altered, repealed or rescinded only by the affirmative vote of the holders of at least 66 and 2/3% in voting power of all the then outstanding shares of New Owlet's stock entitled to vote thereon as a class:

- the provisions regarding New Owlet preferred stock;
- the provisions regarding the size, classification, appointment, removal and authority of the New Owlet Board;
- the provisions prohibiting stockholder actions without a meeting;
- the provisions regarding calling special meetings of stockholders;
- the provisions regarding the selection of certain forums for certain specified legal proceedings between New Owlet and its stockholders; and
- the provisions regarding the limited liability of directors of New Owlet.

The New Owlet Bylaws may be amended or repealed (A) by the affirmative vote of a majority of the entire New Owlet Board then in office (subject to any bylaw requiring the affirmative vote of a larger percentage of the members of the New Owlet Board) or (B) without the approval of the New Owlet Board, by the affirmative vote of the holders of 66 and 2/3% of the outstanding voting stock of New Owlet entitled to vote generally in an election of directors, voting together as a single class.

### *Delaware Anti-Takeover Statute*

Section 203 of the DGCL provides that if a person acquires 15% or more of the voting stock of a Delaware corporation, such person becomes an "interested stockholder" and may not engage in certain "business combinations" with the corporation for a period of three years from the time such person acquired 15% or more of the corporation's voting stock, unless:

1) the board of directors approves the acquisition of stock or the merger transaction before the time that the person becomes an interested stockholder;

2) the interested stockholder owns at least 85% of the outstanding voting stock of the corporation at the time the merger transaction commences (excluding voting stock owned by directors who are also officers and certain employee stock plans); or

3) the merger transaction is approved by the board of directors and at a meeting of stockholders, not by written consent, by the affirmative vote of 2/3 of the outstanding voting stock which is not owned by the interested stockholder. A Delaware corporation may elect in its certificate of incorporation or bylaws not to be governed by this particular Delaware law.

204

Exhibit 7
Page 825

Generally, a "business combination" includes a merger, asset or stock sale or other transaction resulting in a financial benefit to the interested stockholder. Subject to certain exceptions, an "interested stockholder" is a person who, together with that person's affiliates and associates, owns, or within the previous three years owned, 15% or more of our voting stock.

Since New Owlet has not opted out of Section 203 of the DGCL, it will apply to New Owlet. As a result, this provision will make it more difficult for a person who would be an "interested stockholder" to effect various business combinations with New Owlet for a three-year period. This provision may encourage companies interested in acquiring New Owlet to negotiate in advance with the New Owlet Board because the stockholder approval requirement would be avoided if the New Owlet Board approves either the business combination or the transaction which results in the stockholder becoming an interested stockholder. These provisions also may have the effect of preventing changes in the New Owlet Board and may make it more difficult to accomplish transactions which stockholders may otherwise deem to be in their best interests.

**Limitations on Liability and Indemnification of Officers and Directors**

The Proposed Charter limits the liability of the directors of New Owlet to the fullest extent permitted by the DGCL, and the New Owlet Bylaws provide that we will indemnify them to the fullest extent permitted by such law. We expect to enter into agreements to indemnify our directors, executive officers and other employees as determined by our board of directors. Under the terms of such indemnification agreements, we will be required to indemnify each of our directors and officers, to the fullest extent permitted by the laws of the State of Delaware, if the basis of the indemnitee's involvement was by reason of the fact that the indemnitee is or was a director or officer of New Owlet or any of its subsidiaries or was serving at New Owlet's request in an official capacity for another entity. We must indemnify our officers and directors against all reasonable fees, expenses, charges and other costs of any type or nature whatsoever, including any and all expenses and obligations paid or incurred in connection with investigating, defending, being a witness in, participating in (including on appeal), or preparing to defend, be a witness or participate in any completed, actual, pending or threatened action, suit, claim or proceeding, whether civil, criminal, administrative or investigative, or establishing or enforcing a right to indemnification under the indemnification agreement. The indemnification agreements also require us, if so requested, to advance within 10 days of such request all reasonable fees, expenses, charges and other costs that such director or officer incurred, provided that such person will return any such advance if it is ultimately determined that such person is not entitled to indemnification by us. Any claims for indemnification by our directors and officers may reduce our available funds to satisfy successful third-party claims against us and may reduce the amount of money available to us.

**Exclusive Jurisdiction of Certain Actions**

The New Owlet Bylaws require, to the fullest extent permitted by law, unless New Owlet consents in writing to the selection of an alternative forum, that derivative actions brought on behalf of New Owlet, actions against any director, officer or stockholder of New Owlet for breach of fiduciary duty, actions asserting a claim arising pursuant to any provision of the DGCL or the Proposed Charter or the New Owlet Bylaws, and actions asserting a claim against New Owlet governed by the internal affairs doctrine may be brought only in the Court of Chancery of the State of Delaware and, if brought outside of Delaware, the stockholder bringing the suit will be deemed to have consented to the personal jurisdiction of the state and federal courts in the State of Delaware and service of process on such stockholder's counsel. Although we believe this provision benefits New Owlet by providing increased consistency in the application of Delaware law in the types of lawsuits to which it applies, the provision may have the effect of discouraging lawsuits against our directors and officers.

Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all suits brought to enforce any duty or liability created by the Securities Act or the rules and regulations thereunder. Accordingly, both state and federal courts have jurisdiction to entertain such Securities Act claims. To prevent having to litigate claims in multiple jurisdictions and the threat of inconsistent or contrary rulings by different courts, among other considerations, the New Owlet Bylaws require that, unless New Owlet consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall be the sole and exclusive forum for resolving any action asserting a claim arising under the Securities Act and, if brought in a court other than the federal district courts of the United States of America, the stockholder bringing the suit

205

Exhibit 7
Page 826

will be deemed to have consented to the personal jurisdiction of the federal district courts of the United States of America and service of process on such stockholder's counsel. However, there is uncertainty as to whether a court would enforce such provision, and investors cannot waive compliance with federal securities laws and the rules and regulations thereunder.

The foregoing provisions will not apply to suits brought to enforce any liability or duty created by the Exchange Act or any other claim for which the federal courts of the United States have exclusive jurisdiction. Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder.

**Warrants**

***New Owlet Public Warrants***

Each New Owlet whole warrant entitles the registered holder to purchase one share of New Owlet at a price of $11.50 per share, subject to adjustment as discussed below, at any time commencing on the later of 30 days after the completion of the Business Combination or 12 months from the closing of Sandbridge's initial public offering, provided in each case that New Owlet has an effective registration statement under the Securities Act covering the New Owlet common stock issuable upon exercise of the warrants and a current prospectus relating to them is available (or we permit holders to exercise their warrants on a cashless basis under the circumstances specified in the warrant agreement) and such shares are registered, qualified or exempt from registration under the securities, or blue sky, laws of the state of residence of the holder. Pursuant to the warrant agreement, a warrant holder may exercise its warrants only for a whole number of shares of New Owlet common stock. This means only a whole warrant may be exercised at a given time by a warrant holder. No fractional warrants will be issued upon separation of the units, and only whole warrants will trade. The warrants will expire five years after the completion of the Business Combination, at 5:00 p.m., New York City time, or earlier upon redemption or liquidation.

We will not be obligated to deliver any shares of New Owlet common stock pursuant to the exercise of a warrant and will have no obligation to settle such warrant exercise unless a registration statement under the Securities Act with respect to the New Owlet common stock underlying the warrants is then effective and a prospectus relating thereto is current, subject to our satisfying our obligations described below with respect to registration, or a valid exemption from registration is available. No warrant will be exercisable and we will not be obligated to issue a share of New Owlet common stock upon exercise of a warrant unless the share of New Owlet common stock issuable upon such warrant exercise has been registered, qualified or deemed to be exempt under the securities laws of the state of residence of the registered holder of the warrants. In the event that the conditions in the two immediately preceding sentences are not satisfied with respect to a warrant, the holder of such warrant will not be entitled to exercise such warrant and such warrant may have no value and expire worthless. In no event will we be required to net cash settle any warrant.

As soon as practicable, but in no event later than 15 business days after the closing of the Business Combination, New Owlet will be required to use its commercially reasonable efforts to file with the SEC a registration statement covering the shares of New Owlet common stock issuable upon exercise of the warrants, and to use its commercially reasonable efforts to cause the same to become effective within 60 business days after the closing of the Business Combination, and to maintain the effectiveness of such registration statement and a current prospectus relating to those shares of New Owlet common stock until the warrants expire or are redeemed, as specified in the warrant agreement; provided that if the shares of New Owlet common stock are at the time of any exercise of a warrant not listed on a national securities exchange such that they satisfy the definition of a "covered security" under Section 18(b)(1) of the Securities Act, New Owlet may, at its option, require holders of public warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event New Owlet so elects, we will not be required to file or maintain in effect a registration statement. If a registration statement covering the shares of New Owlet common stock issuable upon exercise of the warrants is not effective by the 60th day after the closing of the Business Combination, warrant holders may, until such time as there is an effective registration statement and during any period when we will have failed to maintain an effective registration statement, exercise warrants on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act or another exemption, but we will use our best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available.

206

Exhibit 7
Page 827

Once the warrants become exercisable, we may call the warrants for redemption:

- in whole and not in part;

- at a price of $0.01 per warrant;

- upon not less than 30 days' prior written notice of redemption to each warrant holder; and

- if, and only if, the closing price of the New Owlet common stock equals or exceeds $18.00 per share (as adjusted for share splits, share capitalizations, reorganizations, recapitalizations and the like) for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which notice of the redemption is given to the warrant holder.

If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws.

The last of the redemption criterion discussed above was established to prevent a redemption call unless there is at the time of the call a significant premium to the warrant exercise price. If the foregoing conditions are satisfied and we issue a notice of redemption of the warrants, each warrant holder will be entitled to exercise his, her or its warrant prior to the scheduled redemption date. However, the price of the shares of New Owlet common stock may fall below the $18.00 redemption trigger price (as adjusted for share splits, share capitalizations, reorganizations, recapitalizations and the like) as well as the $11.50 (for whole shares) warrant exercise price after the redemption notice is issued.

Once the warrants become exercisable, we may redeem the outstanding warrants:

- in whole and not in part;

- at $0.10 per warrant upon a minimum of 30 days' prior written notice of redemption, provided that holders will be able to exercise their warrants on a cashless basis prior to redemption and receive that number of shares determined by reference to the table below, based on the redemption date and the "fair market value" of our shares of New Owlet common stock, except as otherwise described below;

- if, and only if, the closing price of the shares of New Owlet equals or exceeds $10.00 per public share (as adjusted for share subdivisions, share dividends, reorganizations, reclassifications, recapitalizations and the like) on the trading day before we send the notice of redemption to the warrant holders; and

- if the closing price of the shares of New Owlet equals or exceeds $18.00 per public share (as adjusted for share subdivisions, share dividends, reorganizations, reclassifications, recapitalizations and the like) on the trading day before we send the notice of redemption to the warrant holders and if, and only if, the private placement warrants are also concurrently called for redemption on the same terms as the outstanding public warrants, as described above; and

- if, and only if, there is an effective registration statement covering the issuance of Class A common stock issuable upon exercise of the warrants and a current prospectus relating thereto available throughout the 30-day period after written notice of redemption is given.

The numbers in the table below represent the number of shares of New Owlet common stock that a warrant holder will receive upon exercise in connection with a redemption by us pursuant to this redemption feature, based on the "fair market value" of the New Owlet common stock on the corresponding redemption date (assuming holders elect to exercise their warrants and such warrants are not redeemed for $0.10 per warrant), determined based on volume weighted average price of the shares of New Owlet common stock as reported during the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants, and the number of months that the corresponding redemption date precedes the expiration date of the warrants, each as set forth in the table below.

The share prices set forth in the column headings of the table below will be adjusted as of any date on which the number of shares of New Owlet common stock issuable upon exercise of a warrant is adjusted as set forth below in the first three paragraphs discussing anti-dilution adjustments. The adjusted share prices in the column headings will equal the share prices immediately prior to such adjustment, multiplied by a fraction, the numerator of which is the number of shares deliverable upon exercise of a warrant immediately prior to such

207

Exhibit 7
Page 828

adjustment and the denominator of which is the number of shares deliverable upon exercise of a warrant as so adjusted. The number of shares in the table below shall be adjusted in the same manner and at the same time as the number of shares issuable upon exercise of a warrant.

| Redemption Date (period to expiration of warrants) | Fair Market Value of New Owlet common stock | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | <10.00 | 11.00 | 12.00 | 13.00 | 14.00 | 15.00 | 16.00 | 17.00 | >18.00 |
| 60 months | 0.261 | 0.281 | 0.297 | 0.311 | 0.324 | 0.337 | 0.348 | 0.358 | 0.361 |
| 57 months | 0.257 | 0.277 | 0.294 | 0.310 | 0.324 | 0.337 | 0.348 | 0.358 | 0.361 |
| 54 months | 0.252 | 0.272 | 0.291 | 0.307 | 0.322 | 0.335 | 0.347 | 0.357 | 0.361 |
| 51 months | 0.246 | 0.268 | 0.287 | 0.304 | 0.320 | 0.333 | 0.346 | 0.357 | 0.361 |
| 48 months | 0.241 | 0.263 | 0.283 | 0.301 | 0.317 | 0.332 | 0.344 | 0.356 | 0.361 |
| 45 months | 0.235 | 0.258 | 0.279 | 0.298 | 0.315 | 0.330 | 0.343 | 0.356 | 0.361 |
| 42 months | 0.228 | 0.252 | 0.274 | 0.294 | 0.312 | 0.328 | 0.342 | 0.355 | 0.361 |
| 39 months | 0.221 | 0.246 | 0.269 | 0.290 | 0.309 | 0.325 | 0.340 | 0.354 | 0.361 |
| 36 months | 0.213 | 0.239 | 0.263 | 0.285 | 0.305 | 0.323 | 0.339 | 0.353 | 0.361 |
| 33 months | 0.205 | 0.232 | 0.257 | 0.280 | 0.301 | 0.320 | 0.337 | 0.352 | 0.361 |
| 30 months | 0.196 | 0.224 | 0.250 | 0.274 | 0.297 | 0.316 | 0.335 | 0.351 | 0.361 |
| 27 months | 0.185 | 0.214 | 0.242 | 0.268 | 0.291 | 0.313 | 0.332 | 0.350 | 0.361 |
| 24 months | 0.173 | 0.204 | 0.233 | 0.260 | 0.285 | 0.308 | 0.329 | 0.348 | 0.361 |
| 21 months | 0.161 | 0.193 | 0.223 | 0.252 | 0.279 | 0.304 | 0.326 | 0.347 | 0.361 |
| 18 months | 0.146 | 0.179 | 0.211 | 0.242 | 0.271 | 0.298 | 0.322 | 0.345 | 0.361 |
| 15 months | 0.130 | 0.164 | 0.197 | 0.230 | 0.262 | 0.291 | 0.317 | 0.342 | 0.361 |
| 12 months | 0.111 | 0.146 | 0.181 | 0.216 | 0.250 | 0.282 | 0.312 | 0.339 | 0.361 |
| 9 months | 0.090 | 0.125 | 0.162 | 0.199 | 0.237 | 0.272 | 0.305 | 0.336 | 0.361 |
| 6 months | 0.065 | 0.099 | 0.137 | 0.178 | 0.219 | 0.259 | 0.296 | 0.331 | 0.361 |
| 3 months | 0.034 | 0.065 | 0.104 | 0.150 | 0.197 | 0.243 | 0.286 | 0.326 | 0.361 |
| 0 months | — | — | 0.042 | 0.115 | 0.179 | 0.233 | 0.281 | 0.323 | 0.361 |

The exact fair market value and redemption date may not be set forth in the table above, in which case, if the fair market value is between two values in the table or the redemption date is between two redemption dates in the table, the number of shares of New Owlet common stock to be issued for each warrant exercised will be determined by a straight-line interpolation between the number of shares set forth for the higher and lower fair market values and the earlier and later redemption dates, as applicable, based on a 365 or 366-day year, as applicable. For example, if the volume weighted average price of the New Owlet common stock as reported during the ten trading days immediately following the date on which the notice of redemption is sent to the holders of the warrants is $11.00 per share, and at such time there are 57 months until the expiration of the warrants, holders may choose to, in connection with this redemption feature, exercise their warrants for 0.277 shares of New Owlet common stock for each whole warrant. For an example where the exact fair market value and redemption date are not as set forth in the table above, if the volume weighted average price of the New Owlet common stock as reported during the ten trading days immediately following the date on which the notice of redemption is sent to the holders of the warrants is $13.50 per share, and at such time there are 38 months until the expiration of the warrants, holders may choose to, in connection with this redemption feature, exercise their warrants for 0.298 shares of New Owlet common stock for each whole warrant. In no event will the warrants be exercisable on a cashless basis in connection with this redemption feature for more than 0.361 shares of New Owlet common stock per whole warrant (subject to adjustment). Finally, as reflected in the table above, if the warrants are out of the money and about to expire, they cannot be exercised on a cashless basis in connection with a redemption by New Owlet pursuant to this redemption feature, since they will not be exercisable for any shares of New Owlet common stock.

This redemption feature differs from the typical warrant redemption features used in many other current or former special purpose acquisition companies, which typically only provide for a redemption of warrants for cash (other than the private placement warrants) when the trading price for the shares of New Owlet common stock exceeds $18.00 per share for a specified period of time. This redemption feature is structured to allow for all of the outstanding warrants to be redeemed when the shares of New Owlet common stock are trading at or above

208

Exhibit 7
Page 829

$10.00 per public share, which may be at a time when the trading price of our shares of New Owlet common stock is below the exercise price of the warrants. This redemption feature has been established to provide us with the flexibility to redeem the warrants without the warrants having to reach the $18.00 per share threshold set forth above. Holders choosing to exercise their warrants in connection with a redemption pursuant to this feature will, in effect, receive a number of shares of New Owlet common stock for their warrants based on an option pricing model with a fixed volatility input. This redemption right provides us with an additional mechanism by which to redeem all of the outstanding warrants, and therefore have certainty as to our capital structure as the warrants would no longer be outstanding and would have been exercised or redeemed. We will be required to pay the applicable redemption price to warrant holders if we choose to exercise this redemption right and it will allow us to quickly proceed with a redemption of the warrants if we determine it is in our best interest to do so. As such, we would redeem the warrants in this manner when we believe it is in our best interest to update our capital structure to remove the warrants and pay the redemption price to the warrant holders.

As stated above, we can redeem the warrants when the shares of New Owlet common stock are trading at a price starting at $10.00, which is below the exercise price of $11.50, because it will provide certainty with respect to our capital structure and cash position while providing warrant holders with the opportunity to exercise their warrants on a cashless basis for the applicable number of shares. If we choose to redeem the warrants when the shares of New Owlet common stock are trading at a price below the exercise price of the warrants, this could result in the warrant holders receiving fewer shares of New Owlet common stock than they would have received if they had chosen to wait to exercise their warrants for shares of New Owlet common stock if and when such shares were trading at a price higher than the exercise price of $11.50.

No fractional shares of New Owlet common stock will be issued upon exercise. If, upon exercise, a holder would be entitled to receive a fractional interest in a share, we will round down to the nearest whole number of the number of shares of New Owlet common stock to be issued to the holder. If, at the time of redemption, the warrants are exercisable for a security other than the shares of New Owlet common stock pursuant to the warrant agreement, the warrants may be exercised for such security. At such time as the warrants become exercisable for a security other than the shares of New Owlet common stock, New Owlet will use its commercially reasonable efforts to register under the Securities Act the security issuable upon the exercise of the warrants.

If we call the warrants for redemption when the price per share of New Owlet common stock equals or exceeds $18.00, our management will have the option to require any holder that wishes to exercise his, her or its warrant to do so on a "cashless basis" beginning on the third trading day prior to the date on which notice of the redemption is given to the holders of warrants. In determining whether to require all holders to exercise their warrants on a "cashless basis," our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of shares of New Owlet common stock issuable upon the exercise of our warrants. If our management takes advantage of this option, all holders of warrants would pay the exercise price by surrendering their warrants for that number of shares equal to the lesser of (A) the quotient obtained by dividing (x) the product of the number of shares of New Owlet common stock underlying the warrants, multiplied by the excess of the "fair market value" (defined below) over the exercise price of the warrants by (y) the fair market value and (B) 0.361 per whole warrant. The "fair market value" will mean the average closing price of the shares of New Owlet common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants. If our management takes advantage of this option, the notice of redemption will contain the information necessary to calculate the number of shares of New Owlet common stock to be received upon exercise of the warrants, including the "fair market value" in such case. Requiring a cashless exercise in this manner will reduce the number of shares to be issued and thereby lessen the dilutive effect of a warrant redemption. If we call our warrants for redemption and our management team does not take advantage of this option, the Sponsor and its permitted transferees would still be entitled to exercise their private placement warrants for cash or on a cashless basis using the same formula described above that other warrant holders would have been required to use had all warrant holders been required to exercise their warrants on a cashless basis, as described in more detail below.

A holder of a warrant may notify us in writing in the event it elects to be subject to a requirement that such holder will not have the right to exercise such warrant, to the extent that after giving effect to such exercise, such

209

Exhibit 7
Page 830

TABLE OF CONTENTS

person (together with such person's affiliates), to the warrant agent's actual knowledge, would beneficially own in excess of 4.9% or 9.8% (or such other amount as the holder may specify) of the shares of New Owlet common stock outstanding immediately after giving effect to such exercise.

*Anti-dilution Adjustments.* If the number of outstanding shares of New Owlet common stock is increased by a capitalization or share dividend payable in shares of New Owlet common stock, or by a split-up of common stock or other similar event, then, on the effective date of such capitalization or share dividend, split-up or similar event, the number of shares of New Owlet common stock issuable on exercise of each warrant will be increased in proportion to such increase in the outstanding shares of common stock. A rights offering made to all or substantially all holders of common stock entitling holders to purchase shares of New Owlet common stock at a price less than the "historical fair market value" (as defined below) will be deemed a share dividend of a number of shares of New Owlet common stock equal to the product of (i) the number of shares of New Owlet common stock actually sold in such rights offering (or issuable under any other equity securities sold in such rights offering that are convertible into or exercisable for shares of New Owlet common stock) and (ii) one minus the quotient of (x) the price per shares of New Owlet common stock paid in such rights offering and (y) the historical fair market value. For these purposes, (i) if the rights offering is for securities convertible into or exercisable for New Owlet common stock, in determining the price payable for shares of New Owlet common stock, there will be taken into account any consideration received for such rights, as well as any additional amount payable upon exercise or conversion and (ii) "historical fair market value" means the volume weighted average price of shares of New Owlet common stock as reported during the 10 trading day period ending on the trading day prior to the first date on which the shares of New Owlet common stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such rights.

In addition, if we, at any time while the warrants are outstanding and unexpired, pay a dividend or make a distribution in cash, securities or other assets to all or substantially all the holders of shares of New Owlet common stock on account of such shares (or other securities into which the warrants are convertible), other than (a) as described above, (b) certain ordinary cash dividends (initially defined as up to $0.50 per share in a 365 day period), or (c) to satisfy the redemption rights of the holders of New Owlet common stock in connection with the Business Combination, then the warrant exercise price will be decreased, effective immediately after the effective date of such event, by the amount of cash and/or the fair market value of any securities or other assets paid on each share of New Owlet common stock in respect of such event.

If the number of outstanding shares of New Owlet common stock is decreased by a consolidation, combination, reverse share split or reclassification of share of New Owlet common stock or other similar event, then, on the effective date of such consolidation, combination, reverse share split, reclassification or similar event, the number of shares of New Owlet common stock issuable on exercise of each warrant will be decreased in proportion to such decrease in outstanding shares of New Owlet common stock.

Whenever the number of shares of New Owlet common stock purchasable upon the exercise of the warrants is adjusted, as described above, the warrant exercise price will be adjusted by multiplying the warrant exercise price immediately prior to such adjustment by a fraction (x) the numerator of which will be the number of shares of New Owlet common stock purchasable upon the exercise of the warrants immediately prior to such adjustment and (y) the denominator of which will be the number of shares of New Owlet common stock so purchasable immediately thereafter.

In case of any reclassification or reorganization of the outstanding shares of New Owlet common stock (other than those described above or that solely affects the par value of such shares of New Owlet common stock), or in the case of any merger or consolidation of us with or into another corporation (other than a consolidation or merger in which we are the continuing corporation and that does not result in any reclassification or reorganization of our outstanding shares of New Owlet common stock), or in the case of any sale or conveyance to another corporation or entity of the assets or other property of us as an entirety or substantially as an entirety in connection with which we are dissolved, the holders of the warrants will thereafter have the right to purchase and receive, upon the basis and upon the terms and conditions specified in the warrants and in lieu of the shares of New Owlet common stock immediately theretofore purchasable and receivable upon the exercise of the rights represented thereby, the kind and amount of shares of New Owlet common stock or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the holder of the warrants would have received if such holder had exercised their warrants immediately prior to such event.

210

Exhibit 7
Page 831

If less than 70% of the consideration receivable by the holders of shares of New Owlet common stock in such a transaction is payable in the form of shares of New Owlet common stock in the successor entity that is listed for trading on a national securities exchange or is quoted in an established over-the-counter market, or is to be so listed for trading or quoted immediately following such event, and if the registered holder of the warrant properly exercises the warrant within thirty days following public disclosure of such transaction, the warrant exercise price will be reduced as specified in the warrant agreement based on the Black-Scholes value (as defined in the warrant agreement) of the warrant. The purpose of such exercise price reduction is to provide additional value to holders of the warrants when an extraordinary transaction occurs during the exercise period of the warrants pursuant to which the holders of the warrants otherwise do not receive the full potential value of the warrants.

The warrants are issued in registered form under a warrant agreement with Continental Stock Transfer & Trust Company, as warrant agent. The warrant agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision or correct any mistake, including to conform the provisions of the warrant agreement to the description of the terms of the warrants and the warrant agreement set forth in Sandbridge's prospectus for its initial public offering, but requires the approval by the holders of at least 50% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders. You should review a copy of the warrant agreement, which is filed as an exhibit to the registration statement of which this proxy statement/prospectus is a part, for a complete description of the terms and conditions applicable to the warrants.

The warrant holders do not have the rights or privileges of holders of shares of New Owlet common stock and any voting rights until they exercise their warrants and receive shares of New Owlet common stock.

Pursuant to the terms of the warrant agreement, subject to applicable law, any action, proceeding or claim against us arising out of or relating in any way to the warrant agreement will be brought and enforced in the courts of the State of New York or the United States District Court for the Southern District of New York, and we irrevocably submit to such jurisdiction, which jurisdiction will be the exclusive forum for any such action, proceeding or claim. This provision applies to claims under the Securities Act but does not apply to claims under the Exchange Act or any claim for which the federal district courts of the United States of America are the sole and exclusive forum.

### *Private Placement Warrants*

Except as described below, the private placement warrants have terms and provisions that are identical to those of the public warrants. The private placement warrants (including the shares of New Owlet common stock issuable upon exercise of the private placement warrants) will not be transferable, assignable or salable until 30 days after the completion of the Business Combination, except pursuant to limited exceptions to our officers and directors and other persons or entities affiliated with the initial purchasers of the private placement warrants, and they will not be redeemable by us, except as described above when the price per share of New Owlet common stock equals or exceeds $10.00, so long as they are held by Sponsor or its permitted transferees. Sponsor, or its permitted transferees, has the option to exercise the private placement warrants on a cashless basis. If the private placement warrants are held by holders other than Sponsor or its permitted transferees, the private placement warrants will be redeemable by us in all redemption scenarios and exercisable by the holders on the same basis as the public warrants. Any amendment to the terms of the private placement warrants or any provision of the warrant agreement with respect to the private placement warrants will require a vote of holders of at least 50% of the number of the then outstanding private placement warrants.

Except as described above regarding redemption procedures and cashless exercise in respect of the public warrants, if holders of the private placement warrants elect to exercise them on a cashless basis, they would pay the exercise price by surrendering his, her or its warrants for that number of shares of New Owlet common stock equal to the quotient obtained by dividing (x) the product of the number of shares of New Owlet common stock underlying the warrants, multiplied by the excess of the "fair market value" (defined below) over the exercise price of the warrants by (y) the fair market value. The "fair market value" will mean the average reported closing price of the shares of New Owlet common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of warrant exercise is sent to the holders of warrants.

### Transfer Agent and Warrant Agent

The transfer agent for New Owlet common stock and warrant agent for the New Owlet public warrants and private placement warrants will be Continental Stock Transfer & Trust Company.

211

Exhibit 7
Page 832

**SECURITIES ACT RESTRICTIONS ON RESALE OF NEW OWLET COMMON STOCK**

Pursuant to Rule 144 under the Securities Act ("Rule 144"), a person who has beneficially owned restricted New Owlet common stock for at least six months would be entitled to sell their securities provided that (i) such person is not deemed to have been an affiliate of New Owlet at the time of, or at any time during the three months preceding, a sale and (ii) New Owlet is subject to the Exchange Act periodic reporting requirements for at least three months before the sale and have filed all required reports under Section 13 or 15(d) of the Exchange Act during the 12 months (or such shorter period as New Owlet was required to file reports) preceding the sale.

Persons who have beneficially owned restricted New Owlet common stock shares for at least six months but who are affiliates of New Owlet at the time of, or at any time during the three months preceding, a sale, would be subject to additional restrictions, by which such person would be entitled to sell within any three-month period only a number of securities that does not exceed the greater of:

- 1% of the total number of New Owlet common stock then outstanding; or

- the average weekly reported trading volume of the New Owlet common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to the sale.

Sales by affiliates of New Owlet under Rule 144 are also limited by manner of sale provisions and notice requirements and to the availability of current public information about New Owlet.

**Restrictions on the Use of Rule 144 by Shell Companies or Former Shell Companies**

Rule 144 is not available for the resale of securities initially issued by shell companies (other than business combination related shell companies) or issuers that have been at any time previously a shell company. However, Rule 144 also includes an important exception to this prohibition if the following conditions are met:

- the issuer of the securities that was formerly a shell company has ceased to be a shell company;

- the issuer of the securities is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act;

- the issuer of the securities has filed all Exchange Act reports and material required to be filed, as applicable, during the preceding 12 months (or such shorter period that the issuer was required to file such reports and materials), other than Form 8-K reports; and

- at least one year has elapsed from the time that the issuer filed current Form 10 type information with the SEC reflecting its status as an entity that is not a shell company.

We anticipate that following the consummation of the Business Combination, New Owlet will no longer be a shell company, and so, once the conditions set forth in the exceptions listed above are satisfied, Rule 144 will become available for the resale of the above noted restricted securities.

212

Exhibit 7
Page 833

**COMPARISON OF STOCKHOLDER RIGHTS**

### General

Sandbridge is incorporated under the laws of the State of Delaware and the rights of Sandbridge stockholders are governed by the laws of the State of Delaware, including the DGCL, the Current Charter and Sandbridge's Bylaws. As a result of the Business Combination, Sandbridge stockholders who receive shares of New Owlet common stock will become New Owlet stockholders. New Owlet is incorporated under the laws of the State of Delaware and the rights of New Owlet stockholders are governed by the laws of the State of Delaware, including the DGCL, the Proposed Charter and New Owlet's Bylaws. Thus, following the Business Combination, the rights of Sandbridge stockholders who become New Owlet stockholders in the Business Combination will continue to be governed by Delaware law but will no longer be governed by the Current Charter and Sandbridge's Bylaws and instead will be governed by the Proposed Charter and New Owlet's Bylaws.

### Comparison of Stockholders' Rights

Set forth below is a summary comparison of material differences between the rights of Sandbridge stockholders under the Current Charter and Sandbridge's Bylaws (left column), and the rights of New Owlet's stockholders under forms of the Proposed Charter and Bylaws (right column). The summary set forth below is not intended to be complete or to provide a comprehensive discussion of each company's governing documents. This summary is qualified in its entirety by reference to the full text of Sandbridge's Charter and Sandbridge's Bylaws, and the forms of the Proposed Charter and New Owlet's Bylaws, which are attached as Annex B and Annex C, respectively, as well as the relevant provisions of the DGCL.

| Sandbridge | New Owlet |
|---|---|
| **Authorized Capital Stock** | |
| Under the Current Charter, Sandbridge is currently authorized to issue 111,000,000 shares of capital stock, consisting of (a) 110,000,000 shares of Sandbridge common stock, including 100,000,000 shares of Sandbridge Class A common stock, par value $0.0001 per share, and 10,000,000 shares of Sandbridge Class B common stock, par value $0.0001 per share, and (b) 1,000,000 shares of preferred stock, par value $0.0001 per share. | Under the Proposed Charter, New Owlet will be authorized to issue 1,100,000,000 shares of capital stock, consisting of (i) 1,000,000,000 shares of New Owlet Class A common stock, par value $0.0001 per share, and (ii) 100,000,000 shares of preferred stock, par value $0.0001 per share. |
| | Upon consummation of the Business Combination, we expect there will be 130,764,371 shares of New Owlet common stock (assuming no redemptions) outstanding. Following consummation of the Business Combination, New Owlet is not expected to have any preferred stock outstanding. |
| **Rights of Preferred Stock** | |
| The Sandbridge Board may fix for any series of preferred stock voting rights, if any, designations, powers, preferences and relative, participating, optional, special and other rights, if any, of each such series and any qualifications, limitations and restrictions thereof, as shall be stated in the resolution or resolutions adopted by the Sandbridge Board providing for the issuance of such series. | The New Owlet Board may fix for any class or series of preferred stock such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof, as may be stated in the resolutions of the New Owlet Board providing for the issuance of such class or series. |
| **Number and Qualification of Directors** | |
| Under the Current Charter, the number of directors of Sandbridge will be fixed from time to time exclusively by the Sandbridge Board pursuant to a resolution adopted by a majority of the Sandbridge Board, subject to any contractual rights of stockholders or any series of the preferred stock to elect directors. | Under the Proposed Charter, the number of directors will be fixed exclusively by one or more resolutions adopted from time to time by the Board of Directors; *provided that* the number for directors that may be elected by the holders of any series of preferred stock will be in addition to the number fixed by the Board of Directors, |

Exhibit 7
Page 834

| Sandbridge | New Owlet |
|---|---|
| | and the total number of directors constituting the whole New Owlet Board will be adjusted accordingly. |

### Classification of the Board of Directors

| Sandbridge | New Owlet |
|---|---|
| The Current Charter provides that Sandbridge's board of directors will be initially divided into three classes, Class I, Class II and Class III, with members of each class serving staggered three-year terms. | The Proposed Charter provides that New Owlet's board of directors will be initially divided into three classes, Class I, Class II and Class III, with members of each class serving staggered three-year terms. |

### Election of Directors

| Sandbridge | New Owlet |
|---|---|
| The stockholders shall elect directors, each of whom will hold office until the annual meeting for the year in which his or her term expires and until his or her successor has been elected and qualified, subject to such director's earlier death, resignation, retirement, disqualification or removal. | The stockholders shall elect directors, each of whom will hold office until his or her successor is duly elected or qualified at the annual meeting for the year in which his or her term expires, or until his or her earlier death, resignation, disqualification or removal. |

### Board of Directors

| Sandbridge | New Owlet |
|---|---|
| Subject to the terms of any preferred stock, any or all of the directors may be removed from office at any time, but only for cause and only by the affirmative vote of holders of a majority of the voting power of all then outstanding shares of Sandbridge's capital stock entitled to vote generally in the election of directors, voting together as a single class. In addition, prior to the completion of an initial business combination, holders of a majority of the Sandbridge Class B common stock may remove a member of the board of directors for any reason. | Subject to the rights of the holders of any series of preferred stock and except as otherwise provided by law, any director or the entire New Owlet Board may be removed from office at any time, but only for cause and only by the affirmative vote of the holders of at least two-thirds (66 and 2/3%) of the voting power of all of the then outstanding shares of voting stock of New Owlet entitled to vote at an election of directors. |

### Voting

| Sandbridge | New Owlet |
|---|---|
| Holders of Sandbridge common stock are entitled to one vote for each share held on all matters to be voted on by stockholders. Holders of the Sandbridge Class A common stock and holders of the Sandbridge Class B common stock will vote together as a single class on all matters submitted to a vote of Sandbridge stockholders, including any vote in connection with Sandbridge's initial business combination, except as required by law; *provided that* prior to Sandbridge's initial business combination, only holders of Sandbridge's founder shares have the right to vote on the election of directors, and holders of Sandbridge's public shares are not entitled to vote on the election of directors during such time. | Holders of New Owlet Class A common stock will be entitled to one vote for each share on each matter submitted to a vote of stockholders; *provided that*, except as otherwise required by applicable law, holders of New Owlet Class A common stock will not be entitled to vote on any amendment to the Proposed Charter that relates solely to the terms of one or more outstanding series of New Owlet preferred stock if the holders of such affected series of New Owlet preferred stock are exclusively entitled to vote thereon pursuant to the Proposed Charter or applicable law. |

### Cumulative Voting

| Sandbridge | New Owlet |
|---|---|
| Delaware law allows for cumulative voting only if provided for in the Current Charter; however, the Current Charter does not authorize cumulative voting. | Delaware law allows for cumulative voting only if provided for in the Proposed Charter; however, the Proposed Charter does not authorize cumulative voting. |

### Vacancies on the Board of Directors

| Sandbridge | New Owlet |
|---|---|
| The Current Charter provides that any vacancy on the Sandbridge Board, including a vacancy resulting from an enlargement of the board, may be filled only by vote of a majority of Sandbridge's directors then in office. | The Proposed Charter provides that any vacancy on the New Owlet Board, including a vacancy resulting from an enlargement of the board, may be filled only by a majority vote of the remaining directors then in office, even if less than a quorum or by a sole |

214

Exhibit 7
Page 835

TABLE OF CONTENTS

| Sandbridge | New Owlet |
|---|---|
| | remaining director (other than any directors elected by the separate vote of one or more outstanding series of preferred stock). |

## Special Meeting of the Board of Directors

| Sandbridge | New Owlet |
|---|---|
| Subject to the rights of the holders of preferred stock, and to the requirements of applicable law, special meetings of Sandbridge stockholders may be called only by the Chairman of the Board, the Chief Executive Officer or pursuant to a resolution adopted by a majority of the Sandbridge Board, and the ability of the Sandbridge stockholders to call a special meeting is specifically denied. | Special meetings of the New Owlet Board for any purpose or purposes may be called at any time by the chairperson of the Board, the Chief Executive Officer, the President, the Secretary of the Corporation, or by a majority of the total number of directors constituting the Board. |

## Stockholder Action by Written Consent

| Sandbridge | New Owlet |
|---|---|
| Under the Current Charter, any action required or permitted to be taken by the stockholders must be effected at an annual or special meeting of the stockholders and may not be effected by written consent other than with respect to the Sandbridge Class B common stock, with respect to which action may be taken by written consent. | Under the Proposed Charter, any action required or permitted to be taken by the stockholders of New Owlet must be effected at an annual or special meeting of the stockholders and may not be effected by written consent; *provided, however*, any action required or permitted to be taken by the holders of any series of preferred stock may be effected by written consent to the extent expressly so provided by the applicable certificate of designation relating to such series of preferred stock, if such written consent is signed by the holders of outstanding shares of the relevant series of preferred stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. |

## Amendment to Certificate of Incorporation

| Sandbridge | New Owlet |
|---|---|
| The Current Charter provides that the Current Charter may be amended in accordance with Delaware law; *provided that*, (i) as long as any shares of Sandbridge Class B common stock remain outstanding, Sandbridge will not amend the Current Charter if such amendment would alter the rights of the Sandbridge Class B common stock without the prior vote or written consent of the holders of a majority of the shares of Sandbridge Class B common stock then outstanding, voting separately as a single class, (ii) prior to the closing of an initial business combination, any amendment to the Current Charter that would alter or change the provisions relating to director elections may only be amended by a resolution passed by holders of a majority of the shares of outstanding Sandbridge Class B common stock, and (iii) prior to an initial business combination, any amendment to the Current Charter that would alter or change the provisions relating to an initial business combination requires the affirmative vote of the holders of at least 65% of all common stock then outstanding. | Under the Proposed Charter, in addition to any vote required by DGCL, the Proposed Charter may be amended only by the affirmative vote of the holders of at least two-thirds (66 and 2/3%) of the total voting power of the then outstanding shares of stock of New Owlet entitled to vote thereon, voting together as a single class. |

## Amendment of the Bylaws

| Sandbridge | New Owlet |
|---|---|
| Under the Current Charter, the Sandbridge Board is expressly authorized to adopt, alter, amend or repeal the | Under the Proposed Charter, the New Owlet Board is expressly authorized to adopt, alter, amend or repeal the |

215

Exhibit 7
Page 836

| Sandbridge | New Owlet |
|---|---|
| Sandbridge Bylaws by the affirmative vote of a majority of the Sandbridge Board. The Sandbridge Bylaws may also be adopted, amended, altered or repealed by the affirmative vote of at least a majority of the voting power of all of the then outstanding shares of capital stock of Sandbridge entitled to vote generally in the election of directors, voting together as a single class. | New Owlet Bylaws in accordance with DGCL; *provided that*, in addition to any vote required by DGCL, the adoption, amendment or repeal of the New Owlet Bylaws by New Owlet stockholders will require the affirmative vote of the holders of at least two-thirds (66 and 2/3%) of the voting power of all of the then outstanding shares of voting stock of New Owlet entitled to vote generally in an election of directors. |

### Quorum

| Sandbridge | New Owlet |
|---|---|
| *Board of Directors*. A majority of the Sandbridge Board constitutes a quorum at any meeting of the Sandbridge Board. | *Board of Directors*. A majority of the New Owlet Board constitutes a quorum at any meeting of the New Owlet Board. |
| *Stockholders*. The presence, in person or by proxy, at a stockholders meeting of the holders of shares of outstanding capital stock representing a majority of the voting power of all outstanding shares of capital stock entitled to vote at such meeting constitutes a quorum; *provided that* when specified business is to be voted on by a class or series of stock voting as a class, the holders of shares representing a majority of the voting power of the outstanding shares of such class or series will constitute a quorum. | *Stockholders*. The holders of a majority in voting power of the stock issued and outstanding and entitled to vote, present in person, or by remote communication, if applicable, or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the stockholders. |

### Interested Directors

| Sandbridge | New Owlet |
|---|---|
| Sandbridge renounces any expectancy of Sandbridge in, or in being offered an opportunity to participate in, any corporate opportunity known by any Sandbridge officer or director, except with respect to a corporate opportunity that was offered to such person solely in his or her capacity as a director or officer of Sandbridge where (i) such opportunity is one that Sandbridge is legally and contractually permitted to undertake and would otherwise be reasonable for Sandbridge to pursue and (ii) the director or officer is permitted to refer that opportunity to Sandbridge without violating any legal obligation. | New Owlet will be governed by DGCL Section 203. |

### Special Stockholder Meeting

| Sandbridge | New Owlet |
|---|---|
| Special meetings of Sandbridge stockholders may be called only by a majority vote of the Sandbridge Board, or by Sandbridge's Chief Executive Officer or Chairman. | Subject to the special rights of the holders of one or more series of preferred stock, special meetings of the stockholders of New Owlet may be called, for any purpose or purposes, at any time only by or at the direction of the Board of Directors, the Chairperson of the Board of Directors, the Chief Executive Officer or the President. |

### Notice of Stockholder Meeting

| Sandbridge | New Owlet |
|---|---|
| Unless otherwise provided by DGCL, the notice of any meeting of stockholders shall be sent or otherwise given not less than 10 nor more than 60 days before the date of the meeting to each stockholder entitled to vote at such meeting. The notice shall specify the place, if any, date and time of the meeting, the means of remote | Unless otherwise provided by DGCL, the notice of any meeting of stockholders shall be sent or otherwise given not less than 10 nor more than 60 days before the date of the meeting to each stockholder entitled to vote at such meeting. The notice shall specify the place, if any, date and time of the meeting, the means |

216

Exhibit 7
Page 837

TABLE OF CONTENTS

| Sandbridge | New Owlet |
|---|---|
| communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting. | of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called. |
| Whenever notice is required to be given to any Sandbridge stockholder, such notice may be given (i) in writing and sent either by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, or (ii) by means of a form of electronic transmission consented to by the stockholder, to the extent permitted by, and subject to the conditions set forth in Section 232 of the DGCL. | Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by New Owlet may be given in writing directed to the stockholder's mailing address (or by electronic transmission directed to the stockholder's electronic mail address, as applicable) as it appears on the records of New Owlet. |

**Stockholder Proposals (Other than Nomination of Persons for Election as Directors)**

| Sandbridge | New Owlet |
|---|---|
| No business may be transacted at an annual meeting of Sandbridge stockholders, other than business that is either (i) specified in Sandbridge's notice of meeting (or any supplement thereto) given by or at the direction of the Sandbridge Board, (ii) otherwise properly brought before the annual meeting by or at the direction of the Sandbridge Board or (iii) otherwise properly brought before the annual meeting by any Sandbridge stockholder who is entitled to vote at the meeting, who complies with the notice procedures set forth in the Sandbridge Bylaws. | No business may be conducted at an annual meeting of New Owlet stockholders, other than business that is either (i) specified in a notice of meeting given by or at the direction of the Board, (ii) if not specified in a notice of meeting, otherwise brought before the meeting by the Board or the Chairman of the Board or (iii) otherwise properly brought before the meeting by a stockholder present in person who (A) (1) was a record owner of shares of New Owlet both at the time of giving the notice provided for in the New Owlet Bylaws and at the time of the meeting, (2) is entitled to vote at the meeting and (3) has complied with these requirements in all applicable respects or (B) properly made such proposal in accordance with Rule 14a-8 under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder. |
| For business to be properly brought before an annual meeting by a stockholder, the stockholder must (i) give timely notice thereof in proper written form to the Secretary of Sandbridge, and (ii) the business must be a proper matter for stockholder action. To be timely, a Sandbridge stockholder's notice must be received by the Secretary at the principal executive offices of Sandbridge not later than the close of business on the 90th day nor earlier than the opening of business on the 120th day before the anniversary date of the immediately preceding annual meeting; *provided, however, that* in the event that the annual meeting is more than thirty (30) days before or more than 70 days after such anniversary date, or if no annual meeting was held in the preceding year, notice must be delivered not earlier than the close of business on the 120th day before the meeting and not later than the later of (x) the close of business on the 90th day before the meeting or (y) the close of business on the 10th day following the day on which public announcement of the date of the annual meeting, is first made by Sandbridge. | For business to be properly brought before an annual meeting by a stockholder, the stockholder must (i) provide timely notice thereof in writing and in proper form to the Secretary of New Owlet and (ii) provide any updates or supplements to such notice at the times and in the forms required by the New Owlet Bylaws. To be timely, a stockholder's notice must be delivered to, or mailed and received at, the principal executive offices of New Owlet not less than 90 days nor more than 120 days prior to the one-year anniversary of the preceding year's annual meeting; provided, however, that if no annual meeting was held in the preceding year, to be timely, a stockholder's notice must be so delivered, or mailed and received, not earlier than the close of business on the 120th day prior to such annual meeting and not later than the close of business on the later of the 90th day prior to such annual meeting or, if later, the 10th day following the day on which public disclosure of the date of such annual meeting was first made by New Owlet; provided, further, that if the date of the annual meeting is more than 30 days before or more than 60 days after |

217

Exhibit 7
Page 838

| Sandbridge | New Owlet |
|---|---|

such anniversary date, to be timely, a stockholder's notice must be so delivered, or mailed and received, not later than the 90th day prior to such annual meeting or, if later, the 10th day following the day on which public disclosure of the date of such annual meeting was first made by New Owlet.

### Stockholder Nominations of Persons for Election as Directors

Nominations of persons for election to the Sandbridge Board may be made by any stockholder of Sandbridge who is a stockholder of record entitled to vote in the election of directors on the date of the required notice and on the record date for the determination of stockholders entitled to vote at such meeting and who gives proper notice.

To be timely, a stockholder's notice to the Secretary must be received by the Secretary at the principal executive offices of Sandbridge (i) in the case of an annual meeting, not later than the close of business on the 90th day nor earlier than the opening of business on the 120th day before the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that in the event that the annual meeting is called for on a date that is not within 30 days before or after such anniversary date, notice by the stockholder to be timely must be so received not earlier than the opening of business on the 120th day before the meeting and not later than the later of (x) the close of business on the 90th day before the meeting or (y) the close of business on the 10th day following the day on which public announcement of the date of the annual meeting was first made by Sandbridge.

Nominations of persons for election to the New Owlet Board may be made at an annual meeting or at a special meeting (but only if the election of directors is a matter specified in the notice of meeting given by or at the direction of the person calling such special meeting) may be made at such meeting only (i) as provided in that certain Stockholders Agreement, to be entered into as of the Closing, by and between New Owlet and Eclipse (as such agreement may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Stockholders Agreement"), (ii), by or at the direction of the New Owlet Board, including by any committee or persons authorized to do so by the New Owlet Board or the New Owlet Bylaws, or (iii) by any stockholder of New Owlet who is present in person, was a record owner of shares of New Owlet both at the time of giving the notice required and at the time of the meeting, is entitled to vote at the meeting, and has complied with notice and nomination requirements.

For a stockholder to make any nomination of a person or persons for election to the Board at an annual meeting, the stockholder must (1) provide timely notice thereof in writing and in proper form to the Secretary of New Owlet, (2) provide the information, agreements and questionnaires with respect to such stockholder and its candidate for nomination as required to be set forth by the by-laws of New Owlet and (3) provide any updates or supplements to such notice at the times and in the forms required by the New Owlet Bylaws.

To be timely, a stockholder's notice must be delivered to, or mailed and received at, the principal executive offices of New Owlet not less than 90 days nor more than 120 days prior to the one-year anniversary of the preceding year's annual meeting; provided, however, that if no annual meeting was held in the preceding year, to be timely, a stockholder's notice must be so delivered, or mailed and received, not earlier than the close of business on the 120th day prior to such annual meeting and not later than the close of business on the later of the 90th day prior to such annual meeting or, if later, the 10th day following the day on which public disclosure of the date of such annual meeting was first made by New Owlet; provided, further, that if the date of the annual meeting is more than 30 days before or more than 60 days after

218

Exhibit 7
Page 839

| Sandbridge | New Owlet |
|---|---|
| | such anniversary date, to be timely, a stockholder's notice must be so delivered, or mailed and received, not later than the 90th day prior to such annual meeting or, if later, the 10th day following the day on which public disclosure of the date of such annual meeting was first made by New Owlet. |

### Limitation of Liability of Directors and Officers

| Sandbridge | New Owlet |
|---|---|
| The DGCL permits limiting or eliminating the monetary liability of a director to a corporation or its stockholders, except with regard to breaches of the duty of loyalty, intentional misconduct, unlawful repurchases or dividends, or improper personal benefit. | The DGCL permits limiting or eliminating the monetary liability of a director to a corporation or its stockholders, except with regard to breaches of the duty of loyalty, intentional misconduct, unlawful repurchases or dividends, or improper personal benefit. |
| The Current Charter provides that no director will be personally liable, except to the extent an exemption from liability or limitation is not permitted under the DGCL unless they violated their duty of loyalty to Sandbridge or its stockholders, acted in bad faith, knowingly or intentionally violated the law, authorized unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or derived improper personal benefit from their actions as directors. | The Proposed Charter provides that no director will be personally liable, except to the extent an exemption from liability or limitation is not permitted under the DGCL. |

### Indemnification of Directors, Officers, Employees and Agents

| Sandbridge | New Owlet |
|---|---|
| The DGCL generally permits a corporation to indemnify its directors and officers acting in good faith. Under the DGCL, the corporation through its stockholders, directors or independent legal counsel, will determine that the conduct of the person seeking indemnity conformed with the statutory provisions governing indemnity. | The DGCL generally permits a corporation to indemnify its directors and officers acting in good faith. Under the DGCL, the corporation through its stockholders, directors or independent legal counsel, will determine that the conduct of the person seeking indemnity conformed with the statutory provisions governing indemnity. |
| The Current Charter provides that Sandbridge will indemnify each director, officer, employee and agent to the fullest extent permitted by the DGCL. | The Proposed Charter provides that New Owlet may indemnify each director, officer, employee and agent. |

### Dividends

| Sandbridge | New Owlet |
|---|---|
| Unless further restricted in the certificate of incorporation, the DGCL permits a corporation to declare and pay dividends out of either (i) surplus, or (ii) if no surplus exists, out of net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year (provided that the amount of capital of the corporation is not less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets). The DGCL defines surplus as the excess, at any time, of the net assets of a corporation over its stated capital. In addition, the DGCL provides that a corporation may redeem or repurchase its shares only when the capital of the corporation is not impaired and only if such redemption or repurchase would not cause any impairment of the capital of a corporation. | Unless further restricted in the certificate of incorporation, the DGCL permits a corporation to declare and pay dividends out of either (i) surplus, or (ii) if no surplus exists, out of net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year (provided that the amount of capital of the corporation is not less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets). The DGCL defines surplus as the excess, at any time, of the net assets of a corporation over its stated capital. In addition, the DGCL provides that a corporation may redeem or repurchase its shares only when the capital of the corporation is not impaired and only if such redemption or repurchase would not cause any impairment of the capital of a corporation. |

219

Exhibit 7
Page 840

| Sandbridge | New Owlet |
|---|---|
| Sandbridge's stockholders are entitled to receive ratable dividends when, as and if declared by the Sandbridge Board out of funds legally available therefor. | The Proposed Charter provides that, subject to applicable law and the rights, if any, of outstanding shares of preferred stock, the holders of shares of New Owlet Class A common stock will be entitled to receive dividends when, as, and if declared by the board of directors in accordance with applicable law. |

**Liquidation**

| Sandbridge | New Owlet |
|---|---|
| Subject to applicable law, the rights, if any, of the holders of preferred, as well as the provisions in the Current Charter related to an initial business combination, in the event of any voluntary or involuntary liquidation, dissolution or winding up of Sandbridge, after payment or provision for payment of debts and other liabilities, the holders of shares of Sandbridge common stock will be entitled to receive all the remaining assets of Sandbridge available for distribution to its stockholders, ratably in proportion to the number of shares of Sandbridge Class A common stock (on an as converted basis with respect to the Sandbridge Class B common stock) held by them. | Subject to applicable law and the preferential or other rights of any holders of preferred stock then outstanding, the Proposed Charter provides that in the event of the liquidation, dissolution or winding up of New Owlet, whether voluntary or involuntary, holders of New Owlet common stock will be entitled to receive ratably all assets of New Owlet available for distribution to its Class A common stockholders. |

**Supermajority Voting Provisions**

| Sandbridge | New Owlet |
|---|---|
| Article IX of the Current Charter relating to business combination requirements may not be amended prior to the consummation of the initial business combination unless approved by the affirmative vote of the holders of at least 65% of all then outstanding shares of Sandbridge common stock. | Under the Proposed Charter, in addition to any vote required by DGCL, the Proposed Charter may be amended only by the affirmative vote of the holders of at least two-thirds (66 and 2/3%) of the total voting power of the then outstanding shares of stock of New Owlet entitled to vote thereon, voting together as a single class. |
| | Under the Proposed Charter, in addition to any vote required by DGCL, the adoption, amendment or repeal of the Bylaws by New Owlet stockholders will require the affirmative vote of the holders of at least two-thirds (66 and 2/3%) of the voting power of all of the then outstanding shares of voting stock of New Owlet entitled to vote generally in an election of directors. |
| | Subject to the rights of the holders of any series of preferred stock and except as otherwise provided by law, any director or the entire New Owlet Board may be removed from office at any time, but only for cause and only by the affirmative vote of the holders of at least two-thirds (66 and 2/3%) of the voting power of all of the then outstanding shares of voting stock of New Owlet entitled to vote at an election of directors. |

**Anti-Takeover Provisions and Other Stockholder Protections**

| Sandbridge | New Owlet |
|---|---|
| The anti-takeover provisions and other stockholder protections included in the Current Charter include a prohibition on stockholder action by written consent, a classified board and blank check preferred stock. The Current Charter provides that Sandbridge expressly disclaims the applicability of Section 203 of the DGCL. | The anti-takeover provisions and other stockholder protections included in the Proposed Charter include a prohibition on stockholder action by written consent, a classified board and blank check preferred stock. Section 203 of the DGCL prohibit a Delaware corporation from engaging in a "business combination" with an "interested stockholder" (i.e. a stockholder owning 15% or more of |

220

Exhibit 7
Page 841

| Sandbridge | New Owlet |
|---|---|
| | Sandbridge voting stock) for three years following the time that the "interested stockholder" becomes such, subject to certain exceptions. |

### Preemptive Rights

| | |
|---|---|
| There are no preemptive rights relating to the Sandbridge common stock. | There are no preemptive rights relating to the shares of New Owlet common stock. |

### Fiduciary Duties of Directors

| | |
|---|---|
| Under Delaware law, the standards of conduct for directors have developed through Delaware court case law. Generally, directors must exercise a duty of care and duty of loyalty and good faith to the company and its stockholders. Members of the board of directors or any committee designated by the board of directors are similarly entitled to rely in good faith upon the records of the corporation and upon such information, opinions, reports and statements presented to the corporation by corporate officers, employees, committees of the board of directors or other persons as to matters such member reasonably believes are within such other person's professional or expert competence, provided that such other person has been selected with reasonable care by or on behalf of the corporation. Such appropriate reliance on records and other information protects directors from liability related to decisions made based on such records and other information. | Under Delaware law, the standards of conduct for directors have developed through Delaware court case law. Generally, directors must exercise a duty of care and duty of loyalty and good faith to the company and its stockholders. Members of the board of directors or any committee designated by the board of directors are similarly entitled to rely in good faith upon the records of the corporation and upon such information, opinions, reports and statements presented to the corporation by corporate officers, employees, committees of the board of directors or other persons as to matters such member reasonably believes are within such other person's professional or expert competence, provided that such other person has been selected with reasonable care by or on behalf of the corporation. Such appropriate reliance on records and other information protects directors from liability related to decisions made based on such records and other information. |
| The Sandbridge Board may exercise all such powers and do all such acts and things as may be exercised or done by Sandbridge, subject to the DGCL. | The New Owlet Board may exercise all such authority and powers of New Owlet and do all such lawful acts and things as are not by statute or the New Owlet Charter or New Owlet Bylaws directed or required to be exercised or done solely by the stockholders. |

### Inspection of Books and Records

| | |
|---|---|
| Under the DGCL, any stockholder or beneficial owner has the right, upon written demand under oath stating the proper purpose thereof, either in person or by attorney or other agent, to inspect and make copies and extracts from the corporation's stock ledger, list of stockholders and its other books and records for a proper purpose during the usual hours for business. Sandbridge's Bylaws permit Sandbridge's books and records to be kept within or outside Delaware. | Under the DGCL, any stockholder or beneficial owner has the right, upon written demand under oath stating the proper purpose thereof, either in person or by attorney or other agent, to inspect and make copies and extracts from the corporation's stock ledger, list of stockholders and its other books and records for a proper purpose during the usual hours for business. |

221

Exhibit 7
Page 842

| Sandbridge | New Owlet |
|---|---|

### Choice of Forum

The Current Charter requires, to the fullest extent permitted by law, that derivative actions brought in Sandbridge's name, actions against directors, officers and employees for breach of fiduciary duty and other similar actions may be brought only in the Court of Chancery in the State of Delaware, except any action (A) as to which the Court of Chancery in the State of Delaware determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten (10) days following such determination), (B) which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, (C) for which the Court of Chancery does not have subject matter jurisdiction, or (D) any action created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. If an action is brought outside of Delaware, the stockholder bringing the suit will be deemed to have consented to service of process on such stockholder's counsel. Unless Sandbridge consents in writing to the selection of an alternative forum, the federal district courts of the United States shall be the exclusive forum for any action arising under the Securities Act. Although we believe this provision benefits Sandbridge by providing increased consistency in the application of Delaware law in the types of lawsuits to which it applies, a court may determine that this provision is unenforceable, and to the extent it is enforceable, the provision may have the effect of discouraging lawsuits against Sandbridge's directors and officers, although our stockholders will not be deemed to have waived Sandbridge's compliance with federal securities laws and the rules and regulations thereunder.

Unless New Owlet consents in writing to the selection of an alternative forum, (a) the Court of Chancery (the "Chancery Court") of the State of Delaware (or, in the event that the Chancery Court does not have jurisdiction, the federal district court for the District of Delaware or other state courts of the State of Delaware) shall, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative proceeding brought on behalf of New Owlet, (ii) any proceeding asserting a claim of breach of a fiduciary duty owed by any director, officer or stockholder of New Owlet to New Owlet or to New Owlet's stockholders, (iii) any Proceeding arising pursuant to any provision of the DGCL or the Certificate of Incorporation or the bylaws (as either may be amended from time to time) or (iv) any Proceeding asserting a claim against New Owlet governed by the internal affairs doctrine; and (b) subject to the preceding provisions, to the extent permitted by applicable law, the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended. If any action the subject matter of which is within the scope of clause (a) of the immediately preceding sentence is filed in a court other than the courts in the State of Delaware (a "Foreign Action"), such stockholder shall be deemed to have consented to (x) the personal jurisdiction of the state and federal courts in the State of Delaware in connection with any action brought in any such court to enforce the provisions of clause (a) of the immediately preceding sentence and (y) having service of process made upon such stockholder in any such action by service upon such stockholder's counsel in the Foreign Action as agent for such stockholder. If any action the subject matter of which is within the scope of clause (b) of the immediately preceding sentence is filed in a court other than the federal district courts of the United States of America (a "Foreign Securities Act Action") in the name of any stockholder, such stockholder shall be deemed to have consented to (i) the personal jurisdiction of the federal district courts of the United States of America in connection with any action brought in any such court to enforce clause (b) (a "Securities Act Enforcement Action"), and (ii) having service of process made upon such stockholder in any such Securities Act Enforcement Action by service upon such stockholder's counsel in the Foreign Securities Act Action as agent for such stockholder.

222

Exhibit 7
Page 843

TABLE OF CONTENTS

**BENEFICIAL OWNERSHIP OF SECURITIES**

The following table sets forth information regarding (i) the beneficial ownership of Sandbridge common stock as of March 22, 2021 and (ii) the expected beneficial ownership of shares of New Owlet common stock immediately following consummation of the Business Combination (assuming a "no redemption" scenario and assuming a "maximum redemption" scenario as described below) by:

- each person known by Sandbridge to be the beneficial owner of more than 5% of Sandbridge common stock;

- each person who is expected to be the beneficial owner of more than 5% of shares of New Owlet common stock immediately following the Business Combination;

- each of Sandbridge's current executive officers and directors;

- each person who will become an executive officer or a director of New Owlet upon consummation of the Business Combination;

- all of Sandbridge's current executive officers and directors as a group; and

- all of New Owlet's executive officers and directors as a group after the consummation of the Business Combination.

Beneficial ownership is determined according to the rules of the SEC, which generally provide that a person has beneficial ownership of a security if he, she or it possesses sole or shared voting or investment power over that security, including options and warrants that are currently exercisable or exercisable within 60 days.

The beneficial ownership of Sandbridge common stock pre-Business Combination is based on 28,750,000 shares of Sandbridge common stock issued and outstanding as of February 15, 2021, which includes an aggregate of 5,750,000 shares of Sandbridge Class B common stock outstanding as of such date.

The expected beneficial ownership of shares of New Owlet common stock immediately following the consummation of the Business Combination assumes two scenarios:

- a "no redemption" scenario where no shares of Sandbridge common stock are redeemed in connection with the Business Combination; and

- a "maximum redemption" scenario where 7.0 million shares of Sandbridge common stock are redeemed in connection with the Business Combination.

Based on the foregoing assumptions, and including the 13.0 million shares of Sandbridge common stock to be issued in connection with the PIPE Investment, we estimate that there would be 132,216,363 shares of New Owlet common stock issued and outstanding immediately following the consummation of the Business Combination in the "no redemption" scenario, and 125,216,363 shares of New Owlet common stock issued and outstanding immediately following the consummation of the Business Combination in the "maximum redemption" scenario. If the actual facts are different from the foregoing assumptions, ownership figures in the combined company and the columns under Post-Business Combination in the table that follows will be different.

223

Exhibit 7
Page 844

The following table does not reflect beneficial ownership of any shares of New Owlet common stock issuable upon exercise of public warrants, private placement warrants or working capital warrants, if any, as such securities are not exercisable or convertible within 60 days of March 22, 2021.

Unless otherwise indicated, Sandbridge believes that all persons named in the table below have sole voting and investment power with respect to the voting securities beneficially owned by them.

| | Pre-Business Combination and PIPE Investment(2) | | | | | Post-Business Combination and PIPE Investment | | | |
| | Class A Common Stock | | Class B Common Stock | | | Assuming No Redemptions | | Assuming Maximum Redemptions | |
| Name and Address of Beneficial Owner(1) | Number of Shares | % | Number of Shares | % | % of Common Stock | Number of Shares of New Owlet Common Stock | % of New Owlet Common Stock | Number of Shares of New Owlet Common Stock | % of New Owlet Common Stock |
|---|---|---|---|---|---|---|---|---|---|
| *5% Holders* | | | | | | | | | |
| Entities affiliated with Eclipse(3) | — | — | — | — | — | 28,422,341 | 21.8% | 28,422,341 | 23.0% |
| Trilogy Equity Partners, LLC(4) | — | — | — | — | — | 8,981,930 | 6.9% | 8,981,930 | 7.3% |
| Sandbridge Acquisition Holdings LLC(5) | — | — | 5,655,000 | 98.3% | 19.7% | 5,655,000 | 4.4% | 5,655,000 | 4.6% |
| Entities affiliated with Magnetar Financial LLC(6) | 1,790,000 | 7.8% | | — | 6.2% | 1,790,000 | 1.4% | 1,790,000 | 1.5% |
| Aristeia Capital, L.L.C.(7) | 1,585,351 | 6.9% | — | — | 5.5% | 1,585,351 | 1.2% | 1,585,351 | 1.3% |
| BlueCrest Capital Management Limited(8) | 1,500,000 | 6.5% | — | — | 5.2% | 3,500,000 | 2.7% | 3,500,000 | 2.9% |
| *Directors and Executive Officers Pre-Business Combination* | | | | | | | | | |
| Ken Suslow | — | — | — | — | — | — | — | — | — |
| Richard Henry | — | — | — | — | — | — | — | — | — |
| Joe Lamastra | — | — | — | — | — | — | — | — | — |
| Domenico De Sole | — | — | 40,000 | * | * | 40,000 | * | 40,000 | * |
| Ramez Toubassy | — | — | 25,000 | * | * | 25,000 | * | 25,000 | * |
| Jamie Weinstein | — | — | — | — | — | — | — | — | — |
| All Sandbridge directors and executive officers as a group (six individuals) | — | — | 65,000 | 1.1% | * | 65,000 | * | 65,000 | * |
| *Directors and Executive Officers Post-Business Combination* | | | | | | | | | |
| Michael Abbott(9) | — | — | — | — | — | 835,941 | * | 835,941 | * |
| Kate Scolnick | — | — | — | — | — | — | — | — | — |
| Kurt Workman(10) | — | — | — | — | — | 4,171,316 | 3.2% | 4,171,316 | 3.4% |
| Zane Burke | — | — | — | — | — | — | — | — | — |
| Laura Durr | — | — | — | — | — | — | — | — | — |
| Amy McCullough | — | — | — | — | — | — | — | — | — |
| Lior Susan(11) | — | — | — | — | — | 28,422,341 | 22.0% | 28,422,341 | 23.2% |
| Ken Suslow | — | — | — | — | — | — | — | — | — |
| Domenico De Sole | — | — | 40,000 | * | * | 40,000 | * | 40,000 | * |
| All New Owlet directors and executive officers as a group (nine individuals) | — | — | 40,000 | * | * | 33,469,598 | 25.9% | 33,469,598 | 27.3% |

\*   Less than 1%.

(1) Unless otherwise noted, the business address of each of those listed in the table above prior to the Business Combination is c/o Sandbridge Acquisition Corporation 1999 Avenue of the Stars, Suite 2088 Los Angeles, CA 90067 and after the Business Combination is Owlet Baby Care Inc., 2500 Executive Parkway, Suite 500, Lehi, Utah, 84043.

(2) Prior to the Closing, holders of record of shares of Sandbridge Class A common stock and Sandbridge Class B common stock are entitled to one vote for each share held on all matters to be voted on by Sandbridge stockholders and vote together as a single class, except as required by law; provided, that holders of Sandbridge Class B common stock have the right to elect all of Sandbridge's directors prior to the Closing, and holders of Sandbridge's class A common stock are not entitled to vote on the election of directors during such time.

224

Exhibit 7
Page 845

(3)    Consists of (i) 13,542,513 shares of New Owlet common stock that will be held of record by Eclipse Ventures Fund I, L.P. ("Eclipse I") and (i) 14,879,828 shares of New Owlet common stock that will be held of record by Eclipse Continuity Fund I, L.P. ("Eclipse Continuity I") following the Business Combination. The address of each of the entities listed above is 514 High Street, Suite 4, Palo Alto, CA 94301.

(4)    Consists of 8,981,930 shares of New Owlet common stock that will be held of record by Trilogy Equity Partners, LLC following the Business Combination. The address for the foregoing entity is 155 108th Ave NE, Suite 400, Bellevue, WA 98004.

(5)    Sandbridge Acquisition Holdings LLC is the record holder of such shares. Its officers—Ken Suslow, Richard Henry and Joe Lamastra—are the three managers of its board of managers. Any action by the Sponsor with respect to Sandbridge or the founder shares held by the Sponsor, including voting and dispositive decisions, requires a majority vote of the managers of the board of managers. Under the so-called "rule of three," because voting and dispositive decisions are made by a majority of the Sponsor's managers, none of the managers of the Sponsor is deemed to be a beneficial owner of the Sponsor's securities, even those in which such manager holds a pecuniary interest. Accordingly, none of the Sponsor's officers is deemed to have or share beneficial ownership of the founder shares held by the Sponsor.

Of the shares to be held by the Sponsor immediately following the Closing, 2,807,500 shares of New Owlet common stock will be outstanding following the Closing but will remain subject to performance vesting terms.

The address for Sandbridge Acquisition Holdings LLC is 1999 Avenue of the Stars, Suite 2088 Los Angeles, CA 90067.

(6)    Based on a Schedule 13G filed with the SEC on February 12, 2021 filed by Magnetar Financial LLC, Magnetar Capital Partners LP, Supernova Management LLC and Alec N. Litowitz. Magnetar Financial LLC, Magnetar Capital Partners LP, Supernova Management LLC and Alec N. Litowitz. The address for the foregoing entities is 1603 Orrington Avenue, 13th Floor, Evanston, Illinois 60201.

(7)    Based on a Schedule 13G filed with the SEC on February 16, 2021 filed by Aristeia Capital, L.L.C. The address for Aristeia Capital, L.L.C. is One Greenwich Plaza, 3rd Floor, Greenwich, CT 06830.

(8)    Consists of        shares of New Owlet common stock that will be held of record by BlueCrest Capital Management Limited following the Business Combination. The address for the foregoing entity is        .

(9)    Consists of 835,941 shares of New Owlet common stock that would be issuable upon exercise of options exercisable as of or within 60 days of March 22, 2021.

(10)    Consists of 4,142,528 shares of New Owlet common stock that will be held following the Business Combination and 28,788 shares of New Owlet common stock that would be issuable upon exercise of options exercisable as of or within 60 days of March 22, 2021.

(11)    Consists of (i) 13,542,513 shares of New Owlet common stock that will be held of record by Eclipse I and (i) 14,879,828 shares of New Owlet common stock that will be held of record by Eclipse Continuity I following the Business Combination. Eclipse Ventures GP I, LLC, or Eclipse I GP, is the general partner of Eclipse I and may be deemed to have voting and dispositive power over the shares held by Eclipse I. Eclipse Continuity GP I, LLC, or Eclipse Continuity GP, is the general partner of Eclipse Continuity I and may be deemed to have voting and dispositive power over the shares held by Eclipse Continuity I. Lior Susan, who will serve as Chair of the New Owlet Board, is the sole managing member of each of Eclipse I GP and Eclipse Continuity GP and may be deemed to have voting and dispositive power over the shares held by each of Eclipse I and Eclipse Continuity I. The address of each of the individuals and entities listed above is 514 High Street, Suite 4, Palo Alto, California 94301.

225

Exhibit 7
Page 846

**NEW OWLET MANAGEMENT AFTER THE BUSINESS COMBINATION**

*In this section, "we", "our", the "Company" or "New Owlet" generally refers to New Owlet from and after the Business Combination.*

**Board of Directors and Management**

The following is a list of the persons who are anticipated to be New Owlet's directors and executive officers following the Business Combination and their ages as of February 15, 2021 and anticipated positions following the Business Combination.

| Name | Age | Position |
| --- | --- | --- |
| **Executive Officers:** | | |
| Kurt Workman | 31 | Chief Executive Officer and Director |
| Michael Abbott | 59 | President and Director |
| Kate Scolnick | 52 | Chief Financial Officer |
| | | |
| **Non-Employee Directors:** | | |
| Ken Suslow | 50 | Director |
| Domenico De Sole | 77 | Director |
| Zane Burke | 55 | Director |
| Laura Durr | 60 | Director |
| Amy McCullough | 41 | Director |
| Lior Susan | 37 | Director |

*Executive Officers*

***Kurt Workman*** will serve as Chief Executive Officer and a member of the board of directors of New Owlet following the closing of the Business Combination. Mr. Workman co-founded and served as the Chief Executive Officer of Owlet from the company's founding in 2012 until December 2019. During his tenure as Chief Executive Officer of Owlet, Mr. Workman led the company's growth from its inception and was instrumental in overseeing the research and development of several of the company's key product offerings, including the iconic Owlet Smart Sock, Owlet Cam and the Owlet Band. Mr. Workman has also served as a member of Owlet's board of directors since he co-founded the company in 2012, and continues to provide key oversight of Owlet's product portfolio, strategy, and growth opportunities. Mr. Workman studied Chemical Engineering at Brigham Young University. We believe Mr. Workman's intimate knowledge of Owlet and his proven success building and overseeing the Owlet's growth and development make him qualified to serve as a member of our board of directors.

***Michael Abbott*** will serve as President and a member of the board of directors of New Owlet following the closing of the Business Combination. Mr. Abbott has held a variety of leadership roles with Owlet, including as President and a member of the Owlet Board since December 2019. From January 2018 to December 2019, he served as Owlet's Chief Financial Officer and Chief Operating Officer, where he was instrumental in securing financing and setting operational standards to fuel Owlet's growth. Before joining Owlet, from January 2014 to December 2017, Mr. Abbott served as the Chief Financial Officer and Chief Operating Officer of Mission Athletecare, where he was responsible for all financial and operational functions. Prior to his time at Mission, Mr. Abbott served as Chief Operating Officer at Specialized Bicycle Components, a premier cycling manufacturer, and Burton Snowboards. At both companies, he was responsible for all operating units and financial functions. Mr. Abbott received his B.S. in Accounting from Drexel University and his M.B.A. with a concentration in Finance from St. Joseph's University. We believe Mr. Abbott's significant experience launching, cultivating, and growing global brands into industry leaders makes him qualified to serve as a member of our board of directors.

***Kate Scolnick*** will serve as Chief Financial Officer of New Owlet following the closing of the Business Combination. Ms. Scolnick served as the Vice President of Finance at Anaplan, Inc. ("Anaplan") from June 2019 until joining Owlet in March 2021. During her tenure at Anaplan, she oversaw corporate financial planning and analysis, global sales finance and global procurement. Prior to joining Anaplan, Ms. Scolnick served in

226

Exhibit 7
Page 847

various executive roles at Seagate Technology from February 2012 until January 2019, where she was responsible for driving its financial operations and maintaining relationships with banks, auditors and shareholders. From June 2015 until June 2019, she served as a director of the Silicon Valley Chapter of the National Investor Relations Institute and from December 2017 until July 2018, she served as a director of eASIC and a member of its audit committee until it was acquired by Intel Corporation. Ms. Scolnick holds a B.A. in history from Michigan State University and holds a certificate in executive leadership from the Stanford University Executive Program.

### *Non-Employee Directors*

**Ken Suslow** is the Chief Executive Officer and the Chairman of the board of directors of Sandbridge. Mr. Suslow is Founding Managing Partner at Sandbridge Capital, where he chairs the Investment Committee. Mr. Suslow has led Sandbridge Capital's investments since its inception in 2013, including the majority buyout of Thom Browne, in which Sandbridge Capital fully divested its ownership position through a strategic sale to Ermenegildo Zegna Group. Mr. Suslow also led Sandbridge Capital's investments in Rossignol, The RealReal, Farfetch and Youth To The People, among others. Mr. Suslow also serves as Chief Executive Officer and Chairman of the board of directors of Sandbridge X2 Corp. Prior to co-founding Sandbridge Capital, Mr. Suslow was Managing Director at The Strand Partners, the Los Angeles-based family office vehicle for William C. Powers, where Mr. Suslow advised and led investments in privately held consumer companies. Mr. Suslow serves on the boards of Hydrow, Inc., Youth To The People, Peach & Lily, Inc., and ILIA, Inc., is a Board Advisor to Rossignol's apparel division and is the former Chairman of Thom Browne. Mr. Suslow has a B.A. from Pomona College and an M.B.A. from the Stanford Graduate School of Business.

**Domenico De Sole** has agreed to serve as a member of the board of directors of New Owlet. Mr. De Sole is the co-founder of luxury retailer Tom Ford International, LLC and has been the Chairman of its board of directors since its formation in 2005. During this time, Mr. De Sole also advised TPG Capital Advisors, LLC in connection with the repositioning and sale of Bally International AG. From 1984 to 1994, Mr. De Sole served as President and Chief Executive Officer of Gucci America and, from 1994 to 2004, he served as the President and Chief Executive Officer of Gucci Group, a company he helped transform from an almost bankrupt monobrand company into one of the largest and most profitable luxury groups in the world, which included brands such as Bottega Veneta, Yves Saint Laurent, Balenciaga, Stella McCartney, Alexander McQueen and Sergio Rossi. Previously, Mr. De Sole practiced law at the firm Patton, Boggs and Blow. Mr. De Sole has served on numerous public and private company boards of directors, including his current roles as Chairman of Tom Ford International, LLC and a director of Sandbridge X2 Corp. and Pirelli & C. S.p.A. He formerly served as Chairman of Sotheby's, lead independent director of Telecom Italia S.p.A. and a director of Acamar Partners Acquisition Corp., Condé Nast, Bausch & Lomb Incorporated, Delta Airlines, Inc., Gap, Inc., Newell Brands Inc. and Procter & Gamble. Mr. De Sole has been nominated to serve on the board of directors of Acamar Partners Acquisition Corp. II and Brimstone Acquisition Holdings Corp. Mr. De Sole graduated from the University of Rome with a law degree and received an L.L.M. from Harvard Law School where he served as a member of the Dean's Advisory Board.

**Zane Burke** has agreed to serve as a board member of New Owlet. Mr. Burke previously served as the Chief Executive Officer of Livongo Health, Inc. ("Livongo") from February 2019 to November 2020 and as a director from April 2019 to November 2020. Prior to joining Livongo, he served in various executive roles at Cerner Corporation, a provider of health IT solutions, services, devices and hardware, from September 1996 to November 2018, most recently as President from September 2013 to November 2018 and Executive Vice President – Client Organization from July 2011 to September 2013. Mr. Burke holds a B.S. in Accounting and a Masters of Accountancy from Kansas State University. He is a certified public accountant, but no longer keeps an active license. Additionally, Mr. Burke serves on the Board of the Truman Medical Center, the Board of the College of Healthcare Information Management Executives, Kansas State University School of Business Advisory Council and Bardavon Health Innovations. We believe Mr. Burke is qualified to serve as a member of our board of directors due to his background in overseeing public healthcare companies and his significant experience in the healthcare industry.

**Laura Durr** has agreed to serve as a board member of New Owlet. Ms. Durr served as the Executive Vice President and Chief Financial Officer of Polycom, Inc. ("Polycom") from May 2014 until its acquisition by Plantronics, Inc. in July 2018. Prior to becoming Chief Financial Officer, Ms. Durr held various finance leadership roles at Polycom between 2004 and 2014, including Senior Vice President-Worldwide Finance, Chief

227

Exhibit 7
Page 848

Accounting Officer and Worldwide Controller. Prior to joining Polycom, Ms. Durr held executive positions in finance and administration at Lucent Technologies, Inc. and International Network Services Inc. and also spent six years at Price Waterhouse LLP. Ms. Durr also serves on the board of directors of Netgear, Inc. and Xperi Holding Corporation. She was a certified public accountant and holds a B.S. in Accounting from San Jose State University. We believe Ms. Durr is qualified to serve as a member of our board of directors because she can provide valuable operational and strategic experience and insight, given her background in finance and strategy for leading Silicon Valley technology companies.

*Lior Susan* has served as a member of Owlet's board of directors since July 2015. Mr. Susan serves as the founder and Managing Partner of Eclipse Ventures, LLC, a venture capital firm. Mr. Susan currently serves on the boards of Lucira Health, Inc. (LHDX) as well as the following private companies: Bright Machines, Inc., Augury, Inc., Cheetah Technologies, Inc., Metrolink, Inc. and Cybertoka Ltd. Prior to founding Eclipse in 2015, Mr. Susan founded and managed the hardware investment and incubation platform of Flex Ltd., a multinational electronics contract manufacturer, where he gained knowledge and experience of scaling manufacturing operations for medical device companies. Before relocating to the United States from Israel, Mr. Susan was an entrepreneur and former member of a Special Forces unit within the Israel Defense Forces. We believe Mr. Susan is qualified to serve as a member of our board of directors due to his significant experience investing in and working with technology companies, including as a board member.

*Amy McCullough* has served as a member of Owlet's board of directors since April of 2018. Ms. McCullough is the President and Managing Director of Trilogy Equity Partner, LLC ("Trilogy"), an early-stage venture capital firm. Ms. McCullough has been a member of the investment team at Trilogy for the last fourteen 14 years and has served in her current role at the firm for the last six years. She leads the investment team and is a member of Trilogy's board of directors, which sets the strategic direction of the fund. Ms. McCullough currently serves on the board of directors of several private companies, including Skilljar, Inc., Boundless Immigration, Inc., Carbitex, Inc., and Bluejay Labs, Inc. dba Showdigs. She is also a board observer at JetClosing, Inc. Prior to her tenure at Trilogy, Ms. McCullough spent four years as an equity research analyst for JPMorgan Chase, as a member of the team that covered the small and mid-cap applied technologies sector for the firm. Ms. McCullough began her career on the treasury operations team within the portfolio management group at Microsoft Corporation and has experience working in both corporate treasury and financial analysis roles. She is a member of the Board of Trustees of Epiphany School, an independent elementary school in Seattle, and currently serves as the treasurer. Ms. McCullough received her B.A. in Business Administration with a focus in Finance from the University of Washington. We believe Ms. McCullough is qualified to serve as a member of our board of directors due to her significant experience investing in technology companies and her broad leadership experience.

There are no family relationships between or among any of New Owlet's directors or executive officers.

**Corporate Governance**

New Owlet will structure its corporate governance in a manner that Owlet and Sandbridge believe will closely align New Owlet's interests with those of its stockholders following the Business Combination. Notable features of this corporate governance include:

- New Owlet will have independent director representation on its audit committee immediately at the time of the Business Combination, and its independent directors will meet regularly in executive sessions without the presence of its corporate officers or non-independent directors;

- at least one of New Owlet's directors will qualify as an "audit committee financial expert" as defined by the SEC; and

- New Owlet will implement a range of other corporate governance best practices, including placing limits on the number of directorships held by its directors to prevent "overboarding" and implementing a robust director education program.

**Role of Board in Risk Oversight**

The New Owlet Board will have extensive involvement in the oversight of risk management related to New Owlet and its business and will accomplish this oversight through the regular reporting to the New Owlet Board by the audit committee. The audit committee will represent the New Owlet Board by periodically reviewing New Owlet's

228

Exhibit 7
Page 849

accounting, reporting and financial practices, including the integrity of its financial statements, the surveillance of administrative and financial controls and its compliance with legal and regulatory requirements. Through its regular meetings with management, including the finance, legal, internal audit and IT functions, the audit committee will review and discuss all significant areas of New Owlet's business and summarize for the board of directors all areas of risk and the appropriate mitigating factors. In addition, the board of directors will receive periodic detailed operating performance reviews from management.

**Composition of the New Owlet Board of Directors After the Business Combination**

New Owlet's business and affairs will be managed under the direction of its board of directors. Following the Business Combination, the board of directors will remain declassified and the directors will be elected annually.

**Board Committees**

The New Owlet Board will direct the management of its business and affairs, as provided by Delaware law, and will conduct its business through meetings of the board of directors and standing committees. New Owlet will have a standing audit committee, compensation committee and nominating and corporate governance committee, each of which will operate under a written charter.

In addition, from time to time, special committees may be established under the direction of the board of directors when the board deems it necessary or advisable to address specific issues. Following the Business Combination, current copies of New Owlet's committee charters will be posted on its website,            , as required by applicable SEC and the NYSE rules. The information on or available through any of such website is not deemed incorporated in this proxy statement/prospectus and does not form part of this proxy statement/prospectus.

*Audit Committee*

Upon the Closing, New Owlet's audit committee will consist of Laura Durr,          and          , with Laura Durr serving as the chair of the committee. Each of these individuals meets the independence requirements of the Sarbanes-Oxley Act of 2002, as amended, or the Sarbanes-Oxley Act, Rule 10A-3 under the Exchange Act and the applicable listing standards of the NYSE. Each member of New Owlet's audit committee meets the requirements for financial literacy under the applicable NYSE rules. In arriving at this determination, the board has examined each audit committee member's scope of experience and the nature of their prior and/or current employment.

Laura Durr will qualify as an audit committee financial expert within the meaning of SEC regulations and meets the financial sophistication requirements of the NYSE rules. Both New Owlet's independent registered public accounting firm and management periodically will meet privately with New Owlet's audit committee.

The audit committee's responsibilities will include, among other things:

- appointing, compensating, retaining, evaluating, terminating and overseeing New Owlet's independent registered public accounting firm;

- discussing with New Owlet's independent registered public accounting firm their independence from management;

- reviewing with New Owlet's independent registered public accounting firm the scope and results of their audit;

- pre-approving all audit and permissible non-audit services to be performed by New Owlet's independent registered public accounting firm;

- overseeing the financial reporting process and discussing with management and New Owlet's independent registered public accounting firm the interim and annual financial statements that New Owlet files with the SEC;

- reviewing and monitoring New Owlet's accounting principles, accounting policies, financial and accounting controls and compliance with legal and regulatory requirements; and

229

Exhibit 7
Page 850

- establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls or auditing matters.

*Compensation Committee*

Upon the Closing, New Owlet's compensation committee will consist of          and          , with          serving as the chair of the committee.          and          are non-employee directors, as defined in Rule 16b-3 promulgated under the Exchange Act.          and          are "independent" as defined under the applicable NYSE listing standards, including the standards specific to members of a compensation committee. The compensation committee's responsibilities include, among other things:

- reviewing and approving corporate goals and objectives relevant to the compensation of New Owlet's Chief Executive Officer, evaluating the performance of New Owlet's Chief Executive Officer in light of these goals and objectives and setting or making recommendations to the Board regarding the compensation of New Owlet's Chief Executive Officer;

- reviewing and setting or making recommendations to the New Owlet Board regarding the compensation of New Owlet's other executive officers;

- making recommendations to the New Owlet Board regarding the compensation of New Owlet's directors;

- reviewing and approving or making recommendations to the New Owlet Board regarding New Owlet's incentive compensation and equity-based plans and arrangements; and

- appointing and overseeing any compensation consultants. We believe that the composition and functioning of New Owlet's compensation committee meets the requirements for independence under the current NYSE listing standards.

*Nominating and Corporate Governance Committee*

Upon the Closing, New Owlet's nominating and corporate governance committee will consist of          and          .

The nominating and corporate governance committee's responsibilities include, among other things:

- identifying individuals qualified to become members of the New Owlet Board, consistent with criteria approved by the New Owlet Board;

- recommending to the New Owlet Board the nominees for election to the New Owlet Board at annual meetings of New Owlet's stockholders;

- overseeing an evaluation of the New Owlet Board and its committees; and

- developing and recommending to the New Owlet Board a set of corporate governance guidelines. We believe that the composition and functioning of New Owlet's nominating and corporate governance committee meets the requirements for independence under the current NYSE listing standards.

The New Owlet Board may from time to time establish other committees.

**Code of Business Conduct and Ethics**

New Owlet will adopt a new code of business conduct that applies to all of its directors, officers and employees, including its principal executive officer, principal financial officer and principal accounting officer, which will be available on New Owlet's website upon the completion of the Business Combination. New Owlet's code of business conduct is a "code of ethics," as defined in Item 406(b) of Regulation S-K. Please note that New Owlet's Internet website address is provided as an inactive textual reference only. New Owlet will make any legally required disclosures regarding amendments to, or waivers of, provisions of its code of ethics on its Internet website.

**Compensation Committee Interlocks and Insider Participation**

No member of the Sandbridge compensation committee was at any time during fiscal year 2020, or at any other time, one of Sandbridge's officers or employees. None of Sandbridge's executive officers has served as a

230

Exhibit 7
Page 851

director or member of a compensation committee (or other committee serving an equivalent function) of any entity, one of whose executive officers served as a director of the Sandbridge Board or member of Sandbridge's compensation committee.

**Independence of the Board of Directors**

NYSE rules generally require that independent directors must comprise a majority of a listed company's board of directors. Based upon information requested from and provided by each proposed director concerning his or her background, employment and affiliations, including family relationships, we anticipate that Zane Burke, Domenico De Sole, Laura Durr, Amy McCullough, Lior Susan and Ken Suslow, representing        of New Owlet's        proposed directors, will be "independent" as that term is defined under the applicable rules and regulations of the SEC and the listing requirements and rules of the NYSE.

231

Exhibit 7
Page 852

**EXECUTIVE AND DIRECTOR COMPENSATION OF OWLET**

*Unless the context requires otherwise, references to "Owlet," "we," "us," "our" and the "company" in this section are to the business and operations of Owlet prior to the Business Combination and the business and operations of New Owlet as directly or indirectly affected by Owlet by virtue of New Owlet's ownership of the business of Owlet following the Business Combination.*

This section discusses the material components of the executive compensation program for our 2020 named executive officers. Our sole named executive officer for fiscal year 2020 is Michael Abbott, our President. In January 2021, Kurt Workman commenced services with us as our Chief Executive Officer. In March 2021, Kate Scolnick commenced services with us as our Chief Financial Officer.

This discussion may contain forward-looking statements that are based on our current plans, considerations, expectations and determinations regarding future compensation programs. Actual compensation programs that we adopt following the Closing may differ materially from the currently planned programs summarized in this discussion. As an "emerging growth company" as defined in the JOBS Act, we are not required to include a Compensation Discussion and Analysis section and have elected to comply with the scaled disclosure requirements applicable to emerging growth companies.

**2020 Summary Compensation Table**

The following table sets forth information concerning the compensation of our named executive officers for the year ended December 31, 2020.

| Name and Principal Position | Year | Salary ($) | Bonus ($)[1] | Option Awards ($)[2] | Non-Equity Incentive Plan Compensation ($)[3] | All Other Compensation ($)[4] | Total ($) |
|---|---|---|---|---|---|---|---|
| Michael Abbott *President* | 2020 | 417,692 | 670 | 59,641 | 209,426 | 92,415 | 779,844 |

(1)  Amount shown reflects a discretionary holiday bonus for fiscal year 2020.

(2)  Amounts reported represent the aggregate grant date fair value of stock options granted to our named executive officer during 2020 computed in accordance with FASB ASC Topic 718, disregarding the effect of estimated forfeitures. Assumptions used in the calculation of this amount are included in Note 1 to our audited consolidated financial statements included in this proxy statement/prospectus.

(3)  Amount shown reflects a discretionary performance bonus earned for fiscal year 2020. For a further description of these payments, see "*Narrative to 2020 Summary Compensation Table—Performance Bonuses*" below.

(4)  Amount reported represents a matching contribution of $13,500 under our 401(k) plan, the payment of $27,952 for the lease of an apartment and related expenses, the payment of $18,802 in commuting expenses and the payment of $32,161 to gross up taxes incurred in connection with the payment by the company of the apartment lease and related expenses and commuting expenses.

**Narrative to the Summary Compensation Table**

***2020 Annual Base Salary***

We pay our executives, including Mr. Abbott, a base salary to compensate them for services rendered to our company. The base salary payable to our executives is intended to provide a fixed component of compensation reflecting the executive's skill set, experience, role and responsibilities. As of December 31, 2020, Mr. Abbott's base salary was $450,000. The salary listed for Mr. Abbott in the Salary column of the Summary Compensation Table above reflects the salary actually paid to him during 2020.

***Performance Bonuses***

We maintain a performance-based bonus program in which Mr. Abbott participates. For 2020, Mr. Abbott was eligible to receive a bonus originally targeted at 40%, and later increased to 50%, of the base salary paid to him during 2020 based on the achievement of certain performance goals based on quarterly revenue targets, as established by our board of directors. In January 2021, based on its assessment that Mr. Abbott had achieved his performance goals for 2020, our board of directors approved paying Mr. Abbott's discretionary performance bonus at target, which, based on the base salary paid to Mr. Abbott during 2020, was $209,426.

232

Exhibit 7
Page 853

*Equity Compensation*

We have granted stock options to our employees, including Mr. Abbott, in order to attract and retain them, as well as to align their interests with the interests of our stockholders. In order to provide a long-term incentive, these stock options generally vest over four years subject to continued service.

In March 2020, we granted Mr. Abbott an option to purchase 50,000 shares of Owlet common stock for an exercise per share of $1.59, which was the fair market value of Owlet's common stock on the date of grant, as determined by our board of directors. The option vests as to 1/48th of the original number of underlying shares on each monthly anniversary of December 1, 2019, subject to continued service through the applicable vesting date.

In connection with the Business Combination, and subject to approval by Sandbridge's stockholders, we will adopt the 2021 Plan in order to facilitate the grant of cash and equity incentives to directors, employees (including Mr. Abbott) and consultants of our company and certain of its affiliates and to enable us to obtain and retain services of these individuals, which is essential to our long-term success. The 2021 Plan will be effective at the Closing. For additional information about the 2021 Plan, please see "*Equity Incentive Plans*" below.

## Other Elements of Compensation

*Retirement Savings and Health and Welfare Benefits*

We maintain a 401(k) retirement savings plan for our employees, including Mr. Abbott, who satisfy certain eligibility requirements. Mr. Abbot is eligible to participate in the 401(k) plan on the same terms as other full-time employees. We match 50% of the first 6% of a participant's annual eligible compensation, up to the IRS limit. We believe that providing a vehicle for tax-deferred retirement savings though our 401(k) plan adds to the overall desirability of our executive compensation package and further incentivizes our employees, including our named executive officers, in accordance with our compensation policies.

All of our full-time employees, including Mr. Abbott, are eligible to participate in our health and welfare plans. These health and welfare plans include medical, dental and vision benefits; short-term and long-term disability insurance; and supplemental life and AD&D insurance.

*Perquisites and Other Personal Benefits*

We determine perquisites on a case-by-case basis and will provide a perquisite to a named executive officer when we believe it is necessary to attract or retain the named executive officer. In 2020, we provided Mr. Abbott $46,754 in commuting and housing expenses related to his travel to our company offices in Utah.

## Outstanding Equity Awards at Fiscal Year-End

The following table summarizes the number of shares of Owlet common stock underlying outstanding option awards for our named executive officer as of December 31, 2020.

| | | Option awards | | | |
|---|---|---|---|---|---|
| Name | Vesting commencement date | Number of securities underlying unexercised options (#) exercisable | Number of securities underlying unexercised options (#) unexercisable | Option exercise price ($) | Option expiration date |
| Michael Abbott | 12/1/2019(1) | 12,500 | 37,500 | 1.59 | 03/22/2030 |
| | 02/26/2018(2) | 347,208 | 142,698 | 0.61 | 03/18/2028 |

(1) Represents an option to purchase 50,000 shares of our common stock, granted March 23, 2020, pursuant to which 1/48th of the shares subject to the option vest on each one-month anniversary of the vesting commencement date, subject to continued service with us through the applicable vesting date. If Mr. Abbott's employment with us is terminated without cause, 100% of the shares subject to the option will vest and become exercisable on the date of termination.

(2) Represents an option to purchase 490,176 shares of our common stock, granted March 19, 2018, pursuant to which 1/4th of the shares subject to the option vest on the first anniversary of the vesting commencement date, and 1/48th of the shares subject to the option vest monthly thereafter, subject to continued service with us through the applicable vesting date. If Mr. Abbott's employment with us is terminated without cause, 100% of the shares subject to the option will vest and become exercisable on the date of termination.

233

Exhibit 7
Page 854

TABLE OF CONTENTS

**Executive Compensation Arrangements**

*Employment and Offer Letter Agreements*

We previously entered into an employment offer letter agreement with Mr. Abbott that sets forth the terms and conditions of his employment, including initial base salary, target bonus opportunity, equity grants and employee benefits eligibility. We subsequently entered into an employment change offer letter with Mr. Abbott in December 2019 that amended the terms of Mr. Abbott's employment.

Mr. Abbott's employment change offer letter provides that in the event his employment with us is terminated by us without cause, Mr. Abbott is entitled to a severance payment of one year of severance equal to $410,000. In addition, if Mr. Abbott's employment with us is terminated without cause, 100% of the shares subject to Mr. Abbott's options will vest and become exercisable on the date of termination. In addition, Mr. Abbott was granted 240,711 additional options which vest monthly in equal amounts over 48 months from December 1, 2020.

In January 2021, we entered into an employment change offer letter that modified certain terms of Mr. Abbott's employment. Under the January 2021 employment change offer letter, Mr. Abbott is entitled to a bonus of $125,000 to be paid on the earlier of February 16, 2021 or the date of the initial filing of this prospectus and an additional bonus of $125,000 to be paid on the earlier of April 27, 2021 or the date of the Closing.

**Director Compensation**

Owlet has not historically maintained a formal non-employee director compensation program and none of Owlet's non-employee directors received any compensation from Owlet during 2020. As of December 31, 2020, Mr. Scal held an option to purchase 337,326 shares of Owlet common stock. None of Owlet's other non-employee directors held any option or stock awards.

Mr. Abbott did not receive additional compensation for his service as a director, and the compensation provided to him as an employee is set forth in the Summary Compensation Table above.

We intend to approve and implement a compensation program for our non-employee directors, or the Non-Employee Director Compensation Program, to be effective in connection with the consummation of the Business Combination.

234

Exhibit 7
Page 855

**CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**

**Sandbridge Related Party Transactions**

*Relationship with Sponsor*

Prior to the consummation of the initial public offering, on June 26, 2020, the Sponsor purchased 5,750,000 shares of Sandbridge Class B common stock for an aggregate purchase price of $25,000, or approximately $0.004 per share. In August 2020, the Sponsor transferred 40,000 founder shares to Mr. De Sole, 25,000 founder shares to Mr. Toubassy, Sandbridge's director nominees, and 30,000 founder shares to Mr. Hilfiger and in October 2020, transferred 40,000 founder shares to Mr. Goss, resulting in the Sponsor holding 5,615,000 founder shares, there being an aggregate of 5,750,000 founder shares outstanding.

Our Sponsor purchased an aggregate of 6,600,000 private placement warrants in connection with Sandbridge's initial public offering, at a price of $1.00 per warrant, generating gross proceeds, before expenses, of approximately $6,600,000. Each private placement warrant entitles the holder to purchase one share of Class A common stock at $11.50 per share. The private placement warrants (including the Class A common stock issuable upon exercise of the private placement warrants) may not, subject to certain limited exceptions, be transferred, assigned or sold until 30 days after the completion of the Business Combination.

Sandbridge's executive offices are located at 1999 Avenue of the Stars, Suite 2088, Los Angeles, CA 90067, which office space is leased by an affiliate of the Sponsor. Commencing upon consummation of its initial public offering, Sandbridge reimburses the affiliate of the Sponsor $10,000 per month for office space, utilities, administrative and support services. Upon completion of Sandbridge's initial business combination or liquidation, it will cease paying these monthly fees.

Sandbridge's Sponsor, officers and directors, or any of its or their respective affiliates, will be reimbursed for any out-of-pocket expenses incurred in connection with activities undertaken on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. Sandbridge's audit committee reviews on a quarterly basis all payments that were made to our Sponsor, officers and directors or any of its or their affiliates and determines which expenses and the amount of expenses that will be reimbursed.

*PIPE Financing*

In connection with the execution of the Business Combination Agreement, Sandbridge entered into the Subscription Agreements with the PIPE Investors, pursuant to which, among other things, Sandbridge agreed to issue and sell in private placements an aggregate of 13,000,000 shares of Sandbridge Class A common stock to the PIPE Investors for $10.00 per share immediately prior to the Closing.

**Owlet Related Party Transactions**

*Except where noted or the context otherwise requires, as used in this subsection, the terms "we," "us," "our," "our company" and "our business" refer to Owlet and its subsidiary prior to the consummation of the Business Combination, and New Owlet and its consolidated subsidiaries following the consummation of the Business Combination.*

*Owlet Series B Preferred Stock and Owlet Series B-1 Preferred Stock Financing*

From April 2018 through June 2018, Owlet issued and sold an aggregate of (i) 6,022,954 shares of Owlet Series B convertible preferred stock at a purchase price of $3.1546 per share for aggregate consideration of approximately $19.0 million and (ii) 1,484,117 shares of Owlet Series B-1 convertible preferred stock pursuant to conversion of approximately $3.7 million outstanding balance of simple agreements for future equity ("Safe") that had previously been issued in 2017.

235

Exhibit 7
Page 856

The participants in this preferred stock financing included certain holders that are expected to hold more than 5% of New Owlet common stock following the consummation of the Business Combination. The following table sets forth the aggregate number of shares of Owlet Series B preferred stock and Owlet Series B-1 preferred stock issued to these related parties in these transactions:

| 5% Stockholder | Owlet Series B preferred stock (#) | Total Purchase Price ($) | Owlet Series B-1 preferred stock (#) | Conversion of Outstanding Balance of Safe ($) |
|---|---|---|---|---|
| Eclipse Continuity Fund I, L.P.[1] | 1,341,715 | 4,232,574.14 | 594,370 | 1,500,000.00 |
| Trilogy Equity Partners, LLC[2] | 1,426,489 | 4,500,002.20 | 198,123 | 500,000.00 |

(1)   Entities affiliated with Eclipse are expected to hold more than 5% of New Owlet common stock.

(2)   Trilogy Equity Partners, LLC is expected to hold more than 5% of New Owlet common stock.

In June 2018, to facilitate an additional investment in the Owlet Series B convertible preferred stock and Owlet Series B-1 convertible preferred stock financing and simultaneously protect other stockholders from further dilution, Kurt Workman, who is expected to be an executive officer of New Owlet following the consummation of the Business Combination, entered into a secured promissory note with Owlet for the aggregate principal amount of $291,174.00. Mr. Workman concurrently entered into a stock pledge agreement in which he pledged 223,980 shares of Owlet common stock as collateral for the secured promissory note. Mr. Workman also entered into a call option agreement, which granted Owlet the right to repurchase such shares of Owlet common stock at a purchase price of $1.30 per share.

In June 2019, the Owlet Board approved (i) the repurchase of Mr. Workman's shares of Owlet common stock pledged as collateral and (ii) a bonus payment for Mr. Workman in the aggregate amount of $415,393.31, which represented the difference between the Owlet Series B convertible preferred stock purchase price of $3.1546 per share and the 409A valuation of Owlet common stock. Mr. Workman paid $4,741.43 in interest upon full settlement of the secured promissory note.

*Investors' Rights Agreement*

Owlet is party to the Amended and Restated Investors' Rights Agreement, dated as of April 20, 2018, which provides, among other things, that certain holders of its capital stock, including (i) entities affiliated with Eclipse and (ii) Trilogy, each of which are expected to hold more than 5% of New Owlet common stock following the consummation of the Business Combination, have the right to demand that Owlet file a registration statement or request that their shares of Owlet capital stock be covered by a registration statement that Owlet is otherwise filing. Lior Susan and Amy McCullough, each of whom are directors of Owlet and will be directors of New Owlet following the consummation of the Business Combination, are affiliated with Eclipse and Trilogy, respectively. This agreement will terminate in connection with the consummation of the Business Combination.

*Right of First Refusal*

Pursuant to certain of Owlet's equity compensation plans and certain agreements with its stockholders, including the Amended and Restated Right of First Refusal and Co-sale Agreement, dated as April 20, 2018 (the "ROFR Agreement"), Owlet or its assignees have the right to purchase shares of Owlet capital stock which stockholders propose to sell to other parties. Certain holders of Owlet capital stock, including (i) entities affiliated with Eclipse and (ii) Trilogy, each of which are expected to hold more than 5% of New Owlet common stock following the consummation of the Business Combination, have rights of first refusal and co-sale under the ROFR Agreement. Lior Susan and Amy McCullough, each of whom are directors of Owlet and will be directors of New Owlet following the consummation of the Business Combination, are affiliated with Eclipse and Trilogy, respectively. This agreement will terminate in connection with the consummation of the Business Combination.

*Voting Agreement*

Owlet is a party to the Amended and Restated Voting Agreement, dated as of April 20, 2018, pursuant to which certain holders of its capital stock, including (i) entities affiliated with Eclipse and (ii) Trilogy, each of which are expected to hold more than 5% of New Owlet common stock following the consummation of the Business Combination, agreed to vote their shares of Owlet capital stock on certain matters, including with

236

Exhibit 7
Page 857

respect to the election of directors. Lior Susan and Amy McCullough, each of whom are directors of Owlet and will be directors of New Owlet following the consummation of the Business Combination, are affiliated with Eclipse and Trilogy, respectively. This agreement will terminate in connection with the consummation of the Business Combination.

*Convertible Promissory Notes*

In April 2019, Owlet issued Subordinated Convertible Promissory Note to certain investors, including $3.0 million in aggregate principal amount to Eclipse Continuity Fund I, L.P. and $1.1 million in aggregate principal amount to Trilogy Equity Partners, LLC. The convertible promissory notes accrue interest at a rate of 5.0% per annum and none of the principal or accrued interest has been repaid to date. Unless repaid in advance of the Closing, all principal and accrued interest on the convertible promissory notes will automatically convert into shares of Owlet's convertible preferred stock immediately prior to the consummation of the Business Combination and in turn convert into shares of New Owlet common stock as part of the Business Combination or, at a holder's election, trigger the repayment of the outstanding principal and accrued interest at the consummation of the Business Combination.

*Indemnification under Proposed Charter and New Owlet Bylaws; Indemnification Agreements*

The New Owlet Bylaws, as will be in effect following the consummation of the Business Combination pending stockholder approval at the Special Meeting, provide that we will indemnify our directors and officers to the fullest extent permitted by the DGCL, subject to certain exceptions contained in the New Owlet Bylaws. In addition, the Proposed Charter, as will be in following the consummation of the Business Combination pending stockholder approval at the Special Meeting, will provide that our directors will not be liable for monetary damages for breach of fiduciary duty.

We also intend to enter into indemnification agreements with each of our executive officers and directors. The indemnification agreements will provide the indemnitees with contractual rights to indemnification, and expense advancement and reimbursement, to the fullest extent permitted under the DGCL, subject to certain exceptions contained in those agreements. For additional information, see "*Description of New Owlet Securities—Limitations on Liability and Indemnification of Officers and Directors*."

*New Owlet Policies for Related Party Transactions*

Upon consummation of the Business Combination, New Owlet will adopt a written related persons transaction policy that sets forth the policies and procedures for the review and approval or ratification of related person transactions. Under such policy:

- any related person transaction, and any material amendment or modification to a related person transaction, must be reviewed and approved or ratified by a committee of the board of directors composed solely of independent directors who are disinterested or by the disinterested members of the board of directors; and

- any employment relationship or transaction involving an executive officer and any related compensation must be approved by the compensation committee of the board of directors or recommended by the compensation committee to the board of directors for its approval.

In connection with the review and approval or ratification of a related person transaction:

- management must disclose to the committee or disinterested directors, as applicable, the name of the related person and the basis on which the person is a related person, the material terms of the related person transaction, including the approximate dollar value of the amount involved in the transaction, and all the material facts as to the related person's direct or indirect interest in, or relationship to, the related person transaction;

- management must advise the committee or disinterested directors, as applicable, as to whether the related person transaction complies with the terms of our agreements governing our material outstanding indebtedness that limit or restrict our ability to enter into a related person transaction;

237

Exhibit 7
Page 858

- management must advise the committee or disinterested directors, as applicable, as to whether the related person transaction will be required to be disclosed in our applicable filings under the Securities Act or the Exchange Act, and related rules, and, to the extent required to be disclosed, management must ensure that the related person transaction is disclosed in accordance with such Acts and related rules; and

- management must advise the committee or disinterested directors, as applicable, as to whether the related person transaction constitutes a "personal loan" for purposes of Section 402 of the Sarbanes-Oxley Act.

In addition, the related person transaction policy will provide that the committee or disinterested directors, as applicable, in connection with any approval or ratification of a related person transaction involving a non-employee director or director nominee, should consider whether such transaction would compromise the director or director nominee's status as an "independent" or "non-employee" director, as applicable, under the rules and regulations of the SEC and NYSE.

A "Related Person Transaction" is a transaction, arrangement or relationship in which New Owlet or its subsidiary was, is or will be a participant, the amount of which involved exceeds $120,000, and in which any related person had, has or will have a direct or indirect material interest. A "Related Person" means:

- any person who is, or at any time during the applicable period was, one of New Owlet's officers or one of New Owlet's directors;

- any person who is known by New Owlet to be the beneficial owner of more than five percent (5%) of its voting stock;

- any immediate family member of any of the foregoing persons, which means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, daughter-in-law, brother-in-law or sister-in-law of a director, officer or a beneficial owner of more than five percent (5%) of its voting stock, and any person (other than a tenant or employee) sharing the household of such director, officer or beneficial owner of more than five percent (5%) of its voting stock; and

- any firm, corporation or other entity in which any of the foregoing persons is a partner or principal or in a similar position or in which such person has a ten percent (10%) or greater beneficial ownership interest.

238

Exhibit 7
Page 859

## LEGAL MATTERS

Ropes & Gray LLP will pass upon the validity of the New Owlet common stock issued in connection with the Business Combination and certain other legal matters related to this proxy statement/prospectus.

## EXPERTS

The financial statements of Sandbridge Acquisition Corporation as of December 31, 2020, and for the period from June 23, 2020 (inception) through December 31, 2020, included in this proxy statement/prospectus have been audited by WithumSmith+Brown, PC, independent registered public accounting firm, as set forth in their report thereon, appearing elsewhere herein, and are included in reliance upon such report given on the authority of such firm as experts in accounting and auditing.

The financial statements of Owlet Baby Care Inc. as of December 31, 2020 and December 31, 2019 and for the years then ended included in this proxy statement/prospectus of Sandbridge Acquisition Corporation have been so included in reliance on the report (which contains an explanatory paragraph relating to Owlet Baby Care Inc.'s ability to continue as a going concern as described in Note 1 to the financial statements) of PricewaterhouseCoopers LLP, an independent registered public accounting firm, given on the authority of said firm as experts in auditing and accounting.

## CHANGE IN INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

On November 19, 2020, the board of directors of Owlet dismissed Tanner LLC ("Tanner") as Owlet's independent auditors.

For the years ended December 31, 2019 and 2018, no report by Tanner on Owlet's financial statements contained an adverse opinion or a disclaimer of opinion, or was qualified or modified as to uncertainty, audit scope or accounting principles. Subsequent to Tanner's dismissal, management identified misstatements related to the financial statements for the years ended December 31, 2019 and 2018. As a result, Owlet restated the December 31, 2019 and 2018 financial statements and Tanner audited the corrections made by management to those financial statements. See "*Risk Factors – Risks Related to Becoming a Public Company*," for details regarding material weaknesses identified.

During the fiscal years ended December 31, 2019 and 2018, and the subsequent interim period through November 19, 2020, there were (i) no "disagreements," as such term is defined in Item 304(a)(1)(iv) of Regulation S-K, with Tanner on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedures, which disagreements, if not resolved to the satisfaction of Tanner, would have caused them to make reference to the subject matter of the disagreements in their audit reports, and (ii) no "reportable events," as such term is defined in Item 304(a)(1)(v) of Regulation S-K.

We have provided Tanner with a copy of these disclosures and requested that Tanner furnish us with a letter addressed to the SEC stating whether or not Tanner agrees with the statements made herein and, if not, stating the respects in which it does not agree. A copy of the letter, dated February 15, 2021, furnished by Tanner in response to that request, is filed as Exhibit 16.1 to the registration statement of which this proxy statement/prospectus is a part.

On December 14, 2020, Owlet engaged PricewaterhouseCoopers LLP ("PwC") to serve as its independent registered public accounting firm. Following its engagement, PwC reaudited Owlet's restated financial statements for the year ended December 31, 2019.

During the fiscal years ended December 31, 2019 and 2018, and through December, 14, 2020, neither Owlet nor anyone acting on its behalf consulted with PwC regarding either: (i) the application of accounting principles to a specified transaction, either completed or proposed; or the type of audit opinion that might be rendered on its financial statements, and neither a written report nor oral advice was provided to Owlet that PwC concluded was an important factor considered by Owlet in reaching a decision as to the accounting, auditing or financial reporting issue; or (ii) any matter that was either the subject of a disagreement or a reportable event.

## DELIVERY OF DOCUMENTS TO STOCKHOLDERS

Pursuant to the rules of the SEC, Sandbridge and the service provider(s) that it employs to deliver communications to its stockholders are permitted to deliver to two or more stockholders sharing the same address a single copy of the proxy statement/prospectus. Upon written or oral request, Sandbridge will deliver a separate

239

Exhibit 7
Page 860

TABLE OF CONTENTS

copy of the proxy statement/prospectus to any stockholder at a shared address to which a single copy of the proxy statement/prospectus was delivered and who wishes to receive separate copies in the future. Stockholders receiving multiple copies of the proxy statement/prospectus may likewise request that Sandbridge deliver single copies of the proxy statement/prospectus in the future. Stockholders may notify Sandbridge of their requests by calling or writing Sandbridge at its principal executive offices at 1999 Avenue of the Stars, Suite 2088, Los Angeles, CA 90067.

240

Exhibit 7
Page 861

TABLE OF CONTENTS

## CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following is a discussion of certain material U.S. federal income tax considerations of the Merger applicable to U.S. holders and Non-U.S. holders (each as defined below, and together, "holders") of shares of Sandbridge Class A common stock (i) that hold New Owlet common stock following the adoption of the Proposed Charter in connection with the Merger or (ii) that elect to have their Sandbridge Class A common stock redeemed for cash if the Merger is completed. This discussion applies only to Sandbridge Class A common stock or New Owlet common stock, as applicable, that is held as a "capital asset" for U.S. federal income tax purposes (generally, property held for investment). This discussion is limited to U.S. federal income tax considerations and does not address any estate, gift tax or other federal tax considerations or considerations arising under the tax laws of any state, local or non-U.S. jurisdiction. This discussion does not describe all of the U.S. federal income tax consequences that may be relevant to you in light of your particular circumstances, including the alternative minimum tax, the Medicare tax on certain investment income, the rules regarding "qualified small business stock" within the meaning of Section 1202 of the Code or "Section 1244 stock" within the meaning of Section 1244 of the Code, and the different consequences that may apply if you are subject to special rules under U.S. federal income tax law that apply to certain types of investors, such as:

- financial institutions or financial services entities;

- broker-dealers;

- insurance companies;

- pension plans;

- dealers or traders subject to a mark-to-market method of accounting with respect to shares of Sandbridge Class A common stock or New Owlet common stock;

- persons holding Sandbridge Class A common stock or New Owlet common stock, as part of a "straddle," hedge, integrated transaction or similar transaction;

- holders (as defined below) whose functional currency is not the U.S. dollar;

- "specified foreign corporations" (including "controlled foreign corporations"), "passive foreign investment companies" and corporations that accumulate earnings to avoid U.S. federal income tax;

- U.S. expatriates or former long-term residents of the United States;

- governments or agencies or instrumentalities thereof;

- regulated investment companies or real estate investment trusts;

- persons that directly, indirectly or constructively own five percent or more (by vote or value) of Sandbridge Class A common stock or New Owlet common stock;

- persons who acquired their shares of Sandbridge Class A common stock or New Owlet common stock pursuant to the exercise of warrants or conversion rights under such convertible instruments;

- persons who acquired their shares of Sandbridge Class A common stock or New Owlet common stock pursuant to an exercise of employee share options, in connection with employee share incentive plans or otherwise as compensation;

- pass-through entities, including (but not limited to) partnerships or limited liability companies treated as partnerships for U.S. federal income tax purposes (including an entity or arrangement treated as a partnership for U.S. federal income tax purposes);

- tax-qualified retirement plans;

- "qualified foreign pension funds" as defined in Section 897(l)(2) of the Code and entities all of the interests of which are held by qualified foreign pension funds; and

- tax-exempt entities.

If a partnership (including an entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds shares of Sandbridge Class A common stock or New Owlet common stock, the U.S. federal income tax treatment of the partners in the partnership will generally depend on the status of the partners and the

241

Exhibit 7
Page 862

TABLE OF CONTENTS

activities of the partnership. Partnerships and their partners should consult their tax advisors with respect to the consequences to them of holding shares of the New Owlet common stock following the adoption of the Proposed Charter in connection with the Merger or electing to have their Sandbridge Class A common stock redeemed for cash if the Merger is completed.

This discussion is based on the Code and administrative pronouncements, judicial decisions and final, temporary and proposed Treasury regulations as of the date hereof, which are subject to change, possibly on a retroactive basis, and changes to any of which subsequent to the date of this proxy statement/prospectus may affect the tax consequences described herein. This discussion does not address any aspect of state, local or non-U.S. taxation, or any U.S. federal taxes other than income taxes (such as gift and estate taxes).

We have not sought, and do not expect to seek, a ruling from the U.S. Internal Revenue Service (the "IRS") as to any U.S. federal income tax consequence described herein. The IRS may disagree with the discussion herein, and its determination may be upheld by a court. Moreover, there can be no assurance that future legislation, regulations, administrative rulings or court decisions will not adversely affect the accuracy of the statements in this discussion.

For purposes of this discussion, a "U.S. holder" is a beneficial owner of Sandbridge Class A common stock or New Owlet common stock, as applicable, who or that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation) organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if (i) a court within the United States is able to exercise primary supervision over the administration of such trust, and one or more such U.S. persons have the authority to control all substantial decisions of such trust or (ii) it has a valid election in effect under Treasury regulations to be treated as a United States person.

A "Non-U.S. Holder" means any beneficial owner of Sandbridge Class A common stock or New Owlet common stock, as applicable, that is an individual, corporation, estate or trust that is not a U.S. holder.

**You are urged to consult your tax advisor with respect to the application of U.S. federal tax laws to your particular situation, as well as any tax consequences arising under the laws of any state, local or non-U.S. jurisdiction.**

**Adoption of the Proposed Charter**

Holders of Sandbridge Class A common stock are not expected to recognize any income, gain or loss under U.S. federal income tax laws as a result of the adoption of the Proposed Charter in connection with the Business Combination. It is expected that each such holder would have the same basis in its New Owlet common stock after the adoption of the Proposed Charter as that holder has in the corresponding Sandbridge Class A common stock immediately prior to the adoption of the Proposed Charter and such holder's holding period in the New Owlet common stock would include the holder's holding period in the corresponding Sandbridge Class A common stock. Although the matter is not entirely clear, these consequences to the holders assume, and we intend to take the position, that the adoption of the Proposed Charter does not result in an exchange by the holders of Sandbridge Class A common stock for New Owlet common stock for U.S. federal income tax purposes. If contrary to this characterization, the adoption of the Proposed Charter does result in an exchange, it is expected that such exchange would be treated as a recapitalization for U.S. federal income tax purposes. The consequences to holders of a recapitalization could be different than those discussed above. Each holder should consult its own tax advisor regarding the U.S. federal income tax consequences to it of the adoption of the Proposed Charter in connection with the Business Combination.

The remainder of this discussion assumes that the adoption of the Proposed Charter will not result in an exchange for U.S. federal income tax purposes.

**Redemption of Sandbridge Class A Common Stock**

In the event that a holder's shares of Sandbridge Class A common stock are redeemed pursuant to the redemption provisions described in this proxy statement/prospectus under the section titled "*The Special Meeting*

242

Exhibit 7
Page 863

TABLE OF CONTENTS

*– Redemption Rights,*" the treatment of the transaction for U.S. federal income tax purposes will depend on whether the redemption qualifies as a sale or other exchange of shares of Sandbridge Class A common stock under Section 302 of the Code. If the redemption qualifies as a sale of shares of Sandbridge Class A common stock, a U.S. holder (as defined above) will be treated as described below under the section titled "- *U.S. Holders – Taxation of Redemption Treated as a Sale of Sandbridge Class A Common Stock,*" and a Non-U.S. holder will be treated as described under the section titled "—*Non-U.S. Holders – Taxation of Redemption Treated as a Sale of Sandbridge Class A Common Stock.*" If the redemption does not qualify as a sale of shares of Sandbridge Class A common stock, a holder will be treated as receiving a corporate distribution with the tax consequences to a U.S. holder described below under the section titled "- *U.S. Holders – Taxation of Redemption Treated as a Distribution,*" and the tax consequences to a Non-U.S. holder described below under the section titled "—*Non-U.S. Holder – Taxation of Redemption Treated as a Distribution.*"

Whether a redemption of shares of Sandbridge Class A common stock qualifies for sale treatment will depend largely on the total number of shares of our stock treated as held by the redeemed holder before and after the redemption (including any stock constructively owned by the holder as a result of owning private placement warrants or public warrants and any of our stock that a holder would directly or indirectly acquire pursuant to the Transactions) relative to all of our shares outstanding both before and after the redemption. The redemption of Sandbridge Class A common stock generally will be treated as a sale of Sandbridge Class A common stock (rather than as a corporate distribution) if the redemption (1) is "substantially disproportionate" with respect to the holder, (2) results in a "complete termination" of the holder's interest in us or (3) is "not essentially equivalent to a dividend" with respect to the holder. These tests are explained more fully below.

In determining whether any of the foregoing tests result in a redemption qualifying for sale treatment, a holder takes into account not only shares of our stock actually owned by the holder, but also shares of our stock that are constructively owned by it under certain attribution rules set forth in the Code. A holder may constructively own, in addition to stock owned directly, stock owned by certain related individuals and entities in which the holder has an interest or that have an interest in such holder, as well as any stock that the holder has a right to acquire by exercise of an option, which would generally include Sandbridge Class A common stock which could be acquired pursuant to the exercise of the private placement warrants or the public warrants. Moreover, any of our stock that a holder directly or constructively acquires pursuant to the Transactions generally should be included in determining the U.S. federal income tax treatment of the redemption.

In order to meet the substantially disproportionate test, the percentage of our outstanding voting stock actually and constructively owned by the holder immediately following the redemption of shares of Sandbridge Class A common stock must, among other requirements, be less than eighty percent (80%) of the percentage of our outstanding voting stock actually and constructively owned by the holder immediately before the redemption (taking into account both redemptions by other holders of Sandbridge Class A common stock and the Sandbridge Class A common stock to be issued pursuant to the Transactions). There will be a complete termination of a holder's interest if either (1) all of the shares of our stock actually and constructively owned by the holder are redeemed or (2) all of the shares of our stock actually owned by the holder are redeemed and the holder is eligible to waive, and effectively waives in accordance with specific rules, the attribution of stock owned by certain family members and the holder does not constructively own any other shares of our stock (including any stock constructively owned by the holder as a result of owning warrants). The redemption of Sandbridge Class A common stock will not be essentially equivalent to a dividend if the redemption results in a "meaningful reduction" of the holder's proportionate interest in us. Whether the redemption will result in a meaningful reduction in a holder's proportionate interest in us will depend on the particular facts and circumstances. However, the IRS has indicated in a published ruling that even a small reduction in the proportionate interest of a small minority stockholder in a publicly held corporation where such stockholder exercises no control over corporate affairs may constitute such a "meaningful reduction."

If none of the foregoing tests is satisfied, then the redemption of shares of Sandbridge Class A common stock will be treated as a corporate distribution to the redeemed holder and the tax effects to such a U.S. holder will be as described below under the section titled "*U.S. Holders – Taxation of Redemption Treated as a Distribution,*" and the tax effects to such a Non-U.S. holder will be as described below under the section titled "*Non-U.S. Holders – Taxation of Redemption Treated as a Distribution.*" After the application of those rules, any

243

Exhibit 7
Page 864

remaining tax basis of the holder in the redeemed Sandbridge Class A common stock will be added to the holder's adjusted tax basis in its remaining stock, or, if it has none, to the holder's adjusted tax basis in its warrants or possibly in other stock constructively owned by it.

Each holder should consult with its own tax advisors as to the tax consequences of a redemption.

**Redemption of Sandbridge Class A Common Stock applicable to U.S. Holders**

This section applies to you if you are a U.S. holder of Sandbridge Class A common stock.

*Taxation of Redemption Treated as a Distribution*. If our redemption of a U.S. holder's shares of Sandbridge Class A common stock is treated as a corporate distribution, as discussed above under the section titled "—*Redemption of Sandbridge Class A Common Stock,*" the amount of cash received in the redemption generally will constitute a dividend for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of our current and accumulated earnings and profits will constitute a return of capital that will be applied against and reduce (but not below zero) the U.S. holder's adjusted tax basis in its shares of our Sandbridge Class A common stock. Any remaining excess will be treated as gain realized on the sale of shares of our Sandbridge Class A common stock and will be treated as described below under the section titled "- *U.S. Holders – Taxation of Redemption Treated as a Sale of Sandbridge Class A Common Stock.*"

Dividends we pay to a U.S. holder that is a taxable corporation generally will qualify for the dividends received deduction if the requisite holding period is satisfied. With certain exceptions (including, but not limited to, dividends treated as investment income for purposes of investment interest deduction limitations), and provided certain holding period requirements are met, dividends we pay to a non-corporate U.S. holder generally will constitute "qualified dividend income" that will be subject to tax at the maximum tax rate accorded to long-term capital gains. It is unclear whether the redemption rights with respect to the Sandbridge Class A common stock described in this proxy statement/prospectus may prevent a U.S. holder from satisfying the applicable holding period requirements with respect to the dividends received deduction or the preferential tax rate on qualified dividend income, as the case may be.

*Taxation of Redemption Treated as a Sale of Sandbridge Class A Common Stock*. If our redemption of a U.S. holder's shares of Sandbridge Class A common stock is treated as a sale, as discussed above under the section titled "- *Redemption of Sandbridge Class A Common Stock,*" a U.S. holder generally will recognize capital gain or loss in an amount equal to the difference between the amount of cash received in the redemption and the U.S. holder's adjusted tax basis in the shares of Sandbridge Class A common stock redeemed. A U.S. holder's adjusted tax basis in its Sandbridge Class A common stock generally will equal the U.S. holder's acquisition cost less any prior distributions paid to such U.S. holder with respect to its shares of Sandbridge Class A common stock treated as a return of capital. Any such capital gain or loss generally will be long-term capital gain or loss if the U.S. holder's holding period for the Sandbridge Class A common stock so disposed of exceeds one year. It is unclear, however, whether the redemption rights with respect to the Sandbridge Class A common stock described in this proxy statement/prospectus may suspend the running of the applicable holding period for this purpose. Long-term capital gain of certain non-corporate U.S. holders (including individuals) is currently eligible for U.S. federal income taxation at preferential rates at a maximum rate of 20%. The deductibility of capital losses is subject to limitations. U.S. holders that realize a loss should consult their tax advisors regarding the allowance of this loss.

U.S. holders who hold different blocks of Sandbridge Class A common stock (shares of Sandbridge Class A common stock purchased or acquired on different dates or at different prices) should consult their tax advisors to determine how the above rules apply to them.

**Redemption of Sandbridge Class A Common Stock applicable to Non-U.S. Holders**

This section applies to you if you are a Non-U.S. holder of Sandbridge Class A common stock.

*Taxation of Redemption Treated as a Distribution*. If our redemption of a Non-U.S. holder's shares of Sandbridge Class A common stock is treated as a corporate distribution, as discussed above under the section titled "- *Redemption of Sandbridge Class A Common Stock,*" the amount of cash received in the redemption generally will constitute a dividend for U.S. federal income tax purposes to the extent paid out of our current or accumulated earnings and profits (as determined under U.S. federal income tax principles) and, provided such

244

Exhibit 7
Page 865

dividend is not effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States, we will be required to withhold tax from the gross amount of the dividend at a rate of thirty percent (30%), unless such Non-U.S. holder is eligible for a reduced rate of withholding tax under an applicable income tax treaty and timely provides proper certification of its eligibility for such reduced rate (usually on an IRS Form W-8BEN or W-8BEN-E). Any distribution not constituting a dividend will be treated first as reducing (but not below zero) the Non-U.S. holder's adjusted tax basis in its shares of our Sandbridge Class A common stock redeemed and, to the extent such distribution exceeds the Non-U.S. holder's adjusted tax basis, as gain realized on the sale of the Sandbridge Class A common stock, which will be treated as described below under the section titled "- *Non-U.S. Holders – Taxation of Redemption Treated as a Sale of Sandbridge Class A Common Stock.*"

Because it may not be certain at the time a Non-U.S. holder is redeemed whether such Non-U.S. holder's redemption will be treated as a sale of shares or a distribution constituting a dividend, and because such determination will depend in part on a Non-U.S. holder's particular circumstances, we or the applicable withholding agent may not be able to determine whether (or to what extent) a Non-U.S. holder is treated as receiving a dividend for U.S. federal income tax purposes. Therefore, we or the applicable withholding agent may withhold tax at a rate of 30% (or such lower rate as may be specified by an applicable income tax treaty) on the gross amount of any consideration paid to a Non-U.S. holder in redemption of such Non-U.S. holder's Sandbridge Class A common stock, unless (i) we or the applicable withholding agent have established special procedures allowing Non-U.S. holders to certify that they are exempt from such withholding tax and (ii) such Non-U.S. holders are able to certify that they meet the requirements of such exemption (e.g., because such Non-U.S. holders are not treated as receiving a dividend under the Section 302 tests described above under the section titled "- *Redemption of Sandbridge Class A Common Stock*"). However, there can be no assurance that we or any applicable withholding agent will establish such special certification procedures. If we or an applicable withholding agent withhold excess amounts from the amount payable to a Non-U.S. holder, such Non-U.S. holder generally may obtain a refund of any such excess amounts by timely filing an appropriate claim for refund with the IRS. Non-U.S. holders should consult their own tax advisors regarding the application of the foregoing rules in light of their particular facts and circumstances and any applicable procedures or certification requirements.

The withholding tax described above does not apply to dividends paid to a Non-U.S. holder who provides an IRS Form W-8ECI certifying that the dividends are effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States. Instead, the effectively connected dividends will be subject to regular U.S. federal income tax as if the Non-U.S. holder were a U.S. resident, subject to an applicable income tax treaty providing otherwise. A corporate Non-U.S. holder that is receiving effectively connected dividends may also be subject to an additional "branch profits tax" imposed at a rate of thirty percent (30%) (or a lower applicable income tax treaty rate).

*Taxation of Redemption Treated as a Sale of Sandbridge Class A Common Stock.* If our redemption of a Non-U.S. holder's shares of Sandbridge Class A common stock is treated as a sale of Sandbridge Class A common stock, as discussed above under the section titled "- *Redemption of Sandbridge Class A Common Stock,*" subject to the discussions of FATCA (as defined below) and backup withholding below, a Non-U.S. holder generally will not be subject to U.S. federal income or withholding tax in respect of gain recognized in connection with the redemption, unless:

• the gain is effectively connected with the conduct of a trade or business by the Non-U.S. holder within the United States (and, under certain income tax treaties, is attributable to a United States permanent establishment or fixed base maintained by the Non-U.S. holder);

• such Non-U.S. holder is an individual who is present in the United States for 183 days or more during the taxable year in which the disposition takes place and certain other conditions are met; or

• we are or have been a "United States real property holding corporation" for U.S. federal income tax purposes at any time during the shorter of the five-year period ending on the date of redemption or the period that the Non-U.S. holder held our Sandbridge Class A common stock and, in the case where shares of our Sandbridge Class A common stock are regularly traded on an established securities market, within the meaning of applicable Treasury Regulations, the Non-U.S. holder has owned, directly or constructively, more than five percent (5%) of our Sandbridge Class A common stock at any time within the shorter of the five-year period preceding the redemption or such Non-U.S. holder's

245

Exhibit 7
Page 866

holding period for the shares of our Sandbridge Class A common stock. There can be no assurance that our Sandbridge Class A common stock is or has been treated as regularly traded on an established securities market within the meaning of applicable Treasury Regulations.

Unless an applicable treaty provides otherwise, gain described in the first bullet point above will be subject to tax at generally applicable U.S. federal income tax rates as if the Non-U.S. holder were a U.S. resident. Any gains described in the first bullet point above of a corporate Non-U.S. holder may also be subject to an additional "branch profits tax" at a thirty percent (30%) rate (or a lower applicable income tax treaty rate). If the second bullet point applies to a Non-U.S. holder, such Non-U.S. holder will be subject to U.S. tax on such Non-U.S. holder's net capital gain for such year (including any gain realized in connection with the redemption) at a tax rate of thirty percent (30%).

If the third bullet point above applies to a Non-U.S. holder, gain recognized by such holder in connection with the redemption will be subject to tax at generally applicable U.S. federal income tax rates. In addition, we may be required to withhold U.S. federal income tax at a rate of fifteen percent (15%) of the amount realized upon such redemption.

We believe that we are not, and have not been at any time during the five-year period preceding the date of Business Combination, a United States real property holding corporation and we do not expect to be a United States real property holding corporation immediately after the Business Combination is completed.

**Information Reporting and Backup Withholding**

Payments resulting from our redemption of our Sandbridge Class A common stock may be subject to information reporting to the IRS and possible U.S. backup withholding. Backup withholding will not apply, however, to a U.S. holder who furnishes a correct taxpayer identification number and makes other required certifications, or who is otherwise exempt from backup withholding and establishes such exempt status.

A Non-U.S. holder generally will eliminate the requirement for information reporting and backup withholding by providing certification of its foreign status, under penalties of perjury, on a duly executed applicable IRS Form W-8. Backup withholding is not an additional tax, but an advance payment, which may be refunded or credited against a holder's U.S. federal income tax liability. A holder generally may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the IRS and furnishing any required information.

**FATCA Withholding Taxes**

Provisions commonly referred to as "FATCA" impose withholding of thirty percent (30%) on payments of dividends including amounts treated as dividends received pursuant to a redemption on our Sandbridge Class A common stock. On December 13, 2018, the IRS released proposed Treasury Regulations that, if finalized in their proposed form, would eliminate the obligation to withhold on gross proceeds from a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest. Although these proposed Treasury regulations are not final, taxpayers generally may rely on them until final Treasury regulations are issued.

In general, no such withholding will be required with respect to a U.S. holder or an individual Non-U.S. holder that timely provides the certifications required on a valid IRS Form W-9 or W-8, respectively. Holders potentially subject to withholding include "foreign financial institutions" (which is broadly defined for this purpose and in general includes investment vehicles) and certain other non-U.S. entities unless various U.S. information reporting and due diligence requirements (generally relating to ownership by U.S. persons of interests in or accounts with those entities) have been satisfied, or an exemption applies (typically certified as to by the delivery of a properly completed IRS Form W-8BEN-E). Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules. Holders should consult their tax advisors regarding the effects of FATCA on a redemption of Sandbridge Class A common stock.

246

Exhibit 7
Page 867

TABLE OF CONTENTS

**STOCKHOLDER PROPOSALS AND NOMINATIONS**

**Stockholder Proposals**

The New Owlet Bylaws establish an advance notice procedure for stockholders who wish to present a proposal before an annual meeting of stockholders. The New Owlet Bylaws provide that the only business that may be conducted at an annual meeting of stockholders is business that is (i) specified in the notice of such meeting (or any supplement or amendment thereto) given by or at the direction of the New Owlet Board, (ii) otherwise properly brought before such meeting by or at the direction of the New Owlet Board or the chairperson of the board, or (iii) otherwise properly brought before such meeting by a stockholder present in person who (A) (1) was a record owner of shares of New Owlet both at the time of giving the notice and at the time of such meeting, (2) is entitled to vote at such meeting, and (3) has complied with notice procedures specified in the New Owlet Bylaws in all applicable respects or (B) properly made such proposal in accordance with Rule 14a-8 under the Exchange Act. To be timely for New Owlet's annual meeting of stockholders, New Owlet's secretary must receive the written notice at New Owlet's principal executive offices:

- not earlier than the 90th day; and

- not later than the 120th day,

- before the one-year anniversary of the preceding year's annual meeting.

In the event that no annual meeting was held in the previous year or New Owlet holds its annual meeting of stockholders more than more than 30 days before or more than 60 days after the one-year anniversary of a preceding year's annual meeting, notice of a stockholder proposal must be not later than the 90th day prior to such annual meeting or, if later, the 10th day following the day on which public disclosure of the date of such annual meeting was first made.

Notice of a nomination or proposal relating to business at the first annual meeting of New Owlet stockholders after the Business Combination must be delivered to New Owlet no later than the 10th day following the earlier of the day on which such notice of the date of such meeting was mailed and the day the public disclosure of the date of the annual meeting is made. Nominations and proposals also must satisfy other requirements set forth in the bylaws.

Under Rule 14a-8 of the Exchange Act, a stockholder proposal to be included in the proxy statement and proxy card for the first annual meeting of New Owlet stockholders pursuant to Rule 14a-8 must be received at New Owlet's principal office a reasonable time before New Owlet begins to print and send its proxy materials and must comply with Rule 14a-8.

A stockholder shall update and supplement its notice to New Owlet's secretary, if necessary, so that the information provided or required to be provided in such notice as described above shall be true and correct as of the record date for notice of the annual meeting and as of the date that is 10 business days prior to the annual meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, New Owlet's secretary not later than five business days after the record date for notice of the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten business days prior to the meeting or any adjournment or postponement thereof).

**Stockholder Director Nominees**

The New Owlet Bylaws permit stockholders to nominate directors for election at an annual meeting or at a special meeting (but only if the election of directors is a matter specified in the notice of meeting given by or at the direction of the person calling such special meeting) of stockholders, subject to the provisions of the Proposed Charter and the Stockholders Agreement. To nominate a director, the stockholder must provide the information required by the New Owlet Bylaws. In addition, the stockholder must give timely notice to New Owlet's secretary in accordance with the New Owlet Bylaws, which, in general, require that the notice be received by New Owlet's secretary within the time periods described above under "— *Stockholder Proposals*" for stockholder proposals.

247

Exhibit 7
Page 868

**STOCKHOLDER COMMUNICATIONS**

Stockholders and interested parties may communicate with the Sandbridge Board, any committee chairperson or the non-management directors as a group by writing to the board or committee chairperson in care of Sandbridge Acquisition Corporation, 1999 Avenue of the Stars, Suite 2088, Los Angeles, CA 90067. Following the Business Combination, such communications should be sent to Owlet, Inc., 2500 Executive Parkway, Suite 500, Lehi, Utah, 84043. Each communication will be forwarded, depending on the subject matter, to the New Owlet board, the appropriate committee chairperson or all non-management directors.

248

Exhibit 7
Page 869

**WHERE YOU CAN FIND MORE INFORMATION**

Sandbridge has filed with the SEC a registration statement on Form S-4 under the Securities Act with respect to the securities offered by this proxy statement/prospectus. This proxy statement/prospectus does not contain all of the information included in the registration statement. For further information pertaining to Sandbridge and its securities, you should refer to the registration statement and to its exhibits. Whenever reference is made in this proxy statement/prospectus to any of Sandbridge's or Owlet's contracts, agreements or other documents, the references are not necessarily complete, and you should refer to the annexes to the proxy statement/prospectus and the exhibits filed with the registration statement for copies of the actual contract, agreement or other document.

Following the consummation of the Business Combination, New Owlet will be subject to the information and periodic reporting requirements of the Exchange Act and will file annual, quarterly and current reports, proxy statements and other information with the SEC. Sandbridge files reports, proxy statements and other information with the SEC as required by the Exchange Act. You can read Sandbridge's or New Owlet's SEC filings, including New Owlet's registration statement and Sandbridge's proxy statement/prospectus, over the internet at the SEC's website at http://www.sec.gov.

If you would like additional copies of this proxy statement/prospectus or if you have questions about the Business Combination or the proposals to be presented at the Special Meeting, you should contact Sandbridge by telephone or in writing:

Sandbridge Acquisition Corporation
1999 Avenue of the Stars, Suite 2088,
Los Angeles, CA 90067
(424) 221-5743

You may also obtain these documents by requesting them in writing or by telephone from Sandbridge's proxy solicitation agent at the following address and telephone number:

Okapi Partners LLC
1212 Avenue of the Americas, 24th Floor
New York, New York 10036
Telephone: (844) 343-2632 (toll-free)
(banks and brokers can call collect at (212) 297-0720)
Email: info@okapipartners.com

If you are a stockholder of Sandbridge and would like to request documents, please do so no later than five business days before the Special Meeting in order to receive them before the Special Meeting. If you request any documents from Sandbridge, Sandbridge will mail them to you by first-class mail, or another equally prompt means.

This document is a prospectus of New Owlet and a proxy statement of Sandbridge for Sandbridge's Special Meeting of stockholders. Neither Owlet nor Sandbridge has authorized anyone to give any information or make any representation about the Business Combination, New Owlet or Sandbridge that is different from, or in addition to, that contained in this proxy statement/prospectus or in any of the materials that Sandbridge has incorporated by reference into this proxy statement/prospectus. Therefore, if anyone does give you information of this sort, you should not rely on it. The information contained in this document speaks only as of the date of this document unless the information specifically indicates that another date applies.

249

Exhibit 7
Page 870

**TABLE OF CONTENTS**

### INDEX TO FINANCIAL STATEMENTS

| | |
|---|---|
| **Audited Financial Statements of Sandbridge Acquisition Corporation** | |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Balance Sheet as of December 31, 2020 | F-3 |
| Statement of Operations for the period from June 23, 2020 (inception) through December 31, 2020 | F-4 |
| Statement of Changes in Stockholders' Equity for the period from June 23, 2020 (inception) through December 31, 2020 | F-5 |
| Statement of Cash Flows for the period from June 23, 2020 (inception) through December 31, 2020 | F-6 |
| Notes to Financial Statements | F-7 |
| | |
| **Audited Consolidated Financial Statements of Owlet** | |
| Report of Independent Registered Public Accounting Firm | F-19 |
| Consolidated Balance Sheets | F-20 |
| Consolidated Statements of Operations | F-21 |
| Consolidated Statements of Redeemable Convertible Preferred Stock and Stockholders' Deficit | F-22 |
| Consolidated Statements of Cash Flows | F-23 |
| Notes to Consolidated Financial Statements | F-24 |

F-1

Exhibit 7
Page 871

TABLE OF CONTENTS

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Stockholders and the Board of Directors of
Sandbridge Acquisition Corporation

**Opinion on the Financial Statements**

We have audited the accompanying balance sheet of Sandbridge Acquisition Corporation (the "Company") as of December 31, 2020, the related statements of operations, changes in stockholders' equity and cash flows for the period from June 23, 2020 (inception) through December 31, 2020 and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and the results of its operations and its cash flows for the period from June 23, 2020 (inception) through December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ WithumSmith+Brown, PC

We have served as the Company's auditor since 2020.
New York, New York
March 25, 2021

F-2

Exhibit 7
Page 872

TABLE OF CONTENTS

**SANDBRIDGE ACQUISITION CORPORATION**
**BALANCE SHEET**
**DECEMBER 31, 2020**

| | |
|---|---:|
| **ASSETS** | |
| Current assets | |
| Cash | $   1,287,234 |
| Prepaid expenses | 273,852 |
| **Total Current Assets** | **1,561,086** |
| | |
| Cash and investments held in Trust Account | 230,053,249 |
| | |
| **Total Assets** | **$231,614,335** |
| | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | |
| Current liabilities | |
| Accrued expenses | $      298,328 |
| Accrued offering costs | 17,000 |
| Total Current Liabilities | 315,328 |
| | |
| Deferred underwriting fee payable | 8,050,000 |
| **Total Liabilities** | **8,365,328** |
| | |
| **Commitments and contingencies** | |
| | |
| Class A common stock subject to possible redemption, 21,824,900 shares at $10.00 per share redemption value | 218,249,000 |
| | |
| **Stockholders' Equity** | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued or outstanding | — |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 1,175,100 shares issued and outstanding (excluding 21,824,900 shares subject to possible redemption) | 118 |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 5,750,000 shares issued and outstanding | 575 |
| Additional paid-in capital | 5,426,501 |
| Accumulated deficit | (427,187) |
| **Total Stockholders' Equity** | **5,000,007** |
| **Total Liabilities and Stockholders' Equity** | **$231,614,335** |

*The accompanying notes are an integral part of the financial statements*

F-3

Exhibit 7
Page 873

TABLE OF CONTENTS

**SANDBRIDGE ACQUISITION CORPORATION**
**STATEMENT OF OPERATIONS**
**FOR THE PERIOD JUNE 23, 2020 (INCEPTION) THROUGH DECEMBER 31, 2020**

| | |
|---|---:|
| General and administrative expenses | $  480,436 |
| **Loss from operations** | **(480,436)** |
| | |
| Other income: | |
| Interest earned on investments held in Trust Account | 53,249 |
| | |
| Loss before provision for income taxes | (427,187) |
| Provision for income taxes | — |
| **Net loss** | **$  (427,187)** |
| | |
| Weighted average shares outstanding of Class A redeemable common stock | 23,000,000 |
| **Basic and diluted income per share, Class A redeemable common stock** | **$      —** |
| | |
| Weighted average shares outstanding of Class A and Class B non-redeemable common stock | 5,435,083 |
| **Basic and diluted net loss per share, Class A and Class B non-redeemable common stock** | **$      (0.08)** |

*The accompanying notes are an integral part of the financial statements*

F-4

Exhibit 7
Page 874

TABLE OF CONTENTS

**SANDBRIDGE ACQUISITION CORPORATION**
**STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY**
**FOR THE PERIOD JUNE 23, 2020 (INCEPTION) THROUGH DECEMBER 31, 2020**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| **Balance – June 23, 2020 (Inception)** | — | $ — | — | $ — | $ — | $ — | $ — |
| Issuance of Class B common stock to Sponsor | — | — | 5,750,000 | 575 | 24,425 | — | 25,000 |
| Sale of 23,000,000 Units, net of underwriting discounts | 23,000,000 | 2,300 | — | — | 217,048,894 | — | 217,051,194 |
| Sale of 6,600,000 Private Placement Warrants | — | — | — | — | 6,600,000 | — | 6,600,000 |
| Common stock subject to possible redemption | (21,824,900) | (2,182) | — | — | (218,246,818) | — | (218,249,000) |
| Net loss | — | — | — | — | — | (427,187) | (427,187) |
| **Balance – December 31, 2020** | **1,175,100** | **$ 118** | **5,750,000** | **$575** | **$ 5,426,501** | **$(427,187)** | **$ 5,000,007** |

*The accompanying notes are an integral part of the financial statements*

F-5

Exhibit 7
Page 875

TABLE OF CONTENTS

**SANDBRIDGE ACQUISITION CORPORATION**
**STATEMENT OF CASH FLOWS**
**FOR THE PERIOD JUNE 23, 2020 (INCEPTION) THROUGH DECEMBER 31, 2020**

| | |
|---|---:|
| **Cash Flows from Operating Activities:** | |
| Net loss | $ (427,187) |
| Adjustments to reconcile net loss to net cash used in operating activities: | |
| Interest earned on investments held in Trust Account | (53,249) |
| Changes in operating assets and liabilities: | |
| Prepaid expenses | (273,852) |
| Accrued expenses | 298,328 |
| **Net cash used in operating activities** | **(455,960)** |
| | |
| **Cash Flows from Investing Activities:** | |
| Investment of cash into Trust Account | (230,000,000) |
| **Net cash used in investing activities** | **(230,000,000)** |
| | |
| **Cash Flows from Financing Activities:** | |
| Proceeds from issuance of Class B common stock to Sponsor | 25,000 |
| Proceeds from sale of Units, net of underwriting discounts paid | 225,796,000 |
| Proceeds from sale of Private Placement Warrants | 6,600,000 |
| Proceeds from promissory note - related party | 250,000 |
| Repayment of promissory note - related party | (250,000) |
| Payment of offering costs | (677,806) |
| **Net cash provided by financing activities** | **231,743,194** |
| | |
| **Net Change in Cash** | **1,287,234** |
| Cash – Beginning of period | — |
| **Cash – End of period** | **$ 1,287,234** |
| | |
| **Non-Cash Financing Activities:** | |
| Initial classification of Class A common stock subject to possible redemption | $ 218,674,370 |
| Change in value of Class A common stock subject to possible redemption | $ (425,370) |
| Deferred underwriting fee payable | $ 8,050,000 |
| Offering costs included in accrued offering costs | $ 17,000 |

*The accompanying notes are an integral part of the financial statements*

F-6

Exhibit 7
Page 876

**NOTE 1. DESCRIPTION OF ORGANIZATION AND BUSINESS OPERATIONS**

Sandbridge Acquisition Corporation (the "Company") was incorporated in Delaware on June 23, 2020. The Company was formed for the purpose of entering into a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses (the "Business Combination").

The Company is not limited to a particular industry or sector for purposes of consummating a Business Combination. The Company is an early stage and emerging growth company and, as such, the Company is subject to all of the risks associated with early stage and emerging growth companies.

As of December 31, 2020, the Company had not commenced any operations. All activity for the period from June 23, 2020 (inception) through December 31, 2020 related to the Company's formation, the initial public offering ("Initial Public Offering"), which is described below and, subsequent to the Initial Public Offering, identifying a target company for a Business Combination. The Company will not generate any operating revenues until after the completion of a Business Combination, at the earliest. The Company will generate non-operating income in the form of interest income from the proceeds derived from the Initial Public Offering.

The registration statement for the Company's Initial Public Offering was declared effective on September 14, 2020. On September 17, 2020 the Company completed the Initial Public Offering of 23,000,000 units (the "Units" and, with respect to the shares of Class A common stock included in the Units sold, the "Public Shares"), which includes the full exercise by the underwriters of their over-allotment option in the amount of 3,000,000 Units, at $10.00 per Unit, generating gross proceeds of $230,000,000, which is described in Note 3.

Simultaneously with the closing of the Initial Public Offering, the Company completed the sale of 6,600,000 warrants (the "Private Placement Warrants") at a price of $1.00 per Private Placement Warrant in a private placement to Sandbridge Acquisition Holdings LLC (the "Sponsor"), generating gross proceeds of $6,600,000, which is described in Note 4.

Transaction costs amounted to $12,948,806, consisting of $4,204,000 in cash underwriting fees, $8,050,000 of deferred underwriting fees and $694,806 of other offering costs.

Following the closing of the Initial Public Offering on September 17, 2020, an amount of $230,000,000 ($10.00 per Unit) from the net proceeds of the sale of the Units in the Initial Public Offering and the sale of the Private Placement Warrants was placed in a trust account (the "Trust Account") located in the United States. The funds in the Trust Account will be invested only in U.S. government securities, within the meaning set forth in Section 2(a)(16) of the Investment Company Act of 1940, as amended (the "Investment Company Act"), with a maturity of 185 days or less, or in any open-ended investment company that holds itself out as a money market fund meeting certain conditions of Rule 2a-7 of the Investment Company Act, as determined by the Company, until the earlier of: (i) the completion of a Business Combination and (ii) the distribution of the funds held in the Trust Account, as described below.

Substantially all of the net proceeds of the Initial Public Offering and the sale of the Private Placement Warrants are intended to be applied generally toward consummating a Business Combination, and the Company's management has broad discretion to identify targets for such a potential Business Combination and over the specific application of the funds held in the Trust Account if and when such funds are properly released from the Trust Account. There is no assurance that the Company will be able to complete a Business Combination successfully. The Company must complete a Business Combination with one or more operating businesses or assets that together have an aggregate fair market value equal to at least 80% of the net assets held in the Trust Account (excluding the deferred underwriting commissions and taxes payable on the income earned on the Trust Account) at the time of the Company's signing a definitive agreement in connection with its initial Business Combination. The Company will only complete a Business Combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires an interest in the target business or assets sufficient for it not to be required to register as an investment company under the Investment Company Act.

The Company will provide its holders of the outstanding Public Shares (the "public stockholders") with the opportunity to redeem all or a portion of their Public Shares upon the completion of a Business Combination either (i) in connection with a stockholder meeting called to approve the Business Combination or (ii) by means of a tender offer. The decision as to whether the Company will seek stockholder approval of a Business Combination or conduct a tender offer will be made by the Company. The public stockholders will be entitled to

F-7

Exhibit 7
Page 877

redeem their Public Shares for a pro rata portion of the amount then in the Trust Account (initially anticipated to be $10.00 per Public Share, plus any pro rata interest earned on the funds held in the Trust Account and not previously released to the Company to pay its tax obligations). There will be no redemption rights upon the completion of a Business Combination with respect to the Company's warrants.

The Company will only proceed with a Business Combination if the Company has net tangible assets of at least $5,000,001 either prior to or upon such consummation of a Business Combination and, if the Company seeks stockholder approval, a majority of the shares voted are voted in favor of the Business Combination. If a stockholder vote is not required by applicable law or stock exchange rules and the Company does not decide to hold a stockholder vote for business or other reasons, the Company will, pursuant to its Amended and Restated Certificate of Incorporation (the "Amended and Restated Certificate of Incorporation"), conduct the redemptions pursuant to the tender offer rules of the U.S. Securities and Exchange Commission ("SEC") and file tender offer documents with the SEC prior to completing a Business Combination. If, however, stockholder approval of the transaction is required by applicable law or stock exchange rules, or the Company decides to obtain stockholder approval for business or other reasons, the Company will offer to redeem shares in conjunction with a proxy solicitation pursuant to the proxy rules and not pursuant to the tender offer rules. If the Company seeks stockholder approval in connection with a Business Combination, the Sponsor has agreed to vote its Founder Shares (as defined in Note 5), and any Public Shares purchased during or after the Initial Public Offering in favor of approving a Business Combination. Additionally, each public stockholder may elect to redeem their Public Shares irrespective of whether they vote for or against the proposed transaction or do not vote at all.

Notwithstanding the above, if the Company seeks stockholder approval of a Business Combination and it does not conduct redemptions pursuant to the tender offer rules, the Amended and Restated Certificate of Incorporation provides that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), will be restricted from redeeming its shares with respect to more than an aggregate of 15% or more of the Public Shares, without the prior consent of the Company.

The Sponsor has agreed (a) to waive its redemption rights with respect to its Founder Shares and Public Shares held by it in connection with the completion of a Business Combination and (b) not to propose an amendment to the Amended and Restated Certificate of Incorporation (i) to modify the substance or timing of the Company's obligation to allow redemption in connection with the Company's initial Business Combination or to redeem 100% of its Public Shares if the Company does not complete a Business Combination or (ii) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity, unless the Company provides the public stockholders with the opportunity to redeem their Public Shares in conjunction with any such amendment.

The Company will have until September 17, 2022, or such later date as a result of a stockholder vote to amend the Amended and Restated Certificate of Incorporation, to complete a Business Combination (the "Combination Period"). If the Company is unable to complete a Business Combination within the Combination Period, the Company will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the Public Shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account including interest earned on the funds held in the Trust Account and not previously released to the Company to pay its tax obligations (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding Public Shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), and (iii) as promptly as reasonably possible following such redemption, subject to the approval of the Company's remaining stockholders and the Company's board of directors, dissolve and liquidate, subject in each case to the Company's obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. There will be no redemption rights or liquidating distributions with respect to the Company's warrants, which will expire worthless if the Company fails to complete a Business Combination within the Combination Period.

The Sponsor has agreed to waive its liquidation rights with respect to the Founder Shares if the Company fails to complete a Business Combination within the Combination Period. However, if the Sponsor acquires Public Shares in or after the Initial Public Offering, such Public Shares will be entitled to liquidating distributions from the Trust Account if the Company fails to complete a Business Combination within the Combination Period. The underwriters have agreed to waive their rights to their deferred underwriting

F-8

Exhibit 7
Page 878

commission (see Note 6) held in the Trust Account in the event the Company does not complete a Business Combination within the Combination Period and, in such event, such amounts will be included with the other funds held in the Trust Account that will be available to fund the redemption of the Public Shares. In the event of such distribution, it is possible that the per share value of the assets remaining available for distribution will be less than the Initial Public Offering price per Unit ($10.00).

In order to protect the amounts held in the Trust Account, the Sponsor has agreed to be liable to the Company if and to the extent any claims by a third party for services rendered or products sold to the Company, or a prospective target business with which the Company has discussed entering into a written letter of intent, confidentiality or similar agreement or business combination agreement, reduce the amount of funds in the Trust Account to below the lesser of (1) $10.00 per Public Share and (2) the actual amount per Public Share held in the Trust Account as of the date of the liquidation of the Trust Account, if less than $10.00 per share due to reductions in the value of the trust assets, less taxes payable. This liability will not apply with respect to claims by a third party who executed a waiver of any and all rights to the monies held in the Trust Account nor will it apply to any claims under the Company's indemnity of the underwriters of the Initial Public Offering against certain liabilities, including liabilities under the Securities Act of 1933, as amended (the "Securities Act"). Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, the Sponsor will not be responsible to the extent of any liability for such third-party claims. The Company will seek to reduce the possibility that the Sponsor will have to indemnify the Trust Account due to claims of creditors by endeavoring to have all vendors, service providers (except the Company's independent registered public accounting firm), prospective target businesses and other entities with which the Company does business, execute agreements with the Company waiving any right, title, interest or claim of any kind in or to monies held in the Trust Account.

### NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Basis of Presentation*

The accompanying financial statements are presented in U.S. dollars and have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") and pursuant to the accounting and disclosure rules and regulations of the Securities and Exchange Commission (the "SEC").

*Emerging Growth Company*

The Company is an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"), and it may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the independent registered public accounting firm attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, reduced disclosure obligations regarding executive compensation in its periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable. The Company has elected not to opt out of such extended transition period which means that when a standard is issued or revised and it has different application dates for public or private companies, the Company, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of the Company's financial statements with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

F-9

Exhibit 7
Page 879

TABLE OF CONTENTS

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.

Making estimates requires management to exercise significant judgment. It is at least reasonably possible that the estimate of the effect of a condition, situation or set of circumstances that existed at the date of the financial statements, which management considered in formulating its estimate, could change in the near term due to one or more future events. Accordingly, the actual results could differ significantly from those estimates.

*Cash and Cash Equivalents*

The Company considers all short-term investments with an original maturity of three months or less when purchased to be cash equivalents. The Company did not have any cash equivalents as of December 31, 2020.

*Cash and Investments Held in Trust Account*

The Company classifies its U.S. Treasury and equivalent securities as held-to-maturity in accordance with ASC Topic 320 "Investments - Debt and Equity Securities." Held-to-maturity securities are those securities which the Company has the ability and intent to hold until maturity. Held-to-maturity treasury securities are recorded at amortized cost on the accompanying balance sheets and adjusted for the amortization or accretion of premiums or discounts.

*Class A Common Stock Subject to Possible Redemption*

The Company accounts for its Class A common stock subject to possible redemption in accordance with the guidance in Accounting Standards Codification ("ASC") Topic 480 "Distinguishing Liabilities from Equity." Class A common stock subject to mandatory redemption is classified as a liability instrument and is measured at fair value. Conditionally redeemable common stock (including common stock that features redemption rights that is either within the control of the holder or subject to redemption upon the occurrence of uncertain events not solely within the Company's control) is classified as temporary equity. At all other times, common stock is classified as stockholders' equity. The Company's Class A common stock features certain redemption rights that are considered to be outside of the Company's control and subject to occurrence of uncertain future events. Accordingly, at December 31, 2020, Class A common stock subject to possible redemption is presented as temporary equity, outside of the stockholders' equity section of the Company's balance sheet.

*Offering Costs*

Offering costs consist of underwriting, legal, accounting and other costs incurred through the Initial Public Offering that are directly related to the Initial Public Offering. Offering costs amounting to $12,948,806 were charged to stockholders' equity upon the completion of the Initial Public Offering.

*Income Taxes*

The Company follows the asset and liability method of accounting for income taxes under ASC 740, "Income Taxes." Deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statements carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that included the enactment date. Valuation allowances are established, when necessary, to reduce deferred tax assets to the amount expected to be realized.

ASC 740 prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more likely than not to be sustained upon examination by taxing authorities. The Company recognizes accrued interest and penalties related to unrecognized tax benefits as income tax expense. There were no unrecognized tax benefits and no amounts accrued for interest and penalties

F-10

Exhibit 7
Page 880

as of December 31, 2020. The Company is currently not aware of any issues under review that could result in significant payments, accruals or material deviation from its position. The Company is subject to income tax examinations by major taxing authorities since inception.

*Net Income (Loss) per Common Share*

Net income (loss) per common share is computed by dividing net income by the weighted average number of common shares outstanding for the period. The Company has not considered the effect of warrants sold in the Initial Public Offering and private placement to purchase 18,100,000 shares of Class A common stock in the calculation of diluted income per share, since the exercise of the warrants are contingent upon the occurrence of future events and the inclusion of such warrants would be anti-dilutive.

The Company's statement of operations includes a presentation of income (loss) per share for common shares subject to possible redemption in a manner similar to the two-class method of income (loss) per share. Net income per common share, basic and diluted, for Class A redeemable common stock is calculated by dividing the interest income earned on the Trust Account, by the weighted average number of Class A redeemable common stock outstanding since original issuance. Net loss per share, basic and diluted, for Class B non-redeemable common stock is calculated by dividing the net loss, adjusted for income attributable to Class A redeemable common stock, net of applicable franchise and income taxes, by the weighted average number of Class B non-redeemable common stock outstanding for the period. Class B non-redeemable common stock includes the Founder Shares as these shares do not have any redemption features and do not participate in the income earned on the Trust Account.

The following table reflects the calculation of basic and diluted net income (loss) per common share (in dollars, except per share amounts):

| | For the Period From June 23, 2020 (inception) Through December 31, 2020 |
|---|---|
| **Redeemable Class A Common Stock** | |
| Numerator: Earnings allocable to Redeemable Class A Common Stock | |
| Interest Income | $ 53,249 |
| Less: Company's portion available to pay taxes | (53,249) |
| Net Earnings | $ — |
| Denominator: Weighted Average Redeemable Class A Common Stock | |
| Redeemable Class A Common Stock, Basic and Diluted | 23,000,000 |
| Earnings/Basic and Diluted Redeemable Class A Common Stock | $ — |
| | |
| Non-Redeemable Class A and B Common Stock | |
| Numerator: Net Income (Loss) minus Redeemable Net Earnings | |
| Net Income (Loss) | $ (427,187) |
| Redeemable Net Earnings | — |
| Non-Redeemable Net Loss | $ (427,187) |
| Denominator: Weighted Average Non-Redeemable Class A and B Common Stock | |
| Non-Redeemable Class A and B Common Stock, Basic and Diluted | 5,435,083 |
| Loss/Basic and Diluted Non-Redeemable Class A and B Common Stock | $ (0.08) |

As of December 31, 2020, basic and diluted shares are the same as there are no non-redeemable securities that are dilutive to the Company's stockholders.

F-11

Exhibit 7
Page 881

*Concentration of Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist of a cash account in a financial institution, which, at times, may exceed the Federal Depository Insurance Coverage of $250,000. The Company has not experienced losses on this account and management believes the Company is not exposed to significant risks on such account.

*Fair Value of Financial Instruments*

The fair value of the Company's assets and liabilities, which qualify as financial instruments under ASC Topic 820, "Fair Value Measurement," approximates the carrying amounts represented in the accompanying balance sheet, primarily due to their short-term nature.

*Recent Accounting Standards*

Management does not believe that any recently issued, but not yet effective, accounting standards, if currently adopted, would have a material effect on the Company's financial statements.

**NOTE 3. INITIAL PUBLIC OFFERING**

Pursuant to the Initial Public Offering, the Company sold 23,000,000 Units, which includes the full exercise by the underwriters of their over-allotment option in the amount of 3,000,000 Units, at a purchase price of $10.00 per Unit. Each Unit consists of one share of Class A common stock and one-half of one redeemable warrant ("Public Warrant"). Each whole Public Warrant entitles the holder to purchase one share of Class A common stock at a price of $11.50 per share, subject to adjustment (see Note 7).

**NOTE 4. PRIVATE PLACEMENT**

Simultaneously with the closing of the Initial Public Offering, the Sponsor purchased an aggregate of 6,600,000 Private Placement Warrants at a price of $1.00 per Private Placement Warrant, for an aggregate purchase price of $6,600,000. Each Private Placement Warrant is exercisable to purchase one share of Class A common stock at an exercise price of $11.50 per share, subject to adjustment (see Note 7). A portion of the proceeds from the Private Placement Warrants were added to the proceeds from the Initial Public Offering held in the Trust Account. If the Company does not complete a Business Combination within the Combination Period, the proceeds from the sale of the Private Placement Warrants held in the Trust Account will be used to fund the redemption of the Public Shares (subject to the requirements of applicable law), and the Private Placement Warrants will expire worthless.

**NOTE 5. RELATED PARTY TRANSACTIONS**

*Founder Shares*

On July 3, 2020, the Sponsor purchased 5,750,000 shares of the Company's Class B common stock (the "Founder Shares") for an aggregate purchase price of $25,000. In August 2020, the Sponsor transferred 40,000 Founder Shares to independent director Mr. De Sole, 25,000 Founder Shares to independent director Mr. Toubassy and 30,000 Founder Shares to advisor Mr. Hilfiger at their original per share purchase price. The Founder Shares included an aggregate of up to 750,000 shares subject to forfeiture by the Sponsor to the extent that the underwriters' over-allotment was not exercised in full or in part, so that the number of Founder Shares would collectively represent approximately 20% of the Company's issued and outstanding shares after the Initial Public Offering. As a result of the underwriters' election to fully exercise their over-allotment option, 750,000 Founder Shares are no longer subject to forfeiture.

The Sponsor has agreed, subject to certain limited exceptions, not to transfer, assign or sell any of the Founder Shares until the earlier of (A) one year after the completion of a Business Combination and (B) subsequent to a Business Combination, (x) if the last reported sale price of the Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after a Business Combination, or (y) the date on which the Company completes a liquidation, merger, stock exchange, reorganization or other similar transaction that results in all of the Company's stockholders having the right to exchange their shares of Class A common stock for cash, securities or other property.

F-12

Exhibit 7
Page 882

### Administrative Support Agreement

The Company entered into an agreement, commencing on September 14, 2020, to pay an affiliate of the Sponsor up to $10,000 per month for office space, utilities and secretarial and administrative services. Upon completion of a Business Combination or its liquidation, the Company will cease paying these monthly fees. For the period from June 23, 2020 (inception) through December 31, 2020, the Company incurred and paid $40,000 in fees for these services.

### Promissory Note – Related Party

On July 3, 2020, the Sponsor issued an unsecured promissory note to the Company (the "Promissory Note"), pursuant to which the Company could borrow up to an aggregate principal amount of $250,000. The Promissory Note was non-interest bearing and payable on the earlier of March 31, 2021 and the consummation of the Initial Public Offering. The outstanding balance under the Promissory Note of $250,000 was repaid at the closing of the Initial Public Offering on September 17, 2020.

### Related Party Loans

In addition, in order to finance transaction costs in connection with a Business Combination, the Sponsor, an affiliate of the Sponsor, or certain of the Company's officers and directors or their affiliates may, but are not obligated to, loan the Company funds as may be required ("Working Capital Loans"). If the Company completes a Business Combination, the Company would repay the Working Capital Loans out of the proceeds of the Trust Account released to the Company. Otherwise, the Working Capital Loans would be repaid only out of funds held outside the Trust Account. In the event that a Business Combination does not close, the Company may use a portion of proceeds held outside the Trust Account to repay the Working Capital Loans but no proceeds held in the Trust Account would be used to repay the Working Capital Loans. The Working Capital Loans would either be repaid upon consummation of a Business Combination, without interest, or, at the lender's discretion, up to $1,500,000 of such Working Capital Loans may be converted into warrants, at a price of $1.00 per warrant, of the post Business Combination entity. The warrants would be identical to the Private Placement Warrants. As of December 31, 2020, no Working Capital Loans were outstanding.

## NOTE 6. COMMITMENTS AND CONTINGENCIES

### Risks and Uncertainties

Management continues to evaluate the impact of the COVID-19 pandemic on the industry and has concluded that while it is reasonably possible that the virus could have a negative effect on the Company's financial position, results of its operations and/or search for a target company, the specific impact is not readily determinable as of the date of these financial statements. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

### Registration Rights

Pursuant to a registration and stockholder rights agreement entered into on September 14, 2020, holders of the Founder Shares, Private Placement Warrants and warrants that may be issued upon conversion of Working Capital Loans (and any shares of Class A common stock issuable upon the exercise of the Private Placement Warrants and warrants that may be issued upon conversion of the Working Capital Loans and upon conversion of the Founder Shares) will be entitled to registration rights, requiring the Company to register such securities for resale (in the case of the Founder Shares, only after conversion to shares of Class A common stock). Any holder of at least 20% of the outstanding registrable securities owned by these holders will be entitled to make up to two demands, excluding short form demands, that the Company register such securities. In addition, the holders will have certain "piggy-back" registration rights with respect to registration statements filed subsequent to the completion of a Business Combination and rights to require the Company to register for resale such securities pursuant to Rule 415 under the Securities Act. However, the registration and stockholder rights agreement provides that the Company will not permit any registration statement filed under the Securities Act. The Company will bear certain expenses incurred in connection with the filing of any such registration statements.

In addition, pursuant to the registration and stockholder rights agreement, upon consummation of a Business Combination, the Sponsor and the future holders of Founder Shares (or securities into which the Founder Shares convert) held by the Sponsor will be entitled to designate three individuals for nomination for election to the

F-13

Exhibit 7
Page 883

Company's board of directors for so long as they continue to hold, collectively, at least 50% of the Founder Shares (or the securities into which such Founder Shares convert) held by such persons on the date of this prospectus. Thereafter, such initial stockholders will be entitled to designate (i) two individuals for nomination for election to the Company's board of directors for so long they continue to hold, collectively, at least 30% of the Founder Shares (or the securities into which such Founder Shares convert) held by such persons on the date of this prospectus and (ii) one individual for nomination for election to the Company's board of directors for so long they continue to hold, collectively, at least 20% of the Founder Shares (or the securities into which such Founder Shares convert) held by such persons on the date of this prospectus.

### Underwriting Agreement

Certain of the underwriters of the Initial Public Offering are entitled to a deferred fee of $0.35 per Unit, or $8,050,000 in the aggregate. The deferred fee will become payable to the underwriters from the amounts held in the Trust Account solely in the event that the Company completes a Business Combination, subject to the terms of the underwriting agreement. The underwriters did not receive any upfront underwriting discount or commissions on the 1,980,000 Units purchased by the PIMCO private funds or their respective affiliates but will receive deferred underwriting commissions with respect to such Units.

### Consulting Arrangement

The Company has an arrangement with a third-party consultant to provide market analyses to the Company relating to potential business combination targets. The fee for this arrangement is approximately $1,350,000, of which 90% is contingent upon the closing of the transaction.

### NOTE 7. STOCKHOLDERS' EQUITY

*Preferred Stock* — The Company is authorized to issue 1,000,000 shares of preferred stock with a par value of $0.0001 per share with such designation, rights and preferences as may be determined from time to time by the Company's board of directors. At December 31, 2020, there were no shares of preferred stock issued or outstanding.

*Class A Common Stock* — The Company is authorized to issue 100,000,000 shares of Class A common stock with a par value of $0.0001 per share. Holders of Class A common stock are entitled to one vote for each share. At December 31, 2020, there were 1,175,100 shares of Class A common stock issued and outstanding, excluding 21,824,900 shares of Class A common stock subject to possible redemption.

*Class B Common Stock* — The Company is authorized to issue 10,000,000 shares of Class B common stock with a par value of $0.0001 per share. At December 31, 2020, there were 5,750,000 shares of Class B common stock issued and outstanding. Holders of Class B common stock are entitled to one vote for each share. Prior to the Business Combination, only holders of shares of Class B common stock have the right to vote on the election of directors.

Holders of Class A common stock and Class B common stock will vote together as a single class on all matters submitted to a vote of stockholders except as required by law.

The shares of Class B common stock will automatically convert into shares of Class A common stock at the time of a Business Combination on a one-for-one basis, subject to adjustment. In the case that additional shares of Class A common stock, or equity-linked securities, are issued or deemed issued in excess of the amounts offered in the Initial Public Offering and related to the closing of a Business Combination, the ratio at which shares of Class B common stock shall convert into shares of Class A common stock will be adjusted (unless the holders of a majority of the outstanding shares of Class B common stock agree to waive such adjustment with respect to any such issuance or deemed issuance) so that the number of shares of Class A common stock issuable upon conversion of all shares of Class B common stock will equal, in the aggregate, on an as-converted basis, 20% of the sum of the total number of all shares of common stock outstanding upon the completion of the Initial Public Offering plus all shares of Class A common stock and equity-linked securities issued or deemed issued in connection with a Business Combination (excluding any shares or equity-linked securities issued, or to be issued, to any seller in a Business Combination, and any private placement-equivalent warrants issued to the Sponsor or its affiliates upon conversion of loans made to the Company).

*Warrants* — Public Warrants may only be exercised for a whole number of shares. No fractional warrants will be issued upon separation of the Units and only whole warrants will trade. The Public Warrants will become

F-14

Exhibit 7
Page 884

exercisable on the later of (a) 12 months from the closing of the Initial Public Offering and (b) 30 days after the completion of a Business Combination. The Public Warrants will expire five years after the completion of a Business Combination or earlier upon redemption or liquidation.

The Company will not be obligated to deliver any shares of Class A common stock pursuant to the exercise of a warrant and will have no obligation to settle such warrant exercise unless a registration statement under the Securities Act with respect to the shares of Class A common stock underlying the warrants is then effective and a prospectus relating thereto is current, subject to the Company satisfying its obligations with respect to registration. No warrant will be exercisable and the Company will not be obligated to issue any shares of Class A common stock upon exercise of a warrant unless Class A common stock issuable upon such warrant exercise has been registered, qualified or deemed to be exempt under the securities laws of the state of residence of the registered holder of the warrants.

The Company has agreed that as soon as practicable, but in no event later than 15 business days after the closing of a Business Combination, it will use its commercially reasonable efforts to file with the SEC a registration statement covering the shares of Class A common stock issuable upon exercise of the warrants, to cause such registration statement to become effective within 60 business days after the closing of the Business Combination and to maintain a current prospectus relating to those shares of Class A common stock until the warrants expire or are redeemed, as specified in the warrant agreement; provided that if shares of the Class A common stock are at the time of any exercise of a public warrant not listed on a national securities exchange such that they satisfy the definition of a "covered security" under Section 18(b)(1) of the Securities Act, the Company may, at its option, require holders of Public Warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event the Company so elects, the Company will not be required to file or maintain in effect a registration statement, but it will use its commercially reasonable efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available. If a registration statement covering the shares of Class A common stock issuable upon exercise of the warrants is not effective by the 60th business day after the closing of a Business Combination, warrant holders may, until such time as there is an effective registration statement and during any period when the Company will have failed to maintain an effective registration statement, exercise warrants on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act or another exemption.

*Redemption of warrants when the price per Class A common stock equals or exceeds $18.00*. Once the Public Warrants become exercisable, the Company may redeem the Public Warrants:

- in whole and not in part;

- at a price of $0.01 per warrant;

- upon not less than 30 days' prior written notice of redemption, or the 30-day redemption period, to each warrant holder; and

- if, and only if, the reported last sale price of the Company's Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which the Company sends the notice of redemption to the warrant holders.

If and when the warrants become redeemable by the Company, the Company may exercise its redemption right even if it is unable to register or qualify the underlying securities for sale under all applicable state securities laws.

*Redemption of warrants when the price per share of Class common stock equals or exceeds $10.00* — Commencing ninety days after the warrants become exercisable, the Company may redeem the outstanding Public Warrants:

- in whole and not in part;

- at a price of $0.10 per warrant provided that holders will be able to exercise their warrants prior to redemption and receive that number of shares of Class A common stock determined based on the redemption date and the "fair market value" of the Company's Class A common stock;

F-15

Exhibit 7
Page 885

- if, and only if, the closing price of the Class A common stock equals or exceeds $10.00 per share for any 20 trading days within the 30-trading day period ending three trading days before the Company send the notice of redemption to the warrant holders; and

- if the closing price of the Class A common stock for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which the Company sends the notice of redemption to the warrant holders is less than $18.00 per share, the Private Placement Warrants must also be concurrently called for redemption on the same terms as the outstanding Public Warrants, as described above.

The exercise price and number of shares of Class A common stock issuable upon exercise of the warrants may be adjusted in certain circumstances including in the event of a stock dividend, or recapitalization, reorganization, merger or consolidation. However, the warrants will not be adjusted for issuance of Class A common stock at a price below its exercise price. Additionally, in no event will the Company be required to net cash settle the warrants. If the Company is unable to complete a Business Combination within the Combination Period and the Company liquidates the funds held in the Trust Account, holders of warrants will not receive any of such funds with respect to their warrants, nor will they receive any distribution from the Company's assets held outside of the Trust Account with the respect to such warrants. Accordingly, the warrants may expire worthless.

In addition, if (x) the Company issues additional shares of Class A common stock or equity-linked securities for capital raising purposes in connection with the closing of a Business Combination at an issue price or effective issue price of less than $9.20 per Class A common (with such issue price or effective issue price to be determined in good faith by the Company's board of directors and, in the case of any such issuance to the Sponsors or its affiliates, without taking into account any Founder Shares held by the Sponsors or such affiliates, as applicable, prior to such issuance) (the "Newly Issued Price"), (y) the aggregate gross proceeds from such issuances represent more than 60% of the total equity proceeds, and interest thereon, available for the funding of a Business Combination on the date of the consummation of a Business Combination (net of redemptions), and (z) the volume weighted average trading price of the Company's Class A common stock during the 20 trading day period starting on the trading day prior to the day on which the Company consummates a Business Combination (such price, the "Market Value") is below $9.20 per share, the exercise price of the warrants will be adjusted (to the nearest cent) to be equal to 115% of the higher of the Market Value and the Newly Issued Price, and the $18.00 per share redemption trigger prices will be adjusted (to the nearest cent) to be equal to 180% of the higher of the Market Value and the Newly Issued Price, and the $10.00 per share redemption trigger price will be adjusted (to the nearest cent) to be equal to the higher of the Market Value and the Newly Issued Price.

The Private Placement Warrants are identical to the Public Warrants underlying the Units sold in the Initial Public Offering, except that the Private Placement Warrants and the shares of Class A common stock issuable upon the exercise of the Private Placement Warrants will not be transferable, assignable or saleable until 30 days after the completion of a Business Combination, subject to certain limited exceptions. Additionally, the Private Placement Warrants will be exercisable on a cashless basis and be non-redeemable so long as they are held by the initial purchasers or their permitted transferees. If the Private Placement Warrants are held by someone other than the initial purchasers or their permitted transferees, the Private Placement Warrants will be redeemable by the Company and exercisable by such holders on the same basis as the Public Warrants.

**NOTE 8. INCOME TAX**

The Company's net deferred tax assets are as follows:

|  | December 31, 2020 |
|---|---|
| Deferred tax asset | |
| Net operating loss carryforward | $ 10,861 |
| Organizational costs/Startup expenses | 78,848 |
| Total deferred tax asset | 89,709 |
| Valuation allowance | (89,709) |
| Deferred tax asset, net of allowance | $     — |

F-16

Exhibit 7
Page 886

The income tax provision consists of the following:

| | December 31, 2020 |
|---|---|
| **Federal** | |
| Current | $ — |
| Deferred | (89,709) |
| | |
| **State** | |
| Current | $ — |
| Deferred | — |
| Change in valuation allowance | 89,709 |
| Income tax provision | $ — |

As of December 31, 2020, the Company had a U.S. federal net operating loss carryover of approximately $52,000 available to offset future taxable income.

In assessing the realization of the deferred tax assets, management considers whether it is more likely than not that some portion of all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which temporary differences representing net future deductible amounts become deductible. Management considers the scheduled reversal of deferred tax liabilities, projected future taxable income and tax planning strategies in making this assessment. After consideration of all of the information available, management believes that significant uncertainty exists with respect to future realization of the deferred tax assets and has therefore established a full valuation allowance. For the period from June 23, 2020 (inception) through December 31, 2020, the change in the valuation allowance was $89,709.

A reconciliation of the federal income tax rate to the Company's effective tax rate at December 31, 2020 is as follows:

| | December 31, 2020 |
|---|---|
| Statutory federal income tax rate | 21.0% |
| State taxes, net of federal tax benefit | 0.0% |
| Change in valuation allowance | (21.0)% |
| Income tax provision | 0.0% |

The Company files income tax returns in the U.S. federal jurisdiction in various state and local jurisdictions and is subject to examination by the various taxing authorities.

**NOTE 9. FAIR VALUE MEASUREMENTS**

The fair value of the Company's financial assets and liabilities reflects management's estimate of amounts that the Company would have received in connection with the sale of the assets or paid in connection with the transfer of the liabilities in an orderly transaction between market participants at the measurement date. In connection with measuring the fair value of its assets and liabilities, the Company seeks to maximize the use of observable inputs (market data obtained from independent sources) and to minimize the use of unobservable inputs (internal assumptions about how market participants would price assets and liabilities). The following fair value hierarchy is used to classify assets and liabilities based on the observable inputs and unobservable inputs used in order to value the assets and liabilities:

Level 1:   Quoted prices in active markets for identical assets or liabilities. An active market for an asset or liability is a market in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis.

Level 2:   Observable inputs other than Level 1 inputs. Examples of Level 2 inputs include quoted prices in active markets for similar assets or liabilities and quoted prices for identical assets or liabilities in markets that are not active.

Level 3:   Unobservable inputs based on our assessment of the assumptions that market participants would use in pricing the asset or liability.

F-17

Exhibit 7
Page 887

At December 31, 2020, assets held in the Trust Account were comprised of $753 in cash and $230,052,496 in U.S. Treasury securities. During the year ended December 31, 2020, the Company did not withdraw any interest income from the Trust Account.

The following table presents information about the Company's assets that are measured at fair value on a recurring basis at December 31, 2020 and indicates the fair value hierarchy of the valuation inputs the Company utilized to determine such fair value. The gross holding gains and fair value of held-to-maturity securities at December 31, 2020 are as follows:

| | Held-To-Maturity | Level | Amortized Cost | Gross Holding Gain | Fair Value |
|---|---|---|---|---|---|
| December 31, 2020 | U.S. Treasury Securities (Maturity 3/18/2021) | 1 | $230,052,496 | $4,291 | $230,056,787 |

**NOTE 10. SUBSEQUENT EVENTS**

The Company evaluated subsequent events and transactions that occurred after the balance sheet date up to the date that the financial statements were issued. Based upon this review, other than as described below, the Company did not identify any subsequent events that would have required adjustment or disclosure in the financial statements.

**Business Combination Agreement**

On February 15, 2021, the Company entered into a business combination agreement by and among itself, Project Olympus Merger Sub, Inc., a wholly owned subsidiary ("Merger Sub"), and Owlet Baby Care Inc. ("Owlet") ("Business Combination Agreement"). Owlet provides a data-driven connectivity platform to the nursey for parents. If approved, Merger Sub will merge with and into Owlet, with Owlet surviving the merger as a wholly owned subsidiary of the Company (the "Merger"). In addition, in connection with the consummation of the transactions contemplated by the Business Combination Agreement (the "Closing"), the Company will be renamed "Owlet, Inc." and is referred to below as "New Owlet" as of the time following such change of name.

As a consequence of the Business Combination, each share of the Company's Class B common stock that is issued and outstanding as of immediately prior to the Effective Time will automatically convert into a share of New Owlet Class A common stock ("New Owlet common stock") on a one-for-one basis in accordance with the terms of the Company's amended and restated certificate of incorporation, dated September 14, 2020. The Business Combination will have no effect on the Company's Class A common stock that is issued and outstanding as of immediately prior to the Effective Time, which will continue to remain outstanding.

As a consequence of the Merger, at the Effective Time, (i) each share of Owlet capital stock that is issued and outstanding immediately prior to the Effective Time will be cancelled and converted into the right to receive the number of shares of New Owlet common stock equal to the Exchange Ratio (as defined in the Business Combination Agreement), rounded down to the nearest whole share; (ii) each option to purchase shares of Owlet common stock, whether vested or unvested, that is outstanding and unexercised as of immediately prior to the Effective Time will be assumed by New Owlet and will automatically become an option (vested or unvested, as applicable) to purchase a number of shares of New Owlet common stock equal to the number of shares of Owlet common stock subject to such option immediately prior to the Effective Time multiplied by the Exchange Ratio, rounded down to the nearest whole share, at an exercise price per share equal to the exercise price per share of such option immediately prior to the Effective Time divided by the Exchange Ratio, rounded up to the nearest whole cent, except that, subject to specified limitations, holders of vested options may instead elect to receive a cash payment in lieu of assumption of a portion of their vested options up to an aggregate cap of $10 million; and (iii) each share of Owlet common stock that is subject to a risk of forfeiture or right of repurchase at the original purchase price as of immediately prior to the Effective Time shall be subject to the same risk of forfeiture or right of repurchase (proportionately adjusted to reflect the Exchange Ratio) which risk of forfeiture or right of repurchase shall lapse in accordance with the same vesting schedule as that of the Owlet restricted stock.

The Business Combination is expected to close in the second quarter of 2021, following the receipt of the required approval by the Company's stockholders and the fulfillment of other customary closing conditions. For additional information please see the Form 8-K filed and with the SEC on February 16, 2021.

F-18

Exhibit 7
Page 888

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of Owlet Baby Care Inc.

### *Opinion on the Financial Statements*

We have audited the accompanying consolidated balance sheets of Owlet Baby Care Inc. and its subsidiary (the "Company") as of December 31, 2020 and 2019, and the related consolidated statements of operations, of redeemable convertible preferred stock and stockholders' deficit and of cash flows for the years then ended, including the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

### *Substantial Doubt about the Company's Ability to Continue as a Going Concern*

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, since inception, the Company has experienced recurring losses from operations and generated negative cash flows from operations that raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

### *Change in Accounting Principle*

As discussed in Note 1 to the consolidated financial statements, the Company changed the manner in which it accounts for revenues from contracts with customers in 2019.

### *Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits of these consolidated financial statements in accordance with the standards of the PCAOB and in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

**/s/ PricewaterhouseCoopers LLP**

Salt Lake City, Utah
March 30, 2021

We have served as the Company's auditor since 2020.

F-19

Exhibit 7
Page 889

**TABLE OF CONTENTS**

**Owlet Baby Care Inc.**
**Consolidated Balance Sheets**
*(In thousands, except share*
*and per share amounts)*

| Assets | As of December 31, 2020 | As of December 31, 2019 |
|---|---|---|
| Current assets: | | |
| Cash and cash equivalents | $ 17,009 | $ 11,736 |
| Accounts receivable, net of allowance for doubtful accounts of $201 and $93 | 10,525 | 7,765 |
| Inventory | 7,912 | 4,861 |
| Prepaid expenses and other current assets | 2,168 | 1,247 |
| Total current assets | 37,614 | 25,609 |
| Property and equipment, net | 1,718 | 1,854 |
| Intangible assets, net | 605 | 624 |
| Other assets | 181 | 113 |
| Total assets | $ 40,118 | $ 28,200 |
| **Liabilities, Redeemable Convertible Preferred Stock, and Stockholders' Deficit** | | |
| Current liabilities: | | |
| Accounts payable | $ 16,379 | $ 8,111 |
| Accrued and other expenses | 10,592 | 7,332 |
| Deferred revenues | 1,643 | 737 |
| Line of credit | 9,700 | 8,647 |
| Current portion of related party convertible notes payable | 6,934 | 0 |
| Current portion of long-term debt | 2,024 | 104 |
| Total current liabilities | 47,272 | 24,931 |
| Deferred rent, net of current portion | 322 | 329 |
| Long-term deferred revenues, net of current portion | 159 | 108 |
| Long-term debt, net | 10,180 | 6,915 |
| Related party convertible notes payable, net of current portion | 0 | 6,590 |
| Preferred stock warrant liability | 2,993 | 1,041 |
| Other long-term liabilities | 13 | 0 |
| Total liabilities | 60,939 | 39,914 |
| Commitments and contingencies (Note 11) | | |
| Redeemable convertible Series A and Series A-1 preferred stock, $0.0001 par value, 23,030,285 shares authorized; 22,596,929 shares issued and outstanding (liquidation preference of $9,702 and $14,245 for Series A and Series A-1, respectively) | 23,652 | 23,652 |
| Redeemable convertible Series B and Series B-1 preferred stock, $0.0001 par value, 7,507,073 shares authorized; 7,507,071 shares issued and outstanding (liquidation preference of $19,000 and $3,745 for Series B and Series B-1, respectively) | 23,536 | 23,536 |
| Stockholders' deficit: | | |
| Common stock, $0.0001 par value, 52,000,000 shares authorized; 10,772,774 and 10,569,235 shares issued and outstanding, respectively | 1 | 1 |
| Additional paid-in capital | 3,708 | 2,294 |
| Accumulated deficit | (71,718) | (61,197) |
| Total stockholders' deficit | (68,009) | (58,902) |
| Total liabilities, redeemable convertible preferred stock, and stockholders' deficit | $ 40,118 | $ 28,200 |

Exhibit 7
Page 890

See accompanying notes to consolidated financial statements

F-20

Exhibit 7
Page 891

**Owlet Baby Care Inc.**
**Consolidated Statements of Operations**
*(In thousands, except share and per share amounts)*

| | Year Ended December 31, 2020 | Year Ended December 31, 2019 |
|---|---|---|
| Revenues | $    75,403 | $    49,801 |
| Cost of revenues | 39,526 | 26,897 |
| Gross profit | 35,877 | 22,904 |
| Operating expenses: | | |
| General and administrative | 13,140 | 14,020 |
| Sales and marketing | 19,263 | 15,323 |
| Research and development | 10,465 | 10,611 |
| Total operating expenses | 42,868 | 39,954 |
| Operating loss | (6,991) | (17,050) |
| Other income (expense): | | |
| Interest expense | (1,420) | (973) |
| Interest income | 38 | 279 |
| Preferred stock mark to market adjustment | (1,952) | (251) |
| Other income (expense), net | (176) | 144 |
| Total other expense, net | (3,510) | (801) |
| Loss before income tax provision | (10,501) | (17,851) |
| Income tax provision | (20) | — |
| Net loss | $    (10,521) | $    (17,851) |
| Net loss per share attributable to common stockholders, basic and diluted | $    (0.98) | $    (1.76) |
| Weighted-average number of shares outstanding used to compute net loss per share attributable to common stockholders, basic and diluted | 10,693,984 | 10,132,242 |

See accompanying notes to consolidated financial statements

F-21

Exhibit 7
Page 892

**TABLE OF CONTENTS**

**Owlet Baby Care Inc.**
**Consolidated Statements of Redeemable Convertible Preferred Stock and Stockholders' Deficit**
*(In thousands, except for share amounts)*

| | Preferred Stock Series A | | Preferred Stock Series A-1 | | Preferred Stock Series B | | Preferred Stock Series B-1 | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | | | |
| Balance as of December 31, 2018 | 12,740,004 | $9,569 | 9,856,925 | $14,083 | 6,022,954 | $18,854 | 1,484,117 | $4,682 | 10,353,848 | $ 1 | $ 544 | $(42,574) | $(42,029) |
| Adoption of Topic 606 (Note 1) | — | — | — | — | — | — | — | — | — | — | — | 52 | 52 |
| Issuance of common stock warrants in connection with debt amendment and new debt issuance | — | — | — | — | — | — | — | — | — | — | 75 | — | 75 |
| Issuance of common stock upon exercise of stock options | — | — | — | — | — | — | — | — | 536,411 | — | 197 | — | 197 |
| Issuance of common stock upon exercise of warrants | — | — | — | — | — | — | — | — | 312,971 | — | 59 | — | 59 |
| Settlement of stockholder notes receivable with common stock returned to the Company | — | — | — | — | — | — | — | — | (633,995) | — | 824 | (824) | — |
| Stock-based compensation | — | — | — | — | — | — | — | — | — | — | 595 | — | 595 |
| Net loss | — | — | — | — | — | — | — | — | — | — | — | (17,851) | (17,851) |
| Balance as of December 31, 2019 | 12,740,004 | $9,569 | 9,856,925 | $14,083 | 6,022,954 | $18,854 | 1,484,117 | $4,682 | 10,569,235 | $ 1 | $2,294 | $(61,197) | $(58,902) |
| Issuance of common stock warrants in connection with debt amendment and new debt issuance | — | — | — | — | — | — | — | — | — | — | 226 | — | 226 |
| Issuance of common stock upon exercise of stock options | — | — | — | — | — | — | — | — | 203,539 | — | 118 | — | 118 |
| Stock-based compensation | — | — | — | — | — | — | — | — | — | — | 1,070 | — | 1,070 |
| Net loss | — | — | — | — | — | — | — | — | — | — | — | (10,521) | (10,521) |
| Balance as of December 31, 2020 | 12,740,004 | $9,569 | 9,856,925 | $14,083 | 6,022,954 | $18,854 | 1,484,117 | $4,682 | 10,772,774 | 1 | $3,708 | $(71,718) | $(68,009) |

See accompanying notes to consolidated financial statements

F-22

Exhibit 7
Page 893

TABLE OF CONTENTS

**Owlet Baby Care Inc.**
**Consolidated Statements of Cash Flows**
*(In thousands)*

| | Year Ended December 31, 2020 | Year Ended December 31, 2019 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net loss | $(10,521) | $(17,851) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 873 | 544 |
| Amortization of debt issuance costs | 38 | 16 |
| Amortization of debt discount | 104 | 10 |
| Loss on disposal of property and equipment | 48 | 176 |
| Stock-based compensation | 1,070 | 595 |
| Write-down of inventory to net realizable value | 417 | 50 |
| Provision for losses on accounts receivable | 201 | 59 |
| Change in fair value of preferred stock warrant liability | 1,952 | 251 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (2,962) | (1,854) |
| Prepaid expenses and other assets | (989) | 26 |
| Inventory | (3,468) | (168) |
| Accounts payable | 8,559 | (168) |
| Accrued and other expenses | 3,260 | 1,995 |
| Deferred related party convertible notes payable interest | 325 | 121 |
| Deferred revenues | 957 | (124) |
| Deferred rent | 7 | 261 |
| Net cash used in operating activities | (129) | (16,061) |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment | (967) | (1,562) |
| Purchase of intangible assets | (89) | (397) |
| Net cash used in investing activities | (1,056) | (1,959) |
| **Cash flows from financing activities:** | | |
| Proceeds from line of credit | 12,316 | 7,857 |
| Payments on line of credit | (11,267) | (4,207) |
| Proceeds from issuance of long-term debt | 3,000 | 2,000 |
| Proceeds from issuance of related party convertible notes payable | — | 6,500 |
| Proceeds from financed insurance premium | 637 | 256 |
| Payments on financed insurance premium | (420) | (154) |
| Payments of debt issuance costs | — | (51) |
| Payments on long-term debt | (1) | (2) |
| Proceeds from Paycheck Protection Program loan | 2,075 | — |
| Proceeds from exercise of common stock options | 118 | 197 |
| Proceeds from exercise of common stock warrants | — | 59 |
| Net cash provided by financing activities | 6,458 | 12,455 |
| Net change in cash and cash equivalents | 5,273 | (5,565) |
| Cash and cash equivalents at beginning of year | 11,736 | 17,301 |
| Cash and cash equivalents at end of year | $ 17,009 | $ 11,736 |
| **Supplemental disclosure of cash flow information:** | | |
| Cash paid for interest | $ 462 | $ 818 |
| Cash paid for income taxes | $ 14 | $ 0 |

Exhibit 7
Page 894

| | | | | | |
|---|---|---|---|---|---|
| **Supplemental disclosure of non-cash investing activities:** | | | | | |
| Unpaid purchases of property and equipment | | $ | 21 | $ | 314 |
| **Supplemental disclosure of non-cash financing activities:** | | | | | |
| Issuance of common stock warrants in connection with debt amendment and new debt issuance (Note 9) | | $ | 226 | $ | 75 |
| Settlement of stockholder notes receivable with common stock returned to the Company (Note 14) | | | — | $ | 824 |

See accompanying notes to consolidated financial statements

F-23

Exhibit 7
Page 895

TABLE OF CONTENTS

**Owlet Baby Care Inc.**
**Notes to Consolidated Financial Statements**
*(In thousands, except shares and per share amounts)*
**December 31, 2020**

1.   **Description of Organization and Summary of Significant Accounting Policies**

*Organization*

Owlet Baby Care Inc. (the "Company") was incorporated on February 24, 2014 as a Delaware corporation. The Company's ecosystem of digital parenting solutions, including our connected anchor product, the Owlet Smart Sock, is helping to transform modern parenting by providing parents data to track the sleep patterns, oxygen levels, and heart rates of their children. Its solutions are designed to provide actionable insights aimed at improving children's sleep and parents' confidence and comfort.

*Basis of Presentation and Principles of Consolidation*

The consolidated financial statements of the Company and its subsidiary have been prepared in conformity with accounting principles generally accepted in the United States ("U.S. GAAP"). All intercompany transactions and balances have been eliminated in consolidation. All dollar amounts in the notes are presented in thousands except for share and per share data or unless otherwise specified. Certain reclassifications were made to the prior year consolidated financial statements to conform to the current year presentation. These reclassifications were made to combine prior year financial statement line items and amounts within the accrued and other expenses, current portion of long-term debt, other income (expense), net line item in the consolidated statements of operations. These reclassifications have no effect on stockholders' deficit or net loss as previously reported.

*Going Concern*

Since inception, the Company has experienced recurring losses from operations and generated negative cash flows from operations, which have been funded primarily through raising debt and issuing common and preferred stock. For the years ended December 31, 2020 and December 31, 2019, the Company generated negative cash flows from operations of ($129) and ($16,061) and net losses of ($10,521) and ($17,851), respectively. As of December 31, 2020 and December 31, 2019, the Company had an accumulated deficit of ($71,718) and ($61,197), respectively. The Company will need to finance future operations through generating additional revenues and raising additional debt or equity. There can be no assurance that the Company will be able to obtain additional debt or equity financing on terms acceptable to the Company, if at all, or that the Company will generate sufficient future revenues.

In accordance with Accounting Standards Update No. 2014-15, *Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern (Subtopic 205-40)*, the Company has evaluated whether there are conditions and events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern within one year after the date that the consolidated financial statements are issued or available to be issued. The recurring operating losses and negative cash flows from operations since inception, and the fact that management's plans to obtain additional capital have not yet been completed, raise substantial doubt about the Company's ability to continue as a going concern. The accompanying consolidated financial statements have been prepared on a going concern basis and accordingly, do not include any adjustments relating to the recoverability and classification of asset carrying amounts, or the amount and classification of liabilities that might result should the Company be unable to continue as a going concern.

**Impact of COVID-19**

The World Health Organization declared a global health emergency in January 2020 and in March 2020, it declared the spread of COVID-19 a global pandemic. The COVID-19 pandemic developed rapidly in 2020 and there was worldwide impact. The impact of COVID-19 included changes in consumer and business behavior, pandemic fears, market downturns, and restrictions on business and individual activities, and created significant volatility in the global economy that led to reduced economic activity.

As a result of the spread of the COVID-19 pandemic, economic uncertainties have arisen which have impacted and may continue to impact certain aspects of the Company's operations and performance. The

F-24

Exhibit 7
Page 896

Company is not aware of any specific events or circumstances that would require an update to estimates, judgements, the measurement of assets or liabilities, or the recognition of gains or losses. The full extent to which the COVID-19 pandemic will directly or indirectly impact the Company's cash flow, business, financial condition, results of operations and prospects will depend on future developments that are uncertain. Accordingly, actual results could materially differ from those estimates given the uncertainty from COVID-19.

As a result of the COVID-19 pandemic, management temporarily limited access to the Company's headquarters and encouraged its employees and contractors to work remotely, where possible, in accordance with local public health recommendations, each of which represented a significant change in how the Company operated its business. In light of the pandemic, management expects to continue to take actions as may be required or recommended by government authorities or as management determines is in the best interest of the Company's employees.

The Company experienced relatively minor impacts on its inventory availability and delivery capacity since the outbreak, neither of which materially impacted its ability to service its customers. The Company continues to work with its existing manufacturing, logistics and other supply chain partners to build key processes to ensure that its ability to service its customers is not significantly disrupted. Ongoing actions to bolster key aspects of the supply chain to support the Company's continued growth include geographically diversifying manufacturing operations to ensure adequate manufacturing capacity and to shorten transit times, implementing alternative order fulfillment options to reduce warehousing costs, developing contingency plans for unexpected third-party manufacturing disruptions, and increasing headcount dedicated to managing and optimizing supply chain processes.

### Use of Estimates

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect reported amounts and disclosures. Accordingly, actual results could differ from those estimates. Key management estimates include those related to revenue recognition (including sales incentives, product returns and implied post contract support and service), allowances for doubtful accounts, write-downs for obsolete or slow-moving inventory, useful lives for property and equipment, impairment assessments for long-lived tangible and intangible assets, warranty obligations, valuation allowances for net deferred income tax assets, and valuation of warrants and stock-based compensation.

### Concentrations of Risk

The Company maintains its cash in bank deposit accounts which, at times, exceed federally insured limits. As of December 31, 2020, the Company had approximately $16,954 of cash that exceeded federally insured limits. To date, the Company has not experienced a loss or lack of access to its invested cash; however, no assurance can be provided that access to the Company's invested cash and cash equivalents will not be impacted by adverse conditions in the financial markets.

In the normal course of business, the Company provides credit terms to some of its customers and generally requires no collateral. A major customer is considered to be one that comprises more than 10% of the Company's accounts receivable or annual revenues. The Company's major customers are as follows:

|  | Percentage of Revenue in 2020 | Percentage of Accounts Receivable as of December 31, 2020 |
|---|---|---|
| Company B | 24% | 26% |
| Company A | 18% | 27% |
| Company C | 9% | 13% |

|  | Percentage of Revenue in 2019 | Percentage of Accounts Receivable as of December 31, 2019 |
|---|---|---|
| Company A | 21% | 45% |
| Company B | 16% | 0% |
| Company C | 12% | 24% |

F-25

Exhibit 7
Page 897

TABLE OF CONTENTS

The Company's top three customers accounted for 51% and 49% of revenues for the years ended December 31, 2020 and December 31, 2019, respectively, and 66% and 69% of accounts receivable as of December 31, 2020 and December 31, 2019, respectively. The Company continuously monitors customer payments and maintains an allowance for doubtful accounts based on its assessment of various factors including historical experience, age of the receivable balances, and other current economic conditions or other factors that may affect customers' ability to pay.

The Company's products are manufactured, assembled, and tested by third-party contractors located primarily in Asia. The Company does not have long-term agreements with these contractors. A significant disruption in the operations of one or more of these contractors would impact the production of the Company's products which could have a material adverse effect on its business, financial condition, and results of operations. The Company also relies on third parties with whom it outsources supply chain activities related to inventory warehousing, order fulfillment, distribution and other direct sales logistics. In the event of a significant disruption to one or more of the third parties' abilities to perform their obligations, the Company may be unable to find alternative partners or satisfactorily deliver its products to its customers on time.

Certain core products of the Company require hosting services which are provided by U.S. based third-party hosting service providers. We have experienced, and may experience in the future, outages and other performance disruptions in the operations of one or more of these third-party providers. These outages and other performance disruptions have impacted, and in the future may impact, the functionality of the Company's products and lead to adverse effects on the Company's business, financial condition, and results of operations.

### Cash and Cash Equivalents

Cash and cash equivalents include all cash balances and highly liquid investments with original maturities of three months or less from the date of purchase. Cash equivalents consist of money market funds and commercial paper.

### Segment Information

The Company operates as a single operating segment. The Company's chief operating decision maker, its Chief Executive Officer, manages the Company's operations on a consolidated basis for purposes of allocating resources, making operating decisions, and evaluating financial performance. Since the Company operates in one operating segment, all required financial segment information can be found in these consolidated financial statements.

Revenue by geographic area is based on the delivery address of the customer and is summarized as follows:

| | Year Ended December 31, 2020 | Year Ended December 31, 2019 |
|---|---|---|
| United States | $71,128 | $47,194 |
| International | 4,275 | 2,607 |
| Total revenues | $75,403 | $49,801 |

Other than the United States, no individual country exceeded 10% of total revenues for the years ended December 31, 2020 and December 31, 2019.

The Company's long-lived assets are composed of property and equipment, net, and are summarized by geographic area as follows:

| | As of December 31, 2020 | As of December 31, 2019 |
|---|---|---|
| United States | $ 528 | $ 678 |
| Thailand | 1,104 | 1,060 |
| Other international | 86 | 116 |
| Total property and equipment, net | $1,718 | $1,854 |

F-26

Exhibit 7
Page 898

*Fair Value Measurements*

Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date.

The Company utilizes a valuation hierarchy for disclosure of the inputs to the valuations used to measure fair value. This hierarchy prioritizes the inputs into three broad levels as follows:

- Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities,

- Level 2 inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration, for substantially the full term of the financial instrument,

- Level 3 inputs are unobservable inputs based on the Company's own assumptions used to measure assets and liabilities at fair value. A financial asset or liability's classification within the hierarchy is determined based on the lowest level input that is significant to the fair value measurement.

The carrying value of the Company's accounts receivable, accounts payable, and accrued expenses approximate their fair value due to the short period of time to maturity or repayment. The Company has concluded that the preferred stock warrants issued meet the definition of a liability under ASC 480, *Distinguishing Liabilities from Equity,* and has classified the liability as a Level 3 fair value measurement.

| | December 31, 2020 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Balance |
| **Assets:** | | | | |
| Money market funds | $16,954 | $— | $  — | $16,954 |
| Total assets | $16,954 | $— | $  — | $16,954 |
| **Liabilities:** | | | | |
| Preferred stock warrant liability | $  — | $— | $2,993 | $ 2,993 |
| Total liabilities | $  — | $— | $2,993 | $ 2,993 |

| | December 31, 2019 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Balance |
| **Assets:** | | | | |
| Money market funds | $11,651 | $— | $  — | $11,651 |
| Total assets | $11,651 | $— | $  — | $11,651 |
| **Liabilities:** | | | | |
| Preferred stock warrant liability | $  — | $— | $1,041 | $ 1,041 |
| Total liabilities | $  — | $— | $1,041 | $ 1,041 |

Money market funds are included within Level 1 of the fair value hierarchy because they are valued using quoted market prices.

F-27

Exhibit 7
Page 899

The Company has re-measured the preferred stock warrant liability to estimated fair value as of December 31, 2020 and December 31, 2019, using the Black-Scholes option pricing model with the following assumptions:

| | As of December 31, 2020 | As of December 31, 2019 |
|---|---|---|
| Series A preferred stock value | $ 7.47 | $ 2.89 |
| Exercise price of warrants | $ 0.76 | $ 0.76 |
| Term in years | 5.75 | 6.75 |
| Risk-free interest rate | 2.97% | 3.00% |
| Volatility | 67.00% | 58.00% |
| Dividend yield | 0.00% | 0.00% |

The following table presents a reconciliation of the Company's preferred stock warrant liability measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the year ended December 31, 2020 and December 31, 2019:

| | Preferred Stock Warrant Liability |
|---|---|
| Balance as of January 1, 2019 | $ 790 |
| Change in fair value upon re-measurement | 251 |
| Balance as of December 31, 2019 | $1,041 |
| Change in fair value upon re-measurement | 1,952 |
| Balance as of December 31, 2020 | $2,993 |

The Company presented the fair value measurement as a Level 3 measurement, relying on unobservable inputs reflecting the Company's own assumptions. Level 3 measurements, which are not based on quoted prices in active markets, introduce a higher degree of subjectivity and may be more sensitive to fluctuations in stock price, volatility rates, and U.S. Treasury Bond rates and could have a material impact on future fair value measurements.

There were no transfers between Level 1 and Level 2 in the period reported. There were no transfers into or out of Level 3 in the periods reported.

### Accounts Receivable

The Company records its accounts receivable at sales value and establishes specific reserves for those customer accounts identified with collection problems due to insolvency or other issues. The Company's accounts receivable are considered past due when payment has not been received by the contractually required due date, which is generally 15-75 days after the invoice date. The amounts of the specific reserves are estimated by management based on various assumptions including the customer's financial position, age of the customer's receivables, and changes in payment schedules and histories. Account balances are charged off against the allowance for doubtful accounts receivable when the potential for recovery is remote. Recoveries of receivables previously charged off are recorded when payment is received. The allowance for doubtful accounts receivable as of December 31, 2020 and December 31, 2019 was $201 and $93, respectively.

### Inventory

Inventory includes material and third-party assembly costs, not in excess of estimated net realizable value. Inventory is recorded at the lower of cost or net realizable value, with cost being determined using the weighted-average cost method. The Company periodically reviews inventory for excess supply, obsolescence, and valuations above estimated realizable amounts, and provides a reserve to cover these items. Once inventory is written down, a new accounting cost basis is established and, accordingly, any associated reserve is not released until the inventory is sold or scrapped. Management established a reserve for obsolete inventory of $417 and $50 as of December 31, 2020 and December 31, 2019, respectively.

F-28

Exhibit 7
Page 900

### Capitalized Transaction Costs

Capitalized transactions costs consist of direct incremental legal, accounting and consulting, and other fees related to the preparation S-4 registration statement. These costs are initially deferred and will be offset against the proceeds of the offering as a reduction of additional paid in capital upon consummation of the merger disclosed in Note 18. For the years ended December 31, 2020 and December 31, 2019, capitalized transaction costs were $522 and $0, respectively.

### Property and Equipment

Property and equipment is stated at cost less accumulated depreciation and amortization. Depreciation and amortization are calculated using the straight-line method over the estimated economic useful lives of the assets or over the related lease terms (if shorter) as follows:

| | |
|---|---|
| Furniture and fixtures | 3-7 years |
| Leasehold improvements | 2-5 years |
| Software | 2-3 years |
| Tooling and manufacturing equipment | 3 years |
| Computer equipment | 2 years |

Expenditures that materially increase values or capacities or extend useful lives of property and equipment are capitalized. Routine maintenance, repairs, and renewal costs are expensed as incurred. Upon sale or other retirement of depreciable property, the cost and accumulated depreciation and amortization are removed from the related accounts and any gain or loss is reflected in the consolidated statements of operations.

### Intangible Assets

Intangible assets, which consist of patents, trademarks, and Dream Lab film production costs are tested for impairment whenever events or changes in circumstances indicate that the carrying amount of the assets may be impaired. Management does not consider any of the Company's intangible assets to be impaired as of December 31, 2020 and December 31, 2019. Patents and trademarks are amortized over ten years using the straight-line method. Film production costs are amortized over three years using the individual-film-forecast-computation method.

### Software Development

The Company's software development costs for applications to be provided to its customers as part of the integrated hardware and application experience are expensed as incurred until the preliminary project stage has been completed and application development begins. The Company discontinues capitalization upon entering the post-implementation stage and expenses ongoing maintenance and support costs. There were no material qualifying costs incurred during the application development stage in the years presented. As a result, software development costs have been expensed as incurred.

### Impairment of Long-Lived Assets

The Company reviews its long-lived assets, consisting primarily of property and equipment and intangible assets, for impairment whenever events or changes in circumstances indicate that the carrying amount of the assets may be impaired. If it is determined that the estimated undiscounted future cash flows are not sufficient to recover the carrying value of the asset, an impairment loss is recognized in the consolidated statement of operations for the difference between the carrying value and the fair value of the asset. There were no impairments of the Company's long-lived assets during the years ended December 31, 2020 and December 31, 2019.

### Debt Issuance Costs

Costs incurred in connection with obtaining financing are capitalized and reported as a direct reduction from the carrying amount of the related debt liability. These costs are amortized to interest expense over the term of the debt using the effective interest method.

### Preferred Stock Warrant Liability

The Company classifies warrants to purchase shares of its redeemable convertible preferred stock as a liability on its consolidated balance sheets as each warrant is a free-standing instrument that may require the Company to transfer consideration upon exercise. Each warrant is initially recorded at fair value upon issuance,

Exhibit 7
Page 901

net of issuance costs, using the Black-Scholes option pricing model, and is re-measured to fair value at each subsequent balance sheet date. Changes in fair value of warrants are recognized as a component of preferred stock mark to market adjustment in the consolidated statements of operations. The Company will continue to adjust the liability for changes in fair value until the earlier of the exercise or expiration of the warrants.

### Leases

The Company leases its office space and certain equipment under operating leases. For leases that contain rent escalation or rent concession provisions, the Company records the total rent payable during the lease term on a straight-line basis over the term of the lease. The Company records the difference between the rent paid and the straight-line rent as a deferred rent liability in the accompanying consolidated balance sheets.

### Revenue Recognition

The Company generates substantially all of its revenues from the sale of its hardware products, primarily the Owlet Smart Sock, Owlet Cam and Owlet Monitor Duo. Substantially all of the Company's revenues are generated in the United States. There are no other geographical regions that represent 10% or more of revenues. Revenues are recognized when control of goods and services is transferred to customers at the transaction price, an amount that reflects the consideration expected to be received by the Company in exchange for those goods and services. The transaction price is calculated as selling price less the Company's estimate of variable consideration, including future returns, volume rebates, and sales incentives related to current period sales.

The Company applies the following five step-approach to recognizing revenue:

- Identify the contract with a customer
- Identify the performance obligations in the contract
- Determine the transaction price
- Allocate the transaction price to performance obligations in the contract
- Recognize revenue when or as a performance obligation is recognized

### Arrangements with Multiple Performance Obligations

The Company enters into contracts that have multiple performance obligations. Product sales include three performance obligations. The first performance obligation is the delivery of hardware and embedded firmware essential to the functionality of the hardware. Embedded firmware allows the hardware to recognize inputs to the hardware and provide appropriate outputs. The second performance obligation is the implied right to connect the downloadable mobile application, provided free of charge, to the hardware, which enables users to view and access real-time data outputs. The third performance obligation is the implied right to receive, on a when-and-if-available basis, future unspecified application upgrades, added features, and bug fixes relating to the product's essential firmware.

The Company allocates the transaction price to each performance obligation based on a relative standalone selling price ("SSP"). The Company's process for determining its SSP considers multiple factors, including an adjusted market assessment and consumer behaviors, and varies depending on the facts and circumstances of each performance obligation. Revenues allocated to the delivery of the hardware and embedded firmware essential to the functionality of the hardware represent substantially all of the arrangement consideration and reflect the Company's best estimate of the selling price if it was sold regularly on a stand-alone basis. SSP for the mobile application and upgrade rights are estimated based on relevant market and consumer data.

Revenues are recognized at the time the related performance obligation is satisfied by transferring control of the promised good or service to a customer. Revenues allocated to the hardware and embedded firmware are recognized at the time of product delivery, provided the other conditions for revenue recognition have been met. This generally occurs upon delivery of the product to a third-party carrier. Revenues allocated to the implied right to access the mobile application and the implied right to receive, on a when-and-if-available basis, future unspecified application upgrades, added features, and bug fixes, are recognized on a straight-line basis over the estimated usage period of the underlying hardware product. The usage period is estimated based on historical user activity and ranges from 10 to 27 months.

F-30

Exhibit 7
Page 902

The Company records revenues net of sales tax and variable consideration such as discounts and customer returns. Payment is typically due within 90 days or less of shipment of product. The Company records estimated reductions to revenue in the form of variable consideration for customer sales programs, returns, and incentive offerings including rebates, markdowns, promotions, and volume-based incentives.

Consideration payable to a customer, such as cooperative advertising and pricing promotions to retailers and distributors, is recorded as a reduction to revenue and an accrued liability unless the Company receives a distinct benefit in exchange for credits claimed and can reasonably estimate the fair value of the distinct benefit received. Deferred revenues represent advance payments received from customers prior to performance by the Company. Sales taxes collected from customers which are remitted to governmental authorities are not included in revenue and are reflected as a liability in the accompanying balance sheets.

### Costs of Obtaining Customer Revenue Contracts

Costs to obtain revenue contracts consist primarily of sales commissions and related payroll taxes paid to the Company's sales force upon the inception of a contract. The Company capitalizes incremental contract acquisition costs and subsequently amortizes them over the expected benefit period unless the expected benefit period is less than 12 months. The Company has elected to apply the practical expedient in *Revenue from Contracts with Customers* (*Topic 606*) for contract costs, which are expensed as incurred when the benefit period is less than one year. The Company has not capitalized any incremental contract acquisition costs as these have not been material to date.

### Sales Returns, Rebates, Discounts, and Allowances

The Company's contracts include promises to provide rights of return to customers which range from 15 to 30 days from activation and 15 to 45 days from product purchase as of December 31, 2020 and December 31, 2019, respectively, as well as promises to issue discounts and provide rebates or allowances to certain retail channel customers if specified conditions are met. Revenues are reduced in the accompanying consolidated statements of operations for anticipated sales returns, discounts, and allowances, based on the Company's analysis of historical sales returns and contractual discounts and allowances. Expected returns, as well as estimated discounts and allowances that have been earned but not yet honored or paid out, are included in accrued and other expenses in the accompanying balance sheets. Actual returns may vary from estimates if the Company experiences a change in actual sales returns or exchange patterns due to unanticipated changes in products or competitive pressures.

### Cost of Revenues

Cost of revenues consists of product costs, including contract manufacturing, shipping and handling, depreciation of tooling and manufacturing equipment, warranty replacement, fulfillment costs, warehousing, hosting, and write-downs of excess and obsolete inventory.

### Product Warranty

The Company offers a limited warranty for product performance, generally one year from the date of device activation as of December 31, 2020 and one year from the date of original purchase as of December 31, 2019. The warranty obligation allows the Company to either repair or replace a defective product. The Company accrues for future expected warranty claims and records the amount to cost of revenues at the time of sale. The estimate of future warranty claims is based on historical warranty claim experience and known conditions. Estimated warranty liabilities are included in accrued and other expenses in the accompanying consolidated balance sheets.

### Shipping and Handling

Shipping and handling activities that are performed prior to the customer obtaining control of the goods are accounted for as fulfillment activities rather than a separate promised good or service. Shipping and handling charges billed to customers are included in product revenues and for the years ended December 31, 2020 and December 31, 2019 were $121 and $187, respectively. Shipping and handling costs associated with the

F-31

Exhibit 7
Page 903

distribution of the Company's product to customers are recorded in cost of revenues when control of the product is transferred to the customer, which is generally when the product is delivered to a third-party carrier. For the years ended December 31, 2020 and December 31, 2019, shipping and handling charges were $1,507 and $1,192, respectively.

### Third Party Logistics

Warehousing costs from utilizing Third Party Logistics Providers (3PLs) are recorded in cost of revenues. For the years ended December 31, 2020 and December 31, 2019, expenses related to 3PLs were $788 and $692, respectively.

### Research and Development

Research and development expenses consist primarily of personnel-related expenses, consulting and contractor expenses, prototype materials. Substantially all of the Company's research and development costs are related to developing new products and services and improving existing products and services. To date, research and development expenses have been expensed as incurred.

### Stock-based Compensation

Stock-based compensation related to grants of stock options is measured at fair value on the date of grant. Stock options are measured at fair value based on the Black-Scholes option pricing model. The related expense is recorded in the consolidated statement of operations over the requisite service period, which in no case exceeds the vesting period. The Company accounts for forfeitures as they occur. Determining the grant date fair value of the awards using the Black-Scholes option pricing model requires assumptions and judgments, including but not limited to the following:

- Expected term — The estimate of the expected term of awards was determined in accordance with the simplified method, which estimates the term based on an averaging of the vesting period and contractual term of the option grant.

- Expected volatility — Since the Company is a private entity without sufficient historical data on the volatility of its ordinary stock, the expected volatility is based on the volatility of similar entities for a period consistent with the expected term of the award. In evaluating similarity, the Company considered factors such as industry, stage of life cycle, and size.

- Risk-free interest rate — The risk-free interest rate used to value awards is based on the United States Treasury yield in effect at the time of grant for a period consistent with the expected term of the award.

- Dividend yield — The Company has never declared or paid any cash dividends and does not presently plan to pay cash dividends in the foreseeable future.

- Fair value of underlying common stock — As the Company's common stock is not publicly traded, the fair value was determined by the Board of Directors with input from management and contemporaneous independent third-party valuations.

### Marketing and Advertising

Marketing and advertising costs are expensed as incurred and are included in sales and marketing expenses in the consolidated statements of operations. Marketing and advertising expenses were approximately $15,317 and $13,156 for the years ended December 31, 2020 and December 31, 2019.

### Income Taxes

Income taxes are provided for the tax effects of transactions reported in the consolidated financial statements and consist of taxes currently due plus deferred taxes related primarily to differences between the book and tax basis of assets and liabilities. The deferred taxes represent the future tax return consequences of those differences, which will either be taxable or deductible when the assets and liabilities are recovered or settled. Deferred income tax assets are reviewed periodically for recoverability, and valuation allowances are provided when it is more likely than not that some or all of the deferred income tax assets may not be realized.

F-32

Exhibit 7
Page 904

TABLE OF CONTENTS

The Company believes that it has appropriate support for the income tax positions taken on its tax returns, and that its accruals for tax liabilities are adequate for all open tax years, which include the tax years ended December 31, 2017, 2018, 2019, and 2020 based on an assessment of many factors including experience and interpretations of tax laws applied to the facts of each matter. Uncertain tax positions are recorded when it is more likely than not that a given tax position would not be sustained upon examination by taxing authorities. The Company's policy for recording interest and penalties related to income taxes, including uncertain tax positions, is to record such items as a component of the provision for income taxes. The Company files income tax returns in the U.S. federal jurisdiction and certain state and local jurisdictions.

### *Net Loss per Share Attributable to Common Stockholders*

Basic and diluted net loss per share attributable to common stockholders is presented in conformity with the two-class method required for participating securities. Under the two-class method, net loss is attributed to common stockholders and participating securities according to dividends declared or accumulated and participation rights in undistributed earnings. The two-class method requires income available to common stockholders for the period to be allocated between common and participating securities based upon their respective rights to receive dividends as if all income for the period had been distributed. The Company considers all series of its redeemable convertible preferred stock to be participating securities. Under the two-class method, the net loss attributable to common stockholders is not allocated to the convertible preferred stock as the holders of the Company's convertible preferred stock do not have a contractual obligation to share in the Company's losses.

Under the two-class method, basic net loss per share attributable to common stockholders is computed by dividing the net loss attributable to common stockholders by the weighted-average number of shares of common stock outstanding during the period. For a period in which the Company reports a net loss, diluted net loss per common share attributable to common stockholders is the same as basic net loss per common share attributable to common stockholders because potentially dilutive common shares are not assumed to have been issued if their effect is anti-dilutive.

### *Recently Adopted Accounting Pronouncements*

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standard Update ("ASU") No. 2014-09, *Revenue from Contracts with Customers* (*Topic 606*). Topic 606 supersedes the revenue recognition requirements in Accounting Standards Codification ("ASC") Topic 605, *Revenue Recognition*, and requires the recognition of revenue when promised goods or services are transferred to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. Topic 606 also includes Subtopic 340-40, *Other Assets and Deferred Costs— Contracts with Customers*, ("*Topic 340"*), which requires the deferral of incremental costs of obtaining a revenue contract with a customer. The Company adopted the requirements of Topic 606 and Topic 340 effective January 1, 2019, utilizing the modified retrospective method of transition. Adoption of Topic 606 and Topic 340 resulted in the Company recognizing a $52 cumulative effect adjustment to its opening accumulated deficit balance as of January 1, 2019. See "Revenue Recognition" within this note for a description of how the Company is applying this guidance.

In June 2018, the FASB issued ASU No. 2018-07, *Compensation-Stock Compensation* (*Topic 718*): *Improvements to Nonemployee Share-Based Payment Accounting (Topic 718)*. The guidance expands the scope to include share-based payment transactions for acquiring goods and services from non-employees. The effective date of this Update is for fiscal years beginning after December 15, 2019 and quarters therein with early adoption permitted. The Company elected to adopt the new guidance as of January 1, 2019. Adoption did not have a material impact on the Company's consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement* (*Topic 820*), which updated guidance modifying certain fair value measurement disclosures. The guidance contains additional disclosures to enable users of the financial statements to better understand the entity's assumptions used to develop significant unobservable inputs for Level 3 fair value measurements, but also eliminates the requirement for entities to disclose the amount of and reasons for transfers between Level 1 and Level 2 investments within the fair value hierarchy. This guidance is effective for fiscal years and interim periods within those fiscal years, beginning after December 15, 2019. Early adoption is permitted. The Company elected to adopt the new guidance as of January 1, 2020. Adoption did not have a material impact on the Company's consolidated financial statements.

F-33

Exhibit 7
Page 905

*Recent Accounting Pronouncements Not Yet Adopted*

In February 2016, the FASB issued ASU 2016-02, *Leases* (*Topic 842*), related to leases to increase transparency and comparability among organizations by requiring the recognition of right-of-use ("ROU") assets obtained in exchange for lease liabilities on the balance sheet. Most prominent among the changes in the standard is the recognition of ROU assets and lease liabilities by lessees for those leases classified as operating leases. Under the standard, disclosures are required to meet the objective of enabling users of financial statements to assess the amount, timing, and uncertainty of cash flows arising from leases. The effective date of this update is for fiscal years beginning after December 15, 2021 and interim periods therein. The Company is currently assessing the impact of adopting this standard on the Company's consolidated financial statements and related disclosures.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments—Credit Losses* (*Topic 326*): *Measurement of Credit Losses on Financial Instruments*. The standard changes how entities will measure credit losses for most financial assets, including accounts and notes receivables. The standard will replace today's "incurred loss" approach with an "expected loss" model, under which companies will recognize allowances based on expected rather than incurred losses. Entities will apply the standard's provisions as a cumulative-effect adjustment to retained earnings as of the beginning of the first reporting period in which the guidance is effective. The effective date of this update is for fiscal years beginning after December 15, 2022 and interim periods therein. The Company is currently assessing the impact of adopting this standard on the Company's consolidated financial statements and related disclosures.

In August 2018, the FASB issued ASU 2018-15, *Intangibles-Goodwill and Other-Internal-Use Software* (*Subtopic 350-40*). ASU 2018-15 clarifies the accounting for implementation costs in cloud computing arrangements. The effective date of this update is for fiscal years beginning after December 15, 2020 and interim periods therein. The Company does not expect the adoption of this guidance to have a significant impact on its consolidated financial statements.

In December 2019, the FASB issued ASU 2019-12, *Income Taxes* (*Topic 740*), guidance simplifying the accounting for income taxes by removing certain exceptions to general principles in Topic 740 and amending certain existing guidance for clarity. This guidance is effective for fiscal years and interim periods within those fiscal years, beginning after December 15, 2020. Early adoption is permitted. The Company does not expect the adoption of this guidance to have a significant impact on its consolidated financial statements.

In March 2020, the FASB issued ASU 2020-04, *Reference Rate Reform*, which provides optional expedients and exceptions for applying U.S. GAAP to contracts, hedging relationships, and other transactions affected by the discontinuation of the London Interbank Offered Rate ("LIBOR") or by another reference rate expected to be discontinued. The guidance was effective beginning March 12, 2020 and can be applied prospectively through December 31, 2022. In January 2021, the FASB issued ASU 2021-01, *Reference Rate Reform—Scope*, which clarified the scope and application of the original guidance. The Company will adopt these standards when LIBOR is discontinued and does not expect them to have a significant impact on its consolidated financial statements and related disclosures.

In August 2020, the FASB issued ASU 2020-06, *Debt-Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging Contracts in Entity's Own Equity (Subtopic 815-40)*, which simplifies the accounting for convertible instruments by removing major separation models required under current guidance. ASU 2020-06 also removes certain settlement conditions that are required for equity contracts to qualify for derivative scope exception and simplifies the diluted earnings per share calculation in certain areas. ASU 2020-06 is effective for annual reporting periods beginning after December 15, 2021, including interim periods. Early adoption is permitted. The Company is currently assessing the impact of adoption of this standard on the Company's consolidated financial statements and related disclosures.

F-34

Exhibit 7
Page 906

2. **Inventory**

Inventory consisted of the following as of December 31:

|  | 2020 | 2019 |
|---|---|---|
| Finished goods | $7,331 | $4,749 |
| Raw materials | 581 | 112 |
| Total inventory | $7,912 | $4,861 |

3. **Prepaid Expenses and Other Current Assets**

Prepaid expenses and other current assets consisted of the following as of December 31:

|  | 2020 | 2019 |
|---|---|---|
| Capitalized transaction costs | $ 522 | $ 0 |
| Prepaid insurance | 499 | 182 |
| Point of Purchase ("POP") displays | 376 | 278 |
| Prepaid hosting | 369 | 0 |
| Prepaid expenses | 163 | 322 |
| Right of return | 146 | 70 |
| Other current assets | 93 | 395 |
| Total prepaid expenses and other current assets | $2,168 | $1,247 |

4. **Property and Equipment, net**

Property and equipment consisted of the following as of December 31:

|  | 2020 | 2019 |
|---|---|---|
| Tooling and manufacturing equipment | $ 1,731 | $ 680 |
| Furniture and fixtures | 569 | 662 |
| Computer equipment | 214 | 276 |
| Software | 213 | 182 |
| Leasehold improvements | 9 | 9 |
| Construction in progress | 0 | 633 |
| Total property and equipment | 2,736 | 2,442 |
| Less accumulated depreciation and amortization | (1,018) | (588) |
| Property and equipment, net | $ 1,718 | $1,854 |

Depreciation and amortization expense on property and equipment for the years ended December 31, 2020 and December 31, 2019 was $765 and $508, respectively. For the years ended December 31, 2020 and December 31, 2019, the Company allocated $462 and $164 of depreciation and amortization expense related to tooling and manufacturing equipment and software to cost of revenues. Loss on disposal of property and equipment for the years ended December 31, 2020 and December 31, 2019 was $48 and $176, respectively.

F-35

Exhibit 7
Page 907

5. **Intangible Assets**

Intangible assets consisted of the following as of December 31:

| | | 2020 | |
| --- | --- | --- | --- |
| | Gross | Accumulated Amortization | Net |
| Patents and trademarks | $511 | $(119) | $392 |
| Film production costs | 278 | (65) | 213 |
| Total intangible assets | $789 | $(184) | $605 |

| | | 2019 | |
| --- | --- | --- | --- |
| | Gross | Accumulated Amortization | Net |
| Patents and trademarks | $422 | $(75) | $347 |
| Film production costs | 278 | (1) | 277 |
| Total intangible assets | $700 | $(76) | $624 |

Amortization expense resulting from intangible assets was $108 and $36 for the years ended December 31, 2020 and December 31, 2019, respectively. For the years ended December 31, 2020 and December 31, 2019, the Company allocated $64 and $1 of amortization expense related to film production costs to cost of revenues.

The future aggregate amounts of amortization expense to be recognized related to finite-lived intangible assets as of December 31, 2020 is as follows:

| Years Ending December 31: | Amount |
| --- | --- |
| 2021 | $145 |
| 2022 | 150 |
| 2023 | 45 |
| 2024 | 42 |
| 2025 | 42 |
| Thereafter | 94 |
| | $518 |

6. **Accrued and Other Expenses**

Accrued and other expenses consisted of the following as of December 31:

| | 2020 | 2019 |
| --- | --- | --- |
| Accrued and other expenses | | |
| Accrued sales returns | 2,844 | $1,730 |
| Sales tax payable | 1,886 | 1,618 |
| Discounts and allowances | 1,747 | 1,254 |
| Payroll liabilities | 1,768 | 731 |
| Accrued warranty | 924 | 378 |
| Credit card liabilities | 263 | 538 |
| Other accrued expenses | 1,160 | 1,083 |
| Total accrued expenses | $10,592 | $7,332 |

F-36

Exhibit 7
Page 908

Changes in accrued warranty were as follows for the year ended December 31:

|  | 2020 | 2019 |
|---|---|---|
| Accrued warranty, beginning of period | $ 378 | $ 291 |
| Provision for warranties issued during the period | 1,840 | 1,312 |
| Settlements of warranty claims during the period | (1,294) | (1,225) |
| Accrued warranty, end of period | $ 924 | $ 378 |

## 7.    Deferred Revenues

Deferred revenues relate to performance obligations for which payments are received from customers prior to the satisfaction of the Company's obligations to the customers. Deferred revenues primarily consist of amounts allocated to the mobile application, unspecified upgrade rights, and content, and are recognized over the service period of the performance obligations, which range from 10 to 27 months.

Changes in the total deferred revenues balance were as follows as of December 31:

|  | 2020 | 2019 |
|---|---|---|
| Beginning balance | $ 845 | $ 968 |
| Deferral of revenues | 3,319 | 1,553 |
| Recognition of deferred revenues | (2,362) | (1,676) |
| Ending balance | $ 1,802 | $ 845 |

## 8.    Line of Credit

The Company had an amended and restated loan and security agreement ("the A&R LSA") with Silicon Valley Bank ("SVB") as of December 31, 2020, which replaced the loan and security agreement in effect as of December 31, 2019 (the "Original LSA"). Both agreements included a line of credit (the "SVB Revolver") that provided the Company with a borrowing capacity of $12,500 and $10,000 as of December 31, 2020 and December 31, 2019, respectively. Draws against the SVB Revolver were $9,700 and $8,647 as of December 31, 2020 and December 31, 2019, respectively. As of December 31, 2020, the SVB Revolver bore interest at an annual rate equal to (i) the greater of the bank's prime rate plus 0.75%, or 5.5% when a streamline period is in effect and (ii) the greater of the bank's prime rate plus 1.25%, or 6.0% at all other times. As of December 31, 2019, the SVB Revolver bore interest at an annual rate equal to (i) the greater of the bank's prime rate plus 0.75%, or 5.75% when a streamline period is in effect and (ii) the greater of the bank's prime rate plus 1.25%, or 6.25% at all other times. Each streamline period commences the first day of the month following a written report of the Company's liquidity and ends the first day after the Company fails to maintain a required cash and cash availability streamline threshold, provided no event of default has occurred and is continuing. If an event of default has occurred and is continuing, SVB may maintain the Company's streamline status at its discretion. The required cash and cash availability streamline threshold was $7,000 and $6,000 as of December 31, 2020 and December 31, 2019, respectively, and the Company was within a streamline period as of both December 31, 2020 and December 31, 2019. The actual interest rate on the SVB Revolver was 5.5% and 5.75% as of December 31, 2020 and December 31, 2019, respectively.

The Original LSA and the A&R LSA both required that the Company meet certain financial covenants. Under the Original LSA, in effect as of December 31, 2019 and up to the April 22, 2020 amendment and restatement at which time the A&R LSA became effective, the financial covenants included the satisfaction of both a maximum cumulative trailing 3-month loss threshold (based on a calculation of EBITDA, plus stock-based compensation expense) and a minimum cash and cash availability requirement. The Company was in compliance with these financial covenants as of December 31, 2019. Under the A&R LSA, in effect as of December 31, 2020, the financial covenant required the satisfaction of a maximum year-to-date loss threshold (based on a calculation of EBITDA, plus stock-based compensation expense and loss on extinguishment of debt). The Company was not in compliance with this financial covenant as of December 31, 2020. On March 10, 2021, the Company amended its loan and security agreement (as amended, the "LSA") to, among other things, waive the existing default and waive any rights and remedies against the Company with respect to the existing default, which includes the financial covenant noncompliance, consent to the merger (see Note 18), and amendments to

F-37

Exhibit 7
Page 909

other provisions of the loan agreement. The amended LSA also set forth new three financial covenants, including a requirement to maintain cash and cash availability of at least $6,000 as of the last day of each month beginning on March 31, 2021, a requirement to complete a qualifying liquidity event with aggregate new net proceeds of at least $50,000 in cash on or before May 31, 2021, and a requirement to agree to terms with SVB on a 2021 EBITDA covenant no later than July 15, 2021.

The LSA defines the SVB Revolver borrowing base as 80% of eligible accounts receivable plus 75% of eligible inventory, with an inventory cap of $10,000. Borrowings are secured by substantially all of the Company's current and future assets, and the SVB Revolver is cross collateralized with the Term Note (as defined in Note 9). The SVB Revolver also contains a cash collection requirement whereby customer payments are processed through a cash collection account that is controlled by the lender. The SVB Revolver is subject to renewal and is scheduled to mature on April 22, 2022.

### 9.   Long-Term Debt

Long-term debt consisted of the following as of December 31:

|  | 2020 | 2019 |
|---|---|---|
| Term note payable to SVB with an interest rate equal to the greater of the prime rate plus 3.50%, or 6.50% and the greater of the prime rate plus 1.00%, or 6.00% for the years ended December 31, 2020 and December 31, 2019, respectively (6.75% and 6.00% as of December 31, 2020 and December 31, 2019, respectively), and maturing on April 1, 2024 | $10,000 | $7,000 |
| Note payable to a company for equipment with an interest rate of 20.57% which matured on March 20, 2020 | 0 | 1 |
| Financed insurance premium with an interest rate of 4.09% and 5.1% for the years ended December 31, 2020 and December 31, 2019 | 320 | 103 |
| Small Business Administration Paycheck Protection Program note payable with an interest rate of 1% and maturing on April 22, 2022 | 2,075 | 0 |
| Total debt | 12,395 | 7,104 |
| Less current portion | (2,024) | (104) |
| Less debt discount | (187) | (65) |
| Less debt issuance costs | (4) | (20) |
| Total long-term debt, net | $10,180 | $6,915 |

#### *Term Note*

As of December 31, 2019, the Company had a term note payable to SVB (the "Term Note") with an aggregate principal balance of $7,000, and an interest rate equal to the greater of the prime rate plus 1.00%, or 6.00%. As of December 31, 2019, the Term Note required interest-only payments through April 30, 2020, followed by 30 equal monthly payments of principal beginning on May 1, 2020. On April 22, 2020, the Company amended its Term Note, which allowed the Company to borrow an additional $1,000 at closing, extended the interest-only period through April 30, 2021, and modified the interest rate to be the greater of the bank's prime rate plus 4.50%, or 7.50%. The amendment also included a provision to further extend the interest-only period through October 31, 2021 and allow the Company to borrow an additional $2,000 if it achieved a specified gross profit milestone for the year ended December 31, 2020. On September 22, 2020, the Company further amended the Term Note to change the repayment term from 36 consecutive equal monthly payments of principal to 30 consecutive equal monthly payments of principal beginning on November 1, 2021 and modified the interest rate to the greater of the bank's prime rate plus 3.50%, or 6.50%. The Company achieved its gross profit milestone and borrowed $2,000 in December 2020. The Term Note had an aggregate principal balance of $10,000 as of December 31, 2020. The Term Note matures on April 1, 2024 and is cross defaulted with the financial covenants on the SVB Revolver (described in Note 8).

#### *Paycheck Protection Program Loan*

In April 2020, the Company received proceeds from Small Business Administration Paycheck Protection Program ("PPP") in the amount of $2,075, with SVB as lender for the loan (the "PPP Loan"), under the Federal Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act").

F-38

Exhibit 7
Page 910

Under the terms of the PPP Loan, interest accrues on the outstanding principal at a rate of 1.0% per annum. The term of the PPP Loan is two years, unless payment is sooner required in connection with an event of default under the PPP Loan. To the extent the PPP Loan amount is not forgiven under the PPP, the Company is obligated to make equal monthly payments of principal and interest, for eight months beginning September 22, 2021, until maturity date of April 22, 2022.

The CARES Act and the PPP provide a mechanism for forgiveness of up to the full amount borrowed. Under the PPP, the Company applied for forgiveness for all of the PPP Loan. However, the Small Business Administration has not made a decision related to the Company's application for forgiveness.

Future aggregate maturities of notes payable, net of debt discount and issuance costs, were the following:

| Years Ending December 31, | |
|---|---|
| 2021 | 2,024 |
| 2022 | 5,038 |
| 2023 | 4,000 |
| 2024 | 1,333 |
| Total | $12,395 |

The Company recognized $172 as a loss on the extinguishment of debt for the year ended December 31, 2020, which relates to the April 22, 2020 amendments of the SVB Revolver and the Term Note.

During 2020 and 2019, the Company issued warrants for the purchase of common stock in conjunction with the Term Note. The value of the warrants was determined using the Black-Scholes option pricing model and was recorded as a debt discount, being amortized to interest expense over the remaining term of the Term Note. Warrants issued were as follows:

| | 2020 | 2019 |
|---|---|---|
| Warrant value | $226 | $75 |
| Number of common stock shares | 240,711 | 86,903 |
| Exercise price | $1.59 | $1.59* and 1.30** |
| Expiration date | April 22, 2030 | July 30, 2029 |

\*    16,332 shares at $1.59 exercise price
\*\*   70,571 shares at $1.30 exercise price

### 10. Related Party Transactions

***Convertible Promissory Notes***

During 2019, the Company issued $6,500 in convertible promissory notes. The convertible promissory notes bear interest at 5.00% per annum and all outstanding principal and accrued interest is due on the earlier of the two-year anniversary of the initial closing date (August 9, 2021) or upon the closing of a change of control, as defined in the convertible note agreements. If a change of control occurs prior to the two-year anniversary date, and the notes have not already converted, the holders of the convertible promissory notes will receive all outstanding principal and interest plus an amount equal to 100% of the original principal amount. The convertible promissory notes cannot be prepaid without the consent of the majority holders and will automatically convert to preferred stock at 80% of the preferred stock price per share upon a qualified preferred stock equity financing round of at least $15,000, excluding the conversion value of the notes. If the Company sells preferred stock in an equity financing round of less than $15,000, the holders of the convertible promissory notes may elect to convert their notes to preferred stock at 80% of the preferred stock price per share. The convertible promissory notes are subordinated to the SVB Revolver and the Term Note (See Notes 8 and 9). The conversion features represent an embedded derivative that is accounted for at fair value at the reporting date. The fair value of the embedded derivative was determined to be immaterial. As of December 31, 2020 and December 31, 2019, the accrued interest on the convertible promissory notes was $447 and $121, respectively, and the unamortized debt issuance costs were $13 and $31, respectively.

F-39

Exhibit 7
Page 911

*Purchases with Related Party Supplier*

The Company purchased approximately $300 and $91 of POP displays and other miscellaneous items for the years ended December 31, 2020 and December 31, 2019, respectively, from a related party supplier whose CEO is a shareholder of the Company.

**11.   Commitments and Contingencies**

*Litigation*

The Company is involved in legal proceedings from time to time arising in the normal course of business. Management, after consultation with legal counsel, believes that the outcome of these proceedings will not have a material impact on the Company's financial position, results of operations, or liquidity.

*Operating Leases*

The Company leases office space and certain equipment under non-cancelable operating leases. As of December 31, 2020, future minimum lease payments under non-cancelable operating leases with terms of one year or more are as follows:

| Years Ending December 31: | Amount |
|---|---|
| 2021 | 1,471 |
| 2022 | 1,541 |
| 2023 | 1,587 |
| 2024 | 954 |
| Total | $5,553 |

Rental expense under operating leases was approximately $1,221 and $850 for the years ended December 31, 2020 and December 31, 2019, respectively.

*Indemnification*

In the ordinary course of business, the Company enters into agreements that may include indemnification provisions. Pursuant to such agreements, the Company may indemnify, hold harmless, and defend an indemnified party for losses suffered or incurred by the indemnified party. Some of the provisions will limit losses to those arising from third party actions. In some cases, the indemnification will continue after the termination of the agreement. The maximum potential amount of future payments the Company could be required to make under these provisions is not determinable. The Company has never incurred material costs to defend lawsuits or settle claims related to these indemnification provisions. The Company intends to enter into indemnification agreements with its directors and officers that may require the Company to indemnify its directors and officers against liabilities that may arise by reason of their status or service as directors or officers to the fullest extent permitted by Delaware corporate law. The Company currently has directors' and officers' insurance coverage that reduces its exposure and enables the Company to recover a portion of any future amounts paid. The Company believes the estimated fair value of these indemnification agreements in excess of applicable insurance coverage is immaterial.

F-40

Exhibit 7
Page 912

**12.  Redeemable Convertible Preferred Stock**

As of December 31, 2020 and December 31, 2019, the Company is authorized to issue 30,537,358 shares of redeemable convertible preferred stock, issued in various individual series. Share information, liquidation preference, and conversion rates by each series of convertible preferred stock class as of December 31, 2020 and December 31, 2019 were as follows (in thousands, except share and per share amounts):

| | Issue Price | Shares Authorized | Shares Issued and Outstanding | Liquidation Preference |
|---|---|---|---|---|
| Series A | $0.7615 | 13,173,360 | 12,740,004 | $ 9,702 |
| Series A-1 | $1.4452 | 9,856,925 | 9,856,925 | 14,245 |
| Series B | $3.1546 | 6,022,956 | 6,022,954 | 19,000 |
| Series B-1 | $2.5237 | 1,484,117 | 1,484,117 | 3,745 |
| | | 30,537,358 | 30,104,000 | $46,692 |

*Liquidation*

In the event of any liquidation event, either voluntarily or involuntary, the holders of the convertible preferred stock shall be entitled to receive, out of the assets of the Company, the applicable liquidation preference specified for each series of preferred stock then held by them before any payment shall be made or any assets distributed to the holders of common stock. Liquidation preference is $ $0.7615 for Series A, $1.4452 for Series A-1, $3.1546 for Series B and $2.5237 for Series B-1, each adjusted for any stock splits, combinations, and reorganizations, plus all declared and unpaid dividends on each such share.

If upon the liquidation event, the assets distributed among the holders of the convertible preferred stock are insufficient to permit the payment to such holders of the full liquidation preference for their shares, then the holders of shares of the Series Preferred stock shall share ratably in any distribution of the assets available for distribution in proportion to their respective amounts, which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid the full preferential amount.

After the payment to the holders of the convertible preferred stock of the full preferential amount specified above, any remaining assets of the Company shall be distributed pro rata among the holders of the Common Stock.

*Optional Conversion*

Each share of convertible preferred stock is convertible at each stockholder's option, at any time after the date of issuance of such share, into common stock as determined by dividing the original issue price for each series by the applicable conversion price for such series in effect at the date of conversion. The conversion ratio shall be subject to appropriate adjustments for anti-dilution provisions, including stock splits, stock dividends, subdivisions, combinations, recapitalization events or similar events.

*Automatic Conversion*

Each share of preferred stock is convertible into common stock at initial conversion rates as shown in the previous table, subject to adjustments based on certain antidilution provisions, including stock splits, stock dividends, subdivision, combinations, recapitalization or similar events, as provided by the Company's certificate of incorporation. Further, all shares of preferred stock automatically convert into common stock upon the vote or written consent of the holders of a majority of the shares of preferred stock (including holders of at least 59% of the shares of Series B and B-1 preferred stock, voting together as a single class) or upon the closing of a firm-commitment underwritten public offering of the Company's common stock with gross aggregate proceeds to the Company of at least $30,000,000 and $4.3356 per share of common stock.

*Dividends*

The holders of shares of Series A, Series A-1, Series B, and Series B-1 convertible preferred stock shall be entitled to receive dividends of $0.7615, $1.4452, $3.1546, and $2.5237, respectively, per annum on each share of Series A, Series A-1, Series B, and Series B-1 convertible preferred stock. The dividends are payable in cash,

F-41

Exhibit 7
Page 913

out of the assets at the time legally available thereof, when, as and if declared by the Board of Directors, on an equal basis according to the number of shares of convertible preferred stock held by such holders, prior and in preference to the common stock and shall be non-cumulative.

### Down Round Anti-dilution Protection

The Company's certificate of incorporation provides that if the Company sells common stock at a price that is lower than any of current conversion prices of the convertible preferred stock, then the conversion price will be reduced to a price based upon a broad-based weighted average formula in the Company's certificate of incorporation. This feature is frequently referred to as "down-round protection." The Company has determined that this embedded conversion option is more akin to equity and has not recorded a liability for the instrument as of December 31, 2020 and December 31, 2019.

### Redemption

Under certain circumstances, subsequent to the occurrence of a deemed liquidation event as defined in the Company's certificate of incorporation, a majority of the holders of the then outstanding convertible preferred stock can require the Company to redeem their shares at a price per share equal to the liquidation amount, to the extent that sufficient funds are available.

### Voting

The holders of the Company's convertible preferred stock are entitled to the number of votes equal to the number of shares of common stock into which the convertible preferred stock could be converted. The Series A and Series A-1 preferred stockholders, voting as a single class (on an as-converted basis), may elect one member of the Board of Directors. The Series B and Series B-1 preferred stockholders, voting as a single class (on an as-converted basis), may elect one member of the Board of Directors. The stockholders of a majority of the common stock, voting separately as a class, may elect two members of the Board of Directors. Any remaining directors, of which there was one as of December 31, 2020 and December 31, 2019, are elected by the holders of the common stock and any other class or series of voting stock, as a single class.

### Stockholder Rights

The holders of the Company's convertible preferred stock have protective provisions that require preferred stockholders representing a majority of the outstanding convertible preferred stock, voting as a single class (on an as-converted basis), to consent to specific actions including the following: changes in the corporation's certificate of incorporation or bylaws that would affect, alter or change the preference or rights of the preferred stock, changes in the authorized number of shares, declaration or payment of dividends, repurchase of shares, changes in the size of the Board of Directors, creation of a new class or series of stock, or taking any action that would cause a liquidation event.

### Classification of Convertible Preferred Stock

The redemption provisions of the Series A, Series A-1, Series B, and Series B-1 convertible preferred stock are considered contingent redemption provisions that are not solely within the Company's control. Also, in the event of a deemed liquidation event, the liquidation preference of the Series A, Series A-1, Series B, and Series B-1 convertible preferred stock are considered contingent redemption provisions that are not solely within the Company's control. Accordingly, the Company's convertible preferred stock has been presented outside of permanent equity in the mezzanine section of the consolidated balance sheets.

### 13. Stock Options and Common Stock Warrants

### Stock Options

The Company's 2014 equity incentive plan, adopted by the Board of Directors on June 30, 2014 (the "Plan"), provides for the grants of equity awards, including incentive stock options, non-statutory stock options, and restricted stock unit awards. Under the terms of the Plan, 7,910,651 common shares are authorized for grants to employees, directors and consultants as of December 31, 2020. The Board of Directors determines the terms of each grant. Generally, the stock options have a 10-year contractual life and a vesting period of 4 years, with 1/4th of the options vesting after the first year of service and 1/48th vesting monthly thereafter. The exercise price

F-42

Exhibit 7
Page 914

of an option will be not less than 100% of the fair market value of the shares on the date of grant. The compensation cost is measured using the fair value method. Forfeitures are recognized when they occur, and options are valued as a single award and measured and recorded using the straight-line attribution method over the requisite service period. There were 1,391,006 shares available for grant under the Plan as of December 31, 2020. Shares issued as a result of stock option exercises are issued as new shares outstanding by the Company or as previously reacquired shares. The shares issuable under the Plan shall be shares of authorized but unissued or reacquired Common Stock, including shares repurchased by the Company on the open market or otherwise. In the following annual period, no shares are expected to be repurchased as historically the repurchase of shares has been minimal and has not occurred since 2018.

Stock-based compensation for the years ended December 31, 2020 and December 31, 2019 was as follows:

|  | 2020 | 2019 |
|---|---|---|
| General and administrative | $ 206 | $172 |
| Sales and marketing | 445 | 111 |
| Research and development | 419 | 312 |
| Total stock-based compensation | $1,070 | $595 |

As of December 31, 2020, the Company had $3,239 of unrecognized stock-based compensation costs related to non-vested awards that will be recognized over a weighted-average period of 3.13 years.

The following table sets forth the outstanding common stock options and related activity for the year ended December 31, 2020:

|  | Number of Options | Weighted Average Exercise Prices | Weighted Average Remaining Contractual Terms (years) | Aggregate Intrinsic Values |
|---|---|---|---|---|
| Balance as of December 31, 2019 | 4,822,097 | $0.78 | 7.73 | $ 5,183 |
| Granted | 1,848,264 | 1.69 |  | — |
| Exercised | (203,539) | 0.58 |  | 740 |
| Canceled | (1,480,219) | 1.46 |  | — |
| Expired | (4,687) | 1.30 |  |  |
| Balance as of December 31, 2020 | 4,981,916 | $0.92 | 7.29 | $54,135 |
| Options vested and exercisable as of December 31, 2020 | 3,250,628 | $0.61 | 6.47 | $36,326 |

The aggregate intrinsic value for balances as of December 31, 2020 was calculated based on the positive differences between the estimated fair value of the Company's common stock on December 31, 2020 of $11.78 per share. The weighted average grant date fair value of stock options granted in 2020 and 2019 was $2.10 per share and $0.98, respectively. The grant date fair value of awards vested in 2020 and 2019 was $842 and $729, respectively. The intrinsic value of options exercised in 2020 and 2019 was $740 and $690, respectively.

The fair value of each stock option award granted was estimated on the date of grant using the Black-Scholes option pricing model with the following assumptions for the year ended December 31:

|  | 2020 | 2019 |
|---|---|---|
| Risk-free interest rate | 0.46% - 0.51% | 1.57% - 2.53% |
| Expected volatility | 63.38% - 64.04% | 54.29% - 55.03% |
| Expected dividend yield | 0.00% | 0.00% |
| Expected term of options (in years) | 6.00 | 5.00 - 6.25 |

Expected option terms and volatilities were calculated based on historical share prices of comparable companies in the industry. The risk-free interest rate was calculated using similar rates published by the United States Treasury. The Company has no plans to declare dividends in the foreseeable future.

Upon the exercise of non-qualified stock options and disqualifying dispositions of incentive stock options, the Company derives a tax deduction measured by the excess of the market value over the option price at the date of exercise or disqualifying disposition. The portion of the benefit from the deduction which equals the

F-43

Exhibit 7
Page 915

estimated fair value of the options (previously recognized as compensation expense) is recorded as a credit to the deferred tax asset for non-qualified stock options and is recorded as a credit to current tax expense for any disqualified dispositions of incentive stock options. For disqualifying dispositions, when the amount of the tax deduction is less than the cumulative amount of compensation expense recognized for the award, the amount credited to current tax expense is limited to the tax benefit associated with the tax deduction. All of the tax benefits received upon option exercise for the tax deduction in excess of the estimated fair value of the options are reflected as a component of income tax expense.

In conjunction with a loan agreement and subsequent amendments, the Company issued common stock warrants. As of December 31, 2020 and December 31, 2019, 459,100 and 218,389, respectively, of common stock warrants were outstanding. The common stock warrants are classified as stockholders' equity and the fair value was recorded to additional paid-in-capital on the Company's consolidated balance sheets.

The Company utilized the Black-Scholes options pricing model and the assumptions in the following table to determine the fair value on the date of grant of the warrants issued:

|  | 2020 | 2019 |
|---|---|---|
| Expected term (in years) | 9.67 - 10.00 | 9.67 - 10.00 |
| Risk-free interest rate | 0.63% - 3.14% | 2.06% - 3.14% |
| Expected volatility | 50.00% - 55.00% | 50.00% - 55.00% |
| Expected dividend yield | 0.00% | 0.00% |
| Exercise price | $1.30 - $1.59 | $1.30 - $1.59 |
| Stock price | $1.30 - $1.59 | $1.30 - $1.59 |

| Warrants to Purchase | Year of Expiration | Number of Shares | Exercise Price |
|---|---|---|---|
| Common stock, issued in conjunction with long-term debt in 2017 | 2027 | 84,236 | $0.59 |
| Common stock, issued in conjunction with long-term debt in 2018 | 2028 | 47,250 | $1.30 |
| Common stock, issued in conjunction with long-term debt in 2019 | 2029 | 70,571 | $1.30 |
| Common stock, issued in conjunction with long-term debt in 2019 | 2029 | 16,332 | $1.59 |
| Common stock, issued in conjunction with long-term debt in 2020 | 2030 | 240,711 | $1.59 |
|  |  | 459,100 |  |

## 14. Related Party Stock Repurchase Agreement

In 2018, the Company received $2,000 as part of a financing transaction involving sales of its convertible preferred stock. As part of the financing transaction, the related parties agreed to sell back to the Company an equivalent number of shares of common stock to protect other shareholders from further dilution. The related parties received promissory notes totaling $824, all of which was collateralized with the Stock Pledge Agreement for the pledged shares. The related parties also entered into a call option agreement with the Company to grant the Company the right to repurchase the shares at $1.30 per share. In February 2019, the Company's Board of Directors approved the repurchase of common stock pledged as collateral. In addition to the repurchase of their shares, the related parties paid $13 in interest upon settlement of the promissory note, which is recorded within other income in the consolidated statements of operations.

F-44

Exhibit 7
Page 916

**15. Income Taxes**

The provision (benefit) for income taxes differs from the amount computed at federal statutory rates as follows for the year ended December 31:

|  | 2020 | 2019 |
|---|---|---|
| Federal income tax at statutory rates | $(2,214) | $(3,749) |
| State income tax at statutory rates | (296) | (671) |
| Change in valuation allowance | 1,980 | 4,236 |
| Warrant expense(1) | 410 | 53 |
| Other | 140 | 131 |
| Total income tax expense | $ 20 | $ — |

_____

(1)   Represents a permanent item attributed to preferred stock mark to market adjustment.

Significant components of the Company's deferred income tax assets (liabilities) are as follows as of December 31:

|  | 2020 | 2019 |
|---|---|---|
| Allowance for bad debt | $ 50 | $ 24 |
| Depreciation and amortization | (49) | (135) |
| Section 163(j) interest expense limitation | 353 | — |
| Accrued liabilities | 387 | 234 |
| Charitable contributions | 163 | 114 |
| Stock-based compensation | 196 | 128 |
| Net operating loss carryforwards | 14,718 | 13,474 |
| Valuation allowance | (15,818) | (13,839) |
| Total deferred income tax assets (liabilities) | $ — | $ — |

As of December 31, 2020, the Company has federal net operating loss ("NOL") carryforwards available to offset future taxable income, if any, of approximately $59,082. NOLs, except those generated in tax years beginning after December 31, 2017, will begin to expire in 2034. The Company has approximately $23,785 in NOLs that will begin to expire in 2034. The remaining NOLs, approximately $35,297, were generated in tax years beginning after December 31, 2017 and will carry forward indefinitely.

Accounting standards require that the tax benefit of net operating losses, temporary differences, and credit carryforwards be recorded as an asset to the extent that management assesses the realization is more likely than not. Realization of the future tax benefits from the net operating losses or credit carryforwards, if any, is dependent on the Company's ability to generate sufficient taxable income within the applicable carryforward period. The Company has established a full valuation allowance due to historical cumulative losses and the uncertainty of its ability to generate sufficient taxable income to realize the deferred tax assets.

The utilization of the NOL carryforwards could be subject to annual limitations under Section 382 of the Internal Revenue Code. Section 382 imposes limitations on a corporation's ability to utilize its NOL carryforwards if it experiences an "ownership change." In general terms, an ownership change results from transactions increasing the ownership of certain stockholders in the stock of a corporation by more than 50% over a three-year period. Additionally, net operating losses utilized after 2017 would be limited to 80% of taxable income in years in which NOL carryforwards would be utilized.

Uncertain tax positions are recorded when it is more likely than not that a given tax position would not be sustained upon examination by taxing authorities. Based on positions taken in the Company's tax filings, the Company has concluded that there are no significant uncertain tax positions requiring disclosure, and there are no material amounts of unrecognized tax benefits.

The CARES Act includes provisions relating to refundable payroll tax credits, deferment of employer's social security payments, NOL carryback periods, alternative minimum tax credit refunds, modifications to the

Exhibit 7
Page 917

net interest deduction limitations and technical corrections to tax depreciation methods for qualified improvement property. This new legislation did not impact the current year provision. The Company will continue to monitor the possible impacts of the CARES Act in the future periods.

16.  **Net Loss Attributable to Common Stockholders**

The following table presents the calculation of basic and diluted net loss per share attributable to common stockholders (in thousands, except share and per share amounts):

|  | 2020 | 2019 |
|---|---|---|
| Numerator: | | |
| Net loss attributable to common stockholders | $ (10,521) | $ (17,851) |
| | | |
| Denominator: | | |
| Weighted-average common shares used in computing net loss per share attributable to common stockholders basic and diluted | 10,693,984 | 10,132,242 |
| | | |
| Net loss per share attributable to common stockholders basic and diluted | $ (0.98) | $ (1.76) |

The following outstanding potentially dilutive common stock equivalents have been excluded from the computation of diluted net loss per share attributable to common stockholders for periods presented due to their anti-dilutive effect:

|  | 2020 | 2019 |
|---|---|---|
| Convertible notes | 2,752,591 | 2,575,602 |
| Preferred stock | 30,104,000 | 30,104,000 |
| Common stock warrants | 459,100 | 218,389 |
| Preferred stock warrants | 433,356 | 433,356 |
| Total | 33,749,047 | 33,331,347 |

17.  **Defined Contribution Plan**

The Company sponsors a 401(k) defined contribution plan. Participation in the plan is available to substantially all employees. Company contributions to the plan are discretionary. Starting in 2019, the Company made matching contributions of 50.0% of the first 6.0% of each participating employee's eligible compensation, subject to vesting requirements over four years. Total expense recognized from the 401(k) matching contributions for the years ended December 31, 2020 and December 31, 2019 was $225 and $60, respectively.

In January 2021, the Company amended its defined contribution plan. The amended plan retroactively changes the vesting period of the Company's matching contributions from four years to one year.

18.  **Subsequent Events**

For its consolidated financial statements as of December 31, 2020 and for the year then ended, the Company evaluated subsequent events through March 30, 2021, the date the consolidated financial statements were originally available for issuance, and has determined that the following subsequent events require disclosure in the consolidated financial statements:

*Options Grants*

In January 2021, the Company's Board of Directors approved 846,209 stock options for grant. The exercise price of the stock options is $14.63.

F-46

Exhibit 7
Page 918

TABLE OF CONTENTS

*Business Combination Agreement with Sandbridge Acquisition Corporation*

On February 15, 2021, the Company entered into the Business Combination Agreement (the "Business Combination Agreement") with Sandbridge Acquisition Corporation ("Sandbridge") and Project Olympus Merger Sub, Inc. ("Merger Sub"). If the Business Combination is consummated, Merger Sub will merge with and into the Company (the "Merger"), with the Company surviving the Merger as a wholly owned subsidiary of Sandbridge and then being renamed "Owlet, Inc." ("New Owlet"). The Company's board of directors unanimously approved the Company's entry into the Business Combination Agreement.

As a consequence of the Merger, at the effective time of the consummation of the Business Combination (the "Effective Time"), (i) each share of the Company's capital stock that is issued and outstanding immediately prior to the Effective Time will become the right to receive the number of shares of New Owlet's Class A common stock, par value $0.0001 per share ("New Owlet common stock"), equal to the Exchange Ratio (as defined in the Business Combination Agreement); (ii) each option to purchase shares of Owlet common stock, whether vested or unvested, that is not a Cash Elected Company Option (as defined in the Business Combination Agreement) and is outstanding and unexercised as of immediately prior to the Effective Time will be assumed by New Owlet and will automatically become an option (vested or unvested, as applicable) to purchase a number of shares of New Owlet common stock equal to the number of shares of Owlet common stock subject to such option immediately prior to the Effective Time multiplied by the Exchange Ratio, rounded down to the nearest whole share, at an exercise price per share equal to the exercise price per share of such option immediately prior to the Effective Time divided by the Exchange Ratio, rounded up to the nearest whole cent, (iii) subject to certain limitations, each Cash Elected Option that is issued and outstanding immediately prior to the Effective Time shall be cancelled and converted into the right to receive the Cash Election Consideration (as defined in the Business Combination Agreement), (iv) each share of Owlet common stock that is subject to a risk of forfeiture or right of repurchase at the original purchase price as of immediately prior to the Effective Time shall be subject to the same risk of forfeiture or right of repurchase (proportionately adjusted to reflect the Exchange Ratio) which risk of forfeiture or right of repurchase shall lapse in accordance with the same vesting schedule as that of the shares of Owlet common stock that, as of immediately prior to the Effective Time, were subject to a risk of forfeiture or right of repurchase at the original purchase price as of immediately prior to the Effective Time.

The Business Combination Agreement provides that the obligations of the Company to consummate the Merger are conditioned on, among other things, that as of the closing of the transactions contemplated by the Business Combination Agreement, the amount of cash available in Sandbridge's trust account, after deducting the amount required to satisfy Sandbridge's obligations to its stockholders (if any) that exercise their rights to redeem their public shares in connection with the stockholders' approval of such transactions, less any deferred underwriting commissions being held in Sandbridge's trust account less certain transaction expenses of Sandbridge, is at least equal to $140.0 million. This condition is for the sole benefit of the Company.

The Business Combination Agreement is also subject to the satisfaction or waiver of certain other closing conditions, including, among other things, Owlet and Sandbridge's performance of their covenants and agreements and no legal restraints or prohibitions preventing the consummation of the transactions.

*Amendment to Related Party Convertible Notes and Outstanding Warrants*

In connection with a potential business combination, in February 2021, the Company amended its outstanding related party convertible notes payable to provide that the notes will automatically convert into shares of the Company's convertible preferred stock immediately prior to the consummation of the potential business combination or, at the holder's election, trigger the repayment of the outstanding principal and accrued interest at the consummation of the potential business combination. Additionally, the Company amended its outstanding convertible preferred stock and common stock warrants to provide that the warrants will be cashless exercised into convertible preferred stock and common stock, respectively, immediately prior to the consummation of the potential business combination if the resulting purchase price of the Company's convertible preferred stock and common stock exceeds the respective exercise price of the warrants.

F-47

Exhibit 7
Page 919

TABLE OF CONTENTS

ANNEX A

**BUSINESS COMBINATION AGREEMENT**

**BY AND AMONG**

**SANDBRIDGE ACQUISITION CORPORATION,**

**PROJECT OLYMPUS MERGER SUB, INC.,**

**AND**

**OWLET BABY CARE INC.**

**DATED AS OF FEBRUARY 15, 2021**

Exhibit 7
Page 920

**TABLE OF CONTENTS**

| | | PAGE |
|---|---|---|
| Article 1 CERTAIN DEFINITIONS | | A-2 |
| Section 1.1. | Definitions | A-2 |
| | | |
| Article 2 MERGER | | A-15 |
| Section 2.1. | Closing Transactions | A-15 |
| Section 2.2. | Closing of the Transactions Contemplated by this Agreement | A-16 |
| Section 2.3. | Treatment of Company Options | A-16 |
| Section 2.4. | Deliverables; Exchange Agent | A-17 |
| Section 2.5. | Withholding | A-19 |
| Section 2.6. | Payment of Expenses | A-20 |
| Section 2.7. | Dissenting Shares | A-20 |
| | | |
| Article 3 REPRESENTATIONS AND WARRANTIES RELATING TO THE GROUP COMPANIES | | A-21 |
| Section 3.1. | Organization and Qualification | A-21 |
| Section 3.2. | Capitalization of the Group Companies | A-21 |
| Section 3.3. | Authority | A-22 |
| Section 3.4. | Financial Statements; Undisclosed Liabilities | A-23 |
| Section 3.5. | Consents and Requisite Governmental Approvals; No Violations | A-24 |
| Section 3.6. | Permits | A-24 |
| Section 3.7. | Material Contracts | A-24 |
| Section 3.8. | Absence of Changes | A-26 |
| Section 3.9. | Litigation | A-26 |
| Section 3.10. | Compliance with Applicable Law | A-26 |
| Section 3.11. | Employee Plans | A-26 |
| Section 3.12. | Environmental Matters | A-27 |
| Section 3.13. | Intellectual Property | A-28 |
| Section 3.14. | Labor Matters | A-30 |
| Section 3.15. | Insurance | A-31 |
| Section 3.16. | Tax Matters | A-31 |
| Section 3.17. | Brokers | A-32 |
| Section 3.18. | Real and Personal Property | A-32 |
| Section 3.19. | Transactions with Affiliates | A-33 |
| Section 3.20. | Data Privacy and Security | A-33 |
| Section 3.21. | Compliance with International Trade & Anti-Corruption Laws | A-34 |
| Section 3.22. | Information Supplied | A-34 |
| Section 3.23. | Regulatory Compliance | A-34 |
| Section 3.24. | Product Warranties; Product Liability | A-35 |
| Section 3.25. | Investigation; No Other Representations | A-36 |
| Section 3.26. | EXCLUSIVITY OF REPRESENTATIONS AND WARRANTIES | A-36 |
| | | |
| Article 4 REPRESENTATIONS AND WARRANTIES RELATING TO THE SANDBRIDGE PARTIES | | A-37 |
| Section 4.1. | Organization and Qualification | A-37 |
| Section 4.2. | Authority | A-37 |

Exhibit 7
Page 921

| Section 4.3. | Consents and Requisite Governmental Approvals; No Violations | A-37 |
|---|---|---|
| Section 4.4. | Brokers | A-38 |
| Section 4.5. | Information Supplied | A-38 |
| Section 4.6. | Capitalization of the Sandbridge Parties | A-38 |
| Section 4.7. | SEC Filings | A-39 |
| Section 4.8. | Trust Account | A-39 |

A-i

Exhibit 7
Page 922

|  |  |  | **PAGE** |
|---|---|---|---|
| Section 4.9. | Transactions with Affiliates | | A-40 |
| Section 4.10. | Litigation | | A-40 |
| Section 4.11. | Compliance with Applicable Law | | A-40 |
| Section 4.12. | Business Activities | | A-41 |
| Section 4.13. | Investment Company Act; JOBS Act | | A-41 |
| Section 4.14. | Internal Controls; Listing; Financial Statements | | A-41 |
| Section 4.15. | Absence of Changes | | A-42 |
| Section 4.16. | No Undisclosed Liabilities | | A-42 |
| Section 4.17. | Tax Matters | | A-42 |
| Section 4.18. | No General Solicitation | | A-43 |
| Section 4.19. | Compliance with International Trade & Anti-Corruption Laws | | A-43 |
| Section 4.20. | PIPE Investment Amount; Subscription Agreements | | A-44 |
| Section 4.21. | Investigation; No Other Representations | | A-44 |
| Section 4.22. | EXCLUSIVITY OF REPRESENTATIONS AND WARRANTIES | | A-44 |
| | | | |
| Article 5 COVENANTS | | | A-45 |
| Section 5.1. | Conduct of Business of the Company | | A-45 |
| Section 5.2 | Efforts to Consummate; Litigation | | A-47 |
| Section 5.3. | Confidentiality and Access to Information | | A-48 |
| Section 5.4. | Notice of Developments | | A-49 |
| Section 5.5. | Public Announcements | | A-49 |
| Section 5.6. | Tax Matters | | A-50 |
| Section 5.7. | Exclusive Dealing | | A-51 |
| Section 5.8. | Preparation of Registration Statement / Proxy Statement | | A-51 |
| Section 5.9. | Sandbridge Stockholder Approval | | A-52 |
| Section 5.10. | Merger Sub Shareholder Approval | | A-53 |
| Section 5.11. | Insider Letter | | A-53 |
| Section 5.12. | Conduct of Business of Sandbridge | | A-53 |
| Section 5.13. | NYSE Listing | | A-54 |
| Section 5.14. | Trust Account | | A-55 |
| Section 5.15. | Company Stockholder Approval | | A-55 |
| Section 5.16. | PIPE Subscriptions | | A-55 |
| Section 5.17. | Sandbridge Indemnification; Directors' and Officers' Insurance | | A-55 |
| Section 5.18. | Company Indemnification; Directors' and Officers' Insurance | | A-56 |
| Section 5.19. | Post-Closing Directors and Officers | | A-57 |
| Section 5.20. | PCAOB Financials | | A-58 |
| Section 5.21. | Owlet Pubco Incentive Equity Plan; Owlet Pubco Employee Stock Purchase Plan | | A-58 |
| Section 5.22. | FIRPTA Certificates | | A-58 |
| | | | |
| Article 6 CONDITIONS TO CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT | | | A-59 |
| Section 6.1. | Conditions to the Obligations of the Parties | | A-59 |
| Section 6.2. | Other Conditions to the Obligations of the Sandbridge Parties | | A-59 |
| Section 6.3. | Other Conditions to the Obligations of the Company | | A-60 |

Exhibit 7
Page 923

Section 6.4.    Frustration of Closing Conditions    A-60

Article 7 TERMINATION    A-60

Section 7.1.    Termination    A-60

Section 7.2.    Effect of Termination    A-61

A-ii

Exhibit 7
Page 924

**TABLE OF CONTENTS**

|  |  |  | **PAGE** |
|---|---|---|---|
| Article 8 MISCELLANEOUS | | | A-61 |
| | Section 8.1. | Non-Survival | A-61 |
| | Section 8.2. | Entire Agreement; Assignment | A-62 |
| | Section 8.3. | Amendment | A-62 |
| | Section 8.4. | Notices | A-62 |
| | Section 8.5. | Governing Law | A-63 |
| | Section 8.6. | Fees and Expenses | A-63 |
| | Section 8.7. | Construction; Interpretation | A-63 |
| | Section 8.8. | Annexes, Exhibits and Schedules | A-64 |
| | Section 8.9. | Parties in Interest | A-64 |
| | Section 8.10. | Severability | A-64 |
| | Section 8.11. | Counterparts; Electronic Signatures | A-64 |
| | Section 8.12. | Knowledge of Company; Knowledge of Sandbridge | A-65 |
| | Section 8.13. | No Recourse | A-65 |
| | Section 8.14. | Extension; Waiver | A-65 |
| | Section 8.15. | Waiver of Jury Trial | A-65 |
| | Section 8.16. | Submission to Jurisdiction | A-66 |
| | Section 8.17. | Remedies | A-66 |
| | Section 8.18. | Trust Account Waiver | A-66 |

**EXHIBITS**

| Exhibit A | Form of Owlet Pubco Certificate of Incorporation |
|---|---|
| Exhibit B | Form of Owlet Pubco Bylaws |
| Exhibit C | Form of Owlet Pubco Incentive Equity Plan |
| Exhibit D | Form of Owlet Pubco Employee Stock Purchase Plan |
| Exhibit E | Form of Registration Rights Agreement |
| Exhibit F | Form of Subscription Agreement |
| Exhibit G | Form of Stockholders Agreement |

A-iii

Exhibit 7
Page 925

**BUSINESS COMBINATION AGREEMENT**

This BUSINESS COMBINATION AGREEMENT (this "Agreement"), dated as of February 15, 2021, is made by and among Sandbridge Acquisition Corporation, a Delaware corporation ("Sandbridge"), Project Olympus Merger Sub, Inc., a Delaware corporation ("Merger Sub"), and Owlet Baby Care Inc., a Delaware corporation (the "Company"). Sandbridge, Merger Sub and the Company shall be referred to herein from time to time collectively as the "Parties". Capitalized terms used but not otherwise defined herein have the meanings set forth in Section 1.1.

WHEREAS, (a) Sandbridge is a blank check company incorporated as a Delaware corporation on June 23, 2020 for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, and (b) Merger Sub is, as of the date of this Agreement, a wholly-owned Subsidiary of Sandbridge that was formed for purposes of consummating the transactions contemplated by this Agreement and the Ancillary Documents;

WHEREAS, pursuant to the Governing Documents of Sandbridge, Sandbridge is required to provide an opportunity for its stockholders to have their outstanding Sandbridge Class A Common Stock redeemed on the terms and subject to the conditions set forth therein in connection with obtaining the Sandbridge Stockholder Approval;

WHEREAS, as of the date of this Agreement, Sandbridge Acquisition Holdings LLC, a Delaware limited liability company (the "Sponsor"), and the Other Class B Stockholders collectively own 5,750,000 shares of Sandbridge Class B Common Stock;

WHEREAS, concurrently with the execution of this Agreement, and as a condition and inducement to the Company's willingness to enter into this Agreement, the Sponsor, the Other Class B Stockholders and Sandbridge are entering into the sponsor letter agreement (the "Sponsor Letter Agreement"), pursuant to which, among other things, the Sponsor and each Other Class B Stockholder has agreed to an amendment of the rights of the Founder Shares such that (a) 1,403,750 of such Founder Shares shall vest on the date, if any, that the closing price of shares of Sandbridge Class A Common Stock on NYSE equals or exceeds $12.50 for any 20 trading days within a 30-trading day period within the five-year period beginning on the Closing Date and (b) 1,403,750 shares of such Founder Shares shall vest on the date, if any, that the closing price of shares of Sandbridge Class A Common Stock on NYSE equals or exceeds $15.00 for any 20 trading days within a 30-trading day period within the five-year period beginning on the Closing Date, in each case, on the terms and subject to the conditions set forth in the Sponsor Letter Agreement;

WHEREAS, in connection with the Merger, Sandbridge shall adopt, subject to obtaining Sandbridge Stockholder Approval, an amended and restated certificate of incorporation, substantially in the form attached hereto as Exhibit A (the "Owlet Pubco Certificate of Incorporation"), and amended and restated bylaws, substantially in the form attached hereto as Exhibit B (the "Owlet Pubco Bylaws");

WHEREAS, on the Closing Date, (a) Merger Sub will merge with and into the Company (the "Merger"), with the Company as the surviving company in the Merger and, after giving effect to the Merger, the Company will be a wholly-owned Subsidiary of Sandbridge, and (b) Sandbridge will change its name to "Owlet, Inc.";

WHEREAS, prior to the Effective Time (as defined below), all of the Company Warrants (as defined below) will be exercised in full on a cash or cashless basis or terminated with exercise, as applicable, in accordance with their respective terms (the "Company Warrant Settlement");

WHEREAS, upon the Effective Time and following the Company Warrant Settlement, all issued and outstanding shares of Company Stock will be converted into the right to receive the Aggregate Merger Consideration as set forth in this Agreement;

WHEREAS, at the Closing, Sandbridge and certain Company Stockholders will enter into a stockholders agreement, substantially in the form attached hereto as Exhibit G (the "Stockholders Agreement") (with such changes as may be agreed in writing by Sandbridge and the Company), which shall be effective as of the Closing;

A-1

Exhibit 7
Page 926

TABLE OF CONTENTS

WHEREAS, at the Closing, Sandbridge, the Sponsor, and certain Company Stockholders will enter into a registration rights agreement (the "Registration Rights Agreement") in the form attached hereto as Exhibit E (with such changes as may be agreed in writing by Sandbridge and the Company), which shall be effective as of the Closing;

WHEREAS, on or prior to the date hereof, Sandbridge entered into Subscription Agreements (as defined below) with the PIPE Investors (as defined below) pursuant to which, at the Closing immediately following the Effective Time, such PIPE Investors agreed to purchase from Sandbridge thirteen (13) million shares of Sandbridge Class A Common Stock (the "PIPE Shares") for an aggregate purchase price equal to the PIPE Investment Amount (the "PIPE Investment");

WHEREAS, the Sandbridge Board has (a) approved this Agreement, the Ancillary Documents to which Sandbridge is or will be a party and the transactions contemplated hereby and thereby (including the Merger) and (b) recommended, among other things, approval of this Agreement and the transactions contemplated by this Agreement (including the Merger) by the holders of Sandbridge Common Stock entitled to vote thereon;

WHEREAS, the board of directors of Merger Sub has approved this Agreement, the Ancillary Documents to which Merger Sub is or will be a party and the transactions contemplated hereby and thereby (including the Merger);

WHEREAS, Sandbridge, as the sole stockholder of Merger Sub, will as promptly as reasonably practicable (and in any event within one Business Day) following the date of this Agreement, approve this Agreement, the Ancillary Documents to which Merger Sub is or will be a party and the transactions contemplated hereby and thereby (including the Merger);

WHEREAS, the board of directors of the Company has (a) approved this Agreement, the Ancillary Documents to which the Company is or will be a party and the transactions contemplated hereby and thereby (including the Merger) and (b) recommended, among other things, the approval of this Agreement, the Ancillary Documents to which the Company is or will be a party and the transactions contemplated hereby and thereby (including the Merger) by the Company Stockholders entitled to vote thereon; and

WHEREAS, each of the Parties intends for U.S. federal income tax purposes that (a) this Agreement constitute a "plan of reorganization" within the meaning of Section 368 of the Code and Treasury Regulations promulgated thereunder and (b) the Merger, or, if applicable, the Alternative Transaction Structure, be treated as a transaction that qualifies as a "reorganization" within the meaning of Section 368 of the Code or, if applicable, as a transaction that qualifies under Section 351 of the Code (clauses (a)-(b), the "Intended Tax Treatment").

NOW, THEREFORE, in consideration of the premises and the mutual promises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, each intending to be legally bound, hereby agree as follows:

**ARTICLE 1**
**CERTAIN DEFINITIONS**

**Section 1.1.    Definitions**. As used in this Agreement, the following terms have the respective meanings set forth below.

"A&R Company Certificate of Incorporation" means the Amended and Restated Certificate of Incorporation of the Company, dated April 19, 2018 (as amended).

"Additional Required Financial Statements" has the meaning set forth in Section 5.20(a).

"Additional Sandbridge SEC Reports" has the meaning set forth in Section 4.7.

"Affiliate" means, with respect to any Person, any other Person who, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto.

"Aggregate Fully Diluted Company Shares" means, without duplication, (a) the aggregate number of shares of Company Stock that are (i) issued and outstanding immediately prior to the Effective Time or (ii) issuable upon the exercise of Company Options (whether or not then vested or exercisable) or upon the settlement of

A-2

Exhibit 7
Page 927

Company restricted stock units or other equity-based awards *minus* (b) the Treasury Shares outstanding immediately prior to the Effective Time, *minus* (c) a number of shares equal to (A) the aggregate exercise price of the Company Options described in clause (ii) above *divided* by (B) the Per Share Merger Consideration; provided, that any Company Option with an exercise price equal to or greater than the Per Share Merger Consideration shall not be counted for purposes of determining the number of Aggregate Fully Diluted Company Shares.

"Aggregate Cash Election Consideration" means an amount of cash equal to the lesser of (i) the aggregate number of Cash Elected Company Options *multiplied by* the Per Share Merger Consideration, *less* the aggregate exercise price of such Cash Elected Company Options and (ii) the Cash Election Consideration Cap.

"Aggregate Merger Consideration" means a number of shares of Sandbridge Common Stock equal to the quotient obtained by *dividing* (i) the Base Purchase Price, *by* (ii) $10.00.

"Aggregate Share Consideration" means a number of shares (rounded to the nearest whole share) of Sandbridge Common Stock equal to (i) the Aggregate Merger Consideration *minus* (ii) the Aggregate Cash Election Consideration *divided by* $10.00.

"Agreement" has the meaning set forth in the introductory paragraph to this Agreement.

"Alternative Transaction Structure" has the meaning set forth in Section 5.6(a)(i).

"Ancillary Documents" means the Stockholders Agreement, the Sponsor Letter Agreement, the Letters of Transmittal, the Registration Rights Agreement and each other agreement, document, instrument and/or certificate contemplated by this Agreement executed or to be executed in connection with the transactions contemplated hereby.

"Anti-Corruption Laws" means, collectively, (a) the U.S. Foreign Corrupt Practices Act, (b) the UK Bribery Act 2010 and (c) any other applicable anti-bribery or anti-corruption Laws related to combatting bribery, corruption and money laundering.

"Assumed Option" has the meaning set forth in Section 2.3(a).

"Available Sandbridge Cash" has the meaning set forth in Section 5.14(a).

"Base Purchase Price" means $1,000,000,000.

"Business Combination Proposal" has the meaning set forth in Section 5.9.

"Business Day" means a day, other than a Saturday or Sunday, on which commercial banks in New York, New York are open for the general transaction of business, provided that banks shall be deemed to be generally open for the general transaction of business in the event of a "shelter in place" or similar closure of physical branch locations at the direction of any governmental authority if such banks' electronic funds transfer system (including for wire transfers) are open for use by customers on such day.

"Cash Elected Company Option" has the meaning set forth in Section 2.3(b).

"Cash Election" has the meaning set forth in Section 2.3(b).

"Cash Election Consideration" has the meaning set forth in Section 2.3(b).

"Cash Election Consideration Cap" means $10,000,000.

"Cash Election Optionholders" has the meaning set forth in Section 2.3(b).

"Certificate of Merger" has the meaning set forth in Section 2.1(b)(ii).

"Certificates" means the certificates representing Company Stock.

"Closing" has the meaning set forth in Section 2.2.

"Closing Company Unaudited Financial Statements" has the meaning set forth in Section 3.4(b).

"Closing Date" has the meaning set forth in Section 2.2.

"Closing Filing" has the meaning set forth in Section 5.5(b).

Exhibit 7
Page 928

"Closing Press Release" has the meaning set forth in Section 5.5(b).

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code and any similar state Law.

"Code" means the U.S. Internal Revenue Code of 1986.

"Company" has the meaning set forth in the introductory paragraph to this Agreement.

"Company Acquisition Proposal" means (a) any transaction or series of related transactions under which any Person(s), directly or indirectly, acquires or otherwise purchases (i) the Company or any of its Subsidiaries or (ii) all or a material portion of assets or businesses of (w) the Company or (x) any of its Subsidiaries holding assets constituting, individually or in the aggregate, 15% or more of the consolidated assets of the Company and its Subsidiaries (in the case of each of clause (i) and (ii), whether by merger, consolidation, recapitalization, purchase or issuance of equity securities, tender offer or otherwise), or (b) any equity or similar investment in the Company or any of its Subsidiaries that results in the relevant investor(s) acquiring 15% or more of any class of equity or voting securities of (y) the Company or (z) any of its Subsidiaries holding assets constituting, individually or in the aggregate, 15% or more of the consolidated assets of the Company and its Subsidiaries (other than the issuance of the applicable class of shares of capital stock of the Company upon the exercise or settlement of any Company Options outstanding on the date of this Agreement in accordance with the terms of the Company Equity Plan and the underlying grant, award or similar agreement). Notwithstanding the foregoing or anything to the contrary herein, none of this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby shall constitute a Company Acquisition Proposal.

"Company Common Stock" means shares of common stock, par value $0.0001 per share, of the Company, designated as "Common Stock" pursuant to the A&R Company Certificate of Incorporation.

"Company D&O Persons" has the meaning set forth in Section 5.18(a).

"Company D&O Tail Policy" has the meaning set forth in Section 5.18(c).

"Company Disclosure Schedules" means the disclosure schedules to this Agreement delivered to Sandbridge by the Company on the date of this Agreement.

"Company Equity Plan" means the Owlet Baby Care Inc. 2014 Equity Incentive Plan.

"Company Fundamental Representations" means the representations and warranties set forth in Section 3.1(a) and Section 3.1(b) (Organization and Qualification), Section 3.2(a) and Section 3.2(c) (Capitalization of the Group Companies), Section 3.3 (Authority) and Section 3.17 (Brokers).

"Company IT Systems" means all computer systems, Software and hardware, communication systems, servers, network equipment and related documentation and information technology systems and services, in each case used or owned by a Group Company.

"Company Licensed Intellectual Property" means Intellectual Property Rights owned by any Person (other than a Group Company) that is licensed to any Group Company.

"Company Material Adverse Effect" means any change, event, effect or occurrence that, individually or in the aggregate with any other change, event, effect or occurrence, has had or would reasonably be expected to have a material adverse effect on (a) the business, results of operations or financial condition of the Group Companies, taken as a whole, or (b) the ability of the Company to consummate the Merger in accordance with the terms of this Agreement; provided, however, that, in the case of clause (a), none of the following shall be taken into account in determining whether a Company Material Adverse Effect has occurred or is reasonably likely to occur: any adverse change, event, effect or occurrence arising from or related to (i) general business or economic conditions in or affecting the United States, or changes therein, or the global economy generally, (ii) any national or international political or social conditions in the United States or any other country, including the engagement by the United States or any other country in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence in any place of any military or terrorist attack, sabotage or cyberterrorism, (iii) changes in conditions of the financial, banking, capital or securities markets generally in the United States or any other country or region in the world, or changes therein, including changes in interest rates in the United States or any other country and changes in exchange rates for the currencies of any countries, (iv) changes in any applicable Laws, (v) any change, event, effect or occurrence that is generally

A-4

Exhibit 7
Page 929

TABLE OF CONTENTS

applicable to the industries or markets in which any Group Company operates, (vi) the execution or public announcement of this Agreement or the pendency of the consummation of the transactions contemplated by this Agreement, including the impact thereof on the relationships, contractual or otherwise, of any Group Company with employees, customers, investors, contractors, lenders, suppliers, vendors, partners, licensors, licensees, payors or other third parties related thereto (provided that the exception in this clause (vi) shall not apply to the representations and warranties set forth in Section 3.5(b) to the extent that its purpose is to address the consequences resulting from the public announcement or pendency or consummation of the transactions contemplated by this Agreement or the condition set forth in Section 6.2(a) to the extent it relates to such representations and warranties), (vii) any failure by any Group Company to meet, or changes to, any internal or published budgets, projections, forecasts, estimates or predictions (although the underlying facts and circumstances resulting in such failure may be taken into account to the extent not otherwise excluded from this definition pursuant to clauses (i) through (vi) or (viii)), or (viii) any hurricane, tornado, flood, earthquake, tsunami, natural disaster, mudslides, wild fires, epidemics, pandemics (including COVID-19) or quarantines, acts of God or other natural disasters or comparable events in the United States or any other country or region in the world, or any escalation of the foregoing; provided, however, that any change, event, effect or occurrence resulting from a matter described in any of the foregoing clauses (i) through (v) or (viii) may be taken into account in determining whether a Company Material Adverse Effect has occurred or is reasonably likely to occur to the extent such change, event, effect or occurrence has a disproportionate adverse effect on the Group Companies, taken as a whole, relative to other participants operating in the industries or markets in which the Group Companies operate.

"Company Non-Party Affiliates" means, collectively, each Company Related Party and each former, current or future Affiliate, Representative, successor and permitted assign of each Company Related Party.

"Company Option" means, as of any determination time, each option to purchase Company Common Stock that is outstanding and unexercised, whether granted under the Company Equity Plan or otherwise.

"Company Owned Intellectual Property" means all Intellectual Property Rights that are owned, or purported to be owned, by a Group Company.

"Company Preferred Stock" means Company Series A Preferred Stock, Company Series A-1 Preferred Stock, Company Series B Preferred Stock and Company Series B-1 Preferred Stock.

"Company Product" means each product and service that is being researched, developed, designed or has been sold or offered for sale, marketed, distributed, developed or manufactured by or on behalf of the Group Companies.

"Company Registered Intellectual Property" means all Registered Intellectual Property owned or purported to be owned by, or filed in the name of, any Group Company.

"Company Related Party" has the meaning set forth in Section 3.19.

"Company Related Party Transactions" has the meaning set forth in Section 3.19.

"Company Restricted Stock" has the meaning set forth in Section 2.1(b)(vii).

"Company Series A Preferred Stock" means shares of preferred stock, par value $0.0001 per share, of the Company designated as "Series A Preferred Stock" pursuant to the A&R Company Certificate of Incorporation.

"Company Series A-1 Preferred Stock" means shares of preferred stock, par value $0.0001 per share, of the Company designated as "Series A-1 Preferred Stock" pursuant to the A&R Company Certificate of Incorporation.

"Company Series B Preferred Stock" means shares of preferred stock, par value $0.0001 per share, of the Company designated as "Series B Preferred Stock" pursuant to the A&R Company Certificate of Incorporation.

"Company Series B-1 Preferred Stock" means shares of preferred stock, par value $0.0001 per share, of the Company designated as "Series B-1 Preferred Stock" pursuant to the A&R Company Certificate of Incorporation.

"Company Stock" means shares of Company Common Stock and Company Preferred Stock.

"Company Stockholder Approval" has the meaning set forth in Section 3.3.

Exhibit 7
Page 930

**TABLE OF CONTENTS**

"Company Stockholders" means, collectively, the holders of Company Stock as of any determination time prior to the Effective Time.

"Company Stockholders Agreements" means, collectively, (i) the Amended and Restated Voting Agreement, dated as of April 20, 2018, by and among the Company and the Company Stockholders party thereto, as amended by that certain Amendment No. 1 dated April 6, 2020 (ii) the Amended and Restated Right of First Refusal and Co-Sale Agreement, dated as of April 20, 2018, by and among the Company and the Company Stockholders party thereto and (iii) the Amended and Restated Investors' Rights Agreement, dated as of April 20, 2018, by and among the Company and the Company Stockholders party thereto, as amended by that certain Amendment No. 1 dated April 6, 2020.

"Company Transaction Expenses" has the meaning set forth in Section 2.6(a).

"Company Warrants" means warrants to purchase shares of Company Common Stock.

"Company Warrant Settlement" has the meaning set forth in the recitals to this Agreement.

"Confidentiality Agreement" means that certain Mutual Nondisclosure Agreement, dated as of October 25, 2020, by and between the Company and Sandbridge.

"Consent" means any notice, authorization, qualification, registration, filing, notification, waiver, order, consent or approval to be obtained from, filed with or delivered to a Governmental Entity or other Person.

"Continental" means Continental Stock Transfer & Trust Company.

"Contract" or "Contracts" means any agreement, contract, license, lease, obligation, undertaking or other commitment or arrangement that is legally binding upon a Person or any of his, her or its properties or assets.

"Copyrights" has the meaning set forth in the definition of Intellectual Property Rights.

"COVID-19" means the illness caused by SARS-CoV-2, and any mutations thereof, or viral illnesses, epidemics, pandemics or disease outbreaks related thereto or associated therewith.

"COVID Actions" means any actions that the Company or any of its Affiliates reasonably determines are necessary to take as a result of COVID-19 or the effects thereof, including to mitigate the adverse effects of COVID-19, to protect the health and safety of customers, employees and other business relationships, including in response to any actions taken by, or recommendations or restrictions issued by, Governmental Entities in response to COVID-19.

"Creator" has the meaning set forth in Section 3.13(d).

"Data Protection Directive" has the meaning set forth in the definition of Privacy Obligations.

"DGCL" means General Corporation Law of the State of Delaware.

"Dissenting Shares" has the meaning set forth in Section 2.7.

"Effective Time" has the meaning set forth in Section 2.1(b)(ii).

"Election" has the meaning set forth in Section 2.4(f).

"Election Deadline" has the meaning set forth in Section 2.4(f).

"Election Period" has the meaning set forth in Section 2.4(h).

"Election Record Date" has the meaning set forth in Section 2.4(h).

"Employee Benefit Plan" means each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA, whether or not subject to ERISA) and each other plan, program, policy, Contract, agreement or arrangement providing for compensation or employee benefits, including each employment, consulting, independent contractor, bonus, commission or other incentive compensation, stock option, stock purchase or other equity-based award, profit sharing, savings, retirement, disability, life insurance, health or medical benefits, sick leave, vacation or other paid time-off, deferred compensation, severance, termination pay, post-employment or

A-6

Exhibit 7
Page 931

TABLE OF CONTENTS

retirement benefits, retention, change of control, fringe, welfare or other employee benefit or other compensation or benefit plan, program, policy, Contract, agreement or arrangement, in each case, that any Group Company maintains, sponsors or contributes to or is required to contribute to, or under or with respect to which any Group Company has any Liability.

"Environmental Laws" means all Laws and Orders concerning pollution, protection of the environment or human health or safety.

"e-Privacy Directive" has the meaning set forth in the definition of Privacy Obligations.

"Equity Incentive Plan Proposal" has the meaning set forth in Section 5.9.

"Equity Securities" means any share, share capital, capital stock, partnership, membership, joint venture or similar interest in any Person (including any stock appreciation, phantom stock, profit participation or similar rights) and any option, warrant, right or security (including debt securities) convertible, exchangeable or exercisable therefor.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any Person that, together with any Group Company, could be deemed a "single employer" within the meaning of Section 4001(b)(1) of ERISA or Section 414(b), (c), (m) or (o) of the Code at any relevant time.

"Exchange Act" means the Securities Exchange Act of 1934.

"Exchange Agent" has the meaning set forth in Section 2.4(a).

"Exchange Fund" has the meaning set forth in Section 2.4(c).

"Exchange Ratio" means the quotient obtained by dividing (a) the number of shares constituting the Aggregate Merger Consideration, by (b) the number of Aggregate Fully Diluted Company Shares.

"FDA" means the U.S. Food and Drug Administration, or any successor agency thereto.

"FDA Law" means all Laws applicable to the operation of the Company's business related to the research, investigation, development, production, marketing, distribution, storage, shipping, transport, advertising, labeling, promotion, sale, export, import, use, handling and control, safety, efficacy, reliability or manufacturing of medical devices, including (a) the Federal Food, Drug, and Cosmetic Act of 1938 (21 U.S.C. 301 et. seq.), (b) the rules and regulations promulgated and enforced by FDA thereunder, including, as applicable, those requirements relating to the FDA's Quality System Regulation contained in 21 C.F.R. Part 820, investigational use, premarket notification and premarket approval and applications to market new medical devices, (c) Laws governing the conduct of non-clinical laboratory studies, including FDA's Good Laboratory Practices regulations contained in 21 C.F.R. Part 58, (d) Laws governing the development, conduct, performance, monitoring, subject informed consent, auditing, recording, analysis and reporting of clinical trials, including FDA's Good Clinical Practice regulations contained in 21 C.F.R. Parts 11, 50, 54, 56 and 812, (e) Laws governing data-gathering activities relating to the detection, assessment, and understanding of adverse events (including adverse event and malfunction reporting under 21 C.F.R. Part 803) and (f) all comparable state, federal or foreign Laws relating to any of the foregoing.

"Federal Securities Laws" means the Exchange Act, the Securities Act and the other U.S. federal securities laws and the rules and regulations of the SEC promulgated thereunder or otherwise.

"Financial Statements" has the meaning set forth in Section 3.4(a).

"Form of Election" has the meaning set forth in Section 2.4(h).

"Founder Shares" means (i) the shares of Sandbridge Class B Common Stock held by Sponsor and (ii) the shares of Sandbridge Class A Common Stock that will be issued to the Sponsor upon the conversion of such shares of Sandbridge Class B Common Stock at the Closing in accordance with the terms of the amended and restated certificate of incorporation of Sandbridge.

"GAAP" means United States generally accepted accounting principles.

"GDPR" has the meaning set forth in the definition of Privacy Obligations.

A-7

Exhibit 7
Page 932

"Governing Document Proposals" has the meaning set forth in Section 5.9.

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs, for example, the certificate of incorporation and bylaws of a U.S. corporation and the certificate of formation and limited liability company agreement of a U.S. limited liability company.

"Governmental Entity" means any United States or non-United States (a) federal, state, local, municipal or other government, (b) governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal) or (c) body exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal (public or private).

"Group Company" and "Group Companies" means, collectively, the Company and its Subsidiaries.

"Hazardous Substance" means any hazardous, toxic, explosive or radioactive material, substance, waste or other pollutant that is regulated by, or may give rise to Liability pursuant to, any Environmental Law, including any petroleum products or byproducts, asbestos, lead, polychlorinated biphenyls, per- and poly-fluoroakyl substances, or radon.

"Holder" has the meaning set forth in Section 2.4(f).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules and regulations promulgated thereunder.

"Indebtedness" means, as of any time, without duplication, with respect to any Person, the outstanding principal amount of, accrued and unpaid interest on, fees and expenses arising under or in respect of (a) indebtedness for borrowed money, (b) other obligations evidenced by any note, bond, debenture or other debt security, (c) obligations for the deferred purchase price of property or assets, including "earn-outs" and "seller notes" (but excluding any trade payables arising in the ordinary course of business), (d) reimbursement and other obligations with respect to letters of credit, bank guarantees, bankers' acceptances or other similar instruments, in each case, solely to the extent drawn, (e) leases required to be capitalized under GAAP, (f) derivative, hedging, swap, foreign exchange or similar arrangements, including swaps, caps, collars, hedges or similar arrangements, and (g) any of the obligations of any other Person of the type referred to in clauses (a) through (f) above directly or indirectly guaranteed by such Person or secured by any assets of such Person, whether or not such Indebtedness has been assumed by such Person.

"Intellectual Property Rights" means all intellectual property rights of every kind and nature however denominated, throughout the world, including all (a) patents and patent applications, industrial designs and design patent rights, including any continuations, divisionals, continuations-in-part and provisional applications and statutory invention registrations, and any patents issuing on any of the foregoing and any reissues, reexaminations, substitutes, supplementary protection certificates, extensions of any of the foregoing (collectively, "Patents"); (b) trademarks, service marks, trade names, brand names, trade dress rights, logos, Internet domain names, corporate names and other source or business identifiers, together with the goodwill associated with any of the foregoing, and all applications, registrations, extensions and renewals of any of the foregoing (collectively, "Marks"); (c) copyrights and works of authorship, rights of publicity, database and design rights, mask work rights and moral rights, whether or not registered or published, and all registrations, applications, renewals, extensions and reversions of any of any of the foregoing (collectively, "Copyrights"); (d) trade secrets, know-how and confidential and proprietary information, including invention disclosures, inventions and formulae, whether patentable or not; (e) rights in or to Software or other technology; and (f) social media accounts and handles.

"Intended Tax Treatment" has the meaning set forth in the recitals to this Agreement.

"Investment Company Act" means the Investment Company Act of 1940.

"IPO" has the meaning set forth in Section 8.18.

"JOBS Act" means the Jumpstart Our Business Startups Act of 2012.

"Latest Balance Sheet" has the meaning set forth in Section 3.4(a).

A-8

Exhibit 7
Page 933

"Law" means any federal, state, local, foreign, national or supranational statute, law (including common law), act, statute, ordinance, treaty, rule, code, regulation or other binding directive or guidance issued, promulgated or enforced by a Governmental Entity having jurisdiction over a given matter.

"Leased Real Property" has the meaning set forth in Section 3.18(b).

"Letter of Transmittal" means a letter of transmittal in a form to be agreed between the Parties and with such modifications, amendments or supplements as may be requested by the Exchange Agent and mutually agreed to by each of Sandbridge and the Company (in either case, such agreement not to be unreasonably withheld, conditioned or delayed).

"Liability" or "liability" means any and all debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, known or unknown, matured or unmatured or determined or determinable, including those arising under any Law (including any Environmental Law), Proceeding or Order and those arising under any Contract, agreement, arrangement, commitment or undertaking.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien, license or sub-license, charge, or other similar encumbrance or interest (including, in the case of any Equity Securities, any voting, transfer or similar restrictions).

"Marks" has the meaning set forth in the definition of Intellectual Property Rights.

"Material Contracts" has the meaning set forth in Section 3.7(a).

"Merger" has the meaning set forth in the recitals to this Agreement.

"Merger Sub" has the meaning set forth in the introductory paragraph to this Agreement.

"Minimum Available Sandbridge Cash Amount" has the meaning set forth in Section 5.14(a).

"Multiemployer Plan" has the meaning set forth in Section (3)37 or Section 4001(a)(3) of ERISA.

"Newco" has the meaning set forth in Section 5.6(a)(i).

"Non-Party Affiliate" has the meaning set forth in Section 8.13.

"NYSE" means the New York Stock Exchange.

"Off-the-Shelf Software" means any Software that is made generally available on a commercial basis and is licensed to any of the Group Companies on a non-exclusive basis under standard terms and conditions.

"Open Source Software" means any Software that is distributed (a) as "free software" (as defined by the Free Software Foundation), (b) as "open source software" or pursuant to any license identified as an "open source license" or that substantially conforms to the "open source definition" (as those terms are defined by the Open Source Initiative), (c) under any similar licensing or distribution model as (a) or (b), or (d) under a license that requires such Software or derivative works thereof to (i) be disclosed in source code form, (ii) be freely relicensable, or (iii) allow for the creation of derivative works.

"Order" means any outstanding writ, order, judgment, injunction, decision, determination, award, ruling, subpoena, verdict or decree entered, issued or rendered by any Governmental Entity.

"Other Class B Stockholders" means, collectively, Domenico De Sole, Ramez Toubassy, Tommy Hilfiger and Mike Goss.

"Other Sandbridge Stockholder Approval" means the approval of each Other Transaction Proposal by the affirmative vote of the holders of the requisite number of shares of Sandbridge Common Stock entitled to vote thereon, whether in person or by proxy at the Sandbridge Stockholders Meeting (or any adjournment thereof), in accordance with the Governing Documents of Sandbridge and applicable Law.

"Other Transaction Proposal" means each Transaction Proposal, other than the Required Transaction Proposals.

"Owlet Pubco Bylaws" has the meaning set forth in the Preamble.

"Owlet Pubco Certificate of Incorporation" has the meaning set forth in the Preamble.

A-9

Exhibit 7
Page 934

"Owlet Pubco Employee Stock Purchase Plan" has the meaning set forth in Section 5.21.

"Owlet Pubco Incentive Equity Plan" has the meaning set forth in Section 5.21.

"Parties" has the meaning set forth in the introductory paragraph to this Agreement.

"Patents" has the meaning set forth in the definition of Intellectual Property Rights.

"PCAOB" means the Public Company Accounting Oversight Board.

"Permits" means any approvals, authorizations, clearances, licenses, registrations, permits or certificates of a Governmental Entity.

"Permitted Liens" means (a) mechanic's, materialmen's, carriers', repairers' and other similar statutory Liens arising or incurred in the ordinary course of business for amounts that are not yet delinquent or are being contested in good faith by appropriate proceedings and for which sufficient reserves have been established in accordance with GAAP, (b) Liens for Taxes, assessments or other governmental charges not yet due and payable as of the Closing Date or which are being contested in good faith by appropriate proceedings, for which sufficient reserves have been established in accordance with GAAP and which are set forth on Section 3.16(g) of the Company Disclosure Schedules, (c) encumbrances and restrictions on real property (including easements, covenants, conditions, rights of way and similar restrictions) that do not prohibit or materially interfere with any of the Group Companies' use or occupancy of such real property, (d) zoning, building codes and other land use Laws regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property and which are not violated by the use or occupancy of such real property or the operation of the businesses of the Group Company and do not prohibit or materially interfere with any of the Group Companies' use or occupancy of such real property, (e) cash deposits or cash pledges to secure the payment of workers' compensation, unemployment insurance, social security benefits or obligations arising under similar Laws or to secure the performance of public or statutory obligations, surety or appeal bonds, and other obligations of a like nature, in each case in the ordinary course of business and which are not yet due and payable, (f) non-exclusive licenses to Intellectual Property Rights that accompany the sale of the Company Products in the ordinary course of business consistent with past practice and (g) other Liens that do not materially and adversely affect the value, use or operation of the asset subject thereto.

"Per Share Merger Consideration" means the product obtained by *multiplying* (i) the Exchange Ratio *by* (ii) $10.00.

"Person" means an individual, partnership, corporation, limited liability company, joint stock company, unincorporated organization or association, trust, joint venture or other similar entity, whether or not a legal entity.

"Personal Data" means any data or information relating to an identified or identifiable natural person that is regulated by the Privacy Obligations.

"PIMCO Private Funds" means the members of the Sponsor that are affiliated with Pacific Investment Management Company LLC.

"PIPE Investment" has the meaning set forth in the recitals to this Agreement.

"PIPE Investment Amount" means $130,000,000.

"PIPE Investors" means those certain investors participating in the PIPE Investment pursuant to the Subscription Agreements.

"PIPE Shares" has the meaning set forth in the recitals to this Agreement.

"Pre-Closing Sandbridge Holders" means the holders of Sandbridge Common Stock at any time prior to the Effective Time.

"Privacy and Data Security Policies" has the meaning set forth in Section 3.20(a).

"Privacy Obligations" means Laws, contractual obligations, self-regulatory standards, or written policies or terms of use relating to the Processing, privacy, security or protection of Personal Data which are applicable to the Group Companies including, to the extent applicable, the EU Data Protection Directive 95/46/EC (the "Data Protection Directive") as implemented under applicable national laws, the UK Data Protection Act 1998,

A-10

Exhibit 7
Page 935

TABLE OF CONTENTS

the General Data Protection Regulation (EU) 2016/679, (the "GDPR"), the UK Data Protection Act 2018, the EU Privacy and Electronic Communications Directive 2002/58/EC, (the "e-Privacy Directive"), the UK Privacy and Electronic Communications (EC Directive) Regulations 2003 (SI 2003/2426) and all other applicable laws, regulations and secondary legislation implementing the GDPR and/or the e-Privacy Directive, California Consumer Privacy Act of 2018, Payment Card Industry Data Security Standard, the Health Insurance Portability and Accountability Act of 1996 as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, the Federal Trade Commission Act, the Controlling the Assault of Non-Solicited Pornography And Marketing Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, Children's Online Privacy Protection Act of 1998, the Computer Fraud and Abuse Act, state data security laws, state unfair or deceptive trade practices laws, state biometric privacy acts, state social security number protection laws, state data breach notification laws, Canada's Personal Information Protection and Electronic Documents Act, the Payment Card Industry Data Security Standards, the Payment Application Data Security Standards, and any Laws concerning requirements for website and mobile application privacy policies and practices, data or web scraping, cybersecurity disclosures in public filings, call or electronic monitoring or recording or any outbound communications, as the case may be, in each case, as amended, replaced, supplemented or updated from time to time and together with any subordinate or related legislation made under or in connection with any of the foregoing. References to "special categories of personal data", "data subject" and "personal data breach" shall have the meanings given to those terms in the GDPR.

"Proceeding" means any lawsuit, litigation, action, audit, examination, claim, complaint, charge, proceeding, suit or arbitration (in each case, whether civil, criminal or administrative and whether public or private) pending by or before or otherwise involving any Governmental Entity.

"Process" (or "Processing" or "Processes") means any operation or set of operations which is performed on Personal Data or on sets of Personal Data, whether or not by automated means, such as the collection, use, storage, recording, organization, structuring, adaptation or alteration, retrieval, consultation, distribution, transfer, import, export, protection (including through security measures), disposal, disclosure by transmission, dissemination or otherwise making available, alignment, combination, erasure, destruction or other activity regarding data (whether electronically or in any other form or medium).

"Processor" means any third parties engaged by any Group Company or Companies to process Personal Data.

"Prospectus" has the meaning set forth in Section 8.18.

"Public Stockholders" has the meaning set forth in Section 8.18.

"Quality System Regulation" means, collectively, Quality System Regulation under 21 C.F.R. Part 820.

"Real Property Leases" means all leases, subleases, licenses or other agreements, in each case, pursuant to which any Group Company leases or subleases any real property.

"Registered Intellectual Property" means all issued Patents, pending Patent applications, registered Marks, pending applications for registration of Marks, registered Copyrights, pending applications for registration of Copyrights, and Internet domain name registrations.

"Registration Rights Agreement" has the meaning set forth in the recitals to this Agreement.

"Registration Statement / Proxy Statement" means a registration statement on Form S-4 relating to the transactions contemplated by this Agreement and the Ancillary documents and containing a prospectus and proxy statement of Sandbridge.

"Representatives" means with respect to any Person, such Person's Affiliates and its and such Affiliates' respective directors, managers, officers, employees, accountants, consultants, advisors, attorneys, agents and other representatives.

"Required Sandbridge Stockholder Approval" means the approval of each Required Transaction Proposal by the affirmative vote of the holders of the requisite number shares of Sandbridge Common Stock entitled to vote thereon, whether in person or by proxy at the Sandbridge Stockholders Meeting (or any adjournment thereof), in accordance with the Governing Documents of Sandbridge and applicable Law.

A-11

Exhibit 7
Page 936

**TABLE OF CONTENTS**

"Required Transaction Proposals" means, collectively, the Business Combination Proposal, the Stock Issuance Proposal, the Equity Incentive Plan Proposal, and the Governing Document Proposals.

"Requisite Company Stockholders" means the Company Stockholders holding shares sufficient to effect the Company Stockholder Approval, each of which or whom is an "accredited investor" as defined in Rule 501 of Regulation D under the Securities Act.

"Sanctions and Export Control Laws" means any applicable Law related to (a) import and export controls, including the U.S. Export Administration Regulations, (b) economic sanctions, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the European Union, any European Union Member State, the United Nations, and Her Majesty's Treasury of the United Kingdom or (c) anti-boycott measures.

"Sandbridge" has the meaning set forth in the introductory paragraph to this Agreement.

"Sandbridge Acquisition Proposal" means (a) any transaction or series of related transactions under which Sandbridge or any of its controlled Affiliates, directly or indirectly, (i) acquires or otherwise purchases any other Person(s), (ii) engages in a business combination with any other Person(s) or (iii) acquires or otherwise purchases all or a material portion of the assets or businesses of any other Persons(s) (in the case of each of clause (i), (ii) and (iii), whether by merger, consolidation, recapitalization, purchase or issuance of equity securities, tender offer or otherwise) or (b) any equity, debt or similar investment in Sandbridge or any of its controlled Affiliates. Notwithstanding the foregoing or anything to the contrary herein, none of this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby shall constitute a Sandbridge Acquisition Proposal.

"Sandbridge Board" has the meaning set forth in the recitals to this Agreement.

"Sandbridge Board Recommendation" has the meaning set forth in Section 5.9.

"Sandbridge Class A Common Stock" means Sandbridge's Class A common stock, par value $0.0001.

"Sandbridge Class B Common Stock" means Sandbridge's Class B common stock, par value $0.0001.

"Sandbridge Common Stock" means Sandbridge Class A Common Stock and Sandbridge Class B Common Stock.

"Sandbridge D&O Persons" has the meaning set forth in Section 5.17(a).

"Sandbridge Disclosure Schedules" means the disclosure schedules to this Agreement delivered to the Company by Sandbridge on the date of this Agreement.

"Sandbridge Financial Statements" means all of the financial statements of Sandbridge included in the Sandbridge SEC Reports.

"Sandbridge Fundamental Representations" means the representations and warranties set forth in Section 4.1 (Organization and Qualification), Section 4.2 (Authority), Section 4.4 (Brokers) and Section 4.6 (Capitalization of the Sandbridge Parties).

"Sandbridge Insider Letter" means that certain letter agreement, dated as of September 14, 2020, by and among Sandbridge, the Sponsor, certain investors in the Sponsor, the other initial stockholders of Sandbridge and each of the directors and officers of Sandbridge.

"Sandbridge Material Adverse Effect" means any change, event, effect or occurrence that, individually or in the aggregate with any other change, event, effect or occurrence, has had or would reasonably be expected to have a material adverse effect on the ability of any Sandbridge Party to consummate the Merger in accordance with the terms of this Agreement.

"Sandbridge Non-Party Affiliates" means, collectively, each Sandbridge Related Party and each former, current or future Affiliate, Representative, successor and permitted assign of each Sandbridge Related Party.

"Sandbridge Parties" means, collectively, Sandbridge and Merger Sub.

"Sandbridge Related Party" has the meaning set forth in Section 4.9.

"Sandbridge Related Party Transactions" has the meaning set forth in Section 4.9.

A-12

Exhibit 7
Page 937

"Sandbridge SEC Reports" has the meaning set forth in Section 4.7.

"Sandbridge Stockholder Approval" means, collectively, the Required Sandbridge Stockholder Approval and the Other Sandbridge Stockholder Approval.

"Sandbridge Stockholder Redemption" means the right of the holders of Sandbridge Class A Common Stock to redeem all or a portion of their Sandbridge Class A Common Stock (in connection with the transactions contemplated by this Agreement or otherwise) as set forth in Governing Documents of Sandbridge.

"Sandbridge Stockholders Meeting" has the meaning set forth in Section 5.9.

"Sandbridge Transaction Expenses" has the meaning set forth in Section 2.6(b).

"Sandbridge Warrants" means each warrant to purchase one share of Sandbridge Class A Common Stock at an exercise price of $11.50 per share, subject to adjustment in accordance with the Warrant Agreement (including, for the avoidance of doubt, each such warrant held by the Sponsor or any Other Class B Stockholder).

"Sarbanes-Oxley Act" means the Sarbanes-Oxley Act of 2002.

"Schedules" means, collectively, the Company Disclosure Schedules and the Sandbridge Disclosure Schedules.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities Act" means the U.S. Securities Act of 1933.

"Securities Laws" means Federal Securities Laws and other applicable foreign and domestic securities or similar Laws.

"Security Breach" means any (i) unauthorized or unlawful access, acquisition, use, disclosure, loss, sale, rental or other Processing of any Company IT System, Personal Data, confidential information or trade secrets used or held for use by or on behalf of a Group Company; (ii) other act or omission that compromises the security, integrity, or confidentiality of any Company IT System, Personal Data, confidential information or trade secrets used or held for use by or on behalf of a Group Company; or (iii) phishing or other cyberattack that results in a monetary loss to or business disruption affecting a Group Company.

"Signing Filing" has the meaning set forth in Section 5.5(b).

"Signing Press Release" has the meaning set forth in Section 5.5(b).

"Software" shall mean any and all (a) computer programs, including any and all software implementations of algorithms, models, and methodologies, whether in source code or object code; (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise; (c) descriptions, flowcharts, and other work product used to design, plan, organize, and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons; and (d) all documentation, including user manuals and other training documentation, related to any of the foregoing.

"Sponsor" has the meaning set forth in the recitals to this Agreement.

"Sponsor Letter Agreement" has the meaning set forth in the recitals to this Agreement.

"Stock Issuance Proposal" has the meaning set forth in Section 5.9.

"Stockholders Agreement" has the meaning set forth in the recitals to this Agreement.

"Subscription Agreements" means the subscription agreements pursuant to which the PIPE Investment will be consummated, each substantially in the form attached hereto as Exhibit F.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership or other legal entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof, or (b) if a limited liability company, partnership,

A-13

Exhibit 7
Page 938

association or other business entity (other than a corporation), a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be a, or control any, managing director or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Supervisory Authority" means any local, national, supranational, state, governmental or quasi-governmental agency, body, department, board, official or entity exercising regulatory or supervisory authority pursuant to any Privacy Obligations including, without limitation, the Information Commissioner in the UK, the U.S. Department of Health and Human Services Office for Civil Rights, the United States Federal Trade Commission, and any state or federal office of attorney general.

"Surviving Company" has the meaning set forth in Section 2.1(b)(i).

"Tax" means any federal, state, local or non-United States income, gross receipts, franchise, estimated, alternative minimum, sales, use, transfer, value added, excise, stamp, customs, duties, ad valorem, real property, personal property (tangible and intangible), capital stock, social security, unemployment, payroll, wage, employment, severance, occupation, registration, environmental, communication, mortgage, profits, license, lease, service, goods and services, withholding, premium, unclaimed property, escheat, turnover, windfall profits or other taxes or similar charges, levies or assessments of any kind whatever, whether computed on a separate or combined, unitary or consolidated basis or in any other manner, together with any interest, deficiencies, penalties, additions to tax, or additional amounts imposed by any Governmental Entity with respect thereto, whether disputed or not, and including any secondary Liability for any of the aforementioned.

"Tax Authority" means any Governmental Entity responsible for the collection or administration of Taxes or Tax Returns.

"Tax Return" means returns, information returns, statements, declarations, claims for refund, schedules, attachments and reports relating to Taxes filed or required to be filed with any Governmental Entity.

"Termination Date" has the meaning set forth in Section 7.1(d).

"Transaction Expenses" has the meaning set forth in Section 2.6(b).

"Transaction Litigation" has the meaning set forth in Section 5.2(d).

"Transaction Proposals" has the meaning set forth in Section 5.9.

"Treasury Shares" has the meaning set forth in Section 2.1(b)(vii).

"Trust Account" has the meaning set forth in Section 8.18.

"Trust Account Released Claims" has the meaning set forth in Section 8.18.

"Trust Agreement" has the meaning set forth in Section 4.8.

"Trustee" has the meaning set forth in Section 4.8.

"Vested Company Option" means a Company Option, or portion thereof, to the extent such Company Option (or applicable portion thereof) is vested as of immediately prior to the Effective Time.

"WARN" means the Worker Adjustment Retraining and Notification Act of 1988, as well as analogous applicable foreign, state or local Laws.

"Warrant Agreement" means the Warrant Agreement, dated as of September 14, 2020, by and between Sandbridge and the Trustee.

"Willful Breach" means a material breach that is a consequence of an act undertaken or a failure to act by the breaching party with the knowledge that the taking of such act or such failure to act would, or would reasonably be expected to, constitute or result in a breach of this Agreement.

"Written Consent" has the meaning set forth in Section 5.15.

A-14

Exhibit 7
Page 939

**ARTICLE 2**
**MERGER**

**Section 2.1.** **Closing Transactions**. On the terms and subject to the conditions set forth in this Agreement, the following transactions shall occur in the order set forth in this Section 2.1:

(a)    Governing Documents. On the Closing Date prior to the Effective Time, the amended and restated certificate of incorporation of Sandbridge shall be amended and restated to be the Owlet Pubco Certificate of Incorporation and the bylaws of Sandbridge shall be amended and restated to be the Owlet Pubco Bylaws.

(b)    The Merger.

(i)    On the terms and subject to the conditions set forth in this Agreement and in accordance with the DGCL, on the Closing Date, the Merger will occur at the Effective Time. Following the Effective Time, the separate existence of Merger Sub shall cease and the Company shall continue as the surviving company of the Merger (the "Surviving Company").

(ii)    At the Closing, the parties hereto shall cause a certificate of merger, in a form reasonably satisfactory to the Company and Sandbridge (the "Certificate of Merger"), to be executed and filed with the Secretary of State of the State of Delaware. The Merger shall become effective on the date and time at which the Certificate of Merger is accepted for filing by the Secretary of State of the State of Delaware or at such later date and/or time as is agreed by Sandbridge and the Company and specified in the Certificate of Merger (the time the Merger becomes effective being referred to herein as the "Effective Time").

(iii)    The Merger shall have the effects set forth in Section 251 of the DGCL. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all of the assets, properties, rights, privileges, powers and franchises of the Company and Merger Sub shall vest in the Surviving Company and all debts, liabilities, obligations, restrictions, disabilities and duties of each of the Company and Merger Sub shall become the debts, liabilities, obligations and duties of the Surviving Company, in each case, in accordance with the DGCL.

(iv)    At the Effective Time, the Governing Documents of Merger Sub shall become the Governing Documents of the Surviving Company, in each case, until thereafter changed or amended as provided therein or by applicable Law.

(v)    From and after the Effective Time, the directors and officers of the Surviving Company shall be the individuals listed on Schedule 2.1(b)(v), each to hold office in accordance with the Governing Documents of the Surviving Company until such director's or officer's successor is duly elected or appointed and qualified, or until the earlier of their death, resignation or removal.

(vi)    At the Effective Time, by virtue of the Merger and without any action on the part of any Party or any other Person, each share of capital stock of Merger Sub issued and outstanding immediately prior to the Effective Time shall be automatically canceled and extinguished and converted into one share of common stock, par value $0.0001, of the Surviving Company.

(vii)    At the Effective Time, by virtue of the Merger and without any action on the part of any Party or any other Person, each share of Company Stock issued and outstanding as of immediately prior to the Effective Time (other than (i) any shares of Company Stock subject to Company Options (which shall be respectively subject to Section 2.3 (Treatment of Company Options)), (ii) any shares of Company Stock held by the Company as treasury stock (the "Treasury Shares") and (iii) any Dissenting Shares), shall be automatically cancelled and converted into the right to receive a number of shares of Sandbridge Class A Common Stock equal to the Exchange Ratio, with fractional shares rounded down to the nearest whole share (after aggregating all fractional shares of Sandbridge Class A Common Stock into which such Person's Company Stock are converted); provided, that any such shares of Sandbridge Class A Common Stock paid as consideration for the cancellation of shares of Company Common Stock that, as of immediately prior to the Effective Time, were subject to a risk of forfeiture or right of repurchase at the original purchase price as of immediately prior to the Effective

A-15

Exhibit 7
Page 940

Time ("Company Restricted Stock") shall be subject to the same risk of forfeiture or right of repurchase (proportionately adjusted to reflect the Exchange Ratio) which risk of forfeiture or right of repurchase shall lapse in accordance with the same vesting schedule as that of the Company Restricted Stock.

(viii)    At the Effective Time, by virtue of the Merger and without any action on the part of any Party or any other Person, each Treasury Share shall be automatically canceled and extinguished, and no consideration shall be paid with respect thereto.

(ix)    Notwithstanding anything in this Agreement to the contrary, no fractional shares of Sandbridge Class A Common Stock shall be issued in the Merger.

Section 2.2.    **Closing of the Transactions Contemplated by this Agreement**. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place electronically by exchange of the closing deliverables by the means provided in Section 8.11 (Counterparts; Electronic Signatures) as promptly as reasonably practicable, but in no event later than the third (3rd) Business Day, following the satisfaction (or, to the extent permitted by applicable Law, waiver) of the conditions set forth in Article 6 (other than those conditions that by their nature are to be satisfied at the Closing, but subject to satisfaction or waiver of such conditions) (the "Closing Date") or at such other place, date and/or time as Sandbridge and the Company may agree in writing.

Section 2.3.    **Treatment of Company Options**.

(a)    At the Effective Time, by virtue of the Merger and without any action of any Party or any other Person (except, in the case of the Company, actions required by Section 2.3(e)), each Company Option that is not a Cash Elected Company Option that is outstanding immediately prior to the Effective Time shall be cancelled and converted into an option to purchase Sandbridge Class A Common Stock upon substantially the same terms and conditions as are in effect with respect to such Company Option immediately prior to the Effective Time, including with respect to vesting, expiration and forfeiture provisions (each, an "Assumed Option"). Each Assumed Option shall (i) cover a number of shares of Sandbridge Class A Common Stock equal to the product of the number of shares of Company Common Stock subject to the applicable Company Option immediately prior to the Effective Time and the Exchange Ratio (rounded down to the nearest whole share) and (ii) have a per share exercise price determined by dividing the per share exercise price of the applicable Company Option immediately prior to the Effective Time by the Exchange Ratio (rounded up to the nearest whole cent); provided that such conversion shall in all events occur in a manner intended to comply with the applicable requirements of Section 409A or Section 424 of the Code.

(b)    At the Effective Time, each Vested Company Option with respect to which an election to receive only cash (a "Cash Election") has been properly made and not revoked pursuant to Section 2.4(j) (a "Cash Elected Company Option") that is issued and outstanding immediately prior to the Effective Time shall be canceled and converted into the right to receive, subject to Section 2.3(c), an amount in cash equal to, with respect to each share of Company Common Stock subject to such Cash Elected Company Option, (i) the Per Share Merger Consideration, without interest, *minus* (ii) the exercise price applicable to the share of Company Common Stock underlying such Cash Elected Company Option (the "Cash Election Consideration"). All Cash Election Consideration payable to the holders of Cash Elected Company Options ("Cash Election Optionholders") will be paid as soon as practicable after the Closing Date through the regular payroll processes of the Company and shall be subject to all applicable Tax and other withholdings.

(c)    If the aggregate amount of Cash Election Consideration to be paid in respect of the aggregate number of Cash Elected Company Options would exceed the Cash Election Consideration Cap, a portion of the Vested Company Options that are considered Cash Elected Company Options will be reduced in accordance with this Section 2.3(c) by the minimum amount necessary to provide that the total Cash Election Consideration does not exceed the Cash Election Consideration Cap. Such reduction shall be applied to the Vested Company Options held by each Cash Election Optionholder in an equitable manner as is determined by the Company in its sole discretion such that the Cash Election Consideration to be received by each Cash Election Optionholder is reduced by approximately the same percentage amount. Following any such reduction in the Vested Company Options eligible to receive Cash Election

A-16

Exhibit 7
Page 941

Consideration pursuant to the foregoing provisions of this Section 2.3(c), the remaining Company Options held by each Cash Election Optionholder shall not be treated as Cash Elected Company Options for purposes of this Agreement and shall be converted into Assumed Options in accordance with Section 2.3(a).

(d)    At the Effective Time, the Company Equity Plan shall terminate, provided that the Assumed Options shall remain subject to the terms of the Company Equity Plan for so long as such Assumed Options remain outstanding. No new awards shall be granted under the Company Equity Plan on or following the Effective Time.

(e)    Prior to the Closing, the Company shall have adopted appropriate resolutions and shall take, or cause to be taken, all necessary or appropriate actions under the Company Equity Plans (and the underlying grant, award or similar agreements) or otherwise to give effect to the provisions of this Section 2.3.

**Section 2.4.    Deliverables; Exchange Agent.**

(a)    As promptly as reasonably practicable following the date of this Agreement, but in no event later than ten (10) Business Days prior to the Closing Date, Sandbridge shall appoint Continental (or its applicable Affiliate) as an exchange agent (the "Exchange Agent") and enter into an exchange agent agreement with the Exchange Agent for the purpose of exchanging Certificates representing the Company Stock and any shares of Company Stock held in book-entry form on the stock transfer books of the Company immediately prior to the Effective Time, in either case, for the portion of the Aggregate Share Consideration issuable in respect of such shares of Company Stock on the terms and subject to the other conditions set forth in this Agreement. Notwithstanding the foregoing or anything to the contrary herein, in the event that Continental is unable or unwilling to serve as the Exchange Agent, then Sandbridge and the Company shall, as promptly as reasonably practicable thereafter, but in no event later than the Closing Date, mutually agree upon an exchange agent (in either case, such agreement not to be unreasonably withheld, conditioned or delayed), Sandbridge shall appoint and enter into an exchange agent agreement with such exchange agent, who shall for all purposes under this Agreement constitute the Exchange Agent and each of Sandbridge and the Company shall mutually agree to any changes to the Letter of Transmittal in order to satisfy any requirements of such exchange agent (in either case, such agreement not to be unreasonably withheld, conditioned or delayed).

(b)    As promptly as reasonably practicable following the date of this Agreement, Sandbridge shall mail or otherwise deliver, or shall cause the Exchange Agent to mail or otherwise deliver, to the Company Stockholders entitled to receive a portion of the Aggregate Merger Consideration pursuant to Section 2.1(b)(vii) a Letter of Transmittal.

(c)    At the Effective Time, Sandbridge shall deposit, or cause to be deposited, with the Exchange Agent, for the benefit of the Company Stockholders and for exchange in accordance with this Section 2.4 through the Exchange Agent, of Sandbridge Class A Common Stock in book-entry form representing the portion of the Aggregate Merger Consideration issuable pursuant to Section 2.1(b)(vii) in exchange for the Company Stock outstanding immediately prior to the Effective Time. All shares of Sandbridge Common Stock comprising the Aggregate Share Consideration issuable in book-entry pursuant to Section 2.1(b)(vii) deposited with the Exchange Agent shall be referred to in this Agreement as the "Exchange Fund".

(d)    Each Company Stockholder whose Company Stock has been converted into the right to receive a portion of the Aggregate Merger Consideration pursuant to Section 2.1(b)(vii) shall be entitled to receive such shares, and Sandbridge shall cause the Exchange Agent to deliver such shares, upon (i) surrender of a Certificate (or affidavit of loss in lieu thereof in the form required by the Letter of Transmittal, together with the posting of a customary bond if required by the Exchange Agent), together with the delivery of a properly completed and duly executed Letter of Transmittal (including, for the avoidance of doubt, any documents or agreements required by the Letter of Transmittal), to the Exchange Agent or (ii) in the case of Company Stock held in book-entry form, a properly completed and duly executed Letter of Transmittal (including, for the avoidance of doubt, any documents or agreements required by the Letter of Transmittal), to the Exchange Agent. Until surrendered as contemplated by this Section 2.4(d), each Certificate entitled to receive a portion of the Aggregate Merger Consideration in accordance with Section 2.1(b)(vii) shall be deemed at all times after the Effective Time to represent only the right to receive upon such surrender the portion of the Aggregate Merger Consideration that such holder is entitled to receive in accordance with the provisions of Section 2.1(b)(vii).

A-17

Exhibit 7
Page 942

(e)    If the shares of Sandbridge Class A Common Stock are to be issued to a Person other than the Company Stockholder in whose name the surrendered Certificate or the transferred Company Stock in book-entry form is registered, it shall be a condition to the issuance of the applicable shares of Sandbridge Class A Common Stock that (i) either such Certificate shall be properly endorsed or shall otherwise be in proper form for transfer or such Company Stock in book-entry form shall be properly transferred and (ii) the Person requesting such consideration pay to the Exchange Agent any transfer Taxes required as a result of such consideration being issued to a Person other than the registered holder of such Certificate or Company Stock in book-entry form or establish to the satisfaction of the Exchange Agent that such transfer Taxes have been paid or are not payable.

(f)    Each holder of record of Vested Company Options (a "Holder") shall have the right, subject to the limitations set forth in this Article 2, to submit an Election in accordance with this Section 2.4(f) on or prior to the Election Deadline. The Company shall not waive or change the Election Deadline unless such Election Deadline is waived or changed with respect to all Holders, the new election deadline is disclosed by the Company to all Holders on a date agreed to by Sandbridge, and Sandbridge has otherwise given its prior written consent (not to be unreasonably withheld, conditioned, delayed or denied) to such waiver. "Election Deadline" means 5:00 p.m. (New York time) on the date that is five (5) Business Days prior to the Closing Date. The Parties shall cooperate to inform each Holder of the selected date of the Election Deadline not more than fifteen (15) Business Days, and at least five (5) Business Days, prior to the Election Deadline.

(g)    Each Holder shall specify in a request made in accordance with the provisions of this Section 2.4(g) (an "Election") whether such Holder desires to make a Cash Election with respect to such Holder's Vested Company Options, and if so, the number of shares with respect to which such Election applies; provided, that a Holder shall not be permitted to make an Election in respect of more than 15% of the Vested Company Options held by such Holder as of immediately prior to the Effective Time and any Election in excess of that threshold shall be reduced automatically to 15% of the Vested Company Options held by such Holder as of immediately prior to the Effective Time. If any Holder fails to make an Election or makes an Election only with respect to a portion of such Holder's Vested Company Options, the portion of such Holder's Vested Company Options with respect to which such Holder did not make an Election shall not be treated as Cash Elected Company Options for purposes of this Agreement and shall be automatically treated as set forth in Section 2.3(a).

(h)    The Company shall prepare a form of election that is reasonably acceptable to Sandbridge (the "Form of Election"), which shall be included with the Letter of Transmittal contemplated by Section 2.4(b) and the Company shall mail the Form of Election to Holders as of the record date as established by the board of directors of the Company (the "Election Record Date"), in consultation with Sandbridge, not less than ten (10) Business Days prior to the anticipated Election Deadline (the period between such mailing and the Election Deadline, the "Election Period").

(i)    Any Election shall have been made properly only if the Exchange Agent shall have received, by the Election Deadline, (i) a Form of Election properly completed and signed in accordance with the instructions therein, and (ii) the properly completed and executed documents required to be delivered by such Holder pursuant to the other provisions of this Section 2.4, as applicable. Any Holder that does not make a valid Election by the Election Deadline shall be deemed to have made no Cash Election, and all of such Holder's Vested Company Options shall automatically be treated as set forth in Section 2.3(a).

(j)    Any Holder may, at any time during the Election Period, revoke his, her or its Election by written notice to the Exchange Agent prior to the Election Deadline, together with a properly completed and signed revised Form of Election. Notwithstanding anything to the contrary in this Agreement, all Elections shall be automatically deemed revoked upon termination of this Agreement in accordance with Article 7. The Company shall have reasonable discretion to determine if any Election is not properly made, changed or revoked with respect to any Vested Company Options (and none of the Company, Sandbridge, Merger Sub or the Exchange Agent shall be under any duty to notify any Holder of any applicable defect). In the event that the Company makes a reasonable determination that an Election was not properly made (including as a result of the Exchange Agent not receiving an Election by the Election Deadline), such Election shall be deemed to be ineffective, and the Vested Company Options covered by such Election shall be automatically treated as set forth in Section 2.3(a).

A-18

Exhibit 7
Page 943

(k)    No dividends or other distributions declared or made after the Effective Time with respect to the Sandbridge Common Stock with a record date after the Effective Time shall be paid to the holder of any unsurrendered Certificate with respect to the shares of Sandbridge Common Stock represented thereby until the holder of such Certificate shall surrender such Certificate in accordance with Section 2.4(d). Subject to the effect of escheat, Tax or other applicable Laws, following surrender of any such Certificate, Sandbridge shall pay or cause to be paid to the holder of the certificates representing shares of Sandbridge Common Stock issued in exchange therefore, without interest, (i) promptly, but in any event within five (5) Business Days of such surrender and (ii) at the appropriate payment date, the amount of dividends or other distributions with a record date after the Effective Time but prior to surrender and a payment date occurring after surrender payable with respect to such shares of Sandbridge Common Stock.

(l)    No interest will be paid or accrued on the shares of Sandbridge Class A Common Stock (or any portion thereof). From and after the Effective Time, the holders of Certificates representing Company Stock outstanding immediately prior to the Effective Time shall cease to have any rights with respect to such Company Stock except as otherwise provided in this Agreement or by Law. On or after the Effective Time, any Certificates presented to the Exchange Agent or Sandbridge for any reason shall be converted into the applicable portion of the Aggregate Merger Consideration in accordance with the provisions of Section 2.1(b)(vii).

(m)    At the Effective Time, the stock transfer books of the Company shall be closed and there shall be no transfers of Company Stock that were outstanding immediately prior to the Effective Time.

(n)    The Aggregate Merger Consideration payable upon conversion of the Company Stock in accordance with the terms hereof shall be deemed to have been paid and issued in full satisfaction of all rights pertaining to such Company Stock.

(o)    The Aggregate Merger Consideration shall be adjusted to reflect appropriately the effect of any stock split, reverse stock split, stock dividend, reorganization, recapitalization, reclassification, combination, exchange of shares or other like changes with respect to Sandbridge Common Stock occurring on or after the date hereof and prior to the Effective Time.

(p)    None of Sandbridge, the Surviving Company or any of their respective Affiliates shall be liable to any Person in respect of any consideration delivered to a public official pursuant to any applicable abandoned property, unclaimed property, escheat, or similar Law. Any portion of the Exchange Fund remaining unclaimed by the Company Stockholders for one year after the Effective Time shall be delivered to Sandbridge, upon demand, and any holders of Company Stock who have not theretofore complied with this Section 2.4 shall thereafter look only to Sandbridge for the Aggregate Merger Consideration, without any interest thereon. Any portion of the Exchange Fund remaining unclaimed by the holders of Company Stock as of a date which is immediately prior to such time when the amounts would otherwise escheat to or become property of any Governmental Entity shall become, to the extent permitted by applicable Law, the property of Sandbridge free and clear of any claims or interest of any Person previously entitled thereto.

Section 2.5.    Withholding. Sandbridge, the Group Companies, the Exchange Agent and any other applicable withholding agent shall be entitled to deduct and withhold (or cause to be deducted and withheld) from any consideration payable pursuant to this Agreement such amounts as are required to be deducted and withheld under applicable Tax Law. Other than with respect to any compensatory payments subject to payroll withholding, the Person intending to withhold shall use commercially reasonable efforts to notify the Person to whom amounts would otherwise be payable of any amounts that it intends to deduct and withhold prior to the payment with respect to which such amounts will be withheld and shall use commercially reasonable efforts to provide the payment recipient with reasonable opportunity to provide any forms or other documentation to avoid or minimize such deduction or withholding. To the extent that amounts are so withheld and timely remitted to the applicable Governmental Entity, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made. Other than with respect to any compensatory payment subject to payroll withholding, the Parties shall cooperate in good faith to eliminate or reduce any such deduction or withholding (including through the request and provision of any statements, forms or other documents to reduce or eliminate any such deduction or withholding).

A-19

Exhibit 7
Page 944

**Section 2.6.    Payment of Expenses**.

(a)    No sooner than five (5) or later than two (2) Business Days prior to the Closing Date, the Company shall provide to Sandbridge a written report setting forth a list of all of the following fees and expenses incurred by or on behalf of the Company in connection with the preparation negotiation and execution of this Agreement and the consummation of the transactions contemplated hereby (together with written invoices and wire transfer instructions for the payment thereof): (i) the fees and disbursements of outside counsel to the Company incurred in connection with the transactions contemplated by this Agreement (including the PIPE Investment) and the Ancillary Documents and (ii) the fees and expenses of any other agents, advisors, consultants, experts, financial advisors and other service providers engaged by the Company in connection with the transactions contemplated by this Agreement and the Ancillary Documents (collectively, the "Company Transaction Expenses"). On the Closing Date following the Closing, Sandbridge shall pay or cause to be paid by wire transfer of immediately available funds all such Company Transaction Expenses. Company Transaction Expenses shall not include any fees and expenses of the Company's stockholders.

(b)    No sooner than five (5) or later than two (2) Business Days prior to the Closing Date, Sandbridge shall provide to the Company a written report setting forth a list of all fees, expenses and disbursements incurred by or on behalf of Sandbridge or Merger Sub for outside counsel, agents, advisors, consultants, experts, financial advisors and other service providers engaged by or on behalf of Sandbridge or Merger Sub in connection with the transactions contemplated by this Agreement and the Ancillary Documents or otherwise in connection with Sandbridge's operations (together with written invoices and wire transfer instructions for the payment thereof) (collectively, the "Sandbridge Transaction Expenses" and together with the Company Transaction Expenses, the "Transaction Expenses"). On the Closing Date following the Closing, Sandbridge shall pay or cause to be paid by wire transfer of immediately available funds all such Sandbridge Transaction Expenses. Sandbridge Transaction Expenses shall not include any fees and expenses of Sponsor.

**Section 2.7.    Dissenting Shares**. Notwithstanding anything in this Agreement to the contrary, shares of Company Stock outstanding immediately prior to the Effective Time and owned by a holder who is entitled to demand and has neither voted in favor of the Merger nor consented thereto in writing and who shall have properly demanded appraisal of such shares in accordance with, and who complies in all respects with, Section 262 of the DGCL (such shares, "Dissenting Shares") shall not be converted into Sandbridge Class A Common Stock, and shall instead represent the right to receive payment of the fair value of such Dissenting Shares in accordance with and to the extent provided by Section 262 of the DGCL. At the Effective Time, (a) all Dissenting Shares shall be canceled, extinguished and cease to exist and (b) the holders of Dissenting Shares shall be entitled only to such rights as may be granted to them under the DGCL. If any such holder fails to perfect or otherwise waives, withdraws or loses such holder's right to appraisal under Section 262 of the DGCL or other applicable Law, then the right of such holder to be paid the fair value of such Dissenting Shares shall cease and such Dissenting Shares shall be deemed to have been converted, as of the Effective Time, into Sandbridge Class A Common Stock upon the terms and conditions set forth in this Agreement applicable to holders that have not properly demanded appraisal rights. The Company shall give Sandbridge prompt notice (and in any event within two (2) Business Days) of any demands received by the Company for appraisal of shares of Company Stock, attempted withdrawals of such demands and any other instruments served pursuant to the DGCL and received by the Company relating to rights to be paid the fair value of Dissenting Shares, and Sandbridge shall have the right to participate in and, following the Effective Time, direct all negotiations and proceedings with respect to such demands. Prior to the Effective Time, the Company shall not, except with the prior written consent of Sandbridge, make any payment with respect to, or settle or compromise or offer to settle or compromise, any such demands or waive any failure to timely deliver a written demand for appraisal or otherwise comply with the provisions under Section 262 of the DGCL, or agree or commit to do any of the foregoing.

A-20

Exhibit 7
Page 945

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES RELATING TO THE GROUP COMPANIES**

Subject to the last sentence of Section 8.8 (Annexes, Exhibits and Schedules), except as set forth in the Company Disclosure Schedules, the Company hereby represents and warrants to the Sandbridge Parties as follows:

**Section 3.1.    Organization and Qualification.**

(a)    Each Group Company is a corporation, limited liability company or other applicable business entity duly organized or formed, as applicable, validly existing and in good standing (or the equivalent thereof, if applicable, in each case, with respect to the jurisdictions that recognize the concept of good standing or any equivalent thereof) under the Laws of its jurisdiction of formation or organization (as applicable). Section 3.1(a) of the Company Disclosure Schedules sets forth the jurisdiction of formation or organization (as applicable) for each Group Company. Each Group Company has the requisite corporate, limited liability company or other applicable business entity power and authority to own, lease and operate its properties and to carry on its businesses as presently conducted, except where the failure to have such power or authority would not have a Company Material Adverse Effect.

(b)    True and complete copies of the Governing Documents of each Group Company, including the Company Stockholders Agreements, have been made available to Sandbridge, in each case, as amended and in effect as of the date of this Agreement. Such Governing Documents are in full force and effect, and no Group Company is in breach or violation of any provision set forth in such Governing Documents.

(c)    Each Group Company is duly qualified or licensed to transact business and is in good standing (or the equivalent thereof, if applicable, in each case, with respect to the jurisdictions that recognize the concept of good standing or any equivalent thereof) in each jurisdiction in which the property and assets owned, leased or operated by it, or the nature of the business conducted by it, makes such qualification or licensing necessary, except where the failure to be so duly qualified or licensed and in good standing would not have a Company Material Adverse Effect.

**Section 3.2.    Capitalization of the Group Companies.**

(a)    Section 3.2(a) of the Company Disclosure Schedules sets forth a true and complete statement as of the date of this Agreement of (i) the number and class or series (as applicable) of all of the Equity Securities of the Company issued and outstanding, (ii) in the case of each share of Company Preferred Stock, the applicable conversion ratio thereof, (iii) the identity of the Persons that are the record and beneficial owners thereof, (iv) with respect to each Company Warrant, the date of issuance, applicable warrant agreement, applicable exercise terms and expiration date and (v) with respect to each Company Option and each award of Company Restricted Stock, (A) the date of grant, (B) the identity of the holder thereof, (C) the applicable exercise price, (D) the expiration date, (E) any applicable vesting schedule (including any accelerated vesting provisions), (F) whether such Company Option is intended to qualify as an "incentive stock option" within the meaning of Section 422 of the Code and (G) whether the holder of such Company Restricted Stock has provided the Company a copy of a timely election under Section 83(b) of the Code. All of the Equity Securities of the Company have been duly authorized and validly issued. All of the outstanding shares of Company Stock are validly issued, fully paid and non-assessable. The Equity Securities of the Company (1) were not issued in violation of the Governing Documents of the Company or any other Contract to which the Company is party or bound, (2) were not issued in violation of any preemptive rights, call option, right of first refusal or first offer, subscription rights, transfer restrictions or similar rights of any Person and (3) have been offered, sold and issued in compliance with applicable Law, including Securities Laws. Except for the Company Options, Company Restricted Stock and Company Warrants set forth on Section 3.2(a) of the Company Disclosure Schedules, the Company has no outstanding (x) equity appreciation, phantom equity or profit participation rights or (y) options, restricted stock, phantom stock, warrants, purchase rights, subscription rights, conversion rights, exchange rights, calls, puts, rights of first refusal or first offer or other Contracts that could require the Company to issue, sell or otherwise cause to become outstanding, or to acquire, repurchase or redeem, any Equity Securities of the Company or securities convertible into or exchangeable for Equity Securities of the Company, or make any payment based on the value of any Equity Securities of the Company. No Company Option has been granted with a per share exercise price that is less than the fair market value of a share of Company Common Stock on the

A-21

Exhibit 7
Page 946

date such Company Option was granted as determined in accordance with Section 409A of the Code or Section 422 of the Code, if applicable. Each Company Option was granted in all material respects in accordance with the terms of the Company Equity Plan and applicable Laws. Each Company Option qualifies for the tax and accounting treatment afforded to such Company Option in the Company's Tax Returns and Financial Statements, respectively.

(b)    The Equity Securities of the Company are free and clear of all Liens (other than transfer restrictions under applicable Securities Law or under the Company Stockholders Agreements). Except for the Company Stockholders Agreements, there are no voting trusts, proxies or other Contracts to which the Company is a party with respect to the voting or transfer of the Company's Equity Securities.

(c)    Section 3.2(c) of the Company Disclosure Schedules sets forth a true and complete statement of (i) the number and class or series (as applicable) of all of the Equity Securities of each Subsidiary of the Company issued and outstanding and (ii) the identity of the Persons that are the record and beneficial owners thereof. There are no outstanding (A) equity appreciation, phantom equity, or profit participation rights or (B) options, restricted stock, phantom stock, warrants, purchase rights, subscription rights, conversion rights, exchange rights, calls, puts, rights of first refusal or first offer or other Contracts that could require any Subsidiary of the Company to issue, sell or otherwise cause to become outstanding or to acquire, repurchase or redeem any Equity Securities or securities convertible into or exchangeable for Equity Securities of the Subsidiaries of the Company. There are no voting trusts, proxies or other Contracts with respect to the voting or transfer of any Equity Securities of any Subsidiary of the Company.

(d)    None of the Group Companies owns or holds (of record, beneficially, legally or otherwise), directly or indirectly, any Equity Securities in any other Person or the right to acquire any such Equity Security, and none of the Group Companies are a partner or member of any partnership, limited liability company or joint venture.

(e)    Section 3.2(e) of the Company Disclosure Schedules sets forth a list of all Indebtedness of the Group Companies as of the date of this Agreement, including the principal amount of such Indebtedness, the outstanding balance as of the date of this Agreement, and the debtor and the creditor thereof.

**Section 3.3.    Authority**. Each Group Company has the requisite corporate power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is or will be a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. Subject to the receipt of the Company Stockholder Approval, the execution, delivery and performance of this Agreement, the Ancillary Documents to which a Group Company is or will be a party and the consummation of the transactions contemplated hereby and thereby have been (or, in the case of any Ancillary Document entered into after the date of this Agreement, will be upon execution thereof) duly authorized by all necessary corporate (or other similar) action on the part of the applicable Group Company. This Agreement and each Ancillary Document to which a Group Company is or will be a party has been or will be, upon execution thereof, as applicable, duly and validly executed and delivered by the applicable Group Company and constitutes or will constitute, upon execution and delivery thereof, as applicable, a valid, legal and binding agreement of the applicable Group Company (assuming that this Agreement and the Ancillary Documents to which the applicable Group Company is or will be a party are or will be upon execution thereof, as applicable, duly authorized, executed and delivered by the other Persons party thereto), enforceable against the applicable Group Company in accordance with its terms (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting generally the enforcement of creditors' rights and subject to general principles of equity). The only vote of holders of any class of Company's Equity Securities necessary to approve and adopt this Agreement, the Merger and the other transactions contemplated hereby is the approval and adoption of this Agreement and approval of the Merger and such other transactions by the affirmative vote or written consent of the holders of a majority of the outstanding shares of Company Common Stock and Company Preferred Stock (voting on an as converted to Company Common Stock basis) voting together as a single class and the affirmative vote or written consent of the holders of a majority of the outstanding shares of Company Preferred Stock (voting together as a single class on an as converted to Company Common Stock basis) (such approvals, the "Company Stockholder Approval").

A-22

Exhibit 7
Page 947

**Section 3.4.    Financial Statements; Undisclosed Liabilities**.

(a)    The Company has made available to Sandbridge a true and complete copy of (i) the audited consolidated balance sheets of the Group Companies as of December 31, 2019 and the related audited consolidated statements of operations and comprehensive loss, convertible preferred stock and stockholders' deficit and cash flows of the Group Companies for each of the periods then ended and (ii) the unaudited consolidated balance sheets of the Group Companies as of December 31, 2020 (the "Latest Balance Sheet") and the related unaudited consolidated statements of operations and comprehensive loss, convertible preferred stock and stockholders' deficit and cash flows of the Group Companies for the twelve-month period then ended (clauses (i) and (ii), collectively, the "Financial Statements"), each of which are attached as Section 3.4(a) of the Company Disclosure Schedules. Each of the Financial Statements (including the notes thereto) (A) was prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto), (B) fairly presents, in all material respects, the financial position, results of operations and cash flows of the Group Companies as at the date thereof and for the period indicated therein, except as otherwise specifically noted therein, (C) in the case of the Financial Statements described in clause (i) of the preceding sentence, were audited in accordance with the standards of the PCAOB and contain an unqualified report of the Company's auditors and (D) comply in all material respects with the applicable accounting requirements and, in the case of the Financial Statements described in clause (i) of the preceding sentence, with the Federal Securities Laws.

(b)    The unaudited consolidated balance sheets of the Group Companies for any 2021 interim period and corresponding prior year period required to be included in the Registration Statement / Proxy Statement and the related unaudited consolidated statements of operations and comprehensive loss, convertible preferred stock and stockholders' deficit and cash flows of the Group Companies for each of the applicable periods then ended (the "Closing Company Unaudited Financial Statements"), when delivered following the date of this Agreement in accordance with Section 5.20 (PCAOB Financials), (i) will be prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto), (ii) will fairly present, in all material respects, the financial position, results of operations and cash flows of the Group Companies as at the date thereof and for the period indicated therein, except as otherwise specifically noted therein and (iii) will comply in all material respects with the applicable accounting requirements and with the Federal Securities Laws.

(c)    Except (i) as set forth on the face of the Latest Balance Sheet, (ii) for Liabilities incurred in the ordinary course of business since the date of the Latest Balance Sheet (none of which is a Liability for breach of contract, breach of warranty, tort, infringement or violation of Law), (iii) for Liabilities incurred in connection with the negotiation, preparation or execution of this Agreement or any Ancillary Documents, the performance of their respective covenants or agreements in this Agreement or any Ancillary Document or the consummation of the transactions contemplated hereby or thereby and (iv) for Liabilities that are not and would not reasonably be expected to be, individually or in the aggregate, material to the Group Companies, taken as a whole, no Group Company, as of the date of this Agreement, has any Liabilities of the type required to be set forth on a balance sheet in accordance with GAAP.

(d)    The Group Companies have established and maintain systems of internal accounting controls that are designed to provide, in all material respects, reasonable assurance that (i) all transactions are executed in accordance with management's authorization and (ii) all transactions are recorded as necessary to permit preparation of proper and accurate financial statements in accordance with GAAP and to maintain accountability for the Group Companies' assets. The Group Companies maintain and, for all periods covered by the Financial Statements, have maintained books and records of the Group Companies in the ordinary course of business that are accurate and complete and reflect the revenues, expenses, assets and liabilities of the Group Companies in all material respects.

(e)    Except as set forth in Section 3.4(e) of the Company Disclosure Schedule, since the incorporation of the Company, no Group Company has received any written complaint, allegation, assertion or claim that there is (i) a "significant deficiency" in the internal controls over financial reporting of the Group Companies to the Company's knowledge, (ii) a "material weakness" in the internal controls over financial reporting of the Group Companies to the Company's knowledge or (iii) fraud, whether or not material, that involves management or other employees of the Group Companies who have a significant role in the

A-23

Exhibit 7
Page 948

internal controls over financial reporting of the Group Companies. The independent auditors of the Company have not withdrawn any audit opinion with respect to any financial statements included in the Financial Statements and there has been no restatement of the Financial Statements.

**Section 3.5.    Consents and Requisite Governmental Approvals; No Violations**.

(a)    No consent, approval or authorization of, or designation, declaration or filing with, any Governmental Entity is required on the part of the Company with respect to the Company's execution, delivery or performance of its obligations under this Agreement or the Ancillary Documents to which the Company is or will be party or the consummation of the transactions contemplated by this Agreement or by the Ancillary Documents, except for (i) compliance with and filings under the HSR Act, (ii) the filing with the SEC of (A) the Registration Statement / Proxy Statement and the declaration of the effectiveness thereof by the SEC and (B) such reports under Section 13(a) or 15(d) of the Exchange Act as may be required in connection with this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby, (iii) filing of the Certificate of Merger or (iv) any other consents, approvals, authorizations, designations, declarations, waivers or filings, the absence of which would not have a Company Material Adverse Effect.

(b)    Neither the execution, delivery or performance by the Company of this Agreement nor the Ancillary Documents to which the Company is or will be a party nor the consummation of the transactions contemplated hereby or thereby will, directly or indirectly (with or without due notice or lapse of time or both) (i) result in any breach of any provision of the Company's Governing Documents, (ii) result in a violation or breach of, or constitute a default or give rise to any right of termination, Consent, cancellation, amendment, modification, suspension, revocation or acceleration under, any of the terms, conditions or provisions of (A) any Contract to which any Group Company is a party or (B) any Permits, (iii) violate, or constitute a breach under, any Order or applicable Law to which any Group Company or any of its properties or assets are bound or (iv) result in the creation of any Lien upon any of the assets or properties (other than any Permitted Liens) or Equity Securities of any Group Company, except, in the case of any of <u>clauses (ii)</u> through <u>(iv)</u> above, as would not have a Company Material Adverse Effect.

**Section 3.6.    Permits**. Each of the Group Companies has all Permits that are required to own, lease or operate its properties and assets and to conduct its business as currently conducted, except where the failure to hold the same would not result in a Company Material Adverse Effect. Except as is not and would not reasonably be expected to be material to the Group Companies, taken as a whole, (i) each Permit is in full force and effect in accordance with its terms and (ii) no written notice of revocation, cancellation or termination of any Permit has been received by the Group Companies.

**Section 3.7.    Material Contracts**.

(a)    <u>Section 3.7(a)</u> of the Company Disclosure Schedules sets forth a list of the following Contracts to which a Group Company is, as of the date of this Agreement, a party (each Contract required to be set forth on <u>Section 3.7(a)</u> of the Company Disclosure Schedules, together with each of the Contracts entered into after the date of this Agreement that would be required to be set forth on <u>Section 3.7(a)</u> of the Company Disclosure Schedules if entered into prior to the execution and delivery of this Agreement, collectively, the "<u>Material Contracts</u>"):

(i)    any Contract relating to Indebtedness of any Group Company in excess of $1,000,000 or to the placing of a Lien (other than any Permitted Lien) on any material assets or properties of any Group Company;

(ii)    any Contract under which any Group Company is lessee of or holds or operates, in each case, any tangible property (other than real property), owned by any other Person, except for any lease or agreement under which the aggregate annual rental payments do not exceed $100,000;

(iii)    any Contract under which any Group Company is lessor of or permits any third party to hold or operate, in each case, any tangible property (other than real property), owned or controlled by such Group Company, except for any lease or agreement under which the aggregate annual rental payments do not exceed $100,000;

A-24

Exhibit 7
Page 949

(iv)     any joint venture, profit-sharing, partnership or collaboration, Contract, in each case, which requires, or would reasonably be expected to require (based on any occurrence, development, activity or event contemplated by such Contract), aggregate payments to or from any Group Company in excess of $1,000,000 over the life of the Contract;

(v)     any Contract that (A) limits or purports to limit, in any material respect, the freedom of any Group Company to engage or compete in any line of business or with any Person or in any area, (B) contains any exclusivity, "most favored nation" or similar provisions, obligations or restrictions or (C) contains any other provisions restricting or purporting to restrict, in any material respect, the ability of any Group Company to sell, manufacture, develop, commercialize, test or research products, directly or indirectly through third parties, or to solicit any potential customer;

(vi)     any Contract requiring any future capital commitment or capital expenditure (or series of capital expenditures) by any Group Company in an amount in excess of (A) $250,000 annually or (B) $625,000 over the life of the agreement;

(vii)     any Contract requiring any Group Company to guarantee the Liabilities of any Person (other than the Company or a Subsidiary) or pursuant to which any Person (other than the Company or a Subsidiary) has guaranteed the Liabilities of a Group Company, in each case in excess of $50,000;

(viii)     any Contract under which any Group Company has, directly or indirectly, made or agreed to make any loan, advance, or assignment of payment to any Person or made any capital contribution to, or other investment in, any Person in excess of $100,000;

(ix)     any Contract required to be disclosed on Section 3.13(c)(i) or Section 3.19 of the Company Disclosure Schedules;

(x)     any collective bargaining agreement or other Contract with any labor union, labor organization, works council, employee delegate, representative or other employee collective group;

(xi)     any Contract (A) governing the terms of, or otherwise related to, the employment, engagement or services of any current director, manager, officer, employee, individual independent contractor or other service provider of a Group Company whose annual base salary (or, in the case of an independent contractor, annual base compensation) is in excess of $200,000, or (B) providing for any success, change of control, retention, transaction bonus or other similar payment or amount due or payable to any Person as a result of or in connection with this Agreement or the transactions contemplated hereby;

(xii)     any Contract for the disposition of any portion of the assets or business of any Group Company or for the acquisition by any Group Company of the assets or business of any other Person (other than acquisitions or dispositions made in the ordinary course of business), or under which any Group Company has any continuing obligation with respect to an "earn-out", contingent purchase price or other contingent or deferred payment obligation, involving payments in excess of $100,000 other than Contracts (A) in which the applicable acquisition or disposition has been consummated and there were no material obligations ongoing as of the date of the Latest Balance Sheet, or (B) between the Company and its Subsidiaries and reflected in the Financial Statements;

(xiii)     any settlement, conciliation or similar Contract (A) the performance of which would be reasonably likely to involve any payments in excess of $500,000 after the date of this Agreement, (B) with a Governmental Entity or (C) that imposes or is reasonably likely to impose, at any time in the future, any material, non-monetary obligations on any Group Company (or Sandbridge or any of its Affiliates after the Closing); and

(xiv)     any other Contract the performance of which requires or would reasonably be expected to result in either (A) annual payments to or from any Group Company in excess of $1,000,000 or (B) aggregate payments to or from any Group Company in excess of $5,000,000 over the life of the agreement and, in each case, that is not terminable by the applicable Group Company without penalty upon less than thirty (30) days' prior written notice.

(b)     (i) Each Material Contract is valid and binding on the applicable Group Company and, to the knowledge of the Company, the counterparty thereto, and is in full force and effect, and subject to obtaining

A-25

Exhibit 7
Page 950

any necessary consents disclosed in Section 3.5 of the Company Disclosure Schedules, will continue to be so enforceable and in full force and effect on terms that are substantially the same in all material respects following the consummation of the Merger and (ii) the applicable Group Company and, to the knowledge of the Company, the counterparties thereto are not in material breach or violation of, or default under, any Material Contract. Each Group Company has delivered to Sandbridge accurate and complete copies or, in the case of any oral Contracts, written summaries of, each Material Contract, in each case, as amended or otherwise modified and in effect.

Section 3.8.    **Absence of Changes**. During the period beginning on the date of the Latest Balance Sheet and ending on the date of this Agreement, (a) no Company Material Adverse Effect has occurred and (b) except as expressly contemplated by this Agreement, any Ancillary Document or in connection with the consummation of the transactions contemplated hereby and thereby, (i) the Company has conducted its business in the ordinary course in all material respects and (ii) no Group Company has taken any action that would require the consent of Sandbridge if taken during the period from the date of this Agreement until the Closing pursuant to Section 5.1(b)(i), Section 5.1(b)(ii), Section 5.1(b)(v), Section 5.1(b)(vi), Section 5.1(b)(vii), Section 5.1(b)(viii), Section 5.1(b)(x), Section 5.1(b)(xi), Section 5.1(b)(xii), Section 5.1(b)(xiii) and Section 5.1(b)(xvi) or entered into a Contract to take, or cause to be taken, any of the actions covered in the foregoing Sections.

Section 3.9.    **Litigation**. As of the date of this Agreement, there is (and since December 31, 2018 there has been) no Proceeding pending or, to the Company's knowledge, threatened in writing against any Group Company that, has been or, if adversely decided or resolved, would reasonably be expected to be, individually or in the aggregate, material to the Group Companies, taken as a whole. Neither the Group Companies nor any of their respective properties or assets is subject to any material Order. As of the date of this Agreement, there are no material Proceedings by a Group Company pending or threatened in writing against any other Person.

Section 3.10.    **Compliance with Applicable Law**. Each Group Company (a) conducts (and since December 31, 2018 has conducted) its business in accordance with all Laws and Orders applicable to such Group Company and is not in violation of any such Law or Order and (b) has not received any written communications from a Governmental Entity that alleges that such Group Company is not in compliance with any such Law or Order, except in each case of clauses (a) and (b), as has not been and would not reasonably be expected to be, individually or in the aggregate, material to the Group Companies, taken as a whole.

Section 3.11.    **Employee Plans**.

(a)    Section 3.11(a) of the Company Disclosure Schedules sets forth a true and complete list of all material Employee Benefit Plan. With respect to each Employee Benefit Plan, the Group Companies have provided Sandbridge with true and complete copies of, to the extent applicable, (i) the documents governing such Employee Benefit Plan, together with all amendments thereto (or, with respect to any unwritten Employee Benefit Plan, a written summary of the material terms thereof), (ii) the most recent annual report on Form 5500; (iii) the most recent determination or opinion letter from the IRS; (iv) any summary plan descriptions, together with any summaries of material modifications; (v) any related trust agreements, insurance policies or other funding mechanisms; and (vi) any material correspondence to or from any Governmental Entity within the past three (3) years.

(b)    No Employee Benefit Plan is, and no Group Company or any ERISA Affiliate of any Group Company has previously maintained, sponsored, participated in, contributed to or been required to contribute to, or currently maintains, sponsors, participates in, contributes to or is required to contribute to, or otherwise has any Liability with respect to or under: (i) a Multiemployer Plan; (ii) a "defined benefit plan" (as defined in Section 3(35) of ERISA, whether or not subject to ERISA) or a plan that is or was subject to Title IV of ERISA or Section 412 of the Code; (iii) a "multiple employer plan" within the meaning of Section of 413(c) of the Code or Section 4063 or Section 4064 of ERISA; or (iv) a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA. No Group Company has any obligation to provide, or Liability in respect of, any retiree or post-termination health or life insurance or other welfare-type benefits to any Person other than health continuation coverage pursuant to COBRA or similar Law and for which the recipient pays the full cost of coverage.

A-26

Exhibit 7
Page 951

(c)    Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination or is entitled to rely on an opinion or advisory letter from the Internal Revenue Service and, to the Company's knowledge, no circumstances exists that could reasonably be expected to adversely affect the qualified status of any such Employee Benefit Plan or otherwise result in material Liability to any Group Company.

(d)    As of the date of this Agreement, there are no pending or, to the Company's knowledge, threatened actions, claims or Proceedings with respect to any Employee Benefit Plan (other than routine claims for benefits). With respect to each Employee Benefit Plan, all material contributions, distributions, reimbursements and premium payments that are due have been timely made.

(e)    Each Employee Benefit Plan has been maintained, funded, operated and administered in accordance with its terms and with applicable Law, in each case, in all material respects, and none of Group Companies or, to the Company's knowledge, any other Person, is in material breach of, or default under, any Employee Benefit Plan.

(f)    Except as set forth in Section 3.11(f) of the Company Disclosure Schedules, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will (alone or in combination with any other event) (i) result in any payment or benefit becoming due to or result in the forgiveness of any indebtedness of any current or former director, manager, officer, employee, individual independent contractor or other service provider of any of the Group Companies, (ii) increase the amount of any compensation or benefits payable to any current or former director, manager, officer, employee, individual independent contractor or other service provider of any of the Group Companies, (iii) result in the acceleration of the time of payment or vesting, result in any forgiveness of indebtedness, or trigger any payment or funding of any compensation or benefits to any current or former director, manager, officer, employee, individual independent contractor or other service provider of any of the Group Companies or (iv) impose any restrictions or limitations on any of the Group Companies' rights to amend or terminate any Employee Benefit Plan.

(g)    No amount that has been or could be received (whether in cash or property or the vesting of property) by any "disqualified individual" of any of the Group Companies under any Employee Benefit Plan or otherwise as a result of the consummation of the transactions contemplated by this Agreement could, separately or in the aggregate, be nondeductible under Section 280G of the Code or subjected to an excise tax under Section 4999 of the Code.

(h)    No current or former director, manager, officer, employee, individual independent contractor or other service provider of any of the Group Companies is entitled to any "gross-up" or similar payment from any Group Company in respect of any Taxes that may become payable under Section 4999 or 409A of the Code.

**Section 3.12.    Environmental Matters**. Except as would not have a Company Material Adverse Effect:

(a)    None of the Group Companies have received any written notice or communication from any Governmental Entity or any other Person regarding any actual, alleged, or potential violation in any respect of, or a failure to comply in any respect with, any Environmental Laws.

(b)    There is (and during the past three (3) years there has been) no Proceeding pending or, to the Company's knowledge, threatened in writing against any Group Company pursuant to Environmental Laws.

(c)    To the Company's knowledge, there has been no manufacture, release, treatment, storage, disposal, arrangement for disposal, transport or handling of, contamination by, or exposure of any Person to, any Hazardous Substances at any Leased Real Property or at any property of any material vendor of the Company.

(d)    No Group Company has retained or assumed, by contract or operation of Law, any liabilities or obligations of third parties under any Environmental Law.

The Group Companies have made available to Sandbridge copies of all material environmental, health and safety reports and documents that are in any Group Company's possession or control relating to the current or former operations, properties or facilities of the Group Companies.

A-27

Exhibit 7
Page 952

**Section 3.13.    Intellectual Property**.

(a)    <u>Section 3.13(a)</u> of the Company Disclosure Schedules sets forth a true and complete list of (i) all currently issued or pending Company Registered Intellectual Property, (ii) all material social media accounts and handles owned by any Group Company, and (iii) material unregistered Marks owned by any Group Company, in each case, as of the date of this Agreement. <u>Section 3.13(a)</u> of the Company Disclosure Schedules lists (as applicable), for each item of Company Registered Intellectual Property as of the date of this Agreement (A) the record owner of such item, (B) the jurisdictions in which such item has been issued or registered or filed, (C) the issuance, registration, or application date for such item, and (D) the issuance, registration, or application number for such item.

(b)    As of the date of this Agreement, all necessary fees and filings with respect to any Company Registered Intellectual Property have been timely submitted to the relevant intellectual property office or Governmental Entity and Internet domain name registrars to maintain such Company Registered Intellectual Property in full force and effect except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. To the knowledge of the Company, as of the date of this Agreement, no issuance or registration obtained and no application filed by the Group Companies for any Intellectual Property Right has been canceled, abandoned, allowed to lapse, or not renewed, except where such Group Company has, in its reasonable business judgment, decided to cancel, abandon, allow to lapse, or not renew such issuance, registration, or application. As of the date of this Agreement there are no Proceedings pending, including litigations, interference, re-examination, *inter parties* review, reissue, opposition, nullity, or cancellation proceedings pending that relate to any of the Company Registered Intellectual Property, and, to the Company's knowledge, no such Proceedings are threatened in writing by any Governmental Entity or any other Person, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(c)    A Group Company exclusively owns all right, title and interest in and to all material Company Owned Intellectual Property free and clear of all Liens or obligations to others (other than Permitted Liens). For all Patents owned or purported to be owned by a Group Company, each inventor on the Patent has assigned all of its rights to a Group Company. No Group Company has granted any customer the right to use any material Company Product on anything other than a non-exclusive basis. <u>Section 3.13(c)</u> of the Company Disclosure Schedules sets forth a list of (i) all current Contracts for Company Licensed Intellectual Property, (ii) Contracts to which any Person has been granted any license or covenant not to sue under, or otherwise has received or acquired any right or interest in, any Company Owned Intellectual Property, and (iii) Contracts under which any Group Company is materially limited in its ability to use any material Company Owned Intellectual Property, in each case, other than (A) licenses to Off-the-Shelf Software, (B) licenses to Open Source Software, (C) non-exclusive licenses to Intellectual Property Rights that accompany the sale of Company Products in the ordinary course of business, (D) non-exclusive licenses granted to employees, consultants or contractors of any Group Company for the purpose of providing services to such Group Company, and (E) non-disclosure agreements. The Group Companies own or have sufficient rights to use all Intellectual Property Rights used in connection with the Company's business, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. The Company Registered Intellectual Property is subsisting and, to the Company's knowledge, valid and enforceable. To the Company's knowledge, all of the Group Companies' rights in and to the unregistered Company Owned Intellectual Property are valid and enforceable.

(d)    Each Group Company's employees and independent contractors who independently or jointly contributed to or otherwise participated in the authorship, invention, creation, improvement, modification or development of any Company Owned Intellectual Property since December 31, 2018 (each such person, a "<u>Creator</u>") have assigned to such Group Company all Intellectual Property Rights authored, invented, created, improved, modified or developed by such person in the course of such Creator's employment or other engagement with such Group Company with respect to such Company Owned Intellectual Property, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(e)    Each Group Company has taken reasonable steps to safeguard and maintain the secrecy of any trade secrets, know-how, and other confidential information owned by or in the possession of such Group Company. Without limiting the foregoing, no Group Company has disclosed any trade secrets, know-how, or

A-28

Exhibit 7
Page 953

confidential information to any employee, contractor, or any other Person unless such disclosure was under a written non-disclosure agreement containing limitations on use and disclosure, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. To the knowledge of the Company, there has been no violation or unauthorized access to or disclosure or use of any trade secrets, know-how or confidential information of a Group Company, or of any written obligations with respect to such, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(f)    None of the Company Owned Intellectual Property is subject to any outstanding Order that restricts in any manner the use, sale, transfer, licensing, or exploitation thereof by the Group Companies or affects the validity, use, or enforceability of any such Company Owned Intellectual Property, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(g)    To the knowledge of the Company, neither the conduct of the business of the Group Companies nor any of the Company Products that are currently complete and are offered, marketed, licensed, provided, sold, distributed, or otherwise exploited by the Group Companies infringes, constitutes, or results from an unauthorized use or misappropriation of or otherwise violates or has, since December 31, 2015, infringed, constituted or resulted from an unauthorized use or misappropriation of or otherwise violated any Intellectual Property Rights of any other Person, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(h)    There is not currently, and since December 31, 2018, there has been no Proceeding pending nor has any Group Company received any written communications (i) alleging that a Group Company has infringed, misappropriated or otherwise violated any Intellectual Property Rights of any other Person, or (ii) challenging the validity, enforceability, use or exclusive ownership of any Company Owned Intellectual Property, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(i)    To the Company's knowledge, no Person is infringing, misappropriating, misusing, diluting or violating or has, since December 31, 2018, infringed, misappropriated, misused, diluted or violated any Company Owned Intellectual Property. Since December 31, 2018, no Group Company has made any written claim against any Person alleging any infringement, misappropriation or other violation of any Company Owned Intellectual Property, other than ordinary course website takedown notices with respect to third party website content that would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(j)    The Group Companies have in their possession the source code and related documentation reasonably necessary to sell, provide, license and support Company Products that are currently complete and ready to be commercialized. No Group Company has disclosed or delivered to any escrow agent or any other Person, other than employees or contractors who are subject to confidentiality obligations, any of the source code that embodies Company Owned Intellectual Property or Company Products, and no other Person has the right, contingent or otherwise, to obtain access to or use any such source code. To the knowledge of the Company, no event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time or both) will, or would reasonably be expected to, result in the delivery, license, or disclosure of any source code that is owned by a Group Company or otherwise embodies Company Owned Intellectual Property or Company Products to any Person who is not, as of the date the event occurs or circumstance or condition comes into existence, a current employee or contractor of a Group Company subject to confidentiality obligations with respect thereto, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(k)    No Group Company has used, modified, linked to, created derivative works from or incorporated into any Company Products that are currently complete and ready to be commercialized, or into other Software that embodies Company Owned Intellectual Property any Open Source Software, in each case in a manner that (i) requires any Company Owned Intellectual Property to be licensed, sold, disclosed, distributed, hosted or otherwise made available, including in source code form and/or for the purpose of making derivative works, for any reason, (ii) grants, or requires any Group Company to grant, the right to decompile, disassemble, reverse engineer or otherwise derive the source code or underlying structure of any

A-29

Exhibit 7
Page 954

Company Owned Intellectual Property, (iii) limits in any manner the ability to charge license fees or otherwise seek compensation in connection with marketing, licensing or distribution of any Company Owned Intellectual Property or (iv) otherwise imposes any limitation, restriction or condition on the right or ability of any Group Company to use, hold for use, license, host, distribute or otherwise dispose of any Company Owned Intellectual Property, other than compliance with notice and attribution requirements, in each case, except as is not and would not reasonably be expected to be, individually or in the aggregate, material to the Group Companies, taken as a whole. The Group Companies are in material compliance with their Contracts relating to Open Source Software, including attribution and notice obligations.

(l)    Each Group Company has a valid right to use any Company IT Systems owned by a third party that are used by such Group Company. The Company IT Systems are reasonably sufficient for the needs of the Group Companies, including as to capacity, scalability and ability to process current and anticipated peak volumes in a timely manner. To the knowledge of the Company, since December 31, 2018, there has been no failure, substandard performance of or security incident involving any Company IT System that has caused a material disruption to a Group Company, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. The Group Companies maintain commercially reasonable backup and data recovery, disaster recovery and business continuity plans and procedures, and facilities, and test such plans and procedures on a regular basis. To the knowledge of the Company, the Company IT Systems owned by the Company and Company Products that are currently complete and ready to be commercialized do not contain any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus," malware or other routines or components intentionally designed to permit unauthorized access to, maliciously disable, encrypt or erase or otherwise harm Software, systems or data, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

**Section 3.14.  Labor Matters**.

(a)    For the past three (3) years, the Group Companies have complied with, and are currently in compliance with, in all material respects, all applicable Laws and Orders with respect to employment and employment practices (including applicable Laws, rules and regulations regarding wage and hour requirements, meals and rest breaks, classification and compensation of independent contractors and employees, immigration status, discrimination in employment, sex-based discrimination, sexual harassment or sexual misconduct, employee health and safety, and collective bargaining). No executive or key employee of any Group Company has been the subject of any sexual harassment, sexual assault, sexual discrimination or other misconduct allegations during his or her tenure at the Company. To the Company's knowledge, no current executive, key employee or group of employees has given notice of termination of employment or otherwise disclosed plans to terminate employment with the applicable Group Company within the twelve (12) month period following the date hereof.

(b)    For the past three (3) years, (i) none of the Group Companies (A) has or has had any material Liability for any arrears of wages or other compensation for services (including salaries, wage premiums, commissions, fees or bonuses), or any penalty or other sums for failure to comply with any of the foregoing, and (B) has or has had any material Liability for any payment to any trust or other fund governed by or maintained by or on behalf of any Governmental Entity with respect to unemployment compensation benefits, social security, social insurances or other benefits or obligations for any employees of any Group Company (other than routine payments to be made in the normal course of business and consistent with past practice); and (ii) the Group Companies have withheld all amounts required by applicable Law or by agreement to be withheld from wages, salaries and other payments to employees or independent contractors or other service providers of each Group Company, except as has not and would not reasonably be expected to result in, individually or in the aggregate, material Liability to the Group Companies.

(c)    For the past three (3) years, there has been no "mass layoff" or "plant closing" as defined by WARN related to any Group Company, and the Group Companies have not incurred any material Liability under WARN nor will they incur any Liability under WARN as a result of the transactions contemplated by this Agreement.

A-30

Exhibit 7
Page 955

(d)    No Group Company is a party to or bound by any collective bargaining agreement or other agreement with any labor organization, labor union, works council or other employee representative or any other Contract with a labor union, labor organization, works council, employee delegate, representative or other employee collective group nor, to the Company's knowledge, is there any duty on the part of any Group Company to bargain with any labor union, labor organization, works council, employee delegate, representative or other employee collective group. Since December 31, 2018, there has been no actual or, to the Company's knowledge, threatened unfair labor practice charges, material grievances, arbitrations, strikes, lockouts, work stoppages, slowdowns, picketing, hand billing or other material labor disputes against or affecting any Group Company. To the Company's knowledge, since December 31, 2018, there have been no labor organizing activities with respect to any employees of any Group Company. No notice, consent or consultation obligations with respect to any employees of any Group Company, or any labor union, labor organization, works council, employee delegate, representative or other employee collective group representing such employees, will be a condition precedent to, or triggered by, the execution of this Agreement or the consummation of the transactions contemplated hereby.

(e)    No employee layoff, facility closure or shutdown (whether voluntary or by Order), reduction-in-force, furlough, temporary layoff, material work schedule change or reduction in hours, or reduction in salary or wages, or other workforce changes affecting employees of the Group Companies has occurred within the past twelve (12) months or is currently contemplated, planned or announced, including as a result of COVID-19 or any Law, Order, directive, guidelines or recommendations by any Governmental Entity in connection with or in response to COVID-19. The Group Companies have not otherwise experienced any material employment-related liability with respect to or arising out of COVID-19 or any Law, Order, directive, guidelines or recommendations by any Governmental Entity in connection with or in response to COVID-19.

Section 3.15.    **Insurance**. Section 3.15 of the Company Disclosure Schedules sets forth a list of all material policies of fire, liability, workers' compensation, property, casualty and other forms of insurance owned or held by any Group Company as of the date of this Agreement. All such policies are in full force and effect, all premiums due and payable thereon as of the date of this Agreement have been paid in full as of the date of this Agreement, and true and complete copies of all such policies have been made available to Sandbridge. As of the date of this Agreement, no claim by any Group Company is pending under any such policies as to which coverage has been denied or disputed, or rights reserved to do so, by the underwriters thereof, except as is not and would not reasonably be expected to be, individually or in the aggregate, material to the Group Companies, taken as a whole.

Section 3.16.    **Tax Matters**.

(a)    Each Group Company has prepared and filed all material Tax Returns required to have been filed by it, all such Tax Returns are true and complete in all material respects and prepared in compliance in all material respects with all applicable Laws and Orders, and each Group Company has paid all material Taxes required to have been paid by it regardless of whether shown on a Tax Return.

(b)    Each Group Company has timely withheld and paid to the appropriate Tax Authority all material amounts required to have been withheld and paid in connection with amounts paid or owing to any employee, individual independent contractor, other service providers, equity interest holder or other third-party.

(c)    No Group Company is currently the subject of a Tax Proceeding with respect to material Taxes. No Group Company has been informed in writing of the commencement or anticipated commencement of any Tax Proceeding that has not been resolved or completed in each case with respect to material Taxes.

(d)    No Group Company has consented to extend or waive the time in which any material Tax may be assessed or collected by any Tax Authority, other than any such extensions or waivers that are no longer in effect or that were extensions of time to file Tax Returns obtained in the ordinary course of business.

(e)    No "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. income Tax Law), private letter rulings, technical advice memoranda or similar agreements or rulings have been entered into or issued by any Tax Authority with respect to a Group Company which agreement or ruling would be effective after the Closing Date.

A-31

Exhibit 7
Page 956

(f)    No Group Company is or has been a party to any "listed transaction" as defined in Section 6707A of the Code and Treasury Regulations Section 1.6011-4 (or any corresponding or similar provision of state, local or non-U.S. income Tax Law).

(g)    There are no Liens for material Taxes on any assets of the Group Companies other than Permitted Liens described in clause (b) of the definition thereof.

(h)    During the two (2)-year period ending on the date of this Agreement, no Group Company was a distributing corporation or a controlled corporation in a transaction purported or intended to be governed by Section 355 of the Code.

(i)    No Group Company (i) has been a member of an affiliated group filing a consolidated federal income Tax Return (other than a group the common parent of which was a Group Company or any of its current Affiliates) or (ii) has any material Liability for the Taxes of any Person (other than a Group Company or any of its current Affiliates) under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local or non-United States Law), as a transferee or successor or by Contract (other than any Contract the principal purpose of which does not relate to Taxes).

(j)    No written claims have ever been made by any Tax Authority in a jurisdiction where a Group Company does not file Tax Returns that such Group Company is or may be subject to taxation or to a Tax Return filing requirement by that jurisdiction, which claims have not been resolved or withdrawn.

(k)    No Group Company is a party to any Tax allocation, Tax sharing or Tax indemnity or similar agreements (other than one that is included in a Contract entered into in the ordinary course of business that is not primarily related to Taxes) and no Group Company is a party to any joint venture, partnership or other arrangement that is treated as a partnership for U.S. federal income Tax purposes.

(l)    Each Group Company is tax resident only in its country of incorporation.

(m)    No Group Company has a permanent establishment (within the meaning of an applicable Tax treaty) or otherwise has an office or fixed place of business in a country other than the country in which it is organized.

(n)    No Group Company has taken or agreed to take any action not contemplated by this Agreement and/or any Ancillary Document that could reasonably be expected to prevent the Merger from qualifying for the Intended Tax Treatment. To the knowledge of the Company, no facts or circumstances exist, other than any facts or circumstances to the extent that such facts or circumstances exist or arise as a result of or related to any act or omission occurring after the signing date of any Sandbridge Party or any of their respective Affiliates not contemplated by this Agreement and/or any of the Ancillary Documents, that could reasonably be expected to prevent the Merger (or, if applicable, the Alternative Transaction Structure) from qualifying for the Intended Tax Treatment.

Section 3.17.    **Brokers**. Except for fees (including the amounts due and payable assuming the Closing occurs) set forth on Section 3.17 of the Company Disclosure Schedules (which fees shall be the sole responsibility of the Company, except as otherwise provided in Section 8.6 (Fees and Expenses)), no broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company or any of its Affiliates for which any of the Group Companies has any obligation.

Section 3.18.    **Real and Personal Property**.

(a)    Owned Real Property. No Group Company owns any real property.

(b)    Leased Real Property. Section 3.18(b) of the Company Disclosure Schedules sets forth a true and complete list (including street addresses) of all real property leased by any of the Group Companies (the "Leased Real Property") and all Real Property Leases pursuant to which any Group Company is a tenant or landlord as of the date of this Agreement. True and complete copies of all such Real Property Leases have been made available to Sandbridge. Each Real Property Lease is in full force and effect and is a valid, legal and binding obligation of the applicable Group Company party thereto, enforceable in accordance with its terms against such Group Company and, to the Company's knowledge, each other party thereto (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting generally the

A-32

Exhibit 7
Page 957

enforcement of creditors' rights and subject to general principles of equity). There is no material breach or default by any Group Company or, to the Company's knowledge, any third party under any Real Property Lease, and, to the Company's knowledge, no event has occurred which (with or without notice or lapse of time or both) would constitute a material breach or default or would permit termination of, or a material modification or acceleration thereof by any party to such Real Property Leases.

(c)    Personal Property. Each Group Company has good, marketable and indefeasible title to, or a valid leasehold interest in or license or right to use, all of the material assets and properties of the Group Companies reflected in the Financial Statements or thereafter acquired by the Group Companies, except for assets disposed of in the ordinary course of business.

Section 3.19.    **Transactions with Affiliates**. Section 3.19 of the Company Disclosure Schedules sets forth all Contracts between (a) any Group Company, on the one hand, and (b) any officer, director, employee, partner, member, manager, direct or indirect equityholder or Affiliate of any Group Company (other than, for the avoidance of doubt, any other Group Company) or any family member of the foregoing Persons, on the other hand (each Person identified in this clause (b), a "Company Related Party"), other than (i) Contracts with respect to a Company Related Party's employment with (including benefit plans and other ordinary course compensation from) any of the Group Companies entered into in the ordinary course of business, (ii) Contracts with respect to a Company Stockholder's or a holder of Company Options' status as a holder of Equity Securities of the Company and (iii) Contracts entered into after the date of this Agreement that are either permitted pursuant to Section 5.1(b) or entered into in accordance with Section 5.1(b). Except as disclosed on Section 3.19 of the Company Disclosure Schedules, no Company Related Party (A) owns any interest in any material asset used in any Group Company's business, or (B) owes any material amount to, or is owed any material amount by, any Group Company (other than ordinary course accrued compensation, employee benefits, employee or director expense reimbursement or other transactions entered into after the date of this Agreement that are either permitted pursuant to Section 5.1(b) or entered into in accordance with Section 5.1(b)). All Contracts, arrangements, understandings, interests and other matters that are required to be disclosed pursuant to this Section 3.19 are referred to herein as "Company Related Party Transactions".

Section 3.20.    **Data Privacy and Security**.

(a)    Except as would not reasonably be expected to be material to the Group Companies, taken as a whole, each Group Company has, (i) for the past three (3) years, complied with applicable Privacy Obligations; and (ii) implemented and complied with an appropriate data protection compliance program and appropriate written policies and procedures relating to the Processing of Personal Data as and to the extent necessary in order to comply with all Privacy Obligations ("Privacy and Data Security Policies"). The Group Companies have adopted and published privacy notices and policies that describe their privacy practices to their websites, mobile applications or other electronic platforms and complied with those notices and policies, except where non-compliance would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. The Group Companies have implemented an information security program that, as of the date of this Agreement and as of the Closing Date, is comprised of commercially reasonable and appropriate physical, technical, organizational and administrative security measures and policies and that complies with all Privacy Obligations and that is reasonably designed to protect and maintain the privacy, security and integrity of any Personal Data, confidential information or trade secrets in their possession or under their control, or otherwise Processed by such Group Companies, including to protect such data from any Security Breaches.

(b)    For the past three (3) years, no Group Company has received written notice of any pending Proceedings, nor, to the knowledge of the Company, has there been any Proceedings against any Group Company initiated by: (i) any Person; (ii) the United States Federal Trade Commission, any state attorney general or similar state official; or (iii) any other Governmental Entity, in each case, alleging that any Processing of Personal Data by or on behalf of a Group Company: (A) is in violation of any applicable Privacy Obligations; or (B) is in violation of any Privacy and Data Security Policies.

(c)    For the past three (3) years no Group Company has (i) received any written notice, request, correspondence or other communication from any Supervisory Authority, or, to the knowledge of the Company, been subject to any investigation or enforcement action (including any fines or other sanctions),

A-33

Exhibit 7
Page 958

TABLE OF CONTENTS

in each case relating to a breach or alleged breach of its obligations under any Privacy Obligations; or (ii) received any claim, complaint, correspondence or other communication from a data subject or any other Person claiming a right to compensation under any Privacy Obligations, or alleging any breach of any Privacy Obligations.

(d)    To the knowledge of the Company, for the past three (3) years: (i) there has been no unauthorized access, use or disclosure of Personal Data in the possession or control of any Group Company or any Processor; (ii) there have been no unauthorized intrusions or breaches of security into any Group Company or Processor systems, or (iii) any other personal data breaches or Security Breaches suffered by any Group Company or any Processor leading to the accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to, any Personal Data and no claims have been made by any third party alleging the same, except with respect to (i), (ii), and (iii) as would not reasonably be expected to be material to the Group Companies, taken as a whole. To the knowledge of the Company, no Group Company has been notified in writing, or been required by applicable Law, Governmental Entity, or Contract to notify in writing, any Person of any Security Breach.

(e)    For the past three (3) years, each Group Company has complied with all applicable requirements under all applicable Privacy Obligations relating to the disclosure or transfer of Personal Data outside the European Economic Area, except where noncompliance would not reasonably be expected to be material to the Group Companies, taken as a whole.

(f)    The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby complies with the Group Companies' applicable privacy notices and policies and with all other Privacy Obligations, except where any such non-compliance would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

**Section 3.21.    Compliance with International Trade & Anti-Corruption Laws.**

(a)    Neither the Group Companies nor, to the Company's knowledge, any of their Representatives, or any other Persons acting for or on behalf of any of the foregoing, is or has been, since December 31, 2018, (i) a Person named on any Sanctions and Export Control Laws-related list of designated Persons maintained by a Governmental Entity; (ii) located, organized or resident in a country or territory which is itself the subject of or target of any Sanctions and Export Control Laws; (iii) an entity owned, directly or indirectly, by one or more Persons described in clause (i) or (ii); or (iv) otherwise engaging in dealings with or for the benefit of any Person described in clauses (i) through (iii) or any country or territory which is or has, since the incorporation of the Company, been the subject of or target of any Sanctions and Export Control Laws (at the time of this Agreement, the Crimea region of Ukraine, Cuba, Iran, North Korea, Sudan and Syria).

(b)    Neither the Group Companies nor, to the Company's knowledge, any of their Representatives, or any other Persons acting for or on behalf of any of the foregoing has (i) made, offered, promised, paid or received any unlawful bribes, kickbacks or other similar payments to or from any Person, (ii) made or paid any contributions, directly or indirectly, to a domestic or foreign political party or candidate or (iii) otherwise made, offered, received, authorized, promised or paid any improper payment under any Anti-Corruption Laws.

**Section 3.22.    Information Supplied.** None of the information supplied or to be supplied by or on behalf of the Group Companies expressly for inclusion or incorporation by reference prior to the Closing in the Registration Statement / Proxy Statement will, when the Registration Statement / Proxy Statement is declared effective or mailed to the Pre-Closing Sandbridge Holders or at the time of the Sandbridge Stockholders Meeting, and in the case of any amendment thereto, at the time of such amendment, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

**Section 3.23.    Regulatory Compliance.**

(a)    Except as set forth on Section 3.23(a) of the Company Disclosure Schedules, since January 1, 2018, all products developed, tested, investigated, produced, manufactured, labeled, stored, promoted, marketed, imported, exported, distributed, or sold by or on behalf of the Group Companies have been, and are being, developed, tested, investigated, produced, manufactured, labeled, distributed, stored, promoted, marketed, imported, exported, distributed and sold in compliance in all material respects with applicable

A-34

Exhibit 7
Page 959

FDA Laws, including, as applicable, those relating to non-clinical research, clinical research, establishment registration, device listing, premarket notification, Quality System Regulation, labeling, advertising, record-keeping, device importation and exportation, adverse event and malfunction reporting and reporting of corrections and removals.

(b)    Except as set forth on Section 3.23(b) of the Company Disclosure Schedules, the Company holds all material Permits, including 510(k) clearances or premarket approvals required by applicable FDA Laws. The Company is, and since January 1, 2018 has been, in compliance in all material respects with all such Permits. Except as set forth on Section 3.23(b) of the Company Disclosure Schedules, to the Company's knowledge, no Governmental Entity is considering limiting, suspending or revoking any product's Permits or changing the marketing classification or labeling of any of the Company Products in any material respect.

(c)    There are no Proceedings pending or, to the Company's knowledge, threatened in writing by or on behalf of the FDA or any other Governmental Entity that has jurisdiction over the operations of any Group Company alleging material noncompliance with applicable Laws. Since January 1, 2018, the Group Companies have not received any written notice or communication from any Governmental Entity or third party alleging or asserting material noncompliance with any applicable FDA Law, any warning or untitled letter, notice of violation, notice of inspectional observations, notice of import or export prohibition, import detention or refusal, unresolved Form FDA-483, or similar written letter or notice alleging noncompliance.

(d)    Except as set forth on Section 3.23(d) of the Company Disclosure Schedules, since January 1, 2018, no product distributed or sold by or on behalf of the Group Companies has been seized, detained, withdrawn, voluntarily or involuntarily recalled or subject to a suspension of manufacturing, and, to the Company's knowledge, there are no facts or circumstances reasonably likely to cause (i) a withdrawal, recall, field notification, field correction, safety alert, termination, seizure, denial, detention, or suspension of the manufacturing, marketing or distribution, of any such product, (ii) a change in the labeling of any such product or (iii) a termination, seizure, or suspension of the marketing or distribution (including for commercial, investigational or any other use) of any such product, except, in each case, that would not reasonably be expected to be material to the Group Companies taken as a whole.

(e)    Any studies, tests and preclinical and clinical trials conducted by or on behalf of the Group Companies were and, if ongoing, are being conducted in accordance with applicable Laws, including, as applicable, FDA Laws. The Group Companies have not received any written notices or correspondence from the FDA, other Governmental Entity, or any institutional review board or other ethics committee exercising comparable authority threatening to initiate or require the termination, suspension or material modification of any studies, tests or preclinical or clinical trials conducted by or on behalf of the Group Companies.

(f)    To the knowledge of the Company, all filings, notifications, reports, and submissions to the FDA and any similar Governmental Entity made by or on behalf of the Group Companies were true, accurate and complete in all material respects as of the date made, and, to the extent required to be updated, have been updated to be true, accurate and complete in all material respects as of the date of such update.

(g)    None of the Group Companies, any of its officers, employees, nor to the knowledge of the Company, any of its agents or distributors have (i) made any materially false statement on, or material omission from, any notifications, applications, approvals, reports and other submissions to any Governmental Entity or in any material legal proceeding; or (ii) committed an act, made a statement, or failed to make a statement that would reasonably be expected to provide a basis for the FDA to invoke its policy respecting "Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities," as set forth in 56 Fed. Reg. 46191 (September 10, 1991) or for any other Governmental Entity to invoke any similar policy.

Section 3.24.    Product Warranties; Product Liability.

(a)    There are currently no claims or other Proceedings that have been submitted or asserted and are ongoing relating to breach of any guarantee, warranty or indemnity relating to any products designed, sold, manufactured, distributed or delivered by, or services provided by, the Group Companies, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. To the Company's knowledge there is no design or manufacturing defect, nor any failure to warn, nor any

A-35

Exhibit 7
Page 960

non-conformity with applicable product warranties, with respect to any products now or previously designed, tested, sold, manufactured, distributed or delivered by, or services now or previously provided by, the Group Companies, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(b)    There are no claims or other Proceedings pending or threatened in writing alleging that the Group Companies have any Liability (whether in negligence, breach of warranty, strict liability, failure to warn, or otherwise) arising out of or relating to any claimed injury or damage to individuals or property as a result of the claimed ownership, possession or use of any products allegedly designed, tested, sold, manufactured, distributed or delivered by the Group Companies, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

**Section 3.25.    Investigation; No Other Representations**.

(a)    The Company, on its own behalf and on behalf of its Representatives, acknowledges, represents, warrants and agrees that (i) it has conducted its own independent review and analysis of, and, based thereon, has formed an independent judgment concerning, the business, assets and liabilities of the Sandbridge Parties and (ii) it has been furnished with or given access to such documents and information about the Sandbridge Parties and their respective businesses as it and its Representatives have deemed necessary to enable it to make an informed decision with respect to the execution, delivery and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby.

(b)    In entering into this Agreement and the Ancillary Documents to which it is or will be a party, the Company has relied solely on its own investigation and analysis and the representations and warranties expressly set forth in Article 4 and in the Ancillary Documents to which it is or will be a party and no other representations or warranties of any Sandbridge Party, any Sandbridge Non-Party Affiliate or any other Person, either express or implied, and the Company, on its own behalf and on behalf of its Representatives, acknowledges, represents, warrants and agrees that, except for the representations and warranties expressly set forth in Article 4 and in the Ancillary Documents to which it is or will be a party, none of the Sandbridge Parties, any Sandbridge Non-Party Affiliate or any other Person makes or has made any representation or warranty, either express or implied, in connection with or related to this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby.

**Section 3.26.    EXCLUSIVITY OF REPRESENTATIONS AND WARRANTIES**. NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO ANY SANDBRIDGE PARTY OR ANY OF THEIR RESPECTIVE REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA), EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS ARTICLE 3 OR THE ANCILLARY DOCUMENTS, NONE OF THE COMPANY, ANY COMPANY NON-PARTY AFFILIATE OR ANY OTHER PERSON MAKES, AND THE COMPANY EXPRESSLY DISCLAIMS, ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, IN CONNECTION WITH THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, INCLUDING AS TO THE MATERIALS RELATING TO THE BUSINESS AND AFFAIRS OR HOLDINGS OF THE GROUP COMPANIES THAT HAVE BEEN MADE AVAILABLE TO ANY SANDBRIDGE PARTY OR ANY OF THEIR REPRESENTATIVES OR IN ANY PRESENTATION OF THE BUSINESS AND AFFAIRS OF THE GROUP COMPANIES BY THE MANAGEMENT OF THE COMPANY OR OTHERS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY OR BY THE ANCILLARY DOCUMENTS, AND NO STATEMENT CONTAINED IN ANY OF SUCH MATERIALS OR MADE IN ANY SUCH PRESENTATION SHALL BE DEEMED A REPRESENTATION OR WARRANTY HEREUNDER OR OTHERWISE OR DEEMED TO BE RELIED UPON BY ANY SANDBRIDGE PARTY OR ANY SANDBRIDGE NON-PARTY AFFILIATE IN EXECUTING, DELIVERING AND PERFORMING THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE 3 OR THE ANCILLARY DOCUMENTS, IT IS UNDERSTOOD THAT ANY COST ESTIMATES, PROJECTIONS OR OTHER PREDICTIONS, ANY DATA, ANY FINANCIAL INFORMATION OR ANY MEMORANDA OR OFFERING MATERIALS OR PRESENTATIONS ARE NOT AND SHALL NOT BE DEEMED TO BE OR TO INCLUDE REPRESENTATIONS OR WARRANTIES OF THE COMPANY, ANY COMPANY NON-PARTY AFFILIATE OR ANY OTHER PERSON, AND ARE NOT AND SHALL NOT BE

A-36

Exhibit 7
Page 961

DEEMED TO BE RELIED UPON BY ANY SANDBRIDGE PARTY OR ANY SANDBRIDGE NON-PARTY AFFILIATE IN EXECUTING, DELIVERING OR PERFORMING THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

## ARTICLE 4
### REPRESENTATIONS AND WARRANTIES RELATING TO THE SANDBRIDGE PARTIES

(a)    Subject to the last sentence of <u>Section 8.8</u> (Annexes, Exhibits and Schedules), except as set forth on the Sandbridge Disclosure Schedules, or (b) except as set forth in any Sandbridge SEC Reports (excluding (i) any disclosures in any "risk factors" section that do not constitute statements of fact, disclosures in any forward-looking statements disclaimers and other disclosures that are generally cautionary, predictive or forward-looking in nature and (ii) any exhibits or other documents appended thereto) (it being acknowledged that nothing disclosed in such Sandbridge SEC Reports will be deemed to modify or qualify the representations and warranties set forth in <u>Section 4.1</u> (Organization and Qualification), <u>Section 4.2</u> (Authority), <u>Section 4.6</u> (Capitalization of the Sandbridge Parties) and <u>Section 4.8</u> (Trust Account)), each Sandbridge Party hereby represents and warrants to the Company as follows:

**Section 4.1.    Organization and Qualification**. Each Sandbridge Party is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and has the requisite corporate power and authority to own, lease or operate all of its properties and assets and to conduct its business as it now being conducted. The copies of each Sandbridge Party's Governing Documents, as amended to the date of this Agreement, previously filed with the SEC or delivered by Sandbridge to the Company, are true, correct and complete. Merger Sub has no assets or operations other than those required to effect the transactions contemplated hereby. All of the equity interests of Merger Sub are held directly by Sandbridge. Each Sandbridge Party is duly licensed or qualified and in good standing as a foreign corporation or company in all jurisdictions in which its ownership of its property or the character of its activities is such as to require it to be so licensed or qualified, except where failure to be so licensed or qualified would not have a Sandbridge Material Adverse Effect.

**Section 4.2.    Authority**. Each Sandbridge Party has the requisite corporate power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is or will be a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. Subject to the receipt of the Sandbridge Stockholder Approval and the approvals and consents to be obtained by Merger Sub pursuant to <u>Section 5.10</u> (Merger Sub Shareholder Approval), the execution and delivery of this Agreement, the Ancillary Documents to which a Sandbridge Party is or will be a party and the consummation of the transactions contemplated hereby and thereby have been (or, in the case of any Ancillary Document entered into after the date of this Agreement, will be upon execution thereof) duly authorized by all necessary corporate action on the part of such Sandbridge Party and this Agreement and the transactions contemplated hereby have been determined by the Sandbridge Board as advisable to Sandbridge and the Sandbridge stockholders and recommended for approval by the Sandbridge stockholders. The foregoing votes and the consent of the PIMCO Private Funds, which has been obtained, are the only votes of any of Sandbridge's stockholders necessary in connection with entry into this Agreement by Sandbridge and Merger Sub and the consummation of the transactions contemplated hereby, including the Closing. No other company proceeding on the part of Sandbridge or Merger Sub is necessary to authorize this Agreement and the documents contemplated hereby (other than the Sandbridge Stockholder Approval). This Agreement has been and each Ancillary Document to which a Sandbridge Party is or will be a party will be, upon execution thereof, duly and validly executed and delivered by such Sandbridge Party and constitutes or will constitute, upon execution thereof, as applicable, a valid, legal and binding agreement of such Sandbridge Party (assuming this Agreement has been and the Ancillary Documents to which such Sandbridge Party is or will be a party are or will be, upon execution thereof, as applicable, duly authorized, executed and delivered by the other Persons party hereto or thereto, as applicable), enforceable against such Sandbridge Party in accordance with their terms (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting generally the enforcement of creditors' rights and subject to general principles of equity).

**Section 4.3.    Consents and Requisite Governmental Approvals; No Violations**.

(a)    No consent, approval or authorization of, or designation, declaration or filing with, any Governmental Entity is required on the part of a Sandbridge Party with respect to such Sandbridge Party's execution, delivery or performance of its obligations under this Agreement or the Ancillary Documents to

A-37

Exhibit 7
Page 962

which it is or will be party or the consummation of the transactions contemplated by this Agreement or by the Ancillary Documents, except for (i) compliance with and filings under the HSR Act, (ii) the filing with the SEC of (A) the Registration Statement / Proxy Statement and the declaration of effectiveness thereof by the SEC and (B) such reports under Section 13(a) or 15(d) of the Exchange Act as may be required in connection with this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby, (iii) such filings with and approvals of the NYSE to permit the Sandbridge Common Stock to be issued to non-accredited investors in connection with the transactions contemplated by this Agreement and the other Ancillary Documents to be listed on the NYSE, (iv) filing of the Certificate of Merger, (v) the approvals and consents to be obtained by Merger Sub pursuant to Section 5.10 (Merger Sub Shareholder Approval), (vi) the Sandbridge Stockholder Approval and (vii) any other consents, approvals, authorizations, designations, declarations, waivers or filings, the absence of which would not have a Sandbridge Material Adverse Effect.

(b)    Neither the execution, delivery or performance by a Sandbridge Party of this Agreement nor the Ancillary Documents to which a Sandbridge Party is or will be a party nor the consummation by a Sandbridge Party of the transactions contemplated hereby or thereby will, directly or indirectly (with or without due notice or lapse of time or both) (i) result in any breach of any provision of the Governing Documents of a Sandbridge Party, (ii) result in a violation or breach of, or constitute a default or give rise to any right of termination, cancellation, amendment, modification, suspension, revocation or acceleration under, any of the terms, conditions or provisions of any Contract to which a Sandbridge Party is a party, (iii) violate, or constitute a breach under, any Order or applicable Law to which any such Sandbridge Party or any of its properties or assets are bound or (iv) result in the creation of any Lien upon any of the assets or properties (other than any Permitted Liens) of a Sandbridge Party, except in the case of clauses (ii) through (iv) above, as would not have a Sandbridge Material Adverse Effect.

Section 4.4.    **Brokers**. Except for fees (including the amounts due and payable assuming the Closing occurs) set forth on Section 4.4 of the Sandbridge Disclosure Schedules (which fees shall be the sole responsibility of the Sandbridge, except as otherwise provided in Section 8.6 (Fees and Expenses)), no broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Sandbridge for which Sandbridge has any obligation.

Section 4.5.    **Information Supplied**. None of the information supplied or to be supplied by or on behalf of either Sandbridge Party expressly for inclusion or incorporation by reference prior to the Closing in the Registration Statement / Proxy Statement will, when the Registration Statement / Proxy Statement is declared effective or is mailed to the Pre-Closing Sandbridge Holders or at the time of the Sandbridge Stockholders Meeting, and in the case of any amendment thereto, at the time of such amendment, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

Section 4.6.    **Capitalization of the Sandbridge Parties**.

(a)    Section 4.6(a) of the Sandbridge Disclosure Schedules, inclusive of the notes thereto, sets forth a true and complete statement of the number and class or series (as applicable) of the issued and outstanding Sandbridge Common Stock and the Sandbridge Warrants as of the date hereof and as of the Closing Date. All outstanding Equity Securities of Sandbridge (except to the extent such concepts are not applicable under the applicable Law of the State of Delaware or other applicable Law) (i) have been duly authorized and validly issued and are fully paid and non-assessable and (ii) have been offered, sold and issued in compliance with applicable Law, including Securities Laws. Such Equity Securities (i) were not issued in violation of the Governing Documents of Sandbridge and (ii) are not subject to any preemptive rights, call option, right of first refusal, subscription rights, transfer restrictions or similar rights of any Person (other than transfer restrictions under applicable Securities Laws or under the Governing Documents of Sandbridge) and were not issued in violation of any preemptive rights, call option, right of first refusal, subscription rights, transfer restrictions or similar rights of any Person. Except for the Sandbridge Common Stock and Sandbridge Warrants set forth on Section 4.6(a) of the Sandbridge Disclosure Schedules, immediately prior to Closing, there shall be no other outstanding Equity Securities of Sandbridge.

A-38

Exhibit 7
Page 963

(b)    Except as expressly contemplated by this Agreement, the Sandbridge SEC Reports, the Ancillary Documents, the PIPE Investment or the transactions contemplated hereby or thereby or as otherwise mutually agreed to by the Company and Sandbridge, there are no outstanding (A) equity appreciation, phantom equity or profit participation rights or (B) options, restricted stock, phantom stock, warrants, purchase rights, subscription rights, conversion rights, exchange rights, calls, puts, rights of first refusal or first offer or other Contracts that could require Sandbridge, and, except as expressly contemplated by this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby or as otherwise mutually agreed in writing by the Company and Sandbridge, there is no obligation of Sandbridge, to issue, sell or otherwise cause to become outstanding or to acquire, repurchase or redeem any Equity Securities or securities convertible into or exchangeable for Equity Securities of Sandbridge.

(c)    The Equity Securities of Merger Sub outstanding as of the date of this Agreement (i) have been duly authorized and validly issued and are fully paid and nonassessable, (ii) were issued in compliance in all material respects with applicable Law, and (iii) were not issued in breach or violation of any preemptive rights or Contract to which Merger Sub is a party or bound. All of the outstanding Equity Securities of Merger Sub are owned directly by Sandbridge free and clear of all Liens (other than transfer restrictions under applicable Securities Law). As of the date of this Agreement, Sandbridge has no Subsidiaries other than Merger Sub and does not own, directly or indirectly, any Equity Securities in any Person other than Merger Sub and has never owned any equity interest in another Person other than Merger Sub.

Section 4.7.    SEC Filings. Sandbridge has timely filed or furnished all statements, forms, reports and documents required to be filed or furnished by it prior to the date of this Agreement with the SEC pursuant to Federal Securities Laws since its initial public offering (collectively, and together with any exhibits and schedules thereto and other information incorporated therein, and as they have been supplemented, modified or amended since the time of filing, the "Sandbridge SEC Reports"), and, as of the Closing, will have filed or furnished all other statements, forms, reports and other documents required to be filed or furnished by it subsequent to the date of this Agreement with the SEC pursuant to Federal Securities Laws through the Closing (collectively, and together with any exhibits and schedules thereto and other information incorporated therein, and as they have been supplemented, modified or amended since the time of filing, but excluding the Registration Statement / Proxy Statement, the "Additional Sandbridge SEC Reports"). Each of the Sandbridge SEC Reports, as of their respective dates of filing, and as of the date of any amendment or filing that superseded the initial filing, complied and each of the Additional Sandbridge SEC Reports, as of their respective dates of filing, and as of the date of any amendment or filing that superseded the initial filing, will comply, in all material respects with the applicable requirements of the Federal Securities Laws (including, as applicable, the Sarbanes-Oxley Act and any rules and regulations promulgated thereunder) applicable to the Sandbridge SEC Reports or the Additional Sandbridge SEC Reports (for purposes of the Additional Sandbridge SEC Reports, assuming that the representation and warranty set forth in Section 3.22 (Information Supplied) is true and correct in all respects with respect to all information supplied by or on behalf of Group Companies expressly for inclusion or incorporation by reference therein). As of their respective dates of filing, the Sandbridge SEC Reports did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made or will be made, as applicable, not misleading (for purposes of the Additional Sandbridge SEC Reports, assuming that the representation and warranty set forth in Section 3.22 (Information Supplied) is true and correct in all respects with respect to all information supplied by or on behalf of Group Companies expressly for inclusion or incorporation by reference therein). As of the date of this Agreement, there are no outstanding or unresolved comments in comment letters received from the SEC with respect to the Sandbridge SEC Reports. To the knowledge of Sandbridge, none of the Sandbridge SEC Reports filed on or prior to the date hereof is subject to ongoing SEC review or investigation as of the date hereof.

Section 4.8.    Trust Account. As of the date of this Agreement, Sandbridge has an amount in cash in the Trust Account equal to at least $230,000,000. The funds held in the Trust Account are (a) invested in United States "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act, having a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act which invest only in direct U.S. government treasury obligations and (b) held in trust pursuant to that certain Investment Management Trust Agreement, dated as of September 14, 2020 (the "Trust Agreement"), between Sandbridge and Continental, as trustee (the "Trustee"). There are no separate agreements, side letters or other agreements or understandings (whether written or unwritten, express or implied)

A-39

Exhibit 7
Page 964

that would cause the description of the Trust Agreement in the Sandbridge SEC Reports to be inaccurate in any material respect or, to Sandbridge's knowledge, that would entitle any Person to any portion of the funds in the Trust Account (other than (i) in respect of deferred underwriting commissions or Taxes, (ii) the Pre-Closing Sandbridge Holders who shall have elected to redeem their Sandbridge Class A Common Stock pursuant to the Governing Documents of Sandbridge or (iii) if Sandbridge fails to complete a business combination within the allotted time period set forth in the Governing Documents of Sandbridge and liquidates the Trust Account, subject to the terms of the Trust Agreement, Sandbridge (in limited amounts to permit Sandbridge to pay the expenses of the Trust Account's liquidation, dissolution and winding up of Sandbridge) and then the Pre-Closing Sandbridge Holders). Prior to the Closing, none of the funds held in the Trust Account are permitted to be released, except in the circumstances described in the Governing Documents of Sandbridge and the Trust Agreement. Sandbridge has performed all material obligations required to be performed by it to date under, and is not in material default or delinquent in performance or any other respect (claimed or actual) in connection with the Trust Agreement, and, to the knowledge of Sandbridge, no event has occurred which, with due notice or lapse of time or both, would constitute such a material default thereunder. As of the date of this Agreement, there are no claims or proceedings pending or, to the knowledge of Sandbridge, threatened in writing with respect to the Trust Account. Sandbridge has not released any money from the Trust Account (other than interest income earned on the funds held in the Trust Account as permitted by the Trust Agreement). Upon the consummation of the transactions contemplated hereby, including the distribution of assets from the Trust Account (A) in respect of deferred underwriting commissions or Taxes or (B) to the Pre-Closing Sandbridge Holders who have elected to redeem their Sandbridge Class A Common Stock pursuant to the Governing Documents of Sandbridge, each in accordance with the terms of and as set forth in the Trust Agreement, Sandbridge shall have no further obligation under either the Trust Agreement or the Governing Documents of Sandbridge to liquidate or distribute any assets held in the Trust Account, and the Trust Agreement shall terminate in accordance with its terms. As of the date hereof, assuming the accuracy of the representations and warranties of the Company contained herein and the compliance by the Company with its obligations hereunder, neither Sandbridge nor Merger Sub has any reason to believe that any of the conditions to the release and use of funds held in the Trust Account will not be satisfied if and when the Closing occurs pursuant to the terms of this Agreement.

Section 4.9.    **Transactions with Affiliates**. Section 4.9 of the Sandbridge Disclosure Schedules sets forth all Contracts between (a) Sandbridge, on the one hand, and (b) any officer, director, employee, partner, member, manager, direct or indirect equityholder (including the Sponsor) or Affiliate of either Sandbridge or the Sponsor, on the other hand (each Person identified in this clause (b), a "Sandbridge Related Party"), other than (i) Contracts with respect to a Sandbridge Related Party's employment with, or the provision of services to, Sandbridge entered into in the ordinary course of business (including employment agreements, benefit plans, indemnification arrangements and other ordinary course compensation), (ii) Contracts with respect to a Pre-Closing Sandbridge Holder's or a holder of Sandbridge Warrants' status as a holder of Sandbridge Common Stock or Sandbridge Warrants, as applicable, and (iii) Contracts entered into after the date of this Agreement that are either permitted pursuant to Section 5.12 (Conduct of Business of Sandbridge) or entered into in accordance with Section 5.12 (Conduct of Business of Sandbridge). No Sandbridge Related Party (A) owns any interest in any material asset used in the business of Sandbridge, (B) possesses, directly or indirectly, any material financial interest in, or is a director or executive officer of, any Person which is a material client, supplier, customer, lessor or lessee of Sandbridge or (C) owes any material amount to, or is owed material any amount by, Sandbridge. All Contracts, arrangements, understandings, interests and other matters that are required to be disclosed pursuant to this Section 4.9 are referred to herein as "Sandbridge Related Party Transactions".

Section 4.10.    **Litigation**. As of the date of this Agreement, there is (and since its organization, incorporation or formation, as applicable, there has been) no Proceeding pending or, to Sandbridge's knowledge, threatened against or involving any Sandbridge Party, their respective properties or assets, or, to the knowledge of Sandbridge, any of their respective directors, managers, officers or employees (in their capacity as such) that, if adversely decided or resolved, would be material to the Sandbridge Parties, taken as a whole. None of the Sandbridge Parties nor any of their respective properties or assets is subject to any material Order. As of the date of this Agreement, there are no material Proceedings by any Sandbridge Party pending or threatened against any other Person.

Section 4.11.    **Compliance with Applicable Law**. Each Sandbridge Party is (and since its organization, incorporation or formation, as applicable, has been) in compliance with all applicable Laws, except as would not

A-40

Exhibit 7
Page 965

have a Sandbridge Material Adverse Effect. Since the date of its respective incorporation, neither Sandbridge Party has received any written notice of or been charged with the violation of any Laws, except where such violation has not been, individually or in the aggregate, material to Sandbridge.

**Section 4.12.    Business Activities**.

(a)    Since its incorporation, Sandbridge has not conducted any business activities other than activities (i) in connection with or incident or related to its incorporation or continuing corporate (or similar) existence, (ii) directed toward the accomplishment of a business combination, including those incident or related to or incurred in connection with the negotiation, preparation or execution of this Agreement or any Ancillary Documents, the performance of its covenants or agreements in this Agreement or any Ancillary Document or the consummation of the transactions contemplated hereby or thereby or (iii) those that are administrative, ministerial or otherwise immaterial in nature. Except as set forth in Sandbridge's Governing Documents, there is no Contract binding upon any Sandbridge Party or to which any Sandbridge Party is a party which has or would reasonably be expected to have the effect of prohibiting or materially impairing any business practice of it or its Subsidiaries, any acquisition of property by it or its Subsidiaries or the conduct of business by it or its Subsidiaries (including, in each case, following the Closing).

(b)    Merger Sub was organized solely for the purpose of entering into this Agreement, the Ancillary Documents and consummating the transactions contemplated hereby and thereby and has not engaged in any activities or business, other than those incident or related to or incurred in connection with its organization, incorporation or formation, as applicable, or continuing corporate (or similar) existence or the negotiation, preparation or execution of this Agreement or any Ancillary Documents, the performance of its covenants or agreements in this Agreement or any Ancillary Document or the consummation of the transactions contemplated hereby or thereby.

(c)    As of the date hereof and except for this Agreement, the Ancillary Documents and the other documents and transactions contemplated hereby and thereby (including with respect to expenses and fees incurred in connection therewith), neither Sandbridge Party are party to any Contract with any other Person that would require payments by Sandbridge or any of its Subsidiaries after the date hereof in excess of $1,000,000 in the aggregate with respect to any individual Contract.

**Section 4.13.    Investment Company Act; JOBS Act.** Sandbridge is not an "investment company" or a Person directly or indirectly "controlled" by or acting on behalf of an "investment company", in each case within the meaning of the Investment Company Act. Sandbridge constitutes an "emerging growth company" within the meaning of the JOBS Act.

**Section 4.14.    Internal Controls; Listing; Financial Statements**.

(a)    Except as is not required in reliance on exemptions from various reporting requirements by virtue of Sandbridge's status as an "emerging growth company" within the meaning of the Securities Act, as modified by the JOBS Act, or "smaller reporting company" within the meaning of the Exchange Act, since its initial public offering, (i) Sandbridge has established and maintained a system of internal controls over financial reporting (as defined in Rule 13a-15 and Rule 15d-15 under the Exchange Act) sufficient to provide reasonable assurance regarding the reliability of Sandbridge's financial reporting and the preparation of Sandbridge's financial statements for external purposes in accordance with GAAP and (ii) Sandbridge has established and maintained disclosure controls and procedures (as defined in Rule 13a-15 and Rule 15d-15 under the Exchange Act) designed to ensure that material information relating to Sandbridge is made known to Sandbridge's principal executive officer and principal financial officer by others within Sandbridge.

(b)    Sandbridge has not taken any action prohibited by Section 402 of the Sarbanes-Oxley Act.

(c)    Since its initial public offering, Sandbridge has complied in all material respects with all applicable listing and corporate governance rules and regulations of the NYSE. The classes of securities representing issued and outstanding Sandbridge Class A Common Stock are registered pursuant to Section 12(b) of the Exchange Act and are listed for trading on the NYSE. There is no Proceeding pending or, to the knowledge of Sandbridge, threatened against Sandbridge by the NYSE or the SEC with respect to any intention by such entity to deregister Sandbridge Class A Common Stock or prohibit or terminate the listing of Sandbridge Class A Common Stock on the NYSE. Sandbridge has not taken any action that is designed to terminate the registration of Sandbridge Class A Common Stock under the Exchange Act.

A-41

Exhibit 7
Page 966

(d)    The Sandbridge SEC Reports contain true and complete copies of the applicable Sandbridge Financial Statements. The Sandbridge Financial Statements (i) fairly present in all material respects the financial position of Sandbridge as at the respective dates thereof, and the results of its operations, stockholders' equity and cash flows for the respective periods then ended (subject, in the case of any unaudited interim financial statements, to normal year-end audit adjustments (none of which is material) and the absence of footnotes), (ii) were prepared in conformity with GAAP applied on a consistent basis during the periods involved (except, in the case of any audited financial statements, as may be indicated in the notes thereto and subject, in the case of any unaudited financial statements, to normal year-end audit adjustments (none of which is material) and the absence of footnotes), (iii) in the case of the audited Sandbridge Financial Statements, were audited in accordance with the standards of the PCAOB and (iv) comply in all material respects with the applicable accounting requirements and with the rules and regulations of the SEC, the Exchange Act and the Securities Act in effect as of the respective dates thereof (including Regulation S-X or Regulation S-K, as applicable).

(e)    Sandbridge has established and maintains systems of internal accounting controls that are designed to provide, in all material respects, reasonable assurance that (i) all transactions are executed in accordance with management's authorization and (ii) all transactions are recorded as necessary to permit preparation of proper and accurate financial statements in accordance with GAAP. Sandbridge maintains and, for all periods covered by the Sandbridge Financial Statements, has maintained books and records of Sandbridge in the ordinary course of business that are accurate and complete in all material respects and reflect the revenues, expenses, assets and liabilities of Sandbridge in all material respects.

(f)    Since its incorporation, Sandbridge has not received any written complaint, allegation, assertion or claim that there is (i) a "significant deficiency" in the internal controls over financial reporting of Sandbridge to Sandbridge's knowledge, (ii) a "material weakness" in the internal controls over financial reporting of Sandbridge to Sandbridge's knowledge or (iii) fraud, whether or not material, that involves management or other employees of Sandbridge who have a significant role in the internal controls over financial reporting of Sandbridge.

(g)    Except as disclosed in filings with the SEC, neither Sandbridge nor Merger Sub have any material Indebtedness.

(h)    There are no outstanding loans or other extensions of credit made by Sandbridge to any executive officer (as defined in Rule 3b-7 under the Exchange Act) or director of Sandbridge.

(i)    The books and records of Sandbridge have been, and are being, maintained in all material respects in accordance with GAAP and any other applicable legal and accounting requirements.

Section 4.15.    **Absence of Changes**. Since November 13, 2020, there has not been any event or occurrence that has had, or would not reasonably be expected to have, a Sandbridge Material Adverse Effect.

Section 4.16.    **No Undisclosed Liabilities**. Except for the Liabilities (a) set forth in Section 4.16 of the Sandbridge Disclosure Schedules, (b) incurred in connection with the negotiation, preparation or execution of this Agreement or any Ancillary Documents, the performance of its covenants or agreements in this Agreement or any Ancillary Document or the consummation of the transactions contemplated hereby or thereby, (c) that are incurred in connection with or incident or related to a Sandbridge Party's organization, incorporation or formation, as applicable, or continuing corporate (or similar) existence, in each case, which are immaterial in nature, (d) that are incurred in connection with activities that are administrative or ministerial, in each case, which are immaterial in nature, (e) that are either permitted pursuant to Section 5.12 (Conduct of Business of Sandbridge) or incurred in accordance with Section 5.12 (Conduct of Business of Sandbridge) (for the avoidance of doubt, in each case, with the written consent of the Company) or (f) set forth or disclosed in the Sandbridge Financial Statements included in the Sandbridge SEC Reports, none of the Sandbridge Parties has any Liabilities of the type required to be set forth on a balance sheet in accordance with GAAP.

Section 4.17.    **Tax Matters**.

(a)    Sandbridge has prepared and filed all material Tax Returns required to have been filed by it, all such Tax Returns are true and complete in all material respects and prepared in compliance in all material respects with all applicable Laws and Orders, and Sandbridge has paid all material Taxes required to have been paid or deposited by it regardless of whether shown on a Tax Return.

A-42

Exhibit 7
Page 967

(b)   Sandbridge has timely withheld and paid to the appropriate Tax Authority all material amounts required to have been withheld and paid in connection with amounts paid or owing to any employee, individual independent contractor, other service providers, equity interest holder or other third-party.

(c)   Sandbridge is not currently the subject of a Tax Proceeding with respect to material taxes. Sandbridge has not been informed in writing of the commencement or anticipated commencement of any Tax Proceeding that has not been resolved or completed, in each case with respect to material Taxes.

(d)   Sandbridge has not consented to extend or waive the time in which any material Tax may be assessed or collected by any Tax Authority, other than any such extensions or waivers that are no longer in effect or that were extensions of time to file Tax Returns obtained in the ordinary course of business, in each case with respect to material Taxes.

(e)   No "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. income Tax Law), private letter rulings, technical advice memoranda or similar agreements or rulings have been entered into or issued by any Tax Authority with respect to Sandbridge which agreement or ruling would be effective after the Closing Date.

(f)   Sandbridge is not and has not been a party to any "listed transaction" as defined in Section 6707A of the Code and Treasury Regulations Section 1.6011-4 (or any corresponding or similar provision of state, local or non-U.S. income Tax Law).

(g)   There are no Liens for material Taxes on any asset of Sandbridge other than Permitted Liens described in clause (b) of the definition thereof.

(h)   Sandbridge is not a party to any Tax allocation, Tax sharing or Tax indemnity or similar agreements (other than one that is included in a Contract (i) entered into in the ordinary course of business or (ii) that is not primarily related to Taxes).

(i)   Sandbridge is tax resident only in its country of incorporation.

(j)   Sandbridge Parties has not taken or agreed to take any action not contemplated by this Agreement and/or any Ancillary Documents that could reasonably be expected to prevent the Merger from qualifying for the Intended Tax Treatment. To the knowledge of Sandbridge, no facts or circumstances exist, other than any facts or circumstances to the extent that such facts or circumstances exist or arise as a result of or related to any act or omission occurring after the signing date by a Group Company or a Company Stockholder or any of their respective Affiliates in each case not contemplated by this Agreement and/or any of the Ancillary Documents, that could reasonably be expected to prevent the Merger (or, if applicable, the Alternative Transaction Structure) from qualifying for the Intended Tax Treatment.

Section 4.18.   **No General Solicitation**. In issuing the Sandbridge Class A Common Stock pursuant to this Agreement, neither Sandbridge nor, to Sandbridge's knowledge, anyone acting on its behalf has offered to sell Sandbridge Class A Common Stock by any form of general solicitation or advertising.

Section 4.19.   **Compliance with International Trade & Anti-Corruption Laws.**

(a)   Since Sandbridge's incorporation, neither Sandbridge nor, to Sandbridge's knowledge, any of their Representatives, or any other Persons acting for or on behalf of any of the foregoing, is or has been, (i) a Person named on any Sanctions and Export Control Laws-related list of designated Persons maintained by a Governmental Entity; (ii) located, organized or resident in a country or territory which is itself the subject of or target of any Sanctions and Export Control Laws; (iii) an entity owned, directly or indirectly, by one or more Persons described in clause (i) or (ii); or (iv) otherwise engaging in dealings with or for the benefit of any Person described in clauses (i) through (iii) or any country or territory which is or has, since Sandbridge's incorporation, been the subject of or target of any Sanctions and Export Control Laws (at the time of this Agreement, the Crimea region of Ukraine, Cuba, Iran, North Korea, Sudan and Syria).

(b)   Since Sandbridge's incorporation, neither Sandbridge nor, to Sandbridge's knowledge, any of their Representatives, or any other Persons acting for or on behalf of any of the foregoing has (i) made, offered,

A-43

Exhibit 7
Page 968

promised, paid or received any unlawful bribes, kickbacks or other similar payments to or from any Person, (ii) made or paid any contributions, directly or indirectly, to a domestic or foreign political party or candidate or (iii) otherwise made, offered, received, authorized, promised or paid any improper payment under any Anti-Corruption Laws.

**Section 4.20.    PIPE Investment Amount; Subscription Agreements**. Sandbridge has provided true and correct copies of each of the Subscription Agreements to the Company on or prior to the date of this Agreement. Such Subscription Agreements are in full force and effect with respect to, and binding on, Sandbridge and, to the knowledge of Sandbridge, on each PIPE Investor party thereto, in accordance with their terms.

**Section 4.21.    Investigation; No Other Representations**.

(a)    Each Sandbridge Party, on its own behalf and on behalf of its Representatives, acknowledges, represents, warrants and agrees that (i) it has conducted its own independent review and analysis of, and, based thereon, has formed an independent judgment concerning, the business, assets, liabilities, condition, operations and prospects, of the Group Companies and (ii) it has been furnished with or given access to such documents and information about the Group Companies and their respective businesses and operations as it and its Representatives have deemed necessary to enable it to make an informed decision with respect to the execution, delivery and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby.

(b)    In entering into this Agreement and the Ancillary Documents to which it is or will be a party, each Sandbridge Party has relied solely on its own investigation and analysis and the representations and warranties expressly set forth in Article 3 and in the Ancillary Documents to which it is or will be a party and no other representations or warranties of the Company, any Company Non-Party Affiliate or any other Person, either express or implied, and each Sandbridge Party, on its own behalf and on behalf of its Representatives, acknowledges, represents, warrants and agrees that, except for the representations and warranties expressly set forth in Article 3 and in the Ancillary Documents to which it is or will be a party, none of the Company, any Company Non-Party Affiliate or any other Person makes or has made any representation or warranty, either express or implied, in connection with or related to this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby.

**Section 4.22.    EXCLUSIVITY OF REPRESENTATIONS AND WARRANTIES**. NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO ANY GROUP COMPANY OR ANY OF THEIR RESPECTIVE REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION, EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS ARTICLE 4 OR THE ANCILLARY DOCUMENTS, NO SANDBRIDGE PARTY OR ANY SANDBRIDGE NON-PARTY AFFILIATE OR ANY OTHER PERSON MAKES, AND SANDBRIDGE EXPRESSLY DISCLAIMS, ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, IN CONNECTION WITH THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, INCLUDING AS TO THE BUSINESS AND AFFAIRS OF THE SANDBRIDGE PARTIES THAT HAVE BEEN MADE AVAILABLE TO ANY GROUP COMPANY OR ANY OF THEIR REPRESENTATIVES OR IN ANY PRESENTATION OF THE BUSINESS AND AFFAIRS OF SANDBRIDGE BY THE MANAGEMENT OF SANDBRIDGE OR OTHERS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY OR BY THE ANCILLARY DOCUMENTS, AND NO STATEMENT CONTAINED IN ANY OF SUCH MATERIALS OR MADE IN ANY SUCH PRESENTATION SHALL BE DEEMED A REPRESENTATION OR WARRANTY HEREUNDER OR OTHERWISE OR DEEMED TO BE RELIED UPON BY ANY GROUP COMPANY OR ANY COMPANY NON-PARTY AFFILIATE IN EXECUTING, DELIVERING AND PERFORMING THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE 4 OR THE ANCILLARY DOCUMENTS, IT IS UNDERSTOOD THAT ANY COST ESTIMATES, PROJECTIONS OR OTHER PREDICTIONS, ANY DATA, ANY FINANCIAL INFORMATION OR ANY MEMORANDA OR OFFERING MATERIALS OR PRESENTATIONS ARE NOT AND SHALL NOT BE DEEMED TO BE OR TO INCLUDE REPRESENTATIONS OR WARRANTIES OF THE SANDBRIDGE PARTIES, ANY SANDBRIDGE NON-PARTY AFFILIATE OR ANY OTHER PERSON, AND ARE NOT AND SHALL NOT BE DEEMED TO

A-44

Exhibit 7
Page 969

BE RELIED UPON BY ANY GROUP COMPANY OR ANY COMPANY NON-PARTY AFFILIATE IN EXECUTING, DELIVERING OR PERFORMING THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

## ARTICLE 5
## COVENANTS

**Section 5.1.   Conduct of Business of the Company**.

(a)    From and after the date of this Agreement until the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Company shall, and the Company shall cause its Subsidiaries to, except as expressly contemplated by this Agreement (including in connection with the PIPE Investment) or any Ancillary Document, as required by applicable Law, as set forth on Section 5.1(a) of the Company Disclosure Schedules, or as consented to in writing by Sandbridge (it being agreed that any request for a consent shall not be unreasonably withheld, conditioned or delayed), use commercially reasonable efforts to (i) operate the business of the Group Companies in the ordinary course in all material respects and (ii) maintain and preserve intact in all material respects the business organization, assets, properties and material business relations of the Group Companies, taken as a whole.

(b)    Without limiting the generality of the foregoing, from and after the date of this Agreement until the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Company shall, and the Company shall cause its Subsidiaries to, except as expressly contemplated by this Agreement (including in connection with the PIPE Investment), the Ancillary Documents, as required by applicable Law, as set forth on Section 5.1(b) of the Company Disclosure Schedules or as consented to in writing by Sandbridge (such consent, not to be unreasonably withheld, conditioned or delayed) not do any of the following:

(i)    declare, set aside, make or pay a dividend on, or make any other distribution or payment in respect of, any Equity Securities of any Group Company or repurchase any outstanding Equity Securities of any Group Company, other than dividends or distributions, declared, set aside or paid by any of the Company's Subsidiaries to the Company or any Subsidiary that is, directly or indirectly, wholly owned by the Company;

(ii)    (A) merge, consolidate, combine or amalgamate any Group Company with any Person or (B) purchase or otherwise acquire (whether by merging or consolidating with, purchasing any Equity Security in or a substantial portion of the assets of, or by any other manner) any corporation, partnership, association or other business entity or organization or division thereof;

(iii)    adopt any amendments, supplements, restatements or modifications to any Group Company's Governing Documents or the Company Stockholders Agreements;

(iv)    transfer, issue, sell, grant or otherwise directly or indirectly dispose of, or subject to a Lien, (A) any Equity Securities of any Group Company or (B) any options, warrants, rights of conversion or other rights, agreements, arrangements or commitments obligating any Group Company to issue, deliver or sell any Equity Securities of any Group Company, other than the issuance of shares of Company Common Stock upon the exercise or settlement of any Company Options outstanding on the date of this Agreement in accordance with the terms of the applicable Company Equity Plan and the underlying grant, award or similar agreement as in effect on the date of this Agreement;

(v)    enter into, renew, modify or revise any Company Related Party Transaction (or any Contract or agreement that if entered into prior to the execution and delivery of this Agreement would be a Company Related Party Transaction);

(vi)    incur, create or assume any Indebtedness, other than ordinary course trade payables;

(vii)    make any loans, advances or capital contributions to, or guarantees for the benefit of, or any investments in, any Person, other than (A) intercompany loans or capital contributions between the Company and any of its wholly owned Subsidiaries and (B) the reimbursement of expenses of employees in the ordinary course of business;

(viii)    except (x) as required under the terms of any Employee Benefit Plan as in effect on the date of this Agreement and that is set forth on the Section 3.11(a) of the Company Disclosure

A-45

Exhibit 7
Page 970

Schedules or (y) in order to comply with applicable Law, (A) materially amend or modify, or adopt, establish, enter into or terminate any Employee Benefit Plan or any benefit or compensation plan, policy, program, Contract or arrangement that would be an Employee Benefit Plan if in effect as of the date of this Agreement, (B) grant to any director, manager, officer, employee, individual independent contractor or other service provider of any Group Company any bonus, incentive, severance, termination pay, or similar payment or increase the compensation or benefits payable to any current or former director, manager, officer, employee, individual independent contractor or other service provider of any Group Company, other than increases in base compensation for non-officer employees with an annual base cash compensation of less than $200,000 (after giving effect to any such increase) in the ordinary course of business consistent with past practice, (C) take any action to accelerate any payment, right to payment, or benefit, or the funding of any payment, right to payment or benefit, payable or to become payable to any current or former director, manager, officer, employee, individual independent contractor or other service provider of any Group Company, (D) hire, engage or terminate the employment or engagement of any director, manager, officer, employee, individual independent contractor or other service provider, other than any non-officer employee with an annual base cash compensation of less than $200,000 in the ordinary course of business consistent with past practice and other than terminations for cause, (E) waive or release any noncompetition, non-solicitation, no-hire, nondisclosure or other restrictive covenant obligation of any current or former director, manager, officer, employee, individual independent contractor or other service provider of any Group Company, (F) promise, commit or agree to do any of the foregoing, or make any communications or commitments regarding any compensation or benefits following the Effective Time;

(ix)    negotiate, enter into, amend or extend any Contract with any labor union, labor organization, works council, employee delegate, representative or other employee collective group;

(x)    make, change or revoke any material election concerning Taxes, enter into any material Tax closing agreement, settle any material Tax claim or assessment, or consent to any extension or waiver of the limitation period applicable to or relating to any material Tax claim or assessment, other than any such extension or waiver that is obtained in the ordinary course of business;

(xi)    enter into any settlement, conciliation or similar Contract the performance of which would involve the payment by the Group Companies in excess of $500,000, in the aggregate, or that imposes, or by its terms will impose at any point in the future, any material, non-monetary obligations on any Group Company (or Sandbridge or any of its Affiliates after the Closing);

(xii)    authorize, recommend, propose or announce an intention to adopt, or otherwise effect, a plan of complete or partial liquidation, dissolution, restructuring, recapitalization, reorganization or similar transaction involving any Group Company;

(xiii)    change any Group Company's methods of accounting in any material respect, other than changes that are made in accordance with PCAOB standards;

(xiv)    enter into any Contract with any broker, finder, investment banker or other Person under which such Person is or will be entitled to any brokerage fee, finders' fee or other commission in connection with the transactions contemplated by this Agreement;

(xv)    (A) amend, modify or terminate any Material Contract of the type described in Section 3.7(a)(iv), Section 3.7(a)(v), Section 3.7(a)(ix), Section 3.7(a)(xi)(B) or Section 3.7(a)(xiii) (excluding, for the avoidance of doubt, any expiration or extension or renewal of any such Material Contract pursuant to its terms, on its existing terms), (B) waive any material benefit or right under any Material Contract of the type described in Section 3.7(a)(iv), Section 3.7(a)(v), Section 3.7(a)(ix), Section 3.7(a)(xi)(B) or Section 3.7(a)(xiii) or (C) enter into any Contract that would constitute a Material Contract of the type described in Section 3.7(a)(iv), Section 3.7(a)(v), Section 3.7(a)(ix), Section 3.7(a)(xi)(B) or Section 3.7(a)(xiii);

(xvi)    (A) exclusively license, sell, assign, transfer, abandon, allow to lapse or otherwise dispose of any Intellectual Property Rights material to the operation of the Group Companies' business; (B) amend, modify, terminate, or waive any material benefit or right under, any Contract of the type required to be disclosed in Section 3.13(c)(i) of the Company Disclosure Schedules that is material to

A-46

Exhibit 7
Page 971

the operation of the Group Companies' business (excluding, for the avoidance of doubt, any expiration or extension or automatic renewal of any such Contract pursuant to its terms or in the ordinary course of business); or (C) enter into any Contract under which any Group Company is limited in any material respect in its ability to use or enforce any material Company Owned Intellectual Property, excluding non-exclusive licenses granted in the ordinary course of business; or

(xvii)    enter into any Contract to take, or cause to be taken, any of the actions set forth in this Section 5.1.

Notwithstanding anything to the contrary in this Agreement, the Company will be permitted to take any COVID Actions without the prior written consent of Sandbridge; provided, that the Company will consult in good faith with Sandbridge with respect to the taking of any such COVID Actions a reasonable time prior to doing so, to the extent practicable.

**Section 5.2.    Efforts to Consummate; Litigation.**

(a)    Subject to the terms and conditions herein provided, each of the Parties shall use reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things reasonably necessary or advisable to consummate and make effective as promptly as reasonably practicable the transactions contemplated by this Agreement including (i) the satisfaction, but not waiver, of the closing conditions set forth in Article 6 and, in the case of any Ancillary Document to which such Party will be a party after the date of this Agreement, to execute and delivery such Ancillary Document when required pursuant to this Agreement and (ii) the Company taking, or causing to be taken, all actions necessary or advisable to cause the agreements set forth on Section 5.2(a) of the Company Disclosure Schedules to be terminated without any further obligations or liabilities to the Company or any of its Affiliates (including the other Group Companies and, from and after the Effective Time, Sandbridge). Without limiting the generality of the foregoing, each of the Parties shall use reasonable best efforts to obtain, file with or deliver to, as applicable, any Consents of any Governmental Entities or other Persons necessary, proper or advisable to consummate the transactions contemplated by this Agreement or the Ancillary Documents. Each Party shall pay fifty percent (50%) of the costs associated with obtaining such Consents, including the HSR Act filing fee; provided, however, that each Party shall bear its out of pocket costs and expenses in connection with the preparation of such Consents. Sandbridge shall pay the SEC filing fee in connection with its filing of the Registration Statement / Proxy Statement. Each Party shall (i) make any appropriate filings pursuant to the HSR Act with respect to the transactions contemplated by this Agreement promptly (and in any event within five (5) Business Days) after the date of this Agreement and (ii) respond as promptly as reasonably practicable to any requests by any Governmental Entity for additional information and documentary material that may be requested pursuant to the HSR Act. Sandbridge shall promptly inform the Company of any communication between any Sandbridge Party, on the one hand, and any Governmental Entity, on the other hand, and the Company shall promptly inform Sandbridge of any communication between the Company, on the one hand, and any Governmental Entity, on the other hand, in either case, regarding any of the transactions contemplated by this Agreement or any Ancillary Document. Without limiting the foregoing, (a) the Parties agree to request early termination of the applicable waiting period under the HSR Act, and (b) no Party or any of its respective Affiliates shall extend any waiting period, review period or comparable period under the HSR Act or enter into any agreement with any Governmental Entity not to consummate the transactions contemplated hereby or by the Ancillary Documents, except with the prior written consent of Sandbridge and the Company. Nothing in this Section 5.2 obligates any Party or any of its Affiliates to (i) sell, license or otherwise dispose of, or hold separate and agree to sell, license or otherwise dispose of, any entities, assets or facilities of any Group Company or any entity, facility or asset of such Party or any of its Affiliates, (ii) terminate, amend or assign existing relationships and contractual rights or obligations, (iii) amend, assign or terminate existing licenses or other agreements, (iv) enter into new licenses or other agreements or (v) take or commit to any action that limits in any respect its freedom of action with respect to, or its ability to retain, any business, products, rights, services, licenses, assets or properties. No Party shall agree to any of the foregoing measures with respect to any other Party, except with Sandbridge's and the Company's prior written consent.

(b)    From and after the date of this Agreement until the earlier of the Closing or termination of this Agreement in accordance with its terms, the Sandbridge Parties, on the one hand, and the Company, on the other hand, shall give counsel for the Company (in the case of any Sandbridge Party) or Sandbridge (in the

A-47

Exhibit 7
Page 972

case of the Company), a reasonable opportunity to review in advance, and consider in good faith the views of the other in connection with, any proposed written communication to any Governmental Entity relating to the transactions contemplated by this Agreement or the Ancillary Documents. Each of the Parties agrees not to participate in any substantive meeting or discussion, either in person or by telephone with any Governmental Entity in connection with the transactions contemplated by this Agreement unless it consults with, in the case of any Sandbridge Party, the Company, or, in the case of the Company, Sandbridge in advance and, to the extent not prohibited by such Governmental Entity, gives, in the case of any Sandbridge Party, the Company, or, in the case of the Company, Sandbridge, the opportunity to attend and participate in such meeting or discussion.

(c)    Notwithstanding anything to the contrary in the Agreement, in the event that this Section 5.2 conflicts with any other covenant or agreement in this Article 5 that is intended to specifically address any subject matter, then such other covenant or agreement shall govern and control solely to the extent of such conflict.

(d)    From and after the date of this Agreement until the earlier of the Closing or termination of this Agreement in accordance with its terms, Sandbridge, on the one hand, and the Company, on the other hand, shall each notify the other in writing promptly after learning of any shareholder demands or other shareholder Proceedings (including derivative claims) relating to this Agreement, any Ancillary Document or any matters relating thereto (collectively, the "Transaction Litigation") commenced against, in the case of Sandbridge, any of the Sandbridge Parties or any of their respective Representatives (in their capacity as a representative of a Sandbridge Party) or, in the case of the Company, any Group Company or any of their respective Representatives (in their capacity as a representative of a Sandbridge Party). Sandbridge and the Company shall each (i) keep the other reasonably informed regarding any Transaction Litigation, (ii) give the other the opportunity to, at its own cost and expense, participate in the defense, settlement and compromise of any such Transaction Litigation and reasonably cooperate with the other in connection with the defense, settlement and compromise of any such Transaction Litigation, (iii) consider in good faith the other's advice with respect to any such Transaction Litigation and (iv) not settle any such Transaction Litigation without the prior written consent of the other party, such consent not to be unreasonably withheld, conditions or delayed.

Section 5.3.    **Confidentiality and Access to Information**.

(a)    From and after the date of this Agreement until the earlier of the Closing Date or the termination of this Agreement in accordance with its terms, except as necessary to complete the Registration Statement / Proxy Statement and in connection with other filings to be made by Sandbridge with the SEC and Sandbridge's efforts to pursue closing of the transactions contemplated by this Agreement, the Company, on the one hand, and Sandbridge, on the other hand, shall hold and shall cause their respective Representatives to hold in strict confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all documents and information concerning the other Party or its respective business or operations furnished to it by such other Party or its Representatives in connection with the transactions contemplated by this Agreement (except to the extent that such information can be shown to have been (a) previously known by the Party to which it was furnished, (b) in the public domain through no fault of such Party or (c) later lawfully acquired from other sources, which source is not the agent of the other Party, by the Party to which it was furnished), and each party shall not use such information, except in connection with the transactions contemplated by this Agreement, or release or disclose such information to any other person, except its Representatives in connection with this Agreement. In the event that any Party believes that it is required to disclose any such confidential information pursuant to applicable Laws, such Party shall give timely written notice to the other Parties so that such Parties may have an opportunity to obtain a protective order or other appropriate relief. Each Party shall be deemed to have satisfied its obligations to hold confidential information concerning or supplied by the other Parties if it exercises the same care as it takes to preserve confidentiality for its own similar information, but in no event with less than a commercially reasonable degree of care. The Parties acknowledge that some previously confidential information will be required to be disclosed in the Registration Statement / Proxy Statement. Notwithstanding the foregoing or anything to the contrary in this Agreement, in the event that this

A-48

Exhibit 7
Page 973

Section 5.3(a) conflicts with any other covenant or agreement contained herein or any Ancillary Document that contemplates the disclosure, use or provision of information or otherwise, then such other covenant or agreement contained herein shall govern and control to the extent of such conflict.

(b)    From and after the date of this Agreement until the earlier of the Closing Date or the termination of this Agreement in accordance with its terms, upon reasonable advance written notice, the Company shall provide, or cause to be provided, to Sandbridge and its Representatives during normal business hours reasonable access to the directors, officers, books and records of the Group Companies (in a manner so as to not interfere with the normal business operations of the Group Companies). Notwithstanding the foregoing, none of the Group Companies shall be required to provide to Sandbridge or any of its Representatives any information (i) if and to the extent doing so would (A) violate any Law to which any Group Company is subject, including any Privacy Obligation, (B) result in the disclosure of any trade secrets of third parties in breach of any Contract with such third party, (C) violate any legally binding obligation of any Group Company with respect to confidentiality, non-disclosure or privacy or (D) jeopardize protections afforded to any Group Company under the attorney-client privilege or the attorney work product doctrine (provided that, in case of each of clauses (A) through (D), the Company shall, and shall cause the other Group Companies to, use commercially reasonable efforts to (x) provide such access as can be provided (or otherwise convey such information regarding the applicable matter as can be conveyed) without violating such privilege, doctrine, obligation or Law and (y) provide such information in a manner without violating such privilege, doctrine, obligation or Law), or (ii) if any Group Company, on the one hand, and any Sandbridge Party, any Sandbridge Non-Party Affiliate or any of their respective Representatives, on the other hand, are adverse parties in a litigation and such information is reasonably pertinent thereto; provided that the Company shall, in the case of clause (i) or (ii), provide prompt written notice of the withholding of access or information on any such basis.

**Section 5.4.    Notice of Developments**. From and after the date of this Agreement until the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Company shall promptly (and in any event prior to the Closing) notify the Sandbridge Parties in writing, and Sandbridge shall promptly (and in any event prior to the Closing) notify the Company in writing, upon any of the Group Companies or the Sandbridge Parties, as applicable, becoming aware: (i) of the occurrence or non-occurrence of any event the occurrence or non-occurrence of which has caused or may reasonably be expected to cause any condition to the obligations of any Party to effect the Merger not to be satisfied, (ii) of any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Merger, (iii) of any notice or other communication from any Governmental Entity relating to the ability of the Parties to consummate the Merger or the timing thereof, or (iv) of the commencement or initiation or threat of commencement or initiation of any Proceeding regarding the Merger. The delivery of any notice pursuant to this Section 5.4 shall not cure any breach of any representation or warranty requiring disclosure of such matter or any breach of any covenant, condition or agreement contained in this Agreement or any Ancillary Document or otherwise limit or affect the rights of, or the remedies available to, the Sandbridge Parties or the Company, as applicable.

**Section 5.5.    Public Announcements**.

(a)    Subject to Section 5.5(b), Section 5.8 (Preparation of Registration Statement / Proxy Statement) and Section 5.9 (Sandbridge Stockholder Approval), none of the Parties or any of their respective Representatives shall issue any press releases or make any public announcements with respect to this Agreement or the transactions contemplated hereby without the prior written consent of, prior to the Closing, the Company and Sandbridge or, after the Closing, Sandbridge; provided, however, that each Party may make any such announcement or other communication (i) if such announcement or other communication is required by applicable Law, in which case the disclosing Party and its Representatives shall use reasonable best efforts to consult with the Company, if the disclosing party is any Sandbridge Party, or Sandbridge, if the disclosing party is the Company, to review such announcement or communication and the opportunity to comment thereon and the disclosing Party shall consider such comments in good faith, (ii) to the extent such announcements or other communications contain only

A-49

Exhibit 7
Page 974

information previously disclosed in a public statement, press release or other communication previously approved in accordance with this Section 5.4 and (iii) to Governmental Entities in connection with any Consents required to be made under this Agreement, the Ancillary Documents or in connection with the transactions contemplated hereby or thereby.

(b)    The initial press release concerning this Agreement and the transactions contemplated hereby shall be a joint press release in the form agreed by the Company and Sandbridge prior to the execution of this Agreement and such initial press release (the "Signing Press Release") shall be released as promptly as reasonably practicable after the execution of this Agreement on the day thereof. Promptly after the execution of this Agreement, Sandbridge shall file a current report on Form 8-K (the "Signing Filing") with the Signing Press Release and a description of this Agreement as required by, and in compliance with, the Securities Laws, which the Company shall have the opportunity to review and comment upon prior to filing and Sandbridge shall consider such comments in good faith. The Company, on the one hand, and Sandbridge, on the other hand, shall mutually agree upon (such agreement not to be unreasonably withheld, conditioned or delayed by either the Company or Sandbridge, as applicable) a press release announcing the consummation of the transactions contemplated by this Agreement (the "Closing Press Release") prior to the Closing, and, on the Closing Date, the Parties shall cause the Closing Press Release to be released. Promptly after the Closing (but in any event within four (4) Business Days after the Closing), Sandbridge shall file a current report on Form 8-K (the "Closing Filing") with the Closing Press Release and disclosures required by Securities Laws. In connection with the preparation of each of the Signing Press Release, the Signing Filing, the Closing Press Release and the Closing Filing, each Party shall, upon written request by any other Party, furnish such other Party with all information concerning itself, its directors, officers and equityholders, and such other matters as may be reasonably necessary for such press release or filing.

**Section 5.6.   Tax Matters.**

(a)    Tax Treatment.

(i)    To the extent applicable, the Parties intend that the transactions shall be treated as a transaction that qualifies under Section 351 of the Code or that the Merger shall be treated as a transaction that qualifies as a "reorganization" within the meaning of Section 368 of the Code, and each Party shall, and shall cause its respective Affiliates to, use reasonable best efforts to so qualify. The Parties shall file all Tax Returns consistent with, and take no position inconsistent with (whether in audits, Tax Returns or otherwise), the treatment described in this Section 5.6(a)(i) unless required to do so pursuant to a "determination" that is final within the meaning of Section 1313(a) of the Code. Notwithstanding anything to the contrary herein, if, after the date hereof but prior to the time at which the Required Sandbridge Stockholder Approval has been obtained Sandbridge and the Company mutually determine in good faith that the transactions are not expected to qualify as a transaction under Section 351 of the Code and that the Merger is not reasonably expected to qualify as a "reorganization" within the meaning of Section 368(a) of the Code, the Parties shall use commercially reasonable efforts to restructure the transactions contemplated hereby (such restructured transactions, the "Alternative Transaction Structure") in a manner that is reasonably expected to cause the Alternative Transaction Structure to so qualify, including by adding a second merger to take place immediately after the Merger whereby the surviving company in the Merger would merge with and into a new limited liability company that is a wholly-owned Subsidiary of Sandbridge ("Newco"), with Newco being the surviving company in such merger.

(ii)    Sandbridge and the Company hereby adopt this Agreement as a "plan of reorganization" within the meaning of Treasury Regulations Sections 1.368-2(g) and 1.368-3(a). From the date hereof through the Closing, and following the Closing, the Parties shall not, and shall not permit or cause their respective Affiliates to, take any action, or knowingly fail to take any action, which action or failure to act prevents or impedes, or would reasonably be expected to prevent or impede the Merger qualifying for the Intended Tax Treatment.

(b)    Tax Matters Cooperation. Each of the Parties shall (and shall cause their respective Affiliates to) cooperate fully, as and to the extent reasonably requested by another Party, in connection with the filing of relevant Tax Returns, and any Tax Proceeding.

A-50

Exhibit 7
Page 975

(c)    Transfer Taxes. The Surviving Company shall be responsible for any sale, use, real property transfer, stamp or other similar transfer Taxes imposed in connection with the Merger or the other transactions contemplated by this Agreement.

**Section 5.7.    Exclusive Dealing**.

(a)    From the date of this Agreement until the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Company shall not, and shall cause the other Group Companies and its and their respective Representatives not to, directly or indirectly: (i) solicit, initiate, encourage (including by means of furnishing or disclosing information), facilitate, discuss or negotiate, directly or indirectly, any inquiry, proposal or offer (written or oral) with respect to a Company Acquisition Proposal; (ii) furnish or disclose any non-public information to any Person in connection with, or that could reasonably be expected to lead to, a Company Acquisition Proposal; (iii) enter into any Contract or other arrangement or understanding regarding a Company Acquisition Proposal; (iv) prepare or take any steps in connection with a public offering of any Equity Securities of any Group Company (or any Affiliate or successor of any Group Company); or (v) otherwise cooperate in any way with, or assist or participate in, or knowingly facilitate or encourage any effort or attempt by any Person to do or seek to do any of the foregoing. The Company agrees to (A) notify Sandbridge promptly upon receipt of any Company Acquisition Proposal by any Group Company, and to describe the material terms and conditions of any such Company Acquisition Proposal in reasonable detail (including the identity of the Persons making such Company Acquisition Proposal) and (B) keep Sandbridge reasonably informed on a current basis of any modifications to such offer or information.

(b)    From the date of this Agreement until the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Sandbridge Parties shall not, and each of them shall cause their Representatives not to, directly or indirectly: (i) solicit, initiate, encourage (including by means of furnishing or disclosing information), facilitate, discuss or negotiate, directly or indirectly, any inquiry, proposal or offer (written or oral) with respect to a Sandbridge Acquisition Proposal; (ii) furnish or disclose any non-public information to any Person in connection with, or that could reasonably be expected to lead to, a Sandbridge Acquisition Proposal; (iii) enter into any Contract or other arrangement or understanding regarding a Sandbridge Acquisition Proposal; (iv) prepare or take any steps in connection with an offering of any securities of any Sandbridge Party (or any Affiliate or successor of any Sandbridge Party); or (v) otherwise cooperate in any way with, or assist or participate in, or knowingly facilitate or encourage any effort or attempt by any Person to do or seek to do any of the foregoing. Sandbridge agrees to (A) notify the Company promptly upon receipt of any Sandbridge Acquisition Proposal by any Sandbridge Party, and to describe the material terms and conditions of any such Sandbridge Acquisition Proposal in reasonable detail (including the identity of any person or entity making such Sandbridge Acquisition Proposal) and (B) keep the Company reasonably informed on a current basis of any modifications to such offer or information.

**Section 5.8.    Preparation of Registration Statement / Proxy Statement**. As promptly as reasonably practicable following the date of this Agreement, Sandbridge and the Company shall prepare and mutually agree upon (such agreement not to be unreasonably withheld, conditioned or delayed by either Sandbridge or the Company, as applicable), and Sandbridge shall file with the SEC, the Registration Statement / Proxy Statement (it being understood that the Registration Statement / Proxy Statement shall include a prospectus of Sandbridge which will be included therein as a prospectus and which will be used for the Sandbridge Stockholders Meeting to adopt and approve the Transaction Proposals and other matters reasonably related to the Transaction Proposals, all in accordance with and as required by Sandbridge's Governing Documents, applicable Law, and any applicable rules and regulations of the SEC and the NYSE). Each of Sandbridge and the Company shall use its reasonable best efforts to (a) cause the Registration Statement / Proxy Statement to comply in all material respects with the applicable rules and regulations promulgated by the SEC (including, with respect to the Group Companies, the provision of financial statements of, and any other information with respect to, the Group Companies for all periods, and in the form, required to be included in the Registration Statement / Proxy Statement under Securities Laws (after giving effect to any waivers received) or in response to any comments from the SEC); (b) promptly notify the others of, reasonably cooperate with each other with respect to and respond promptly to any comments of the SEC or its staff; (c) have the Registration Statement / Proxy Statement declared effective under the Securities Act as promptly as reasonably practicable after it is filed with the SEC; and (d) keep the Registration Statement / Proxy Statement effective through the Closing in order to permit the

A-51

Exhibit 7
Page 976

consummation of the transactions contemplated by this Agreement. Prior to the effective date of the Registration Statement / Proxy Statement, Sandbridge shall take any and all actions required under any applicable federal or state securities laws in connection with the issuance of shares of Sandbridge Common Stock, in each case to be issued or issuable to the Company Stockholders pursuant to this Agreement, and as promptly as practicable after finalization of the Registration Statement / Proxy Statement, each of the Company and Sandbridge shall mail the Registration Statement / Proxy Statement to their respective stockholders. Sandbridge, on the one hand, and the Company, on the other hand, shall promptly furnish, or cause to be furnished, to the other all information concerning such Party, its Non-Party Affiliates and their respective Representatives that may be required or reasonably requested in connection with any action contemplated by this Section 5.8 or for including in any other statement, filing, notice or application made by or on behalf of Sandbridge to the SEC or the NYSE in connection with the transactions contemplated by this Agreement or the Ancillary Documents, including, delivering customary tax representation letters to counsel to enable such counsel to deliver any tax opinions requested or required by the SEC to be submitted in connection therewith. If any Party becomes aware of any information that should be disclosed in an amendment or supplement to the Registration Statement / Proxy Statement, then (i) such Party shall promptly inform, in the case of any Sandbridge Party, the Company, or, in the case of the Company, Sandbridge, thereof; (ii) such Party shall prepare and mutually agree upon with, in the case of Sandbridge, the Company, or, in the case of the Company, Sandbridge (in either case, such agreement not to be unreasonably withheld, conditioned or delayed), an amendment or supplement to the Registration Statement / Proxy Statement; (iii) Sandbridge shall file such mutually agreed upon amendment or supplement with the SEC; and (iv) the Parties shall reasonably cooperate, if appropriate, in mailing such amendment or supplement to the Pre-Closing Sandbridge Holders. No filing of, or amendment or supplement to the Registration Statement / Proxy Statement will be made by Sandbridge without providing the Company a reasonable opportunity to review and comment on the Registration Statement / Proxy Statement and any amendment or supplement thereto. Sandbridge shall consider in good faith the comments of the Company in respect of such filing, amendment or supplement, and shall cooperate in good faith with the Company with respect to the incorporation of such comments. Sandbridge shall as promptly as reasonably practicable advise the Company of the time of effectiveness of the Registration Statement / Proxy Statement or the time at which any supplement or amendment has been filed, the issuance of any stop order relating thereto or the suspension of the qualification of shares of Sandbridge Common Stock for offering or sale in any jurisdiction (and Sandbridge and the Company shall each use its reasonable best efforts to have any such stop order or suspension lifted, reversed or otherwise terminated), or of any request by the SEC for amendment of the Registration Statement / Proxy Statement or comments thereon and responses thereto or requests from the SEC for additional information. Each of the Parties shall ensure that none of the information related to it or any of its Non-Party Affiliates or its or their respective Representatives supplied by or on his, her or its behalf for inclusion or incorporation by reference in the Registration Statement / Proxy Statement will, at the time the Registration Statement / Proxy Statement is initially filed with the SEC, at any time at which it is amended, or at the time it becomes effective under the Securities Act contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading. Sandbridge shall consult with the Company in good faith in connection with any response to comments of the SEC or its staff with respect to the Registration Statement / Proxy Statement and any amendment to the Registration Statement / Proxy Statement filed in response thereto, shall consider in good faith the comments of the Company in respect thereof and shall cooperate in good faith with the Company with respect to the incorporation of any such comments.

    Section 5.9.    **Sandbridge Stockholder Approval**. As promptly as reasonably practicable following the time at which the Registration Statement / Proxy Statement is declared effective under the Securities Act, Sandbridge shall (a) duly give notice of and (b) use reasonable best efforts to duly convene and hold a meeting of its stockholders (the "Sandbridge Stockholders Meeting") in accordance with the Governing Documents of Sandbridge, for the purposes of obtaining the Sandbridge Stockholder Approval and, if applicable, any approvals related thereto and providing its shareholders with the opportunity to elect to effect a Sandbridge Stockholder Redemption. Sandbridge shall, through unanimous approval of its board of directors, recommend to its stockholders (the "Sandbridge Board Recommendation"), (i) the adoption and approval of this Agreement and the transactions contemplated hereby (including the Merger) (the "Business Combination Proposal"); (ii) the adoption and approval of the issuance of the Sandbridge Common Stock in connection with the transactions contemplated by this Agreement as required by the NYSE listing requirements (the "Stock Issuance Proposal"); (iii) the adoption and approval of the amendments to the Governing Documents of Sandbridge contemplated by

A-52

Exhibit 7
Page 977

the Owlet Pubco Certificate of Incorporation and the Owlet Pubco Bylaws (the "Governing Document Proposals"); (iv) the adoption and approval of the Owlet Pubco Incentive Equity Plan (the "Equity Incentive Plan Proposal"); (v) the adoption and approval of the Owlet Pubco Employee Stock Purchase Plan; (vi) the adoption and approval of any other proposals as the SEC (or staff member thereof) may indicate are necessary in its comments to the Registration Statement / Proxy Statement or correspondence related thereto, (vii) the adoption and approval of any other proposal the parties reasonably deem necessary to effectuate the transactions contemplated by this Agreement, and (viii) adjournment of the Sandbridge Stockholders Meeting, if necessary, to permit further solicitation of proxies because there are not sufficient votes to approve and adopt any of the foregoing (such proposals in clauses (i) through (viii) together, the "Transaction Proposals"); provided, that Sandbridge may adjourn the Sandbridge Stockholders Meeting, but only to (w) to solicit additional proxies for the purpose of obtaining the Sandbridge Stockholder Approval, (x) for the absence of a quorum, (y) to allow reasonable additional time for the filing or mailing of any supplemental or amended disclosure that Sandbridge has determined in good faith after consultation with outside legal counsel is required under applicable Law and for such supplemental or amended disclosure to be disseminated and reviewed by the Pre-Closing Sandbridge Holders prior to the Sandbridge Stockholders Meeting, (z) to solicit additional proxies for the purpose of obtaining the Sandbridge Stockholder Approval in the event that the holders of Sandbridge Class A Common Stock have elected to redeem a number of shares of Sandbridge Class A Common Stock as of such time that would reasonably be expected to result in the condition set forth in Section 6.3(c) not being satisfied or (aa) upon receipt of a Company Adjournment Request; provided, further, that the Sandbridge Stockholders Meeting shall not be adjourned to a date that is more than fifteen (15) days after the date for which the Sandbridge Stockholders Meeting was originally scheduled (in addition to any adjournments required by applicable law) and shall not be held later than three (3) Business Days prior to the Termination Date. By written notice, the Company may request that Sandbridge adjourn the Sandbridge Stockholders Meeting ("Company Adjournment Request") until the earlier of (A) 15 days after the date for which the Sandbridge Stockholders Meeting was then scheduled or (B) the date that is the third Business Day prior to the Termination Date, if the Company believes in good faith that such adjournment is necessary in order to solicit additional proxies for the purpose of obtaining the Sandbridge Stockholder Approval or for the absence of a quorum of the Sandbridge stockholders. Upon receipt of the Company Adjournment Request, Sandbridge shall adjourn the Sandbridge Stockholders Meeting for the period of time specified in the Company Adjournment Request; provided, that the Company may not issue more than on Company Adjournment Request. The board of directors of Sandbridge shall not withdraw, amend, qualify or modify the Sandbridge Board Recommendation. To the fullest extent permitted by applicable Law, (i) Sandbridge agrees to establish a record date for, duly call, give notice to, convene and hold the Sandbridge Stockholders Meeting, and (ii) Sandbridge agrees that if the Sandbridge Stockholder Approval shall not have been obtained at any such Sandbridge Stockholders Meeting, then Sandbridge shall promptly continue to take all necessary actions, including actions required by this Section 5.9, and hold additional Sandbridge Stockholders Meetings in order to obtain the Sandbridge Stockholders Approval.

Section 5.10.    **Merger Sub Shareholder Approval**. As promptly as reasonably practicable (and in any event within one Business Day) following the date of this Agreement, Sandbridge, as the sole stockholder of Merger Sub, will approve and adopt this Agreement, the Ancillary Documents to which Merger Sub is or will be a party and the transactions contemplated hereby and thereby (including the Merger).

Section 5.11.    **Insider Letter**. Sandbridge shall not waive the obligations of any Person under Section 2 of the Sandbridge Insider Letter to vote Sandbridge Common Stock held by them in favor of the Merger.

Section 5.12.    **Conduct of Business of Sandbridge**.

(a)    From and after the date of this Agreement until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sandbridge shall, and shall cause its Subsidiaries (including Merger Sub) to, except as expressly contemplated by this Agreement (including as contemplated by the PIPE Investment) or any Ancillary Document, as required by applicable Law, as set forth on Section 5.12(a) of the Sandbridge Disclosure Schedules, or as consented to in writing by the Company (it being agreed that any request for a consent shall not be unreasonably withheld, conditioned or delayed), use commercially reasonable efforts to operate the business of Sandbridge and its Subsidiaries (including Merger Sub) in the ordinary course consistent with past practice.

(b)    Without limiting the generality of the foregoing, from and after the date of this Agreement until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sandbridge

A-53

Exhibit 7
Page 978

shall not, and shall cause its Subsidiaries (including Merger Sub) not to, as applicable, except as expressly contemplated by this Agreement or any Ancillary Document (including, for the avoidance of doubt in connection with the PIPE Investment), as required by applicable Law, as set forth on Section 5.12(b) of the Sandbridge Disclosure Schedules or as consented to in writing by the Company, not to be unreasonably withheld, do any of the following:

(i)     adopt any amendments, supplements, restatements or modifications to the Trust Agreement, Warrant Agreement or the Governing Documents of any Sandbridge Party or any of its Subsidiaries;

(ii)    declare, set aside, make or pay a dividend on, or make any other distribution or payment in respect of, any Equity Securities of Sandbridge or any of its Subsidiaries, or repurchase, redeem (other than in connection with any Sandbridge Stockholder Redemptions) or otherwise acquire, or offer to repurchase, redeem or otherwise acquire, any outstanding Equity Securities of Sandbridge or any of its Subsidiaries, as applicable;

(iii)   split, combine or reclassify any of its capital stock or other Equity Securities or issue any other security in respect of, in lieu of or in substitution for shares of its capital stock;

(iv)    incur, create or assume any Indebtedness;

(v)     make any loans or advances to, or capital contributions in, any other Person, other than to, or in, Sandbridge or any of its Subsidiaries;

(vi)    issue any Equity Securities of Sandbridge or any of its Subsidiaries or grant any additional options, warrants or stock appreciation rights with respect to Equity Securities of the foregoing of Sandbridge or any of its Subsidiaries;

(vii)   enter into, modify or revise any Sandbridge Related Party Transaction (or any Contract or agreement that if entered into prior to the execution and delivery of this Agreement would be a Sandbridge Related Party Transaction);

(viii)  engage in any activities or business, other than activities or business (i) in connection with or incident or related to such Person's organization, incorporation or formation, as applicable, or continuing corporate (or similar) existence, (ii) contemplated by, or incident or related to, this Agreement, any Ancillary Document, the performance of covenants or agreements hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby or (iii) those that are administrative or ministerial, in each case, which are immaterial in nature;

(ix)    make, change or revoke any material election concerning Taxes, enter into any material Tax closing agreement, settle any material Tax claim or assessment, or consent to any extension or waiver of the limitation period applicable to or relating to any material Tax claim or assessment, other than any such extension or waiver that is obtained in the ordinary course of business;

(x)     authorize, recommend, propose or announce an intention to adopt a plan of complete or partial liquidation or dissolution;

(xi)    enter into any Contract with any broker, finder, investment banker or other Person under which such Person is or will be entitled to any brokerage fee, finders' fee or other commission in connection with the transactions contemplated by this Agreement; or

(xii)   enter into any Contract to take, or cause to be taken, any of the actions set forth in this Section 5.12.

Notwithstanding anything in this Section 5.12 or this Agreement to the contrary, nothing set forth in this Agreement shall prohibit any Sandbridge Party from using, or otherwise restrict the ability of any Sandbridge Party to use, the funds held by Sandbridge outside the Trust Account to pay its fees and expenses and other Liabilities, or from otherwise distributing or paying over any funds held by Sandbridge outside the Trust Account to the Sponsor or any of its Affiliates, in each case, prior to the Closing.

Section 5.13.    NYSE Listing. Sandbridge shall use its reasonable best efforts to cause Sandbridge to satisfy all applicable continuing listing requirements of the NYSE.

A-54

Exhibit 7
Page 979

**Section 5.14.    Trust Account**.

(a)    If the amount of cash available in the Trust Account following the Sandbridge Stockholders Meeting, after deducting (x) the amounts payable, if any, to the Public Stockholders pursuant to the Sandbridge Stockholder Redemption, (y) any deferred underwriting commissions being held in the Trust Account, and (z) any Sandbridge Transaction Expenses, (the resulting amount, the "Available Sandbridge Cash"), is equal to or greater than $140,000,000 (the "Minimum Available Sandbridge Cash Amount"), then the condition set forth in Section 6.3(c) shall be satisfied.

(b)    Upon satisfaction or, to the extent permitted by applicable Law, waiver of the conditions set forth in Article 6 and provision of notice thereof to the Trustee, at the Closing, Sandbridge shall (i) cause the documents, certificates and notices required to be delivered to the Trustee pursuant to the Trust Agreement to be so delivered, and (ii) make all appropriate arrangements to cause the Trustee to (A) pay as and when due all amounts, if any, payable to the Public Stockholders pursuant to the Sandbridge Stockholder Redemption, (B) pay the amounts due to the underwriters of Sandbridge's initial public offering for their deferred underwriting commissions as set forth in the Trust Agreement and (C) immediately thereafter, pay all remaining amounts then available in the Trust Account to Sandbridge in accordance with the Trust Agreement.

**Section 5.15.    Company Stockholder Approval**. Upon the terms set forth in this Agreement, the Company shall use its reasonable best efforts to obtain promptly after the execution of this Agreement, and in any event no later than 5:00pm Eastern Time on the day next succeeding the date of this Agreement, an irrevocable written consent from the Requisite Company Stockholders, pursuant to which such Requisite Company Stockholders will approve and adopt the matters required for the Company Stockholder Approval (the "Written Consent"). The Written Consent shall be irrevocable with respect to all shares of Company Stock owned beneficially or of record by the Requisite Company Stockholders or as to which such Requisite Company Stockholders have, directly or indirectly, the right to vote or direct the voting thereof.

**Section 5.16.    PIPE Subscriptions**. Unless otherwise approved in writing by the Company, Sandbridge shall not permit any amendment or modification to be made to, any waiver (in whole or in part) of, or provide consent to modify (including consent to termination) any provision or remedy under, or any replacements of, any of the Subscription Agreements; provided, that any modification or waiver that is solely ministerial in nature or otherwise immaterial shall not require the prior written consent of the Company. Subject to the immediately preceding sentence, Sandbridge shall take, or cause to be taken, all actions required, necessary or that it otherwise deems proper or advisable to consummate the transactions contemplated by the Subscription Agreements in all material respects on the terms described therein, including to enforce its rights under the Subscription Agreements to cause the PIPE Investors to pay to (or as directed by) Sandbridge the applicable purchase price under each PIPE Investor's applicable Subscription Agreement in accordance with its terms. In the event that any PIPE Investor terminates, attempts to terminate or provides written notice to Sandbridge of its intent to terminate such PIPE Investor's obligations under its Subscription Agreement, then, notwithstanding the restrictions on replacements in the foregoing, Sandbridge shall be entitled to arrange for the purchase by third Persons of the subject shares of Sandbridge Class A Common Stock in connection with the transactions contemplated by this Agreement on the same terms and conditions as the other PIPE Investors have agreed pursuant to their respective Subscription Agreements; provided that such third Persons shall be reasonably acceptable to the Company as confirmed in writing by the Company prior to Sandbridge's entry into a Subscription Agreement with such third Persons.

**Section 5.17.    Sandbridge Indemnification; Directors' and Officers' Insurance**.

(a)    Each Party agrees that (i) all rights to indemnification or exculpation now existing in favor of the directors and officers of each Sandbridge Party, as provided in the applicable Sandbridge Party's Governing Documents or otherwise in effect as of immediately prior to the Effective Time, in either case, solely with respect to any matters occurring on or prior to the Effective Time shall survive the transactions contemplated by this Agreement and shall continue in full force and effect from and after the Effective Time for a period of six (6) years and (ii) Sandbridge will perform and discharge, or cause to be performed and discharged, all obligations to provide such indemnity and exculpation during such six (6)-year period. To the maximum extent permitted by applicable Law, during such six (6)-year period, Sandbridge shall advance, or caused to be advanced, expenses in connection with such indemnification as provided in the applicable

A-55

Exhibit 7
Page 980

Sandbridge Party's Governing Documents or other applicable agreements as in effect immediately prior to the Effective Time. The indemnification and liability limitation or exculpation provisions of the Sandbridge Parties' Governing Documents shall not, during such six (6)-year period, be amended, repealed or otherwise modified after the Effective Time in any manner that would materially and adversely affect the rights thereunder of individuals who, as of immediately prior to the Effective Time, or at any time prior to such time, were directors or officers of any Sandbridge Party (the "Sandbridge D&O Persons") entitled to be so indemnified, have their liability limited or be exculpated with respect to any matters occurring on or prior to the Effective Time and relating to the fact that such Sandbridge D&O Person was a director or officer of any Sandbridge Party immediately prior to the Effective Time, unless such amendment, repeal or other modification is required by applicable Law.

(b)    Sandbridge shall not have any obligation under this Section 5.17 to any Sandbridge D&O Person when and if a court of competent jurisdiction shall ultimately determine (and such determination shall have become final and non-appealable) that the indemnification of such Sandbridge D&O Person in the manner contemplated hereby is prohibited by applicable Law.

(c)    For a period of six (6) years after the Effective Time, Sandbridge shall maintain, without any lapses in coverage, directors' and officers' liability insurance for the benefit of those Persons who are currently covered by any comparable insurance policies of the Sandbridge Parties as of the date of this Agreement with respect to matters occurring on or prior to the Effective Time. Such insurance policies shall provide coverage on terms (with respect to coverage and amount) that are substantially the same as (and no less favorable in the aggregate to the insured than) the coverage provided under Sandbridge's directors' and officers' liability insurance policies as of the date of this Agreement; provided that Sandbridge shall not be obligated to pay annual premiums in excess of three hundred percent (300%) of the most recent annual premium paid by Sandbridge prior to the date of this Agreement and, in such event, Sandbridge shall purchase the maximum coverage available for three hundred percent (300%) of the most recent annual premium paid by Sandbridge prior to the date of this Agreement.

(d)    If Sandbridge or any of its successors or assigns (i) shall merge or consolidate with or merge into any other corporation or entity and shall not be the surviving or continuing corporation or entity of such consolidation or merger or (ii) shall transfer all or substantially all of their respective properties and assets as an entity in one or a series of related transactions to any Person, then in each such case, proper provisions shall be made so that the successors or assigns of Sandbridge shall assume all of the obligations set forth in this Section 5.17.

(e)    The Sandbridge D&O Persons entitled to the indemnification, liability limitation, exculpation and insurance set forth in this Section 5.17 are intended to be third-party beneficiaries of this Section 5.17. This Section 5.17 shall survive the consummation of the transactions contemplated by this Agreement and shall be binding on all successors and assigns of Sandbridge.

**Section 5.18.    Company Indemnification; Directors' and Officers' Insurance**.

(a)    Each Party agrees that (i) all rights to indemnification or exculpation now existing in favor of the directors and officers of the Group Companies, as provided in the Group Companies' Governing Documents or otherwise in effect as of immediately prior to the Effective Time, in either case, solely with respect to any matters occurring on or prior to the Effective Time, shall survive the transactions contemplated by this Agreement and shall continue in full force and effect from and after the Effective Time for a period of six (6) years and (ii) Sandbridge will cause the applicable Group Companies to perform and discharge all obligations to provide such indemnity and exculpation during such six (6)-year period. To the maximum extent permitted by applicable Law, during such six (6)-year period, Sandbridge shall cause the applicable Group Companies to advance expenses in connection with such indemnification as provided in the Group Companies' Governing Documents or other applicable agreements in effect as of immediately prior to the Effective Time. The indemnification and liability limitation or exculpation provisions of the Group Companies' Governing Documents shall not, during such six (6)-year period, be amended, repealed or otherwise modified after the Effective Time in any manner that would materially and adversely affect the rights thereunder of individuals who, as of the Effective Time or at any time prior to the Effective Time, were directors or officers of the Group Companies (the "Company D&O Persons") entitled to be so

A-56

Exhibit 7
Page 981

indemnified, have their liability limited or be exculpated with respect to any matters occurring prior to Closing and relating to the fact that such Company D&O Person was a director or officer of any Group Company prior to the Effective Time, unless such amendment, repeal or other modification is required by applicable Law.

(b)    None of Sandbridge or the Group Companies shall have any obligation under this Section 5.17(e) to any Company D&O Person when and if a court of competent jurisdiction shall ultimately determine (and such determination shall have become final and non-appealable) that the indemnification of such Company D&O Person in the manner contemplated hereby is prohibited by applicable Law.

(c)    The Company shall purchase, at or prior to the Closing, and Sandbridge shall maintain, or cause to be maintained, in effect for a period of six (6) years after the Effective Time, without lapses in coverage, a "tail" policy providing directors' and officers' liability insurance coverage for the benefit of those Persons who are currently covered by any comparable insurance policies of the Group Companies as of the date of this Agreement with respect to matters occurring on or prior to the Effective Time (the "Company D&O Tail Policy"). Such "tail" policy shall provide coverage on terms (with respect to coverage and amount) that are substantially the same as (and no less favorable in the aggregate to the insured than) the coverage provided under the Group Companies' directors' and officers' liability insurance policies as of the date of this Agreement; provided that none of the Company, Sandbridge or any of their respective Affiliates shall pay a premium for such "tail" policy in excess of three hundred percent (300%) of the most recent annual premium paid by the Group Companies prior to the date of this Agreement and, in such event, the Company, Sandbridge or one of their respective Affiliates shall purchase the maximum coverage available for three hundred percent (300%) of the most recent annual premium paid by the Group Companies prior to the date of this Agreement.

(d)    If Sandbridge or any of its successors or assigns (i) shall merge or consolidate with or merge into any other corporation or entity and shall not be the surviving or continuing corporation or entity of such consolidation or merger or (ii) shall transfer all or substantially all of their respective properties and assets as an entity in one or a series of related transactions to any Person, then in each such case, proper provisions shall be made so that the successors or assigns of Sandbridge shall assume all of the obligations set forth in this Section 5.17(e).

(e)    The Company D&O Persons entitled to the indemnification, liability limitation, exculpation and insurance set forth in this Section 5.17(e) are intended to be third-party beneficiaries of this Section 5.17(e). This Section 5.17(e) shall survive the consummation of the transactions contemplated by this Agreement and shall be binding on all successors and assigns of Sandbridge.

**Section 5.19.    Post-Closing Directors and Officers.**

(a)    Sandbridge shall take all such action within its power as may be necessary or appropriate such that effective immediately after the Effective Time the Sandbridge Board shall initially consist of up to nine (9) directors.

(b)    Sandbridge shall designate the two (2) individuals identified on Section 5.19(b) of the Sandbridge Disclosure Schedules to serve as directors on the Sandbridge Board, in the classes indicated, effective as of the Effective Time, at least one of whom shall be an "independent" director for purposes of NYSE.

(c)    The Company shall designate up to seven (7) individuals identified on Section 5.19(c) of the Company Disclosure Schedules to serve as directors on the Sandbridge Board, in the classes indicated, effective as of the Effective Time.

(d)    Effective as of the Effective Time, the individuals identified on Section 5.19(d) of the Company Disclosure Schedules shall serve on the committee(s) of the Sandbridge Board as set forth opposite his or her name.

(e)    Effective as of the Effective Time, the individuals identified on Section 5.19(e) of the Company Disclosure Schedules shall be the officers of Sandbridge, with each such individual holding the title set forth opposite his or her name.

A-57

Exhibit 7
Page 982

**Section 5.20.    PCAOB Financials**.

(a)    As promptly as reasonably practicable, and in any event not later than the later of (1) March 31, 2021 and (2) 45 days after the end of the applicable fiscal period, the Company shall deliver to Sandbridge (i) the audited consolidated balance sheets of the Group Companies as of December 31, 2020 and the related audited consolidated statements of operations and comprehensive loss, convertible preferred stock and stockholders' deficit and cash flows of the Group Companies for the period then ended, and (ii) any other audited or unaudited consolidated balance sheets and the related audited or unaudited consolidated statements of operations and comprehensive loss, convertible preferred stock and stockholders' deficit and cash flows of the Group Companies as of and for a year-to-date period ended as of the end of any other different fiscal quarter (and as of and for the same period from the previous fiscal year) or fiscal year (and as of and for the prior fiscal quarter), as applicable, that is required to be included in the Registration Statement / Proxy Statement ((i) and (ii) together, the "Additional Required Financial Statements") provided, that upon delivery of such Additional Required Financial Statements, such financial statements shall (x) be deemed "Financial Statements" for the purposes of the representation and warranties set forth in Section 3.4 and (y) in the case of audited Additional Required Financial Statements, be deemed to be incorporated in clause (i) of Section 3.4(a), in the case of each of clause (x) and (y), with the same force and effect as if made as of the date of this Agreement. The Additional Required Financial Statements, together with any audited or unaudited consolidated balance sheet and the related audited or unaudited consolidated statements of operations and comprehensive loss, convertible preferred stock and stockholders' deficit and cash flows of the Group Companies as of and for a year-to-date period ended as of the end of a different fiscal quarter (and as of and for the same period from the previous fiscal year) or fiscal year (and as of and for the prior fiscal quarter) that are required to be included in the Registration Statement / Proxy Statement (A) will fairly present in all material respects the financial position of the Group Companies as at the date thereof, and the results of its operations, stockholders' equity and cash flows for the respective periods then ended, (B) will be prepared in conformity with GAAP applied on a consistent basis during the periods involved, (C) in the case of any audited financial statements, will be audited in accordance with the standards of the PCAOB and contain an unqualified report of the Company's auditor and (D) will comply in all material respects with the applicable accounting requirements and with the Federal Securities Laws.

(b)    The Company and Sandbridge shall work in good faith with one another and use their reasonable best efforts (i) to assist, upon advance written notice, during normal business hours and in a manner such as to not unreasonably interfere with the normal operation of any party, such other party in causing to be prepared in a timely manner all other financial information or statements (including customary pro forma financial statements) and related disclosure (including Management's Discussion & Analysis disclosures) that are required to be included in the Registration Statement / Proxy Statement and any other filings to be made by Sandbridge and/or the Company with the SEC in connection with the transactions contemplated by this Agreement or any Ancillary Document and (ii) to obtain the consents of their respective auditors with respect thereto as may be required by applicable Law or requested by the SEC.

**Section 5.21.    Owlet Pubco Incentive Equity Plan; Owlet Pubco Employee Stock Purchase Plan**. Prior to the filing with the SEC of the definitive Registration Statement / Proxy Statement, the Sandbridge Board shall approve and adopt an equity incentive plan, in substantially the form attached hereto as Exhibit C, and with any changes or modifications thereto as the Company and Sandbridge may mutually agree (the "Owlet Pubco Incentive Equity Plan"), in the manner prescribed under applicable Laws, effective as of one day prior to the Closing Date. Prior to the filing with the SEC of the definitive Registration Statement / Proxy Statement, the Sandbridge Board shall approve and adopt an employee stock purchase plan, in substantially the form attached hereto as Exhibit D, with any changes or modifications thereto as the Company and Sandbridge may mutually agree (the "Owlet Pubco Employee Stock Purchase Plan"), in the manner prescribed under Section 423 of the Code and other applicable Laws, effective as of one day prior to the Closing Date.

**Section 5.22.    FIRPTA Certificates**. At or prior to the Closing, the Company shall deliver, or cause to be delivered, to Sandbridge a certificate, duly executed by the Company, complying with Treasury Regulations Section 1.1445-2(c)(3), together with evidence that the Company has provided notice to the Internal Revenue Service in accordance with the provisions of Treasury Regulations Section 1.897-2(h)(2), in each case, in a form and substance reasonably acceptable to Sandbridge.

A-58

Exhibit 7
Page 983

**ARTICLE 6**
**CONDITIONS TO CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT**

**Section 6.1.    Conditions to the Obligations of the Parties**. The obligations of the Parties to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, if permitted by applicable Law, waiver by the Party for whose benefit such condition exists of the following conditions:

(a)    the applicable waiting period under the HSR Act relating to the transactions contemplated by this Agreement shall have expired or been terminated;

(b)    no Order or Law issued by any court of competent jurisdiction or other Governmental Entity or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement shall be in effect;

(c)    the Company Stockholder Approval shall have been obtained;

(d)    the Required Sandbridge Stockholder Approval shall have been obtained;

(e)    immediately following the Effective Time, Sandbridge shall satisfy any applicable continuing listing requirements of the NYSE, and Sandbridge shall not have received any notice of non-compliance therewith that has not been cured or would not be cured at or immediately following the Effective Time;

(f)    The Registration Statement / Proxy Statement shall have become effective under the Securities Act and no stop order suspending the effectiveness of the Registration Statement / Proxy Statement shall have been issued and no proceeding for such purpose shall have been initiated or threatened by the SEC and not withdrawn; and

(g)    after giving effect to the transactions contemplated hereby (including the PIPE Investment), Sandbridge shall have at least $5,000,001 of net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) immediately after the Effective Time.

**Section 6.2.    Other Conditions to the Obligations of the Sandbridge Parties**. The obligations of the Sandbridge Parties to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, if permitted by applicable Law, waiver by Sandbridge (on behalf of itself and the other Sandbridge Parties) of the following further conditions:

(a)    (i) the Company Fundamental Representations shall be true and correct in all material respects (without giving effect to any limitation as to "materiality" or "Company Material Adverse Effect" or any similar limitation set forth herein) as of the Closing Date, as though made on and as of the Closing Date (except to the extent that any such representation and warranty is made as of an earlier date, in which case such representation and warranty shall be true and correct in all material respects as of such earlier date), and (ii) the representations and warranties of the of the Company set forth in Article 3 (other than the Company Fundamental Representations) shall be true and correct (without giving effect to any limitation as to "materiality" or "Company Material Adverse Effect" or any similar limitation set forth herein) in all respects as of the Closing Date, as though made on and as of the Closing Date (except to the extent that any such representation and warranty is made as of an earlier date, in which case such representation and warranty shall be true and correct in all respects as of such earlier date), except where the failure of such representations and warranties to be true and correct, taken as a whole, does not cause a Company Material Adverse Effect;

(b)    the Company shall have performed and complied in all material respects with the covenants and agreements required to be performed or complied with by the Company under this Agreement at or prior to the Closing;

(c)    since the date of this Agreement, no Company Material Adverse Effect has occurred that is continuing; and

A-59

Exhibit 7
Page 984

(d)    at or prior to the Closing, the Company shall have delivered, or caused to be delivered, to Sandbridge the following documents:

(i)    a certificate duly executed by an authorized officer of the Company, dated as of the Closing Date, to the effect that the conditions specified in Section 6.2(a), Section 6.2(b) and Section 6.2(c) are satisfied, in a form and substance reasonably satisfactory to Sandbridge;

(ii)    the Registration Rights Agreement, duly executed by the Company Stockholders party thereto; and

(iii)    the Stockholders Agreement, duly executed by the Company Stockholders party thereto.

**Section 6.3.    Other Conditions to the Obligations of the Company**. The obligations of the Company to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, if permitted by applicable Law, waiver by the Company of the following further conditions:

(a)    (i) the Sandbridge Fundamental Representations and the representations and warranties of the Sandbridge Parties set forth in Section 4.17(j) shall be true and correct in all material respects as of the Closing Date, as though made on and as of the Closing Date (except to the extent that any such representation and warranty is made as of an earlier date, in which case such representation and warranty shall be true and correct in all material respects as of such earlier date), and (ii) the representations and warranties of the Sandbridge Parties (other than the Sandbridge Fundamental Representations and the representations and warranties of the Sandbridge Parties set forth in Section 4.17(j)) contained in Article 4 of this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Sandbridge Material Adverse Effect" or any similar limitation set forth herein) in all respects as of the Closing Date, as though made on and as of the Closing Date (except to the extent that any such representation and warranty is made as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of such representations and warranties to be true and correct, taken as a whole, does not cause a Sandbridge Material Adverse Effect;

(b)    the Sandbridge Parties shall have performed and complied in all material respects with the covenants and agreements required to be performed or complied with by them under this Agreement at or prior to the Closing;

(c)    the Available Sandbridge Cash shall be equal to or greater than the Minimum Available Sandbridge Cash Amount; and

(d)    at or prior to the Closing, Sandbridge shall have delivered, or caused to be delivered, the following documents to the Company:

(i)    a certificate duly executed by an authorized officer of Sandbridge, dated as of the Closing Date, to the effect that the conditions specified in Section 6.3(a) and Section 6.3(b) are satisfied, in a form and substance reasonably satisfactory to the Company;

(ii)    the Registration Rights Agreement, duly executed by the authorized representatives of Sandbridge and the Sponsor; and

(iii)    the Stockholders Agreement, duly executed by the authorized representatives of Sandbridge.

**Section 6.4.    Frustration of Closing Conditions**. Neither the Company nor any Sandbridge Party may rely on the failure of any condition set forth in Article 6 to be satisfied, as applicable, if such failure was caused by such party's failure to perform any of its material obligations under this Agreement.

**ARTICLE 7**
**TERMINATION**

**Section 7.1.    Termination**. This Agreement may be terminated and the transactions contemplated by this Agreement may be abandoned at any time prior to the Closing:

(a)    by mutual written consent of Sandbridge and the Company;

(b)    by Sandbridge, upon written notice to the Company, if any of the representations or warranties set forth in Article 3 would not then be true and correct or if the Company has failed to perform any covenant or agreement on the part of the Company set forth in this Agreement (including an obligation to

A-60

Exhibit 7
Page 985

consummate the Closing) such that the condition to Closing set forth in either Section 6.2(a) or Section 6.2(b) would not then be satisfied and the inaccuracy causing such representations or warranties not to be true and correct, or the failures to perform any covenant or agreement, as applicable, is (or are) not cured or cannot be cured within the earlier of (i) thirty (30) days after written notice thereof is delivered to the Company by Sandbridge, and (ii) the Termination Date; provided, however, that none of the Sandbridge Parties is then in breach of this Agreement so as to prevent the condition to Closing set forth in either Section 6.3(a) or Section 6.3(b) from being satisfied;

(c)    by the Company, upon written notice to Sandbridge, if any of the representations or warranties set forth in Article 4 would not then be true and correct or if any Sandbridge Party has failed to perform any covenant or agreement on the part of such applicable Sandbridge Party set forth in this Agreement (including an obligation to consummate the Closing) such that the condition to Closing set forth in either Section 6.3(a) or Section 6.3(b) would not then be satisfied and the inaccuracy causing such representations or warranties not to be true and correct, or the failures to perform any covenant or agreement, as applicable, is (or are) not cured or cannot be cured within the earlier of (i) thirty (30) days after written notice thereof is delivered to Sandbridge by the Company and (ii) the Termination Date; provided, however, the Company is not then in breach of this Agreement so as to prevent the condition to Closing set forth in Section 6.2(a) or Section 6.2(b) from being satisfied;

(d)    by either Sandbridge or the Company, if the transactions contemplated by this Agreement shall not have been consummated on or prior to July 31, 2021 (the "Termination Date"); provided, that (i) the right to terminate this Agreement pursuant to this Section 7.1(d) shall not be available to Sandbridge if any Sandbridge Party's breach of any of its covenants or obligations under this Agreement shall have proximately caused the failure to consummate the transactions contemplated by this Agreement on or before the Termination Date, and (ii) the right to terminate this Agreement pursuant to this Section 7.1(d) shall not be available to the Company if the Company's breach of its covenants or obligations under this Agreement shall have proximately caused the failure to consummate the transactions contemplated by this Agreement on or before the Termination Date;

(e)    by either Sandbridge or the Company, if any Governmental Entity shall have issued an Order or taken any other action permanently enjoining, restraining or otherwise prohibiting the transactions contemplated by this Agreement and such Order or other action shall have become final and nonappealable; or

(f)    by either Sandbridge or the Company if the Sandbridge Stockholders Meeting has been held (including any adjournment thereof), has concluded, Sandbridge's stockholders have duly voted and the Required Sandbridge Stockholder Approval was not obtained; or

(g)    by Sandbridge, if the Company does not deliver, or cause to be delivered, to Sandbridge the Written Consent in accordance with Section 5.15 (Company Stockholder Approval).

Section 7.2.    **Effect of Termination**. In the event of the termination of this Agreement pursuant to Section 7.1, this entire Agreement shall forthwith become void (and there shall be no Liability or obligation on the part of the Parties and their respective Non-Party Affiliates) with the exception of Section 5.3(a), Section 5.5(a), this Section 7.2, Article 8 and Article 1 (to the extent the definitions included in Article 1 relate to the foregoing Sections), each of which shall survive such termination and remain valid and binding obligations of the Parties. Notwithstanding the foregoing or anything to the contrary herein, the termination of this Agreement pursuant to Section 7.1 shall not affect (i) any Liability on the part of any Party for any Willful Breach of any covenant or agreement set forth in this Agreement prior to such termination or fraud or (ii) any Person's Liability under any Subscription Agreement and the Confidentiality Agreement to the extent arising from a claim against such Person by another Person party to such agreement on the terms and subject to the conditions thereof.

## ARTICLE 8
## MISCELLANEOUS

Section 8.1.    **Non-Survival**. Each of the representations and warranties, and each of the agreements and covenants (to the extent such agreement or covenant contemplates or requires performance at or prior to the Effective Time), of the Parties set forth in this Agreement, shall terminate at the Effective Time, such that no claim for breach of any such representation, warranty, agreement or covenant, detrimental reliance or other right

A-61

Exhibit 7
Page 986

or remedy (whether in contract, in tort, at law, in equity or otherwise) may be brought with respect thereto after the Effective Time against any Party, any Company Non-Party Affiliate or any Sandbridge Non-Party Affiliate. Each covenant and agreement contained herein that, by its terms, expressly contemplates performance after the Effective Time shall so survive the Effective Time in accordance with its terms, and each covenant and agreement contained in any Ancillary Document that, by its terms, expressly contemplates performance after the Effective Time shall so survive the Effective Time in accordance with its terms and any other provision in any Ancillary Document that expressly survives the Effective Time shall so survive the Effective Time in accordance with the terms of such Ancillary Document.

Section 8.2.    **Entire Agreement; Assignment**. This Agreement (together with the Confidentiality Agreement and the Ancillary Documents) constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof. This Agreement may not be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of Sandbridge and the Company prior to Closing. Any attempted assignment of this Agreement not in accordance with the terms of this Section 8.2 shall be void.

Section 8.3.    **Amendment**. This Agreement may be amended or modified only by a written agreement executed and delivered by Sandbridge and the Company. Any purported amendment by any Party or Parties effected in a manner which does not comply with this Section 8.3 shall be void, *ab initio*.

Section 8.4.    **Notices**. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by e-mail, or by registered or certified mail (postage prepaid, return receipt requested) to the other Parties as follows:

(a)    If to any Sandbridge Party, to:

c/o Sandbridge Acquisition Corporation
1999 Avenue of the Stars, Suite 2088
Los Angeles, CA

Attention:    Ken Suslow

Richard Henry

E-mail:    ksuslow@sandbridgecap.com
rhenry@sandbridgecap.com

with a copy (which shall not constitute notice) to:

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600

Attention:    Emily Oldshue

Christopher Comeau

E-mail:    emily.oldshue@ropesgray.com
christopher.comeau@ropesgray.com

A-62

Exhibit 7
Page 987

(b)    If to the Company, to:


Owlet Baby Care Inc.
2500 Executive Parkway, Suite 500
Lehi, Utah 84043

Attention:    Mike Abbott

              Jake Briem

Email:        mabbott@owletcare.com
              jbriem@owletcare.com


with copies (which shall not constitute notice) to:


Eclipse Continuity Fund I, L.P.
Eclipse Ventures II, LP
514 High Street, Suite 4
Palo Alto, California 94301

Attention:    Lior Susan

Email:        lior@eclipse.vc


and


Latham & Watkins LLP
811 Main Street
Suite 3700
Houston, TX 77002

Attention:    Ryan J. Maierson

              Benjamin A. Potter

E-mail:       ryan.maierson@lw.com
              benjamin.potter@lw.com

or to such other address as the Party to whom notice is given may have previously furnished to the others in writing in the manner set forth above.

Section 8.5.    **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of Delaware.

Section 8.6.    **Fees and Expenses**. Except as otherwise set forth in this Agreement, all fees and expenses incurred in connection with this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby, including the fees and disbursements of counsel, financial advisors and accountants, shall be paid by the Party incurring such fees or expenses; provided that if the Closing occurs, then Sandbridge shall pay, or cause to be paid, the Company Transaction Expenses in accordance with Section 2.6 (Payment of Expenses). For the avoidance of doubt, any payments to be made (or caused to be made) by Sandbridge pursuant to this Section 8.6 shall be paid upon consummation of the Merger and release of proceeds from the Trust Account.

Section 8.7.    **Construction; Interpretation**. The term "this Agreement" means this Business Combination Agreement together with the Schedules and Exhibits hereto, as the same may from time to time be amended, modified, supplemented or restated in accordance with the terms hereof. The headings set forth in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement. No Party, nor its respective counsel, shall be deemed the drafter of this Agreement for purposes of construing the provisions hereof, and all provisions of this Agreement shall be construed according to their fair meaning and not strictly for or against any Party. Unless otherwise indicated to the contrary herein by the context or use thereof: (a) the words, "herein," "hereto," "hereof" and words of similar import refer to this Agreement as a whole, including the Schedules and Exhibits, and not to any particular section, subsection, paragraph, subparagraph or clause set forth in this Agreement; (b) masculine gender shall also include the feminine and

A-63

Exhibit 7
Page 988

neutral genders, and vice versa; (c) words importing the singular shall also include the plural, and vice versa; (d) the words "include," "includes" or "including" shall be deemed to be followed by the words "without limitation"; (e) references to "$" or "dollar" or "US$" shall be references to United States dollars; (f) the word "or" is disjunctive but not necessarily exclusive; (g) the words "writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form; (h) the word "day" means calendar day unless Business Day is expressly specified; (i) the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase shall not mean simply "if"; (j) all references to Articles, Sections, Exhibits or Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement; (k) the words "provided" or "made available" or words of similar import (regardless of whether capitalized or not) shall mean, when used with reference to documents or other materials required to be provided or made available to Sandbridge, any documents or other materials posted to the electronic data room located at intralinks.com under the project name "Project Olympus" as of 5:00 p.m., Eastern Time, at least one (1) day prior to the date of this Agreement; (l) all references to any Law will be to such Law as amended, supplemented or otherwise modified or re-enacted from time to time; and (m) all references to any Contract are to that Contract as amended or modified from time to time in accordance with the terms thereof (subject to any restrictions on amendments or modifications set forth in this Agreement). If any action under this Agreement is required to be done or taken on a day that is not a Business Day, then such action shall be required to be done or taken not on such day but on the first succeeding Business Day thereafter.

Section 8.8.    **Annexes, Exhibits and Schedules**. All annexes and exhibits to this agreement and the Schedules are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full in this Agreement. The Schedules shall be arranged in sections and subsections corresponding to the numbered and lettered Sections and subsections set forth in this Agreement. Any item disclosed in the Company Disclosure Schedules or in the Sandbridge Disclosure Schedules corresponding to any Section or subsection of Article 3 (in the case of the Company Disclosure Schedules) or Article 4 (in the case of the Sandbridge Disclosure Schedules) shall be deemed to have been disclosed with respect to every other section and subsection of Article 3 (in the case of the Company Disclosure Schedules) or Article 4 (in the case of the Sandbridge Disclosure Schedules), as applicable, where the relevance of such disclosure to such other Section or subsection is reasonably apparent on the face of the disclosure. The information and disclosures set forth in the Schedules that correspond to the section or subsections of Article 3 or Article 4 may include matters not required to be disclosed in the Schedules, and any such additional information or disclosure is for informational purposes only and does not necessarily include other matters of a similar nature.

Section 8.9.    **Parties in Interest**. This Agreement shall be binding upon and inure solely to the benefit of each Party and its successors and permitted assigns and, except as provided in Section 5.17 (Sandbridge Indemnification; Directors' and Officers' Insurance), Section 5.17(e) (Company Indemnification; Directors' and Officers' Insurance) and the subsequent sentence of this Section 8.9, nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement. Each of the Non-Party Affiliates shall be an express third-party beneficiary of Section 8.13 (No Recourse) and this Section 8.9 (Parties in Interest) (to the extent related to the foregoing).

Section 8.10.    **Severability**. Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable Law, but if any term or other provision of this Agreement is held to be invalid, illegal or unenforceable under applicable Law, all other provisions of this Agreement shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision of this Agreement is invalid, illegal or unenforceable under applicable Law, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 8.11.    **Counterparts; Electronic Signatures**. This Agreement and each Ancillary Document (including any of the closing deliverables contemplated hereby) may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. Electronic execution or delivery of an executed counterpart of a signature page to this Agreement or any

A-64

Exhibit 7
Page 989

TABLE OF CONTENTS

Ancillary Document (including any of the closing deliverables contemplated hereby), including delivery of such electronic signatures or scanned pages by e-mail, shall be effective as delivery of a manually executed counterpart to this Agreement and any such Ancillary Document.

Section 8.12.    **Knowledge of Company; Knowledge of Sandbridge**. For all purposes of this Agreement, the phrase "to the Company's knowledge" and "known by the Company" and any derivations thereof shall mean as of the applicable date, the actual knowledge of the individuals set forth on Section 8.12(a) of the Company Disclosure Schedules, assuming reasonable due inquiry and investigation of his or her direct reports. For all purposes of this Agreement, the phrase "to Sandbridge's knowledge" and "to the knowledge of Sandbridge" and any derivations thereof shall mean as of the applicable date, the actual knowledge of the individuals set forth on Section 8.12(b) of the Sandbridge Disclosure Schedules, assuming reasonable due inquiry and investigation of his or her direct reports. For the avoidance of doubt, none of the individuals set forth on Section 8.12(a) of the Company Disclosure Schedules or Section 8.12(b) of the Sandbridge Disclosure Schedules shall have any personal Liability or obligations regarding such knowledge.

Section 8.13.    **No Recourse**. Each Party agrees on behalf of itself and on behalf of Company Non-Party Affiliates, in the case of the Company, and Sandbridge Non-Party Affiliates, in the case of Sandbridge, that (a) this Agreement may only be enforced against, and any action for breach of this Agreement may only be made against, the Parties, and no claims of any nature whatsoever arising under or relating to this Agreement, the negotiation hereof or its subject matter, or the transactions contemplated hereby shall be asserted against any Company Non-Party Affiliate or Sandbridge Non-Party Affiliate (each, a "Non-Party Affiliate"), and (b) none of the Non-Party Affiliates shall have any Liability arising out of or relating to this Agreement, the negotiation hereof or its subject matter, or the transactions contemplated hereby, including with respect to any claim (whether in tort, contract or otherwise) for breach of this Agreement or in respect of any written or oral representations made or alleged to be made in connection herewith, as expressly provided herein, or for any actual or alleged inaccuracies, misstatements or omissions with respect to any information or materials of any kind furnished by the Company, Sandbridge or any Non-Party Affiliate concerning any Group Company, any Sandbridge Party, this Agreement or the transactions contemplated hereby.

Section 8.14.    **Extension; Waiver**. The Company prior to the Closing and the Company after the Closing may (a) extend the time for the performance of any of the obligations or other acts of the Sandbridge Parties set forth herein, (b) waive any inaccuracies in the representations and warranties of the Sandbridge Parties set forth herein or (c) waive compliance by the Sandbridge Parties with any of the agreements or conditions set forth herein. Sandbridge may (i) extend the time for the performance of any of the obligations or other acts of the Company, set forth herein, (ii) waive any inaccuracies in the representations and warranties of the Company set forth herein or (iii) waive compliance by the Company with any of the agreements or conditions set forth herein. Any agreement on the part of any such Party to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of such Party. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement. The failure of any Party to assert any of its rights hereunder shall not constitute a waiver of such rights.

Section 8.15.    **Waiver of Jury Trial**. THE PARTIES EACH HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY PROCEEDING, CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT OR UNDER ANY ANCILLARY DOCUMENT OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES IN RESPECT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT OR ANY OF THE TRANSACTIONS RELATED HERETO OR THERETO OR ANY FINANCING IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREBY, IN EACH CASE, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. THE PARTIES EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH PROCEEDING, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY

A-65

Exhibit 7
Page 990

HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY AND (D) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS Section 8.15.

Section 8.16.    Submission to Jurisdiction. Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Chancery Court of the State of Delaware for the purposes of any Proceeding, claim, demand, action or cause of action (a) arising under this Agreement or under any Ancillary Document or (b) in any way connected with or related or incidental to the dealings of the Parties in respect of this Agreement or any Ancillary Document or any of the transactions contemplated hereby or any of the transactions contemplated thereby, and irrevocably and unconditionally waives any objection to the laying of venue of any such Proceeding in any such court, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such Proceeding has been brought in an inconvenient forum. Each Party hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any Proceeding claim, demand, action or cause of action against such Party (i) arising under this Agreement or under any Ancillary Document or (ii) in any way connected with or related or incidental to the dealings of the Parties in respect of this Agreement or any Ancillary Document or any of the transactions contemplated hereby or any of the transactions contemplated thereby, (A) any claim that such Party is not personally subject to the jurisdiction of the courts as described in this Section 8.16 for any reason, (B) that such Party or such Party's property is exempt or immune from the jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (C) that (x) the Proceeding, claim, demand, action or cause of action in any such court is brought against such Party in an inconvenient forum, (y) the venue of such Proceeding, claim, demand, action or cause of action against such Party is improper or (z) this Agreement, or the subject matter hereof, may not be enforced against such Party in or by such courts. Each Party agrees that service of any process, summons, notice or document by registered mail to such party's respective address set forth in Section 8.4 shall be effective service of process for any such Proceeding, claim, demand, action or cause of action.

Section 8.17.    Remedies. Except as otherwise expressly provided herein, any and all remedies provided herein will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy. The Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the Parties do not perform their respective obligations under the provisions of this Agreement (including failing to take such actions as are required of them hereunder to consummate the transactions contemplated by this Agreement) in accordance with their specific terms or otherwise breach such provisions. It is accordingly agreed that the Parties shall be entitled to seek an injunction or injunctions, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, in each case, without posting a bond or undertaking and without proof of damages and this being in addition to any other remedy to which they are entitled at law or in equity. Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement on the basis that the other parties have an adequate remedy at law or an award of specific performance is not an appropriate remedy for any reason at law or equity.

Section 8.18.    Trust Account Waiver. Reference is made to the final prospectus of Sandbridge, filed with the SEC (File No. 333-248320) on September 16, 2020 (the "Prospectus"). The Company acknowledges and agrees and understands that Sandbridge has established a trust account (the "Trust Account") containing the proceeds of its initial public offering (the "IPO") and from certain private placements occurring simultaneously with the IPO (including interest accrued from time to time thereon) for the benefit of Sandbridge's public stockholders (including overallotment shares acquired by Sandbridge's underwriters, the "Public Stockholders"), and Sandbridge may disburse monies from the Trust Account only in the express circumstances described in the Prospectus. For and in consideration of Sandbridge entering into this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company hereby agrees on behalf of itself and its Representatives that, notwithstanding the foregoing or anything to the contrary in this

A-66

Exhibit 7
Page 991

TABLE OF CONTENTS

Agreement, none of the Company nor any of it Representatives does now or shall at any time hereafter have any right, title, interest or claim of any kind in or to any monies in the Trust Account or distributions therefrom, or make any claim against the Trust Account (including any distributions therefrom), regardless of whether such claim arises as a result of, in connection with or relating in any way to, this Agreement or any proposed or actual business relationship between Sandbridge or any of its Representatives, on the one hand, and, the Company or any of its Representatives, on the other hand, or any other matter, and regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability (any and all such claims are collectively referred to hereafter as the "Trust Account Released Claims"). The Company, on its own behalf and on behalf of its Representatives, hereby irrevocably waives any Trust Account Released Claims that it or any of its Representatives may have against the Trust Account (including any distributions therefrom) now or in the future as a result of, or arising out of, any negotiations or Contracts with Sandbridge or its Representatives and will not seek recourse against the Trust Account (including any distributions therefrom) for any reason whatsoever (including for an alleged breach of any agreement with Sandbridge or its Affiliates).

*    *    *    *    *

A-67

Exhibit 7
Page 992

**IN WITNESS WHEREOF**, each of the Parties has caused this Business Combination Agreement to be duly executed on its behalf as of the day and year first above written.

**SANDBRIDGE ACQUISITION CORPORATION**

By:     /s/ Ken Suslow

Name:   Ken Suslow

Title:   Chief Executive Officer

**PROJECT OLYMPUS MERGER SUB, INC.**

By:     /s/ Ken Suslow

Name:   Ken Suslow

Title:   Chief Executive Officer

**OWLET BABY CARE INC.**

By:     /s/ Kurt Workman

Name:   Kurt Workman

Title:   CEO

[*Signature Page to Business Combination Agreement*]

A-68

Exhibit 7
Page 993

TABLE OF CONTENTS

**EXHIBIT A**

**Form of Owlet Pubco Certificate of Incorporation**

**[Attached as Annex B to this proxy statement/prospectus.]**

A-69

Exhibit 7
Page 994

TABLE OF CONTENTS

**EXHIBIT B**

**Form of Owlet Pubco Bylaws**

**[Attached as Annex C to this proxy statement/prospectus.**]

A-70

Exhibit 7
Page 995

TABLE OF CONTENTS

**EXHIBIT C**

**Form of Owlet Pubco Incentive Equity Plan**

[Attached as Annex D to this proxy statement/prospectus.]

A-71

Exhibit 7
Page 996

TABLE OF CONTENTS

**EXHIBIT D**

**Form of Owlet Pubco Employee Stock Purchase Plan**

**[Attached as Annex E to this proxy statement/prospectus.]**

A-72

Exhibit 7
Page 997

TABLE OF CONTENTS

**EXHIBIT E**

**Form of Registration Rights Agreement**

[*See attached.*]

A-73

Exhibit 7
Page 998

TABLE OF CONTENTS

**AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT**

This Amended and Restated Registration Rights Agreement (this "**Agreement**") is entered into as of [ • ], 2021 (the "**Effective Date**") by and among:

(i)  Owlet, Inc., a Delaware corporation f/k/a Sandbridge Acquisition Corporation (the "**Company**");

(ii)  the equityholders designated as Sponsor Equityholders on Schedule A hereto (collectively, the "**Sponsor Equityholders**"); and

(iii) the equityholders designated as Legacy Owlet Equityholders on Schedule B hereto (collectively, the "**Legacy Owlet Equityholders**" and, together with the Sponsor Equityholders and any person or entity who hereafter becomes a party to this Agreement pursuant to Section 6.2 of this Agreement, the "**Holders**" and each individually a "**Holder**").

**RECITALS**

WHEREAS, the Company, Sandbridge Acquisition Holdings LLC, a Delaware limited liability company (the "**Sponsor**"), and the parties listed under Holder on the signature page thereto, are parties to that certain Registration and Stockholder Rights Agreement, dated as of September 14, 2020 (the "**Prior Agreement**");

WHEREAS, the Company, Project Olympus Merger Sub, Inc., a Delaware corporation ("**Merger Sub**") and Owlet Baby Care Inc., a Delaware corporation ("**Legacy Owlet**"), are party to that certain Business Combination Agreement, dated as of February 15, 2021 (the "**Business Combination Agreement**"), pursuant to which, on the Effective Date, Merger Sub will merge (the "**Merger**") with and into Legacy Owlet, with Legacy Owlet surviving the Merger as a wholly owned subsidiary of the Company;

WHEREAS, the Legacy Owlet Equityholders are receiving shares of Common Stock (the "**Business Combination Shares**") on or about the date hereof, pursuant to the Business Combination Agreement;

WHEREAS, the Sponsor Equityholders hold an aggregate of 5,750,000 shares of the Company's Class B common stock, par value $0.0001 per share, which shares of Sandbridge Class B Common Stock will automatically convert into an aggregate of 5,750,000 shares of Common Stock in connection with the Closing (together with the shares of Sandbridge Class A Common Stock into which such shares convert, the "**Founder Shares**");

WHEREAS, the Company and the Sponsor are party to that certain Private Placement Warrants Purchase Agreement, dated September 14, 2020, pursuant to which the Sponsor purchased 6,600,000 warrants (together with the shares of Sandbridge Class A Common Stock for which such warrants are exercisable, the "**Private Placement Warrants**") in private placement transactions occurring simultaneously with the closing of the Company's initial public offering; and

WHEREAS, in connection with the consummation of the Merger, the parties to the Prior Agreement desire to amend and restate the Prior Agreement in its entirety as set forth herein, and the parties hereto desire to enter into this Agreement pursuant to which the Company shall grant the Holders certain registration rights with respect to the Registrable Securities (as defined below) on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows.

1.  **DEFINITIONS**. The following capitalized terms used herein have the following meanings:

"**Adverse Disclosure**" shall mean any public disclosure of material non-public information, which disclosure, in the good faith judgment of the Chief Executive Officer of the Company or the Board, after consultation with counsel to the Company, (i) would be required to be made in any Registration Statement or Prospectus in order for the applicable Registration Statement or Prospectus not to contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein (in the case of any prospectus and any preliminary prospectus, in the light of the circumstances under which they were made) not misleading, (ii) would not be required to be made at such time if the Registration Statement were not being filed, declared effective or used, as the case may be, and (iii) the Company has a bona fide business purpose for not making such information public.

A-74

Exhibit 7
Page 999

"**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including without limitation any general partner, managing member, officer or director of such Person or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management or advisory company with, such Person. "**Affiliate**" shall also mean, in the case of any venture capital, private equity or similar fund now or hereafter existing that is an Investor, all partners, members, shareholders or other equity holders of any kind of such venture capital, private equity or other similar fund, regardless of whether such partners, members, shareholders or other equity owners control such venture capital, private equity fund or other similar fund.

"**Agreement**" is defined in the preamble to this Agreement.

"**Block Trade**" means an offering and/or sale of Registrable Securities by any Holder on a block trade or underwritten basis (whether firm commitment or otherwise) without substantial marketing efforts prior to pricing, including, without limitation, a same day trade, overnight trade or similar transaction.

"**Board**" means the board of directors of the Company.

"**Business Combination Agreement**" is defined in the recitals to this Agreement.

"**Business Combination Shares**" is defined in the recitals to this Agreement.

"**Commission**" means the Securities and Exchange Commission, or any other Federal agency then administering the Securities Act or the Exchange Act.

"**Common Stock**" means the common stock, par value $0.0001 per share, of the Company.

"**Company**" is defined in the preamble to this Agreement.

"**Demanding Holder**" is defined in Section 2.1.4.

"**Effective Date**" is defined in the preamble to this Agreement.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission promulgated thereunder, all as the same shall be in effect at the time.

"**FINRA**" means the Financial Industry Regulatory Authority Inc.

"**Form S-1 Shelf**" is defined in Section 2.1.1.

"**Form S-3 Shelf**" is defined in Section 2.1.1.

"**Founder Shares**" is defined in the recitals to this Agreement.

"**Governmental Authority**" means any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency (which for the purposes of this Agreement shall include FINRA and the Commission), governmental commission, department, board, bureau, agency or instrumentality, court or tribunal.

"**Governmental Order**" means any order, judgment, injunction, decree, writ, stipulation, determination or award, in each case, entered by or with any Governmental Authority.

"**Holder**" is defined in the preamble to this Agreement.

"**Holder Indemnified Party**" is defined in Section 4.1.

"**Immediate Family Member**" means a child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including, adoptive relationships, of a natural person referred to herein.

"**Indemnified Party**" is defined in Section 4.3.

"**Indemnifying Party**" is defined in Section 4.3.

"**Law**" means any statute, law, ordinance, rule, regulation or Governmental Order, in each case, of any Governmental Authority.

A-75

Exhibit 7
Page 1000

"**Legacy Owlet**" is defined in the recitals to this Agreement.

"**Legacy Owlet Equityholders**" is defined in the preamble to this Agreement.

"**Maximum Number of Securities**" is defined in Section 2.1.5.

"**Merger**" is defined in the recitals to this Agreement.

"**Merger Sub**" is defined in the recitals to this Agreement.

"**Minimum Takedown Threshold**" is defined in Section 2.1.4.

"**Misstatement**" means an untrue statement of a material fact or an omission to state a material fact required to be stated in a Registration Statement or Prospectus or necessary to make the statements in a Registration Statement or Prospectus (in the case of a Prospectus, in the light of the circumstances under which they were made) not misleading.

"**New Registration Statement**" is defined in Section 2.1.7.

"**Notices**" is defined in Section 6.3.

"**Other Coordinated Offering**" is defined in Section 2.4.1.

"**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

"**Piggyback Registration**" is defined in Section 2.2.1.

"**Prior Agreement**" is defined in the recitals to this Agreement.

"**Private Placement Warrants**" is defined in the recitals to this Agreement.

"**Prospectus**" means the prospectus included in any Registration Statement, as supplemented by any and all prospectus supplements and as amended by any and all post-effective amendments and including all material incorporated by reference in such prospectus.

"**Register**," "**Registered**" and "**Registration**" mean a registration, including any related Shelf Takedown, effected by preparing and filing a registration statement, prospectus or similar document in compliance with the requirements of the Securities Act, and the applicable rules and regulations promulgated thereunder, and such registration statement becoming effective.

"**Registrable Securities**" means (a) the Founder Shares, (b) the Private Placement Warrants, (c) any outstanding shares of Common Stock or Warrants held by a Holder as of the date of this Agreement (including the Business Combination Shares), (d) any shares of Common Stock that may be acquired by Holders upon the exercise of a Warrant or other right to acquire Common Stock held by a Holder as of the date of this Agreement, (e) any shares of Common Stock or Warrants (including any shares of Common Stock issued or issuable upon the exercise of any such Warrant) of the Company otherwise acquired or owned by a Holder following the date hereof to the extent that such securities are "restricted securities" (as defined in Rule 144) or are otherwise held by an "affiliate" (as defined in Rule 144) of the Company, and (f) any other equity security of the Company or any of its subsidiaries issued or issuable with respect to any securities referenced in clause (a), (b), (c), (d) or (e) above by way of a stock dividend or stock split or in connection with a recapitalization, merger, consolidation, spin-off, reorganization or similar transaction; provided, however, that, as to any particular Registrable Securities, such securities shall cease to be Registrable Securities upon the earliest to occur of: (A) a Registration Statement with respect to the sale of such securities shall have become effective under the Securities Act and such securities shall have been sold, transferred, disposed of or exchanged in accordance with such Registration Statement; (B) such securities shall have been otherwise transferred, new certificates for such securities not bearing a legend restricting further transfer shall have been delivered by the Company and subsequent public distribution of such securities shall not require registration under the Securities Act; (C) such securities shall have ceased to be outstanding; (D) such securities may be sold without registration pursuant to Rule 144 or any successor rule promulgated under the Securities Act (but with no volume or other restrictions or limitations including as to manner or timing of sale); and (E) such securities have been sold to, or through, a broker, dealer or underwriter in a public distribution or other public securities transaction.

A-76

Exhibit 7
Page 1001

"**Registration Expenses**" shall mean the expenses of a Registration, including, without limitation, the following:

(i)    all registration and filing fees (including fees with respect to filings required to be made with FINRA) and any national securities exchange on which the Common Stock is then listed;

(ii)    fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of outside counsel for the Underwriters, placement agent or sales agent in connection with blue sky qualifications of Registrable Securities);

(iii)    printing, messenger, telephone and delivery expenses;

(iv)    reasonable fees and disbursements of counsel for the Company;

(v)    reasonable fees and disbursements of all independent registered public accountants of the Company incurred specifically in connection with such Registration; and

(vi)    reasonable fees and expenses of one legal counsel selected by the majority-in-interest of the Demanding Holders in an Underwritten Offering or Other Coordinated Offering (not to exceed $50,000 without the consent of the Company).

"**Registration Statement**" means a registration statement filed by the Company with the Commission in compliance with the Securities Act and the rules and regulations promulgated thereunder for a public offering and sale of equity securities, or securities or other obligations exercisable or exchangeable for, or convertible into, equity securities (other than a registration statement on Form S-4 or Form S-8, or their successors, or any registration statement covering only securities proposed to be issued in exchange for securities or assets of another entity).

"**Requesting Holder**" is defined in Section 2.1.5.

"**SEC Guidance**" is defined in Section 2.1.7.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the Commission promulgated thereunder, all as the same shall be in effect at the time.

"**Shelf**" means the Form S-1 Shelf, the Form S-3 Shelf or any Subsequent Shelf Registration, as the case may be.

"**Shelf Registration**" means a registration of securities pursuant to a registration statement filed with the Commission in accordance with and pursuant to Rule 415 promulgated under the Securities Act (or any successor rule then in effect).

"**Shelf Takedown**" means an Underwritten Shelf Takedown or any proposed transfer or sale using a Registration Statement, including a Piggyback Registration.

"**Sponsor**" is defined in the recitals to this Agreement.

"**Sponsor Equityholders**" is defined in the preamble to this Agreement.

"**Subscription Agreements**" means those certain subscription agreements the Company entered into with certain investors pursuant to which such investors purchased shares of Common Stock in connection with the consummation of the transactions contemplated in the Business Combination Agreement.

"**Subsequent Shelf Registration**" is defined in Section 2.1.2.

"**Transfer**" shall mean the (a) sale of, offer to sell, contract or agreement to sell, hypothecate, pledge, grant of any option to purchase or otherwise dispose of or agreement to dispose of, directly or indirectly, or establishment or increase of a put equivalent position or liquidation with respect to or decrease of a call equivalent position within the meaning of Section 16 of the Exchange Act with respect to, any security, (b) entry into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any security, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise, or (c) public announcement of any intention to effect any transaction specified in clause (a) or (b).

A-77

Exhibit 7
Page 1002

"**Underwriter**" means a securities dealer who purchases any Registrable Securities as principal and not as part of such dealer's market-making activities.

"**Underwritten Offering**" means a Registration in which securities of the Company are sold to an Underwriter in a firm commitment underwriting for distribution to the public.

"**Underwritten Shelf Takedown**" is defined in Section 2.1.4.

"**Warrants**" means the warrants of the Company with each whole warrant entitling the holder to purchase one share of Common Stock.

"**Withdrawal Notice**" is defined in Section 2.1.6.

**2    REGISTRATION RIGHTS**.

2.1    Shelf Registration.

2.1.1    Filing. The Company shall file within 45 days after the date of this Agreement, and use commercially reasonable efforts to cause to be declared effective as soon as practicable thereafter, a Registration Statement for a Shelf Registration on Form S-1 (the "**Form S-1 Shelf**") or, if the Company is eligible to use a Registration Statement on Form S-3, a Shelf Registration on Form S-3 (the "**Form S-3 Shelf**"), in each case, covering the resale of all the Registrable Securities (determined as of two business days prior to such filing) on a delayed or continuous basis. Such Shelf shall provide for the resale of the Registrable Securities included therein pursuant to any method or combination of methods legally available to, and requested by, any Holder named therein. The Company shall maintain a Shelf in accordance with the terms hereof, and shall prepare and file with the SEC such amendments, including post-effective amendments, and supplements as may be necessary to keep a Shelf continuously effective, available for use and in compliance with the provisions of the Securities Act until such time as there are no longer any Registrable Securities. In the event the Company files a Form S-1 Shelf, the Company shall use its commercially reasonable efforts to convert the Form S-1 Shelf (and any Subsequent Shelf Registration) to a Form S-3 Shelf as soon as practicable after the Company is eligible to use Form S-3.

2.1.2    Subsequent Shelf Registration. If any Shelf ceases to be effective under the Securities Act for any reason at any time while Registrable Securities are still outstanding, the Company shall, subject to Section 3.4, use its commercially reasonable efforts to as promptly as is reasonably practicable cause such Shelf to again become effective under the Securities Act (including obtaining the prompt withdrawal of any order suspending the effectiveness of such Shelf), and shall use its commercially reasonable efforts to as promptly as is reasonably practicable amend such Shelf in a manner reasonably expected to result in the withdrawal of any order suspending the effectiveness of such Shelf or file an additional registration statement as a Shelf Registration (a "**Subsequent Shelf Registration**") registering the resale of all Registrable Securities (determined as of two business days prior to such filing), and pursuant to any method or combination of methods legally available to, and requested by, any Holder named therein. If a Subsequent Shelf Registration is filed, the Company shall use its commercially reasonable efforts to (i) cause such Subsequent Shelf Registration to become effective under the Securities Act as promptly as is reasonably practicable after the filing thereof (it being agreed that the Subsequent Shelf Registration shall be an automatic shelf registration statement (as defined in Rule 405 promulgated under the Securities Act) if the Company is a well-known seasoned issuer (as defined in Rule 405 promulgated under the Securities Act) at the most recent applicable eligibility determination date) and (ii) keep such Subsequent Shelf Registration continuously effective, available for use and in compliance with the provisions of the Securities Act until such time as there are no longer any Registrable Securities. Any such Subsequent Shelf Registration shall be on Form S-3 to the extent that the Company is eligible to use such form. Otherwise, such Subsequent Shelf Registration shall be on another appropriate form.

2.1.3    Additional Registrable Securities. In the event that any Holder holds Registrable Securities that are not registered for resale on a delayed or continuous basis, the Company, upon request of a Sponsor Equityholder or a Legacy Owlet Equityholder that holds at least five (5.0%) percent of the Registrable Securities, shall promptly use its commercially reasonable efforts to cause the resale of such Registrable Securities to be covered by either, at the Company's option, the Shelf (including by means of a post-effective amendment) or a Subsequent Shelf Registration and cause the same to become effective as soon as practicable after such filing and such Shelf or Subsequent Shelf Registration shall be subject to the terms hereof; provided, however, that the Company shall only be required to cause such Registrable Securities to be so covered twice per calendar year for the Legacy Owlet Equityholders, on the one hand, and the Sponsor Equityholders, on the other hand.

A-78

Exhibit 7
Page 1003

2.1.4   Requests for Underwritten Shelf Takedowns. At any time and from time to time when an effective Shelf is on file with the Commission, any one or more Legacy Owlet Equityholders or one or more Sponsor Equityholders (any of the Legacy Owlet Equityholders or the Sponsor Equityholders being, in such case, a "**Demanding Holder**") may request to sell all or any portion of its Registrable Securities in an Underwritten Offering that is registered pursuant to the Shelf (each, an "**Underwritten Shelf Takedown**"); provided in each case that the Company shall only be obligated to effect an Underwritten Offering if such offering shall include Registrable Securities proposed to be sold by the Demanding Holder(s) with a total offering price reasonably expected to exceed, in the aggregate, $50 million (the "**Minimum Takedown Threshold**"). All requests for Underwritten Shelf Takedowns shall be made by giving written notice to the Company, which shall specify the approximate number of Registrable Securities proposed to be sold in the Underwritten Shelf Takedown. Subject to Section 2.3.4, the Company shall have the right to select the Underwriters for such offering (which shall consist of one or more reputable nationally recognized investment banks), subject to the initial Demanding Holder's prior approval (which shall not be unreasonably withheld, conditioned or delayed). The Legacy Owlet Equityholders, on the one hand, and the Sponsor Equityholders, on the other hand, may each demand not more than two (2) Underwritten Shelf Takedown pursuant to this Section 2.1.4 in any 12-month period. Notwithstanding anything to the contrary in this Agreement, the Company may affect any Underwritten Shelf Takedown pursuant to any then effective Registration Statement, including a Form S-3, that is then available for such offering.

2.1.5   Reduction of Underwritten Shelf Takedown. If the managing Underwriter or Underwriters in an Underwritten Shelf Takedown advises the Company, the Demanding Holders and the Holders requesting piggy back rights pursuant to this Agreement with respect to such Underwritten Shelf Takedown (the "**Requesting Holders**") (if any) in writing that the dollar amount or number of Registrable Securities that the Demanding Holders and the Requesting Holders (if any) desire to sell, taken together with all other shares of Common Stock or other equity securities that the Company desires to sell and all other shares of Common Stock or other equity securities, if any, that have been requested to be sold in such Underwritten Shelf Takedown pursuant to separate written contractual piggy-back registration rights held by any other stockholders, exceeds the maximum dollar amount or maximum number of equity securities that can be sold in the Underwritten Shelf Takedown without adversely affecting the proposed offering price, the timing, the distribution method, or the probability of success of such offering (such maximum dollar amount or maximum number of such securities, as applicable, the "**Maximum Number of Securities**"), then the Company shall include in such Underwritten Shelf Takedown, before including any shares of Common Stock or other equity securities proposed to be sold by Company or by other holders of Common Stock or other equity securities, the Registrable Securities of the Demanding Holders and the Requesting Holders (if any) (pro rata, as nearly as practicable, based on the respective number of Registrable Securities that each Demanding Holder and Requesting Holder (if any) has requested be included in such Underwritten Shelf Takedown and the aggregate number of Registrable Securities that the Demanding Holders and Requesting Holders have requested be included in such Underwritten Shelf Takedown, or in such other proportion as shall mutually be agreed to by all such Demanding Holders and Requesting Holders) that can be sold without exceeding the Maximum Number of Securities; provided, however, that the number of Registrable Securities held by the Holders to be included in such Underwritten Shelf Takedown shall not be reduced unless all other securities are first entirely excluded from the Underwritten Shelf Takedown. For purposes of the provision in this Section 2.1.5 concerning apportionment, for any selling Holder that is a partnership, limited liability company, or corporation, the partners, members, retired partners, retired members, stockholders, and Affiliates of such Holder, or the estates and Immediate Family Members of any such partners, retired partners, members, and retired members and any trusts for the benefit of any of the foregoing Persons, shall be deemed to be a single "selling Holder," and any pro rata reduction with respect to such "selling Holder" shall be based upon the aggregate number of Registrable Securities owned by all Persons included in such "selling Holder," as defined in this sentence. To facilitate the allocation of Registrable Securities in accordance with the above provisions, the Company or the Underwriters may round the number of shares allocated to any Holder to the nearest 100 shares. The Company shall not be required to include any Registrable Securities in such Underwritten Shelf Takedown unless the Holders accept the terms of the underwriting as agreed upon between the Company and its Underwriters.

2.1.6   Withdrawal. Prior to the filing of the applicable "red herring" prospectus or prospectus supplement used for marketing such Underwritten Shelf Takedown, a majority-in-interest of the Demanding Holders initiating an Underwritten Shelf Takedown shall have the right to withdraw from such Underwritten Shelf Takedown for

A-79

Exhibit 7
Page 1004

any or no reason whatsoever upon written notification (a "**Withdrawal Notice**") to the Company and the Underwriter or Underwriters (if any) of their intention to withdraw from such Underwritten Shelf Takedown; provided that any Legacy Owlet Equityholder or Sponsor Equityholder may elect to have the Company continue an Underwritten Shelf Takedown if the Minimum Takedown Threshold would still be satisfied by the Registrable Securities proposed to be sold in the Underwritten Shelf Takedown by the Legacy Owlet Equityholders and the Sponsor Equityholders. If withdrawn, a demand for an Underwritten Shelf Takedown shall constitute a demand for an Underwritten Shelf Takedown for purposes of Section 2.1.4, unless either (i) the Demanding Holder has not previously withdrawn any Underwritten Shelf Takedown or (ii) the Holder reimburses the Company for all Registration Expenses with respect to such Underwritten Shelf Takedown; provided that, if a Legacy Owlet Equityholder or a Sponsor Equityholder elects to continue an Underwritten Shelf Takedown pursuant to the proviso in the immediately preceding sentence, such Underwritten Shelf Takedown shall instead count as an Underwritten Shelf Takedown demanded by the Legacy Owlet Equityholders or the Sponsor Equityholders, as applicable, for purposes of Section 2.1.4. Following the receipt of any Withdrawal Notice, the Company shall promptly forward such Withdrawal Notice to any other Holders that had elected to participate in such Underwritten Shelf Takedown. Notwithstanding anything to the contrary in this Agreement, the Company shall be responsible for the Registration Expenses incurred in connection with a Underwritten Shelf Takedown prior to its withdrawal under this Section 2.1.6, other than if a Demanding Holder elects to pay such Registration Expenses pursuant to clause (ii) of the second sentence of this Section 2.1.6.

2.1.7    New Registration Statement. Notwithstanding the registration obligations set forth in this Section 2.1, in the event the Commission informs the Company that all of the Registrable Securities cannot, as a result of the application of Rule 415, be registered for resale as a secondary offering on a single registration statement, the Company agrees to promptly (i) inform each of the holders thereof and use its commercially reasonable efforts to file amendments to the Shelf Registration as required by the Commission and/or (ii) withdraw the Shelf Registration and file a new registration statement (a "**New Registration Statement**"), on Form S-3, or if Form S-3 is not then available to the Company for such registration statement, on such other form available to register for resale the Registrable Securities as a secondary offering; provided, however, that prior to filing such amendment or New Registration Statement, the Company shall use its commercially reasonable efforts to advocate with the Commission for the registration of all of the Registrable Securities in accordance with any publicly-available written or oral guidance, comments, requirements or requests of the Commission staff (the "**SEC Guidance**"), including without limitation, the Manual of Publicly Available Telephone Interpretations D.29. Notwithstanding any other provision of this Agreement, if any SEC Guidance sets forth a limitation of the number of Registrable Securities permitted to be registered on a particular Registration Statement as a secondary offering (and notwithstanding that the Company used commercially reasonable efforts to advocate with the Commission for the registration of all or a greater number of Registrable Securities), unless otherwise directed in writing by a holder as to its Registrable Securities, the number of Registrable Securities to be registered on such Registration Statement will be reduced on a pro rata basis based on the total number of Registrable Securities held by the Holders, subject to a determination by the Commission that certain Holders must be reduced first based on the number of Registrable Securities held by such Holders. In the event the Company amends the Shelf Registration or files a New Registration Statement, as the case may be, under clauses (i) or (ii) above, the Company will use its commercially reasonable efforts to file with the Commission, as promptly as allowed by Commission or SEC Guidance provided to the Company or to registrants of securities in general, one or more registration statements on Form S-3 or such other form available to register for resale those Registrable Securities that were not registered for resale on the Shelf Registration, as amended, or the New Registration Statement.

2.1.8    Effective Registration. Notwithstanding the provisions of Section 2.1.3 or Section 2.1.4 above or any other part of this Agreement, a Registration shall not count as a Registration unless and until (i) the Registration Statement has been declared effective by the Commission and (ii) the Company has complied with all of its obligations under this Agreement with respect thereto; provided, further, that if, after such Registration Statement has been declared effective, an offering of Registrable Securities is subsequently interfered with by any stop order or injunction of the Commission, federal or state court or any other governmental agency the Registration Statement with respect to such Registration shall be deemed not to have been declared effective, unless and until, (i) such stop order or injunction is removed, rescinded or otherwise terminated, and (ii) a majority-in-interest of the Demanding Holders initiating such Registration thereafter affirmatively elect to continue with such Registration and accordingly notify the Company in writing, but in no event later than five (5) days, of such

A-80

Exhibit 7
Page 1005

election; provided, further, that the Company shall not be obligated or required to file another Registration Statement until the Registration Statement that has been previously filed with respect to a Registration pursuant to a Demand Registration becomes effective or is subsequently terminated.

2.2    Piggyback Registration.

2.2.1    Piggyback Rights. Subject to Section 2.4.3, if the Company or any Holder proposes to conduct a registered offering of, or if the Company proposes to file a Registration Statement under the Securities Act with respect to the Registration of, equity securities, or securities or other obligations exercisable or exchangeable for, or convertible into equity securities, for its own account or for the account of stockholders of the Company (or by the Company and by the stockholders of the Company including, without limitation, an Underwritten Shelf Takedown pursuant to Section 2.1 hereof), other than a Registration Statement (or any registered offering with respect thereto) (i) filed in connection with any employee stock option or other benefit plan, (ii) pursuant to a Registration Statement on Form S-4 (or similar form that relates to a transaction subject to Rule 145 under the Securities Act or any successor rule thereto), (iii) for an offering of debt that is convertible into equity securities of the Company, (iv) for a dividend reinvestment plan or (v) for a rights offering, then the Company shall give written notice of such proposed offering to all of the Holders of Registrable Securities as soon as practicable but not less than ten (10) days before the anticipated filing date of such Registration Statement or, in the case of an Underwritten Offering pursuant to a Shelf Registration, the applicable "red herring" prospectus or prospectus supplement used for marketing such offering, which notice shall (A) describe the amount and type of securities to be included in such offering, the intended method(s) of distribution, and the name of the proposed managing Underwriter or Underwriters, if any, in such offering, and (B) offer to all of the Holders of Registrable Securities the opportunity to include in such registered offering such number of Registrable Securities as such Holders may request in writing within five (5) days after receipt of such written notice (such registered offering, a "**Piggyback Registration**"). Subject to Section 2.2.2, the Company shall cause such Registrable Securities to be included in such Piggyback Registration and, if applicable, shall use its commercially reasonable efforts to cause the managing Underwriter or Underwriters of such Piggyback Registration to permit the Registrable Securities requested by the Holders pursuant to this Section 2.2.1 to be included therein on the same terms and conditions as any similar securities of the Company included in such registered offering and to permit the sale or other disposition of such Registrable Securities in accordance with the intended method(s) of distribution thereof. The inclusion of any Holder's Registrable Securities in a Piggyback Registration shall be subject to such Holder's agreement to enter into an underwriting agreement in customary form with the Underwriter(s) selected for such Underwritten Offering.

2.2.2    Reduction of Offering. If the managing Underwriter or Underwriters in an Underwritten Offering that is to be a Piggyback Registration advises the Company and the Holders of Registrable Securities participating in the Piggyback Registration in writing that the dollar amount or number of shares of Common Stock or other equity securities that the Company desires to sell, taken together with (i) the shares of Common Stock or other equity securities, if any, as to which Registration or a registered offering has been demanded pursuant to separate written contractual arrangements with persons or entities other than the Holders of Registrable Securities hereunder, (ii) the Registrable Securities as to which registration has been requested pursuant to Section 2.2 hereof, and (iii) the shares of Common Stock or other equity securities, if any, as to which Registration or a registered offering has been requested pursuant to separate written contractual piggy-back registration rights of other stockholders of the Company, exceeds the Maximum Number of Securities, then:

(a)    If the Registration or registered offering is undertaken for the Company's account, the Company shall include in any such Registration or registered offering (A) first, the shares of Common Stock or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; (B) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (A), the Registrable Securities of Holders exercising their rights to register their Registrable Securities pursuant to Section 2.2.1, pro rata (as nearly as practicable), based on the respective number of Registrable Securities that each Holder has requested be included in such Underwritten Offering and the aggregate number of Registrable Securities that the Holders have requested to be included in such Underwritten Offering or in such other proportions as shall mutually be agreed to by all such selling Holders, which can be sold without exceeding the Maximum Number of Securities; and (C) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A) and (B), the shares of Common

A-81

Exhibit 7
Page 1006

Stock or other equity securities, if any, as to which Registration or a registered offering has been requested pursuant to written contractual piggy-back registration rights of other stockholders of the Company, which can be sold without exceeding the Maximum Number of Securities;

(b)    If the Registration or registered offering is pursuant to a request by persons or entities other than the Holders of Registrable Securities, then the Company shall include in any such Registration or registered offering (A) first, the shares of Common Stock or other equity securities, if any, of such requesting persons or entities, other than the Holders of Registrable Securities, which can be sold without exceeding the Maximum Number of Securities; (B) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (A), the Registrable Securities of Holders exercising their rights to register their Registrable Securities pursuant to Section 2.2.1, pro rata (as nearly as practicable), based on the respective number of Registrable Securities that each Holder has requested be included in such Underwritten Offering and the aggregate number of Registrable Securities that the Holders have requested to be included in such Underwritten Offering or in such other proportions as shall mutually be agreed to by all such selling Holders, which can be sold without exceeding the Maximum Number of Securities; (C) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A) and (B), the shares of Common Stock or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; and (D) fourth, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A), (B) and (C), the shares of Common Stock or other equity securities for the account of other persons or entities that the Company is obligated to register pursuant to separate written contractual arrangements with such persons or entities, which can be sold without exceeding the Maximum Number of Securities; and

(c)    If the Registration or registered offering is pursuant to a request by Holder(s) of Registrable Securities pursuant to Section 2.1 hereof, then the Company shall include in any such Registration or registered offering securities pursuant to Section 2.1.5.

2.2.3    Piggyback Withdrawal. Any Holder of Registrable Securities (other than a Demanding Holder, whose right to withdrawal from an Underwritten Shelf Takedown, and related obligations, shall be governed by Section 2.1.6) shall have the right to withdraw from a Piggyback Registration for any or no reason whatsoever upon written notification to the Company and the Underwriter or Underwriters (if any) of his, her or its intention to withdraw from such Piggyback Registration prior to the effectiveness of the Registration Statement filed with the Commission with respect to such Piggyback Registration or, in the case of a Piggyback Registration pursuant to a Shelf Registration, the filing of the applicable "red herring" prospectus or prospectus supplement with respect to such Piggyback Registration used for marketing such transaction. The Company (whether on its own determination or as the result of a request for withdrawal by persons pursuant to separate written contractual obligations) may withdraw a Registration Statement filed with the Commission in connection with a Piggyback Registration (which, in no circumstance, shall include the Shelf) at any time prior to the effectiveness of such Registration Statement. Notwithstanding anything to the contrary in this Agreement (other than Section 2.1.6), the Company shall be responsible for the Registration Expenses incurred in connection with the Piggyback Registration prior to its withdrawal under this Section 2.2.3.

2.2.4    Unlimited Piggyback Registration Rights. For purposes of clarity, subject to Section 2.1.6, any Piggyback Registration effected pursuant to Section 2.2 hereof shall not be counted as a demand for an Underwritten Shelf Takedown under Section 2.1.4 hereof.

2.3    Market Stand-Off. In connection with any Underwritten Offering of equity securities of the Company (other than a Block Trade or Other Coordinated Offering), each Holder given an opportunity to participate in the Underwritten Offering pursuant to the terms of this Agreement agrees that it shall not Transfer any shares of Common Stock or other equity securities of the Company (other than those included in such offering pursuant to this Agreement), without the prior written consent of the Company, during the Market Standoff Period or such shorter period during which the Company agrees not to conduct an underwritten primary offering of Common Stock, except in the event the Underwriters managing the offering otherwise agree by written consent. Each Holder agrees to execute a customary lock-up agreement in favor of the Underwriters to such effect (in each case on substantially the same terms and conditions as all such Holders). "**Market Standoff Period**" means the 90-day period beginning on the date of the pricing of such offering if such pricing occurs prior to the first anniversary of the Closing and the 60-day period beginning on the date of the pricing of such offering if such pricing occurs on or after the first anniversary of the Closing.

A-82

Exhibit 7
Page 1007

2.4    Block Trades; Other Coordinated Offerings.

2.4.1    Notwithstanding the foregoing, at any time and from time to time when an effective Shelf is on file with the Commission and effective, if a Demanding Holder wishes to engage in (a) a Block Trade or (b) an "at the market" or similar registered offering through a broker, sales agent or distribution agent, whether as agent or principal (an "**Other Coordinated Offering**"), in each case with a total offering price reasonably expected to exceed, in the aggregate, either (x) $50 million or (y) all remaining Registrable Securities held by the Demanding Holder, then notwithstanding the time periods provided for in Section 2.1.4, such Demanding Holder need only to notify the Company of the Block Trade or Other Coordinated Offering at least five (5) business days prior to the day such offering is to commence and the Company shall as expeditiously as possible use its commercially reasonable efforts to facilitate such Block Trade or Other Coordinated Offering; provided that the Demanding Holders representing a majority of the Registrable Securities wishing to engage in the Block Trade or Other Coordinated Offering shall use commercially reasonable efforts to work with the Company and any Underwriters or placement agents or sales agents prior to making such request in order to facilitate preparation of the registration statement, prospectus and other offering documentation related to the Block Trade or Other Coordinated Offering.

2.4.2    Prior to the filing of the applicable "red herring" prospectus or prospectus supplement used in connection with a Block Trade or Other Coordinated Offering, a majority-in-interest of the Demanding Holders initiating such Block Trade or Other Coordinated Offering shall have the right to submit a Withdrawal Notice to the Company and the Underwriter or Underwriters or placement agents or sales agents (if any) of their intention to withdraw from such Block Trade or Other Coordinated Offering. Notwithstanding anything to the contrary in this Agreement, the Company shall be responsible for the Registration Expenses incurred in connection with a Block Trade or Other Coordinated Offering prior to its withdrawal under this Section 2.4.2.

2.4.3    Notwithstanding anything to the contrary in this Agreement, Section 2.2 hereof shall not apply to a Block Trade or Other Coordinated Offering initiated by a Demanding Holder pursuant to this Agreement.

2.4.4    The Demanding Holder in a Block Trade shall have the right to select the Underwriters and any sale agents or placement agents (if any) for such Block Trade or Other Coordinated Offering (in each case, which shall consist of one or more reputable nationally recognized investment banks).

**3    REGISTRATION PROCEDURES**

3.1    Filings; Information. In connection with any Shelf and/or Shelf Takedown, the Company shall use its commercially reasonable efforts to effect the registration and sale of such Registrable Securities in accordance with the intended method(s) of distribution thereof as expeditiously as practicable, and in connection therewith:

3.1.1    Filing Registration Statement. The Company shall prepare and file with the Commission a Registration Statement on any form for which the Company then qualifies or which counsel for the Company shall deem appropriate and which form shall be available for the sale of all Registrable Securities to be registered thereunder in accordance with the intended method(s) of distribution thereof, and shall use its commercially reasonable efforts to cause such Registration Statement to become effective and use its commercially reasonable efforts to keep it effective for the period required by Section 3.1.3.

3.1.2    Copies. The Company shall, prior to filing a Registration Statement or Prospectus, or any amendment or supplement thereto, furnish without charge to the holders of Registrable Securities included in such registration, and such holders' legal counsel, copies of such Registration Statement as proposed to be filed, each amendment and supplement to such Registration Statement (in each case including all exhibits thereto and documents incorporated by reference therein), the Prospectus included in such Registration Statement (including each preliminary Prospectus), and such other documents as the holders of Registrable Securities included in such registration or legal counsel for any such holders may request in order to facilitate the disposition of the Registrable Securities owned by such holders.

3.1.3    Amendments and Supplements. The Company shall prepare and file with the Commission such amendments, including post-effective amendments, and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective and in compliance with the provisions of the Securities Act until all Registrable Securities and other securities covered by such Registration Statement have been disposed of in accordance with the intended method(s) of distribution set forth in such Registration Statement or such securities have been withdrawn.

A-83

Exhibit 7
Page 1008

3.1.4    Notification. After the filing of a Registration Statement, the Company shall promptly, and in no event more than two (2) business days after such filing, notify the holders of Registrable Securities included in such Registration Statement of such filing, and shall further notify such holders promptly and confirm such advice in writing in all events within two (2) business days of the occurrence of any of the following: (i) when such Registration Statement becomes effective; (ii) when any post-effective amendment to such Registration Statement becomes effective; (iii) the issuance or threatened issuance by the Commission of any stop order (and the Company shall take all actions required to prevent the entry of such stop order or to remove it if entered); and (iv) any request by the Commission for any amendment or supplement to such Registration Statement or any Prospectus relating thereto or for additional information or of the occurrence of an event requiring the preparation of a supplement or amendment to such Prospectus so that, as thereafter delivered to the purchasers of the securities covered by such Registration Statement, such Prospectus will not contain a Misstatement, and promptly make available to the holders of Registrable Securities included in such Registration Statement any such supplement or amendment; except that before filing with the Commission a Registration Statement or Prospectus or any amendment or supplement thereto, including documents incorporated by reference, the Company shall furnish to the holders of Registrable Securities included in such Registration Statement and to the legal counsel for any such holders, copies of all such documents proposed to be filed sufficiently in advance of filing to provide such holders and legal counsel with a reasonable opportunity to review such documents and comment thereon, and the Company shall not file any Registration Statement or Prospectus or amendment or supplement thereto, including documents incorporated by reference, to which such holders or their legal counsel shall object.

3.1.5    State Securities Laws Compliance. The Company shall use its commercially reasonable efforts to (i) register or qualify the Registrable Securities covered by the Registration Statement under such securities or "blue sky" laws of such jurisdictions in the United States as the holders of Registrable Securities included in such Registration Statement (in light of their intended plan of distribution) may request (or provide evidence satisfactory to such Holders that the Registrable Securities are exempt from such registration or qualification) and (ii) take such action necessary to cause such Registrable Securities covered by the Registration Statement to be registered with or approved by such other governmental authorities as may be necessary by virtue of the business and operations of the Company and do any and all other acts and things that may be necessary or advisable to enable the Holders of Registrable Securities included in such Registration Statement to consummate the disposition of such Registrable Securities in such jurisdictions; provided, however, that the Company shall not be required to qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this paragraph or subject itself to general service of process or taxation in any such jurisdiction.

3.1.6    Agreements for Disposition. The Company shall enter into customary agreements (including, if applicable, an underwriting agreement or other sales or distribution agreement in customary form) and take such other actions as are reasonably required in order to expedite or facilitate the disposition of such Registrable Securities. The representations, warranties and covenants of the Company in any such agreement which are made to or for the benefit of any Underwriters or other placement agent or sales agent, to the extent applicable, shall also be made to and for the benefit of the holders of Registrable Securities included in such registration statement.

3.1.7    Cooperation. The principal executive officer of the Company, the principal financial officer of the Company, the principal accounting officer of the Company and all other officers and members of the management of the Company shall cooperate fully in any offering of Registrable Securities hereunder, which cooperation shall include, without limitation, the preparation of the Registration Statement with respect to such offering and all other offering materials and related documents, and participation in meetings with Underwriters or placement agents or sales agents, attorneys, accountants and potential investors.

3.1.8    Records. The Company shall make available for inspection by the holders of Registrable Securities included in such Registration Statement, any Underwriter or placement agent or sales agent participating in any disposition pursuant to such registration statement and any attorney, accountant or other professional retained by any holder of Registrable Securities included in such Registration Statement or any Underwriter or placement agent or sales agent, all financial and other records, pertinent corporate documents and properties of the Company, as shall be necessary to enable them to exercise their due diligence responsibility, and cause the Company's officers, directors and employees to supply all information requested by any of them in connection with such Registration Statement.

A-84

Exhibit 7
Page 1009

3.1.9    Opinions and Comfort Letters. The Company shall use commercially reasonable efforts to obtain (i) a "comfort" letter (including a bring-down letter dated as of the date the Registrable Securities are delivered for sale pursuant to such Registration) from the Company's independent registered public accountants in the event of an Underwritten Offering, Block Trade or Other Coordinated Offering, in customary form and covering such matters of the type customarily covered by "comfort" letters as the managing Underwriter or placement agent or sales agent may reasonably request and (ii) an opinion and negative assurance letter, to be delivered on the date the Registrable Securities are delivered for sale pursuant to such Registration Statement, of counsel representing the Company for the purposes of such Registration, addressed to the Holders, the placement agent or sale agent, if any, and the Underwriters, if any, covering such legal matters with respect to the Registration in respect of which such opinion is being given as the Holders, placement agent, sales agent, or Underwriter may reasonably request and as are customarily included in such opinions and negative assurance letters, and reasonably satisfactory to a majority in interest of the participating Holders and any Underwriter or placement agent or sales agent.

3.1.10    Earnings Statement. The Company shall comply with all applicable rules and regulations of the Commission and the Securities Act, and make available to its shareholders, as soon as practicable, an earnings statement covering a period of twelve (12) months, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder.

3.1.11    Listing. The Company shall use its commercially reasonable efforts to cause all Registrable Securities included in any registration to be listed on such exchanges or otherwise designated for trading in the same manner as similar securities issued by the Company are then listed or designated or, if no such similar securities are then listed or designated, in a manner satisfactory to the holders of a majority of the Registrable Securities included in such registration.

3.1.12    Road Show. The Company shall use its reasonable efforts to make available senior executives of the Company to participate in customary "road show" presentations that may be reasonably requested by the Underwriter in any underwritten offering.

3.2    Registration Expenses. The Registration Expenses of all Registrations shall be borne by the Company. It is acknowledged by the Holders that the Holders shall bear all incremental selling expenses relating to the sale of Registrable Securities, such as Underwriters' or agents' commissions and discounts, brokerage fees, Underwriter marketing costs and, other than as set forth in the definition of "Registration Expenses," all reasonable fees and expenses of any legal counsel representing the Holders.

3.3    Information. The Holders of Registrable Securities shall provide such information as may reasonably be requested by the Company, or the managing Underwriter or placement agent or sales agent, if any, in connection with the preparation of any Registration Statement or Prospectus, including amendments and supplements thereto, in order to effect the registration of any Registrable Securities under the Securities Act pursuant to Article 2 and in connection with the Company's obligation to comply with federal and applicable state securities laws. Notwithstanding anything in this Agreement to the contrary, if any Holder does not provide such information, the Company may exclude such Holder's Registrable Securities from the applicable Registration Statement or Prospectus if the Company determines, based on the advice of counsel, that such information is necessary to effect the Registration and such Holder continues thereafter to withhold such information. No person may participate in any Underwritten Offering or other coordinated offering for equity securities of the Company pursuant to a Registration initiated by the Company hereunder unless such person (i) agrees to sell such person's securities on the basis provided in any arrangements approved by the Company and (ii) completes and executes all customary questionnaires, powers of attorney, indemnities, lock-up agreements, underwriting or other agreements and other customary documents as may be reasonably required under the terms of such arrangements. The exclusion of a Holder's Registrable Securities as a result of this Section 3.3 shall not affect the registration of the other Registrable Securities to be included in such Registration.

3.4    Suspension of Sales; Adverse Disclosure; Restrictions on Registration Rights.

3.4.1    Upon receipt of written notice from the Company that a Registration Statement or Prospectus contains a Misstatement, each of the Holders shall forthwith discontinue disposition of Registrable Securities

A-85

Exhibit 7
Page 1010

until it has received copies of a supplemented or amended Prospectus correcting the Misstatement (it being understood that the Company hereby covenants to prepare and file such supplement or amendment as soon as practicable after the time of such notice), or until it is advised in writing by the Company that the use of the Prospectus may be resumed.

3.4.2    If the filing, initial effectiveness or continued use of a Registration Statement in respect of any Registration at any time would (a) require the Company to make an Adverse Disclosure, (b) require the inclusion in such Registration Statement of financial statements that are unavailable to the Company for reasons beyond the Company's control, or (c) in the good faith judgment of the majority of the Board such Registration, be seriously detrimental to the Company and the majority of the Board concludes as a result that it is essential to defer such filing, initial effectiveness or continued use at such time, the Company may delay the filing or initial effectiveness of, or suspend use of, such Registration Statement for a period of not more than one hundred twenty (120) days after the request of the Holders is given; provided, however, that the Company may not invoke this right more than twice in any twelve (12) month period. In the event the Company exercises its rights under this Section 3.4.2, the Holders agree to suspend, immediately upon their receipt of the notice referred to above, their use of the Prospectus relating to any Registration in connection with any sale or offer to sell Registrable Securities.

3.4.3    (a)    During the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of the filing of, and ending upon the completion of the Market Standoff Period, a Company-initiated Registration and provided that the Company continues to actively employ, in good faith, all reasonable efforts to maintain the effectiveness of the applicable shelf registration statement, or (b) if, pursuant to Section 2.1.4, Holders have requested an Underwritten Shelf Takedown and the Company and such Holders are unable to obtain the commitment of underwriters to firmly underwrite such offering, the Company may, upon giving prompt written notice of such action to the Holders, delay any other registered offering pursuant to Section 2.1.4 or 2.4.

## 4    INDEMNIFICATION AND CONTRIBUTION.

4.1    Indemnification by the Company. To the extent permitted by law, the Company agrees to indemnify and hold harmless each Holder of Registrable Securities, and each of their respective officers, employees, affiliates, directors, partners, members, attorneys and agents, and each person, if any, who controls a Holder of Registrable Securities (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) (each, an "**Holder Indemnified Party**"), from and against all losses, judgments, claims, damages, liabilities and out-of-pocket expenses, whether joint or several, arising out of or based upon any untrue statement (or alleged untrue statement) of a material fact contained in any Registration Statement under which the sale of such Registrable Securities was registered under the Securities Act, any Prospectus contained in the Registration Statement, or any amendment or supplement to such Registration Statement, or arising out of or based upon any omission (or alleged omission) to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation by the Company of the Securities Act or any rule or regulation promulgated thereunder applicable to the Company and relating to action or inaction required of the Company in connection with any such registration; and the Company shall promptly reimburse the Holder Indemnified Party for any legal and any other expenses reasonably incurred by such Holder Indemnified Party in connection with investigating and defending any such losses, judgments, claims, damages, liabilities or out-of-pocket expenses whether or not any such person is a party to any such claim or action and including any and all legal and other expenses incurred in giving testimony or furnishing documents in response to a subpoena or otherwise; provided, however, that the indemnity agreement contained in this Section 4.1 shall not apply to amounts paid in settlement of any such claim or proceeding if such settlement is effected without the consent of the Company, which consent shall not be unreasonably withheld, and the Company will not be liable in any such case to the extent that any such losses, judgments, claims, damages, liabilities or out-of-pocket expenses arises out of or is based upon any untrue statement or allegedly untrue statement or omission or alleged omission made in such Registration Statement, Prospectus, or any such amendment or supplement, in reliance upon and in conformity with information furnished to the Company, in writing, by a Holder Indemnified Party expressly for use therein.

4.2    Indemnification by Holders of Registrable Securities. To the extent permitted by law and subject to the limitations set forth in Section 4.4.3 hereof, each selling Holder of Registrable Securities will, in the event that any Registration is being effected under the Securities Act pursuant to this Agreement of any Registrable

A-86

Exhibit 7
Page 1011

Securities held by such selling Holder, indemnify and hold harmless the Company, each of its directors and officers, legal counsel and accountants for the Company and each Underwriter or placement agent or sales agent (if any), and each other selling Holder and each other person, if any, who controls the Company, another selling holder or such Underwriter or placement agent or sales agent within the meaning of the Securities Act, against any losses, claims, judgments, damages, liabilities and out-of-pocket expenses, whether joint or several, insofar as such losses, claims, judgments, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or allegedly untrue statement of a material fact contained in any Registration Statement under which the sale of such Registrable Securities was registered under the Securities Act, any Prospectus contained in the Registration Statement, or any amendment or supplement to the Registration Statement, or arise out of or are based upon any omission or the alleged omission to state a material fact required to be stated therein or necessary to make the statement therein not misleading, if the statement or omission was made in reliance upon and in conformity with information furnished in writing to the Company by such selling Holder expressly for use therein, and shall reimburse the Company, its directors and officers, and each other selling holder or controlling person for any legal or other expenses reasonably incurred by any of them in connection with investigation or defending any such loss, claim, damage, liability or action; provided, however, that the indemnity agreement contained in this Section 4.2 shall not apply to amounts paid in settlement of any such claim or proceeding if such settlement is effected without the consent of the Holder, which consent shall not be unreasonably withheld. Each selling Holder's indemnification obligations hereunder shall be several and not joint and shall be limited to the amount of any net proceeds actually received by such selling holder, except in the case of fraud or willful misconduct by such Holder.

4.3    Conduct of Indemnification Proceedings. Promptly after receipt by any person of any notice of any loss, claim, damage or liability or any action in respect of which indemnity may be sought pursuant to Section 4.1 or 5.2, such person (the "**Indemnified Party**") shall, if a claim in respect thereof is to be made against any other person for indemnification hereunder, notify such other person (the "**Indemnifying Party**") in writing of the loss, claim, judgment, damage, liability or action; provided, however, that the failure by the Indemnified Party to notify the Indemnifying Party shall not relieve the Indemnifying Party from any liability which the Indemnifying Party may have to such Indemnified Party hereunder, except and solely to the extent the Indemnifying Party is actually prejudiced by such failure. If the Indemnified Party is seeking indemnification with respect to any claim or action brought against the Indemnified Party, then the Indemnifying Party shall be entitled to participate in such claim or action, and, to the extent that it wishes, jointly with all other Indemnifying Parties, to assume control of the defense thereof with counsel satisfactory to the Indemnified Party. After notice from the Indemnifying Party to the Indemnified Party of its election to assume control of the defense of such claim or action, the Indemnifying Party shall not be liable to the Indemnified Party for any legal or other expenses subsequently incurred by the Indemnified Party in connection with the defense thereof other than reasonable costs of investigation; provided, however, that in any action in which both the Indemnified Party and the Indemnifying Party are named as defendants, the Indemnified Party shall have the right to employ separate counsel (but no more than one such separate counsel) to represent the Indemnified Party and its controlling persons who may be subject to liability arising out of any claim in respect of which indemnity may be sought by the Indemnified Party against the Indemnifying Party, with the fees and expenses of such counsel to be paid by such Indemnifying Party if, based upon the written advice of counsel of such Indemnified Party, representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, consent to entry of judgment or effect any settlement of any claim or pending or threatened proceeding in respect of which the Indemnified Party is or could have been a party and indemnity could have been sought hereunder by such Indemnified Party, unless such judgment or settlement includes an unconditional release of such Indemnified Party from all liability arising out of such claim or proceeding.

4.4    Contribution.

4.4.1    If the indemnification provided for in the foregoing Sections 5.1, 5.2 and 5.3 is unavailable to any Indemnified Party in respect of any loss, claim, damage, liability or action referred to herein, then each such Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, claim, damage, liability or action in such proportion as is appropriate to reflect the relative fault of the Indemnified Parties and the Indemnifying Parties in connection with the actions or omissions which resulted in such loss, claim, damage, liability or action, as well as any other relevant equitable considerations. The relative fault of any Indemnified Party and any Indemnifying Party shall

A-87

Exhibit 7
Page 1012

be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by such Indemnified Party or such Indemnifying Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

4.4.2    The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 4.4 were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding Section 4.4.1.

4.4.3    The amount paid or payable by an Indemnified Party as a result of any loss, claim, damage, liability or action referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses incurred by such Indemnified Party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 4.4, no holder of Registrable Securities shall be required to contribute any amount in excess of the dollar amount of the net proceeds (after payment of any underwriting fees, discounts, commissions or taxes) actually received by such holder from the sale of Registrable Securities which gave rise to such contribution obligation. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) with respect to any action shall be entitled to contribution in such action from any person who was not guilty of such fraudulent misrepresentation.

## 5    UNDERWRITING AND DISTRIBUTION.

5.1    Rule 144. The Company covenants that it shall file any reports required to be filed by it under the Securities Act and the Exchange Act and shall take such further action as the holders of Registrable Securities may reasonably request, all to the extent required from time to time to enable such holders to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 under the Securities Act, as such Rules may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission.

## 6    MISCELLANEOUS.

6.1    Other Registration Rights. Except as provided in the Subscription Agreements, the Company represents and warrants that no person, other than the holders of the Registrable Securities, has any right to require the Company to register any shares of the Company's capital stock for sale or to include shares of the Company's capital stock in any registration filed by the Company for the sale of shares of capital stock for its own account or for the account of any other person.

6.2    Assignment; No Third Party Beneficiaries. This Agreement and the rights, duties and obligations of the Company hereunder may not be assigned or delegated by the Company in whole or in part. This Agreement and the rights, duties and obligations of the holders of Registrable Securities hereunder may be freely assigned or delegated by such holder of Registrable Securities in conjunction with and to the extent of any transfer of Registrable Securities by any such holder. This Agreement and the provisions hereof shall be binding upon and shall inure to the benefit of each of the parties, to the permitted assigns of the Holders or holder of Registrable Securities or of any assignee of the Holders or holder of Registrable Securities. This Agreement is not intended to confer any rights or benefits on any persons that are not party hereto other than as expressly set forth in Article 4 and this Section 6.2.

6.3    Notices. All notices, demands, requests, consents, approvals or other communications (collectively, "**Notices**") required or permitted to be given hereunder or which are given with respect to this Agreement shall be in writing and shall be personally served, delivered by reputable air courier service with charges prepaid, or transmitted by hand delivery, electronic transmission with receipt verified by electronic confirmation, addressed as set forth below, or to such other address as such party shall have specified most recently by written notice. Notice shall be deemed given on the date of service or transmission if personally served or transmitted by electronic transmission; provided, that if such service or transmission is not on a business day or is after normal business hours, then such notice shall be deemed given on the next business day. Notice otherwise sent as provided herein shall be deemed given on the next business day following timely delivery of such notice to a reputable air courier service with an order for next-day delivery.

A-88

Exhibit 7
Page 1013

To the Company:

Owlet Baby Care Inc.

2500 Executive Parkway

Lehi, UT 84043

Email:        mabbott@owletcare.com; jbriem@owletcare.com

Attention:    Mike Abbott, President, and Jake Briem, General Counsel

with a copy to:

Latham & Watkins LLP

140 Scott Drive

Menlo Park, CA 94025

Tel:          (650) 470-4809; (713) 546-7420 and (714) 755-8008

Email:        benjamin.potter@lw.com; ryan.maierson@lw.com; drew.capurro@lw.com

Attention:    Benjamin A. Potter; Ryan J. Maierson and Drew Capurro

To a Holder, to the address or contact information set forth in the Company's books and records.

6.4    Severability. This Agreement shall be deemed severable, and the invalidity or unenforceability of any term or provision hereof shall not affect the validity or enforceability of this Agreement or of any other term or provision hereof. Furthermore, in lieu of any such invalid or unenforceable term or provision, the parties hereto intend that there shall be added as a part of this Agreement a provision as similar in terms to such invalid or unenforceable provision as may be possible that is valid and enforceable.

6.5    Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument. Delivery of a signed counterpart of this Agreement by facsimile or email/pdf transmission shall constitute valid and sufficient delivery thereof.

6.6    Entire Agreement. This Agreement (including Schedule A and Schedule B and all agreements entered into pursuant hereto and all certificates and instruments delivered pursuant hereto and thereto) constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all prior and contemporaneous agreements, representations, understandings, negotiations and discussions between the parties, whether oral or written.

6.7    Modifications, Amendments and Waivers. Upon the written consent of (a) the Company and (b) the Holders of a majority of the total Registrable Securities, compliance with any of the provisions, covenants and conditions set forth in this Agreement may be waived, or any of such provisions, covenants or conditions may be amended or modified; provided, however, that in the event any such waiver, amendment or modification would be adverse in any material respect to the material rights or obligations hereunder of a Holder, the written consent of such Holder will also be required; provided further that in the event any such waiver, amendment or modification would be disproportionate and adverse in any material respect to the material rights or obligations hereunder of a Holder, the written consent of such Holder will also be required. No course of dealing between any Holder or the Company and any other party hereto or any failure or delay on the part of a Holder or the Company in exercising any rights or remedies under this Agreement shall operate as a waiver of any rights or remedies of any Holder or the Company. No single or partial exercise of any rights or remedies under this Agreement by a party shall operate as a waiver or preclude the exercise of any other rights or remedies hereunder or thereunder by such party.

6.8    Termination of Existing Registration Rights. The registration rights granted under this Agreement shall supersede any registration, qualification or similar rights of the Holders with respect to any shares or securities of the Company or Legacy Owlet granted under any other agreement, including, but not limited to, the Prior Agreement, and any of such preexisting registration, qualification or similar rights and such agreements shall be terminated and of no further force and effect.

6.9    Term. This Agreement shall terminate with respect to any Holder on the date that such Holder no longer holds any Registrable Securities. The provisions of Article IV shall survive any termination.

A-89

Exhibit 7
Page 1014

6.10    Titles and Headings. Titles and headings of sections of this Agreement are for convenience only and shall not affect the construction of any provision of this Agreement.

6.11    Remedies Cumulative. In the event that the Company fails to observe or perform any covenant or agreement to be observed or performed under this Agreement, the Holder or any other holder of Registrable Securities may proceed to protect and enforce its rights by suit in equity or action at law, whether for specific performance of any term contained in this Agreement or for an injunction against the breach of any such term or in aid of the exercise of any power granted in this Agreement or to enforce any other legal or equitable right, or to take any one or more of such actions, without being required to post a bond. None of the rights, powers or remedies conferred under this Agreement shall be mutually exclusive, and each such right, power or remedy shall be cumulative and in addition to any other right, power or remedy, whether conferred by this Agreement or now or hereafter available at law, in equity, by statute or otherwise.

6.12    Governing Law. THIS AGREEMENT, AND ALL CLAIMS OR CAUSES OF ACTION BASED UPON, ARISING OUT OF, OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES WOULD REQUIRE OR PERMIT THE APPLICATION OF LAWS OF ANOTHER JURISDICTION.

6.13    Jurisdiction; Waiver of Trial by Jury.

6.13.1    Any action based upon, arising out of or related to this Agreement, or the transactions contemplated hereby, shall be brought in the Court of Chancery of the State of Delaware or, if such court declines to exercise jurisdiction, any federal or state court located in New York County, New York, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such action, waives any objection it may now or hereafter have to personal jurisdiction, venue or to convenience of forum, agrees that all claims in respect of the action shall be heard and determined only in any such court, and agrees not to bring any action arising out of or relating to this Agreement or the transactions contemplated hereby in any other court. Nothing herein contained shall be deemed to affect the right of any party to serve process in any manner permitted by Law, or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction, in each case, to enforce judgments obtained in any action brought pursuant to this Section 6.13.1.

6.13.2    EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, COUNTERCLAIM OR OTHER PROCEEDING (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF, CONNECTED WITH OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, OR THE ACTIONS OF THE INVESTOR IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

A-90

Exhibit 7
Page 1015

TABLE OF CONTENTS

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their duly authorized representatives as of the date first written above.

COMPANY:

OWLET, INC.

By: _____

Name:

Title:

HOLDERS:

[ • ]

[Signature Page to Registration Rights Agreement]

A-91

Exhibit 7
Page 1016

TABLE OF CONTENTS

**SCHEDULE A**

**Sponsor Equityholders**

[ • ]

A-92

Exhibit 7
Page 1017

**SCHEDULE B**

[ • ]

A-93

Exhibit 7
Page 1018

TABLE OF CONTENTS

**EXHIBIT F**

**Form of Subscription Agreement**

[*See attached.*]

A-94

Exhibit 7
Page 1019

TABLE OF CONTENTS

**SUBSCRIPTION AGREEMENT**

Sandbridge Acquisition Corporation
1999 Avenue of the Stars, Suite 2088
Los Angeles, CA 90067

Ladies and Gentlemen:

This Subscription Agreement (this "Subscription Agreement") is being entered into by and between Sandbridge Acquisition Corporation, a Delaware corporation ("Sandbridge"), and the undersigned subscriber (the "Investor"), as of the date set forth on Sandbridge's signature page hereto, in connection with the Business Combination Agreement, to be entered into concurrently herewith (as may be amended, supplemented or otherwise modified from time to time, the "Transaction Agreement"), by and among Sandbridge, Owlet Baby Care Inc., a Delaware corporation (the "Company"), Project Olympus Merger Sub, Inc., a Delaware corporation ("Merger Sub"), pursuant to which, among other things, Merger Sub will merge with and into the Company, with the Company as the surviving company in the merger and, after giving effect to such merger, becoming a wholly-owned subsidiary of Sandbridge, on the terms and subject to the conditions therein (such merger, the "Transaction"). In connection with the Transaction, Sandbridge is seeking commitments from interested investors to purchase, prior to the closing of the Transaction, shares of Sandbridge's Class A common stock, par value $0.0001 per share (the "Shares"), in a private placement for a purchase price of $10.00 per share (the "Per Share Purchase Price"). On or about the date of this Subscription Agreement, Sandbridge is entering into subscription agreements (the "Other Subscription Agreements") with certain other investors (the "Other Investors" and together with the Investor, the "Investors"), severally and not jointly, pursuant to which the Investors, severally and not jointly, have agreed to purchase on the closing date of the Transaction, inclusive of the Shares subscribed for by the Investor, an aggregate amount of up to thirteen (13) million Shares, at the Per Share Purchase Price.

The aggregate purchase price to be paid by the Investor for the subscribed Shares (as set forth on the signature page hereto) is referred to herein as the "Subscription Amount."

In connection therewith, and in consideration of the foregoing and the mutual representations, warranties and covenants, and subject to the conditions, set forth herein, and intending to be legally bound hereby, each of the Investor and Sandbridge acknowledges and agrees as follows:

1.    Subscription. The Investor hereby subscribes for and agrees to purchase from Sandbridge, and Sandbridge agrees to issue and sell to the Investor, the number of Shares set forth on the signature page of this Subscription Agreement on the terms and subject to the conditions provided for herein.

2.    Closing. The closing of the sale of the Shares contemplated hereby (the "Closing") is contingent upon the substantially concurrent consummation of the Transaction. The Closing shall occur on the date of, and substantially concurrently with and conditioned upon the effectiveness of, the Transaction. Upon (a) satisfaction or waiver of the conditions set forth in Section 3 below and (b) delivery of written notice from (or on behalf of) Sandbridge to the Investor (the "Closing Notice"), that Sandbridge reasonably expects all conditions to the closing of the Transaction to be satisfied or waived on a date that is not less than five (5) business days from the date on which the Closing Notice is delivered to the Investor, the Investor shall deliver to Sandbridge, two (2) business days prior to the closing date specified in the Closing Notice (the "Closing Date"), the Subscription Amount by wire transfer of United States dollars in immediately available funds to the account(s) specified by Sandbridge in the Closing Notice to be held in escrow until Closing. On the Closing Date, Sandbridge shall issue a number of Shares to the Investor set forth on the signature page to this Subscription Agreement, free and clear of any liens or restrictions (other than those arising under state and federal securities laws), and subsequently cause such Shares to be registered in book entry form in the name of the Investor on Sandbridge's share register; provided, however, that Sandbridge's obligation to issue the Shares to the Investor is contingent upon Sandbridge having received the Subscription Amount in full accordance with this Section 2. In the event that the consummation of the Transaction does not occur within ten (10) business days after the anticipated Closing Date specified in the Closing Notice, Sandbridge shall promptly (but in no event later than twelve (12) business days after the anticipated Closing Date specified in the Closing Notice) return the funds so delivered by the Investor to Sandbridge by wire transfer in immediately available funds to the account specified by the Investor. Notwithstanding such return, (i) failure to close on the Closing Date contained in the Closing Notice shall

A-95

Exhibit 7
Page 1020

not, by itself, be deemed to be a failure of any of the conditions to Closing set forth in this Section 2 to be satisfied or waived, and (ii) Investor shall remain obligated to (A) redeliver funds to Sandbridge following Sandbridge's delivery to Investor of a new Closing Notice with a new Closing Date in accordance with this Subscription Agreement and (B) consummate the Closing upon satisfaction of the conditions set forth in Section 3, subject to termination of this Agreement in accordance with Section 8 below. For purposes of this Subscription Agreement, "business day" shall mean a day, other than a Saturday or Sunday, on which commercial banks in New York, New York are open for the general transaction of business.

3.    Closing Conditions.

a.    The obligation of the parties hereto to consummate the purchase and sale of the Shares pursuant to this Subscription Agreement is subject to the following conditions:

(i)    no applicable governmental authority shall have issued, enforced or entered any judgment or order, which is then in effect and has the effect of making the consummation of the transactions contemplated hereby illegal or otherwise restraining or prohibiting consummation of the transactions contemplated hereby; and

(ii)    (A) all conditions precedent to the closing of the Transaction under the Transaction Agreement shall have been satisfied (as determined by the parties to the Transaction Agreement and other than those conditions under the Transaction Agreement which, by their nature, are to be satisfied at the closing of the Transaction, including to the extent that any such condition is dependent upon the consummation of the purchase and sale of the Shares pursuant to this Subscription Agreement) or waived and (B) the closing of the Transaction shall be scheduled to occur concurrently with or on the same date as the Closing; and

(iii)    no suspension of the qualification of the Shares for offering or sale or trading in any jurisdiction in the United States, or initiation of any proceedings for any of such purposes, shall have occurred and be continuing.

b.    The obligation of Sandbridge to consummate the issuance and sale of the Shares pursuant to this Subscription Agreement shall be subject to the condition that all representations and warranties of the Investor contained in this Subscription Agreement are true and correct in all material respects at and as of the Closing Date, and consummation of the Closing shall constitute a reaffirmation by the Investor of each of the representations and warranties of the Investor contained in this Subscription Agreement as of the Closing Date.

c.    The obligation of the Investor to consummate the purchase of the Shares pursuant to this Subscription Agreement shall be subject to the following conditions:

(i)    no amendment, modification or waiver of the Transaction Agreement (as the same exists on the date of this Subscription Agreement) shall have occurred without the Investor's written consent that would materially and adversely affect the economic benefits that Investor would reasonably expect to receive under this Subscription Agreement;

(ii)    all representations and warranties of Sandbridge contained in this Subscription Agreement shall be true and correct as of the Closing Date (other than those representations and warranties expressly made as of an earlier date, which shall be true and correct as of such date), except, in the case of this clause (ii), for any failure of any such representation and warranty to be so true and correct (without giving effect to any qualification by materiality or Material Adverse Effect contained therein) that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(iii)    Sandbridge shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by the Subscription Agreement to be performed, satisfied or complied with by it at or prior to the Closing; provided, that this condition shall be deemed satisfied unless written notice of such non-compliance is provided by the Investor to Sandbridge, and Sandbridge fails to cure such non-compliance in all material respects within five (5) business days of receipt of such notice;

A-96

Exhibit 7
Page 1021

(iv)     there shall have been no amendment, waiver, or modification to the other Subscription Agreements that materially economically benefits the Other Investor unless the Investor has been offered substantially the same benefits; and

(vi)     the Stock Exchange (as defined herein) shall have conditionally authorized, subject to official notice of issuance, the listing of the Shares.

4.     Further Assurances. Prior to or at the Closing, the Investor shall deliver all such other information as is reasonably requested in order for Sandbridge to issue the Shares to the Investor.

5.     Sandbridge Representations and Warranties. Sandbridge represents and warrants to the Investor that:

a.     Sandbridge is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware. Sandbridge has all corporate power and authority to own, lease and operate its properties and conduct its business as presently conducted and to enter into, deliver and perform its obligations under this Subscription Agreement.

b.     As of the Closing Date, the Shares will be duly authorized and, when issued and delivered to the Investor against full payment therefor in accordance with the terms of this Subscription Agreement, the Shares will be validly issued, fully paid and non-assessable and will not have been issued in violation of or subject to any preemptive or similar rights created under Sandbridge's certificate of incorporation, bylaws or under the General Corporation Law of the State of Delaware.

c.     This Subscription Agreement has been duly authorized, executed and delivered by Sandbridge and, assuming that this Subscription Agreement constitutes the valid and binding agreement of the Investor, this Subscription Agreement is enforceable against Sandbridge in accordance with its terms, except as may be limited or otherwise affected by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other laws relating to or affecting the rights of creditors generally, or (ii) principles of equity, whether considered at law or equity.

d.     The execution and delivery of this Subscription Agreement and the issuance and sale of the Shares and the compliance by Sandbridge with all of the provisions of this Subscription Agreement and the consummation of the transactions contemplated herein will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of Sandbridge or any of its subsidiaries pursuant to the terms of (i) any indenture, mortgage, deed of trust, loan agreement, lease, license or other agreement or instrument to which Sandbridge or any of its subsidiaries is a party or by which Sandbridge or any of its subsidiaries is bound or to which any of the property or assets of Sandbridge is subject that would reasonably be expected to have a material adverse effect on the business, financial condition or results of operations of Sandbridge and its subsidiaries, taken as a whole and assuming for this purpose the consummation of the Transaction (a "Material Adverse Effect") or materially affect the validity of the Shares or the legal authority of Sandbridge to comply in all material respects with the terms of this Subscription Agreement; (ii) result in any violation of the provisions of the organizational documents of Sandbridge; or (iii) result in any violation of any statute or any judgment, order, rule or regulation of any court or governmental agency or body, domestic or foreign, having jurisdiction over Sandbridge or any of their properties that would reasonably be expected to have a Material Adverse Effect or materially affect the validity of the Shares or the legal authority of Sandbridge to comply in all material respects with this Subscription Agreement.

e.     As of their respective dates, all reports (the "SEC Reports") required to be filed by Sandbridge with the U.S. Securities and Exchange Commission (the "SEC") complied in all material respects with the applicable requirements of the Securities Act of 1933, as amended, (the "Securities Act") and the Securities Exchange Act of 1934, as amended (the "Exchange Act") and the rules and regulations of the SEC promulgated thereunder, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. Sandbridge has timely filed each SEC Report, statement, schedule, prospectus and registration statement that Sandbridge was required to file with the SEC since the

A-97

Exhibit 7
Page 1022

effective date of its initial registration statement relating to the initial public offering of its securities. The financial statements of Sandbridge included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the SEC with respect thereto as in effect at the time of filing and fairly present in all material respects the financial position of Sandbridge as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, year-end audit adjustments. A copy of each SEC Report is available to the Investor via the SEC's EDGAR system. There are no outstanding or unresolved comments in comment letters received by Sandbridge from the staff of the Division of Corporation Finance of the SEC with respect to any of the SEC Reports.

f.    Other than the Other Subscription Agreements, the Transaction Agreement and any other agreement expressly contemplated by the Transaction Agreement, Sandbridge has not entered into any side letter or similar agreement with any Other Investor in connection with such investor's investment in the Shares, and no Other Subscription Agreement includes terms and conditions that are materially more favorable to any such Other Investor than Investor hereunder, and such Other Subscription Agreements reflect the same Per Share Purchase Price. The Other Subscription Agreements have not been amended in any material respect following the date of this Subscription Agreement.

g.    Sandbridge is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority, self-regulatory organization or other person in connection with the execution, delivery and performance by Sandbridge of this Subscription Agreement (including, without limitation, the issuance of the Shares), other than (i) filings with the SEC, (ii) filings required by applicable state securities laws, (iii) filings required by the New York Stock Exchange (the "Stock Exchange"), and (iv) the failure of which to obtain would not have, individually or in the aggregate, a Material Adverse Effect.

h.    As of the date of this Subscription Agreement, the authorized capital stock of Sandbridge consists of 1,000,000 shares of Preferred Stock, 100,000,000 shares of Class A common stock ("Class A Stock"), and 10,000,000 shares of Class B common stock (the "Class B Stock"), each par value $0.0001 per share. As of the date of this Subscription Agreement, (i) no Preferred Shares are issued and outstanding, (ii) 23,000,000 shares of Class A Stock are issued and outstanding, (iii) 5,750,000 shares of Class B Stock are issued and outstanding and (iv) 11,500,000 redeemable warrants and 6,600,000 private placement warrants to acquire shares of Class A Stock are outstanding. All (A) issued and outstanding shares of Class A Stock and Class B Stock have been duly authorized, are fully paid and are non-assessable and (B) outstanding warrants have been duly authorized. Except as set forth above, and except for any equity interests issued upon conversion or exercise of any of the equity interests set forth above in accordance with their terms, and other than pursuant to the Other Subscription Agreements, the Transaction Agreement and the other agreements and arrangements referred to therein, as of the date hereof, there are no outstanding options, warrants or other rights to subscribe for, purchase or acquire from Sandbridge any shares of Class A Stock, Class B Stock or other equity interests in Sandbridge, or securities convertible into or exchangeable or exercisable for such equity interests. As of the date hereof, Sandbridge has no subsidiaries, other than Merger Sub, and does not own, directly or indirectly, interests or investments (whether equity or debt) in any person, whether incorporated or unincorporated. There are no stockholder agreements, voting trusts or other agreements or understandings to which Sandbridge is a party or by which it is bound relating to the voting of any securities of Sandbridge, other than (1) as set forth in the SEC Reports and (2) as contemplated by the Transaction Agreement. There are no securities or instruments issued by Sandbridge containing anti-dilution provisions that will be triggered by the issuance of (i) the Shares pursuant to this Subscription Agreement or (ii) the Shares to be issued pursuant to any Other Subscription Agreement, in each case, that have not been or will not be validly waived on or prior to the Closing Date.

i.    The issued and outstanding shares of Class A Stock are registered pursuant to Section 12(b) of the Exchange Act, and are listed for trading on the Stock Exchange. As of the date hereof, there is no suit, action, proceeding or investigation pending or, to the knowledge of Sandbridge, threatened against

A-98

Exhibit 7
Page 1023

Sandbridge by the Stock Exchange or the SEC, respectively, to prohibit or terminate the listing of the Class A Stock, or to deregister the Class A Stock. Sandbridge has taken no action that is designed to terminate the registration of the shares of Class A Stock under the Exchange Act.

j.    Assuming the accuracy of the Investor's representations and warranties set forth in Section 6, no registration under the Securities Act is required for the offer and sale of the Shares by Sandbridge to the Investor hereunder. The Shares (i) were not offered by any form of general solicitation or general advertising and (ii) are not being offered in a manner involving a public offering under, or in a distribution in violation of, the Securities Act, or any state securities laws.

k.    Except for such matters as have not had and would not have, individually or in the aggregate, a Material Adverse Effect, there is no (i) action, suit, claim or other proceeding, in each case by or before any governmental authority pending, or, to the knowledge of Sandbridge, threatened against Sandbridge or (ii) judgment, decree, injunction, ruling or order of any governmental entity or arbitrator outstanding against Sandbridge.

l.    Sandbridge is in compliance with all applicable laws, except where such non-compliance would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Sandbridge has not received any written communication from a governmental authority that alleges that Sandbridge is not in compliance with or is in default or violation of any applicable law, except where such non-compliance, default or violation would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

m.    Other than the Placement Agents (as defined below), Sandbridge has not engaged any broker, finder, commission agent, placement agent or arranger in connection with the sale of the Shares, and Sandbridge is not under any obligation to pay any broker's fee or commission in connection with the sale of the Shares other than to the Placement Agents.

n.    Sandbridge is not a United States real property holding corporation (as defined in Section 897(c)(2) of the Internal Revenue Code of 1986, as amended).

o.    No part of the proceeds of the Subscription Amount will be used, directly or indirectly, for any purpose that would breach the Foreign Corrupt Practices Act of 1977 or the U.K. Bribery Act 2010, each as may be amended, or similar law of any other relevant jurisdiction, or the rules or regulations thereunder, or for any purpose that would breach any U.S. or other applicable anti-money laundering or economic sanctions laws.

p.    Sandbridge is not required to be registered as, and is not an affiliate of, and immediately following the Closing (including the closing of the Transaction) will not be required to register as, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

r.    Sandbridge acknowledges that, notwithstanding anything herein to the contrary, the Shares may be pledged by Investor in connection with a bona fide margin agreement, provided such pledge shall be (i) pursuant to an available exemption from the registration requirements of the Securities Act or (ii) pursuant to, and in accordance with, a registration statement that is effective under the Securities Act at the time of such pledge, and the Investor effecting a pledge of Shares shall not be required to provided Sandbridge with any notice thereof; provided, however, that neither Sandbridge or its counsel shall be required to take any action (or refrain from taking any action) in connection with any such pledge.

6.    <u>Investor Representations and Warranties</u>. The Investor represents and warrants to Sandbridge that:

a.    The Investor (i) is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act), an institutional "accredited investor" (within the meaning of Rule 501(a) under the Securities Act) or a "qualified purchaser" (as defined in Section 2(a)(51)(A) of the Investment Company Act of 1940), in each case, satisfying the applicable requirements set forth on <u>Schedule A</u>, (ii) is acquiring the Shares only for his, her or its own account and not for the account of others, or if the Investor is subscribing for the Shares as a fiduciary or agent for one or more investor accounts, the Investor has full investment discretion with respect to each such account, and the full power and authority to make the acknowledgements, representations and agreements herein on behalf of each

A-99

Exhibit 7
Page 1024

owner of each such account, and (iii) is not acquiring the Shares with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act (and shall provide the requested information set forth on Schedule A). The Investor is not an entity formed for the specific purpose of acquiring the Shares.

b.    The Investor acknowledges and agrees that the Shares are being offered in a transaction not involving any public offering within the meaning of the Securities Act and that the Shares have not been registered under the Securities Act. The Investor acknowledges and agrees that the Shares may not be offered, resold, transferred, pledged or otherwise disposed of by the Investor absent an effective registration statement under the Securities Act except (i) to Sandbridge or a subsidiary thereof, (ii) to non-U.S. persons pursuant to offers and sales that occur outside the United States within the meaning of Regulation S under the Securities Act or (iii) pursuant to another applicable exemption from the registration requirements of the Securities Act, and in each of clauses (i) and (iii) in accordance with any applicable securities laws of the states and other jurisdictions of the United States, and that any certificates representing the Shares shall contain a restrictive legend to such effect. The Investor acknowledges and agrees that the Shares will be subject to the foregoing transfer restrictions and, as a result of these transfer restrictions, the Investor may not be able to readily offer, resell, transfer, pledge or otherwise dispose of the Shares and may be required to bear the financial risk of an investment in the Shares for an indefinite period of time. The Investor acknowledges and agrees that the Shares will not be eligible for offer, resale, transfer, pledge or disposition pursuant to Rule 144 promulgated under the Securities Act until at least one year from the date that Sandbridge files a Current Report on Form 8-K following the Closing Date that includes the "Form 10" information required under applicable SEC rules and regulations. The Investor acknowledges and agrees that it has been advised to consult legal counsel prior to making any offer, resale, transfer, pledge or disposition of any of the Shares.

c.    The Investor acknowledges and agrees that the Investor is purchasing the Shares from Sandbridge. The Investor further acknowledges that there have been no representations, warranties, covenants and agreements made to the Investor by or on behalf of Sandbridge, the Company, any of their respective officers and directors, or any other person or entity, expressly or by implication, other than those representations, warranties, covenants and agreements of Sandbridge expressly set forth in this Subscription Agreement.

d.    The Investor's acquisition and holding of the Shares will not constitute or result in a non-exempt prohibited transaction under Section 406 of the Employee Retirement Income Security Act of 1974, as amended, Section 4975 of the Internal Revenue Code of 1986, as amended, or any applicable similar law.

e.    The Investor acknowledges and agrees that the Investor has received such information as the Investor deems necessary in order to make an investment decision with respect to the Shares, including, with respect to Sandbridge, the Transaction and the business of the Company and its subsidiaries. Without limiting the generality of the foregoing, the Investor acknowledges that he, she or it has reviewed the SEC Reports. The Investor acknowledges and agrees that the Investor and the Investor's professional advisor(s), if any, have had the full opportunity to ask such questions, receive such answers and obtain such information as the Investor and such Investor's professional advisor(s), if any, have deemed necessary to make an investment decision with respect to the Shares.

f.    The Investor became aware of this offering of the Shares solely by means of direct contact between the Investor and Sandbridge, the Company or a representative of Sandbridge or the Company, and the Shares were offered to the Investor solely by direct contact between the Investor and Sandbridge, the Company or a representative of Sandbridge or the Company. The Investor did not become aware of this offering of the Shares, nor were the Shares offered to the Investor, by any other means. The Investor acknowledges that the Shares (i) were not offered to the Investor by any form of general solicitation or general advertising and (ii) are not being offered to the Investor in a manner involving a public offering under, or in a distribution in violation of, the Securities Act, or any state securities laws. The Investor acknowledges that it is not relying upon, and has not relied upon, any statement, representation or warranty made by any person, firm or corporation (including, without limitation, Sandbridge, the Company, the Placement Agents (defined below), any of their respective

A-100

Exhibit 7
Page 1025

affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing), other than the representations and warranties of Sandbridge contained in Section 5 of this Subscription Agreement, in making its investment or decision to invest in Sandbridge. The Investor acknowledges that certain information provided by the Company was based on projections, and such projections were prepared based on assumptions and estimates that are inherently uncertain and are subject to a wide variety of significant business, economic and competitive risks and uncertainties that could cause actual results to differ materially from those contained in the projections.

g.    The Investor acknowledges that it is aware that there are substantial risks incident to the purchase and ownership of the Shares, including those set forth in Sandbridge's filings with the SEC. The Investor has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Shares, and the Investor has sought such accounting, legal and tax advice as the Investor has considered necessary to make an informed investment decision.

h.    Alone, or together with any professional advisor(s), the Investor has analyzed and considered the risks of an investment in the Shares and the Investor is able at this time and in the foreseeable future to bear the economic risk of a total loss of the Investor's investment in Sandbridge. The Investor acknowledges specifically that a possibility of total loss exists.

i.    In making its decision to purchase the Shares, the Investor has relied solely upon independent investigation made by the Investor. Neither Sandbridge nor any of its affiliates have offered the Investor any tax advice relating to Investor's investment in the Shares, or made any representations, warranties or guarantees regarding the tax consequences of Investor's investment in the Shares.

j.    The Investor acknowledges and agrees that no federal or state agency has passed upon or endorsed the merits of the offering of the Shares or made any findings or determination as to the fairness of this investment.

k.    The Investor, if not an individual, has been duly formed or incorporated and is validly existing and is in good standing under the laws of its jurisdiction of formation or incorporation, with power and authority to enter into, deliver and perform its obligations under this Subscription Agreement.

l.    The execution, delivery and performance by the Investor of this Subscription Agreement are within the powers of the Investor, have been duly authorized and will not constitute or result in a breach or default under or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which the Investor is a party or by which the Investor is bound, and, if the Investor is not an individual, will not violate any provisions of the Investor's organizational documents, including, without limitation, its incorporation or formation papers, bylaws, indenture of trust or partnership or operating agreement, as may be applicable. The signature on this Subscription Agreement is genuine, and the signatory has been duly authorized to execute the same, and this Subscription Agreement constitutes a legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms except as may be limited or otherwise affected by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other laws relating to or affecting the rights of creditors generally, and (ii) principles of equity, whether considered at law or equity.

m.    The Investor is not (i) a person or entity named on the List of Specially Designated Nationals and Blocked Persons administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") or in any Executive Order issued by the President of the United States and administered by OFAC ("OFAC List"), or a person or entity prohibited by any OFAC sanctions program, (ii) a Designated National as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (iii) a non-U.S. shell bank or providing banking services indirectly to a non-U.S. shell bank. If the Investor is a financial institution subject to the Bank Secrecy Act (31 U.S.C. Section 5311 et seq.), as amended by the USA PATRIOT Act of 2001, and its implementing regulations (collectively, the "BSA/PATRIOT Act"), the Investor maintains policies and procedures reasonably designed to comply with applicable obligations under the BSA/PATRIOT Act. To the extent required, it maintains policies

A-101

Exhibit 7
Page 1026

and procedures reasonably designed for the screening of its investors against the OFAC sanctions programs, including the OFAC List. To the extent required by applicable law, the Investor maintains policies and procedures reasonably designed to ensure that the funds held by the Investor and used to purchase the Shares were legally derived.

n.    The Investor acknowledges that no disclosure or offering document has been provided to the Investor by Citigroup Global Markets Inc. and BofA Securities, Inc. or any of their respective affiliates (collectively, the "Placement Agents") in connection with the offer and sale of the Shares.

o.    The Investor acknowledges that neither Placement Agent has, nor have any of their respective affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing made any independent investigation with respect to Sandbridge, the Company or its subsidiaries or any of their respective businesses, or the Shares or the accuracy, completeness or adequacy of any information supplied to the Investor by Sandbridge.

p.    The Investor acknowledges that in connection with the issue and purchase of the Shares, neither Placement Agent has acted as the Investor's financial advisor or fiduciary.

q.    The Investor will have sufficient funds to pay the Subscription Amount and consummate the purchase and sale of the Shares pursuant to this Subscription Agreement pursuant to Section 2.

7.    Registration Rights.

(a)    In the event that the Shares are not registered in connection with the consummation of the Transaction, Sandbridge agrees that, within thirty (30) calendar days after the Closing Date, it will file with the SEC (at its sole cost and expense) a registration statement registering the resale of the Shares (the "Registration Statement"), and it shall use its commercially reasonable efforts to have the Registration Statement declared effective as soon as practicable after the filing thereof, but no later than the earliest of (i) sixty (60) calendar days (or ninety (90) calendar days if the SEC notifies Sandbridge that it will "review" the Registration Statement) following the Closing Date and (ii) five (5) business days after Sandbridge is notified (orally or in writing, whichever is earlier) by the SEC that the Registration Statement will not be "reviewed" or will not be subject to further review. Sandbridge agrees to cause such Registration Statement, or another shelf registration statement that includes the Shares to be sold pursuant to this Subscription Agreement, to remain effective until the earliest of (x) the third anniversary of the Closing, (y) the date on which the Investor ceases to hold any Shares issued pursuant to this Subscription Agreement, and (z) on the first date on which the Investor is able to sell all of its Shares issued pursuant to this Subscription Agreement (or shares received in exchange therefor) without restriction under Rule 144 of the Securities Act within ninety (90) days without limitation as to the amount of such securities that may be sold, any volume and manner of sale restrictions which may be applicable to affiliates under Rule 144 and without the requirement for Sandbridge to be in compliance with the current public information required under Rule 144(c)(i) (or Rule 144(i)(2), if applicable). The Investor agrees to disclose its ownership to Sandbridge upon request to assist it in making the determination described above. In no event shall the Investor be identified as a statutory underwriter in the Registration Statement unless requested by the SEC; provided, that if the SEC requests that the Investor be identified as a statutory underwriter in the Registration Statement, the Investor will have an opportunity to withdraw its Shares from the Registration Statement. Notwithstanding the foregoing, if the SEC seeks to prevent Sandbridge from including any or all of the shares proposed to be registered under the Registration Statement due to limitations on the use of Rule 415 of the Securities Act for the resale of the Shares by the applicable stockholders or otherwise, Sandbridge shall use its best efforts to ensure that the SEC determines that (1) the offering contemplated by the Registration Statement is a bona fide secondary offering and not an offering "by or on behalf of the issuer" as defined in Rule 415 of the Securities Act and (2) the Investor is not a statutory underwriter. If Sandbridge is unsuccessful in the efforts described in the preceding sentence then Sandbridge shall cause such Registration Statement to register for resale such number of Shares which is equal to the maximum number of Shares as is permitted by the SEC. In such event, the number of Shares to be registered for each selling stockholder named in the Registration Statement shall be reduced pro rata among all such selling stockholders, and Sandbridge will register Investor's remaining Shares that were not registered at the earliest date permitted by the SEC and subject to the

A-102

Exhibit 7
Page 1027

other terms and conditions of this Section 7. For as long as the Registration Statement shall remain effective pursuant to this Section 7(a), Sandbridge will use commercially reasonable efforts to (1) qualify the Shares for listing on the Stock Exchange, and (2) update or amend the Registration Statement as necessary to include the Shares. For as long as the Investor holds the Shares, Sandbridge will use commercially reasonable efforts to file all reports, and provide all customary and reasonable cooperation, necessary to enable the undersigned to resell the Shares pursuant to the Registration Statement or Rule 144 of the Securities Act (when Rule 144 of the Securities Act becomes available to the Investor), as applicable. Notwithstanding anything to the contrary contained herein, Sandbridge may delay or postpone filing of such Registration Statement, and from time to time require the Investor not to sell under the Registration Statement or suspend the use or effectiveness of any such Registration Statement, if the board of directors of Sandbridge determines in good faith that either in order for the Registration Statement to not contain a material misstatement or omission, an amendment thereto would be needed, or if such filing or use could materially affect a bona fide business or financing transaction of Sandbridge or would require premature disclosure of information that could materially adversely affect Sandbridge (each such circumstance, a "Suspension Event"); provided, that, (I) Sandbridge shall not so delay filing or so suspend the use of the Registration Statement on more than two (2) occasions or for a period of more than sixty (60) consecutive days or more than a total of one hundred-twenty (120) calendar days, in each case in any three hundred sixty (360) day period, and (II) Sandbridge shall use commercially reasonable efforts to make such Registration Statement available for the sale by the undersigned of such securities as soon as practicable thereafter. If so directed by Sandbridge, the Investor will deliver to Sandbridge or, in the Investor's sole discretion destroy, all copies of the prospectus covering the Shares in the Investor's possession; provided, however, that this obligation to deliver or destroy all copies of the prospectus covering the Shares shall not apply (i) to the extent the Investor is required to retain a copy of such prospectus (A) in order to comply with applicable legal or regulatory requirements or (B) in accordance with a bona fide pre-existing document retention policy or (ii) to copies stored electronically on archival servers as a result of automatic data back-up. Sandbridge's obligations to include the Shares issued pursuant to this Subscription Agreement (or shares issued in exchange therefor) for resale in the Registration Statement are contingent upon the Investor furnishing in writing to Sandbridge such information regarding the Investor, the securities of Sandbridge held by the Investor and the intended method of disposition of such Shares, which shall be limited to non-underwritten public offerings, as shall be reasonably requested by Sandbridge to effect the registration of such Shares, and shall execute such documents in connection with such registration as Sandbridge may reasonably request that are customary of a selling stockholder in similar situations; provided that the Investor shall not be required to execute any lock-up or similar agreement or otherwise be subject to any contractual restriction on the ability to transfer the Shares. Sandbridge shall provide to Investor a copy of any filing that is proposed to include disclosure relating to the Investor at least five (5) business days in advance of any disclosure thereof and shall include such revisions to such proposed disclosure as Investor shall reasonably request so as to result in disclosure that is compliant with applicable securities laws and regulations.

(b)    At its expense Sandbridge shall advise the Investor within two (2) business days: (i) when a Registration Statement or any post-effective amendment thereto has become effective; (ii) of any request by the SEC for amendments or supplements to any effective Registration Statement or the prospectus included therein or for additional information; (iii) of the issuance by the SEC of any stop order suspending the effectiveness of any Registration Statement or the initiation of any proceedings for such purpose; (iv) of the receipt by Sandbridge of any notification with respect to the suspension of the qualification of the Shares included therein for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose; and (v) subject to the provisions in this Subscription Agreement, of the occurrence of any event that requires the making of any changes in any Registration Statement or prospectus so that, as of such date, the statements therein are not misleading and do not omit to state a material fact required to be stated therein or necessary to make the statements therein (in the case of a prospectus, in the light of the circumstances under which they were made) not misleading. Upon receipt of any written notice from Sandbridge (which notice shall not contain any material non-public information regarding Sandbridge or the Company) of the happening of any of the foregoing or of a Suspension Event during the period that the Registration Statement is effective or if as a result of a Suspension Event the Registration Statement or related prospectus contains any untrue statement of a

A-103

Exhibit 7
Page 1028

material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made (in the case of the prospectus) not misleading, the undersigned agrees that (1) it will immediately discontinue offers and sales of the Shares under the Registration Statement (excluding, for the avoidance of doubt, sales conducted pursuant to Rule 144) until the undersigned receives copies of a supplemental or amended prospectus (which Sandbridge agrees to promptly prepare) that corrects the misstatement(s) or omission(s) referred to above and receives notice that any post-effective amendment has become effective or unless otherwise notified by Sandbridge that it may resume such offers and sales, and (2) it will maintain the confidentiality of any information included in such written notice delivered by Sandbridge except (A) for disclosure to the Investor's employees, agents and professional advisers who need to know such information and are obligated to keep it confidential, (B) for disclosures to the extent required in order to comply with reporting obligations to its limited partners who have agreed to keep such information confidential and (C) as required by law or subpoena. Sandbridge shall use its commercially reasonable efforts to obtain the withdrawal of any order suspending the effectiveness of any Registration Statement as soon as reasonably practicable. Upon the occurrence of any event contemplated in clauses (i) through (v) above, except for such times as Sandbridge is permitted hereunder to suspend, and has suspended, the use of a prospectus forming part of a Registration Statement, Sandbridge shall use its commercially reasonable efforts to as soon as reasonably practicable prepare a post-effective amendment to such Registration Statement or a supplement to the related prospectus, or file any other required document so that, as thereafter delivered to purchasers of the Shares included therein, such prospectus will not include any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(c)    Indemnification.

(i)    Sandbridge agrees to indemnify and hold harmless, to the extent permitted by law, the Investor, its directors, and officers, trustees, partners, members, managers, shareholders, investment advisors, employees, and agents, and each person who controls the Investor (within the meaning of the Securities Act or the Exchange Act) and each affiliate of the Investor (within the meaning of Rule 405 under the Securities Act) from and against any and all losses, claims, damages, liabilities and expenses (including, without limitation, any attorneys' fees and expenses incurred in connection with defending or investigating any such action or claim) caused by any untrue or alleged untrue statement of material fact contained in any Registration Statement, prospectus included in any Registration Statement ("Prospectus") or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same are caused by or contained in any information furnished in writing to Sandbridge by or on behalf of the Investor expressly for use therein.

(ii)    The Investor agrees, severally and not jointly with any other person that is a party to the Other Subscription Agreements, to indemnify and hold harmless Sandbridge, its directors and officers and agents and each person who controls Sandbridge (within the meaning of the Securities Act) against any losses, claims, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees) resulting from any untrue statement of material fact contained in the Registration Statement, Prospectus or preliminary Prospectus or any amendment thereof or supplement thereto or any omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is contained in any information or affidavit so furnished in writing by the Investor expressly for use therein. In no event shall the liability of the Investor be greater in amount than the dollar amount of the net proceeds received by such Investor upon the sale of the Shares purchased pursuant to this Subscription Agreement giving rise to such indemnification obligation.

(iii)    Any person entitled to indemnification herein shall (1) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give prompt notice shall not impair any person's right to indemnification hereunder to the extent such failure has not prejudiced the indemnifying party) and (2) permit such

A-104

Exhibit 7
Page 1029

indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent. An indemnifying party who elects not to assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of legal counsel to any indemnified party a conflict of interest exists between such indemnified party and any other of such indemnified parties with respect to such claim. No indemnifying party shall, without the consent of the indemnified party, consent to the entry of any judgment or enter into any settlement which cannot be settled in all respects by the payment of money (and such money is so paid by the indemnifying party pursuant to the terms of such settlement) or which settlement does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect of such claim or litigation.

(iv)    The indemnification provided for under this Subscription Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director, employee, agent, affiliate or controlling person of such indemnified party and shall survive the transfer of the Shares purchased pursuant to this Subscription Agreement.

(v)    If the indemnification provided under this Section 7(c) from the indemnifying party is unavailable or insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities and expenses referred to herein, then the indemnifying party, in lieu of indemnifying the indemnified party, shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages, liabilities and expenses in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and indemnified party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, was made by, or relates to information supplied by, such indemnifying party or indemnified party, and the indemnifying party's and indemnified party's relative intent, knowledge, access to information and opportunity to correct or prevent such action. The amount paid or payable by a party as a result of the losses or other liabilities referred to above shall be deemed to include, subject to the limitations set forth above, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution pursuant to this Section 7(c) from any person who was not guilty of such fraudulent misrepresentation. Each indemnifying party's obligation to make a contribution pursuant to this Section 7 shall be individual, not joint and several, and in no event shall the liability of Investor hereunder exceed the net proceeds received by Investor upon the sale of the Shares giving rise to such indemnification obligation.

(d)    In addition, in connection with any sale, assignment, transfer or other disposition of the Shares by the Investor pursuant to Rule 144 or pursuant to any other exemption under the Securities Act such that the Shares held by the Investor become freely tradable and upon compliance by the Investor with the requirements of this Subscription Agreement, if requested by the Investor, Sandbridge shall cause the transfer agent for the Shares (the "Transfer Agent") to remove any restrictive legends related to the book entry account holding such Shares and make a new, unlegended entry for such book entry Shares sold or disposed of without restrictive legends within two (2) trading days of any such request therefor from the Investor, provided that Sandbridge and the Transfer Agent have timely received from the Investor customary representations and other documentation reasonably acceptable to Sandbridge and the Transfer Agent in connection therewith. Subject to receipt from the Investor by Sandbridge and the Transfer Agent of customary representations and other documentation reasonably acceptable to Sandbridge and the Transfer Agent in connection therewith, including, if required by the Transfer Agent, an opinion of Sandbridge's counsel, in a form reasonably acceptable to the Transfer Agent, to the effect that the removal of such restrictive legends in such circumstances may be effected under the Securities Act, the Investor may request that Sandbridge remove any legend from the book

A-105

Exhibit 7
Page 1030

TABLE OF CONTENTS

entry position evidencing its Shares following the earliest of such time as such Shares (i) (x) are subject to or (y) have been or are about to be sold or transferred pursuant to an effective registration statement, (ii) have been or are about to be sold pursuant to Rule 144, or (iii) are eligible for resale under Rule 144(b)(1) or any successor provision without the requirement for Sandbridge to be in compliance with the current public information requirement under Rule 144 and without volume or manner-of-sale restrictions applicable to the sale or transfer of such Shares. If restrictive legends are no longer required for such Shares pursuant to the foregoing, Sandbridge shall, in accordance with the provisions of this Section 7(f) and within two (2) trading days of any request therefor from the Investor accompanied by such customary and reasonably acceptable representations and other documentation referred to above establishing that restrictive legends are no longer required, deliver to the Transfer Agent instructions that the Transfer Agent shall make a new, unlegended entry for such book entry Shares. Sandbridge shall be responsible for the fees of its Transfer Agent and all DTC fees associated with such issuance.

8.    Termination. This Subscription Agreement shall terminate and be void and of no further force or effect, and all rights and obligations of the parties hereunder shall terminate without any further liability on the part of any party in respect thereof, upon the earliest to occur of (a) such date and time as the Transaction Agreement is terminated in accordance with its terms, (b) upon the mutual written agreement of each of the parties hereto to terminate this Subscription Agreement, (c) July 31, 2021, if the Closing has not occurred by such date, and (d) if any of the conditions to Closing set forth in Section 3 of this Subscription Agreement are not satisfied or waived, or are not capable of being satisfied, on or prior to the Closing and, as a result thereof, the transactions contemplated by this Subscription Agreement will not be and are not consummated at the Closing (the termination events described in clauses (a)-(d) above, collectively, the "Termination Events"); provided that nothing herein will relieve any party from liability for any willful breach hereof prior to the time of termination, and each party will be entitled to any remedies at law or in equity to recover losses, liabilities or damages arising from any such willful breach. Sandbridge shall notify the Investor of the termination of the Transaction Agreement promptly after the termination of such agreement. Upon the occurrence of any Termination Event, this Subscription Agreement shall be void and of no further force or effect and any monies paid by the Investor to Sandbridge in connection herewith shall promptly (and in any event within one business day) following the Termination Event be returned to the Investor without any deduction for or on account of any tax, withholding, charges or set-off.

9.    Trust Account Waiver. The Investor acknowledges that Sandbridge is a blank check company with the powers and privileges to effect a merger, asset acquisition, reorganization or similar business combination involving Sandbridge and one or more businesses or assets. The Investor further acknowledges that, as described in Sandbridge's prospectus relating to its initial public offering dated September 14, 2020 (the "IPO Prospectus") available at www.sec.gov, substantially all of Sandbridge's assets consist of the cash proceeds of Sandbridge's initial public offering and private placement of its securities, and substantially all of those proceeds have been deposited in a trust account (the "Trust Account") for the benefit of Sandbridge, its public stockholders and the underwriters of Sandbridge's initial public offering. Except with respect to interest earned on the funds held in the Trust Account that may be released to Sandbridge to pay its tax obligations, if any, the cash in the Trust Account may be disbursed only for the purposes set forth in the IPO Prospectus. For and in consideration of Sandbridge entering into this Subscription Agreement, the receipt and sufficiency of which are hereby acknowledged, the Investor hereby irrevocably waives any and all right, title and interest, or any claim of any kind it has or may have in the future, in or to any monies held in the Trust Account, and agrees not to seek recourse against the Trust Account as a result of, or arising out of, this Subscription Agreement; provided, however, that nothing in this Section 9 shall be deemed to limit the Investor's right, title, interest or claim to any monies held in the Trust Account by virtue of its record or beneficial ownership of shares of Class A Stock currently outstanding on the date hereof, pursuant to a validly exercised redemption right with respect to any such shares of Class A Stock, except to the extent that the Investor has otherwise agreed with Sandbridge to not exercise such redemption right.

10.    Miscellaneous.

a.    Neither this Subscription Agreement nor any rights that may accrue to the Investor hereunder (other than the Shares acquired hereunder, if any) may be transferred or assigned. Notwithstanding the foregoing, Investor may assign its rights and obligations under this Subscription Agreement to one or more of its

A-106

Exhibit 7
Page 1031

affiliates (including other investment funds or accounts managed or advised by the investment manager who acts on behalf of Investor) or, with the Sandbridge's prior written consent, to another person, provided that no such assignment shall relieve Investor of its obligations hereunder if any such assignee fails to perform such obligations.

b.    Sandbridge may request from the Investor such additional information as Sandbridge may deem necessary to register the resale of the Shares and evaluate the eligibility of the Investor to acquire the Shares, and the Investor shall provide such information as may reasonably be requested to the extent readily available and to the extent consistent with its internal policies and procedures; provided that Sandbridge agrees to keep any such information provided by Subscriber confidential.

c.    The Investor acknowledges that Sandbridge will rely on the acknowledgments, understandings, agreements, representations and warranties of the Investor contained in this Subscription Agreement. Prior to the Closing, the Investor agrees to promptly notify Sandbridge and the Placement Agents if any of the acknowledgments, understandings, agreements, representations and warranties set forth in Section 6 above are no longer accurate. The Investor acknowledges and agrees that each purchase by the Investor of Shares from Sandbridge will constitute a reaffirmation of the acknowledgments, understandings, agreements, representations and warranties herein (as modified by any such notice) by the Investor as of the time of such purchase.

d.    Sandbridge acknowledges and agrees that each of the Placement Agents is entitled to rely on the representations and warranties of Sandbridge contained in this Subscription Agreement. The Investor acknowledges and agrees that each of the Placement Agents is entitled to rely on the representations and warranties of the Investor contained in this Subscription Agreement.

e.    Each of the Investor and Sandbridge are entitled to rely upon this Subscription Agreement; provided, however, that the foregoing clause of this Section 10(e) shall not give the Placement Agents any rights other than those expressly set forth herein and, without limiting the generality of the foregoing.

f.    All of the agreements, representations and warranties made by each party hereto in this Subscription Agreement shall survive the Closing.

g.    This Subscription Agreement may not be amended, modified, waived or terminated (other than pursuant to the terms of Section 8 above) except by an instrument in writing, signed by each of the parties hereto. No failure or delay of either party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have hereunder.

h.    This Subscription Agreement (including the schedule hereto) constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, among the parties, with respect to the subject matter hereof. Except as otherwise provided herein, this Subscription Agreement shall not confer any rights or remedies upon any person other than the parties hereto, and their respective successor and assigns, and the parties hereto acknowledge that such persons so referenced are third-party beneficiaries of this Subscription Agreement for the purposes of, and to the extent of, the rights granted to them, if any, pursuant to such provisions.

i.    Except as otherwise provided herein, this Subscription Agreement shall be binding upon, and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns, and the agreements, representations, warranties, covenants and acknowledgments contained herein shall be deemed to be made by, and be binding upon, such heirs, executors, administrators, successors, legal representatives and permitted assigns.

j.    If any provision of this Subscription Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions of this Subscription Agreement shall not in any way be affected or impaired thereby and shall continue in full force and effect.

A-107

Exhibit 7
Page 1032

k.    This Subscription Agreement may be executed by wet-ink signature or electronically, in one or more counterparts and by different parties in separate counterparts, and delivered by facsimile or electronic mail or in .pdf, with the same effect as if all parties hereto had manually signed the same document. All counterparts so executed and delivered shall be construed together and shall constitute one and the same agreement.

l.    The parties hereto acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Subscription Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Subscription Agreement, without posting a bond or undertaking and without proof of damages, to enforce specifically the terms and provisions of this Subscription Agreement, this being in addition to any other remedy to which such party is entitled at law, in equity, in contract, in tort or otherwise.

m.    Any notice or communication required or permitted hereunder to be given to the Investor or Sandbridge shall be in writing and either delivered personally, emailed or sent by overnight mail via a reputable overnight carrier, or sent by certified or registered mail, postage prepaid, (1) in the case of the Investor, to such address(es) or email address(es) set forth on the signature page hereto, and shall be deemed to be given and received (i) when so delivered personally, (ii) when sent, with no mail undeliverable or other rejection or out-of-office notice, if sent by email, or (iii) three (3) business days after the date of mailing to the address below or to such other address or addresses as the Investor may hereafter designate by notice to Sandbridge and (2) in the case of Sandbridge, to its address set forth on the cover of the Registration Statement/Proxy Statement or to ksuslow@sandbridge.com.

n.    The Investor hereby acknowledges and agrees that it will not, and will cause each person acting at the Investor's direction or pursuant to any understanding with the Investor to not, directly or indirectly offer, sell, pledge, contract to sell or sell any option to purchase, or engage in hedging activities or execute any "short sales" as defined in Rule 200 of Regulation SHO under the Exchange Act in respect of, Sandbridge's Class A common stock until the consummation of the transactions contemplated hereby (or such earlier termination of this Subscription Agreement in accordance with its terms). For the avoidance of doubt, nothing contained herein shall prohibit Investor from engaging in (i) any purchase of securities by the Investor, its controlled affiliates or any person or entity acting on behalf of the Investor or any of its controlled affiliates in an open market transaction after the execution of this Subscription Agreement, or (ii) any sale (including the exercise of any redemption right) of securities of Sandbridge (A) held by the Investor, its controlled affiliates or any person or entity acting on behalf of the Investor or any of its controlled affiliates prior to the execution of this Subscription Agreement or (B) purchased by the Investor, its controlled affiliates or any person or entity acting on behalf of the Investor or any of its controlled affiliates in an open market transaction after the execution of this Subscription Agreement. Notwithstanding the foregoing, (i) nothing herein shall prohibit other entities under common management with Investor that have no knowledge of this Subscription Agreement or of Investor's participation in the Transaction (including the Investor's controlled affiliates and/or affiliates) from entering into any "short sales" as defined in Rule 200 of Regulation SHO under the Exchange Act and (ii) in the case of an Investor that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Investor's assets and the portfolio managers have no knowledge of the investment decisions made by the portfolio managers managing other portions of such Investor's assets, the representation set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Shares covered by this Subscription Agreement.

o.    Investor shall pay all of its own expenses in connection with this Subscription Agreement and the transactions contemplated herein.

p.    THE PARTIES HERETO IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE COURT OF CHANCERY OF THE STATE OF DELAWARE (OR, TO THE EXTENT SUCH COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, THE SUPERIOR COURT OF THE STATE OF DELAWARE), OR, IF IT HAS OR CAN ACQUIRE JURISDICTION, THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE SOLELY IN RESPECT OF THE INTERPRETATION AND ENFORCEMENT OF THE PROVISIONS OF THIS SUBSCRIPTION AGREEMENT AND THE DOCUMENTS REFERRED TO IN THIS SUBSCRIPTION AGREEMENT AND IN RESPECT OF THE

A-108

Exhibit 7
Page 1033

TABLE OF CONTENTS

TRANSACTIONS CONTEMPLATED HEREBY, AND HEREBY WAIVE, AND AGREE NOT TO ASSERT, AS A DEFENSE IN ANY ACTION, SUIT OR PROCEEDING FOR INTERPRETATION OR ENFORCEMENT HEREOF OR ANY SUCH DOCUMENT THAT IS NOT SUBJECT THERETO OR THAT SUCH ACTION, SUIT OR PROCEEDING MAY NOT BE BROUGHT OR IS NOT MAINTAINABLE IN SAID COURTS OR THAT VENUE THEREOF MAY NOT BE APPROPRIATE OR THAT THIS SUBSCRIPTION AGREEMENT OR ANY SUCH DOCUMENT MAY NOT BE ENFORCED IN OR BY SUCH COURTS, AND THE PARTIES HERETO IRREVOCABLY AGREE THAT ALL CLAIMS WITH RESPECT TO SUCH ACTION, SUIT OR PROCEEDING SHALL BE HEARD AND DETERMINED BY SUCH A DELAWARE STATE OR FEDERAL COURT. THE PARTIES HEREBY CONSENT TO AND GRANT ANY SUCH COURT JURISDICTION OVER THE PERSON OF SUCH PARTIES AND OVER THE SUBJECT MATTER OF SUCH DISPUTE.

EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS SUBSCRIPTION AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS SUBSCRIPTION AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS SUBSCRIPTION AGREEMENT.

11.    Exculpation. The Investor acknowledges and agrees that none of (i) any other investor pursuant to any other subscription agreement related to the private placement of the Shares (including the investor's respective affiliates or any control persons, officers, directors or employees) or (ii) the Placement Agents, their respective affiliates or any control persons, officers, directors, or employees shall have any liability to the Investor pursuant to, arising out of or relating to this Subscription Agreement, the negotiation hereof or thereof or its subject matter, or the transactions contemplated hereby or thereby, including, without limitation, with respect to any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase of the Shares or with respect to any claim (whether in tort, contract or otherwise) for breach of this Subscription Agreement or in respect of any written or oral representations made or alleged to be made in connection herewith, as expressly provided herein, or for any actual or alleged inaccuracies, misstatements or omissions with respect to any information or materials of any kind furnished by Sandbridge, the Company, the Placement Agents or any Non-Party Affiliate concerning Sandbridge, the Company, the Placement Agents, any of their controlled affiliates, this Subscription Agreement or the transactions contemplated hereby. For purposes of this Subscription Agreement, "Non-Party Affiliates" means each former, current or future officer, director, employee, partner, member, manager, direct or indirect equityholder or affiliate of Sandbridge, the Company, any Placement Agent or any of Sandbridge's, the Company's or any Placement Agent's controlled affiliates or any family member of the foregoing.

12.    Disclosure. Sandbridge shall, by 9:00 a.m., New York City time, on the first (1st) business day immediately following the date of this Subscription Agreement, issue one or more press releases or file with the SEC a Current Report on Form 8-K (collectively, the "Disclosure Document") disclosing all material terms of the transactions contemplated hereby and by the Other Subscription Agreements, the Transaction and any other material, nonpublic information that Sandbridge, the Company or any of its officers, directors, employees or agents (including the Placement Agents) has provided to the Investor at any time prior to the filing of the Disclosure Document. From and after the issuance of the Disclosure Document, the Investor shall not be in possession of any material, non-public information received from Sandbridge or any of its officers, directors, employees or agents (including the Placement Agents), and the Investor shall no longer be subject to any confidentiality or similar obligations under any current agreement, whether written or oral, with Sandbridge or any of its affiliates or agents relating to the transactions contemplated by this Subscription Agreement. Except with the express written consent of Investor and unless prior thereto the Investor shall have executed a written agreement regarding the confidentiality and use of such information, Sandbridge shall not, and shall cause its officers, directors, employees and agents, not to, provide the Investor with any material, non-public information regarding Sandbridge or the Transaction from and after the filing of the Disclosure Document. Sandbridge acknowledges that the Investor is entitled to rely on provisions of this Section 12 in effecting transactions in securities of Sandbridge. Notwithstanding anything in this Subscription Agreement to the contrary, Sandbridge (i) shall not, without the prior written consent of

A-109

Exhibit 7
Page 1034

Investor, publicly disclose the name of Investor or any of its affiliates, or include the name of Investor or any of its affiliates in any press release or marketing materials of Sandbridge and (ii) shall not, without the prior written consent of Investor publicly disclose the name of Investor or any of its affiliates, or include the name of Investor or any of its affiliates in any filings with the Commission or any regulatory agency or trading market except (A) required by the federal securities law in connection with the Registration Statement, and (B), to the extent such disclosure is required by law, at the request of the Staff of the Commission or regulatory agency or under the regulations of the NYSE or by any other governmental authority, in which case Sandbridge shall provide Investor with prior written notice of such disclosure permitted under this subclause (B).

13.    Legal Opinions. If a transfer agent requires a legal opinion stating that it is permissible to remove the restrictive legend from the Shares pursuant to Rule 144 of the Securities Act in order to effect a proposed transfer of Shares by the Investor that is otherwise permissible under Rule 144 of the Securities Act, then at the Investor's request, Sandbridge shall promptly, at its sole cost and expense, cause its legal counsel to issue such opinion to the transfer agent, subject to receipt by Sandbridge's counsel and transfer of any reasonable and customary documentation they may require from or on behalf of the Investor.

14.    Massachusetts Business Trust. If Subscriber is a Massachusetts Business Trust, a copy of the Agreement and Declaration of Trust of Subscriber or any affiliate thereof is on file with the Secretary of State of the Commonwealth of Massachusetts and notice is hereby given that the Subscription Agreement is executed on behalf of the trustees of Subscriber or any affiliate thereof as trustees and not individually and that the obligations of the Subscription Agreement are not binding on any of the trustees, officers or stockholders of Subscriber or any affiliate thereof individually but are binding only upon Subscriber or any affiliate thereof and its assets and property.

[*SIGNATURE PAGES FOLLOW*]

A-110

Exhibit 7
Page 1035

**TABLE OF CONTENTS**

**IN WITNESS WHEREOF**, the Investor has executed or caused this Subscription Agreement to be executed by its duly authorized representative as of the date set forth below.

Name of Investor:                                          State/Country of Formation or Domicile:

[INVESTOR]


By:_____

Name:_____

Title:_____

Name in which Shares are to be registered (if different):          Date: _____, 2021

Investor's EIN:

Business Address-Street:                                   Mailing Address-Street (if different):

City, State, Zip:                                          City, State, Zip:

Attn:_____          Attn:_____

Telephone No.:                                            Telephone No.:

Email Address:                                            Email Address:

Number of Shares subscribed for:

Aggregate Subscription Amount: $

                                                          Price Per Share: $10.00

You must pay the Subscription Amount by wire transfer of United States dollars in immediately available funds to the account specified by Sandbridge in the Closing Notice.

A-111

Exhibit 7
Page 1036

TABLE OF CONTENTS

IN WITNESS WHEREOF, Sandbridge has accepted this Subscription Agreement as of the date set forth below.

SANDBRIDGE ACQUISITION CORPORATION

By: _____

Name:

Title:

Date: _____, 2021

A-112

Exhibit 7
Page 1037

TABLE OF CONTENTS

**SCHEDULE A**

**ELIGIBILITY REPRESENTATIONS OF THE INVESTOR**

A.    QUALIFIED INSTITUTIONAL BUYER STATUS
(Please check the applicable subparagraphs):

☐    We are a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act (a "QIB")).

**\*\* OR \*\***

B.    INSTITUTIONAL ACCREDITED INVESTOR STATUS
(Please check the applicable subparagraphs):

1.    ☐ We are an "accredited investor" (within the meaning of Rule 501(a) under the Securities Act or an entity in which all of the equity holders are accredited investors within the meaning of Rule 501(a) under the Securities Act), and have marked the appropriate box in the following item indicating the provision under which we qualify as an "accredited investor."

2.    ☐ We are not a natural person.

**\*\*\* OR \*\*\***

C.    We are a "qualified purchaser" as defined in Section 2(a)(51)(A) of the Investment Company Act of 1940.

**\*\* AND \*\***

D.    AFFILIATE STATUS
(Please                    check the applicable box)

SUBSCRIBER:
☐
is:

☐ is not:

an "affiliate" (as defined in Rule 144 under the Securities Act) of the Company or acting on behalf of an affiliate of the Company.

Rule 501(a), in relevant part, states that an "accredited investor" shall mean any person who comes within any of the below listed categories, or who the issuer reasonably believes comes within any of the below listed categories, at the time of the sale of the securities to that person. The Investor has indicated, by marking the appropriate box below, the provision(s) below which apply to the Investor and under which the Investor accordingly qualifies as an "accredited investor."

☐ Any bank, registered broker or dealer, insurance company, registered investment company, business development company, or small business investment company;

☐ Any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000;

☐ Any employee benefit plan, within the meaning of the Employee Retirement Income Security Act of 1974, if a bank, insurance company, or registered investment adviser makes the investment decisions, or if

Exhibit 7
Page 1038

Exhibit 7
Page 1039

the plan has total assets in excess of $5,000,000;

☐ Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

☐ Any trust with assets in excess of $5,000,000, not formed to acquire the securities offered, whose purchase is directed by a sophisticated person; or

☐ Any entity in which all of the equity owners are accredited investors meeting one or more of the above tests.

***This page should be completed by the Investor and constitutes a part of the Subscription Agreement.***

Please indicate the basis of the Investor's status as a "qualified purchaser," as defined in Section 2(a)(51)(A) of the Investment Company Act and the regulations issued thereunder:

☐   The Investor is an individual who owns not less than $5,000,000 in "Investments" either separately or jointly or as community property with his or her spouse. (See Annex A to this Investor Questionnaire for the definition of and method for calculating the value of "Investments");

☐   The Investor is an entity, acting for its own account or the accounts of other "qualified purchasers," that in the aggregate owns and invests on a discretionary basis not less than $25,000,000 in "Investments." (See Annex A to this Investor Questionnaire for the definition of and method for calculating the value of "Investments");

☐   The Investor is a "family company" that owns not less than $5,000,000 in "Investments." (See Annex A to this Investor Questionnaire for the definition of and method for calculating the value of "Investments.") A "family company" means any company (including a trust, partnership, limited liability company or corporation) that is owned directly or indirectly by or for (a)(i) two or more individuals who are related as siblings, spouses or former spouses, or as direct lineal descendants by birth or adoption, or (ii) spouses of such persons, (b) estates of such persons, or (c) foundations, charitable organizations or trusts established by or for the benefit of such persons;

☐   The Investor is an entity (other than a trust), each of the beneficial owners of which is a "qualified purchaser"; or

☐   The Investor is a trust that was not formed for the specific purpose of investing in the Company, each trustee (or other person authorized to make decisions with respect to the trust) and each grantor (or other person who has contributed assets to the trust) of which are "qualified purchasers".

A-114

Exhibit 7
Page 1040

**Annex A to Investor Questionnaire**

### INVESTMENTS

For determining whether the Investor is a "qualified purchaser," the term "Investments" means:

1.  Securities (as defined by Section 2(a)(1) of the Securities Act), other than securities of an issuer that controls, is controlled by, or is under common control with, the Investor that owns such securities, unless the issuer of such securities is a "public company," a "financial company" or has more than $50,000,000 in equity, as reflected on such company's financial statements which present such equity information as of a date within 16 months preceding the date on which the Investor acquires an Interest. The term "public company" includes all companies that file reports pursuant to Section 13 or 15(d) of the Exchange Act or have a class of securities that are listed on a Designated Offshore Securities Market, as defined by Regulation S of the Securities Act. The term "financial company" includes a commodity pool or an "investment company" (whether U.S. or offshore) or a company required to register as such under the Investment Company Act but for the exclusions or exemptions provided by Sections 3(c)(1) through 3(c)(9) of the Investment Company Act;

2.  Real estate held for investment purposes so long as it is not used by the prospective qualified purchaser or a close relative (generally, a sibling, spouse, former spouse, direct ancestor or descendent or a spouse of such an ancestor or descendent) for personal or business purposes. However, real estate owned by a prospective qualified purchaser who is primarily in the real estate business is includable as an "investment" even if it is held by the owner;

3.  "Commodity Interests" or "Physical Commodity" held for investment purposes by the Investor. "Commodity Interests" means commodity futures contracts, options on commodity futures contracts, and options on physical commodities traded on or subject to the rules of (a) any contract market designated for trading such transactions under the Commodity Exchange Act, and the regulations issued thereunder and the rules thereunder, or (b) any board of trade or exchange outside the United States, as contemplated in Part 30 of the rules under the Commodity Exchange Act. "Physical Commodity" means any physical commodity with respect to which a "Commodity Interest" is traded on a market specified in the definition of Commodity Interests above;

4.  To the extent not securities, "financial contracts" entered into for investment purposes or in connection with investments. "Financial contracts" means any arrangement that (a) takes the form of an individually negotiated contract, agreement, or option to buy, sell, lend, swap, or repurchase, or other similar individually negotiated transaction commonly entered into by participants in the financial markets; (b) is in respect of securities, commodities, currencies, interest or other rates, other measures of value, or any other financial or economic interest similar in purpose or function to any of the foregoing; and (c) is entered into in response to a request from a counterparty for a quotation, or is otherwise entered into and structured to accommodate the objectives of the counterparty to such arrangement;

5.  In the case of an Investor that is a commodity pool operator or an investment company excepted from registration by Section 3(c)(1) or 3(c)(7) of the Investment Company Act, any amounts payable to such Investor pursuant to a firm agreement or similar binding commitment pursuant to which a person has agreed to acquire an interest in, or make Capital Contributions to, the Investor upon the demand of the Investor; and

6.  Cash and cash equivalents (including foreign currencies) held for investment purposes. "Cash and cash equivalents" include bank deposits, certificates of deposits, bankers acceptances and similar bank instruments held for investment purposes and the net cash surrender value of an insurance policy.

   *"Investments" do not include other assets which do not reflect experience in the financial markets, such as jewelry, art work, antiques and other collectibles.*

   For purposes of determining the amount of "Investments" owned by a company, "Investments" of a parent company and its majority-owned subsidiaries may be aggregated to meet the minimum "investment" amount requirements, regardless of which company is the prospective qualified purchaser.

   For purposes of determining the amount of "Investments" owned by an individual, there may be included any "investment" held jointly or as community property with such person's spouse. In

A-115

Exhibit 7
Page 1041

determining whether spouses who are making a joint investment in the Partnership are qualified purchasers, there may be included in the amount of each spouse's "Investments" any "Investments" owned by the other spouse (whether or not such "investments" are held jointly).

In determining whether an individual is a qualified purchaser, there may be included in the amount of such person's "Investments" any "Investments" held in an individual retirement account or similar account the investments of which are directed by and held for the benefit of such person.

## VALUATION OF INVESTMENTS

In determining the value of "Investments" in order to ascertain qualified purchaser status, the aggregate amount of "Investments" owned and invested on a discretionary basis by such person shall be their fair market value on the most recent practicable date or their cost provided that the same method must be used for all "Investments." However,

1.   in the case of "Commodity Interests," the amount of "Investments" is the value of the initial margin or option premium deposited in connection with such "Commodity Interests," and

2.   in each case, there shall be deducted from the amount of such "Investments" the following amounts:

(a)   the amount of any outstanding indebtedness incurred by the prospective qualified purchaser to acquire such "Investments," and

(b)   in the case of a Family Company (as defined in the Investor Questionnaire), in addition to the amounts specified in paragraph (2)(a) above, any outstanding indebtedness incurred by an owner of the Family Company to acquire the Family Company's "Investments."

A-116

Exhibit 7
Page 1042

TABLE OF CONTENTS

**EXHIBIT G**

**Form of Stockholders Agreement**

[*See attached.*]

A-117

Exhibit 7
Page 1043

**STOCKHOLDERS AGREEMENT**

This Stockholders Agreement (as the same may be amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**") is made and entered into effective as of [ ], 2021 by and among Owlet, Inc., a Delaware corporation (the "**Company**"), Eclipse Ventures Fund I, L.P. and Eclipse Continuity Fund I, L.P. (together with their respective Affiliates, "**Eclipse**"). The Company and Eclipse are sometimes referred to herein collectively as the "**Parties**" and individually as a "**Party**."

**RECITALS**

**WHEREAS**, the Company and Owlet Baby Care Inc., a Delaware corporation ("**Legacy Owlet**"), are party to that certain Business Combination Agreement, dated as of February 15, 2021 (as it may be amended, supplemented, amended and restated or otherwise modified from time to time, the "**Business Combination Agreement**"), by and among the Company, Project Olympus Merger Sub, Inc. ("**Merger Sub**") and Legacy Owlet, pursuant to which, subject to the terms and conditions set forth therein, Merger Sub will merge with and into Legacy Owlet (the "**Merger**"), with Legacy Owlet surviving the Merger as a wholly owned subsidiary of the Company;

**WHEREAS**, capitalized terms used but not otherwise defined in this Agreement shall have the meanings ascribed to them in the Business Combination Agreement; and

**WHEREAS**, pursuant to the Business Combination Agreement, the Parties are entering into this Agreement to set forth certain understandings between the Parties with respect to certain governance and other matters of the Company.

**NOW, THEREFORE**, in consideration of the representations, covenants and agreements contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

**DEFINITIONS AND CONSTRUCTION**

**Section 1.01    Definitions**. In addition to the terms defined elsewhere herein, the following terms have the following meanings when used herein with initial capital letters:

"**Affiliate**" has the meaning set forth in Rule 12b-2 promulgated under the Exchange Act, as in effect on the date hereof.

"**Agreement**" has the meaning set forth in the Preamble hereto.

"**Beneficially Own**" has the meaning set forth in Rule 13d-3 promulgated under the Exchange Act.

"**Board**" means the board of directors of the Company.

"**Business Combination Agreement**" has the meaning set forth in the Recitals hereto.

"**Bylaws**" means the Amended and Restated Bylaws of the Company, as amended or amended and restated from time to time.

"**Certificate of Incorporation**" means the Amended and Restated Certificate of Incorporation of the Company, as amended, restated and/or amended and restated from time to time.

"**Closing**" has the meaning set forth in the Business Combination Agreement.

"**Common Stock**" means the Company's Class A common stock, with a par value of $0.0001 per share.

"**Company**" has the meaning set forth in the Recitals hereto.

"**Company Stockholders Meeting**" means an annual meeting or special meeting of the stockholders of the Company, in each case, including any adjournment or postponement thereof, at which Directors are to be elected to the Board.

"**control**" (including its correlative meanings, "**controlled by**" and "**under common control with**") has the meaning set forth in the Business Combination Agreement.

"**Director**" means any member of the Board.

A-118

Exhibit 7
Page 1044

"**Eclipse Director**" has the meaning set forth in Section 2.01(a).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder, as the same may be amended from time to time.

"**Governmental Authority**" has the meaning set forth in the Business Combination Agreement.

"**Law**" has the meaning set forth in the Business Combination Agreement.

"**Legacy Owlet**" has the meaning set forth in the Preamble hereto.

"**Merger**" has the meaning set forth in the Recitals hereto.

"**Merger Sub**" has the meaning set forth in the Recitals hereto.

"**Necessary Action**" means, with respect to any party and a specified result, all actions (to the extent such actions are not prohibited by applicable law, within such party's control and do not directly conflict with any rights expressly granted to such party in this Agreement, the Business Combination Agreement, the Registration Rights Agreement, the Certificate of Incorporation or the Bylaws) reasonably necessary and desirable within its control to cause such result.

"**Non-Recourse Party**" has the meaning set forth in Section 4.15.

"**NYSE**" means the New York Stock Exchange.

"**Parties**" or "**Party**" has the meaning set forth in the Preamble hereto.

"**Person**" has the meaning set forth in the Business Combination Agreement.

"**Proceeding**" has the meaning set forth in the Business Combination Agreement.

"**Representative**" has the meaning set forth in the Business Combination Agreement.

"**Shares**" means shares of Common Stock, or any securities of the Company into which such shares of Common Stock are converted or reclassified or for which such shares of Common Stock are exchanged.

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which: (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote generally in the election of directors (or similar fiduciaries) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; or (ii) if a limited liability company, partnership, association or other business entity, a majority of the total voting power of limited liability company interests, partnership interests, stock or equivalent ownership interest of the limited liability company, partnership, association or other business entity is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of the limited liability company, partnership, association or other business entity gains or losses or shall be or control the managing member, managing director or other governing body or general partner of such limited liability company, partnership, association or other business entity.

"**Transaction**" has the meaning set forth in the Business Combination Agreement.

**Section 1.02 Rules of Construction**. For all purposes of this Agreement, except as otherwise provided in this Agreement or unless the context otherwise requires:

the meanings of defined terms are applicable to the singular as well as the plural forms of such terms;

the words "hereof", "herein", "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

references in this Agreement to any Law shall be deemed also to refer to such Law, and all rules and regulations promulgated thereunder;

whenever the words "include", "includes" or "including" are used in this Agreement, they shall mean "without limitation";

A-119

Exhibit 7
Page 1045

the captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement;

pronouns of any gender or neuter shall include, as appropriate, the other pronoun forms; and

all references to "or" shall be construed in the inclusive sense of "and/or."

**CORPORATE GOVERNANCE MATTERS**

**Section 2.01    Nomination Rights of Eclipse**. The Company and Eclipse hereby agree that, subject to the rules of the NYSE, from and after the Closing and until such time as Eclipse Beneficially Owns less than 10.0% of the outstanding Common Stock:

(a)    Eclipse shall be entitled to nominate one individual (the "**Eclipse Director**") for election as a Class III Director at the applicable Company Stockholders Meeting by written notice to the Company given (i) in the case of an annual meeting of the stockholders of the Company, no less than ninety (90) days prior to the one-year anniversary of the preceding year's annual meeting (provided, however, that, if no annual meeting of the Company's stockholders was held in the preceding year, not later than the ninetieth (90th) day prior to such annual meeting or, if later, the tenth (10th) day following the day on which public disclosure (as defined in the Bylaws) was first made by the Company; provided, further, that if the date of the annual meeting of the stockholders of the Company is more than thirty (30) days before or more than sixty (60) days after such anniversary date, not later than the ninetieth (90th) day prior to such annual meeting or, if later, the tenth (10th) day following the day on which public disclosure of the date of such annual meeting was first made by the Company) and (ii) in the case of a special meeting of the stockholders of the Company, not less than the later of ninety (90) days prior to such special meeting or the tenth (10th) day following the day on which public disclosure of the date of such special meeting was first made by the Company, which such notice shall include all information relating to such Eclipse Director that is required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors in a contested election pursuant to Section 14(a) of the Exchange Act (including such Eclipse Director's written consent to being named in the proxy statement as a nominee and to serving as a director if elected);

(b)    if Eclipse nominates an Eclipse Director for election as provided in Section 2.01(a), the Company shall (i) include such Eclipse Director as a nominee for election as a Director at the applicable Company Stockholders Meeting in its proxy solicitation materials (including any form of proxy it distributes), (ii) recommend to the Company's stockholders that such Eclipse Director be elected as a Director at such Company Stockholders Meeting and (iii) take all Necessary Action to cause to be elected and/or maintained in office as a member of the Board the Eclipse Director; and

(c)    the Company shall not take, directly or indirectly, any actions that would knowingly frustrate, obstruct or otherwise affect the provisions of this Agreement and the intention of the parties hereto with respect to Eclipse's right to nominate the Eclipse Director for election as provided in Section 2.01(a).

For the avoidance of doubt, (i) Eclipse's right to nominate an Eclipse Director as a Director under this Section 2.01 (A) shall not be transferable and (B) shall not be subject to any requirement other than as provided in this Section 2.01 that Eclipse provide advance notice of, or comply with any other procedures governing, the nomination of individuals for election to the Board as provided in the Bylaws, and (ii) Eclipse shall not be required to comply with the notice provisions of Section 2.01(a) with respect to an election of Directors at any Company Stockholders Meeting if the Board or any committee thereof shall have nominated the Eclipse Director for election as a Director without regard to the provisions of this Section 2.01.

**Section 2.02    Vacancy**. Eclipse and the Company hereby agree that (i) for so long as Eclipse shall be entitled to nominate a director pursuant to Section 2.01, Eclipse shall have the exclusive right to remove the Eclipse Director and to designate a replacement Eclipse Director for election to the Board to fill a vacancy be reason of death, resignation, disqualification or removal of the Eclipse Director and (ii) the Company shall take all Necessary Action to cause any vacancies with respect to an Eclipse Director to be filled by the replacement Eclipse Director as promptly as reasonably practicable.

**Section 2.03    Chairperson of the Board**. Lior Susan shall serve as Chairperson of the Board until such time as the Board elects a successor Chairperson in accordance with the Bylaws.

A-120

Exhibit 7
Page 1046

**Section 2.04    Classified Board**. The Company represents and warrants that immediately prior to the execution and delivery hereof the Board is divided into three classes, with the Directors serving staggered three-year terms as follows:

(a)    Class I Directors, whose initial terms continue through the 2022 annual meeting of the stockholders of the Company;

(b)    Class II Directors, whose initial terms continue through the 2023 annual meeting of the stockholders of the Company; and

(c)    Class III Directors, whose initial terms continue through the 2024 annual meeting of the stockholders of the Company and include the Eclipse Director.

**Section 2.05    Indemnification and D&O Insurance**. As promptly as reasonably practicable following the Closing, the Company shall enter into an indemnification agreement with each Director, each on substantially the same terms entered into with, and based on the same customary and reasonable form provided to, the other Directors. To the fullest extent permitted by applicable Law, the Company shall not amend, alter or repeal any right to indemnification, advancement of expenses or exculpation benefiting any Director nominated pursuant to this Agreement, as and to the extent consistent with applicable Law, contained in the Company's Certificate of Incorporation or Bylaws (except to the extent such amendment or alteration permits the Company to provide broader rights to indemnification, advancement of expenses or exculpation). The Company shall (a) purchase directors' and officers' liability insurance in an amount determined by the Board to be reasonable and customary and (b) for so long as a Director nominated pursuant to this Article II serves as a Director of the Company, maintain such coverage with respect to such Director and shall take all actions necessary to extend such coverage for a period of not less than six years from any removal or resignation of such Director, in respect of any act or omission occurring at or prior to such event.

**Section 2.06    Reimbursement of Expenses**. The Company shall reimburse the Directors for all reasonable and documented out-of-pocket expenses incurred in connection with their attendance at meetings of the Board and any committees thereof, including travel, lodging and meal expenses.

### REPRESENTATIONS AND WARRANTIES OF ECLIPSE

Eclipse on its own behalf hereby represents and warrants to the Company as of the date of this Agreement, as follows:

**Section 3.01    Organization; Authority**.

(a)    Eclipse (1) is duly formed, duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and (2) has all requisite corporate or other entity power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby and the execution and delivery by Eclipse of this Agreement, the performance and compliance by Eclipse with each of its obligations herein and the consummation by Eclipse of the transactions contemplated hereby have been duly authorized by all necessary corporate or other entity action on the part of Eclipse.

(b)    This Agreement constitutes a valid and binding obligation of Eclipse enforceable in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at Law).

**Section 3.02    No Consent**. Except as provided in this Agreement, no consent, approval or authorization of, or designation, declaration or filing with, any Governmental Authority or other Person on the part of Eclipse is required in connection with the execution, delivery and performance of this Agreement, except where the failure to obtain such consents, approvals, authorizations or to make such designations, declarations or filings would not materially interfere with Eclipse's ability to perform his or its obligations under to this Agreement.

**Section 3.03    No Conflicts; Litigation**. Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, nor compliance with the terms hereof, will, (a) if Eclipse is a legal entity, conflict with or violate any provision of the organizational documents of Eclipse or (b) violate, conflict with or result in a breach of, or constitute a default (with or without notice or lapse of time or both)

A-121

Exhibit 7
Page 1047

under any provision of, any trust agreement, loan or credit agreement, note, bond, mortgage, indenture, lease or other agreement, instrument, permit, concession, franchise, license, judgment, order, notice, decree, statute, law, ordinance, rule or regulation applicable to Eclipse or to Eclipse's property or assets, except, in the case of this clause (b), that would not reasonably be expected to impair, individually or in the aggregate, Eclipse's ability to fulfill its obligations under this Agreement. As of the date of this Agreement, there is no Proceeding pending or, to the knowledge of Eclipse, threatened, against Eclipse or any of Eclipse's Affiliates or any of their respective assets or properties that would materially interfere with Eclipse's ability to perform his or its obligations under this Agreement or that would reasonably be expected to prevent, enjoin, alter or delay any of the transactions contemplated by this Agreement.

## GENERAL PROVISIONS

**Section 4.01    Effectiveness; Termination**. Notwithstanding anything to the contrary contained herein, but subject to the early termination of any provision as a result of an amendment to this Agreement agreed to by the Parties as provided under Section 4.04, this Agreement (other than Section 2.01 (which, for the avoidance of doubt, shall terminate as provided therein), Section 2.02 (which shall survive until the Eclipse's rights pursuant to Section 2.01 terminate as provided therein), the last sentence of Section 2.05 (which, for the avoidance of doubt, shall terminate as provided therein) and this Article IV) shall terminate at such time at which all of the members of the initial Board shall cease to serve as directors.

**Section 4.02    No Agreement as Director or Officer**. Eclipse is signing this Agreement solely in its capacity as a stockholder of the Company.

**Section 4.03    Notices**. All notices, requests, claims, demands and other communications under this Agreement shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by email or by registered or certified mail (postage prepaid, return receipt requested) to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 4.03):

If to the Company, to:

Owlet Inc.

2500 Executive Parkway, Suite 500

Lehi, Utah 84043

Attn:    Mike Abbott
Jake Briem

Email:    mabbott@owletcare.com
jbriem@owletcare.com

with copies (which shall not constitute notice) to:

Latham & Watkins LLP

811 Main Street, Suite 3700

Houston, TX 77002

Attn:    Ryan J. Maierson
Benjamin A. Potter

Email:    Ryan.Maierson@lw.com
Benjamin.Potter@lw.com

If to Eclipse, to such address set forth on Eclipse's signature page or to such other address or addresses as Eclipse may from time to time designate in writing to the Company.

Any Party may change its address for notice at any time and from time to time by written notice to the other Parties, and such change of address shall become effective thirty (30) days after delivery of such notice as provided in this Section 4.03.

A-122

Exhibit 7
Page 1048

**Section 4.04    Amendment; Waiver**.

This Agreement may be amended or modified only by a written agreement executed and delivered by the Company and Eclipse. Any purported amendment by any Party or Parties effected in a manner which does not comply with this Section 4.04 shall be void, *ab initio*.

Except as expressly set forth in this Agreement, neither the failure nor delay on the part of any Party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence.

No Party shall be deemed to have waived any claim arising out of this Agreement, or any right, remedy, power or privilege under this Agreement, unless the waiver of such claim, right, remedy, power or privilege is expressly set forth in a written instrument duly executed and delivered on behalf of such Party, and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

Any Party may unilaterally waive any of its rights hereunder in a signed writing delivered to the Company.

**Section 4.05    Further Assurances**. To the fullest extent permitted by Law, Eclipse agrees to sign such further documents, cause such meetings to be held, resolutions passed and do and perform and cause to be done such further acts and things reasonably necessary in order to give full effect to this Agreement and every provision hereof. To the fullest extent permitted by Law, the Company shall not directly or indirectly take any action that is intended to, or would reasonably be expected to result in, Eclipse being deprived of the rights contemplated by this Agreement.

**Section 4.06    Parties in Interest**. This Agreement shall be binding upon and inure solely to the benefit of each Party, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, other than Section 4.15.

**Section 4.07    Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of Delaware.

**Section 4.08    Waiver of Jury Trial**. THE PARTIES EACH HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY PROCEEDING, CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. THE PARTIES EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH PROCEEDING, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY AND (D) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 4.08.

**Section 4.09    Submission to Jurisdiction**. Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Chancery Court of the State of Delaware for the purposes of any Proceeding, claim, demand, action or cause of action (a) arising under this Agreement or (b) in any way connected with or related or incidental to the dealings of the Parties in respect of this Agreement or any of the transactions

A-123

Exhibit 7
Page 1049

contemplated hereby, and irrevocably and unconditionally waives any objection to the laying of venue of any such Proceeding in any such court, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such Proceeding has been brought in an inconvenient forum. Each Party hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any Proceeding claim, demand, action or cause of action against such Party (i) arising under this Agreement or (ii) in any way connected with or related or incidental to the dealings of the Parties in respect of this Agreement or any of the transactions contemplated hereby, (A) any claim that such Party is not personally subject to the jurisdiction of the courts as described in this Section 4.09 for any reason, (B) that such Party or such Party's property is exempt or immune from the jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (C) that (x) the Proceeding, claim, demand, action or cause of action in any such court is brought against such Party in an inconvenient forum, (y) the venue of such Proceeding, claim, demand, action or cause of action against such Party is improper or (z) this Agreement, or the subject matter hereof, may not be enforced against such Party in or by such courts. Each Party agrees that service of any process, summons, notice or document by registered mail to such party's respective address as provided in Section 4.03 shall be effective service of process for any such Proceeding, claim, demand, action or cause of action.

Section 4.10   **Specific Performance**. The Parties acknowledge and agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof. Eclipse agrees with the Company (and only with the Company) that, in the event of any breach or threatened breach by any other Party of any covenant or obligation contained in this Agreement, the Company shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof in the Court of Chancery of the State of Delaware or, if that court does not have jurisdiction, any federal court located in the State of Delaware or any other Delaware state court without proof of actual damages or otherwise, in addition to any other remedy to which they are entitled at Law or in equity as expressly permitted in this Agreement. Eclipse agrees, severally and not jointly, with the Company (and only with the Company) that, in the event of any breach or threatened breach by the other Party of Section 2.01 of this Agreement, Eclipse or the Company, as the case may be, shall be entitled to seek an injunction or injunctions to prevent such breach or to enforce specifically the performance of the terms and provisions of Section 2.01 of this Agreement in the Court of Chancery of the State of Delaware or, if that court does not have jurisdiction, any federal court located in the State of Delaware or any other Delaware state court without proof of actual damages or otherwise, in addition to any other remedy to which such Party is entitled at Law or in equity as expressly permitted in this Agreement. Eclipse hereby further agrees with the Company (and only with the Company) to waive (a) any defense in any action for specific performance that a remedy at Law would be adequate and (b) any requirement under any Law to post security or a bond as a prerequisite to obtaining equitable relief.

Section 4.11   **Entire Agreement; Assignment**. This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof. This Agreement may not be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties hereto. Any attempted assignment of this Agreement not in accordance with the terms of this Section 4.11 shall be void

Section 4.12   **Severability**. Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable Law, but if any term or other provision of this Agreement is held to be invalid, illegal or unenforceable under applicable Law, all other provisions of this Agreement shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision of this Agreement is invalid, illegal or unenforceable under applicable Law, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 4.13   **Headings**. The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

A-124

Exhibit 7
Page 1050

  **Section 4.14** <u>Counterparts</u>. This Agreement may be executed and delivered (including by facsimile or portable document format (pdf) transmission) in one or more counterparts, and by the different Parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

  **Section 4.15** <u>No Recourse</u>. This Agreement may only be enforced against, and any claim or cause of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement, the transactions contemplated hereby or the subject matter hereof may only be made against the Parties and no past, present or future Affiliate, director, officer, employee, incorporator, member, manager, partner, shareholder, agent, attorney or representative of any Party or any past, present or future Affiliate, director, officer, employee, incorporator, member, manager, partner, stockholder, agent, attorney or representative of any of the foregoing (each, a "**Non-Recourse Party**") shall have any liability arising out of or relating to this Agreement, the negotiation hereof or its subject matter, or the transactions contemplated hereby. Without limiting the rights of any Party against the other Parties, in no event shall any Party or any of its Affiliates seek to enforce this Agreement against, make any claims for breach of this Agreement against, or seek to recover monetary damages from, any Non–Recourse Party.

[<em>Signature Pages Follow.</em>]

A-125

Exhibit 7
Page 1051

TABLE OF CONTENTS

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

**COMPANY:**

**OWLET, INC.**

By: _____

Name: _____

Title: _____

**ECLIPSE:**

**ECLIPSE VENTURES FUND I, L.P.**

By: _____

Name: _____

Title: _____

ADDRESS:

_____

_____

_____

**ECLIPSE CONTINUITY FUND I, L.P.**

By: _____

Name: _____

Title: _____

ADDRESS:

_____

_____

_____

A-126

Exhibit 7
Page 1052

**ANNEX B**

**SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**
**OF**
**SANDBRIDGE ACQUISITION CORPORATION**

Sandbridge Acquisition Corporation (the "Corporation"), a corporation organized and existing under the General Corporation Law of the State of Delaware (the "DGCL"), does hereby certify as follows:

1.    The name of the Corporation is Sandbridge Acquisition Corporation. The Corporation was incorporated under the name Sandbridge Acquisition Corporation by the filing of its original Certificate of Incorporation with the Secretary of State of the State of Delaware on June 23, 2020 (the "Original Certificate").

2.    An Amended and Restated Certificate of Incorporation, which amended and restated the Original Certificate in its entirety, was filed with the Secretary of State of the State of Delaware on September 14, 2020 (as amended from time to time, the "Existing Certificate").

3.    This Second Amended and Restated Certificate of Incorporation (the "Second Amended and Restated Certificate"), which amends and restates the Existing Certificate in its entirety, has been approved by the Board of Directors of the Corporation (the "Board of Directors") in accordance with Sections 242 and 245 of the DGCL and has been adopted by the stockholders of the Corporation at a meeting of the stockholders of the Corporation in accordance with the provisions of Section 211 of the DGCL.

4.    The text of the Existing Certificate is hereby amended and restated by this Second Amended and Restated Certificate to read in its entirety as set forth in EXHIBIT A attached hereto.

5.    This Second Amended and Restated Certificate shall become effective on the date of filing with the Secretary of State of the State of Delaware.

IN WITNESS WHEREOF, Sandbridge Acquisition Corporation has caused this Second Amended and Restated Certificate to be signed by a duly authorized officer of the Corporation, on _____, 2021.

**SANDBRIDGE ACQUISITION**
**CORPORATION**

By: _____

Name:

Title:

B-1

Exhibit 7
Page 1053

**EXHIBIT A**

**ARTICLE I**
**NAME**

The name of the corporation is Owlet, Inc. (the "Corporation").

**ARTICLE II**
**REGISTERED OFFICE AND AGENT**

The address of the Corporation's registered office in the State of Delaware is 1209 Orange Street, in the City of Wilmington, County of New Castle, 19801, and the name of its registered agent at such address is The Corporation Trust Company.

**ARTICLE III**
**PURPOSE**

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "DGCL") as it now exists or may hereafter be amended and supplemented.

**ARTICLE IV**
**CAPITAL STOCK**

The Corporation is authorized to issue two classes of stock to be designated, respectively, "Class A Common Stock" and "Preferred Stock." The total number of shares of capital stock which the Corporation shall have authority to issue is 1,100,000,000. The total number of shares of Class A Common Stock that the Corporation is authorized to issue is 1,000,000,000, having a par value of $0.0001 per share, and the total number of shares of Preferred Stock that the Corporation is authorized to issue is 100,000,000, having a par value of $0.0001 per share.

The designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of capital stock of the Corporation are as follows:

A.    CLASS A COMMON STOCK.

1.    General. The voting, dividend, liquidation, and other rights and powers of the Class A Common Stock are subject to and qualified by the rights, powers and preferences of any series of Preferred Stock as may be designated by the Board of Directors of the Corporation (the "Board of Directors") and outstanding from time to time.

2.    Voting. Except as otherwise provided herein or expressly required by law, each holder of Class A Common Stock, as such, shall be entitled to vote on each matter submitted to a vote of stockholders and shall be entitled to one (1) vote for each share of Class A Common Stock held of record by such holder as of the record date for determining stockholders entitled to vote on such matter. Except as otherwise required by law, holders of Class A Common Stock, as such, shall not be entitled to vote on any amendment to this Second Amended and Restated Certificate (including any Certificate of Designation (as defined below)) that relates solely to the rights, powers, preferences (or the qualifications, limitations or restrictions thereof) or other terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Second Amended and Restated Certificate (including any Certificate of Designation) or pursuant to the DGCL.

Subject to the rights of any holders of any outstanding series of Preferred Stock, the number of authorized shares of Class A Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the stock of the Corporation entitled to vote, irrespective of the provisions of Section 242(b)(2) of the DGCL.

3.    Dividends. Subject to applicable law and the rights and preferences of any holders of any outstanding series of Preferred Stock, the holders of Class A Common Stock, as such, shall be entitled to the payment of dividends on the Class A Common Stock when, as and if declared by the Board of Directors in accordance with applicable law.

B-2

Exhibit 7
Page 1054

4.  Liquidation. Subject to the rights and preferences of any holders of any outstanding series of Preferred Stock, in the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the funds and assets of the Corporation that may be legally distributed to the Corporation's stockholders shall be distributed among the holders of the then outstanding Class A Common Stock *pro rata* in accordance with the number of shares of Class A Common Stock held by each such holder.

B.  PREFERRED STOCK

Shares of Preferred Stock may be issued from time to time in one or more series, each of such series to have such terms as stated or expressed herein and in the resolution or resolutions providing for the creation and issuance of such series adopted by the Board of Directors as hereinafter provided.

Authority is hereby expressly granted to the Board of Directors from time to time to issue the Preferred Stock in one or more series, and in connection with the creation of any such series, by adopting a resolution or resolutions providing for the issuance of the shares thereof and by filing a certificate of designation relating thereto in accordance with the DGCL (a "Certificate of Designation"), to determine and fix the number of shares of such series and such voting powers, full or limited, or no voting powers, and such designations, preferences and relative participating, optional or other special rights, and qualifications, limitations or restrictions thereof, including without limitation thereof, dividend rights, conversion rights, redemption privileges and liquidation preferences, and to increase or decrease (but not below the number of shares of such series then outstanding) the number of shares of any series as shall be stated and expressed in such resolutions, all to the fullest extent now or hereafter permitted by the DGCL. Without limiting the generality of the foregoing, the resolution or resolutions providing for the creation and issuance of any series of Preferred Stock may provide that such series shall be superior or rank equally or be junior to any other series of Preferred Stock to the extent permitted by law and this Second Amended and Restated Certificate (including any Certificate of Designation). Except as otherwise required by law, holders of any series of Preferred Stock shall be entitled only to such voting rights, if any, as shall expressly be granted thereto by this Second Amended and Restated Certificate (including any Certificate of Designation).

The number of authorized shares of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the stock of the Corporation entitled to vote, irrespective of the provisions of Section 242(b)(2) of the DGCL.

**ARTICLE V**
**BOARD OF DIRECTORS**

For the management of the business and for the conduct of the affairs of the Corporation it is further provided that:

A.  Subject to that certain Stockholders Agreement, dated as of [ • ], by and among the Corporation and certain stockholders of the Corporation (as such agreement may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Stockholders Agreement") and the special rights of the holders of one or more outstanding series of Preferred Stock to elect directors, the directors of the Corporation shall be classified with respect to the time for which they severally hold office into three classes, designated as Class I, Class II and Class III. The initial Class I directors shall serve for a term expiring at the first annual meeting of the stockholders following the date of this Second Amended and Restated Certificate; the initial Class II directors shall serve for a term expiring at the second annual meeting of the stockholders following the date of this Second Amended and Restated Certificate; and the initial Class III directors shall serve for a term expiring at the third annual meeting following the date of this Second Amended and Restated Certificate. At each annual meeting of the stockholders of the Corporation beginning with the first annual meeting of the stockholders following the date of this Second Amended and Restated Certificate, subject to the Stockholders Agreement and the special rights of the holders of one or more outstanding series of Preferred Stock to elect directors, the successors of the class of directors whose term expires at that meeting shall be elected to hold office for a term expiring at the annual meeting of the stockholders held in the third year following the year of their election. Each director shall hold office until his or her successor is duly elected and

B-3

Exhibit 7
Page 1055

qualified or until his or her earlier death, resignation, disqualification or removal. No decrease in the number of directors shall shorten the term of any incumbent director. Subject to the Stockholders Agreement, the Board of Directors is authorized to assign members of the Board of Directors already in office to Class I, Class II and Class III.

B.    Except as otherwise expressly provided by the DGCL or this Second Amended and Restated Certificate, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. The number of directors which shall constitute the whole Board of Directors shall be fixed exclusively by one or more resolutions adopted from time to time by the Board of Directors.

C.    Subject to the Stockholders Agreement and the special rights of the holders of one or more outstanding series of Preferred Stock to elect directors, the Board of Directors or any individual director may be removed from office at any time, but only for cause and only by the affirmative vote of the holders of at least two-thirds (66 and 2/3%) of the voting power of all of the then outstanding shares of voting stock of the Corporation entitled to vote at an election of directors.

D.    Subject to the Stockholders Agreement and the special rights of the holders of one or more outstanding series of Preferred Stock to elect directors, except as otherwise provided by law, any vacancies on the Board of Directors resulting from death, resignation, disqualification, retirement, removal or other causes and any newly created directorships resulting from any increase in the number of directors shall be filled exclusively by the affirmative vote of a majority of the directors then in office, even though less than a quorum, or by a sole remaining director (other than any directors elected by the separate vote of one or more outstanding series of Preferred Stock), and shall not be filled by the stockholders. Subject to the Stockholders Agreement, any director appointed in accordance with the preceding sentence shall hold office until the expiration of the term of the class to which such director shall have been appointed or until his or her earlier death, resignation, retirement, disqualification, or removal.

E.    Whenever the holders of any one or more series of Preferred Stock issued by the Corporation shall have the right, voting separately as a series or separately as a class with one or more such other series, to elect directors at an annual or special meeting of stockholders, the election, term of office, removal and other features of such directorships shall be governed by the terms of this Second Amended and Restated Certificate (including any Certificate of Designation). Notwithstanding anything to the contrary in this Article V, the number of directors that may be elected by the holders of any such series of Preferred Stock shall be in addition to the number fixed pursuant to paragraph B of this Article V, and the total number of directors constituting the whole Board of Directors shall be automatically adjusted accordingly. Except as otherwise provided in the Certificate of Designation(s) in respect of one or more series of Preferred Stock, whenever the holders of any series of Preferred Stock having such right to elect additional directors are divested of such right pursuant to the provisions of such Certificate of Designation(s), the terms of office of all such additional directors elected by the holders of such series of Preferred Stock, or elected to fill any vacancies resulting from the death, resignation, disqualification or removal of such additional directors, shall forthwith terminate (in which case each such director thereupon shall cease to be qualified as, and shall cease to be, a director) and the total authorized number of directors of the Corporation shall automatically be reduced accordingly.

F.    In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to adopt, amend or repeal the Amended and Restated Bylaws of the Corporation (as amended and/or restated from time to time, the "Bylaws"). In addition to any vote of the holders of any class or series of stock of the Corporation required by applicable law or by this Second Amended and Restated Certificate (including any Certificate of Designation in respect of one or more series of Preferred Stock) or the Bylaws of the Corporation, the adoption, amendment or repeal of the Bylaws of the Corporation by the stockholders of the Corporation shall require the affirmative vote of the holders of at least two-thirds (66 and 2/3%) of the voting power of all of the then outstanding shares of voting stock of the Corporation entitled to vote generally in an election of directors.

G.    The directors of the Corporation need not be elected by written ballot unless the Bylaws so provide.

B-4

Exhibit 7
Page 1056

## ARTICLE VI
### STOCKHOLDERS

A.    Any action required or permitted to be taken by the stockholders of the Corporation must be effected at an annual or special meeting of the stockholders of the Corporation, and shall not be taken by written consent in lieu of a meeting. Notwithstanding the foregoing, any action required or permitted to be taken by the holders of any series of Preferred Stock, voting separately as a series or separately as a class with one or more other such series, may be taken without a meeting, without prior notice and without a vote, to the extent expressly so provided by the applicable Certificate of Designation relating to such series of Preferred Stock, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding shares of the relevant series of Preferred Stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation in accordance with the applicable provisions of the DGCL.

B.    Subject to the special rights of the holders of one or more series of Preferred Stock, special meetings of the stockholders of the Corporation may be called, for any purpose or purposes, at any time only by or at the direction of the Board of Directors, the Chairperson of the Board of Directors, the Chief Executive Officer or the President, and shall not be called by any other person or persons.

C.    Advance notice of stockholder nominations for the election of directors and of other business proposed to be brought by stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the Bylaws of the Corporation.

## ARTICLE VII
### LIABILITY

No director of the Corporation shall have any personal liability to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the DGCL as the same exists or hereafter may be amended. Any amendment, repeal or modification of this Article VII, or the adoption of any provision of the Second Amended and Restated Certificate inconsistent with this Article VII, shall not adversely affect any right or protection of a director of the Corporation with respect to any act or omission occurring prior to such amendment, repeal, modification or adoption. If the DGCL is amended after approval by the stockholders of this Article VII to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL as so amended.

## ARTICLE VIII
### INDEMNIFICATION

The Corporation shall have the power to provide rights to indemnification and advancement of expenses to its current and former officers, directors, employees and agents and to any person who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise.

## ARTICLE IX
### AMENDMENTS

A.    Notwithstanding anything contained in this Second Amended and Restated Certificate to the contrary, in addition to any vote required by applicable law, the following provisions in this Second Amended and Restated Certificate may be amended, altered, repealed or rescinded, in whole or in part, or any provision inconsistent therewith or herewith may be adopted, only by the affirmative vote of the holders of at least two-thirds (66 and 2/3%) of the total voting power of all the then outstanding shares of stock of the Corporation entitled to vote thereon, voting together as a single class: Part B of Article IV, Article V, Article VI, Article VII, Article VIII, and this Article IX.

B.    If any provision or provisions of this Second Amended and Restated Certificate shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever: (i) the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Second Amended and Restated Certificate (including, without limitation, each portion of any paragraph of this

B-5

Exhibit 7
Page 1057

TABLE OF CONTENTS

Second Amended and Restated Certificate containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not, to the fullest extent permitted by applicable law, in any way be affected or impaired thereby and (ii) to the fullest extent permitted by applicable law, the provisions of this Second Amended and Restated Certificate (including, without limitation, each such portion of any paragraph of this Second Amended and Restated Certificate containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to permit the Corporation to protect its directors, officers, employees and agents from personal liability in respect of their good faith service to or for the benefit of the Corporation to the fullest extent permitted by law.

B-6

Exhibit 7
Page 1058

**ANNEX C**

# Amended and Restated Bylaws of

# Owlet, Inc.

**(a Delaware corporation)**

Exhibit 7
Page 1059

**Table of Contents**

| | | Page |
|---|---|---|
| Article I - Corporate Offices | | C-1 |
| 1.1 | Registered Office | C-1 |
| 1.2 | Other Offices | C-1 |
| Article II - Meetings of Stockholders | | C-1 |
| 2.1 | Place of Meetings | C-1 |
| 2.2 | Annual Meeting | C-1 |
| 2.3 | Special Meeting | C-1 |
| 2.4 | Notice of Business to be Brought before a Meeting. | C-1 |
| 2.5 | Notice of Nominations for Election to the Board. | C-4 |
| 2.6 | Notice of Stockholders' Meetings | C-7 |
| 2.7 | Quorum | C-7 |
| 2.8 | Adjourned Meeting; Notice | C-7 |
| 2.9 | Conduct of Business | C-8 |
| 2.10 | Voting | C-8 |
| 2.11 | Record Date for Stockholder Meetings and Other Purposes | C-8 |
| 2.12 | Proxies | C-9 |
| 2.13 | List of Stockholders Entitled to Vote | C-9 |
| 2.14 | Inspectors of Election | C-9 |
| 2.15 | Delivery to the Corporation. | C-10 |
| Article III - Directors | | C-10 |
| 3.1 | Powers | C-10 |
| 3.2 | Number of Directors | C-10 |
| 3.3 | Election, Qualification and Term of Office of Directors | C-10 |
| 3.4 | Resignation and Vacancies | C-10 |
| 3.5 | Place of Meetings; Meetings by Telephone | C-11 |
| 3.6 | Regular Meetings | C-11 |
| 3.7 | Special Meetings; Notice | C-11 |
| 3.8 | Quorum | C-11 |
| 3.9 | Board Action without a Meeting | C-12 |
| 3.10 | Fees and Compensation of Directors | C-12 |
| Article IV - Committees | | C-12 |
| 4.1 | Committees of Directors | C-12 |
| 4.2 | Committee Minutes | C-12 |
| 4.3 | Meetings and Actions of Committees | C-12 |
| 4.4 | Subcommittees. | C-13 |
| Article V - Officers | | C-13 |
| 5.1 | Officers | C-13 |
| 5.2 | Appointment of Officers | C-13 |
| 5.3 | Subordinate Officers | C-13 |
| 5.4 | Removal and Resignation of Officers | C-13 |
| 5.5 | Vacancies in Offices | C-13 |
| 5.6 | Representation of Shares of Other Corporations | C-13 |
| 5.7 | Authority and Duties of Officers | C-13 |

Exhibit 7
Page 1060

| 5.8 | Compensation. | C-14 |
|---|---|---|
| Article VI - Records | | C-14 |
| Article VII - General Matters | | C-14 |
| 7.1 | Execution of Corporate Contracts and Instruments | C-14 |
| 7.2 | Stock Certificates | C-14 |
| 7.3 | Special Designation of Certificates. | C-14 |

C-i

Exhibit 7
Page 1061

|  |  |  | Page |
|---|---|---|---|
| | 7.4 | Lost Certificates | C-15 |
| | 7.5 | Shares Without Certificates | C-15 |
| | 7.6 | Construction; Definitions | C-15 |
| | 7.7 | Dividends | C-15 |
| | 7.8 | Fiscal Year | C-15 |
| | 7.9 | Seal | C-15 |
| | 7.10 | Transfer of Stock | C-15 |
| | 7.11 | Stock Transfer Agreements | C-16 |
| | 7.12 | Registered Stockholders | C-16 |
| | 7.13 | Waiver of Notice | C-16 |
| Article VIII - Notice | | | C-16 |
| | 8.1 | Delivery of Notice; Notice by Electronic Transmission | C-16 |
| Article IX - Lock-Up | | | C-17 |
| | 9.1 | Lock-Up | C-17 |
| Article X - Indemnification | | | C-18 |
| | 10.1 | Indemnification of Directors and Officers | C-18 |
| | 10.2 | Indemnification of Others | C-18 |
| | 10.3 | Prepayment of Expenses | C-18 |
| | 10.4 | Determination; Claim | C-18 |
| | 10.5 | Non-Exclusivity of Rights | C-18 |
| | 10.6 | Insurance | C-18 |
| | 10.7 | Other Indemnification | C-19 |
| | 10.8 | Continuation of Indemnification | C-19 |
| | 10.9 | Amendment or Repeal; Interpretation | C-19 |
| Article XI - Amendments | | | C-19 |
| Article XII - Forum Selection | | | C-20 |
| Article XIII - Definitions | | | C-20 |

C-ii

Exhibit 7
Page 1062

TABLE OF CONTENTS

**Amended and Restated Bylaws of
Owlet, Inc.**

_____

### Article I - Corporate Offices

1.1   Registered Office.

The address of the registered office of Owlet, Inc. (the "Corporation") in the State of Delaware, and the name of its registered agent at such address, shall be as set forth in the Corporation's certificate of incorporation, as the same may be amended and/or restated from time to time (the "Certificate of Incorporation").

1.2   Other Offices.

The Corporation may have additional offices at any place or places, within or outside the State of Delaware, as the Corporation's board of directors (the "Board") may from time to time establish or as the business of the Corporation may require.

### Article II - Meetings of Stockholders

2.1   Place of Meetings.

Meetings of stockholders shall be held at any place, within or outside the State of Delaware, designated by the Board. The Board may, in its sole discretion, determine that a meeting of stockholders shall not be held at any place, but may instead be held solely by means of remote communication as authorized by Section 211(a)(2) of the General Corporation Law of the State of Delaware (the "DGCL"). In the absence of any such designation or determination, stockholders' meetings shall be held at the Corporation's principal executive office.

2.2   Annual Meeting.

The Board shall designate the date and time of the annual meeting. At the annual meeting, directors shall be elected and other proper business properly brought before the meeting in accordance with Section 2.4 may be transacted. The Board may postpone, reschedule or cancel any previously scheduled annual meeting of stockholders.

2.3   Special Meeting.

Special meetings of the stockholders may be called only by such persons and only in such manner as set forth in the Certificate of Incorporation.

No business may be transacted at any special meeting of stockholders other than the business specified in the notice of such meeting. The Board may postpone, reschedule or cancel any previously scheduled special meeting of stockholders.

2.4   Notice of Business to be Brought before a Meeting.

(a)   At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting. To be properly brought before an annual meeting, business must be (i) specified in a notice of meeting given by or at the direction of the Board, (ii) if not specified in a notice of meeting, otherwise brought before the meeting by the Board or the Chairman of the Board or (iii) otherwise properly brought before the meeting by a stockholder present in person who (A) (1) was a record owner of shares of the Corporation both at the time of giving the notice provided for in this Section 2.4 and at the time of the meeting, (2) is entitled to vote at the meeting and (3) has complied with this Section 2.4 in all applicable respects or (B) properly made such proposal in accordance with Rule 14a-8 under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (as so amended and inclusive of such rules and regulations, the "Exchange Act"). The foregoing clause (iii) shall be the exclusive means for a stockholder to propose business to be brought before an annual meeting of the stockholders. The only matters that may be brought before a special meeting are the matters specified in the notice of meeting given by or at the direction of the person calling the meeting pursuant to Section 2.3, and stockholders shall not be permitted to propose business to be brought before a special meeting of the stockholders. For purposes of this Section 2.4, "present in person" shall mean that the stockholder proposing that the business be brought before the annual meeting of the Corporation, or a

C-1

Exhibit 7
Page 1063

qualified representative of such proposing stockholder, appear at such annual meeting. A "qualified representative" of such proposing stockholder shall be a duly authorized officer, manager or partner of such stockholder or any other person authorized by a writing executed by such stockholder or an electronic transmission delivered by such stockholder to act for such stockholder as proxy at the meeting of stockholders and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at the meeting of stockholders. Stockholders seeking to nominate persons for election to the Board must comply with Section 2.5, and this Section 2.4 shall not be applicable to nominations except as expressly provided in Section 2.5.

(b)    For business to be properly brought before an annual meeting by a stockholder, the stockholder must (i) provide Timely Notice (as defined below) thereof in writing and in proper form to the Secretary of the Corporation and (ii) provide any updates or supplements to such notice at the times and in the forms required by this Section 2.4. To be timely, a stockholder's notice must be delivered to, or mailed and received at, the principal executive offices of the Corporation not less than ninety (90) days nor more than one hundred twenty (120) days prior to the one-year anniversary of the preceding year's annual meeting; provided, however, that if no annual meeting was held in the preceding year, to be timely, a stockholder's notice must be so delivered, or mailed and received, not earlier than the close of business on the one hundred and twentieth (120th) day prior to such annual meeting and not later than the close of business on the later of the ninetieth (90th) day prior to such annual meeting or, if later, the tenth (10th) day following the day on which public disclosure of the date of such annual meeting was first made by the Corporation; provided, further, that if the date of the annual meeting is more than thirty (30) days before or more than sixty (60) days after such anniversary date, to be timely, a stockholder's notice must be so delivered, or mailed and received, not later than the ninetieth (90th) day prior to such annual meeting or, if later, the tenth (10th) day following the day on which public disclosure of the date of such annual meeting was first made by the Corporation (such notice within such time periods, "Timely Notice"). In no event shall any adjournment or postponement of an annual meeting or the announcement thereof commence a new time period for the giving of Timely Notice as described above.

(c)    To be in proper form for purposes of this Section 2.4, a stockholder's notice to the Secretary of the Corporation shall set forth:

(i)    As to each Proposing Person (as defined below), (A) the name and address of such Proposing Person (including, if applicable, the name and address that appear on the Corporation's books and records); and (B) the class or series and number of shares of the Corporation that are, directly or indirectly, owned of record or beneficially owned (within the meaning of Rule 13d-3 under the Exchange Act) by such Proposing Person, except that such Proposing Person shall in all events be deemed to beneficially own any shares of any class or series of the Corporation as to which such Proposing Person has a right to acquire beneficial ownership at any time in the future (the disclosures to be made pursuant to the foregoing clauses (A) and (B) are referred to as "Stockholder Information");

(ii)    As to each Proposing Person, (A) the full notional amount of any securities that, directly or indirectly, underlie any "derivative security" (as such term is defined in Rule 16a-1(c) under the Exchange Act) that constitutes a "call equivalent position" (as such term is defined in Rule 16a-1(b) under the Exchange Act) ("Synthetic Equity Position") and that is, directly or indirectly, held or maintained by such Proposing Person with respect to any shares of any class or series of shares of the Corporation; provided that, for the purposes of the definition of "Synthetic Equity Position," the term "derivative security" shall also include any security or instrument that would not otherwise constitute a "derivative security" as a result of any feature that would make any conversion, exercise or similar right or privilege of such security or instrument becoming determinable only at some future date or upon the happening of a future occurrence, in which case the determination of the amount of securities into which such security or instrument would be convertible or exercisable shall be made assuming that such security or instrument is immediately convertible or exercisable at the time of such determination; and, provided, further, that any Proposing Person satisfying the requirements of Rule 13d-1(b)(1) under the Exchange Act (other than a Proposing Person that so satisfies Rule 13d-1(b)(1) under the Exchange Act solely by reason of Rule 13d-1(b)(1)(ii)(E)) shall not be deemed to hold or maintain the notional amount of any securities that underlie a Synthetic Equity Position held by such Proposing Person as a

C-2

Exhibit 7
Page 1064

hedge with respect to a bona fide derivatives trade or position of such Proposing Person arising in the ordinary course of such Proposing Person's business as a derivatives dealer, (B) any rights to dividends on the shares of any class or series of shares of the Corporation owned beneficially by such Proposing Person that are separated or separable from the underlying shares of the Corporation, (C) any material pending or threatened legal proceeding in which such Proposing Person is a party or material participant involving the Corporation or any of its officers or directors, or any affiliate of the Corporation, (D) any other material relationship between such Proposing Person, on the one hand, and the Corporation or any affiliate of the Corporation, on the other hand, (E) any direct or indirect material interest in any material contract or agreement of such Proposing Person with the Corporation or any affiliate of the Corporation (including, in any such case, any employment agreement, collective bargaining agreement or consulting agreement), (F) a representation that such Proposing Person intends or is part of a group that intends to deliver a proxy statement or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to approve or adopt the proposal or otherwise solicit proxies from stockholders in support of such proposal and (G) any other information relating to such Proposing Person that would be required to be disclosed in a proxy statement or other filing required to be made in connection with solicitations of proxies or consents by such Proposing Person in support of the business proposed to be brought before the meeting pursuant to Section 14(a) of the Exchange Act (the disclosures to be made pursuant to the foregoing clauses (A) through (G) are referred to as "Disclosable Interests"); *provided*, *however*, that Disclosable Interests shall not include any such disclosures with respect to the ordinary course business activities of any broker, dealer, commercial bank, trust company or other nominee who is a Proposing Person solely as a result of being the stockholder directed to prepare and submit the notice required by these bylaws on behalf of a beneficial owner; and

(iii)   As to each item of business that the stockholder proposes to bring before the annual meeting, (A) a brief description of the business desired to be brought before the annual meeting, the reasons for conducting such business at the annual meeting and any material interest in such business of each Proposing Person, (B) the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event that such business includes a proposal to amend the bylaws, the language of the proposed amendment), and (C) a reasonably detailed description of all agreements, arrangements and understandings (x) between or among any of the Proposing Persons or (y) between or among any Proposing Person and any other person or entity (including their names) in connection with the proposal of such business by such stockholder; and (D) any other information relating to such item of business that would be required to be disclosed in a proxy statement or other filing required to be made in connection with solicitations of proxies in support of the business proposed to be brought before the meeting pursuant to Section 14(a) of the Exchange Act; *provided*, *however*, that the disclosures required by this Section 2.4(c)(iii) shall not include any disclosures with respect to any broker, dealer, commercial bank, trust company or other nominee who is a Proposing Person solely as a result of being the stockholder directed to prepare and submit the notice required by these bylaws on behalf of a beneficial owner.

For purposes of this Section 2.4, the term "Proposing Person" shall mean (i) the stockholder providing the notice of business proposed to be brought before an annual meeting, (ii) the beneficial owner or beneficial owners, if different, on whose behalf the notice of the business proposed to be brought before the annual meeting is made, and (iii) any participant (as defined in paragraphs (a)(ii)-(vi) of Instruction 3 to Item 4 of Schedule 14A) with such stockholder in such solicitation.

(d)   A Proposing Person shall update and supplement its notice to the Corporation of its intent to propose business at an annual meeting, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 2.4 shall be true and correct as of the record date for stockholders entitled to vote at the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary of the Corporation at the principal executive offices of the Corporation not later than five (5) business days after the record date for stockholders entitled to vote at the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight (8) business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the

C-3

Exhibit 7
Page 1065

meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof). For the avoidance of doubt, the obligation to update and supplement as set forth in this paragraph or any other Section of these bylaws shall not limit the Corporation's rights with respect to any deficiencies in any notice provided by a stockholder, extend any applicable deadlines hereunder or enable or be deemed to permit a stockholder who has previously submitted notice hereunder to amend or update any proposal or to submit any new proposal, including by changing or adding matters, business or resolutions proposed to be brought before a meeting of the stockholders.

(e)    Notwithstanding anything in these bylaws to the contrary, no business shall be conducted at an annual meeting that is not properly brought before the meeting in accordance with this Section 2.4. The presiding officer of the meeting shall, if the facts warrant, determine that the business was not properly brought before the meeting in accordance with this Section 2.4, and if he or she should so determine, he or she shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted.

(f)    This Section 2.4 is expressly intended to apply to any business proposed to be brought before an annual meeting of stockholders other than any proposal made in accordance with Rule 14a-8 under the Exchange Act and included in the Corporation's proxy statement. In addition to the requirements of this Section 2.4 with respect to any business proposed to be brought before an annual meeting, each Proposing Person shall comply with all applicable requirements of the Exchange Act with respect to any such business. Nothing in this Section 2.4 shall be deemed to affect the rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act.

(g)    For purposes of these bylaws, "public disclosure" shall mean disclosure in a press release reported by a national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14 or 15(d) of the Exchange Act.

2.5    Notice of Nominations for Election to the Board.

(a)    Nominations of any person for election to the Board at an annual meeting or at a special meeting (but only if the election of directors is a matter specified in the notice of meeting given by or at the direction of the person calling such special meeting) may be made at such meeting only (i) as provided in that certain Stockholders Agreement, dated as of [•], by and among the Corporation and certain stockholders of the Corporation (as such agreement may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Stockholders Agreement"), (ii), by or at the direction of the Board, including by any committee or persons authorized to do so by the Board or these bylaws, or (iii) by a stockholder present in person (A) who was a record owner of shares of the Corporation both at the time of giving the notice provided for in this Section 2.5 and at the time of the meeting, (B) is entitled to vote at the meeting, and (C) has complied with this Section 2.5 as to such notice and nomination. For purposes of this Section 2.5, "present in person" shall mean that the stockholder proposing that the business be brought before the meeting of the Corporation, or a qualified representative of such stockholder, appear at such meeting. A "qualified representative" of such proposing stockholder shall be a duly authorized officer, manager or partner of such stockholder or any other person authorized by a writing executed by such stockholder or an electronic transmission delivered by such stockholder to act for such stockholder as proxy at the meeting of stockholders and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at the meeting of stockholders. Other than as provided in the Stockholders Agreement, the foregoing clause (iii) shall be the exclusive means for a stockholder to make any nomination of a person or persons for election to the Board at an annual meeting or special meeting.

(b)    (i) Without qualification, for a stockholder to make any nomination of a person or persons for election to the Board at an annual meeting, the stockholder must (1) provide Timely Notice (as defined in Section 2.4) thereof in writing and in proper form to the Secretary of the Corporation, (2) provide the information, agreements and questionnaires with respect to such stockholder and its candidate for nomination as required to be set forth by this Section 2.5 and (3) provide any updates or supplements to such notice at the times and in the forms required by this Section 2.5.

C-4

Exhibit 7
Page 1066

(ii) Without qualification, if the election of directors is a matter specified in the notice of meeting given by or at the direction of the person calling a special meeting, then for a stockholder to make any nomination of a person or persons for election to the Board at a special meeting, the stockholder must (i) provide Timely Notice thereof in writing and in proper form to the Secretary of the Corporation at the principal executive offices of the Corporation, (ii) provide the information with respect to such stockholder and its candidate for nomination as required by this Section 2.5 and (iii) provide any updates or supplements to such notice at the times and in the forms required by this Section 2.5. To be timely, a stockholder's notice for nominations to be made at a special meeting must be delivered to, or mailed and received at, the principal executive offices of the Corporation not earlier than the one hundred twentieth (120th) day prior to such special meeting and not later than the ninetieth (90th) day prior to such special meeting or, if later, the tenth (10th) day following the day on which public disclosure (as defined in Section 2.4) of the date of such special meeting was first made.

(iii) In no event shall any adjournment or postponement of an annual meeting or special meeting or the announcement thereof commence a new time period for the giving of a stockholder's notice as described above.

(iv) In no event may a Nominating Person provide Timely Notice with respect to a greater number of director candidates than are subject to election by shareholders at the applicable meeting. If the Corporation shall, subsequent to such notice, increase the number of directors subject to election at the meeting, such notice as to any additional nominees shall be due on the later of (i) the conclusion of the time period for Timely Notice, (ii) the date set forth in Section 2.5(b)(ii) or (iii) the tenth day following the date of public disclosure (as defined in Section 2.4) of such increase.

(c)    To be in proper form for purposes of this Section 2.5, a stockholder's notice to the Secretary of the Corporation shall set forth:

(i)    As to each Nominating Person (as defined below), the Stockholder Information (as defined in Section 2.4(c)(i), except that for purposes of this Section 2.5, the term "Nominating Person" shall be substituted for the term "Proposing Person" in all places it appears in Section 2.4(c)(i));

(ii)    As to each Nominating Person, any Disclosable Interests (as defined in Section 2.4(c)(ii), except that for purposes of this Section 2.5, the term "Nominating Person" shall be substituted for the term "Proposing Person" in all places it appears in Section 2.4(c)(ii) and the disclosure with respect to the business to be brought before the meeting in Section 2.4(c)(ii) shall be made with respect to the election of directors at the meeting); and

(iii)    As to each candidate whom a Nominating Person proposes to nominate for election as a director, (A) all information with respect to such candidate for nomination that would be required to be set forth in a stockholder's notice pursuant to this Section 2.5 if such candidate for nomination were a Nominating Person, (B) all information relating to such candidate for nomination that is required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors in a contested election pursuant to Section 14(a) under the Exchange Act (including such candidate's written consent to being named in the proxy statement as a nominee and to serving as a director if elected), (C) a description of any direct or indirect material interest in any material contract or agreement between or among any Nominating Person, on the one hand, and each candidate for nomination or his or her respective associates or any other participants in such solicitation, on the other hand, including, without limitation, all information that would be required to
be disclosed pursuant to Item 404 under
Regulation S-K if such Nominating Person were the "registrant" for purposes of such rule and the candidate for nomination were a director or executive officer of such registrant and (D) a completed and signed questionnaire, representation and agreement as provided in Section 2.5(f).

For purposes of this Section 2.5, the term "Nominating Person" shall mean (i) the stockholder providing the notice of the nomination proposed to be made at the meeting, (ii) the beneficial owner or beneficial owners, if different, on whose behalf the notice of the nomination proposed to be made at the meeting is made, and (iii) any other participant in such solicitation.

C-5

Exhibit 7
Page 1067

(d)    A stockholder providing notice of any nomination proposed to be made at a meeting shall further update and supplement such notice, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 2.5 shall be true and correct as of the record date for stockholders entitled to vote at the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary of the Corporation at the principal executive offices of the Corporation not later than five (5) business days after the record date for stockholders entitled to vote at the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight (8) business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof). For the avoidance of doubt, the obligation to update and supplement as set forth in this paragraph or any other Section of these bylaws shall not limit the Corporation's rights with respect to any deficiencies in any notice provided by a stockholder, extend any applicable deadlines hereunder or enable or be deemed to permit a stockholder who has previously submitted notice hereunder to amend or update any nomination or to submit any new nomination.

(e)    In addition to the requirements of this Section 2.5 with respect to any nomination proposed to be made at a meeting, each Nominating Person shall comply with all applicable requirements of the Exchange Act with respect to any such nominations.

(f)    To be eligible to be a candidate for election as a director of the Corporation at an annual or special meeting, a candidate must be nominated in the manner prescribed in Section 2.5 and the candidate for nomination, whether nominated by the Board or by a stockholder of record, must have previously delivered (in accordance with the time period prescribed for delivery in a notice to such candidate given by or on behalf of the Board), to the Secretary of the Corporation at the principal executive offices of the Corporation, (i) a completed written questionnaire (in a form provided by the Corporation) with respect to the background, qualifications, stock ownership and independence of such proposed nominee and (ii) a written representation and agreement (in form provided by the Corporation) that such candidate for nomination (A) is not and, if elected as a director during his or her term of office, will not become a party to (1) any agreement, arrangement or understanding with, and has not given and will not give any commitment or assurance to, any person or entity as to how such proposed nominee, if elected as a director of the Corporation, will act or vote on any issue or question (a "Voting Commitment") or (2) any Voting Commitment that could limit or interfere with such proposed nominee's ability to comply, if elected as a director of the Corporation, with such proposed nominee's fiduciary duties under applicable law, (B) is not, and will not become a party to, any agreement, arrangement or understanding with any person or entity other than the Corporation with respect to any direct or indirect compensation or reimbursement for service as a director that has not been disclosed to the Corporation and (C) if elected as a director of the Corporation, will comply with all applicable corporate governance, conflict of interest, confidentiality, stock ownership and trading and other policies and guidelines of the Corporation applicable to directors and in effect during such person's term in office as a director (and, if requested by any candidate for nomination, the Secretary of the Corporation shall provide to such candidate for nomination all such policies and guidelines then in effect).

(g)    The Board may also require any proposed candidate for nomination as a Director to furnish such other information as may reasonably be requested by the Board in writing prior to the meeting of stockholders at which such candidate's nomination is to be acted upon in order for the Board to determine the eligibility of such candidate for nomination to be an independent director of the Corporation in accordance with the Corporation's corporate governance guidelines.

(h)    A candidate for nomination as a director shall further update and supplement the materials delivered pursuant to this Section 2.5, if necessary, so that the information provided or required to be provided pursuant to this Section 2.5 shall be true and correct as of the record date for stockholders entitled to vote at the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary of the Corporation at the principal executive offices of the Corporation (or any

C-6

Exhibit 7
Page 1068

other office specified by the Corporation in any public announcement) not later than five (5) business days after the record date for stockholders entitled to vote at the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight (8) business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof). For the avoidance of doubt, the obligation to update and supplement as set forth in this paragraph or any other Section of these bylaws shall not limit the Corporation's rights with respect to any deficiencies in any notice provided by a stockholder, extend any applicable deadlines hereunder or enable or be deemed to permit a stockholder who has previously submitted notice hereunder to amend or update any proposal or to submit any new proposal, including by changing or adding nominees, matters, business or resolutions proposed to be brought before a meeting of the stockholders.

(i)     No candidate shall be eligible for nomination as a director of the Corporation unless such candidate for nomination and the Nominating Person seeking to place such candidate's name in nomination has complied with this Section 2.5. The presiding officer at the meeting shall, if the facts warrant, determine that a nomination was not properly made in accordance with Section 2.5, and if he or she should so determine, he or she shall so declare such determination to the meeting, the defective nomination shall be disregarded and any ballots cast for the candidate in question (but in the case of any form of ballot listing other qualified nominees, only the ballots cast for the nominee in question) shall be void and of no force or effect.

(j)     Notwithstanding anything in these bylaws to the contrary, no candidate for nomination shall be eligible to be seated as a director of the Corporation unless nominated and elected in accordance with Section 2.5.

2.6     Notice of Stockholders' Meetings.

Unless otherwise provided by law, the Certificate of Incorporation or these bylaws, the notice of any meeting of stockholders shall be sent or otherwise given in accordance with Section 8.1 not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting. The notice shall specify the place, if any, date and time of the meeting, the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.

2.7     Quorum.

Unless otherwise provided by law, the Certificate of Incorporation or these bylaws, the holders of a majority in voting power of the stock issued and outstanding and entitled to vote, present in person, or by remote communication, if applicable, or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the stockholders. A quorum, once established at a meeting, shall not be broken by the withdrawal of enough votes to leave less than a quorum. If, however, a quorum is not present or represented at any meeting of the stockholders, then either (i) the person presiding over the meeting or (ii) a majority in voting power of the stockholders entitled to vote at the meeting, present in person, or by remote communication, if applicable, or represented by proxy, shall have power to recess the meeting or adjourn the meeting from time to time in the manner provided in Section 2.8 until a quorum is present or represented. At any recessed or adjourned meeting at which a quorum is present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed.

2.8     Adjourned Meeting; Notice.

When a meeting is adjourned to another time or place, unless these bylaws otherwise require, notice need not be given of the adjourned meeting if the time, place, if any, thereof, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken. At any adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date for

C-7

Exhibit 7
Page 1069

determination of stockholders entitled to vote is fixed for the adjourned meeting, the Board shall fix as the record date for determining stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote at the adjourned meeting, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such meeting as of the record date so fixed for notice of such adjourned meeting.

2.9    Conduct of Business.

The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting by the person presiding over the meeting. The Board may adopt by resolution such rules and regulations for the conduct of the meeting of stockholders as it shall deem appropriate. Except to the extent inconsistent with such rules and regulations as adopted by the Board, the person presiding over any meeting of stockholders shall have the right and authority to convene and (for any or no reason) to recess and/or adjourn the meeting, to prescribe such rules, regulations and procedures (which need not be in writing) and to do all such acts as, in the judgment of such presiding person, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board or prescribed by the person presiding over the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present (including, without limitation, rules and procedures for removal of disruptive persons from the meeting); (iii) limitations on attendance at or participation in the meeting to stockholders entitled to vote at the meeting, their duly authorized and constituted proxies or such other persons as the person presiding over the meeting shall determine; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (v) limitations on the time allotted to questions or comments by participants. The presiding person at any meeting of stockholders, in addition to making any other determinations that may be appropriate to the conduct of the meeting (including, without limitation, determinations with respect to the administration and/or interpretation of any of the rules, regulations or procedures of the meeting, whether adopted by the Board or prescribed by the person presiding over the meeting), shall, if the facts warrant, determine and declare to the meeting that a matter of business was not properly brought before the meeting and if such presiding person should so determine, such presiding person shall so declare to the meeting and any such matter or business not properly brought before the meeting shall not be transacted or considered. Unless and to the extent determined by the Board or the person presiding over the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.

2.10    Voting.

Except as may be otherwise provided in the Certificate of Incorporation, these bylaws or the DGCL, each stockholder shall be entitled to one (1) vote for each share of capital stock held by such stockholder.

Except as otherwise provided by the Certificate of Incorporation, at all duly called or convened meetings of stockholders at which a quorum is present, for the election of directors, a plurality of the votes cast shall be sufficient to elect a director. Except as otherwise provided by the Certificate of Incorporation, these bylaws, the rules or regulations of any stock exchange applicable to the Corporation, or applicable law or pursuant to any regulation applicable to the Corporation or its securities, each other matter presented to the stockholders at a duly called or convened meeting at which a quorum is present shall be decided by the affirmative vote of the holders of a majority in voting power of the votes cast (excluding abstentions and broker non-votes) on such matter.

2.11    Record Date for Stockholder Meetings and Other Purposes.

In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall, unless otherwise required by law, not be more than sixty (60) days nor less than ten (10) days before the date of such meeting. If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be the close of business on the next day preceding the day on which notice is first given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of

C-8

Exhibit 7
Page 1070

stockholders shall apply to any adjournment of the meeting; *provided, however*, that the Board may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting; and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance herewith at the adjourned meeting.

In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment or any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of capital stock, or for the purposes of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

2.12    Proxies.

Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for such stockholder by proxy authorized by an instrument in writing or by a transmission permitted by law filed in accordance with the procedure established for the meeting, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Section 212 of the DGCL. A proxy may be in the form of an electronic transmission which sets forth or is submitted with information from which it can be determined that the transmission was authorized by the stockholder.

2.13    List of Stockholders Entitled to Vote.

The Corporation shall prepare, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting (*provided, however*, that if the record date for determining the stockholders entitled to vote is less than ten (10) days before the date of the meeting, the list shall reflect the stockholders entitled to vote as of the tenth (10th) day before the meeting date), arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. The Corporation shall not be required to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of at least ten (10) days prior to the meeting: (i) on a reasonably accessible electronic network, *provided* that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the Corporation's principal executive office. In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation. If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting. Such list shall presumptively determine the identity of the stockholders entitled to vote at the meeting and the number of shares held by each of them. Except as otherwise provided by law, the stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list of stockholders required by this Section 2.13 or to vote in person or by proxy at any meeting of stockholders.

2.14    Inspectors of Election.

Before any meeting of stockholders, the Corporation shall appoint an inspector or inspectors of election to act at the meeting or its adjournment and make a written report thereof. The Corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act. If any person appointed as inspector or any alternate fails to appear or fails or refuses to act, then the person presiding over the meeting shall appoint a person to fill that vacancy.

C-9

Exhibit 7
Page 1071

Such inspectors shall:

    (i)   determine the number of shares outstanding and the voting power of each, the number of shares represented at the meeting and the validity of any proxies and ballots;

    (ii)   count all votes or ballots;

    (iii)   count and tabulate all votes;

    (iv)   determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspector(s); and

    (v)   certify its or their determination of the number of shares represented at the meeting and its or their count of all votes and ballots.

Each inspector, before entering upon the discharge of the duties of inspector, shall take and sign an oath faithfully to execute the duties of inspection with strict impartiality and according to the best of such inspector's ability. Any report or certificate made by the inspectors of election is *prima facie* evidence of the facts stated therein. The inspectors of election may appoint such persons to assist them in performing their duties as they determine.

2.15   Delivery to the Corporation.

Whenever this Article II requires one or more persons (including a record or beneficial owner of stock) to deliver a document or information to the Corporation or any officer, employee or agent thereof (including any notice, request, questionnaire, revocation, representation or other document or agreement), such document or information shall be in writing exclusively (and not in an electronic transmission) and shall be delivered exclusively by hand (including, without limitation, overnight courier service) or by certified or registered mail, return receipt requested, and the Corporation shall not be required to accept delivery of any document not in such written form or so delivered. For the avoidance of doubt, the Corporation expressly opts out of Section 116 of the DGCL with respect to the delivery of information and documents to the Corporation required by this Article II.

**Article III - Directors**

3.1   Powers.

Except as otherwise provided by the Certificate of Incorporation or the DGCL, the business and affairs of the Corporation shall be managed by or under the direction of the Board.

3.2   Number of Directors.

Subject to the Certificate of Incorporation and the Stockholders Agreement, the total number of directors constituting the Board shall be determined from time to time by resolution of the Board. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

3.3   Election, Qualification and Term of Office of Directors.

Except as provided in Section 3.4, and subject to the Certificate of Incorporation and the Stockholders Agreement, each director, including a director elected to fill a vacancy or newly created directorship, shall hold office until the expiration of the term of the class, if any, for which elected and until such director's successor is elected and qualified or until such director's earlier death, resignation, disqualification or removal. Directors need not be stockholders. The Certificate of Incorporation or these bylaws may prescribe qualifications for directors.

3.4   Resignation and Vacancies.

Any director may resign at any time upon notice given in writing or by electronic transmission to the Corporation. The resignation shall take effect at the time specified therein or upon the happening of an event specified therein, and if no time or event is specified, at the time of its receipt. Subject to the Stockholders Agreement, when one or more directors so resigns and the resignation is effective at a future date or upon the

C-10

Exhibit 7
Page 1072

happening of an event to occur on a future date, a majority of the directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in Section 3.3.

Subject to the Stockholders Agreement, and unless otherwise provided in the Certificate of Incorporation or these bylaws, vacancies resulting from the death, resignation, disqualification or removal of any director, and newly created directorships resulting from any increase in the authorized number of directors shall be filled only by a majority of the directors then in office, although less than a quorum, or by a sole remaining director.

3.5    Place of Meetings; Meetings by Telephone.

The Board may hold meetings, both regular and special, either within or outside the State of Delaware.

Unless otherwise restricted by the Certificate of Incorporation or these bylaws, members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any committee, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting pursuant to this bylaw shall constitute presence in person at the meeting.

3.6    Regular Meetings.

Regular meetings of the Board may be held within or outside the State of Delaware and at such time and at such place as which has been designated by the Board and publicized among all directors, either orally or in writing, by telephone, including a voice-messaging system or other system designed to record and communicate messages, facsimile, telegraph or telex, or by electronic mail or other means of electronic transmission. No further notice shall be required for regular meetings of the Board.

3.7    Special Meetings; Notice.

Special meetings of the Board for any purpose or purposes may be called at any time by the chairperson of the Board, the Chief Executive Officer, the President or the Secretary of the Corporation or a majority of the total number of directors constituting the Board.

Notice of the time and place of special meetings shall be:

        (i)    delivered personally by hand, by courier or by telephone;

        (ii)    sent by United States first-class mail, postage prepaid;

        (iii)    sent by facsimile or electronic mail; or

        (iv)    sent by other means of electronic transmission,

directed to each director at that director's address, telephone number, facsimile number or electronic mail address, or other address for electronic transmission, as the case may be, as shown on the Corporation's records.

If the notice is (i) delivered personally by hand, by courier or by telephone, (ii) sent by facsimile or electronic mail, or (iii) sent by other means of electronic transmission, it shall be delivered or sent at least twenty-four (24) hours before the time of the holding of the meeting. If the notice is sent by U.S. mail, it shall be deposited in the U.S. mail at least four (4) days before the time of the holding of the meeting. The notice need not specify the place of the meeting (if the meeting is to be held at the Corporation's principal executive office) nor the purpose of the meeting.

3.8    Quorum.

At all meetings of the Board, unless otherwise provided by the Certificate of Incorporation, a majority of the total number of directors shall constitute a quorum for the transaction of business. The vote of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board, except as may be otherwise specifically provided by statute, the Certificate of Incorporation or these bylaws. If a quorum is not present at any meeting of the Board, then the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

C-11

Exhibit 7
Page 1073

3.9    Board Action without a Meeting.

Unless otherwise restricted by the Certificate of Incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board, or of any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission. After an action is taken, the consent or consents relating thereto shall be filed with the minutes of the proceedings of the Board, or the committee thereof, in the same paper or electronic form as the minutes are maintained. Such action by written consent or consent by electronic transmission shall have the same force and effect as a unanimous vote of the Board.

3.10    Fees and Compensation of Directors.

Unless otherwise restricted by the Certificate of Incorporation or these bylaws, the Board shall have the authority to fix the compensation, including fees and reimbursement of expenses, of directors for services to the Corporation in any capacity.

## Article IV - Committees

4.1    Committees of Directors.

The Board may designate one (1) or more committees, each committee to consist, of one (1) or more of the directors of the Corporation. The Board may designate one (1) or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board or in these bylaws, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it; but no such committee shall have the power or authority to (i) approve or adopt, or recommend to the stockholders, any action or matter expressly required by the DGCL to be submitted to stockholders for approval, or (ii) adopt, amend or repeal any bylaw of the Corporation.

4.2    Committee Minutes.

Each committee shall keep regular minutes of its meetings and report the same to the Board when required.

4.3    Meetings and Actions of Committees.

Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of:

(i)    Section 3.5 (place of meetings; meetings by telephone);

(ii)    Section 3.6 (regular meetings);

(iii)    Section 3.7 (special meetings; notice);

(iv)    Section 3.9 (board action without a meeting); and

(v)    Section 7.13 (waiver of notice),

with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the Board and its members; *provided, however*, that:

(i)    the time of regular meetings of committees may be determined either by resolution of the Board or by resolution of the committee;

(ii)    special meetings of committees may also be called by resolution of the Board or the chairperson of the applicable committee; and

(iii)    the Board may adopt rules for the governance of any committee to override the provisions that would otherwise apply to the committee pursuant to this Section 4.3, *provided* that such rules do not violate the provisions of the Certificate of Incorporation or applicable law.

C-12

Exhibit 7
Page 1074

4.4  Subcommittees.

Unless otherwise provided in the Certificate of Incorporation, these bylaws or the resolutions of the Board designating the committee, a committee may create one (1) or more subcommittees, each subcommittee to consist of one (1) or more members of the committee, and delegate to a subcommittee any or all of the powers and authority of the committee.

**Article V - Officers**

5.1  Officers.

The officers of the Corporation shall include a Chief Executive Officer, a President and a Secretary. The Corporation may also have, at the discretion of the Board, a Chairperson of the Board, a Vice Chairperson of the Board, a Chief Financial Officer, a Treasurer, one (1) or more Vice Presidents, one (1) or more Assistant Vice Presidents, one (1) or more Assistant Treasurers, one (1) or more Assistant Secretaries, and any such other officers as may be appointed in accordance with the provisions of these bylaws. Any number of offices may be held by the same person. No officer need be a stockholder or director of the Corporation.

5.2  Appointment of Officers.

The Board shall appoint the officers of the Corporation, except such officers as may be appointed in accordance with the provisions of Section 5.3.

5.3  Subordinate Officers.

The Board may appoint, or empower the Chief Executive Officer or, in the absence of a Chief Executive Officer, the President, to appoint, such other officers and agents as the business of the Corporation may require. Each of such officers and agents shall hold office for such period, have such authority, and perform such duties as are provided in these bylaws or as the Board may from time to time determine.

5.4  Removal and Resignation of Officers.

Subject to the rights, if any, of an officer under any contract of employment, any officer may be removed, either with or without cause, by the Board or, except in the case of an officer chosen by the Board, by any officer upon whom such power of removal may be conferred by the Board.

Any officer may resign at any time by giving written notice to the Corporation. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice. Unless otherwise specified in the notice of resignation, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Corporation under any contract to which the officer is a party.

5.5  Vacancies in Offices.

Any vacancy occurring in any office of the Corporation shall be filled by the Board or as provided in Section 5.2.

5.6  Representation of Shares of Other Corporations.

The Chairperson of the Board, the Chief Executive Officer, or the President of this Corporation, or any other person authorized by the Board, the Chief Executive Officer or the President, is authorized to vote, represent and exercise on behalf of this Corporation all rights incident to any and all shares or voting securities of any other corporation or other person standing in the name of this Corporation. The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

5.7  Authority and Duties of Officers.

All officers of the Corporation shall respectively have such authority and perform such duties in the management of the business of the Corporation as may be provided herein or designated from time to time by the Board and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board.

C-13

Exhibit 7
Page 1075

5.8    Compensation.

The compensation of the officers of the Corporation for their services as such shall be fixed from time to time by or at the direction of the Board. An officer of the Corporation shall not be prevented from receiving compensation by reason of the fact that he or she is also a director of the Corporation.

### Article VI - Records

A stock ledger consisting of one or more records in which the names of all of the Corporation's stockholders of record, the address and number of shares registered in the name of each such stockholder, and all issuances and transfers of stock of the corporation are recorded in accordance with Section 224 of the DGCL shall be administered by or on behalf of the Corporation. Any records administered by or on behalf of the Corporation in the regular course of its business, including its stock ledger, books of account, and minute books, may be kept on, or by means of, or be in the form of, any information storage device, or method, or one or more electronic networks or databases (including one or more distributed electronic networks or databases), *provided* that the records so kept can be converted into clearly legible paper form within a reasonable time and, with respect to the stock ledger, that the records so kept (i) can be used to prepare the list of stockholders specified in Sections 219 and 220 of the DGCL, (ii) record the information specified in Sections 156, 159, 217(a) and 218 of the DGCL, and (iii) record transfers of stock as governed by Article 8 of the Uniform Commercial Code as adopted in the State of Delaware.

### Article VII - General Matters

7.1    Execution of Corporate Contracts and Instruments.

The Board, except as otherwise provided in these bylaws, may authorize any officer or officers, or agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the Corporation; such authority may be general or confined to specific instances.

7.2    Stock Certificates.

The shares of the Corporation shall be represented by certificates or shall be uncertificated. Certificates for the shares of stock, if any, shall be in such form as is consistent with the Certificate of Incorporation and applicable law. Every holder of stock represented by a certificate shall be entitled to have a certificate signed by, or in the name of the Corporation by, any two officers authorized to sign stock certificates representing the number of shares registered in certificate form. The Chairperson or Vice Chairperson of the Board, the Chief Executive Officer, the President, Vice President, the Treasurer, any Assistant Treasurer, the Secretary or any Assistant Secretary of the Corporation shall be specifically authorized to sign stock certificates. Any or all of the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he or she were such officer, transfer agent or registrar at the date of issue.

The Corporation may issue the whole or any part of its shares as partly paid and subject to call for the remainder of the consideration to be paid therefor. Upon the face or back of each stock certificate issued to represent any such partly paid shares, or upon the books and records of the Corporation in the case of uncertificated partly paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated. Upon the declaration of any dividend on fully paid shares, the Corporation shall declare a dividend upon partly paid shares of the same class, but only upon the basis of the percentage of the consideration actually paid thereon.

7.3    Special Designation of Certificates.

If the Corporation is authorized to issue more than one class of stock or more than one series of any class, then the powers, the designations, the preferences and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or on the back of the certificate that the Corporation shall issue to represent such class or series of stock (or, in the case of uncertificated shares, set forth in a notice provided pursuant to Section 151 of the DGCL); *provided, however*, that except as otherwise provided in Section 202 of the DGCL, in lieu of the foregoing requirements, there may be set forth on the face of back of

C-14

Exhibit 7
Page 1076

the certificate that the Corporation shall issue to represent such class or series of stock (or, in the case of any uncertificated shares, included in the aforementioned notice) a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, the designations, the preferences and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

### 7.4    Lost Certificates.

Except as provided in this Section 7.4, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the Corporation and cancelled at the same time. The Corporation may issue a new certificate of stock or uncertificated shares in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

### 7.5    Shares Without Certificates

The Corporation may adopt a system of issuance, recordation and transfer of its shares of stock by electronic or other means not involving the issuance of certificates, provided the use of such system by the Corporation is permitted in accordance with applicable law.

### 7.6    Construction; Definitions.

Unless the context requires otherwise, the general provisions, rules of construction and definitions in the DGCL shall govern the construction of these bylaws. Without limiting the generality of this provision, the singular number includes the plural and the plural number includes the singular.

### 7.7    Dividends.

The Board, subject to any restrictions contained in either (i) the DGCL or (ii) the Certificate of Incorporation, may declare and pay dividends upon the shares of its capital stock. Dividends may be paid in cash, in property or in shares of the Corporation's capital stock.

The Board may set apart out of any of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve. Such purposes shall include but not be limited to equalizing dividends, repairing or maintaining any property of the Corporation, and meeting contingencies.

### 7.8    Fiscal Year.

The fiscal year of the Corporation shall be fixed by resolution of the Board and may be changed by the Board.

### 7.9    Seal.

The Corporation may adopt a corporate seal, which shall be adopted and which may be altered by the Board. The Corporation may use the corporate seal by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

### 7.10    Transfer of Stock.

Shares of the stock of the Corporation shall be transferable in the manner prescribed by law and in these bylaws. Shares of stock of the Corporation shall be transferred on the books of the Corporation only by the holder of record thereof or by such holder's attorney duly authorized in writing, upon surrender to the Corporation of the certificate or certificates representing such shares endorsed by the appropriate person or persons (or by delivery of duly executed instructions with respect to uncertificated shares), with such evidence of the authenticity of such endorsement or execution, transfer, authorization and other matters as the Corporation may reasonably require, and accompanied by all necessary stock transfer stamps. No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing the names of the persons from and to whom it was transferred.

C-15

Exhibit 7
Page 1077

7.11    Stock Transfer Agreements.

The Corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes or series of stock of the Corporation to restrict the transfer of shares of stock of the Corporation of any one or more classes owned by such stockholders in any manner not prohibited by the DGCL.

7.12    Registered Stockholders.

The Corporation:

(i)    shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends and to vote as such owner; and

(ii)    shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Delaware.

7.13    Waiver of Notice.

Whenever notice is required to be given under any provision of the DGCL, the Certificate of Incorporation or these bylaws, a written waiver, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the Certificate of Incorporation or these bylaws.

**Article VIII - Notice**

8.1    Delivery of Notice; Notice by Electronic Transmission.

Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under any provisions of the DGCL, the Certificate of Incorporation, or these bylaws may be given in writing directed to the stockholder's mailing address (or by electronic transmission directed to the stockholder's electronic mail address, as applicable) as it appears on the records of the Corporation and shall be given (1) if mailed, when the notice is deposited in the U.S. mail, postage prepaid, (2) if delivered by courier service, the earlier of when the notice is received or left at such stockholder's address or (3) if given by electronic mail, when directed to such stockholder's electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail. A notice by electronic mail must include a prominent legend that the communication is an important notice regarding the Corporation.

Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given. Any such consent shall be revocable by the stockholder by written notice or electronic transmission to the Corporation. Notwithstanding the provisions of this paragraph, the Corporation may give a notice by electronic mail in accordance with the first paragraph of this section without obtaining the consent required by this paragraph.

Any notice given pursuant to the preceding paragraph shall be deemed given:

(i)    if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice;

(ii)    if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (A) such posting and (B) the giving of such separate notice; and

(iii)    if by any other form of electronic transmission, when directed to the stockholder.

Notwithstanding the foregoing, a notice may not be given by an electronic transmission from and after the time that (1) the Corporation is unable to deliver by such electronic transmission two (2) consecutive notices

C-16

Exhibit 7
Page 1078

given by the Corporation and (2) such inability becomes known to the Secretary or an Assistant Secretary of the Corporation or to the transfer agent, or other person responsible for the giving of notice; *provided, however*, that the inadvertent failure to discover such inability shall not invalidate any meeting or other action.

An affidavit of the Secretary or an Assistant Secretary of the Corporation or of the transfer agent or other agent of the Corporation that the notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

### Article IX - Lock-Up

9.1    Lock-Up. Subject to this Section 9.1, the holders (the "Lock-up Holders") of common stock of the Corporation issued (a) as consideration pursuant to the merger of Project Olympus Merger Sub, Inc., a Delaware corporation, with and into Owlet Baby Care Inc., a Delaware corporation (the "Owlet Transaction") or (b) to directors, officers and employees of the Corporation upon the settlement or exercise of stock options or other equity awards outstanding as of immediately following the closing of the Owlet Transaction in respect of awards of Owlet Baby Care Inc. outstanding immediately prior to the closing of the Owlet Transaction (such shares referred to in Section 7.12(i)(b), the "Owlet Equity Award Shares"), may not Transfer any Lock-up Shares until the first day following the expiration of the Lock-up Period (the "Lock-up").

Notwithstanding the provisions set forth in the paragraph above, the Lock-up Holders or their respective permitted transferees may Transfer the Lock-up Shares during the Lock-up Period (A) to any affiliate or immediate family members of the Corporation's officers or directors; (B) in the case of an individual, by gift to a member of such individual's immediate family or a charitable organization or to a trust, the beneficiary of which is such individual, a member of such individual's immediate family, an affiliate of such individual, or an entity wholly owned by such individual or a member of such individual's immediate family; (C) in the case of an individual, by virtue of laws of descent and distribution upon death of such individual; or (D) in the case of an individual, pursuant to a qualified domestic relations order; provided, however, that in the case of clauses (A) through (D), these permitted transferees must enter into a written agreement with the Corporation agreeing to be bound by the terms of this Section 9.1.

For purposes of this Section 9.1:

(i)    the term "Lock-up Period" means 18 months after the consummation of the Owlet Transaction; notwithstanding the foregoing, Lock-up Holders shall be entitled to Transfer (i) one-third (1/3) of the Lock-up Shares if the closing price of the common stock equals or exceeds $12.50 per share for any 20 trading days within any 30-trading day period commencing at least 240 days following the closing of the Owlet Transaction and (ii) an additional one-third (1/3) of the Lock-up Shares if the closing price of the common stock equals or exceeds $15.00 per share for any 20 trading days within any 30-trading day period commencing at least 240 days following the closing of the Owlet Transaction;

(ii)    the term "Lock-up Shares" means the shares of common stock held by the Lock-up Holders immediately following the closing of the Owlet Transaction (other than shares of common stock acquired in the public market or pursuant to a transaction exempt from registration under the Securities Act of 1933, as amended, pursuant to a subscription agreement where the issuance of common stock occurs on or after the closing of the Owlet Transaction) and the Owlet Equity Award Shares; provided, that, for clarity, shares of common stock issued in connection with the PIPE Investment (as defined in the Business Combination Agreement, entered into by and among, the Corporation, Owlet Baby Care Inc. and Project Olympus Merger Sub, Inc., dated as of February 15, 2021 (the "Business Combination Agreement")) shall not constitute Lock-up Shares;

(iii)    the term "Transfer" shall mean the (a) sale of, offer to sell, contract or agreement to sell, hypothecate, pledge, grant of any option to purchase or otherwise dispose of or agreement to dispose of, directly or indirectly, or establishment or increase of a put equivalent position or liquidation with respect to or decrease of a call equivalent position within the meaning of Section 16 of the Exchange Act, and the rules and regulations promulgated thereunder with respect to, any security or the economic value thereof, (b) entry into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any security, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise, or (c) public announcement of any intention to effect any transaction specified in clause (a) or (b).

C-17

Exhibit 7
Page 1079

**Article X - Indemnification**

10.1    Indemnification of Directors and Officers.

The Corporation shall indemnify and hold harmless, to the fullest extent permitted by the DGCL as it presently exists or may hereafter be amended, any director or officer of the Corporation who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding") by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the Corporation or, while serving as a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership (a "covered person"), joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes or penalties, and amounts paid in settlement) reasonably incurred by such person in connection with any such Proceeding. Notwithstanding the preceding sentence, except as otherwise provided in Section 9.4, the Corporation shall be required to indemnify a person in connection with a Proceeding initiated by such person only if the Proceeding was authorized in the specific case by the Board.

10.2    Indemnification of Others.

The Corporation shall also have the power to indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any employee or agent of the Corporation who was or is made or is threatened to be made a party or is otherwise involved in any Proceeding by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was an employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses reasonably incurred by such person in connection with any such Proceeding.

10.3    Prepayment of Expenses.

The Corporation shall to the fullest extent not prohibited by applicable law pay the expenses (including, without limitation, attorneys' fees) incurred by any director or officer of the Corporation, and may also pay the expenses incurred by any employee or agent of the Corporation, in defending any Proceeding in advance of its final disposition; *provided, however*, that such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the person to repay all amounts advanced if it should be ultimately determined that the person is not entitled to be indemnified under this Article IX or otherwise.

10.4    Determination; Claim.

If a claim for indemnification (following the final disposition of such Proceeding) under this Article IX is not paid in full within sixty (60) days, or a claim for advancement of expenses under this Article IX is not paid in full within thirty (30) days, after a written claim therefor has been received by the Corporation the claimant may thereafter (but not before) file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim to the fullest extent permitted by law. In any such action the Corporation shall have the burden of proving that the claimant was not entitled to the requested indemnification or payment of expenses under applicable law.

10.5    Non-Exclusivity of Rights.

The rights conferred on any person by this Article IX shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

10.6    Insurance.

The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director,

C-18

Exhibit 7
Page 1080

officer, employee or agent of another corporation, partnership, joint venture, trust enterprise or non-profit entity against any liability asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power to indemnify him or her against such liability under the provisions of the DGCL.

10.7    Other Indemnification.

The Corporation's obligation, if any, to indemnify or advance expenses to any person who was or is serving at its request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, enterprise or non-profit entity shall be reduced by any amount such person actually collects as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, enterprise or non-profit enterprise.

10.8    Continuation of Indemnification.

The rights to indemnification and to prepayment of expenses provided by, or granted pursuant to, this Article IX shall continue notwithstanding that the person has ceased to be a director or officer of the Corporation and shall inure to the benefit of the estate, heirs, executors, administrators, legatees and distributees of such person.

10.9    Amendment or Repeal; Interpretation.

The provisions of this Article IX shall constitute a contract between the Corporation, on the one hand, and, on the other hand, each individual who serves or has served as a director or officer of the Corporation (whether before or after the adoption of these bylaws), in consideration of such person's performance of such services, and pursuant to this Article IX the Corporation intends to be legally bound to each such current or former director or officer of the Corporation. With respect to current and former directors and officers of the Corporation, the rights conferred under this Article IX are present contractual rights and such rights are fully vested, and shall be deemed to have vested fully, immediately upon adoption of theses bylaws. With respect to any directors or officers of the Corporation who commence service following adoption of these bylaws, the rights conferred under this provision shall be present contractual rights and such rights shall fully vest, and be deemed to have vested fully, immediately upon such director or officer commencing service as a director or officer of the Corporation. Any repeal or modification of the foregoing provisions of this Article IX shall not adversely affect any right or protection (i) hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification or (ii) under any agreement providing for indemnification or advancement of expenses to an officer or director of the Corporation in effect prior to the time of such repeal or modification.

Any reference to an officer of the Corporation in this Article IX shall be deemed to refer exclusively to the Chief Executive Officer, the President and the Secretary of the Corporation, or other officer of the Corporation appointed by (x) the Board pursuant to Article V or (y) an officer to whom the Board has delegated the power to appoint officers pursuant to Article V, and any reference to an officer of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall be deemed to refer exclusively to an officer appointed by the board of directors (or equivalent governing body) of such other entity pursuant to the certificate of incorporation and bylaws (or equivalent organizational documents) of such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise. The fact that any person who is or was an employee of the Corporation or an employee of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise has been given or has used the title of "Vice President" or any other title that could be construed to suggest or imply that such person is or may be an officer of the Corporation or of such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall not result in such person being constituted as, or being deemed to be, an officer of the Corporation or of such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise for purposes of this Article IX.

**Article XI - Amendments**

The Board is expressly empowered to adopt, amend or repeal the bylaws of the Corporation. The stockholders also shall have power to adopt, amend or repeal the bylaws of the Corporation; *provided, however*, that such action by stockholders shall require, in addition to any other vote required by the Certificate of Incorporation or applicable law, the affirmative vote of the holders of at least two-thirds of the voting power of all the then-outstanding shares of voting stock of the Corporation with the power to vote generally in an election of directors, voting together as a single class. Notwithstanding other provisions set forth in Section 9.1, the

C-19

Exhibit 7
Page 1081

Board may, in its sole discretion, determine to waive, amend, or repeal the Lockup obligations set forth in Section 9.1; *provided, that*, any such waiver, amendment or repeal shall require, in addition to any other vote of the members of the Board required to take such action pursuant to these bylaws or applicable law, the affirmative vote of one director that has been designated by Sandbridge pursuant to the Business Combination Agreement.

## Article XII - Forum Selection

Unless the Corporation consents in writing to the selection of an alternative forum, (a) the Court of Chancery (the "Chancery Court") of the State of Delaware (or, in the event that the Chancery Court does not have jurisdiction, the federal district court for the District of Delaware or other state courts of the State of Delaware) shall, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative Proceeding brought on behalf of the Corporation, (ii) any Proceeding asserting a claim of breach of a fiduciary duty owed by any director, officer or stockholder of the Corporation to the Corporation or to the Corporation's stockholders, (iii) any Proceeding arising pursuant to any provision of the DGCL or the Certificate of Incorporation or these bylaws (as either may be amended from time to time) or (iv) any Proceeding asserting a claim against the Corporation governed by the internal affairs doctrine; and (b) subject to the preceding provisions of this Article XII, to the extent permitted by applicable law, the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended. If any action the subject matter of which is within the scope of clause (a) of the immediately preceding sentence is filed in a court other than the courts in the State of Delaware (a "Foreign Action"), such stockholder shall be deemed to have consented to (x) the personal jurisdiction of the state and federal courts in the State of Delaware in connection with any action brought in any such court to enforce the provisions of clause (a) of the immediately preceding sentence and (y) having service of process made upon such stockholder in any such action by service upon such stockholder's counsel in the Foreign Action as agent for such stockholder. If any action the subject matter of which is within the scope of clause (b) of the immediately preceding sentence is filed in a court other than the federal district courts of the United States of America (a "Foreign Securities Act Action") in the name of any stockholder, such stockholder shall be deemed to have consented to (i) the personal jurisdiction of the federal district courts of the United States of America in connection with any action brought in any such court to enforce clause (b) (a "Securities Act Enforcement Action"), and (ii) having service of process made upon such stockholder in any such Securities Act Enforcement Action by service upon such stockholder's counsel in the Foreign Securities Act Action as agent for such stockholder.

Any person or entity purchasing or otherwise acquiring any interest in any security of the Corporation shall be deemed to have notice of and consented to this Article XI. Notwithstanding the foregoing, the provisions of this Article XI shall not apply to suits brought to enforce any liability or duty created by the Securities Exchange Act of 1934, as amended, or any other claim for which the federal courts of the United States have exclusive jurisdiction.

## Article XIII - Definitions

As used in these bylaws, unless the context otherwise requires, the following terms shall have the following meanings:

An "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

An "electronic mail" means an electronic transmission directed to a unique electronic mail address (which electronic mail shall be deemed to include any files attached thereto and any information hyperlinked to a website if such electronic mail includes the contact information of an officer or agent of the Corporation who is available to assist with accessing such files and information).

An "electronic mail address" means a destination, commonly expressed as a string of characters, consisting of a unique user name or mailbox (commonly referred to as the "local part" of the address) and a reference to an internet domain (commonly referred to as the "domain part" of the address), whether or not displayed, to which electronic mail can be sent or delivered.

C-20

Exhibit 7
Page 1082

TABLE OF CONTENTS

The term "person" means any individual, general partnership, limited partnership, limited liability company, corporation, trust, business trust, joint stock company, joint venture, unincorporated association, cooperative or association or any other legal entity or organization of whatever nature, and shall include any successor (by merger or otherwise) of such entity.

C-21

Exhibit 7
Page 1083

TABLE OF CONTENTS

**Owlet, Inc.**

**Certificate of Amendment and Restatement of Bylaws**

_____

The undersigned hereby certifies that he is the duly elected, qualified, and acting Secretary of Owlet, Inc., a Delaware corporation (the "Corporation"), and that the foregoing bylaws were approved on _____, 2021, effective as of _____, 2021, by the Corporation's board of directors.

IN WITNESS WHEREOF, the undersigned has hereunto set his hand this _____ day of _____, 2021.

_____

[Name]

[Full Title of Secretary]

C-22

Exhibit 7
Page 1084

ANNEX D

## OWLET, INC.
### 2021 INCENTIVE AWARD PLAN

### ARTICLE I.
### PURPOSE

The Plan's purpose is to enhance the Company's ability to attract, retain and motivate persons who make (or are expected to make) important contributions to the Company by providing these individuals with equity ownership opportunities.

### ARTICLE II.
### DEFINITIONS

As used in the Plan, the following words and phrases have the meanings specified below, unless the context clearly indicates otherwise:

2.1   "*Administrator*" means the Board or a Committee to the extent that the Board's powers or authority under the Plan have been delegated to such Committee. With reference to the Board's or a Committee's powers or authority under the Plan that have been delegated to one or more officers pursuant to Section 4.2, the term "Administrator" shall refer to such officer(s) unless and until such delegation has been revoked.

2.2   "*Applicable Law*" means any applicable law, including without limitation: (a) provisions of the Code, the Securities Act, the Exchange Act and any rules or regulations thereunder; (b) corporate, securities, tax or other laws, statutes, rules, requirements or regulations, whether federal, state, local or foreign; and (c) rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded.

2.3   "*Award*" means an Option, Stock Appreciation Right, Restricted Stock award, Restricted Stock Unit award, Performance Bonus Award, Performance Stock Unit award, Dividend Equivalents award or Other Stock or Cash Based Award granted to a Participant under the Plan.

2.4   "*Award Agreement*" means an agreement evidencing an Award, which may be written or electronic, that contains such terms and conditions as the Administrator determines, consistent with and subject to the terms and conditions of the Plan.

2.5   "*Board*" means the Board of Directors of the Company.

2.6   "*Change in Control*" means any of the following:

(a)   A transaction or series of transactions (other than an offering of Common Stock to the general public through a registration statement filed with the Securities and Exchange Commission) whereby any "person" or related "group" of "persons" (as such terms are used in Sections 13(d) and 14(d)(2) of the Exchange Act) directly or indirectly acquires beneficial ownership (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) of the Company's securities possessing more than 50% of the total combined voting power of the Company's securities outstanding immediately after such acquisition; provided, however, that the following acquisitions shall not constitute a Change in Control: (i) any acquisition by the Company or any of its Subsidiaries; (ii) any acquisition by an employee benefit plan maintained by the Company or any of its Subsidiaries, (iii) any acquisition which complies with Sections 2.6(c)(i), 2.6(c)(ii) and 2.6(c)(iii); or (iv) in respect of an Award held by a particular Participant, any acquisition by the Participant or any group of persons including the Participant (or any entity controlled by the Participant or any group of persons including the Participant);

(b)   The completion of a liquidation or dissolution of the Company; or

(c)   The consummation by the Company (whether directly involving the Company or indirectly involving the Company through one or more intermediaries) of (x) a merger, consolidation, reorganization, or business combination, (y) a sale or other disposition of all or substantially all of the Company's assets in any single transaction or series of related transactions or (z) the acquisition of assets or stock of another entity, in each case other than a transaction:

(i)   which results in the Company's voting securities outstanding immediately before the transaction continuing to represent (either by remaining outstanding or by being converted into voting securities

D-1

Exhibit 7
Page 1085

of the Company or the person that, as a result of the transaction, controls, directly or indirectly, the Company or owns, directly or indirectly, all or substantially all of the Company's assets or otherwise succeeds to the business of the Company (the Company or such person, the "Successor Entity")) directly or indirectly, at least a majority of the combined voting power of the Successor Entity's outstanding voting securities immediately after the transaction;

(ii)    after which no person or group beneficially owns voting securities representing 50% or more of the combined voting power of the Successor Entity; provided, however, that no person or group shall be treated for purposes of this Section 2.6(c)(ii) as beneficially owning 50% or more of the combined voting power of the Successor Entity solely as a result of the voting power held in the Company prior to the consummation of the transaction; and

(iii)    after which at least a majority of the members of the board of directors (or the analogous governing body) of the Successor Entity were Board members at the time of the Board's approval of the execution of the initial agreement providing for such transaction.

Notwithstanding the foregoing, if a Change in Control constitutes a payment event with respect to any Award (or any portion of an Award) that provides for the deferral of compensation that is subject to Section 409A, to the extent required to avoid the imposition of additional taxes under Section 409A, the transaction or event described in subsection (a), (b), or (c) of this Section 2.6 with respect to such Award (or portion thereof) shall only constitute a Change in Control for purposes of the payment timing of such Award if such transaction also constitutes a "change in control event," as defined in Treasury Regulation Section 1.409A-3(i)(5).

The Administrator shall have full and final authority, which shall be exercised in its sole discretion, to determine conclusively whether a Change in Control has occurred pursuant to the above definition, the date of such Change in Control and any incidental matters relating thereto; provided that any exercise of authority in conjunction with a determination of whether a Change in Control is a "change in control event" as defined in Treasury Regulation Section 1.409A-3(i)(5) shall be consistent with such regulation.

2.7    "*Code*" means the U.S. Internal Revenue Code of 1986, as amended, and all regulations, guidance, compliance programs and other interpretive authority issued thereunder.

2.8    "*Committee*" means one or more committees or subcommittees of the Board, which may include one or more Company directors or executive officers, to the extent permitted by Applicable Law. To the extent required to comply with the provisions of Rule 16b-3, it is intended that each member of the Committee will be, at the time the Committee takes any action with respect to an Award that is subject to Rule 16b-3, a "non-employee director" within the meaning of Rule 16b-3; however, a Committee member's failure to qualify as a "non-employee director" within the meaning of Rule 16b-3 will not invalidate any Award granted by the Committee that is otherwise validly granted under the Plan.

2.9    "*Common Stock*" means the common stock of the Company.

2.10    "*Company*" means Owlet, Inc., a Delaware corporation, or any successor.

2.11    "*Consultant*" means any person, including any adviser, engaged by the Company or its parent or Subsidiary to render services to such entity if the consultant or adviser: (i) renders bona fide services to the Company; (ii) renders services not in connection with the offer or sale of securities in a capital-raising transaction and does not directly or indirectly promote or maintain a market for the Company's securities; and (iii) is a natural person.

2.12    "*Designated Beneficiary*" means the beneficiary or beneficiaries the Participant designates, in a manner the Company determines, to receive amounts due or exercise the Participant's rights if the Participant dies. Without a Participant's effective designation, "Designated Beneficiary" will mean the Participant's estate.

2.13    "*Director*" means a Board member.

2.14    "*Disability*" means a permanent and total disability under Section 22(e)(3) of the Code.

D-2

Exhibit 7
Page 1086

2.15    "**_Dividend Equivalents_**" means a right granted to a Participant to receive the equivalent value (in cash or Shares) of dividends paid on a specified number of Shares. Such Dividend Equivalent shall be converted to cash or additional Shares, or a combination of cash and Shares, by such formula and at such time and subject to such limitations as may be determined by the Administrator.

2.16    "**_DRO_**" means a "domestic relations order" as defined by the Code or Title I of the Employee Retirement Income Security Act of 1974, as amended, or the rules thereunder.

2.17    "**_Effective Date_**" has the meaning set forth in Section 11.3.

2.18    "**_Employee_**" means any employee of the Company or any of its Subsidiaries.

2.19    "**_Equity Restructuring_**" means a nonreciprocal transaction between the Company and its stockholders, such as a stock dividend, stock split (including a reverse stock split), spin-off or recapitalization through a large, nonrecurring cash dividend, that affects the number or kind of Shares (or other Company securities) or the share price of Common Stock (or other Company securities) and causes a change in the per share value of the Common Stock underlying outstanding Awards.

2.20    "**_Exchange Act_**" means the U.S. Securities Exchange Act of 1934, as amended, and all regulations, guidance and other interpretative authority issued thereunder.

2.21    "**_Fair Market Value_**" means, as of any date, the value of a Share determined as follows: (i) if the Common Stock is listed on any established stock exchange, the value of a Share will be the closing sales price for a Share as quoted on such exchange for such date, or if no sale occurred on such date, the last day preceding such date during which a sale occurred, as reported in _The Wall Street Journal_ or another source the Administrator deems reliable; (ii) if the Common Stock is not listed on an established stock exchange but is quoted on a national market or other quotation system, the value of a Share will be the closing sales price for a Share on such date, or if no sales occurred on such date, then on the last date preceding such date during which a sale occurred, as reported in The Wall Street Journal or another source the Administrator deems reliable; or (iii) if the Common Stock is not listed on any established stock exchange or quoted on a national market or other quotation system, the value established by the Administrator in its sole discretion.

2.22    "**_Greater Than 10% Stockholder_**" means an individual then owning (within the meaning of Section 424(d) of the Code) more than 10% of the total combined voting power of all classes of stock of the Company or any parent corporation or subsidiary corporation of the Company, as determined in accordance with in Section 424(e) and (f) of the Code, respectively.

2.23    "**_Incentive Stock Option_**" means an Option that meets the requirements to qualify as an "incentive stock option" as defined in Section 422 of the Code.

2.24    "**_Nonqualified Stock Option_**" means an Option that is not an Incentive Stock Option.

2.25    "**_Option_**" means a right granted under Article VI to purchase a specified number of Shares at a specified price per Share during a specified time period. An Option may be either an Incentive Stock Option or a Nonqualified Stock Option.

2.26    "**_Other Stock or Cash Based Awards_**" means cash awards, awards of Shares, and other awards valued wholly or partially by referring to, or are otherwise based on, Shares or other property.

2.27    "**_Overall Share Limit_**" means the sum of (i) [_____][1] Shares; (ii) any Shares that are subject to Prior Plan Awards that become available for issuance under the Plan pursuant to Article V; and (iii) an annual increase on the first day of each year beginning in 2022 and ending in 2031, equal to the lesser of (A) 5% of the Shares outstanding on the last day of the immediately preceding fiscal year and (B) such smaller number of Shares as determined by the Board or Committee.

2.28    "**_Participant_**" means a Service Provider who has been granted an Award.

2.29    "**_Performance Bonus Award_**" has the meaning set forth in Section 8.3.

_____

[1] NTD:   Amount to equal 10% of the fully diluted shares of Common Stock to be outstanding immediately after the closing.

D-3

Exhibit 7
Page 1087

2.30    "**Performance Stock Unit**" means a right granted to a Participant pursuant to Section 8.1 and subject to Section 8.2, to receive Shares, the payment of which is contingent upon achieving certain performance goals or other performance-based targets established by the Administrator.

2.31    "**Permitted Transferee**" means, with respect to a Participant, any "family member" of the Participant, as defined in the General Instructions to Form S-8 Registration Statement under the Securities Act (or any successor form thereto), or any other transferee specifically approved by the Administrator after taking into account Applicable Law.

2.32    "**Plan**" means this 2021 Incentive Award Plan.

2.33    "**Prior Plan**" means the Owlet Baby Care Inc. 2014 Equity Incentive Plan.

2.34    "**Prior Plan Award**" means an award outstanding under the Prior Plan as of the Effective Date. Up to [_____][2] Shares underlying Prior Plan Awards may become available under the Plan in accordance with Section 5.2.

2.35    "**Public Trading Date**" means the first date upon which Common Stock is listed (or approved for listing) upon notice of issuance on any securities exchange or designated (or approved for designation) upon notice of issuance as a national market security on an interdealer quotation system.

2.36    "**Restricted Stock**" means Shares awarded to a Participant under Article VII, subject to certain vesting conditions and other restrictions.

2.37    "**Restricted Stock Unit**" means an unfunded, unsecured right to receive, on the applicable settlement date, one Share or an amount in cash or other consideration determined by the Administrator to be of equal value as of such settlement date, subject to certain vesting conditions and other restrictions.

2.38    "**Rule 16b-3**" means Rule 16b-3 promulgated under the Exchange Act.

2.39    "**Section 409A**" means Section 409A of the Code.

2.40    "**Securities Act**" means the Securities Act of 1933, as amended, and all regulations, guidance and other interpretative authority issued thereunder.

2.41    "**Service Provider**" means an Employee, Consultant or Director.

2.42    "**Shares**" means shares of Common Stock.

2.43    "**Stock Appreciation Right**" or "**SAR**" means a right granted under Article VI to receive a payment equal to the excess of the Fair Market Value of a specified number of Shares on the date the right is exercised over the exercise price set forth in the applicable Award Agreement.

2.44    "**Subsidiary**" means any entity (other than the Company), whether domestic or foreign, in an unbroken chain of entities beginning with the Company if each of the entities other than the last entity in the unbroken chain beneficially owns, at the time of the determination, securities or interests representing at least 50% of the total combined voting power of all classes of securities or interests in one of the other entities in such chain.

2.45    "**Substitute Awards**" means Awards granted or Shares issued by the Company in assumption of, or in substitution or exchange for, awards previously granted, or the right or obligation to make future awards, in each case by a company or other entity acquired by the Company or any Subsidiary or with which the Company or any Subsidiary combines.

2.46    "**Termination of Service**" means:

(a)    As to a Consultant, the time when the engagement of a Participant as a Consultant to the Company or a Subsidiary is terminated for any reason, with or without cause, including, without limitation, by resignation, discharge, death or retirement, but excluding terminations where the Consultant simultaneously commences or remains in employment or service with the Company or any Subsidiary.

---

[2] NTD:   To equal the number of shares under outstanding Prior Awards as of immediately prior to closing.

D-4

Exhibit 7
Page 1088

(b)    As to a Non-Employee Director, the time when a Participant who is a Non-Employee Director ceases to be a Director for any reason, including, without limitation, a termination by resignation, failure to be elected, death or retirement, but excluding terminations where the Participant simultaneously commences or remains in employment or service with the Company or any Subsidiary.

(c)    As to an Employee, the time when the employee-employer relationship between a Participant and the Company or any Subsidiary is terminated for any reason, including, without limitation, a termination by resignation, discharge, death, disability or retirement; but excluding terminations where the Participant simultaneously commences or remains in employment or service with the Company or any Subsidiary.

The Administrator, in its sole discretion, shall determine the effect of all matters and questions relating to any Termination of Service, including, without limitation, whether a Termination of Service has occurred, whether a Termination of Service resulted from a discharge for "cause" and all questions of whether particular leaves of absence constitute a Termination of Service. For purposes of the Plan, a Participant's employee-employer relationship or consultancy relationship shall be deemed to be terminated in the event that the Subsidiary employing or contracting with such Participant ceases to remain a Subsidiary following any merger, sale of stock or other corporate transaction or event (including, without limitation, a spin-off), even though the Participant may subsequently continue to perform services for that entity.

## ARTICLE III.
## ELIGIBILITY

Service Providers are eligible to be granted Awards under the Plan, subject to the limitations described herein. No Service Provider shall have any right to be granted an Award pursuant to the Plan and neither the Company nor the Administrator is obligated to treat Service Providers, Participants or any other persons uniformly.

## ARTICLE IV.
## ADMINISTRATION AND DELEGATION

4.1    Administration.

(a)    The Plan is administered by the Administrator. The Administrator has authority to determine which Service Providers receive Awards, grant Awards and set Award terms and conditions, subject to the conditions and limitations in the Plan. The Administrator also has the authority to take all actions and make all determinations under the Plan, to interpret the Plan and Award Agreements and to adopt, amend and repeal Plan administrative rules, guidelines and practices as it deems advisable. The Administrator may correct defects and ambiguities, supply omissions, reconcile inconsistencies in the Plan or any Award and make all other determinations that it deems necessary or appropriate to administer the Plan and any Awards. The Administrator (and each member thereof) is entitled to, in good faith, rely or act upon any report or other information furnished to it, him or her by any officer or other employee of the Company or any Subsidiary, the Company's independent certified public accountants, or any executive compensation consultant or other professional retained by the Company to assist in the administration of the Plan. The Administrator's determinations under the Plan are in its sole discretion and will be final, binding and conclusive on all persons having or claiming any interest in the Plan or any Award.

(b)    Without limiting the foregoing, the Administrator has the exclusive power, authority and sole discretion to: (i) designate Participants; (ii) determine the type or types of Awards to be granted to each Participant; (iii) determine the number of Awards to be granted and the number of Shares to which an Award will relate; (iv) subject to the limitations in the Plan, determine the terms and conditions of any Award and related Award Agreement, including, but not limited to, the exercise price, grant price, purchase price, any performance criteria, any restrictions or limitations on the Award, any schedule for vesting, lapse of forfeiture restrictions or restrictions on the exercisability of an Award, and accelerations, waivers or amendments thereof; (v) determine whether, to what extent, and under what circumstances an Award may be settled in, or the exercise price of an Award may be paid in cash, Shares, or other property, or an Award may be canceled, forfeited, or surrendered; and (vi) make all other decisions and determinations that may be required pursuant to the Plan or as the Administrator deems necessary or advisable to administer the Plan.

4.2    Delegation of Authority. To the extent permitted by Applicable Law, the Board or any Committee may delegate any or all of its powers under the Plan to one or more Committees or officers of the Company or any of

D-5

Exhibit 7
Page 1089

its Subsidiaries; provided, however, that in no event shall an officer of the Company or any of its Subsidiaries be delegated the authority to grant Awards to, or amend Awards held by, the following individuals: (a) individuals who are subject to Section 16 of the Exchange Act, or (b) officers of the Company or any of its Subsidiaries or Directors to whom authority to grant or amend Awards has been delegated hereunder. Any delegation hereunder shall be subject to the restrictions and limits that the Board or Committee specifies at the time of such delegation or that are otherwise included in the applicable organizational documents, and the Board or Committee, as applicable, may at any time rescind the authority so delegated or appoint a new delegatee. At all times, the delegatee appointed under this Section 4.2 shall serve in such capacity at the pleasure of the Board or the Committee, as applicable, and the Board or the Committee may abolish any committee at any time and re-vest in itself any previously delegated authority. Further, regardless of any delegation, the Board or a Committee may, in its discretion, exercise any and all rights and duties as the Administrator under the Plan delegated thereby, except with respect to Awards that are required to be determined in the sole discretion of the Committee under the rules of any securities exchange or automated quotation system on which the Shares are listed, quoted or traded.

## ARTICLE V.
## STOCK AVAILABLE FOR AWARDS

5.1    Number of Shares. Subject to adjustment under Article IX and the terms of this Article V, Awards may be made under the Plan covering up to the Overall Share Limit. As of the Effective Date, the Company will cease granting awards under the Prior Plan; however, Prior Plan Awards will remain subject to the terms of the Prior Plan. Shares issued or delivered under the Plan may consist of authorized but unissued Shares, Shares purchased on the open market or treasury Shares.

5.2    Share Recycling.

(a)    If all or any part of an Award or Prior Plan Award expires, lapses or is terminated, converted into an award in respect of shares of another entity in connection with a spin-off or other similar event, exchanged for cash, surrendered, repurchased, canceled without having been fully exercised or forfeited, in any case, in a manner that results in the Company acquiring Shares covered by the Award or Prior Plan Award at a price not greater than the price (as adjusted to reflect any Equity Restructuring) paid by the Participant for such Shares or not issuing any Shares covered by the Award or Prior Plan Award, the unused Shares covered by the Award or Prior Plan Award will, as applicable, become or again be available for Awards under the Plan. The payment of Dividend Equivalents in cash in conjunction with any outstanding Awards or Prior Plan Awards shall not count against the Overall Share Limit.

(b)    In addition, the following Shares shall be available for future grants of Awards: (i) Shares tendered by a Participant or withheld by the Company in payment of the exercise price of an Option or any stock option granted under the Prior Plan; (ii) Shares tendered by the Participant or withheld by the Company to satisfy any tax withholding obligation with respect to an Award or any award granted under the Prior Plan; and (iii) Shares subject to a Stock Appreciation Right that are not issued in connection with the stock settlement of the Stock Appreciation Right on exercise thereof. Notwithstanding the provisions of this Section 5.2(b), no Shares may again be optioned, granted or awarded pursuant to an Incentive Stock Option if such action would cause such Option to fail to qualify as an incentive stock option under Section 422 of the Code.

5.3    Incentive Stock Option Limitations. Notwithstanding anything to the contrary herein, no more than [_____][3] Shares (as adjusted to reflect any Equity Restructuring) may be issued pursuant to the exercise of Incentive Stock Options.

5.4    Substitute Awards. In connection with an entity's merger or consolidation with the Company or any Subsidiary or the Company's or any Subsidiary's acquisition of an entity's property or stock, the Administrator may grant Awards in substitution for any options or other stock or stock-based awards granted before such merger or consolidation by such entity or its affiliate. Substitute Awards may be granted on such terms and conditions as the Administrator deems appropriate, notwithstanding limitations on Awards in the Plan. Substitute Awards will not count against the Overall Share Limit (nor shall Shares subject to a Substitute Award be added to the Shares available for Awards under the Plan as provided above), except that Shares acquired by exercise of substitute Incentive Stock Options will count against the maximum number of Shares that may be issued pursuant to the exercise of Incentive Stock Options under the Plan. Additionally, in the event that a company

---

[3] NTD:  Amount to equal 75% (125% (to allow for share growth) of the sum of 10% initial reserve plus 10 years of evergreen) of the fully diluted shares of Common Stock to be outstanding immediately after the closing.

D-6

Exhibit 7
Page 1090

acquired by the Company or any Subsidiary or with which the Company or any Subsidiary combines has shares available under a pre-existing plan approved by stockholders and not adopted in contemplation of such acquisition or combination that can be assumed in accordance with Applicable Laws, the shares available for grant pursuant to the terms of such pre-existing plan (as appropriately adjusted to reflect the transaction) may be used for Awards under the Plan and shall not reduce the Shares authorized for grant under the Plan (and Shares subject to such Awards may again become available for Awards under the Plan as provided under Section 5.2 above); provided that Awards using such available shares shall not be made after the date awards or grants could have been made under the terms of the pre-existing plan, absent the acquisition or combination, and shall only be made to individuals who were not employees or directors of the Company or any of its Subsidiaries prior to such acquisition or combination or as permitted by Applicable Laws.

5.5    Non-Employee Director Award Limit. Notwithstanding any provision to the contrary in the Plan or in any policy of the Company regarding non-employee director compensation, the sum of the grant date fair value (determined as of the grant date in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 718, or any successor thereto) of all equity-based Awards and the maximum amount that may become payable pursuant to all cash-based Awards that may be granted to a Service Provider as compensation for services as a Non-Employee Director during any calendar year shall not exceed $1,000,000.

**ARTICLE VI.**
**STOCK OPTIONS AND STOCK APPRECIATION RIGHTS**

6.1    General. The Administrator may grant Options or Stock Appreciation Rights to one or more Service Providers, subject to such terms and conditions not inconsistent with the Plan as the Administrator shall determine. The Administrator will determine the number of Shares covered by each Option and Stock Appreciation Right, the exercise price of each Option and Stock Appreciation Right and the conditions and limitations applicable to the exercise of each Option and Stock Appreciation Right. A Stock Appreciation Right will entitle the Participant (or other person entitled to exercise the Stock Appreciation Right) to receive from the Company upon exercise of the exercisable portion of the Stock Appreciation Right an amount determined by multiplying the excess, if any, of the Fair Market Value of one Share on the date of exercise over the exercise price per Share of the Stock Appreciation Right by the number of Shares with respect to which the Stock Appreciation Right is exercised, subject to any limitations of the Plan or that the Administrator may impose and payable in cash, Shares valued at Fair Market Value on the date of exercise or a combination of the two as the Administrator may determine or provide in the Award Agreement.

6.2    Exercise Price. The Administrator will establish each Option's and Stock Appreciation Right's exercise price and specify the exercise price in the Award Agreement. Subject to Section 6.6, the exercise price will not be less than 100% of the Fair Market Value on the grant date of the Option or Stock Appreciation Right. Notwithstanding the foregoing, in the case of an Option or Stock Appreciation Right that is a Substitute Award, the exercise price per share of the Shares subject to such Option or Stock Appreciation Right, as applicable, may be less than the Fair Market Value per share on the date of grant; provided that the exercise price of any Substitute Award shall be determined in accordance with the applicable requirements of Section 424 and 409A of the Code.

6.3    Duration of Options. Subject to Section 6.6, each Option or Stock Appreciation Right will be exercisable at such times and as specified in the Award Agreement, provided that the term of an Option or Stock Appreciation Right will not exceed ten years; provided, further, that, unless otherwise determined by the Administrator, (a) no portion of an Option or Stock Appreciation Right which is unexercisable at a Participant's Termination of Service shall thereafter become exercisable and (b) the portion of an Option or Stock Appreciation Right that is unexercisable at a Participant's Termination of Service shall automatically expire on the date of such Termination of Service. Notwithstanding the foregoing, if the Participant, prior to the end of the term of an Option or Stock Appreciation Right, commits an act of "cause" (as determined by the Administrator), or violates any non-competition, non-solicitation or confidentiality provisions of any employment contract, confidentiality and nondisclosure agreement or other agreement between the Participant and the Company or any of its Subsidiaries, the right to exercise the Option or Stock Appreciation Right, as applicable, may be terminated by the Company and the Company may suspend the Participant's right to exercise the Option or Stock Appreciation Right when it reasonably believes that the Participant may have participated in any such act or violation.

D-7

Exhibit 7
Page 1091

6.4    Exercise. Options and Stock Appreciation Rights may be exercised by delivering to the Company (or such other person or entity designated by the Administrator) a notice of exercise, in a form and manner the Company approves (which may be written, electronic or telephonic and may contain representations and warranties deemed advisable by the Administrator), signed or authenticated by the person authorized to exercise the Option or Stock Appreciation Right, together with, as applicable, payment in full of (a) the exercise price for the number of Shares for which the Option is exercised in a manner specified in Section 6.5 and (b) all applicable taxes in a manner specified in Section 10.5. The Administrator may, in its discretion, limit exercise with respect to fractional Shares and require that any partial exercise of an Option or Stock Appreciation Right be with respect to a minimum number of Shares.

6.5    Payment Upon Exercise. The Administrator shall determine the methods by which payment of the exercise price of an Option shall be made, including, without limitation:

(a)    Cash, check or wire transfer of immediately available funds; provided that the Company may limit the use of one of the foregoing methods if one or more of the methods below is permitted;

(b)    If there is a public market for Shares at the time of exercise, unless the Company otherwise determines, (A) delivery (including electronically or telephonically to the extent permitted by the Company) of a notice that the Participant has placed a market sell order with a broker acceptable to the Company with respect to Shares then issuable upon exercise of the Option and that the broker has been directed to deliver promptly to the Company funds sufficient to pay the exercise price, or (B) the Participant's delivery to the Company of a copy of irrevocable and unconditional instructions to a broker acceptable to the Company to deliver promptly to the Company an amount sufficient to pay the exercise price by cash, wire transfer of immediately available funds or check; provided that such amount is paid to the Company at such time as may be required by the Company;

(c)    To the extent permitted by the Administrator, delivery (either by actual delivery or attestation) of Shares owned by the Participant valued at their Fair Market Value on the date of delivery;

(d)    To the extent permitted by the Administrator, surrendering Shares then issuable upon the Option's exercise valued at their Fair Market Value on the exercise date;

(e)    To the extent permitted by the Administrator, delivery of a promissory note or any other lawful consideration; or

(f)    To the extent permitted by the Administrator, any combination of the above payment forms.

6.6    Additional Terms of Incentive Stock Options. The Administrator may grant Incentive Stock Options only to employees of the Company, any of its present or future parent or subsidiary corporations, as defined in Sections 424(e) or (f) of the Code, respectively, and any other entities the employees of which are eligible to receive Incentive Stock Options under the Code. If an Incentive Stock Option is granted to a Greater Than 10% Stockholder, the exercise price will not be less than 110% of the Fair Market Value on the Option's grant date, and the term of the Option will not exceed five years. All Incentive Stock Options (and Award Agreements related thereto) will be subject to and construed consistently with Section 422 of the Code. By accepting an Incentive Stock Option, the Participant agrees to give prompt notice to the Company of dispositions or other transfers (other than in connection with a Change in Control) of Shares acquired under the Option made within (a) two years from the grant date of the Option or (b) one year after the transfer of such Shares to the Participant, specifying the date of the disposition or other transfer and the amount the Participant realized, in cash, other property, assumption of indebtedness or other consideration, in such disposition or other transfer. Neither the Company nor the Administrator will be liable to a Participant, or any other party, if an Incentive Stock Option fails or ceases to qualify as an "incentive stock option" under Section 422 of the Code. Any Incentive Stock Option or portion thereof that fails to qualify as an "incentive stock option" under Section 422 of the Code for any reason, including becoming exercisable with respect to Shares having a fair market value exceeding the $100,000 limitation under Treasury Regulation Section 1.422-4, will be a Nonqualified Stock Option.

## ARTICLE VII.
## RESTRICTED STOCK; RESTRICTED STOCK UNITS

7.1    General. The Administrator may grant Restricted Stock, or the right to purchase Restricted Stock, to any Service Provider, subject to forfeiture or the Company's right to repurchase all or part of such shares at their issue price or other stated or formula price from the Participant if conditions the Administrator specifies in the

D-8

Exhibit 7
Page 1092

Award Agreement are not satisfied before the end of the applicable restriction period or periods that the Administrator establishes for such Award. In addition, the Administrator may grant Restricted Stock Units, which may be subject to vesting and forfeiture conditions during the applicable restriction period or periods, as set forth in an Award Agreement, to Service Providers. The Administrator shall establish the purchase price, if any, and form of payment for Restricted Stock and Restricted Stock Units; provided, however, that if a purchase price is charged, such purchase price shall be no less than the par value, if any, of the Shares to be purchased, unless otherwise permitted by Applicable Law. In all cases, legal consideration shall be required for each issuance of Restricted Stock and Restricted Stock Units to the extent required by Applicable Law. The Award Agreement for each Restricted Stock and Restricted Stock Unit Award shall set forth the terms and conditions not inconsistent with the Plan as the Administrator shall determine.

7.2    Restricted Stock.

(a)    *Stockholder Rights*. Unless otherwise determined by the Administrator, each Participant holding shares of Restricted Stock will be entitled to all the rights of a stockholder with respect to such Shares, subject to the restrictions in the Plan and the applicable Award Agreement, including the right to receive all dividends and other distributions paid or made with respect to the Shares to the extent such dividends and other distributions have a record date that is on or after the date on which such Participant becomes the record holder of such Shares; provided, however, that with respect to a share of Restricted Stock subject to restrictions or vesting conditions as described in Section 8.3, except in connection with a spin-off or other similar event as otherwise permitted under Section 9.2, dividends which are paid to Company stockholders prior to the removal of restrictions and satisfaction of vesting conditions shall only be paid to the Participant to the extent that the restrictions are subsequently removed and the vesting conditions are subsequently satisfied and the share of Restricted Stock vests.

(b)    *Stock Certificates*. The Company may require that the Participant deposit in escrow with the Company (or its designee) any stock certificates issued in respect of shares of Restricted Stock, together with a stock power endorsed in blank.

(c)    *Section 83(b) Election*. If a Participant makes an election under Section 83(b) of the Code to be taxed with respect to the Restricted Stock as of the date of transfer of the Restricted Stock rather than as of the date or dates upon which such Participant would otherwise be taxable under Section 83(a) of the Code, such Participant shall be required to deliver a copy of such election to the Company promptly after filing such election with the Internal Revenue Service along with proof of the timely filing thereof.

7.3    Restricted Stock Units. The Administrator may provide that settlement of Restricted Stock Units will occur upon or as soon as reasonably practicable after the Restricted Stock Units vest or will instead be deferred, on a mandatory basis or at the Participant's election, subject to compliance with Applicable Law.

## ARTICLE VIII.
## OTHER TYPES OF AWARDS

8.1    General. The Administrator may grant Performance Stock Unit awards, Performance Bonus Awards, Dividend Equivalents or Other Stock or Cash Based Awards, to one or more Service Providers, in such amounts and subject to such terms and conditions not inconsistent with the Plan as the Administrator shall determine.

8.2    Performance Stock Unit Awards. Each Performance Stock Unit award shall be denominated in a number of Shares or in unit equivalents of Shares or units of value (including a dollar value of Shares) and may be linked to any one or more of performance or other specific criteria, including service to the Company or Subsidiaries, determined to be appropriate by the Administrator, in each case on a specified date or dates or over any period or periods determined by the Administrator. In making such determinations, the Administrator may consider (among such other factors as it deems relevant in light of the specific type of award) the contributions, responsibilities and other compensation of the particular Participant.

8.3    Performance Bonus Awards. Each right to receive a bonus granted under this Section 8.3 shall be denominated in the form of cash (but may be payable in cash, stock or a combination thereof) (a "Performance Bonus Award") and shall be payable upon the attainment of performance goals that are established by the Administrator and relate to one or more of performance or other specific criteria, including service to the Company or Subsidiaries, in each case on a specified date or dates or over any period or periods determined by the Administrator.

D-9

Exhibit 7
Page 1093

8.4    Dividend Equivalents. If the Administrator provides, an Award (other than an Option or Stock Appreciation Right) may provide a Participant with the right to receive Dividend Equivalents. Dividend Equivalents may be paid currently or credited to an account for the Participant, settled in cash or Shares and subject to the same restrictions on transferability and forfeitability as the Award with respect to which the Dividend Equivalents are granted and subject to other terms and conditions as set forth in the Award Agreement. Notwithstanding anything to the contrary herein, Dividend Equivalents with respect to an Award subject to vesting shall either (i) to the extent permitted by Applicable Law, not be paid or credited or (ii) be accumulated and subject to vesting to the same extent as the related Award. All such Dividend Equivalents shall be paid at such time as the Administrator shall specify in the applicable Award Agreement.

8.5    Other Stock or Cash Based Awards. Other Stock or Cash Based Awards may be granted to Participants, including Awards entitling Participants to receive cash or Shares to be delivered in the future and annual or other periodic or long-term cash bonus awards (whether based on specified performance criteria or otherwise), in each case subject to any conditions and limitations in the Plan. Such Other Stock or Cash Based Awards will also be available as a payment form in the settlement of other Awards, as standalone payments and as payment in lieu of compensation to which a Participant is otherwise entitled. Other Stock or Cash Based Awards may be paid in Shares, cash or other property, as the Administrator determines. Subject to the provisions of the Plan, the Administrator will determine the terms and conditions of each Other Stock or Cash Based Award, including any purchase price, performance goal(s), transfer restrictions, and vesting conditions, which will be set forth in the applicable Award Agreement. Except in connection with a spin-off or other similar event as otherwise permitted under Article IX, dividends that are paid prior to vesting of any Other Stock or Cash Based Award shall only be paid to the applicable Participant to the extent that the vesting conditions are subsequently satisfied and the Other Stock or Cash Based Award vests.

**ARTICLE IX.**
**ADJUSTMENTS FOR CHANGES IN COMMON STOCK**
**AND CERTAIN OTHER EVENTS**

9.1    Equity Restructuring. In connection with any Equity Restructuring, notwithstanding anything to the contrary in this Article IX the Administrator will equitably adjust the terms of the Plan and each outstanding Award as it deems appropriate to reflect the Equity Restructuring, which may include (i) adjusting the number and type of securities subject to each outstanding Award or with respect to which Awards may be granted under the Plan (including, but not limited to, adjustments of the limitations in Article V hereof on the maximum number and kind of shares that may be issued); (ii) adjusting the terms and conditions of (including the grant or exercise price), and the performance goals or other criteria included in, outstanding Awards; and (iii) granting new Awards or making cash payments to Participants. The adjustments provided under this Section 9.1 will be nondiscretionary; provided that the Administrator will determine whether an adjustment is equitable.

9.2    Corporate Transactions. In the event of any dividend or other distribution (whether in the form of cash, Common Stock, other securities, or other property), reorganization, merger, consolidation, split-up, spin off, combination, amalgamation, repurchase, recapitalization, liquidation, dissolution, or sale, transfer, exchange or other disposition of all or substantially all of the assets of the Company, or sale or exchange of Common Stock or other securities of the Company, Change in Control, issuance of warrants or other rights to purchase Common Stock or other securities of the Company, other similar corporate transaction or event, other unusual or nonrecurring transaction or event affecting the Company or its financial statements or any change in any Applicable Law or accounting principles, the Administrator, on such terms and conditions as it deems appropriate, either by the terms of the Award or by action taken prior to the occurrence of such transaction or event (except that action to give effect to a change in Applicable Law or accounting principles may be made within a reasonable period of time after such change) and either automatically or upon the Participant's request, is hereby authorized to take any one or more of the following actions whenever the Administrator determines that such action is appropriate in order to (x) prevent dilution or enlargement of the benefits or potential benefits intended by the Company to be made available under the Plan or with respect to any Award granted or issued under the Plan, (y) to facilitate such transaction or event or (z) give effect to such changes in Applicable Law or accounting principles:

(a)    To provide for the cancellation of any such Award in exchange for either an amount of cash or other property with a value equal to the amount that could have been obtained upon the exercise or settlement of the vested portion of such Award or realization of the Participant's rights under the vested portion of such Award,

D-10

Exhibit 7
Page 1094

as applicable; provided that, if the amount that could have been obtained upon the exercise or settlement of the vested portion of such Award or realization of the Participant's rights, in any case, is equal to or less than zero, then the Award may be terminated without payment;

(b)    To provide that such Award shall vest and, to the extent applicable, be exercisable as to all Shares (or other property) covered thereby, notwithstanding anything to the contrary in the Plan or the provisions of such Award;

(c)    To provide that such Award be assumed by the successor or survivor corporation or entity, or a parent or subsidiary thereof, or shall be substituted for by awards covering the stock of the successor or survivor corporation or entity, or a parent or subsidiary thereof, with appropriate adjustments as to the number and kind of shares and applicable exercise or purchase price, in all cases, as determined by the Administrator;

(d)    To make adjustments in the number and type of shares of Common Stock (or other securities or property) subject to outstanding Awards or with respect to which Awards may be granted under the Plan (including, but not limited to, adjustments of the limitations in Article V hereof on the maximum number and kind of shares which may be issued) or in the terms and conditions of (including the grant or exercise price), and the criteria included in, outstanding Awards;

(e)    To replace such Award with other rights or property selected by the Administrator; or

(f)    To provide that the Award will terminate and cannot vest, be exercised or become payable after the applicable event.

9.3    Change in Control.

(a)    Notwithstanding any other provision of the Plan, in the event of a Change in Control, unless the Administrator elects to (i) terminate an Award in exchange for cash, rights or property, or (ii) cause an Award to become fully exercisable and no longer subject to any forfeiture restrictions prior to the consummation of a Change in Control, pursuant to Section 9.2, (A) such Award (other than any portion subject to performance-based vesting) shall continue in effect or be assumed or an equivalent Award substituted by the successor corporation or a parent or subsidiary of the successor corporation and (B) the portion of such Award subject to performance-based vesting shall be subject to the terms and conditions of the applicable Award Agreement and, in the absence of applicable terms and conditions, the Administrator's discretion.

(b)    In the event that the successor corporation in a Change in Control refuses to assume or substitute for an Award (other than any portion subject to performance-based vesting), the Administrator shall cause such Award to become fully vested and, if applicable, exercisable immediately prior to the consummation of such transaction and all forfeiture restrictions on such Award to lapse and, to the extent unexercised upon the consummation of such transaction, to terminate in exchange for cash, rights or other property. The Administrator shall notify the Participant of any Award that becomes exercisable pursuant to the preceding sentence that such Award shall be fully exercisable for a period of 15 days from the date of such notice, contingent upon the occurrence of the Change in Control, and such Award shall terminate upon the consummation of the Change in Control in accordance with the preceding sentence.

(c)    For the purposes of this Section 9.3, an Award shall be considered assumed if, following the Change in Control, the Award confers the right to purchase or receive, for each Share subject to the Award immediately prior to the Change in Control, the consideration (whether stock, cash, or other securities or property) received in the Change in Control by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the Change in Control was not solely common stock of the successor corporation or its parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of the Award, for each Share subject to an Award, to be solely common equity of the successor entity or its parent equal in fair market value to the per-share consideration received by holders of Common Stock in the Change in Control.

9.4    Administrative Stand Still. In the event of any pending stock dividend, stock split, combination or exchange of shares, merger, consolidation or other distribution (other than normal cash dividends) of Company assets to stockholders, or any other extraordinary transaction or change affecting the Shares or the share price of

D-11

Exhibit 7
Page 1095

Common Stock (including any Equity Restructuring or any securities offering or other similar transaction) or for reasons of administrative convenience or to facilitate compliance with any Applicable Law, the Company may refuse to permit the exercise or settlement of one or more Awards for such period of time as the Company may determine to be reasonably appropriate under the circumstances.

9.5    General. Except as expressly provided in the Plan or the Administrator's action under the Plan, no Participant will have any rights due to any subdivision or consolidation of Shares of any class, dividend payment, increase or decrease in the number of Shares of any class or dissolution, liquidation, merger, or consolidation of the Company or other corporation. Except as expressly provided with respect to an Equity Restructuring under Section 9.1 above or the Administrator's action under the Plan, no issuance by the Company of Shares of any class, or securities convertible into Shares of any class, will affect, and no adjustment will be made regarding, the number of Shares subject to an Award or the Award's grant or exercise price. The existence of the Plan, any Award Agreements and the Awards granted hereunder will not affect or restrict in any way the Company's right or power to make or authorize (i) any adjustment, recapitalization, reorganization or other change in the Company's capital structure or its business, (ii) any merger, consolidation, spinoff, dissolution or liquidation of the Company or sale of Company assets or (iii) any sale or issuance of securities, including securities with rights superior to those of the Shares or securities convertible into or exchangeable for Shares. For the avoidance of doubt, the Administrator need not treat Participants or Awards (or portions thereof) in a uniform manner, and may treat different Participants and/or Awards differently, in connection with an Equity Restructuring, Change in Control or other corporate transaction.

**ARTICLE X.**
**PROVISIONS APPLICABLE TO AWARDS**

10.1    Transferability.

(a)    No Award may be sold, assigned, transferred, pledged or otherwise encumbered, either voluntarily or by operation of law, except by will or the laws of descent and distribution, or, subject to the Administrator's consent, pursuant to a domestic relations order, unless and until such Award has been exercised or the Shares underlying such Award have been issued, and all restrictions applicable to such Shares have lapsed. During the life of a Participant, Awards will be exercisable only by the Participant, unless it has been disposed of pursuant to a domestic relations order. After the death of a Participant, any exercisable portion of an Award may, prior to the time when such portion becomes unexercisable under the Plan or the applicable Award Agreement, be exercised by the Participant's personal representative or by any person empowered to do so under the deceased Participant's will or under the then-Applicable Law of descent and distribution. References to a Participant, to the extent relevant in the context, will include references to a transferee approved by the Administrator.

(b)    Notwithstanding Section 10.1(a), the Administrator, in its sole discretion, may determine to permit a Participant or a Permitted Transferee of such Participant to transfer an Award other than an Incentive Stock Option (unless such Incentive Stock Option is intended to become a Nonqualified Stock Option) to any one or more Permitted Transferees of such Participant, subject to the following terms and conditions: (i) an Award transferred to a Permitted Transferee shall not be assignable or transferable by the Permitted Transferee other than (A) to another Permitted Transferee of the applicable Participant or (B) by will or the laws of descent and distribution or, subject to the consent of the Administrator, pursuant to a domestic relations order; (ii) an Award transferred to a Permitted Transferee shall continue to be subject to all the terms and conditions of the Award as applicable to the original Participant (other than the ability to further transfer the Award to any Person other than another Permitted Transferee of the applicable Participant); (iii) the Participant (or transferring Permitted Transferee) and the receiving Permitted Transferee shall execute any and all documents requested by the Administrator, including, without limitation documents to (A) confirm the status of the transferee as a Permitted Transferee, (B) satisfy any requirements for an exemption for the transfer under Applicable Law and (C) evidence the transfer; and (iv) any transfer of an Award to a Permitted Transferee shall be without consideration, except as required by Applicable Law. In addition, and further notwithstanding Section 10.1(a), the Administrator, in its sole discretion, may determine to permit a Participant to transfer Incentive Stock Options to a trust that constitutes a Permitted Transferee if, under Section 671 of the Code and other Applicable Law, the Participant is considered the sole beneficial owner of the Incentive Stock Option while it is held in the trust.

(c)    Notwithstanding Section 10.1(a), a Participant may, in the manner determined by the Administrator, designate a Designated Beneficiary. A Designated Beneficiary, legal guardian, legal representative, or other person claiming any rights pursuant to the Plan is subject to all terms and conditions of the Plan and

D-12

Exhibit 7
Page 1096

any Award Agreement applicable to the Participant and any additional restrictions deemed necessary or appropriate by the Administrator. If the Participant is married or a domestic partner in a domestic partnership qualified under Applicable Law and resides in a community property state, a designation of a person other than the Participant's spouse or domestic partner, as applicable, as the Participant's Designated Beneficiary with respect to more than 50% of the Participant's interest in the Award shall not be effective without the prior written or electronic consent of the Participant's spouse or domestic partner. Subject to the foregoing, a beneficiary designation may be changed or revoked by a Participant at any time; provided that the change or revocation is delivered in writing to the Administrator prior to the Participant's death.

10.2    Documentation. Each Award will be evidenced in an Award Agreement in such form as the Administrator determines in its discretion. Each Award may contain such terms and conditions as are determined by the Administrator in its sole discretion, to the extent not inconsistent with those set forth in the Plan.

10.3    Discretion. Except as the Plan otherwise provides, each Award may be made alone or in addition or in relation to any other Award. The terms of each Award to a Participant need not be identical, and the Administrator need not treat Participants or Awards (or portions thereof) uniformly.

10.4    Changes in Participant's Status. The Administrator will determine how the disability, death, retirement, authorized leave of absence or any other change or purported change in a Participant's Service Provider status affects an Award and the extent to which, and the period during which, the Participant, the Participant's legal representative, conservator, guardian or Designated Beneficiary may exercise rights under the Award, if applicable. Except to the extent otherwise required by law or expressly authorized by the Company or by the Company's written policy on leaves of absence, no Service credit shall be given for vesting purposes for any period the Participant is on a leave of absence.

10.5    Withholding. Each Participant must pay the Company, or make provision satisfactory to the Administrator for payment of, any taxes required by law to be withheld in connection with such Participant's Awards by the date of the event creating the tax liability. The Company may deduct an amount sufficient to satisfy such tax obligations from any payment of any kind otherwise due to a Participant. The amount deducted shall be determined by the Company and may be up to, but no greater than, the aggregate amount of such obligations based on the maximum statutory withholding rates in the applicable Participant's jurisdiction for federal, state, local and foreign income tax and payroll tax purposes that are applicable to such taxable income. Subject to any Company insider trading policy (including blackout periods), Participants may satisfy such tax obligations (i) in cash, by wire transfer of immediately available funds, by check made payable to the order of the Company; provided that the Company may limit the use of one of the foregoing methods if one or more of the exercise methods below is permitted, (ii) to the extent permitted by the Administrator, in whole or in part by delivery of Shares, including Shares delivered by attestation and Shares retained from the Award creating the tax obligation, valued at their Fair Market Value on the date of delivery, (iii) if there is a public market for Shares at the time the tax obligations are satisfied, unless the Administrator otherwise determines, (A) delivery (including electronically or telephonically to the extent permitted by the Company) of a notice that the Participant has placed a market sell order with a broker acceptable to the Company with respect to Shares then issuable in respect of the Award and that the broker has been directed to deliver promptly to the Company funds sufficient to satisfy the tax obligations, or (B) the Participant's delivery to the Company of a copy of irrevocable and unconditional instructions to a broker acceptable to the Company to deliver promptly to the Company an amount sufficient to satisfy the tax withholding by cash, wire transfer of immediately available funds or check; provided that such amount is paid to the Company at such time as may be required by the Company, (iv) to the extent permitted by the Administrator, delivery of a promissory note or any other lawful consideration or (v) to the extent permitted by the Administrator, any combination of the foregoing payment forms. If any tax withholding obligation will be satisfied under clause (ii) of the immediately preceding sentence by the Company's retention of Shares from the Award creating the tax obligation and there is a public market for Shares at the time the tax obligation is satisfied, the Company may elect to instruct any brokerage firm determined acceptable to the Company for such purpose to sell on the applicable Participant's behalf some or all of the Shares retained and to remit the proceeds of the sale to the Company or its designee, and each Participant's acceptance of an Award under the Plan will constitute the Participant's authorization to the Company and instruction and authorization to such brokerage firm to complete the transactions described in this sentence.

10.6    Amendment of Award; Repricing. The Administrator may amend, modify or terminate any outstanding Award, including by substituting another Award of the same or a different type, changing the exercise

D-13

Exhibit 7
Page 1097

or settlement date, and converting an Incentive Stock Option to a Nonqualified Stock Option. The Participant's consent to such action will be required unless (i) the action, taking into account any related action, does not materially and adversely affect the Participant's rights under the Award, or (ii) the change is permitted under Article IX or pursuant to Section 11.6. In addition, the Administrator shall, without the approval of the stockholders of the Company, have the authority to (a) amend any outstanding Option or Stock Appreciation Right to reduce its exercise price per Share, or (b) cancel any Option or Stock Appreciation Right in exchange for cash or another Award.

10.7    Conditions on Delivery of Stock. The Company will not be obligated to deliver any Shares under the Plan or remove restrictions from Shares previously delivered under the Plan until (i) all Award conditions have been met or removed to the Company's satisfaction, (ii) as determined by the Company, all other legal matters regarding the issuance and delivery of such Shares have been satisfied, including any applicable securities laws and stock exchange or stock market rules and regulations, and (iii) the Participant has executed and delivered to the Company such representations or agreements as the Administrator deems necessary or appropriate to satisfy Applicable Law. The Company's inability to obtain authority from any regulatory body having jurisdiction, which the Administrator determines is necessary to the lawful issuance and sale of any securities, will relieve the Company of any liability for failing to issue or sell such Shares as to which such requisite authority has not been obtained.

10.8    Acceleration. The Administrator may at any time provide that any Award will become immediately vested and fully or partially exercisable, free of some or all restrictions or conditions, or otherwise fully or partially realizable.

**ARTICLE XI.**
**MISCELLANEOUS**

11.1    No Right to Employment or Other Status. No person will have any claim or right to be granted an Award, and the grant of an Award will not be construed as giving a Participant the right to continue employment or any other relationship with the Company. The Company expressly reserves the right at any time to dismiss or otherwise terminate its relationship with a Participant free from any liability or claim under the Plan or any Award, except as expressly provided in an Award Agreement or other written agreement between the Participant and the Company or any Subsidiary.

11.2    No Rights as Stockholder; Certificates. Subject to the Award Agreement, no Participant or Designated Beneficiary will have any rights as a stockholder with respect to any Shares to be distributed under an Award until becoming the record holder of such Shares. Notwithstanding any other provision of the Plan, unless the Administrator otherwise determines or Applicable Law requires, the Company will not be required to deliver to any Participant certificates evidencing Shares issued in connection with any Award and instead such Shares may be recorded in the books of the Company (or, as applicable, its transfer agent or stock plan administrator). The Company may place legends on any share certificate or book entry to reference restrictions applicable to the Shares (including, without limitation, restrictions applicable to Restricted Stock).

11.3    Effective Date. The Plan was approved by the Board on [_____], 2021. The Plan will become effective (the "Effective Date") on the day prior to the date of the closing of the transactions contemplated by that certain Business Combination Agreement entered into on or about February 15, 2021, by and among the Owlet Baby Care Inc., a Delaware corporation, Sandbridge Acquisition Corporation, a Delaware corporation, and Project Olympus Merger Sub, Inc., a Delaware corporation (the "Business Combination Agreement"), provided that it is approved by a majority of the Company's stockholders at a duly held meeting prior to such date and occurring within twelve (12) months following the date the Board approved Plan, and provided further that the effectiveness of the Plan is subject to the consummation of the transactions contemplated by the Business Combination Agreement. If the Plan is not approved by the Company's stockholders within the foregoing time frame, or if the Business Combination Agreement is terminated prior to the consummation of the transactions contemplated thereby, the Plan will not become effective. The Plan will be submitted for approval of the Company's stockholders within twelve (12) months following the date the Board approved the Plan. No Incentive Stock Option may be granted pursuant to the Plan after the tenth anniversary of the earlier of (i) the date the Plan was approved by the Board and (ii) the date the Plan was approved by the Company's stockholders.

11.4    Amendment of Plan. The Board may amend, suspend or terminate the Plan at any time and from time to time; provided that (a) no amendment requiring stockholder approval to comply with Applicable Law shall be

D-14

Exhibit 7
Page 1098

effective unless approved by the Board, and (b) no amendment, other than an increase to the Overall Share Limit or pursuant to Article IX or Section 11.6, may materially and adversely affect any Award outstanding at the time of such amendment without the affected Participant's consent. No Awards may be granted under the Plan during any suspension period or after Plan termination. Awards outstanding at the time of any Plan suspension or termination will continue to be governed by the Plan and the Award Agreement, as in effect before such suspension or termination. The Board will obtain stockholder approval of any Plan amendment to the extent necessary to comply with Applicable Law.

11.5    Provisions for Foreign Participants. The Administrator may modify Awards granted to Participants who are foreign nationals or employed outside the United States, establish subplans or procedures under the Plan or take any other necessary or appropriate action to address Applicable Law, including (a) differences in laws, rules, regulations or customs of such foreign jurisdictions with respect to tax, securities, currency, employee benefit or other matters, (b) listing and other requirements of any foreign securities exchange, and (c) any necessary local governmental or regulatory exemptions or approvals.

11.6    Section 409A.

(a)    General. The Company intends that all Awards be structured to comply with, or be exempt from, Section 409A, such that no adverse tax consequences, interest, or penalties under Section 409A apply. Notwithstanding anything in the Plan or any Award Agreement to the contrary, the Administrator may, without a Participant's consent, amend this Plan or Awards, adopt policies and procedures, or take any other actions (including amendments, policies, procedures and retroactive actions) as are necessary or appropriate to preserve the intended tax treatment of Awards, including any such actions intended to (A) exempt this Plan or any Award from Section 409A, or (B) comply with Section 409A, including regulations, guidance, compliance programs and other interpretative authority that may be issued after an Award's grant date. The Company makes no representations or warranties as to an Award's tax treatment under Section 409A or otherwise. The Company will have no obligation under this Section 11.6 or otherwise to avoid the taxes, penalties or interest under Section 409A with respect to any Award and will have no liability to any Participant or any other person if any Award, compensation or other benefits under the Plan are determined to constitute noncompliant "nonqualified deferred compensation" subject to taxes, penalties or interest under Section 409A.

(b)    Separation from Service. If an Award constitutes "nonqualified deferred compensation" under Section 409A, any payment or settlement of such Award upon a Participant's Termination of Service will, to the extent necessary to avoid taxes under Section 409A, be made only upon the Participant's "separation from service" (within the meaning of Section 409A), whether such "separation from service" occurs upon or after the Participant's Termination of Service. For purposes of this Plan or any Award Agreement relating to any such payments or benefits, references to a "termination," "termination of employment" or like terms means a "separation from service."

(c)    Payments to Specified Employees. Notwithstanding any contrary provision in the Plan or any Award Agreement, any payment(s) of "nonqualified deferred compensation" required to be made under an Award to a "specified employee" (as defined under Section 409A and as the Administrator determines) due to his or her "separation from service" will, to the extent necessary to avoid taxes under Section 409A(a)(2)(B)(i) of the Code, be delayed for the six-month period immediately following such "separation from service" (or, if earlier, until the specified employee's death) and will instead be paid (as set forth in the Award Agreement) on the day immediately following such six-month period or as soon as administratively practicable thereafter (without interest). Any payments of "nonqualified deferred compensation" under such Award payable more than six months following the Participant's "separation from service" will be paid at the time or times the payments are otherwise scheduled to be made.

11.7    Limitations on Liability. Notwithstanding any other provisions of the Plan, no individual acting as a director, officer or other employee of the Company or any Subsidiary will be liable to any Participant, former Participant, spouse, beneficiary, or any other person for any claim, loss, liability, or expense incurred in connection with the Plan or any Award, and such individual will not be personally liable with respect to the Plan because of any contract or other instrument executed in his or her capacity as an Administrator, director, officer or other employee of the Company or any Subsidiary. The Company will indemnify and hold harmless each director, officer or other employee of the Company or any Subsidiary that has been or will be granted or delegated any duty or power relating to the Plan's administration or interpretation, against any cost or expense

D-15

Exhibit 7
Page 1099

(including attorneys' fees) or liability (including any sum paid in settlement of a claim with the Administrator's approval) arising from any act or omission concerning this Plan unless arising from such person's own fraud or bad faith; provided that he or she gives the Company an opportunity, at its own expense, to handle and defend the same before he or she undertakes to handle and defend it on his or her own behalf.

11.8    Data Privacy. As a condition for receiving any Award, each Participant explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of personal data as described in this Section by and among the Company and its Subsidiaries and affiliates exclusively for implementing, administering and managing the Participant's participation in the Plan. The Company and its Subsidiaries and affiliates may hold certain personal information about a Participant, including the Participant's name, address and telephone number; birthdate; social security, insurance number or other identification number; salary; nationality; job title(s); any Shares held in the Company or its Subsidiaries and affiliates; and Award details, to implement, manage and administer the Plan and Awards (the "Data"). The Company and its Subsidiaries and affiliates may transfer the Data amongst themselves as necessary to implement, administer and manage a Participant's participation in the Plan, and the Company and its Subsidiaries and affiliates may transfer the Data to third parties assisting the Company with Plan implementation, administration and management. These recipients may be located in the Participant's country, or elsewhere, and the Participant's country may have different data privacy laws and protections than the recipients' country. By accepting an Award, each Participant authorizes such recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, to implement, administer and manage the Participant's participation in the Plan, including any required Data transfer to a broker or other third party with whom the Company or the Participant may elect to deposit any Shares. The Data related to a Participant will be held only as long as necessary to implement, administer, and manage the Participant's participation in the Plan. A Participant may, at any time, view the Data that the Company holds regarding such Participant, request additional information about the storage and processing of the Data regarding such Participant, recommend any necessary corrections to the Data regarding the Participant or refuse or withdraw the consents in this Section 11.8 in writing, without cost, by contacting the local human resources representative. The Company may cancel Participant's ability to participate in the Plan and, in the Administrator's sole discretion, the Participant may forfeit any outstanding Awards if the Participant refuses or withdraws the consents in this Section 11.8. For more information on the consequences of refusing or withdrawing consent, Participants may contact their local human resources representative.

11.9    Severability. If any portion of the Plan or any action taken under it is held illegal or invalid for any reason, the illegality or invalidity will not affect the remaining parts of the Plan, and the Plan will be construed and enforced as if the illegal or invalid provisions had been excluded, and the illegal or invalid action will be null and void.

11.10    Governing Documents. If any contradiction occurs between the Plan and any Award Agreement or other written agreement between a Participant and the Company (or any Subsidiary), the Plan will govern, unless such Award Agreement or other written agreement was approved by the Administrator and expressly provides that a specific provision of the Plan will not apply.

11.11    Governing Law. The Plan and all Awards will be governed by and interpreted in accordance with the laws of the State of Delaware, without regard to the conflict of law rules thereof or of any other jurisdiction.

11.12    Clawback Provisions. All Awards (including the gross amount of any proceeds, gains or other economic benefit the Participant actually or constructively receives upon receipt or exercise of any Award or the receipt or resale of any Shares underlying the Award) will be subject to recoupment by the Company to the extent required to comply with Applicable Law or any policy of the Company providing for the reimbursement of incentive compensation, whether or not such policy was in place at the time of grant of an Award.

11.13    Titles and Headings. The titles and headings in the Plan are for convenience of reference only and, if any conflict, the Plan's text, rather than such titles or headings, will control.

11.14    Conformity to Applicable Law. Participant acknowledges that the Plan is intended to conform to the extent necessary with Applicable Law. Notwithstanding anything herein to the contrary, the Plan and all Awards will be administered only in a manner intended to conform with Applicable Law. To the extent Applicable Law permit, the Plan and all Award Agreements will be deemed amended as necessary to conform to Applicable Law.

D-16

Exhibit 7
Page 1100

11.15    Relationship to Other Benefits. No payment under the Plan will be taken into account in determining any benefits under any pension, retirement, savings, profit sharing, group insurance, welfare or other benefit plan of the Company or any Subsidiary, except as expressly provided in writing in such other plan or an agreement thereunder.

11.16    Unfunded Status of Awards. The Plan is intended to be an "unfunded" plan for incentive compensation. With respect to any payments not yet made to a Participant pursuant to an Award, nothing contained in the Plan or Award Agreement shall give the Participant any rights that are greater than those of a general creditor of the Company or any Subsidiary.

11.17    Limitations Applicable to Section 16 Persons. Notwithstanding any other provision of the Plan, the Plan and any Award granted or awarded to any individual who is then subject to Section 16 of the Exchange Act shall be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including Rule 16b-3 of the Exchange Act and any amendments thereto) that are requirements for the application of such exemptive rule. To the extent permitted by Applicable Law, the Plan and Awards granted or awarded hereunder shall be deemed amended to the extent necessary to conform to such applicable exemptive rule.

11.18    Prohibition on Executive Officer Loans. Notwithstanding any other provision of the Plan to the contrary, no Participant who is a Director or an "executive officer" of the Company within the meaning of Section 13(k) of the Exchange Act shall be permitted to make payment with respect to any Awards granted under the Plan, or continue any extension of credit with respect to such payment, with a loan from the Company or a loan arranged by the Company in violation of Section 13(k) of the Exchange Act.

11.19    Broker-Assisted Sales. In the event of a broker-assisted sale of Shares in connection with the payment of amounts owed by a Participant under or with respect to the Plan or Awards, including amounts to be paid under the final sentence of Section 10.5: (a) any Shares to be sold through the broker-assisted sale will be sold on the day the payment first becomes due, or as soon thereafter as practicable; (b) such Shares may be sold as part of a block trade with other Participants in the Plan in which all participants receive an average price; (c) the applicable Participant will be responsible for all broker's fees and other costs of sale, and by accepting an Award, each Participant agrees to indemnify and hold the Company harmless from any losses, costs, damages, or expenses relating to any such sale; (d) to the extent the Company or its designee receives proceeds of such sale that exceed the amount owed, the Company will pay such excess in cash to the applicable Participant as soon as reasonably practicable; (e) the Company and its designees are under no obligation to arrange for such sale at any particular price; and (f) in the event the proceeds of such sale are insufficient to satisfy the Participant's applicable obligation, the Participant may be required to pay immediately upon demand to the Company or its designee an amount in cash sufficient to satisfy any remaining portion of the Participant's obligation.

* * * * *

D-17

Exhibit 7
Page 1101

TABLE OF CONTENTS

I hereby certify that the foregoing Plan was adopted by the Board of Directors of Owlet, Inc. on _____.

I hereby certify that the foregoing Plan was approved by the stockholders of Owlet, Inc. on _____.

Executed on _____.

_____

Corporate Secretary

D-18

Exhibit 7
Page 1102

TABLE OF CONTENTS

**ANNEX E**

**OWLET, INC.**
**2021 EMPLOYEE STOCK PURCHASE PLAN**

**ARTICLE 1**
**PURPOSE**

The Plan's purpose is to assist employees of the Company and its Designated Subsidiaries in acquiring a stock ownership interest in the Company, and to help such employees provide for their future security and to encourage them to remain in the employment of the Company and its Subsidiaries.

The Plan consists of two components: the Section 423 Component and the Non-Section 423 Component. The Section 423 Component is intended to qualify as an "employee stock purchase plan" under Section 423 of the Code and shall be administered, interpreted and construed in a manner consistent with the requirements of Section 423 of the Code. In addition, this Plan authorizes the grant of Options under the Non-Section 423 Component, which need not qualify as Options granted pursuant to an "employee stock purchase plan" under Section 423 of the Code; such Options granted under the Non-Section 423 Component shall be granted pursuant to separate Offerings containing such sub-plans, appendices, rules or procedures as may be adopted by the Administrator and designed to achieve tax, securities laws or other objectives for Eligible Employees and the Designated Subsidiaries in locations outside of the United States. Except as otherwise provided herein, the Non-Section 423 Component will operate and be administered in the same manner as the Section 423 Component. Offerings intended to be made under the Non-Section 423 Component will be designated as such by the Administrator at or prior to the time of such Offering.

For purposes of this Plan, the Administrator may designate separate Offerings under the Plan, the terms of which need not be identical, in which Eligible Employees will participate, even if the dates of the applicable Offering Period(s) in each such Offering is identical, provided that the terms of participation are the same within each separate Offering under the Section 423 Component as determined under Section 423 of the Code. Solely by way of example and without limiting the foregoing, the Company could, but shall not be required to, provide for simultaneous Offerings under the Section 423 Component and the Non-Section 423 Component of the Plan.

**ARTICLE 2**
**DEFINITIONS**

As used in the Plan, the following words and phrases have the meanings specified below, unless the context clearly indicates otherwise:

2.1   "**Administrator**" means the Committee, or such individuals to which authority to administer the Plan has been delegated under Section 7.1 hereof.

2.2   "**Agent**" means the brokerage firm, bank or other financial institution, entity or person(s), if any, engaged, retained, appointed or authorized to act as the agent of the Company or an Employee with regard to the Plan.

2.3   "**Board**" means the Board of Directors of the Company.

2.4   "**Code**" means the U.S. Internal Revenue Code of 1986, as amended, and all regulations, guidance, compliance programs and other interpretative authority issued thereunder.

2.5   "**Committee**" means the Compensation Committee of the Board.

2.6   "**Common Stock**" means the common stock of the Company.

2.7   "**Company**" means Owlet, Inc., a Delaware corporation, or any successor.

2.8   "**Compensation**" of an Employee means the regular earnings or base salary, bonuses and commissions paid to the Employee from the Company on each Payday as compensation for services to the Company or any Designated Subsidiary, before deduction for any salary deferral contributions made by the Employee to any tax-qualified or nonqualified deferred compensation plan, including overtime, shift differentials, vacation pay, salaried production schedule premiums, holiday pay, jury duty pay, funeral leave pay, paid time off, military pay, prior week adjustments and weekly bonus, but excluding education or tuition reimbursements, imputed income

E-1

Exhibit 7
Page 1103

arising under any group insurance or benefit program, travel expenses, business and moving reimbursements, including tax gross ups and taxable mileage allowance, income received in connection with any stock options, restricted stock, restricted stock units or other compensatory equity awards and all contributions made by the Company or any Designated Subsidiary for the Employee's benefit under any employee benefit plan now or hereafter established. Such Compensation shall be calculated before deduction of any income or employment tax withholdings, but shall be withheld from the Employee's net income.

2.9   "**Designated Subsidiary**" means each Subsidiary, including any Subsidiary in existence on the Effective Date and any Subsidiary formed or acquired following the Effective Date, that has been designated by the Board or Committee from time to time in its sole discretion as eligible to participate in the Plan, in accordance with Section 7.2 hereof, such designation to specify whether such participation is in the Section 423 Component or Non-Section 423 Component. A Designated Subsidiary may participate in either the Section 423 Component or Non-Section 423 Component, but not both, *provided* that a Subsidiary that, for U.S. tax purposes, is disregarded from the Company or any Subsidiary that participates in the Section 423 Component shall automatically constitute a Designated Subsidiary that participates in the Section 423 Component.

2.10   "**Effective Date**" means the date immediately prior to the date of the closing of the transactions contemplated by that certain Business Combination Agreement entered into on or about February 15, 2021, by and among the Owlet Baby Care Inc., a Delaware corporation, Sandbridge Acquisition Corporation, a Delaware corporation, and Project Olympus Merger Sub, Inc., a Delaware corporation, *provided* that the Board has adopted the Plan prior to or on such date, subject to approval of the Plan by the Company's stockholders.

2.11   "**Eligible Employee**" means an Employee:

(a)   who is customarily scheduled to work at least 20 hours per week;

(b)   whose customary employment is more than five months in a calendar year; and

(c)   who, after the granting of the Option, would not be deemed for purposes of Section 423(b)(3) of the Code to possess 5% or more of the total combined voting power or value of all classes of stock of the Company or any Subsidiary.

For purposes of clause (c), the rules of Section 424(d) of the Code with regard to the attribution of stock ownership shall apply in determining the stock ownership of an individual, and stock which an Employee may purchase under outstanding options shall be treated as stock owned by the Employee.

Notwithstanding the foregoing, the Administrator may exclude from participation in the Section 423 Component as an Eligible Employee:

(x)   any Employee that is a "highly compensated employee" of the Company or any Designated Subsidiary (within the meaning of Section 414(q) of the Code), or that is such a "highly compensated employee" (A) with compensation above a specified level, (B) who is an officer or (C) who is subject to the disclosure requirements of Section 16(a) of the Exchange Act; or

(y)   any Employee who is a citizen or resident of a foreign jurisdiction (without regard to whether they are also a citizen of the United States or a resident alien (within the meaning of Section 7701(b)(1)(A) of the Code)) if either (A) the grant of the Option is prohibited under the laws of the jurisdiction governing such Employee, or (B) compliance with the laws of the foreign jurisdiction would cause the Section 423 Component, any Offering thereunder or an Option granted thereunder to violate the requirements of Section 423 of the Code; *provided* that any exclusion in clauses (x) or (y) shall be applied in an identical manner under each Offering to all Employees of the Company and all Designated Subsidiaries, in accordance with Treas. Reg. § 1.423-2(e). Notwithstanding the foregoing, with respect to the Non-Section 423 Component, the first sentence in this definition shall apply in determining who is an "Eligible Employee," except (a) the Administrator may limit eligibility further within the Company or a Designated Subsidiary so as to only designate some Employees of the Company or a Designated Subsidiary as Eligible Employees, and (b) to the extent the restrictions in the first sentence in this definition are not consistent with applicable local laws, the applicable local laws shall control.

2.12   "**Employee**" means any person who renders services to the Company or a Designated Subsidiary in the status of an employee within the meaning of Section 3401(c) of the Code. "Employee" shall not include any director of the Company or a Designated Subsidiary who does not render services to the Company or a

E-2

Exhibit 7
Page 1104

Designated Subsidiary in the status of an employee within the meaning of Section 3401(c) of the Code. For purposes of the Plan, the employment relationship shall be treated as continuing intact while the individual is on military leave, sick leave or other leave of absence approved by the Company or a Designated Subsidiary and meeting the requirements of Treas. Reg. § 1.421-1(h)(2). Where the period of leave exceeds three months, or such other period specified in Treas. Reg. § 1.421-1(h)(2), and the individual's right to reemployment is not guaranteed either by statute or by contract, the employment relationship shall be deemed to have terminated on the first day immediately following such three-month period, or such other period specified in Treas. Reg. § 1.421-1(h)(2).

2.13   "*Enrollment Date*" means the first date of each Offering Period.

2.14   "*Exercise Date*" means the last day of each Purchase Period, except as provided in Section 5.2 hereof.

2.15   "*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

2.16   "*Fair Market Value*" means, as of any date, the value of Common Stock determined as follows:

(a)   If the Common Stock is (i) listed on any established securities exchange (such as the New York Stock Exchange or Nasdaq Stock Market), (ii) listed on any national market system or (iii) listed, quoted or traded on any automated quotation system, its Fair Market Value shall be the closing sales price for a share of Common Stock as quoted on such exchange or system for such date or, if there is no closing sales price for a share of Common Stock on the date in question, the closing sales price for a share of Common Stock on the last preceding date for which such quotation exists, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable;

(b)   If the Common Stock is not listed on an established securities exchange, national market system or automated quotation system, but the Common Stock is regularly quoted by a recognized securities dealer, its Fair Market Value shall be the mean of the high bid and low asked prices for such date or, if there are no high bid and low asked prices for a share of Common Stock on such date, the high bid and low asked prices for a share of Common Stock on the last preceding date for which such information exists, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable; or

(c)   If the Common Stock is neither listed on an established securities exchange, national market system or automated quotation system nor regularly quoted by a recognized securities dealer, its Fair Market Value shall be established by the Administrator in good faith.

2.17   "*Grant Date*" means the first day of an Offering Period.

2.18   "*New Exercise Date*" has the meaning set forth in Section 5.2(b) hereof.

2.19   "*Non-Section 423 Component*" means those Offerings under the Plan, together with the sub-plans, appendices, rules or procedures, if any, adopted by the Administrator as a part of this Plan, in each case, pursuant to which Options may be granted to non-U.S. Eligible Employees that need not satisfy the requirements for Options granted pursuant to an "employee stock purchase plan" that are set forth under Section 423 of the Code.

2.20   "*Offering*" means an offer under the Plan of an Option that may be exercised during an Offering Period as further described in Section 4 hereof. Unless otherwise specified by the Administrator, each Offering to the Eligible Employees of the Company or a Designated Subsidiary shall be deemed a separate Offering, even if the dates and other terms of the applicable Exercise Periods of each such Offering are identical and the provisions of the Plan will separately apply to each Offering. To the extent permitted by Treas. Reg. § 1.423-2(a)(1), the terms of each separate Offering under the Section 423 Component need not be identical, provided that the terms of the Section 423 Component and an Offering thereunder together satisfy Treas. Reg. § 1.423-2(a)(2) and (a)(3).

2.21   "*Offering Period*" means each consecutive, overlapping twenty-four (24) month period commencing on such date(s) as determined by the Board or Committee, in its sole discretion, and with respect to which Options shall be granted to Participants. The duration and timing of Offering Periods may be established or changed by the Board or Committee at any time, in its sole discretion. Notwithstanding the foregoing, in no event may an Offering Period exceed twenty-seven (27) months.

E-3

Exhibit 7
Page 1105

TABLE OF CONTENTS

2.22    "*Option*" means the right to purchase shares of Common Stock pursuant to the Plan during each Offering Period.

2.23    "*Option Price*" means the purchase price of a share of Common Stock hereunder as provided in Section 4.2 hereof.

2.24    "*Parent*" means any entity that is a parent corporation of the Company within the meaning of Section 424 of the Code.

2.25    "*Participant*" means any Eligible Employee who elects to participate in the Plan.

2.26    "*Payday*" means the regular and recurring established day for payment of Compensation to an Employee of the Company or any Designated Subsidiary.

2.27    "*Plan*" means this 2021 Employee Stock Purchase Plan, including both the Section 423 Component and Non-Section 423 Component and any other sub-plans or appendices hereto, as amended from time to time.

2.28    "*Plan Account*" means a bookkeeping account established and maintained by the Company in the name of each Participant.

2.29    "*Purchase Period*" means each consecutive six (6) month period commencing on such date(s) as determined by the Board or Committee, in its sole discretion, within each Offering Period. The first Purchase Period of each Offering Period shall commence on the Grant Date and end with the next Exercise Date. The duration and timing of Purchase Periods may be established or changed by the Board or Committee at any time, in its sole discretion. Notwithstanding the foregoing, in no event may a Purchase Period exceed the duration of the Offering Period under which it is established.

2.30    "*Section 409A*" means Section 409A of the Code.

2.31    "*Section 423 Component*" means those Offerings under the Plan that are intended to meet the requirements under Section 423(b) of the Code.

2.32    "*Subsidiary*" means any entity that is a subsidiary corporation of the Company within the meaning of Section 424 of the Code. In addition, with respect to the Non-Section 423 Component, Subsidiary shall include any corporate or noncorporate entity in which the Company has a direct or indirect equity interest or significant business relationship.

2.33    "*Treas. Reg.*" means U.S. Department of the Treasury regulations.

2.34    "*Withdrawal Election*" has the meaning set forth in Section 6.1(a) hereof.

### ARTICLE 3
### PARTICIPATION

3.1    Eligibility.

(a)    Any Eligible Employee who is employed by the Company or a Designated Subsidiary on a given Enrollment Date for an Offering Period shall be eligible to participate in the Plan during such Offering Period, subject to the requirements of Articles 4 and 5 hereof, and, for the Section 423 Component, the limitations imposed by Section 423(b) of the Code.

(b)    No Eligible Employee shall be granted an Option under the Section 423 Component which permits the Participant's rights to purchase shares of Common Stock under the Plan, and to purchase stock under all other employee stock purchase plans of the Company, any Parent or any Subsidiary subject to Section 423 of the Code, to accrue at a rate which exceeds $25,000 of fair market value of such stock (determined at the time such Option is granted) for each calendar year in which such Option is outstanding at any time. The limitation under this Section 3.1(b) shall be applied in accordance with Section 423(b)(8) of the Code.

3.2    Election to Participate; Payroll Deductions

(a)    Except as provided in Sections 3.2(e) and 3.3 hereof, an Eligible Employee may become a Participant in the Plan only by means of payroll deduction. Each individual who is an Eligible Employee as of an Offering Period's Enrollment Date may elect to participate in such Offering Period and the Plan by delivering to the Company a payroll deduction authorization no later than the period of time prior to the applicable Enrollment Date that is determined by the Administrator, in its sole discretion.

E-4

Exhibit 7
Page 1106

(b)    Subject to Section 3.1(b) hereof and except as may otherwise be determined by the Administrator, payroll deductions (i) shall equal at least 1% of the Participant's Compensation as of each Payday of the Offering Period following the Enrollment Date, but not more than 15% of the Participant's Compensation as of each Payday of the Offering Period following the Enrollment Date; and (ii) may be expressed either as (A) a whole number percentage, or (B) a fixed dollar amount. Amounts deducted from a Participant's Compensation with respect to an Offering Period pursuant to this Section 3.2 shall be deducted each Payday through payroll deduction and credited to the Participant's Plan Account; provided that for the first Offering Period under this Plan, payroll deductions shall not begin until such date determined by the Board or Committee, in its sole discretion.

(c)    Following at least one payroll deduction, a Participant may decrease (to as low as zero) the amount deducted from such Participant's Compensation only once during an Offering Period upon ten calendar days' prior written notice to the Company. A Participant may not increase the amount deducted from such Participant's Compensation during an Offering Period.

(d)    Upon the completion of an Offering Period, each Participant in such Offering Period shall automatically participate in the immediately following Offering Period at the same payroll deduction percentage or fixed amount as in effect at the termination of such Offering Period, unless such Participant delivers to the Company a different election with respect to the successive Offering Period in accordance with Section 3.2(a) hereof, or unless such Participant becomes ineligible for participation in the Plan.

(e)    Notwithstanding any other provisions of the Plan to the contrary, in non-U.S. jurisdictions where participation in the Plan through payroll deductions is prohibited, the Administrator may provide that an Eligible Employee may elect to participate through contributions to the Participant's account under the Plan in a form acceptable to the Administrator in lieu of or in addition to payroll deductions; provided, however, that, for any Offering under the Section 423 Component, the Administrator must determine that any alternative method of contribution is applied on an equal and uniform basis to all Eligible Employees in the Offering.

3.3    Leave of Absence. During leaves of absence approved by the Company meeting the requirements of Treas. Reg. § 1.421-1(h)(2), a Participant may continue participation in the Plan by making cash payments to the Company on the Participant's normal payday equal to the Participant's authorized payroll deduction.

ARTICLE 4
PURCHASE OF SHARES

4.1    Grant of Option. The Company may make one or more Offerings under the Plan, which may be successive or overlapping with one another, until the earlier of: (i) the date on which the Shares available under the Plan have been sold or (ii) the date on which the Plan is suspended or terminates. The Administrator shall designate the terms and conditions of each Offering in writing, including without limitation, the Offering Period and the Purchase Periods. Each Participant shall be granted an Option with respect to an Offering Period on the applicable Grant Date. Subject to the limitations of Section 3.1(b) hereof, the number of shares of Common Stock subject to a Participant's Option shall be determined by dividing (a) such Participant's payroll deductions accumulated prior to an Exercise Date and retained in the Participant's Plan Account on such Exercise Date by (b) the applicable Option Price; provided that in no event shall a Participant be permitted to purchase during each Offering Period more than 50,000 shares of Common Stock (subject to any adjustment pursuant to Section 5.2 hereof). The Administrator may, for future Offering Periods, increase or decrease, in its absolute discretion, the maximum number of shares of Common Stock that a Participant may purchase during such future Offering Periods. Each Option shall expire on the last Exercise Date for the applicable Offering Period immediately after the automatic exercise of the Option in accordance with Section 4.3 hereof, unless such Option terminates earlier in accordance with Article 6 hereof.

4.2    Option Price. The "Option Price" per share of Common Stock to be paid by a Participant upon exercise of the Participant's Option on an Exercise Date for an Offering Period shall equal 85% of the lesser of the Fair Market Value of a share of Common Stock on (a) the applicable Grant Date and (b) the applicable Exercise Date, or such other price designated by the Administrator; provided that in no event shall the Option Price per share of Common Stock be less than the par value per share of the Common Stock.

E-5

Exhibit 7
Page 1107

4.3   Purchase of Shares.

(a)   On each Exercise Date for an Offering Period, each Participant shall automatically and without any action on such Participant's part be deemed to have exercised the Participant's Option to purchase at the applicable per share Option Price the largest number of whole shares of Common Stock which can be purchased with the amount in the Participant's Plan Account. Any balance less than the per share Option Price that is remaining in the Participant's Plan Account (after exercise of such Participant's Option) as of the Exercise Date shall be carried forward to the next Purchase Period or Offering Period. Any balance not carried forward to the next Purchase Period or Offering Period in accordance with the prior sentence promptly shall be refunded to the applicable Participant.

(b)   As soon as practicable following each Exercise Date, the number of shares of Common Stock purchased by such Participant pursuant to Section 4.3(a) hereof shall be delivered (either in share certificate or book entry form), in the Company's sole discretion, to either (i) the Participant or (ii) an account established in the Participant's name at a stock brokerage or other financial services firm designated by the Company. If the Company is required to obtain from any commission or agency authority to issue any such shares of Common Stock, the Company shall seek to obtain such authority. Inability of the Company to obtain from any such commission or agency authority which counsel for the Company deems necessary for the lawful issuance of any such shares shall relieve the Company from liability to any Participant except to refund to the Participant such Participant's Plan Account balance, without interest thereon.

4.4   Automatic Termination of Offering Period. If the Fair Market Value of a share of Common Stock on any Exercise Date (except the final scheduled Exercise Date of any Offering Period) is lower than the Fair Market Value of a share of Common Stock on the Grant Date for an Offering Period, then such Offering Period shall terminate on such Exercise Date after the automatic exercise of the Option in accordance with Section 4.3 hereof, and each Participant shall automatically be enrolled in the Offering Period that commences immediately following such Exercise Date and such Participant's payroll deduction authorization shall remain in effect for such Offering Period.

4.5   Transferability of Rights. An Option granted under the Plan shall not be transferable, other than by will or the applicable laws of descent and distribution, and is exercisable during the Participant's lifetime only by the Participant. No option or interest or right to the Option shall be available to pay off any debts, contracts or engagements of the Participant or the Participant's successors in interest or shall be subject to disposition by pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempt at disposition of the Option shall have no effect.

**ARTICLE 5**
**PROVISIONS RELATING TO COMMON STOCK**

5.1   Common Stock Reserved. Subject to adjustment as provided in Section 5.2 hereof, the maximum number of shares of Common Stock that shall be made available for sale under the Plan shall be the sum of (a) [_____][1] shares and (b) an annual increase on the first day of each year beginning in 2022 and ending in 2031 equal to the lesser of (i) 1% of the shares outstanding (on an as converted basis) on the last day of the immediately preceding fiscal year and (ii) such number of shares as may be determined by the Board or Committee; *provided, however*, no more than [_____][2] shares may be issued under the Plan. Shares made available for sale under the Plan may be authorized but unissued shares, treasury shares of Common Stock, or reacquired shares reserved for issuance under the Plan.

5.2   Adjustments Upon Changes in Capitalization, Dissolution, Liquidation, Merger or Asset Sale.

(a)   Changes in Capitalization. Subject to any required action by the stockholders of the Company, the number of shares of Common Stock which have been authorized for issuance under the Plan but not yet placed under Option, as well as the price per share and the number of shares of Common Stock covered by each Option under the Plan which has not yet been exercised shall be proportionately adjusted for any increase or decrease in the number of issued shares of Common Stock resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the Common Stock, or any other increase or decrease in the number of shares

---

[1] **NTD**: Amount to equal 1% of the fully diluted shares of Common Stock to be outstanding immediately after the closing.

[2] **NTD**: Amount to equal 14.375% of the fully diluted shares of Common Stock to be outstanding immediately after the closing.

E-6

Exhibit 7
Page 1108

of Common Stock effected without receipt of consideration by the Company. Such adjustment shall be made by the Administrator, whose determination in that respect shall be final, binding and conclusive. Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares of Common Stock subject to an Option.

(b)    Dissolution or Liquidation. In the event of the proposed dissolution or liquidation of the Company, the Offering Periods then in progress shall be shortened by setting a new Exercise Date (the "New Exercise Date"), and shall terminate immediately prior to the consummation of such proposed dissolution or liquidation, unless provided otherwise by the Administrator. The New Exercise Date shall be before the date of the Company's proposed dissolution or liquidation. The Administrator shall notify each Participant in writing, at least ten business days prior to the New Exercise Date, that the Exercise Date for the Participant's Option has been changed to the New Exercise Date and that the Participant's Option shall be exercised automatically on the New Exercise Date, unless prior to such date the Participant has withdrawn from the Offering Period as provided in Section 6.1 hereof or the Participant has ceased to be an Eligible Employee as provided in Section 6.2 hereof.

(c)    Merger or Asset Sale. In the event of a proposed sale of all or substantially all of the assets of the Company, or the merger of the Company with or into another corporation, each outstanding Option shall be assumed or an equivalent Option substituted by the successor corporation or a Parent or Subsidiary of the successor corporation. If the successor corporation refuses to assume or substitute for the Option, any Offering Periods then in progress shall be shortened by setting a New Exercise Date and any Offering Periods then in progress shall end on the New Exercise Date. The New Exercise Date shall be before the date of the Company's proposed sale or merger. The Administrator shall notify each Participant in writing, at least ten business days prior to the New Exercise Date, that the Exercise Date for the Participant's Option has been changed to the New Exercise Date and that the Participant's Option shall be exercised automatically on the New Exercise Date, unless prior to such date the Participant has withdrawn from the Offering Period as provided in Section 6.1 hereof or the Participant has ceased to be an Eligible Employee as provided in Section 6.2 hereof.

5.3    Insufficient Shares. If the Administrator determines that, on a given Exercise Date, the number of shares of Common Stock with respect to which Options are to be exercised may exceed the number of shares of Common Stock remaining available for sale under the Plan on such Exercise Date, the Administrator shall make a pro rata allocation of the shares of Common Stock available for issuance on such Exercise Date in as uniform a manner as shall be practicable and as it shall determine in its sole discretion to be equitable among all Participants exercising Options to purchase Common Stock on such Exercise Date, and unless additional shares are authorized for issuance under the Plan, no further Offering Periods shall take place and the Plan shall terminate pursuant to Section 7.5 hereof. If an Offering Period is so terminated, then the balance of the amount credited to the Participant's Plan Account which has not been applied to the purchase of shares of Common Stock shall be paid to such Participant in one lump sum in cash within 30 days after such Exercise Date, without any interest thereon.

5.4    Rights as Stockholders. With respect to shares of Common Stock subject to an Option, a Participant shall not be deemed to be a stockholder of the Company and shall not have any of the rights or privileges of a stockholder. A Participant shall have the rights and privileges of a stockholder of the Company when, but not until, shares of Common Stock have been deposited in the designated brokerage account following exercise of the Participant's Option.

## ARTICLE 6
## TERMINATION OF PARTICIPATION

6.1    Cessation of Contributions; Voluntary Withdrawal.

(a)    A Participant may cease payroll deductions during an Offering Period and elect to withdraw from the Plan by delivering written notice of such election to the Company in such form and at such time prior to the Exercise Date for such Offering Period as may be established by the Administrator (a "**Withdrawal Election**"). A Participant electing to withdraw from the Plan may elect to either (i) withdraw all of the funds then credited to the Participant's Plan Account as of the date on which the Withdrawal Election is received by the Company, in which case amounts credited to such Plan Account shall be returned to the Participant in one lump-sum payment in cash within 30 days after such election is received by the Company, without any interest thereon, and the Participant shall cease to participate in the Plan and the Participant's Option for such Offering Period shall

E-7

Exhibit 7
Page 1109

terminate; or (ii) exercise the Option for the maximum number of whole shares of Common Stock on the applicable Exercise Date with any remaining Plan Account balance returned to the Participant in one lump-sum payment in cash within 30 days after such Exercise Date, without any interest thereon, and after such exercise cease to participate in the Plan. Upon receipt of a Withdrawal Election, the Participant's payroll deduction authorization and the Participant's Option shall terminate.

(b)    A Participant's withdrawal from the Plan shall not have any effect upon the Participant's eligibility to participate in any similar plan which may hereafter be adopted by the Company or in succeeding Offering Periods which commence after the termination of the Offering Period from which the Participant withdraws.

(c)    A Participant who ceases contributions to the Plan during any Offering Period shall not be permitted to resume contributions to the Plan during that Offering Period.

6.2    Termination of Eligibility. Upon a Participant's ceasing to be an Eligible Employee, for any reason, such Participant's Option for the applicable Offering Period shall automatically terminate, the Participant shall be deemed to have elected to withdraw from the Plan, and such Participant's Plan Account shall be paid to such Participant or, in the case of the Participant's death, to the person or persons entitled thereto pursuant to applicable law, within 30 days after such cessation of being an Eligible Employee, without any interest thereon. If a Participant transfers employment from the Company or any Designated Subsidiary participating in the Section 423 Component to any Designated Subsidiary participating in the Non-Section 423 Component, such transfer shall not be treated as a termination of employment, but the Participant shall immediately cease to participate in the Section 423 Component; however, any contributions made for the Offering Period in which such transfer occurs shall be transferred to the Non-Section 423 Component, and such Participant shall immediately join the then-current Offering under the Non-Section 423 Component upon the same terms and conditions in effect for the Participant's participation in the Section 423 Component, except for such modifications otherwise applicable for Participants in such Offering. A Participant who transfers employment from any Designated Subsidiary participating in the Non-Section 423 Component to the Company or any Designated Subsidiary participating in the Section 423 Component shall not be treated as terminating the Participant's employment and shall remain a Participant in the Non-Section 423 Component until the earlier of (i) the end of the current Offering Period under the Non-Section 423 Component, or (ii) the Enrollment Date of the first Offering Period in which the Participant is eligible to participate following such transfer. Notwithstanding the foregoing, the Administrator may establish different rules to govern transfers of employment between companies participating in the Section 423 Component and the Non-Section 423 Component, consistent with the applicable requirements of Section 423 of the Code.

**ARTICLE 7**
**GENERAL PROVISIONS**

7.1    Administration.

(a)    The Plan shall be administered by the Committee, which shall be composed of members of the Board. The Committee may delegate administrative tasks under the Plan to the services of an Agent or Employees to assist in the administration of the Plan, including establishing and maintaining an individual securities account under the Plan for each Participant.

(b)    It shall be the duty of the Administrator to conduct the general administration of the Plan in accordance with the provisions of the Plan. The Administrator shall have the power, subject to, and within the limitations of, the express provisions of the Plan:

(i)    To establish and terminate Offerings;

(ii)    To determine when and how Options shall be granted and the provisions and terms of each Offering (which need not be identical);

(iii)    To select Designated Subsidiaries in accordance with Section 7.2 hereof; and

(iv)    To construe and interpret the Plan, the terms of any Offering and the terms of the Options and to adopt such rules for the administration, interpretation, and application of the Plan as are consistent

E-8

Exhibit 7
Page 1110

therewith and to interpret, amend or revoke any such rules. The Administrator, in the exercise of this power, may correct any defect, omission or inconsistency in the Plan, any Offering or any Option, in a manner and to the extent it shall deem necessary or expedient to administer the Plan, subject to Section 423 of the Code for the Section 423 Component.

(c)    The Administrator may adopt rules or procedures relating to the operation and administration of the Plan to accommodate the specific requirements of local laws and procedures. Without limiting the generality of the foregoing, the Administrator is specifically authorized to adopt rules and procedures regarding handling of participation elections, payroll deductions, payment of interest, conversion of local currency, payroll tax, withholding procedures and handling of stock certificates which vary with local requirements. In its absolute discretion, the Board may at any time and from time to time exercise any and all rights and duties of the Administrator under the Plan.

(d)    The Administrator may adopt sub-plans applicable to particular Designated Subsidiaries or locations, which sub-plans may be designed to be outside the scope of Section 423 of the Code. The rules of such sub-plans may take precedence over other provisions of this Plan, with the exception of Section 5.1 hereof, but unless otherwise superseded by the terms of such sub-plan, the provisions of this Plan shall govern the operation of such sub-plan.

(e)    All expenses and liabilities incurred by the Administrator in connection with the administration of the Plan shall be borne by the Company. The Administrator may, with the approval of the Committee, employ attorneys, consultants, accountants, appraisers, brokers or other persons. The Administrator, the Company and its officers and directors shall be entitled to rely upon the advice, opinions or valuations of any such persons. All actions taken and all interpretations and determinations made by the Administrator in good faith shall be final and binding upon all Participants, the Company and all other interested persons. No member of the Board or Administrator shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or the options, and all members of the Board or Administrator shall be fully protected by the Company in respect to any such action, determination, or interpretation.

7.2    Designation of Subsidiary Corporations. The Board or Administrator shall designate from time to time the Subsidiaries that shall constitute Designated Subsidiaries, and determine whether such Designated Subsidiaries shall participate in the Section 423 Component or Non-Section 423 Component. The Board or Administrator may designate a Subsidiary, or terminate the designation of a Subsidiary, without the approval of the stockholders of the Company.

7.3    Reports. Individual accounts shall be maintained for each Participant in the Plan. Statements of Plan Accounts shall be given to Participants at least annually, which statements shall set forth the amounts of payroll deductions, the Option Price, the number of shares purchased and the remaining cash balance, if any.

7.4    No Right to Employment. Nothing in the Plan shall be construed to give any person (including any Participant) the right to remain in the employ of the Company, a Parent or a Subsidiary or to affect the right of the Company, any Parent or any Subsidiary to terminate the employment of any person (including any Participant) at any time, with or without cause, which right is expressly reserved.

7.5    Amendment and Termination of the Plan.

(a)    The Board may, in its sole discretion, amend, suspend or terminate the Plan at any time and from time to time. To the extent necessary to comply with Section 423 of the Code (or any successor rule or provision), with respect to the Section 423 Component, or any other applicable law, regulation or stock exchange rule, the Company shall obtain stockholder approval of any such amendment to the Plan in such a manner and to such a degree as required by Section 423 of the Code or such other law, regulation or rule.

(b)    If the Administrator determines that the ongoing operation of the Plan may result in unfavorable financial accounting consequences, the Administrator may in its discretion modify or amend the Plan to reduce or eliminate such accounting consequence. Such modifications or amendments shall not require stockholder approval or the consent of any Participant.

(c)    Upon termination of the Plan, the balance in each Participant's Plan Account shall be refunded as soon as practicable after such termination, without any interest thereon.

E-9

Exhibit 7
Page 1111

7.6    Use of Funds; No Interest Paid. All funds received by the Company by reason of purchase of shares of Common Stock under the Plan shall be included in the general funds of the Company free of any trust or other restriction and may be used for any corporate purpose. No interest shall be paid to any Participant or credited under the Plan.

7.7    Term; Approval by Stockholders. No Option may be granted during any period of suspension of the Plan or after termination of the Plan. The Plan shall be submitted for the approval of the Company's stockholders within 12 months after the date of the Board's initial adoption of the Plan. Options may be granted prior to such stockholder approval; *provided*, *however*, that such Options shall not be exercisable prior to the time when the Plan is approved by the stockholders; *provided*, *further* that if such approval has not been obtained by the end of the 12-month period, all Options previously granted under the Plan shall thereupon terminate and be canceled and become null and void without being exercised.

7.8    Effect Upon Other Plans. The adoption of the Plan shall not affect any other compensation or incentive plans in effect for the Company, any Parent or any Subsidiary. Nothing in the Plan shall be construed to limit the right of the Company, any Parent or any Subsidiary (a) to establish any other forms of incentives or compensation for Employees of the Company or any Parent or any Subsidiary, or (b) to grant or assume Options otherwise than under the Plan in connection with any proper corporate purpose, including, but not by way of limitation, the grant or assumption of options in connection with the acquisition, by purchase, lease, merger, consolidation or otherwise, of the business, stock or assets of any corporation, firm or association.

7.9    Conformity to Securities Laws. Notwithstanding any other provision of the Plan, the Plan and the participation in the Plan by any individual who is then subject to Section 16 of the Exchange Act shall be subject to any additional limitations set forth in any applicable exemption rule under Section 16 of the Exchange Act (including any amendment to Rule 16b-3 of the Exchange Act) that are requirements for the application of such exemptive rule. To the extent permitted by applicable law, the Plan shall be deemed amended to the extent necessary to conform to such applicable exemptive rule.

7.10    Notice of Disposition of Shares. Each Participant shall give the Company prompt notice of any disposition or other transfer of any shares of Common Stock, acquired pursuant to the exercise of an Option granted under the Section 423 Component, if such disposition or transfer is made (a) within two years after the applicable Grant Date or (b) within one year after the transfer of such shares of Common Stock to such Participant upon exercise of such Option. The Company may direct that any certificates evidencing shares acquired pursuant to the Plan refer to such requirement.

7.11    Tax Withholding. The Company or any Parent or any Subsidiary shall be entitled to require payment in cash or deduction from other compensation payable to each Participant of any sums required by federal, state or local tax law to be withheld with respect to any purchase of shares of Common Stock under the Plan or any sale of such shares.

7.12    Governing Law. The Plan and all rights and obligations thereunder shall be construed and enforced in accordance with the laws of the State of Delaware, without regard to the conflict of law rules thereof or of any other jurisdiction.

7.13    Notices. All notices or other communications by a Participant to the Company under or in connection with the Plan shall be deemed to have been duly given when received in the form specified by the Company at the location, or by the person, designated by the Company for the receipt thereof.

7.14    Conditions To Issuance of Shares.

(a)    Notwithstanding anything herein to the contrary, the Company shall not be required to issue or deliver any certificates or make any book entries evidencing shares of Common Stock pursuant to the exercise of an Option by a Participant, unless and until the Board or the Committee has determined, with advice of counsel, that the issuance of such shares of Common Stock is in compliance with all applicable laws, regulations of governmental authorities and, if applicable, the requirements of any securities exchange or automated quotation system on which the shares of Common Stock are listed or traded, and the shares of Common Stock are covered by an effective registration statement or applicable exemption from registration. In addition to the terms and conditions provided herein, the Board or the Committee may require that a Participant make such reasonable covenants, agreements, and representations as the Board or the Committee, in its discretion, deems advisable in order to comply with any such laws, regulations, or requirements.

E-10

Exhibit 7
Page 1112

(b)    All certificates for shares of Common Stock delivered pursuant to the Plan and all shares of Common Stock issued pursuant to book entry procedures are subject to any stop-transfer orders and other restrictions as the Committee deems necessary or advisable to comply with federal, state, or foreign securities or other laws, rules and regulations and the rules of any securities exchange or automated quotation system on which the shares of Common Stock are listed, quoted, or traded. The Committee may place legends on any certificate or book entry evidencing shares of Common Stock to reference restrictions applicable to the shares of Common Stock.

(c)    The Committee shall have the right to require any Participant to comply with any timing or other restrictions with respect to the settlement, distribution or exercise of any Option, including a window-period limitation, as may be imposed in the sole discretion of the Committee.

(d)    Notwithstanding any other provision of the Plan, unless otherwise determined by the Committee or required by any applicable law, rule or regulation, the Company may, in lieu of delivering to any Participant certificates evidencing shares of Common Stock issued in connection with any Option, record the issuance of shares of Common Stock in the books of the Company (or, as applicable, its transfer agent or stock plan administrator).

7.15    Equal Rights and Privileges. All Eligible Employees of the Company (or of any Designated Subsidiary) granted Options pursuant to an Offering under the Section 423 Component shall have equal rights and privileges under this Plan to the extent required under Section 423 of the Code so that the Section 423 Component qualifies as an "employee stock purchase plan" within the meaning of Section 423 of the Code. Any provision of the Section 423 Component that is inconsistent with Section 423 of the Code shall, without further act or amendment by the Company or the Board, be reformed to comply with the equal rights and privileges requirement of Section 423 of the Code. Eligible Employees participating in the Non-Section 423 Component need not have the same rights and privileges as Eligible Employees participating in the Section 423 Component.

7.16    Rules Particular to Specific Countries. Notwithstanding anything herein to the contrary, the terms and conditions of the Plan with respect to Participants who are tax residents of a particular non-U.S. country or who are foreign nationals or employed in non-U.S. jurisdictions may be subject to an addendum to the Plan in the form of an appendix or sub-plan (which appendix or sub-plan may be designed to govern Offerings under the Section 423 Component or the Non-Section 423 Component, as determined by the Administrator). To the extent that the terms and conditions set forth in an appendix or sub-plan conflict with any provisions of the Plan, the provisions of the appendix or sub-plan shall govern. The adoption of any such appendix or sub-plan shall be pursuant to Section 7.1 above. Without limiting the foregoing, the Administrator is specifically authorized to adopt rules and procedures, with respect to Participants who are foreign nationals or employed in non-U.S. jurisdictions, regarding the exclusion of particular Subsidiaries from participation in the Plan, eligibility to participate, the definition of Compensation, handling of payroll deductions or other contributions by Participants, payment of interest, conversion of local currency, data privacy security, payroll tax, withholding procedures, establishment of bank or trust accounts to hold payroll deductions or contributions.

7.17    Section 409A. The Section 423 Component of the Plan and the Options granted pursuant to Offerings thereunder are intended to be exempt from the application of Section 409A. Neither the Non-Section 423 Component nor any Option granted pursuant to an Offering thereunder is intended to constitute or provide for "nonqualified deferred compensation" within the meaning of Section 409A. Notwithstanding any provision of the Plan to the contrary, if the Administrator determines that any Option granted under the Plan may be or become subject to Section 409A or that any provision of the Plan may cause an Option granted under the Plan to be or become subject to Section 409A, the Administrator may adopt such amendments to the Plan and/or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions as the Administrator determines are necessary or appropriate to avoid the imposition of taxes under Section 409A, either through compliance with the requirements of Section 409A or with an available exemption therefrom.

* * * * *

E-11

Exhibit 7
Page 1113

I hereby certify that the foregoing Plan was adopted by the Board of Directors of Owlet, Inc. on _____.

I hereby certify that the foregoing Plan was approved by the stockholders of Owlet, Inc. on _____.

Executed on _____.

_____

Corporate Secretary

E-12

Exhibit 7
Page 1114

ANNEX F

**FORM OF SPONSOR LETTER AGREEMENT**

February 15, 2021

Sandbridge Acquisition Corporation
1999 Avenue of the Stars, Suite 2088
Los Angeles, CA

Owlet Baby Care Inc.
2500 Executive Parkway, Suite 500
Lehi, Utah 84043

Re:  Sponsor Agreement

Ladies and Gentlemen:

This letter (this "*Sponsor Agreement*") is being delivered to you in accordance with that Business Combination Agreement, dated as of the date hereof, by and among Sandbridge Acquisition Corporation, a Delaware corporation ("*Sandbridge*"), Project Olympus Merger Sub, Inc., a Delaware corporation, and Owlet Baby Care Inc., a Delaware corporation (the "*Company*") (the "*Business Combination Agreement*") and the transactions contemplated therein (the "*Business Combination*") and hereby amends and restates in its entirety that certain letter, dated September 14, 2020, from Sandbridge Acquisition Holdings LLC, a Delaware limited liability company (the "*Sponsor*"), GCCU IX LLC, a Delaware limited liability company ("*GCCU*"), TOCU XXXIV LLC, a Delaware limited liability company ("*TOCU*"), Sandbridge Sponsor LLC, a Delaware limited liability company (together with GCCU and TOCU, the "*Investors*") and the individuals named therein to Sandbridge (the "*Prior Letter Agreement*"). Certain capitalized terms used herein are defined in paragraph 7 hereof. Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Business Combination Agreement.

The Sponsor and certain members of Sandbridge's board of directors and/or management team and certain advisors to Sandbridge (each, an "*Insider*" and together, the "*Insiders*") are currently, and as of the Closing will be, the record owners of all of the outstanding Founder Shares and outstanding Private Placement Warrants, with the Sponsor and each Insider's ownership as of the date hereof detailed on Schedule A hereto.

In order to induce the Company and Sandbridge to enter into the Business Combination Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1)    The Sponsor and each Insider irrevocably agrees that it, he or she shall:

   a)    vote any Common Stock and Founder Shares owned by it, him or her (all such common stock, the "*Covered Shares*") in favor of the Business Combination and each other proposal related to the Business Combination included on the agenda for the special meeting of stockholders relating to the Business Combination;

   b)    when such meeting of stockholders is held, appear at such meeting or otherwise cause the Covered Shares to be counted as present thereat for the purpose of establishing a quorum;

   c)    vote (or execute and return an action by written consent), or cause to be voted at such meeting, or validly execute and return and cause such consent to be granted with respect to, all of such Covered Shares against any Alternative Business Combination Proposal and any other action that would reasonably be expected to impede, interfere with, delay, postpone or adversely affect the Merger or any of the other transactions contemplated by the Business Combination Agreement or result in a breach of any covenant, representation or warranty or other obligation or agreement of Sandbridge or Merger Sub under the Business Combination Agreement or result in any of the conditions set forth in Article 6 of the Business Combination Agreement not being fulfilled, result in a breach of any covenant, representation or warranty or other obligation or agreement of the Sponsor or the Insiders contained in this Sponsor Agreement or change in any manner the dividend policy or capitalization of, including the voting rights of, any class of capital stock of Sandbridge;

   d)    vote (or execute and return an action by written consent), or cause to be voted at such meeting, or validly execute and return and cause such consent to be granted with respect to, all of such Covered Shares against

F-1

Exhibit 7
Page 1115

> any change in business, management or Board of Directors of Sandbridge (other than in connection with the Business Combination and the other proposals related to the Business Combination); and

e)   not redeem any Founder Shares owned by it, him or her in connection with such stockholder approval.

Prior to any valid termination of the Business Combination Agreement, the Sponsor shall take, or cause to be taken, all actions and to do, or cause to be done, all things reasonably necessary under applicable Laws to consummate the Business Combination and the other transactions contemplated by the Business Combination Agreement on the terms and subject to the conditions set forth therein.

The obligations of the Sponsor specified in this paragraph 1 shall apply whether or not the Merger or any action described above is recommended by the Sandbridge Board.

2)   The Sponsor agrees that it shall not:

a)   Transfer any Founder Shares or Private Placement Warrants (or shares of Common Stock issued or issuable upon the exercise of Private Placement Warrants) until 18 months after the Closing (the "***Lock-up Period***"). Notwithstanding the foregoing, the Sponsor shall be entitled to Transfer (i) one-third (1/3) of the Founder Shares and one-third (1/3) of the Private Placement Warrants Beneficially Owned by the Sponsor as of the Closing (and shares of Common Stock issued or issuable upon the exercise or conversion of such Private Placement Warrants) if the closing price of the Common Stock equals or exceeds $12.50 per share for any 20 trading days within any 30-trading day period commencing at least 240 days following the Closing and (ii) an additional one-third (1/3) of the Founder Shares and one-third (1/3) of the Private Placement Warrants Beneficially Owned by the Sponsor as of the Closing (and shares of Common Stock issued or issuable upon the exercise or conversion of such Private Placement Warrants) if the closing price of the Common Stock equals or exceeds $15.00 per share for any 20 trading days within any 30-trading day period commencing at least 240 days following the Closing.

b)   Notwithstanding the provisions set forth in paragraphs 2(a), Transfers of the Founder Shares, Private Placement Warrants and shares of Common Stock issued or issuable upon the exercise or conversion of the Private Placement Warrants and that are held by the Sponsor, any Insider or any of their permitted transferees (that have complied with this paragraph 2(b)) are permitted (A) to Sandbridge's officers or directors, any affiliate or family member of any of Sandbridge's officers or directors or any affiliate of the Sponsor or to any member(s) of the Sponsor or any of their respective affiliates; (B) in the case of an individual, by gift to a member of such individual's immediate family or a charitable organization or to a trust, the beneficiary of which is a member of such individual's immediate family, an affiliate of such individual or to a charitable organization; (C) in the case of an individual, by virtue of laws of descent and distribution upon death of such individual; (D) in the case of an individual, pursuant to a qualified domestic relations order; and (E) by private transfers or transfers made in connection with any contingent forward purchase agreement or similar arrangement or in connection with the consummation of the Business Combination at prices no greater than the price at which the shares or warrants were originally purchased; provided, however, that in the case of clauses (A) through (E), these permitted transferees, to the extent not already party hereto, must enter into a written agreement with Sandbridge agreeing to be bound by this Agreement.

3)   Vesting Provisions. The Sponsor agrees that, as of immediately prior to (but subject to) the Closing, all of the Founder Shares held by the Sponsor as of the Closing shall be subject to the vesting and forfeiture provisions set forth in this paragraph 3. The Sponsor agrees that it shall not (and will cause its affiliates not to) Transfer any unvested Founder Shares held by the Sponsor prior to the date such Founder Shares become vested pursuant to this paragraph 3, except to the extent permitted by paragraph 2(b). For the avoidance of doubt, the Founder Shares beneficially owned by the individual Insiders other than the Sponsor shall not be subject to vesting or forfeiture.

a)   Vesting of Founder Shares.

i)   *Shares Subject to Vesting*. 50% of the Founder Shares Beneficially Owned by the Sponsor as of the Closing shall not be subject to vesting and shall convert to shares of Common Stock in accordance with the terms of the Amended and Restated Certificate of Incorporation of Sandbridge.

F-2

Exhibit 7
Page 1116

ii)   *Shares Subject to Vesting.* The remaining 50% of the Founder Shares Beneficially Owned by the Sponsor as of the Closing shall convert to shares of Common Stock in accordance with the terms of the Amended and Restated Certificate of Incorporation of Sandbridge and be subject to the following performance vesting terms: (1) 25% of the Founder Shares Beneficially Owned by the Sponsor as of the Closing shall vest at such time as a $12.50 stock price level is achieved and (2) the remaining 25% of the Founder Shares Beneficially Owned by the Sponsor as of the Closing shall vest at such time as a $15.00 stock price level is achieved, in each case, on or before the fifth anniversary of the Closing Date. Such stock price levels will be equitably adjusted on account of any share split, reverse share split or similar equity restructuring transaction. Founder Shares subject to vesting pursuant to this paragraph 3(a)(ii) that do not vest in accordance with the terms of this paragraph 3(a)(ii) shall be forfeited.

b)   <u>Forfeiture of Unvested Founder Shares</u>. Unvested Founder Shares that are forfeited pursuant to paragraph 3(a)(ii) shall be cancelled, without any consideration for such Transfer.

c)   <u>Stock Price Level</u>. For purposes of this paragraph 3, the "stock price level" will be considered achieved only (a) when the closing price of a share of Common Stock on the New York Stock Exchange (or other exchange or other market where the Common Stock is then traded) is greater than or equal to the applicable price for any 20 trading days within a 30 trading day period or (b) in a Sandbridge Sale, the price paid per share of Common Stock in such Sandbridge Sale is greater than or equal to the applicable price (to the extent the price paid per share includes contingent consideration or property other than cash, the Sandbridge Board shall determine the price paid per share of Common Stock in such Sandbridge Sale in good faith).

4)   The Sponsor and each Insider hereby agrees that, during the period commencing on the date hereof and ending at the Effective Time, the Sponsor and each Insider shall not modify or amend any Contract between or among Sponsor or such Insider, anyone related by blood, marriage or adoption to the Sponsor or such Insider or any affiliate of the Sponsor or such Insider (other than Sandbridge and its Subsidiaries), on the one hand, and Sandbridge or any of Sandbridge's Subsidiaries, on the other hand.

5)   As used herein, (i) "***Beneficially Own***" has the meaning ascribed to it in Section 13(d) of the Securities Exchange Act; (ii) "***Founder Shares***" shall mean the shares of Class B common stock, par value $0.0001 per share, and the shares of Common Stock issuable upon conversion of such shares in connection with the Closing; (iii) "***Transfer***" shall mean the (a) sale of, offer to sell, contract or agreement to sell, hypothecate, pledge, grant of any option to purchase or otherwise dispose of or agreement to dispose of, directly or indirectly, or establishment or increase of a put equivalent position or liquidation with respect to or decrease of a call equivalent position within the meaning of Section 16 of the Exchange Act, and the rules and regulations promulgated thereunder with respect to, any security, (b) entry into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any security, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise, or (c) public announcement of any intention to effect any transaction specified in clause (a) or (b); provided that the exercise of any Private Placement Warrant(s) by the Sponsor or any permitted transferee of Sponsor, at any time, in the Sponsor or such transferee's sole and absolute discretion, shall not constitute a "Transfer; (iv) "***Common Stock***" shall mean the Class A Common Stock, par value $0.0001 per share of Sandbridge; (v) "***Private Placement Warrants***" shall mean the Sandbridge Warrants to purchase up to 6,600,000 shares of Common Stock that the Sponsor purchased for an aggregate purchase price $6,600,000, or $1.00 per Warrant, in a private placement that occurred simultaneously with the consummation of Sandbridge's initial public offering; (vi) "***Sandbridge Sale***" shall mean the occurrence of any of the following events (which, for the avoidance of doubt, shall not include the Business Combination): (a) any Person or any group of Persons acting together which would constitute a "group" for purposes of Section 13(d) of the Exchange Act or any successor provisions thereto is or becomes the beneficial owner, directly or indirectly, of securities of Sandbridge representing more than 50% of the combined voting power of Sandbridge's then outstanding voting securities, (b) consummation of a merger or consolidation of Sandbridge with any other corporation or other entity, and, immediately after the consummation of such merger or consolidation, either (x) the Sandbridge Board immediately prior to the merger or consolidation does not constitute at least a majority of the board of directors of the company surviving the merger or, if the surviving company is a Subsidiary, the ultimate parent thereof, or (y) the

F-3

Exhibit 7
Page 1117

voting securities of Sandbridge immediately prior to such merger or consolidation do not continue to represent or are not converted into more than 50% of the combined voting power of the then outstanding voting securities of the Person resulting from such merger or consolidation or, if the surviving company is a Subsidiary, the ultimate parent thereof, or (c) the shareholders of Sandbridge approve a plan of complete liquidation or dissolution of Sandbridge or there is consummated an agreement or series of related agreements for the sale, lease or other disposition, directly or indirectly, by Sandbridge of all or substantially all of the assets of Sandbridge and its Subsidiaries, taken as a whole, other than such sale or other disposition by Sandbridge of all or substantially all of the assets of Sandbridge and its Subsidiaries, taken as a whole, to an entity at least 50% of the combined voting power of the voting securities of which are owned by shareholders of Sandbridge in substantially the same proportions as their ownership of Sandbridge immediately prior to such sale; and (vii) "***Alternative Business Combination Proposal***" means any action to solicit, initiate, continue or engage in discussions or negotiations with, or enter into any agreement, letter of intent, memorandum of understanding or agreement in principle with, or encourage, respond, provide information to or commence due diligence with respect to, any Person (other than the Company, its stockholders or any of their affiliates or Representatives), concerning, relating to or which is intended or is reasonably likely to give rise to or result in, any offer, inquiry, proposal or indication of interest, written or oral relating to any merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination, involving Sandbridge.

6)    This Sponsor Agreement, the Business Combination Agreement and the other agreements referenced herein and therein constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and supersede all prior understandings, agreements, or representations by or among the parties hereto, written or oral, to the extent they relate in any way to the subject matter hereof or the transactions contemplated hereby, including, without limitation, with respect to the Sponsor, each Insider and the Prior Letter Agreement. This Sponsor Agreement may not be changed, amended, modified or waived (other than to correct a typographical error) as to any particular provision, except by a written instrument executed by Sandbridge and the other parties charged with such change, amendment, modification or waiver, it being acknowledged and agreed that the Company's execution of such an instrument will not be required after any valid termination of the Business Combination Agreement.

7)    Subject to, and conditioned upon, the occurrence of the Closing, to the fullest extent permitted by Law and the certificate of incorporation and bylaws of Sandbridge, Sponsor and each Insider hereby irrevocably and unconditionally waives and agrees not to assert or perfect any rights to adjustment or other anti-dilution protection with respect to the rate that the Founder Shares held by him, her or it converts into Common Stock pursuant to Section 4.3 of the certificate of incorporation of Sandbridge or any other adjustment or anti-dilution protections that arise in connection with the issuance of Common Stock (including in connection with the PIPE Investment).

8)    No party hereto may, except as set forth herein, assign either this Sponsor Agreement or any of its rights, interests, or obligations hereunder, other than in conjunction with transfers permitted by paragraph 2 or, in the case of the Investors, to an affiliate of such Investor, without the prior written consent of the other parties; provided, that such assignment by an Investor shall not relieve such Investor of its obligations under this Agreement. Any purported assignment in violation of this paragraph shall be void and ineffectual and shall not operate to transfer or assign any interest or title to the purported assignee. This Sponsor Agreement shall be binding on the Sponsor, each Insider, Sandbridge and the Company and their respective successors, heirs, personal representatives and assigns and permitted transferees.

9)    Nothing in this Sponsor Agreement shall be construed to confer upon, or give to, any person or corporation other than the parties hereto any right, remedy or claim under or by reason of this Sponsor Agreement or of any covenant, condition, stipulation, promise or agreement hereof. All covenants, conditions, stipulations, promises and agreements contained in this Sponsor Agreement shall be for the sole and exclusive benefit of the parties hereto and their successors, heirs, personal representatives and assigns and permitted transferees.

10)    This Sponsor Agreement may be executed in any number of original, electronic or facsimile counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

11)    This Sponsor Agreement shall be deemed severable, and the invalidity or unenforceability of any term or

F-4

Exhibit 7
Page 1118

TABLE OF CONTENTS

provision hereof shall not affect the validity or enforceability of this Sponsor Agreement or of any other term or provision hereof. Furthermore, in lieu of any such invalid or unenforceable term or provision, the parties hereto intend that there shall be added as a part of this Sponsor Agreement a provision as similar in terms to such invalid or unenforceable provision as may be possible and be valid and enforceable.

12) This Sponsor Agreement, and all claims or causes of action based upon, arising out of, or related to this Sponsor Agreement or the transactions contemplated hereby, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of Laws of another jurisdiction. Any Proceeding based upon, arising out of or related to this Sponsor Agreement or the transactions contemplated hereby may be brought in federal and state courts located in Wilmington in the State of Delaware, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such Proceeding, waives any objection it may now or hereafter have to personal jurisdiction, venue or convenience of forum, agrees that all claims in respect of the Proceeding shall be heard and determined only in any such court, and agrees not to bring any Proceeding arising out of or relating to this Sponsor Agreement or the transactions contemplated hereby in any other court. Nothing herein contained shall be deemed to affect the right of any party to serve process in any manner permitted by Law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction, in each case, to enforce judgments obtained in any Proceeding brought pursuant to this paragraph. The prevailing party in any such Proceeding (as determined by a court of competent jurisdiction) shall be entitled to be reimbursed by the non-prevailing party for its reasonable expenses, including reasonable attorneys' fees, incurred with respect to such Proceeding. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING BASED UPON, ARISING OUT OF OR RELATED TO THIS SPONSOR AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY

13) Any notice, consent or request to be given in connection with any of the terms or provisions of this Sponsor Agreement shall be in writing and shall be sent by express mail or similar private courier service, by certified mail (return receipt requested), by hand delivery or facsimile or e-mail transmission.

14) This Sponsor Agreement shall terminate upon a Sandbridge Sale and, if earlier, the latest to occur of (a) the earlier of (i) the achievement of a $15.00 stock price level and (ii) the fifth anniversary of the Closing Date and (b) the expiration of the Lock-up Period. In the event of a valid termination of the Business Combination Agreement, this Sponsor Agreement shall be of no force and effect and the parties agree that the Prior Letter Agreement shall be effective and binding upon them in accordance with its terms notwithstanding the amendment and restatement of such agreement herein. No such termination or reinstatement of the Prior Letter Agreement shall relieve the Sponsor, any Insider, Sandbridge or the Company from any liability resulting from a breach of this Sponsor Agreement occurring prior to such termination or reinstatement.

15) The Sponsor and each Insider hereby represents and warrants (severally and not jointly, and as to itself, himself or herself only) to Sandbridge and the Company as follows: (i) if such Person is not an individual, it is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized, and such party has all necessary power and authority to execute, deliver and perform this Sponsor Agreement and consummate the transactions contemplated hereby; (ii) if such Person is an individual, such Person has full legal capacity, right and authority to execute and deliver this Sponsor Agreement and to perform his or her obligations hereunder; (iii) this Sponsor Agreement has been duly executed and delivered by such Person and, assuming due authorization, execution and delivery by the other parties to this Sponsor Agreement, this Sponsor Agreement constitutes a legally valid and binding obligation of such Person, enforceable against such Person in accordance with the terms hereof (except as enforceability may be limited by bankruptcy Laws, other similar Laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies); (iv) the execution and delivery of this Sponsor Agreement by such Person does not, and the performance by such Person of his, her or its obligations hereunder will not, (A) if such Person is not an individual, conflict with or result in a violation of the organizational documents of such Person, or (B) require any consent or approval that has not been given or other action that has not been taken by any third party (including under any Contract binding upon such Person or such Person's Founder Shares or Private Placement Warrants, as applicable), in each case, to the extent such consent, approval or other action would prevent, enjoin or materially delay the performance by such Person of his, her or its obligations under this Sponsor Agreement; (v) there are no Proceedings pending against such Person or, to the knowledge of such Person, threatened against

F-5

Exhibit 7
Page 1119

such Person, before (or, in the case of threatened Proceedings, that would be before) any arbitrator or any Governmental Authority, which in any manner challenges or seeks to prevent, enjoin or materially delay the performance by such Person of its, his or her obligations under this Sponsor Agreement; (vi) except for fees described on Section 4.4 of the Sandbridge Disclosure Schedules, no financial advisor, investment banker, broker, finder or other similar intermediary is entitled to any fee or commission from such Person or its controlled Affiliates in connection with the Business Combination Agreement or the transactions contemplated thereby based upon any arrangement or agreement made by or, to the knowledge of such Person, on behalf of such Person, for which Sandbridge or any of its controlled Affiliates or, following the Closing, the Company or any of its controlled Affiliates, would have any obligations or liabilities of any kind or nature; (vii) such Person has had the opportunity to read the Business Combination Agreement and this Sponsor Agreement and has had the opportunity to consult with its tax and legal advisors; (viii) such Person has not entered into, and shall not enter into, any agreement that would restrict, limit or interfere with the performance of such Person's obligations hereunder; (ix) such Person has good title to all such Founder Shares and Private Placement Warrants, and there exist no Liens or any other limitation or restriction (including, without limitation, any restriction on the right to vote, sell or otherwise dispose of such Founder Shares or Private Placement Warrants) affecting any such Founder Shares or Private Placement Warrants, other than pursuant to (A) this Sponsor Agreement, (B) the amended and restated certificate of incorporation of Sandbridge, (C) the Business Combination Agreement, (D) the Registration Rights Agreement, dated as of September 14, 2020, by and among Sandbridge and certain security holders, (E) the Amended and Restated Limited Liability Company Agreement of the Sponsor or (F) any applicable securities laws; and (x) the Founder Shares and Private Placement Warrants identified on Schedule A are the only Founder Shares or Private Placement Warrants Beneficially Owned by such Person as of the date hereof.

16) The Sponsor and each Insider hereby agrees and acknowledges that: (i) Sandbridge and, prior to any valid termination of the Business Combination Agreement, the Company would be irreparably injured in the event of a breach by the Sponsor or any Insider of its, his or her obligations under paragraphs 1 and 2, as applicable, of this Sponsor Agreement, (ii) monetary damages may not be an adequate remedy for such breach and (iii) the non-breaching party shall be entitled to injunctive relief, in addition to any other remedy that such party may have in law or in equity, in the event of such breach. The Sponsor and each Insider shall also be entitled to seek injunctive relief, in addition to any other remedy that such parties may have in law or in equity, in the event of a breach under this Sponsor Agreement.

17) Through the date of the Closing, Sandbridge will maintain an insurance policy or policies providing directors' and officers' liability insurance, and each Insider who is a director or officer of Sandbridge or its subsidiaries shall be covered by such policy or policies, in accordance with its or their terms, to the maximum extent of the coverage available for any other Sandbridge director or officer.

18) Sandbridge shall not, without the prior consent of each of the Investors, (i) include the name of the Investors or any of their respective affiliates in any disclosure, marketing materials, tombstones and other usages in connection with the activities of the Company or in connection with the Merger or thereafter; (ii) amend any term of the Founder Shares, including, but not limited to, the economic terms or terms regarding transferability; (iii) amend any term of the Private Placement Warrants, including, but not limited to, economic terms or terms regarding transferability; or (iv) amend any terms of the Trust Account.

19) If, and as often as, (a) there is any stock split, stock dividend, combination or reclassification that results in the Sponsor acquiring new Founder Shares or new Private Placement Warrants, (b) the Sponsor purchases or otherwise acquires beneficial ownership of any Founder Shares or the Private Placement Warrants after the date of this Sponsor Agreement, or (c) Sponsor acquires the right to vote or share in the voting of any Founder Shares after the date of this Sponsor Agreement (such Founder Shares and Private Placement Warrants collectively the "**New Securities**"), then, in each case, such New Securities acquired or purchased by the Sponsor shall be subject to the terms of this Sponsor Agreement to the same extent as if they constituted Founder Shares or Private Placement Warrants owned by Sponsor as of the date hereof.

20) Each of the parties hereto agrees to execute and deliver hereafter any further document, agreement or instrument of assignment, transfer or conveyance as may be necessary or desirable to effectuate the purposes hereof and as may be reasonably requested in writing by another party hereto.

**[signature page follows]**

F-6

Exhibit 7
Page 1120

TABLE OF CONTENTS

Sincerely,

**SANDBRIDGE ACQUISITION HOLDINGS LLC**

By:    /s/ Richard Henry

Name: Richard Henry

Title: Manager

**INVESTORS**

**GCCU IX LLC**

By:    /s/ Russell D. Gannaway

Name: Russell D. Gannaway

Title: Authorized Person

**TOCU XXXIV LLC**

By:    /s/ Russell D. Gannaway

Name: Russell D. Gannaway

Title: Authorized Person

**SANDBRIDGE SPONSOR LLC**

By:    /s/ Richard Henry

Name: Richard Henry

Title: Chief Executive Officer

**INSIDERS**

/s/ Ken Suslow

Ken Suslow

/s/ Joe Lamastra

Joe Lamastra

/s/ Richard Henry

Richard Henry

/s/ Domenico De Sole

Domenico De Sole

/s/ Michael Goss

Michael Goss

Exhibit 7
Page 1121

/s/ Krystal Kahler

Krystal Kahler

F-7

Exhibit 7
Page 1122

/s/ Ramez Toubassy
_____

Ramez Toubassy


/s/ Jamie Weinstein
_____

Jamie Weinstein


/s/ Thomas Hilfiger
_____

Thomas Hilfiger


Acknowledged and Agreed:


**SANDBRIDGE ACQUISITION CORPORATION**


By:    /s/ Ken Suslow
       _____

       Name: Ken Suslow

       Title: Chief Executive Officer


Acknowledged and Agreed:


**OWLET BABY CARE INC.**


By:    /s/ Kurt Workman
       _____

       Name: Kurt Workman

       Title: CEO


F-8

Exhibit 7
Page 1123

TABLE OF CONTENTS

**Schedule A**

**Sponsor Ownership of Securities**

| Sponsor | Founder Shares | Private Placement Warrants |
|---|---|---|
| Sandbridge Acquisition Holdings LLC | 5,615,000 | 6,600,000 |
| **Total** | 5,615,000 | 6,600,000 |

**Insider Ownership of Securities**

| Insider | Founder Shares | Private Placement Warrants |
|---|---|---|
| Ken Suslow | — | — |
| Richard Henry | — | — |
| Joe Lamastra | — | — |
| Domenico De Sole | 40,000 | — |
| Michael Goss | 40,000 | — |
| Krystal Kahler | — | — |
| Ramez Toubassy | 25,000 | — |
| Jamie Weinstein | — | — |
| Thomas Hilfiger | 30,000 | — |
| **Total** | **135,000** | — |

F-9

Exhibit 7
Page 1124

**PART II**
**INFORMATION NOT REQUIRED IN PROSPECTUS**

**Item 20.     Indemnification of Directors and Officers.**

Section 145 of the DGCL provides, generally, that a corporation shall have the power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that such person is or was a director, officer, employee or agent of the corporation against all expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. A corporation may similarly indemnify such person for expenses actually and reasonably incurred by such person in connection with the defense or settlement of any action or suit by or in the right of the corporation, provided that such person acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation, and, in the case of claims, issues and matters as to which such person shall have been adjudged liable to the corporation, provided that a court shall have determined, upon application, that, despite the adjudication of liability but in view of all of the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

In accordance with Section 102(b)(7) of the DGCL, the Current Charter provides that a director will not be personally liable to Sandbridge or Sandbridge's stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the DGCL. No such provision shall eliminate or limit the liability of a director for any act or omission occurring prior to the date when such provision became effective. Accordingly, these provisions will have no effect on the availability of equitable remedies such as an injunction or rescission based on a director's breach of his or her duty of care.

The Current Charter provides that Sandbridge will indemnify its present and former directors and officers to the maximum extent permitted by the DGCL and that such indemnification will not be exclusive of any other rights to which those seeking indemnification may be entitled under any bylaw provision, agreement, vote of stockholders or disinterested directors or otherwise.

Sandbridge has entered into indemnification agreements with each of its current directors and executive officers. These agreements require Sandbridge to indemnify these individuals to the fullest extent permitted under the DGCL against liabilities that may arise by reason of their service to Sandbridge, and to advance expenses incurred as a result of any proceeding against them as to which they could be indemnified.

The Proposed Charter will provide for indemnification of New Owlet's directors, officers, employees and other agents to the maximum extent permitted by the DGCL, and New Owlet's Bylaws will provide for indemnification of New Owlet's directors, officers, employees and other agents to the maximum extent permitted by the DGCL.

In addition, effective upon the Closing, New Owlet will have entered into indemnification agreements with its directors and officers containing provisions which are in some respects broader than the specific indemnification provisions contained in the DGCL. The indemnification agreements require New Owlet, among other things, to indemnify its directors against certain liabilities that may arise by reason of their status or service as directors and to advance their expenses incurred as a result of any proceeding against them as to which they could be indemnified.

II-1

Exhibit 7
Page 1125

**Item 21.    Exhibits and Financial Statement Schedules.**

The following exhibits are filed as part of this registration statement:

| Exhibit | Description |
| --- | --- |
| 2.1† | Business Combination Agreement, dated as of February 15, 2021, by and among Sandbridge Acquisition Corporation, Project Olympus Merger Sub, Inc. and Owlet Baby Care Inc. (incorporated by reference to Exhibit 2.1 of Sandbridge's Current Report on Form 8-K, filed with the SEC on February 16, 2021). |
| 3.1 | Amended and Restated Certificate of Incorporation of Sandbridge Acquisition Corporation (incorporated by reference to Exhibit 3.1 of Sandbridge's Form 8-K, filed with the SEC on September 18, 2020). |
| 3.2 | Bylaws of Sandbridge Acquisition Corporation. (incorporated by reference to Exhibit 3.3 of Sandbridge's Form S-1 (File No. 333-248320), filed with the SEC on August 24, 2020). |
| 3.3 | Form of New Owlet Charter (included as Annex B to this proxy statement/prospectus). |
| 3.4 | Form of New Owlet Bylaws (included as Annex C to this proxy statement/prospectus). |
| 4.1 | Warrant Agreement, dated as of September 14, 2020, between the Registrant and Continental Stock Transfer & Trust Company (incorporated by reference to Exhibit 4.1 of Sandbridge Acquisition Corporation's Current Report on Form 8-K filed on September 18, 2020). |
| 5.1 | Opinion of Ropes & Gray LLP as to the validity of the securities being registered. |
| 10.1 | Form of Owlet, Inc. 2021 Incentive Award Plan (attached to the proxy statement/prospectus which forms a part of this registration statement as Annex D). |
| 10.2 | Form of Subscription Agreement (incorporated by reference to Exhibit 10.1 of Sandbridge's Current Report on Form 8-K filed with the SEC on February 16, 2021). |
| 10.3 | Form of Owlet, Inc. 2021 Employee Stock Purchase Plan (attached to the proxy statement/prospectus which forms a part of this registration statement as Annex E). |
| 10.4 | Form of Amended and Restated Registration Rights Agreement, (incorporated by reference to Exhibit E to Exhibit 2.1 of Sandbridge's Current Report on Form 8-K filed with the SEC on February 16, 2021). |
| 10.5 | Sponsor Letter Agreement, dated as of February 15, 2021, by and among Sandbridge Acquisition Holdings LLC, certain initial stockholders of Sandbridge and Owlet, Inc. (attached to the proxy statement/prospectus which forms a part of this registration statement as Annex F). |
| 10.6 | Form of Stockholders Agreement (incorporated by reference to Exhibit G of Exhibit 2.1 of Sandbridge's Current Report on Form 8-K filed with the SEC on February 16, 2021). |
| 10.7 | Owlet Baby Care Inc. 2014 Equity Incentive Plan. |
| 10.7(a) | Form of Owlet Baby Care Inc. Stock Option Grant Notice under the 2014 Equity Incentive Plan. |
| 10.7(b) | Form of Restricted Stock Grant Agreement Award Notice under the 2014 Equity Incentive Plan. |
| 10.7(c) | Form of Restricted Stock Unit Award Agreement under the 2014 Equity Incentive Plan. |
| 10.8 | Amended and Restated Offer of Employment Letter, dated as of March 30, 2021, by and between Owlet, Inc. and Michael Abbott. |
| 10.9 | Amended and Restated Offer of Employment Letter, dated as of March 29, 2021, by and between Owlet, Inc. and Kurt Workman. |
| 10.10 | Offer of Employment Letter, dated as of March 3, 2021, by and between Owlet, Inc. and Kate Scolnick. |
| 10.11 | Manufacturing and Supply Agreement, dated as of June 21, 2018, by and between Owlet Baby Care Inc. and Shenzhen Aoni Electronic Co., Ltd. |
| 10.12 | Subscription Agreement, dated as of May 20, 2014, by and between Owlet Baby Care Inc. and Ayla Networks, Inc. |
| 10.12(a) | Amendment to Subscription Agreement, dated as of July 14, 2020, by and between Owlet Baby Care Inc. and Ayla Networks, Inc. |
| 10.13# | Manufacturing Services Agreement, dated as of October 24, 2017, by and between Owlet Baby Care Inc. and Benchmark Electronics, Inc. |
| 10.13(a) | Amendment No. 1 to Manufacturing Services Agreement, dated as of July 5, 2018, by and between Owlet Baby Care Inc. and Benchmark Electronics, Inc. |

II-2

Exhibit 7
Page 1126

TABLE OF CONTENTS

| Exhibit | Description |
|---|---|
| 10.13(b) | Amendment No. 2 to Manufacturing Services Agreement, dated as of September 23, 2020, by and between Owlet Baby Care Inc. and Benchmark Electronics, Inc. |
| 10.14# | Kalay Service and License Agreement, dated as of January 31, 2018, by and between Owlet Baby Care Inc. and ThroughTek Co. Ltd. |
| 10.15# | Second Amended and Restated Loan and Security Agreement, dated as of April 22, 2020, by and between Owlet Baby Care Inc. and Silicon Valley Bank. |
| 10.15(a) | First Amendment to Second Amended and Restated Loan and Security Agreement, dated as of April 23, 2020, by and between Owlet Baby Care Inc. and Silicon Valley Bank. |
| 10.15(b) | Second Amendment to Second Amended and Restated Loan and Security Agreement, dated as of September 22, 2020, by and between Owlet Baby Care Inc. and Silicon Valley Bank. |
| 10.15(c)# | Default Waiver, Consent, and Third Amendment to Second Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, by and between Owlet Baby Care Inc. and Silicon Valley Bank. |
| 16.1 | Letter from Tanner LLC, dated as of February 15, 2021. |
| 23.1 | Consent of WithumSmith+Brown, PC. |
| 23.2 | Consent of PricewaterhouseCoopers LLP, Independent Registered Public Accounting Firm. |
| 23.3 | Consent of Ropes & Gray LLP (included in Exhibit 5.1 hereto). |
| 24.1 | Power of Attorney (included on signature page to the proxy statement/prospectus which forms part of this registration statement). |
| 99.1 | Form of Preliminary Proxy Card. |
| 99.2 | Consent of Michael Abbott to be named as a director. |
| 99.3 | Consent of Amy McCullough to be named as a director. |
| 99.4 | Consent of Lior Susan to be named as a director. |
| 99.5 | Consent of Kurt Workman to be named as a director. |
| 99.6 | Consent of Zane Burke to be named as a director. |
| 99.7 | Consent of Laura Durr to be named as a director. |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

†     Certain of the exhibits and schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(b)(2). The Registrant agrees to furnish a copy of all omitted exhibits and schedules to the SEC upon its request.

#     Certain portions of this exhibit (indicated by "[***]") have been omitted pursuant to Regulation S-K, Item (601)(b)(10).

II-3

Exhibit 7
Page 1127

**Item 22.    Undertakings.**

The undersigned registrant hereby undertakes:

(1)    To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

    i.    To include any prospectus required by Section 10(a)(3) of the Securities Act;

    ii.    To reflect in the proxy statement/prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement;

    iii.    To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

(2)    That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(3)    To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4)    That, for the purpose of determining liability under the Securities Act to any purchaser, each prospectus filed pursuant to Rule 424(b) as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A, shall be deemed to be part of and included in the registration statement as of the date it is first used after effectiveness. Provided, however, that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

(5)    That, for the purpose of determining liability of the registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities, the undersigned registrant undertakes that in a primary offering of securities of the undersigned registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

    i.    Any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

    ii.    Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

    iii.    The portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

    iv.    Any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

(6)    That, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the

II-4

Exhibit 7
Page 1128

Securities Exchange Act of 1934) that is incorporated by reference in this registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(7)    That prior to any public reoffering of the securities registered hereunder through use of a prospectus which is a part of this registration statement, by any person or party who is deemed to be an underwriter within the meaning of Rule 145(c), the issuer undertakes that such reoffering prospectus will contain the information called for by the applicable registration form with respect to reofferings by persons who may be deemed underwriters, in addition to the information called for by the other items of the applicable form.

(8)    That every prospectus: (i) that is filed pursuant to the immediately preceding paragraph, or (ii) that purports to meet the requirements of Section 10(a)(3) of the Act and is used in connection with an offering of securities subject to Rule 415, will be filed as a part of an amendment to the registration statement and will not be used until such amendment is effective, and that, for purposes of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

The undersigned registrant hereby undertakes to respond to requests for information that is incorporated by reference into the prospectus pursuant to Items 4, 10(b), 11, or 13 of this Form, within one business day of receipt of such request, and to send the incorporated documents by first class mail or other equally prompt means. This includes information contained in documents filed subsequent to the effective date of the registration statement through the date of responding to the request.

The undersigned registrant hereby undertakes to supply by means of a post-effective amendment all information concerning a transaction, and the company being acquired involved therein, that was not the subject of and included in the registration statement when it became effective.

II-5

Exhibit 7
Page 1129

**SIGNATURES**

Pursuant to the requirements of the Securities Act, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Los Angeles, State of California, on March 31, 2021.

**SANDBRIDGE ACQUISITION CORPORATION**

By: /s/ Ken Suslow

Name: Ken Suslow

Title:  Chief Executive Officer

POWER OF ATTORNEY

Each of the undersigned, whose signature appears below, hereby constitutes and appoints Ken Suslow and Richard Henry, and each of them, his true and lawful attorney-in-fact and agent, with full power of substitution and re-substitution, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments to this registration statement and to file the same with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing necessary or appropriate to be done with respect to this registration statement or any amendments hereto in the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, or his or their substitute or substitutes, may lawfully do or cause to be done by virtue thereof.

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated:

| Name | Title | Date |
|---|---|---|
| /s/ Ken Suslow<br><br>Ken Suslow | Chief Executive Officer (Principal Executive Officer) and Chairman of the Board of Directors | March 31, 2021 |
| /s/ Richard Henry<br><br>Richard Henry | Chief Financial Officer (Principal Financial and Accounting Officer) | March 31, 2021 |
| /s/ Domenico De Sole<br><br>Domenico De Sole | Director | March 31, 2021 |
| /s/ Mike Goss<br><br>Mike Goss | Director | March 31, 2021 |
| /s/ Krystal Kahler<br><br>Krystal Kahler | Director | March 31, 2021 |
| /s/ Ramez Toubassy<br><br>Ramez Toubassy | Director | March 31, 2021 |
| /s/ Jamie Weinstein<br><br>Jamie Weinstein | Director | March 31, 2021 |

II-6

Exhibit 7
Page 1130

**Exhibit 5.1**



ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

March 31, 2021

Sandbridge Acquisition Corporation
1999 Avenue of the Stars, Suite 2088
Los Angeles, CA 90067

Ladies and Gentlemen:

We have acted as counsel to Sandbridge Acquisition Corporation, a Delaware corporation (the "Company"), in connection with the Registration Statement on Form S-4 (as amended through the date hereof, the "Registration Statement") filed by the Company with the Securities and Exchange Commission (the "Commission") under the Securities Act of 1933, as amended (the "Securities Act"), for the registration of 44,116,721 shares of Class A common stock, $0.0001 par value per share (the "Securities") to be issued in connection with a merger (the "Merger") contemplated by that certain  Business Combination Agreement, dated February 15, 2021 (the "Business Combination Agreement"), by and among the Company, Project Olympus Merger Sub, Inc., a Delaware corporation and wholly-owned subsidiary of the Company ("Merger Sub"), and Owlet Baby Care Inc., a Delaware corporation ("Owlet").

In connection with this opinion letter, we have examined such certificates, documents and records and have made such investigation of fact and such examination of law as we have deemed appropriate in order to enable us to render the opinions set forth herein.  In conducting such investigation, we have relied, without independent verification, upon certificates of officers of the Company, public officials and other appropriate persons.

The opinions expressed below are limited to the Delaware General Corporation Law.

Based upon and subject to the foregoing, we are of the opinion that the Securities have been duly authorized and, when issued upon the consummation of the Merger in accordance with terms and conditions set forth in the Registration Statement and the Business Combination Agreement, will be validly issued, fully paid and non-assessable.

Exhibit 7
Page 1131

Sandbridge Acquisition Corporation          - 2 -

We hereby consent to your filing this opinion as an exhibit to the Registration Statement and to the use of our name therein.  In giving such consent, we do not thereby admit that we are in the category of persons whose consent is required under Section 7 of the Securities Act or the rules and regulations of the Commission thereunder.

Very truly yours,

/s/ Ropes & Gray LLP

Ropes & Gray LLP

Exhibit 7
Page 1132

**Exhibit 10.7**

**OWLET BABY CARE INC.**

**2014 EQUITY INCENTIVE PLAN**

**ADOPTED BY THE BOARD OF DIRECTORS: JUNE 30, 2014**
**APPROVED BY THE STOCKHOLDERS: MAY 7, 2015**
**TERMINATION DATE: JUNE 30, 2024**

1.    **GENERAL**.

(a)    **Eligible Stock Award Recipients.**  The persons eligible to receive Stock Awards are Employees, Directors and Consultants.

(b)    **Available Stock Awards.**  The Plan provides for the grant of the following Stock Awards: (i) Incentive Stock Options, (ii) Nonstatutory Stock Options, (iii) Stock Appreciation Rights, (iv) Restricted Stock Awards, and (v) Restricted Stock Unit Awards.

(c)    **Purpose.**  The Company, by means of the Plan, seeks to secure and retain the services of the group of persons eligible to receive Stock Awards as set forth in Section 1(a), to provide incentives for such persons to exert maximum efforts for the success of the Company and any Affiliate, and to provide a means by which such eligible recipients may be given an opportunity to benefit from increases in value of the Common Stock through the granting of Stock Awards.

2.    **ADMINISTRATION**.

(a)    **Administration by Board**.  The Board shall administer the Plan unless and until the Board delegates administration of the Plan to a Committee or Committees, as provided in Section 2(c).

(b)    **Powers of Board.**  The Board shall have the power, subject to, and within the limitations of, the express provisions of the Plan:

(i)    To determine from time to time (A) which of the persons eligible under the Plan shall be granted Stock Awards; (B) when and how each Stock Award shall be granted; (C) what type or combination of types of Stock Award shall be granted; (D) the provisions of each Stock Award granted (which need not be identical), including the time or times when a person shall be permitted to receive cash or Common Stock pursuant to a Stock Award; (E) the number of shares of Common Stock with respect to which a Stock Award shall be granted to each such person; and (F) the Fair Market Value applicable to a Stock Award.

(ii)    To construe and interpret the Plan and Stock Awards granted under it, and to establish, amend and revoke rules and regulations for administration of the Plan.  The Board, in the exercise of this power, may correct any defect, omission or inconsistency in the Plan or in any Stock Award Agreement, in a manner and to the extent it shall deem necessary or expedient to make the Plan or Stock Award fully effective.

Exhibit 7
Page 1133

**(iii)**　　To settle all controversies regarding the Plan and Stock Awards granted under it.

**(iv)**　　To accelerate the time at which a Stock Award may first be exercised or the time during which a Stock Award or any part thereof will vest in accordance with the Plan, notwithstanding the provisions in the Stock Award stating the time at which it may first be exercised or the time during which it will vest.

**(v)**　　To suspend or terminate the Plan at any time.  Suspension or termination of the Plan shall not impair rights and obligations under any Stock Award granted while the Plan is in effect except with the written consent of the affected Participant.

**(vi)**　　To amend the Plan in any respect the Board deems necessary or advisable, including, without limitation, amendments relating to Incentive Stock Options and certain nonqualified deferred compensation under Section 409A of the Code and/or to bring the Plan or Stock Awards granted under the Plan into compliance therewith, subject to the limitations, if any, of applicable law.  However, except *as* provided in Section 9(a) relating to Capitalization Adjustments, to the extent required by applicable law, stockholder approval shall be required for any amendment of the Plan that either (A) materially increases the number of shares of Common Stock available for issuance under the Plan, (B) materially expands the class of individuals eligible to receive Stock Awards under the Plan, (C) materially increases the benefits accruing to Participants under the Plan or materially reduces the price at which shares of Common Stock may be issued or purchased under the Plan, (D) materially extends the term of the Plan, or (E) expands the types of Stock Awards available for issuance under the Plan. Except as provided above, rights under any Stock Award granted before amendment of the Plan shall not be impaired by any amendment of the Plan unless (1) the Company requests the consent of the affected Participant, and (2) such Participant consents in writing.

**(vii)**　　To submit any amendment to the Plan for stockholder approval, including, but not limited to, amendments to the Plan intended to satisfy the requirements of Section 422 of the Code regarding Incentive Stock Options.

**(viii)**　　To approve forms of Stock Award Agreements for use under the Plan and to amend the terms of any one or more Stock Awards, including, but not limited to, amendments to provide terms more favorable to the Participant than previously provided in the Stock Award Agreement, subject to any specified limits in the Plan that are not subject to Board discretion; *provided however,* that, the rights under any Stock Award shall not be impaired by any such amendment unless (i) the Company requests the consent of the affected Participant, and (ii) such Participant consents in writing.  Notwithstanding the foregoing, subject to the limitations of applicable law, if any, and without the affected Participant's consent, the Board may amend the terms of any one or more Stock Awards if necessary to maintain the qualified status of the Stock Award as an Incentive Stock Option or to bring the Stock Award into compliance with Section 409A of the Code.

2

Exhibit 7
Page 1134

**(ix)** Generally, to exercise such powers and to perform such acts as the Board deems necessary or expedient to promote the best interests of the Company and that are not in conflict with the provisions of the Plan or Stock Awards.

**(x)** To adopt such procedures and sub-plans as are necessary or appropriate to permit participation in the Plan by Employees, Directors or Consultants who are foreign nationals or employed outside the United States.

**(xi)** To effect, at any time and from time to time, with the consent of any adversely affected Participant, (A) the reduction of the exercise price (or strike price) of any outstanding Option or SAR under the Plan, (B) the cancellation of any outstanding Option or SAR under the Plan and the grant in substitution therefore of (1) a new Option or SAR under the Plan or another equity plan of the Company covering the same or a different number of shares of Common Stock, (2) a Restricted Stock Award, (3) a Restricted Stock Unit Award, (4) cash and/or (5) other valuable consideration (as determined by the Board, in its sole discretion), or (C) any other action that is treated as a repricing under generally accepted accounting principles; *provided, however,* that no such reduction or cancellation may be effected if it is determined, in the Company's sole discretion, that such reduction or cancellation would result in any such outstanding Option becoming subject to the requirements of Section 409A of the Code.

**(c)** **Delegation to Committee.** The Board may delegate some or all of the administration of the Plan to a Committee or Committees. If administration of the Plan is delegated to a Committee, the Committee shall have, in connection with the administration of the Plan, the powers theretofore possessed by the Board that have been delegated to the Committee, including the power to delegate to a subcommittee of the Committee any of the administrative powers the Committee is authorized to exercise (and references in this Plan to the Board shall thereafter be to the Committee or subcommittee), subject, however, to such resolutions, not inconsistent with the provisions of the Plan, as may be adopted from time to time by the Board. The Board may retain the authority to concurrently administer the Plan with the Committee and may, at any time, revest in the Board some or all of the powers previously delegated.

**(d)** **Delegation to an Officer.** The Board may delegate to one or more Officers of the Company the authority to do one or both of the following: (i) designate Officers and Employees of the Company or any of its Subsidiaries to be recipients of Options and Stock Appreciation Rights (and, to the extent permitted by applicable law, other Stock Awards) and the terms thereof, and (ii) determine the number of shares of Common Stock to be subject to such Stock Awards granted to such Officers and Employees; *provided, however,* that the Board resolutions regarding such delegation shall specify the total number of shares of Common Stock that may be subject to the Stock Awards granted by such Officer and that such Officer may not grant a Stock Award to himself or herself. Notwithstanding the foregoing, the Board may not delegate authority to an Officer to determine the Fair Market Value pursuant to Section 13(t) below.

**(e)** **Effect of Board's Decision.** All determinations, interpretations and constructions made by the Board in good faith shall not be subject to review by any person and shall be final, binding and conclusive on all persons.

3

Exhibit 7
Page 1135

3.    **SHARES SUBJECT TO THE PLAN.**

(a)    **Share Reserve.**  Subject to the provisions of Section 9(a) relating to Capitalization Adjustments, the aggregate number of shares of Common Stock that may be issued pursuant to Stock Awards beginning on the Effective Date shall not exceed 7,910,651 shares (the "*Share Reserve*").  Furthermore, if a Stock Award (i) expires or otherwise terminates without having been exercised in full or (ii) is settled in cash *(i.e.,* the holder of the Stock Award receives cash rather than stock), such expiration, termination or settlement shall not reduce (or otherwise offset) the number of shares of Common Stock that may be issued pursuant to the Plan.  For clarity, the limitation in this Section 3(a) is a limitation in the number of shares of Common Stock that may be issued pursuant to the Plan.  Accordingly, this Section 3(a) does not limit the granting of Stock Awards except as provided in Section 7(a).

(b)    **Reversion of Shares to the Share Reserve.**  If any shares of Common Stock issued pursuant to a Stock Award are forfeited back to the Company because of the failure to meet a contingency or condition required to vest such shares in the Participant, then the shares which are forfeited shall revert to and again become available for issuance under the Plan.  Also, any shares reacquired by the Company pursuant to Section 8(g) or as consideration for the exercise of an Option shall again become available for issuance under the Plan.  Notwithstanding the provisions of this Section 3(b), any such shares shall not be subsequently issued pursuant to the exercise of Incentive Stock Options.

(c)    **Incentive Stock Option Limit.**  Notwithstanding anything to the contrary in this Section 3(c), subject to the provisions of Section 9(a) relating to Capitalization Adjustments, the aggregate maximum number of shares of Common Stock that may be issued pursuant to the exercise of Incentive Stock Options shall be equal to the Share Reserve.

(d)    **Source of Shares.**  The stock issuable under the Plan shall be shares of authorized but unissued or reacquired Common Stock, including shares repurchased by the Company on the open market or otherwise.

4.    **ELIGIBILITY.**

(a)    **Eligibility for Specific Stock Awards.**  Incentive Stock Options may be granted only to employees of the Company or a "parent corporation" or "subsidiary corporation" thereof (as such terms are defined in Sections 424(e) and (f) of the Code).  Stock Awards other than Incentive Stock Options may be granted to Employees, Directors and Consultants; *provided, however,* Nonstatutory Stock Options and SARs may not be granted to Employees, Directors and Consultants who are providing Continuous Service only to any "parent" of the Company, as such term is defined in Rule 405, unless the stock underlying such Stock Awards is treated as "service recipient stock" under Section 409A of the Code because the Stock Awards are granted pursuant to a corporate transaction (such as a spin off transaction) or unless such Stock Awards comply with the distribution requirements of Section 409A of the Code.

(b)    **Ten Percent Stockholders.**  A Ten Percent Stockholder shall not be granted an Incentive Stock Option unless the exercise price of such Option is at least one hundred ten percent (110%) of the Fair Market Value on the date of grant and the Option is not exercisable after the expiration of five (5) years from the date of grant.

4

Exhibit 7
Page 1136

(c)    **Consultants.**  A Consultant shall not be eligible for the grant of a Stock Award if, at the time of grant, either the offer or the sale of the Company's securities to such Consultant is not exempt under Rule 701 because of the nature of the services that the Consultant is providing to the Company, because the Consultant is not a natural person, or because of any other provision of Rule 701, unless the Company determines that such grant need not comply with the requirements of Rule 701 and will satisfy another exemption under the Securities Act as well as comply with the securities laws of all other relevant jurisdictions.

5.    **PROVISIONS RELATING TO OPTIONS AND STOCK APPRECIATION RIGHTS**.

Each Option or SAR shall be in such form and shall contain such terms and conditions as the Board shall deem appropriate.  All Options shall be separately designated Incentive Stock Options or Nonstatutory Stock Options at the time of grant, and, if certificates are issued, a separate certificate or certificates shall be issued for shares of Common Stock purchased on exercise of each type of Option.  If an Option is not specifically designated as an Incentive Stock Option, then the Option shall be a Nonstatutory Stock Option.  The provisions of separate Options or SARs need not be identical; *provided, however,* that each Option Agreement or Stock Appreciation Right Agreement shall conform to (through incorporation of provisions hereof by reference in the applicable Stock Award Agreement or otherwise) the substance of each of the following provisions:

(a)    **Term.**  Subject to the provisions of Section 4(b) regarding Ten Percent Stockholders, no Option or SAR shall be exercisable after the expiration of ten (10) years from the date of its grant or such shorter period specified in the Stock Award Agreement.

(b)    **Exercise Price.**  Subject to the provisions of Section 4(b) regarding Incentive Stock Options granted to Ten Percent Stockholders, the exercise price (or strike price) of each Option or SAR shall be not less than one hundred percent (100%) of the Fair Market Value of the Common Stock subject to the Option or SAR on the date the Option or SAR is granted.  Notwithstanding the foregoing, an Option or SAR may be granted with an exercise price (or strike price) lower than one hundred percent (100%) of the Fair Market Value of the Common Stock subject to the Option or SAR if such Option or SAR is granted pursuant to an assumption of or substitution for another option or stock appreciation right pursuant to a Corporate Transaction and in a manner consistent with the provisions of Sections 409A and 424(a) of the Code (whether or not such Stock Awards are Incentive Stock Options).  Each SAR will be denominated in shares of Common Stock equivalents.

(c)    **Consideration for Options.**  The purchase price of Common Stock acquired pursuant to the exercise of an Option shall be paid, to the extent permitted by applicable law and as determined by the Board in its sole discretion, by any combination of the methods of payment set forth below.  The Board shall have the authority to grant Options that do not permit all of the following methods of payment (or otherwise restrict the ability to use certain methods) and to grant Options that require the consent of the Company to utilize a particular method of payment.  The permitted methods of payment are as follows:

(i)    by cash, check, bank draft or money order payable to the Company;

5

Exhibit 7
Page 1137

**(ii)**        pursuant to a program developed under Regulation D as promulgated by the Federal Reserve Board that, prior to the issuance of the stock subject to the Option, results in either the receipt of cash (or check) by the Company or the receipt of irrevocable instructions to pay the aggregate exercise price to the Company from the sales proceeds;

**(iii)**        by delivery to the Company (either by actual delivery or attestation) of shares of Common Stock;

**(iv)**        if the Option is a Nonstatutory Stock Option, by a "net exercise" arrangement pursuant to which the Company will reduce the number of shares of Common Stock issuable upon exercise by the largest whole number of shares with a Fair Market Value that does not exceed the aggregate exercise price; *provided, however,* that the Company shall accept a cash or other payment from the Participant to the extent of any remaining balance of the aggregate exercise price not satisfied by such reduction in the number of whole shares to be issued; *provided, further,* that shares of Common Stock will no longer be subject to an Option and will not be exercisable thereafter to the extent that (A) shares issuable upon exercise are reduced to pay the exercise price pursuant to the "net exercise," (B) shares are delivered to the Participant as a result of such exercise, and (C) shares are withheld to satisfy tax withholding obligations; or

**(v)**        according to a deferred payment or similar arrangement with the Optionholder; *provided, however,* that interest shall compound at least annually and shall be charged at the minimum rate of interest necessary to avoid (A) the imputation of interest income to the Company and compensation income to the Optionholder under any applicable provisions of the Code, and (B) the classification of the Option as a liability for financial accounting purposes; or

**(vi)**        in any other form of legal consideration that may be acceptable to the Board.

**(d)**        **Exercise and Payment of a SAR.**  To exercise any outstanding Stock Appreciation Right, the Participant must provide written notice of exercise to the Company in compliance with the provisions of the Stock Appreciation Right Agreement evidencing such Stock Appreciation Right.  The appreciation distribution payable on the exercise of a Stock Appreciation Right will be not greater than an amount equal to the excess of (A) the aggregate Fair Market Value (on the date of the exercise of the Stock Appreciation Right) of a number of shares of Common Stock equal to the number of Common Stock equivalents in which the Participant is vested under such Stock Appreciation Right, and with respect to which the Participant is exercising the Stock Appreciation Right on such date, over (B) the strike price that will be determined by the Board at the time of grant of the Stock Appreciation Right.  The appreciation distribution in respect to a Stock Appreciation Right may be paid in Common Stock, in cash, in any combination of the two or in any other form of consideration, as determined by the Board and contained in the Stock Appreciation Right Agreement evidencing such Stock Appreciation Right.

6

Exhibit 7
Page 1138

(e)    **Transferability of Options and SARs.**  The Board may, in its sole discretion, impose such limitations on the transferability of Options and SARs as the Board shall determine.  In the absence of such a determination by the Board to the contrary, the following restrictions on the transferability of Options and SARs shall apply:

(i)    **Restrictions on Transfer**.  An Option or SAR shall not be transferable except by will or by the laws of descent and distribution and shall be exercisable during the lifetime of the Participant only by the Participant; *provided, however,* that the Board may, in its sole discretion, permit transfer of the Option or SAR to such extent as permitted by Rule 701 and in a manner consistent with applicable tax and securities laws upon the Participant's request.

(ii)    **Domestic Relations Orders**.  Notwithstanding the foregoing, an Option or SAR may be transferred pursuant to a domestic relations order; *provided, however,* that if an Option is an Incentive Stock Option, such Option may be deemed to be a Nonstatutory Stock Option as a result of such transfer.

(iii)    **Beneficiary Designation**.  Notwithstanding the foregoing, the Participant may, by delivering written notice to the Company, in a form provided by or otherwise satisfactory to the Company and any broker designated by the Company to effect Option exercises, designate a third party who, in the event of the death of the Participant, shall thereafter be entitled to exercise the Option or SAR and receive the Common Stock or other consideration resulting from such exercise.  In the absence of such a designation, the executor or administrator of the Participant's estate shall be entitled to exercise the Option or SAR and receive the Common Stock or other consideration resulting from such exercise.

(f)    **Vesting Generally.**  The total number of shares of Common Stock subject to an Option or SAR may vest and therefore become exercisable in periodic installments that may or may not be equal.  The Option or SAR may be subject to such other terms and conditions on the time or times when it may or may not be exercised (which may be based on the satisfaction of performance goals or other criteria) as the Board may deem appropriate.  The vesting provisions of individual Options or SARs may vary.  The provisions of this Section 5(f) are subject to any Option or SAR provisions governing the minimum number of shares of Common Stock as to which an Option or SAR may be exercised.

(g)    **Termination of Continuous Service.**  Except as otherwise provided in the applicable Stock Award Agreement or other agreement between the Participant and the Company, in the event that a Participant's Continuous Service terminates (other than for Cause or upon the Participant's death or Disability), the Participant may exercise his or her Option or SAR (to the extent that the Participant was entitled to exercise such Stock Award as of the date of termination of Continuous Service) but only within such period of time ending on the earlier of (i) the date three (3) months following the termination of the Participant's Continuous Service (or such longer or shorter period specified in the Stock Award Agreement, which period shall not be less than thirty (30) days if necessary to comply with applicable state laws unless such termination is for Cause) or (ii) the expiration of the term of the Option or SAR as set forth in the Stock Award Agreement.  If, after termination of Continuous Service, the Participant does not exercise his or her Option or SAR within the time specified herein or in the Stock Award Agreement (as applicable), the Option or SAR shall terminate.

Exhibit 7
Page 1139

**(h)** **Extension of Termination Date.** Except as otherwise provided in the applicable Stock Award Agreement or other agreement between the Participant and the Company, if the exercise of an Option or SAR following the termination of the Participant's Continuous Service (other than for Cause or upon the Participant's death or Disability) would be prohibited at any time solely because the issuance of shares of Common Stock would violate the registration requirements under the Securities Act, then the Option or SAR shall terminate on the earlier of (i) the expiration of a period of three (3) months after the termination of the Participant's Continuous Service during which the exercise of the Option or SAR would not be in violation of such registration requirements, or (ii) the expiration of the term of the Option or SAR as set forth in the Stock Award Agreement.  In addition, unless otherwise provided in a Participant's Award Agreement, if the sale of any Common Stock received upon exercise of an Option or SAR following the termination of the Participant's Continuous Service (other than for Cause) would violate the Company's insider trading policy, then the Option or SAR shall terminate on the earlier of (i) the expiration of a period equal to the applicable post-termination exercise period after the termination of the Participant's Continuous Service during which the exercise of the Option or SAR would not be in violation of the Company's insider trading policy, or (ii) the expiration of the term of the Option or SAR as set forth in the applicable Stock Award Agreement.

**(i)** **Disability of Participant.** Except as otherwise provided in the applicable Stock Award Agreement or other agreement between the Participant and the Company, in the event that a Participant's Continuous Service terminates as a result of the Participant's Disability, the Participant may exercise his or her Option or SAR (to the extent that the Participant was entitled to exercise such Option or SAR as of the date of termination of Continuous Service), but only within such period of time ending on the earlier of (i) the date twelve (12) months following such termination of Continuous Service (or such longer or shorter period specified in the Stock Award Agreement, which period shall not be less than six (6) months if necessary to comply with applicable state laws), or (ii) the expiration of the term of the Option or SAR as set forth in the Stock Award Agreement.  If, after termination of Continuous Service, the Participant does not exercise his or her Option or SAR within the time specified herein or in the Stock Award Agreement (as applicable), the Option or SAR shall terminate.

**(j)** **Death of Participant.** Except as otherwise provided in the applicable Stock Award Agreement or other agreement between the Participant and the Company, in the event that (i) a Participant's Continuous Service terminates as a result of the Participant's death, or (ii) the Participant dies within the period (if any) specified in the Stock Award Agreement after the termination of the Participant's Continuous Service for a reason other than death, then the Option or SAR may be exercised (to the extent the Participant was entitled to exercise such Option or SAR as of the date of death) by the Participant's estate, by a person who acquired the right to exercise the Option or SAR by bequest or inheritance or by a person designated to exercise the Option or SAR upon the Participant's death, but only within the period ending on the earlier of (i) the date eighteen (18) months following the date of death (or such longer or shorter period specified in the Stock Award Agreement, which period shall not be less than six (6) months if necessary to comply with applicable state laws), or (ii) the expiration of the term of such Option or SAR as set forth in the Stock Award Agreement.  If, after the Participant's death, the Option or SAR is not exercised within the time specified herein or in the Stock Award Agreement (as applicable), the Option or SAR shall terminate.

Exhibit 7
Page 1140

**(k)**    **Termination for Cause.**  Except as explicitly provided otherwise in a Participant's Stock Award Agreement, if a Participant's Continuous Service is terminated for Cause, the Option or SAR shall terminate upon the termination date of such Participant's Continuous Service, and the Participant shall be prohibited from exercising his or her Option or SAR from and after the time of such termination of Continuous Service.

**(l)**    **Non-Exempt Employees.**  No Option or SAR granted to an Employee who is a non-exempt employee for purposes of the Fair Labor Standards Act of 1938, as amended, shall be first exercisable for any shares of Common Stock until at least six months following the date of grant of the Option or SAR. Notwithstanding the foregoing, consistent with the provisions of the Worker Economic Opportunity Act, in the event of the Participant's death or Disability, upon a Corporate Transaction or a Change in Control in which the vesting of such Options or SARs accelerates, or upon the Participant's retirement (as such term may be defined in the Participant's Stock Award Agreement or in another applicable agreement or in accordance with the Company's then current employment policies and guidelines) any such vested Options and SARs may be exercised earlier than six months following the date of grant.  The foregoing provision is intended to operate so that any income derived by a non-exempt employee in connection with the exercise or vesting of an Option or SAR will be exempt from his or her regular rate of pay.

**(m)**    **Early Exercise of Options.**  An Option may, but need not, include a provision whereby the Optionholder may elect at any time before the Optionholder's Continuous Service terminates to exercise the Option as to any part or all of the shares of Common Stock subject to the Option prior to the full vesting of the Option.  Subject to the "Repurchase Limitation" in Section 8(1), any unvested shares of Common Stock so purchased may be subject to a repurchase right in favor of the Company or to any other restriction the Board determines to be appropriate.  Provided that the "Repurchase Limitation" in Section 8(1) is not violated, the Company shall not be required to exercise its repurchase right until at least six (6) months (or such longer or shorter period of time required to avoid classification of the Option as a liability for financial accounting purposes) have elapsed following exercise of the Option unless the Board otherwise specifically provides in the Option Agreement.

**(n)**    **Right of Repurchase.**  Subject to the "Repurchase Limitation" in Section 8(1), the Option or SAR may include a provision whereby the Company may elect to repurchase all or any part of the vested shares of Common Stock acquired by the Participant pursuant to the exercise of the Option or SAR.

**(o)**    **Right of First Refusal.**  The Option or SAR may include a provision whereby the Company may elect to exercise a right of first refusal following receipt of notice from the Participant of the intent to transfer all or any part of the shares of Common Stock received upon the exercise of the Option or SAR.  Such right of first refusal shall be subject to the "Repurchase Limitation" in Section 8(1).  Except as expressly provided in this Section 5(o) or in the Stock Award Agreement, such right of first refusal shall otherwise comply with any applicable provisions of the Bylaws of the Company.

9

Exhibit 7
Page 1141

6.    **PROVISIONS OF RESTRICTED STOCK AWARDS AND RESTRICTED STOCK UNIT AWARDS**

     (a)    **Restricted Stock Awards.**  Each Restricted Stock Award Agreement shall be in such form and shall contain such terms and conditions as the Board shall deem appropriate.  To the extent consistent with the Company's Bylaws, at the Board's election, shares of Common Stock may be (x) held in book entry form subject to the Company's instructions until any restrictions relating to the Restricted Stock Award lapse; or (y) evidenced by a certificate, which certificate shall be held in such form and manner as determined by the Board.  The terms and conditions of Restricted Stock Award Agreements may change from time to time, and the terms and conditions of separate Restricted Stock Award Agreements need not be identical; *provided, however,* that each Restricted Stock Award Agreement shall conform to (through incorporation of the provisions hereof by reference in the agreement or otherwise) the substance of each of the following provisions:

     (i)    **Consideration**.  A Restricted Stock Award may be awarded in consideration for (A) cash or cash equivalents, (B) past or future services actually or to be rendered to the Company or an Affiliate, or (C) any other form of legal consideration that may be acceptable to the Board in its sole discretion and permissible under applicable law.

     (ii)    **Vesting**.  Subject to the "Repurchase Limitation" in Section 8(1), shares of Common Stock awarded under the Restricted Stock Award Agreement may be subject to forfeiture to the Company in accordance with a vesting schedule to be determined by the Board.

     (iii)    **Termination of Participant's Continuous Service**.  If a Participant's Continuous Service terminates, the Company may receive through a forfeiture condition or a repurchase right, any or all of the shares of Common Stock held by the Participant that have not vested as of the date of termination of Continuous Service under the terms of the Restricted Stock Award Agreement.

     (iv)    **Transferability**.  Rights to acquire shares of Common Stock under the Restricted Stock Award Agreement shall be transferable by the Participant only upon such terms and conditions as are set forth in the Restricted Stock Award Agreement, as the Board shall determine in its sole discretion, so long as Common Stock awarded under the Restricted Stock Award Agreement remains subject to the terms of the Restricted Stock Award Agreement.

     (v)    **Dividends**.  A Restricted Stock Award Agreement may provide that any dividends paid on Restricted Stock will be subject to the same vesting and forfeiture restrictions as apply to the shares subject to the Restricted Stock Award to which they relate.

     (b)    **Restricted Stock Unit Awards.**  Each Restricted Stock Unit Award Agreement shall be in such form and shall contain such terms and conditions as the Board shall deem appropriate.  The terms and conditions of Restricted Stock Unit Award Agreements may change from time to time, and the terms and conditions of separate Restricted Stock Unit Award Agreements need not be identical, *provided, however,* that each Restricted Stock Unit Award Agreement shall conform to (through incorporation of the provisions hereof by reference in the Agreement or otherwise) the substance of each of the following provisions:

Exhibit 7
Page 1142

**(i)** **Consideration**. At the time of grant of a Restricted Stock Unit Award, the Board will determine the consideration, if any, to be paid by the Participant upon delivery of each share of Common Stock subject to the Restricted Stock Unit Award. The consideration to be paid (if any) by the Participant for each share of Common Stock subject to a Restricted Stock Unit Award may be paid in any form of legal consideration that may be acceptable to the Board in its sole discretion and permissible under applicable law.

**(ii)** **Vesting**. At the time of the grant of a Restricted Stock Unit Award, the Board may impose such restrictions or conditions to the vesting of the Restricted Stock Unit Award as it, in its sole discretion, deems appropriate.

**(iii)** **Payment**. A Restricted Stock Unit Award may be settled by the delivery of shares of Common Stock, their cash equivalent, any combination thereof or in any other form of consideration, as determined by the Board and contained in the Restricted Stock Unit Award Agreement.

**(iv)** **Additional Restrictions**. At the time of the grant of a Restricted Stock Unit Award, the Board, as it deems appropriate, may impose such restrictions or conditions that delay the delivery of the shares of Common Stock (or their cash equivalent) subject to a Restricted Stock Unit Award to a time after the vesting of such Restricted Stock Unit Award.

**(v)** **Dividend Equivalents**. Dividend equivalents may be credited in respect of shares of Common Stock covered by a Restricted Stock Unit Award, as determined by the Board and contained in the Restricted Stock Unit Award Agreement. At the sole discretion of the Board, such dividend equivalents may be converted into additional shares of Common Stock covered by the Restricted Stock Unit Award in such manner as determined by the Board. Any additional shares covered by the Restricted Stock Unit Award credited by reason of such dividend equivalents will be subject to all the terms and conditions of the underlying Restricted Stock Unit Award Agreement to which they relate.

**(vi)** **Termination of Participant's Continuous Service**. Except as otherwise provided in the applicable Restricted Stock Unit Award Agreement, such portion of the Restricted Stock Unit Award that has not vested will be forfeited upon the Participant's termination of Continuous Service.

**(vii)** **Compliance with Section 409A of the Code**. Notwithstanding anything to the contrary set forth herein, any Restricted Stock Unit Award granted under the Plan that is not exempt from the requirements of Section 409A of the Code shall contain such provisions so that such Restricted Stock Unit Award will comply with the requirements of Section 409A of the Code. Such restrictions, if any, shall be determined by the Board and contained in the Restricted Stock Unit Award Agreement evidencing such Restricted Stock Unit Award. For example, such restrictions may include, without limitation, a requirement that any Common Stock that is to be issued in a year following the year in which the Restricted Stock Unit Award vests must be issued in accordance with a fixed pre-determined schedule.

Exhibit 7
Page 1143

7.      COVENANTS OF THE COMPANY.

(a)      **Availability of Shares.**  During the terms of the Stock Awards, the Company shall keep available at all times the number of shares of Common Stock reasonably required to satisfy such Stock Awards.

(b)      **Securities Law Compliance.**  The Company shall seek to obtain from each regulatory commission or agency having jurisdiction over the Plan such authority as may be required to grant Stock Awards and to issue and sell shares of Common Stock upon exercise of the Stock Awards; *provided, however,* that this undertaking shall not require the Company to register under the Securities Act the Plan, any Stock Award or any Common Stock issued or issuable pursuant to any such Stock Award.  If, after reasonable efforts, the Company is unable to obtain from any such regulatory commission or agency the authority that counsel for the Company deems necessary for the lawful issuance and sale of Common Stock under the Plan, the Company shall be relieved from any liability for failure to issue and sell Common Stock upon exercise of such Stock Awards unless and until such authority is obtained. A Participant shall not be eligible for the grant of a Stock Award or the subsequent issuance of Common Stock pursuant to the Stock Award if such grant or issuance would be in violation of any applicable securities law.

(c)      **No Obligation to Notify.**  The Company shall have no duty or obligation to any Participant to advise such holder as to the time or manner of exercising such Stock Award.  Furthermore, the Company shall have no duty or obligation to warn or otherwise advise such holder of a pending termination or expiration of a Stock Award or a possible period in which the Stock Award may not be exercised.  The Company has no duty or obligation to minimize the tax consequences of a Stock Award to the holder of such Stock Award.

8.      MISCELLANEOUS.

(a)      **Use of Proceeds from Sales of Common Stock.**  Proceeds from the sale of shares of Common Stock pursuant to Stock Awards shall constitute general funds of the Company.

(b)      **Corporate Action Constituting Grant of Stock Awards.**  Corporate action constituting a grant by the Company of a Stock Award to any Participant shall be deemed completed as of the date of such corporate action, unless otherwise determined by the Board, regardless of when the instrument, certificate, or letter evidencing the Stock Award is communicated to, or actually received or accepted by, the Participant.

(c)      **Stockholder Rights.**  No Participant shall be deemed to be the holder of, or to have any of the rights of a holder with respect to, any shares of Common Stock subject to such Stock Award unless and until (i) such Participant has satisfied all requirements for exercise of the Stock Award pursuant to its terms, if applicable, and (ii) the issuance of the Common Stock subject to such Stock Award has been entered into the books and records of the Company.

11

Exhibit 7
Page 1144

(d)      **No Employment or Other Service Rights.**  Nothing in the Plan, any Stock Award Agreement or any other instrument executed thereunder or in connection with any Stock Award granted pursuant thereto shall confer upon any Participant any right to continue to serve the Company or an Affiliate in the capacity in effect at the time the Stock Award was granted or shall affect the right of the Company or an Affiliate to terminate (i) the employment of an Employee with or without notice and with or without cause, (ii) the service of a Consultant pursuant to the terms of such Consultant's agreement with the Company or an Affiliate, or (iii) the service of a Director pursuant to the Bylaws of the Company or an Affiliate, and any applicable provisions of the corporate law of the state in which the Company or the Affiliate is incorporated, as the case may be.

(e)      **Incentive Stock Option $100,000 Limitation.**  To the extent that the aggregate Fair Market Value (determined at the time of grant) of Common Stock with respect to which Incentive Stock Options are exercisable for the first time by any Optionholder during any calendar year (under all plans of the Company and any Affiliates) exceeds one hundred thousand dollars ($100,000), the Options or portions thereof that exceed such limit (according to the order in which they were granted) shall be treated as Nonstatutory Stock Options, notwithstanding any contrary provision of the applicable Option Agreement(s).

(f)      **Investment Assurances.**  The Company may require a Participant, as a condition of exercising or acquiring Common Stock under any Stock Award, (i) to give written assurances satisfactory to the Company as to the Participant's knowledge and experience in financial and business matters and/or to employ a purchaser representative reasonably satisfactory to the Company who is knowledgeable and experienced in financial and business matters and that he or she is capable of evaluating, alone or together with the purchaser representative, the merits and risks of exercising the Stock Award; and (ii) to give written assurances satisfactory to the Company stating that the Participant is acquiring Common Stock subject to the Stock Award for the Participant's own account and not with any present intention of selling or otherwise distributing the Common Stock.  The foregoing requirements, and any assurances given pursuant to such requirements, shall be inoperative if (x) the issuance of the shares upon the exercise or acquisition of Common Stock under the Stock Award has been registered under a then currently effective registration statement under the Securities Act, or (y) as to any particular requirement, a determination is made by counsel for the Company that such requirement need not be met in the circumstances under the then applicable securities laws.  The Company may, upon advice of counsel to the Company, place legends on stock certificates issued under the Plan as such counsel deems necessary or appropriate in order to comply with applicable securities laws, including, but not limited to, legends restricting the transfer of the Common Stock.

(g)      **Withholding Obligations**.  Unless prohibited by the terms of a Stock Award Agreement, the Company may, in its sole discretion, satisfy any federal, state or local tax withholding obligation relating to a Stock Award by any of the following means or by a combination of such means: (i) causing the Participant to tender a cash payment; (ii) withholding shares of Common Stock from the shares of Common Stock issued or otherwise issuable to the Participant in connection with the Stock Award; *provided, however,* that no shares of Common Stock are withheld with a value exceeding the minimum amount of tax required to be withheld by law (or such lesser amount as may be necessary to avoid classification of the Stock Award as a liability for financial accounting purposes); (iii) withholding payment from any amounts otherwise payable to the Participant; (iv) withholding cash from a Stock Award settled in cash; or (v) by such other method as may be set forth in the Stock Award Agreement.

12

Exhibit 7
Page 1145

**(h)     Electronic Delivery.**    Any reference herein to a written agreement or document shall include any agreement or document delivered electronically or posted on the Company's intranet.

**(i)     Deferrals.**    To the extent permitted by applicable law, the Board, in its sole discretion, may determine that the delivery of Common Stock or the payment of cash, upon the exercise, vesting or settlement of all or a portion of any Stock Award may be deferred and may establish programs and procedures for deferral elections to be made by Participants.  Deferrals by Participants will be made in accordance with Section 409A of the Code.  Consistent with Section 409A of the Code, the Board may provide for distributions while a Participant is still an employee or otherwise providing services to the Company.  The Board is authorized to make deferrals of Stock Awards and determine when, and in what annual 'percentages, Participants may receive payments, including lump sum payments, following the Participant's termination of Continuous Service, and implement such other terms and conditions consistent with the provisions of the Plan and in accordance with applicable law.

**(j)     Compliance with Section 409A.**    To the extent that the Board determines that any Stock Award granted hereunder is subject to Section 409A of the Code, the Stock Award Agreement evidencing such Stock Award shall incorporate the terms and conditions necessary to avoid the consequences specified in Section 409A(a)(1) of the Code.  To the extent applicable, the Plan and Stock Award Agreements shall be interpreted in accordance with Section 409A of the Code.

**(k)     Compliance with Exemption Provided by Rule 12h-1(f).**    If: (i) the aggregate of the number of Optionholders and the number of holders of all other outstanding compensatory employee stock options to purchase shares of Common Stock equals or exceeds five hundred (500), and (ii) the assets of the Company at the end of the Company's most recently completed fiscal year exceed $10 million, then the following restrictions shall apply during any period during which the Company does not have a class of its securities registered under Section 12 of the Exchange Act and is not required to file reports under Section 15(d) of the Exchange Act: (A) the Options and, prior to exercise, the shares of Common Stock acquired upon exercise of the Options may not be transferred until the Company is no longer relying on the exemption provided by Rule 12h-1(f) promulgated under the Exchange Act ("*Rule 12h-10")*, except: (1) as permitted by Rule 701(c) promulgated under the Securities Act, (2) to a guardian upon the disability of the Optionholder, or (3) to an executor upon the death of the Optionholder (collectively, the "*Permitted Transferees"); provided, however,* the following transfers are permitted: (i) transfers by the Optionholder to the Company, and (ii) transfers in connection with a change of control or other acquisition involving the Company, if following such transaction, the Options no longer remain outstanding and the Company is no longer relying on the exemption provided by Rule 12h-1(f); *provided further,* that any Permitted Transferees may not further transfer the Options; (B) except as otherwise provided in (A) above, the Options and shares of Common Stock acquired upon exercise of the Options are restricted as to any pledge, hypothecation, or other transfer, including any short position, any "put equivalent position" as defined by Rule 16a-1(h) promulgated under the Exchange Act, or any "call equivalent position" as defined by Rule 16a-1(b) promulgated under the Exchange Act by the Optionholder prior to exercise of an Option until the Company is no longer relying on the exemption provided by Rule 12h-1(f); and (C) at any time that the Company is relying on the exemption provided by Rule 12h-1(f), the Company shall deliver to Optionholders (whether by physical or electronic delivery or written notice of the availability of the information on an internet site) the information required by Rule 701(e)(3), (4), and (5) promulgated under the Securities Act every six (6) months, including financial statements that are not more than one hundred eighty (180) days old; *provided, however,* that the Company may condition the delivery of such information upon the Optionholder's agreement to maintain its confidentiality.

13

Exhibit 7
Page 1146

**(l)     Repurchase Limitation.** The terms of any repurchase right shall be specified in the Stock Award Agreement. The repurchase price for vested shares of Common Stock shall be the Fair Market Value of the shares of Common Stock on the date of repurchase. The repurchase price for unvested shares of Common Stock shall be the lower of (i) the Fair Market Value of the shares of Common Stock on the date of repurchase or (ii) their original purchase price. However, the Company shall not exercise its repurchase right until at least six (6) months (or such longer or shorter period of time necessary to avoid classification of the Stock Award as a liability for financial accounting purposes) have elapsed following delivery of shares of Common Stock subject to the Stock Award, unless otherwise specifically provided by the Board.

9.      ADJUSTMENTS UPON CHANGES IN COMMON STOCK; OTHER CORPORATE EVENTS.

**(a)     Capitalization Adjustments.** In the event of a Capitalization Adjustment, the Board shall appropriately and proportionately adjust: (i) the class(es) and maximum number of securities subject to the Plan pursuant to Section 3(a), (ii) the class(es) and maximum number of securities that may be issued pursuant to the exercise of Incentive Stock Options pursuant to Section 3(c), and (iii) the class(es) and number of securities and price per share of stock subject to outstanding Stock Awards. The Board shall make such adjustments, and its determination shall be final, binding and conclusive.

**(b)     Dissolution or Liquidation.** Except as otherwise provided in the Stock Award Agreement, in the event of a dissolution or liquidation of the Company, all outstanding Stock Awards (other than Stock Awards consisting of vested and outstanding shares of Common Stock not subject to a forfeiture condition or the Company's right of repurchase) shall terminate immediately prior to the completion of such dissolution or liquidation, and the shares of Common Stock subject to the Company's repurchase rights or subject to a forfeiture condition may be repurchased or reacquired by the Company notwithstanding the fact that the holder of such Stock Award is providing Continuous Service, *provided, however,* that the Board may, in its sole discretion, cause some or all Stock Awards to become fully vested, exercisable and/or no longer subject to repurchase or forfeiture (to the extent such Stock Awards have not previously expired or terminated) before the dissolution or liquidation is completed but contingent on its completion.

**(c)     Corporate Transaction.** The following provisions shall apply to Stock Awards in the event of a Corporate Transaction unless otherwise provided in the instrument evidencing the Stock Award or any other written agreement between the Company or any Affiliate and the holder of the Stock Award or unless otherwise expressly provided by the Board at the time of grant of a Stock Award. Except as otherwise stated in the Stock Award Agreement, in the event of a Corporate Transaction, then, notwithstanding any other provision of the Plan, the Board shall take one or more of the following actions with respect to Stock Awards, contingent upon the closing or completion of the Corporate Transaction:

**(i)** arrange for the surviving corporation or acquiring corporation (or the surviving or acquiring corporation's parent company) to assume or continue the Stock Award or to substitute a similar stock award for the Stock Award (including, but not limited to, an award to acquire the same consideration paid to the stockholders of the Company pursuant to the Corporate Transaction);

14

Exhibit 7
Page 1147

**(ii)** arrange for the assignment of any reacquisition or repurchase rights held by the Company in respect of Common Stock issued pursuant to the Stock Award to the surviving corporation or acquiring corporation (or the surviving or acquiring corporation's parent company);

**(iii)** accelerate the vesting, in whole or in part, of the Stock Award (and, if applicable, the time at which the Stock Award may be exercised) to a date prior to the effective time of such Corporate Transaction as the Board shall determine (or, if the Board shall not determine such a date, to the date that is five (5) days prior to the effective date of the Corporate Transaction), with such Stock Award terminating if not exercised (if applicable) at or prior to the effective time of the Corporate Transaction;

**(iv)** arrange for the lapse of any reacquisition or repurchase rights held by the Company with respect to the Stock Award;

**(v)** cancel or arrange for the cancellation of the Stock Award, to the extent not vested or not exercised prior to the effective time of the Corporate Transaction, in exchange for such cash consideration, if any, as the Board, in its sole discretion, may consider appropriate; and

**(vi)** make a payment, in such form as may be determined by the Board equal to the excess, if any, of (A) the value of the property the holder of the Stock Award would have received upon the exercise of the Stock Award, over (B) any exercise price payable by such holder in connection with such exercise.

The Board need not take the same action with respect to all Stock Awards or with respect to all Participants.

**(d)    Change in Control.** A Stock Award may be subject to additional acceleration of vesting and exercisability upon or after a Change in Control as may be provided in the Stock Award Agreement for such Stock Award or as may be provided in any other written agreement between the Company or any Affiliate and the Participant, but in the absence of such provision, no such acceleration shall occur.

10.    **Termination or Suspension of the Plan.**

**(a)    Plan Term.** The Board may suspend or terminate the Plan at any time. Unless sooner terminated by the Board pursuant to Section 2, the Plan shall automatically terminate on the day before the tenth (10th) anniversary of the earlier of (i) the date the Plan is adopted by the Board, or (ii) the date the Plan is approved by the stockholders of the Company. No Stock Awards may be granted under the Plan while the Plan is suspended or after it is terminated.

**(b)    No Impairment of Rights.** Suspension or termination of the Plan shall not impair rights and obligations under any Stock Award granted while the Plan is in effect except with the written consent of the affected Participant.

15

Exhibit 7
Page 1148

11.    **EFFECTIVE DATE OF PLAN**.

This Plan shall become effective on the Effective Date.

12.    **CHOICE OF LAW**.

The law of the State of New York shall govern all questions concerning the construction, validity and interpretation of this Plan, without regard to that state's conflict of laws rules.

13.    **DEFINITIONS**.  As used in the Plan, the following definitions shall apply to the capitalized terms indicated below:

**(a)**    "*Affiliate*" means, at the time of determination, any "parent" or "majority-owned subsidiary" of the Company, as such terms are defined in Rule 405 of the Securities Act.  The Board shall have the authority to determine the time or times at which "parent" or "majority-owned subsidiary" status is determined within the foregoing definition.

**(b)**    "*Board*" means the Board of Directors of the Company.

**(c)**    "*Capitalization Adjustment*" means any change that is made in, or other events that occur with respect to, the Common Stock subject to the Plan or subject to any Stock Award after the Effective Date without the receipt of consideration by the Company (through merger, consolidation, reorganization, recapitalization, reincorporation, stock dividend, dividend in property other than cash, large nonrecurring cash dividend, stock split, liquidating dividend, combination of shares, exchange of shares, change in corporate structure, or any similar equity restructuring transaction, as that term is used in Statement of Financial Accounting Standards No. 123 (revised).  Notwithstanding the foregoing, the conversion of any convertible securities of the Company shall not be treated as a Capitalization Adjustment.

**(d)**    "*Cause*" shall have the meaning ascribed to such term in any written agreement between the Participant and the Company defining such term and, in the absence of such agreement, such term means with respect to a Participant, the occurrence of any of the following events: (i) such Participant's commission of any felony or any crime involving fraud, dishonesty or moral turpitude under the laws of the United States or any state thereof; (ii) such Participant's attempted commission of, or participation in, a fraud or act of dishonesty against the Company; (iii) such Participant's intentional, material violation of any contract or agreement between the Participant and the Company or of any statutory duty owed to the Company; (iv) such Participant's unauthorized use or disclosure of the Company's confidential information or trade secrets; or (v) such Participant's gross misconduct.  The determination that a termination of the Participant's Continuous Service is either for Cause or without Cause shall be made by the Company in its sole discretion.  Any determination by the Company that the Continuous Service of a Participant was terminated with or without Cause for the purposes of outstanding Stock Awards held by such Participant shall have no effect upon any determination of the rights or obligations of the Company or such Participant for any other purpose.

16

Exhibit 7
Page 1149

(e)        "**Change in Control**" means the occurrence, in a single transaction or in a series of related transactions, of any one or more of the following events:

(i)        any Exchange Act Person becomes the Owner, directly or indirectly, of securities of the Company representing more than fifty percent (50%) of the combined voting power of the Company's then outstanding securities other than by virtue of a merger, consolidation or similar transaction. Notwithstanding the foregoing, a Change in Control shall not be deemed to occur (A) on account of the acquisition of securities of the Company directly from the Company, (B) on account of the acquisition of securities of the Company by an investor, any affiliate thereof or any other Exchange Act Person that acquires the Company's securities in a transaction or series of related transactions the primary purpose of which is to obtain financing for the Company through the issuance of equity securities or (C) solely because the level of Ownership held by any Exchange Act Person (the *"Subject Person"*) exceeds the designated percentage threshold of the outstanding voting securities as a result of a repurchase or other acquisition of voting securities by the Company reducing the number of shares outstanding, provided that if a Change in Control would occur (but for the operation of this sentence) as a result of the acquisition of voting securities by the Company, and after such share acquisition, the Subject Person becomes the Owner of any additional voting securities that, assuming the repurchase or other acquisition had not occurred, increases the percentage of the then outstanding voting securities Owned by the Subject Person over the designated percentage threshold, then a Change in Control shall be deemed to occur;

(ii)       there is consummated a merger, consolidation or similar transaction involving (directly or indirectly) the Company and, immediately after the consummation of such merger, consolidation or similar transaction, the stockholders of the Company immediately prior thereto do not Own, directly or indirectly, either (A) outstanding voting securities representing more than fifty percent (50%) of the combined outstanding voting power of the surviving Entity in such merger, consolidation or similar transaction or (B) more than fifty percent (50%) of the combined outstanding voting power of the parent of the surviving Entity in such merger, consolidation or similar transaction, in each case in substantially the same proportions as their Ownership of the outstanding voting securities of the Company immediately prior to such transaction;

(iii)      the stockholders of the Company approve or the Board approves a plan of complete dissolution or liquidation of the Company, or a complete dissolution or liquidation of the Company shall otherwise occur, except for a liquidation into a parent corporation;

(iv)      there is consummated a sale, lease, exclusive license or other disposition of all or substantially all of the consolidated assets of the Company and its Subsidiaries, other than a sale, lease, license or other disposition of all or substantially all of the consolidated assets of the Company and its Subsidiaries to an Entity, more than fifty percent (50%) of the combined voting power of the voting securities of which are Owned by stockholders of the Company in substantially the same proportions as their Ownership of the outstanding voting securities of the Company immediately prior to such sale, lease, license or other disposition; or

(v)       individuals who, on the date this Plan is adopted by the Board, are members of the Board (the "**Incumbent Board**") cease for any reason to constitute at least a majority of the members of the Board; *provided however,* that if the appointment or election (or nomination for election) of any new Board member was approved or recommended by a majority vote of the members of the Incumbent Board then still in office, such new member shall, for purposes of this Plan, be considered as a member of the Incumbent Board.

17

Exhibit 7
Page 1150

Notwithstanding the foregoing definition or any other provision of this Plan, (A) the term Change in Control shall not include a sale of assets, merger or other transaction effected exclusively for the purpose of changing the domicile of the Company, and (B) the definition of Change in Control (or any analogous term) in an individual written agreement between the Company or any Affiliate and the Participant shall supersede the foregoing definition with respect to Stock Awards subject to such agreement; *provided, however,* that if no definition of Change in Control or any analogous term is set forth in such an individual written agreement, the foregoing definition shall apply.

(f)   "*Code*" means the Internal Revenue Code of 1986, as amended, as well as any applicable regulations and guidance thereunder.

(g)   "*Committee*" means a committee of one (1) or more Directors to whom authority has been delegated by the Board in accordance with Section 2(c).

(h)   "*Common Stock*" means the common stock of the Company.

(i)   "*Company*" means Owlet Baby Care Inc., a Delaware corporation.

(j)   "*Consultant*" means any person, including an advisor, who is (i) engaged by the Company or an Affiliate to render consulting or advisory services and is compensated for such services, or (ii) serving as a member of the board of directors of an Affiliate and is compensated for such services. However, service solely as a Director, or payment of a fee for such service, shall not cause a Director to be considered a "Consultant" for purposes of the Plan.

(k)   "*Continuous Service*" means that the Participant's service with the Company or an Affiliate, whether as an Employee, Director or Consultant, is not interrupted or terminated. A change in the capacity in which the Participant renders service to the Company or an Affiliate as an Employee, Director, or Consultant or a change in the Entity for which the Participant renders such service, provided that there is no interruption or termination of the Participant's service with the Company or an Affiliate, shall not terminate a Participant's Continuous Service; *provided, however,* if the Entity for which a Participant is rendering service ceases to qualify as an Affiliate, as determined by the Board in its sole discretion, such Participant's Continuous Service shall be considered to have terminated on the date such Entity ceases to qualify as an Affiliate. For example, a change in status from an employee of the Company to a consultant of an Affiliate or to a Director shall not constitute an interruption of Continuous Service. To the extent permitted by law, the Board or the chief executive officer of the Company, in that party's sole discretion, may determine whether Continuous Service shall be considered interrupted in the case of (i) any leave of absence approved by the Board or chief executive officer, including sick leave, military leave or any other personal leave, or (ii) transfers between the Company, an Affiliate, or their successors. Notwithstanding the foregoing, a leave of absence shall be treated as Continuous Service for purposes of vesting in a Stock Award only to such extent as may be provided in the Company's leave of absence policy, in the written terms of any leave of absence agreement or policy applicable to the Participant, or as otherwise required by law.

18

Exhibit 7
Page 1151

**(l)** "*Corporate Transaction*" means the occurrence, in a single transaction or in a series of related transactions, of any one or more of the following events:

      **(i)**      the consummation of a sale or other disposition of all or substantially all, as determined by the Board in its sole discretion, of the consolidated assets of the Company and its Subsidiaries;

      **(ii)**      the consummation of a sale or other disposition of at least ninety percent (90%) of the outstanding securities of the Company;

      **(iii)**      the consummation of a merger, consolidation or similar transaction following which the Company is not the surviving corporation; or

      **(iv)**      the consummation of a merger, consolidation or similar transaction following which the Company is the surviving corporation but the shares of Common Stock outstanding immediately preceding the merger, consolidation or similar transaction are converted or exchanged by virtue of the merger, consolidation or similar transaction into other property, whether in the form of securities, cash or otherwise.

**(m)**      "*Director*" means a member of the Board.

**(n)**      "*Disability*" means the inability of a Participant to engage in any substantially gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months as provided in Sections 22(e)(3) and 409A(a)(2)(c)(i) of the Code and shall be determined by the Board on the basis of such medical evidence as the Board deems warranted under the circumstances.

**(o)**      "*Effective Date*" means the effective date of this Plan, which is the earlier of (i) the date that this Plan is first approved by the Company's stockholders, or (ii) the date this Plan is adopted by the Board.

**(p)**      "*Employee*" means any person employed by the Company or an Affiliate. However, service solely as a Director, or payment of a fee for such services, shall not cause a Director to be considered an "Employee" for purposes of the Plan.

**(q)**      "*Entity*" means a corporation, partnership, limited liability company or other entity.

**(r)**      "*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

19

Exhibit 7
Page 1152

(s)    "***Exchange Act Person***" means any natural person, Entity or "group" (within the meaning of Section 13(d) or 14(d) of the Exchange Act), except that "Exchange Act Person" shall not include (i) the Company or any Subsidiary of the Company, (ii) any employee benefit plan of the Company or any Subsidiary of the Company or any trustee or other fiduciary holding securities under an employee benefit plan of the Company or any Subsidiary of the Company, (iii) an underwriter temporarily holding securities pursuant to a registered public offering of such securities, (iv) an Entity Owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their Ownership of stock of the Company; or (v) any natural person, Entity or "group" (within the meaning of Section 13(d) or 14(d) of the Exchange Act) that, as of the Effective Date, is the Owner, directly or indirectly, of securities of the Company representing more than fifty percent (50%) of the combined voting power of the Company's then outstanding securities.

(t)    "***Fair Market Value***" means, as of any date, the value of the Common Stock determined by the Board in compliance with Section 409A of the Code or, in the case of an Incentive Stock Option, in compliance with Section 422 of the Code.

(u)    "***Incentive Stock Option***" means an option that qualifies as an "incentive stock option" within the meaning of Section 422 of the Code and the regulations promulgated thereunder.

(v)    "***Nonstatutory Stock Option***" means an Option that does not qualify as an Incentive Stock Option.

(w)    "***Officer***" means any person designated by the Company as an officer.

(x)    "***Option***" means an Incentive Stock Option or a Nonstatutory Stock Option to purchase shares of Common Stock granted pursuant to the Plan.

(y)    "***Option Agreement***" means a written agreement between the Company and an Optionholder evidencing the terms and conditions of an Option grant.  Each Option Agreement shall be subject to the terms and conditions of the Plan.

(z)    "***Optionholder***" means a person to whom an Option is granted pursuant to the Plan or, if applicable, such other person who holds an outstanding Option.

(aa)   "***Own,***" "***Owned,***" "***Owner,***" "***Ownership***" A person or Entity shall be deemed to "Own," to have "Owned," to be the "Owner" of, or to have acquired "Ownership" of securities if such person or Entity, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares voting power, which includes the power to vote or to direct the voting, with respect to such securities.

(bb)   "***Participant***" means a person to whom a Stock Award is granted pursuant to the Plan or, if applicable, such other person who holds an outstanding Stock Award.

(cc)   "***Plan***" means this Owlet Baby Care Inc. 2014 Equity Incentive Plan.

(dd)   "***Restricted Stock Award***" means an award of shares of Common Stock which is granted pursuant to the terms and conditions of Section 6(a).

(ee)   "***Restricted Stock Award Agreement***" means a written agreement between the Company and a holder of a Restricted Stock Award evidencing the terms and conditions of a Restricted Stock Award.  Each Restricted Stock Award Agreement shall be subject to the terms and conditions of the Plan.

Exhibit 7
Page 1153

**(ff)** "*Restricted Stock Unit Award*" means a right to receive shares of Common Stock which is granted pursuant to the terms and conditions of Section 6(b).

**(gg)** "*Restricted Stock Unit Award Agreement*" means a written agreement between the Company and a holder of a Restricted Stock Unit Award evidencing the terms and conditions of a Restricted Stock Unit Award grant. Each Restricted Stock Unit Award Agreement shall be subject to the terms and conditions of the Plan.

**(hh)** "*Rule 405*" means Rule 405 promulgated under the Securities Act.

**(ii)** "*Rule 701*" means Rule 701 promulgated under the Securities Act.

**(jj)** "*Securities Act*" means the Securities Act of 1933, as amended.

**(kk)** "*Stock Appreciation Right*" or "*SAR*" means a right to receive the appreciation on Common Stock that is granted pursuant to the terms and conditions of Section 5.

**(ll)** "*Stock Appreciation Right Agreement*" means a written agreement between the Company and a holder of a Stock Appreciation Right evidencing the terms and conditions of a Stock Appreciation Right grant. Each Stock Appreciation Right Agreement shall be subject to the terms and conditions of the Plan.

**(mm)** "*Stock Award*" means any right to receive Common Stock granted under the Plan, including an Incentive Stock Option, a Nonstatutory Stock Option, a Restricted Stock Award, a Restricted Stock Unit Award, or a Stock Appreciation Right.

**(nn)** "*Stock Award Agreement*" means a written agreement between the Company and a Participant evidencing the terms and conditions of a Stock Award grant. Each Stock Award Agreement shall be subject to the terms and conditions of the Plan.

**(oo)** "*Subsidiary*" means, with respect to the Company, (i) any corporation of which more than fifty percent (50%) of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, Owned by the Company, and (ii) any partnership, limited liability company or other entity in which the Company has a direct or indirect interest (whether in the form of voting or participation in profits or capital contribution) of more than fifty percent (50%) .

**(pp)** "*Ten Percent Stockholder*" means a person who Owns (or is deemed to Own pursuant to Section 424(d) of the Code) stock possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or any Affiliate.

21

Exhibit 7
Page 1154

**Exhibit 10.7(a)**

**OWLET BABY CARE INC.**
**STOCK OPTION GRANT NOTICE**
**(2014 EQUITY INCENTIVE PLAN)**

**Owlet Baby Care Inc.** (the "*Company*"), pursuant to its 2014 Equity Incentive Plan (the "*Plan*"), hereby grants to Optionholder an option to purchase the number of shares of the Company's Common Stock set forth below. This option is subject to all of the terms and conditions as set forth herein and in the Option Agreement, the Plan, and the Notice of Exercise, all of which are attached hereto and incorporated herein in their entirety.

Optionholder: _____

Date of Grant: _____

Vesting Commencement Date: _____

Number of Shares Subject to Option: _____

Purchase Price (Per Share): _____

Total Purchase Price: _____

Expiration Date: _____

**Type of Grant:**       ☒ Incentive Stock Option[1]       ☐ Nonstatutory Stock Option

**Exercise Schedule:**   ☒ Same as Vesting Schedule       ☐ Early Exercise Permitted

**Vesting Schedule:**    (i) 1/4th of the Shares subject to the Option shall vest on the first anniversary of the Vesting Commencement Date; and (ii) 1/48th of the shares subject to the Option shall vest over the next thirty-six (36) months on the same day of the month as the Vesting Commencement Date (and if there is no corresponding date, on the last day of the month), subject in all such cases to recipient providing Continuous Service to the Company through and on such dates.

**Payment:**             By one or a combination of the following items (described in the Option Agreement):
☒ By cash or check
☐ Pursuant to a Regulation T Program if the Shares are publicly traded
☐ By delivery of already-owned shares if the Shares are publicly traded
☐ By deferred payment
☐ By net exercise[2]

**Additional Terms/Acknowledgements:** The undersigned Optionholder acknowledges receipt of, and understands and agrees to, this Stock Option Grant Notice, the Option Agreement and the Plan. Optionholder acknowledges and agrees that this Stock Option Grant Notice and the Option Agreement may not be modified, amended or revised except in a writing signed by Optionholder and a duly authorized officer of the Company. Optionholder further acknowledges that as of the Date of Grant, this Stock Option Grant Notice, the Option Agreement, and the Plan set forth the entire understanding between Optionholder and the Company regarding the acquisition of stock in the Company and supersede all prior oral and written agreements, promises and/or representations on that subject with the exception of (i) options previously granted and delivered to Optionholder under the Plan, and (ii) the following agreements only:

OTHER AGREEMENTS: _____

_____

---

[1] If this is an Incentive Stock Option, it (plus other outstanding Incentive Stock Options) cannot be first exercisable for more than $100,000 in value (measured by exercise price) in any calendar year. Any excess over $100,000 is a Nonstatutory Stock Option.

[2] An Incentive Stock Option may not be exercised by a net exercise arrangement.

Exhibit 7
Page 1155

**OWLET BABY CARE INC.**                    **OPTIONHOLDER:**

By: _____         _____
              Signature                                    Signature

Title: _____      Date: _____

Date: _____

**ATTACHMENTS:** Option Agreement, 2014 Equity Incentive Plan and Notice of Exercise

Exhibit 7
Page 1156

**ATTACHMENT 3**

**OPTION AGREEMENT**

Exhibit 7
Page 1157

OWLET BABY CARE INC.
**2014 EQUITY INCENTIVE PLAN**

**OPTION AGREEMENT**
**(INCENTIVE STOCK OPTION OR NONSTATUTORY STOCK OPTION)**

Pursuant to your Stock Option Grant Notice ("*Grant Notice*") and this Option Agreement, Owlet Baby Care Inc. (the "*Company*") has granted you an option under its 2014 Equity Incentive Plan (the "*Plan*") to purchase the number of shares of the Company's Common Stock indicated in your Grant Notice at the exercise price indicated in your Grant Notice.  Defined terms not explicitly defined in this Option Agreement but defined in the Plan shall have the same definitions as in the Plan.

The details of your option are as follows:

1.      VESTING.  Subject to the limitations contained herein, your option will vest as provided in your Grant Notice, provided that vesting will cease upon the termination of your Continuous Service.

2.      NUMBER OF SHARES AND EXERCISE PRICE.  The number of shares of Common Stock subject to your option and your exercise price per share referenced in your Grant Notice may be adjusted from time to time for Capitalization Adjustments.

3.      EXERCISE RESTRICTION FOR NON-EXEMPT EMPLOYEES.  In the event that you are an Employee eligible for overtime compensation under the Fair Labor Standards Act of 1938, as amended (*i.e.*, a "*Non-Exempt Employee*"), you may not exercise your option until you have completed at least six (6) months of Continuous Service measured from the Date of Grant specified in your Grant Notice, notwithstanding any other provision of your option.

4.      EXERCISE PRIOR TO VESTING ("EARLY EXERCISE").  If permitted in your Grant Notice (*i.e.*, the "Exercise Schedule" indicates "Early Exercise Permitted") and subject to the provisions of your option, you may elect at any time that is both (i) during the period of your Continuous Service and (ii) during the term of your option, to exercise all or part of your option, including the unvested portion of your option; *provided, however*, that:

    (a)      a partial exercise of your option shall be deemed to cover first vested shares of Common Stock and then the earliest vesting installment of unvested shares of Common Stock;

    (b)      any shares of Common Stock so purchased from installments that have not vested as of the date of exercise shall be subject to the purchase option in favor of the Company as described in the Company's form of Early Exercise Stock Purchase Agreement;

    (c)      you shall enter into the Company's form of Early Exercise Stock Purchase Agreement with a vesting schedule that will result in the same vesting as if no early exercise had occurred; and

    (d)      if your option is an Incentive Stock Option, then, to the extent that the aggregate Fair Market Value (determined at the time of grant) of the shares of Common Stock with respect to which your option plus all other Incentive Stock Options you hold are exercisable for the first time by you during any calendar year (under all plans of the Company and its Affiliates) exceeds one hundred thousand dollars ($100,000), your option(s) or portions thereof that exceed such limit (according to the order in which they were granted) shall be treated as Nonstatutory Stock Options.

Exhibit 7
Page 1158

5.      **METHOD OF PAYMENT**.  Payment of the exercise price is due in full upon exercise of all or any part of your option.  You may elect to make payment of the exercise price in cash or by check or in any other manner *permitted by your Grant Notice*, which may include one or more of the following:

(a)      Provided that at the time of exercise the Common Stock is publicly traded and quoted regularly in *The Wall Street Journal*, pursuant to a program developed under Regulation T as promulgated by the Federal Reserve Board that, prior to the issuance of Common Stock, results in either the receipt of cash (or check) by the Company or the receipt of irrevocable instructions to pay the aggregate exercise price to the Company from the sales proceeds.

(b)      Provided that at the time of exercise the Common Stock is publicly traded and quoted regularly in *The Wall Street Journal*, by delivery to the Company (either by actual delivery or attestation) of already-owned shares of Common Stock that are owned free and clear of any liens, claims, encumbrances or security interests, and that are valued at Fair Market Value on the date of exercise.  Notwithstanding the foregoing, you may not exercise your option by tender to the Company of Common Stock to the extent such tender would violate the provisions of any law, regulation or agreement restricting the redemption of the Company's stock.

(c)      Pursuant to the following deferred payment alternative:

(i)      Not less than one hundred percent (100%) of the aggregate exercise price, plus accrued interest, shall be due four (4) years from date of exercise or, at the Company's election, upon termination of your Continuous Service.

(ii)      Interest shall be compounded at least annually and shall be charged at the minimum rate of interest necessary to avoid (1) the treatment as interest, under any applicable provisions of the Code, of any amounts other than amounts stated to be interest under the deferred payment arrangement and (2) the classification of your option as a liability for financial accounting purposes.

(iii)      In order to elect the deferred payment alternative, you must, as a part of your written notice of exercise, give notice of the election of this payment alternative and, in order to secure the payment of the deferred exercise price to the Company hereunder, if the Company so requests, you must tender to the Company a promissory note and a pledge agreement covering the purchased shares of Common Stock, both in form and substance satisfactory to the Company, or such other or additional documentation as the Company may request.

6.      **WHOLE SHARES**.  You may exercise your option only for whole shares of Common Stock.

7.      **SECURITIES LAW COMPLIANCE**.  Notwithstanding anything to the contrary contained herein, you may not exercise your option unless the shares of Common Stock issuable upon such exercise are then registered under the Securities Act or, if such shares of Common Stock are not then so registered, the Company has determined that such exercise and issuance would be exempt from the registration requirements of the Securities Act.  The exercise of your option also must comply with other applicable laws and regulations governing your option, and you may not exercise your option if the Company determines that such exercise would not be in material compliance with such laws and regulations.

Exhibit 7
Page 1159

**8.**      TERM.  You may not exercise your option before the commencement or after the expiration of its term.  The term of your option commences on the Date of Grant and expires upon the earliest of the following:

**(a)**      three (3) months after the termination of your Continuous Service for any reason other than your Disability or death, provided that if during any part of such three (3) month period your option is not exercisable solely because of the condition set forth in the section above relating to "Securities Law Compliance," your option shall not expire until the earlier of the Expiration Date or until it shall have been exercisable for an aggregate period of three (3) months after the termination of your Continuous Service;

**(b)**      twelve (12) months after the termination of your Continuous Service due to your Disability;

**(c)**      eighteen (18) months after your death if you die during your Continuous Service;

**(d)**      the Expiration Date indicated in your Grant Notice; or

**(e)**      the day before the tenth (10th) anniversary of the Date of Grant.

Notwithstanding the foregoing, if you die during the period provided in Section 8(a) or 8(b) above, the term of your option shall not expire until the earlier of eighteen (18) months after your death, the Expiration Date indicated in your Grant Notice, or the day before the tenth (10th) anniversary of the Date of Grant.

If your option is an Incentive Stock Option, note that to obtain the federal income tax advantages associated with an Incentive Stock Option, the Code requires that at all times beginning on the date of grant of your option and ending on the day three (3) months before the date of your option's exercise, you must be an employee of the Company or an Affiliate, except in the event of your death or your permanent and total disability, as defined in Section 22(e)(3) of the Code.  (The definition of disability in Section 22(e)(3) of the Code is different from the definition of the Disability under the Plan).  The Company has provided for extended exercisability of your option under certain circumstances for your benefit but cannot guarantee that your option will necessarily be treated as an Incentive Stock Option if you continue to provide services to the Company or an Affiliate as a Consultant or Director after your employment terminates or if you otherwise exercise your option more than three (3) months after the date your employment with the Company or an Affiliate terminates.

**9.**      EXERCISE.

**(a)**      You may exercise the vested portion of your option (and the unvested portion of your option if your Grant Notice so permits) during its term by delivering a Notice of Exercise (in a form designated by the Company) together with the exercise price to the Secretary of the Company, or to such other person as the Company may designate, during regular business hours, together with such additional documents as the Company may then require.

**(b)**      By exercising your option you agree that, as a condition to any exercise of your option, the Company may require you to enter into an arrangement providing for the payment by you to the Company of any tax withholding obligation of the Company arising by reason of (1) the exercise of your option, (2) the lapse of any substantial risk of forfeiture to which the shares of Common Stock are subject at the time of exercise, or (3) the disposition of shares of Common Stock acquired upon such exercise.

**(c)**      If your option is an Incentive Stock Option, by exercising your option you agree that you will notify the Company in writing within fifteen (15) days after the date of any disposition of any of the shares of the Common Stock issued upon exercise of your option that occurs within two (2) years after the date of your option grant or within one (1) year after such shares of Common Stock are transferred upon exercise of your option.

Exhibit 7
Page 1160

(d)    By exercising your option you agree that you shall not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, any shares of Common Stock or other securities of the Company held by you, for a period of one hundred eighty (180) days following the effective date of a registration statement of the Company filed under the Securities Act or such longer period as necessary to permit compliance with NASD Rule 2711 or NYSE Member Rule 472 and similar rules and regulations (the "**Lock-Up Period**"); *provided, however*, that nothing contained in this section shall prevent the exercise of a repurchase option, if any, in favor of the Company during the Lock-Up Period.  You further agree to execute and deliver such other agreements as may be reasonably requested by the Company and/or the underwriter(s) that are consistent with the foregoing or that are necessary to give further effect thereto.  In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to your shares of Common Stock until the end of such period.  The underwriters of the Company's stock are intended third party beneficiaries of this Section 9(d) and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto.

10.    TRANSFERABILITY.  Your option is not transferable, except by will or by the laws of descent and distribution, and is exercisable during your life only by you.  Notwithstanding the foregoing, by delivering written notice to the Company, in a form satisfactory to the Company, you may designate a third party who, in the event of your death, shall thereafter be entitled to exercise your option.  In addition, if permitted by the Company you may transfer your option to a trust if you are considered to be the sole beneficial owner (determined under Section 671 of the Code and applicable state law) while the option is held in the trust, provided that you and the trustee enter into a transfer and other agreements required by the Company.

11.    RIGHT OF FIRST REFUSAL.  Shares of Common Stock that you acquire upon exercise of your option are subject to any right of first refusal that may be described in the Company's bylaws in effect at such time the Company elects to exercise its right; *provided, however*, that if your option is an Incentive Stock Option and the right of first refusal described in the Company's bylaws in effect at the time the Company elects to exercise its right is more beneficial to you than the right of first refusal described in the Company's bylaws on the Date of Grant, then the right of first refusal described in the Company's bylaws on the Date of Grant shall apply.  The Company's right of first refusal shall expire on the first date upon which any security of the Company is listed (or approved for listing) upon notice of issuance on a national securities exchange or quotation system.

12.    RIGHT OF REPURCHASE.  To the extent provided in the Company's bylaws in effect at such time the Company elects to exercise its right, the Company shall have the right to repurchase all or any part of the shares of Common Stock you acquire pursuant to the exercise of your option.

13.    OPTION NOT A SERVICE CONTRACT.  Your option is not an employment or service contract, and nothing in your option shall be deemed to create in any way whatsoever any obligation on your part to continue in the employ of the Company or an Affiliate, or of the Company or an Affiliate to continue your employment.  In addition, nothing in your option shall obligate the Company or an Affiliate, their respective stockholders, Boards of Directors, Officers or Employees to continue any relationship that you might have as a Director or Consultant for the Company or an Affiliate.

Exhibit 7
Page 1161

14.   WITHHOLDING OBLIGATIONS.

(a)     At the time you exercise your option, in whole or in part, or at any time thereafter as requested by the Company, you hereby authorize withholding from payroll and any other amounts payable to you, and otherwise agree to make adequate provision for (including by means of a "cashless exercise" pursuant to a program developed under Regulation T as promulgated by the Federal Reserve Board to the extent permitted by the Company), any sums required to satisfy the federal, state, local and foreign tax withholding obligations of the Company or an Affiliate, if any, which arise in connection with the exercise of your option.

(b)     Upon your request and subject to approval by the Company, in its sole discretion, and compliance with any applicable legal conditions or restrictions, the Company may withhold from fully vested shares of Common Stock otherwise issuable to you upon the exercise of your option a number of whole shares of Common Stock having a Fair Market Value, determined by the Company as of the date of exercise, not in excess of the minimum amount of tax required to be withheld by law (or such lower amount as may be necessary to avoid classification of your option as a liability for financial accounting purposes). If the date of determination of any tax withholding obligation is deferred to a date later than the date of exercise of your option, share withholding pursuant to the preceding sentence shall not be permitted unless you make a proper and timely election under Section 83(b) of the Code, covering the aggregate number of shares of Common Stock acquired upon such exercise with respect to which such determination is otherwise deferred, to accelerate the determination of such tax withholding obligation to the date of exercise of your option. Notwithstanding the filing of such election, shares of Common Stock shall be withheld solely from fully vested shares of Common Stock determined as of the date of exercise of your option that are otherwise issuable to you upon such exercise. Any adverse consequences to you arising in connection with such share withholding procedure shall be your sole responsibility.

(c)     You may not exercise your option unless the tax withholding obligations of the Company and/or any Affiliate are satisfied. Accordingly, you may not be able to exercise your option when desired even though your option is vested, and the Company shall have no obligation to issue a certificate for such shares of Common Stock or release such shares of Common Stock from any escrow provided for herein unless such obligations are satisfied.

15.   TAX CONSEQUENCES. You hereby agree that the Company does not have a duty to design or administer the Plan or its other compensation programs in a manner that minimizes your tax liabilities. You shall not make any claim against the Company, or any of its Officers, Directors, Employees or Affiliates related to tax liabilities arising from your option or your other compensation. In particular, you acknowledge that this option is exempt from Section 409A of the Code only if the exercise price per share specified in the Grant Notice is at least equal to the "fair market value" per share of the Common Stock on the Date of Grant and there is no other impermissible deferral of compensation associated with the option. Because the Common Stock is not traded on an established securities market, the Fair Market Value is determined by the Board, perhaps in consultation with an independent valuation firm retained by the Company. You acknowledge that there is no guarantee that the Internal Revenue Service will agree with the valuation as determined by the Board, and you shall not make any claim against the Company, or any of its Officers, Directors, Employees or Affiliates in the event that the Internal Revenue Service asserts that the valuation determined by the Board is less than the "fair market value" as subsequently determined by the Internal Revenue Service.

16.   NOTICES. Any notices provided for in your option or the Plan shall be given in writing and shall be deemed effectively given upon receipt or, in the case of notices delivered by mail by the Company to you, five (5) days after deposit in the United States mail, postage prepaid, addressed to you at the last address you provided to the Company.

17.   GOVERNING PLAN DOCUMENT. Your option is subject to all the provisions of the Plan, the provisions of which are hereby made a part of your option, and is further subject to all interpretations, amendments, rules and regulations, which may from time to time be promulgated and adopted pursuant to the Plan. In the event of any conflict between the provisions of your option and those of the Plan, the provisions of the Plan shall control.

Exhibit 7
Page 1162

**2014 EQUITY INCENTIVE PLAN**

Exhibit 7
Page 1163

**NOTICE OF EXERCISE**

Exhibit 7
Page 1164

**Exhibit 10.7(b)**

**OWLET BABY CARE INC.**
**RESTRICTED STOCK GRANT AGREEMENT**

**AWARD NOTICE**
**(2014 EQUITY INCENTIVE PLAN)**

Owlet Baby Care Inc. (the "***Company***"), pursuant to its 2014 Equity Incentive Plan (the "***Plan***"), hereby grants to Participant the number of shares of the Company's Common Stock set forth below (the "***Award***"). The Award is subject to all of the terms and conditions as set forth herein and in the Restricted Stock Grant Agreement and the Plan, all of which are attached hereto and incorporated herein in their entirety.

Participant:
Date of Grant:                                  March __, 2018
Number of Shares Subject to Award:

**Vesting Schedule:**              100% vested upon grant.

**Additional Terms/Acknowledgements**:  The undersigned Participant acknowledges receipt of, and understands and agrees to, this Award Notice, the Restricted Stock Grant Agreement and the Plan.  Participant further acknowledges that as of the Date of Grant, this Award Notice, the Restricted Stock Grant Agreement and the Plan set forth the entire understanding between Participant and the Company regarding the acquisition of stock in the Company and supersede all prior oral and written agreements on that subject hereof. The Company's grant of shares of Common Stock to the Participant pursuant to this Award Notice is subject to the Participant executing and delivering the Acknowledgment of Termination of Restricted Stock Purchase Agreement between the Company and the Participant, in which the Participant agrees to terminate the Participant's rights to acquire shares of common stock of the Company pursuant to the Restricted Stock Purchase Agreement dated June 30, 2014.

**OWLET BABY CARE INC.**                                                  **PARTICIPANT:**

By: _____                              By: _____
        Signature                                                                      Signature
Name:  Kurt Workman                                                      Name:
Title:    Chief Executive Officer                                          Date: _____
Date: _____

**ATTACHMENTS:**  Restricted Stock Grant Agreement, 2014 Equity Incentive Plan, Assignment Separate from Certificate, Joint Escrow Instructions

Exhibit 7
Page 1165

**RESTRICTED STOCK GRANT AGREEMENT**
**2014 EQUITY INCENTIVE PLAN**

Owlet Baby Care Inc. (the "***Company***") wishes to grant to you, and you wish to acquire, shares of Common Stock from the Company, pursuant to the provisions of the Company's 2014 Equity Incentive Plan (the "***Plan***").

Therefore, pursuant to the terms of the Restricted Stock Grant Award Notice ("***Award Notice***") and this Restricted Stock Grant Agreement ("***Agreement'***") (collectively, the "***Award***"), the Company grants you the number of shares of Common Stock indicated in the Award Notice. Defined terms not explicitly defined in this Agreement but defined in the Plan shall have the same definitions as in the Plan.

The details of your Award are as follows:

1.      GRANT OF SHARES. You hereby agree to acquire from the Company, and the Company hereby agrees to grant to you, the aggregate number of shares of Common Stock specified in your Award Notice as consideration for services to be provided by the Grantee to the Company as a service provider (as defined below) of the Company.

2.      CLOSING. The transfer of the Shares shall occur at a closing (the "***Closing***") to be held on the date first set forth above, or at any other time mutually agreed upon by the Company and you. The Closing will take place at the principal office of the Company or at such other place as shall be designated by the Company. As promptly after the Closing as practicable, the Company will issue a stock certificate, registered in your name, reflecting the Shares.

3.      NUMBER OF SHARES. The number of shares of Common Stock subject to your Award referenced in your Award Notice may be adjusted from time to time for Capitalization Adjustments.

4.      LIMITATIONS ON TRANSFER. In addition to any other limitation on transfer created by applicable securities laws, you shall not sell, assign, hypothecate, donate, encumber or otherwise dispose of any interest in the Common Stock except in compliance with the provisions herein and applicable securities laws.

5.      RESTRICTIVE LEGENDS. All certificates representing the Common Stock shall have endorsed thereon legends in substantially the following forms (in addition to any other legend which may be required by other agreements between the parties hereto):

    (a)     "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED."

    (b)     "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE COMPANY AND/OR ITS ASSIGNEE(S) AS PROVIDED IN THE BYLAWS OF THE COMPANY."

    (c)     Any legend required by appropriate blue sky officials.

Exhibit 7
Page 1166

**6.**    INVESTMENT REPRESENTATIONS.   In connection with the acquisition of the Common Stock, you represent to the Company the following:

**(a)**    You are aware of the Company's business affairs and financial condition and have acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Common Stock.  You are acquiring the Common Stock for investment for your own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

**(b)**    You understand that the Common Stock has not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of your investment intent as expressed herein.

**(c)**    You further acknowledge and understand that the Common Stock must be held indefinitely unless the Common Stock is subsequently registered under the Securities Act or an exemption from such registration is available.  You further acknowledge and understand that the Company is under no obligation to register the Common Stock.  You understand that the certificate evidencing the Common Stock will be imprinted with a legend that prohibits the transfer of the Common Stock unless the Common Stock is registered or such registration is not required in the opinion of counsel for the Company.

**(d)**    You are familiar with the provisions of Rules 144 and 701, under the Securities Act, as in effect from time to time, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer thereof (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions.  Rule 701 provides that if the issuer qualifies under Rule 701 at the time of issuance of the securities, such issuance will be exempt from registration under the Securities Act.  In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the securities exempt under Rule 701 may be sold by you ninety (90) days thereafter, subject to the satisfaction of certain of the conditions specified by Rule 144 and the market stand-off provision described in Section 7 below.

**(e)**    In the event that the sale of the Common Stock does not qualify under Rule 701 at the time of purchase, then the Common Stock may be resold by you in certain limited circumstances subject to the provisions of Rule 144, which requires, among other things: (i) the availability of certain public information about the Company and (ii) the resale occurring following the required holding period under Rule 144 after you have purchased, and made full payment of (within the meaning of Rule 144), the securities to be sold.

**(f)**    You further understand that at the time you wish to sell the Common Stock there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public current information requirements of Rule 144 or 701, and that, in such event, you would be precluded from selling the Common Stock under Rule 144 or 701 even if the minimum holding period requirement had been satisfied.

**7.**    MARKET STAND-OFF AGREEMENT.  By purchasing shares of Common Stock under your Award, you shall not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, any shares of Common Stock or other securities of the Company held by you, for a period of one hundred eighty (180) days following the effective date of a registration statement of the Company filed under the Securities Act or such longer period as necessary to permit compliance with NASD Rule 2711 and similar or successor regulatory rules and regulations (the "***Lock-Up Period***").  You further agree to execute and deliver such other agreements as may be reasonably requested by the Company and/or the underwriter(s) that are consistent with the foregoing or that are necessary to give further effect thereto.  In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to your shares of Common Stock until the end of such period.  The underwriters of the Company's stock are intended third party beneficiaries of this Section 7 and shall have the right, power and authority to enforce the provision hereof as though they were a party hereto.

Exhibit 7
Page 1167

8.      **TRANSFERABILITY**.  Your Award is not transferable, except with the consent of the Company, which the Company may withhold in its sole discretion

9.      **RIGHT OF FIRST REFUSAL**.  Shares of Common Stock that you acquire under your Award are subject to any right of first refusal that may be described in the Company's bylaws in effect at such time the Company elects to exercise its right.  The Company's right of first refusal shall expire on the Listing Date.  For purposes of this Agreement, Listing Date shall mean the first date upon which any security of the Company is listed (or approved for listing) upon notice of issuance on a national securities exchange or on the Global Market System of the Nasdaq Stock Market (or any successor to that entity).

10.     **AWARD NOT A SERVICE CONTRACT**.  Your Award is not an employment or service contract, and nothing in your Award shall be deemed to create in any way whatsoever any obligation on your part (or the part of any affiliate or owner of you) to continue in the employ of the Company or an Affiliate, or of the Company or an Affiliate to continue your employment (or the employment of any affiliate or owner of you).  In addition, nothing in your Award shall obligate the Company or an Affiliate, their respective stockholders, Boards of Directors, Officers or Employees to continue any relationship that you (or any owner or affiliate of you) might have as a Director or Consultant for the Company or an Affiliate.

11.     **TAX OBLIGATIONS**.

(a)     At the time your Award is granted, or at any time thereafter as requested by the Company, you hereby authorize withholding from payroll and any other amounts payable to you, and otherwise agree to make adequate provision for, any sums required to satisfy the federal, state, local and foreign tax withholding obligations of the Company or an Affiliate, if any, which arise in connection with your Award.  You further agree to be responsible for, indemnify and hold the Company harmless for, all income taxes and for your portion of the employment taxes, imposed in connection with the acquisition or otherwise in connection with the Award.

(b)     Unless the tax withholding obligations of the Company or any Affiliate are satisfied, the Company shall have no obligation to issue a certificate for such shares or release such shares from any escrow provided for herein.

12.     **NOTICES**.  Any notices provided for in your Award or the Plan shall be given in writing (including e-mail or facsimile) and shall be deemed effectively given upon receipt or, in the case of notices sent by mail by the Company to you, three (3) days after deposit in the United States mail, postage prepaid, addressed to you at the last address you provided to the Company.

13.     **MISCELLANEOUS**.

(a)     The rights and obligations of the Company under your Award shall be transferable to any one or more persons or entities, and all covenants and agreements hereunder shall inure to the benefit of, and be enforceable by the Company's successors and assigns.  Your rights and obligations under your Award may only be assigned with the prior written consent of the Company.

Exhibit 7
Page 1168

**(b)** You agree upon request to execute any further documents or instruments necessary or desirable in the sole determination of the Company to carry out the purposes or intent of your Award.

**(c)** You acknowledge and agree that you have reviewed your Award in its entirety, have had an opportunity to obtain the advice of counsel prior to executing and accepting your Award and fully understand all provisions of your Award.

**14.** **GOVERNING PLAN DOCUMENT**. Your Award is subject to all the provisions of the Plan, the provisions of which are hereby made a part of your Award, and is further subject to all interpretations, amendments, rules and regulations which may from time to time be promulgated and adopted pursuant to the Plan. In the event of any conflict between the provisions of your Award and those of the Plan, the provisions of the Plan shall control.

Exhibit 7
Page 1169

ATTACHMENT 20

**2014 E**QUITY **I**NCENTIVE **P**LAN

Exhibit 7
Page 1170

Exhibit 10.7(c)

**OWLET BABY CARE, INC.**

**2014 EQUITY INCENTIVE PLAN**

**RESTRICTED STOCK UNIT AWARD AGREEMENT**

Unless otherwise defined herein, the terms defined in the 2014 Equity Incentive Plan, as amended (the "Plan") shall have the same defined meanings in this Restricted Stock Unit Award Agreement (the "Award Agreement").

**I.      NOTICE OF GRANT OF RESTRICTED STOCK UNIT AWARD**

**Name:**

**Address:**

The undersigned individual (the "Participant") has been granted the right to receive a Restricted Stock Unit Award, subject to the terms and conditions of the Plan and this Award Agreement, as follows:

Date of Grant:                                         June __, 2017

Vesting Commencement Date:                            February 1, 2017

Restricted Stock Unit Award:

Election for Withholding of Taxes:                    paying cash;
(Check appropriate method)                            electing to have the Company withhold otherwise deliverable Shares having a Fair Market Value equal to the amount of such Withholding Taxes;
                                                      withholding the amount of such Withholding Taxes from Participant's paycheck(s); **OR**
                                                      delivering to the Company already vested and owned Shares having a Fair Market Value equal to such Withholding Taxes.

Vesting Schedule:

Subject to any acceleration provisions contained in the Plan, the Restricted Stock Unit Award will vest in accordance with the following schedule:

(i) 5/12th of the Restricted Stock Unit Award shall vest on July 1, 2017; and (ii) an additional 1/12th of the Restricted Stock Unit Award shall vest at the end of each full month thereafter, such that all of the Restricted Stock Unit Award shall become fully vested on February 1, 2018, subject in all such cases to the Participant providing Continuous Service to the Company through and on such dates. In the event that Participant's Continuous Service ceases for any or no reason before Participant fully vests in the Restricted Stock Unit Award, the unvested portion of the Restricted Stock Unit Award and Participant's right to acquire any shares of Common Stock (the "Shares") for such unvested portion hereunder will be forfeited and shall immediately terminate.

**II.      AGREEMENT**

1.      Grant of Restricted Stock Unit Award.  The Company hereby grants to the Participant named in the Notice of Grant of Restricted Stock Unit Award in Part I of this Award Agreement under the Plan a Restricted Stock Unit Award, subject to all of the terms and conditions in this Award Agreement and the Plan, which is incorporated herein by reference.  Subject to Section 10(b) of the Plan, in the event of a conflict between the terms and conditions of the Plan and this Award Agreement, the terms and conditions of the Plan shall prevail.

-1-

Exhibit 7
Page 1171

2.      Company's Obligation to Pay.  The Restricted Stock Unit Award represents the right to receive Shares on each date that a portion of the Restricted Stock Unit Award vests.  Unless and until the a portion of the Restricted Stock Unit Award will have vested in the manner set forth in Part I of this Award Agreement, Participant will have no right to payment of any portion of such Restricted Stock Unit Award.  Prior to actual payment of any vested portion of a Restricted Stock Unit Award, such vested portion of the Restricted Stock Unit Award will represent an unsecured obligation of the Company, payable (if at all) only from the general assets of the Company.

3.      Participant's Representations. In the event the Shares have not been registered under the Securities Act at the time any vested portion of the Restricted Stock Unit Award is paid to Participant, Participant shall, if required by the Company, concurrently with the receipt of all or any portion of this Restricted Stock Unit Award, deliver to the Company his or her Investment Representation Statement in the form attached hereto as Exhibit A.

4.      Vesting Schedule.  Except as provided in Section 6, and subject to Section 7, the Restricted Stock Unit Award will vest in accordance with the vesting schedule set forth in Part I of this Award Agreement, subject to Participant providing Continuing Service to the Company through each applicable vesting date.

5.      Lock-Up Period. Participant hereby agrees that Participant shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Common Stock (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Common Stock (or other securities) of the Company held by Participant (other than those included in the registration) for a period specified by the representative of the underwriters of Common Stock (or other securities) of the Company not to exceed one hundred and eighty (180) days following the effective date of any registration statement of the Company filed under the Securities Act (or such other period as may be requested by the Company or the underwriters to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto).

Participant agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. In addition, if requested by the Company or the representative of the underwriters of Common Stock (or other securities) of the Company, Participant shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act. The obligations described in this Section 5 shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of said one hundred and eighty (180) day (or other) period. Participant agrees that any transferee of any vested portion of the Restricted Stock Unit Award or Shares acquired pursuant to the Restricted Stock Unit Award shall be bound by this Section 5.

-2-

Exhibit 7
Page 1172

6.    Payment after Vesting.  Subject to Section 10, any vested portion of a Restricted Stock Unit Award that will be paid to Participant (or in the event of Participant's death, to his or her properly designated beneficiary or estate) in whole Shares.  Subject to the provisions of the next paragraph, such vested portion of the Restricted Stock Unit Award shall be paid in whole Shares as soon as practicable after vesting, but in each such case within the period ending no later than the fifteenth (15th) day of the third (3rd) month following the end of the calendar year, or if later, the end of the Company's tax year, in either case that includes the vesting date.  In no event will Participant be permitted, directly or indirectly, to specify the taxable year of payment of any vested portion of a Restricted Stock Unit Award payable under this Award Agreement.

Notwithstanding anything in the Plan or this Agreement to the contrary, if the vesting of the balance, or some lesser portion of the balance, of the Restricted Stock Unit Award is accelerated in connection with the termination of Participant's Continuous Service (provided that such termination is a "separation from service" within the meaning of Section 409A, as determined by the Company), other than due to death, and if (x) Participant is a "specified employee" within the meaning of Section 409A at the time of such termination of Participant's Continuous Service and (y) the payment of such accelerated portion of the Restricted Stock Unit Award will result in the imposition of additional tax under Section 409A if paid to Participant on or within the six (6) month period following the termination of Participant's Continuous Service, then the payment of such accelerated RSUs will not be made until the date six (6) months and one (1) day following the date of the termination of Participant's Continuous Service, unless the Participant dies following his or her termination of Continuous Services, in which case, the RSUs will be paid in Shares to the Participant's estate as soon as practicable following his or her death.  It is the intent of this Agreement to comply with the requirements of Section 409A so that no portion of the Restricted Stock Unit Award provided under this Award Agreement or Shares issuable thereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply.  For purposes of this Award Agreement, "Section 409A" means Section 409A of the Code, and any proposed, temporary or final Treasury Regulations and Internal Revenue Service guidance thereunder, as each may be amended from time to time.

7.    Forfeiture Upon Termination of Continuous Service.  Notwithstanding any contrary provision of this Award Agreement, if Participant's Continuous Service to the Company ceases for any or no reason, the then-unvested portion of the Restricted Stock Unit Award will thereupon be forfeited at no cost to the Company and Participant will have no further rights thereunder.

8.    Tax Consequences.  Participant has reviewed with his or her own tax advisors the U.S. federal, state, local and foreign tax consequences of this investment and the transactions contemplated by this Award Agreement.  With respect to such matters, Participant relies solely on such advisors and not on any statements or representations of the Company or any of its agents, written or oral.  Participant understands that Participant (and not the Company) shall be responsible for Participant's own tax liability that may arise as a result of this investment or the transactions contemplated by this Award Agreement.

9.    Death of Participant.  Any distribution or delivery to be made to Participant under this Award Agreement will, if Participant is then deceased, be made to Participant's designated beneficiary, or if no beneficiary survives Participant, the administrator or executor of Participant's estate.  Any such transferee must furnish the Company with (a) written notice of his or her status as transferee, and (b) evidence satisfactory to the Company to establish the validity of the transfer and compliance with any laws or regulations pertaining to said transfer.

-3-

Exhibit 7
Page 1173

10.     Tax Withholding. Pursuant to such procedures as the Administrator may specify from time to time, the Company shall withhold the minimum amount required to be withheld for the payment of income, employment and other taxes which the Company determines must be withheld (the "Withholding Taxes"). As indicated in Part I of this Award Agreement, the Participant shall satisfy such Withholding Taxes, in whole or in part (without limitation) by (a) paying cash, (b) electing to have the Company withhold otherwise deliverable Shares having a Fair Market Value equal to the amount of such Withholding Taxes, (c) withholding the amount of such Withholding Taxes from Participant's paycheck(s), or (d) delivering to the Company already vested and owned Shares having a Fair Market Value equal to such Withholding Taxes. If the Participant does not specify how such Withholding Taxes will be satisfied, to the extent determined appropriate by the Company in its discretion, it shall have the right (but not the obligation) to satisfy any tax withholding obligations by reducing the number of Shares otherwise deliverable to Participant. If Participant fails to make satisfactory arrangements for the payment of such Withholding Taxes hereunder at the time any applicable portion of the Restricted Stock Unit Award otherwise is scheduled to vest pursuant to Sections 4 or 6, Participant will permanently forfeit such vested portion of Restricted Stock Unit Award and any right to receive Shares thereunder and such portion of the Restricted Stock Unit Award will be returned to the Company at no cost to the Company. Participant acknowledges and agrees that the Company may refuse to deliver the Shares if such Withholding Taxes are not delivered at the time they are due.

11.     Rights as Stockholder. Neither Participant nor any person claiming under or through Participant will have any of the rights or privileges of a stockholder of the Company in respect of any Shares deliverable hereunder unless and until certificates representing such Shares will have been issued, recorded on the records of the Company or its transfer agents or registrars, and delivered to Participant. After such issuance, recordation and delivery, Participant will have all the rights of a stockholder of the Company with respect to voting such Shares and receipt of dividends and distributions on such Shares.

12.     No Guarantee of Continued Service. PARTICIPANT ACKNOWLEDGES AND AGREES THAT THE VESTING OF THE RESTRICTED STOCK UNIT AWARD PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY PROVIDING CONTINUOUS SERVICE AT THE WILL OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING PARTICIPANT) AND NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS RESTRICTED STOCK UNIT AWARD OR ACQUIRING SHARES HEREUNDER. PARTICIPANT FURTHER ACKNOWLEDGES AND AGREES THAT THIS AWARD AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH PARTICIPANT'S RIGHT OR THE RIGHT OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING PARTICIPANT) TO TERMINATE PARTICIPANT'S CONTINOUS TO THE COMPANY AT ANY TIME, WITH OR WITHOUT CAUSE.

13.     Grant is Not Transferable. Except to the limited extent provided in Section 9, this grant and the rights and privileges conferred hereby will not be transferred, assigned, pledged or hypothecated in any way (whether by operation of law or otherwise) and will not be subject to sale under execution, attachment or similar process. Upon any attempt to transfer, assign, pledge, hypothecate or otherwise dispose of this grant, or any right or privilege conferred hereby, or upon any attempted sale under any execution, attachment or similar process, this grant and the rights and privileges conferred hereby immediately will become null and void.

14.     Company's Right of First Refusal. Shares of Common Stock that Participant acquires pursuant to this Award Agreement are subject to any right of first refusal that may be described in the Company's bylaws in effect at such time the Company elects to exercise its right. The Company's right of first refusal shall expire on the first date upon which any security of the Company is listed (or approved for listing) upon notice of issuance on a national securities exchange or quotation system.

Exhibit 7
Page 1174

15.    <u>Restrictive Legends and Stop-Transfer Orders</u>.

(a)    <u>Legends</u>.  Participant understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or federal securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL IN FAVOR OF THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE RESTRICTED STOCK UNIT AWARD AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.  SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL IN FAVOR OF THE ISSUER OR ITS ASSIGNEE(S) ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD OF TIME FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES SET FORTH IN AN AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER PRIOR TO THE EXPIRATION OF SUCH PERIOD WITHOUT THE CONSENT OF THE COMPANY OR THE MANAGING UNDERWRITER.

(b)    <u>Stop-Transfer Notices</u>.  Participant agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company  transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)    <u>Refusal to Transfer</u>.  The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Award Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

16.    <u>Notice</u>.  Any notice, demand or request required or permitted to be given by either the Company or Participant pursuant to the terms of this Agreement shall be in writing and shall be deemed given when delivered personally or deposited in the U.S. mail, First Class with postage prepaid, and addressed to the parties at the addresses of the parties set forth at the end of this Agreement or such other address as a party may request by notifying the other in writing.

-5-

Exhibit 7
Page 1175

17.     Electronic Delivery.  The Company may, in its sole discretion, decide to deliver any documents related to the Restricted Stock Unit Award under the Plan or any future Restricted Stock Unit Awards that under the Plan by electronic means or request Participant's consent to participate in the Plan by electronic means.  Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through any on-line or electronic system established and maintained by the Company or another third party designated by the Company.

18.     No Waiver.  Either party's failure to enforce any provision or provisions of this Agreement shall not in any way be construed as a waiver of any such provision or provisions, nor prevent that party from thereafter enforcing each and every other provision of this Agreement.  The rights granted both parties herein are cumulative and shall not constitute a waiver of either party's right to assert all other legal remedies available to it under the circumstances.

19.     Successors and Assigns.  The Company may assign any of its rights under this Agreement to single or multiple assignees, and this Agreement shall inure to the benefit of the successors and assigns of the Company.  Subject to the restrictions on transfer herein set forth, this Agreement shall be binding upon Participant and his or her heirs, executors, administrators, successors and assigns.  The rights and obligations of Participant under this Agreement may only be assigned with the prior written consent of the Company.

20.     Additional Conditions to Issuance of Stock.  If at any time the Company will determine, in its discretion, that the listing, registration or qualification of the Shares upon any securities exchange or under any state or federal law, or the consent or approval of any governmental regulatory authority is necessary or desirable as a condition to the issuance of Shares to Participant (or his or her estate), such issuance will not occur unless and until such listing, registration, qualification, consent or approval will have been effected or obtained free of any conditions not acceptable to the Company.  Where the Company determines that the delivery of the payment of any Shares will violate federal securities laws or other applicable laws, the Company will defer delivery until the earliest date at which the Company reasonably anticipates that the delivery of Shares will no longer cause such violation.  The Company will make all reasonable efforts to meet the requirements of any such state or federal law or securities exchange and to obtain any such consent or approval of any such governmental authority.

21.     Interpretation.  The Administrator will have the power to interpret the Plan and this Award Agreement and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith and to interpret or revoke any such rules (including, but not limited to, the determination of whether or not any portion of the Restricted Stock Unit Award has vested).  All actions taken and all interpretations and determinations made by the Administrator in good faith will be final and binding upon Participant, the Company and all other interested persons.  Neither the Administrator nor any person acting on behalf of the Administrator will be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or this Award Agreement.

22.     Modifications to the Agreement.  This Award Agreement constitutes the entire understanding of the parties on the subjects covered.  Participant expressly warrants that he or she is not accepting this Award Agreement in reliance on any promises, representations, or inducements other than those contained herein.  Modifications to this Award Agreement or the Plan can be made only in an express written contract executed by a duly authorized officer of the Company.  Notwithstanding anything to the contrary in the Plan or this Award Agreement, the Company reserves the right to revise this Award Agreement as it deems necessary or advisable, in its sole discretion and without the consent of Participant, to comply with Section 409A or to otherwise avoid imposition of any additional tax or income recognition under Section 409A in connection to this Restricted Stock Unit Award.

Exhibit 7
Page 1176

23.      Governing Law; Severability. This Award Agreement is governed by the internal substantive laws, but not the choice of law rules, of Delaware. In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Award Agreement shall continue in full force and effect.

24.      Entire Agreement. The Plan is incorporated herein by reference. The Plan and this Award Agreement (including the exhibits referenced herein) constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof, and may not be modified adversely to the Participant's interest except by means of a writing signed by the Company and Participant.

Participant acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts this Award Agreement subject to all of the terms and provisions thereof.  Participant has reviewed the Plan and this Award Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Award Agreement and fully understands all provisions of this Award Agreement.  Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or this Award Agreement.  Participant further agrees to notify the Company upon any change in the residence address indicated below.

PARTICIPANT:                                    OWLET BABY CARE, INC.


_____                _____
Signature                                       By


_____                _____
Print Name                                      Title

Residence Address:


_____


_____


-7-

Exhibit 7
Page 1177

EXHIBIT 2

**INVESTMENT REPRESENTATION STATEMENT**

PARTICIPANT          :

COMPANY              :          OWLET BABY CARE, INC.

SECURITY             :          COMMON STOCK

AMOUNT               :

DATE                 :

In connection with the receipt of the above-listed Securities, the undersigned Participant represents to the Company the following:

(a)          Participant is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities. Participant is acquiring these Securities for investment for Participant's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the "Securities Act").

(b)          Participant acknowledges and understands that the Securities constitute "restricted securities" under the Securities Act and have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Participant's investment intent as expressed herein. In this connection, Participant understands that, in the view of the Securities and Exchange Commission, the statutory basis for such exemption may be unavailable if Participant's representation was predicated solely upon a present intention to hold these Securities for the minimum capital gains period specified under tax statutes, for a deferred sale, for or until an increase or decrease in the market price of the Securities, or for a period of one year or any other fixed period in the future. Participant further understands that the Securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Participant further acknowledges and understands that the Company is under no obligation to register the Securities. Participant understands that the certificate evidencing the Securities shall be imprinted with any legend required under applicable state securities laws.

(c)          Participant is familiar with the provisions of Rule 701 and Rule 144, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly from the issuer thereof, in a non-public offering subject to the satisfaction of certain conditions.  Rule 701 provides that if the issuer qualifies under Rule 701 at the time of the grant of the Restricted Stock Unit Award to Participant, the exercise shall be exempt from registration under the Securities Act.  In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, ninety (90) days thereafter (or such longer period as any market stand-off agreement may require) the Securities exempt under Rule 701 may be resold, subject to the satisfaction of the applicable conditions specified by Rule 144, including in the case of affiliates (1) the availability of certain public information about the Company, (2) the amount of Securities being sold during any three (3) month period not exceeding specified limitations, (3) the resale being made in an unsolicited "broker's transaction", transactions directly with a "market maker" or "riskless principal transactions" (as those terms are defined under the Securities Exchange Act of 1934) and (4) the timely filing of a Form 144, if applicable.

-8-

Exhibit 7
Page 1178

In the event that the Company does not qualify under Rule 701 at the time of grant of the Restricted Stock Unit Award, then the Securities may be resold in certain limited circumstances subject to the provisions of Rule 144, which may require (i) the availability of current public information about the Company; (ii) the resale to occur more than a specified period after the purchase and full payment (within the meaning of Rule 144) for the Securities; and (iii) in the case of the sale of Securities by an affiliate, the satisfaction of the conditions set forth in sections (2), (3) and (4) of the paragraph immediately above.

(d)     Participant further understands that in the event all of the applicable requirements of Rule 701 or 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption shall be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rules 144 or 701 shall have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk. Participant understands that no assurances can be given that any such other registration exemption shall be available in such event.

PARTICIPANT

_____

Signature

_____

Print Name

_____

Date

-9-

Exhibit 7
Page 1179

Exhibit 10.8

**OWLET BABY CARE INC.**
2500 EXECUTIVE PARKWAY SUITE 500
LEHI, UT 84043

March 29, 2021

Mike Abbott

Dear Mike,

You and Owlet Baby Care Inc. ("Owlet") are parties to employment change offer letters executed on February 8, 2021, January 26, 2021 and December 13, 2019 (the "Change Letters"), and an employment offer letter executed on January 26, 2018 (the "Original Offer Letter"), which set forth the terms and conditions of your employment with Owlet. This letter amends and restates the Change Letters and the Original Offer Letter in its entirety and reflects the changes to the terms of your continued employment with Owlet in the position of **President** and reporting to **the Board of Directors**. By signing this letter, your Original Offer Letter and Change Letters will be of no further force or effect and you will be accepting continued employment on the following terms.

**Base Salary:** You will receive a bi-weekly amount of **$17,307.69,** the equivalent of **$450,000** annually.

**Status:** Full-time, Salary Exempt.

**Bonus Potential 2021:** Based on the achievement of performance goals set by the Board of Directors, you are eligible for an annual bonus of 50% of your base salary (the "Annual Bonus"), payable on or before March 15, 2022.

**Severance:** In the event that Owlet terminates your employment for other than Cause (as defined below), then, subject to your delivery to Owlet of a general release of claims in a form acceptable to Owlet (a "Release") that becomes effective and irrevocable within 60 days following your termination of employment (or such shorter time as specified by Owlet) and your continued compliance with all applicable restrictive covenants, including, without limitation, your Confidentiality Agreement (as defined below), Owlet will pay you a cash severance payment equal to (i) **12 months** of your annual base salary at the rate in effect immediately prior to your date of termination plus (ii) if and only if your employment is terminated other than for Cause on or prior to December 31, 2021, a prorated portion of your target Annual Bonus assuming achievement of the performance goals at 100% based on the number of days you were employed by the Company during 2021, less required withholding taxes and authorized deductions, in a single lump sum on the first payroll date following the date your release of claims becomes effective and irrevocable (subject to the terms and conditions set forth on **Exhibit A**).

For the purposes of this letter, "Cause" means (i) your conviction of, or the entering a plea of guilty or no contest to, any felony or any crime involving moral turpitude, (ii) your commission of an act of fraud, embezzlement, misappropriation, willful misconduct or breach of fiduciary duty against Owlet or other similar conduct, (iii) your commission of a material breach of any of the covenants, terms and provisions of the Confidentiality Agreement, this offer letter of employment with Owlet, or any other agreement between you and Owlet which is entered into after the date of this offer letter, (iv) your misrepresentation of any material fact to Owlet or Owlet's board of directors, as determined by the board of directors, in its sole discretion, or (v) your willful and repeated failure to perform assigned duties or responsibilities as Owlet's President, which failure is not corrected by you to the satisfaction of Owlet within fifteen (15) days after written notice from Owlet.

**Cash Compensation:**

- $125,000, less applicable withholdings and deductions – paid on April 27, 2021 or after the closing of closing of the transactions contemplated by that certain Business Combination Agreement entered into on or about February 15, 2021, by and among Owlet, Sandbridge Acquisition Corporation, a Delaware corporation, and Project Olympus Merger Sub, Inc., a Delaware corporation, whichever occurs first, subject to your continued employment through such earlier date.

**Reimbursement of Expenses:** All reasonable business expenses that are documented by you, with receipts, and incurred in the ordinary course of business will be reimbursed in accordance with the Company's standard policies and procedures.

Exhibit 7
Page 1180

**OWLET BABY CARE INC.**
2500 EXECUTIVE PARKWAY SUITE 500
LEHI, UT 84043



**Employee Benefits:** You will continue to be eligible to participate in Company-sponsored benefits including health benefits, holidays, 401(k) program with employer match, and other benefits that the Company may offer to similarly-situated employees from time to time. Your continued eligibility to receive such benefits will be subject in each case to the generally applicable terms and conditions for the benefits in question and to the determinations of any person or committee administering such benefits. You will continue to be covered by worker's compensation insurance, state disability insurance and other governmental benefit programs as required by state law.

The Company may from time to time, in its sole discretion, amend or terminate the benefits available to you and the Company's other employees.

**Options:**  If for any reason you are terminated for other than Cause, then 100% of the then-unvested shares subject to any outstanding options you hold at the time of such termination shall automatically vest on the date of such termination, contingent upon your execution and delivery, and not revoking, of a Release within sixty (60) days following your termination date (or such shorter time as specified by Owlet), and your continued compliance with all applicable restrictive covenants, including without limitation, your Confidentiality Agreement.

**At-Will Employment:** Your employment with the Company is "at-will." In other words, either you or the Company can terminate your employment at any time for any reason, with or without cause and with or without notice, without liability except as expressly set forth in this letter. No representative of the Company has authority to enter into any agreement contrary to the foregoing "employment at will" relationship.

**Adjustments and Changes in Employment Status**: The Company reserves the right to make personnel decisions regarding your employment, including but not limited to, decisions regarding any transfers or other changes in duties or assignments, changes in your salary and other compensation, changes in benefits and changes in Company policies or procedures.

**Proprietary Information Agreement:** You acknowledge and agree to be bound by and abide by the terms of that certain Proprietary Information and Inventions Agreement by and between you and the Company (the "Confidentiality Agreement"), which include, among other provisions, the assignment of patent rights to any invention made during your employment at the Company, and non-disclosure of the Company's proprietary information.

**No Conflicting Obligations:** By executing this letter, you represent and warrant that your performance of this letter does not and will not breach any agreement you have entered into, or will enter into, with any other party. You must disclose to the Company any and all agreements relating to your prior employment that may affect your eligibility to be employed by the Company or limit the manner in which you may be employed. You shall not engage in any other employment, occupation, consulting, or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of your employment, nor will you engage in any other activities that conflict with your obligations to the Company. Similarly, you agree not to bring any third-party confidential information to the Company, including that of any former employer, and that you will not in any way utilize any such information in performing your duties for the Company. It is the Company's understanding that any such agreements will not prevent you from performing the duties of your position and you represent that such is the case. By signing this letter, you represent and warrant that: (i) you are not subject to any pre-existing contractual or other legal obligation with any person, company or business enterprise which may be an impediment to, or a conflict of interest with, your employment with the Company, or your providing services to the Company as its employee; (ii) you do not have and shall not bring onto the Company's premises, or use in the course of your employment with the Company, any confidential or proprietary information of another person, company or business enterprise to whom you previously provided services; and (iii) you will not, at any time during your employment with the Company, breach any obligation or agreement that you have entered into with any third party, including your former employers. You agree not to enter into any written or oral agreement that conflicts with this letter.

**Integrated Agreement:** This letter supersedes any prior agreements, representations or promises of any kind, whether written, oral, express or implied between the parties hereto with respect to its subject matter, including the Original Offer Letter and the Change Letters. Likewise, this letter will constitute the full, complete and exclusive agreement between you and the Company with respect to its subject matter. This Agreement may only be changed by a writing, signed by you and an authorized representative of the Company.

Exhibit 7
Page 1181

**OWLET BABY CARE INC.**
2500 EXECUTIVE PARKWAY SUITE 500
LEHI, UT 84043



**Severability:** If any term of this letter is held to be invalid, void or unenforceable, the remainder of the terms herein will remain in full force and effect and will in no way be affected, and the parties will use their best efforts to find an alternative way to achieve the same result.

**Governing Law**: The terms of this letter and the resolution of any dispute as to the meaning, effect, performance or validity of this letter or arising out of, related to, or in any way connected with, this letter, your employment with the Company or any other relationship between you and the Company (a "Dispute") will be governed by the laws of the State of Utah, without giving effect to the principles of conflict of laws. To the extent not subject to arbitration as described in the Mutual Agreement to Arbitrate Claims entered into by and between you and the Company, you and the Company consent to the exclusive jurisdiction of, and venue in, the state courts in Utah County in the State of Utah (or in the event of exclusive federal jurisdiction, the courts of the District of Utah in connection with any Dispute or any claim related to any Dispute).

To confirm your agreement with and acceptance of these terms, please sign this letter and return it to me.

**Sincerely,**

**Owlet Baby Care Inc.**

/s/ Kim Arnold

**Kim Arnold**
**Director of Human Resources**
**kim.a@owletcare.com**
**801-901-0336**

**Acknowledgment and Acceptance of Amended and Restated Employment Offer**

I accept continued employment with Owlet Baby Care Inc. and acknowledge and fully agree to the terms and conditions set forth in this amended and restated offer letter:

| | |
|---|---|
| /s/ Mike Abbott | 03/30/2021 |
| Mike Abbott | Date |

Exhibit 7
Page 1182

**OWLET BABY CARE INC.**
2500 EXECUTIVE PARKWAY SUITE 500
LEHI, UT 84043



**EXHIBIT A**

The payment and benefits under the letter are intended to qualify for an exemption from application of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), or comply with its requirements to the extent necessary to avoid adverse personal tax consequences under Section 409A of the Code. To the extent that any provision of the letter is ambiguous as to its exemption from or compliance with Section 409A of the Code, the provision shall be read in such a manner so that all payments hereunder are exempt from, or if not exempt from, comply with, Section 409A of the Code.

Anything in the letter to the contrary notwithstanding, if at the time of your separation from service within the meaning of Section 409A of the Code, Owlet determines that you are a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code, then to the extent any payment or benefit that you become entitled to under the letter on account of your separation from service would be considered deferred compensation subject to additional tax imposed pursuant to Section 409A(a) of the Code, such payment shall not be payable and such benefit shall not be provided until the date that is the earlier of (A) six months and one day after your separation from service, or (B) your death.

Your right, if any, to receive installment payments pursuant to the letter shall be treated as a right to receive a series of separate and distinct payments.

To the extent that any reimbursements payable pursuant to the letter are subject to the provisions of Section 409A of the Code, any such reimbursements payable to you pursuant to the letter shall be paid to you no later than December 31 of the year following the year in which the expense was incurred, the amount of expenses reimbursed in one year shall not affect the amount eligible for reimbursement in any subsequent year, and your right to reimbursement under the letter will not be subject to liquidation or exchange for another benefit.

Notwithstanding anything in the letter to the contrary, if any payment or distribution you would receive pursuant to this letter or otherwise ("Payment") would (i) constitute a "parachute payment" within the meaning of Section 280G of the Code, and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the "Excise Tax"), then Owlet shall cause to be determined, before any amounts of the Payment are paid to you, which of the following alternative forms of payment would maximize your after-tax proceeds: (A) payment in full of the entire amount of the Payment or (B) payment of only a part of the Payment so that you receive that largest Payment possible without being subject to the Excise Tax, whichever of the foregoing amounts, taking into account the applicable federal, state and local income taxes and the Excise Tax (all computed at the highest marginal rate, net of the maximum reduction in federal income taxes which could be obtained from a deduction of such state and local taxes), results in your receipt, on an after-tax basis, of the greater amount of the Payment, notwithstanding that all or some portion the Payment may be subject to the Excise Tax. If necessary, the specific Payments that shall be reduced will occur in the following order: (1) reduction of cash payments; (2) cancellation of accelerated vesting of equity awards other than stock options; (3) cancellation of accelerated vesting of stock options; and (4) reduction of other benefits payable to you. All determinations shall be made by such adviser as may be selected by Owlet, provided, that the adviser's determination shall be made based upon "substantial authority" within the meaning of Section 6662 of the Code. The adviser shall provide its determination, together with detailed supporting calculations and documentation, to you and Owlet within fifteen (15) business days following the date of termination of your employment, if applicable, or such other time as requested by you (provided, that you reasonably believe that any of the Payments may be subject to the Excise Tax) or Owlet. All reasonable fees and expenses of the adviser in reaching such a determination shall be borne solely by Owlet.

Exhibit 7
Page 1183

**Exhibit 10.9**

**OWLET BABY CARE INC.**
2500 EXECUTIVE PARKWAY SUITE 500
LEHI, UT 84043



March 29, 2021

Kurt Workman

Dear Kurt:

You and Owlet Baby Care Inc. ("Owlet"), are parties to an employment offer letter executed on January 10, 2021 (the "Original Offer Letter"), which sets forth the terms and conditions of your employment with Owlet.  This letter amends and restates the Original Offer Letter in its entirety and reflects the changes to the terms of your continued employment with Owlet in the position of **CEO** and reporting to **the Board of Directors** . By signing this letter, your Original Offer Letter will be of no further force or effect and you will be accepting continued employment on the following terms.

**Base Salary:** You will receive a bi-weekly payment of **$13,461.54** equivalent to **$350,000** on an annual basis.

**Status:** Full-time, Salary Exempt.

**Severance:**  In the event that Owlet terminates your employment for other than Cause (as defined below), then, subject to your delivery to Owlet of a general release of claims in a form acceptable to Owlet (a "Release") that becomes effective and irrevocable within 60 days following your termination of employment (or such shorter time as specified by Owlet) and your continued compliance with all applicable restrictive covenants, including, without limitation, your Confidentiality Agreement (as defined below), Owlet will pay you a cash severance payment equal to **6 months** of your annual base salary at the rate in effect immediately prior to your date of termination, less required withholding taxes and authorized deductions, in a single lump sum on the first payroll date following the date your release of claims becomes effective and irrevocable (subject to the terms and conditions set forth on **Exhibit A**).

**Board of Directors:**  You were initially elected to serve on the **CEO seat** on the Board.

**Reimbursement of Expenses:** All reasonable business expenses that are documented by you, with receipts, and incurred in the ordinary course of business will be reimbursed in accordance with the Company's standard policies and procedures.

**Employee Benefits:** You will continue to be eligible to participate in Company-sponsored benefits including health benefits, holidays, 401(k) program with employer match, and other benefits that the Company may offer to similarly-situated employees from time to time. Your continued eligibility to receive such benefits will be subject in each case to the generally applicable terms and conditions for the benefits in question and to the determinations of any person or committee administering such benefits. You will continue to be covered by worker's compensation insurance, state disability insurance and other governmental benefit programs as required by state law.

**<u>Additional Benefits</u>:**

- **Flex-time Scheduling:** Flex-time scheduling encompasses sick, vacation, and personal time. Flex-time is approved by your manager.
- **Product Discounts**: Owlet employees may purchase products for a discount.
- **Paid Holidays**
- **Babysitting/Entertainment Reimbursement**: In order to have a balanced work/home life, Owlet will reimburse $60.00/month, per employee, for babysitting and/or entertainment costs.
- **HSA**:  Owlet will contribute to an HSA Account, with participation in the High Deductible Health Insurance Plan.

The Company may from time to time, in its sole discretion, amend or terminate the benefits available to you and the Company's other employees.

Exhibit 7
Page 1184

**OWLET BABY CARE INC.**
2500 EXECUTIVE PARKWAY SUITE 500
LEHI, UT 84043



---

**Options:** The Company previously granted you an option to purchase **.35% (168,498)** shares of the Company's total fully diluted capitalization on the date of the Original Offer Letter(the "Option"), with a per share exercise price determined by the Company's board of directors (the "Board"), on the date the Option is granted and which shall be based on the most current 409A valuation report representing the fair market value of a share of the Company's common stock on the date of grant. The Option is subject to the terms and conditions applicable to options granted under the Company's 2014 Equity Incentive Plan (the "Plan"), as described in the Plan and the applicable stock option agreement entered into by and between you and the Company. Your Option vests in accordance with the following schedule, as described in the applicable stock option agreement: 1/48th of the shares subject to the Option shall vest on the date that is one month after the vesting commencement date; and 1/48th of the shares subject to the Option shall vest over the next forty-seven (47) months on the same day, subject to your continued service with the Company through each vesting date, such that the Option will be 100% vested on the fourth anniversary of the vesting commencement date.

**Double-Trigger Acceleration:** Notwithstanding the foregoing, in the event your employment with the Company (or the Company's successor) is either (i) terminated by the Company (or the Company's successor) without Cause or (ii) terminated by you for Good Reason (as defined below), within twelve (12) months after a Change in Control Transaction (as defined below), then 100% of the then-unvested shares subject to the Option shall automatically vest on the date of such termination, contingent upon your execution and delivery, and not revoking, of a Release within sixty (60) days following your termination date (or such shorter time as specified by Owlet), and your continued compliance with all applicable restrictive covenants, including, without limitation, your Confidentiality Agreement.

**Definitions.**

1.  "Cause" shall mean (i) your conviction of, or the entering a plea of guilty or no contest to, any felony or any crime involving moral turpitude, (ii) your commission of an act of fraud, embezzlement, misappropriation, willful misconduct or breach of fiduciary duty against the Company or other similar conduct, (iii) your commission of a material breach of any of the covenants, terms and provisions of the Confidentiality Agreement, this offer letter of employment with the Company, or any other agreement between you and the Company which is entered into after the date of this offer letter, (iv) your misrepresentation of any material fact to the Company or the Board, as determined by the Board, in its sole discretion, or (v) your willful and repeated failure to perform assigned duties or responsibilities as the Company's Chief Executive Officer, which failure is not corrected by you to the satisfaction of the Company within fifteen (15) days after written notice from the Board.

2.  "Change in Control Transaction" shall mean a Change in Control, as defined in the 2014 Equity Incentive Plan.

3.  "Good Reason" shall mean, without your written consent, (i) a material reduction of your duties or responsibilities relative to your duties or responsibilities in effect immediately prior to such reduction provided, however, that a reduction in duties or responsibilities solely by virtue of the Company being acquired and made part of a larger entity (as, for example, when the Chief Executive Officer of the Company remains as such following a Change in Control but is not made the Chief Executive Officer of the acquiring corporation) will not constitute "Good Reason"; (ii) a material reduction by the Company in your base salary as in effect immediately prior to such reduction, except for any such reductions which affect all similarly situated employees of the Company to the same degree; (iii) your relocation to a facility or a location more than fifty (50) miles from the Company's Lehi office, or (iv) any material breach by the Company of this letter.  In order for you to resign for Good Reason, you must provide written notice to the Company of the existence of the Good Reason condition within 60 days of the initial existence of such Good Reason condition. Upon receipt of such notice, the Company will have 30 days during which it may remedy the Good Reason condition. If the Good Reason condition is not remedied within such 30-day period, you may resign based on the Good Reason condition specified in the notice effective no later than 30 days following the expiration of the 30-day cure period.

**At-Will Employment:** Your employment with the Company is "at-will." In other words, either you or the Company can terminate your employment at any time for any reason, with or without cause and with or without notice, without liability except as expressly set forth in this letter. No representative of the Company has authority to enter into any agreement contrary to the foregoing "employment at will" relationship.

---

Exhibit 7
Page 1185

**OWLET BABY CARE INC.**
2500 EXECUTIVE PARKWAY SUITE 500
LEHI, UT 84043



---

**Adjustments and Changes in Employment Status**: The Company reserves the right to make personnel decisions regarding your employment, including but not limited to, decisions regarding any transfers or other changes in duties or assignments, changes in your salary and other compensation, changes in benefits and changes in Company policies or procedures.

**Proprietary Information Agreement:** You acknowledge and agree to be bound by and abide by the terms of that certain Proprietary Information and Inventions Agreement by and between you and the Company (the "Confidentiality Agreement"), which include, among other provisions, the assignment of patent rights to any invention made during your employment at the Company, and non-disclosure of the Company's proprietary information.

**No Conflicting Obligations:** By executing this letter, you represent and warrant that your performance of this letter does not and will not breach any agreement you have entered into, or will enter into, with any other party. You must disclose to the Company any and all agreements relating to your prior employment that may affect your eligibility to be employed by the Company or limit the manner in which you may be employed. You shall not engage in any other employment, occupation, consulting, or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of your employment, nor will you engage in any other activities that conflict with your obligations to the Company. Similarly, you agree not to bring any third-party confidential information to the Company, including that of any former employer, and that you will not in any way utilize any such information in performing your duties for the Company. It is the Company's understanding that any such agreements will not prevent you from performing the duties of your position and you represent that such is the case. By signing this letter, you represent and warrant that: (i) you are not subject to any pre-existing contractual or other legal obligation with any person, company or business enterprise which may be an impediment to, or a conflict of interest with, your employment with the Company, or your providing services to the Company as its employee; (ii) you do not have and shall not bring onto the Company's premises, or use in the course of your employment with the Company, any confidential or proprietary information of another person, company or business enterprise to whom you previously provided services; and (iii) you will not, at any time during your employment with the Company, breach any obligation or agreement that you have entered into with any third party, including your former employers. You agree not to enter into any written or oral agreement that conflicts with this letter.

**Integrated Agreement:** This letter supersedes any prior agreements, representations or promises of any kind, whether written, oral, express or implied between the parties hereto with respect to its subject matter, including the Original Offer Letter. Likewise, this letter will constitute the full, complete and exclusive agreement between you and the Company with respect to its subject matter. This Agreement may only be changed by a writing, signed by you and an authorized representative of the Company.

**Severability:** If any term of this letter is held to be invalid, void or unenforceable, the remainder of the terms herein will remain in full force and effect and will in no way be affected, and the parties will use their best efforts to find an alternative way to achieve the same result.

**Governing Law:** The terms of this letter and the resolution of any dispute as to the meaning, effect, performance or validity of this letter or arising out of, related to, or in any way connected with, this letter, your employment with the Company or any other relationship between you and the Company (a "Dispute") will be governed by the laws of the State of Utah, without giving effect to the principles of conflict of laws. To the extent not subject to arbitration as described in the Mutual Agreement to Arbitrate Claims entered into by and between you and the Company, you and the Company consent to the exclusive jurisdiction of, and venue in, the state courts in **Utah County** in the State of Utah (or in the event of exclusive federal jurisdiction, the courts of the District of Utah in connection with any Dispute or any claim related to any Dispute).

To confirm your agreement with and acceptance of these terms, please sign this letter and return it to me.

**Sincerely,**

**Owlet Baby Care Inc.**

**/s/ Kim Arnold**

**Kim Arnold**
**Director of Human Resources**
**kim.a@owletcare.com**
**801-901-0336**

---

Exhibit 7
Page 1186

**OWLET BABY CARE INC.**
2500 EXECUTIVE PARKWAY SUITE 500
LEHI, UT 84043

---

**Acknowledgment and Acceptance of Amended and Restated Employment Offer**

I accept continued employment with Owlet Baby Care Inc. and acknowledge and fully agree to the terms and conditions set forth in this amended and restated offer letter:

| | |
|---|---|
| /s/ Kurt Workman | 03/29/2021 |
| Kurt Workman | Date |

Exhibit 7
Page 1187

**OWLET BABY CARE INC.**
2500 EXECUTIVE PARKWAY SUITE 500
LEHI, UT 84043



---

### EXHIBIT A

The payment and benefits under the letter are intended to qualify for an exemption from application of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), or comply with its requirements to the extent necessary to avoid adverse personal tax consequences under Section 409A of the Code. To the extent that any provision of the letter is ambiguous as to its exemption from or compliance with Section 409A of the Code, the provision shall be read in such a manner so that all payments hereunder are exempt from, or if not exempt from, comply with, Section 409A of the Code.

Anything in the letter to the contrary notwithstanding, if at the time of your separation from service within the meaning of Section 409A of the Code, Owlet determines that you are a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code, then to the extent any payment or benefit that you become entitled to under the letter on account of your separation from service would be considered deferred compensation subject to additional tax imposed pursuant to Section 409A(a) of the Code, such payment shall not be payable and such benefit shall not be provided until the date that is the earlier of (A) six months and one day after your separation from service, or (B) your death.

Your right, if any, to receive installment payments pursuant to the letter shall be treated as a right to receive a series of separate and distinct payments.

To the extent that any reimbursements payable pursuant to the letter are subject to the provisions of Section 409A of the Code, any such reimbursements payable to you pursuant to the letter shall be paid to you no later than December 31 of the year following the year in which the expense was incurred, the amount of expenses reimbursed in one year shall not affect the amount eligible for reimbursement in any subsequent year, and your right to reimbursement under the letter will not be subject to liquidation or exchange for another benefit.

Notwithstanding anything in the letter to the contrary, if any payment or distribution you would receive pursuant to this letter or otherwise ("Payment") would (i) constitute a "parachute payment" within the meaning of Section 280G of the Code, and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the "Excise Tax"), then Owlet shall cause to be determined, before any amounts of the Payment are paid to you, which of the following alternative forms of payment would maximize your after-tax proceeds: (A) payment in full of the entire amount of the Payment or (B) payment of only a part of the Payment so that you receive that largest Payment possible without being subject to the Excise Tax, whichever of the foregoing amounts, taking into account the applicable federal, state and local income taxes and the Excise Tax (all computed at the highest marginal rate, net of the maximum reduction in federal income taxes which could be obtained from a deduction of such state and local taxes), results in your receipt, on an after-tax basis, of the greater amount of the Payment, notwithstanding that all or some portion the Payment may be subject to the Excise Tax. If necessary, the specific Payments that shall be reduced will occur in the following order: (1) reduction of cash payments; (2) cancellation of accelerated vesting of equity awards other than stock options; (3) cancellation of accelerated vesting of stock options; and (4) reduction of other benefits payable to you. All determinations shall be made by such adviser as may be selected by Owlet, provided, that the adviser's determination shall be made based upon "substantial authority" within the meaning of Section 6662 of the Code. The adviser shall provide its determination, together with detailed supporting calculations and documentation, to you and Owlet within fifteen (15) business days following the date of termination of your employment, if applicable, or such other time as requested by you (provided, that you reasonably believe that any of the Payments may be subject to the Excise Tax) or Owlet. All reasonable fees and expenses of the adviser in reaching such a determination shall be borne solely by Owlet.

---

Exhibit 7
Page 1188

**Exhibit 10.10**

March 3, 2021

Kate Scolnick

Dear Kate:

Congratulations! We are excited to offer you the position of **CFO** at Owlet Baby Care Inc. located in Lehi, Utah and reporting to **Mike Abbott - President**. This letter sets forth the terms and conditions of your employment with the Company. It is important that you understand clearly both what your compensation and benefits are and what the Company expects of you. By signing this letter, you will be accepting employment on the following terms.

**Responsibilities:**

Owlet is seeking a highly strategic and collaborative Chief Financial Officer (CFO) to join as a key member of the executive team to lead the company through an exceptional growth phase. Reporting to the President, the CFO will oversee all global aspects of Owlet's finance, accounting and investor relations.

- Provide insightful and trusted counsel to the management team and Board on financial and business issues related to Owlet's overall performance.

- Spearhead and prepare Owlet for public company readiness through the development of public company compliance processes, timely reporting procedures, and implementation of scalable solutions across the finance organization and in collaboration with other departments.

- Develop and enhance a global financial foundation with appropriate systems and processes that will foster effective, scalable, and intelligent growth.

- Lead annual budgeting and planning processes; own and direct all financial plans and budgets; monitor progress against budget and maintain direct and open communication with the senior leadership team in connection with all aspects of Owlet's financial status.

- Build a world-class finance organization. Mentor and grow existing team, attract and hire top talent, and establish infrastructure and processes for scale.

- Be a visible, collaborative leader who communicates early and often with all team members.

**Effective Start Date: March 15, 2021.**

**Base Salary:** You will receive a bi-weekly payment of **$13,461.54** equivalent to **$350,000** on an annual basis.

**Status:** Full-time, Salary Exempt

**Bonus Potential:** You have the potential to earn 40**%** annual bonus, based on company goals. Payment of the bonus will be made within one month following the completion of the Company's financial statement audit, unless otherwise determined by your manager, and will be taxed as compensation. The bonus is contingent upon being employed by Owlet at the time of the payout.

**Signing Bonus:** You will receive a signing bonus of **$37,500** upon hire, and **$37,500** at 90 days successful completion of employment, both taxed as compensation.

**Severance:** In the event of termination without cause, Owlet will guarantee **6-month severance**, equivalent to **$175,000.**

Exhibit 7
Page 1189

**Initial Equity Award:** Subject to the approval of the Company's board of directors (the "Board"), the Company will grant you an equity award covering **240,711** shares of Company common stock (the "Initial Equity Award"). The Initial Equity Award will be in the form of an option to purchase Company common stock, restricted stock units, as determined by the Board, in its sole discretion. The Initial Equity Award will be subject to the terms and conditions of the Company's then- current equity incentive plan and an award agreement to be signed by you and the Company. Your Initial Equity Award will vest over four years, with the first 25% vesting on the first anniversary of the applicable vesting commencement date and the remainder vesting no less frequently than quarterly, in each case, subject to your continued employment with the Company through the applicable vesting date.

**Double-Trigger Acceleration:** Notwithstanding the foregoing, in the event your employment with the Company (or the Company's successor) is either (i) terminated by the Company (or the Company's successor) without Cause (as defined below) or (ii) terminated by you for Good Reason (as defined below), within twelve (12) months after a Change in Control Transaction (as defined below), then 100% of the then-unvested shares subject to the Option shall automatically vest on the date of such termination, contingent upon your execution and delivery, and not revoking, of a separation agreement and general release of claims in favor of the Company in a form acceptable to the Company within sixty (60) days following your termination date, and your continued compliance with all applicable restrictive covenants, including, without limitation, your Confidentiality Agreement (as defined below).

**Definitions.** Solely for purposes of the Option:

1. "Cause" shall mean (i) your conviction of, or the entering a plea of guilty or no contest to, any felony or any crime involving moral turpitude, (ii) your commission of an act of fraud, embezzlement, misappropriation, willful misconduct or breach of fiduciary duty against the Company or other similar conduct, (iii) your commission of a material breach of any of the covenants, terms and provisions of the Confidentiality Agreement, this offer letter of employment with the Company, or any other agreement between you and the Company which is entered into after the date of this offer letter, (iv) your misrepresentation of any material fact to the Company or the Board, as determined by the Board, in its sole discretion, or (v) your willful and repeated failure to perform assigned duties or responsibilities as the Company's Chief Financial Officer, which failure is not corrected by you to the satisfaction of the Company within fifteen (15) days after written notice from the Board.

2. "Change in Control Transaction" shall mean a Change in Control, as defined in the 2014 Equity Incentive Plan.

3. "Good Reason" shall mean, without your written consent, (i) a material reduction of your duties or responsibilities relative to your duties or responsibilities in effect immediately prior to such reduction provided, however, that a reduction in duties or responsibilities solely by virtue of the Company being acquired and made part of a larger entity (as, for example, when the Chief Financial Officer of the Company remains as such following a Change in Control but is not made the Chief Financial Officer of the acquiring corporation) will not constitute "Good Reason"; (ii) a material reduction by the Company in your base salary as in effect immediately prior to such reduction, except for any such reductions which affect all similarly situated employees of the Company to the same degree; or (iii) any material breach by the Company of this letter. In order for you to resign for Good Reason, you must provide written notice to the Company of the existence of the Good Reason condition within 60 days of the initial existence of such Good Reason condition. Upon receipt of such notice, the Company will have 30 days during which it may remedy the Good Reason condition. If the Good Reason condition is not remedied within such 30-day period, you may resign based on the Good Reason condition specified in the notice effective no later than 30 days following the expiration of the 30-day cure period.

**Reimbursement of Expenses:** All reasonable business expenses that are documented by you, with receipts, and incurred in the ordinary course of business will be reimbursed in accordance with the Company's standard policies and procedures.

**Employee Benefits:** You will be eligible to participate in Company-sponsored benefits effective **April 1, 2021**, including health benefits, holidays, 401(k) program with employer match, and other benefits that the Company may offer to similarly-situated employees from time to time. Your eligibility to receive such benefits will be subject in each case to the generally applicable terms and conditions for the benefits in question and to the determinations of any person or

committee administering such benefits. You will be covered by worker's compensation insurance, state disability insurance and other governmental benefit programs as required by state law.

Exhibit 7
Page 1190

**Additional Benefits:**

- **Flex-time Scheduling:** Flex-time scheduling encompasses sick, vacation, and personal time. Flex-time is approved by your manager.

- **Product Discounts**: Owlet employees may purchase products for a discount.

- **Paid Holidays**

- **Babysitting/Entertainment Reimbursement**: In order to have a balanced work/home life, Owlet will reimburse $60.00/month, per employee, for babysitting and/or entertainment costs.

- **HSA**: Owlet will contribute to an HSA Account, with participation in the High Deductible Health Insurance Plan.

The Company may from time to time, in its sole discretion, amend or terminate the benefits available to you and the Company's other employees.

**At-Will Employment:** Your employment with the Company is "at-will." In other words, either you or the Company can terminate your employment at any time for any reason, with or without cause and with or without notice, without liability except as expressly set forth in this letter. No representative of the Company has authority to enter into any agreement contrary to the foregoing "employment at will" relationship.

**Adjustments and Changes in Employment Status**: The Company reserves the right to make personnel decisions regarding your employment, including but not limited to, decisions regarding any transfers or other changes in duties or assignments, changes in your salary and other compensation, changes in benefits and changes in Company policies or procedures.

**Proprietary Information Agreement:** You will be required to sign and abide by the terms of the enclosed Proprietary Information and Inventions Agreement prior to beginning employment, indicating your full agreement to, and ongoing compliance with, the terms of that agreement, which include, among other provisions, the assignment of patent rights to any invention made during your employment at the Company, and non-disclosure of the Company's proprietary information.

**References and Immigration Documents:** This offer is contingent upon your ability to prove your identity and authorization to work in the U.S. for the Company. You must comply with the United States Citizenship and Immigration Services employment verification requirements.

**No Conflicting Obligations:** By executing this letter, you represent and warrant that your performance of this letter does not and will not breach any agreement you have entered into, or will enter into, with any other party. You must disclose to the Company any and all agreements relating to your prior employment that may affect your eligibility to be employed by the Company or limit the manner in which you may be employed. You shall not engage in any other employment, occupation, consulting, or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of your employment, nor will you engage in any other activities that conflict with your obligations to the Company. Similarly, you agree not to bring any third-party confidential information to the Company, including that of any former employer, and that you will not in any way utilize any such information in performing your duties for the Company. It is the Company's understanding that any such agreements will not prevent you from performing the duties of your position and you represent that such is the case. By signing and accepting this offer, you represent and warrant that: (i) you are not subject to any pre-existing contractual or other legal obligation with any person, company or business enterprise which may be an impediment to, or a conflict of interest with, your employment with the Company, or your providing services to the Company as its employee; (ii) you do not have and shall not bring onto the Company's premises, or use in the course of your employment with the Company, any confidential or proprietary information of another person, company or business enterprise to whom you previously provided services; and (iii) you will not, at any time during your employment with the Company, breach any obligation or agreement that you have entered into with any third party, including your former employers. You agree not to enter into any written or oral agreement that conflicts with this letter.

Exhibit 7
Page 1191

**Integrated Agreement:** This letter supersedes any prior agreements, representations or promises of any kind, whether written, oral, express or implied between the parties hereto with respect to its subject matter. Likewise, this letter will constitute the full, complete and exclusive agreement between you and the Company with respect to its subject matter. This Agreement may only be changed by a writing, signed by you and an authorized representative of the Company.

**Severability:** If any term of this letter is held to be invalid, void or unenforceable, the remainder of the terms herein will remain in full force and effect and will in no way be affected, and the parties will use their best efforts to find an alternative way to achieve the same result.

**Governing Law:** The terms of this letter and the resolution of any dispute as to the meaning, effect, performance or validity of this letter or arising out of, related to, or in any way connected with, this letter, your employment with the Company or any other relationship between you and the Company (a "**Dispute**") will be governed by the laws of the State of Utah, without giving effect to the principles of conflict of laws. To the extent not subject to arbitration as described in **Exhibit A**, you and the Company consent to the exclusive jurisdiction of, and venue in, the state courts in **Utah County** in the State of Utah (or in the event of exclusive federal jurisdiction, the courts of the District of Utah in connection with any Dispute or any claim related to any Dispute).

To confirm your agreement with and acceptance of these terms, please sign this letter and return it to me. This offer letter expires on **March 5, 2021.**

If you have any questions regarding these programs, or for more information please contact me.

**Sincerely,**

**Owlet Baby Care Inc.**

/s/ Kim Arnold

**Kim Arnold**
**Director of Human Resources**
**kim.a@owletcare.com**
**801-901-0336**

**Acknowledgment and Acceptance of Employment Offer**

I accept employment with Owlet Baby Care Inc. and acknowledge and fully agree to the terms and conditions set forth in this offer letter:

| | |
|---|---|
| /s/ Kate Scolnick | 3/5/2021 |
| Kate Scolnick | Date |

Exhibit 7
Page 1192

**EXHIBIT A**

**MUTUAL AGREEMENT TO ARBITRATE CLAIMS**

I recognize that differences may arise between Owlet Baby Care, Inc. (the "**Company**") and me during or following my employment with the Company. In consideration of my continued employment with the Company, its promise to arbitrate all employment-related disputes, and my receipt of the compensation, pay raises, and other benefits paid to me by the Company, at present and in the future, I agree that any and all controversies, claims, or disputes with anyone (including the Company and any employee, officer, director, shareholder, or benefit plan of the Company, in their capacity as such or otherwise), arising out of, relating to, or resulting from my employment with the Company or the termination of my employment with the Company, including any breach of this Mutual Agreement to Arbitrate Claims (this "**Agreement**"), shall be subject to binding arbitration under the Federal Arbitration Act and applicable state law.

**Claims Covered by this Agreement**. To the maximum extent allowed by law, the Company and I mutually consent to the resolution by binding arbitration of all claims or causes of action that the Company may have against me or that I may have against the Company or the Company's current and former owners, partners, members, officers, directors, employees, representatives and agents, all subsidiary and affiliated entities, all benefit plans, the benefit plans' sponsors, fiduciaries, administrators, affiliates, and all successors and assigns of any of them.

The claims covered by this Agreement include, but are not limited to: claims for breach of any contract or covenant; tort claims; claims for discrimination or harassment (including, but not limited to, race, sex, religion, national origin, age, medical condition, disability or sexual orientation); claims for retaliation; claims for violation of public policy; and claims for violation of any federal, state, local or other law, statute, regulation or ordinance, including, but not limited to, all claims arising under Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act, the Fair Labor Standards Act, and applicable state employment laws.

**Class Action Waiver.** I agree to bring any dispute in arbitration on an individual basis only, and not on a class or collective basis. Nor will I join or serve as a member of a class or collective action, or otherwise seek to represent the interests of any other person. There will be no right or authority for any dispute to be brought, heard or arbitrated as a class or collective action, or for either party to be a participant in any purported class or collective proceeding, including without limitation pending but not certified class actions. (Hereafter, this agreement will be referred to as the Class Action Waiver.) I understand that disputes regarding the validity and enforceability of this Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which (1) the dispute is filed as a class or collective action and (2) a civil court of competent jurisdiction finds all or part of the Class Action Waiver unenforceable, the class and/or collective action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration.

**Administrative Relief**. I understand that this Agreement does not prohibit me from pursuing an administrative claim with a local, state, or federal administrative body or governing agency that is authorized to enforce or administer laws related to employment, including but not limited to the Department of Fair Employment and Housing, the Equal Employment Opportunity Commission, the National Labor Relations Board, or the Workers' Compensation Board. This Agreement does, however, preclude me from pursuing court action regarding any such claim, except as permitted by law.

**Waiver of Right to Jury Trial**. I understand that, by signing this Agreement, both the Company and I are giving up any right we may have to a jury trial on all claims we may have against each other, as described in Paragraph 1.

**Required Notice of All Claims**. The Company and I agree that if a dispute arises, the party who wants to arbitrate the dispute must give written notice of any claim to the other party. Written notice to the Company or its officers, employees or agents, shall be sent to the Company's corporate office. I will be given notice at the last address recorded in my personnel file (unless I send written notice to the Company notifying them of the need to use a different address). The written notice must describe the nature of all claims asserted and must detail the facts upon which the claims are based. The notice must be sent to the other party(ies) by federal express (or another similar overnight mail service provider) or by certified or registered mail, return receipt requested.

Exhibit 7
Page 1193

**Arbitration Procedures.** The Company and I agree that, except as provided in this Agreement, any arbitration shall be in accordance with and under the auspices and rules of the Judicial Arbitration and Mediation Services, Inc. ("**JAMS**") for the resolution of employment disputes. The JAMS Employment Arbitration Rules and procedures are available at www.JAMSadr.com. The arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of class proceeding. I agree that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication, motions to dismiss and demurrers, and motions for class certification, prior to any arbitration hearing. I agree that this Agreement and its validity, construction, and performance shall be governed by the Federal Arbitration Act (the "FAA") and cases decided thereunder and, to the extent relevant, the laws of the State of Utah. Further, the terms and procedures governing the enforcement of this Agreement shall be governed by and construed and enforced in accordance with the FAA, and not individual state laws regarding enforcement of arbitration agreements. I agree that the decision of the arbitrator shall be in writing. I agree that any arbitration under this Agreement shall be conducted in Utah County, Utah. The arbitrator's decision regarding the claims shall be final and binding upon the parties and shall be enforceable in any court having jurisdiction thereof.

**Arbitration Fees and Costs.** In the event that either party initiates an arbitration, I agree that each party shall be responsible for paying such party's own attorneys' fees and costs. I agree that the arbitrator shall have the power to award any remedies available under applicable law, and that the arbitrator shall award attorneys' fees and costs to the prevailing party, except as prohibited by law. Without in any way limiting the scope of claims subject to arbitration, I understand that the issue of which party pays for any administrative or hearing fees charged by the arbitrator or JAMS shall depend on whether the claim being arbitrated is one that I have initiated against Company relating to any of my constitutional rights, fundamental rights, unwaivable public rights, unwaivable federal or state statutory rights, or an employment claim for violation of the common law that is grounded on similar unwaivable statutory rights (including, without limitation, any claim relating to wrongful termination in violation of public policy, collectively an "Employment Claim") or whether the claim being arbitrated does not constitute an Employment Claim but rather relates to a waivable right (whether statutory, common law, constitutional or otherwise) including, without limitation, a claim by either party relating to misuse of confidential information or other breach of the Nondisclosure Agreement between me and the Company ("Non-Employment Claim").

To the extent either party initiates an Employment Claim, then the Company shall pay for the costs of arbitration, including any administrative or hearing fees charged by the arbitrator or JAMS, except that I shall pay any filing fees associated with any Employment Claim arbitration that I initiate, but only so much of the filing fees as I would have instead paid had I filed a complaint in a court of law. To the extent that either party initiates a Non-Employment Claim, then each party shall bear an equal (pro-rata) share of any arbitration costs, including any administrative or hearing fees charged by the arbitrator or JAMS. The parties intend for the foregoing to comply with the then-current JAMS Policy on Employment Arbitration (Minimum Standards of Procedural Fairness) and any other applicable law concerning the enforcement of agreements to arbitrate. To the extent any of the foregoing cost-splitting provisions are found not to comply with such then-applicable law, the arbitrator shall reform this Agreement such that it is enforceable and consistent with then- applicable decisional or statutory law.

**Modification/Entire Agreement.** This Agreement to arbitrate shall survive the termination of my employment. It can only be revoked or modified by a writing signed by the parties that specifically states an intent to revoke or modify this Agreement. This is the complete agreement of the parties on the subject of arbitration of disputes (except for any arbitration agreement in connection with any pension or benefit plan). This Agreement supersedes any prior or contemporaneous oral or written understanding on the subject. No party is relying on any representations, oral or written, on the subject of the effect, enforceability, or meaning of this Agreement, except as specifically set forth in this Agreement. If any provision of this Agreement is found to be unenforceable, in whole or in part, such finding shall not affect the validity of the remainder of this Agreement and this Agreement shall be reformed to the greatest extent possible to ensure that the resolution of all conflicts between the parties are resolved by neutral, binding arbitration.

**Violation of this Agreement.** Should any party to this Agreement pursue any arbitrable dispute by any method other than arbitration, the responding party shall recover from the initiating party all damages, costs, expenses and attorneys' fees incurred as a result of such action.

**Not an Employment Agreement.** This Agreement is not and shall not be construed to create any contract of employment, express or implied. Nor does this Agreement alter the at will status of any employment.

[Remainder of Page Blank; Signature Page Follows]

Exhibit 7
Page 1194

**I acknowledge that I have read this Agreement carefully and I understand and accept the obligations which it imposes upon me without reservation. No promises or representations have been made to me to induce me to sign this Agreement. I further acknowledge that I have been given the opportunity to discuss this Agreement with my private, legal counsel and have taken advantage of that opportunity to the extent I wanted to do so.**

/s/ Kate Scolnick
_____
Signature

Kate Scolnick
_____
Name (Printed)

Accepted and Agreed to:

Owlet Baby Care, Inc.

By    /s/ Kim Arnold
_____

Exhibit 7
Page 1195

**Exhibit 10.11**

**MANUFACTURING AND SUPPLY AGREEMENT**

**BY AND BETWEEN**

**SHENZHEN AONI ELECTRONIC CO., LTD ("SUPPLIER"),**

**AND**

**OWLET BABY CARE INC.**

**("OWLET")**

**DATED June 21, 2018**

Exhibit 7
Page 1196

**TABLE OF CONTENTS**

| | | Page |
|---|---|---:|
| **ARTICLE I** DEFINITIONS | | 1 |
| **ARTICLE II** SUPPLY | | 5 |
| 2.1 | Forecasts | 5 |
| 2.2 | Firm Orders | 5 |
| 2.3 | Samples | 5 |
| 2.4 | Minimum Order Quantities | 5 |
| 2.5 | Unforeseen Demand | 5 |
| 2.6 | Raw Materials Procurement | 6 |
| 2.7 | Packaging | 7 |
| 2.8 | Shipping and Delivery | 7 |
| 2.9 | Title | 8 |
| 2.10 | Inspection; Non-Conforming Products | 8 |
| 2.11 | Dispute Regarding Non-Conforming Product | 8 |
| 2.12 | Replacement Product | 9 |
| 2.13 | Inability to Supply | 9 |
| **ARTICLE III** MANUFACTURING | | 9 |
| 3.1 | Manufacturing Processes | 9 |
| 3.2 | Production Changes | 9 |
| 3.3 | Capacity | 12 |
| 3.4 | Product Testing | 12 |
| 3.5 | Record Retention | 12 |
| 3.6 | Subcontracting | 12 |
| 3.7 | Tools | 13 |
| 3.8 | Waste | 14 |
| 3.9 | Supply Chain Security and Related Issues | 14 |
| 3.10 | Survival | 15 |
| **ARTICLE IV** PRICING AND PAYMENT | | 15 |
| 4.1 | Pricing | 15 |
| 4.2 | Billing and Payment | 15 |
| 4.3 | Reschedules/Holds | 15 |
| 4.4 | Changes to Specifications | 15 |
| 4.5 | Technical Transfer | 16 |
| 4.6 | Audit Rights | 16 |
| **ARTICLE V** REPRESENTATIONS, WARRANTIES AND COVENANTS | | 16 |
| 5.1 | Corporate Authority; No Breach of Other Agreement | 16 |
| 5.2 | Product Warranties | 16 |
| 5.3 | Remedies for Breach of Warranty | 17 |

i

Exhibit 7
Page 1197

| 5.4 | Additional Supplier Representations and Warranties | 17 |
| 5.5 | Supplier's Financial Statements | 18 |
| 5.6 | Survival | 18 |

**ARTICLE VI** INTELLECTUAL PROPERTY MATTERS | 18

| 6.1 | Specifications | 18 |
| 6.2 | Owlet Intellectual Property | 19 |
| 6.3 | Work Product | 19 |
| 6.4 | Other Intellectual Property Rights | 19 |
| 6.5 | Use of Trademarks | 19 |
| 6.6 | Promotion Limitation | 19 |
| 6.7 | Black and Grey Market Products | 20 |
| 6.8 | Licensed IP Misuse | 20 |
| 6.9 | No Reverse Engineering | 20 |
| 6.10 | Supplier Representative | 20 |
| 6.11 | IP Protection and Infringement | 20 |
| 6.12 | Liquidated Damages | 21 |

**ARTICLE VII** COMPLIANCE AND QUALITY CONTROL | 22

| 7.1 | Compliance with Laws | 22 |
| 7.2 | Permits and Approvals | 22 |
| 7.3 | Quality Standards | 22 |
| 7.4 | Manufacturing Audits | 22 |
| 7.5 | Debarment | 23 |
| 7.6 | Recordkeeping | 23 |

**ARTICLE VIII** CONFIDENTIALITY | 23

**ARTICLE IX** INSURANCE AND INDEMNITY | 23

| 9.1 | Insurance | 23 |
| 9.2 | Indemnification | 23 |
| 9.3 | No Consequential Damages | 23 |

**ARTICLE X** TERM AND TERMINATION | 24

| 10.1 | Term | 24 |
| 10.2 | Termination | 24 |
| 10.3 | Order Fulfillment; Depletion of Inventory | 24 |
| 10.4 | Effect of Termination on Rights | 25 |

**ARTICLE XI** MISCELLANEOUS | 25

| 11.1 | Interpretive Conventions | 25 |
| 11.2 | Entire Agreement | 25 |
| 11.3 | Amendments | 25 |
| 11.4 | Force Majeure | 26 |
| 11.5 | Successors and Assigns | 26 |

ii

Exhibit 7
Page 1198

| 11.6 | Relationship of Parties | 26 |
|---|---|---|
| 11.7 | Severability | 26 |
| 11.8 | Waiver | 26 |
| 11.9 | Remedies Cumulative | 26 |
| 11.10 | Notice | 26 |
| 11.11 | Jointly Prepared | 27 |
| 11.12 | Further Assurances | 27 |
| 11.13 | Ethical Business Practices | 27 |
| 11.14 | Export Controls | 27 |
| 11.15 | Governing Law | 27 |
| 11.16 | Dispute Resolution | 28 |
| 11.17 | Non-Exclusivity | 29 |
| 11.18 | Counterparts; Electronic of Facsimile Transmission | 29 |

EXHIBIT A Product Description

EXHIBIT B Product Pricing

EXHIBIT C Supplier Quality Agreement

iii

Exhibit 7
Page 1199

**MANUFACTURING AND SUPPLY AGREEMENT**

This Manufacturing and Supply Agreement (this "Agreement") is made as of the 21st day of June, 2018, (the "Effective Date") by and between SHENZHEN AONI ELECTRONIC CO., LTD having an office at 5 Bldg, Honghui Industrial Park, 2nd Liuxian Road, Baoan District, Shenzhen, P.R.China, 518101, including the following factories: 5 Bldg, Honghui Industrial Park, 2nd Liuxian Road, Baoan District, Shenzhen, P.R.China, 518101 (collectively, "Supplier"), and Owlet Baby Care Inc. with its principal offices at 2500 Executive Pkwy, Suite 300, Lehi, UT, 84043 USA ("Owlet"). Supplier and Owlet are each referred to in this Agreement as a "Party" and are collectively referred to in this Agreement as the "Parties."

**RECITALS**

A.    Owlet develops, manufactures, markets and sells baby monitoring devices and related products.

B.    Supplier has the experience and capability to manufacture and supply products and/or services as contemplated by this Agreement.

C.    The Parties' desire for Supplier to manufacture and supply the Products described in Exhibit A to Owlet, subject to and in accordance with the terms and conditions of this Agreement.

**AGREEMENT**

In consideration of the premises and mutual promises of the Parties set forth in this Agreement, the Parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

For the purposes of this Agreement, the following words and phrases shall have the following meanings:

1.1    **"Affiliate"** means, as to a Party, any corporation or business entity that, directly or indirectly, controls, is under common control with, or is controlled by, such Party. For purposes of this definition, "control" (including with its correlative meanings, "controlled" "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such corporation or business entity, whether through ownership of voting securities, by contract, or otherwise.

1.2    **"Applicable Laws"** means all applicable U.S. federal, state and local and P.R.C. laws, rules, regulations, common law, statutes, ordinances, codes, requirements or orders of any Governmental Authority, including, but not limited to, the Federal Food, Drug and Cosmetic Act, as amended, and the regulations promulgated thereunder.

1.3    **"Approved Vendor List"** or **"AVL"** means the list of manufacturers or suppliers of production materials, components, or subassemblies to be used by Supplier in manufacturing the Products.

Exhibit 7
Page 1200

1.4      **"Assignment"** means any assignment, whether voluntary or involuntary, by merger, consolidation, dissolution, operation of law, or any other manner.

1.5      **"Black Market"** means any fake products or components manufactured by unauthorized factories, or products or components manufactured at Supplier or Subcontractor factory(ies) without approval or authorization from Owlet.

1.6      **"Business Award Letter"** means a letter or email from Owlet to Supplier indicating Owlet's awarding to Supplier of a given project for a particular set of Products.

1.7      **"Certificate of Compliance"** shall mean a written certification or certifications signed by Supplier and delivered to Owlet stating that the applicable batch or lot of Product was processed in accordance with the agreed upon Specifications and that lists the applicable specification range, test method and results

1.8      **"Change of Control"**– means with respect to a given entity, any transaction or series of related transactions that constitute: (a) the sale or lease of all or substantially all of an entity's business or assets; (b) any merger, consolidation, share exchange, recapitalization, business combination or other transaction resulting in the exchange of the outstanding shares of an entity for securities or consideration issued, or caused to be issued, by the acquiring corporation or its subsidiary, unless the stockholders of such entity as of the date prior to the closing date of such transaction (or series of related transactions) hold more than fifty percent (50%) of the voting securities in the surviving corporation in such transaction computed on a fully-diluted basis; or (c) any person having acquired beneficial ownership or the right to acquire beneficial ownership of fifty percent (50%) or more of the outstanding voting securities of an entity. For the purposes of clause (c) of this definition, the term "person" includes a group of two or more persons that act as a partnership, limited partnership, syndicate or other group for the purposes of acquiring, holding, or disposing of outstanding voting securities of an entity.

1.9      **"Conflict Mineral"** means a material designated as a "conflict mineral" pursuant to the Conflict Minerals Law.

1.10     **"Conflict Minerals Law"** means section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, as it may be amended from time to time, and any regulations, rules, decisions, or orders relating thereto adopted by the US Securities and Exchange Commission or successor governmental agency responsible for adopting regulations relating thereto.

1.11     **"FDA"** shall mean the United States Food and Drug Administration or any successor thereto.

1.12     **"GMPs"** means the minimum requirements for the methods, facilities and controls used in the manufacturing, processing, packaging or holding of a regulated product as specified in the Regulatory Laws of the applicable Regulatory Authority, as such Regulatory Laws are in effect at the time of manufacturing.

1.13     **"Governmental Authority"** means any national, federal, state, local, municipal, foreign, or other government; governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); multi-national organization or body; exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

2

Exhibit 7
Page 1201

1.14    **"Grey Market"** means any products or components manufactured with approval or authorization from Owlet but not sold directly to Owlet or its authorized agent.

1.15    **"Intellectual Property"** or **"IP"** means (a) patents, patent applications, patent disclosures and inventions (whether patentable or not), (b) trademarks, service marks, trade dress, trade names, logos, corporate names, Internet domain names, and registrations and applications for the registration thereof together with all of the goodwill associated therewith, (c) copyrights and copyrightable works (including computer programs and mask works) and registrations and applications thereof, (d) trade secrets, know-how, manufacturing techniques, engineering drawings, specifications and other confidential information, (e) waivable or assignable rights of publicity, waivable or assignable moral rights and (f) all other forms of intellectual property, such as data and databases.

1.16    **"Licensed IP"** means the Trademarks, product names, product or packaging designs, software, firmware, hardware, Specifications, Proprietary Information and other IP owned by (or in-licensed from a third party to) a Party that are licensed (or sublicensed, as applicable) and provided by a Party to the other Party for use only in relation to the Products in strict accordance with the terms and conditions of this Agreement.

1.17    **"Long Lead Time Product Materials"** means Product Materials for which lead times exceed ninety (90) days.

1.18    **"Material Authorization"** means a written commitment by Owlet to allow Supplier to purchase Long Lead-Time Product Materials such that Owlet is liable for those materials and Supplier can procure the materials necessary to meet anticipated Purchase Orders in accordance with Owlet's forecast.

1.19    **"Materials Regulations"** means industry safety, environmental, energy, hazardous substance, and recycling standards applicable to Products, as advised by Owlet from time to time during the Term.

1.20    **"Product"** or **"Products"** shall mean the product or products manufactured or supplied by Supplier under this Agreement, as described at Exhibit A.

1.21    **"Proprietary Information"** means any confidential or proprietary information owned and furnished by one Party to the other, pursuant to the terms of this Agreement, either in writing or by electronic means, including, but not limited to, know-how, manufacturing techniques, trade secrets, patents, copyrights, technical data, cost analyses, descriptions, inventions, technology, formulae, calculations, algorithms, code, designs, engineering drawings, specifications, components, forecasts, subcontractors, test methods, test fixtures or studies.

1.22    **"Purchase Order"** means a document setting forth Owlet's requested order of Products placed with Supplier with all relevant terms.

3

Exhibit 7
Page 1202

1.23        "**Regulatory Authority**" means, any Governmental Authority involved in granting approval of the investigation, manufacture, distribution, marketing, sale, pricing or reimbursement of a Product or in administering Regulatory Laws in that country or jurisdiction, including the FDA in the United States.

1.24        "**Regulatory Laws**" means all Applicable Laws governing the import, export, testing, design, investigation, manufacture, packaging, labeling, promotion, marketing or sale of a Product, or establishing recordkeeping and reporting obligations for product complaints or adverse events, or relating to recalls or other field actions or similar regulatory matters, in each case, with respect to the Products.

1.25        "**Services**" means the manufacturing and related services set forth in Exhibit A hereto (as amended by the Parties from time to time during the Term).

1.26        "**Specifications**" means technical specifications agreed by the Parties for the manufacture and inspection of the Products, including without limitation the materials, reliability, dimensions, quality, AVL, designs, graphics, manufacturing specifications, engineering tolerances, handling, labeling, packaging, shipping and other production requirements, all as designated by Owlet in writing to Supplier prior to with the Purchase Orders placed by Owlet.

1.27        "**Subcontractor**" means any person or entity retained by Supplier to participate in the manufacture, assembly, and/or packaging of Products, regardless of whether Owlet nominated or directly-approved such person or entity.

1.28        "**Supplier Quality Agreement**" means the primary document which provides guidance to Supplier regarding Owlet's quality requirements.

1.29        "**Supplier Representative**" means a dedicated and exclusive staff member to act as Supplier's point of contact having responsibility for the development and manufacturing of Products for Owlet.

1.30        "**Territory**" means the country where Supplier's manufacturing facilities are located and the United States of America, as may be expanded by written agreement of the Parties from time to time depending on Supplier's place of manufacture.

1.31        "**Tools**" means molds, dies, punches, templates, tooling, cavities, and other equipment or fixtures necessary or useful in the manufacture and quality assurance of Products in accordance with Specifications that are supplied by Owlet or that are purchased by, charged to, or paid for by Owlet.

1.32        "**Trademarks**" means any and all trademarks, trade names, logos, designs, and trade dress owned or in-licensed by Owlet that are used in connection with Products and placed on the Products or packaging (including inserts) associated with the Products by Supplier, including as set forth on Exhibit A hereto (as amended by the Parties from time to time during the term of this Agreement).

Capitalized terms not defined in this Article I shall have the meanings specified elsewhere in the text of this Agreement.

4

Exhibit 7
Page 1203

**ARTICLE II**
**SUPPLY**

2.1     Forecasts. Owlet shall provide Supplier with access to forecasts of Owlet's expected purchases of the Products. The forecasts will show anticipated monthly orders for a period of at least six (6) months. All forecasts shall be used for planning purposes only and shall not be binding on Supplier and Owlet. Supplier acknowledges that Owlet may order more or fewer Products than projected in such forecasts. The first forecast shall be provided approximately three (3) months before the delivery date set forth on the first purchase order submitted to Supplier pursuant to Section 2.2 of this Agreement and shall be updated monthly thereafter.

2.2     Firm Orders. From time to time and at Owlet's discretion, Owlet will submit Purchase Orders for the Product to Supplier in written or electronic form. Each Purchase Order will specify the quantity of Products ordered, delivery dates and delivery and shipping instructions. If there is any conflict between the provisions of this Agreement and the Purchase Order or any acknowledgement or acceptance document of Supplier as to the obligations of the Parties regarding any Products ordered, the Parties agree that the resolution of such issue shall be controlled first by the terms of this Agreement and then the terms of the subject Purchase Order. Supplier shall notify Owlet in writing of its acceptance of the Purchase Order within five (5) days of receipt. If Supplier fails to respond to a Purchase Order after such five (5)-day period, Supplier will be deemed to have accepted the Purchase Order. Any terms and conditions in any written acceptance by Supplier that conflict with and Purchase Order or this Agreement shall be void and of no force and effect. Each Purchase Order hereunder is separate and severable and not part of one or more installment contracts. Each Purchase Order is to be issued as a global order, with specific regional allocations to be provided by Owlet's Purchasing Department prior to shipment.

2.3     Samples. Supplier shall manufacture and deliver to Owlet pre-production samples for approval prior to the commencement of mass production. Supplier shall make any and all changes to the pre-production samples requested by Owlet, but to be not beyond the Specifications, if any, and shall ship new pre- production samples of the Products to Owlet for approval. The finished Products are not to differ in any respect from the pre-production samples approved by Owlet, and Owlet reserves the right at its sole discretion to reject any Products differing from the final pre-production samples without any liability to Supplier. Samples are to be requested via Purchase Order. Samples are to be of production quality and meet all Owlet Specifications as set forth in this Agreement and the Supplier Quality Agreement.

2.4     Minimum Order Quantities. All orders of Products shall be subject to the minimum batch quantities set forth in Exhibit A to this Agreement. Notwithstanding any other provision to the contrary contained herein, Supplier acknowledges and agrees that Owlet has no specific requirement to purchase any amount of Products from Supplier during the Term hereof or to submit any specific number of Purchase Orders.

2.5     Unforeseen Demand. Owlet and Supplier recognize that there may be instances in which unforeseen demand for Products occurs. In such instances, Owlet shall make every effort to notify Supplier immediately of such requirements and Supplier shall make commercially reasonable efforts to fulfill Owlet's unforeseen requirements of the Products.

Exhibit 7
Page 1204

2.6      <u>Raw Materials Procurement</u>.

(a)      Supplier shall order sufficient quantities of all raw materials required to manufacture the Products ("Product Materials") to enable Supplier to manufacture and deliver Products in accordance with Owlet's Purchase Orders. The costs of all such Product Materials shall be included in the purchase price for the Products set forth on <u>Exhibit B</u>. To the extent that Supplier purchases Product Materials for the purpose of manufacturing the Products in accordance with Owlet's Purchase Orders, Owlet shall reimburse Supplier in full for such Product Materials that (a) were purchased but unused as a result of subsequent changes to such Purchase Orders approved pursuant to Section 2.2 and that Supplier is unable to use for subsequent manufacturing or packaging of the Products, and (b) included in non-cancellable orders of Long Lead-Time Product Materials and that Supplier is unable to use for subsequent manufacturing or packaging of the Products (the "Obsolescence Charge"). The calculation of the Obsolescence Charge shall be made by Supplier once every second calendar quarter and shall be limited to inventories of Product Materials required to manufacture the quantities of Products in outstanding Purchase orders and Long Lead-time Material Purchase Authorizations For the avoidance of doubt, in the event Supplier orders quantities of Product Materials beyond the quantities reasonably required to manufacture and deliver Product in accordance with Owlet's Purchase Orders and Long Lead-time Material Purchase Authorizations, the cost of such excess Product Materials will not be included in the Obsolescence Charge.

(b)      To the extent Owlet has negotiated pricing for certain Product Materials and the applicable vendor has agreed to extend such pricing to Owlet's designees, Owlet shall notify Supplier, and Supplier may purchase such Product Materials directly from the specified vendor at the pricing negotiated by Owlet. Supplier acknowledges and agrees that Supplier will inspect the incoming materials which are provided by Owlet nominated-Supplier according to Supplier's own IQC procedure and standard. (a) Owlet makes no representations or warranties regarding such Product Material vendors; (b) Owlet does not assume any responsibility or liability for any acts or omissions of such vendors or their agents, and (c) Owlet shall not be liable for any loss of any kind that occurs with respect to any order or purchase of Product Materials by Supplier from such vendors. (d) Supplier will report any damage or shortages which are found from Supplier's IQC to Owlet and nominated supplier. It is suppliers responsibility to receive credit or replacement parts from nominated supplier. If Owlet nominated supplier doesn't cooperate to improve quality issue or to receive credit or replacement parts, Supplier has the right to change the Owlet nominated supplier only after Owlet approves the new sub supplier.

(c)      In order to reduce production lead-time, Owlet shall utilize Long Lead-time Material Purchase Authorizations for any raw materials who lead-times are constraining to the production lead-time required to meet purchase order delivery requirements.

6

Exhibit 7
Page 1205

2.7     Packaging. Supplier shall produce, inspect, label, package, store and ship all Products in a finished state in compliance with Applicable Laws and in accordance with the Specifications and any other reasonable instructions from Owlet as indicated on the applicable Purchase Order and standards defined by Owlet and agreed by the parties. Supplier shall make necessary arrangements and take reasonable precautions to protect the quality of the Products after its final inspection during storage, shipping and delivery of the Products, and Supplier agrees to package the Product suitably for export and appropriately to prevent damage during shipment. Each shipment shall be accompanied by a Certificate of Compliance signed by an authorized representative of Supplier concerning all applicable quality and testing records for each lot of Product produced and delivered to Owlet. Supplier will ensure packaging and labeling of Products is in accordance with Owlet's instructions, including with labels approved by Owlet or provided by Owlet (or its designee), and in accordance with all applicable Specifications.

2.8     Shipping and Delivery. Delivery of Products shall be made FOB ShenZhen (Incoterms 2010) ("Delivery"). The Parties shall bear the risk of loss and expenses allocated to them in accordance with this international delivery term. Products are to be shipped via full container when possible. Any less than container load shipments must be approved by Owlet in writing prior to shipment. Provided that, Owlet shall bear the costs, expenses, and fees arising out of and in connection with failure to ship Products which have been ready to be shipped on delivery date specified in the Purchase Order.

(a)     Supplier's Obligations. Supplier shall ensure that each Purchase Order received from Owlet is timely filled and that Products are delivered within the agreed-upon delivery schedule. Supplier shall ensure that all Products delivered to Owlet are invoiced and packaged in accordance with the applicable Purchase Order and all Applicable Laws and Regulatory Authorities.

(b)     Delivery Date Confirmation. Delivery dates must be confirmed within seven (7) calendar days after Supplier's receipt of each Purchase Order, at which time the Supplier shall provide a production schedule for the entire Purchase Order. Supplier shall submit subsequent production schedules to Owlet on a weekly basis.

(c)     Late Delivery. In the event that Supplier fails to deliver Product by the delivery dates specified in the Purchase Order, at Owlet's discretion and direction, all shipments made after said dates are to be made via air freight until such time as Supplier is able to resume delivery according to the requirements of the Purchase Order. This is defined as delays arising for Aoni's actions or Aoni's controlled supply chain. In such event, Supplier's responsibility for air freight is as follows:

(i)     If the delivery is two weeks late, Supplier is responsible for the cost difference between air freight and ocean freight.

(ii)     If the delivery is three weeks late, Supplier is responsible for the entire cost of air freight for all affected Products.

7

Exhibit 7
Page 1206

(iii)    If the delivery is more than three weeks late, Supplier is responsible for the entire cost of air freight for all affected Products and Owlet receives an additional 4% discount on all affected quantities.

(iv)    Owlet has the right to refuse any Products shipped thirty (30) or more days after the requested delivery date. and Owlet has the right to terminate this Agreement immediately upon notice.

(v)    Supplier is to be billed directly by Owlet's freight forwarder for air freight charges. On a case-by-case basis, Owlet will evaluate the effect of Supplier's late delivery as it relates to final in-store delivery, and has sole discretion on whether to allow Supplier to ship by sea (if Owlet determines that final in-store delivery will not be compromised thereby).

(d)    <u>Rescheduled Delivery and Cancellation of Orders</u>. Owlet has the right to request that Supplier reschedule the delivery date for Product(s) at any time prior to shipment, and loss, damage, costs, expenses and fees arising from rescheduling the delivery shall be borne by Owlet. In the event of a request to cancel a shipment, Owlet shall reimburse Supplier for any finished Products and for Product Materials in accordance with Section 2.6.

2.9    <u>Title</u>. Supplier shall bear responsibility for risk of loss or damage to the Products, and title shall not pass, until Delivery, notwithstanding any other terms contained in this Agreement.

2.10    <u>Inspection; Non-Conforming Products</u>. All Products delivered under this Agreement shall be subject to inspection and applicable testing by Owlet notwithstanding prior receipt and payment. Any acceptance thereof shall not be construed as a waiver of its warranty and indemnification rights under this Agreement. If Owlet determines that any Products in a shipment are damaged, defective, or non-conforming to the Specifications or any applicable Purchase Order (including incorrect shipping documentation such as packing slips or certifications) ("Non-conforming Product"), Owlet may, except for claims relating to latent defects, reject any Non-conforming Product by providing notice of rejection to Supplier within ninety (90) days following receipt by Owlet of any shipment of such Products hereunder. Claims relating to latent defects are not deemed waived by Owlet unless Owlet fails to notify Supplier of such latent defects within twelve months (12) months following the date of manufacture of the Non-conforming Product giving rise to the claim. Provided that, Supplier shall not be liable for the damage, defect, or non-conformance arising out of and in connection with the reasons which are not attributable to Supplier.

2.11    <u>Dispute Regarding Non-Conforming Product</u>. If Supplier does not agree that any such Product failed to meet the Specifications and Supplier's validated manufacturing and analytical processes and Supplier and Owlet cannot reach agreement with respect to such Product, Supplier will submit the question of whether the Product failed to meet the Specifications to a mutually agreed upon and independent laboratory in the United States selected by Owlet and acceptable to Supplier (which acceptance shall not be unreasonably withheld) for determination. The findings of such laboratory shall be binding upon Supplier and Owlet and the cost of such determination shall be paid by the party in error.

8

Exhibit 7
Page 1207

2.12    After-sale Service. Supplier shall provide an additional one and a half percent (1.5%) extra units per shipment free of charge. Supplier shall have the rights to reject return, repair or replacement and other after-sale services after providing 1.5% extra units per shipment. Supplier shall not be liable for any and all losses and damages arising from or in connection with non - conforming products after providing 1.5% extra units per shipment by Supplier, but excluding batch volume quality problems caused by inherent defect of product design.

2.13    Inability to Supply. In the event that Supplier becomes aware of or reasonably anticipates that it will be unable to supply the quantities of the Products that Owlet has ordered pursuant to duly submitted Purchase Orders by the requested delivery date, either in whole or in part, Supplier shall inform Owlet in writing as soon as reasonably possible of such anticipated inability to supply. In case of Supplier's inability to meet any aforesaid Purchase Orders, Supplier shall fulfill such orders with such quantities of Products as can be reasonably made available for supply to Owlet hereunder and work closely with Owlet to adjust delivery schedules, expedite production and or shipping, or otherwise cancel orders for units which did not meet the delivery terms of the Purchase Order.

**ARTICLE III**
**MANUFACTURING**

3.1    Manufacturing Processes. Supplier shall manufacture, package, label and store the Products at its manufacturing facility located at [5 Bldg, Honghui Industrial Park, 2nd Liuxian Road, Baoan District, Shenzhen, P.R.China, 518101 in accordance with the Specifications, industry standards, any and all Applicable Laws and quality standards agreed by the Parties. Supplier represents and warrants to Owlet that Supplier's manufacturing facility and processes (including equipment and machinery utilized in the manufacturing process) applicable to the Products comply with all Applicable Laws (including GMPs).

3.2    Production Changes.

(a)    Owlet-Requested Changes.

(i)    Requests. At any time during the Term, Owlet has the right to request each of the following in writing:

(1)    a change to manufacturing and other Services, packaging and shipping specifications, and Products test procedures;

(2)    increases in production volume of Products for an outstanding build schedule; and/or

(3)    configuration or engineering changes to Products.

9

Exhibit 7
Page 1208

(ii)   Responses. Within five (5) business days after receipt of such request, Supplier shall analyze it and (based on each category of changes set forth in clause (i) above):

(1)   *[for manufacturing and other Services, packaging and shipping specifications, and test procedures changes]* provide Owlet with an assessment of the effect that the requested change would have on cost, manufacturing, scheduling, delivery and implementation;

(2)   *[for production increases]* determine if it can meet the requested increase within the required lead-time, and provide either (A) Owlet with a new build schedule setting forth the expected delivery date of the changed order, if Supplier can satisfy the requested increase, or (B) the reasons preventing it from satisfying the requested increase, if Supplier is unable to satisfy or comply with Owlet's requested increase in production volume within the requested time frame for delivery;

(3)   *[for configuration or engineering changes]* determine if it can meet the requested changes within the required lead-time, and provide either (A) a notice of acceptance of the requested changes along with any additional costs and expected changes to delivery schedules, if Supplier can satisfy the requested change, or (B) the reasons preventing Supplier from satisfying the requested increase, if Supplier is unable to satisfy or comply with Owlet's requested changes within the requested timeframe for delivery.

(b)   Supplier-Generated Changes. For any Supplier-generated change request in relation to Products currently in production, Supplier shall submit a notification of proposed change in writing in accordance with the Change Levels outlined below:

(i)   Change Level I: Changes that affect the fit, form, function, or reliability of the Product. Any changes in specification, dimension, materials of construction, visual appearance of the Product, usage of different components or raw material than originally specified, or any changes of performance of the Product supplied. For all known or planned Level I changes, Supplier must provide a minimum of one hundred and eighty (180) days' notice of change to allow for review, validation, and approval by Owlet.

(ii)   Change Level II: Changes to the process, procedure, manufacturing location, process equipment, inspection methods and/or equipment, and inspection sampling plans. Supplier must provide a minimum of ninety (90) days' notice for adequate review, validation, and approval by Owlet.

(iii)   Change Level III: Changes that do not directly affect the Product performance, cosmetics, reliability, salability or the process to manufacture the Product. Supplier must provide a minimum of fifteen (15) days' notice for adequate review by Owlet.

10

Exhibit 7
Page 1209

(iv)  Owlet Approval of Changes. All Supplier-generated changes, across all change levels, must obtain Owlet approval prior to the commencement of mass production thereof. As part of the approval process, Owlet may ask for additional information on a case-by-case basis.

(v)  Samples of Supplier-Generated Changes Products.

(1)  Supplier shall provide product samples in the necessary quantities to complete any testing and qualification requirements for any changes at no charge to Owlet for Owlet's evaluation and approval.

(2)  Supplier shall make any changes to the pre-production samples requested by Owlet, and shall ship new pre-production samples to Owlet for approval.

(3)  To avoid production delays, Supplier shall supply Owlet with previously-approved Products until Owlet completes approval of submitted changes.

(4)  In some exceptions, the minimum notification periods set forth above may be adjusted at Owlet's sole discretion.

(5)  Supplier shall not manufacture, distribute or disseminate any Products based on its proposed changes without Owlet's prior written approval.

(6)  If any Products, or any element(s) or portion(s) thereof, are manufactured, distributed or disseminated prior to or without Owlet' written approval, Owlet has the right to require Supplier to recall such Products at Supplier's sole expense, and Supplier, at Owlet's discretion and in addition to any and all other remedies available to Owlet hereunder (including without limitation terminating this Agreement, seeking monetary or other legal relief should any irreparable damages or losses be incurred), shall pay liquidated damages of five thousand United States dollars (US$5,000.00) per occurrence.

(vi)  Effects of Noncompliance. In the event notice is not given in accordance with requirements in this Section 3.2(b), Owlet has the right to reject or return all materials and Products subject to the changes and may cancel all unfulfilled Purchase Orders without liability. Supplier shall bear any costs incurred, as well as losses suffered by Owlet in relation to such rejected or returned Products, including but not limited to expedited shipping costs and any revenue lost by Owlet.

(vii)  Urgent Changes. In urgent or emergency situations where changes to the Products and/or process arise in an unforeseen and unanticipated manner, Supplier and Owlet shall establish a mutually agreed upon timetable and manner for implementing such urgent changes or mitigating the effect or loss of such urgent changes. If Supplier is liable for such urgent changes, Supplier shall bear any costs or losses incurred due to such urgent changes, including but not limited to any revenue lost by Owlet.

11

Exhibit 7
Page 1210

3.3    Capacity. Supplier shall fulfill Owlet's requirements for the Products and shall maintain sufficient manufacturing capacity (including appropriate manufacturing, storage and distribution facilities and qualified personnel) to meet Owlet's forecasted demand for the Products. At a minimum, Supplier shall maintain and have available a sufficient inventory to supply Owlet's requirements for a period of three (3) months based on Owlet's forecasts. Further, within six (6) months after the Effective Date, Supplier shall establish a disaster recovery plan that is reasonably satisfactory to Owlet, which plan will provide for the continued supply of the Products to Owlet in the event of a catastrophic event or other circumstance that could negatively affect Supplier's production capacity.

3.4    Product Testing. Supplier agrees that it will conduct all necessary testing of the Products, as required by any and all Applicable Laws and quality standards agreed by the Parties, to meet Specifications.

3.5    Record Retention. Supplier shall maintain throughout the Term (or for such longer period as may be required by Applicable Laws) accurate and complete records relating to its manufacture and testing of the Products, including all records required under Applicable Laws. Supplier will allow Owlet reasonable access to such records upon request.

3.6    Subcontracting. Without prior notice Supplier shall not subcontract any of its obligations under this Agreement to any subcontractors or other third parties. If approved by Owlet, Supplier shall comply with all Applicable Laws related to suppliers, subcontractors and vendors, and Supplier shall require that all of its suppliers, subcontractors and vendors providing services or products in relation to the Products are in compliance with this Agreement and Applicable Laws with regard to such services or products. Without limiting the foregoing, and notwithstanding any arrangements between Supplier and its suppliers, subcontractors and vendors, Supplier shall remain responsible for performance of its obligations hereunder, including obligations relating to quality assurance, delivery timelines, compliance with Applicable Laws and confidentiality obligations regardless of whether any of Supplier's obligations are undertaken by a subcontractor.

(a)    Upon Supplier's receipt of notice from Owlet, Supplier will discontinue use of a Subcontractor in relation to the manufacture of Products or other services provided to Supplier.

(b)    Supplier shall allow Owlet to inspect Subcontractor facilities at any time during the Term, so long as Supplier-designated personnel accompany Owlet representatives (with Supplier making every reasonable effort to procure such accompaniment) and Owlet provides Supplier with reasonable notice of its intent to visit Subcontractor facilities.

(c)    Supplier shall allow Owlet to have direct contact with Subcontractor personnel when such contact is urgent and is of a specific technical nature related to the design or manufacture of Products, and can be most efficiently communicated when communicated directly. Owlet shall make Supplier aware of the need for any such direct contact at least twenty-four (24) hours prior to said communication.

12

Exhibit 7
Page 1211

(d)    Supplier shall maintain an AVL and publish this to Owlet quarterly or upon any updates or changes to the AVL.

3.7    Tools.

(a)    Usage. All Tools are to be used exclusively to fill Purchase Orders. Supplier shall not use any Tools to manufacture, or cause to be manufactured, directly or indirectly, products for any third party without Owlet's prior written consent.

(b)    Cycle counter. All Tools containing Owlet trademarks or per tooling specifications from Owlet shall be manufactured capable with tamper proof cycle counter.

(c)    Maintenance. Supplier shall reasonably maintain all Tools during their normal productive lives. Projected life for all styles of Tools must be presented to Owlet prior to any manufacture of such Tools. Notwithstanding such maintenance, Supplier shall submit to Owlet tooling maintenance and end-of-life reports on a monthly basis. Orders for, manufacture or replacement of any Tools shall be made only upon receipt of Owlet's written authorization. Any tooling issues that could impact Product performance, reliability or Purchase Order delivery or lead- time must be communicated to Owlet's supply chain manager immediately.

(d)    Sufficiency. Supplier shall order, manufacture, or cause to be manufactured Tools in quantities agreed upon and deemed necessary by Owlet to manufacture a sufficient number of Products to meet the quantities specified in Owlet's Purchase Orders and/or forecasts. Any realization that tooling capacities are insufficient to meet current Purchase Orders and/or forecasts must be communicated to Owlet's supply chain manager immediately.

(e)    Ownership. All Tools for which Owlet has paid 100% of Supplier's incurred costs, or that contain the IP granted to Owlet by a third party or any other IP of Owlet, are Owlet's sole property and treated as Proprietary Information hereunder. In the event that Supplier subsidizes or offers to subsidize or pay for Tools outright, Owlet is to have ownership and title to any such Tools upon expiration or earlier termination of this Agreement.

(f)    Identification. All Tools will be clearly marked "Property of Owlet, Inc., 32 Center Street, Provo, Utah, U.S.A." and affixed or otherwise indicated with all appropriate identification information in accordance with Owlet's instructions.

(g)    Return to Owlet. Supplier shall immediately tender and deliver all Tools to Owlet upon request during the Term, or upon termination or expiration of this Agreement. Supplier shall take such actions as Owlet may reasonably request to cause Subcontractors to comply with Owlet's request to return Tools.

(h)    Specific Remedies. Any delay by Supplier or Subcontractors in returning Tools to Owlet may result in irreparable injury to Owlet. If Supplier or any Subcontractors fail or refuse immediately to return Tools to Owlet upon Owlet's request during the Term, or upon termination or expiration of the Agreement, as the case may be, Owlet is entitled to seek injunctive or other legal relief for any such breach or anticipated breach without being required to post a bond or other security. Any such relief is to be in addition to monetary damages (including but not limited to, costs and expenses associated with production delays, e.g., airfreight).

13

Exhibit 7
Page 1212

3.8    Waste. Supplier shall expressly be responsible for the treatment, storage, disposal and/or transportation of any waste products or waste streams (hazardous, toxic or otherwise) that are related to, directly or indirectly, the manufacture of the Products pursuant to this Agreement. Any treatment, storage, disposal and/or transportation of any such waste products or waste streams will be in material compliance with all applicable environmental laws.

3.9    Supply Chain Security and Related Issues.

(a)    Security and Inspections. Supplier shall maintain tight security on Supplier's premises during production and warehousing and ensure secure transportation of Products from Supplier's premises to the point of transfer to the freight forwarder. Supplier acknowledges the importance of supply chain security in terms of theft, damage, and terrorism prevention, and represents that it has taken appropriate measures to insure the integrity of the supply chain from the Supplier's premises through delivery to the freight forwarder. Supplier hereby consents to allow periodic, unannounced "spot check" inspections by Owlet's security enforcement personnel to ensure the integrity of Supplier's security and inventory control measures. Supplier shall ensure their supply chain provides tight security on production and warehousing.

(b)    Violations. If any deficiencies or violations of the security measures ("Violations") are found during such spot check inspections or through external investigations of Supplier or any Subcontractors, Supplier shall remedy and document via a Corrective Action Report such Violations within thirty (30) days. Upon confirmation of any further occurrence of any Violation, Owlet may, at its election, (1) require Supplier pay for a third party security audit to be performed within 15 days from time of Violation (2) require Supplier pay Owlet liquidated damages in the amount of ten thousand US dollars (US$10,000) or (3) withhold in escrow a percentage (in its reasonable discretion) from then-payable Purchase Orders until such time as the Violation is remedied.

(c)    Specific Security Measures. Supplier shall implement security measures to maintain the security of the Products and its supply chain, including without limitation the following: (1) secure facilities with the ability to control, record, and manage entrance into and out of all exits, including but not limited to: dedicated security staff, metal detectors at all entry and exit points, well maintained fencing, enforceable processes for the recordation of all visitors and staff; (2) comprehensive video monitoring of all exits, production floors, and warehouses that are actively monitored and the video data history saved in a secure location for at least 6 months; (3) periodic, regular training of all staff regarding facility processes and policies for controlling product loss; (4) provide Owlet with a copy of relevant security measures, policies, as well as the confidentiality agreement entered into by and between Supplier and the individual members of its staff, as well as Subcontractors, who have access to Products during any phase of production, assembly, storage, delivery, or transportation; and (5) if Supplier becomes aware of any unauthorized access to, use, theft, leak or damages of the Product by any person (each a "Security Event"), it shall immediately notify Owlet in writing of such Security Event and provide Owlet with all information it has relating thereto. Supplier shall provide Owlet with all reasonable assistance as requested by Owlet to limit any damages that may be caused by such Security Event.

14

Exhibit 7
Page 1213

3.10    Survival. All warranties, covenants and commitments set forth in this Article 3 shall be deemed to be made and given by Supplier on a continuing basis throughout the Term of this Agreement.

**ARTICLE IV**
**PRICING AND PAYMENT**

4.1    Pricing. The prices at which Supplier will sell the Products to Owlet are set forth on the attached Exhibit B and shall be fixed for one year calculating from the first MP order for Supplier's own materials based on 30 day leadtime except Owlet's nominated suppliers for the Term of this Agreement. These prices are inclusive of all costs associated with the purchase of the Products. If the price of any component from an Owlet nominated supplier changes the full unit price will be adjusted in the cost of the finished good to the Supplier accordingly. The Purchase Order shall be fulfilled before the parties adjust the price.

4.2    Billing and Payment. Supplier shall submit invoices to Owlet for the amount due for the Products shipped to Owlet. Owlet shall make payments to Supplier for the purchase price of Product within Thirty (30) days following delivery and acceptance thereof and receipt by Owlet of Supplier's invoice. Improper invoices may be returned without loss of discount. Owlet may withhold payment of any amount that it reasonably disputes in good faith until such dispute is resolved. All payments by Owlet shall be made in U.S. dollars.

4.3    Reschedules/Holds. In the event of reschedules by Owlet or Owlet's freight forwarder, or shipments placed on hold by Owlet or Owlet's freight forwarder (except for shipments placed on hold for quality reasons), in excess of thirty (30) days after the delivery date, Supplier shall invoice in full, unless Supplier has accepted such reschedule in writing.

4.4    Changes to Specifications. If during the Term of this Agreement, upon Owlet's request, the parties agree to change part or all of the Specifications for a Product and such changes to the Specifications increase or decrease Supplier's manufacturing costs or procurement of raw materials cost, Supplier and Owlet agree to negotiate in good faith to make reasonable changes to the purchase price of the affected Products.

15

Exhibit 7
Page 1214

4.5    Technical Transfer. Supplier acknowledges and agrees that Supplier will bear all costs incurred by Supplier as part of the general technical transfer of files for purposes of manufacturing the Products under this Agreement.

4.6    Audit Rights. During the Term of this Agreement and for (2) two years thereafter, Owlet will have the right, on no less than thirty (30) days' notice, to examine and audit the records of Supplier that are necessary and directly related to charges for Products shipped pursuant to this Agreement so that Owlet auditors may verify that charges are true and correct and do not contain substantial errors. Any such examinations or audits will be conducted upon reasonable notice and at reasonable times.

4.7    Currency Exchange Rate Management. Product BOM pricing will be negotiated in local currency and transferred to USD($) at a negotiated exchange rate. If the actual exchange rate varies by an average of more than 3% from the negotiated rate over the trailing 45 days, the rate applied to new purchase orders will be adjusted to the average rate of the previous 90 days.

4.8    Cost Down Initiatives. Owlet seeks to work collaboratively with its manufacturers to improve manufacturing processes, efficiencies and find cost savings. If Owlet initiates a change that yields savings, these savings will be passed onto owlet. If Supplier initiates a change that is subsequently approved by Owlet and implemented into production, Supplier will receive 100% of the savings for 3 months, 50% of the savings for an additional 2 months, after which Owlet will receive the savings.

**ARTICLE V**
**REPRESENTATIONS, WARRANTIES AND COVENANTS**

5.1    Corporate Authority; No Breach of Other Agreement. Each Party represents and warrants that it is a legal entity duly incorporated or organized, validly existing and in good standing under the laws of its incorporation or organization and has all corporate power and authority to carry on its business as now conducted, to own, license or lease its assets and properties which it owns, licenses or leases, and to execute and deliver this Agreement and to perform its obligations hereunder. Each Party represents and warrants to the other that the execution of this Agreement and the full performance and enjoyment of the rights of Supplier and Owlet under this Agreement will not breach or in any way be inconsistent with the terms and conditions of any license, contract, understanding or agreement, whether express, implied, written or oral between the warranting Party and any third party.

5.2    Product Warranties. Supplier warrants to Owlet that all Products supplied by Supplier under this Agreement (a) shall be in compliance with the Specifications and will be free from defects in materials, fabrication and workmanship; and (b) will be manufactured in accordance with Applicable Laws and the applicable quality requirements incorporated by reference into this Agreement. Supplier will convey to Owlet good and valid title to the Products, free from any lien, claim, security interest or encumbrance. In addition to these warranties, Supplier shall take all steps necessary to effect the transfer or extension to Owlet of all manufacturer warranties on the Products in the event Supplier is not the original manufacturer of a Product or a Product Material, to the extent permitted by such manufacturer. These warranties shall survive Delivery and payment for the Products and shall run to Owlet, its successors, assigns, customers and the users of its Products. For clarity, Supplier's warranties included in this Section 5.2 do not apply to any defect in a Product arising from any drawing, design, Specification, process, testing or other procedure, adjustment or modification supplied by Owlet.

16

Exhibit 7
Page 1215

5.3    <u>Remedies for Breach of Warranty</u>. In the event of a breach of any of the warranties outlined in Section 5.2, Owlet shall give Supplier notice of such breach. Upon receipt of such notice, Supplier shall promptly and without undue delay (a) repair, replace or modify the affected Product so as to correct the warranty breach to Owlet's satisfaction at no cost to Owlet, or, at Owlet's option, (b) refund the full price paid by Owlet for the affected Products, including shipping costs. Nothing herein, and no election of a remedy, will be construed as a waiver of Owlet's indemnification rights under this Agreement.

5.4    <u>Additional Supplier Representations and Warranties</u>. Supplier further represents, warrants, and covenants that:

(a)    it (1) has sufficient expertise and know-how in its industry to manufacture Products in accordance with Specifications, (2) will dedicate sufficient resources, materials and personnel to perform its obligations hereunder, (3) will deliver the quantities ordered by Owlet in accordance with Owlet's requirements, and (4) will pay all Subcontractors in a timely manner;

(b)    it has reviewed its supply chain security procedures and that these procedures and their implementation are, and shall remain during the Term, in accordance with the conveyance security criteria set forth by Owlet;

(c)    it has developed and implemented, or shall develop and implement within sixty (60) days after its execution of this Agreement, procedures for periodically reviewing and, if necessary, improving its supply chain security procedures to assure the integrity of Products;

(d)    it will be accountable for any unauthorized disclosure of Proprietary Information, or any unauthorized use of Owlet's IP, or for any breach of exclusivity by Supplier and/or Subcontractors;

(e)    for the duration of this Agreement, Supplier, and any entity owned wholly or partially by any manager, officer or director of Supplier or their related Affiliates or individuals, does not and will not by itself, or with its assistance or prior knowledge, produce, sell or offer for sale, advertise or otherwise provide to any of Owlet's existing or prospective customers any products that are identical and/or substantially similar in design, get-up or product packaging with products sold by Owlet without Owlet's written consent, including but not limited to sensor capable baby monitor devices and/or related products and components;

(f)    none of its or its Affiliates' partners, officers, directors, or employees is or will become an official or employee of the government during the Term without prior notice to, and prior written approval from, Owlet;

17

Exhibit 7
Page 1216

(g)    all Products will be manufactured and packaged in compliance with Owlet's quality guidelines, including without limitation any applicable Materials Regulations in the Territory;

(h)    it is and will remain in full compliance with the Conflict Minerals Law, and no Products delivered to Owlet will contain any Conflict Mineral unless specifically approved in writing by an authorized officer of Owlet, in which case Supplier further represents and warrants that any such Conflict Mineral included in any such merchandise will not originate from the Democratic Republic of Congo or an adjoining country;

(i)    it will comply with and ensure that its Subcontractors sign and comply with Owlet's *Social Responsibility Policy* as updated from time to time, which policy may require unannounced social responsibility compliance audits by Owlet and/or third-party auditors;

5.5    Supplier's Financial Statements.

(a)    Importance. The Parties acknowledge that the financial stability of Supplier is important to ensure that Owlet's business can continue uninterrupted.

(b)    Documentation. Upon Owlet's request, Supplier shall cooperate with a third-party, accounting firm agreed upon by Supplier and Owlet to provide all relevant documentation regarding its financial status, including:

   (i)    a copy of Supplier's balance sheet, income statement, and cash flow statement extracted from its most recent audited financial statements within thirty (30) days after the availability of such audited financial statements; and

(c)    Failure to Cooperate. If Supplier fails to provide the Financial Information within ten (10) days after receipt of the request, or upon determination by Owlet (in its sole discretion) that Supplier's financial position poses a risk to Owlet's business, Owlet has the right, at its option, to terminate this Agreement immediately upon notice, without liability to Supplier therefor.

5.6    Survival. The representations, warranties and covenants set forth in this Article V shall survive the termination or expiration of this Agreement.

**ARTICLE VI**
**INTELLECTUAL PROPERTY MATTERS**

6.1    The Owlet shall choose the model and design of the Product and provide the Specification and special function requirements for the Product to the Supplier. The Supplier shall develop and manufacture the Product independently according to the Owlet's requirements.

18

Exhibit 7
Page 1217

6.2    Each party shall retain exclusive ownership and control of its background Intellectual Property Rights ("background IPRs"), which existed before the execution of this Agreement. The IPRs are provided by one Party to the other Party shall not use for any purposes other than the performance of this agreement.

6.3    The entire foreground Intellectual Property Rights created, conceived or generated under this Agreement by the Supplier in fulfilling the Supplier's obligation under this Agreement shall be owned by the Supplier, including the IPRS in connection with Internal Plastic Structure Design, PCB Hardware Design, PCB Layout, Embedded Software Development, API, SDK, Test Software &Tools and Manufacturing Techniques ("the Supplier's foreground IPRs). The entire foreground Intellectual Property Rights created, conceived or generated under this Agreement by the Owlet shall be owned by the Owlet, including the IPRS in connection with ID Design, Packaging Design and APP Development ("the Owlet's foreground IPRs).

The Supplier shall not use the Owlet's foreground IPRs and the Owlet's technical specifications, special function requirements and Owlet's background IPRs for any purpose other than the manufacture and supply of the Product to the Owlet, nor shall the Supplier authorize or knowingly permit them to be used by anyone else for, or in connection with, any purpose other than the manufacture and supply of the Product to the Owlet.

The Owlet shall not use the Supplier's foreground IPRs and Supplier's background IPRs for any purpose other than the sale and distribution of the Product to the Owlet's client, distributor, or retailers, nor shall the Owlet authorize or knowingly permit them to be used by anyone else for, or in connection with, any purpose other than the sale and distribution of the Product to the Owlet's client, distributor, or retailers. With respect to filing of patent application for the Owlet's foreground IPRs (in USA and PRC), the right to apply for a patent shall be owned by the Owlet. With respect to filing of patent application for the Supplier's foreground IPRs (in USA and PRC), the right to apply for a patent shall be owned by the Supplier.

6.4    Without the other party's written authorization, any party shall not use the other party's foreground IPRs, or have them used or manufactured in any other products or components.

6.5    The Owlet grants to the Supplier a non-exclusive and indivisible right not capable of being transferred or encumbered, either voluntarily or by law, to use the trademarks assigned by the Owlet (the "Trademarks") on the Packaging Materials or the Product. The use of the Trademarks shall be allowed only in a form previously approved by the Owlet in writing.

6.6    The Supplier shall always strictly comply with the instructions, directions and specifications which the Owlet or its representatives may give from time to time with regard to the quality, manufacture, and packing in respect to the appearance and way of use of the Trademarks on the Product and the Packaging Materials thereof, provided, however, that the above mentioned instructions, directions and specifications shall be agreed by both parties and subject to the laws of the USA.

19

Exhibit 7
Page 1218

6.7     Use of Trademarks. If directed by Owlet in writing, Supplier shall place onto the Products shipped to Owlet (or the packaging for such Products) the designated Owlet trademarks and part numbers in accordance with Owlet Specifications and subject to final approval from Owlet. In the event that any Products so labeled are not delivered to Owlet, whether due to scrap, rejection, cancellation of orders or otherwise, Supplier shall promptly remove and destroy or, at the request of Owlet, return to Owlet, any and all labels, name plates, or other trademarks placed on the Products. Supplier shall not use the "Owlet" name or any Owlet trademarks except as provided in this Agreement. Upon termination of this Agreement or upon the request of Owlet, Supplier will discontinue the use of the name "Owlet" and, thereafter, will not use Owlet's name or trademarks in any manner.

6.8     Promotion Limitation. Supplier covenants that it shall not use the "Owlet" name or any Owlet Trademarks, products or trade names in any advertising or promotion by Supplier (whether by including reference to Owlet in any list of customers, advertising that its services and products are used by Owlet, denying or confirming the foregoing or for any other purposes) without advance written permission and subject to final approval from Owlet.

6.9     Black and Grey Market Products.

(a)     Cooperation. The Parties acknowledge the importance of preventing Black Market Products and Grey Market Products from entering the stream of commerce. If Owlet becomes aware of, discovers, identifies, or receives any such products manufactured by Supplier or Subcontractors, Supplier shall cause its Subcontractors to cooperate in any investigation conducted by or on behalf of Owlet in connection therewith.

(b)     Liquidated Damages. If an investigation conclusively determines that the products or components were introduced into the black or grey market by, with the assistance, prior knowledge, or due to the negligence, of Supplier, Subcontractors, or their agents or employees, Supplier shall pay Owlet liquidated damages in accordance with Section 6.12 of this Agreement.

(c)     Factory Leaks. Supplier shall procure that Subcontractors and Supplier's employees have full knowledge of the importance of preventing leaks of Black Market Products and Grey Market Products from Subcontractor or Supplier factory(ies) by incorporating relevant obligations in agreements entered into by and between Supplier and Subcontractors. Supplier shall ensure that its and Subcontractors' internal policies and documentation are updated accordingly to make their respective employees aware of this issue. Such documentation is to include posting of an announcement to inform all employees that any distribution or sale of Black Market Products and Grey Market Products is prohibited and appropriate legal action will be taken in the event that such activity is discovered.

6.10     Licensed IP Misuse. Any Party shall not take advantage of any Licensed IP to enter into business relationships with any of the other Party's competitors in the juvenile products industry or to implement such Licensed IP in the manufacture of products or components for other baby monitor devices and/or related products and components equipment manufacturers and brands.

6.11     No Reverse Engineering. To the fullest extent permitted under applicable law, Any Party shall not modify, disassemble, decompile, adapt, alter, translate, reverse engineer, or create derivative works based on the Products, Licensed IP, or any materials associated or included with, or embedded into, the Products.

20

Exhibit 7
Page 1219

6.12     <u>Supplier Representative</u>. Supplier shall provide a Supplier Representative. The Supplier Representative must be able to speak, read, and write English and the local language (if not English) fluently and will serve as the primary contact between Owlet and Supplier. The Supplier Representative is to be technically competent and possess sufficient expertise to manage the manufacture of Products in accordance with the Specifications. The Supplier Representative is responsible for taking the necessary steps to ensure that Supplier supplies Owlet with Products that meet Owlet's Specifications and in accordance with the terms and conditions for delivery set forth in the Purchase Order, this Agreement and the Supplier Quality Agreement incorporated herein by reference.

6.13     <u>IP Protection and Infringement</u>.

(a)     <u>Proper Use of IP / No Filings</u>. Supplier shall refrain from acting in any manner that may compromise Owlet's rights in and to Trademarks, the reputation or goodwill associated with Trademarks, or any Owlet IP. Supplier shall not adapt, use, file or attempt to file anywhere in the world any applications for registration of trademarks, trade names, logos, copyright, patents or other IP rights that are identical or confusingly similar to Trademarks, Licensed IP, or any other IP of the Parties.

(b)     <u>No Encourage of Infringement</u>. Supplier itself shall not, nor shall it knowingly direct, encourage, or cause third parties to, engage in any activities that infringe Owlet's IP rights, including but not limited to (i) applying to register any Owlet Trademarks or logos; or (ii) engaging in any of the following conduct relating to Products not approved by Owlet ("**Unauthorized Products**"): (1) production by Supplier of quantities of Products in excess of those identified in any given Purchase Order; (2) without the written consent of Owlet, production by Supplier, Subcontractors, or any other third parties under Supplier's direction or control, of products that bear Trademarks, or imitate, copy or embody Owlet's copyright in drawings of the Products, and/or the Products' designs; and/or (3) selling or offering to sell any such products to third parties.

(c)     <u>Owlet Optional Remedies</u>. Upon any violation of this Section 6.11, Owlet has the right to deem such violation a material breach of this Agreement, which breach is grounds for termination with immediate effect upon the Supplier's receipt of notice thereof from Owlet. Alternatively, Owlet can notify Supplier in writing within thirty (30) days after Owlet's discovery of such activity and allow Supplier to submit a written action plan fully to address and eliminate the same within thirty (30) days following Supplier's receipt of notice.

**6.14**     <u>Liquidated Damages</u>. In the event Any Party breeches its obligations with right to the Licensed IP under Sections 6.1, 6.2, 6.5, 6.7, 6.8, 6.9 or 6.11 of this Agreement, it shall pay the other Party the sum of Four Hundred Thousand U.S. Dollars (USD $400,000) as liquidated damages. Any Party acknowledges that these liquidated damages set forth in this Section 6.12 are reasonable under the circumstances existing on the Effective Date and reasonably approximate the amount of damages that would be sustained including legal and other expenses that would need to be incurred, by the other Party as a consequence of such a breach. The liquidated damage amounts provided for herein are not intended to constitute a forfeiture or penalty, but are instead intended to reflect the Parties' mutual best estimate of aggrieved party's actual damages. Nothing in this Section 6.12 shall prevent observant party from pursuing any claim in law or equity against Breaching party to observant party from pursuing any claim in law or equity against Breaching party to remedy a breach of observant party's rights in the Licensed IP.

21

Exhibit 7
Page 1220

**ARTICLE VII**
**COMPLIANCE AND QUALITY CONTROL**

7.1        Compliance with Laws. Supplier will comply with all Applicable Laws that pertain to its activities under this Agreement and, except as otherwise provided herein, will bear the entire cost and expense of such compliance. In addition, Supplier covenants that it will comply with the U.S. Foreign Corrupt Practice Act (the "FCPA"), which prohibits offering, promising or paying any money, gift or any other thing of value to any person for the purpose of influencing official governmental actions or decisions in obtaining or retaining business relating to Products or Supplier's other obligations hereunder. Supplier covenants to promptly notify Owlet if it becomes aware of any failure to comply with Applicable Laws or the FCPA by Supplier or its directors, officers, employees, representatives, or agents. In the event that Supplier, its directors, officers, employees, representatives, or agents has violated any Applicable Laws or the FCPA, such violation shall be a breach of this Agreement and Owlet shall have the right to immediately terminate this Agreement in accordance with Section 10.2(d) and without further liability or obligation to Supplier.

7.2        Permits and Approvals. At all times during the Term of this Agreement, Supplier shall obtain and maintain (at Supplier's expense) all permits, certifications and licenses required by Applicable Law (including, without limitation, ISO certification, FDA registration and all other U.S. or international permits and approvals required) for the performance of Supplier's duties and obligations under this Agreement. Supplier shall notify Owlet as soon as practicable after receiving notice of any claim or action by the FDA or other Governmental Authority with respect to its permits, certifications or licenses that could adversely affect Supplier's performance of its obligations under this Agreement.

7.3        Quality Standards. Supplier agrees to comply at all times with Owlet's quality requirements as set forth in the Supplier Quality Agreement attached hereto as Exhibit C (the "SQA") and as otherwise agreed by the Parties, which quality requirements are hereby incorporated by reference into this Agreement. Supplier further agrees that Owlet may update its quality requirements and form of Supplier Quality Agreement from time to time and that, as a material condition of Supplier's right to continue as an approved Supplier, Owlet may require Supplier to sign its then current form of Supplier Quality Agreement; provided that if Supplier elects not to do so, Owlet shall have the right to terminate this Agreement. To the extent that any term in the SQA conflicts with any term of this Agreement, this Agreement shall govern and control.

7.4        Manufacturing Audits. Owlet shall have the right, at its expense, upon reasonable advance notice and at reasonable times, to inspect and audit Supplier's facilities involved in manufacturing the Product and other operations for the purpose of and to the extent necessary for verifying Supplier's compliance with its obligations hereunder and Owlet quality system requirements, including the right to (a) inspect the Products, (b) observe manufacturing and related operations, processes and methods with respect to the Products, (c) review documentation, and (d) conduct quality assurance, quality system and regulatory compliance audits with respect to the Products. Supplier shall cooperate in good faith with Owlet's inspection and verification efforts.

22

Exhibit 7
Page 1221

7.5      Debarment. Supplier certifies that it has not and will not use in any capacity in connection with the performance of its obligations under this Agreement, the services of any individual or entity debarred, excluded, suspended or disqualified by the U.S. Office of Inspector General of the Department of Health and Human Services or otherwise deemed ineligible to participate in any U.S. federal or state healthcare program.

7.6      Recordkeeping. Without limiting the generality of Section 7.1, Supplier agrees to create and maintain, at its own expense, all records necessary to comply with Applicable Law that relates to Supplier's performance under this Agreement and sufficient to demonstrate Supplier's compliance with its obligations under this Agreement.

## ARTICLE VIII
## CONFIDENTIALITY

The confidentiality terms set forth in the Confidentiality Agreement (or similar contract) between the parties attached to this Agreement as Exhibit D are hereby incorporated by reference into this Agreement and shall apply and extend to this Agreement and any related purchase order for the Term of this Agreement.

## ARTICLE IX
## INDEMNITY

9.1      Indemnification. Supplier shall indemnify and hold harmless Owlet, its affiliates, distributors and sales agents, and their respective directors, officers and employees from and against any and all claims, demands, suits, liabilities, losses, damages, penalties, fines, costs and expenses (including attorneys' fees and litigation expenses) paid or incurred by them which arise from or are related to: (a) any bodily injury, death or property damage resulting from any actual or proved defect in the materials, fabrication or workmanship of the Products or from the failure of the Products to comply with the Specifications or any other provision of this Agreement; (b) any facts or circumstances that would constitute a breach by Supplier of any of its representations, warranties or obligations under this Agreement or any agreement incorporated by reference into this Agreement; (c) any actual or proved violation by Supplier of any Applicable Law; or (d) any negligent or more culpable act or omission of Supplier or subcontractors or any of their respective employees or agents relating to the activities in connection with this Agreement.

9.2      NO CONSEQUENTIAL DAMAGES. NOTWITHSTANDING ANY OTHER TERM OF THIS AGREEMENT, EXCEPT AS SET FORTH IN THIS SECTION 9.3, IN NO EVENT SHALL EITHER PARTY OR ITS AFFILIATES BE LIABLE TO THE OTHER OR ITS AFFILIATES FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES OR ANY LOST PROFITS OR LOST OPPORTUNITIES, DIRECTLY OR INDIRECTLY ARISING FROM THE PERFORMANCE, FAILURE TO PERFORM OR BREACH OF THIS AGREEMENT, REGARDLESS OF ANY NOTICE OF THE POSSIBILITY OF SUCH DAMAGES.

Exhibit 7
Page 1222

NOTWITHSTANDING ANY OTHER TERM OF THIS AGREEMENT TO THE CONTRARY, NO PROVISION OF THIS AGREEMENT SHALL LIMIT EITHER PARTY'S LIABILITY FOR BREACH OF ITS CONFIDENTIALITY OBLIGATIONS, DEATH OR PERSONAL INJURIES SUFFERED BY THIRD PARTIES AS A RESULT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH PARTY, OR INTELLECTUAL PROPERTY INFRINGEMENT.

**ARTICLE X**
**TERM AND TERMINATION**

10.1     Term. The term of this Agreement shall be for one (1) year commencing on the Effective Date (the "Term"). Thereafter, the Term of this Agreement may be extended at Owlet's option upon ninety (90) days' written notice to Supplier. This Agreement may be terminated before expiration only by agreement of the Parties or in accordance with Section 10.2.

10.2     Termination. This Agreement may be terminated as follows:

(a)     By either Party upon written notice to the other Party in the event the other Party files for bankruptcy, liquidation, dissolution, or takes similar action seeking protection against creditors under insolvency laws, or has entered against it involuntarily a decree in bankruptcy or similar decree which remains in effect for sixty (60) days;

(b)     By either Party upon written notice to other Party if the other Party shall have breached any of its material representations, warranties, covenants or agreements hereunder and shall have failed to cure the same within ninety (90) days following receipt of written notice of such breach from such party, which notice shall specify the breach in reasonable detail;

(c)     By the mutual agreement of the Parties;

(d)     By Owlet immediately if it becomes aware that (i) Supplier has violated any compliance-related programs, policies or procedures of Owlet made available to Supplier, (ii) Supplier has violated any federal or state law, regulation or requirement, including without limitation the FCPA or any healthcare-related laws, rules or regulations, that are, or reasonably could be, detrimental to Owlet's business, or (iii) any charging or conviction of Supplier of any crime involving fraud, moral turpitude or immoral conduct; or

(e)     By Owlet, without cause, upon six (6) months' prior written notice to Supplier.

10.3     Order Fulfillment; Depletion of Inventory. Upon the expiration or termination of this Agreement by Owlet pursuant to Sections 10.2, at Owlet's request, Supplier shall continue to manufacture and deliver all Products that are the subject of firm purchase orders from Owlet as of the date of expiration or termination in accordance with the terms of this Agreement.

24

Exhibit 7
Page 1223

10.4    Effect of Termination on Rights . The termination or expiration of this Agreement shall not relieve either Party of any accrued obligations (including indemnification and confidentiality obligations) that are intended to survive or to be performed after, the termination or expiration of this Agreement. The termination or expiration of this Agreement shall be without prejudice to any rights that shall have accrued to the benefit of any Party prior to such termination or expiration.

(a)    IP Use. Upon expiration or termination of this Agreement for any reason, any party shall immediately cease using Licensed IP and Trademarks.

(b)    Delivery of Materials and Payments Owing. Upon expiration or termination of this Agreement, Supplier shall deliver to Owlet all Tools, tooling 2D and 3D drawings, tooling maintenance records, jigs and fixtures, quality and manufacturing documentation, Specifications, finished or unfinished Products, samples, Product Seconds, as well as all Owlet Proprietary Information, Trademarks, and Owlet IP, and Owlet shall pay to Supplier any undisputed amounts of payments owing under this Agreement. Further, all deposits, prepayments or other property of Owlet held by Supplier are thereafter to be held on behalf of Owlet, and Supplier shall return the same to Owlet promptly on request in accordance with this and any other applicable terms of this Agreement.

**ARTICLE XI**
**MISCELLANEOUS**

11.1    Interpretive Conventions. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be understood to be followed by the words "without limitation." Pronouns, including "he," "she" and "it," when used in reference to any person, shall be deemed applicable to entities or individuals, male or female, as appropriate in any given case. Standard variations on defined terms (such as the plural form of a term defined in the singular form, and the past tense of a term defined in the present tense) shall be deemed to have meanings that correlate to the meanings of the defined terms. Article, Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of any provision of this Agreement.

When a reference is made in this Agreement to a Recital, an Article, a Section, a Schedule, an Attachment or an Exhibit, such reference is to a Recital, Article or Section of, or a Schedule, Attachment or Exhibit to, this Agreement, unless otherwise indicated. All references to "dollars" or "$" shall be deemed to be references to the lawful currency of the United States.

11.2    Entire Agreement. This Agreement, along with the attached exhibits and any other terms and/or agreements incorporated herein by reference, constitute the entire understanding between the parties regarding the subject matter hereof and no party has relied on any representation not expressly set forth or referred to in this Agreement.

11.3    Amendments. Except as otherwise provided herein, this Agreement may not be amended, supplemented or otherwise modified except by an instrument in writing signed by both parties.

25

Exhibit 7
Page 1224

11.4    Force Majeure. Neither party shall be liable to the other for default or delay in performing any of its obligations when such default or delay is caused by events or circumstances beyond the party's reasonable control. any party shall notify the other party immediately of any actual or potential force majeure event that threatens to delay the time and performance of its obligations under this Agreement.

11.5    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. Neither party shall assign this Agreement or any of its rights or liabilities hereunder without the prior written consent of the other party.

11.6    Relationship of Parties. Each party to this Agreement is an independent contractor and nothing contained in this Agreement shall be construed to place the parties in the relationship of employer and employee, partners, principal and agent, or joint venturers. Employees and agents of one party are not employees or agents of the other party, shall not hold themselves out as such, and shall not have any authority or power to bind the other party to any contract or other obligation.

11.7    Severability. If any provision of this Agreement or the application thereof to any party or circumstances shall be declared void, illegal or unenforceable, the remainder of this Agreement shall be valid and enforceable to the extent permitted by Applicable Laws. In such event, the parties shall use their best efforts to replace the invalid or unenforceable provision with a provision that, to the extent permitted by the Applicable Laws, achieves the purposes intended under the invalid or unenforceable provision. Any deviation by any party from the terms and provisions of this Agreement in order to comply with Applicable Laws shall not be considered a breach of this Agreement.

11.8    Waiver. This Agreement and any rights hereunder shall not be waived, released, abandoned, discharged, changed or modified in any manner except by an instrument in writing signed by each of the parties. The failure of a party to enforce any of the provisions of this

Agreement at any time shall in no way be construed to be a waiver of such provision, nor affect the validity of this Agreement or such provision, or limit the right of the party thereafter to enforce this Agreement or such provision. No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.

11.9    Remedies Cumulative. No right or remedy conferred upon or reserved to a party in this Agreement is intended to be exclusive of any other right or remedy. Remedies provided for in this Agreement shall be cumulative, and in addition to and not in lieu of, any other remedies available to either party at law, in equity or otherwise.

11.10    Notice. Notice Means one party notifying the other that they are in breach of the contract or they intend to end the contract. Any notice provided for under this Agreement shall be in writing, shall be deemed to have been sufficiently provided and effectively made as of the delivery date if hand-delivered, or as of the date received if mailed by registered or certified mail, postage prepaid, facsimile or by overnight courier, and addressed to the receiving party at its respective address as follows:

Exhibit 7
Page 1225

If to Owlet:

Owlet Baby Care Inc.
2500 Executive Pkwy, Suite 300
Lehi, UT 84043
Fax No.:
Attn.: Supply Chain Manager

If to Supplier (*Supplier to fill in*):

SHENZHEN AONI ELECTRONIC CO., LTD
8F, #5 Bldg, Honghui Industrial Park, 2nd Liuxian Road,
Baoan District, Shenzhen, P.R.China, 518101
Fax:
Attention: General Manager of IPC

11.11    Jointly Prepared. This Agreement has been prepared jointly and shall not be strictly construed against either party.

11.12    Further Assurances. Each party hereto agrees to execute, acknowledge and deliver such further instruments, and to do all such other acts, as may be necessary or appropriate in order to carry out the purposes and intent of this Agreement.

11.13    Ethical Business Practices. In no event will Owlet be obligated under this Agreement to take any action or omit to take any action that it believes in good faith would cause it to be in violation of any laws, including without limitation the US Foreign Corrupt Practices Act. Supplier shall provide Owlet and Owlet's Affiliates with such assurances and certifications regarding Supplier's activities as Owlet may reasonably request with respect to Supplier's compliance with Section1.2. Supplier understands that U.S. law (a) generally prohibits payments by Owlet or Owlet's Affiliates or any intermediary, including Supplier, to foreign government officials for an improper business purpose, (b) restricts export or re-export of Products to, or transactions with, certain countries or nationals of such countries, (c) generally prohibits compliance with or facilitation of boycotts of countries by Owlet or Owlet's Affiliates or their agents, and (iv) generally prohibits any dealings with individuals or organizations that commit, threaten to commit, or support terrorism (a current list of such individuals and organizations may be obtained at the US Treasury Department website at www.ustreas.gov/ofac under the "Terrorist Financing and Financial Crime" link).

11.14    Export Controls. Without in any way limiting the provisions of this Agreement, no products, items, commodities, or technical data or information obtained from the other Party nor any direct product of such technical data or information is intended to or shall be exported or re-exported, directly or indirectly, to any destination restricted or prohibited by applicable law without necessary authorization by governmental authorities, including (without limitation) the US Bureau of Industry and Security.

11.15    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.

27

Exhibit 7
Page 1226

11.16    <u>Dispute Resolution</u>. The parties will resolve any claims or disputes by the sequential methods outlined in this section.

(a)    <u>Direct Negotiation</u>. The parties will attempt in good faith to resolve any claims or disputes arising out of or relating to this Agreement ("Dispute") promptly by direct negotiations within sixty (60) days after a Party's written request for a meeting.

(b)    <u>Arbitration</u>. If the parties cannot resolve a dispute after direct negotiation outlined in Section 11.14(a) within sixty (60) days after a party's written request for a meeting, the other party may submit the Dispute for binding arbitration, and the Dispute shall be determined by arbitration in accordance with the International Arbitration Rules of the International Centre for Dispute Resolution (the "Rules"). The place of the arbitration shall be in New York City, New York State, USA. The language of the arbitration shall be English. There shall be one (1) arbitrator who shall be appointed according to the Rules. The arbitrator shall decide the matters in the Dispute in accordance with the internal laws of the State of New York, USA, without reference to the conflict of laws rules thereof. The parties agree that the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 applies to this Agreement, as implemented by the Federal Arbitration Act, 9 U.S.C. §§1-16, §§201-208. Unless otherwise ordered by the arbitrator, each party shall bear its own costs and fees, including attorneys' fees and expenses. The arbitrator shall have the right to award or include in his or her award any relief which the arbitrator deems proper under the circumstances, including without limitation, money damages (with interest on unpaid amounts from due date), specific performance, injunctive relief, legal fees and costs, provided that the arbitrator shall not have the authority to award <u>exemplary or punitive damages and is not empowered to act <i>ex aequo et bono</i> or as <i>amiable compositeur</i></u>.

(c)    <u>Injunctive Relief</u>. The procedures specified in this Section 11.16 shall be the sole and exclusive procedures for the resolutions of Disputes between the parties arising out of or relating to this Agreement; provided, however, that a party may seek injunctive or other provisional judicial relief in any court having jurisdiction over the Dispute, if in its reasonable judgment such action is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the parties will continue to participate in good faith in the procedures specified in this Section 11.16. Injunctive or provisional relief or judgment enforcing any award rendered by the arbitrator may be entered by any court having jurisdiction over the party against whom enforcement is sought. The parties hereby agree to submit to the jurisdiction of any court having jurisdiction over the parties with respect to such injunctive or provisional relief or such judgment to enforce the arbitral award. Each of the parties hereby consents to the service of process by registered mail or by an express delivery service providing a return receipt at its address set forth in the Agreement and agrees that its submissions to jurisdiction and its consent to service of process by mail are made for the express benefit of the other party.

28

Exhibit 7
Page 1227

11.17    Non-Exclusivity. Supplier acknowledges and agrees that Supplier may not be Owlet's exclusive supplier of the Products, and that Owlet is free to purchase the same Products or similar products from other suppliers as Owlet may determine in its sole discretion and to manufacture the Product or similar products internally.

11.18    Counterparts; Electronic of Facsimile Transmission. This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument. This Agreement may be delivered by one or both parties by facsimile or electronic transmission with the same effect as if delivered personally.

*[Signatures appear on the following page]*

29

Exhibit 7
Page 1228

**IN WITNESS WHEREOF**, the duly authorized representatives of the parties hereto have caused this Manufacturing and Supply Agreement to be executed as of the Effective Date.

| OWLET BABY CARE INC. | | SUPPLIER: **SHENZHEN AONI ELECTRONIC CO., LTD** | |
|---|---|---|---|
| By: | /s/ David Kizer | By: | /s/ Wendell Woo |
| | *Signature* | | *Signature* |
| Name: | David Kizer | Name: | Wendell Woo |
| | *Print name* | | *Print name* |
| Title: | VP Sourcing | Title: | General Manager of IPC Division |
| | *Print title* | | *Print title* |

30

Exhibit 7
Page 1229

**EXHIBIT A**

**Product Description**

The Products are fully packaged baby monitor devices and/or related products and components that Supplier and/or Subcontractors manufacture and assemble on Owlet's behalf and to Owlet's Specifications under this Agreement, including any updates, renewals, modifications or amendments thereto, all of the foregoing as may be further specified in this Exhibit A (as amended by the Parties from time to time during the Term) and/or as set out in Business Award Letters.

1)   Owlet Baby Camera

---

A-1

Exhibit 7
Page 1230

**EXHIBIT B**

**<u>Product Pricing</u>**

<u>*Payment*</u>

1). non-MP orders to pay up front for samples and mockups.

2). 10% deposit and 90% OA 30 days for the first 2 months of MP orders (shipments made <60 days from MP start).

3). 100% OA 30 days starting from the 3rd month of MP orders (shipments made >60 days from MP start).

4). FOB Shenzhen

5). 500K credit, only open invoices count against credit

6) $30K NRE- 50% upon business award and 50% when we get our first working sample with all features.

7) $56,430 Tooling- 50% on tooling kickoff and 50% upon tooling approval.

8) Remarks: Orders for month 1 and month 2 of MP will be 10% deposit and 90% OA 30 days. Orders for the 3rd month MP and later will be 100% OA 30 days.

<u>*Each Pricing*</u>

TO BE ADDED ONCE FINALIZED

---

B-1

Exhibit 7
Page 1231

**EXHIBIT C**

**<u>Supplier Quality Agreement</u>**

**1)  General**

This Supplier Quality Agreement (this "Agreement") by and between Owlet Baby Care Inc. and its affiliates ("Owlet") and **[ <u>SHENZHEN AONI ELECTRONIC CO., LTD</u> ]** ("Supplier"), is entered into as of the date signed by Owlet below.

**2)  Scope**

This Agreement is an attachment to the Manufacturing and Supply Agreement between Owlet and Supplier dated of even date herewith (the "Manufacturing Agreement") and provides the individual responsibilities of all parties as it relates to the quality aspects of manufacturing, testing, handling, release and distribution of Product(s) to ensure compliance. The Agreement takes the form of a detailed listing of the activities associated with manufacture, testing, handling, release and distribution of Product(s). Responsibility for each activity is assigned to a party. This Agreement shall be maintained by the quality organization of each party.

**3)  Defined Terms**

Terms used as defined terms but not defined in this Agreement shall have the meanings ascribed to them in the Manufacturing and Supply Agreement. This Agreement is subject to the terms of the Manufacturing and Supply Agreement. Notwithstanding anything to the contrary contained in this Agreement, all activities performed by Supplier must be done shall be done in compliance with all Applicable Laws including, without limitation, GMPs.

**4)  Communications**

Supplier will contact the appropriate Owlet representative as outlined below:

- <u>Regarding this Agreement</u>: Inquiries will be addressed to the Owlet Contact Person listed in Section 15B of this agreement (Owlet Contact Person).
- <u>Regarding individual Owlet Purchase Orders</u>: Inquiries will be addressed to the Owlet Sourcing representative (as the "Owlet Buyer") as shown by the Purchasing Authorization signature line on the applicable purchase order.
- <u>Via written correspondence</u>: As used in this Agreement, "via written correspondence" means that the correspondence must be in writing and sent to the designated Owlet Contact Person.

**5)  Specifications and Contract Review**

Supplier will manufacture products and/or perform services in compliance with industry standards and the requirements specified by Owlet, including but not limited to requirements in the following Owlet documents (collectively, the "Specifications"):

C-1

Exhibit 7
Page 1232

- Purchase Orders;
- Product Prints, Material Specifications and/or Owlet Engineering Specifications; and
- Inspection Criteria.2

Owlet will provide Supplier with Purchase Orders and documentation that reflects the current revision level Specifications, as appropriate. During contract review, the Supplier will examine all technical documentation, for feasibility upon receipt; the Supplier will notify the Owlet contact person promptly of any defects and risks.

Supplier will communicate to the Owlet Buyer if there are any questions or issues regarding the interpretation and/or understanding of any of the Specifications provided by Owlet. Supplier will manufacture products for Owlet in accordance with the Specifications.

**6) Management Changes and Quality System Changes**

Supplier will maintain a Quality Management System that complies with ISO 9001:2008 or ISO 13485:2003 and 21 CFR Part 820.

The Supplier shall notify the Owlet Contact Person, <u>via written correspondence</u>, of significant changes in the Organizational Management structure within 10 business days of the change so that Owlet can evaluate the potential impact. These changes include, but are not limited to, changes in management with executive responsibility or changes in management responsible for regulatory, regulatory compliance, quality or quality systems.

Supplier will notify the Owlet Contact Person, <u>via written correspondence</u>, within 10 days of any changes to the status of their Quality Management System registration/certification (e.g., loss of certification) with regard to any regulatory agency, including the Food and Drug Administration ("FDA"), Notified Body, or other governmental authority.

Management and Quality Systems changes will be documented on Supplier's letterhead and sent, <u>via written correspondence</u>, to the Owlet Contact Person.

**7) Product Complaints, Field Alerts, and Recalls**

Owlet will notify Supplier, <u>via written correspondence</u>, in a timely manner, of any customer complaints or Medical Adverse Event Reports that implicate Supplier's processes (i.e., manufacturing, filling, and packaging/distribution).

If Supplier becomes aware of any product complaints that impact the products and/or services Supplier provides to Owlet, it is the responsibility of Supplier to notify the Owlet Contact Person, <u>via written correspondence</u>, immediately.

Supplier, if requested by Owlet, will conduct internal investigations, record reviews, and sample evaluations as required to determine the validity of the complaint and report the results to the Owlet Contact Person in the requested timeframe. The nature of the complaint will dictate the appropriate response time.

---

2   Note to draft: please advise if there are other documents containing Specifications that we should list.

Exhibit 7
Page 1233

In the event Owlet is required or voluntarily decides to recall or withdraw product that potentially implicates Supplier's processes, Supplier will fully cooperate with Owlet in connection with such a recall or withdrawal.

**8) Process Control and Process Validation**

Supplier will ensure that all processes that directly affect the quality of products and/or services performed are clearly defined and carried out under controlled conditions. Supplier's process control program must include:
- Use of suitable equipment and environment to produce products.
- Monitoring and control of critical process parameters and product characteristics using in-process inspection or other applicable statistical methods.
- Documentation of changes regarding production and process controls.
- Trained, qualified personnel to perform operations on Owlet products and/or services. For example, where certifications are required (i.e., Fluorescent Penetrant Inspection (FPI), X-Ray, welding, etc.) only certified operators are to perform these operations.
- Defined and controlled criteria for workmanship standards, such as representative samples, or illustrations.
- Validation of processes that cannot be fully verified.
- System(s) to protect Owlet's products from contamination by foreign materials.
- Control of non-conforming materials
- Validation and control of any and all rework processes.

Supplier will create written instructions and procedures which describe the manner in which manufacturing activities are carried out. Each new revision of these documents must be reviewed and approved by both the Supplier and by Owlet before they are used in manufacturing. Only documents which are approved in this manner may be used in the manufacture of Owlet product.

Supplier shall have established process validation process with records documented and available for Owlet review when requested. Supplier's process validation process must include:
- Monitor and control process parameters to meeting Owlet's specified requirements.
- If changes or process deviation occur, Supplier shall evaluate the process and perform revalidation where appropriate.

Supplier will ensure all employees have the appropriate training and skills to perform their job function, and establish training requirements and maintain records for each job function.

**9) Changes to Supplier Processes or Materials**

Supplier shall notify the Owlet Contact Person, <u>via written correspondence</u>, of any significant changes prior to implementation of the proposed change. Significant process or material changes include, but are not limited to, changes to the production processes, manufacturing materials, manufacturing location, in-sourced or out-sourced product and or services or equipment associated with Owlet's products and/or services. See Appendix A for further guidance.

C-3

Exhibit 7
Page 1234

Supplier will document proposed change requests and will send the proposed change request, <u>via written correspondence</u>, to the Owlet Contact Person. Owlet will evaluate the proposed change request for impact to Owlet's product and notify Supplier in writing of the proposed change request disposition. Supplier must obtain written approval from Owlet before changes to product or service are made effective.

Supplier will have a documented procedure to ensure all purchased raw materials, manufacturing materials, products and services conform to requirements. This process shall at a minimum include:
- Evaluation of new and existing suppliers, contractors, consultants
- Type and extent of control exercised over products or services
- Maintenance of records of acceptable suppliers, service providers, contractors, and consultants.
- CAPA system
- Supplier Scorecard System

If Supplier subcontracts to third parties for products and/or services, Supplier shall ensure that these subcontractors are in compliance with Supplier's documented Quality Management System and Specifications, including but not limited to:
- Monitor the subcontractors
- Obtain from each subcontractor a duly signed and authorized written agreement, in which the subcontractor explicitly confirms its compliance with the Quality Management System and Specifications
- Present such agreement without delay to Owlet
- Deliver any and all additional documentation as Owlet may reasonably request.
- Report regularly to Owlet the supplier scorecard and CAPA status for all suppliers.

Owlet may request documented proof showing Supplier has ensured the effectiveness of sub- contractors quality management system.

If requested by Owlet, Supplier shall provide validation protocols and applicable results of validation activities when requesting any changes to processes or equipment for which validation requirements have been established and agreed upon.

**10) Product Identification and Traceability**

Supplier will maintain a system(s) to:
- Maintain line clearance to prevent contamination by comingling with another lot.
- Establish unique identification of individual product or batches from receipt through all stages of production and delivery.
- Control the segregation of product through all production processes.
- Ensure a first-in-first-out (FIFO) control system.

C-4

Exhibit 7
Page 1235

- Supplier must ensure that identification of the packaged products will remain legible during shipping and storage.
- Handle any nonconforming materials
- Handle any materials discovered to be outside of the system controls.

**11) Inspection**

Supplier will ensure that all incoming product, including raw material, whether from an outside supplier or from a Owlet facility are conforming to all required specifications.

Supplier will establish and maintain quality records of in-process and final inspection criteria as well as document results of inspections performed on Owlet's product and/or services

First article layout inspections will be conducted and documented by Supplier. When first article layout samples are required, they will be submitted according to Owlet's site requirements.

**12) Non-Conforming Product and CAPA**

Supplier shall establish and maintain procedures for control of non-conforming products and corrective and preventative actions. This includes identification of non-conformances, segregation and/or quarantine, investigation of cause, evaluation and disposition/destruction of non-conformances.

Supplier shall at the request of Owlet perform investigations and take corrective actions on any Owlet Supplier Corrective Action Request (SCAR). Supplier agrees to respond to SCARs within the timeframe specified in the documents.

Owlet may provide regular communication regarding supplier performance to the Supplier contact person and others as appropriate (e.g. Quality Manager).

Supplier shall notify via written correspondence to the Owlet contact person of any process disruptions and quality deviations, and shall analyze the causes, initiate improvement measures and review their effectiveness. In case Supplier has to ship non-conforming product to Owlet, this product shall be separated from regular products and clearly identified "Non Conforming Product" or equivalent.

Any repair or rework, if any, must be inspected in accordance with documented inspection procedures and/or the Quality Requirements Specification and the other requirements as set forth in this Agreement. Repair or rework that involves a change as defined in section 7 requires Owlet's prior written approval.

**13) Certification and Shipment**

Supplier will utilize appropriate packaging for shipments to prevent damage and contamination during transit. Supplier will also provide proper certification of conformity with each lot. Certification will include at minimum:

C-5

Exhibit 7
Page 1236

- Owlet part number and revision
- Owlet Purchase Order (PO) number
- Material heat # (if applicable)
- Supplier job/lot number
- Owlet Work Order#/ job # (if applicable)
- Quantity
- Statement of conformance to all specifications in accordance to the revisions of these documents specified with the Purchase Order
- Signature, printed name and date must be on each certificate
- Any hand written information required for traceability or acceptance must have the printed name, signature and date

If certification is not received or does not contain the required information, the material shall be considered non-conforming. Owlet has the right to independently check the data reported by the Supplier. Any issues will be resolved jointly.

**14) Records**

Supplier will maintain records in accordance with its document retention policy. Prior to disposing of any records, including by reason of expiration of the holding period, or if Supplier ceases business with Owlet, or closes its facility, then the Supplier will notify, <u>via written correspondence</u>, the Owlet Contact Person immediately and supply Owlet all requested manufacturing and quality related documents.

Owlet, its employees, agents, contractors and assigns will have access to all manufacturing and quality records either directly or by a third party in a timely manner.

Supplier will use commercially reasonable efforts to maintain and store documents in a manner to prevent loss or deterioration.

**15) Audits**

Supplier will allow Owlet, and third parties assigned by Owlet, to perform audits of its facilities on mutually agreed upon schedules and intervals. If corrective actions are needed in Owlets' sole discretion, Supplier agrees to provide and comply with Corrective and Preventative Action plans as required to achieve the corrective actions.

Supplier shall grant Owlet and its representative access to all plant areas, test departments, warehouses and adjoining areas, as well as access to relevant documents that pertain to Owlet's products and services.

In the event of quality issues, the Supplier shall enable Owlet and/or its representatives, to conduct an audit at their sub-contractor, and Supplier may accompany Owlet.

Supplier will notify Owlet, <u>via written correspondence</u>, of any regulatory body or notified body (FDA, competent authority) inspection that is scheduled or initiated at their facility. Supplier will provide required details of any actions (e.g. correction, removal, 483 findings, warning letter, etc.) that impacts the products and/or services Supplier provides to Owlet.

C-6

Exhibit 7
Page 1237

**16) Continuous Quality Improvement**

Supplier is recommended to improve its processes, systems, and performance and sustain both internal and external quality levels of its materials, processes or services using improvement techniques such as six sigma, lean manufacturing and/or other techniques consistent with the medical device and biologics industry.

Supplier is recommended to use statistical process controls and a supporting process capability analysis to achieve continuous quality improvement and failure rate reductions. If applicable, Supplier will, upon request, provide Owlet with evidence of such process controls and capabilities, including all supporting information.

Supplier will regularly share continuous improvement activities' updates with Owlet.

**17) Contact Information**

| A) Supplier Information: |
| Note to Supplier: This section is to be filled out electronically or can be legibly handwritten. |
| Company Name: **SHENZHEN AONI ELECTRONIC CO., LTD** |
| Supplier Contact Person: Lyle Lee |
| Title: Product Manager |
| E-mail Address: liyy@anc.cn |
| Telephone No.: (+)86-755-29169461Ext.: 8801 |
|  |
| B) Owlet Information |
| Owlet *Contact Person : Jutika Gokarn |
| Title: Quality Manager |
| E-mail Address: jutika.g@owletcare.com |
| Telephone No.: (+)1-217-417-4027 |

C-7

Exhibit 7
Page 1238

* THIS IS THE OWLET CONTACT PERSON

*[Signatures appear on the following page]*

C-8

Exhibit 7
Page 1239

IN WITNESS WHEREOF, the signatories below certify that they representative of Supplier and Owlet and can enter into this agreement. are an authorized

**SUPPLIER**

**Operations Management Representative**

Print Name:     Wendell Woo

Title:     General Manager of IPC Division

Signature:     /s/ Wendell Woo

Date:     6/21/2018

**Quality Management Representative**

Print Name:     Lyle Lee

Title:     Product Manager

Signature:     /s/ Lyle Lee

Date:     6/21/2018

C-9

Exhibit 7
Page 1240

**OWLET**

**Owlet Sourcing Management Representative**

David Kizer
_____
Print Name

VP Sourcing
_____
Title

/s/ David Kizer
_____
Signature

6/21/2018
_____
Date

**Owlet Quality Management Representative**

Jutika Gokarn
_____
Print Name

Quality Manager
_____
Title

/s/Jutika Gokarn
_____
Signature

6/21/2018
_____
Date

C-10

Exhibit 7
Page 1241

**Exhibit 10.12**

**SUBSCRIPTION AGREEMENT**

This Subscription Agreement (the "Agreement") is made as of May 20, 2014 ("Effective Date"), by and between Owlet Baby Care ("Subscriber"), having offices in Provo, Utah, and Ayla Networks, Inc. ("Ayla"), having offices at 607 W. California Ave., Sunnyvale, California 94086.

1  <u>Description of Services</u>. Ayla's Services allow manufacturers to build "Devices," which are devices which connect to or interoperate with the Services. The "Services" consist of (a) Ayla's web sites located at aylanetworks.com (the "Site"); (b) Ayla Cloud Services, a platform that allows Subscriber and Subscriber's end user customers to view and manage Subscriber's use of the Service and manage Devices; (c) Ayla Connectivity Stacks, which consists of software that enables a Device to connect to Ayla Cloud Services; and (d) Ayla Application Libraries, which consist of software that allows Subscriber to build applications that allow Subscriber's end user customers to access Devices and the Service (collectively with (c), the "Software"). The Services may also include data and other content and printed and electronic documentation provided by Ayla ("Documentation"). Any new features added to or augmenting the Service are also subject to this Agreement.

2  <u>Access and Use of the Service; Restrictions</u>.

2.1  Subject to the terms of this Agreement, Ayla hereby grants Subscriber a limited, non-exclusive, non-transferable, non-sublicensable, license during the term of this Agreement to (i) access Ayla Cloud Services pursuant to the terms provided therein and in accordance with the selected device and data plan; (ii) install the Software onto Devices in order to allow them to access the Service; (iii) install, copy, use and modify the microcontroller code drivers contained in the Software that implement the APIs for the Ayla Connectivity Stacks solely as necessary to incorporate onto Devices to allow them to connect to the Service; (iv) install, copy, use and modify the Ayla Application Libraries contained in the Software to create applications that allows end user customers to access their Devices and the Service; and (v) distribute the Software in object form only and as incorporated in Devices to distributors and purchasers of the Devices pursuant to end user license agreements at least as protective of Ayla as the terms of this Agreement. Any rights not expressly granted herein are reserved and no license or right to use any trademark of Ayla or any third party is granted to Subscriber in connection with the Services. For clarity, Ayla reserves the right to refuse connection to the Ayla Cloud Service by any Device that is not in compliance with its selected device and/or data plan.

2.2  Subscriber will not, directly or indirectly: (i) reverse engineer, decompile, disassemble or otherwise attempt to discover the source code, object code or underlying structure, ideas or algorithms of the Services or any software or documentation related to the Services; (ii) modify, translate, or create derivative works based on the Services or any Software (except to the extent expressly permitted by Ayla or authorized within the Services); (iii) use the Services in connection with any other software in a manner that would modify the license terms of the Software or require Ayla or its licensors to distribute or make available any of Ayla's or such licensors' proprietary software or intellectual property; or (iv) remove, efface or obscure any proprietary notices or labels. Subscriber will not (and will not allow any third party to) use any portion of the Services, including without limitation the microcontroller code drivers or software included in the Ayla Connectivity Stacks, to connect a Device to any website or service other than*.aylanetworks.com without Ayla's explicit written consent.

2.3  Subscriber agrees to promptly communicate to Ayla Subscriber's discovery of any bugs or errors in the Services, and Subscriber may communicate to Ayla suggestions for improvements to the Services (collectively, "Feedback"). Ayla shall own all right, title, and interest in and to the Feedback, and will be entitled to use the Feedback without restriction. Ayla shall not be required to use any Feedback, including fixing any bugs or errors, and will in its sole discretion determine the manner and schedule for any bug or error fixes.

2.4  Subscriber is responsible for obtaining and maintaining any equipment and ancillary services needed to connect to, access or otherwise use the Services, including, without limitation, Devices, modems, hardware, servers, software, operating systems, networking, and web servers (collectively, "Equipment"). Subscriber shall also be responsible for maintaining the security of the Equipment, Subscriber's account, passwords (including but not limited to administrative and user passwords) and files, and for all uses of Subscriber's account or the Equipment with or without Subscriber's knowledge or consent.

Exhibit 7
Page 1242

2.5   Subscriber represents, covenants, and warrants that Subscriber will use the Services only in compliance with this Agreement, Ayla's standard published policies then in effect, and all applicable laws and regulations (including but not limited to policies and laws related to spamming, privacy, intellectual property, consumer and child protection, obscenity or defamation). Any use of the Services in violation of the foregoing will result in immediate termination of Subscriber's account and Ayla may pursue all available remedies at law and equity. Subscriber hereby agrees to indemnify and hold harmless Ayla against any damages, losses, liabilities, settlements and expenses (including without limitation costs and attorneys' fees) in connection with any claim or action that arises from an alleged violation of the foregoing or otherwise from Subscriber's use of Services in violation of this Agreement. Without limiting Ayla's other rights and remedies, Subscriber acknowledges and agrees that any actual or threatened breach of Sections 4 or 5 would result in irreparable harm to Ayla, and Ayla shall be entitled to equitable relief as a remedy for such breach.

3   Payment. Subscriber will pay fees for the Services as set out in Exhibit A of this Agreement. Subscriber agree to pay all fees due to Ayla within 30 days after invoice, or in any other manner agreed to by Subscriber and Ayla in writing. If Subscriber disputes any charges, Subscriber must let Ayla know within sixty (60) days after the date that Ayla invoices Subscriber. Subscriber is responsible for all taxes associated with Subscriber's use of the Services, excluding taxes based on Ayla's income.

4   Confidentiality. Each party (the "Receiving Party") understands that the other party (the "Disclosing Party") has disclosed or may disclose business, technical or financial information relating to the Disclosing Party's business, which may include personally identifying information of individuals (hereinafter referred to as "Proprietary Information" of the Disclosing Party). Proprietary Information of Ayla includes non-public information regarding features, functionality and performance of the Service. The Receiving Party agrees: (i) to take reasonable precautions to protect such Proprietary Information, and (ii) not to use (except as expressly permitted herein) or divulge to any third person any such Proprietary Information. The Disclosing Party agrees that the foregoing shall not apply with respect to any information after five (5) years following the disclosure thereof or any information that the Receiving Party can document (a) is or becomes generally available to the public, or (b) was in its possession or known by it prior to receipt from the Disclosing Party, or (c) was rightfully disclosed to it without restriction by a third party, or (d) was independently developed without use of any Proprietary Information of the Disclosing Party or (e) is required by law.

5   Data. All data provided by Subscriber and Subscriber's end user customers to the Services (collectively, "Device Data") belong to Subscriber and/or Subscriber's end user customers, as applicable. Subscriber hereby grants Ayla, and will contractually obligate Subscriber's end user customers to grant to Ayla, a perpetual, worldwide, non-exclusive, royalty-free, fully paid up, assignable and transferable right and license to use Device Data to provide the Services, to improve and enhance the Services and Devices, and for other development, diagnostic and corrective purposes in connection with the Services. Ayla may collect certain usage statistics and data from the Service and information on which portion of the Services are being used and how they are being used. Such data may be used by Ayla in aggregated and anonymized format in order to improve and enhance the Services and otherwise in connection with Ayla's business.

6   Term and Termination. This Agreement will be in effect as of the Effective Date and continue for the term set forth in Exhibit A. Subscriber has the right to terminate Subscriber's account and this Agreement at any time in accordance with the procedures set forth on the Services. Either party may terminate this Agreement upon thirty (30) days' notice (or immediately and without notice in the case of nonpayment or breach of Section 2), if the other party materially breaches any of the terms or conditions of this Agreement. Subscriber will pay in full for the Services contractually committed except in the case of breach by Ayla. Upon any termination, all rights and licenses granted to Subscriber hereunder will immediately terminate, other than sublicenses of the software binaries and microcontroller code drivers included in the Ayla Connectivity Modules solely as installed onto a Device pursuant to Section 2.1(iv) (subject to continued payment, if applicable) and Subscriber's and Ayla's rights to data under Section 5. All sections of this Agreement which by their nature should survive termination will survive termination, including, without limitation, restrictions on use, accrued rights to payment, data, confidentiality obligations, indemnification obligations, warranty disclaimers, and limitations of liability.

Exhibit 7
Page 1243

7    Transition Assistance Services. If Ayla discontinues the Services or Documentation, ceases to do business in the ordinary course, or files any petition for bankruptcy, Ayla will, at Subscriber's cost, provide to Subscriber reasonable transition assistance to allow the Services to continue without interruption or disruption, to minimize adverse effect, and to facilitate the orderly transfer of the services to Subscriber or Subscriber's designee.

8    WARRANTIES AND DISCLAIMER. Ayla shall use reasonable efforts consistent with prevailing industry standards to provide and maintain the Services in a manner which minimizes errors and interruptions in the Services. Services may be temporarily unavailable for scheduled maintenance or for unscheduled emergency maintenance, either by Ayla or by third-party providers, or because of other causes beyond Ayla's reasonable control, but Ayla shall use reasonable efforts to provide advance notice in writing or by e-mail of any scheduled service disruption. EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE SERVICES, ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT ANY WARRANTIES OF ANY KIND, AND AYLA EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT.

9    LIMITATION OF LIABILITY.

9.1    UNDER NO CIRCUMSTANCES AND UNDER NO LEGAL THEORY (WHETHER IN CONTRACT, TORT, OR OTHERWISE) SHALL AYLA BE LIABLE TO SUBSCRIBER OR ANY THIRD PARTY FOR (A) ANY INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING LOST PROFITS, LOST SALES OR BUSINESS, LOST DATA OR BUSINESS INTERRUPTION, OR (B) FOR ANY DIRECT DAMAGES, COSTS, LOSSES OR LIABILITIES IN EXCESS OF THE FEES ACTUALLY PAID BY SUBSCRIBER IN THE SIX (6) MONTHS PRECEDING THE EVENT GIVING RISE TO SUBSCRIBER'S CLAIM. THE PROVISIONS OF THIS SECTION ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN THE PARTIES, AND THE PARTIES HAVE RELIED ON THESE LIMITATIONS IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

9.2    Some states do not allow the exclusion of implied warranties or limitation of liability for incidental or consequential damages, which means that some of the above limitations may not apply to Subscriber. IN THESE STATES, AYLA'S LIABILITY WILL BE LIMITED TO THE GREATEST EXTENT PERMITTED BY LAW.

9.3    The Services are not designed, intended, or certified for use in components of systems intended for the operation of weapons, weapons systems, nuclear installations, means of mass transportation, aviation, life support computers or equipment (including resuscitation equipment and surgical implants), pollution control, hazardous substances management, or for any other dangerous application in which the failure of the Services could create a situation where personal injury or death may occur. Subscriber may not use the Services in connection with such equipment or application.

10    Indemnification.

10.1    Subscriber shall defend, indemnify, and hold harmless Ayla from and against any claims, actions or demands, including without limitation reasonable legal and accounting fees, arising or resulting from Subscriber's breach of this Agreement, or Subscriber's use or misuse of the Services.

10.2    Ayla shall indemnify, defend, and hold harmless Subscriber against any liabilities, damages and costs (including reasonable attorneys' fees) payable to a third party arising out of a third party claim alleging that the use of the Services as permitted herein infringe any third party intellectual property right. Notwithstanding the foregoing, Ayla will have no obligation under this section or otherwise with respect to any infringement claim to the extent based upon (i) any unauthorized use, reproduction, or distribution of the Services, any breach of this Agreement by Subscriber, or any specifications supplied by Subscriber which cannot be implemented in a manner without causing the relevant claim, (ii) any combination of the Services with other products, equipment, software, uses or data not supplied, authorized or recommended by Ayla, (iii) any modification of the Services by any person other than Ayla or its authorized agents or contractors or (iv) any activity after Ayla has provided Subscriber with a work around or modification that would have avoided such issue without materially adversely affecting the functionality or availability of the Services. Further, if Ayla reasonably believes that all or any portion of the Services, or the use thereof, is likely to become the subject of any infringement claim, suit or proceeding, Ayla will procure, at Ayla's expense, for Subscriber the right to continue using the Services in accordance with the terms hereof, replace or modify the allegedly infringing Service to make it non-infringing, or, in the event the preceding is infeasible or not commercially practicable, Ayla may, in its sole discretion, terminate this Agreement or the applicable Statement of Work upon written notice to Subscriber and refund to Subscriber any prepaid amounts for unused Services.

Exhibit 7
Page 1244

10.3  A party seeking indemnity shall provide the indemnifying party with prompt notice of any claim, allow the indemnifying sole control over defense and settlement of the claim, and provide reasonable assistance with defense and settlement.

11   Export Controls. Subscriber may not remove or export from the United States or allow the export or re-export of the Services, Software or anything related thereto, or any direct product thereof in violation of any restrictions, laws or regulations of the United States Department of Commerce, the United States Department of Treasury Office of Foreign Assets Control, or any other United States or foreign agency or authority. As defined in FAR section 2.101, the Software and documentation are "commercial items" and according to DFAR section 252.2277014(a)(1) and (5) are deemed to be "commercial computer software" and "commercial computer software documentation." Consistent with DFAR section 227.7202 and FAR section 12.212, any use modification, reproduction, release, performance, display, or disclosure of such commercial software or commercial software documentation by the U.S. Government will be governed solely by the terms of this Agreement and will be prohibited except to the extent expressly permitted by the terms of this Agreement.

12   Miscellaneous. If any provision of this Agreement is found to be unenforceable or invalid, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement will otherwise remain in full force and effect and enforceable. This Agreement is not assignable, transferable or sublicensable by Subscriber except with Ayla's prior written consent. Ayla may transfer and assign any of its rights and obligations under this Agreement without consent. This Agreement is the complete and exclusive statement of the mutual understanding of the parties and supersedes and cancels all previous written and oral agreements, communications and other understandings relating to the subject matter of this Agreement, and that all waivers and modifications must be. in a writing signed by both parties, except as otherwise provided herein. No agency, partnership, joint venture, or employment is created as a result of this Agreement and Subscriber does not have any authority of any kind to bind Ayla in any respect whatsoever. In any action or proceeding to enforce rights under this Agreement, the prevailing party will be entitled to recover costs and attorneys' fees. This Agreement shall be governed by the laws of the State of California without regard to the principles of conflicts of law. Unless otherwise elected by Ayla in a particular instance, Subscriber hereby expressly agree to submit to the exclusive personal jurisdiction of the federal and state courts of the State of California for the purpose of resolving any dispute relating to Subscriber's access to or use of the Service.

IN WITNESS THEREOF, the parties hereto have executed this Agreement as of the day, month, and year written above.

Exhibit 7
Page 1245

**Owlet Baby Care**

By:     /s/ Zach Bomsta

Name:     Zach Bomsta

Title:     CTO, Co-Founder

Date:     5/21/2014

**AYLA NETWORKS, INC.**

By:     /s/David Friedman

Name:     David Friedman

Title:     CEO

Date:     7/22/14

Exhibit 7
Page 1246

**Exhibit 10.12(a)**

Amendment to the Subscription Agreement dated May 20, 2014 (the "Agreement")
By and between Ayla Networks, Inc. ("Ayla") and Owlet Baby Care Inc. ("Customer")

This Amendment supplements and modifies the Agreement as follows:

1.  Section 2, "Access and Use of the Service; Restrictions"
    Section 2.1 shall be supplemented with the following:

Subject to the terms stated herein and Customer's performance of its obligations, Ayla grants to Customer a personal, non-exclusive, license to use the Software, which, as defined herein includes software made available to Customer in source code format. Customer may use the Software solely to de-bug the software embedded in its device(s) or application(s) solely for the purpose of connecting to the Ayla cloud platform. The 'Ayla cloud platform' includes the developer platform (which is Ayla's proprietary developer and testing cloud platform) and the field platform (which is Ayla's proprietary production cloud platform). Customer's rights are for internal company use only, and Customer shall not disclose, distribute or otherwise transfer the Software for any purpose. Customer may not use such Software to connect to any other cloud service or platform. Any transfer by Customer of any Software or other application made available in source code format is prohibited. The Software is provided to Customer on an 'as-is, where-is' basis, and Ayla will not provide support, documentation or any other assistance. If Customer discovers a bug using the Software, Customer may request that Ayla provide a patch in accordance with applicable support policies and procedures.

In addition to the terms contained herein, Customer agrees that Software is considered Confidential Information and is accessible only by Customer's employees who have a need to access the Software. Customer warrants that: (a) any such employee has been apprised of and acknowledges the confidential and proprietary nature of the Software; (b) has been trained in accordance with industry standard procedures designed to preserve the confidentiality of the Software; and (c) its employees are aware and agree to Customer's obligations to use the Software only under the conditions permitted herein. Customer will not allow hard copy versions of any portion of the Software to exist except within secure locations. Customer will not allow soft copy versions of any portion of Software to reside on computers or networks unless they are password protected with access available only to authorized employees. Ayla may, from time to time and upon reasonable prior written notice, audit Customer's compliance with the terms contained herein. Customer will be responsible and fully liable to Ayla for any breach hereunder. If there is any unauthorized use or disclosure of the Software, Customer shall notify Ayla immediately and fully cooperate, at Customer's expense, in minimizing the effects of such unauthorized use or disclosure.

The Software may contain third party materials, including software (along with libraries, databases, drivers and similar components, or portions thereof) that is made available for use under a free or open source license. In addition to the restrictions and obligations stated herein, Customer will comply with any restrictions and obligations related to the third party materials. The third party materials are published at http://www.aylanetworks.com/third-party-software, and may be updated from time to time. Customer shall not use or take action with any portion of the Software in a manner that would: (a) require the Software to be disclosed or distributed in source code format; or (b) require the Software to be modified or derivative works made without additional compensation; or (c) require the Software be redistributable at no charge; or (d) permits reverse engineering of the Software; or (e) require the Software to be used only for non-commercial purposes; or (f) require third party attribution; or (g) restrict any rights to assert or enforce patent rights.

Exhibit 7
Page 1247

The Software is not designed, intended, or certified for use involving the operation of weapons, weapons systems, nuclear installations, means of mass transportation, aviation, life support computers, pollution control, hazardous substance management. Customer shall not, directly or indirectly, transmit, disclose or otherwise provide: (i) social security numbers (or similar personal identification number) ; (ii) health insurance or policy identification numbers, protected health information regulated under the Health Insurance Portability and Accountability Act of 1996; or (iii) credit card, payment account information or any other payment information where the transfer to and processing by Ayla would cause Ayla to be subject to the Payment Card Industry Data Security Standard. If Customer, directly or indirectly, transmits or provides to Ayla any Data or information described herein, Customer shall indemnify, and hold Ayla harmless from and against, any liability arising from such transmission.

2.      Section 8, "Warranties and Disclaimer"

For Software provided in source code format, Ayla does not warrant that any Software modified by Customer will achieve the functionality described in the Agreement or elsewhere.

3.      Section 10, "Indemnification"

Section 10.2 shall be supplemented with the following:

Ayla shall have no obligations under this section or otherwise with respect to any infringement claim to the extent such claim is based upon or arises out of any modification or alteration of the Software, including any changes in the source code unless such changes were made by Ayla.

This Amendment is effective as of July 14, 2020. To the extent there is a conflict between the Agreement and this Amendment, the terms contained in this Amendment shall control. Other than as expressly agreed herein, no other terms in the Agreement are affected or modified.

| OWLET BABY CARE INC. (CUSTOMER) | AYLA NETWORKS, INC. |
|---|---|
| By:   /s/ Mike Abbott | By:   /s/ Jonathan Cobb |
| Name:   Mike Abbott | Name:   Jonathan Cobb |
| Title:   President | Title:   CEO |

Exhibit 7
Page 1248

**Exhibit 10.13**

[***] Certain information in this document has been excluded pursuant to Regulation S-K, Item (601)(b)(10). Such excluded information is not material and would likely cause competitive harm to the registrant if publicly disclosed.

**MANUFACTURING SERVICES AGREEMENT**

by and between

**OWLET BABY CARE, INC.**

and

**BENCHMARK ELECTRONICS (THAILAND) PCL**

Page 1 of 21

Exhibit 7
Page 1249

**TABLE OF CONTENTS**

| **MANUFACTURING SERVICES AGREEMENT** | | **3** |
|---|---|---|
| **1.** | **TERM AND SCOPE** | **3** |
| 1.1 | Term. | 3 |
| 1.2 | Scope. | 3 |
| **2.** | **AGREEMENT INTERPRETATION** | **3** |
| 2.1 | Definitions. | 3 |
| 2.2 | Order of Precedence. | 5 |
| 2.3 | General. | 5 |
| **3.** | **PRICES AND ADJUSTMENTS** | **6** |
| 3.1 | Prices. | 6 |
| 3.2 | Exclusions from Price. | 6 |
| 3.3 | Other Price Adjustments. | 6 |
| **4.** | **PURCHASE ORDERS** | **7** |
| 4.1 | Orders. | 7 |
| 4.2 | Initial Order / Rolling Firm Order Horizon. | 7 |
| 4.3 | Order Acceptance. | 7 |
| **5.** | **DELIVERY AND ACCEPTANCE** | **7** |
| 5.1 | Delivery. | 7 |
| 5.2 | Acceptance. | 7 |
| 5.3 | Late Delivery. | 7 |
| **6.** | **INVOICING AND PAYMENT TERMS** | **8** |
| 6.1 | Invoicing. | 8 |
| 6.2 | Payment. | 8 |
| 6.3 | Customer's Financial Status. | 8 |
| **7.** | **FORECASTS AND MATERIALS LIABILITY** | **8** |
| 7.1 | Forecast. | 8 |
| 7.2 | Excess Components and Obsolete Components Inventory. | 9 |
| 7.3 | Prepaid Inventory Option. | 9 |
| 7.4 | Component Yield Loss/Attrition. | 10 |
| 7.5 | Inventory Turns. | 10 |
| **8.** | **CHANGES** | **10** |
| 8.1 | General. | 10 |
| 8.2 | Non-ECO Changes. | 10 |
| 8.3 | ECO Changes. | 10 |
| 8.4 | Deviations. | 10 |
| 8.5 | Waivers. | 10 |
| 8.6 | Cost Reductions. | 10 |
| **9.** | **QUALITY** | **11** |
| 9.1 | Specifications. | 11 |
| 9.2 | Content of Specifications. | 11 |
| 9.3 | Quality of Components. | 11 |
| 9.4 | Inspection of Facility. | 11 |
| 9.5 | Root Cause Analysis. | 11 |
| 9.6 | Supplier Representative. | 11 |
| **10.** | **CUSTOMER FURNISHED ITEMS / SUBCONTRACTORS** | **11** |
| 10.1 | Customer-Furnished Items. | 11 |
| 10.2 | Care of Customer-Furnished Items. | 12 |
| 10.3 | Components Sold by Customer to Benchmark. | 12 |
| 10.4 | Subcontractors. | 12 |
| **11.** | **WARRANTY** | **12** |
| 11.1 | Limited Warranty. | 12 |
| 11.2 | RMA Procedure. | 12 |
| 11.3 | Warranty Exclusions. | 13 |
| 11.4 | Disclaimers. | 13 |
| 11.5 | Remedy. | 13 |
| **12.** | **TERMINATION** | **13** |
| 12.1 | Termination for Convenience. | 13 |
| 12.2 | Termination for Cause. | 13 |
| 12.3 | Insolvency or Material Change. | 13 |
| 12.4 | Asset Transfer at Termination. | 13 |
| **13.** | **INDEMNITY** | **14** |
| 13.1 | Benchmark Indemnity Obligations. | 14 |
| 13.2 | Customer Indemnity Obligations. | 14 |
| 13.3 | Infringement Mitigation. | 14 |
| 13.4 | Indemnification Procedure. | 14 |

Exhibit 7

Page 1250

| 13.5 | Exclusive Indemnity. | 15 |
| **14.** | **LIMITATIONS** | **15** |
| 14.1 | Remedies. | 15 |
| 14.2 | Consequential and Other Damages. | 15 |
| 14.3 | Cumulative Damages. | 15 |
| 14.4 | Limitations Essential. | 15 |
| **15.** | **CONFIDENTIALITY.** | **15** |
| **16.** | **INTELLECTUAL PROPERTY** | **15** |
| 16.1 | Infringement. | 15 |
| 16.2 | Joint Inventions. | 15 |
| 16.3 | Work Product. | 15 |
| 16.4 | License. | 15 |
| 16.5 | Trademarks. | 16 |
| 16.6 | Promotion Limitation. | 16 |
| 16.7 | Manufacturing Process Data. | 16 |
| 16.8 | Black and Grey Market Products. | 16 |
| 16.9 | No Reverse Engineering. | 17 |
| **17.** | **INSURANCE** | **17** |
| 17.1 | Required Coverages. | 17 |
| 17.2 | Policy Requirements. | 17 |
| 17.3 | Waiver of Right of Recovery. | 18 |
| 17.4 | No Release. | 18 |
| 17.5 | Policy Copies. | 18 |
| **18.** | **COMPLIANCE WITH LAWS** | **18** |
| 18.1 | General. | 18 |
| 18.2 | Import/Export. | 18 |
| 18.3 | Product Content Regulation. | 19 |
| **19.** | **MISCELLANEOUS** | **19** |
| 19.1 | Force Majeure. | 19 |
| 19.2 | Independent Contractor. | 19 |
| 19.3 | Audit. | 19 |
| 19.4 | Assignment and Delegation. | 19 |
| 19.5 | Successors and Assigns. | 20 |
| 19.6 | Notices. | 20 |
| 19.7 | Dispute Resolution / Governing Law. | 20 |
| 19.8 | Waiver. | 20 |
| 19.9 | Severability. | 20 |
| 19.10 | Survival. | 20 |
| 19.11 | No Third Party Beneficiaries. | 20 |
| 19.12 | Integration and Modification. | 21 |
| 19.13 | Counterparts. | 21 |
| 19.14 | No Solicitation. | 21 |
| **20.** | **BUSINESS ETHICS AND COMPLIANCE.** | **21** |
| **EXHIBIT "A" – STATEMENT OF WORK** | | **21** |
| **EXHIBIT "B" – NONDISCLOSURE AGREEMENT** | | **21** |
| **EXHIBIT "C" – DECLARATION ON BUSINESS ETHICS AND COMPLIANCE** | | **21** |
| **EXHIBIT "D" – ENGINEERING SERVICES AGREEMENT TEMPLATE** | | **21** |

Exhibit 7
Page 1251

**MANUFACTURING SERVICES AGREEMENT**

This MANUFACTURING SERVICES AGREEMENT (the "*Agreement*") is effective as of October 24, 2017 (the "*Effective Date*"), by and between **Owlet Baby Care, Inc.**, a Delaware Corporation with offices at 2500 Executive Parkway, Suite 300, Lehi, UT 84043 ("*Customer*") and **Benchmark Electronics, Inc.**, a Texas corporation with offices at 3000 Technology Drive, Angleton, TX 77515, along with its wholly-owned subsidiary **Benchmark Electronics (Thailand) PCL,** a Thailand company with offices at 94 Moo 1 Hi-Tech Industrial Estate, Banlane, Bang Pa-In, Ayutthaya 13160, Thailand (collectively, "*Benchmark*").

## 1.    TERM AND SCOPE

**Term.** This Agreement is effective on the Effective Date and shall remain in effect for a period of one (1) year. Thereafter, this Agreement will be extended automatically on each anniversary date for successive one (1) year periods, until one Party provides written notice of non-renewal at least ninety (90) days before the end of the then-current term or extension. Notwithstanding the foregoing, the term of this Agreement shall automatically extend to include the term of any Order accepted hereunder, except where this Agreement has been terminated for cause.

**Scope.** This Agreement shall only cover the sale of goods and/or manufacturing services by Benchmark to Customer. If Customer desires for Benchmark to provide goods and/or manufacturing services to Customer's Affiliate, or for a Benchmark Affiliate to provide goods and/or manufacturing services to Customer and/or its Affiliate, the engagement of such goods and/or manufacturing services shall be subject to the terms and conditions of this Agreement upon the execution by the contracting entities of an SOW incorporating, in whole or in part, the terms and conditions of this Agreement, and adding any additional terms or modifying any existing terms of the Agreement necessary to reflect the manufacturing and business requirements unique to the relationship between the contracting entities. Benchmark and Customer shall also complete an SOW for the purposes of this Agreement.

(a)    *DFx*. Customer shall ensure that its Product(s) design adheres to good engineering practices. Benchmark may provide DFx services to Customer related to Products manufactured under this Agreement, or in connection with quoting new manufacturing opportunities. Customer is responsible for any changes it elects to incorporate into its design, including any DFx.

(b)    *Design Services*. The scope of this Agreement does not include engineering/design services and deliverables relative to any Product(s) ("*Design Services*"). Any such Design Services shall be provided pursuant to a separate Engineering Services Agreement ("*ESA*") executed by the Parties in substantially similar form as Exhibit D.

(c)    *Test Fabrication*. Any Test Fabrication shall be provided under a separate SOW. All Test Fabrication shall be owned by Customer upon Customer's approval and/or release of the production test equipment for use in manufacturing.

## 2.    AGREEMENT INTERPRETATION

0.3    **Definitions.**

"*Affiliate*" shall mean any individual, partnership, association, corporation, trust, unincorporated organization, limited liability company or any other business entity or enterprise that directly or indirectly Controls, or is controlled by, or is under common control with, a specified Party.

"*AML*" shall refer to the Approved Manufacturer List.

"*Authorized Purchase*" shall have the meaning assigned in Section 7.1(c).

"*AVL*" shall refer to the Approved Vendor List.

"*BOM*" shall refer to Customer's Bill of Materials.

"*Claim*" shall refer to demands, actions, causes of action, proceedings, lawsuits, assessments, losses, damages, liabilities, settlements, judgments, fines, penalties, interest, costs and expenses (including fees and disbursements of counsel) of every kind brought by any person, corporation, governmental entity or other entity that are not a party to this Agreement.

"*Component*" shall refer to any raw materials, parts, assemblies, or other constituent part listed in the Specifications, BOM, AML, AVL, or other written requirements for any Product.

Exhibit 7
Page 1252

"*Confidential Information*" shall mean information (in any form or media) provided by a Party ("*Discloser*") to another Party ("*Recipient*") regarding Discloser's customers, prospective customers, methods of operation, engineering methods and processes, programs and databases, patents and designs, vendors and suppliers, prices, business methods and procedures, finances, management, or any other business information relating to Discloser that is marked "Confidential", or if disclosed orally or otherwise in non-documented form, is identified as confidential at the time of initial disclosure, and is designated as confidential in a writing provided to Recipient within thirty (30) days after disclosure; provided, however, that Confidential Information does not include information that: (i) was known to Recipient prior to receipt from Discloser; (ii) is or becomes part of the public domain through no breach of this Agreement; (iii) is received from a third party without breach of any obligation of confidentiality; or (iv) is independently developed by Recipient without reference to Confidential Information.

"*Control*" (and with correlative meanings, the terms "controlled by" and "under common control with") means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of another Person, whether through the ownership or voting securities, by contract, or otherwise.

"*Customer-Furnished Items*" shall have the meaning assigned in Section 10.1.

"*Delivered Cost*" shall mean Benchmark's quoted cost of the Components together with any applicable VAT and/or in-process duties, plus a three percent (3%) markup on said costs for handling and reasonable restocking charges.

"*Deviation*" shall refer to a specific written authorization, granted prior to the manufacture of an item, to depart from a particular performance or design requirement of a specification, drawing or other document for a specific number of Products or a specific period of time. A deviation differs from an engineering change in that an engineering change requires corresponding revision of documentation of the affected item, whereas a deviation does not contemplate revision of the applicable specification or drawing.

"*DFx*" shall refer to any combination of DFC (design for component), DFM (design for manufacturability), DFT (design for testing) or DFQ (design for quality) services and related change proposals, if any, provided by Benchmark relative to any Product(s) in connection with volume production.

"*ECO*" shall refer to a written engineering change order.

"*Excess Components*" shall mean Authorized Purchases of individual Component inventory that either (a) exceeds [***] and/or then-current Forecast, or (b) has been in Benchmark's inventory for more than [***].

"*Forecast*" shall have the meaning assigned in Section 7.1(a).

"*Intellectual Property*" shall mean any patent, trademark, mask work, copyright, trade secret or any other intellectual property rights.

"*Intellectual Property Infringement*" shall mean actual or alleged infringement or misappropriation of any Intellectual Property rights.

"*Long Lead-Time Components*" shall refer to those Components with procurement lead times greater than ninety (90) days.

"*MOQ*" shall refer to that Minimum Order Quantity of Components that certain suppliers may require generally or at certain price points.

"*MRO*" shall refer to Maintenance, Repair and Operations supplies and consumables that are necessary for normal equipment maintenance, repair and manufacturing operations but not typically included in the Specifications.

"*NCNR*" shall refer to Component purchases that are non-cancellable and/or non-returnable, whether designated as such at purchase or that become NCNR after purchase (including "broken" packages, open reels, or passage of time).

"*Nonconforming Product*" shall refer to a Product that does not conform to the Product warranty provided in Section 11.1(a).

"*NRE Charges*" shall refer to setup, tooling, ECO, or non-recurring engineering activities.

"*Obsolete Components*" shall mean the individual Authorized Purchase Component inventory for which there is no demand based upon Customer's Orders and/or Forecast (whether as a result of an ECO or any other reason whatsoever), even though Customer considers the Products that incorporate such Components as "active" Products because such Products remain on Customer's Product list or price list made available to Customer's end users.

"*Party*" or "*Parties*" shall refer in the singular to either Customer or Benchmark, and collectively to both.

"*Passive Sourcing*" shall include sending a letter to key Component suppliers advising them of their PCR responsibilities, then archiving any data/certification communications received and forwarding such information to Customer.

"*Person*" means any individual, partnership, corporation, trust, limited liability entity, unincorporated organization, association, governmental authority or any other entity.

"*Pre-Existing IP*" shall mean the intellectual property owned, developed or created by a Party either before or independently of this Agreement.

"*Prices*" shall have the meaning assigned in Section 3.1(a).

Exhibit 7
Page 1253

*"Product"* shall refer to those finished good items specified in Exhibit A and/or a Product Quotation for volume production accepted by Customer.

Exhibit 7
Page 1254

"**Product Content Regulation**" or "**PCR**" refers to the following laws and/or regulations on content, packaging, or labeling of Products, Components or substances, and/or similar issues: "**RoHS**" (EU Directives 2011/65/EU on Restriction of Hazardous Substances Directive and 2015/863 amending Annex II to Directive 2011/65/EU); "**WEEE**" (EU Directive 2012/19/EU on Waste Electrical and Electronic Equipment); "**REACH**" (EC Regulation No 1907/2006 on Registration, Evaluation and Authorization of Chemicals); and EU Member State's implementations of the foregoing; "**Conflict Minerals**" as defined in the U.S. Dodd-Frank Wall Street Reform and Consumer Protection Act § 1502(b), implementing legislation and rules; the People's Republic of China (PRC) Management Methods for the Restriction of the Use of Hazardous Substances in Electrical and Electronic Products; and/or any other mutually agreed PCR; together with implementing regulations and/or administrative rules.

"**Product Quotation**" shall refer to Benchmark's written proposal(s) from time to time issued to Customer listing the Product and the new or revised pricing for each assembly of the Product, together with the Assumptions (as defined in Section 3.1(a)) upon which the proposal relies.

"**Purchase Order**" or "**Order**" shall refer to a written or other mutually agreed upon signal obligating Benchmark to manufacture and ship Products according to the particulars of the signal or SOW that it pertains to, and for Customer to purchase such Products as agreed.

"**RMA**" shall refer to Return of Merchandise Authorization and the related procedure at Section 11.2.

"**Specifications**" shall refer to, drawings, SOW, BOM, AML/AVL or other Customer-provided documentation or data that sets forth the Components, design, technical aspects, configuration, labeling, manufacturing and deliverable details and/or requirements for a Product, or any of these that are approved in writing by Customer and clearly provided as Specifications to Benchmark.

"**Statement of Work**" or "**SOW**" shall refer to a document executed by the Parties in substantially similar form as Exhibit A that details the particulars for a specific product(s) or program(s).

"**Test Fabrication**" shall mean services for the design and/or build of production test equipment relative to the Products.

"**Waiver**" shall mean a written authorization to accept a configuration item or other designated items, which during production or after having been submitted for inspection, are found to depart from specified requirements, but nevertheless are considered suitable "as is" or after rework by an approved method, to be determined at the sole discretion of Customer.

"**Workmanship**" shall refer to Benchmark's manufacturing and test processes performed in accordance with the Specifications and the workmanship standards set forth therein. In any case where the Specifications are silent with respect to workmanship standards, then for those details Benchmark will manufacture in accordance with IPC-A-610 (current rev), Class 2.

**Order of Precedence.** All Orders, order acknowledgments and invoices issued pursuant to this Agreement are issued for the convenience of the Parties only and shall be subject to the provisions of this Agreement and the Exhibits hereto. When interpreting this Agreement, precedence shall be given to the respective parts in the following descending order:

(a)      this Agreement;

(b)      Exhibits to this Agreement;

(c)      SOWs subject to this Agreement;

(d)      Product Quotations accepted by Customer;

(e)      those portions of accepted Order(s) concerning part numbers, quantity and delivery dates, excluding any other pre-printed or referenced terms and conditions; and

(f)      other documents incorporated by reference herein.

0.5     **General.**

(g)      Headings and bold type are for convenience only and do not affect the interpretation of this Agreement.

(h)      Words of any gender include all genders and the plural shall include the singular and bodies corporate shall include unincorporated bodies and (in each case) vice versa.

(i)      Other parts of speech and grammatical forms of a word or phrase defined in this Agreement have a corresponding meaning.

(j)      An expression referring to a person includes any company, partnership, joint venture, association, corporation or other body corporate and any authority as well as an individual.

(k)      A reference to a clause, Party, schedule, attachment or exhibit is a reference to a clause of, or a Party, schedule, attachment or exhibit to, this Agreement.

Exhibit 7
Page 1255

(l)        A reference to any legislation includes all delegated legislation made under it and amendments, consolidations, replacements or re-enactments of any of them.

(m)        No provision of this Agreement will be construed adversely to a Party because that Party was responsible for the preparation of this Agreement or that provision. The provisions of this Agreement shall be construed and interpreted fairly and in good faith to both Parties without regard to which Party drafted the same.

(n)        Specifying anything in this Agreement after the words 'including' or 'for example' or similar expressions does not limit what else is included.

(o)        This Agreement is written in the English language. The meaning of the English text herein shall prevail over the meaning of any translation thereof.

## 3.        PRICES AND ADJUSTMENTS

0.6        **Prices.**

(a)        During the term of this Agreement, Customer shall have the right to purchase Products from Benchmark at the prices or price models set forth in an SOW and/or an accepted Product Quotation (the "***Prices***"). Prices are in U.S. Dollars and are based upon: [***] ("***Assumptions***") set forth in an SOW and/or an accepted Product Quotation.

(b)        The Parties agree that the following methodology shall be used to add new Products to this Agreement and/or to revise current Prices for existing Products. Benchmark shall issue a Product Quotation to Customer stating the new Product and its pricing or the revised pricing for an existing Product. To indicate Customer's acceptance of the Product Quotation, Customer shall: (i) provide Benchmark with written acceptance (by electronic mail or facsimile) of the Product Quotation; (ii) enter into an SOW incorporating the Product Quotation; or (iii) issue an Order or revise an open Order, to reflect the new Product or the existing Product, as specified in the Product Quotation. All Product Quotations accepted by Customer shall be made a part of this Agreement as if set out herein in their entirety.

**Exclusions from Price.** Prices do not include:

(c)        freight, export and/or import licensing of the Product, or payment of broker's fees, duties, tariffs, or other similar charges; any such charges shall be separately stated and invoiced to Customer, except to the extent that such charges are incurred due to Benchmark's failure to adhere to Customer's labeling instructions as stated in the Specifications, or for any other reason caused by Benchmark's failure to comply with any requirements of this Agreement;

(d)        taxes or charges (other than those based on net income of Benchmark) imposed by any taxing authority upon the manufacture, sale, shipment, storage, "value add", or use of the Product which Benchmark is obligated to pay or collect; any such taxes or charges shall be separately stated and invoiced to Customer;

(e)        the cost of compliance with any legislation that relates to the return of end of life Product from Customer to Benchmark for disposal; if Benchmark is required to comply with such legislation, Benchmark shall be compensated for reasonable costs incurred, chargeable on a monthly basis;

(f)        NRE Charges, which shall be separately stated and invoiced; provided, however, that upon mutual agreement Benchmark will amortize NRE Charges over a period of six (6) to twelve (12) months to be mutually agreed upon by the Parties in writing;

(g)        expedited fees or premiums charged by suppliers of Components resulting from Customer's schedule changes as permitted herein; or

(h)        penalties imposed by the Thai government resulting from an error on the import documentation for materials.

0.8        **Other Price Adjustments.**

(i)        ***Initial Volume Production***. For the limited purpose of the first month after the mutually agreed date for the start of volume production, as identified in the delivery schedule of the first production Order, the definition of Excess Components shall be modified to refer to any inventory that is not used in the manufacture of the Product and shipped to Customer within one hundred eighty (180) days from receipt of the individual Components. The value of such Excess Components inventory shall be Benchmark's purchase price. If Customer communicates a delay in this schedule in writing, then Benchmark shall provide a detailed cost breakdown of the Excess Components inventory for every thirty (30) days of delay in the schedule. Customer shall purchase the Excess Components from Benchmark and consign the Excess Components back to Benchmark. Immediately following the shipment of the first month of volume production ramp for Product, the definition of "Excess Components" shall revert back to that in Section 2.1.

Exhibit 7
Page 1256

(j)         **Pricing Assumptions**. Customer acknowledges that the Prices set forth in an SOW and/or an accepted Product Quotation are based on the Assumptions set forth in Exhibit A, or in the applicable SOW and/or a Product Quotation. If Benchmark experiences an increase in cost as a result of changes in the Assumptions, Benchmark has the right to re-quote the Prices of the affected Products by submitting a Product Quotation with revised Prices and/or pricing model to Customer in accordance with Section 3.1(b), for which Customer may object to the increased pricing within thirty (30) days of receipt of such Product Quotation. Upon rejection, Customer may cancel future Orders under the SOW, subject to Customer's responsibilities relating to Authorized Purchases as set forth in this Agreement.

(k)         **Component Pricing**. In the event Benchmark is unable to purchase Components at the standard costs set forth in the BOM ([***]) used by Benchmark to prepare a Product Quotation that is later accepted by Customer, Benchmark shall be permitted to increase its Prices for the affected Product in proportion to the increase in the cost of the Component(s). This applies only to Orders placed by Customer which are within the agreed upon lead time.

(l)         **Market Conditions**. Pricing will be locked in for [***] following business award. Either Party may reopen the subject of Product pricing in response to material changes in market conditions, including labor rates, which are outside of the control of Benchmark. For a change to be considered to reopen negotiations [***].

(m)         **Exchange Rates**. With regard to applicable foreign currency exchange rate ratios between (i) the local currency of the facility in which Benchmark incurs Component or other costs in connection with this Agreement ("**Local Currency**") and (ii) the currency of the sales price (or payment price, if different from the sales price); if the ninety (90) day average exchange rate as quoted by Wall Street Journal's applicable foreign currency exchange rate varies by more than five percent (5%) from the date of the most recent accepted Product Quotation, the Parties shall adjust Prices for Products as mutually agreed in writing to compensate for the effects of the foreign currency exchange rate variance for costs incurred in the Local Currency. Upon each adjustment, the Parties shall set a new mutually agreed base rate based upon the then-current exchange rate for determining future adjustments until the next accepted Product Quotation.

## 4.    PURCHASE ORDERS

**Orders.** Customer will issue Orders at the mutually agreed upon lead-time for the specific Product(s). Each Order shall be in the form of a written or electronic communication and shall contain the following information: [***].

**Initial Order / Rolling Firm Order Horizon.** Upon the execution of this Agreement, Customer shall provide Benchmark with an initial ninety (90) day firm Order(s). Each month, Customer shall provide additional Order(s) sufficient to maintain the firm Order horizons.

**Order Acceptance.** Benchmark has the right to accept or reject an Order within [***] business days after receiving the Order. If Benchmark does not accept or reject the Order within this period, the Order shall be deemed accepted by Benchmark provided that there is documentation evidencing Benchmark's actual receipt of the Order from Customer. In the event Benchmark is unable to meet the shipment date set forth in an Order, or finds the Order to be unacceptable for some other reason, the Parties shall negotiate in good faith to resolve the disputed matter(s). All accepted Orders shall be binding.

## 5.    DELIVERY AND ACCEPTANCE

**Delivery.** All Product shipments shall be as follows: (i) for ocean shipments, "FOB Benchmark's Thailand facility's port at Laem Chabang or Bangkok Incoterms® 2010"; and (ii) for air or ground shipments, "FCA Benchmark's facility Incoterms® 2010". Time is of the essence for Product deliveries. Title to and risk of loss or damage to the Product shall pass to Customer upon delivery as defined in the specified Incoterm. Benchmark shall mark, pack, package, and crate Products in accordance with the Specification. Customer shall be responsible for securing all export and/or import licenses, as required by applicable law, to export and/or import the Products.

**Acceptance.** Customer shall have the right to reject and return deliveries of Products no later than [***] after Customer's receipt in its warehouse of the Product ("**Acceptance Period**"), and rejection shall be based solely on whether the Product fails a mutually agreed test procedure or inspection designed to demonstrate a Product's compliance with the Specifications. Products not rejected within the Acceptance Period shall be deemed accepted. For all rejected and returned shipments, Customer shall: obtain an RMA number from Benchmark; specify the reason(s) for each such rejection; comply with Benchmark's RMA instructions; and provide Benchmark a reasonable opportunity to cure any defect. After acceptance, all Product returns shall be handled in accordance with Section 11.

**Late Delivery.** In the event that Benchmark fails to deliver Product by the delivery dates specified in the accepted Purchase Order, where such failure is due to Benchmark's fault, at Customer's discretion and direction, all shipments made after said dates are to be made via air freight until such time as Benchmark is able to resume delivery according to the requirements of the Purchase Order. This Section is not subject to the limitations in Section 14.3.

(a)         In such event, Benchmark's responsibility for air freight is as follows:

i)         If the delivery is seven (7) days to thirteen (13) days late, Benchmark is responsible for the cost difference between air freight and ocean freight.

Exhibit 7
Page 1257

ii)    If the delivery is fourteen (14) or more days late, Benchmark is responsible for the entire cost of air freight for all affected late Products.

iii)    Except in the case of any upside schedule changes or where a delivery date has been pulled in from the original delivery date specified in the Purchase Order (or any revised later date as agreed between the Parties), if the delivery is more than two (2) weeks late, Benchmark shall issue Customer a credit calculated as a two percent (2%) discount on all affected late Products.

(b)    Benchmark is to be billed directly by Customer's freight forwarder for air freight charges for which Benchmark is responsible under this Section 5.3. On a case-by-case basis, Customer will evaluate the effect of Benchmark's late delivery as it relates to final in-store delivery, and has sole discretion on whether to allow Benchmark to ship by sea (if Customer determines that final in-store delivery will not be compromised thereby).

## 6.    INVOICING AND PAYMENT TERMS

**Invoicing.** Benchmark shall invoice Customer upon shipment of Products, or on a monthly basis with respect to NRE Charges. Any objections to invoices must be presented within thirty (30) days after the invoice date.

**Payment.** Customer shall make all payments in U.S. Dollars via electronic funds transfer received by Benchmark no later than [***] days after the invoice date without set-off of any kind. This payment term shall likewise apply to any invoices or other amounts owed from Benchmark to Customer. If any invoice remains unpaid after the due date thereof, Customer will be subject to a charge equal to the lesser of [***] or the highest rate allowed by law, and Benchmark may place a credit hold on Customer's account for pending and future shipments.

**Customer's Financial Status.**

(a)    Each issuance of an Order to Benchmark will constitute Customer's representation and warranty that Customer is solvent and is able to pay for the Products identified in such Order and meet its other obligations in accordance with the terms of this Agreement. If Customer is or becomes privately held, then Customer shall promptly furnish to Benchmark statements accurately and fairly evidencing Customer's financial condition as Benchmark may, from time to time, reasonably request, including without limitation annual audited financial statements, quarterly (within forty-five (45) days after the end of each fiscal quarters) balance sheets, income statements, and/or statement of cash flows. If, at any time, Benchmark determines that Customer's financial condition or creditworthiness is inadequate or unsatisfactory to meet Customer's obligations under this Agreement, then in addition to Benchmark's other rights under this Agreement, at law or in equity, Benchmark may without liability or penalty: (i) on sixty (60) days' prior written notice, require Customer to obtain a financial guarantee, the sufficiency of which shall be mutually agreed between the Parties, as a continuing condition of doing business; and/or (ii) delay or withhold any further shipment of Products to Customer; and/or (iii) on forty-five (45) days' prior written notice, require Customer to pay for Products on a cash in advance or on delivery basis. In determining Customer's financial condition and creditworthiness, Benchmark shall take into account certain factors including Customer's financial portfolio, credit rating, current and future anticipated cash flow, payment history with both Benchmark and other suppliers.

(b)    The minimum financial requirements and the method for calculating the credit allowance, if any, granted by Benchmark to Customer are as follows:

i)    Customer will maintain a minimum cash balance of [***] for the credit calculation method in paragraph ii) below to be applicable. Customer will report to Benchmark Thailand Finance a financial statement to demonstrate the cash balance minimum required at beginning of every calendar quarter.

ii)    The credit calculation method will be as follows: [***]

## 7.    FORECASTS AND MATERIALS LIABILITY

0.18    **Forecast.**

(a)    *Initial Forecast Horizon*. Upon the execution of this Agreement, Customer shall provide Benchmark with an initial forecast for Product requirements (in weekly buckets) [***] ("*Forecast*"), which is intended to give Benchmark an estimation of Customer's future Product demand, but shall not be binding upon either Party except as expressly set forth herein.

(b)    *Rolling Forecast Horizon*. Each [***], Customer shall provide a Forecast update sufficient to maintain the Forecast horizon, which is intended to give Benchmark an estimate of Customer's future Product demand, but shall not be binding upon either Party except as expressly set forth herein.

(c)    *Authorized Purchases*. Benchmark is authorized to make supply chain purchase commitments for Components as required to meet Product demand based upon: (i) the Order(s); (ii) the upcoming ninety (90) days' Forecast; and (iii) Long Lead-Time Components at the required lead time and MOQ as required to meet the then-current Forecast (collectively, "*Authorized Purchases*"). Customer shall be liable to Benchmark for all such Authorized Purchases. For any Component purchases beyond a one hundred and twenty (120) day material lead time, Benchmark will be required to obtain a material authorization from Customer before making the purchase.

Exhibit 7
Page 1258

0.19    **Excess Components and Obsolete Components Inventory.**

(d)    Within five (5) business days after the end of each calendar month, Benchmark shall provide Customer with a list of any Excess Components or Obsolete Components in its inventory and the Delivered Cost of such Components (the "***E&O List***") for reconciliation between the Parties. Benchmark will make good faith efforts to mitigate Customer's liability by attempting to return or sell Excess Components and Obsolete Components, and Customer shall be responsible for payment of all restocking fees and reimbursement of price variances from quoted standard cost.

(e)    Within five (5) business days after receiving Benchmark's E&O List ("***Dispute Period***"), Customer shall:

    i)    advise Benchmark of any Component on the E&O List that it reasonably believes is not an Excess Component or Obsolete Component, and the reasons therefore; and

    ii)    issue a purchase order for: (1) all undisputed Obsolete Components; and (2) all undisputed Excess Components wherein Benchmark has elected to sell such Excess Components to Customer.

(f)    Any disputed Excess Components or Obsolete Components not resolved (for which no Order is issued) within ten (10) days after the Dispute Period shall be escalated to the Parties' respective executive management level (General Manager or above) for prompt resolution and issuance of an Order within twenty (20) days thereafter.

(g)    The Parties may mutually agree to place undisputed Excess Components or Obsolete Components in consignment at Benchmark's facility. Customer shall own all such consigned Components. Customer shall take actual delivery and possession of any consigned Excess Components or Obsolete Components that have been in Benchmark's inventory for more than six (6) months without activity. Customer agrees to waive any further dispute to liability for any consigned Excess Components or Obsolete Components.

(h)    For those undisputed Excess Components that Customer requests and Benchmark agrees to not sell to Customer, Benchmark has the right to charge Customer an inventory carrying charge of [***] per [***] of the total Delivered Cost of Excess Components; provided, however, that Benchmark shall only carry such Components for six (6) months after the date they became Excess Components, at which point Customer shall issue a purchase order to Benchmark for any such Excess Components at the Delivered Cost. Customer agrees to waive any further dispute to liability for any carried Excess Components or Obsolete Components.

**Prepaid Inventory Option.** For Excess Components that the Parties agree to handle according to the "***Prepaid Inventory Option***" set forth in this Section 7.3, the following provisions shall apply:

(i)    "Prepaid Inventory" shall consist of the undisputed Excess Components on the then current E&O List provided by Benchmark to Customer that the Parties agree to handle according to the Prepaid Inventory Option and for which Benchmark has issued Customer an invoice according to paragraph (c) below. Customer waives any further dispute to Customer's liability for such Excess Components added to Prepaid Inventory.

(j)    Customer shall own the Prepaid Inventory upon invoice.

(k)    The "Prepaid Inventory Balance" shall refer to Benchmark's total Delivered Cost for Prepaid Inventory. By the twentieth (20th) day of each month, or such other interval as may be mutually agreed between the Parties, Customer shall issue a Prepaid Inventory purchase order to Benchmark in the amount of the Prepaid Inventory Balance for those items the Parties agree to be handled under the Prepaid Inventory Option pursuant to paragraph (a) above. Benchmark shall invoice Customer for the amount of the Prepaid Inventory purchase order, and Customer shall pay such invoice within the payment term specified in Section 6.2.

(l)    Within five (5) business days after the end of each month Benchmark shall provide to Customer a complete Prepaid Inventory reconciliation detailing the total Prepaid Inventory previously purchased by Customer and in Benchmark's care custody or control.

(m)    In the event of a decrease in the Prepaid Inventory for any reason, Benchmark shall issue a credit to Customer for Benchmark's unburdened cost, in the amount of the decrease.

(n)    Benchmark will hold Prepaid Inventory items for a maximum of one hundred eighty (180) days after the date that such Excess Component is added to Prepaid Inventory, at which time Prepaid Inventory items will be shipped or dispositioned, at Customer's discretion. Customer will be responsible for approved and reasonable costs incurred by Benchmark for such shipment and/or disposal.

(o)    Benchmark shall retain such Excess Components in its inventory for the duration of the Prepaid Inventory process. In the event that Benchmark, in its discretion, decides or agrees to terminate the Prepaid Inventory process or upon expiration or termination of this Agreement, the Parties shall complete a final Prepaid Inventory reconciliation as provided in paragraph (d) above to close the Prepaid Inventory process, at which time the Prepaid Inventory will be shipped and/or dispositioned at Customer's discretion. Customer will be responsible for approved and reasonable costs incurred by Benchmark for such shipment and/or disposal.

Exhibit 7
Page 1259

**Component Yield Loss/Attrition.** Customer acknowledges that the manufacturing processes for the manufacture of the Product will result in the loss and scrap of Products due to the fallout or scrap of Components used in production ("***Yield Loss / Attrition***"). The total Yield Loss / Attrition value (calculated as a number of Products which were scrapped) from each Purchase Order will be consolidated on a monthly basis. Benchmark shall issue an invoice to Customer each month for all such Products where the Yield Loss / Attrition number is less than or equal to five percent (5%) of the total number of Products in the Purchase Order. Benchmark will be liable for any Yield Loss / Attrition which is greater than five percent (5%) of the total number of Products in the Purchase Order.

**Inventory Turns.** The agreed Inventory Turns is [***]. If any calendar quarter's Inventory Turns falls below the agreed rate, then Benchmark shall provide written notice of such to Customer. Thereafter, the Parties shall mutually agree in writing to prepayment against Total Inventory and/or to those contract amendments and/or modifications required to meet the agreed Inventory Turns in the most recent calendar quarter as well as the next calendar quarter. Such contract amendments and/or modifications may include adjustments to Product pricing, materials inventory handling, buffer, flexibility, availability, and other provision modification(s) or any combination thereof designed to meet Inventory Turns. Notwithstanding anything to the contrary in this Agreement, failure to achieve Inventory Turns in the most recent or next calendar quarter following such written notice shall constitute a material breach by Customer of this Agreement. "***Inventory Turns***" shall refer to the minimum inventory turns rate, calculated by <u>dividing</u> Benchmark facility total annualized "Product Revenue" (product invoices issued by a Benchmark facility to Customer under this Agreement within the measurement period) <u>by</u> the "Total Inventory" (all Authorized Purchases plus work in process and finished goods per Orders at the end of the measurement period). For example, [***].

## 8.    CHANGES

**General.** Benchmark shall not make any change to the Specifications, form, fit or function of any Products without prior written Customer approval. Such approval must be finalized in the form of a formal ECO. Customer may, upon sufficient written notice to Benchmark, request changes within the general scope of this Agreement. Such changes may include, but are not limited to changes in: (a) Specifications; (b) methods of packaging and shipment; (c) quantities of Product to be furnished; (d) shipment date; or (e) Customer-Furnished Items.

**Non-ECO Changes.** For requested changes in shipment dates or quantities of Products, Customer shall issue a revised Order to Benchmark which shall account for any increased costs for such change, and Benchmark shall accept or reject such revised Order in accordance with Section 4.2.

**ECO Changes.** All requested changes other than changes in shipment date or quantity of Products to be furnished shall be made by Customer via an ECO. If any proposed ECO causes either an increase or decrease in Benchmark's cost or the time required to fulfill Orders following implementation of the ECO, the Parties shall mutually agree in writing upon the costs, impact on shipment dates for open Orders, inventory and any other item that may be impacted by the ECO prior to Benchmark's implementation of such ECO. Benchmark will process [***] ECOs per month per assembly without non-recurring administrative cost; additional ECOs shall incur a mutually agreed processing charge, but in no event less than [***] each plus any change related impacts. ECOs that are required due to Component end of life and/or changes to sub-tier suppliers will not be counted against the monthly allotment.

**Deviations.** The Parties shall discuss and document any proposed Deviations in writing, including any impacts to costs, delivery timing or other factors. A Deviation shall be deemed to be part of the Specifications for the Products manufactured and delivered as approved in the Deviation.

**Waivers.** Waivers of a departure from Specifications and the reasons therefore shall be documented in writing and approved by the Parties.

**Cost Reductions.** The Parties agree that competitive pressure necessitates a program of continuous improvement. The Parties intend cooperate in good faith to implement a Product cost reduction program involving new technologies, Component cost reduction, productivity, quality and reliability improvements, and manufacturing process improvements (including cycle time and assembly costs).

(a)      The Parties shall conduct quarterly program reviews with specific emphasis on quality, delivery, and cost improvements. Benchmark cost savings realized as a result of implementing Cost Reductions shall be shared between the Parties as follows:

i)      For Cost Reductions proposed solely by Customer (without any input from Benchmark), the Price of the affected Products shall be reduced by the entire amount of Benchmark's cost savings due to the Cost Reduction proposal.

Exhibit 7
Page 1260

ii)  For Cost Reductions proposed solely by Benchmark, such savings shall initially be shared equally between the Parties for a period of twelve (12) months and thereafter retained exclusively by Customer.

iii)  For Cost Reductions proposed jointly by the Parties, such savings shall initially be shared equally between the Parties for a period of six (6) months, and thereafter retained exclusively by Customer.

(b)  The foregoing Cost Reductions will commence only after all open Orders have been closed and Benchmark consumes all Components on-hand, in work in process or contained in non-shipped Products; or alternatively at Customer's option, Customer may issue an Order for the cost of such Component cost reduction buy down, in which case the Component Cost Reductions shall commence upon the issuance of the cost reduction buy down Order.

(c)  "*Cost Reduction*" shall refer to lower Product purchase prices based on changes in manufacturing processes, alternate components or alternate component supplier.

## 9.  QUALITY

**Specifications.** Product shall be manufactured by Benchmark in accordance with the Specifications, as modified via written ECOs in accordance with this Agreement. Neither Party shall make any change to the Specifications, to any Components described therein, or to the Products (including changes in form, fit, function, design, appearance or place of manufacture of the Products, or changes which would affect the reliability of any of the Products) unless such change is made in accordance with Section 8.

**Content of Specifications.** The Specifications shall include: (a) detailed electrical, mechanical, performance and appearance specifications for each assembly of Product; (b) the BOM; (c) tooling specifications, along with a detailed description of the operation thereof; (d) art work drawings; (e) Component specifications; (f) AVL; and (g) packaging requirements.

**Quality of Components.** Benchmark shall use in its manufacture of Products such Components of a type, quality, and grade specified by Customer to the extent Customer chooses to so specify in the Specifications, and shall purchase Components only from vendors appearing on Customer's AVL. Customer's AVL shall designate Customer-approved manufacturers of Components and Component parts, and in the case of an open AVL or deviation from Customer's AVL or purchase from a non-franchised distributor, Customer shall review and approve such manufacturers or non-franchised distributors on a case-by-case basis, including any specific date and/or lot code restrictive information. Benchmark will not use Components known by Benchmark to be counterfeit Components. Benchmark will develop, maintain (and update as necessary) and execute appropriate quality processes and standards to determine the quality assurance of Components.

**Inspection of Facility.** Upon prior reasonable written notice, Customer may inspect the Products and Components held by Benchmark for Customer at Benchmark's facilities during Benchmark's regular business hours, provided that such inspection does not unduly interfere with Benchmark's operations. Customer and its representatives shall: (a) comply with Benchmark security requirements and execute any requested confidentiality or nondisclosure agreement(s) before entering Benchmark's premises; and (b) observe all Benchmark safety, security and handling measures.

**Root Cause Analysis.** Benchmark and Customer shall cooperate to promptly determine the root cause of defects or failures. Benchmark shall utilize best practices and industry standards in providing Workmanship, and shall cooperate with Customer and suppliers to resolve or minimize any such issues. If the Parties cannot agree on the root cause of defects or failures, upon mutual agreement an independent, mutually acceptable third party shall be retained to determine the root cause.

**Supplier Representative.** Benchmark shall provide a representative for Customer's programs (the "*Supplier Representative*"). The Supplier Representative must be able to speak, read, and write English and the local language (if not English) fluently and will serve as the primary contact between Customer and Benchmark. The Supplier Representative is to be technically competent and possess sufficient expertise to manage the manufacture of Products in accordance with the Specifications. The Supplier Representative is responsible for taking the necessary steps to ensure that Benchmark supplies Customer with Products that meet the Specifications and in accordance with the terms and conditions for delivery set forth in the relevant Purchase Order and this Agreement.

## 10.  CUSTOMER FURNISHED ITEMS / SUBCONTRACTORS

**Customer-Furnished Items.** Customer shall provide Benchmark with the software, firmware, equipment, tooling, Components owned by Customer, or documentation set forth in the Product Quotation accepted by Customer and/or in a writing signed by the Parties (collectively, "*Customer-Furnished Items*"). The Customer-Furnished Items shall be fit for their intended purposes and shall be delivered to Benchmark in a timely manner. Documentation provided by Customer to Benchmark, including Specifications, shall be current and complete. Customer shall be responsible for schedule delays, reasonable inventory carrying charges and allocated equipment down time charges associated with the incompleteness, late delivery or non-delivery of the Customer-Furnished Items.

Exhibit 7
Page 1261

0.36    **Care of Customer-Furnished Items.**

(a)        All Customer-Furnished Items shall remain the property of Customer. Benchmark shall clearly identify all Customer-Furnished Items by a tag, where appropriate, and shall utilize such Customer-Furnished Items only for Customer. Benchmark shall not make or allow modifications to be made to the Customer-Furnished Items without Customer's prior written consent.

(b)        Benchmark shall be responsible for: (i) reasonable diligence and care in the use and protection of any Customer-Furnished Items, ordinary wear and tear excepted; and (ii) routine maintenance and repairs and third party calibration of any Customer-Furnished Items, up to a total of $1500.00 U.S. Dollars per Customer-Furnished Item per year.

(c)        Customer shall be responsible for: (i) the costs of major repairs to Customer-Furnished Items, except where due to Benchmark's gross negligence; (ii) end of life replacements; (iii) service warranties and/or third-party calibration to Customer-Furnished Items which are not within Benchmark's responsibility under paragraph (b) above; and (iv) repair or replacement of failed or defective Customer-Furnished Items. If any Customer-Furnished Items are defective, Benchmark has the right to return such defective items to Customer at Customer's sole expense, and Customer acknowledges that such return may impact the Product shipment date(s).

(d)        Upon Customer's written request, Benchmark shall return to Customer all Customer-Furnished Items at Customer's sole expense. Notwithstanding anything to the contrary in this Agreement, after the removal from Benchmark's facility of any Customer-Furnished Items required by Benchmark to manufacture, test and/or repair the Products: (i) Benchmark shall not be responsible for the completion of any warranty work on Products already shipped to Customer; and (ii) any Products manufactured by Benchmark shall be sold to Customer "as is".

**Components Sold by Customer to Benchmark.** Customer may sell Components to Benchmark from time to time at a quantity and price to be mutually agreed upon by the Parties. If there is a defect in any such Components or such Components have not been utilized in production within six (6) months of purchase from Customer, Benchmark has the right to return such Components to Customer, at Customer's sole expense, for a full refund of the purchase price paid by Benchmark for such Components; and, in the event of a defect in such Components, Customer acknowledges that such return may impact the Product shipment date. With regard to any such Components purchased from Customer, Customer warrants that the Components are: (a) free of defects in materials and workmanship; (b) ready for use without inspection, except as may be specifically provided in the document detailing such purchase; and (c) not counterfeit.

**Subcontractors.** Benchmark reserves the right to qualify all Customer-approved or Customer-directed subcontractors to ensure compliance with Benchmark's minimum quality and creditworthiness standards.

## 11.    WARRANTY

0.39    **Limited Warranty.**

(a)        *Manufacturing Services*. For a period of twelve (12) months from the date of manufacture, Benchmark warrants that: (i) the Products shall conform to Specifications at shipment; and (ii) Workmanship shall be free from defects. Benchmark shall, at its option and expense, repair or replace Nonconforming Products returned to Benchmark during the warranty period pursuant to the RMA Procedure below. Benchmark will attempt to repair Nonconforming Products in the first instance, but in the event that a Nonconforming Product cannot be repaired or reworked in order to meet the warranty requirements, including where Components of such Nonconforming Product are unavailable due to obsolescence or end of life, then Benchmark shall replace such Nonconforming Product. In addition, Benchmark will pass on, transfer and/or assign to Customer all Component manufacturer warranties to the extent possible, but Benchmark does not independently warrant any Components. Time is of the essence for the repair and/or replacement of Nonconforming Products.

(b)        *Test Fabrication*. Benchmark warrants that any Test Fabrication provided will be performed in a professional and workmanlike manner and in accordance with any applicable SOW, specification, or documentation for a period of twelve (12) months following acceptance. If Test Fabrication fails to conform to this warranty, Benchmark shall, at its expense and as its sole liability and Customer's exclusive remedy, re-perform such nonconforming Test Fabrication.

(c)        *DFx or Prototypes*. Any DFx or prototypes provided under this Agreement are provided "AS IS", with no warranty whatsoever.

**RMA Procedure.** The Parties shall agree in advance on all Products to be returned for repair or replacement although such agreement shall not mean that such return cannot be found to be invalid or "no defect found" as further described below. An RMA number must be obtained by Customer from Benchmark prior to return shipment, and displayed on the shipping container as well as on the packing slip or attached to the returned Product. All returns shall state the specific reason for such return, and will be processed in accordance with Benchmark's RMA Procedure. Benchmark shall pay all transportation costs for valid Product returns to Benchmark, and for repaired or replacement Product shipment to Customer, and shall bear all risk of loss or damage to such Product while in transit; provided, however, that Customer shall pay these costs plus a reasonable handling charge for invalid or "no defect found" returns. The warranty for any replacement or repaired Nonconforming Product shall continue for the full remaining balance of the original warranty period, calculated as of the date that Customer returns the Nonconforming Products to Benchmark, or an additional sixty (60) day period (starting from the date that the repaired or replacement Product is returned to Customer), whichever is greater.

Exhibit 7
Page 1262

**Warranty Exclusions.** Benchmark's warranty does not include Product defects or failures resulting from, but not limited to: (a) Product design or Specifications; (b) Specifications for soldering processes and/or soldering alloys that have not been subjected to a mutually agreed upon qualification plan and determined to produce satisfactory results; (c) accident, disaster, neglect, abuse, misuse, or improper handling, testing, storage or installation, including improper handling in accordance with static sensitive electronic device handling requirements, after Benchmark shipment; (d) alterations, modifications, or repairs by Customer or third parties; (e) defective Customer-Furnished Items, including test equipment or test software; (f) Products without specified functional tests to allow adequate failure diagnosis; or (g) Products found to be non-operable which have passed all Customer-specified tests prior to shipment, yet failed some functionality or performance criteria in the field.

**Disclaimers.** EXCEPT FOR THE WARRANTY PROVIDED IN SECTION 11.1, BENCHMARK MAKES NO OTHER WARRANTY, AND DISCLAIMS WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY, AND WARRANTIES OF TITLE FOR ANY CUSTOMER SUPPLIED MATERIALS, WHETHER EXPRESS, IMPLIED BY LAW OR COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE.

BENCHMARK DISCLAIMS ANY PRODUCT REQUIREMENTS, APPROVALS OR CERTIFICATIONS NOT EXPRESSLY AGREED IN WRITING.

**Remedy.** THE REMEDIES SET FORTH IN SECTION 11.1 SHALL BE THE CUSTOMER'S SOLE AND EXCLUSIVE REMEDY AND BENCHMARK'S ENTIRE LIABILITY FOR ANY BREACH OF THE LIMITED WARRANTY SET FORTH IN SECTION 11.1.

**12.    TERMINATION**

**Termination for Convenience.** Customer may terminate this Agreement and/or an Order for any reason at its convenience upon ninety (90) days' prior written notice. Benchmark may terminate this Agreement and/or an Order for any reason at its convenience upon one hundred eighty (180) days' prior written notice.

**Termination for Cause.** Either Party may terminate this Agreement and/or an Order for cause if the other Party materially breaches this Agreement, and such breach is not cured within forty-five (45) days after the Party is notified in writing of the breach or, for payment-related breaches, within ten (10) days after the due date of the amount owed.

**Insolvency or Material Change.** This Agreement shall automatically terminate without notice or opportunity to cure if either Party: (a) makes a general assignment for the benefit of its creditors or a proposal or arrangement under the bankruptcy laws or similar legislation of the United States; (b) has a petition is filed against it under such legislation which is not dismissed in such Party's favor within sixty (60) days; (c) is declared or adjudicated bankrupt; (d) has a liquidator, trustee in bankruptcy, custodian, receiver, manager, receiver-manager, or any other officer with similar powers shall be appointed for it or its business or assets; (e) commits an act of bankruptcy, proposes a compromise or arrangement, or institutes proceedings to be adjudged bankrupt or insolvent, or consents to the institution of such appointment or proceedings; or (f) admits in writing an inability to pay debts generally as they become due.

0.47    **Asset Transfer at Termination.**

(a)       Upon the expiration or termination of this Agreement (in whole or in part) and/or an Order, for any reason, Customer shall be responsible to pay for the following inventory transfers:

i)       the contract price for all finished goods existing at the time of expiration or termination;

ii)       Benchmark's cost for all work in process (including labor, materials, any applicable VAT and a reasonable mark-up for recovery of handling costs incurred of ten percent (10%) of the value of the work in process);

iii)       Benchmark's Delivered Cost for all Authorized Purchases (after Benchmark has made good faith efforts to mitigate Customer's liability under this clause by first attempting to return or sell remaining Components); and/or

iv)       any vendor cancellation and restocking charges, including Benchmark's cost for NCNR Components on open orders with suppliers where the Components have not yet been shipped to Benchmark.

Benchmark shall invoice Customer for the foregoing as soon as practicable after the effective date of expiration or termination, and Customer shall pay Benchmark within the payment term specified herein.

(b)       Upon payment in full of the charges set forth in this Section 12.4, neither Party shall incur any additional liability by reason of the expiration or termination of this Agreement, and each Party shall have been deemed to release the other Party from any claims of any nature (including damages sustained on account of loss of prospective profits, or on investments, contracts, leases or other commitments) resulting from or arising out of such expiration or termination.

Exhibit 7
Page 1263

**13.    INDEMNITY**

0.48    **Benchmark Indemnity Obligations.**

(a)    Benchmark shall indemnify, defend, and hold harmless Customer and Customer's Affiliates, shareholders, directors, officers, employees, contractors, agents and other representatives (the "***Customer Indemnitees***") from Claims asserted against Customer Indemnitees based upon:

i)    personal injury (including death) or property damage to the extent any of the foregoing is proximately caused by Benchmark's manufacturing processes, or the grossly negligent or willful acts of Benchmark or its officers, employees, subcontractors or agents; or

ii)    Intellectual Property Infringement arising from or in connection with Benchmark's manufacturing processes or Benchmark Pre-Existing IP.

(b)    Benchmark's indemnity under this Section 13.1 is limited to the extent such Claims are within Customer's indemnity obligation to Benchmark in Section 13.2.

0.49    **Customer Indemnity Obligations.**

(c)    Customer shall indemnify, defend, and hold harmless Benchmark and Benchmark's Affiliates, shareholders, directors, officers, employees, contractors, agents and other representatives (the "***Benchmark Indemnitees***") from Claims asserted against Benchmark Indemnitees based upon:

i)    personal injury (including death) or property damage to the extent any of the foregoing is proximately caused by a Customer-Furnished Item, the Specifications, a defective Product, or the grossly negligent or willful acts of Customer or its officers, employees, subcontractors or agents; or

ii)    Intellectual Property Infringement arising from or in connection with the Products, Specifications and/or Customer-Furnished Items.

(d)    Customer's indemnity under this Section 13.2 is limited to the extent that any such Claims are within Benchmark's indemnity obligation to Customer in Section 13.1.

0.50    **Infringement Mitigation.**

(e)    ***Injunction Mitigation***. In addition to Benchmark's indemnity obligation to Customer, if use of the Product is enjoined based on a claim of Intellectual Property Infringement solely due to Benchmark's manufacturing processes or Benchmark Pre-Existing IP, Benchmark will, at its sole expense and option and as Customer's sole and exclusive remedy for such injunctions: (i) procure the right for Customer Indemnitees to continue using the Product; (ii) replace the Product with a non-infringing product of substantially similar function and performance; (iii) modify the Product to be non-infringing; or (iv) refund to Customer a pro rata amount for any payments made by Customer for the affected Product. In the event Benchmark is unable, despite its best efforts, to avail itself of the options set forth in (i), (ii) or (iii), Benchmark shall have the right, in furtherance of its obligation to mitigate and/or prevent further damages, to suspend manufacturing and its performance hereunder, solely as it relates to the item, Component and/or Product which is the subject of the Claim until such Claim is settled or otherwise resolved.

(f)    ***Continued Infringement Mitigation***. In the event of a claim of Intellectual Property Infringement under Section 13.2(a)ii) above, Benchmark shall have the right, in furtherance of its obligation to mitigate and/or prevent further damages, to suspend manufacturing and its performance hereunder, solely as it relates to the item, Component and/or Product which is the subject of the Claim until such Claim is settled or otherwise resolved.

**Indemnification Procedure.**    A Party entitled to indemnification pursuant to this Section 13 (the "***Indemnitee***") shall promptly notify the other Party from whom indemnity is sought (the "***Indemnitor***") in writing of any Claims covered by this indemnity. Promptly after receipt of such notice, the Indemnitor shall assume the defense of such Claim with counsel reasonably satisfactory to the Indemnitee. If the Indemnitor fails, within a reasonable time after receipt of such notice, to assume the defense with counsel reasonably satisfactory to the Indemnitee or, if in the reasonable judgment of the Indemnitee, a direct or indirect conflict of interest exists between the Parties with respect to the Claim, the Indemnitee shall have the right to undertake the defense, compromise and settlement of such Claim for the account and at the expense of the Indemnitor. Notwithstanding the foregoing, if the Indemnitee in its sole judgment so elects, the Indemnitee may also participate in the defense of such action by employing counsel at its expense, without waiving the Indemnitor's obligation to indemnify and defend. The Indemnitor shall not compromise any Claim or consent to the entry of any judgment without an unconditional release of all liability of the Indemnitee to each claimant or plaintiff.

Page 14 of 21

Exhibit 7
Page 1264

**Exclusive Indemnity.** Each Party's rights and obligations under this Indemnity Section is expressly in lieu of any other form of indemnity that may be available under the Uniform Commercial Code or the United Nations Convention on Contracts for the International Sale of Goods.

## 14.    LIMITATIONS

**Remedies.**  To the extent allowable under law, the remedies expressly conferred on a Party herein are not cumulative with and are exclusive of other inconsistent remedies available at law or in equity.

**Consequential and Other Damages.**    Benchmark and Customer acknowledge and agree that this Agreement has been negotiated in consideration of the agreement to limit certain of Benchmark's liabilities. Accordingly, to the fullest extent allowable by law and except as provided in Section 13 (Indemnity), IN NO EVENT SHALL BENCHMARK BE LIABLE TO CUSTOMER FOR ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR SPECIAL DAMAGES OF ANY KIND OR NATURE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR CONNECTED WITH OR RESULTING FROM THE MANUFACTURE, SALE, DELIVERY, RESALE, REPAIR, REPLACEMENT, OR USE OF ANY PRODUCTS OR THE FURNISHING OF ANY SERVICE OR PART THEREOF, WHETHER SUCH LIABILITY IS BASED IN CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, EVEN IF SUCH PARTY HAD BEEN WARNED OF THE POSSIBILITY OF ANY SUCH DAMAGES.

**Cumulative Damages.**  Except as otherwise provided in this Agreement, in no event will Benchmark's total cumulative liability to Customer arising out of or related to this Agreement, over and above Benchmark's warranty, indemnity and confidentiality obligations herein, exceed the greater of [***], whichever is greater. The cap does not include any liabilities owed by Benchmark in relation to its warranty, confidentiality and indemnity obligations

**Limitations Essential.**    The Parties acknowledge that these limitations on potential remedies, damages and liabilities were an essential element in setting consideration under this Agreement and that, in the absence of such limitations, the economic terms of this Agreement would be substantially different.

## 15.    CONFIDENTIALITY.

The Parties' confidential communications shall be governed by the Nondisclosure Agreement entered into effective September 27, 2016 attached as Exhibit B and incorporated by reference herein. Notwithstanding its stated duration, the term of such Nondisclosure Agreement is extended to align with the term of this Agreement.

## 16.    INTELLECTUAL PROPERTY

**Infringement.**  Customer represents to its best knowledge as of the Effective Date, and warrants thereafter, that no Intellectual Property Infringement exists with regard to Customer intellectual property.

**Joint Inventions.**  If a manufacturing process invention is created exclusively by one Party in connection with this Agreement separate and independent from an ESA, then ownership and patent rights to such invention shall be the sole property of the creating Party. If a manufacturing process invention is created jointly by both Parties ("***Joint Invention***"), separate and independent of from an ESA, then each Party shall have an equal, undivided one-half interest in ownership of and any patent rights to such Joint Invention. Each Party shall retain sole and exclusive ownership of any and all of its Pre-Existing IP.

**Work Product.**  Unless expressly agreed otherwise in writing by the Parties, Customer will own and have all right and title to any Intellectual Property created or developed by Benchmark based upon proprietary information provided by Customer in connection with Benchmark's execution of its obligations under this Agreement (collectively, "***Work Product***") and any Work Product which Benchmark may subcontract (upon Customer's advanced consent) in support of the performance of its obligations under this Agreement. Benchmark agrees to promptly disclose any such Work Product to Customer and Benchmark hereby assigns to Customer any rights to the Intellectual Property in such Work Product, and Benchmark agrees to execute, and cause its agents, employees and subcontractors to execute, any documents necessary or desirable to effectuate such assignment or to otherwise secure or perfect Customer's legal rights in such Work Product. Benchmark acknowledges that the pricing for Products under this Agreement already includes Customer's payment for any Work Product created or developed by Benchmark hereunder, and no further payment by Customer is due or owing to Benchmark for the assignment of such Intellectual Property to Customer or for assistance to secure or perfect Customer's rights in the same.

**License.**  Customer hereby grants to Benchmark a non-exclusive, royalty free license (without the right to sublicense) to use Customer's technology (including Customer-Furnished Items) to manufacture and sell the Products exclusively to Customer and to no other Party. Except as may be required to perform warranty or other continuing obligations, upon the termination or expiration of this Agreement: (a) the licenses granted herein by Customer shall terminate; (b) Benchmark shall deliver to Customer all materials possessed by it relating to Customer's technology; and (c) Benchmark shall cease all further use of Customer's technology. No other rights or licenses are granted by Customer to Benchmark relating to Customer's technology, except as specifically stated herein. Benchmark shall not use and take advantage of any Customer Intellectual Property to enter into business relationships with any of Customer's competitors in the juvenile products industry or to use and implement such Customer Intellectual Property in the manufacture of products or components for other baby monitor devices and/or related products and components equipment manufacturers and brands.

Exhibit 7
Page 1265

**Trademarks.**

(a)      No proprietary or other rights with respect to the trademarks, trade names or brand names of either Party are conferred either expressly or by implication, upon the other Party. Benchmark shall affix such trademarks and/or trade names of Customer on Products manufactured by Benchmark for sale to Customer under this Agreement as set forth in the Specifications. All such trademarks and/or trade names to be so affixed are recognized by Benchmark to be the property of Customer and Benchmark shall not sell or otherwise distribute or dispose of Products bearing such trademarks and/or trade names to any third party.

(b)      In the event that any Products so labeled are not delivered to Customer, whether due to scrap, rejection, cancellation of orders or otherwise, Benchmark shall promptly remove and destroy or, at the request of Customer, return to Customer, any and all labels, name plates, or other trademarks placed on the Products. Benchmark shall not use the "Owlet" name or any Customer trademarks except as provided in this Agreement. Upon termination of this Agreement or upon the request of Customer, Benchmark will discontinue the use of the name "Owlet" and, thereafter, will not use Customer's name or trademarks in any manner.

(c)      *Proper Use of IP / No Filings.* Benchmark shall refrain from acting in any manner that may compromise Customer's rights in and to Customer's trademarks, the reputation or goodwill associated with such trademarks, or any Customer Intellectual Property. Benchmark shall not adapt, use, file or attempt to file anywhere in the world any applications for registration of trademarks, trade names, logos, copyright, patents or other Intellectual Property rights that are identical or confusingly similar to Customer's trademarks or any other Customer Intellectual Property.

(d)      *No Encourage of Infringement.* Benchmark itself shall not, nor shall it knowingly direct, encourage, or cause third parties to, engage in any activities that infringe Customer's Intellectual Property rights, including but not limited to: (i) applying to register any Customer trademarks or logos; or (ii) engaging in any of the following conduct relating to Products not approved by Customer ("*Unauthorized Products*"): (1) production by Benchmark of quantities of Products in excess of those identified in any given Purchase Order; (2) without the written consent of Customer, production by Benchmark, its subcontractors, or any other third parties under Benchmark's direction or control, of products that bear Customer's trademarks, or imitate, copy or embody Customer's copyright in drawings of the Products, and/or the Products' designs, which are contained in the Specifications; and/or (3) selling or offering to sell any such products to third parties.

(e)      *Customer Optional Remedies.* Upon any violation of this Section 16.5, Customer has the right to deem such violation a material breach of this Agreement, which breach is grounds for termination with immediate effect upon the Benchmark's receipt of notice thereof from Customer. Alternatively, Customer can notify Benchmark in writing within thirty (30) days after Customer's discovery of such activity and allow Benchmark to submit a written action plan fully to address and eliminate the same within thirty (30) days following Benchmark's receipt of such notice.

**Promotion Limitation.**   Benchmark covenants that it shall not use the "Owlet" name or any Customer trademarks, products or trade names in any advertising or promotion by Benchmark (whether by including reference to Customer in any list of customers, advertising that its services and products are used by Customer, denying or confirming the foregoing or for any other purposes) without advance written permission and subject to final approval from Customer.

**Manufacturing Process Data.**   Customer will have access to manufacturing process, inspection, test and other quality documentation pertaining to the Product(s), excluding any data or documentation concerning Benchmark's manufacturing work instructions, inasmuch as such data was developed at private expense, and not as an element of performance of any contract. Any changes to Benchmark's processes pertaining to receipt and storage of Components and production and shipment of the Product(s) should be approved by Customer.

0.64    **Black and Grey Market Products.**

(f)      *Cooperation.*   The Parties acknowledge the importance of preventing the sale, resale or conveyance of Customer's Products through means or channels that are not in accordance with applicable Laws or which are not designated and authorized by Customer ("*Black Market and Grey Market Sales*"). If Customer becomes aware of, discovers, identifies, or receives any Black Market and Grey Market Sales of Products manufactured by Benchmark or its subcontractors, Benchmark shall cause its subcontractors to cooperate in any investigation conducted by or on behalf of Customers in connection therewith.

(g)      Benchmark shall not sell or distribute any Products via Black Market and Grey Market Sales. Any breach of this paragraph (b) by Benchmark due to Benchmark's gross negligence, recklessness or willful misconduct shall not be subject to the limitations in Sections 14.2 and 14.3.

Exhibit 7
Page 1266

(h)        *Factory Leaks.* Benchmark shall inform its subcontractors and employees of the importance of preventing leaks of Products sold via Black Market and Grey Market Sales from subcontractor or Benchmark factory(ies) by incorporating relevant obligations in agreements entered into by and between Benchmark and its subcontractors. Benchmark shall ensure that its internal policies and documentation are updated accordingly to make their respective employees aware of this issue, and shall require its subcontractors to do the same. Such documentation is to include posting of an announcement to inform all Benchmark employees that any distribution or sale of Products via Black Market and Grey Market Sales is prohibited and appropriate legal action will be taken in the event that such activity is discovered.

**No Reverse Engineering.** To the fullest extent permitted under applicable law, Benchmark shall not modify, disassemble, decompile, adapt, alter, translate, reverse engineer, or create derivative works based on the Products, Licensed IP, or any materials associated or included with, or embedded into, the Products, except as may be necessary to perform its obligations under this Agreement and to comply with the Specifications.

**17.    INSURANCE**

**Required Coverages.** Each Party agrees to maintain during the term of this Agreement:

(a)        *Workers' Compensation and Employers Liability Insurance* as prescribed by state or country law with minimum limits of $500,000 per accident / $500,000 per disease / $1,000,000 policy limit;

(b)        *Comprehensive Automobile Liability – Bodily Injury/Property Damage Insurance* covering all motor vehicles used in connection with this Agreement, with minimum limits of $1,000,000 combined single limit per occurrence;

(c)        *Comprehensive General Liability Insurance*, including blanket contractual liability and broad form property damage, with minimum limits of $5,000,000 combined single limit per occurrence and an aggregate limit of at least $5,000,000 but in no event less than the amount otherwise carried by the contract holder. Coverage must be written on ISO occurrence form CG 00 01 12 04 (or an equivalent substitute form) or ISO claims-made form CG 00 02 12 04 (or an equivalent substitute form). The policy must include coverage for, but not limited to, Bodily Injury, Property Damage, Personal Injury, Advertising Injury (for Customer only), Fire legal liability, Products Liability (for Customer only, and including with respect to the design of the Products and all components), and completed operations; and

(d)        *Intellectual Property Infringement Insurance* (for Customer only) with a combined single limit of a minimum of $5,000,000 each occurrence and an aggregate limit of at least $5,000,000 but in no event less than the amount otherwise carried by the contract holder. The policy must cover claims, regardless of when raised, based on occurrences relating in any way to actual or alleged infringement of patent, copyright, trademark, trade name, trade dress, trade secret, or any other type of intellectual property related to Customer IP, Customer's design, or Specifications.

(e)        *Medical Products Liability Insurance* (for Customer only, applicable only to Products which are medical devices) including broad form contractual liability with a combined single limit of a minimum of $5,000,000 each occurrence and an aggregate limit of at least $5,000,000 but in no event less than the amount otherwise carried by the contract holder.

0.67    **Policy Requirements.**

(a)        All policy(s) and coverages specified in Section 17.1 which are held by each insured Party must:

i)        Be written in a form acceptable to the other Party;

ii)        Specify that all coverage provided by the insured Party is primary.

iii)        Excluding coverage specified in Section 17.1(a), contain an additional insured endorsement in favor of and acceptable to the other Party, which shall not be limited by the insured Party's liability under any of its indemnity obligations under this Agreement;

iv)        Require notice to the other Party in writing at least thirty (30) days prior to any cancellation, non-renewal, substitution or material alteration of such policies; and

v)        Be written by a reputable insurance company acceptable to the other Party or with a current Best's Guide Rating of A- and Class VII or better, and authorized to do business in the state(s) and/or country(ies) in which the service is to be provided.

(b)        Upon request by the other Party, the insured Party shall furnish to the other Party an acceptable certificate(s) of insurance from an authorized representative evidencing the required coverage(s), endorsements, and amendments. The insured Party shall deliver a copy of each additional insured endorsement within two (2) business days after request by the other Party. Failure by the insured Party to provide evidence as required shall be deemed a material breach of this Agreement. Acceptance of a certificate that does not comply with this Section 17 shall not operate as a waiver of the insured Party's obligations hereunder.

Exhibit 7
Page 1267

(c)        If coverage(s) under Sections 17.1(c), 17.1(d), or 17.1(e) is written on a claims-made form, the policies shall provide, and the insured Party warrants, that: (i) any retroactive date applicable to coverage under the policy precedes the effective date of this Agreement; and (ii) continuous coverage will be maintained for a period of three (3) years beginning from the time this Agreement is no longer in effect or the policies extended discovery period, if any, will exercised for the maximum time of the policy.

**Waiver of Right of Recovery.** Each insured Party waives its right of recovery, and its insurers also waive their right of subrogation, against the other Party for loss of its owned or leased property or property under the insured Party's care, custody or control. Allocated Loss Expense shall be in addition to all policy limits for coverages referenced above.

**No Release.** The fact that insurance (including, without limitation, self-insurance) is obtained by the insured Party shall not be deemed to release or diminish the liability of the insured Party including, without limitation, liability under the indemnity provisions of this Agreement. Damages recoverable by Benchmark shall not be limited by the amount of the required insurance coverage.

**Policy Copies.** In the event of a claim or lawsuit involving a Party arising out of this Agreement, the insured Party will make available any required policy covering such claim or lawsuit.

## 18.    COMPLIANCE WITH LAWS

0.71    **General.**

(d)        With regard to each Party's respective responsibilities under and performance of this Agreement, each Party shall at all times comply with all applicable laws, statutes, ordinances, rules, regulations, orders, and other requirements, including such governmental requirements applicable to environmental protection (except as may otherwise be provided herein), health, safety, wages, hours, immigration, equal employment opportunity, nondiscrimination, working conditions, import or export control, customs, and transportation (individually and collectively referred to as "***Laws***"). Each Party shall promptly notify the other Party in the event the other Party's assistance is necessary to achieve compliance with any applicable Laws. Upon request, each Party shall provide the other Party with reasonable documentation demonstrating such compliance.

(e)        *Anti-Corruption / Anti-Bribery*. In addition, the Parties shall:

i)        comply with all applicable country laws relating to anticorruption or anti-bribery, including but not limited to legislation implementing the Organization for Economic Co-operation and Development "Convention on Combating Bribery of Foreign Public Officials in International Business Transactions", or other anti-corruption/anti-bribery convention, the Foreign Corrupt Practices Act as amended (FCPA) (15 US.C.. §§78dd-1, *et. seq.*), whether either Party is within the jurisdiction of the United States; and

ii)        neither directly nor indirectly, pay, offer, give, or promise to or give, anything of value received from a Party to a non-U.S. public official or any person in violation of the FCPA and/or any applicable country laws relating to anti-corruption or anti-bribery.

(f)        *Nondiscrimination*. Executive Orders 11246 and 13201 and 29 C.F.R. Part 470 and 41 C.F.R. Parts 60-1.4, 60-1.8, 60-250.5, 60-300.5 and 60-741.5, as amended, are incorporated, as applicable.

0.72    **Import/Export.**

(g)        With regard to each Party's respective obligations under and performance of this Agreement, each Party shall at all times comply with all export/import laws (including re-export), sanctions, regulations, orders, and authorizations (including the Export Administration Regulations (EAR), International Traffic in Arms Regulations (ITAR), and the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC)) that are applicable to the export or import of goods, software, technology, or technical data ("***Items***") or services (collectively, "***Export/Import Laws***").

(h)        The Party conducting the export or import shall obtain all export or import authorizations which are required under the Export/Import Laws for such Party to execute its obligations under this Agreement. Each Party shall reasonably cooperate and exercise reasonable efforts at its own expense to support the other Party in obtaining any necessary licenses or authorizations required to perform its obligations under this Agreement. Reasonable cooperation shall include providing reasonably necessary documentation, including import, end user and re-transfer certificates.

(i)        The Party providing Items or services under this Agreement shall, upon request by the other Party, notify the other Party of the export classification (e.g. the Export Control Classification Numbers or U.S, Munitions List (USML) category and subcategory) of such Items or services as well as the export classification of any components or parts thereof if the classification is different from the export classification of the Item or service at issue. The Parties acknowledge that this representation means that an official capable of binding the Party providing such Items or services knows or has otherwise determined the proper export classification. Each Party agrees to reasonably cooperate with the other in providing, upon request by the other Party, documentation or other information that supports or confirms this representation.

Page 18 of 21

Exhibit 7
Page 1268

(j)      *Importer of Record for Components.* Benchmark Thailand will be the importer of record for all Components imported for use in manufacturing the Product. Benchmark Thailand will be exclusively liable for any fines or penalties imposed for improper importation or documentation of said Components.

0.73    **Product Content Regulation.**

(k)      *Benchmark Responsibilities*. Upon written request by Customer, Benchmark shall:

   i)      certify in writing that its Product manufacturing processes comply with applicable PCR;

   ii)      provide Customer with compliance information regarding applicable PCR for the consumable (MRO) materials which Benchmark adds to the Product and which are not typically listed on the BOM (for example, solder paste), and for open source Components, if any, for which Customer has delegated independent selection authority to Benchmark;

   iii)      provide Customer with SVHC compliance information on Products received through Passive Sourcing, as may be required of Benchmark under REACH Article 33;

   iv)      provide Customer with Product environmental documentation received from Component suppliers through Passive Sourcing, including, upon Customer's request, Certificates of Conformance received from Component suppliers; and

   v)      provide disclosures legally required regarding Conflict Minerals.

Except as expressly provided above, Benchmark has no responsibility or obligation to evaluate, document or demonstrate that any design, Specification(s), BOM, Components, Products, packaging or labeling satisfy any PCR which may be applicable to the Components and/or Product(s).

(l)      *Customer Responsibilities*. Customer shall have the sole responsibility to evaluate and ensure that all Product design elements (including any DFx, Specifications, BOM, Components, AVL and/or AML) meet the requirements of any applicable PCR, including whether all Components and materials incorporated into, and the packaging and labeling of, such Product(s) conform to any applicable PCR. Customer shall have the sole responsibility and expense for any Product's required PCR compliance, including: (i) any REACH-required application and registration, and/or otherwise obtaining compliance for all Products, customer-directed processes and/or Components; and (ii) any WEEE-required funding or utilizing recycling mechanisms applicable to any Product and/or Component.

## 19.    MISCELLANEOUS

**Force Majeure.** Neither Party shall be liable for its failure to perform hereunder due to any occurrence beyond its reasonable control, including acts of God; fires; floods; wars; acts of terrorism; sabotage; accidents; labor disputes or shortages; governmental laws, ordinances, rules, and regulations, whether valid or invalid (including, but not limited to, priorities, requisitions, allocations, and price adjustment restrictions); inability to obtain material, equipment, or transportation; and any other occurrence; provided, however, that obligations for payment under this Agreement shall not be relieved or suspended by any event of force majeure. The Party whose performance is prevented by any such occurrence shall notify the other Party thereof in writing as soon as is reasonably possible after the commencement of such occurrence, and shall promptly give written notice to the other Party of the cessation of such occurrence. The Party affected by such occurrence shall use reasonable commercial efforts to remedy or remove such event of force majeure as expeditiously as possible.

**Independent Contractor.** In the performance of this Agreement, Benchmark is acting as an independent contractor. Neither Benchmark nor Benchmark's Affiliates, or their employees are the servants, agents, or employees of Customer. Customer shall have no direction, supervision, or control over Benchmark's or Benchmark Affiliates' employees. Neither Party has the right or ability to: (a) bind the other Party to any agreement with a third party; or (b) incur any obligation or liability on behalf of the other Party without the other Party's written consent.

**Audit.** Notwithstanding any language or provision to the contrary, Customer shall not be allowed the right to audit or examine Benchmark's non-public financial books and records.

**Assignment and Delegation.** Neither Party shall assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed. For purposes of this Section, "assign" and/or "delegate" shall include assignment by a Party to any corporation controlling, controlled by or under common control with its parent corporation, or to any successor to substantially all of the assets or the business of the Party, or through a merger, share acquisition, or otherwise. Any purported assignment or delegation in violation of this Section is null and void. No assignment or delegation shall relieve the assigning or delegating party of any of its obligations hereunder unless the non-assigning or non-delegating Party enters into a novation with Benchmark releasing the assigning or delegating Party of its obligation under the Agreement.

Exhibit 7
Page 1269

**Successors and Assigns.** This Agreement is binding on and inures to the benefit of the Parties and their respective permitted successors and permitted assigns. This Section 19.5 does not address, directly or indirectly, whether a Party may assign its rights or delegate its performance under this Agreement, which Section 19.4 above separately addresses.

**Notices.** All notices relating to this Agreement shall be in writing and shall be deemed given: (a) in the case of mail, on the date deposited in the mail, postage prepaid, either registered or certified, with return receipt requested (or its equivalent); (b) in the case of personal delivery to an authorized representative or officer of the Party, or in the case of express courier service or overnight delivery service of national standing, on the date of delivery or attempted delivery (if receipt is refused); or (c) in the case of facsimile, twenty-four (24) hours after it has been sent provided that a duplicate copy of such notice is also promptly sent pursuant to delivery methods (a) or (b) above. Notices shall be addressed to the Parties as set forth below, but each Party may change its address by giving ten (10) days' prior written notice thereof to the other Party:

| | |
|---|---|
| *If to Customer:* | *with a copy to:* |
| Owlet Baby Care | Owlet Baby Care |
| 2500 Executive Parkway, Suite 300 | 2500 Executive Parkway, Suite 300 |
| Lehi, UT 84106, USA | Lehi, UT 84106, USA |
| Attn: Legal Director | Attn: Legal Director |
| *If to Benchmark:* | *with a copy to:* |
| Benchmark Electronics, Inc. | Benchmark Electronics, Inc. |
| 4141 N. Scottsdale Road, Suite 301 | 3000 Technology Drive |
| Scottsdale, AZ 85251 | Angleton, Texas 77515 |
| Attn: General Counsel | Attn: Chief Financial Officer |

0.80    **Dispute Resolution / Governing Law.**

(m)    The Parties shall first seek to settle through good faith negotiations any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or invalidity thereof ("***Dispute***").

(n)    The construction, interpretation and performance hereof and all Disputes concerning this Agreement will be governed by the laws of the State of New York, U.S.A. without regard to or application of its principles or laws regarding conflicts of laws. The Parties specifically exclude from application to this Agreement the United Nations Convention on Contracts for the International Sale of Goods. The sole and exclusive forum for litigation permitted under this Agreement will be the state or federal courts within the geographic bounds of the United States District Court for the District of Utah, U.S.A. (the "***Courts***"). Each Party irrevocably submits to the jurisdiction of the Courts for the litigation of Disputes, and irrevocably waives and agrees not to assert any claim or defense that the Party is not subject to the jurisdiction of the Courts, or that the Courts are an inconvenient forum or an improper venue. Each Party shall bear their own attorneys' fees and costs expended in connection with the resolution of any Disputes.

**Waiver.** No waiver of any term or provision of this Agreement will be valid unless such waiver is in writing signed by an authorized representative of the Party (which for Benchmark shall be an officer of the company) against whom enforcement of the waiver is sought. The waiver of any rights or obligations of a Party, or the waiver of a breach or potential breach of any provision of this Agreement will not constitute a waiver of any other rights or obligations, or of a breach of any other provisions, nor will it be deemed to be a general waiver of such provision by the waiving Party or to sanction any subsequent breach thereof by the other Party.

**Severability.** If any provision of this Agreement is held invalid by any law, rule, order, or regulation of any government or by the final determination of any court of competent jurisdiction, such invalidity shall not affect the enforceability of any other provisions and such provisions shall be interpreted so as to best accomplish the objectives of such invalid provision within the limits of applicable law or applicable court decisions.

**Survival.** Sections of this Agreement relating to limitation of liability, warranties, confidentiality, exclusivity, notices, disputes and governing law, and such other clauses which by their nature govern rights and obligations of the Parties after the expiration or termination of this Agreement shall survive such expiration or termination.

**No Third Party Beneficiaries.** This Agreement is intended for the sole and exclusive benefit of the Parties and is not intended to confer any enforceable rights, remedies or benefits upon any third party. A person who is not a Party to this Agreement may not enforce any of its terms.

Exhibit 7
Page 1270

**Integration and Modification.** This Agreement, including all exhibits, attachments, appendices, and documents incorporated into or referenced herein, including exhibits, attachments, appendices, and documents that are subsequently updated by Benchmark and accepted by Customer in writing, and the terms and conditions in each accepted Order (excluding any preprinted terms and conditions) and SOW(s), constitute the complete agreement between the Parties and supersede all prior or contemporaneous agreements or representations, written or oral, concerning the subject matter of this Agreement. Except as provided by the previous sentence, this Agreement may not be modified or amended except in a writing signed by a duly authorized representative of each Party, and no other act, document, usage, or custom shall be deemed or permitted to amend or modify this Agreement.

**Counterparts.** This Agreement may be executed in multiple counterparts, each of which so executed shall be considered an original and all of which taken together constitute only one agreement. Once signed, any accurate reproduction of this Agreement made by reliable means (for example, electronic image, photocopy, or facsimile) shall be considered an original.

**No Solicitation.** The following restriction shall not apply to non-solicited, non-recruited responses to general advertisements for employment. During the term of this Agreement and for one (1) year after termination or expiration, neither Party shall, directly or indirectly, solicit or recruit for employment, cause to be solicited for employment, or attempt to solicit or recruit for employment, persons employed by the other Party at the relevant time, except with the other Party's prior written consent. As to employees who left the employ of a Party prior to termination of this Agreement, the other Party shall not, directly or indirectly, employ or otherwise contract such former employee of a Party until one (1) year after the former employee's termination or separation from that Party, except with that Party's prior written consent.

## 20.    BUSINESS ETHICS AND COMPLIANCE.

Benchmark is committed to industry best practices in business ethics, worker safety and fairness, environmental responsibility, integrity and efficiency, and requires the same of all of its business partners. Customer acknowledges and agrees with the Declaration on Business Ethics and Compliance attached hereto as Exhibit C, and upon request shall complete and sign the Exhibit as a condition of entering into or remaining in a business relationship with Benchmark. In the event that Customer has cause to believe that Benchmark or any employee or agent of Benchmark has acted improperly or unethically under this Agreement, Customer should report such conduct to Benchmark's Ethics and Compliance HelpLine at (country code +1) 979-848-5315.

Although failure to make such a report will not constitute a basis for claiming breach of contract by Customer, Customer is nevertheless encouraged to make such reports when warranted. Both Parties declare that none of its officers are government officials, police officers or civil servants.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed effective as of the Effective Date, by their duly authorized officers.

**BENCHMARK ELECTRONICS (THAILAND) PCL**          **OWLET BABY CARE, INC.**

| | |
|---|---|
| By      /s/ Don Adam | By:      /s/ David Kizer |
| Signature | Signature |
| Don Adam | David Kizer |
| Printed Name | Printed Name |
| Director                          10/23/2017 | VP, Sourcing & Supply Chain          10/24/17 |
| Title                                Date | Title                                Date |

**List of Exhibits/Attachments:**

- Exhibit A – Statement of Work
- Exhibit B – Nondisclosure Agreement
- Exhibit C – Declaration on Business Ethics and Compliance
- Exhibit D – Engineering Services Agreement Template

Page 21 of 21

Exhibit 7
Page 1271

**Exhibit 10.13(a)**

**Amendment No. 1**
**to**
**Manufacturing Services Agreement**:

This Amendment No. 1 (this "**Amendment**") to the Manufacturing Services Agreement dated October 24, 2017, (the "**Agreement**") between the Parties is entered into on July 5, 2018 (the "**Amendment Effective Date**") by and between Owlet Baby Care, Inc., a Delaware corporation with its principal office at 2500 Executive Parkway, Suite 300, Lehi, Utah 84043 ("**Customer**"), and Benchmark Electronics, Inc., a Texas corporation with its principal place of business at 4141 N. Scottsdale Road, Suite 301, Scottsdale, Arizona 85251, along with its wholly-owned subsidiary, Benchmark Electronics (Thailand) PCL, a Thailand company with offices at 94 Moo 1 Hi-Tech Industrial Estate, Banlane, Bang Pa-In, Ayutthaya 13160, Thailand, (collectively, "**Benchmark**"). The terms of the Agreement between Customer and Benchmark shall be incorporated into and apply to this Amendment. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

WHEREAS, Customer and Benchmark wish to amend the Agreement;

NOW THEREFORE, in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Customer and Benchmark agree as follows:

1. <u>Section 7.4 (Component Yield Loss/Attrition)</u>. Section 7.4 of the Agreement is hereby deleted in its entirety and replaced with the following:

"Customer acknowledges that the manufacturing processes for the manufacture of the Product will result in the loss and scrap of Products due to the fallout or scrap of Components used in production ("***Yield Loss / Attrition***"). The total Yield Loss / Attrition value (calculated as a number of Products which were scrapped) from each Purchase Order will be consolidated on a monthly basis. Benchmark may issue an invoice to Customer each month for all such Products where the Yield Loss / Attrition number is less than or equal to three percent (2.5%) of the total number of Products in the Purchase Order. Benchmark will be liable for any Yield Loss / Attrition which is greater than three percent (3%) of the total number of Products in the Purchase Order."

2. <u>Section 7.5 (Inventory Turns)</u>. Section 7.5 of the Agreement is hereby deleted in its entirety.

3. A new section, <u>Section 11.6 (Epidemic Failure)</u> is hereby added to the Agreement as follows:

"11.6 **Epidemic Failure**. In the event that five percent (5%) or more of any lot, batch or other separately distinguishable manufacturing run of Products which was verified by Benchmark to have been delivered to Customer is found to be Nonconforming Product with the same root cause defects within the twelve (12) month period following Benchmark's delivery of such Products to Customer, Benchmark will promptly: (a) dedicate sufficient resources to thoroughly investigate the cause of the defect; (b) perform root cause analysis; and (c) implement corrective action. In addition, after Benchmark's verification, Benchmark will render repair and replacement services, as reasonably requested by Customer, during the applicable Product warranty period. In addition to repair or replacement of such Nonconforming Products with the same root cause defects, Manufacturer will credit Customer an amount equal to ten percent (10%) of the price paid by Customer as compensation for removal and reinstallation associated with the repair or replacement of such Nonconforming Products."

4. <u>No other changes</u>. All other terms and conditions of the Agreement remain unchanged and in full force and effect. The Agreement as hereby amended contains the entire agreement between the Parties with respect to the matters set forth therein and herein, and the Agreement and this Amendment shall be read as one document.

IN WITNESS WHEREOF, this Amendment has been signed effective as of the Amendment Effective Date on behalf of Customer and Benchmark by duly authorized representatives.

Exhibit 7
Page 1272

**BENCHMARK ELECTRONICS (THAILAND) PCL**

By:  /s/ Mike Buseman
       Signature

Mike Buseman
Printed Name

Director                      7/6/18
Title                         Date

**BENCHMARK ELECTRONICS, INC.**

By:  /s/ Mike Buseman
       Signature

Mike Buseman
Printed Name

EVP, Global Operations        7/6/18
Title                         Date

**OWLET BABY CARE, INC.**

By:  /s/ David Kizer
       Signature

David Kizer
Printed Name

VP Sourcing & Supply Chain      7/3/18
Title                         Date

Exhibit 7
Page 1273

Exhibit 10.13(b)

**Amendment No. 2
to
Manufacturing Services Agreement**:

This Amendment No. 2 (this "**Amendment**") to the Manufacturing Services Agreement dated October 24, 2017, (the "**Agreement**") between the Parties is entered into on September 23, 2020 (the "**Amendment Effective Date**") by and between Owlet Baby Care Inc., a Delaware corporation with its principal office at 2500 Executive Parkway, Suite 500, Lehi, Utah 84043 ("**Customer**"), and Benchmark Electronics, Inc., a Texas corporation with its principal place of business at 56 S. Rockford Drive, Tempe, Arizona 85281, along with its wholly-owned subsidiary, Benchmark Electronics (Thailand) PCL, a Thailand company with offices at 94 Moo 1 Hi-Tech Industrial Estate, Banlane, Bang Pa-In, Ayutthaya 13160, Thailand, (collectively, "**Benchmark**"). The terms of the Agreement between Customer and Benchmark shall be incorporated into and apply to this Amendment. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

WHEREAS, Customer and Benchmark wish to amend the Agreement;

NOW THEREFORE, in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Customer and Benchmark agree as follows:

1. The following new Sections 1.3 (Exclusivity) and 1.4 (Additional Site) are added immediately following Section 1.2 (Scope) in the Agreement:

   "1.3    **Exclusivity.** Starting on the Amendment Effective Date and expiring not less than three (3) years after the Amendment Effective Date ("*Exclusivity Period*"), Customer grants to Benchmark the exclusive right to manufacture the Exclusive Products. Customer shall not place Orders for the manufacture of the Exclusive Products with any third party, and Customer shall not develop Customer's own manufacturing of the Exclusive Products during the Exclusivity Period. The Parties may agree to allow another Benchmark Affiliate to provide the manufacturing services for the Exclusive Products during the Exclusivity Period."

   "1.4    **Additional Site.** Within one (1) calendar year from the Amendment Effective Date, Customer may engage a second production site owned by Benchmark and/or Benchmark Affiliate for the sale of goods and/or manufacturing services and receive the benefit of Section 6.4 (Production Cost) below."

2. Definition. The following definition is added to the defined terms in Section 2.1 (Definitions) of the Agreement:

   "*Exclusive Products*" means all of Customer's Products in the following product families: Owlet Smart Sock, Owlet Monitor Duo, and Owlet Band including all revisions and future generations of these Products and or product families. For the avoidance of doubt, "Exclusive Products" does not include the Owlet Cam product.

3. Section 6.2 (Payment) of the Agreement is deleted in its entirety and replaced with the following:

   "6.2    **Payment**. Customer shall make all payments to Benchmark in U.S. Dollars via electronic funds transfer received by Benchmark no later than net ninety (90) days after the invoice date without set-off of any kind. Nevertheless, Customer may apply any Benchmark-issued credit memo against any outstanding Benchmark invoices to Customer. This payment term shall likewise apply to any invoices or other amounts owed from Benchmark to Customer. If any invoice remains unpaid after the due date thereof, Customer will be subject to a charge equal to the lesser of one and one-half percent (1.5%) per month or the highest rate allowed by law, and Benchmark may place a credit hold on Customer's account for pending and future shipments."

4. The following new Section 6.4 (Production Cost) is added immediately following Section 6.3 (Customer's Financial Status) in the Agreement:

   "6.4    **Production Cost**. If Customer engages a second production site owned by Benchmark and/or Benchmark Affiliate for the sale of goods and/or manufacturing services, pursuant to Section 1.4 (Additional Site); then upon completion of the production set-up, Customer may provide copies of invoices for the costs of production set-up, and Benchmark will pay such undisputed invoices on Customer's behalf at the lesser of either fifty percent (50%) of the total production set-up costs, or three hundred thousand dollars (USD $300,000)."

Exhibit 7
Page 1274

5. <u>No other changes</u>. All other terms and conditions of the Agreement remain unchanged and in full force and effect. The Agreement as hereby amended contains the entire agreement between the Parties with respect to the matters set forth therein and herein, and the Agreement and this Amendment shall be read as one document.

IN WITNESS WHEREOF, this Amendment has been signed effective as of the Amendment Effective Date on behalf of Customer and Benchmark by duly authorized representatives.

**BENCHMARK ELECTRONICS (THAILAND) PCL**

By: /s/ Roop K. Lakkaraju
     Signature

Roop K. Lakkaraju
Printed Name

EVP & CFO
Title                        Date

**BENCHMARK ELECTRONICS, INC.**

By: /s/ Roop K. Lakkaraju
     Signature

Roop K. Lakkaraju
Printed Name

EVP & CFO
Title                        Date

**OWLET BABY CARE INC.**

By: /s/ Michael Abbott
     Signature

Michael Abbott
Printed Name

President              9/24/20
Title                        Date

Exhibit 7
Page 1275

**Exhibit 10.14**

[***] Certain information in this document has been excluded pursuant to Regulation S-K, Item (601)(b)(10). Such excluded information is not material and would likely cause competitive harm to the registrant if publicly disclosed.

## KALAY SERVICE AND LICENSE AGREEMENT

This Kalay Service and License Agreement (the "Agreement") is made and entered into effective as of the 31th of January, 2018 (the "Effective Date"), by and between ThroughTek Co., Ltd., a company incorporated and existing under the laws of Taiwan (R.O.C.), having its principle office at 9F, No.364, Sec. I, Nangang Rd., Nangang Dist., Taipei City 115, Taiwan (the "Provider") And Owlet Baby Care, Inc., a company incorporated and existing under the laws of the United State and having its principle office at 2500 Executive PKWY Suite 300 Lehi, UT 84043.(the "Customer").

WHEREAS

The Customer wishes to purchase UIDs from the Provider.

The Customer also wishes to utilize the Provider's Kalay point to point connection service (the "P2P Service") and Kalay OTA Service (the "KOTA Service"). P2P Service and KOTA Service are collectively referred to as "Services" hereunder.

In addition, the Customer wishes to purchase partial source code of the Provider's Android version Kalay App and iOS version Kalay App.

The Provider agrees to provide UIDs in consideration of UID fees, to provide Services in consideration of Service fees and to provide the Partial Source Code in consideration of license fees under the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the agreement, provisions and covenants herein, the Parties hereby agree as follows:

**Article 1. Definitions and Interpretations**

In the Agreement, the following expressions, where used, shall have the meanings respectively ascribed to them:

"App" - Mobile application. A self-contained program or piece of software, together with necessary and suitable hardware, servers and other equipment and facilities designed to fulfill a particular purpose; an application, downloaded by a user to a Client-side Apparatus.

"Client-side Apparatus" - an apparatus where App runs, such as a smartphone, a pad, a tablet.

"Device"- a device with an UID embedded in its firmware, such as an IP camera.

"End User"- an existing or potential consumer who purchases Device from the Customer and then utilizes the Services or any part thereof via the App.

"Intellectual Property Right(s)"- any patent, petty patent, copyright, database right, design right, community design right, semiconductor topography right, registered design, rights in know-how, or any similar right in any part of the world and shall include any applications for the registration of any patents or registered designs or similar rights capable of registration in any part of the world.

1

Exhibit 7
Page 1276

"KOTA Service"- a service that could allow the Customer to upload new firmware for Devices to the Provider's KOTA Server. An End User may operate App on a Client-Side Apparatus to check if the firmware of a Device is the same as the newest version firmware on the KOTA server. If not, the End User may choose to operate App on a Client-Side Apparatus to download the newest version of firmware to the Device.

"P2P Server"- a server which provides P2P Service.

"P2P Service"- a service comprises (1) a Device logs in the P2P Server for waiting connection requirement from Client-side Apparatus, (2) when the Client-side Apparatus enquires the P2P Server, the P2P Server will provide the Device with Client-side Apparatus address for P2P penetration to each other.

"UID" - an unique key used to confirm the identity of Devices and the legitimacy to access the Provider's servers.

"Working Day" - any day other than a Saturday, Sunday or public holiday in the Taiwan.

**Article 2. The Partial Source Code**

2.1    After the Customer has fulfilled its payment obligations, the Provider will provide the Customer with (a) source code of UI layer, and (b) libraries for the Customer to call functions; of the Provider's Android version Kalay App and iOS version Kalay App. The above items are collectively referred to as the "Partial Source Code" hereunder.

2.2    The structure, organization and code of the Partial Source Code are the valuable trade secrets and confidential information of the Provider. The Partial Source Code is protected by copyright, including without limitation by international treaty provisions and applicable laws in the country in which it is being used. The Customer acknowledges that the Provider retains the ownership of all patents, copyrights, trade secrets, trademarks and other intellectual property rights pertaining to the Partial Source Code, and that the Provider's ownership rights extend to any images, photographs, animations, videos, audio, music, text and applets incorporated into the Partial Source Code and all accompanying printed materials. The Customer shall take no actions which adversely affect the Provider's intellectual property rights in the Partial Source Code.

2.3    The Customer may only use, modify, compile or reproduce the Partial Source Code.

2.4    Except as otherwise set forth in this Agreement, the Customer may not resell, transfer, sublicense or disclose all or any part of Partial Source Code to any third party without prior written consent of the Provider.

2.5    The Customer may not change, reverse engineer, decompile or disassemble the library of the Partial Source Code.

2.6    The Customer shall protect the Partial Source Code from inadvertent disclosure to a third party using the same care and diligence that the Customer uses to protect its own proprietary and confidential information, but in no case less than reasonable care. The Customer shall ensure that each of its employees, officers or directors who has access to the Partial Source Code is informed of its proprietary and confidential nature and is required to abide by the terms of this Agreement. The Customer shall be liable if any of its employees, officers or directors, either former or present, resells, transfers or discloses all or any part of the Partial Source Code to any third party without prior written consent of the Provider OR change, reverse engineer, decompile or disassemble the library of the Partial Source Code.

2

Exhibit 7
Page 1277

2.7    The Provider warrants for a period of one hundred and eighty calendar days following delivery of Partial Source Code ("Warranty Period"). During the Warranty Period, when the Customer encounters any technical problems using the Partial Source Code, the Customer has to contact the Provider either by phone or by email. After obtaining the notice from the Customer, the Provider will make preliminary judgement as to whether such problems were caused by the library files, API functions or other possible reasons. The FAE team of the Provider will help fix the problems, free of charge, if the problems are caused by library files or API functions . However, if the Provider is not attributable to the aforementioned problems, the Provider will charge the Customer if the Customer needs the Provider's assistance .

2.8    After the warranty period ends or any issues not attributable to the Provider, any and all technical related supports shall be deemed to the extra service. The fee of extra service is priced at USD 500 per day (i.e. eight working hours, less than eight hours will be treated as eight hours.). The cost of transportation, accommodation and all reasonable related fees will be separately billed to the Customer. A Statement of Work will be agreed upon before any billable work is conducted.

2.9    After the warranty period ends or any issues not attributable to the Provider, if licenses are continuing to be purchased the Provider will continue to provide, by the Customer' s request, the most-updated Partial Source Code to be compatible with the latest iOS and Android Operation Systems up to one hundred and eighty calendar days from the last UID purchase. When the Customer makes a request, it has to describe the reason why it needs the updated Partial Source Code.

**Article 3. Service Level**

3.1    The Service Level is described more fully in Appendix 1. For the avoidance of doubts, this Article 3 and Appendix 1 only apply to services issues relating to the Provider's servers. Provider guarantees server uptime of 99.999%.

3.2    Notwithstanding the foregoing, the Provider may make changes or updates to the Services (such as infrastructure, security, technical configurations, application features, etc.) during the term of this Agreement, including to reflect changes in technology, industry practices, patterns of system use, and availability of third party content. Provider shall give reasonable notice to Customer of any significant changes, regardless of the reason for the change. A significant change, for purposes of this Article 3.2 shall be determined by taking into account, among others, the following factors:

1)    the estimated effect on Customer or its operations; 2) an expectation of any negative effect to Provider's Services as described in this Agreement; 3) any delay in provision of Services to Customer for any reason .

3.3    For the duration of this Agreement and subject to the Customer's payment obligations as set forth in this Agreement, the Customer has a non-exclusive, royalty free and worldwide right to use the Services. The Provider shall use commercially reasonable endeavors to make available to the End User, through the App, the Services mutually agreed by the Parties. This will also imply a continuity of services if there is a change in control of the provider.

3

Exhibit 7
Page 1278

3.4      If the agreement is terminated by either party the lifespan of existing UIDs (3 year term) will continue to be honored.

**Article 4. Consideration and payment method**

4.1      The license fees for the Partial Source Code is USD 25,000. 50% down payment shall be made with the remaining 50% being paid by wire transfer within thirty (30) calendar days after the Effective Date of this Agreement.

4.2      UID Fees payable by the Customer

    (a)      The price for each unit of UID is [***]. The Customer understands the above fee is a discount and promises to obtain 100,000 units of UIDs from the Provider within one year of Mass Production start which estimated to be June 2018. If the Customer does not pay for 100,000 units of UIDs within the above specified period, the Customer agrees to pay [***] before one year since Mass Production start which is estimated to be June 2019 to the Provider within 30 days of the one year anniversary of Mass Production start.

    (b)      The price for each unit of UID purchased by the Customer after June 21, 2019 shall be negotiated by the Customer and the Provider, and confirmed by signed quotations from the Customer. The UID purchase price after June 21, 2019 shall not increase by more than [***] per year.

    (c)      When the Customer purchases UIDs from the Provider, the Customer has to make full payment to the Provider by wire transfer within [***] calendar days after receiving the UIDs. Quantity for each purchase order shall be a minimum of [***] units of UIDs. After [***] units of UIDs have been purchased payment will be provided within [***] days of receiving the UIDs

4.3      Service fees for the Services payable by the Customer:

    (a)      The service fee for providing [***] with the Services for first [***] during the Term hereof shall be negotiated by the Customer and the Provider, and confirmed by signed quotations from the Customer subsequently after signing of this Agreement. However, the Provider agrees not to charge Service fee for the first [***] devices embedded with UIDs. The price to extend service each additional year shall not exceed a cost that is greater than a [***] increase compared to the prorated [***] original service fee for that UID.

    (b)      When the Customer purchases the Services from the Provider, the Customer has to make full payment to the Provider by wire transfer within thirty (30) calendar days after receiving the UIDs. After [***] units of UIDs have been purchased payment will be provided within [***] days of receiving the UIDs

4.4      Any technical related supports other than those stated in Article 2.7 and Appendix 1 requested by the Customer shall be deemed as extra service(s) and will be subject to extra charges. The fee of extra service is priced at [***]. The cost of transportation, accommodation and all reasonable related fees will be separately billed to the Customer. A Statement of Work will be agreed upon before any billable work is conducted.

4

Exhibit 7
Page 1279

4.5    The payment made by the Customer is nonrefundable, except otherwise provided in this Agreement. All payments under this Agreement are exclusive of sales, value-added, withholding and other taxes.

4.6    Account information of the Provider: [***]

**Article 5. Intellectual Property**

5.1    Except for the rights granted to the Customer herein or otherwise mentioned, all right, title, copyright, and interest in the software, server, software modifications and error corrections thereto will be and remain the property of the Provider Changes developed or paid for by customer will be available to customer royalty free for use with TUTK service for perpetuity.

5.2    Notwithstanding the aforesaid and as between the Parties, each party shall own and retain all right, title and interest in the intellectual property rights and materials owned or created by or for such party.

**Article 6. Confidentiality**

The Provider and the Customer shall keep confidential with utmost care any and all confidential information acquired from the other in the course of business and shall not disclose or divulge confidential information to a third party without prior written approval of the disclosing party. The confidential information shall not be used for any purpose other than performance of this Agreement, and shall be disclosed only to officers or employees who are required to know it for the purpose of performance of this Agreement. The receiving party shall cause all of its officers and employees who have an access to the confidential information to be bound to the confidentiality obligation substantially the same as the foregoing obligation of the receiving party. The preceding obligation of confidentiality shall survive for a period of five (5) years after the termination of this Agreement.

**Article 7. Warranties, Disclaimers and exclusive remedies**

7.1    Each Party represents that it has the full right, power, and authority to enter into this Agreement, to perform its obligations under this Agreement, and is an entity duly authorized and in good standing in all relevant jurisdictions as of the Effective Date, and shall maintain such status and such aforementioned full right, power, and authority throughout the duration of the Agreement.

7.2    The Provider represents that the Provider has all necessary rights, title, interest, or necessary licenses to grant the rights and licenses herein to the Customer for the Partial Source Code, and shall maintain such rights, title, interests, and licenses in effect for the duration of this Agreement.

7.3    The Provider warrants that it will deliver the Partial Source Code in all material respects as described in this Agreement.

7.4    The Provider warrants that it will perform the Services strictly conforming in all respects with the requirements set out in this Agreement. If the Services were not performed as warranted, the Customer must promptly provide written notice to the Provider and the Provider shall rectify the same amicably pursuant to Articles 3 and Appendix 1.

5

Exhibit 7
Page 1280

7.5   THE PROVIDER DOES NOT GUARANTEE THAT THE QUALITY OF P2P CONNECTION WILL MEET THE CUSTOMER'S EXPECTATIONS. THE CUSTOMER ACKNOWLEDGES THAT THE PROVIDER DOES NOT CONTROL THE TRANSFER OF DATA OVER COMMUNICATIONS FACILITIES, INCLUDING THE INTERNET, AND THAT P2P CONNECTION MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF SUCH COMMUNICATIONS FACILITIES. THE PROVIDER IS NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGE RESULTING FROM SUCH PROBLEMS . THE PROVIDER IS NOT RESPONSIBLE FOR ANY ISSUES RELATED TO THE PERFORMANCE, OPERATION OR SECURITY OF P2P CONNECTION THAT ARISES FROM THE CUSTOMER'S OR ITS END USERS' ACTS (INCLUDING BUT NOT LIMITED TO REPEATED USE OF THE SAME UID ON TWO OR MORE DEVICES), CONTENT, APPLICATIONS, EQUIPMENTS OR THIRD PARTY CONTENT, APPLICATIONS, EQUIPMENTS. THE PROVIDER DOES NOT MAKE ANY REPRESENTATION OR WARRANTY REGARDING THE RELIABILITY, ACCURACY, COMPLETENESS, CORRECTNESS, OR USEFULNESS OF THIRD PARTY CONTENT, AND DISCLAIMS ALL LIABILITIES ARISING FROM OR RELATING TO THIRD PARTY CONTENT.

7.6   Except as otherwise specified under this Agreement and TO THE EXTENT NOT PROHIBITED BY LAW, THESE WARRANTIES ARE EXCLUSIVE AND THERE ARE NO OTHER EXPRESS OR IMPLIED WARRANTIES OR CONDITIONS INCLUDING FOR SOFTWARE, HARDWARE, SYSTEMS, NETWORKS OR ENVIRONMENTS OR FOR MERCHANTABILITY, SATISFACTORY QUALITY AND FITNESS FOR A PARTICULAR PURPOSE.

**Article 8. Limitation of Liability**

Except as otherwise specified under this Agreement, NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, OR ANY LOSS OF REVENUE OR PROFITS (EXCLUDING FEES UNDER THIS AGREEMENT), DATA, OR DATA USE . PROVIDER'S MAXIMUM LIABILITY FOR ALL DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT OR TORT, OR OTHERWISE, SHALL IN NO EVENT EXCEED, IN THE AGGREGATE, THE TOTAL AMOUNTS ACTUALLY PAID TO THE PROVIDER FOR THE SERVICES UNDER THIS AGREEMENT THAT IS THE SUBJECT OF THE CLAIM IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM.

The limitations of liability will exclude the below damages

- Continuous server downtime in excess of 1 hour will be charged a penalty of $5000 per hour calculated in 15 min increments.

**Article 9. Indemnification**

9.1   Subject to the terms of this Article 9 (Indemnification), if a third party makes a claim against either Customer or Provider ("Recipient" which may refer to Customer or Provider depending upon which party received the Material), that any information, design, specification, instruction, software, service, data, hardware, or material (collectively "Material") furnished by either Customer or Provider ("Furnisher" which may refer to Customer or Provider depending on which party furnished the Material) and used by the Recipient infringes the third party's intellectual property rights or any other rights, the Furnisher, at the Furnisher's sole cost and expense, will defend the Recipient against the claim and indemnify the Recipient from the direct damages, liabilities, costs and expenses awarded by the court to the third party claiming infringement or the settlement agreed to by the Furnisher to the extent the award is directly and solely attributable to such infringement, if the Recipient does the following:

Exhibit 7
Page 1281

(a)    notifies the Furnisher promptly in writing along with all the information known to the Recipient, not later than seven days after the Recipient receives notice of the claim (or sooner if required by applicable law);

(b)    gives the Furbisher sole control of the defense and any settlement negotiations; and

(c)    gives the Furnisher the information, authority and assistance the Furnisher needs to defend against or settle the claim.

9.2    Notwithstanding any provisions herein, the Provider will not indemnify the Customer for any portion of an infringement claim that is based upon the combination of any Material with any products or services not provided by the Provider.

**Article 10. Force Majeure**

Neither party shall be responsible for failure or delay of performance if caused by: an act of war, hostility, or sabotage; act of God, natural disasters, fire, storm, flood, earthquake, explosion, accident, acts of the public enemy, war, rebellion, insurrection, quarantine restrictions, riots, labor disputes, transportation embargoes, boycotts, acts of any government, whether national, state, local or otherwise, or any agency thereof, or judicial action. Both parties will use reasonable efforts to mitigate the effect of a force majeure event. If such event continues for more than sixty days, either party may cancel unperformed Services upon written notice. This Article does not excuse either Party's obligation to take reasonable steps to follow its normal disaster recovery procedures or the Customer's obligation to pay for UID fees, service fees and license fees.

**Article 11. Assignment**

The Customer may not assign this Agreement or an interest in it to another individual or entity without the prior written consent from the Provider.

**Article 12. Term and Termination**

12.1    Term. The initial term of this Agreement shall commence on the Effective Date and extend for three (3) years thereafter, unless earlier terminated pursuant to the terms hereof ("Initial Term") . This Agreement will renew automatically and successively in one year increments unless terminated by either Party upon the provision of prior written notice given to the other Party at least ninety (90) days prior to the expiration of the Initial Term or any renewal term.

12.2    Without affecting any other right or remedy available to it, either Party may terminate this Agreement with immediate effect by giving written notice to the other Party if:

(a)    The other Party fails to pay any amount due under this Agreement on the due date for payment, and remains in default not less than ten (10) business days after its receipt of written notice of such non-payment;

7

Exhibit 7
Page 1282

(b)     The other Party commits a material breach of any other term of this Agreement which breach is irremediable or (if such breach is remediable) fails to remedy that breach within a period of thirty (30) days after being notified in writing to do so;

(c)     The other Party suspends, or threatens to suspend, payment of its debts or is unable to pay its debts as they fall due or admits inability to pay its debts or (being a company or limited liability partnership) is deemed unable to pay its debts and is deemed either unable to pay its debts or as having no reasonable prospect of so doing;

(d)     The other Party commences negotiations with all or any class of its creditors with a view to rescheduling any of its debts, or makes a proposal for or enters into any compromise or arrangement with its creditors [other than (being a company) for the sole purpose of a scheme for a solvent amalgamation of that other Party with one or more other companies or the solvent reconstruction of that other Party;

(e)     A petition is filed, a notice is given, a resolution is passed, or an order is made, for or in connection with the winding up of that other party (being a company) other than for the sole purpose of a scheme for a solvent amalgamation of that other party with one or more other companies or the solvent reconstruction of that other party;

(f)     An application is made to court, or an order is made, for the appointment of an administrator, or if a notice of intention to appoint an administrator is given or if an administrator is appointed, over the other Party (being a company);

(g)     The holder of a qualifying floating charge over the assets of that other party (being a company) has become entitled to appoint or has appointed an administrative receiver;

(h)     A person becomes entitled to appoint a receiver over the assets of the other Party, or a receiver is appointed over the assets of the other Party;

(i)     A creditor or encumbrance of the other Party attaches or takes possession of, or a distress, execution, sequestration or other such process is levied or enforced on or sued against, the whole or any part of the other Party's assets and such attachment or process is not discharged within fourteen (14) days;

(j)     Any event occurs, or proceeding is taken, with respect to the other Party in any jurisdiction to which it is subject that has an effect equivalent or similar to any of the events mentioned in clause 12.2.(a) to clause 12.2.(j) (inclusive);

(k)     The other Party suspends or ceases carrying on all or a substantial part of its business.

(l)     For the purposes of Article 12.2, Provider shall provide continued support and access to its Services, as described herein, and agrees to provide to Customer a continued license to its source code for any software included in the Services, UIDs, or other products or services included in this Agreement, in the event of a termination by Provider under Article 12.2 subsections (d), (e), (f), (g), (h), (i), (j), or (k). In the event of any change in control of Provider, Provider shall give access to similar services as described in this Article 12.2(1) to Customer for the duration of this Agreement. This subsection (1) shall survive the termination of this Agreement.

8

Exhibit 7
Page 1283

(m)     Customer deems that the service levels and product quality is no longer marketable to its customers.

**Article 13. Consequences of Termination**

13.1    On termination or expiry of this Agreement, the Customer shall immediately pay to the Provider all of the Provider's outstanding unpaid invoices and interest and, in respect of UIDs, Services or software supplied but for which no invoice has been submitted, the Provider may submit an invoice, which shall be payable immediately on receipt ;

13.2    Survival. Articles 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 16 and any other provision of this Agreement which is expressed to survive or operate in the event of the termination of this Agreement shall survive termination of this Agreement.

13.3    Termination or expiry of this Agreement shall not affect any rights, remedies, obligations or liabilities of the Parties that have accrued up to the date of termination or expiry, including the right to claim damages in respect of any breach of the agreement, which existed at or before the date of termination or expiry.

**Article 14. Entirety of Agreement**

The terms and conditions set forth herein, together with Appendix, constitute the entire agreement between the Provider and the Customer and supersede any communications or previous agreements with respect to the subject matter of this Agreement. There are no written or oral understandings directly or indirectly related to this Agreement that are not set forth herein, unless otherwise agreed by the Parties in writing from time to time after the signing of this Agreement. No change can be made to this Agreement other than in writing and signed by both parties. If the terms and conditions herein are conflict with those under the Appendix, the Appendix shall prevail. For the avoidance of doubts, a quotation or a purchase order will not be construed as an appendix to the Agreement.

**Article 15. Governing Law**

This Agreement shall be construed and enforced according to the laws of the State of New York, USA, without regard to conflicts of law principles that would require application of any other law.

**Article 16. Competent Court**

In the event a dispute shall arise between the parties to this Agreement, it is hereby agreed that the dispute shall be referred to arbitration in the state of New York, USA in accordance with its arbitration rules. The place of arbitration is The state of New York, USA. The arbitrator's decision shall be final and binding and judgment may be entered thereon.

**Article 17. Headings in this Agreement**

The headings in and sectioning of this Agreement are for convenience only, confirm no rights or obligations in either party, and do not alter any terms of this agreement.

9

Exhibit 7
Page 1284

**IN WITNESS WHEREOF the parties have caused this Agreement to be executed by their duly authorized officers.**

**For and on behalf of the Provider:**

/s/ Chi-Ming Kuo
_____

Full Name: [Chi-Ming Kuo]
Position: [CEO]
Date: [31 / 01 / 2018]

**For and on behalf of the Customer:**

/s/ David Kizer
_____

Full Name: [David Kizer]
Position: [VP Sourcing and Supply Chain]
Date: [   /   /   ]

10

Exhibit 7
Page 1285

**Exhibit 10.15**

[***] Certain information in this document has been excluded pursuant to Regulation S-K, Item (601)(b)(10). Such excluded information is not material and would likely cause competitive harm to the registrant if publicly disclosed.

## SECOND AMENDED AND RESTATED
## LOAN AND SECURITY AGREEMENT

**THIS SECOND AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT** (this " **Agreement**") dated as of April 22, 2020 (the "**Effective Date**") between **SILICON VALLEY BANK**, a California corporation ("**Bank**"), and **OWLET BABY CARE INC.**, a Delaware corporation ("**Borrower**"), provides the terms on which Bank shall lend to Borrower and Borrower shall repay Bank.

### RECITALS

A.    Bank and Borrower entered into that certain Amended and Restated Loan and Security Agreement dated as of December 21, 2017 (as the same has been amended, modified, supplemented, renewed, or otherwise modified, from time to time, the "**Prior Loan Agreement**"). Pursuant to the Prior Loan Agreement, Bank made certain loans and other credit accommodations available to Borrower, including, without limitation, growth capital term loan advances in the aggregate original principal amount not to exceed Seven Million Dollars ($7,000,000) (each an "**Existing Growth Capital Advance**", and collectively, the "**Existing Growth Capital Advances**").

B.    Borrower has requested that Bank, and Bank has agreed to, among other things, (i) make a new term loan available to Borrower which will repay in full, the Existing Growth Capital Advances, and (ii) replace, amend, and restate the Prior Loan Agreement in its entirety.

### AGREEMENT

The parties hereby agree that the Prior Loan Agreement is hereby amended, restated, and replaced in its entirety as follows:

**1.    ACCOUNTING AND OTHER TERMS**

Accounting terms not defined in this Agreement shall be construed following GAAP. Calculations and determinations must be made following GAAP, except with respect to unaudited financial statements for the absence of footnotes and subject to year-end audit adjustments, provided that if at any time any change in GAAP would affect the computation of any covenant requirement set forth in any of the Loan Documents, and either Borrower or Bank shall so request, Borrower and Bank shall negotiate in good faith to amend such ratio or covenant requirement to preserve the original intent thereof in light of such change in GAAP; provided, further, that, until so amended, such covenant requirement shall continue to be computed in accordance with GAAP prior to such change therein; provided, further, that all obligations of any Person that are or would have been treated as operating leases for purposes of GAAP prior to the issuance by the ASU shall continue to be accounted for as operating leases for purposes of all financial definitions, calculations and covenants for purpose of this Agreement (whether or not such operating lease obligations were in effect on such date) notwithstanding the fact that such obligations are required in accordance with the ASU (on a prospective or retroactive basis or otherwise) to be treated as capitalized lease obligations in accordance with GAAP. Notwithstanding the foregoing, all financial covenant and other financial calculations shall be computed with respect to Borrower only, and not on a consolidated basis. Notwithstanding any terms in this Agreement to the contrary, for purposes of any financial covenant and other financial calculations in this Agreement (other than for purposes of updating the Borrowing Base) which are made in whole or in part based upon the Availability Amount as of the last day of a particular month, calculations relying on information from a Borrowing Base Statement shall be derived from the Borrowing Base Statement delivered either (i) within seven (7) days of month end or (ii) weekly if the Streamline Period is not in effect, pursuant to Section 6.2(a) (and not, for clarity, any more recent Borrowing Base Statement delivered after such period), and the actual delivery date of such Borrowing Base Statement shall be deemed to be the last day of the applicable month. Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in Section 13.1. All other terms contained in this Agreement, unless otherwise indicated, shall have the meaning provided by the Code to the extent such terms are defined therein.

Exhibit 7
Page 1286

2.    **LOAN AND TERMS OF PAYMENT**

**2.1**    **Promise to Pay.** Borrower hereby unconditionally promises to pay Bank the outstanding principal amount of all Credit Extensions and accrued and unpaid interest thereon as and when due in accordance with this Agreement.

**2.2**    **Revolving Line.**

(a)    Availability. Subject to the terms and conditions of this Agreement and to deduction of Reserves, Bank shall make Advances not exceeding the Availability Amount. Amounts borrowed under the Revolving Line may be repaid and, prior to the Revolving Line Maturity Date, reborrowed, subject to the applicable terms and conditions precedent herein.

(b)    Termination; Repayment. The Revolving Line terminates on the Revolving Line Maturity Date, when the principal amount of all Advances, the unpaid interest thereon, and all other Obligations relating to the Revolving Line shall be immediately due and payable.

**2.3**    **Existing Growth Capital Advances**. Borrower hereby acknowledges that, as part of the Prior Loan Agreement, Bank made available to Borrower, the Existing Growth Capital Advances in the aggregate original principal amount equal to Seven Million Dollars ($7,000,000). Borrower acknowledges and agrees that as of the Effective Date, (i) the aggregate outstanding principal balance of the Existing Growth Capital Advances is Seven Million Dollars ($7,000,000), which remains outstanding and is continued as an Obligation hereunder as of the Effective Date, (ii) that such sum is not subject to any offset or defense of any kind whatsoever, and in the event Borrower has any offsets or defenses thereto, Borrower hereby irrevocably waives all such offsets and defenses, (iii) there is no further availability to borrow under the Existing Growth Capital Advances, and (iv) that the Existing Growth Capital Advances will be replaced by the Growth Capital Advances (as defined below) as more fully described herein. The Obligations owing with respect to the Existing Growth Capital Advances have not been extinguished or discharged hereby and the execution of this Agreement is not intended to and shall not cause or result in a novation with respect to the Existing Growth Capital Advances. Borrower shall, on or about the Effective Date and in conjunction with Borrower's execution of this Agreement, use a portion of the proceeds from the Tranche One Growth Capital Advance to repay in full in cash all of the Obligations owing to Bank under the Existing Growth Capital Advances.

**2.4**    **Growth Capital Advances.**

(a)    Availability. Subject to the terms and conditions of this Agreement, Bank shall make a growth capital term loan available to Borrower in multiple advances (each, a "**Growth Capital Advance**" and, collectively, "**Growth Capital Advances**") in an aggregate original principal amount not to exceed the Growth Capital Commitment Amount. The Growth Capital Advances shall be available in two (2) tranches as follows: (a) the first (1st) tranche of the Growth Capital Advances will be funded on or about the Effective Date as a single Growth Capital Advance in an original principal amount of Eight Million Dollars ($8,000,000) (the "**Tranche One Growth Capital Advance**"), and (b) provided that Bank has determined that Borrower has achieved the Tranche Two Milestone, the second (2nd) tranche shall be available to Borrower during the Tranche Two Draw Period in multiple advances in the aggregate original principal amount not to exceed Two Million Dollars ($2,000,000). Each Growth Capital Advance shall not be less than Two Hundred Fifty Thousand Dollars ($250,000). After repayment, no Growth Capital Advance (or any portion thereof) may be re-borrowed.

(b)    Interest-Only Payments. With respect to each Growth Capital Advance, commencing on the first Payment Date following the Funding Date of such Growth Capital Advance and continuing on the Payment Date of each month thereafter during the Interest-Only Period, Borrower shall make monthly payments of interest, in arrears, on the principal amount of such Growth Capital Advance at the rate set forth in Section 2.6(a)(ii).

(c)    Principal and Interest Payments. For each Growth Capital Advance, commencing on the Conversion Date and continuing on each Payment Date thereafter, Borrower shall repay each Growth Capital Advance in Applicable Number of consecutive equal monthly payments of principal, each in an amount which would fully amortize the outstanding Growth Capital Advances, as of the Conversion Date, over the Growth Capital Repayment Period, plus accrued interest, which interest shall be calculated at the rate set forth in Section 2.6(a)(ii). All unpaid principal and accrued and unpaid interest on the Growth Capital Advances is due and payable in full on the Growth Capital Maturity Date.

2

Exhibit 7
Page 1287

(d)      _Permitted Prepayment_. Borrower shall have the option to prepay all, but not less than all, of the Growth Capital Advances, provided Borrower (i) delivers written notice to Bank of its election to prepay the Growth Capital Advances at least ten (10) days prior to such prepayment, and (ii) pays, on the date of such prepayment (A) the outstanding principal plus accrued and unpaid interest with respect to the Growth Capital Advances, (B) the Prepayment Fee, and (C) all other sums, if any, that shall have become due and payable with respect to the Growth Capital Advances, including interest at the Default Rate with respect to any past due amounts.

(e)      _Mandatory Prepayment Upon an Acceleration_. If the Growth Capital Advances are accelerated by Bank following the occurrence and during the continuance of an Event of Default, Borrower shall immediately pay to Bank an amount equal to the sum of (i) all outstanding principal plus accrued and unpaid interest with respect to the Growth Capital Advances, (ii) the Prepayment Fee, and (iii) all other sums, if any, that shall have become due and payable with respect to the Growth Capital Advances, including interest at the Default Rate with respect to any past due amounts.

**2.5      Overadvances.** If, at any time, the outstanding principal amount of any Advances exceeds the lesser of either the Revolving Line or the Borrowing Base, Borrower shall immediately pay to Bank in cash the amount of such excess (such excess, the "**Overadvance**"). Without limiting Borrower's obligation to repay Bank any Overadvance, Borrower agrees to pay Bank interest on the outstanding amount of any Overadvance, on demand, at a per annum rate equal to the rate that is otherwise applicable to Advances plus five percent (5.0%).

**2.6      Payment of Interest on the Credit Extensions.**

(a)      _Interest Rate_.

(i)      _Advances_. Subject to Section 2.6(b), the principal amount outstanding under the Revolving Line shall accrue interest at a floating per annum rate equal to (1) when a Streamline Period is in effect, the greater of (A) three-quarters of one percent (0.75%) above the Prime Rate or (B)  five and one-half of one percent (5.50%), or (2) at all other times, the greater of (A)  one and one-quarter of one percent (1.25%) above the Prime Rate or (B) six percent (6.00%) which interest shall be payable monthly in accordance with Section 2.6(d) below.

(ii)      _Growth Capital Advances_. Subject to Section 2.6(b), the principal amount outstanding under each Growth Capital Advance shall accrue interest at a floating per annum rate equal to the greater of (A) four and one-half of one percent (4.50%) above the Prime Rate, or (B) seven and one-half of one percent (7.50%), which interest shall be payable monthly in accordance with Section 2.6(d) below.

(b)      _Default Rate_. Immediately upon the occurrence and during the continuance of an Event of Default at the option of Bank in its sole discretion, Obligations shall bear interest at a rate per annum which is three percent (3.0%) above the rate that is otherwise applicable thereto (the "**Default Rate**"). Fees and expenses which are required to be paid by Borrower pursuant to the Loan Documents (including, without limitation, Bank Expenses) but are not paid when due shall bear interest until paid at a rate equal to the highest rate applicable to the Obligations. Payment or acceptance of the increased interest rate provided in this Section 2.6(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Bank.

(c)      _Adjustment to Interest Rate_. Changes to the interest rate of any Credit Extension based on changes to the Prime Rate shall be effective on the effective date of any change to the Prime Rate and to the extent of any such change.

3

Exhibit 7
Page 1288

(d)  <u>Payment; Interest Computation</u>. Interest is payable monthly on the Payment Date of each month and shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed. In computing interest, (i) all payments received after 12:00 p.m. Pacific time on any day shall be deemed received at the opening of business on the next Business Day, and (ii) the date of the making of any Credit Extension shall be included and the date of payment shall be excluded; provided, however, that if any Credit Extension is repaid on the same day on which it is made, such day shall be included in computing interest on such Credit Extension.

**2.7  Fees.**

(a)  <u>Revolving Line Commitment Fee</u>. Borrower shall pay to Bank a fully earned, non-refundable commitment fee of Eighteen Thousand Five Hundred Ten Dollars ($18,510), on the Effective Date (the "**Revolving Line Commitment Fee**").

(b)  <u>Growth Capital Advance Commitment Fee</u>. Borrower shall pay to Bank a fully earned, non-refundable commitment fee of Fifty Thousand Dollars ($50,000), on the Effective Date (the "**Growth Capital Advance Commitment Fee**").

(c)  <u>Anniversary Fee</u>. Borrower shall pay to Bank a fully earned, non-refundable anniversary fee of Thirty-One Thousand Two Hundred Fifty Dollars ($31,250) (the "**Anniversary Fee**") is earned as of the Effective Date and is due and payable on each anniversary of the Effective Date.

(d)  <u>Unused Revolving Line Facility Fee</u>. Payable quarterly in arrears on the last day of each calendar quarter prior to the Revolving Line Maturity Date, and on the Revolving Line Maturity Date, Borrower shall pay to Bank a fee (the "**Unused Revolving Line Facility Fee**") in an amount equal to one-fifth of one percent (0.20%) per annum of the average unused portion of the Revolving Line, as determined by Bank, computed on the basis of a year with the applicable number of days as set forth in Section 2.6(d). The unused portion of the Revolving Line, for purposes of this calculation, shall be calculated on a calendar year basis and shall equal the difference between (i) the Revolving Line, and (ii) the average for the period of the daily closing balance of the Revolving Line outstanding.

(e)  <u>Prepayment Fee</u>. Borrower shall pay to Bank the Prepayment Fee, when due hereunder, provided, however, Bank agrees to waive the Prepayment Fee if (a) at the time of such prepayment of the Growth Capital Advances, a Liquidity Event has occurred or (b) if Borrower closes on the refinance and re-documentation of the Growth Capital Advances under this Agreement with Bank (in its sole and exclusive discretion) prior to the Growth Capital Maturity Date.

(f)  <u>Bank Expenses</u>. Borrower shall pay to Bank all Bank Expenses (including reasonable attorneys' fees and expenses for documentation and negotiation of this Agreement) incurred through and after the Effective Date, when due (or, if no stated due date, upon demand by Bank).

(g)  <u>Fees Fully Earned</u>. Unless otherwise provided in this Agreement or in a separate writing by Bank, Borrower shall not be entitled to any credit, rebate, or repayment of any fees earned by Bank pursuant to this Agreement notwithstanding any termination of this Agreement or the suspension or termination of Bank's obligation to make loans and advances hereunder. Bank may deduct amounts owing by Borrower under the clauses of this Section 2.7 pursuant to the terms of Section 2.8(c). Bank shall provide Borrower written notice of deductions made from the Designated Deposit Account pursuant to the terms of the clauses of this Section 2.7.

**2.8  Payments; Application of Payments; Debit of Accounts.**

(a)  All payments to be made by Borrower under any Loan Document shall be made in immediately available funds in Dollars, without setoff or counterclaim, before 12:00 p.m. Pacific time on the date when due. Payments of principal and/or interest received after 12:00 p.m. Pacific time are considered received at the opening of business on the next Business Day. When a payment is due on a day that is not a Business Day, the payment shall be due the next Business Day, and additional fees or interest, as applicable, shall continue to accrue until paid.

4

Exhibit 7
Page 1289

(b)      Bank has the exclusive right to determine the order and manner in which all payments with respect to the Obligations may be applied. Borrower shall have no right to specify the order or the accounts to which Bank shall allocate or apply any payments required to be made by Borrower to Bank or otherwise received by Bank under this Agreement when any such allocation or application is not specified elsewhere in this Agreement.

(c)      Bank may debit any of Borrower's deposit accounts, including the Designated Deposit Account, for principal and interest payments or any other amounts Borrower owes Bank when due. These debits shall not constitute a set-off.

**2.9      Withholding.** Payments received by Bank from Borrower under this Agreement will be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority (including any interest, additions to tax or penalties applicable thereto but excluding taxes imposed or measured by net income, franchise taxes and branch profits taxes imposed solely as a result of Bank being organized under the laws of, or having its principal office or applicable office in the jurisdiction imposing such tax). Specifically, however, if at any time any Governmental Authority, applicable law, regulation or international agreement requires Borrower to make any withholding or deduction from any such payment or other sum payable hereunder to Bank, Borrower hereby covenants and agrees that the amount due from Borrower with respect to such payment or other sum payable hereunder will be increased to the extent necessary to ensure that, after the making of such required withholding or deduction, Bank receives a net sum equal to the sum which it would have received had no withholding or deduction been required, and Borrower shall pay the full amount withheld or deducted to the relevant Governmental Authority. Borrower will, upon request, furnish Bank with proof reasonably satisfactory to Bank indicating that Borrower has made such withholding payment; provided, however, that Borrower need not make any withholding payment if the amount or validity of such withholding payment is contested in good faith by appropriate and timely proceedings and as to which payment in full is bonded or reserved against by Borrower. The agreements and obligations of Borrower contained in this Section 2.9 shall survive the termination of this Agreement.

**3.      CONDITIONS OF LOANS**

**3.1      Conditions Precedent to Initial Credit Extension.** Bank's obligation to make the initial Credit Extension is subject to the condition precedent that Bank shall have received, in form and substance satisfactory to Bank, such documents, and completion of such other matters, as Bank may reasonably deem necessary or appropriate, including, without limitation:

(a)      duly executed signatures to the Loan Documents;

(b)      duly executed signatures to the 2020 Warrant, together with a capitalization table and copies of Borrower's equity documents;

(c)      the Operating Documents and a long-form good standing certificate of Borrower certified by the Secretary of State (or equivalent agency) of Borrower's jurisdiction of organization or formation and good standing certificates from each other jurisdiction in which Borrower is qualified to conduct business, each as of a date no earlier than thirty (30) days prior to the Effective Date;

(d)      a secretary's certificate of Borrower with respect to such Borrower's Operating Documents, incumbency, specimen signatures and resolutions authorizing the execution and delivery of this Agreement and the other Loan Documents to which it is a party;

(e)      duly executed signatures to the completed Borrowing Resolutions for Borrower;

(f)      certified copies, dated as of a recent date, of financing statement searches, as Bank may request, accompanied by written evidence (including any UCC termination statements) that the Liens indicated in any such financing statements either constitute Permitted Liens or have been or, in connection with the initial Credit Extension, will be terminated or released;

5

Exhibit 7
Page 1290

(g)        the Perfection Certificate(s) of Borrower, together with the duly executed signatures thereto;

(h)        Intellectual Property search results and completed exhibits to the IP Agreement;

(i)        if required pursuant to Section 7.2, a bailee's waiver in favor of Bank for each location where Borrower maintains property with a third party, by each such third party, together with the duly executed signatures thereto;

(j)        evidence satisfactory to Bank that the insurance policies and endorsements required by Section 6.7 hereof are in full force and effect, together with appropriate evidence showing lender loss payable and/or additional insured clauses or endorsements in favor of Bank;

(k)        with respect to the initial Advance, a completed Borrowing Base Statement (and any schedules related thereto and including any other information requested by Bank with respect to Borrower's Accounts); and

(l)        payment of the fees and Bank Expenses then due as specified in Section 2.7 hereof.

**3.2        Conditions Precedent to all Credit Extensions.** Bank's obligations to make each Credit Extension, including the initial Credit Extension, is subject to the following conditions precedent:

(a)        timely receipt of (i) the Credit Extension request and any materials and documents required by Section 3.4 and (ii) with respect to the request for Growth Capital Advances, an executed Payment/Advance Form and any materials and documents required by Section 3.4;

(b)        the representations and warranties in this Agreement shall be true, accurate, and complete in all material respects on the date of the proposed Credit Extension and/or of the Payment/Advance Form, as applicable, and on the Funding Date of each Credit Extension; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date, and no Event of Default shall have occurred and be continuing or result from the Credit Extension. Each Credit Extension is Borrower's representation and warranty on that date that the representations and warranties in this Agreement remain true, accurate, and complete in all material respects; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date; and

(c)        Bank determines to its satisfaction that there has not been a Material Adverse Change.

**3.3        Covenant to Deliver.** Borrower agrees to deliver to Bank each item required to be delivered to Bank under this Agreement as a condition precedent to any Credit Extension. Borrower expressly agrees that a Credit Extension made prior to the receipt by Bank of any such item shall not constitute a waiver by Bank of Borrower's obligation to deliver such item, and the making of any Credit Extension in the absence of a required item shall be in Bank's sole discretion.

**3.4        Procedures for Borrowing.**

(a)        <u>Advances</u>. Subject to the prior satisfaction of all other applicable conditions to the making of an Advance set forth in this Agreement, to obtain an Advance, Borrower (via an individual duly authorized by an Administrator) shall notify Bank (which notice shall be irrevocable) by electronic mail by 12:00 p.m. Pacific time on the Funding Date of the Advance. Such notice shall be made by Borrower through Bank's online banking program, provided, however, if Borrower is not utilizing Bank's online banking program, then such notice shall be in a written format acceptable to Bank that is executed by an Authorized Signer. Bank shall have received satisfactory evidence that the Board has approved that such Authorized Signer may provide such notices and request Advances. In connection with any such notification, Borrower must promptly deliver to Bank by electronic mail or through Bank's online banking program such reports and information, including without limitation, sales journals, cash receipts journals, a Borrowing Base Statement, accounts receivable aging reports and a detailed accounts receivable ledger, and Inventory transaction report, as Bank may request in its sole discretion. Bank shall credit proceeds of an Advance to the Designated Deposit Account. Bank may make Advances under this Agreement based on instructions from an Authorized Signer or without instructions if the Advances are necessary to meet Obligations which have become due.

6

Exhibit 7
Page 1291

(b)    <u>Growth Capital Advances</u>. Subject to the prior satisfaction of all other applicable conditions to the making of a Growth Capital Advance set forth in this Agreement, to obtain a Growth Capital Advance, Borrower (via an individual duly authorized by an Administrator) shall notify Bank (which notice shall be irrevocable) by electronic mail by 12:00 noon Pacific time on the Funding Date of the Growth Capital Advance. Such notice shall be made by Borrower through Bank's online banking program, provided, however, if Borrower is not utilizing Bank's online banking program, then such notice shall be in a written format acceptable to Bank that is executed by an Authorized Signer. Bank shall have received satisfactory evidence that the Board has approved that such Authorized Signer may provide such notices and request Growth Capital Advances. In connection with such notification, Borrower must promptly deliver to Bank by electronic mail or through Bank's online banking program a completed Payment/Advance Form executed by an Authorized Signer together with such other reports and information, as Bank may request in its sole discretion. Bank shall credit proceeds of any Growth Capital Advance to the Designated Deposit Account. Bank may make Growth Capital Advances under this Agreement based on instructions from an Authorized Signer or without instructions if the Growth Capital Advances are necessary to meet Obligations which have become due.

**4.    CREATION OF SECURITY INTEREST**

**4.1    Grant of Security Interest.** Borrower hereby grants Bank, to secure the payment and performance in full of all of the Obligations, a continuing security interest in, and pledges to Bank, the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.

Borrower acknowledges that it previously has entered, and/or may in the future enter, into Bank Services Agreements with Bank. Regardless of the terms of any Bank Services Agreement, Borrower agrees that any amounts Borrower owes Bank thereunder shall be deemed to be Obligations hereunder and that it is the intent of Borrower and Bank to have all such Obligations secured by the first priority perfected security interest in the Collateral granted herein (subject only to Permitted Liens that are permitted pursuant to the terms of this Agreement to have superior priority to Bank's Lien in this Agreement).

If this Agreement is terminated, Bank's Lien in the Collateral shall continue until the Obligations (other than inchoate indemnity obligations) are repaid in full in cash. Upon payment in full in cash of the Obligations (other than inchoate indemnity obligations) and at such time as Bank's obligation to make Credit Extensions has terminated, Bank shall, at the sole cost and expense of Borrower, release its Liens in the Collateral and all rights therein shall revert to Borrower. In the event (x) all Obligations (other than inchoate indemnity obligations), except for Bank Services, are satisfied in full, and (y) this Agreement is terminated, Bank shall terminate the security interest granted herein upon Borrower providing cash collateral acceptable to Bank in its good faith business judgment for Bank Services, if any. In the event such Bank Services consist of outstanding Letters of Credit, Borrower shall provide to Bank cash collateral in an amount equal to (x) if such Letters of Credit are denominated in Dollars, then at least one hundred five percent (105.0%); and (y) if such Letters of Credit are denominated in a Foreign Currency, then at least one hundred ten percent (110.0%), of the Dollar Equivalent of the face amount of all such Letters of Credit plus all interest, fees, and costs due or to become due in connection therewith (as estimated by Bank in its business judgment), to secure all of the Obligations relating to such Letters of Credit.

**4.2    Priority of Security Interest.** Borrower represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a first priority perfected security interest in the Collateral (subject only to Permitted Liens that are permitted pursuant to the terms of this Agreement to have superior priority to Bank's Lien under this Agreement). If Borrower shall acquire a commercial tort claim with an amount at issue in excess of One Hundred Thousand Dollars ($100,000), Borrower shall promptly notify Bank in a writing signed by Borrower of the general details thereof and grant to Bank in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to Bank.

Exhibit 7
Page 1292

**4.3**    **Authorization to File Financing Statements.** Borrower hereby authorizes Bank to file financing statements, without notice to Borrower, with all appropriate jurisdictions to perfect or protect Bank's interest or rights hereunder, including a notice that any disposition of the Collateral, by either Borrower or any other Person, shall be deemed to violate the rights of Bank under the Code.

**5.**    **REPRESENTATIONS AND WARRANTIES**

Borrower represents and warrants as follows:

**5.1**    **Due Organization, Authorization; Power and Authority.** Borrower is duly existing and in good standing as a Registered Organization in its jurisdiction of formation and is qualified and licensed to do business and is in good standing in any jurisdiction in which the conduct of its business or its ownership of property requires that it be qualified except where the failure to do so could not reasonably be expected to have a material adverse effect on Borrower's business. In connection with this Agreement, Borrower has delivered to Bank a completed certificate, entitled "Perfection Certificate" (the "**Perfection Certificate**"). Borrower represents and warrants to Bank that (a) Borrower's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof; (b) Borrower is an organization of the type and is organized in the jurisdiction set forth in the Perfection Certificate; (c) the Perfection Certificate accurately sets forth Borrower's organizational identification number or accurately states that Borrower has none; (d) the Perfection Certificate accurately sets forth Borrower's place of business, or, if more than one, its chief executive office as well as Borrower's mailing address (if different than its chief executive office); (e) Borrower (and each of its predecessors) has not, in the past five (5) years, changed its jurisdiction of formation, organizational structure or type, or any organizational number assigned by its jurisdiction; and (f) all other information set forth on the Perfection Certificate pertaining to Borrower and each of its Subsidiaries is accurate and complete (it being understood and agreed that Borrower may from time to time update certain information in the Perfection Certificate after the Effective Date to the extent permitted by one or more specific provisions in this Agreement).

The execution, delivery and performance by Borrower of the Loan Documents to which it is a party have been duly authorized, and do not (i) conflict with any of Borrower's organizational documents, (ii) contravene, conflict with, constitute a default under or violate any material Requirement of Law, (iii) contravene, conflict or violate any applicable order, writ, judgment, injunction, decree, determination or award of any Governmental Authority by which Borrower or any of its Subsidiaries or any of their property or assets may be bound or affected, (iv) require any action by, filing, registration, or qualification with, or Governmental Approval from, any Governmental Authority (except such Governmental Approvals which have already been obtained and are in full force and effect or are being obtained pursuant to Section 6.1(b)), or (v) conflict with, contravene, constitute a default or breach under, or result in or permit the termination or acceleration of, any material agreement by which Borrower is bound. Borrower is not in default under any agreement to which it is a party or by which it is bound in which the default could reasonably be expected to have a material adverse effect on Borrower's business.

**5.2**    **Collateral.** Borrower has good title to, rights in, and the power to transfer each item of the Collateral upon which it purports to grant a Lien hereunder, free and clear of any and all Liens except Permitted Liens. Borrower has no Collateral Accounts at or with any bank or financial institution other than Bank or Bank's Affiliates except for the Collateral Accounts described in the Perfection Certificate delivered to Bank in connection herewith and which Borrower has taken such actions as are necessary to give Bank a perfected security interest therein, pursuant to the terms of Section 6.8(b). The Accounts are bona fide, existing obligations of the Account Debtors.

The Collateral is not in the possession of any third party bailee (such as a warehouse) except as otherwise provided in the Perfection Certificate. None of the components of the Collateral shall be maintained at locations other than as provided in the Perfection Certificate or as permitted pursuant to Section 7.2.

All Inventory is in all material respects of good and marketable quality, free from material defects.

8

Exhibit 7
Page 1293

Borrower is the sole owner of the Intellectual Property which it owns or purports to own except for (a) non-exclusive licenses granted to its customers in the ordinary course of business, (b) over-the-counter software that is commercially available to the public, and (c) material Intellectual Property licensed to Borrower and noted on the Perfection Certificate. Each Patent which it owns or purports to own and which is material to Borrower's business is valid and enforceable, and no part of the Intellectual Property which Borrower owns or purports to own and which is material to Borrower's business has been judged invalid or unenforceable, in whole or in part. To the best of Borrower's knowledge, no claim has been made that any part of the Intellectual Property violates the rights of any third party except to the extent such claim would not reasonably be expected to have a material adverse effect on Borrower's business.

Except as noted on the Perfection Certificate, Borrower is not a party to, nor is it bound by, any Restricted License.

**5.3    Accounts Receivable; Inventory.**

(a)    For each Account with respect to which Advances are requested, on the date each Advance is requested and made, such Account shall be an Eligible Account.

(b)    All statements made and all unpaid balances appearing in all invoices, instruments and other documents evidencing the Eligible Accounts are and shall be true and correct and all such invoices, instruments and other documents, and all of Borrower's Books are genuine and in all respects what they purport to be. All sales and other transactions underlying or giving rise to each Eligible Account shall comply in all material respects with all applicable laws and governmental rules and regulations. Borrower has no knowledge of any actual or imminent Insolvency Proceeding of any Account Debtor whose accounts are Eligible Accounts in any Borrowing Base Statement. To the best of Borrower's knowledge, all signatures and endorsements on all documents, instruments, and agreements relating to all Eligible Accounts are genuine, and all such documents, instruments and agreements are legally enforceable in accordance with their terms.

(c)    For any item of Inventory consisting of Eligible Inventory in any Borrowing Base Statement, such Inventory:

(1) consists of finished goods in good, new, and salable condition, which is not perishable, returned, consigned, obsolete, not sellable, damaged, or defective, and is not comprised of demonstrative or custom inventory, works in progress, packaging or shipping materials, or supplies; provided, however, that with respect to the Warehouse Inventory, the Inventory only consists of either (i) finished goods (e.g., Smart Sock, Base Station, Toddler Camera, Belly Band, etc.) or (ii) refurbished units so long as such refurbished units do not constitute more than five percent (5%) of the Eligible Inventory portion of the Borrowing Base.

(2) meets all applicable governmental standards;

(3) has been manufactured in compliance with the Fair Labor Standards Act;

(4) is not subject to any Liens, except the first priority Liens granted or in favor of Bank under this Agreement or any of the other Loan Documents;

(5) is either (x) located at a warehouse premise located in the Dallas, Texas area identified by Borrower in the Perfection Certificate for which Bank has received a bailee agreement in form and substance satisfactory to Bank signed by the bailee ("**Warehouse Inventory**") or (y) in transit ("**In-Transit Inventory**") and insured by freight insurance (*i.e.*, in-transit or cargo insurance) and property policies with a lender's loss payable endorsement showing Bank as the sole lender loss payee; and

(6) with respect to (A) the Warehouse Inventory, is aged less than one hundred twenty (120) days and (B) the In-Transit Inventory, is in transit for no more than forty-five (45) days.

9

Exhibit 7
Page 1294

**5.4    Litigation.** There are no actions or proceedings pending or, to the knowledge of any Responsible Officer, threatened in writing by or against Borrower or any of its Subsidiaries involving more than, individually or in the aggregate, One Hundred Thousand Dollars ($100,000).

**5.5    Financial Statements; Financial Condition.** All consolidated financial statements for Borrower and any of its Subsidiaries delivered to Bank by submission to the Financial Statement Repository or otherwise submitted to Bank fairly present in all material respects Borrower's consolidated financial condition and Borrower's consolidated results of operations. There has not been any material deterioration in Borrower's consolidated financial condition since the date of the most recent financial statements submitted to the Financial Statement Repository or otherwise submitted to Bank.

**5.6    Solvency.** The fair salable value of Borrower's consolidated assets (including goodwill minus disposition costs) exceeds the fair value of Borrower's liabilities; Borrower is not left with unreasonably small capital after the transactions in this Agreement; and Borrower is able to pay its debts (including trade debts) as they mature.

**5.7    Regulatory Compliance.** Borrower is not an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended. Borrower is not engaged as one of its important activities in extending credit for margin stock (under Regulations X, T and U of the Federal Reserve Board of Governors). Borrower (a) has complied in all material respects with all Requirements of Law, and (b) has not violated any Requirements of Law the violation of which could reasonably be expected to have a material adverse effect on its business. None of Borrower's or any of its Subsidiaries' properties or assets has been used by Borrower or any Subsidiary or, to the best of Borrower's knowledge, by previous Persons, in disposing, producing, storing, treating, or transporting any hazardous substance other than legally. Borrower and each of its Subsidiaries have obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary to continue their respective businesses as currently conducted.

**5.8    Subsidiaries; Investments.** Borrower does not own any stock, partnership, or other ownership interest or other equity securities except for Permitted Investments.

**5.9    Tax Returns and Payments; Pension Contributions.** Borrower has timely filed all required tax returns and reports, and Borrower has timely paid all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower except (a) to the extent such taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefor, or (b) if such taxes, assessments, deposits and contributions do not, individually or in the aggregate, exceed Twenty-Five Thousand Dollars ($25,000).

To the extent Borrower defers payment of any contested taxes, Borrower shall (i) notify Bank in writing of the commencement of, and any material development in, the proceedings, and (ii) post bonds or take any other steps required to prevent the Governmental Authority levying such contested taxes from obtaining a Lien upon any of the Collateral that is other than a "Permitted Lien." Borrower is unaware of any claims or adjustments proposed for any of Borrower's prior tax years which could result in additional taxes becoming due and payable by Borrower in excess of Twenty-Five Thousand Dollars ($25,000). Borrower has paid all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms, and Borrower has not withdrawn from participation in, and has not permitted partial or complete termination of, or permitted the occurrence of any other event with respect to, any such plan which could reasonably be expected to result in any liability of Borrower, including any liability to the Pension Benefit Guaranty Corporation or its successors or any other governmental agency.

**5.10    Use of Proceeds.** Borrower shall use the proceeds of the Growth Capital Advances solely (i) to refinance the Existing Growth Capital Advances and (ii) as working capital and to fund its general business requirements and not for personal, family, household or agricultural purposes. Borrower shall use the proceeds of the Advances solely as working capital and to fund its general business requirements and not for personal, family, household or agricultural purposes.

**5.11    Full Disclosure.** No written representation, warranty or other statement of Borrower in any report, certificate, or written statement submitted to the Financial Statement Repository or otherwise submitted to Bank, as of the date such representation, warranty, or other statement was made, taken together with all such written reports, written certificates and written statements submitted to the Financial Statement Repository or otherwise submitted to Bank, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in the reports, certificates, or written statements not misleading (it being recognized by Bank that the projections and forecasts provided by Borrower in good faith and based upon reasonable assumptions are not viewed as facts and that actual results during the period or periods covered by such projections and forecasts may differ from the projected or forecasted results).

Exhibit 7
Page 1295

**5.12**   **Definition of "Knowledge."** For purposes of the Loan Documents, whenever a representation or warranty is made to Borrower's knowledge or awareness, to the "best of" Borrower's knowledge, or with a similar qualification, knowledge or awareness means the actual knowledge, after reasonable investigation, of any Responsible Officer.

**6.**   **AFFIRMATIVE COVENANTS**

Borrower shall do all of the following:

**6.1**   **Government Compliance.**

(a)   Maintain its and all its Subsidiaries' legal existence and good standing in their respective jurisdictions of formation and maintain qualification in each jurisdiction in which the failure to so qualify would reasonably be expected to have a material adverse effect on Borrower's business or operations. Borrower shall comply, and have each Subsidiary comply, in all material respects, with all laws, ordinances and regulations to which it is subject.

(b)   Obtain all of the Governmental Approvals necessary for the performance by Borrower of its obligations under the Loan Documents to which it is a party and the grant of a security interest to Bank in the Collateral. Borrower shall promptly provide copies of any such obtained Governmental Approvals to Bank.

**6.2**   **Financial Statements, Reports, Certificates.** Provide Bank with the following:

(a)   upon each request for an Advance and (x) no later than Friday of each week when a Streamline Period is not in effect and (y) within seven (7) days after the last day of each month, (i) a Borrowing Base Statement (and any schedules related thereto and including any other information requested by Bank with respect to Borrower's Accounts), (ii) an accounts receivable ledger aging report, and (iii) monthly perpetual inventory reports for Inventory valued on an average cost basis at the lower of cost or market (in accordance with GAAP), Inventory transaction report, or such other inventory reports as are requested by Bank in its good faith business judgment;

(b)   within thirty (30) days after the last day of each month, (i) monthly accounts receivable agings, aged by invoice date, (ii) monthly accounts payable agings, aged by invoice date, and outstanding or held check registers, if any, and (iii) monthly reconciliations of accounts receivable agings (aged by invoice date), sell through report, Deferred Revenue report, and general ledger;

(c)   as soon as available, but no later than thirty (30) days after the last day of each month, a company prepared consolidated balance sheet and income statement covering Borrower's consolidated operations for such month in a form acceptable to Bank (the "**Monthly Financial Statements**") and to the extent not already provided in the Monthly Financial Statements, as of the last day of each month, a monthly statement or "screen shot" showing amounts in the [***] (each as hereafter defined);

(d)   within thirty (30) days after the last day of each month and together with the Monthly Financial Statements, a completed Compliance Statement, confirming that as of the end of such month, Borrower was in full compliance with all of the terms and conditions of this Agreement, and setting forth calculations showing compliance with the financial covenants set forth in this Agreement and such other information as Bank may reasonably request;

11

Exhibit 7
Page 1296

(e)        within the earlier of January 31st of each year or fifteen (15) days after the approval by Borrower's Board of Directors, (1) annual operating budgets (including income statements, balance sheets and cash flow statements, by month) for the upcoming fiscal year of Borrower, and (2) annual financial projections for the following fiscal year (on a quarterly basis), in each case as approved by the Board, together with any related business forecasts used in the preparation of such annual financial projections;

(f)        as soon as available, and in any event within one hundred eighty (180) days following the end of Borrower's fiscal year, audited consolidated financial statements prepared under GAAP, consistently applied, together with an unqualified opinion (except for a qualification with respect to going concern that is typical for venture backed companies similar to Borrower) on the financial statements from an independent certified public accounting firm reasonably acceptable to Bank;

(g)        prompt written notice of any changes to the beneficial ownership information set out in Section 2 of the Perfection Certificate. Borrower understands and acknowledges that Bank relies on such true, accurate and up-to-date beneficial ownership information to meet Bank's regulatory obligations to obtain, verify and record information about the beneficial owners of its legal entity customers.

(h)        in the event that Borrower becomes subject to the reporting requirements under the Exchange Act within five (5) days of filing, copies of all periodic and other reports, proxy statements and other materials filed by Borrower and/or any Guarantor with the SEC, any Governmental Authority succeeding to any or all of the functions of the SEC or with any national securities exchange, or distributed to its shareholders, as the case may be. Documents required to be delivered pursuant to the terms hereof (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which Borrower posts such documents, or provides a link thereto, on Borrower's website on the internet at Borrower's website address; provided, however, Borrower shall promptly notify Bank in writing (which may be by electronic mail) of the posting of any such documents;

(i)        a copy of each 409(a) valuation report for Borrower's capital stock within thirty (30) days after completion thereof and more frequently as updated;

(j)        within five (5) days of delivery, copies of all statements, reports and notices made available to Borrower's security holders or to any holders of Subordinated Debt;

(k)        prompt report of any legal actions pending or threatened in writing against Borrower or any of its Subsidiaries that could result in damages or costs to Borrower or any of its Subsidiaries of, individually or in the aggregate, One Hundred Thousand Dollars ($100,000) or more; and

(l)        promptly, from time to time, such other information regarding Borrower or compliance with the terms of any Loan Documents as reasonably requested by Bank.

Any submission by Borrower of a Compliance Statement, a Borrowing Base Statement or any other financial statement submitted to the Financial Statement Repository pursuant to this Section 6.2 or otherwise submitted to Bank shall be deemed to be a representation by Borrower that (i) as of the date of such Compliance Statement, Borrowing Base Statement or other financial statement, the information and calculations set forth therein are true, accurate and correct in all material respects, (ii) as of the end of the compliance period set forth in such submission, Borrower is in complete compliance with all required covenants except as noted in such Compliance Statement, Borrowing Base Statement or other financial statement, as applicable, (iii) as of the date of such submission, no Events of Default have occurred and are continuing, (iv) all representations and warranties other than any representations or warranties that are made as of a specific date in Section 5 remain true and correct in all material respects as of the date of such submission except as noted in such Compliance Statement, Borrowing Base Statement or other financial statement, as applicable, (v) as of the date of such submission, Borrower and each of its Subsidiaries has timely filed all required tax returns and reports, and Borrower has timely paid all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower except as otherwise permitted pursuant to the terms of Section 5.9, and (vi) as of the date of such submission, no Liens have been levied or claims made against Borrower or any of its Subsidiaries relating to unpaid employee payroll or benefits of which Borrower has not previously provided written notification to Bank.

12

Exhibit 7
Page 1297

**6.3**     **Accounts Receivable.**

(a)     Schedules and Documents Relating to Accounts. Borrower shall deliver to Bank transaction reports and schedules of collections, as provided in Section 6.2, on Bank's standard forms; provided, however, that Borrower's failure to execute and deliver the same shall not affect or limit Bank's Lien and other rights in all of Borrower's Accounts, nor shall Bank's failure to advance or lend against a specific Account affect or limit Bank's Lien and other rights therein. If requested by Bank, Borrower shall furnish Bank with copies (or, at Bank's request, originals) of all contracts, orders, invoices, and other similar documents, and all shipping instructions, delivery receipts, bills of lading, and other evidence of delivery, for any goods the sale or disposition of which gave rise to such Accounts. In addition, Borrower shall deliver to Bank, on its request, the originals of all instruments, chattel paper, security agreements, guarantees and other documents and property evidencing or securing any Accounts, in the same form as received, with all necessary indorsements, and copies of all credit memos.

(b)     Disputes. Borrower shall promptly notify Bank of all disputes or claims relating to Accounts. Borrower may forgive (completely or partially), compromise, or settle any Account for less than payment in full, or agree to do any of the foregoing so long as (i) Borrower does so in good faith, in a commercially reasonable manner, in the ordinary course of business, in arm's-length transactions, and reports the same to Bank in the regular reports provided to Bank; (ii) no Event of Default has occurred and is continuing; and (iii) after taking into account all such discounts, settlements and forgiveness, the total outstanding Advances will not exceed the lesser of the Revolving Line or the Borrowing Base.

(c)     Collection of Accounts. Borrower shall direct Account Debtors to deliver or transmit all proceeds of Accounts into a lockbox account, or via electronic capture into a "blocked account" as specified by Bank (either such account, the "**Cash Collateral Account**"). Whether or not an Event of Default has occurred and is continuing, Borrower shall immediately deliver all payments on and proceeds of Accounts to the Cash Collateral Account. Subject to Bank's right to maintain a reserve pursuant to Section 6.3(d), all amounts received in the Cash Collateral Account shall be (i) when a Streamline Period is not in effect, applied to immediately reduce the Obligations under the Revolving Line (unless Bank, in its sole discretion, at times when an Event of Default exists, elects not to so apply such amounts), or (ii) when a Streamline Period is in effect, transferred on a daily basis to Borrower's operating account with Bank. Borrower hereby authorizes Bank to transfer to the Cash Collateral Account any amounts that Bank reasonably determines are proceeds of the Accounts (provided that Bank is under no obligation to do so and this allowance shall in no event relieve Borrower of its obligations hereunder).

(d)     Reserves. Notwithstanding any terms in this Agreement to the contrary, at times when an Event of Default exists, Bank may hold any proceeds of the Accounts and any amounts in the Cash Collateral Account that are not applied to the Obligations pursuant to Section 6.3(c) above (including amounts otherwise required to be transferred to Borrower's operating account with Bank when a Streamline Period is in effect) as a reserve to be applied to any Obligations regardless of whether such Obligations are then due and payable.

(e)     Returns. Provided no Event of Default has occurred and is continuing, if any Account Debtor returns any Inventory to Borrower, Borrower shall promptly (i) determine the reason for such return, (ii) issue a credit memorandum to the Account Debtor in the appropriate amount, and (iii) provide a copy of such credit memorandum to Bank, upon request from Bank. In the event any attempted return occurs after the occurrence and during the continuance of any Event of Default, Borrower shall hold the returned Inventory in trust for Bank, and immediately notify Bank of the return of the Inventory.

(f)     Verifications; Confirmations; Credit Quality; Notifications. Bank may, from time to time, (i) verify and confirm directly with the respective Account Debtors the validity, amount and other matters relating to the Accounts, either in the name of Borrower or Bank or such other name as Bank may choose, and notify any Account Debtor of Bank's security interest in such Account and/or (ii) conduct a credit check of any Account Debtor to approve any such Account Debtor's credit.

(g)     No Liability. Bank shall not be responsible or liable for any shortage or discrepancy in, damage to, or loss or destruction of, any goods, the sale or other disposition of which gives rise to an Account, or for any error, act, omission, or delay of any kind occurring in the settlement, failure to settle, collection or failure to collect any Account, or for settling any Account in good faith for less than the full amount thereof, nor shall Bank be deemed to be responsible for any of Borrower's obligations under any contract or agreement giving rise to an Account. Nothing herein shall, however, relieve Bank from liability for its own gross negligence or willful misconduct.

13

Exhibit 7
Page 1298

**6.4**      **Remittance of Proceeds.** Except as otherwise provided in Section 6.3(c), deliver, in kind, all proceeds arising from the disposition of any Collateral to Bank in the original form in which received by Borrower not later than the following Business Day after receipt by Borrower, to be applied to the Obligations (a) prior to an Event of Default, pursuant to the terms of Section 6.3(c) hereof, and (b) after the occurrence and during the continuance of an Event of Default, pursuant to the terms of Section 9.4 hereof; provided that, if no Event of Default has occurred and is continuing, Borrower shall not be obligated to remit to Bank the proceeds of the sale of worn out or obsolete Equipment disposed of by Borrower in good faith in an arm's length transaction for an aggregate purchase price of One Hundred Thousand Dollars ($100,000.00) or less (for all such transactions in any fiscal year). Borrower agrees that it will not commingle proceeds of Collateral with any of Borrower's other funds or property, but will hold such proceeds separate and apart from such other funds and property and in an express trust for Bank. Nothing in this Section 6.4 limits the restrictions on disposition of Collateral set forth elsewhere in this Agreement.

**6.5**      **Taxes; Pensions.** Timely file, and require each of its Subsidiaries to timely file, all required tax returns and reports and timely pay, and require each of its Subsidiaries to timely pay, all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower and each of its Subsidiaries, except for deferred payment of any taxes contested pursuant to the terms of Section 5.9 hereof, and shall deliver to Bank, on demand, appropriate certificates attesting to such payments, and pay all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms.

**6.6**      **Access to Collateral; Books and Records.** At reasonable times, on one (1) Business Day's notice (provided no notice is required if an Event of Default has occurred and is continuing), Bank, or its agents, shall have the right to inspect the Collateral and the right to audit and copy Borrower's Books. The foregoing inspections and audits shall be conducted no more often than once every twelve (12) months (or more frequently as Bank in its sole discretion determines that conditions warrant), unless an Event of Default has occurred and is continuing in which case such inspections and audits shall occur as often as Bank shall determine is necessary. The foregoing inspections and audits shall be conducted at Borrower's expense and the charge therefor shall be One Thousand Dollars ($1,000) per person per day (or such higher amount as shall represent Bank's then-current standard charge for the same), plus reasonable out-of-pocket expenses. In the event Borrower and Bank schedule an audit more than eight (8) days in advance, and Borrower cancels or seeks to or reschedules the audit with less than eight (8) days written notice to Bank, then (without limiting any of Bank's rights or remedies) Borrower shall pay Bank a fee of Two Thousand Dollars ($2,000) plus any out-of-pocket expenses incurred by Bank to compensate Bank for the anticipated costs and expenses of the cancellation or rescheduling. In addition to the above, Borrower hereby agrees that an inventory appraisal performed by a valuation firm satisfactory to Bank shall be conducted no more often than once every twelve (12) months (or more frequently as Bank in its sole discretion determines that conditions warrant), unless an Event of Default has occurred and is continuing in which case such inspections and audits shall occur as often as Bank shall determine is necessary.

**6.7**      **Insurance.**

(a)      Keep its business and the Collateral insured for risks (including, without limitation, loss or damage by fire and loss in transit; theft, burglary, pilferage, larceny, embezzlement, and other criminal activities; business interruption; and general liability) and such other hazards and in amounts standard for companies in Borrower's industry and location and as Bank may reasonably request. Insurance policies shall be in a form, with financially sound and reputable insurance companies that are not Affiliates of Borrower, and in amounts that are satisfactory to Bank. Insurance policies shall also include freight insurance coverage (*i.e.*, in-transit or cargo insurance). All property policies shall have a lender's loss payable endorsement showing Bank as the sole lender loss payee. All liability policies shall show, or have endorsements showing, Bank as an additional insured. Bank shall be named as lender loss payee and/or additional insured with respect to any such insurance providing coverage in respect of any Collateral (including, without limitation, Borrower's Inventory).

(b)      Ensure that proceeds payable under any property policy are, at Bank's option, payable to Bank on account of the Obligations. Notwithstanding the foregoing, (a) so long as no Event of Default has occurred and is continuing, Borrower shall have the option of applying the proceeds of any casualty policy up to One Hundred Thousand Dollars ($100,000) with respect to any loss and One Hundred Thousand Dollars ($100,000) in the aggregate for all losses under all casualty policies in any one year, toward the replacement or repair of destroyed or damaged property; provided that any such replaced or repaired property (i) shall be of equal or like value as the replaced or repaired Collateral and (ii) shall be deemed Collateral in which Bank has been granted a first priority security interest, and (b) after the occurrence and during the continuance of an Event of Default, all proceeds payable under such casualty policy shall, at the option of Bank, be payable to Bank on account of the Obligations.

14

Exhibit 7
Page 1299

(c)        At Bank's request, Borrower shall deliver certified copies of insurance policies and evidence of all premium payments. Each provider of any such insurance required under this Section 6.7 shall agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to Bank, that it will give Bank thirty (30) days prior written notice before any such policy or policies shall be materially altered or canceled. If Borrower fails to obtain insurance as required under this Section 6.7 or to pay any amount or furnish any required proof of payment to third persons and Bank, Bank may make all or part of such payment or obtain such insurance policies required in this Section 6.7, and take any action under the policies Bank deems prudent.

**6.8    Accounts.**

(a)        Borrower and any Subsidiary of Borrower shall maintain all of its operating accounts and excess cash with Bank or Bank's Affiliates. Borrower shall also maintain its Cash Collateral Account with Bank. Notwithstanding the foregoing, or anything to the contrary herein, Borrower may maintain (1) the merchant account with [***] as more fully described in the Perfection Certificate (the "[***]"), provided that (x) the aggregate balance of the [***] shall not exceed Five Hundred Thousand Dollars ($500,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every three (3) calendar days, (2) the merchant accounts with [***] and [***] each as more fully described in the Perfection Certificate (collectively, the "[***]"), provided that (x) the aggregate balance of the [***] shall not exceed Seventy-Five Thousand Dollars ($75,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every three (3) calendar days, (3) the merchant account with [***] as more fully described in the Perfection Certificate (the "[***]"), provided that (x) the aggregate balance of the [***] shall not exceed Five Hundred Thousand Dollars ($500,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every two (2) weeks, (4) the merchant account with [***] as more fully described in the Perfection Certificate (the "[***]"), provided that (x) the aggregate balance of the [***] shall not exceed One Hundred Thousand Dollars ($100,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every three (3) calendar days, (5) the merchant account with [***] as more fully described in the Perfection Certificate (the "[***]"), provided that (x) the aggregate balance of the [***] shall not exceed One Hundred Thousand Dollars ($100,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every three (3) calendar days, (6) the merchant account with [***] as more fully described in the Perfection Certificate (the "[***]"), provided that (x) the aggregate balance of the [***] shall not exceed One Hundred Thousand Dollars ($100,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every three (3) calendar days, (7) the merchant account with [***] as more fully described in the Perfection Certificate (the "[***]"), provided that (x) the aggregate balance of the [***] shall not exceed Five Hundred Thousand Dollars ($500,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every three (3) calendar days, (8) the merchant account with [***] as more fully described in the Perfection Certificate (the "[***]"), provided that (x) the aggregate balance of the [***] shall not exceed One Hundred Thousand Dollars ($100,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every three (3) calendar days, and (9) the merchant account with [***] as more fully described in the Perfection Certificate (the "[***]"), provided that (x) the aggregate balance of the [***] shall not exceed One Hundred Thousand Dollars ($100,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every seven (7) calendar days. Any Guarantor shall maintain all depository, operating and securities/investment accounts with Bank and Bank's Affiliates in those jurisdictions where Bank or Bank's Affiliates provide banking services.

15

Exhibit 7
Page 1300

(b)        In addition to and without limiting the restrictions in 6.8(a), Borrower shall provide Bank five (5) days prior written notice before establishing any Collateral Account at or with any bank or financial institution other than Bank or Bank's Affiliates. For each Collateral Account that Borrower at any time maintains, Borrower shall cause the applicable bank or financial institution (other than Bank) at or with which any Collateral Account is maintained to execute and deliver a Control Agreement or other appropriate instrument with respect to such Collateral Account to perfect Bank's Lien in such Collateral Account in accordance with the terms hereunder which Control Agreement may not be terminated without the prior written consent of Bank. The provisions of the previous sentence shall not apply to (1) deposit accounts exclusively used for payroll, payroll taxes, and other employee wage and benefit payments to or for the benefit of Borrower's employees and identified to Bank by Borrower as such, (2) the [***], provided that (x) the aggregate balance of the [***] does not exceed Five Hundred Thousand Dollars ($500,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every three (3) calendar days, (3) the [***], provided that (x) the aggregate balance of the [***] do not exceed Seventy-Five Thousand Dollars ($75,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every three (3) calendar days, (4) the [***], provided that (x) the aggregate balance of the [***] does not exceed Five Hundred Thousand Dollars ($500,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every two (2) weeks, (5) the [***], provided that (x) the aggregate balance of the [***] does not exceed One Hundred Thousand Dollars ($100,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every three (3) calendar days, (6) the [***], provided that (x) the aggregate balance of the [***] shall not exceed One Hundred Thousand Dollars ($100,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every three (3) calendar days, (7) the [***], provided that (x) the aggregate balance of the [***] shall not exceed One Hundred Thousand Dollars ($100,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every three (3) calendar days, (8) the [***], provided that (x) the aggregate balance of the [***] shall not exceed Five Hundred Thousand Dollars ($500,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every three (3) calendar days, (9) the [***], provided that (x) the aggregate balance of the [***] shall not exceed One Hundred Thousand Dollars ($100,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every three (3) calendar days, and (10) the [***], provided that (x) the aggregate balance of the [***] shall not exceed One Hundred Thousand Dollars ($100,000) at any time and (y) Borrower sweeps the funds in the [***] to Borrower's operating account maintained with Bank every seven (7) calendar days.

(c)        Borrower, any Subsidiary of Borrower and any Guarantor shall obtain any business credit card and letters of credit exclusively from Bank, unless otherwise agreed in writing by Bank on a case-by-case basis.

**6.9        Financial Covenants.** Maintain at least one of the following two financial covenants, as of the last day of each month, on a consolidated basis with respect to Borrower and its Subsidiaries; provided however, for the month ending on December 31, 2020, Borrower shall maintain the financial covenant set forth in Section 6.9(a) below:

(a)        Maximum Negative Cumulative EBITDA. Tested by Bank as of the last day of each month through the fiscal year ending on December 31, 2020, total cumulative EBITDA on a fiscal year-to-date basis, that is not more negative than negative [***] (the "**EBITDA Covenant**").

Commencing with the month ending January 31, 2021 and as of the last day of each month thereafter, the EBITDA Covenant set forth in this Section 6.9(a) for Borrower's fiscal year 2021 (the "**2021 EBITDA Covenant**") is subject to change based on Borrower's annual financial projections approved by the Board for the 2021 fiscal year and delivered to Bank pursuant to Section 6.2(e) as determined by Bank in its sole discretion. Borrower's failure to reach an agreement with Bank on the 2021 EBITDA Covenant and to execute and deliver to Bank an amendment to this Agreement which provides the terms for the 2021 EBITDA Covenant by no later February 28, 2021 shall constitute an immediate Event of Default under this Agreement.

16

Exhibit 7
Page 1301

(b)    <u>Minimum Liquidity</u>. Tested by Bank as of the last day of each month (with the exception of the month ending on December 31, 2020, for which this financial covenant will not be tested during such month end), Liquidity of at least [***] (the "**Liquidity Covenant**").

(For purposes of clarity, Borrower must maintain either the 2020 EBITDA Covenant or the Liquidity Covenant as of the last day of each month, except for the month ending on December 31, 2020, in which Borrower shall maintain the 2020 EBITDA Covenant for the month ending on December 31, 2020.)

**6.10    Protection and Registration of Intellectual Property Rights.**

(a)    (i) Protect, defend and maintain the validity and enforceability of its Intellectual Property; (ii) promptly advise Bank in writing of material infringements or any other event that could reasonably be expected to materially and adversely affect the value of its Intellectual Property; and (iii) not allow any Intellectual Property material to Borrower's business to be abandoned, forfeited or dedicated to the public without Bank's written consent.

(b)    If Borrower (i) obtains any Patent, registered Trademark, registered Copyright, registered mask work, or any pending application for any of the foregoing, whether as owner, licensee or otherwise, or (ii) applies for any Patent or the registration of any Trademark, then Borrower shall, with delivery of the next Compliance Certificate due pursuant to Section 6.2(d), provide written notice thereof to Bank and shall execute such intellectual property security agreements and other documents and take such other actions as Bank may request in its good faith business judgment to perfect and maintain a first priority perfected security interest in favor of Bank in such property. If Borrower decides to register any Copyrights or mask works in the United States Copyright Office, Borrower shall: (x) provide Bank with at least fifteen (15) days prior written notice of Borrower's intent to register such Copyrights or mask works together with a copy of the application it intends to file with the United States Copyright Office (excluding exhibits thereto); (y) execute an intellectual property security agreement and such other documents and take such other actions as Bank may request in its good faith business judgment to perfect and maintain a first priority perfected security interest in favor of Bank in the Copyrights or mask works intended to be registered with the United States Copyright Office; and (z) record such intellectual property security agreement with the United States Copyright Office contemporaneously with filing the Copyright or mask work application(s) with the United States Copyright Office. Borrower shall promptly provide to Bank copies of all applications that it files for Patents or for the registration of Trademarks, Copyrights or mask works, together with evidence of the recording of the intellectual property security agreement required for Bank to perfect and maintain a first priority perfected security interest in such property.

(c)    Provide written notice to Bank within ten (10) days of entering or becoming bound by any Restricted License (other than over-the-counter software that is commercially available to the public). Borrower shall use commercially reasonable efforts to take such steps as Bank requests to obtain the consent of, or waiver by, any person whose consent or waiver is necessary for (i) any Restricted License to be deemed "Collateral" and for Bank to have a security interest in it that might otherwise be restricted or prohibited by law or by the terms of any such Restricted License, whether now existing or entered into in the future, and (ii) Bank to have the ability in the event of a liquidation of any Collateral to dispose of such Collateral in accordance with Bank's rights and remedies under this Agreement and the other Loan Documents.

**6.11    Litigation Cooperation.** From the date hereof and continuing through the termination of this Agreement, make available to Bank, without expense to Bank, Borrower and its officers, employees and agents and Borrower's books and records, at reasonable times and upon reasonable notice, to the extent that Bank may deem them reasonably necessary to prosecute or defend any third-party suit or proceeding instituted by or against Bank with respect to any Collateral or relating to Borrower.

**6.12    Online Banking.**

(a)    Utilize Bank's online banking platform for all matters requested by Bank which shall include, without limitation (and without request by Bank for the following matters), uploading information pertaining to Accounts and Account Debtors, requesting approval for exceptions, requesting Credit Extensions, and uploading financial statements and other reports required to be delivered by this Agreement (including, without limitation, those described in Section 6.2 of this Agreement).

17

Exhibit 7
Page 1302

(b)      Comply with the terms of Bank's Online Banking Agreement as in effect from time to time and ensure that all persons utilizing Bank's online banking platform are duly authorized to do so by an Administrator. Bank shall be entitled to assume the authenticity, accuracy and completeness on any information, instruction or request for a Credit Extension submitted via Bank's online banking platform and to further assume that any submissions or requests made via Bank's online banking platform have been duly authorized by an Administrator.

**6.13**      **Formation or Acquisition of Subsidiaries.** Notwithstanding and without limiting the negative covenants contained in Sections 7.3 and 7.7 hereof, at the time that Borrower or any Guarantor forms any direct or indirect Domestic Subsidiary or acquires any direct or indirect Domestic Subsidiary after the Effective Date (including without limitation, pursuant to a Division) upon Bank's request, Borrower shall and such Guarantor shall (a) cause such new Subsidiary to provide to Bank a joinder to this Agreement to become a co-borrower hereunder or a Guaranty to become a Guarantor hereunder (as Bank may direct in its sole discretion), together with such appropriate financing statements and/or Control Agreements, all in form and substance satisfactory to Bank (including being sufficient to grant Bank a first priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary), (b) provide to Bank appropriate certificates and powers and financing statements, pledging all of the direct or beneficial ownership interest in such new Subsidiary, in form and substance satisfactory to Bank; and (c) provide to Bank all other documentation in form and substance satisfactory to Bank, including one or more opinions of counsel satisfactory to Bank, which in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above. Any document, agreement, or instrument executed or issued pursuant to this Section 6.13 shall be a Loan Document.

**6.14**      **Further Assurances.** Execute any further instruments and take further action as Bank reasonably requests to perfect or continue Bank's Lien in the Collateral or to effect the purposes of this Agreement. Deliver to Bank, within five (5) days after the same are sent or received, copies of all correspondence, reports, documents and other filings with any Governmental Authority regarding compliance with or maintenance of Governmental Approvals or Requirements of Law or that could reasonably be expected to have a material effect on any of the Governmental Approvals or otherwise on the operations of Borrower or any of its Subsidiaries.

**7.**      <u>**NEGATIVE COVENANTS**</u>

Borrower shall not do any of the following without Bank's prior written consent:

**7.1**      **Dispositions.** Convey, sell, lease, transfer, assign, or otherwise dispose of (including without limitation, pursuant to a Division) (collectively, "Transfer"), or permit any of its Subsidiaries to Transfer, all or any part of its business or property, except for Transfers (a) of Inventory in the ordinary course of business; (b) of worn-out or obsolete Equipment that is, in the reasonable judgment of Borrower, no longer economically practicable to maintain or useful in the ordinary course of business of Borrower; (c) consisting of Permitted Liens and Permitted Investments; (d) consisting of the sale or issuance of any stock of Borrower permitted under Section 7.2 of this Agreement; and (e) consisting of Borrower's use or transfer of money or Cash Equivalents in the ordinary course of its business for the payment of ordinary course business expenses in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents.

**7.2**      **Changes in Business, Management, Control, or Business Locations.** (a) Engage in or permit any of its Subsidiaries to engage in any business other than the businesses currently engaged in by Borrower and such Subsidiary, as applicable, or reasonably related thereto; (b) liquidate or dissolve; (c) any Key Person departs from or ceases to be employed by Borrower; or (d) permit or suffer any Change in Control.

Borrower shall not, without at least thirty (30) days prior written notice to Bank: (1) add any new offices or business locations, including warehouses (unless such new offices or business locations contain less than Two Hundred Fifty Thousand Dollars ($250,000) in Borrower's assets or property) or deliver any portion of the Collateral valued, individually or in the aggregate, in excess of Two Hundred Fifty Thousand Dollars ($250,000) to a bailee at a location other than to a bailee and at a location already disclosed in the Perfection Certificate, (2) change its jurisdiction of organization, (3) change its organizational structure or type, (4) change its legal name, or (5) change any organizational number (if any) assigned by its jurisdiction of organization. If Borrower intends to add any new offices or business locations, including warehouses, containing in excess of Two Hundred Fifty Thousand Dollars ($250,000) of Borrower's assets or property, then Borrower will first receive the written consent of Bank, and the landlord of any such new offices or business locations, including warehouses, shall execute and deliver a landlord consent in form and substance satisfactory to Bank. If Borrower intends to deliver any portion of the Collateral valued, individually or in the aggregate, in excess of Two Hundred Fifty Thousand Dollars ($250,000) to a bailee, and Bank and such bailee are not already parties to a bailee agreement governing both the Collateral and the location to which Borrower intends to deliver the Collateral, then Borrower will first receive the written consent of Bank, and such bailee shall execute and deliver a bailee agreement in form and substance satisfactory to Bank.

18

Exhibit 7
Page 1303

**7.3    Mergers or Acquisitions.** Merge or consolidate, or permit any of its Subsidiaries to merge or consolidate, with any other Person, or acquire, or permit any of its Subsidiaries to acquire, all or substantially all of the capital stock or property of another Person (including, without limitation, by the formation of any Subsidiary or pursuant to a Division). A Subsidiary may merge or consolidate into another Subsidiary or into Borrower.

**7.4    Indebtedness.** Create, incur, assume, or be liable for any Indebtedness, or permit any Subsidiary to do so, other than Permitted Indebtedness.

**7.5    Encumbrance.** Create, incur, allow, or suffer any Lien on any of its property, or assign or convey any right to receive income, including the sale of any Accounts, or permit any of its Subsidiaries to do so, except for Permitted Liens, permit any Collateral not to be subject to the first priority security interest granted herein, or enter into any agreement, document, instrument or other arrangement (except with or in favor of Bank) with any Person which directly or indirectly prohibits or has the effect of prohibiting Borrower or any Subsidiary from assigning, mortgaging, pledging, granting a security interest in or upon, or encumbering any of Borrower's or any Subsidiary's Intellectual Property, except (a) as is otherwise permitted in Section 7.1 hereof and the definition of "Permitted Liens" herein and (b) customary negative pledge arrangements in acquisition agreements, provided that such restrictions do not prohibit the granting of a security interest in Borrower's or any Subsidiary's Intellectual Property in favor of Bank and provided further that such agreements do not grant a security interest in Borrower's or any Subsidiary's property.

**7.6    Maintenance of Collateral Accounts.** Maintain any Collateral Account except pursuant to the terms of Section 6.8(b) hereof.

**7.7    Distributions; Investments.** (a) Pay any dividends or make any distribution or payment or redeem, retire or purchase any capital stock, provided that (i) Borrower may convert any of its convertible securities into other securities pursuant to the terms of such convertible securities or otherwise in exchange thereof, (ii) Borrower may pay dividends solely in common stock, and (iii) Borrower may repurchase the stock of former employees, directors or consultants pursuant to stock repurchase agreements so long as an Event of Default does not exist at the time of such repurchase and would not exist after giving effect to such repurchase, provided that the aggregate amount of all such repurchases does not exceed One Hundred Thousand Dollars ($100,000) per fiscal year; or (b) directly or indirectly make any Investment (including, without limitation, by the formation of any Subsidiary) other than Permitted Investments, or permit any of its Subsidiaries to do so.

**7.8    Transactions with Affiliates.** Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrower, except for transactions that are in the ordinary course of Borrower's business, upon fair and reasonable terms that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person.

**7.9    Subordinated Debt.** (a) Make or permit any payment on any Subordinated Debt, except under the terms of the subordination, intercreditor, or other similar agreement to which such Subordinated Debt is subject, or (b) amend any provision in any document relating to the Subordinated Debt which would increase the amount thereof, provide for earlier or greater principal, interest, or other payments thereon, or adversely affect the subordination thereof to Obligations owed to Bank.

**7.10    Compliance.** Become an "investment company" or a company controlled by an "investment company", under the Investment Company Act of 1940, as amended, or undertake as one of its important activities extending credit to purchase or carry margin stock (as defined in Regulation U of the Board of Governors of the Federal Reserve System), or use the proceeds of any Credit Extension for that purpose; fail to meet the minimum funding requirements of ERISA, prevent a Reportable Event or Prohibited Transaction, as defined in ERISA from occurring or comply with the Federal Fair Labor Standards Act, the failure of any of the conditions described in clauses (a) through (c) which could reasonably be expected to have a material adverse effect on Borrower's business; or violate any other law or regulation, if the violation could reasonably be expected to have a material adverse effect on Borrower's business, or permit any of its Subsidiaries to do so; withdraw or permit any Subsidiary to withdraw from participation in, permit partial or complete termination of, or permit the occurrence of any other event with respect to, any present pension, profit sharing and deferred compensation plan which could reasonably be expected to result in any liability of Borrower, including any liability to the Pension Benefit Guaranty Corporation or its successors or any other governmental agency.

19

Exhibit 7
Page 1304

**8.    EVENTS OF DEFAULT**

Any one of the following shall constitute an event of default (an "**Event of Default**") under this Agreement:

**8.1    Payment Default.** Borrower fails to (a) make any payment of principal or interest on any Credit Extension when due, or (b) pay any other Obligations within three (3) Business Days after such Obligations are due and payable (which three (3) Business Day cure period shall not apply to payments due on the Revolving Line Maturity Date or the Growth Capital Maturity Date). During the cure period, the failure to make or pay any payment specified under clause (b) hereunder is not an Event of Default (but no Credit Extension will be made during the cure period);

**8.2    Covenant Default.**

(a)    Borrower fails or neglects to perform any obligation in Sections 6.2, 6.3, 6.4, 6.5, 6.6, 6.7, 6.8, 6.9, 6.10, or 6.12 or violates any covenant in Section 7; or

(b)    Borrower fails or neglects to perform, keep, or observe any other term, provision, condition, covenant or agreement contained in this Agreement or any Loan Documents, and as to any default (other than those specified in this Section 8) under such other term, provision, condition, covenant or agreement that can be cured, has failed to cure the default within ten (10) days after the occurrence thereof; provided, however, that if the default cannot by its nature be cured within the ten (10) day period or cannot after diligent attempts by Borrower be cured within such ten (10) day period, and such default is likely to be cured within a reasonable time, then Borrower shall have an additional period (which shall not in any case exceed thirty (30) days) to attempt to cure such default, and within such reasonable time period the failure to cure the default shall not be deemed an Event of Default (but no Credit Extensions shall be made during such cure period). Cure periods provided under this section shall not apply, among other things, to financial covenants or any other covenants set forth in clause 8.2(a) above;

**8.3    Material Adverse Change.** A Material Adverse Change occurs;

**8.4    Attachment; Levy; Restraint on Business.**

(a)    (i) The service of process seeking to attach, by trustee or similar process, any funds of Borrower or of any entity under the control of Borrower (including a Subsidiary), or (ii) a notice of lien or levy is filed against any of Borrower's assets by any Governmental Authority, and the same under subclauses (i) and (ii) hereof are not, within ten (10) days after the occurrence thereof, discharged or stayed (whether through the posting of a bond or otherwise); provided, however, no Credit Extensions shall be made during any ten (10) day cure period; or

(b)    (i) any material portion of Borrower's assets is attached, seized, levied on, or comes into possession of a trustee or receiver, or (ii) any court order enjoins, restrains, or prevents Borrower from conducting all or any material part of its business;

**8.5    Insolvency.** (a) Borrower or any of its Subsidiaries is unable to pay its debts (including trade debts) as they become due or otherwise becomes insolvent; (b) Borrower or any of its Subsidiaries begins an Insolvency Proceeding; or (c) an Insolvency Proceeding is begun against Borrower or any of its Subsidiaries and is not dismissed or stayed within forty-five (45) days (but no Credit Extensions shall be made while any of the conditions described in clause (a) exist and/or until any Insolvency Proceeding is dismissed);

20

Exhibit 7
Page 1305

**8.6**      **Other Agreements.** There is, under any agreement to which Borrower or any Guarantor is a party with a third party or parties, (a) any default resulting in a right by such third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount individually or in the aggregate in excess of Two Hundred Fifty Thousand Dollars ($250,000); or (b) any breach or default by Borrower or Guarantor, the result of which could have a material adverse effect on Borrower's or any Guarantor's business;

**8.7**      **Judgments; Penalties.** One or more fines, penalties or final judgments, orders or decrees for the payment of money in an amount, individually or in the aggregate, of at least Two Hundred Fifty Thousand Dollars ($250,000) (not covered by independent third-party insurance as to which liability has been accepted by such insurance carrier) shall be rendered against Borrower by any Governmental Authority, and the same are not, within ten (10) days after the entry, assessment or issuance thereof, discharged, satisfied, or paid, or after execution thereof, stayed or bonded pending appeal, or such judgments are not discharged prior to the expiration of any such stay (provided that no Credit Extensions will be made prior to the satisfaction, payment, discharge, stay, or bonding of such fine, penalty, judgment, order or decree);

**8.8**      **Misrepresentations.** Borrower or any Person acting for Borrower makes any representation, warranty, or other statement now or later in this Agreement, any Loan Document or in any writing delivered to Bank or to induce Bank to enter this Agreement or any Loan Document, and such representation, warranty, or other statement is incorrect in any material respect when made;

**8.9**      **Subordinated Debt.** Any document, instrument, or agreement evidencing any Subordinated Debt shall for any reason be revoked or invalidated or otherwise cease to be in full force and effect, any Person shall be in breach thereof or contest in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder, or the Obligations shall for any reason be subordinated or shall not have the priority contemplated by this Agreement or any applicable subordination or intercreditor agreement;

**8.10**      **Guaranty.** (a) Any guaranty of any Obligations terminates or ceases for any reason to be in full force and effect; (b) any Guarantor does not perform any obligation or covenant under any guaranty of the Obligations; (c) any circumstance described in Sections 8.3, 8.4, 8.5, 8.6, 8.7, or 8.8 of this Agreement occurs with respect to any Guarantor, (d) the death, liquidation, winding up, or termination of existence of any Guarantor; or (e)(i) a material impairment in the perfection or priority of Bank's Lien in the collateral provided by Guarantor or in the value of such collateral or (ii) a material adverse change in the general affairs, management, results of operation, condition (financial or otherwise) or the prospect of repayment of the Obligations occurs with respect to any Guarantor; or

**8.11**      **Governmental Approvals.** Any Governmental Approval shall have been (a) revoked, rescinded, suspended, modified in an adverse manner or not renewed in the ordinary course for a full term or (b) subject to any decision by a Governmental Authority that designates a hearing with respect to any applications for renewal of any of such Governmental Approval or that could result in the Governmental Authority taking any of the actions described in clause (a) above, and such decision or such revocation, rescission, suspension, modification or non-renewal (i) causes, or could reasonably be expected to cause, a Material Adverse Change, or (ii) adversely affects the legal qualifications of Borrower or any of its Subsidiaries to hold such Governmental Approval in any applicable jurisdiction and such revocation, rescission, suspension, modification or non-renewal could reasonably be expected to affect the status of or legal qualifications of Borrower or any of its Subsidiaries to hold any Governmental Approval in any other jurisdiction.

**9.**      **BANK'S RIGHTS AND REMEDIES**

**9.1**      **Rights and Remedies.** Upon the occurrence and during the continuance of an Event of Default, Bank may, without notice or demand, do any or all of the following:

(a)      declare all Obligations immediately due and payable (but if an Event of Default described in Section 8.5 occurs all Obligations are immediately due and payable without any action by Bank);

(b)      stop advancing money or extending credit for Borrower's benefit under this Agreement or under any other agreement between Borrower and Bank;

21

Exhibit 7
Page 1306

(c)        demand that Borrower (i) deposit cash with Bank in an amount equal to at least (A) one hundred five percent (105.0%) of the Dollar Equivalent of the aggregate face amount of all Letters of Credit denominated in Dollars remaining undrawn, and (B) one hundred ten percent (110.0%) of the Dollar Equivalent of the aggregate face amount of all Letters of Credit denominated in a Foreign Currency remaining undrawn (plus, in each case, all interest, fees, and costs due or to become due in connection therewith (as estimated by Bank in its good faith business judgment)), to secure all of the Obligations relating to such Letters of Credit, as collateral security for the repayment of any future drawings under such Letters of Credit, and Borrower shall forthwith deposit and pay such amounts, and (ii) pay in advance all letter of credit fees scheduled to be paid or payable over the remaining term of any Letters of Credit;

(d)        terminate any FX Contracts;

(e)        verify the amount of, demand payment of and performance under, and collect any Accounts and General Intangibles, settle or adjust disputes and claims directly with Account Debtors for amounts on terms and in any order that Bank considers advisable, and notify any Person owing Borrower money of Bank's security interest in such funds. Borrower shall collect all payments in trust for Bank and, if requested by Bank, immediately deliver the payments to Bank in the form received from the Account Debtor, with proper endorsements for deposit;

(f)        make any payments and do any acts it considers necessary or reasonable to protect the Collateral and/or its security interest in the Collateral. Borrower shall assemble the Collateral if Bank requests and make it available as Bank designates. Bank may enter premises where the Collateral is located, take and maintain possession of any part of the Collateral, and pay, purchase, contest, or compromise any Lien which appears to be prior or superior to its security interest and pay all expenses incurred. Borrower grants Bank a license to enter and occupy any of its premises, without charge, to exercise any of Bank's rights or remedies;

(g)        apply to the Obligations any (i) balances and deposits of Borrower it holds, or (ii) amount held by Bank owing to or for the credit or the account of Borrower;

(h)        ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell the Collateral. Bank is hereby granted a non-exclusive, royalty-free license or other right to use, without charge, Borrower's labels, Patents, Copyrights, mask works, rights of use of any name, trade secrets, trade names, Trademarks, and advertising matter, or any similar property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Bank's exercise of its rights under this Section 9.1, Borrower's rights under all licenses and all franchise agreements inure to Bank's benefit;

(i)        place a "hold" on any account maintained with Bank and/or deliver a notice of exclusive control, any entitlement order, or other directions or instructions pursuant to any Control Agreement or similar agreements providing control of any Collateral;

(j)        demand and receive possession of Borrower's Books; and

(k)        exercise all rights and remedies available to Bank under the Loan Documents or at law or equity, including all remedies provided under the Code (including disposal of the Collateral pursuant to the terms thereof).

**9.2        Power of Attorney.** Borrower hereby irrevocably appoints Bank as its lawful attorney-in-fact, exercisable following the occurrence and during the continuance of an Event of Default, to: (a) endorse Borrower's name on any checks, payment instruments, or other forms of payment or security; (b) sign Borrower's name on any invoice or bill of lading for any Account or drafts against Account Debtors; (c) demand, collect, sue, and give releases to any Account Debtor for monies due, settle and adjust disputes and claims about the Accounts directly with Account Debtors, and compromise, prosecute, or defend any action, claim, case, or proceeding about any Collateral (including filing a claim or voting a claim in any bankruptcy case in Bank's or Borrower's name, as Bank chooses); (d) make, settle, and adjust all claims under Borrower's insurance policies; (e) pay, contest or settle any Lien, charge, encumbrance, security interest, or other claim in or to the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; and (f) transfer the Collateral into the name of Bank or a third party as the Code permits. Borrower hereby appoints Bank as its lawful attorney-in-fact to sign Borrower's name on any documents necessary to perfect or continue the perfection of Bank's security interest in the Collateral regardless of whether an Event of Default has occurred until all Obligations have been satisfied in full and the Loan Documents have been terminated. Bank's foregoing appointment as Borrower's attorney in fact, and all of Bank's rights and powers, coupled with an interest, are irrevocable until all Obligations have been fully repaid and performed and the Loan Documents have been terminated.

22

Exhibit 7
Page 1307

**9.3**    **Protective Payments.** If Borrower fails to obtain the insurance called for by Section 6.7 or fails to pay any premium thereon or fails to pay any other amount which Borrower is obligated to pay under this Agreement or any other Loan Document or which may be required to preserve the Collateral, Bank may obtain such insurance or make such payment, and all amounts so paid by Bank are Bank Expenses and immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the Collateral. Bank will make reasonable efforts to provide Borrower with notice of Bank obtaining such insurance at the time it is obtained or within a reasonable time thereafter. No payments by Bank are deemed an agreement to make similar payments in the future or Bank's waiver of any Event of Default.

**9.4**    **Application of Payments and Proceeds Upon Default.** If an Event of Default has occurred and is continuing (or at any time on the terms set forth in Section 6.3(c), regardless of whether an Event of Default exists) Bank shall have the right to apply in any order any funds in its possession, whether from Borrower account balances, payments, proceeds realized as the result of any collection of Accounts or other disposition of the Collateral, or otherwise, to the Obligations. Bank shall pay any surplus to Borrower by credit to the Designated Deposit Account or to other Persons legally entitled thereto; Borrower shall remain liable to Bank for any deficiency. If Bank, directly or indirectly, enters into a deferred payment or other credit transaction with any purchaser at any sale of Collateral, Bank shall have the option, exercisable at any time, of either reducing the Obligations by the principal amount of the purchase price or deferring the reduction of the Obligations until the actual receipt by Bank of cash therefor.

**9.5**    **Bank's Liability for Collateral.** So long as Bank complies with reasonable banking practices regarding the safekeeping of the Collateral in the possession or under the control of Bank, Bank shall not be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage to the Collateral; (c) any diminution in the value of the Collateral; or (d) any act or default of any carrier, warehouseman, bailee, or other Person. Borrower bears all risk of loss, damage or destruction of the Collateral.

**9.6**    **No Waiver; Remedies Cumulative.** Bank's failure, at any time or times, to require strict performance by Borrower of any provision of this Agreement or any other Loan Document shall not waive, affect, or diminish any right of Bank thereafter to demand strict performance and compliance herewith or therewith. No waiver hereunder shall be effective unless signed by the party granting the waiver and then is only effective for the specific instance and purpose for which it is given. Bank's rights and remedies under this Agreement and the other Loan Documents are cumulative. Bank has all rights and remedies provided under the Code, by law, or in equity. Bank's exercise of one right or remedy is not an election and shall not preclude Bank from exercising any other remedy under this Agreement or other remedy available at law or in equity, and Bank's waiver of any Event of Default is not a continuing waiver. Bank's delay in exercising any remedy is not a waiver, election, or acquiescence.

**9.7**    **Demand Waiver.** Borrower waives demand, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees held by Bank on which Borrower is liable.

**10.**    **<u>NOTICES</u>**

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail or facsimile transmission (if applicable); (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number (if applicable), or email address indicated below. Bank or Borrower may change its mailing or electronic mail address or facsimile number (if applicable) by giving the other party written notice thereof in accordance with the terms of this Section 10.

---

Exhibit 7
Page 1308

If to Borrower:      Owlet Baby Care Inc.
                     2500 Executive Parkway, Suite 500
                     Lehi, Utah 84043
                     Attn:   Mike Abbott, President
                     Email:  mabbott@owletcare.com

If to Bank:          Silicon Valley Bank
                     1200 17th Street, Suite 1600
                     Denver, Colorado 80202
                     Attn:   Jordan Rigberg, Vice President
                     Email:  jrigberg@svb.com
                     and the Financial Statement Repository

11.    **CHOICE OF LAW, VENUE, JURY TRIAL WAIVER AND JUDICIAL REFERENCE**

Except as otherwise expressly provided in any of the Loan Documents, California law governs the Loan Documents without regard to principles of conflicts of law. Borrower and Bank each submit to the exclusive jurisdiction of the State and Federal courts in Santa Clara County, California; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Bank from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favor of Bank. Borrower expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and Borrower hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court. Borrower hereby waives personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified mail addressed to Borrower at the address set forth in, or subsequently provided by Borrower in accordance with, Section 10 of this Agreement and that service so made shall be deemed completed upon the earlier to occur of Borrower's actual receipt thereof or three (3) days after deposit in the U.S. mails, proper postage prepaid.

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND BANK EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Santa Clara County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Santa Clara County, California; and the parties hereby submit to the jurisdiction of such court. The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure Sections 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Santa Clara County, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure Section 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

24

Exhibit 7
Page 1309

This Section 11 shall survive the termination of this Agreement.

12.    **GENERAL PROVISIONS**

12.1    **Termination Prior to Maturity Date; Survival.** All covenants, representations and warranties made in this Agreement shall continue in full force until this Agreement has terminated pursuant to its terms and all Obligations have been satisfied. So long as Borrower has satisfied the Obligations (other than inchoate indemnity obligations, and any other obligations which, by their terms, are to survive the termination of this Agreement, and any Obligations under Bank Services Agreements that are cash collateralized in accordance with Section 4.1 of this Agreement), this Agreement may be terminated by Borrower prior to (a) the Revolving Line Maturity Date, effective three (3) Business Days after written notice of termination is given to Bank and (b) the Growth Capital Maturity Date pursuant to Section 2.4(d). Those obligations that are expressly specified in this Agreement as surviving this Agreement's termination shall continue to survive notwithstanding this Agreement's termination.

12.2    **Successors and Assigns.** This Agreement binds and is for the benefit of the successors and permitted assigns of each party. Borrower may not assign this Agreement or any rights or obligations under it without Bank's prior written consent (which may be granted or withheld in Bank's discretion). Bank has the right, without the consent of or notice to Borrower, to sell, transfer, assign, negotiate, or grant participation in all or any part of, or any interest in, Bank's obligations, rights, and benefits under this Agreement and the other Loan Documents (other than the Warrant, as to which assignment, transfer and other such actions are governed by the terms thereof).

12.3    **Indemnification.** Borrower agrees to indemnify, defend and hold Bank and its directors, officers, employees, agents, attorneys, or any other Person affiliated with or representing Bank (each, an "**Indemnified Person**") harmless against: (i) all obligations, demands, claims, and liabilities (collectively, "**Claims**") claimed or asserted by any other party in connection with the transactions contemplated by the Loan Documents; and (ii) all losses or expenses (including Bank Expenses) in any way suffered, incurred, or paid by such Indemnified Person as a result of, following from, consequential to, or arising from transactions between Bank and Borrower (including reasonable attorneys' fees and expenses), except for Claims and/or losses directly caused by such Indemnified Person's gross negligence or willful misconduct.

This Section 12.3 shall survive until all statutes of limitation with respect to the Claims, losses, and expenses for which indemnity is given shall have run.

12.4    **Time of Essence.** Time is of the essence for the performance of all Obligations in this Agreement.

12.5    **Severability of Provisions.** Each provision of this Agreement is severable from every other provision in determining the enforceability of any provision.

12.6    **Correction of Loan Documents.** Bank may correct patent errors and fill in any blanks in the Loan Documents consistent with the agreement of the parties.

12.7    **Amendments in Writing; Waiver; Integration.** No purported amendment or modification of any Loan Document, or waiver, discharge or termination of any obligation under any Loan Document, shall be enforceable or admissible unless, and only to the extent, expressly set forth in a writing signed by the party against which enforcement or admission is sought. Without limiting the generality of the foregoing, no oral promise or statement, nor any action, inaction, delay, failure to require performance or course of conduct shall operate as, or evidence, an amendment, supplement or waiver or have any other effect on any Loan Document. Any waiver granted shall be limited to the specific circumstance expressly described in it, and shall not apply to any subsequent or other circumstance, whether similar or dissimilar, or give rise to, or evidence, any obligation or commitment to grant any further waiver. The Loan Documents represent the entire agreement about this subject matter and supersede prior negotiations or agreements. All prior agreements, understandings, representations, warranties, and negotiations between the parties about the subject matter of the Loan Documents merge into the Loan Documents.

25

Exhibit 7
Page 1310

**12.8**     **Counterparts.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Agreement.

**12.9**     **Confidentiality.** In handling any confidential information, Bank shall exercise the same degree of care that it exercises for its own proprietary information, but disclosure of information may be made: (a) to Bank's Subsidiaries or Affiliates (such Subsidiaries and Affiliates, together with Bank, collectively, "**Bank Entities**"); (b) to prospective transferees or purchasers of any interest in the Credit Extensions (provided, however, Bank shall use its best efforts to obtain any prospective transferee's or purchaser's agreement to the terms of this provision); (c) as required by law, regulation, subpoena, or other order; (d) to Bank's regulators or as otherwise required in connection with Bank's examination or audit; (e) as Bank considers appropriate in exercising remedies under the Loan Documents; and (f) to third-party service providers of Bank so long as such service providers have executed a confidentiality agreement with Bank with terms no less restrictive than those contained herein. Confidential information does not include information that is either: (i) in the public domain or in Bank's possession when disclosed to Bank, or becomes part of the public domain (other than as a result of its disclosure by Bank in violation of this Agreement) after disclosure to Bank; or (ii) disclosed to Bank by a third party, if Bank does not know that the third party is prohibited from disclosing the information.

Bank Entities may use anonymous forms of confidential information for aggregate datasets, for analyses or reporting, and for any other uses not expressly prohibited in writing by Borrower. The provisions of the immediately preceding sentence shall survive the termination of this Agreement.

**12.10**     **Attorneys' Fees, Costs and Expenses.** In any action or proceeding between Borrower and Bank arising out of or relating to the Loan Documents, the prevailing party shall be entitled to recover its reasonable attorneys' fees and other costs and expenses incurred, in addition to any other relief to which it may be entitled.

**12.11**     **Electronic Execution of Documents.** The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

**12.12**     **Right of Setoff.** Borrower hereby grants to Bank a Lien and a right of setoff as security for all Obligations to Bank, whether now existing or hereafter arising upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Bank or any entity under the control of Bank (including a subsidiary of Bank) or in transit to any of them. At any time after the occurrence and during the continuance of an Event of Default, without demand or notice, Bank may setoff the same or any part thereof and apply the same to any liability or Obligation of Borrower even though unmatured and regardless of the adequacy of any other collateral securing the Obligations. ANY AND ALL RIGHTS TO REQUIRE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF BORROWER, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

**12.13**     **Captions.** The headings used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

Exhibit 7
Page 1311

**12.14    Construction of Agreement.** The parties mutually acknowledge that they and their attorneys have participated in the preparation and negotiation of this Agreement. In cases of uncertainty this Agreement shall be construed without regard to which of the parties caused the uncertainty to exist.

**12.15    Relationship.** The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement. The parties do not intend to create any agency, partnership, joint venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract.

**12.16    Third Parties.** Nothing in this Agreement, whether express or implied, is intended to: (a) confer any benefits, rights or remedies under or by reason of this Agreement on any persons other than the express parties to it and their respective permitted successors and assigns; (b) relieve or discharge the obligation or liability of any person not an express party to this Agreement; or (c) give any person not an express party to this Agreement any right of subrogation or action against any party to this Agreement.

**12.17    Transitional Arrangements**. On the Effective Date, this Agreement shall amend, restate and supersede the Prior Loan Agreement in its entirety, except as provided in this Section 12.17. This Agreement is not intended to, and does not, novate the Prior Loan Agreement. On the Effective Date, the rights and obligations of the parties evidenced by the Prior Loan Agreement shall be evidenced by this Agreement and the other Loan Documents and the grant of security interest in the Collateral by the Borrower under the Prior Loan Agreement and the other "Loan Documents" (as defined in the Prior Loan Agreement) shall continue under this Agreement and the other Loan Documents, and such security interest and any other rights and obligations which by their express terms survive the termination of the Loan Documents shall not in any event be terminated, extinguished or annulled but shall hereafter be governed by this Agreement and the other Loan Documents. All references to the Prior Loan Agreement in any Loan Document or other document or instrument delivered in connection therewith shall be deemed to refer to this Agreement and the provisions hereof as amended, restated, or otherwise modified from time to time.

**13.    DEFINITIONS**

**13.1    Definitions.** As used in the Loan Documents, the word "shall" is mandatory, the word "may" is permissive, the word "or" is not exclusive, the words "includes" and "including" are not limiting, the singular includes the plural, and numbers denoting amounts that are set off in brackets are negative. As used in this Agreement, the following capitalized terms have the following meanings:

"**2020 Warrant**" means the Warrant to Purchase Common Stock dated as of the Effective Date between Borrower and Bank, as may be amended, modified, supplemented and/or restated from time to time.

"**2021 EBITDA Covenant**" is defined in Section 6.9(a).

"**Account**" is, as to any Person, any "**account**" of such Person as "account" is defined in the Code with such additions to such term as may hereafter be made, and includes, without limitation, all accounts receivable and other sums owing to such Person.

"**Account Debtor**" is any "**account debtor**" as defined in the Code with such additions to such term as may hereafter be made.

"**Accounts Payable Reserve**" is a Reserve established by Bank in an amount equal to the aggregate balance of Borrower's accounts payable that Borrower has not paid within ninety (90) days of invoice date, regardless of invoice payment period terms, as determined by Bank from Borrower's most recent Borrowing Base Statement and monthly accounts payable agings (as delivered pursuant to Section 6.2).

"**Administrator**" is an individual that is named:

(a)    as an "Administrator" in the "SVB Online Services" form completed by Borrower with the authority to determine who will be authorized to use SVB Online Services (as defined in Bank's Online Banking Agreement as in effect from time to time) on behalf of Borrower; and

27

Exhibit 7
Page 1312

(b)          as an Authorized Signer of Borrower in an approval by the Board.

"**Advance**" or "**Advances**" means a revolving credit loan (or revolving credit loans) under the Revolving Line.

"**Affiliate**" is, with respect to any Person, each other Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members. For purposes of the definition of Eligible Accounts, Affiliate shall include a Specified Affiliate.

"[***]" is defined in Section 6.8(a).

"**Agreement**" is defined in the preamble hereof.

"[***]" is defined in Section 6.8(a).

"[***]" is defined in Section 6.8(a).

"**Anniversary Fee**" is defined in Section 2.7(c).

"**Applicable Number**" means thirty-six (36), provided, however, if Bank determines that Borrower has achieved the Tranche Two Milestone, then the Applicable Number means thirty (30).

"**ASU**" is the Accounting Standards Update issued on February 25, 2016 by the Financial Accounting Standards Board.

"**Authorized Signer**" is any individual listed in Borrower's Borrowing Resolution who is authorized to execute the Loan Documents, including making (and executing if applicable) any Credit Extension request, on behalf of Borrower.

"**Availability Amount**" is (a) the lesser of (i) the Revolving Line or (ii) the amount available under the Borrowing Base, minus (b) the outstanding principal balance of any Advances.

"**Bank**" is defined in the preamble hereof.

"**Bank Entities**" is defined in Section 12.9.

"**Bank Expenses**" are all audit fees and expenses, costs, and expenses (including reasonable attorneys' fees and expenses) for preparing, amending, negotiating, administering, defending and enforcing the Loan Documents (including, without limitation, those incurred in connection with appeals or Insolvency Proceedings) or otherwise incurred with respect to Borrower or any Guarantor.

"**Bank Services**" are any products, credit services, and/or financial accommodations previously, now, or hereafter provided to Borrower or any of its Subsidiaries by Bank or any Bank Affiliate, including, without limitation, any letters of credit, cash management services (including, without limitation, merchant services, direct deposit of payroll, business credit cards, and check cashing services), interest rate swap arrangements, and foreign exchange services as any such products or services may be identified in Bank's various agreements related thereto (each, a "**Bank Services Agreement**").

"**Bank Services Agreement**" is defined in the definition of Bank Services.

"**Board**" is Borrower's board of directors.

"**Borrower**" is defined in the preamble hereof.

28

Exhibit 7
Page 1313

"**Borrower's Books**" are all Borrower's books and records including ledgers, federal and state tax returns, records regarding Borrower's assets or liabilities, the Collateral, business operations or financial condition, and all computer programs or storage or any equipment containing such information.

"**Borrowing Base**" is (a) eighty percent (80%) of Eligible Accounts, plus (b) the lesser of the Inventory Advance Rate or the Eligible Inventory Cap, minus (c) the Accounts Payable Reserve, each as determined by Bank from Borrower's most recent Borrowing Base Statement (and as may subsequently be updated by Bank based upon information received by Bank including, without limitation, Accounts that are paid and/or billed following the date of the Borrowing Base Statement); provided, however, that Bank has the right to decrease each and any of the foregoing percentage, the Inventory Advance Rate and Eligible Inventory Cap (if applicable) in its good faith business judgment to mitigate the impact of events, conditions, contingencies, or risks which may adversely affect the Collateral or its value.

"**Borrowing Base Statement**" is that certain report of the value of certain Collateral in the form specified by Bank to Borrower from time to time.

"**Borrowing Resolutions**" are, with respect to any Person, those resolutions adopted by such Person's board of directors (and, if required under the terms of such Person's Operating Documents, stockholders) and delivered by such Person to Bank approving the Loan Documents to which such Person is a party and the transactions contemplated thereby, together with a certificate executed by its secretary on behalf of such Person certifying (a) such Person has the authority to execute, deliver, and perform its obligations under each of the Loan Documents to which it is a party, (b) that set forth as a part of or attached as an exhibit to such certificate is a true, correct, and complete copy of the resolutions then in full force and effect authorizing and ratifying the execution, delivery, and performance by such Person of the Loan Documents to which it is a party, (c) the name(s) of the Person(s) authorized to execute the Loan Documents, including making (and executing if applicable) any Credit Extension request, on behalf of such Person, together with a sample of the true signature(s) of such Person(s), and (d) that Bank may conclusively rely on such certificate unless and until such Person shall have delivered to Bank a further certificate canceling or amending such prior certificate.

"**Business Day**" is any day that is not a Saturday, Sunday or a day on which Bank is closed.

"**Cash Collateral Account**" is defined in Section 6.3(c).

"**Cash Equivalents**" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States or any agency or any State thereof having maturities of not more than one (1) year from the date of acquisition; (b) commercial paper maturing no more than one (1) year after its creation and having the highest rating from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc.; (c) Bank's certificates of deposit issued maturing no more than one (1) year after issue; and (d) money market funds at least ninety-five percent (95%) of the assets of which constitute Cash Equivalents of the kinds described in clauses (a) through (c) of this definition.

"**Change in Control**" means (a) at any time, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), shall become, or obtain rights (whether by means of warrants, options or otherwise) to become, the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of forty-nine percent (49%) or more of the ordinary voting power for the election of directors of Borrower (determined on a fully diluted basis) other than by the sale of Borrower's equity securities in a public offering or to venture capital or private equity investors so long as Borrower identifies to Bank the venture capital or private equity investors at least seven (7) Business Days prior to the closing of the transaction and provides to Bank a description of the material terms of the transaction; (b) during any period of twelve (12) consecutive months, a majority of the members of the Board or other equivalent governing body of Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or (c) at any time, Borrower shall cease to own and control, of record and beneficially, directly or indirectly, one hundred percent (100.0%) of each class of outstanding capital stock of each subsidiary of Borrower (except for director's qualifying shares) free and clear of all Liens (except Liens created by this Agreement).

29

Exhibit 7
Page 1314

"**Claims**" is defined in Section 12.3.

"**Code**" is the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of California; provided, that, to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, or priority of, or remedies with respect to, Bank's Lien on any Collateral is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of California, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies and for purposes of definitions relating to such provisions.

"**Collateral**" is any and all properties, rights and assets of Borrower described on Exhibit A.

"**Collateral Account**" is any Deposit Account, Securities Account, or Commodity Account.

"**Commodity Account**" is any "commodity account" as defined in the Code with such additions to such term as may hereafter be made.

"**Compliance Statement**" is that certain statement in the form attached hereto as Exhibit B.

"**Contingent Obligation**" is, for any Person, any direct or indirect liability, contingent or not, of that Person for (a) any indebtedness, lease, dividend, letter of credit or other obligation of another such as an obligation, in each case, directly or indirectly guaranteed, endorsed, co made, discounted or sold with recourse by that Person, or for which that Person is directly or indirectly liable; (b) any obligations for undrawn letters of credit for the account of that Person; and (c) all obligations from any interest rate, currency or commodity swap agreement, interest rate cap or collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices; but "Contingent Obligation" does not include endorsements in the ordinary course of business. The amount of a Contingent Obligation is the stated or determined amount of the primary obligation for which the Contingent Obligation is made or, if not determinable, the maximum reasonably anticipated liability for it determined by the Person in good faith; but the amount may not exceed the maximum of the obligations under any guarantee or other support arrangement.

"**Control Agreement**" is any control agreement entered into among the depository institution at which Borrower maintains a Deposit Account or the securities intermediary or commodity intermediary at which Borrower maintains a Securities Account or a Commodity Account, Borrower, and Bank pursuant to which Bank obtains control (within the meaning of the Code) over such Deposit Account, Securities Account, or Commodity Account.

"**Conversion Date**" means May 1, 2021; provided that if Bank determines that Borrower has achieved the Tranche Two Milestone, the Conversion Date will automatically be extended to November 1, 2021.

"**Copyrights**" are any and all copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work thereof, whether published or unpublished and whether or not the same also constitutes a trade secret.

"**Credit Extension**" is any Advance, any Growth Capital Advance, any Overadvance, or any other extension of credit by Bank for Borrower's benefit.

"[***]" is defined in Section 6.8(a).

"**Default Rate**" is defined in Section 2.6(b).

30

Exhibit 7
Page 1315

"**Deferred Revenue**" is all amounts received or invoiced in advance of performance under contracts and not yet recognized as revenue.

"**Deposit Account**" is any "**deposit account**" as defined in the Code with such additions to such term as may hereafter be made.

"**Designated Deposit Account**" is the account number ending 2470 (last four digits) maintained by Borrower with Bank (provided, however, if no such account number is included, then the Designated Deposit Account shall be any deposit account of Borrower maintained with Bank as chosen by Bank).

"**Division**" means, in reference to any Person which is an entity, the division of such Person into two (2) or more separate Persons, with the dividing Person either continuing or terminating its existence as part of such division, including, without limitation, as contemplated under Section 18-217 of the Delaware Limited Liability Company Act for limited liability companies formed under Delaware law, or any analogous action taken pursuant to any other applicable law with respect to any corporation, limited liability company, partnership or other entity.

"**Dollar Equivalent**" is, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in a Foreign Currency, the equivalent amount therefor in Dollars as determined by Bank at such time on the basis of the then-prevailing rate of exchange in San Francisco, California, for sales of the Foreign Currency for transfer to the country issuing such Foreign Currency.

"**Dollars**," "**dollars**" or use of the sign "$" means only lawful money of the United States and not any other currency, regardless of whether that currency uses the "$" sign to denote its currency or may be readily converted into lawful money of the United States.

"**Domestic Subsidiary**" means a Subsidiary organized under the laws of the United States or any state or territory thereof or the District of Columbia.

"**EBITDA**" shall mean (a) Net Income, plus (b) Interest Expense, plus (c) to the extent deducted in the calculation of Net Income, depreciation expense and amortization expense, plus (d) income tax expense, plus (e) non-cash stock compensation, plus (f) the total Loss on Extinguishment of Debt.

"**EBITDA Covenant**" is defined in Section 6.9(a).

"**Effective Date**" is defined in the preamble hereof.

"**Eligible Accounts**" means Accounts owing to Borrower which arise in the ordinary course of Borrower's business that meet all Borrower's representations and warranties in Section 5.3, that have been, at the option of Bank, confirmed in accordance with Section 6.3(f) of this Agreement, and are due and owing from Account Debtors deemed creditworthy by Bank in its good faith business judgment. Bank reserves the right at any time after the Effective Date to adjust any of the criteria set forth below and to establish new criteria in its good faith business judgment. Unless Bank otherwise agrees in writing, Eligible Accounts shall not include:

(a)       Accounts (i) for which the Account Debtor is Borrower's Affiliate, officer, employee, investor, or agent, or (ii) that are intercompany Accounts;

(b)       Accounts that the Account Debtor has not paid within ninety (90) days of invoice date regardless of invoice payment period terms;

(c)       Accounts with credit balances over ninety (90) days from invoice date;

(d)       Accounts owing from an Account Debtor if fifty percent (50%) or more of the Accounts owing from such Account Debtor have not been paid within ninety (90) days of invoice date;

31

Exhibit 7
Page 1316

(e)    Accounts owing from an Account Debtor (i) which does not have its principal place of business in the United States or Canada or (ii) whose billing address (as set forth in the applicable invoice for such Account) is not in the United States, unless in the case of both (i) and (ii) such Accounts are Eligible Foreign Accounts;

(f)    Accounts billed from and/or payable to Borrower outside of the United States (sometimes called foreign invoiced accounts);

(g)    Accounts in which Bank does not have a first priority, perfected security interest under all applicable laws;

(h)    Accounts billed and/or payable in a Currency other than Dollars unless converted to Dollars at the time of collection;

(i)    Accounts owing from an Account Debtor to the extent that Borrower is indebted or obligated in any manner to the Account Debtor (as creditor, lessor, supplier or otherwise - sometimes called "contra" accounts, accounts payable, customer deposits or credit accounts);

(j)    Accounts with or in respect of accruals for marketing allowances, incentive rebates, price protection, cooperative advertising and other similar marketing credits, unless otherwise approved by Bank in writing;

(k)    Accounts owing from an Account Debtor which is a United States government entity or any department, agency, or instrumentality thereof unless Borrower has assigned its payment rights to Bank and the assignment has been acknowledged under the Federal Assignment of Claims Act of 1940, as amended;

(l)    Accounts with customer deposits and/or with respect to which Borrower has received an upfront payment, to the extent of such customer deposit and/or upfront payment;

(m)    Accounts for demonstration or promotional equipment, or in which goods are consigned, or sold on a "sale guaranteed", "sale or return", "sale on approval", or other terms if Account Debtor's payment may be conditional;

(n)    Accounts owing from an Account Debtor where goods or services have not yet been rendered to the Account Debtor (sometimes called memo billings or pre-billings);

(o)    Accounts subject to contractual arrangements between Borrower and an Account Debtor where payments shall be scheduled or due according to completion or fulfillment requirements (sometimes called contracts accounts receivable, progress billings, milestone billings, or fulfillment contracts);

(p)    Accounts owing from an Account Debtor the amount of which may be subject to withholding based on the Account Debtor's satisfaction of Borrower's complete performance (but only to the extent of the amount withheld; sometimes called retainage billings);

(q)    Accounts subject to trust provisions, subrogation rights of a bonding company, or a statutory trust;

(r)    Accounts owing from an Account Debtor that has been invoiced for goods that have not been shipped to the Account Debtor unless Bank, Borrower, and the Account Debtor have entered into an agreement acceptable to Bank wherein the Account Debtor acknowledges that (i) it has title to and has ownership of the goods wherever located, (ii) a bona fide sale of the goods has occurred, and (iii) it owes payment for such goods in accordance with invoices from Borrower (sometimes called "bill and hold" accounts);

(s)    Accounts for which the Account Debtor has not been invoiced;

(t)    Accounts that represent non-trade receivables or that are derived by means other than in the ordinary course of Borrower's business;

32

Exhibit 7
Page 1317

(u)       Accounts for which Borrower has permitted Account Debtor's payment to extend beyond ninety (90) days (including Accounts with a due date that is more than ninety (90) days from invoice date);

(v)       Accounts arising from chargebacks, debit memos or other payment deductions taken by an Account Debtor;

(w)       Accounts arising from product returns and/or exchanges (sometimes called "warranty" or "RMA" accounts);

(x)       Accounts in which the Account Debtor disputes liability or makes any claim (but only up to the disputed or claimed amount), or if the Account Debtor is subject to an Insolvency Proceeding (whether voluntary or involuntary), or becomes insolvent, or goes out of business;

(y)       Accounts owing from an Account Debtor with respect to which Borrower has received Deferred Revenue (but only to the extent of such Deferred Revenue);

(z)       Accounts owing from an Account Debtor, whose total obligations to Borrower exceed twenty-five percent (25.0%) of all Accounts, except for [***] for which such percentage is forty-five percent (45%), for the amounts that exceed that percentage; and

(aa)       Accounts for which Bank in its good faith business judgment determines collection to be doubtful, including, without limitation, accounts represented by "refreshed" or "recycled" invoices

"**Eligible Foreign Accounts**" are Accounts for which the Account Debtor does not have its principal place of business in the United States or Canada or are billed and/or payable outside of the United States and which (a)(i) otherwise satisfy the definition of Eligible Accounts and (ii) are due and owing from Cheeky Rascals Limited, or Danish by Design Pty Ltd., or (b) are approved by Bank in writing on a case-by-case basis.

"**Eligible Inventory**" means Inventory that meets all of Borrower's representations and warranties in Section 5.3 and is otherwise acceptable to Bank in all respects.

"**Eligible Inventory Cap**" is Ten Million Dollars ($10,000,000).

"**Equipment**" is all "**equipment**" as defined in the Code with such additions to such term as may hereafter be made, and includes without limitation all machinery, fixtures, goods, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing.

"**ERISA**" is the Employee Retirement Income Security Act of 1974, and its regulations.

"**Event of Default**" is defined in Section 8.

"**Exchange Act**" is the Securities Exchange Act of 1934, as amended.

"**Existing Growth Capital Advance**" and "**Existing Growth Capital Advances**" are each defined in Recital A.

"**Financial Statement Repository**" is each of (a) the folder under Bank's cloud storage account or such other means of collecting information approved and designated by Bank after providing notice thereof to Borrower from time to time and (b) Bank's online banking platform as described in Section 6.12.

"**Foreign Currency**" means lawful money of a country other than the United States.

"**Funding Date**" is any date on which a Credit Extension is made to or for the account of Borrower which shall be a Business Day.

33

Exhibit 7
Page 1318

"**FX Contract**" is any foreign exchange contract by and between Borrower and Bank under which Borrower commits to purchase from or sell to Bank a specific amount of Foreign Currency on a specified date.

"**GAAP**" is generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other Person as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination.

"**General Intangibles**" is all "general intangibles" as defined in the Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation, all Intellectual Property, claims, income and other tax refunds, security and other deposits, payment intangibles, contract rights, options to purchase or sell real or personal property, rights in all litigation presently or hereafter pending (whether in contract, tort or otherwise), insurance policies (including without limitation key man, property damage, and business interruption insurance), payments of insurance and rights to payment of any kind.

"**Governmental Approval**" is any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"**Governmental Authority**" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"**Gross Profit**" means, with respect to any period, the gross profit of Borrower as determined in accordance with GAAP consistently applied.

"**Growth Capital Advance**" is defined in Section 2.4.

"**Growth Capital Advance Commitment Fee**" is defined in Section 2.7(b).

"**Growth Capital Commitment Amount**" is Ten Million Dollars ($10,000,000).

"**Growth Capital Maturity Date**" is April 1, 2024.

"**Growth Capital Repayment Period**" is a period of time, for each Growth Capital Advance, equal to thirty-six (36) months commencing on the Conversion Date and continuing through the Growth Capital Maturity Date; provided however, if Bank determines that Borrower has achieved the Tranche Two Milestone, then the Growth Capital Repayment Period shall be equal to thirty (30) months.

"**Guarantor**" is any Person providing a Guaranty in favor of Bank.

"**Guaranty**" is any guarantee of all or any part of the Obligations, as the same may from time to time be amended, restated, modified or otherwise supplemented.

"**Indebtedness**" is (a) indebtedness for borrowed money or the deferred price of property or services, such as reimbursement and other obligations for surety bonds and letters of credit, (b) obligations evidenced by notes, bonds, debentures or similar instruments, (c) capital lease obligations, and (d) Contingent Obligations.

"**Indemnified Person**" is defined in Section 12.3.

"**Insolvency Proceeding**" is any proceeding by or against any Person under the United States Bankruptcy Code, or any other bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

34

Exhibit 7
Page 1319

"**Intellectual Property**" means, with respect to any Person, all of such Person's right, title, and interest in and to the following:

(a)    its Copyrights, Trademarks and Patents;

(b)    any and all trade secrets and trade secret rights, including, without limitation, any rights to unpatented inventions, know-how, and operating manuals;

(c)    any and all object or source code;

(d)    any and all design rights which may be available to such Person;

(e)    any and all claims for damages by way of past, present and future infringement of any of the foregoing, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the Intellectual Property rights identified above; and

(f)    all amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents.

"**Interest Expense**" means for any fiscal period, interest expense (whether cash or non-cash) determined in accordance with GAAP for the relevant period ending on such date, including, in any event, interest expense with respect to any Credit Extension and other Indebtedness of Borrower and its Subsidiaries, including, without limitation or duplication, all commissions, discounts, or related amortization and other fees and charges with respect to letters of credit and bankers' acceptance financing and the net costs associated with interest rate swap, cap, and similar arrangements, and the interest portion of any deferred payment obligation (including leases of all types).

"**Interest-Only Period**" is, for each Growth Capital Advance, from the date of such Growth Capital Advance through April 30, 2021; provided that if Bank has determined that Borrower has achieved the Performance Milestone, then the Interest-Only Period will automatically be extended through October 31, 2021.

"**In-Transit Inventory**" is defined in Section 5.3(c).

"**Inventory**" is all "**inventory**" as defined in the Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of Borrower's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"**Inventory Advance Rate**" is the lesser of (x) seventy-five percent (75%) of Borrower's Eligible Inventory (valued at the lower of cost or wholesale fair market value) and (y) (i) the OLV Percentage multiplied by (ii) Borrower's Eligible Inventory (valued at the lower of cost or wholesale fair market value).

"**Investment**" is any beneficial ownership interest in any Person (including stock, partnership interest or other securities), and any loan, advance or capital contribution to any Person.

"**IP Agreement**" is that certain Intellectual Property Security Agreement between Borrower and Bank dated as of the Effective Date, as may be amended, modified or restated from time to time.

"**Key Person**" is Borrower's President, Mike Abbott, as of the Effective Date.

"[***]" is defined in Section 6.8(a).

"**Letter of Credit**" is a standby or commercial letter of credit issued by Bank upon request of Borrower based upon an application, guarantee, indemnity, or similar agreement.

35

Exhibit 7
Page 1320

"**Lien**" is a claim, mortgage, deed of trust, levy, charge, pledge, security interest or other encumbrance of any kind, whether voluntarily incurred or arising by operation of law or otherwise against any property.

"**Liquidity**" is, on any date, (a) Borrower's unrestricted and unencumbered cash maintained with Bank and its Affiliates, plus (b) the Availability Amount.

"**Liquidity Covenant**" is defined in Section 6.9(b).

"**Liquidity Event**" means (a) an initial public offering of Borrower's equity securities, or (ii) any sale or merger of the voting securities of Borrower where the holders of Borrower's securities before the transaction beneficially own less than 50% of the outstanding voting securities of the surviving entity after the transaction, (iii) the sale of all or substantially all of Borrower's assets.

"**Loan Documents**" are, collectively, this Agreement and any schedules, exhibits, certificates, notices, and any other documents related to this Agreement, the Warrant, the IP Agreement, any Bank Services Agreement, any subordination agreement, any note, or notes or guaranties executed by Borrower or any Guarantor, and any other present or future agreement by Borrower and/or any Guarantor with or for the benefit of Bank, all as amended, restated, or otherwise modified.

"**Loss on Extinguishment of Debt**" means, the sum of (i) those certain losses incurred by Borrower on Accounts #28211, #28215 and #25021, totaling $79,595, plus (ii) the amount of the Growth Capital Advance Commitment Fee paid by Borrower to Bank on the Effective Date, plus (iii) the amount of the Revolving Line Commitment Fee paid by Borrower to Bank on the Effective Date.

"**Material Adverse Change**" is (a) a material impairment in the perfection or priority of Bank's Lien in the Collateral or in the value of such Collateral; (b) a material adverse change in the business, operations, or condition of Borrower; (c) a material impairment of the prospect of repayment of any portion of the Obligations; or (d) Bank determines, based upon information available to it and in its reasonable judgment, that there is a reasonable likelihood that Borrower shall fail to comply with one or more of the financial covenants in Section 6 during the next succeeding financial reporting period.

"**Monthly Financial Statements**" is defined in Section 6.2(b).

"**Net Income**" means, as calculated on a consolidated basis for Borrower and its Subsidiaries for any period as at any date of determination, the net profit (or loss), after provision for taxes, of Borrower and its Subsidiaries for such period taken as a single accounting period.

"**Obligations**" are Borrower's obligations to pay when due any debts, principal, interest, fees, Bank Expenses, the Prepayment Fee, the Anniversary Fee, the Unused Revolving Line Facility Fee, and other amounts Borrower owes Bank now or later, whether under this Agreement, the other Loan Documents (other than the Warrant), or otherwise, including, without limitation, all obligations relating to Bank Services and interest accruing after Insolvency Proceedings begin and debts, liabilities, or obligations of Borrower assigned to Bank, and to perform Borrower's duties under the Loan Documents (other than the Warrant).

"**OLV Percentage**" means, for a measurement period, the percentage obtained by dividing (i) the value of Eligible Inventory based on the orderly liquidation value as determined by the most recent periodic inventory appraisal satisfactory to Bank by (ii) the value of such Eligible Inventory on Borrower's Books for such measurement period.

"**Operating Documents**" are, for any Person, such Person's formation documents, as certified by the Secretary of State (or equivalent agency) of such Person's jurisdiction of organization on a date that is no earlier than thirty (30) days prior to the Effective Date, and, (a) if such Person is a corporation, its bylaws in current form, (b) if such Person is a limited liability company, its limited liability company agreement (or similar agreement), and (c) if such Person is a partnership, its partnership agreement (or similar agreement), each of the foregoing with all current amendments or modifications thereto.

Exhibit 7
Page 1321

"**Overadvance**" is defined in Section 2.5.

"**Patents**" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"**Payment/Advance Form**" is that certain form in the form attached hereto as <u>Exhibit C</u>.

"**Payment Date**" is (a) with respect to the Growth Capital Advances, the first (1st) calendar day of each month and (b) with respect to Advances, the last calendar day of each month.

"**[***]**" is defined in Section 6.8(a).

"**Perfection Certificate**" is defined in Section 5.1.

"**Permitted Indebtedness**" is:

      (a)      Borrower's Indebtedness to Bank under this Agreement and the other Loan Documents;

      (b)      Indebtedness existing on the Effective Date which is shown on the Perfection Certificate;

      (c)      Subordinated Debt;

      (d)      unsecured Indebtedness to trade creditors incurred in the ordinary course of business;

      (e)      Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business;

      (f)      Indebtedness secured by Liens permitted under clauses (a) and (c) of the definition of "Permitted Liens" hereunder; and

      (g)      extensions, refinancings, modifications, amendments and restatements of any items of Permitted Indebtedness (a) through (f) above, provided that the principal amount thereof is not increased or the terms thereof are not modified to impose more burdensome terms upon Borrower or its Subsidiary, as the case may be.

"**Permitted Investments**" are:

      (a)      Investments (including, without limitation, Subsidiaries) existing on the Effective Date which are shown on the Perfection Certificate;

      (b)      Investments consisting of Cash Equivalents;

      (c)      Investments consisting of the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of Borrower;

      (d)      Investments consisting of deposit accounts in which Bank has a perfected security interest;

      (e)      Investments accepted in connection with Transfers permitted by Section 7.1;

      (f)      Investments (i) by Borrower in Subsidiaries not to exceed Three Hundred Thousand Dollars ($300,000) in the aggregate in any fiscal year and (ii) by Subsidiaries in other Subsidiaries not to exceed Three Hundred Thousand Dollars ($300,000) in the aggregate in any fiscal year or in Borrower;

      (g)      Investments consisting of (i) travel advances and employee relocation loans and other employee loans and advances in the ordinary course of business, and (ii) loans to employees, officers or directors relating to the purchase of equity securities of Borrower or its Subsidiaries pursuant to employee stock purchase plans or agreements approved by Borrower's Board of Directors;

37

Exhibit 7
Page 1322

(h)        Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of business; and

(i)        Investments consisting of notes receivable of, or prepaid royalties and other credit extensions, to customers and suppliers who are not Affiliates, in the ordinary course of business; provided that this paragraph (i) shall not apply to Investments of Borrower in any Subsidiary.

"**Permitted Liens**" are:

(a)        Liens existing on the Effective Date which are shown on the Perfection Certificate or arising under this Agreement or the other Loan Documents;

(b)        Liens for taxes, fees, assessments or other government charges or levies, either (i) not due and payable or (ii) being contested in good faith and for which Borrower maintains adequate reserves on Borrower's Books, provided that no notice of any such Lien has been filed or recorded under the Internal Revenue Code of 1986, as amended, and the Treasury Regulations adopted thereunder;

(c)        purchase money Liens (i) on Equipment acquired or held by Borrower incurred for financing the acquisition of the Equipment securing no more than Two Hundred Fifty Thousand Dollars ($250,000) in the aggregate amount outstanding, or (ii) existing on Equipment when acquired, if the Lien is confined to the property and improvements and the proceeds of the Equipment;

(d)        Liens of carriers, warehousemen, suppliers, or other Persons that are possessory in nature arising in the ordinary course of business so long as such Liens attach only to Inventory, securing liabilities in the aggregate amount not to exceed Five Hundred Thousand Dollars ($500,000) and which are not delinquent or remain payable without penalty or which are being contested in good faith and by appropriate proceedings which proceedings have the effect of preventing the forfeiture or sale of the property subject thereto;

(e)        Liens to secure payment of workers' compensation, employment insurance, old-age pensions, social security and other like obligations incurred in the ordinary course of business (other than Liens imposed by ERISA);

(f)        Liens incurred in the extension, renewal or refinancing of the Indebtedness secured by Liens described in (a) through (c), but any extension, renewal or replacement Lien must be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness may not increase;

(g)        leases or subleases of real property granted in the ordinary course of Borrower's business (or, if referring to another Person, in the ordinary course of such Person's business), and leases, subleases, non-exclusive licenses or sublicenses of personal property (other than Intellectual Property) granted in the ordinary course of Borrower's business (or, if referring to another Person, in the ordinary course of such Person's business), if the leases, subleases, licenses and sublicenses do not prohibit granting Bank a security interest therein;

(h)        non-exclusive licenses of Intellectual Property granted to third parties in the ordinary course of business;

(i)        Liens arising from attachments or judgments, orders, or decrees in circumstances not constituting an Event of Default under Sections 8.4 and 8.7; and

(j)        Liens in favor of other financial institutions arising in connection with Borrower's deposit and/or securities accounts held at such institutions, provided that Bank has a perfected security interest in the amounts held in such deposit and/or securities accounts.

38

Exhibit 7
Page 1323

"**Person**" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"**Prepayment Fee**" shall be an additional fee, payable to Bank, with respect to each Growth Capital Advance, in an amount equal to (a) if such prepayment occurs on or prior to the first (1st) anniversary of the Funding Date of such Growth Capital Advance, three percent (3.0%) of the outstanding principal balance of such Growth Capital Advance, (b) if such prepayment occurs after the first (1st) anniversary of the Funding Date of such Growth Capital Advance, but on or prior to the second (2nd) anniversary of such Growth Capital Advance, two percent (2.0%) of the outstanding principal balance of such Growth Capital Advance, or (c) if such prepayment occurs after the second (2nd) anniversary of the Funding Date of such Growth Capital Advance, one percent (1.0%) of the outstanding principal balance of such Growth Capital Advance.

"**Prime Rate**" is the rate of interest per annum from time to time published in the money rates section of The Wall Street Journal or any successor publication thereto as the "prime rate" then in effect; provided that, in the event such rate of interest is less than zero, such rate shall be deemed to be zero for purposes of this Agreement; and provided further that if such rate of interest, as set forth from time to time in the money rates section of The Wall Street Journal, becomes unavailable for any reason as determined by Bank, the "Prime Rate" shall mean the rate of interest per annum announced by Bank as its prime rate in effect at its principal office in the State of California (such Bank announced Prime Rate not being intended to be the lowest rate of interest charged by Bank in connection with extensions of credit to debtors); provided that, in the event such rate of interest is less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"**Prior Loan Agreement**" is defined in Recital A.

"**Registered Organization**" is any "registered organization" as defined in the Code with such additions to such term as may hereafter be made.

"**Requirement of Law**" is as to any Person, the organizational or governing documents of such Person, and any law (statutory or common), treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Reserves**" means, as of any date of determination, such amounts as Bank may from time to time establish and revise in its good faith business judgment, including, but not limited to, the Accounts Payable Reserve, reducing the amount of Advances and other financial accommodations which would otherwise be available to Borrower (a) to reflect events, conditions, contingencies or risks which, as determined by Bank in its good faith business judgment, do or may adversely affect (i) the Collateral or any other property which is security for the Obligations or its value (including without limitation any increase in delinquencies of Accounts), (ii) the assets, business or prospects of Borrower or any Guarantor, or (iii) the security interests and other rights of Bank in the Collateral (including the enforceability, perfection and priority thereof); or (b) to reflect Bank's reasonable belief that any collateral report or financial information furnished by or on behalf of Borrower or any Guarantor to Bank is or may have been incomplete, inaccurate or misleading in any material respect; or (c) in respect of any state of facts which Bank determines constitutes an Event of Default or may, with notice or passage of time or both, constitute an Event of Default.

"**Responsible Officer**" is any of the Chief Executive Officer, President, and Chief Financial Officer of Borrower.

"**Restricted License**" is any material license or other agreement with respect to which Borrower is the licensee (a) that prohibits or otherwise restricts Borrower from granting a security interest in Borrower's interest in such license or agreement or any other property, or (b) for which a default under or termination of could interfere with Bank's right to sell any Collateral.

"**Revolving Line**" is an aggregate principal amount equal to Twelve Million Five Hundred Thousand Dollars ($12,500,000).

39

Exhibit 7
Page 1324

"**Revolving Line Commitment Fee**" is defined in Section 2.7(a).

"**Revolving Line Maturity Date**" is April 22, 2022.

"**SEC**" shall mean the Securities and Exchange Commission, any successor thereto, and any analogous Governmental Authority.

"**Securities Account**" is any "**securities account**" as defined in the Code with such additions to such term as may hereafter be made.

"[***]" is defined in Section 6.8(a).

"**Specified Affiliate**" is any Person (a) more than ten percent (10.0%) of whose aggregate issued and outstanding equity or ownership securities or interests, voting, non-voting or both, are owned or held directly or indirectly, beneficially or of record, by Borrower, and/or (b) whose equity or ownership securities or interests representing more than ten percent (10.0%) of such Person's total outstanding combined voting power are owned or held directly or indirectly, beneficially or of record, by Borrower.

"[***]" is defined in Section 6.8(a).

"**Streamline Period**" is, provided no Event of Default has occurred and is continuing, the period (a) commencing on the first (1st) day of the month following the day that Borrower provides to Bank a written report that Borrower's Liquidity, for each consecutive day in the immediately preceding month, as determined by Bank in its discretion, is equal to or greater than Seven Million Dollars ($7,000,000) (the "**Streamline Threshold**"); and (b) terminating on the earlier to occur of (i) the occurrence of an Event of Default, and (ii) the first (1st) day thereafter in which Borrower fails to maintain the Streamline Threshold, as determined by Bank in its discretion. Upon the termination of a Streamline Period, Borrower must maintain the Streamline Threshold each consecutive day for one (1) fiscal quarter as determined by Bank in its discretion, prior to entering into a subsequent Streamline Period. Borrower shall give Bank prior written notice of Borrower's election to enter into any such Streamline Period, and each such Streamline Period shall commence on the first (1st) day of the month following the date Bank determines, in its reasonable discretion, that the Streamline Threshold has been achieved.

"**Streamline Threshold**" is defined in the definition of Streamline Period.

"**Subordinated Debt**" is indebtedness incurred by Borrower subordinated to all of Borrower's now or hereafter indebtedness to Bank (pursuant to a subordination, intercreditor, or other similar agreement in form and substance satisfactory to Bank entered into between Bank and the other creditor), on terms acceptable to Bank.

"**Subsidiary**" is, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless the context otherwise requires, each reference to a Subsidiary herein shall be a reference to a Subsidiary of Borrower or Guarantor.

"**Trademarks**" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower connected with and symbolized by such trademarks.

"**Tranche One Growth Capital Advance**" is defined in Section 2.4(a).

"**Tranche Two Draw Period**" is, subject to Bank determining that Borrower has achieved the Tranche Two Milestone, the period of time commencing on December 31, 2020 and continuing through the earlier to occur of (a) June 30, 2021, and (b) the occurrence and continuance of an Event of Default. (For the avoidance of doubt, any Events of Default waived by Bank or cured within the applicable cure periods specified by Bank shall not irrevocably terminate the Tranche Two Draw Period.)

40

Exhibit 7
Page 1325

"**Tranche Two Milestone**" is Bank's receipt, no later than April 30, 2021, of evidence in form and substance satisfactory to Bank in its sole and absolute discretion, which determination shall be made in its good faith business discretion, that the aggregate amount of Borrower's Gross Profit for the fiscal year ending December 31, 2020 is at least Thirty-Eight Million Three Hundred Thousand Dollars ($38,300,000).

"**Transfer**" is defined in Section 7.1.

"**Unused Revolving Line Facility Fee**" is defined in Section 2.7(d).

"**Warehouse Inventory**" is defined in Section 5.3(c).

"**Warrant**" means, individually and collectively, (a) Warrant to Purchase Common Stock dated as of February 14, 2017 executed by Borrower in favor of Bank, (b) the Warrant to Purchase Common Stock dated as of December 21, 2017 executed by Borrower in favor of Bank, (c) the Warrant to Purchase Common Stock dated as of October 25, 2018 executed by Borrower in favor of Bank, (d) the Warrant to Purchase Common Stock dated as of March 27, 2019 executed by Borrower in favor of Bank, (e) the Warrant to Purchase Common Stock dated as of the July 24, 2019 executed by Borrower in favor of Bank, and (f) the 2020 Warrant, each as may be amended, modified, supplemented and/or restated from time to time.

"[***]" is defined in Section 6.8(a).

[Signature page follows.]

41

Exhibit 7
Page 1326

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Effective Date.

**BORROWER**:

OWLET BABY CARE INC.

By:     /s/ Mike Abbott
      Name:  Mike Abbott
      Title:    President

**BANK**:

SILICON VALLEY BANK

By:     /s/ Jordan Rigberg
      Name:  Jordan Rigberg
      Title:    Vice President

[Signature Page to Second Amended and Restated Loan and Security Agreement]

Exhibit 7
Page 1327

**EXHIBIT A - COLLATERAL DESCRIPTION**

The Collateral consists of all of Borrower's right, title and interest in and to the following personal property:

All goods, Accounts (including health-care receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, Intellectual Property, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, certificates of deposit, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and

All Borrower's Books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

A-1

Exhibit 7
Page 1328

**EXHIBIT B**
COMPLIANCE STATEMENT

TO:     SILICON VALLEY BANK         Date: _____
FROM:   OWLET BABY CARE INC.

      Under the terms and conditions of the Second Amended and Restated Loan and Security Agreement between Borrower and Bank (the "**Agreement**"), Borrower is in complete compliance for the period ending _____ with all required covenants except as noted below. Attached are the required documents evidencing such compliance, setting forth calculations prepared in accordance with GAAP consistently applied from one period to the next except as explained in an accompanying letter or footnotes. The undersigned acknowledges that no borrowings may be requested at any time or date of determination that Borrower is not in compliance with any of the terms of the Agreement, and that compliance is determined not just at the date this Compliance Statement is delivered. Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Agreement.

**Please indicate compliance status by circling Yes/No under "Complies" column.**

| <u>Reporting Covenants</u> | <u>Required</u> | <u>Complies</u> |
|---|---|---|
| | | |
| Monthly financial statements with Compliance Statement | Monthly within 30 days | Yes  No |
| Annual financial statements (CPA Audited) | FYE within 180 days | Yes  No |
| 10-Q, 10-K and 8-K | Within 5 days after filing with SEC | Yes  No |
| A/R & A/P Agings; Sell Through Report; Deferred Revenue Report; General Ledger | Monthly within 30 days | Yes  No |
| Borrowing Base Statements; A/R Ledger Aging Report; Inventory Report | Weekly on Friday of each week*/ monthly within 7 days of month end, and on each Advance request | Yes  No |
| 409(a) valuation report | Within 30 days after completion | Yes  No |
| Annual budget and board-approved projections | The earlier of (a) January 31 of each year or (b) 15 days after Board approval | Yes  No |
| Copies of Statements for [***] | Monthly within 30 days | Yes  No |
| *When Streamline Period is not in effect | | |
| | | |
| | | |

The following Intellectual Property not previously disclosed to Bank was registered after the Effective Date (if no registrations, state "None")

_____

B-1

Exhibit 7
Page 1329

| Financial Covenant | Required | Actual | Complies |
|---|---|---|---|
| | | | |
| Maintain at least one of the following two financial covenants, as of the last day of each month; provided however, for the month ending on December 31, 2020, Borrower shall maintain the EBITDA Covenant as set forth below: | | | |
| Maximum negative cumulative EBITDA on a year-to-date basis (tested monthly): | [***] | $_____ | Yes  No |
| | | | |
| Minimum Liquidity | [***] | $_____ | Yes  No |

| Streamline Period Eligibility and Performance Pricing | | | |
|---|---|---|---|
| Liquidity | Streamline Period | Interest Rate for Advances | Applies |
| Liquidity ≥ $7,000,000 | Yes | *Greater of (i) Prime + 0.75% or (ii) 5.50%* | Yes  No |
| Liquidity < $7,000,000 | No | Greater of (i) Prime + 1.25% or (ii) 6.00% | Yes  No |

The following financial covenant analyses, streamline period eligibility analysis and information set forth in Schedule 1 attached hereto are true and accurate as of the date of this Compliance Statement.

The following are the exceptions with respect to the statements above: (If no exceptions exist, state "No exceptions to note.")

_____

_____

_____

B-2

Exhibit 7
Page 1330

**Schedule 1 to Compliance Statement**

**Financial Covenants of Borrower**

In the event of a conflict between this Schedule and the Agreement, the terms of the Agreement shall govern.

Dated: _____

Maintain at least one of the following two financial covenants set forth below, as of the last day of each month, on a consolidated basis with respect to Borrower and its Subsidiaries; <u>provided however</u>, for the month ending on December 31, 2020, Borrower shall maintain the EBITDA Covenant:

I.      **Maximum Negative Cumulative EBITDA** (EBITDA Covenant — Section 6.9(a))

Required:        Not more negative than [***] on a calendar year-to-date basis.

Actual:

| | | | |
|---|---|---|---|
| A. | Net Income of Borrower and its Subsidiaries (the net profit (or loss), after provision for taxes, of Borrower and its Subsidiaries for such period taken as a single accounting period) | $ | _____ |
| B. | Interest expense (determined in accordance with GAAP) | $ | _____ |
| C. | To the extent deducted in the calculation of Net Income | | |
| | 1.  Depreciation expense | $ | _____ |
| | 2.  Amortization expense | $ | _____ |
| | 3.  The sum of lines 1 through 2 | $ | _____ |
| D. | Income tax expense | $ | _____ |
| E. | Non-cash stock compensation | $ | _____ |
| F. | Total Loss on Extinguishment of Debt | $ | _____ |
| G. | EBITDA (line A plus line B plus line C.3 plus line D plus line E plus line F) | $ | _____ |

Is line G not more negative than [***] on a calendar year-to-date basis for the applicable month end (other than for the month ending December 31, 2020)?

_____   No, continue to Liquidity calculation _____   Yes, in compliance with Section 6.9

Is line G not more negative than [***] on a calendar year-to-date basis for the month ending December 31, 2020?

_____   No, not in compliance with Section 6.9_____   Yes, in compliance with Section 6.9

II.     **Minimum Liquidity** (Liquidity Covenant — Section 6.9(b))

Required: ≥ [***]

Actual: $ _____

| | | |
|---|---|---|
| A. | Aggregate amount of unrestricted and unencumbered cash held at such time by Borrower in accounts maintained with Bank or its affiliates | $_____ |
| B. | The lesser of (i) the Revolving Line or (ii) the amount available under the Borrowing Base | $_____ |
| C. | The outstanding principal balance of any Advances | $_____ |
| D. | Availability Amount (Line B minus Line C) | $_____ |
| E. | Liquidity (line A plus line D) | |

Is line E equal to or greater than [***] for the applicable month end (other than for the month ending December 31, 2020)?

_____   No, not in compliance with Section 6.9 _____   Yes, in compliance with Section 6.9

B-3

Exhibit 7
Page 1331

**Streamline Period Eligibility**

In the event of a conflict between this Schedule and the Loan Agreement, the terms of the Loan Agreement shall govern.

Dated: _____

    **Liquidity** (definition of Streamline Period in Section 13.1)

Required: ≥$7,000,000

Actual: $_____

| | | |
|---|---|---|
| A. | Aggregate amount of unrestricted and unencumbered cash held at such time by Borrower in accounts maintained with Bank or its affiliates | $_____ |
| B. | The lesser of (i) the Revolving Line or (ii) the amount available under the Borrowing Base | $_____ |
| C. | The outstanding principal balance of any Advances | $_____ |
| D. | Availability Amount (Line B minus Line C) | $_____ |
| E. | Liquidity (line A plus line D) | |

Is line E equal to or greater than $7,000,000?

_____ No, Streamline Period is not in effect    _____ Yes, Streamline Period is in effect

B-4

Exhibit 7
Page 1332

**EXHIBIT C**

**LOAN PAYMENT/ADVANCE REQUEST FORM**

**DEADLINE FOR SAME DAY PROCESSING IS NOON PACIFIC TIME**

Fax To: _____                    Date: _____

---

**LOAN PAYMENT:**

OWLET BABY CARE INC.

From Account # _____        To Account # _____
              (Deposit Account #)                              (Loan Account #)

Principal $ _____            and/or Interest $ _____

Authorized Signature: _____    Phone Number: _____
Print Name/Title: _____

---

**LOAN ADVANCE:**

Complete *Outgoing Wire Request* section below if all or a portion of the funds from this loan advance are for an outgoing wire.

From Account # _____        To Account # _____
              (Loan Account #)                              (Deposit Account #)

Amount of Growth Capital
Advance $ _____

All Borrower's representations and warranties in the Second Amended and Restated Loan and Security Agreement are true, correct and complete in all material respects on the date of the request for an advance; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date:

Authorized Signature: _____    Phone Number: _____
Print Name/Title: _____

---

C-1

Exhibit 7
Page 1333

**OUTGOING WIRE REQUEST:**

**Complete only if all or a portion of funds from the loan advance above is to be wired.**

Deadline for same day processing is noon, Pacific Time

Beneficiary Name: _____        Amount of Wire: $ _____
Beneficiary Bank: _____        Account Number: _____
City and State: _____

Beneficiary Bank Transit (ABA) #: _____        Beneficiary Bank Code (Swift, Sort, Chip, etc.): _____

**(For International Wire Only)**

Intermediary Bank: _____        Transit (ABA) #: _____
For Further Credit to: _____

Special Instruction: _____

*By signing below, I (we) acknowledge and agree that my (our) funds transfer request shall be processed in accordance with and subject to the terms and conditions set forth in the agreements(s) covering funds transfer service(s), which agreements(s) were previously received and executed by me (us).*

Authorized Signature: _____        2nd Signature (if required): _____
Print Name/Title: _____        Print Name/Title: _____
Telephone #: _____        Telephone #: _____

C-2

Exhibit 7
Page 1334

**Exhibit 10.15(a)**

**FIRST AMENDMENT TO**
**SECOND AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT**

**THIS FIRST AMENDMENT TO SECOND AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT** (this "**Amendment**") is entered into this 23rd day of April, 2020, but effective as of April 22, 2020, by and between **SILICON VALLEY BANK**, a California corporation ("**Bank**") and **OWLET BABY CARE INC.**, a Delaware corporation ("**Borrower**").

RECITALS

A.        Bank and Borrower have entered into that certain Second Amended and Restated Loan and Security Agreement dated as of April 22, 2020 (as the same may from time to time be amended, modified, supplemented or restated, the "**Loan Agreement**").

B.        Bank has extended credit to Borrower for the purposes permitted in the Loan Agreement.

C.        Borrower has requested that Bank amend the Loan Agreement to make certain revisions to the Loan Agreement as more fully set forth herein.

D.        Bank has agreed to so amend certain provisions of the Loan Agreement, but only to the extent, in accordance with the terms, subject to the conditions and in reliance upon the representations and warranties set forth below.

AGREEMENT

**Now, THEREFORE,** in consideration of the foregoing recitals and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

1.        **Definitions.** Capitalized terms used but not defined in this Amendment shall have the meanings given to them in the Loan Agreement.

2.        **Amendments to Loan Agreement.**

    2.1        **Section 13 (Definitions).** The term "Interest-Only Period" and its definition set forth in Section 13.1 of the Loan Agreement is hereby amended by deleting it in its entirety and replacing it with the following:

        "**Interest-Only Period**" is, for each Growth Capital Advance, from the date of such Growth Capital Advance through April 30, 2021; provided that if Bank has determined that Borrower has achieved the Tranche Two Milestone, then the Interest-Only Period will automatically be extended through October 31, 2021.

Exhibit 7
Page 1335

3.    **Limitation of Amendment**.

3.1    The amendment set forth in Section 2, above, is effective for the purposes set forth herein and shall be limited precisely as written and shall not be deemed to (a) be a consent to any amendment, waiver or modification of any other term or condition of any Loan Document, or (b) otherwise prejudice any right or remedy which Bank may now have or may have in the future under or in connection with any Loan Document.

3.2    This Amendment shall be construed in connection with and as part of the Loan Documents and all terms, conditions, representations, warranties, covenants and agreements set forth in the Loan Documents, except as herein amended, are hereby ratified and confirmed and shall remain in full force and effect.

3.3    In addition to those Events of Default specifically enumerated in the Loan Documents, the failure to comply with the terms of any covenant or agreement contained herein shall constitute an Event of Default and shall entitle the Bank to exercise all rights and remedies provided to the Bank under the terms of any of the other Loan Documents as a result of the occurrence of the same.

4.    **Representations and Warranties.** To induce Bank to enter into this Amendment, Borrower hereby represents and warrants to Bank as follows:

4.1    Immediately after giving effect to this Amendment (a) the representations and warranties contained in the Loan Documents are true, accurate and complete in all material respects as of the date hereof (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such date), and (b) no Event of Default has occurred and is continuing;

4.2    Borrower has the power and authority to execute and deliver this Amendment and to perform its obligations under the Loan Agreement, as amended by this Amendment;

4.3    The organizational documents of Borrower delivered to Bank on the Effective Date remain true, accurate and complete and have not been amended, supplemented or restated and are and continue to be in full force and effect;

4.4    The execution and delivery by Borrower of this Amendment and the performance by Borrower of its obligations under the Loan Agreement, as amended by this Amendment, have been duly authorized;

4.5    The execution and delivery by Borrower of this Amendment and the performance by Borrower of its obligations under the Loan Agreement, as amended by this Amendment, do not and will not contravene (a) any law or regulation binding on or affecting Borrower, (b) any contractual restriction with a Person binding on Borrower, (c) any order, judgment or decree of any court or other governmental or public body or authority, or subdivision thereof, binding on Borrower, or (d) the organizational documents of Borrower;

2

Exhibit 7
Page 1336

4.6      The execution and delivery by Borrower of this Amendment and the performance by Borrower of its obligations under the Loan Agreement, as amended by this Amendment, do not require any order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by any governmental or public body or authority, or subdivision thereof, binding on Borrower, except as already has been obtained or made; and

4.7      This Amendment has been duly executed and delivered by Borrower and is the binding obligation of Borrower, enforceable against Borrower in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, liquidation, moratorium or other similar laws of general application and equitable principles relating to or affecting creditors' rights.

5.      **Integration**. This Amendment and the Loan Documents represent the entire agreement about this subject matter and supersede prior negotiations or agreements. All prior agreements, understandings, representations, warranties, and negotiations between the parties about the subject matter of this Amendment and the Loan Documents merge into this Amendment and the Loan Documents.

6.      **Counterparts.** This Amendment may be executed in any number of counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument.

7.      **Effectiveness**. This Amendment shall be deemed effective as of April 22, 2020 upon the due execution and delivery to Bank of this Amendment by each party hereto.

[Signature page follows.]

3

Exhibit 7
Page 1337

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered as of the date first written above.

**BORROWER**:

OWLET BABY CARE INC.

By:  /s/ Michael Abbott
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    Name: Michael Abbott
    Title:  President and Chief Financial Officer

**BANK**:

SILICON VALLEY BANK

By:  /s/ Jordan Rigberg
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    Name: Jordan Rigberg
    Title:  Vice President

[Signature Page to First Amendment to Second Amended and Restated Loan and Security Agreement]

Exhibit 7
Page 1338

Exhibit 10.15(b)

**SECOND AMENDMENT TO**
**SECOND AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT**

THIS SECOND AMENDMENT TO SECOND AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT (this "**Amendment**") is entered into this 22nd day of September, 2020 by and between **SILICON VALLEY BANK**, a California corporation ("**Bank**") and **OWLET BABY CARE INC.**, a Delaware corporation ("**Borrower**").

**RECITALS**

A.       Bank and Borrower have entered into that certain Second Amended and Restated Loan and Security Agreement dated as of April 22, 2020, as amended by that certain First Amendment to Second Amended and Restated Loan and Security Agreement by and between Bank and Borrower dated as of April 23, 2020, but effective as of April 22, 2020 (as the same may from time to time be further amended, modified, supplemented or restated, the "**Loan Agreement**").

B.       Bank has extended credit to Borrower for the purposes permitted in the Loan Agreement.

C.       Borrower has requested that Bank amend the Loan Agreement to make certain revisions to the Loan Agreement as more fully set forth herein.

D.       Bank has agreed to so amend certain provisions of the Loan Agreement, but only to the extent, in accordance with the terms, subject to the conditions and in reliance upon the representations and warranties set forth below.

**AGREEMENT**

Now, **THEREFORE,** in consideration of the foregoing recitals and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

1.       **Definitions.** Capitalized terms used but not defined in this Amendment shall have the meanings given to them in the Loan Agreement.

2.       **Amendments to Loan Agreement.**

2.1       **Section 2.4 (Growth Capital Advances).** Section 2.4(c) of the Loan Agreement is hereby amended by deleting it in its entirety and replacing it with the following:

(c)       <u>Principal and Interest Payments</u>. For each Growth Capital Advance, commencing on the Conversion Date and continuing on each Payment Date thereafter, Borrower shall repay each Growth Capital Advance in thirty (30) consecutive equal monthly payments of principal, each in an amount which would fully amortize the outstanding Growth Capital Advances, as of the Conversion Date, over the Growth Capital Repayment Period, plus accrued interest, which interest shall be calculated at the rate set forth in Section 2.6(a)(ii). All unpaid principal and accrued and unpaid interest on the Growth Capital Advances is due and payable in full on the Growth Capital Maturity Date.

Exhibit 7
Page 1339

**2.2** **Section 2.6 (Payment of Interest on the Credit Extensions).** Section 2.6(a)(ii) of the Loan Agreement is hereby amended by deleting it in its entirety and replacing it with the following:

(ii) <u>Growth Capital Advances</u>. Subject to Section 2.6(b), the principal amount outstanding under each Growth Capital Advance shall accrue interest at a floating per annum rate equal to the greater of (A) three and one-half of one percent (3.50%) above the Prime Rate, or (B) six and one-half of one percent (6.50%), which interest shall be payable monthly in accordance with Section 2.6(d) below.

**2.3** **Section 8.6 (Other Agreements).** Section 8.6 of the Loan Agreement is hereby amended by deleting it in its entirety and replacing it with the following:

**8.6** **Other Agreements.** There is, under any agreement to which Borrower or any Guarantor is a party with a third party or parties, (a) any default resulting in a right by such third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount individually or in the aggregate in excess of Two Hundred Fifty Thousand Dollars ($250,000); (b) any breach or default by Borrower or Guarantor, the result of which could have a material adverse effect on Borrower's or any Guarantor's business; or (c) an event of default under the PPP Loan;

**2.4** **Section 13 (Definitions).**

(a) The following terms and their respective definitions set forth in Section 13.1 of the Loan Agreement are hereby amended by deleting them in their entirety and replacing them with the following:

"**Borrowing Base**" is (a) eighty percent (80%) of Eligible Accounts, plus (b) the lesser of the Inventory Advance Rate or the Eligible Inventory Cap, each as determined by Bank from Borrower's most recent Borrowing Base Statement (and as may subsequently be updated by Bank based upon information received by Bank including, without limitation, Accounts that are paid and/or billed following the date of the Borrowing Base Statement); provided, however, that Bank has the right to decrease each and any of the foregoing percentage, the Inventory Advance Rate and Eligible Inventory Cap (if applicable) in its good faith business judgment to mitigate the impact of events, conditions, contingencies, or risks which may adversely affect the Collateral or its value.

"**Conversion Date**" means November 1, 2021.

"**Growth Capital Repayment Period**" is a period of time, for each Growth Capital Advance, equal to thirty (30) months commencing on the Conversion Date and continuing through the Growth Capital Maturity Date.

2

Exhibit 7
Page 1340

"**Interest-Only Period**" is, for each Growth Capital Advance, from the date of such Growth Capital Advance through October 31, 2021.

"**Obligations**" are Borrower's obligations to pay when due any debts, principal, interest, fees, Bank Expenses, the Prepayment Fee, the Anniversary Fee, the Unused Revolving Line Facility Fee, and other amounts Borrower owes Bank now or later, whether under this Agreement, the other Loan Documents (other than the Warrant and the PPP Loan), or otherwise, including, without limitation, all obligations relating to Bank Services and interest accruing after Insolvency Proceedings begin and debts, liabilities, or obligations of Borrower assigned to Bank, and to perform Borrower's duties under the Loan Documents (other than the Warrant and the PPP Loan).

"**Reserves**" means, as of any date of determination, such amounts as Bank may from time to time establish and revise in its good faith business judgment, reducing the amount of Advances and other financial accommodations which would otherwise be available to Borrower (a) to reflect events, conditions, contingencies or risks which, as determined by Bank in its good faith business judgment, do or may adversely affect (i) the Collateral or any other property which is security for the Obligations or its value (including without limitation any increase in delinquencies of Accounts), (ii) the assets, business or prospects of Borrower or any Guarantor, or (iii) the security interests and other rights of Bank in the Collateral (including the enforceability, perfection and priority thereof); or (b) to reflect Bank's reasonable belief that any collateral report or financial information furnished by or on behalf of Borrower or any Guarantor to Bank is or may have been incomplete, inaccurate or misleading in any material respect; or (c) in respect of any state of facts which Bank determines constitutes an Event of Default or may, with notice or passage of time or both, constitute an Event of Default.

"**Tranche Two Draw Period**" is, subject to Bank determining that Borrower has achieved the Tranche Two Milestone, the period of time commencing on December 31, 2020 and continuing through the earlier to occur of (a) October 31, 2021, and (b) the occurrence and continuance of an Event of Default. (For the avoidance of doubt, any Events of Default waived by Bank or cured within the applicable cure periods specified by Bank shall not irrevocably terminate the Tranche Two Draw Period.)

(b)    The defined term "**Permitted Indebtedness**" in Section 13.1 of the Loan Agreement is hereby amended by deleting clause (g) in the definition of Permitted Indebtedness and replacing it with the following clauses (g) and (h):

(g)    Borrower's Indebtedness to Bank incurred pursuant to the PPP Loan; and

(h)    extensions, refinancings, modifications, amendments and restatements of any items of Permitted Indebtedness (a) through (g) above, provided that the principal amount thereof is not increased or the terms thereof are not modified to impose more burdensome terms upon Borrower or its Subsidiary, as the case may be.

(c)    The following new defined term and its definition are hereby inserted alphabetically in Section 13.1 of the Loan Agreement:

3

Exhibit 7
Page 1341

"**PPP Loan**" means the unsecured loan in the principal amount of Two Million Seventy Five Thousand Four Hundred Ninety Two Dollars and Fifty Cents ($2,075,492.50) from Bank to Borrower in connection with the Paycheck Protection Program under the U.S. Small Business Administration, Coronavirus Aid, Relief, and Economic Security Act.

(d)     The defined terms "**Accounts Payable Reserve**" and "**Applicable Number**", and their respective definitions as set forth in Section 13.1 of the Loan Agreement are hereby deleted in their entirety and all occurrences of and references to such terms in the Loan Agreement are hereby deleted in their entirety and from and after the date of this Amendment shall be of no further force and effect under the Loan Agreement.

3.     **Limitation of Amendments**.

3.1     The amendments set forth in Section 2, above, are effective for the purposes set forth herein and shall be limited precisely as written and shall not be deemed to (a) be a consent to any amendment, waiver or modification of any other term or condition of any Loan Document, or (b) otherwise prejudice any right or remedy which Bank may now have or may have in the future under or in connection with any Loan Document.

3.2     This Amendment shall be construed in connection with and as part of the Loan Documents and all terms, conditions, representations, warranties, covenants and agreements set forth in the Loan Documents, except as herein amended, are hereby ratified and confirmed and shall remain in full force and effect.

3.3     In addition to those Events of Default specifically enumerated in the Loan Documents, the failure to comply with the terms of any covenant or agreement contained herein shall constitute an Event of Default and shall entitle the Bank to exercise all rights and remedies provided to the Bank under the terms of any of the other Loan Documents as a result of the occurrence of the same.

4.     **Representations and Warranties.** To induce Bank to enter into this Amendment, Borrower hereby represents and warrants to Bank as follows:

4.1     Immediately after giving effect to this Amendment (a) the representations and warranties contained in the Loan Documents are true, accurate and complete in all material respects as of the date hereof (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such date), and (b) no Event of Default has occurred and is continuing;

4.2     Borrower has the power and authority to execute and deliver this Amendment and to perform its obligations under the Loan Agreement, as amended by this Amendment;

4.3     The organizational documents of Borrower delivered to Bank on the Effective Date remain true, accurate and complete and have not been amended, supplemented or restated and are and continue to be in full force and effect;

4

Exhibit 7
Page 1342

**4.4**        The execution and delivery by Borrower of this Amendment and the performance by Borrower of its obligations under the Loan Agreement, as amended by this Amendment, have been duly authorized;

**4.5**        The execution and delivery by Borrower of this Amendment and the performance by Borrower of its obligations under the Loan Agreement, as amended by this Amendment, do not and will not contravene (a) any material law or regulation binding on or affecting Borrower, (b) any material contractual restriction with a Person binding on Borrower, (c) any order, judgment or decree of any court or other governmental or public body or authority, or subdivision thereof, binding on Borrower, or (d) the organizational documents of Borrower;

**4.6**        The execution and delivery by Borrower of this Amendment and the performance by Borrower of its obligations under the Loan Agreement, as amended by this Amendment, do not require any order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by any governmental or public body or authority, or subdivision thereof, binding on Borrower, except as already has been obtained or made; and

**4.7**        This Amendment has been duly executed and delivered by Borrower and is the binding obligation of Borrower, enforceable against Borrower in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, liquidation, moratorium or other similar laws of general application and equitable principles relating to or affecting creditors' rights.

**5.**        **Integration**. This Amendment and the Loan Documents represent the entire agreement about this subject matter and supersede prior negotiations or agreements. All prior agreements, understandings, representations, warranties, and negotiations between the parties about the subject matter of this Amendment and the Loan Documents merge into this Amendment and the Loan Documents.

**6.**         **Counterparts.** This Amendment may be executed in any number of counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument.

**7.**        **Effectiveness**. This Amendment shall be deemed effective upon the due execution and delivery to Bank of this Amendment by each party hereto.

[Signature page follows.]

5

Exhibit 7
Page 1343

In Witness Whereof, the parties hereto have caused this Amendment to be duly executed and delivered as of the date first written above.

**BORROWER**:

OWLET BABY CARE INC.

By:  /s/ Michael Abbott

Name: Michael Abbott
Title:  President and Chief Financial Officer

**BANK**:

SILICON VALLEY BANK

By:  /s/ Jordan Rigberg

Name: Jordan Rigberg
Title:  Vice President

[Signature Page to Second Amendment to Second Amended and Restated Loan and Security Agreement]

Exhibit 7
Page 1344

Exhibit 10.15(c)

[***] Certain information in this document has been excluded pursuant to Regulation S-K, Item (601)(b)(10). Such excluded information is not material and would likely cause competitive harm to the registrant if publicly disclosed.

**DEFAULT WAIVER, CONSENT, AND THIRD AMENDMENT TO
SECOND AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT**

**THIS DEFAULT WAIVER, CONSENT, AND THIRD AMENDMENT TO SECOND AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT** (this "**Agreement**") is entered into this 10th day of March, 2021 (the "**Third Amendment Effective Date**") by and between **SILICON VALLEY BANK**, a California corporation ("**Bank**") and **OWLET BABY CARE INC.**, a Delaware corporation ("**Borrower**").

RECITALS

A.      Bank and Borrower have entered into that certain Second Amended and Restated Loan and Security Agreement dated as of April 22, 2020, as amended by that certain First Amendment to Second Amended and Restated Loan and Security Agreement by and between Bank and Borrower dated as of April 23, 2020, but effective as of April 22, 2020, as further amended by that certain Second Amendment to Second Amended and Restated Loan and Security Agreement by and between Bank and Borrower dated as of September 22, 2020 (as the same may from time to time be further amended, modified, supplemented or restated, the "**Loan Agreement**").

B.      Bank has extended credit to Borrower for the purposes permitted in the Loan Agreement.

C.      Borrower is currently in default of the Loan Agreement for failing to (i) comply with the minimum EBITDA financial covenant set forth in Section 6.9(a) of the Loan Agreement (prior to the Third Amendment Effective Date) for the month ending December 31, 2020, and (ii) execute and deliver an amendment to set the 2021 EBITDA Covenant as required by Section 6.9(a) of the Loan Agreement (prior to the Third Amendment Effective Date) on or before February 28, 2021 (collectively, the "**Existing Defaults**").

D.      Borrower has notified Bank that it has entered into that certain Business Combination Agreement dated as of February 15, 2021 by and among Sandbridge Acquisition Corporation, a Delaware corporation, ("**Sandbridge**"), Project Olympus Merger Sub, Inc., a Delaware corporation, ("**Merger Sub**"), and Borrower (the "**Merger Agreement**", and, together with the other material documents executed in connection with the Merger Agreement, the "**Merger Documents**"). Pursuant to the Merger Documents, Borrower intends to merge with and into Merger Sub and become a wholly-owned Subsidiary of Sandbridge (the "**Merger**").

E.      Pursuant to Sections 7.1, 7.2, and 7.3 of the Loan Agreement, Borrower is required to obtain Bank's prior written consent before consummating the Merger.

F.      Borrower has requested that Bank (i) waive the Existing Defaults, (ii) consent to the Merger, and (iii) amend the Loan Agreement to make certain revisions to the Loan Agreement as more fully set forth herein.

Exhibit 7
Page 1345

G.        Bank has agreed to (i) waive the Existing Defaults, (ii) consent to the Merger, and (iii) amend certain provisions of the Loan Agreement, but only to the extent, in accordance with the terms, subject to the conditions and in reliance upon the representations and warranties set forth below.

<strong>AGREEMENT</strong>

**Now, THEREFORE,** in consideration of the foregoing recitals and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

1.        **Definitions.**  Capitalized terms used but not defined in this Agreement, including its preamble and recitals, shall have the meanings given to them in the Loan Agreement.

2.        **Waiver of Existing Defaults**. Borrower acknowledges and agrees that unless the Existing Defaults are waived by Bank, such Existing Defaults would constitute an Event of Default under the Loan Documents.  Bank hereby waives the Existing Defaults and waives any rights and remedies against Borrower under the Loan Documents solely with respect to the Existing Defaults.  Bank's agreement to waive the Existing Defaults shall in no way obligate Bank to make any other modifications to the Loan Agreement or to waive Borrower's compliance with any other terms of the Loan Documents, and shall not limit or impair Bank's right to demand strict performance of all other terms and covenants of the Loan Agreement or any of the Loan Documents as of any date.  The waiver set forth above shall not be deemed or otherwise construed to constitute a waiver of any other provisions of the Loan Agreement or any of the Loan Documents in connection with any other transaction.

3.        **Consent**.  Subject to Borrower's satisfaction of the terms and conditions of this Agreement, Bank hereby consents to the Merger.  The consummation of the Merger shall not, in and of itself, constitute a default or "Event of Default" under Sections 7.1, 7.2 and 7.3 of the Loan Agreement.  Bank's agreement to consent to the Merger shall in no way obligate Bank to make any other modifications to the Loan Agreement or to waive compliance with any other terms of the Loan Documents, and shall not limit or impair Bank's right to demand strict performance of all other terms and covenants as of any date.  The consent set forth herein shall not be deemed or otherwise be construed to constitute a consent or waiver of any provisions of the Loan Agreement or any other terms of the Loan Documents in connection with any other transaction.

4.        **Amendments to Loan Agreement.**

4.1        **Section 1 (ACCOUNTING AND OTHER TERMS).**  The fourth (4th) sentence of Section 1 of the Loan Agreement is hereby amended by deleting it in its entirety and replacing it with the following:

Notwithstanding any terms in this Agreement to the contrary, for purposes of any financial covenant and other financial calculations in this Agreement (other than for purposes of updating the Borrowing Base) which are made in whole or in part based upon the Availability Amount as of the last day of a particular month, calculations relying on information from a Borrowing Base Statement shall be derived from the Borrowing Base Statement delivered either (i) no later than Friday of each week, prior to the Qualifying Liquidity Event Date, or (ii) within seven (7) days after the last day of each month, on and after the Qualifying Liquidity Event Date, in each case, pursuant to Section 6.2(a) (and not, for clarity, any more recent Borrowing Base Statement delivered after such period), and the actual delivery date of such Borrowing Base Statement shall be deemed to be the last day of the applicable month.

2

Exhibit 7
Page 1346

**4.2**      **Section 6.2 (Financial Statements, Reports, Certificates).**  Sections 6.2(a) and (b) of the Loan Agreement are hereby amended by deleting them in their entirety and replacing them with the following:

(a)      upon each request for an Advance and (x) prior to the Qualifying Liquidity Event Date, no later than Friday of each week, and (y) on and after the Qualifying Liquidity Event Date, within seven (7) days after the last day of each month, (i) a Borrowing Base Statement (and any schedules related thereto and including any other information requested by Bank with respect to Borrower's Accounts) and (ii) an accounts receivable ledger aging report;

(b)      (i) within thirty (30) days after the last day of each month, (A) monthly accounts receivable agings, aged by invoice date, (B) monthly accounts payable agings, aged by invoice date, and outstanding or held check registers, if any, and (C) monthly reconciliations of accounts receivable agings (aged by invoice date), sell through report, Deferred Revenue report, and general ledger; and (ii) within seven (7) days after the last day of each month, monthly perpetual inventory reports for Inventory valued on an average cost basis at the lower of cost or market (in accordance with GAAP), Inventory transaction report, or such other inventory reports as are requested by Bank in its good faith business judgment;

**4.3**      **Section 6.3 (Accounts Receivable).**  Sections 6.3(c) and (d) of the Loan Agreement are hereby amended by deleting them in their entirety and replacing them with the following:

(c)      <u>Collection of Accounts</u>.  Borrower shall direct Account Debtors to deliver or transmit all proceeds of Accounts into a lockbox account, or via electronic capture into a "blocked account" as specified by Bank (either such account, the "**Cash Collateral Account**").  Whether or not an Event of Default has occurred and is continuing, Borrower shall immediately deliver all payments on and proceeds of Accounts to the Cash Collateral Account.  Subject to Bank's right to maintain a reserve pursuant to Section 6.3(d), all amounts received in the Cash Collateral Account shall be (i) while an Event of Default exists and is continuing, at Bank's option in its sole discretion, applied to immediately reduce the Obligations, and (ii) otherwise transferred on a daily basis to Borrower's operating account with Bank.  Borrower hereby authorizes Bank to transfer to the Cash Collateral Account any amounts that Bank reasonably determines are proceeds of the Accounts (provided that Bank is under no obligation to do so and this allowance shall in no event relieve Borrower of its obligations hereunder).

(d)      <u>Reserves</u>.  Notwithstanding any terms in this Agreement to the contrary, at times when an Event of Default exists, Bank may hold any proceeds of the Accounts and any amounts in the Cash Collateral Account that are not applied to the Obligations pursuant to Section 6.3(c) above (including amounts otherwise required to be transferred to Borrower's operating account with Bank) as a reserve to be applied to any Obligations regardless of whether such Obligations are then due and payable.

3

Exhibit 7
Page 1347

4.4     **Section 6.9 (Financial Covenants).**  Section 6.9 of the Loan Agreement is hereby amended by deleting it in its entirety and replacing it with the following:

6.9     **Financial Covenants**.  Borrower shall:

(a)     Minimum Liquidity.  Commencing with the month ending March 31, 2021, maintain Liquidity (tested by Bank as of the last day of each month) of at least [***].

(b)     Qualifying Liquidity Event. Complete a Qualifying Liquidity Event on or before May 31, 2021.

(c)     2021 EBITDA Covenant.  Commencing with the month ending June 30, 2021, and as of the last day of each month thereafter, Borrower shall maintain total cumulative EBITDA on a fiscal year-to-date basis in amounts determined by Bank in its good faith business discretion based on Borrower's annual financial projections approved by the Board for the 2021 fiscal year and delivered to Bank pursuant to Section 6.2(e) (the "**2021 EBITDA Covenant**").  Borrower's failure to reach an agreement with Bank on the 2021 EBITDA Covenant and to execute and deliver to Bank an amendment to this Agreement which provides the terms for the 2021 EBITDA Covenant by no later than July 15, 2021 shall constitute an immediate Event of Default under this Agreement.

4.5     **Section 13 (Definitions).**

(a)     The following terms and their respective definitions set forth in Section 13.1 of the Loan Agreement are hereby amended by deleting them in their entirety and replacing them with the following:

"**2020 Warrant**" means the Warrant to Purchase Common Stock dated as of the Effective Date between Borrower and Bank, as amended by that certain Amendment to the Common Stock Warrant dated as of January 19, 2021 by and between Borrower and SVB Financial Group, as may be further amended, modified, supplemented and/or restated from time to time.

"**Liquidity Event**" means any of the following events: (i) an initial public offering of Borrower's equity securities, or (ii) any acquisition by, or merger of Borrower with, Sandbridge Acquisition Corporation, a Delaware corporation, or its Affiliates ("**Sandbridge**"), pursuant to that certain Business Combination Agreement dated as of February 15, 2021 by and among Sandbridge, Project Olympus Merger Sub, Inc., a Delaware corporation, and Borrower, or (iii) an equity financing (to the extent not prohibited by Section 7.2) and/or Subordinated Debt financing of Borrower with existing investors that are, in each case, approved by Borrower's Board.

4

Exhibit 7
Page 1348

"**Warrant**" means, individually and collectively, (a) Warrant to Purchase Common Stock dated as of February 14, 2017 executed by Borrower in favor of Bank, as amended by that certain Amendment to the Common Stock Warrant dated as of January 19, 2021 by and between Borrower and SVB Financial Group, (b) the Warrant to Purchase Common Stock dated as of October 25, 2018 executed by Borrower in favor of Bank, as amended by that certain Amendment to the Common Stock Warrant dated as of January 19, 2021 by and between Borrower and SVB Financial Group, (c) the Warrant to Purchase Common Stock dated as of March 27, 2019 executed by Borrower in favor of Bank, as amended by that certain Amendment to the Common Stock Warrant dated as of January 19, 2021 by and between Borrower and SVB Financial Group, (d) the Warrant to Purchase Common Stock dated as of the July 24, 2019 executed by Borrower in favor of Bank, as amended by that certain Amendment to the Common Stock Warrant dated as of January 19, 2021 by and between Borrower and SVB Financial Group, and (e) the 2020 Warrant, each as may be further amended, modified, supplemented and/or restated from time to time.

(b)      The defined term "**Eligible Accounts**" in Section 13.1 of the Loan Agreement is hereby amended by deleting clause (z) thereof in its entirety and replacing it with the following:

(z)      Accounts owing from an Account Debtor, whose total obligations to Borrower exceed twenty-five percent (25.0%) of all Accounts, except for [***], for which such percentage is forty-five percent (45%), for the amounts that exceed that percentage; and

(c)      The following new defined terms and their respective definitions are hereby inserted alphabetically in Section 13.1 of the Loan Agreement:

"**Net Proceeds**" means the gross proceeds received by Borrower from a Liquidity Event, less reasonable and customary closing costs (including, but not limited to, reasonable attorneys' fees, brokers' fees or commissions, investment bankers' fees or commissions and similar items) owed to any Person in an arm's length transaction that are actually incurred in connection with such Liquidity Event.

"**Qualifying Liquidity Event**" means one or more Liquidity Events from which Borrower receives aggregate new Net Proceeds, in cash, of at least Fifty Million Dollars ($50,000,000).

"**Qualifying Liquidity Event Date**" means the date, which shall be not later than May 31, 2021, that Bank has received evidence to its reasonable satisfaction that Borrower has completed a Qualifying Liquidity Event.

(d)      The defined terms "**EBITDA Covenant**" and "**Liquidity Covenant**", and their respective definitions as set forth in Section 13.1 of the Loan Agreement are hereby deleted in their entirety and all occurrences of and references to such terms in the Loan Documents are hereby deleted in their entirety and from and after the date of this Agreement shall be of no further force and effect under the Loan Documents.

5

Exhibit 7
Page 1349

**4.6**    **Compliance Certificate.**  The Compliance Certificate attached to the Loan Agreement as <u>Exhibit B</u> is hereby replaced in its entirety with the Compliance Certificate attached hereto as <u>Exhibit B</u>.  From and after the date hereof, all references in the Loan Agreement to the Compliance Certificate shall be deemed to refer to the Compliance Certificate in the form attached hereto as <u>Exhibit B</u>

**5.**    **Limitation of Waiver, Consent, and Amendments**.

**5.1**    The default waiver, consent, and amendments, set forth in Section 2 through 4, above, are effective for the purposes set forth herein and shall be limited precisely as written and shall not be deemed to  be a consent to any amendment, waiver or modification of any other term or condition of any Loan Document, or  otherwise prejudice any right or remedy which Bank may now have or may have in the future under or in connection with any Loan Document.

**5.2**    This Agreement shall be construed in connection with and as part of the Loan Documents and all terms, conditions, representations, warranties, covenants and agreements set forth in the Loan Documents, except as herein amended, are hereby ratified and confirmed and shall remain in full force and effect.

**5.3**    In addition to those Events of Default specifically enumerated in the Loan Documents (other than the Existing Defaults), the failure to comply with the terms of any covenant or agreement contained herein shall constitute an Event of Default and shall entitle the Bank to exercise all rights and remedies provided to the Bank under the terms of any of the other Loan Documents as a result of the occurrence of the same.

**6.**    **Representations and Warranties.**  To induce Bank to enter into this Agreement, Borrower hereby represents and warrants to Bank as follows:

**6.1**    Immediately after giving effect to this Agreement (a) the representations and warranties contained in the Loan Documents are true, accurate and complete in all material respects as of the date hereof (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such date), and (b) no Event of Default (other than the Existing Defaults) has occurred and is continuing or will arise solely from Borrower's performance of its obligations in connection with the Merger;

**6.2**    Borrower has the power and authority to execute and deliver this Agreement and to perform its obligations under the Loan Agreement, as amended by this Agreement;

**6.3**    The organizational documents of Borrower delivered to Bank on the Effective Date remain true, accurate and complete and have not been amended, supplemented or restated and are and continue to be in full force and effect;

**6.4**    The execution and delivery by Borrower of this Agreement and the performance by Borrower of its obligations under the Loan Agreement, as amended by this Agreement, have been duly authorized;

6

Exhibit 7
Page 1350

**6.5**        The execution and delivery by Borrower of this Agreement and the performance by Borrower of its obligations under the Loan Agreement, as amended by this Agreement, do not and will not contravene  any material law or regulation binding on or affecting Borrower,  any material contractual restriction with a Person binding on Borrower,  any order, judgment or decree of any court or other governmental or public body or authority, or subdivision thereof, binding on Borrower, or  the organizational documents of Borrower;

**6.6**        The execution and delivery by Borrower of this Agreement and the performance by Borrower of its obligations under the Loan Agreement, as amended by this Agreement, do not require any order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by any governmental or public body or authority, or subdivision thereof, binding on Borrower, except as already has been obtained or made;

**6.7**        This Agreement has been duly executed and delivered by Borrower and is the binding obligation of Borrower, enforceable against Borrower in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, liquidation, moratorium or other similar laws of general application and equitable principles relating to or affecting creditors' rights; and

**6.8**        Attached hereto as <u>Annex I</u> is a true, correct and complete copy of the Merger Agreement, and copies or drafts, as applicable, of the other Merger Documents to be executed in connection with the Merger. The Merger will be effected, closed and consummated pursuant to, and in accordance with, the terms and conditions of the Merger Documents and with all applicable laws.

**7.**        **Prior Agreement.**  The Loan Documents are hereby ratified and reaffirmed and shall remain in full force and effect. This Agreement is not a novation and the terms and conditions of this Agreement shall be in addition to and supplemental to all terms and conditions set forth in the Loan Documents. In the event of any conflict or inconsistency between this Agreement and the terms of such documents, the terms of this Agreement shall be controlling, but such document shall not otherwise be affected or the rights therein impaired.

**8.**        **Integration**.  This Agreement and the Loan Documents represent the entire agreement about this subject matter and supersede prior negotiations or agreements.  All prior agreements, understandings, representations, warranties, and negotiations between the parties about the subject matter of this Agreement and the Loan Documents merge into this Agreement and the Loan Documents.

**9.**        **Counterparts.**  This Agreement may be executed in any number of counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument.

**10.**        **Effectiveness**.  This Agreement shall be deemed effective upon the due execution and delivery to Bank of this Agreement by each party hereto.

Exhibit 7
Page 1351

**11.**    **Bank Expenses**.  Borrower shall pay all of Bank's legal fees and expenses in connection with the negotiation and preparation of this Agreement and the review of the Merger Documents.

**12.**    **Governing Law.**  This Agreement and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of California.

[Signature page follows.]

8

Exhibit 7
Page 1352

Iɴ Wɪᴛɴᴇss Wʜᴇʀᴇᴏғ, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first written above.

**BORROWER**:

OWLET    BABY
CARE INC.

By:    /s/ Michael Abbott

      Name:    Michael Abbott
      Title:    President and Chief Financial Officer

**BANK**:

SILICON VALLEY BANK

By:    /s/ Jordan Rigberg

      Name:    Jordan Rigberg
      Title:    Vice President

[Signature Page to Default Waiver, Consent, and Third Amendment to
Second Amended and Restated Loan and Security Agreement]

Exhibit 7
Page 1353

**EXHIBIT B**

COMPLIANCE STATEMENT

TO:    SILICON VALLEY BANK                                                                                              Date: _____

FROM: OWLET BABY CARE INC.

         Under the terms and conditions of the Second Amended and Restated Loan and Security Agreement between Borrower and Bank (the "**Agreement**"), Borrower is in complete compliance for the period ending _____ with all required covenants except as noted below.  Attached are the required documents evidencing such compliance, setting forth calculations prepared in accordance with GAAP consistently applied from one period to the next except as explained in an accompanying letter or footnotes.  The undersigned acknowledges that no borrowings may be requested at any time or date of determination that Borrower is not in compliance with any of the terms of the Agreement, and that compliance is determined not just at the date this Compliance Statement is delivered.  Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Agreement.

**Please indicate compliance status by circling Yes/No under "Complies" column.**

| Reporting Covenants | Required | Complies |
|---|---|---|
| | | |
| Monthly financial statements with Compliance Statement | Monthly within 30 days of month end | Yes  No |
| Annual financial statements (CPA Audited) | FYE within 180 days | Yes  No |
| 10-Q, 10-K and 8-K | Within 5 days after filing with SEC | Yes  No |
| A/R & A/P Agings; Sell Through Report; Deferred Revenue Report; General Ledger | Monthly within 30 days of month end | Yes  No |
| Borrowing Base Statements; A/R Ledger Aging Report | Friday of each week* / monthly within 7 days of month end; and on each Advance request | Yes  No |
| Inventory Report; Inventory Transaction Report | Monthly within 7 days of month end | Yes  No |
| 409(a) valuation report | Within 30 days after completion | Yes  No |
| Annual budget and board-approved projections | The earlier of (a) January 31 of each year or (b) 15 days after Board approval | Yes  No |
| Copies of Statements for [***] | Monthly within 30 days of month end | Yes  No |
| *Prior to the Qualifying Liquidity Event Date; otherwise monthly within 7 days of month end | | |
| | | |
| The following Intellectual Property not previously disclosed to Bank was registered after the Effective Date (if no registrations, state "None") _____ | | |

Exhibit B-1

Exhibit 7
Page 1354

| Financial Covenant | Required | Actual | Complies |
|---|---|---|---|
|  |  |  |  |
| Minimum Liquidity | [***] | $_____ | Yes  No |
| Qualifying Liquidity Event | No later than 05/31/2021 | __/__/202__ | Yes  No |
|  |  |  |  |

| Streamline Period Eligibility and Performance Pricing | | | |
|---|---|---|---|
| Liquidity | Streamline Period | Interest Rate for Advances | Applies |
| Liquidity ≥ $7,000,000 | Yes | Greater of (i) Prime + 0.75% or (ii) 5.50% | Yes  No |
| Liquidity < $7,000,000 | No | Greater of (i) Prime + 1.25% or (ii) 6.00% | Yes  No |

The following financial covenant analyses, streamline period eligibility analysis and information set forth in Schedule 1 attached hereto are true and accurate as of the date of this Compliance Statement.

The following are the exceptions with respect to the statements above:  (If no exceptions exist, state "No exceptions to note.")

------------------------------------------------------------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------------------------------------------------------------

Exhibit B-2

Exhibit 7
Page 1355

**Schedule 1 to Compliance Statement**

**Financial Covenants of Borrower**

In the event of a conflict between this Schedule and the Agreement, the terms of the Agreement shall govern.

Dated: _____

I.    **Minimum Liquidity** (Section 6.9(a))

Required: ≥ [***]

Actual: $_____

| | | |
|---|---|---|
| A. | Aggregate amount of unrestricted and unencumbered cash held at such time by Borrower in accounts maintained with Bank or its affiliates | $ |
| B. | The lesser of (i) the Revolving Line or (ii) the amount available under the Borrowing Base | $ |
| C. | The outstanding principal balance of any Advances | $ |
| D. | Availability Amount (Line B minus Line C) | $ |
| E. | Liquidity (line A plus line D) | |

Is line E equal to or greater than [***] for the applicable month end?

_____ No, not in compliance with Section 6.9(a)          _____ Yes, in compliance with Section 6.9(a)

Schedule I to Exhibit B

Exhibit 7
Page 1356

**<u>Streamline Period Eligibility</u>**

In the event of a conflict between this Schedule and the Loan Agreement, the terms of the Loan Agreement shall govern.

Dated: _____

**Liquidity** (definition of Streamline Period in Section 13.1)

Required: ≥$7,000,000

Actual: $_____

| | | |
|---|---|---|
| A. | Aggregate amount of unrestricted and unencumbered cash held at such time by Borrower in accounts maintained with Bank or its affiliates | $ |
| B. | The lesser of (i) the Revolving Line or (ii) the amount available under the Borrowing Base | $ |
| C. | The outstanding principal balance of any Advances | $ |
| D. | Availability Amount (Line B minus Line C) | $ |
| E. | Liquidity (line A plus line D) | |

Is line E equal to or greater than $7,000,000?

_____ No, not in compliance with Section 6.9(a)          _____ Yes, in compliance with Section 6.9(a)

Schedule I to Exhibit B

Exhibit 7
Page 1357

**Annex I**

Merger Documents

(see attached)

Annex I

Exhibit 7
Page 1358

**Exhibit 16.1**

February 15, 2021

Office of the Chief Accountant
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Dear Sirs/Madams:

We have read the *Change in Independent Registered Public Accounting Firm* disclosure regarding Owlet Baby Care Inc. appearing in the Registration Statement on Form S-4 of Sandbridge Acquisition Corporation to be dated on or about February 16, 2021, and have the following comments:

1.  We agree with the statements made in the first through fourth paragraphs of the disclosure.

2.  We have no basis on which to agree or disagree with the statements made in the fifth and sixth paragraphs of the disclosure.

We hereby consent to the filing of this letter as an exhibit on Form S-4.

Sincerely,

/s/ Tanner LLC

Exhibit 7
Page 1359

**Exhibit 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We hereby consent to the use in the Prospectus constituting a part of this Registration Statement on Form S-4 of our report dated March 25, 2021, relating to the financial statements of Sandbridge Acquisition Corporation., which is contained in that Prospectus. We also consent to the reference to our Firm under the caption "Experts" in the Prospectus.

/s/ WithumSmith+Brown, PC

New York, New York
March 30, 2021

Exhibit 7
Page 1360

**Exhibit 23.2**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the use in this Registration Statement on Form S-4 of Sandbridge Acquisition Corporation of our report dated March 30, 2021 relating to the financial statements of Owlet Baby Care Inc., which appears in this Registration Statement. We also consent to the reference to us under the heading "Experts" in such Registration Statement.

/s/ PricewaterhouseCoopers LLP
Salt Lake City, Utah
March 30, 2021

Exhibit 7
Page 1361

Exhibit 99.1

SANDBRIDGE ACQUISITION CORPORATION

**VOTE BY INTERNET**
*Before The Meeting* - Go to **www.proxyvote.com**

Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 p.m. Eastern Time on         , 2021, the day before the meeting. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

*During The Meeting* - Go to **www.virtualshareholdermeeting.com/SBG2021**

You may attend the meeting via the Internet and vote during the meeting. Have the information that is printed in the box marked by the arrow available and follow the instructions.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 p.m. Eastern Time on         , 2021, the day before the meeting. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

---

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:                                D45041-S20598

## SANDBRIDGE ACQUISITION CORPORATION

### THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.

The Board of Directors recommends you vote FOR the following proposals:

|  | For | Against | Abstain |
|---|---|---|---|
| 1. **Business Combination Proposal** — to approve the business combination agreement | ☐ | ☐ | ☐ |
| 2. **The Charter Amendment Proposal, including the Advisory Charter Amendment Proposals** | ☐ | ☐ | ☐ |
| 2a. **Advisory Charter Amendment Proposal A** | ☐ | ☐ | ☐ |
| 2b. **Advisory Charter Amendment Proposal B** | ☐ | ☐ | ☐ |
| 2c. **Advisory Charter Amendment Proposal C** | ☐ | ☐ | ☐ |
| 2d. **Advisory Charter Amendment Proposal D** | ☐ | ☐ | ☐ |
| 2e. **Advisory Charter Amendment Proposal E** | ☐ | ☐ | ☐ |
| 2f. **Advisory Charter Amendment Proposal F** | ☐ | ☐ | ☐ |
| 3. **The NYSE Proposal** | ☐ | ☐ | ☐ |
| 4. **The Incentive Award Plan Proposal** | ☐ | ☐ | ☐ |
| 5. **The ESPP Proposal** | ☐ | ☐ | ☐ |
| 6. **The Adjournment Proposal** | ☐ | ☐ | ☐ |

NOTE: Such other business as may properly come before the meeting or any adjournment thereof.

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name by authorized officer.

Signature [PLEASE SIGN WITHIN BOX]        Date            Signature [PLEASE SIGN WITHIN BOX]        Date

Exhibit 7
Page 1362

Exhibit 7
Page 1363

**Important Notice Regarding the Availability of Proxy Materials for the Special Meeting:**
The Proxy Statement is available at www.proxyvote.com.

345042-520598

### SANDBRIDGE ACQUISITION CORPORATION
#### Special Meeting of the Stockholders
, 2021 at        Eastern Time
**This proxy is solicited by the Board of Directors.**

The stockholder(s) hereby appoint(s) Ken Suslow and Richard Henry, or either of them, as proxies, each with the power to appoint his substitute, and hereby authorize(s) them to represent and to vote, as designated on the reverse side of this ballot, all of the shares of Class A common stock and Class B common stock of Sandbridge Acquisition Corporation that the stockholder(s) is/are entitled to vote at the Special Meeting of Stockholders to be held at       , ET on       , 2021, virtually at www.virtualshareholdermeeting.com/SBG2021, and any adjournment or postponement thereof.

**This proxy, when properly executed, will be voted in the manner directed herein. If no such direction is made, this proxy will be voted in accordance with the Board of Directors' recommendations.**

**Continued and to be signed on reverse side.**

Exhibit 7
Page 1364

**Exhibit 99.2**

**Consent to be Named as a Director**

In connection with the filing by Sandbridge Acquisition Corporation of the Registration Statement on Form S-4 with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), I hereby consent, pursuant to Rule 438 of the Securities Act, to being named in the Registration Statement and any and all amendments and supplements thereto as a member of the board of directors of Sandbridge Acquisition Corporation following the consummation of the business combination. I also consent to the filing of this consent as an exhibit to such Registration Statement and any amendments thereto.

Dated:          February 14, 2021

By:     /s/ Michael Abbott

Signature

Exhibit 7
Page 1365

**Exhibit 99.3**

**Consent to be Named as a Director**

In connection with the filing by Sandbridge Acquisition Corporation of the Registration Statement on Form S-4 with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), I hereby consent, pursuant to Rule 438 of the Securities Act, to being named in the Registration Statement and any and all amendments and supplements thereto as a member of the board of directors of Sandbridge Acquisition Corporation following the consummation of the business combination. I also consent to the filing of this consent as an exhibit to such Registration Statement and any amendments thereto.

Dated:        February 14, 2021

By:    /s/ Amy McCullough
Signature

Exhibit 7
Page 1366

**Exhibit 99.4**

**Consent to be Named as a Director**

In connection with the filing by Sandbridge Acquisition Corporation of the Registration Statement on Form S-4 with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), I hereby consent, pursuant to Rule 438 of the Securities Act, to being named in the Registration Statement and any and all amendments and supplements thereto as a member of the board of directors of Sandbridge Acquisition Corporation following the consummation of the business combination. I also consent to the filing of this consent as an exhibit to such Registration Statement and any amendments thereto.

Dated:        February 14, 2021

By:     /s/ Lior Susan
        _____
        Signature

Exhibit 7
Page 1367

**Exhibit 99.5**

**Consent to be Named as a Director**

In connection with the filing by Sandbridge Acquisition Corporation of the Registration Statement on Form S-4 with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), I hereby consent, pursuant to Rule 438 of the Securities Act, to being named in the Registration Statement and any and all amendments and supplements thereto as a member of the board of directors of Sandbridge Acquisition Corporation following the consummation of the business combination. I also consent to the filing of this consent as an exhibit to such Registration Statement and any amendments thereto.

Dated:       February 14, 2021

By:      /s/ Kurt Workman

Signature

Exhibit 7
Page 1368

**Exhibit 99.6**

**Consent to be Named as a Director**

In connection with the filing by Sandbridge Acquisition Corporation of the Registration Statement on Form S-4 with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), I hereby consent, pursuant to Rule 438 of the Securities Act, to being named in the Registration Statement and any and all amendments and supplements thereto as a member of the board of directors of Sandbridge Acquisition Corporation following the consummation of the business combination. I also consent to the filing of this consent as an exhibit to such Registration Statement and any amendments thereto.

Dated: March 24, 2021

By: /s/ Zane Burke

Signature

Exhibit 7
Page 1369

**Exhibit 99.7**

**Consent to be Named as a Director**

In connection with the filing by Sandbridge Acquisition Corporation of the Registration Statement on Form S-4 with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), I hereby consent, pursuant to Rule 438 of the Securities Act, to being named in the Registration Statement and any and all amendments and supplements thereto as a member of the board of directors of Sandbridge Acquisition Corporation following the consummation of the business combination. I also consent to the filing of this consent as an exhibit to such Registration Statement and any amendments thereto.

Dated: March 24, 2021

By:   /s/ Laura Durr
       Signature

Exhibit 7
Page 1370