POMERANTZ LLP
Tamar A. Weinrib
taweinrib@pomlaw.com
600 Third Avenue, 20th floor
New York, New York 10016
Telephone: (646) 581-9973

*Lead Counsel for Lead Plaintiff Drew Conant and the Section 14(a) Class*

*Additional Counsel on Signature Page*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| MICHAEL J. BUTALA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> OWLET, INC. f/k/a SANDBRIDGE ACQUISITION CORPORATION, KURT WORKMAN, KATE SCOLNICK, KEN SUSLOW, RICHARD HENRY, DOMENICO DE SOLE, RAMEZ TOUBASSY, JAMIE WEINSTEIN, KRYSTAL KAHLER, and MICHAEL F. GOSS, <br><br> Defendants. | Case No.: 2:21-cv-09016-FLA-SSC <br><br> **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE OWLET DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S 14(a) COMPLAINT** <br><br> Hearing Date: May 31, 2024 <br> Time:　　　1:30 P.M. <br> Courtroom:　6B <br> Judge:　　Hon. Fernando L. Aenlle-Rocha |

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ...................................................................................1

II.    STATEMENT OF FACTS .........................................................................................3

       A.    Defendants Flout FDA Regulations ..................................................................4

       B.    Defendants Always Knew the Smart Sock Qualified as A Medical
             Device.................................................................................................................5

       C.    Materially False and Misleading Statements in the Proxy.............................7

       D.    The Truth Emerges ..........................................................................................10

III.   ARGUMENT ...........................................................................................................13

       A.    Applicable Standards........................................................................................13

             1)    The Complaint Adequately Pleads Falsity...........................................15

                   a.    Misleading Statements that the Smart Sock Is Not a
                         Medical Device.................................................................................15

                   b.    Misleading Statements that the FDA *May* Disagree that the
                         Smart Sock is not a Medical Device.........................................18

                   c.    Misleading Statements of Regulatory Compliance .................22

                   d.    Misleading Projections .............................................................22

       B.    The Complaint Adequately Pleads a §20(a) Claim.......................................24

       C.    Defendants Failed to Comply with L.R. 7-3................................................24

IV.    CONCLUSION........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...................................................................21

*Brown v. Papa Murphy's Holdings*,
  2021 U.S. Dist. LEXIS 12250 (W.D. Wash. Jan. 12, 2021) ........................23

*Brown v. Papa Murphy's Holdings*,
  2021 U.S. Dist. LEXIS 77849 (W.D. Wash. 2021)......................................18

*Fed. Hous. Fin. Agency v. UBS Ams., Inc.*,
  858 F. Supp. 2d 306 (S.D.N.Y. 2012) .......................................................18

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ...............................................................16, 24

*In re Gilead Scis. Sec Litig.*,
  536 F.3d 1049 (9th Cir. 2008) .................................................................13

*In re Hot Topic, Inc. Sec. Litig.*,
  2014 WL 7499375 (C.D. Cal. May 2, 2014)................................................14

*In re Hot Topic Sec. Litig.*,
  No. CV 13-02939 SJO 2014 U.S. Dist. LEXIS 180513 (C.D. Cal. May
  2, 2014) ...............................................................................................18

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .................................................................23

*Jian Zhou v. Faraday Future Intelligent Elec. Inc.*,
  2022 U.S. Dist. LEXIS 192565 (C.D. Cal. Oct. 20, 2022) ..........................14

*Karri v. Oclaro, Inc.*,
  2020 U.S. Dist. LEXIS 187317 (N.D. Cal. Oct. 8, 2020) ............................23

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 204
  L. Ed. 2d 264 (2019)..............................................................................13

*Knollenberg v. Harmonic, Inc.*,
    152 F. App'x 674 (9th Cir. 2005) ................................................................................14

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)......................................................................................................13

*NCUA Bd. v. Wachovia Capital Mkts., LLC*,
    2014 U.S. Dist. LEXIS 62592 (S.D.N.Y. 2014)........................................................18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015).....................................................................................................16

*Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*,
    2023 U.S. Dist. LEXIS 157803 (N.D. Ill. Sept. 6, 2023)............................................22

*Schueneman v. Arena Pharm., Inc.*,
    840 F.3d 698 (9th Cir. 2016) .....................................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).....................................................................................................13

**Statutes**

15 U.S.C. 78n-1(b) ................................................................................................. *passim*

15 U.S.C. §78t(a) .............................................................................................................24

21 U.S.C. § 321(h) ........................................................................................................4, 22

21 U.S.C. § 331(a) ........................................................................................................4, 22

21 U.S.C. § 351(f)(1)(B)...............................................................................................4, 22

21 U.S.C. §360c(a)(1)(B).....................................................................................................4

21 U.S.C. § 360e(a) ..........................................................................................................22

21 U.S.C. § 360j(g) ...........................................................................................................22

Medical Device Amendments of 1976 ..............................................................................4

**Rules**

Fed. R. Civ. P. 8................................................................................................................14

Fed. R. Civ. P. 9 .......................................................................................................... 14

L.R. 7-3 ............................................................................................................... 2, 3, 24

L.R. 7-4 .................................................................................................................. 2, 25

**Other Authorities**

86 FR 41383 ..................................................................................................................17

86 FR 41386 ..................................................................................................................17

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

iv

## I.      PRELIMINARY STATEMENT

In violation of §14(a) of the Exchange Act, Defendants negligently disseminated a Proxy[1] to solicit shareholder approval of the de-SPAC Merger[2] which falsely stated that Owlet's flagship Smart Sock product *is not* a medical device for which they needed FDA pre-authorization to market and sell, that it was only *possible* rather than *certain* that the FDA would determine that the Smart Sock *is* a medical device requiring pre-authorization, that Owlet complied with all relevant FDA regulations, and that Owlet could achieve over a billion dollars in revenue by 2025 based on the premise that it could continue selling the Smart Sock unimpeded without FDA pre-authorization.  Defendants do not challenge, and thus concede as they must, that the Complaint[3] adequately pleads the objective falsity of their misstatements, their negligence in disseminating the Proxy, and that the Proxy was an essential link in the accomplishment of the de-SPAC Merger. All that remains unchallenged is subjective falsity, which, given incontrovertible facts alleged in the Complaint, is also adequately pled.

Indeed, there is no dispute that: 1) devices used to diagnose a condition are medical devices requiring FDA pre-authorization before they can be marketed or sold; 2)

---

[1] "Proxy" refers collectively to the Preliminary Proxy Statement included in the Registration Statement, signed by Defendants Suslow, Henry, De Sole, Goss, Kahler, Toubassy, and Weinstein, filed on Form S-4 on March 31, 2021, and the final Proxy Statement filed with the SEC on June 21, 2021

[2] Defined *infra.*

[3] All "Complaint" and "¶__" references are to the Amended Consolidated Complaint for Violations of The Federal Securities Laws, filed December 22, 2023, Doc. No. 80.

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

medical devices sold without FDA pre-authorization are deemed "adulterated" and the FDA prohibits their marketing or sale; 3) Owlet's flagship Smart Sock measured blood oxygen saturation and pulse rate to identify, i.e., *diagnose*, desaturation and bradycardia, and contained an alarm feature to notify users when these vital signs fell outside preset zones; 4) at all relevant times, Owlet's marketing materials touted these features; 5) Defendant Workman admitted well before the Smart Sock's 2015 launch that the pulse oximetry and alarm features qualified the Smart Sock as a medical device requiring FDA approval; 6) in the Warning Letter the FDA ultimately issued to Owlet, the FDA explicitly stated that it had told Owlet unequivocally since 2016 that the Smart Sock qualified as a medical device; 7) Owlet *never* obtained FDA pre-authorization to market and sell the Smart Sock; and 8) the revenue projections in the Proxy unreasonably assumed that Owlet would not have to stop marketing and selling the Smart Sock despite its egregious violations of FDA regulations. Therefore, try as they might, Defendants cannot credibly challenge either the objective *or* subjective falsity of the misstatements in the Proxy.

In any event, as described *infra*, Defendants filed their motion to dismiss ("Mot.") in violation of Central District of California Local Civil Rule ("L.R.") 7-3 and should be denied on that basis alone in accordance with L.R. 7-4. Specifically, Defendants falsely certified that counsel engaged in a conference "pursuant to L.R. 7-3 which commenced via electronic mail on or before January 31, 2024, and continued through February 7,

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

2

2024, via electronic mail, telephone, and Zoom." Mot. at 1.  The parties did not confer *at any point via any means* regarding the "substance of the contemplated motions to dismiss" as L.R. 7-3 requires of defendants at least seven days before they file a motion. In the only communications that transpired between the parties from January 31, 2024 through February 7, 2024, counsel solely discussed word limits and Defendants' request to file an omnibus brief.

Therefore, Plaintiff respectfully requests that the Court deny Defendants' Mot., not only because the Complaint satisfies the elements of the §14(a) claim (most of which Defendants concede), but because Defendants violated L.R. 7-3.

## II.    STATEMENT OF FACTS

Sandbridge, a publicly traded shell special purpose acquisition company ("SPAC") with no ongoing business operations, combined with Owlet Baby Care Inc. via a "de-SPAC" transaction, a type of reverse merger ("de-SPAC Merger") on July 15, 2021.  ¶¶2-3, 32, 36, 38.  Owlet's flagship product at the time was the Smart Sock, a baby monitor utilizing pulse oximetry sensors embedded in a sock to track a baby's vital signs like heart rate and oxygen levels in real time. ¶¶4, 41.  The Smart Sock purported to identify and alert parents via an alarm to respiratory-driven infant health issues like desaturation (low blood oxygen levels) and bradycardia (a heart rate that's too slow) when the infant's vital signs leave preset zones, and thus prevent SIDS. ¶¶5, 41.

## A.    Defendants Flout FDA Regulations

Under the Food, Drug, and Cosmetic Act (the "Act"), 21 U.S.C. § 321(h), the Smart Sock qualified as a medical "device" because it was "intended for use in the diagnosis of disease or other conditions," *i.e.,* desaturation and bradycardia. ¶¶43-44, 45, 48, 59.  Under the Act, before a company can market and sell a medical device it must seek FDA pre-authorization. ¶66. For Class II[4] medical devices, like the Smart Sock, approval is obtained via a 510(k) premarket submission, a process Defendants described as "lengthy and time consuming". ¶67. If a company fails to obtain FDA authorization, the device is deemed "adulterated," under 21 U.S.C. § 351(f)(1)(B); companies are forbidden from selling adulterated devices under 21 U.S.C. § 331(a). ¶68. The Proxy Defendants filed to solicit shareholder approval for the de-SPAC Merger confirmed their in-depth familiarity with the Act.

The Proxy also illustrated the detriment to Owlet should the FDA direct it to cease marketing and selling the Smart Sock suite of products.  The Proxy made clear the Smart Sock was Owlet's anchor product and that Owlet was "highly dependent on" and "rel[ied] on sales of our Owlet Smart Sock technologies and related products for the majority of our revenue and expect to continue to do so for the foreseeable future." ¶¶6, 81-83, 96, 102, 110.  Defendants also explained that Owlet faced reputational harm in

---

[4] Under the Medical Device Amendments of 1976, there are three classes of medical device; a Class II medical device represents a "moderate to high level of risk to the patient or user." Act, §513(a)(1)(B); 21 U.S.C. §360c(a)(1)(B).

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

4

the form of lost customers and sales if the FDA determined that the Smart Sock was a medical device, and that Owlet failed to comply with FDA regulations. ¶85. Additionally, failing to obtain FDA authorization for a medical device could also prevent Owlet from obtaining authorization to market and sell the device internationally, and achieving one of the growth strategies outlined in the Proxy. ¶86.

### B.  Defendants Always Knew the Smart Sock Qualified as A Medical Device

As early as May 2013, when questioned about a prototype of the Smart Sock at the International Business Model Competition ("IBMC") at Harvard University, Defendant Workman repeatedly acknowledged that the Smart Sock is a medical device because it has pulse oximetry and an alarm. ¶¶45-48.  Specifically, when asked whether the Smart Sock is a Class I, II or III device, Defendant Workman confirmed it is "*a Class II device . . . [b]ecause it's sounding an alarm*. ¶45. So an alarm means that we are giving advice to parents,'" explained that "since pulse oximetry has been around [and] there's so many devices already out there, predicate-wise, that's just how it is," and that *"[a]larm plus pulse oximetry means that you need FDA clearance*." ¶¶45-46.  Defendant Workman further confirmed that Owlet would initially sell a "more minimal and less risky" product in August 2013 without an alarm to avoid "all that liability," and then later launch its

flagship Class II device *with an alarm.* Indeed, that's what Owlet did.[5] ¶¶46, 50, 61. Owlet launched the Vitals/Baby Monitor without an alarm in August 2013 and stated in the press release that subsequent iterations containing alarm and notification features would require FDA clearance. ¶¶50-53. Owlet launched the Smart Sock with those features in October 2015, but *never obtained FDA clearance.* ¶61. Instead, Owlet claimed that its Smart Sock qualified as a low risk "wellness" product under 2015 FDA guidance and therefore did not require approval. ¶¶58-61. However, no amount of wordplay in Owlet's marketing materials, *e.g.,* using the words "peace of mind," could change that the diagnostic and alarm features classified the Smart Sock a Class II medical device. ¶¶63-64. Owlet even used a medical device manufacturer to manufacture the Smart Sock. ¶62.

Indeed, since 2016, the FDA explicitly and repeatedly told Owlet that the Smart Sock qualified as a medical device. ¶¶70, 74, 122. Four CWs confirmed that the FDA had warned Owlet multiple times that because the Smart Sock's alarm alerts parents to a potential medical problem, it is a diagnostic tool requiring FDA authorization. ¶¶75-79. They also confirmed that Workman and other senior executives knew this well before the de-SPAC Merger. *Id.* ***Nevertheless, Owlet brazenly continued to market and sell the***

---

[5] A 2014 medical journal publication later confirmed that, "Owlet's cofounder Jacob Colvin explained that the alarm was removed so that it could be sold as an unregulated monitoring device." ¶55.

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

*Smart Sock without FDA authorization*, triggering a substantial risk that Owlet would receive a Warning Letter from the FDA.

In addition to Workman's statements conceding that the Smart Sock is a Class II device and the FDA's explicit communications to Owlet, the FDA also issued industry wide guidance on August 22, 2018 making clear that, "[a] baby product is considered a medical device if claims to cure, treat, prevent, or reduce a disease or condition are made in the product's labeling, packaging, or advertising . . . ." ¶80. The FDA directed that all manufacturers of baby products designed to prevent any disease or condition, (*e.g., the Smart Sock*), review their marketing "for any direct or implied claims to cure, treat, or prevent a disease or condition, including SIDS," and to immediately "stop marketing" the products until they "receive FDA clearance or approval." *Id.* Despite these clear admonitions, both direct and industry wide, Owlet continued marketing the Smart Sock without approval.

As such, the Owlet Defendants negligently signed the Proxy with the materially false and misleading statements contained therein, depriving Sandbridge shareholders of their right to make an informed decision whether to redeem their Sandbridge common stock for cash or whether to approve the de-SPAC Merger.

## C.   Materially False and Misleading Statements in the Proxy

Defendants solicited shareholder approval for the de-SPAC Merger by authorizing the dissemination of the false and misleading Proxy. Specifically, the Proxy misled

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

7

Sandbridge shareholders by falsely stating that the Smart Sock is not a medical device, though clearly used to "diagnos[e] [] disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease," *the Act's very definition of a medical device*, failing to disclose that the FDA expressly told Owlet for years that the Smart Sock is a medical device, that Owlet's marketing of the Smart Sock violated FDA regulations, that the Company thus faced a real risk that the FDA would direct Owlet to cease its marketing and selling of the Smart Sock until Owlet obtained the necessary FDA authorizations, and that the revenue projections included in the Proxy had no reasonable basis.

Proxy repeatedly stated that the Smart Sock did not qualify as a medical device and thus did not require FDA pre-authorization. ¶96.  Even when describing a *Tachyarrhythmia Study* that touted the efficacy of the Smart Sock in diagnosing not only desaturation and bradycardia, but also supraventricular tachycardia ("SVT"), the most common arrhythmia found in children, Defendants doubled down on their claim that the Smart Sock was not a medical device. ¶¶99, 107-08.

The Proxy also misled investors by describing the risk that the "FDA ___may___ not agree" that the Smart Sock is not a medical device (and identified the Medicines and Healthcare products Regulatory Agency, the regulatory authority responsible for the UK medical device market as the only regulatory agency that had disagreed with Owlet's position) as *theoretical* and not disclosing that the FDA had in fact already repeatedly

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS
8

*confirmed* it **_did not_** agree with that conclusion. ¶¶96-97, 105-06. The FDA communicated to Owlet starting in 2016 "that the Owlet Smart Sock meets the definition of a device under the Act," a fact that Defendant Workman conceded in 2013; Defendants thus knew the Smart Sock was "adulterated" and that the FDA would ultimately insist that Owlet cease its unauthorized marketing and selling of the Smart Sock. ¶¶98, 105.

Moreover, the Proxy stated that the Sandbridge Board relied upon financial projections set forth "with numerical specificity," forecasting revenues skyrocketing from $75.2 million in 2020 to $1.06 billion in 2025. ¶¶101, 109. The Sandbridge Board used "this information" to determine "the fair value of common stock," as a basis for stating that "the Business Combination was in the best interest of its stockholders," and as a basis for recommending that shareholders approve the de-SPAC Merger. ¶¶102, 110. The projections, however, were both objectively and subjectively false. *Id.* Owlet based the revenue projections on the false underlying premise that Owlet would continue to market and sell the Smart Sock unimpeded and without FDA authorization. *Id.* Indeed, Defendants made clear the Smart Sock constituted "the majority of its revenue and expect[ed] to continue to do so for the foreseeable future." ¶¶6, 81, 96, 102, 110.

The Proxy further misled Sandbridge shareholders by representing that Owlet fully complied with applicable FDA regulations when marketing and selling the Smart Sock, and held "all material permits, including 501(k) clearances or premarket approvals

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

required by applicable FDA Laws." ¶¶103, 111. The foregoing statements were false and misleading because Owlet did not have FDA authorization to market and sell the Smart Sock as FDA laws required given that it qualified as a medical device. ¶¶104, 112. Owlet nevertheless consistently marketed the Smart Sock as tracking babies' vital signs and alerting parents if blood oxygen saturation or pulse rates fell outside safe zones, i.e., the Smart Sock assisted parents in identifying and/or diagnosing instances of desaturation and bradycardia. *Id.*

The Proxy also touted Owlet's revenue growth as a direct result of "substantial sales growth for the Owlet Smart Sock" but failed to disclose that Owlet faced a material risk of losing future revenue from the Smart Sock, the main source of its revenue and substantial growth driver, because it had been marketing and selling the Smart Sock in violation of the Act despite explicit admonitions form the FDA since 2016 that the Smart Sock qualified as a medical device given its role in identifying episodes of desaturation and bradycardia and thus required FDA authorization. ¶¶ 113-14.

### D.    **The Truth Emerges**

On October 4, 2021, less than three months after completing the de-SPAC Merger, Owlet revealed that it had received a Warning Letter from the FDA concerning the "Owlet Smart Sock Family." ¶¶ 116-17. The FDA issues Warning Letters "only for violations of regulatory significance," *i.e.,* "those [] that may lead to enforcement action if not promptly and adequately corrected." ¶ 118. The Warning Letter stated that after

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS
10

reviewing Owlet's website, commercial websites, and Owlet's responses to FDA correspondence, the FDA determined that Owlet "is marketing Owlet Smart Socks in the United States without marketing clearance or approval, in violation of the … Act," and that the products are therefore "adulterated." ¶¶ 119-20.   The Warning Letter provided a non-exhaustive list that "is not intended to be an all-inclusive list of the violations at your firm" of Owlet marketing the Smart Sock as a medical device in violation of the Act both on its website and retail sites. ¶ 121.

*Most shocking was the FDA's revelation that it had been telling Owlet since 2016 that the Smart Sock is a medical device and not a low-risk general wellness product, yet Owlet continued to market and sell the device without FDA authorization*. ¶ 122.   The FDA ordered that Owlet cease marketing and selling the Smart Sock and warned of additional repercussions. ¶ 123.

Owlet did not dispute the FDA's conclusions but rather assured investors that that Owlet would pursue marketing authorization and, in the meantime, engage with the FDA regarding modifications to the Smart Sock that might allow continued distribution pending authorization.  ¶ 124.

On this news, Owlet's stock price fell 23%, to close at $4.19 per share on October 4, 2021, on unusually heavy trading volume. ¶ 125. Thus, Sandbridge investors who could have voted against the de-SPAC Merger and redeemed their shares at $10.00 per share suffered a loss of $5.81 per share. *Id.*

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

On October 25, 2021, Owlet announced that it had ceased distribution of the Smart Sock in the U.S. as of October 22, 2021. ¶ 127. Despite its prior assurances, the Company never resumed commercial distribution of the Smart Sock with modifications or marketing changes. *Id.*

During an earnings call for the third quarter of 2021 held on November 10, 2021, Defendant Scolnick admitted that the FDA's Warning Letter, and Owlet's required cessation of all sales of the Smart Sock, already caused, "near-term headwinds for our product sales growth trajectory in the U.S." ¶ 128. Moreover, Owlet did not provide an update to its 2021 guidance given the Smart Sock's regulatory status and recent suspension of distribution. ¶ 129.

Then, during an earnings call for the fourth quarter of 2021 held on March 7, 2022, Defendant Scolnick stated: ¶ 130.

> As a result, for the fourth quarter and year ended 2021, the company recorded a contra revenue adjustment of $23.2 million for received and anticipated returns on the Owlet Smart Sock and Owlet monitor duo products.
>
> ***
>
> The cessation of US Smart Sock and Duo sales and product returns however, resulted in total net negative revenues of $2.5 million for the fourth quarter 2021.

When the Company later filed its Form 10-K for the year ended December 31, 2021, it stated that because Owlet had been "dependent on sales of the Owlet Smart Sock in the U.S. for a majority of our revenue, and expected to continue to be dependent for

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

the foreseeable future," the "Company's results of operations for the fourth quarter and year-ended 2021 were ***substantially and negatively impacted*** due to the reduction of revenues for received and anticipated returns of Owlet Smart Sock and Owlet Monitor Duo product." ¶ 131.  The negative reverberations continued in the first quarter 2022. ¶ 132.  Owlet's stock price has never recovered.

## III.    ARGUMENT

### A.    Applicable Standards

Plaintiffs "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).[6]  "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 204 L. Ed. 2d 264 (2019). Courts must accept as true all well-pled factual allegations, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).

A plaintiff states a §14(a) claim by alleging that: "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3)

---

[6] All citations omitted, and emphasis added, unless otherwise noted.

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

13

that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *In re Hot Topic, Inc. Sec. Litig.*, 2014 WL 7499375, at *4 (C.D. Cal. May 2, 2014). No allegations of scienter are required for Section 14(a)— negligence suffices. *See Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682 (9th Cir. 2005). Rule 8(a)'s notice pleading standards thus apply to Plaintiff's claim. *Jian Zhou v. Faraday Future Intelligent Elec. Inc.*, 2022 U.S. Dist. LEXIS 192565, at *36-37 (C.D. Cal. Oct. 20, 2022).  In any event, the Complaint also satisfies Rule 9(b).

The Complaint sufficiently alleges that Defendants filed the Proxy to solicit shareholder approval of the de-SPAC Merger, which contained material misstatements and omitted material information.  Specifically, the Proxy falsely stated: 1) that the Smart Sock was not a medical device; 2) that the FDA "may not agree" that the Smart Sock is not a medical device; 3) that Owlet complied with applicable FDA regulations and held material permits; and 4) that Owlet expected revenues to skyrocket to $1.06 billion by 2025; the Proxy omitted that: 1) Defendant Workman and other Owlet senior executives knew since 2013 that the Smart Sock was a Class II medical device; 2) the FDA repeatedly told Owlet since 2016 that the Smart Sock is a medical device under the Act; 3) Owlet's violation of applicable regulations raised a substantial risk that the FDA would order Owlet to cease marketing/selling the Smart Sock, Owlet's primary source of revenue, until it obtained authorization; and 4) Sandbridge unreasonably relied on

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS
14

Owlet's revenue projections in determining to approve the de-SPAC Merger because the forecast improperly assumed Owlet would continue selling its primary source of revenue unimpeded "for the foreseeable future."

### 1) The Complaint Adequately Pleads Falsity

#### a. Misleading Statements that the Smart Sock Is Not a Medical Device

Defendants negligently disseminated the Proxy, despite the numerous false statements averring that the Smart Sock, upon which Owlet relied for most of its revenue, "is not a medical device and does not require marketing authorization from the FDA." There is no dispute that, under the Act, if a device is used to diagnose a disease or condition, it is a medical device and, that without FDA pre-authorization, medical devices cannot be marketed or sold. There is no dispute that the Smart Sock measured blood oxygen saturation and pulse rate to identify, i.e., diagnose, desaturation and bradycardia, and contained an alarm feature to notify users when these vital signs fell outside preset zones. There is no dispute that at all relevant times, Owlet's marketing materials touted these features. There is no dispute that the Complaint therefore pleads *objective* falsity. There is also no dispute that Defendant Workman understood and admitted in 2013, *years* before the de-SPAC Merger and before the product launched, the that the pulse oximetry and alarm features meant the Smart Sock qualified as a Class II device. Moreover, as the Warning Letter confirms, the FDA communicated to Owlet as far back is 2016 that the Smart Sock is a medical device. Nevertheless, Owlet *never*

obtained FDA pre-authorization to market the Smart Sock.  The Complaint thus pleads *subjective* falsity.  With objective and subjective falsity adequately pled, the falsity inquiry can end here.

Try as they might, Defendants cannot claim that their statements are inactionable opinion. The Proxy includes statements that the Smart Sock is not a medical device conveyed **as fact,** not an "inherently subjective assessment," as Defendants summarily argue. *See, e.g.,* ¶99 ("Although the Owlet Smart Sock is a consumer product and not a medical device…").  Moreover, inserting the word "belief" into a misstatement, *e.g.,* ¶¶97, 105, does not permit the speaker to affirmatively create an impression that doesn't "fairly align[] with the information in the issuer's possession at the time." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764, 771, 779 (9th Cir. 2023). Defendants did not genuinely believe that the Smart Sock was not a medical device given the Act's unambiguous requirements, Defendant Workman's statements in 2013, and the FDA's repeated communications to Owlet since 2016. ¶¶45-46, 70, 74, 122.  As Defendants concede, opinions are actionable under *Omnicare* where "the speaker did not hold the belief she professed," i.e., subjective falsity. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186-87 (2015).

Based on three equally fallacious premises. Defendants ask this Court to buy into their self-serving assertions that Owlet held a "sincere belief that the Smart Sock was, in fact, a general wellness product and not a medical device," all of which ignore the

immovable and determinative fact *that the FDA stated that it told Owlet multiple times since 2016 that the Smart Sock is a medical device not a wellness product*. ¶122.

First, mischaracterizing the FDA's definition of intended use, to which they cite, Defendants incorrectly argue that only the content of Owlet's "promotional claims" are relevant to the "medical device" determination, not the Smart Sock's functionality. Mot. at 16. The FDA rejected this position outright. *See* 86 FR 41383, 41386 ("nothing in the statue requires the narrow scope that…evidence of intended use is limited to promotional claims…") In fact, the FDA (also citing abundant case law) made clear that to limit the inquiry to what a company says publicly would encourage "firms…to evade FDA [] jurisdiction by avoiding making express claims about their products or disclaiming a particular intended use…," as Owlet unsuccessfully tried to do here. *Id.* at 41383. Moreover, the FDA explicitly listed the "design and composition of an article," i.e., its functionality, as relevant to "determining the article's intended use." *Id.* at 41390. That other pulse oximeters have been deemed wellness products is irrelevant, Mot. at 17, as they did not contain the "alarm" function intended to alert users to potential desaturation and bradycardia in infants.

Second, Defendants downplay the significance of Workman's 2013 statements because they predate the FDA's creation of the general wellness category in 2015, Mot. at 17, though the general wellness guidance clearly did not apply to the Smart Sock as the FDA told Owlet starting in 2016 follow the Smart Sock's launch.

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

17

Third, the CW allegations confirm Owlet knew the Smart Sock was a medical device. *See, e.g.,* ¶76 ("CW2 stated that Owlet knew it needed FDA approval…"); ¶78 ("CW4 confirmed…that Owlet knew it had to get FDA approval for the Smart Sock as a medical device…").

Without citing a single §14 case, and confusing subjective falsity with scienter[7], Defendants also untenably argue that Plaintiffs can never assert subjective falsity in a §14(a) case given that the standard is negligence. Mot. at 15-16. However, just because the ***standard*** is negligence, does not mean Plaintiff cannot establish the subjective falsity of opinion statements. *Brown v. Papa Murphy's Holdings*, No. C19-5514 BHS-JRC, 2021 U.S. Dist. LEXIS 77849, **5-9 (W.D. Wash. 2021) (applying the negligence standard to a §14(e) claim, holding that plaintiff is "not required to establish any evil motive or even reckless disregard of the facts," but finding subjective falsity as to alleged misrepresentations); *In re Hot Topic Sec. Litig.*, No. CV 13-02939 SJO (JCx) 2014 U.S. Dist. LEXIS 180513, **20, 27 (C.D. Cal. May 2, 2014) (same in §14(a) case).

### b. Misleading Statements that the FDA *May* Disagree that the Smart Sock is not a Medical Device

The Proxy also falsely stated that the FDA expressed that it "may" disagree with Owlet's conclusion that the Smart Sock is not a medical device. First, Owlet did not

---

[7] *Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 326-327 (S.D.N.Y. 2012) (making clear the distinction between subjective falsity and scienter); *NCUA Bd. v. Wachovia Capital Mkts., LLC*, 2014 U.S. Dist. LEXIS 62592, *17-18 (S.D.N.Y. 2014) (same).

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

18

actually conclude that the Smart Sock is not a medical device. Defendants well knew that the Smart Sock met the definition of a medical device under the Act but sought to avoid the "lengthy and time consuming" pre-authorization process by pretending its diagnostic tool was a low-risk wellness product. Second, even if it had, the FDA made clear in the Warning Letter that, "*[s]ince 2016*, the FDA has corresponded with Owlet that the Owlet Smart Sock meets the definition of a device under the FD&C Act and does not fall under the compliance policy for low-risk products that promote a healthy lifestyle (General Wellness guidance)." ¶122.

Defendants falsely state in their motion that the FDA communicated to Owlet once in 2016 that "the Smart Sock appears to meet the definition of a device" and that the FDA's next communication, the Warning Letter, came six years later. Mot. at 6-7, 11. The FDA did not state in 2016 that the Smart Sock *may* meet the definition of a device, but rather than it appears that it *did*. Def. Ex. 2. The Warning Letter confirms this. ¶122. As such, Defendants' citation to facts outside the record describing the purported differences between an "It Has Come to Our Attention Letter" and a Warning Letter, to deflect from the FDA's own characterization of its communications with Owlet, is a red herring. The 2016 letter did not reflect the FDA's uncertainty as to whether the Smart Sock qualified as a medical device but rather, after definitively determining that it is a medical device because it "is intended to monitor sleeping infant's blood oxygen level and irregular vital signs," told Owlet that it could not find

any FDA clearance or approval number for the Smart Sock and directed Owlet to "provide us with the FDA clearance or approval number for the Owlet Smart Sock." Doc. No. 92-3. No such clearance or approval number existed.

The Complaint alleges that the FDA communicated its determination to Owlet again in 2017. ¶74. Seeking an unreasonable inference in their favor, Defendants characterize the FDA's 2017 admonition as an "internal agency communication," though the Complaint alleges that the FDA communicated its determination to Owlet. *Id.*, fn. 12. Moreover, four CWs corroborating one another verified that the FDA repeatedly communicated to Owlet that the Smart Sock was a medical device and also confirmed that Defendants knew (and discussed at regularly held meetings) that Owlet needed authorization because, despite attempts to manipulate marketing verbiage, the Smart Sock met the definition of a medical device, the marketing still described the functionality of the product (including the pulse oximetry and alert features, ¶121) that rendered it a medical device, and consumers perceived it as such. ¶¶75-79.

Defendants next argue they had no obligation to disclose the FDA's communications prior to the Warning Letter. However, having opted to falsely represent in the Proxy that the Smart Sock is not a medical device and to falsely characterize the FDA's disagreement with that assessment as purely hypothetical, Defendants triggered a duty to disclose that the Smart Sock qualified as a medical device and that the FDA had definitively communicated as such to Owlet, so as not mislead Sandbridge investors

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

deciding whether to approve the de-SPAC Merger or redeem their shares. *Schueneman v. Arena Pharm., Inc*., 840 F.3d 698, 707-08 (9th Cir. 2016).

Defendants then assert that, in any event, by divulging that the UK regulatory agency had disagreed with Owlet's assessment of the Smart Sock, Owlet adequately disclosed "the *possibility* that the FDA would reach a similar adverse determination." Mot. at 13. Again, the word "*possibility*" is key.  Communicating a risk is "*possible*" when the risk has already transpired and is thus "*certain*" is misleading.  *Berson v. Applied Signal Tech., Inc*., 527 F.3d 982, 987 (9th Cir. 2008).[8]

Without support, Defendants also argue that Item 303 should not create a duty to disclose for a §14(a) claim, and alternatively argue that for Item 303 omissions must be material.  Mot. at 13.  No courts in the Ninth Circuit have held that an Item 303 violation will not sustain a §14(a) claim[9].  Moreover, Defendants cannot credibly claim that misstatements regarding a product that earns most of Owlet's revenue and concerning Owlet's ability to continue marketing and selling that product are immaterial.  Indeed, the substantial negative impact to Owlet's results of operations when it ultimately stopped selling the Smart Sock following the Warning Letter is a stark demonstration of materiality.  ¶¶127-32.   Defendants do not address, and therefore concede, that

---

[8] Defendants' assertion that "Owlet did not omit any information that would render misleading its opinion that the Smart Sock qualified as a general wellness product," is therefore bizarre and unavailing. Mot. at 19.

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

21

Defendants violated their duty to disclose the most significant risk factors that made the investment speculative or risky in the Proxy, as Item 105 requires. ¶¶91-93.

### c. Misleading Statements of Regulatory Compliance

The Proxy falsely stated that Owlet marketed and sold "all products" "in compliance in all material respects with applicable FDA Laws" and that Owlet "holds all material permits, including 501(k) clearances or premarket approvals required by applicable FDA Laws."  The falsity of these statements is incontrovertible.  By describing the functionality of the Smart Sock in marketing materials as tracking vital signs and alerting users to health events ("if your baby's oxygen level or heart rate leave preset zones," signs of desaturation and bradycardia) and selling the medical device without FDA pre-authorization, Owlet violated the Act (including 21 U.S.C. § 321(h), 21 U.S.C. § 351(f)(1)(B), 21 U.S.C. § 360e(a), 21 U.S.C. § 360j(g), 21 U.S.C. § 331(a)). Moreover, given that Owlet had not obtained 501(k) clearance to market and sell the Smart Sock, as FDA Laws required, it did not in fact "hold all material permits…"

Defendants do not address, and thus concede, the falsity of these misstatements.

### d. Misleading Projections

The Proxy included misleading projections forecasting that revenues would skyrocket to $1.06 billion by 2025 based on the false premise that the FDA would permit

---

[9] Indeed, Courts outside the Ninth Circuit have held that it will. *See, e.g., Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc*., 2023 U.S. Dist. LEXIS 157803, *45 (N.D. Ill. Sept. 6, 2023).

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

Owlet to continue to sell the Smart Sock, which Owlet relied upon "for the majority of our revenue and expect[ed] to continue to do so for the foreseeable future." ¶¶6, 101, 109. The Proxy made clear that the Sandbridge Board used "this information" to determine "the fair value of common stock," as a basis for stating that "the Business Combination was in the best interest of its shareholders," and as a basis for recommending that Sandbridge shareholders approve the merger. ¶102. Moreover, Owlet represented that the Smart Sock is its "anchor" product; customers would purchase the Smart Sock first, and then add other of Owlet's complementary solutions like the Owlet Cam or Owlet Dream Lab. ¶82. An inability to market and sell the "anchor," would therefore also impact Owlet's ability to sell other of its products. As explained, Defendants knew the Smart Sock qualified as a medical device as early as 2013, and certainly no later than 2016. The objective and subjective falsity of the projections is thus adequately pled. *See Brown v. Papa Murphy's Holdings*, 2021 U.S. Dist. LEXIS 12250, at *10 (W.D. Wash. Jan. 12, 2021) (projections actionable if they are both subjectively and objectively false or misleading).

Defendants cannot hide behind the PSLRA's safe harbor, which does *not* apply when, as here, management is expressing a *current* belief in the accuracy of forecasts, and plaintiff alleges such belief is not genuinely held. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017); *Karri v. Oclaro, Inc.,* 2020 U.S. Dist. LEXIS 187317, at *14-15 (N.D. Cal. Oct. 8, 2020). Moreover, the Proxy did not include

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

sufficient cautionary language as it omitted the fact that the FDA had already communicated its definitive determination to Owlet that the Smart Sock is a medical device. *Forescout Techs., Inc.*, 63 F.4th at 780.

### B. The Complaint Adequately Pleads a §20(a) Claim

Defendants concede that if the Court upholds the §14(a) claim, the §20(a) claim also survives. *See* Mot. at 21.

### C. Defendants Failed to Comply with L.R. 7-3

L.R. 7-3 required Defendants to contact opposing counsel at least seven days before filing their motions to dismiss to "discuss thoroughly…the substance of the contemplated motion," i.e., on or before February 2, 2024. There is no futility exception to this rule; even if the moving party suspects a pre-motion conference will fail to resolve any aspect of the dispute, the moving party is still required to adhere to L.R. 7-3. Defendants *falsely certified* in their motions to dismiss, *see* Doc. Nos. 92 and 94 that counsel engaged in a conference "pursuant to L.R. 7-3 which commenced via electronic mail on or before January 31, 2024, and continued through February 7, 2024, via electronic mail, telephone, and Zoom." The parties did not confer *at any point via any means* regarding the substance of the contemplated motions to dismiss. Counsel for the parties, excluding counsel for the Sandbridge Defendants, telephonically conferred *for the first time* solely regarding Defendants' request to file an omnibus brief and to increase word limits on February 5, 2024, four days before Defendants filed their

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS

24

motions.  During a follow up Zoom meeting held on February 7, 2024, attended by all parties, the parties once again only discussed word limits.  Per L.R. 7-4, the "Court may decline to consider a motion unless it meets the requirements of L.R. 7-3…".  Defendants' motions do not.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Motion be denied.

Dated: March 22, 2024                                    Respectfully submitted,

**POMERANTZ LLP**

By: /s/ Tamar A. Weinrib
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (646) 581-9973
Facsimile: (917) 463-1044
taweinrib@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Lead Counsel for Lead Plaintiff and the Section 14(a) Class*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff, certifies that this brief contains 6,135 words, which complies with the word limit of L.R. 11-6.1.

March 22, 2024                                      __/s Tamar A. Weinrib_____
                                                   Tamar A. Weinrib

PLAINTIFF'S OPPOSITION TO OWLET DEFENDANTS' MOTION TO DISMISS
1