POMERANTZ LLP
Tamar A. Weinrib
taweinrib@pomlaw.com
600 Third Avenue, 20th floor
New York, New York 10016
Telephone: (646) 581-9973

*Lead Counsel for Lead Plaintiff Drew
Conant and the Section 14(a) Class*

*Additional Counsel on Signature Page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| MICHAEL J. BUTALA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>OWLET, INC. f/k/a SANDBRIDGE ACQUISITION CORPORATION, KURT WORKMAN, KATE SCOLNICK, KEN SUSLOW, RICHARD HENRY, DOMENICO DE SOLE, RAMEZ TOUBASSY, JAMIE WEINSTEIN, KRYSTAL KAHLER, and MICHAEL F. GOSS,<br><br>Defendants. | Case No.: 2:21-cv-09016-FLA-SSC<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE SANDBRIDGE DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S 14(a) COMPLAINT**<br><br>Hearing Date: May 31, 2024<br>Time:          1:30 P.M.<br>Courtroom:   6B<br>Judge:        Hon. Fernando L. Aenlle-Rocha |

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

# **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ........................................................................1

II.   STATEMENT OF FACTS ...............................................................................4

    A.    Background ...........................................................................................4

    B.    The Sandbridge Defendants Negligently Disseminate the Proxy .................5

III.  ARGUMENT...................................................................................................10

    A.    Applicable Standards..........................................................................10

        1)    The Sandbridge Defendants are Liable for Each Misleading Statement in the Proxy ........................................................11

        2)    The Complaint Adequately Pleads the Sandbridge Directors' Negligence ..........................................................12

        3)    The Exculpatory Provision Does Not Shield the Sandbridge Defendants from Liability .................................................15

    B.    The Sandbridge Defendants Failed to Comply with the Local Rules.........17

IV.   CONCLUSION................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Azar v. Blount Int'l, Inc.*,
2017 U.S. Dist. LEXIS 39493 (D. Or. Mar. 20, 2017)................................................14

*Baum v. Harman Int'l Indus.*,
575 F. Supp. 3d 289 (D. Conn. 2021)........................................................................15

*Blockchain Innovation, LLC v. Franklin Res., Inc.*,
2023 U.S. Dist. LEXIS 48109 (N.D. Cal. 2023) ..................................................16, 17

*Brown v. Brewer*,
2010 U.S. Dist. LEXIS 60863 (C.D. Cal. June 17, 2010)..........................................15

*Brown v. Papa Murphy's Holdings*,
2021 U.S. Dist. LEXIS 77849 (W.D. Wash. Apr. 22, 2021) .........................13, 14, 15

*City of Westland Police & Fire Ret. Sys. v. Sonic Sols.*,
2009 U.S. Dist. LEXIS 33339 (N.D. Cal. Apr. 6, 2009)............................................14

*In re Gilead Scis. Sec Litig.*,
536 F.3d 1049 (9th Cir. 2008) ...................................................................................10

*In re Hot Topic, Inc. Sec. Litig.*,
2014 WL 7499375 (C.D. Cal. May 2, 2014).........................................................10, 14

*In re Zoran Corp. Derivative Litig.*,
511 F. Supp. 2d 986 (N.D. Cal. 2007).......................................................................16

*Jian Zhou v. Faraday Future Intelligent Elec. Inc.*,
2022 U.S. Dist. LEXIS 192565 (C.D. Cal. Oct. 20, 2022) ..................................11, 12

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 204 L. Ed.
2d 264 (2019)..............................................................................................................10

*Knollenberg v. Harmonic, Inc.*,
152 F. App'x 674 (9th Cir. 2005).................................................................................10

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ................................................................................................ 10

*Shaev v. Baker*,
2017 U.S. Dist. LEXIS 68523 (N.D. Cal., May 4, 2017) ........................................ 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........................................................................................ 10, 15

**Statutes**

21 U.S.C. § 360c(a)(1)(B) ........................................................................................ 4

15 USCS § 78l ...................................................................................................... 11

15 USCS § 78n ............................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 8 .............................................................................................. 11, 12

Fed. R. Civ. P. 9 .............................................................................................. 11, 12

L.R. 7-3 ...................................................................................................... 1, 17, 18

L.R. 7-4 ............................................................................................................ 1, 18

L.R. 11-6.1 .................................................................................................. 1, 2, 18

## I.    PRELIMINARY STATEMENT

The Sandbridge Mot.[1] reflects an egregious disregard of the Central District of California's Local Civil Rules and should be denied on that basis alone.  First, as detailed *infra,* the Sandbridge Defendants[2] falsely certified that they complied with L.R. 7-3 though they did not meet and confer with Plaintiff at any point regarding the substance of their motion to dismiss.  Per L.R. 7-4, the Court can therefore decline to consider their motion.  Second, the Sandbridge Defendants state in their motion that:

> The Sandbridge Defendants *adopt and join the Owlet 14(a) Brief[3] in full*. The Sandbridge Defendants respectfully submit their Motion and this *supplemental Memorandum* to raise additional, further bases on which the claims against them should be dismissed.

Sandbridge Mot. at 1.  As such, collectively, the Sandbridge Defendants have proffered 10,131 words of argument for the Court to consider on their motion, far exceeding the 7,000 word limit set by L.R. 11-6.1.  Even if the Court opted to overlook the Sandbridge Defendants' false certification of compliance and flouting of L.R. 7-3, the Court should

---

[1], "Sandbridge Mot." refers to the Memorandum of Points and Authorities in Support of Sandbridge Defendants' Motion to Dismiss Amended Class Action Complaint. Doc. No. 95.

[2] Including CEO and Board Chairman Ken Suslow, CFO Richard Henry, and Directors Domenico de Sole, Ramez Toubassy, Jamie Weinstein, Krystal Kahler, and Michael F. Goss.

[3] The Owlet Defendants' Notice of Motion and Motion to Dismiss Plaintiff's 14(a) Complaint, Doc. No. 92, referred to herein as Owlet Mot.

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

not consider the Sandbridge Defendants' "supplemental memorandum"[4] as it brings them more than 3,000 words over the limits imposed by L.R. 11-6.1.

In any event, the Sandbridge Mot. provides no valid basis for dismissal. The Sandbridge Defendants authorized the dissemination of a proxy containing false and misleading statements to solicit shareholder approval of the de-SPAC Merger.[5] Ignoring the elements of a §14(a) claim and the Complaint's allegations, the Sandbridge Defendants proffer three equally fallible premises for their motion. First, conveying a fundamental misunderstanding of §14(a), which governs the *solicitation* of proxies, they argue they are not liable because the alleged misstatements in the Proxy[6] are attributable to Owlet, not Sandbridge. Any defendant that negligently prepares, reviews, and/or disseminates a false and misleading proxy statement is liable under §14(a) for the misleading statements contained therein. As the Complaint alleges, and as Sandbridge has made clear in multiple filings with the SEC, "Sandbridge and its directors and executive officers may be deemed

---

[4] Alternatively, the Court should reject the Sandbridge Defendants' attempt to "adopt and join the Owlet 14(a) brief in full." To the extent the Court considers the Sandbridge Defendants' "supplemental memorandum," Plaintiff respectfully incorporates herein all arguments set forth in Plaintiff's Memorandum of Points and Authorities in Opposition to the Owlet Defendants' Motion to Dismiss Plaintiff's 14(a) Complaint filed contemporaneously ("Opp. Br.").

[5] Defined below.

[6] "Proxy" refers collectively to the Preliminary Proxy Statement included in the Registration Statement, signed by Defendants Suslow, Henry, De Sole, Goss, Kahler, Toubassy, and Weinstein, filed on Form S-4 on March 31, 2021, and the final Proxy Statement filed with the SEC on June 21, 2021

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

2

participants in the solicitation of proxies from Sandbridge's stockholders with respect to the proposed business combination." Second, the Sandbridge Defendants argue they did not *negligently* disseminate the Proxy. Each Sandbridge Defendant, as signatories and participants in the solicitation, and per the Business Combination Agreement ("BCA"), had access to information contradicting the misstatements of fact in the Proxy. The Sandbridge Defendants could not have genuinely believed in the accuracy of the misstatements had they undertaken even the barest diligence (as they claimed to) into Owlet's primary source of revenue at the time of the de-SPAC Merger and the expected source of primary revenue for the "foreseeable future." Negligence is thus adequately pled. Third, the Sandbridge Defendants argue they are immunized from §14(a) liability because of a §102(b)(7) exculpation clause in Sandbridge's Articles of Incorporation. Numerous courts in this Circuit have upheld §14(a) claims despite such clauses where defendants, as here, have exhibited bad faith or breached their duty of loyalty. Moreover, the clause only applies to directors, and thus does not apply to Defendant Henry. Bereft of any credible challenge, and given their disregard for the Local Rules, the Sandbridge Mot. must fail.

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

3

## II.    STATEMENT OF FACTS[7]

### A.    Background

Sandbridge, a publicly traded shell special purpose acquisition company ("SPAC") with no ongoing business operations, combined with Owlet Baby Care Inc. via a "de-SPAC" transaction, a type of reverse merger ("de-SPAC Merger") on July 15, 2021.  ¶¶2-3, 32, 36, 38.  Owlet's flagship product at the time was the Smart Sock, a baby monitor utilizing pulse oximetry sensors embedded in a sock to track a baby's vital signs like heart rate and oxygen levels in real time. ¶¶4, 41.  The Smart Sock purported to identify and alert parents via an alarm to respiratory-driven infant health issues like desaturation (low blood oxygen levels) and bradycardia (a heart rate that's too slow) when the infant's vital signs leave preset zones, and thus prevent SIDS. ¶¶5, 41.  That functionality qualified the Smart Sock as a Class II[8] medical device requiring FDA pre-authorization to market and sell. ¶¶43-44, 45, 48, 59.

The Proxy made clear that the Smart Sock was Owlet's anchor product, and that Owlet was "highly dependent on" and "rel[ied] on sales of our Owlet Smart Sock technologies and related products for the majority of our revenue and expect to continue

---

[7] All "¶__" references are to the Amended Consolidated Complaint for Violations of The Federal Securities Laws ("Complaint"), filed December 22, 2023, Doc. No. 80.

[8] Under the Medical Device Amendments of 1976, there are three classes of medical device; a Class II medical device represents a "moderate to high level of risk to the patient or user." 21 U.S.C. § 360c(a)(1)(B).

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

4

to do so for the foreseeable future." ¶¶6, 81-83, 96, 102, 110. The Proxy also explained that Owlet faced reputational harm in the form of lost customers and sales if the FDA determined that the Smart Sock was a medical device, and that Owlet had failed to obtain FDA authorization. ¶85.  Additionally, failing to obtain FDA authorization for a medical device could also prevent Owlet from obtaining authorization to market and sell the device internationally, and achieving one of the growth strategies it outlined in the Proxy. ¶86.

Defendant Workman conceded the Smart Sock qualified as a medical device as early as May 2013, when questioned about a prototype of the Smart Sock at the International Business Model Competition ("IBMC") at Harvard University. ¶45. Moreover, the FDA told Owlet repeatedly beginning in 2016 that the Smart Sock qualified as a medical device (and not a wellness product which would not need authorization). ¶¶70, 74, 122. The FDA also issued industry wide guidance on August 22, 2018 making clear that baby products with functionality like the Smart Sock that can diagnose or prevent a condition qualify as medical devices requiring FDA approval. ¶80.  Owlet nevertheless marketed the Smart Sock without obtaining FDA approval.

**B.     The Sandbridge Defendants Negligently Disseminate the Proxy**

The Form 8-K Sandbridge filed to announce the execution of the BCA on February 16, 2021, and every Form 425 filed with the SEC leading up to the de-SPAC Merger, made clear that, "[Sandbridge] and its directors and executive officers may be deemed participants in the solicitation of proxies from Sandbridge's stockholders with respect to

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

5

the proposed business combination." *See, e.g.*, Weinrib Decl.[9], Exs. A-B; *see also* ¶¶1, 6, 20-26, 81, 95-96, 141.  The Complaint further alleges that each Defendant signed the Proxy. ¶¶89, 96. The Sandbridge Defendants are therefore liable for every misstatement contained therein.

According to the Proxy, no later than November 7, 2020, pursuant to the BCA, the Sandbridge Defendants had access to all material information regarding the Smart Sock through Owlet's directors, officers, books and records. ¶87. The BCA made clear that the Sandbridge Defendants availed themselves of that access to conduct an independent review and analysis of Owlet's business, assets, liabilities, condition, operations, and prospects. ¶88. Moreover, the Proxy explains that Sandbridge proposed the de-SPAC merger "based on its due diligence investigations of Owlet and the industries in which it operates." Owlet Mot., Ex. 6, at 1 (Ex. Page 37).  During the diligence process, senior management from Sandbridge[10] and Owlet met multiple times to review Owlet's operations.  For example, on November 12, 2020, management from both companies held a meeting where "Owlet's management team presented an investor presentation regarding Owlet and its business operations, including financial information, historic and projected

---

[9] "Weinrib Decl." refers to the Declaration of Tamar A. Weinrib in Support of Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motions to Dismiss Plaintiff's 14(a) Complaint, filed contemporaneously herewith.

[10] The first paragraph of the Proxy makes clear that "Sandbridge" refers to "the board of directors of Sandbridge Acquisition Corporation." Owlet Mot., Ex. 6, at cover page (Ex. Page 21).

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

6

revenues and profits, views on competitive positioning, market opportunity, product roadmap, and background on the Owlet management team, together with a general overview of the emerging telehealth opportunity. *Id.* at 99 (Ex. Page 137). In addition, members of Owlet's management team responded to questions from Sandbridge." *Id.* For the next two months Sandbridge reviewed Owlet documents in a virtual data room. *Id.* On January 19, 2021 the Sandbridge Board met to discuss "key diligence findings." *Id.* The Proxy explains that the diligence included a review of Owlet's "plan for a comprehensive ecosystem of offerings related to baby care, its ability to enhance, extend and expand its platform, the strength of the Owlet brand and total addressable market for its products." *Id.* at 100 (Ex. Page 138). Per the Proxy, the Sandbridge Defendants understood the relevant FDA regulations and that failing to obtain marketing authorization for medical device products like the Smart Sock "could severely harm Owlet's business," *Id.* at 25, 52, 53, 182 (Ex. Pages 62, 89, 90, 222), because Owlet relie[d] on sales of our Owlet Smart Sock technologies and related products for the majority of its revenue and expects to continue to do so for the foreseeable future." *Id.* at 25, 37 (Ex. Pages 62, 74). Given that the foregoing is listed a significant risk factor in the Proxy, given Owlet's reliance on revenue from the Smart Sock, the acknowledgment that failing to obtain authorization could severely harm its business, and the Proxy's references to Owlet communications with the FDA, the Sandbridge Defendants due diligence undoubtedly included FDA communications with Owlet regarding the Smart Sock. Moreover, as part of its legal

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

review, Sandbridge would have evaluated whether Owlet had complied with relevant FDA regulations.

The Sandbridge Board tellingly opted to forego obtaining a fairness opinion and relied upon Owlet's lofty projections though based on the faulty premise that Owlet could continue to sell the Smart Sock suite of products unimpeded without FDA marketing authorization. ¶¶6, 40, 101-02, 109. The Sandbridge Defendants also made clear to investors in the Proxy that, "You should rely only on the information contained in this proxy statement/prospectus. No one has been authorized to provide you with information that is different from that contained in this proxy statement/prospectus." *Id.* at ii.

Despite their admitted access to information contradicting statements in the Proxy that the Smart Sock is not a medical device, that the FDA *may* disagree with that assessment (thought the FDA already had), that Owlet complied with all applicable regulations and held all material permits (though it did not), and projecting revenues skyrocketing to $1.06 billion by 2025 (based on the false premise that Owlet did not face a substantial risk of losing its primary source of revenue from the Smart Sock as a result of a FDA Warning Letter), the Sandbridge Defendants authorized the dissemination of the Proxy to solicit shareholder approval of the de-SPAC Merger.

As such, the Sandbridge Defendants each negligently signed the Proxy Statement with the materially false and misleading statements contained therein, thus depriving

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

8

Sandbridge shareholders of their right to make an informed decision whether to redeem their Sandbridge common stock for cash or whether to approve the de-SPAC Merger.

When the FDA ultimately issued the Warning Letter[11] stating that Owlet violated the Act by marketing the Smart Sock without pre-authorization, that the Smart Sock was therefore "adulterated," that the FDA had told Owlet since 2016 that the Smart Sock is a medical device and not a wellness product, and ordering Owlet to stop marketing and selling the Smart Sock, Owlet's stock price fell 23%, to close at $4.19 per share on October 4, 2021, on unusually heavy trading volume. ¶¶ 119-25.

Thus, Sandbridge investors who could have voted against the de-SPAC Merger and redeemed their shares at $10.00 per share suffered a loss of $5.81 per share. ¶ 125. The Company never resumed commercial distribution of the Smart Sock. ¶ 127. Moreover, because of Owlet's reliance on revenue from the Smart Sock, the "Company's results of operations for the fourth quarter and year-ended 2021 were ***substantially and negatively impacted*** due to the reduction of revenues for received and anticipated returns of Owlet Smart Sock and Owlet Monitor Duo product." ¶ 131. The negative reverberations continued thereafter, and the stock price still has not recovered.

---

[11] Available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/owlet-baby-care-inc-616354-10052021.

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

9

## III.   ARGUMENT

### A. Applicable Standards

Plaintiffs "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).[12] "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 204 L. Ed. 2d 264 (2019). Courts must accept as true all well-pled factual allegations, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).

A plaintiff states a §14(a) claim by alleging that: "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *In re Hot Topic, Inc. Sec. Litig.*, 2014 WL 7499375, at *4 (C.D. Cal. May 2, 2014). No allegations of scienter are required for Section 14(a)— negligence suffices. *See Knollenberg v. Harmonic, Inc.*, 152

---

[12] All citations omitted, and emphasis added, unless otherwise noted.

F. App'x 674, 682 (9th Cir. 2005). Rule 8(a)'s notice pleading standards thus apply to Plaintiff's claim. *Jian Zhou v. Faraday Future Intelligent Elec. Inc.*, 2022 U.S. Dist. LEXIS 192565, at *36-37 (C.D. Cal. Oct. 20, 2022).  In any event, the Complaint also satisfies Rule 9(b).

### 1) The Sandbridge Defendants are Liable for Each Misleading Statement in the Proxy

Other than adopting the arguments set forth in the Owlet Mot. (which the Court should not consider for the reasons stated *infra* but which are addressed in the contemporaneously filed Opp. Br.), the Sandbridge Defendants do not raise a single argument disputing the falsity of the alleged misstatements.  Instead, ignoring the plain language of §14(a), the Sandbridge Defendants make the untenable argument that none of the misstatements in the Proxy are attributable to them because the Proxy "attribute[s] each of the statements at issue to Old Owlet." Sandbridge Mot. at 4-6.  However, §14(a) governs the *solicitation of proxies*:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 USCS § 78l].

15 USCS § 78n.  In other words, §14(a) and Rule 14a-9 prohibit the *solicitation* of a Proxy with a Proxy Statement that contains a material misrepresentation or omission.  Any

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

defendant that negligently prepared, reviewed, and/or disseminated a false and misleading Proxy Statement is liable under §14(a).

The Form 8-K Sandbridge filed to announce the execution of the BCA on February 16, 2021, and every Form 425 filed with the SEC leading up to the de-SPAC Merger, made clear that, "[Sandbridge] and its directors and executive officers may be deemed participants in the solicitation of proxies from Sandbridge's stockholders with respect to the proposed business combination." *See, e.g.*, Weinrib Decl., Exs. A-B; *see also* ¶¶1, 6, 20-26, 81, 95-96, 141.  The Complaint further alleges that each Defendant signed the Proxy. ¶¶89, 96.

The Sandbridge Defendants are thus liable for every misstatement contained in the Proxy.

**2) The Complaint Adequately Pleads the Sandbridge Directors' Negligence**

The parties agree that §14(a) claims require negligence, not scienter.  Accordingly, Rule 8(a)'s notice pleading standard, not Rule 9(b)'s particularity standard, applies to Plaintiff's claim. *Jian Zhou*, 2022 U.S. Dist. LEXIS 192565, at *36-37 (C.D. Cal. Oct. 20, 2022).  Regardless, even under a Rule 9(b) particularity standard, the Complaint adequately alleges precisely how the Sandbridge Defendants each acted not only negligently, but in bad faith.

Each Sandbridge Defendant authorized the dissemination of a Proxy containing misstatements of fact they could not have genuinely believed had they undertaken even

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

12

the barest diligence into Owlet's flagship product, the Smart Sock, its primary source of revenue at the time of the de-SPAC Merger and the expected source of primary revenue for the "foreseeable future."  Negligence is thus adequately pled.  *See Brown v. Papa Murphy's Holdings,* No. C19-5514 BHS-JRC, 2021 U.S. Dist. LEXIS 77849 at \*9 (W.D. Wash. Apr. 22, 2021) ("a corporate officer's 'deliberate decision' can demonstrate 'a culpable state of mind far in excess of negligence.'"). In the Proxy, each signatory and participant in the solicitation acknowledged their in-depth understanding of FDA regulations, referenced the FDA's communications with Owlet, described the vital sign tracking and alert functions of the Smart Sock, purported that Owlet was in compliance with FDA regulations, and stated they relied upon Owlet's projections forecasting over a billion dollars in revenue by 2025 that did not account for the significant risk that the FDA would direct Owlet to stop selling the Smart Sock given its violations of applicable FDA regulations.

Either the Sandbridge Defendants conducted adequate diligence into these matters before signing their names to the Proxy and thus would have known that the pulse oximetry and alarm features qualified the Smart Sock as a medical device under FDA regulations, that Owlet therefore needed FDA authorization to market and sell the Smart Sock, that Owlet had not in fact obtained such authorization, that, indeed the FDA had already told Owlet repeatedly that the Smart Sock is a medical device, that the marketing and sale of the Smart Sock therefore violated applicable regulations, and that Owlet

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

therefore faced a substantial risk that the FDA would issue a Warning Letter requiring Owlet to stop marketing and selling the Smart Sock until it obtains the requisite approval, or the Sandbridge Defendants acted negligently in disseminating the Proxy.

Indeed, the Proxy makes clear that the Sandbridge Defendants **each** availed themselves of the access to Owlet's directors, officers, books and records afforded to them under the terms of the BCA. ¶88. The Proxy also explains that Sandbridge had access to a virtual data room to conduct due diligence and that Sandbridge's legal counsel made "multiple due diligence requests" to Owlet.  The first paragraph of the Proxy makes clear that references to "Sandbridge" in the Proxy refers to "the board of directors of Sandbridge Acquisition Corporation." Owlet Mot., Ex. 6, at cover page (Ex. Page 21).  According to the Proxy, Sandbridge and Owlet also met multiple times to review Owlet's operations and so Sandbridge could ask Owlet diligence questions. *Id.* at 99 (Ex. Page 136). Moreover, CW1 (Chief Brand Officer at Owlet from 2019 until 2021) confirmed that Owlet would have communicated with Sandbridge regarding the FDA warnings and the risks of marketing the Smart Sock without authorization as a medical device. ¶¶28, 75.

If the Sandbridge Defendants did not do adequate diligence into Owlet's operations and examine facts essential to the marketability and sale of Owlet's core product, then their dissemination of the Proxy recommending shareholder approval of the de-SPAC Merger was negligent.  *See Azar v. Blount Int'l, Inc.*, 2017 U.S. Dist. LEXIS 39493 (D. Or. Mar. 20, 2017), at *28; *In re Hot Topic Sec. Litig.*, 2014 WL 7499375, at *20; *City of*

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

*Westland Police & Fire Ret. Sys. v. Sonic Sols.*, 2009 U.S. Dist. LEXIS 33339 (N.D. Cal. Apr. 6, 2009) (negligence adequately pled because board was responsible for ensuring the accuracy of company's public statements); *Baum v. Harman Int'l Indus.,* 575 F. Supp. 3d 289, 301 (D. Conn. 2021) (negligence adequately plead where directors disseminated a proxy containing a misleading statement); *Brown*, 2021 U.S. Dist. LEXIS 12250, at *18-20 (finding negligence based on similar facts); *Brown v. Brewer*, 2010 U.S. Dist. LEXIS 60863, at *81 (C.D. Cal. June 17, 2010) ("[T]he preparation of a proxy statement by corporate insiders containing materially false or misleading statements . . . is sufficient to satisfy the . . . negligence standard.").[13]

### 3) The Exculpatory Provision Does Not Shield the Sandbridge Defendants from Liability

Unable to credibly counter the allegations of negligence against them, the Sandbridge Defendants seek to hide behind an inapplicable §102(b)(7) exculpatory clause in Sandbridge's Articles of Incorporation. First, the exculpation clause is limited to

---

[13] While the standard here is negligence, and though the allegations in the Complaint far exceed the negligence threshold, Defendants ask this Court to apply a "smoking gun" standard (i.e., requiring granular details on precisely what documents were in the data room and which had actually been reviewed) that exceeds even the standard for alleging scienter. *Tellabs,* 551 U.S. at 324 (holding that the inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible.'" Moreover, contrary to the Sandbridge Defendants' assertions otherwise, the Complaint is clear that each Sandbridge Defendant had access to the data room pursuant to the BCA and represented in the Proxy that each "had conducted its own independent review and analysis" of "documents and information" that Owlet had "furnished." ¶¶87-88.

directors. Defendant Henry was the CFO, not a director, and the exculpation clause therefore does not apply to him.  Second, even if the Court holds that the exculpation clause applies to §14(a) claims, the allegations demonstrate that the Sandbridge Defendants disseminated the Proxy containing misstatements in bad faith and thus breached not only their fiduciary duty, but their duty of loyalty to Sandbridge investors. *In re Zoran Corp. Derivative Litig*., 511 F. Supp. 2d 986, 1017 (N.D. Cal. 2007) (denying motion to dismiss §14(a) claim despite exculpatory provision because, "[i]f the facts that plaintiff has pled are taken as true, the exculpatory provision will give individual defendants no quarter").  By the plain language of the exculpation clause, it does not apply if defendants "violated their duty of loyalty to the Corporation or its stockholders, acted in bad faith, knowingly or intentionally violated the law…" Sandbridge Mot. at 9; *see also Blockchain Innovation, LLC v. Franklin Res., Inc*., 2023 U.S. Dist. LEXIS 48109, at *19 (N.D. Cal. 2023).   As explained herein, section 2, the Complaint alleges that the Sandbridge Defendants disseminated the Proxy to solicit shareholder approval of the de-SPAC Merger with numerous misstatements they knew or should have known would mislead investors: 1) stating that the Smart Sock is not a medical device; 2) omitting that the FDA had told Owlet repeatedly since 2016 that the Smart Sock is not a medical device: 3) stating that Owlet complied with all FDA regulations and held all material permits; and 4) including projections that did not account for the substantial risk that the FDA would order Owlet to stop marketing and selling the Smart Sock.  These misstatements, the

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

dissemination of which the Sandbridge Board authorized, concerned Owlet's flagship product on which it relied for most of its revenue then and intended to do so for the foreseeable future. The Sandbridge Defendants had access, which they admitted to using, to information contradicting the misstatements in the Proxy. Given their diligence, they also knew or should have known from the plain language of the Act that the pulse oximetry and alarm functions qualified the Smart Sock as a medical device, that Owlet therefore violated applicable regulations in marketing and selling it without FDA authorization, and that the projections unreasonably assumed Owlet would continue to market and sell the Smart Sock for the foreseeable future without FDA intervention. The exculpation clause therefore "does not exculpate Defendants as a matter of law at the motion to dismiss stage…" *Id.*, at **19-20; *see also Shaev v. Baker*, 2017 U.S. Dist. LEXIS 68523, at **32, 51-56 (N.D. Cal., May 4, 2017) (finding that "Director Defendants face a substantial likelihood of liability on Plaintiffs' claims under Section 14(a)" despite exculpatory clause because the allegations "show that a director consciously disregarded an obligation to be reasonably informed about the business and its risks or consciously disregarded the duty to monitor and oversee the business.")

**B.     The Sandbridge Defendants Failed to Comply with the Local Rules**

The Court should deny the Sandbridge Defendants' motion for the independent reason that it exhibits a complete disregard of the Local Rules. L.R. 7-3 required the Sandbridge Defendants to contact opposing counsel *at least seven days before filing their*

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

*motions to dismiss* to "discuss thoroughly…*the substance* of the contemplated motion," i.e., on or before February 2, 2024.  There is no futility exception to this rule; even if the moving party suspects a pre-motion conference will fail to resolve any aspect of the dispute, the moving party is still required to adhere to L.R. 7-3.  The Sandbridge Defendants *falsely certified* in their motion to dismiss, *see* Doc. No. 94 that their motion follows a "conference of counsel pursuant to L.R. 7-3 which commenced via electronic mail on or before January 31, 2024, and continued through February 7, 2024, via electronic mail, telephone, and Zoom."  The Sandbridge Defendants did not confer with Plaintiff *at any point via any means* regarding the substance of their contemplated motion to dismiss. Counsel for the parties, *excluding counsel for the Sandbridge Defendants*, telephonically conferred *for the first time* solely regarding Defendants' request to file an omnibus brief and to increase word limits on February 5, 2024, *four days before Defendants filed their motions*.  During a follow up Zoom meeting held *two days before Defendants filed their motions,* on February 7, 2024, attended for the first time by counsel for the Sandbridge Defendants, the parties once again only discussed word limits.  Per L.R. 7-4, the "Court may decline to consider a motion unless it meets the requirements of L.R. 7-3…". The Sandbridge Defendants' motion does not.

Moreover, by stating that they "adopt and join the Owlet 14(a) Brief in full" and then filing a "supplemental memorandum" that collectively total 10,131 words, the Sandbridge Defendants have also violated L.R. 11-6.1, which limits briefs to 7,000 words.

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

Given these egregious violations of the local rules, and the false certifications filed with Defendants' motions to dismiss, they should be denied in their entirety. Alternatively, as to the Sandbridge Defendants, the Court should either strike their "supplemental memorandum," or reject their attempts to "adopt and join the Owlet 14(a) brief in full."

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Motion be denied.

Dated: March 22, 2024

Respectfully submitted,

**POMERANTZ LLP**

By: /s/ Tamar A. Weinrib
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (646) 581-9973
Facsimile: (917) 463-1044
taweinrib@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

***Lead Counsel for Lead Plaintiff and the Section 14(a) Class***

PLAINTIFF'S OPPOSITION TO SANDBRIDGE DEFENDANTS' MOTION TO DISMISS

19

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff, certifies that this brief contains 4,635 words, which complies with the word limit of L.R. 11-6.1.

March 22, 2024                                         __/s Tamar A. Weinrib_____
                                                                          Tamar A. Weinrib