KESSLER TOPAZ MELTZER
   & CHECK, LLP
JENNIFER L. JOOST (296164)
One Sansome Street, Suite 1850
San Francisco, CA  94104
Telephone:  415/400-3000
415/400-3001 (fax)
jjoost@ktmc.com

Counsel for Lead Plaintiff Dr. Thomas E. Tweito
and Lead Counsel for the Section 10(b) Class

ROBBINS GELLER RUDMAN
   & DOWD LLP
DEBRA J. WYMAN (190812)
ASHLEY M. PRICE (281797)
JUSTIN GARY OETTING (350807)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com
aprice@rgrdlaw.com
joetting@rgrdlaw.com

Additional Counsel for the Section 10(b) Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL J. BUTALA, Individually and on Behalf of All Others Similarly Situated,<br><br>                 Plaintiff,<br><br>   vs.<br><br>OWLET, INC. f/k/a SANDBRIDGE ACQUISITION CORPORATION, et al.,<br><br>                 Defendants. | Case No. 2:21-cv-09016-FLA(SSCx)<br><br>Consolidated with Case No. 2:21-cv-09293-FLA (JEMx)<br><br><u>CLASS ACTION</u><br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECTION 10(b) COMPLAINT |

4859-8606-5325.v3

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................... 1

II.    STATEMENT OF FACTS .............................................................................. 3

    A.  The FDA Regulates Medical Devices Like the Smart Sock ................. 3

    B.  Defendants Launched the Smart Sock Prototype, Acknowledging that an Alarm Feature Required FDA Clearance ................................................................................. 4

    C.  Defendants Exploited the FDA's Wellness Device Exception to Launch the Smart Sock with an Alarm ................................... 5

    D.  The FDA Questioned Owlet About the Smart Sock's Status as a Medical Device, but Owlet Continued Selling It ................................ 6

    E.  Owlet Falsely Represented Its Communications with the FDA During and After Its Transition to Becoming a Publicly Traded Company ................................................................. 6

    F.  The Relevant Truth Was Revealed, Causing Significant Harm to Shareholders ................................................................. 8

III.   LEGAL STANDARD ................................................................................... 8

IV.    THE COMPLAINT ALLEGES FALSITY ..................................................... 8

    A.  Defendants Made Material Misrepresentations About the Smart Sock and Owlet's Interactions with the FDA, Regulatory Compliance, and Ability to Sell the Smart Sock ................................ 9

    B.  Defendants' "Opinion" Statements Are Actionable ......................... 14

V.     THE COMPLAINT ALLEGES SCIENTER ................................................. 18

VI.    DEFENDANTS' STANDING ARGUMENT IS MERITLESS ................... 19

VII.   THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY ........... 21

VIII.  CONCLUSION ......................................................................................... 21

4859-8606-5325.v3

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................................8

*Cheng Jiangchen v. Rentech Inc.*,
    2017 WL 10363990 (C.D. Cal. Nov. 20, 2017) ....................................................9

*City of Coral Springs Officers' Ret. Plan v. Farfetch Ltd.*,
    565 F. Supp. 3d 478 (S.D.N.Y. 2021) ..................................................................16

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ..........................................................................15, 16

*Dawod v. Garland*,
    2023 WL 8168832 (C.D. Cal. Oct. 12, 2023) .....................................................21

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023) ...................................................................................8

*ESG Cap. Partners, LP v. Stratos*,
    828 F.3d 1023 (9th Cir. 2016) ..............................................................................18

*Frater v. Hemispherx Biopharma, Inc.*,
    996 F. Supp. 2d 335 (E.D. Pa. 2014) ................................................................9, 11

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) .............................................................9, 10, 11, 13

*Gorlamari v. Verrica Pharms., Inc.*,
    2024 WL 150341 (E.D. Pa. Jan. 11, 2024) .........................................................12

*Homyk v. ChemoCentryx, Inc.*,
    2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) ..........................................10, 12, 16

*Ikeda v. Baidu, Inc.*,
    2021 WL 1299046 (N.D. Cal. Apr. 7, 2021) .......................................................16

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) .......................................................................11, 18, 19

- ii -

**TABLE OF AUTHORITIES**

**Page**

*In re Amylin Pharms. Inc. Sec. Litig.*,
  2003 WL 21500525 (S.D. Cal. May 1, 2003) ............................................... 12, 17

*In re Arrowhead Pharms., Inc. Sec. Litig.*,
  2017 WL 5635422 (C.D. Cal. Sept. 20, 2017) ...................................................... 12

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) ....................................................... 10, 12, 13, 16

*In re CCIV/Lucid Motors Sec. Litig.*,
  2023 WL 325251 (N.D. Cal. Jan. 11, 2023) ....................................................... 20

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ............................................................................. 3

*In re Intuitive Surgical Sec. Litig.*,
  2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) .................................................... 16

*In re MannKind Sec. Actions*,
  835 F. Supp. 2d 797 (C.D. Cal. 2011) ..................................................... 10, 13, 19

*In re Mullen Auto. Sec. Litig.*,
  2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) .................................................... 20

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ............................................................................. 8

*In re QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022) ............................................................... 14

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ............................................................................... 8

*McGuire v. Dendreon Corp.*,
  2008 WL 5130042 (W.D. Wash. Dec. 5, 2008) .................................................. 11

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
  54 F.4th 82 (2d Cir. 2022) ................................................................................. 20

# TABLE OF AUTHORITIES

**Page**

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ...................................................................................... 9

*Nguyen v. Radient Pharms. Corp.*,
    2011 WL 13141630 (C.D. Cal. Oct. 26, 2011) .................................................... 19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*
    *Pension Fund*,
    575 U.S. 175 (2015) ...................................................................... 9, 14, 15, 16

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ................................................................ 10, 11, 14

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ....................................................................................... 8, 18

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ................................................. 9, 21

*Tomaszewski v. Trevena, Inc.*,
    482 F. Supp. 3d 317 (E.D. Pa. 2020) ................................................................. 11

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) ................................................................................ 12

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) ................................................................................ 12

*Zamani v. Carnes*,
    491 F.3d 990 (9th Cir. 2007) .............................................................................. 13

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
    §78j(b) ..................................................................................................................... 1
    §78t(a) ...................................................................................................................... 1
    §78u-4 ................................................................................................................. 8, 10

Local Civil Rules
    Rule 7-3 .............................................................................................................. 2, 21

- iv -

4859-8606-5325.v3

## TABLE OF ABBREVIATIONS

| ABBREVIATION | DEFINITION |
|---|---|
| ¶__ and ¶¶__ | Citations to paragraphs in the Consolidated Complaint for Violations of the Federal Securities Laws (ECF 79) |
| 510(k) | 510(k) premarket application |
| CEO | Chief Executive Officer |
| Class Period | March 31, 2021 through October 4, 2021, inclusive |
| Complaint | Consolidated Complaint for Violations of the Federal Securities Laws (ECF 79) |
| Defendants | Owlet and Kurt Workman |
| Exchange Act | Securities Exchange Act of 1934 |
| Exhibit or Ex. __ | References to exhibits are to those attached to the Declaration of Colleen C. Smith in Support of Defendants' Motion to Dismiss Plaintiff's Section 10(b) Complaint (ECF 90-2) |
| FDA | U.S. Food and Drug Administration |
| FD&C Act | Food, Drug, and Cosmetic Act, 21 U.S.C. §321 |
| IPO | Initial public offering |
| MHRA | U.K. Medicines and Healthcare products Regulatory Agency |
| Motion or Mtn. | Defendants' Notice of Motion and Motion to Dismiss Plaintiff's Section 10(b) complaint; Memorandum of Points and Authorities in Support Thereof (ECF 90) |
| Owlet | Owlet, Inc. f/k/a Sandbridge and Owlet Baby Care, Inc. |
| Plaintiff | Lead Plaintiff Dr. Thomas E. Tweito |
| PSLRA | Private Securities Litigation Reform Act of 1995, codified at 15 U.S.C. §78u-4 |
| Sandbridge | Sandbridge Acquisition Corporation |
| SEC | U.S. Securities and Exchange Commission |
| SIDS | Sudden Infant Death Syndrome |

- v -

4859-8606-5325.v3

**TABLE OF ABBREVIATIONS**

| ABBREVIATION | DEFINITION |
|---|---|
| Smith Decl. | Declaration of Colleen C. Smith in Support of Defendants' Motion to Dismiss Plaintiff's Section 10(b) Complaint (ECF 90-2) |
| SPAC | Special purpose acquisition company |
| Workman | Defendant Kurt Workman |

- vi -

4859-8606-5325.v3

## I.    INTRODUCTION

In this securities fraud action under §§10(b) and 20(a) of the Exchange Act, Defendants falsely told investors that Owlet's flagship product, the Smart Sock, a monitor used by parents to track their baby's heart rate and oxygen levels, was not a medical device.  However, because the Smart Sock sounded an alarm if the baby's pulse or breathing fell outside preset levels, it was a medical device requiring FDA clearance under the FD&C Act.

Defendant Workman, a co-founder and Owlet's CEO, knew that the Smart Sock was a medical device, conceding in a 2013 presentation, "*[a]larm plus pulse oximeter means that you need FDA clearance*."  Yet, to avoid the expensive FDA clearance process, he and Owlet affirmatively chose to defy the FD&C Act and FDA regulations to market and sell the Smart Sock as a general wellness product.  The FDA recognized Defendants' ploy, and beginning in 2016, informed them in non-public communications that the Smart Sock was not a general wellness product but a medical device that required FDA clearance before it could be marketed and sold.

Shortly after Owlet became a public company through a SPAC transaction, the FDA issued a Warning Letter publicly stating for the first time that it had "corresponded with Owlet" since 2016 to inform Defendants that the Smart Sock "does not fall under the compliance policy for low-risk products" and that marketing the Smart Sock violated the FD&C Act, and requesting Owlet cease its distribution of the Smart Sock.  When Owlet publicly disclosed the FDA's Warning Letter, the price of Owlet's common stock plummeted 23% in a single trading day and investors were damaged.

Defendants now move to dismiss the Complaint.  The Motion is procedurally infirm because it relies on extrinsic documents – including a non-public FDA letter – to create factual disputes that cannot be resolved at the pleading stage without converting the Motion to one for summary judgment and allowing Plaintiff to take discovery.  Defendants also failed to seek a conference of counsel on or before

- 1 -

4859-8606-5325.v3

February 2, 2024, over the substance of their Motion, as required by Local Rule 7-3, and then falsely certified that the parties had held that conference.  ECF 90 at 2.

The Motion fails for substantive reasons, too.  Defendants ignore the well-pled allegations, cutting from whole cloth an alternative set of facts utilizing extrinsic documents to support baseless legal challenges to falsity and scienter.  In fact, Plaintiff's falsity allegations – including that Defendants affirmatively misled investors by unequivocally stating that the Smart Sock was "not a medical device," that the Smart Sock was "sold in compliance in all material respects with applicable FDA Laws," that Owlet held all "510(k) clearances . . . required by applicable FDA Laws," and that Owlet had "not received any written notice or communication from any [g]overnmental [e]ntity," including the FDA, "asserting material noncompliance with any applicable FDA Law" – are virtually unrebutted.

These statements are demonstrably false because Workman admitted that the Smart Sock's alarm feature made it a Class II medical device, which requires 510(k) clearance from the FDA.  Because Owlet sold the Smart Sock without the required 510(k) clearance, and instead marketed it as a wellness device, the FDA notified Owlet in written correspondence starting in 2016, that the product was not a wellness device, but a medical device as regulated by the FD&C Act.  And the FDA's position remained unaltered.  The FDA's Warning Letter, which Defendants largely ignore, confirmed what Workman said from the product's debut – that the Smart Sock with an alarm *was* a medical device requiring FDA authorization to market and sell.  Thus, these facts contradicting Defendants' Class Period representations show why those representations were false.

Defendants all but concede that the Complaint adequately pleads scienter, claiming merely that the motive to raise money is typical of corporations and insufficient by itself to plead scienter.  But that is not the scenario presented by the Complaint, which asks the Court to appraise that Defendants' motive was not just for profit, but to fund the necessary and expensive FDA clearance process critical to

- 2 -

4859-8606-5325.v3

marketing the Smart Sock. When this motive is considered holistically with other well-pled scienter allegations, such as Workman's early admission the Smart Sock needed FDA clearance and the FDA's communication concluding the same – the sufficiency of which Defendants do not even challenge – the inference weighs in clear favor that the Complaint pleads Defendants' scienter.

The Motion's resolution turns on whether the Complaint sets forth facts "to support a theory that is not facially implausible." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).[1] It surpasses this bar; therefore, Defendants' Motion must be denied.

## II. STATEMENT OF FACTS

### A. The FDA Regulates Medical Devices Like the Smart Sock

Owlet was responsible for determining if its product, the Smart Sock, qualifies as a medical device under the FD&C Act. ¶36. The FD&C Act defines a medical device as an "instrument" that is "intended for use in the diagnosis of disease or other conditions . . . or prevention of disease," and entrusts the FDA with regulating them. ¶34. Medical devices are divided into three different classes based in part on the risk posed to the user. ¶35. At issue here are Class II devices, which represent a moderate to high level of risk to the user.

Owlet was responsible for defining the product's "intended use," which establishes if the product is a medical device, and if so, its classification. ¶37. Notably, the FDA has classified pulse oximeters – the same technology used in the Smart Sock to monitor a baby's heart rate and oxygen levels – as Class II medical devices. ¶38. To market a Class II medical device, Owlet was required to submit a 510(k) to the FDA. ¶¶39-40. Until the FDA provides an order declaring the devices substantially equivalent, the device may not proceed to market. ¶41.

---

[1] All citations and footnotes are omitted and emphasis is added unless noted.

- 3 -

4859-8606-5325.v3

**B.**     **Defendants Launched the Smart Sock Prototype, Acknowledging that an Alarm Feature Required FDA Clearance**

Owlet's primary product was the Smart Sock, a wearable sock that monitors a baby's heart rate and oxygen levels and sounds an alarm if the baby's pulse or breathing fall outside preset limits.  ¶1.  In May 2013, Workman and five of his fellow university students debuted its prototype, the Owlet Baby Monitor, at a college business competition.   ¶46.   Referencing SIDS and other respiratory and heart problems, their competition entry stated that their "core product . . . alerts parents if their child stops breathing at night."  *Id.*

During the competition's presentation, Workman acknowledged that because the Owlet Baby Monitor had an alarm, it needed FDA authorization.  ¶¶47-48.  He stated: "***Alarm plus pulse oximetry means that you need FDA clearance***."   ¶48. Workman explained that the Owlet Baby Monitor was "a Class II device . . . [b]ecause it's sounding an alarm.  So an alarm means that we are giving advice to parents." ¶49. Workman further recognized that "predicate-wise," it was a Class II device because "pulse oximetry has been around [and] there's so many devices already out there." *Id.* Workman also noted the time and expense associated with seeking FDA clearance, explaining that his team had considered selling a "more minimal and less risky" product without alarms to avoid "all that liability."  ¶47.

Although not "excited about" it, Workman and his team opted to launch the "non-alarm health tracking version that doesn't need FDA [clearance]."  ¶¶50-51. Workman confirmed that the non-alarm version would be a "bridge" until the FDA cleared the alarm version, which the team anticipated would take seven months.  *Id.* In a press release published on August 26, 2013, Owlet publicly unveiled the Smart Sock without an alarm.  ¶53.

Owlet's press release acknowledged that the forthcoming alarm and notification features required FDA clearance before Owlet could launch those features.  ¶56. Owlet stated that it was "currently going through the FDA process to add an alarm,

- 4 -

4859-8606-5325.v3

along with other features, to the next version of the product." *Id.* However, it noted that "[t]he FDA process is a long and expensive one." ¶57.

### C. Defendants Exploited the FDA's Wellness Device Exception to Launch the Smart Sock with an Alarm

Securing funding for the "expensive" process necessary to obtain FDA clearance placed Owlet in a predicament. ¶¶61-62. Owlet needed tens of millions of dollars that it was unable to raise. ¶61. But to attract more funding, Owlet needed to be able to sell its flagship Smart Sock with the alarm – the very product that the FDA had not authorized. ¶62.

Then, in 2015, the FDA announced that it no longer "intend[ed] to examine low-risk general wellness products" to determine whether they must be regulated as medical devices under the FD&C Act. ¶64. Under this guidance, the FDA provided a "general wellness" exception "limited to certain products" that possessed an intended use: (1) relating to "encouraging a general state of health or a healthy activity"; or (2) associating "the role of [a] healthy lifestyle" with reducing the risk of certain chronic diseases or conditions. ¶66.

Owlet seized on the new "general wellness" category to launch its flagship product – the Smart Sock with an alarm – while avoiding the need to raise millions of dollars to achieve FDA clearance. ¶68. Shortly thereafter, Owlet raised $6 million in venture capital funding in August 2015 to launch the Smart Sock with an alarm in October 2015 without FDA clearance. ¶69.

Despite exploiting the "general wellness product" exception, Owlet's marketing emphasized the Smart Sock's medical and diagnostic capabilities. ¶¶71-72. For example, in an October 2015 press release, Owlet confirmed: "[T]he sole purpose of the device is to alert parents if their baby is not breathing or if the baby's heart rate is out of range." ¶73. The press release also touted that the Smart Sock "leverage[d] pulse oximetry, the same technology used in hospitals." ¶72. In a blog article posted to support the launch, Owlet highlighted its "strong initial evidence that [the Smart

- 5 -

4859-8606-5325.v3

Sock] *really can alert parents if, for some reason, their baby is unable to breathe*." ¶74.

Following the launch and throughout 2016, Owlet reiterated this message and marketed the Smart Sock as "us[ing] pulse oximetry, the same technology used in hospitals," which was "designed to send alerts" to parents "if a baby were to stop breathing while sleeping." ¶¶75-76.

**D.     The FDA Questioned Owlet About the Smart Sock's Status as a Medical Device, but Owlet Continued Selling It**

In 2016, the FDA privately told Owlet that the "Smart Sock meets the definition of a device under the FD&C Act and does not fall under the compliance policy for low-risk products that promote a healthy lifestyle (General Wellness guidance)." ¶77. Owlet failed to publicly disclose the FDA's determination that Owlet could not use the general wellness product exception to sell its Smart Sock with an alarm. ¶78. Since the FDA did not take public action to stop Owlet from selling a Class II medical device without FDA clearance, Owlet pressed on and continued to market its product as a wellness device. *Id.*

In March 2017, Owlet launched the second version of the Smart Sock – still without FDA clearance. The same year, the FDA again privately informed Owlet of its conclusion that the Smart Sock was a medical device requiring FDA clearance. ¶97. Owlet still did not stop selling the Smart Sock nor did it publicly disclose that the FDA had determined the Smart Sock required FDA clearance before Owlet could sell it to consumers. ¶98. Instead, Owlet launched a third version of the Smart Sock in mid-2020, again without FDA clearance. ¶109.

**E.     Owlet Falsely Represented Its Communications with the FDA During and After Its Transition to Becoming a Publicly Traded Company**

Although Smart Sock sales had grown since Owlet's initial launch, the funding it required to secure FDA clearance remained elusive. ¶111. Defendants, well aware of the FDA's non-public position that the Smart Sock was not a wellness product and

- 6 -

4859-8606-5325.v3

the need to obtain FDA clearance, opted to access a capital infusion from the public equity markets.  ¶¶110-111.

Following a strategy used by other small start-up companies seeking to avoid a traditional IPO's disclosure obligations, Owlet became a public company by merging with a SPAC called Sandbridge.  ¶¶112-113, 116.  On February 15, 2021, Sandbridge and Owlet entered into the definitive Business Combination Agreement pursuant to which Owlet Baby Care would merge with Sandbridge's wholly owned subsidiary, while Sandbridge changed its name to Owlet.  ¶123.  Workman signed the Business Combination Agreement on Owlet's behalf.  ¶131.

A Form S-4 registration statement, filed with the SEC on March 31, 2021 in connection with the merger, attached a copy of the Business Combination Agreement. ¶¶130-131.  In it, Defendants falsely claimed that "all" Owlet products "***have been, and are being . . . marketed . . . and sold in compliance in all material respects with applicable FDA Laws***."  ¶132.  Defendants asserted that Owlet "'***holds all material . . . 510(k) clearances . . . required by applicable FDA Laws***."  *Id.* Defendants further claimed that the Smart Sock was "***not a medical device***" and therefore "***d[id] not require marketing authorization from the FDA***."  ¶135.  And Defendants stated that "the FDA . . . ***could*** require" Owlet "to obtain marketing authorization . . . to continue to sell the product" in the U.S.  *Id.*  In the Form S-4, Owlet also unequivocally stated that the Smart Sock was "a consumer product and not a medical device."  *Id.*

In truth, by marketing and selling the Smart Sock with an alarm as a general wellness product and without FDA clearance, Defendants were not in compliance "with applicable FDA Laws" and had defied non-public FDA entreaties to obtain marketing authorization for the Smart Sock.  ¶¶132-133, 136.  Given Workman's initial acknowledgment and Defendants' receipt of the FDA's correspondence, Defendants knew, or were deliberately reckless in not knowing, that the Smart Sock was a medical device.  ¶¶133, 136.

- 7 -

4859-8606-5325.v3

**F.      The Relevant Truth Was Revealed, Causing Significant Harm to Shareholders**

On October 4, 2021, Owlet publicly disclosed that it had received a Warning Letter from the FDA, stating that the Smart Sock was a medical device because it was "intended for use in the diagnosis of disease or other condition or in the cure, mitigation, treatment, or prevention of disease." ¶140.  The FDA confirmed that Owlet sold the Smart Sock "without marketing approval, clearance, or authorization from [the] FDA" and therefore was "in violation of the [FD&C] Act." ¶¶141-142. The FDA required Owlet to "'cease any activities'" related to the Smart Sock in the United States. ¶143.  In response, Owlet's stock price plunged 23% in a single trading day, damaging investors.  ¶145.

## III.   LEGAL STANDARD

In assessing the sufficiency of the Complaint, the Court must "accept all factual allegations . . . as true" and "assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 326 (2007); *see In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (allegations of material fact are construed "'in the light most favorable to the nonmoving party'").  A complaint need only contain sufficient factual matter to state a claim for relief that is "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Ninth Circuit has repeatedly recognized that "'[w]hile the PSLRA "significantly altered pleading requirements in private securities fraud litigation," it did not impose an insurmountable standard.'" *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 947 (9th Cir. 2023) (quoting *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012)).

## IV.   THE COMPLAINT ALLEGES FALSITY

To adequately plead falsity, "'the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *VeriFone*, 704 F.3d at 701.  In the Ninth Circuit, while "[f]alsity is subject to a particularity requirement," a complaint need only meet "the ***reasonable***

- 8 -

*inference* standard of plausibility." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (original emphasis). Thus, if Plaintiff's falsity allegations – which are taken as true – meet the particularity standard, the **only** remaining question is whether **Plaintiff's** inference of falsity is plausible.

"To give rise to an actionable claim for securities fraud," a defendant's statement or omission "'must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.'" *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at \*5 (C.D. Cal. Apr. 12, 2016). Additionally, "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.").

### A. Defendants Made Material Misrepresentations About the Smart Sock and Owlet's Interactions with the FDA, Regulatory Compliance, and Ability to Sell the Smart Sock

The Complaint adequately alleges that Defendants made several categories of materially false and misleading statements during the Class Period regarding the Smart Sock, as well as Owlet's interactions with the FDA, regulatory compliance, and ability to sell the Smart Sock without FDA clearance. Collectively, "these statements . . . make an attentive investor far more sanguine about [Owlet's and the Smart Sock's] prospects . . . than was merited by the reality of the situation." *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 347 (E.D. Pa. 2014).[2]

---

[2] Defendants claim that the chart in Appendix A, presenting the alleged misrepresentations, "does not contain argument" but its "Statement Type" mischaracterizes misstatements of fact as either "Owlet Opinion" or "FDA Assessment." ECF 90-1 at 1. As such, Plaintiff moves that the Court strike Appendix A, which amounts to Defendants attempting to obtain the word limit increase they belatedly sought before the Motion's deadline. *Cheng Jiangchen v. Rentech Inc.*, 2017 WL 10363990, at \*4 (C.D. Cal. Nov. 20, 2017).

- 9 -

4859-8606-5325.v3

***First***, Defendants unequivocally told investors that the Smart Sock was "not a medical device." ¶162. These statements were false when made because the Smart Sock measured a baby's heart rate and oxygen levels and sounded an alarm when those metrics fell outside preset levels, making it a medical device. ¶¶7, 48-49, 140, 163. This is more than sufficient to allege falsity. *Forescout*, 63 F.4th at 764 ("A statement is false or misleading if it 'directly contradict[s] what the defendant knew at the time' or 'omits material information.'"); *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794 (9th Cir. 2017) (falsity under PSLRA satisfied where statements that a test was FDA-cleared "directly contradict[ed]" defendant's statements); *see also In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 809-10 (C.D. Cal. 2011) (falsity shown "by a later revelation demonstrating that the FDA" did not agree with defendants' class period statements).

***Second***, Defendants represented that the FDA "***could***" require marketing authorization for the Smart Sock with an alarm when, in reality the FDA ***had already*** communicated to Defendants that the Smart Sock was a medical device requiring FDA clearance under the FD&C Act. *See* ¶¶77, 97, 167, 171.[3] Public representations at odds with non-public FDA correspondence can be actionable misrepresentations. *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 708 (9th Cir. 2016); *Atossa*, 868 F.3d at 795 (sustaining claims where defendants falsely asserted test was FDA-cleared). Thus, Plaintiff "plausibly alleges that, at the time the statements were made, the FDA had already shared feedback" on whether the Smart Sock was a wellness product "indicat[ing] it disagreed with Defendants' position . . . , rendering Defendants' abstract warnings of future risk insufficient." *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *11 (N.D. Cal. Feb. 23, 2023).

---

[3]   Defendants' attempt to discount the 2017 communication from the FDA fails. This communication is sufficiently alleged, providing the source and the date, which is enough to put Defendants on notice of the allegations against them. Defendants' suggestion that the FDA's 2017 report was not received by Owlet is a factual dispute improper for this Motion; regardless, the Warning Letter confirms that the FDA and Owlet had corresponded since 2016. ¶142.

- 10 -

4859-8606-5325.v3

Likewise, risk disclosures such as these are actionable misrepresentations "when they 'speak[] entirely of as-yet-unrealized risk and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition.'" *Forescout*, 63 F.4th at 781; *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (same).[4]  The Ninth Circuit's decision in *Khoja v. Orexigen Therapeutics, Inc.* is particularly instructive, holding that "telling investors that the data ***might*** change is different from saying" that the FDA had previously told defendants that "the data ***already has*** a high degree of uncertainly and is likely to change."  899 F.3d 988, 1010 (9th Cir. 2018).  This, for the Ninth Circuit, was sufficient "[f]or pleading purposes." *Id.*

Nevertheless, Defendants contend that the FDA's correspondence was not "definitive," which, they claim, discharges them from the obligation to disclose what they already knew – namely, that because the Smart Sock with an alarm was a medical device, the FDA would require marketing authorization.  Mtn. at 11-12.[5]  But this is not the law.  "'[O]nce defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information."  *Arena*, 840 F.3d at 705-06.

Moreover, even when communications are "not final agency determinations," failing to disclose "'significant objectionable conditions'" creates an actionable "'impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'"  *McGuire v. Dendreon Corp.*, 2008 WL 5130042, at \*6 & n.4

[4]  These statements also misrepresented what the FDA had told Defendants about the Smart Sock.  *See, e.g.*, *Frater*, 996 F. Supp. 2d at 346 (statements about FDA's position on the need for a new trial actionable); *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 323 (E.D. Pa. 2020) (denying motion where defendants described non-public FDA meeting as successful without "disclos[ing] the FDA's criticism").

[5]  Defendants also improperly cite to a non-public letter not previously available to Plaintiff to make factual disputes regarding the FDA's intent and Defendants' understanding at the time.  Mtn. at 11, citing Smith Decl., Ex. 2.  But "there is no fact established by [this letter] 'not subject to reasonable dispute.'"  *Khoja*, 899 F.3d at 1000.  If this "fact-driven defense" is permitted, Plaintiff "should have . . . the opportunity to develop the record and litigate the issue."  *Id.* at 1012.

- 11 -

4859-8606-5325.v3

(W.D. Wash. Dec. 5, 2008); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (public statements that the approval process was progressing were misleading where defendant knew based on interactions with the FDA that a drug would not be approved); *Gorlamari v. Verrica Pharms., Inc.*, 2024 WL 150341, at \*8 (E.D. Pa. Jan. 11, 2024) (the FDA's "interim feedback" placed defendants "under a duty not to falsely imply that the FDA's inspections were on track for a timely approval . . . when this was not the case").  Here, "the concerns raised by the FDA . . . were much more significant than a 'bump on the road' and shed serious doubt on" Defendants' ability to market the Smart Sock as a wellness product, obligating Defendants "to disclose the FDA's concerns to render their statement[s] not misleading."  *In re Amylin Pharms. Inc. Sec. Litig.*, 2003 WL 21500525, at \*8 (S.D. Cal. May 1, 2003); *ChemoCentryx*, 2023 WL 3579440, at \*8 (even if there was "no indication that the FDA's concerns would preclude the drug's approval," "the FDA's undisclosed concerns" were material omissions because they "cast doubt" on the drug's approval).  Thus, "Defendants were obligated to disclose the FDA's" conclusion regarding the Smart Sock "to render their statements not misleading."  *Amylin*, 2003 WL 21500525, at \*8.[6]

***Third***, Defendants falsely stated that Owlet was "in compliance in all material respects with applicable FDA Laws," and that it held "all . . . 510(k) clearance[s]" required by applicable FDA laws.  ¶159.  Defendants further claimed that "no [g]overnment [e]ntity is considering . . . changing the marketing classification" of any Owlet products, nor had Owlet "received any written notice or communication" alleging noncompliance with FDA laws.  *Id.*

---

[6]    Contrary to Defendants' out-of-circuit citation to *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (Mtn. at 12), the Ninth Circuit holds that "failing to disclose that the FDA gave a warning" about a product's lack of clearance was misleading because it did "not 'fairly align[] with the information in [defendant's] possession at the time.'" *Atossa*, 868 F.3d at 802.  And *In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422, at \*6 (C.D. Cal. Sept. 20, 2017), the defendant "***followed***" the FDA's interim recommendation and "subsequently received approval," in contrast with Owlet's course of action here.

- 12 -

4859-8606-5325.v3

These statements were materially false and misleading because the FDA had already communicated to Defendants that the Smart Sock was a medical device requiring FDA clearance. ¶161.  As a result, Owlet's marketing violated the FD&C Act, thereby contradicting Defendants' public representation.  It also was false that "no [g]overnment [e]ntity" was considering a change in Smart Sock's marketing classification or that Owlet had received no communication asserting noncompliance with FDA laws, because in fact, Owlet had received at least two such communications since 2016.  ¶¶77, 97, 161.  Because Defendants' statements "'directly contradict[ed]'" what they knew at the time, falsity is sufficiently alleged. *Forescout*, 63 F.4th at 764; *MannKind*, 835 F. Supp. 2d at 811 ("'courts have inferred . . . falsity'" where the FDA identified "'problems with a product'" but defendants "'nonetheless continue[d] to make confident statements about'" it).

Defendants all but ignore these well-pled misrepresentations, quibbling that any "'written notice'" regarding noncompliance with FDA laws was dated "before 2018." Mtn. at 13.  At a minimum, as Defendants concede, such communications *were* made "before 2018" (*id.*); by omitting "the balance" of the FDA's communications, Defendants "hid the ball," even if their representation is "not literally false" (*Atossa*, 868 F.3d at 797).  Moreover, not all of the alleged misrepresentations in the Business Combination Agreement were limited by date, as is the case for the representation that Owlet holds "all material [p]ermits, including 510(k) clearance[s]" and "there are no facts . . . reasonably likely to cause" termination or suspension in the marketing of Smart Sock. ¶159.  Defendants bring no challenge to these statements, and cannot do so on reply. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

*Finally*, Defendants make only a fleeting – and insufficient – argument contesting the misrepresentations made that "if the FDA 'were to require marketing authorization[,] . . . Owlet could be required to cease selling'" the Smart Sock.  Mtn.

- 13 -

4859-8606-5325.v3

at 12.[7]  The Complaint identifies with particularity the misrepresentation and alleges the reasons why it was false – specifically, that the FDA already had told Owlet that the Smart Sock required FDA clearance before it could be sold to consumers.  ¶173.

### B.     Defendants' "Opinion" Statements Are Actionable

Defendants claim that certain alleged misstatements are non-actionable opinions.  However, when statements "express[] certainty about a thing," they are not opinions.  *Omnicare*, 575 U.S. at 183; ¶¶162-163; *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 739-40 (N.D. Cal. 2022) (distinguishing statements of "'certainty'" and those with "opinion-qualifying language").  Accordingly, Defendants' unequivocal statement that the Smart Sock is a "consumer product and not a medical device," is not an opinion.  ¶162.  Defendants' assertion that Owlet was in compliance with FDA regulations is also not an opinion.  ¶159.  Nor are Defendants' unqualified statements that Owlet "holds all material [p]ermits, including 510(k) clearance."  *Id.*  Because the Complaint particularly alleges facts contradicting each of these representations as explained in §IV.A, *supra*, falsity is established.  *Khoja*, 899 F.3d at 1008; *Arena*, 840 F.3d at 709.

Despite making such statements unqualified by words like "I believe," Defendants argue that such statements nevertheless "still qualify as opinions."  Mtn. at 14.  But *Omnicare* did not render every subjective statement an opinion, as Defendants would have it (*id.*), but rather referred to those statements beginning with, for example, "'we believe'" as "pure statements of opinion" (*Omnicare*, 575 U.S. at 186).  Thus, the Supreme Court recognized the difference between "'the coffee is hot'" and "'I think the coffee is hot.'"  *Id.* at 183.  The Supreme Court also

---

[7]    Defendants again improperly cite to a previously undisclosed letter (Smith Decl., Ex. 2) to raise factual arguments, which should be tested at summary judgment, regarding the FDA's position on the Smart Sock.  Mtn. at 12.

4859-8606-5325.v3

countenanced a distinction between "'our marketing practices are lawful,'" and "'I believe our marketing practices are lawful.'" *Id.* at 184.[8]

Likewise, here, a difference exists between Defendants' statements that the Smart Sock *is* not a medical device, and Defendants' ***belief*** that it is not. *Omnicare*, 575 U.S. at 187 (a statement of fact does not have the "lack of certainty" that statements containing "'I think'" or "'I believe'" have). Accordingly, because the Smart Sock was, in fact, a medical device requiring FDA authorization, falsity is sufficiently alleged against Defendants' unqualified representation that it was not a medical device. ¶¶77, 140, 162-163.

Regardless, even if certain alleged misstatements are considered to be "opinions," they are actionable. An opinion is actionable where: (i) both the "'the speaker did not hold the belief she profess[es]'" and the belief is objectively untrue; (ii) a fact contained within an opinion statement was untrue; or (iii) the statement is rendered misleading because the speaker omitted facts "'going to the basis'" of the opinion. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) ("*Align*").

The statements that Defendants challenge as "opinions" either contain untrue facts, omit facts going to the opinion's basis, or both, and thus are actionable under *Omnicare* and *Align*. For example, Defendants' statement asserting their belief that the Smart Sock was not a medical device is actionable because it omits the material fact that the FDA had repeatedly told Defendants that the Smart Sock was a medical device. Defendants' claim that Owlet was in compliance with FDA regulations omits the same material fact and includes an untrue fact – that Owlet was in compliance with FDA regulations while selling a medical device as a wellness product without

---

[8] Defendants' out-of-circuit citation to *In re Philip Morris Int'l Inc. Sec. Litig.*, is inapplicable because unlike here, where the FDA's determination that the Smart Sock was not a wellness product contradicted Defendants' statements, there, the FDA identified no violations in the clinical practices, consistent with defendants' statements. 89 F.4th 408, 419 (2d Cir. 2023).

- 15 -

authorization.  ¶¶77, 97, 106, 140, 160-161; *Atossa*, 868 F.3d at 802 ("failing to disclose that the FDA gave a warning about the [medical test] not having 510(k) clearance is an omission"); *ChemoCentryx*, 2023 WL 3579440, at \*14 (defendants' opinions on the safety and efficacy of a drug trial were misleading where "[d]efendants failed to . . . disclose the FDA's concerns" about a drug trial's results). Because "Defendants said 'one thing'" concerning their beliefs with respect to the Smart Sock and compliance with FDA laws, while they "'held back'" material facts concerning the FDA's communications that the Smart Sock was a medical device and Owlet was incompliant with the FD&C Act, their statements are actionable.  *In re Intuitive Surgical Sec. Litig.*, 2017 WL 4355072, at \*4-\*5 (N.D. Cal. Sept. 29, 2017).[9]

Defendants contend that their "opinions" are not actionable because the Complaint does not allege that Defendants did not "actually hold[] the stated belief" that the Smart Sock was not a medical device.  Mtn. at 14-15.  However, Plaintiff need only satisfy one prong of *Align* for any opinion statement to be actionable under *Omnicare*.  Thus, any opinion statements alleged in the Complaint are actionable because they omit material facts or contain untrue facts, irrespective of whether Defendants actually held the stated belief.

Nevertheless, the Complaint adequately alleges that Defendants' belief is both objectively and subjectively untrue, making these statements actionable under all three *Align* prongs.  For instance, with respect to Defendants' belief that the Smart Sock is not a medical device, the Complaint alleges that this was objectively not true, *see, e.g.*, ¶¶77, 97, 140, 162, 201, and that Defendants did not believe the Smart Sock was not a

---

[9]   *City of Coral Springs Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 493 (S.D.N.Y. 2021) is distinguishable because there, defendants "stated exactly how much . . . revenue came from" the categories the plaintiff alleged were concealed, whereas here, Defendants ***did*** conceal that the FDA had already informed Defendants that the Smart Sock was a medical device.  Likewise, in *Ikeda v. Baidu, Inc.*, 2021 WL 1299046, at \*10 (N.D. Cal. Apr. 7, 2021), warnings of "constantly shifting" Chinese regulations that may result in the company falling out of compliance is different than Defendants' warnings that the FDA "could" disagree that the Smart Sock was not a medical device, when Defendants knew the FDA already had.  *Khoja*, 899 F.3d at 1010.

- 16 -

4859-8606-5325.v3

medical device because of their statements in 2013 and their receipt of FDA correspondence telling them that the Smart Sock was a medical device. ¶47 (Workman: the Owlet team **learned "[they] needed FDA clearance**"); ¶48 (Workman: "**[a]larm plus pulse oximetry means that you need FDA clearance**"); ¶49 (Workman: Owlet's baby monitor was "**a Class II device . . . [b]ecause it's sounding an alarm**").

Raising a factual dispute whose basis is unfounded in the Complaint, Defendants contend that Workman believed the Smart Sock fell within the FDA's general wellness guidance issued in 2015. Mtn. at 16. In truth, after Owlet launched the Smart Sock as a general wellness device, the FDA notified Defendants that it was not, and had "corresponded with Owlet" "[s]ince 2016" that the Smart Sock "me[t] the definition of a device under the FD&C Act." ¶¶77, 142. Since the Smart Sock had not substantively changed since its inception, it was **still "a Class II device**." ¶49. Thus, Defendants' contention is "seriously undermine[d]" by the FDA's undisclosed communications to Defendants. *Amylin*, 2003 WL 21500525, at *9.

Raising another unsupported factual dispute, Defendants profess that the Smart Sock's "intended use" was "to aid in sleep management." Mtn. at 15. Conceding on the one hand that a "manufacturer's 'promotional claims'" indicate a product's intended use (*id.*), Defendants ignore the well-pled facts demonstrating Defendants' promotion of the Smart Sock's diagnostic capabilities. *See, e.g.*, ¶74 (Owlet blog announcing that the Smart Sock with an alarm "can alert parents if . . . their baby is unable to breathe); ¶75 (Owlet blog posting that the Smart Sock "measures your baby's heart rate, and lets you know if the range looks like it is normal," while its pulse oximeter "tell[s] you how well your baby's respiratory system is working"); ¶95 (Owlet blog comparing "hospital-grade monitors" to the Smart Sock's at-home use). Furthermore, Defendants' counterfactual argument proposing an alternative "intended use" as a wellness device fails to address that the FDA did not agree, and even

- 17 -

4859-8606-5325.v3

identified examples of Owlet's marketing to support its conclusion.  ¶¶140-141. Accordingly, the Complaint alleges falsity.

## V.    THE COMPLAINT ALLEGES SCIENTER

A complaint pleads scienter where it alleges defendants acted "knowingly, intentionally, or with deliberate recklessness." *Alphabet*, 1 F.4th at 705.  Courts consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322-23 (original emphasis).  "[I]f two possible inferences – one fraudulent and the other nonfraudulent – are equally compelling, a plaintiff has demonstrated a strong inference of scienter." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1032-33 (9th Cir. 2016).

The Complaint alleges facts strongly inferring Defendants' scienter by demonstrating that Defendants knew, or recklessly disregarded, that the Smart Sock was a medical device requiring FDA clearance.  Defendants fail to challenge the Complaint's well-pled facts establishing a strong scienter inference.  *See* Mtn. at 18-19.  These include:

- Workman's admissions that the Smart Sock with an alarm requires Class II medical clearance (¶¶48-51, 187);

- The FDA's communications notifying Defendants that the Smart Sock is not wellness device (¶¶77, 99, 106, 188-189);

- Defendants' knowing circumvention of FDA clearance by marketing the Smart Sock as a wellness device (¶¶68-73, 193); and

- The financial imperative to the Company's existence to continue marketing the Smart Sock (¶195).

Instead, Defendants merely object to the allegations that Owlet's motivation to raise capital was a "common need" (Mtn. at 19) and thus insufficient to infer scienter.[10]  But courts in this Circuit have repeatedly rejected this simplistic argument,

---

[10]    In any case, an absence of motive is not dispositive. *Tellabs*, 551 U.S. at 325. Defendants also complain in passing that the Complaint does not plead "internal" communications (before discovery), nor does it identify whistleblowers, confidential

- 18 -

4859-8606-5325.v3

particularly where, as here, the motive allegations are combined with other facts to infer scienter. *See, e.g.*, *MannKind*, 835 F. Supp. 2d at 812 (defendants motivated to commit fraud "lest they lose access [to] a key financing arrangement"); *Nguyen v. Radient Pharms. Corp.*, 2011 WL 13141630, at *6 (C.D. Cal. Oct. 26, 2011) (scienter pled where "desire to raise company financing" was combined with other "'red flags'"). With a red herring, Defendants further try to undermine the well-pled motive allegations by suggesting that the money raised could have been spent on FDA clearance. Mtn. at 19. Little analysis is required to determine this argument's mathematical weakness. The average cost to clear a 510(k) product is $31 million. ¶61. With only $40 million total raised in 2017 and 2018, little money remained for what Owlet recognized would be an "expensive" process (*id.*), especially as the Company developed new versions and products (¶¶74, 92, 99, 109). Thus, greater access to funding bolsters the already strong scienter inference.

Considered holistically, the Complaint adequately alleges scienter. Only by ignoring the well-pled facts can Defendants suggest an alternative explanation – that Defendants suffered from corporate optimism that the FDA would agree that the Smart Sock was a wellness product. Mtn. at 19. This inference does stand up against the facts alleging Defendants' actual knowledge that the Smart Sock with an alarm required FDA clearance and was not a wellness product.

## VI.    DEFENDANTS' STANDING ARGUMENT IS MERITLESS

As an afterthought, Defendants claim that Plaintiff cannot bring §10(b) claims for statements contained in the Form S-4 filed with the SEC by Sandbridge prior to its merger with Owlet. As an initial matter, the Form S-4 attaches the merger agreement between Sandbridge and Owlet. Because Workman executed this document as Owlet's CEO and it contained statements concerning, among other topics, Owlet's

witnesses, or insider trading – none of which is a requirement for pleading scienter. Mtn. at 18; *see, e.g.*, *Alphabet*, 1 F.4th at 707 ("Allegations of suspicious stock sales or information from confidential witnesses are not needed where, as here, other allegations in the complaint raise a strong inference of scienter.").

- 19 -

4859-8606-5325.v3

compliance with the FD&C Act relating to the marketing and sale of the Smart Sock, there is no question that these statements were made by Defendants and are thus actionable under §10(b).

Moreover, because Plaintiff purchased shares in the resulting public company after the SPAC merger, they have standing "to hold [Owlet] and its CEO [Workman] liable for inducing them to make those purchases through misrepresentations and omissions" contained within the Form S-4 "about the value of [Owlet] itself which [Sandbridge] then acquired." *In re CCIV/Lucid Motors Sec. Litig.*, 2023 WL 325251, at *10 (N.D. Cal. Jan. 11, 2023); *see also In re Mullen Auto. Sec. Litig.*, 2023 WL 8125447, at *5 (C.D. Cal. Sept. 28, 2023) ("Defendants fail to point to any Ninth Circuit authority – let alone a generally settled rule – barring a purchaser from bringing suit based on material misstatements made by a corporate predecessor to the company whose securities the plaintiffs acquired.").

Defendants assert that because Plaintiff alleges "only" misstatements and omissions "by and about Owlet *prior* to its merger with Sandbridge," his claims cannot be brought under §10(b). Mtn. at 20. Urging this Court to adopt reasoning from the Second Circuit's decision in *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 86 (2d Cir. 2022), Defendants assert that Plaintiff, having purchased public Owlet stock (previously Sandbridge), lacks statutory standing to allege misrepresentations regarding Owlet. Mtn. at 20-21. Yet Defendants have provided no justification to adopt out-of-circuit authority that courts in this Circuit have rejected, nor does their argument accord with the alleged facts, and should therefore be discarded. *CCIV*, 2023 WL 325251, at *8 (rejecting *Menora*); *Mullen Auto*, 2023 WL 8125447, at *6 (same).

Moreover, Defendants disregarded that Sandbridge shares *were* publicly traded before the merger when they became Owlet shares, and the S-4 and Proxy Statement filed by Sandbridge contained the misrepresentations made by pre-merger Owlet. ¶¶127-128, 130-131, 134. Thus, it is no answer for Defendants to claim that "Owlet

- 20 -

4859-8606-5325.v3

remained a privately held company" on March 31, and June 21, 2021, since the SEC filings issued on those days incorporated pre-merger Owlet's misrepresentations and omissions. Furthermore, Defendants overlook Plaintiff's statutory standing for the misrepresentations made on August 5, 2021. ¶183.

## VII. THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY

Defendants' sole argument against Plaintiff's §20(a) claims is that it fails on the "[d]erivative" basis that the §10(b) was not alleged. Mtn. at 21. But since the Complaint "establishes a primary violation, Defendants' argument . . . is unavailing." *STAAR*, 2016 WL 6699284, at *14.

## VIII. CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety. Especially given Defendants' failure to comply with Local Rule 7-3 to discuss the Motion's substance, and because Defendants themselves do not request, and therefore waive any argument that the Court dismiss the Complaint with prejudice (*see* Mtn. at 21), should the Court decide to dismiss the Complaint in whole or in part, Plaintiff requests leave to amend. *See Dawod v. Garland*, 2023 WL 8168832, at *5 (C.D. Cal. Oct. 12, 2023).

DATED: March 22, 2024

KESSLER TOPAZ MELTZER
 & CHECK, LLP
JENNIFER L. JOOST (296164)


s/ Jennifer L. Joost
JENNIFER L. JOOST

One Sansome Street, Suite 1850
San Francisco, CA  94104
Telephone:  415/400-3000
415/400-3001 (fax)
jjoost@ktmc.com

Counsel for Lead Plaintiff Dr. Thomas E. Tweito and Lead Counsel for the Section 10(b) Class

- 21 -

4859-8606-5325.v3

ROBBINS GELLER RUDMAN
  & DOWD LLP
DEBRA J. WYMAN
ASHLEY M. PRICE
JUSTIN GARY OETTING
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com
aprice@rgrdlaw.com
joetting@rgrdlaw.com

Additional Counsel for the Section 10(b) Class

SCHALL LAW FIRM
BRIAN SCHALL (290685)
1880 Century Park East, Suite 404
Los Angeles, CA  90067
Telephone:  310/301-3335
310/338-0192 (fax)
brian@schallfirm.com

Additional Counsel

## LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Lead Plaintiff Dr. Thomas E. Tweito, certifies that this brief contains 6,990 words, which complies with the word limit of Local Rule 11-6.1.

DATED:  March 22, 2024

s/ Jennifer L. Joost
JENNIFER L. JOOST

- 22 -

4859-8606-5325.v3