UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MICHAEL J. BUTALA,

Plaintiff,

v.

OWLET, INC., *et al.*,

Defendants.

Case No. 2:21-cv-09016-FLA (JEMx)

**ORDER DENYING OWLET DEFENDANTS' MOTIONS TO DISMISS [DKTS. 90, 92]; AND GRANTING SANDBRIDGE DEFENDANTS' MOTION TO DISMISS [DKT. 94]**

**RULING**

Before the court are three motions: 1) Defendants Owlet, Inc. ("Owlet"), Kurt Workman ("Workman), and Kate Scolnick's (together, "Owlet Defendants") Motion to Dismiss the Section 10(b) Complaint (Dkt. 90, "Owlet 10(b) Mot."); 2) the Owlet Defendants' Motion to Dismiss the Section 14(a) Complaint (Dkt. 92, "Owlet 14(a) Mot.");[1] and 3) Defendants Ken Suslow, Richard Henry, Domenico De Sole, Ramez

[1] Plaintff Michael J. Butala filed two complaints in the instant action. Both complaints are premised on the same conduct but assert different causes of action under Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") (Dkt. 79, "10(b) Compl.") and Section 14(a) of the Securities Exchange Act of 1934 ("Section 14(a)") (Dkt. 80, "14(a) Compl."). The court refers to the complaints as the 10(b) Complaint and 14(a) Complaint, respectively.

Toubassy, Jamie Weinstein, Krystal Kahler, and Michael F. Goss (together, "Sandbridge Defendants") Motion to Dismiss the Section 14(a) Complaint (Dkt. 94, "Sandbridge Mot.").[2] Lead Plaintiff Thomas Tweito opposes the Owlet Defendants' 10(b) Motion (Dkt. 114), and Lead Plaintiff Drew Conant opposes the Owlet Defendants' and Sandbridge Defendants' 14(a) Motions (Dkts. 109, 111).

On May 29, 2024, the court found the matters appropriate for resolution without oral argument and vacated the hearings set for May 31, 2024. Dkt. 123; *see* Fed. R. Civ. P. 78(b); Local Rule 7-15. For the reasons stated herein, the court DENIES the Owlet Defendants' Motions and GRANTS the Sandbridge Defendant's Motion.

## BACKGROUND

Both complaints allege Defendants disseminated materially false and misleading statements about whether Owlet obtained requisite approval from the Food and Drug Administration ("FDA") to market and sell its device (the "Smart Sock") in the United States. *See generally* 10(b) Compl.; 14(a) Compl.[3] The court treats the following allegations as true.[4]

### A. FDA Regulation of Medical Devices

The FDA regulates medical devices, which are defined as an "instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article" that is "intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease" or is "intended to affect the structure or any function of the body." 10(b) Compl. ¶ 34.

---

[2] The court refers to the Owlet Defendants and Sandbridge Defendants collectively as "Defendants."

[3] The facts alleged in the 10(b) and 14(a) Complaints largely overlap, and the court cites primarily to the 10(b) Complaint for efficiency.

[4] When evaluating a complaint under Rule 12(b)(6), the court "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

Medical devices are categorized into one of three groups based upon risk level. *Id.* ¶ 35.

The manufacturer of a product (here, Owlet) is responsible for determining if its product qualifies as a "medical device," and, if so, determining the appropriate regulatory classification for the product. *Id.* ¶ 36. To determine if a product is a medical device, the manufacturer must define the product's "intended use" and its "indications for use." *Id.* ¶ 37. A product's intended use is the general purpose or function that will appear on the label, and a product's indications for use describe the condition or reasons for using a device, including a description of intended users. *Id.*

**B. First Launch of the Smart Sock**

Owlet manufactures and sells "products and services that proactively monitor an infant's health and wellness," including the Smart Sock, which monitors an infant's heart rate and oxygen levels. *Id.* ¶¶ 30, 46.

In May 2013, Workman (co-founder and CEO of Owlet) debuted a prototype of the Smart Sock, and stated the device would alert "parents if their child stops breathing at night." *Id.* ¶ 46. Workman acknowledged the product contained an alarm feature and stated, "[a]larm plus pulse oximetry means that you need FDA clearance." *Id.* ¶ 48. He further noted the prototype was "a Class II device … [b]ecause it's sounding an alarm. So an alarm means that we are giving advice to parents." *Id.* ¶ 49 (brackets in original).

Workman then decided to "launch[] … [a] non-alarm health tracking version that doesn't need FDA [clearance] to lower risk[.]" *Id.* ¶ 51 (brackets in original). On August 26, 2013, Owlet unveiled publicly a version of the Smart Sock, without the alarm and notification features. *Id.* ¶ 53. The press release noted forthcoming versions of the device with "alarm and notification features would require FDA clearance before Owlet could launch these features to the broader public," and "'[t]he Owlet Team [wa]s currently going through the FDA process to add an alarm, along with other features, to the next version of the product' which will take the Smart Sock

'to a whole new level, notifying parents of drops in heart rate or oxygen levels, and helping to prevent emergencies.'" *Id.* ¶ 56 (brackets in original).

### C. FDA Wellness Device Guidance

In early 2015, after the launch of the initial version of the Smart Sock, the FDA issued guidance explaining it would exercise enforcement discretion for certain low-risk "general wellness products," which could otherwise qualify as medical devices. 10(b) Compl. ¶¶ 4, 64. Under this new guidance, the FDA noted it did not intend to "examine low-risk general wellness products … to determine whether" they were medical devices, which require compliance with certain regulatory requirements. *Id.* ¶ 64. The term "general wellness product" was defined as a product which is "intended for only general wellness use … and [] present[s] a very low risk to users' safety[.]" *Id.* ¶ 65 (cleaned up). The FDA finalized the guidance in July 2016. *Id.* ¶ 64.

### D. Second Launch of the Smart Sock

On or around October 21, 2015, Owlet launched a new version of the Smart Sock with an alarm feature, which provided four types of notifications via different colored lights and sounds. *Id.* ¶ 70. For example, a green light indicated "the Smart Sock [was] taking readings and they look good," a blue light meant "the Smart Sock [was] too far from the Base Station," a yellow light meant "the Smart Sock [could not] get a good read from [the] baby's foot," and a red light meant "heart rate or oxygen levels look[ed] problematic." *Id.* In marketing the new Smart Sock, Owlet described it as a "unique device that leverages pulse oximetry, the same technology used in hospitals … to alert parents if their baby's oxygen levels and heart rate are out of range[.]" *Id.* ¶ 72; *see also id.* ¶¶ 73, 75 (noting the Smart Sock used the same technology as that used in hospitals to send alerts to parents).

Based on the technology utilized and the intended use of the updated Smart Sock with the integrated alarm feature, Plaintiff alleges Owlet should have determined the Smart Sock qualified as a Class II medical device and obtained necessary FDA approvals.

**E. 2016 FDA Communications with Owlet**

In 2016, the FDA "began privately telling Owlet in written correspondence" that the "'Smart Sock meets the definition of a [medical] device … and does not fall under the compliance policy for low-risk products that promote a healthy lifestyle (General Wellness guidance).'" *Id.* ¶ 77. Owlet did not disclose publicly that the FDA had issued such warnings and continued to sell the Smart Sock with the integrated alarm feature in the United States. *Id.* ¶ 78.

In March 2017, Owlet launched another updated version of the Smart Sock, which still contained the alarm feature, but "tone[d] down its promotional efforts" by "switching 'alert' to 'notification'" and including a disclaimer that the product was not intended to "cure, treat, or prevent any disease or health condition[.]" *Id.* ¶¶ 92–93. The FDA again "informed Owlet that the Smart Sock was a medical device that needed FDA marketing approvals[.]" *Id.* ¶ 97. Owlet continued to sell the Smart Sock and did not disclose it was required to seek FDA clearance. *Id.* ¶¶ 98–99.

**F. Sandbridge Merger**

On February 16, 2021, Owlet announced it was merging with Sandbridge,[5] a special purpose acquisition company, to become a public company. *Id.* ¶ 116. A Form S-4 registration statement was filed with the Securities and Exchange Commission ("SEC") in connection with the merger shortly thereafter. *Id.* ¶¶ 130–31. In a section titled "Regulatory Compliance," the form stated that since January 1, 2018, "all products marketed and sold by Owlet have been, and are being … marketed … and sold in compliance … with applicable FDA Laws." *Id.* ¶ 132 (cleaned up). The Form S-4 additionally certified Owlet "holds all material … clearances … required by applicable FDA Laws," and that "[s]ince January 1, 2018," Owlet had not

[5] The Sandbridge Defendants comprise executive officers and board members of Sandbridge. 10(b) Compl. ¶¶ 117, 119.

"received any written or notice or communication from any [g]overnmental [e]ntity," regarding "material noncompliance with any applicable FDA law[.]" *Id.* ¶ 132.

With regard to the Smart Sock, Owlet asserted it was a "consumer product and not a medical device," and, therefore, did not "require marketing authorization from the FDA," but that the FDA "could require" Owlet to obtain "marketing authorization … to continue to sell the product[.]" *Id.* ¶ 135. The Form S-4 included a preliminary proxy statement soliciting shareholder approval for the merger. 14(a) Compl. ¶ 82. Owlet and Sandbridge then filed a Final Proxy Statement for a Special Meeting of Sandbridge shareholders to vote on the merger with Owlet, which was adopted and closed the next day. 10(b) Compl. ¶ 128; 14(a) Compl. ¶ 95.

**G. 2021 FDA Warning Letter**

On October 4, 2021, in a Form 8-K filed with the SEC, Owlet revealed it had received a public warning letter from the FDA on October 1, 2021, which stated the Smart Sock was a medical device because it was "intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or to affect the structure of any function of the body[.]" 10(b) Compl. ¶ 140. The warning letter also stated products that "measure blood oxygen saturation and pulse rate are [medical] devices when they are intended to identify (diagnose) desaturation and bradycardia and provide an alarm to notify users that measurements are outside preset values." *Id.*

The FDA letter announced the FDA had corresponded with Owlet since 2016 regarding the Smart Sock's qualification as a medical device, and that the Smart Sock did not "fall under the compliance policy for low-risk products that promote a healthy lifestyle (General Wellness guidance)[.]" *Id.* ¶ 142. The letter requested Owlet "cease any activities that result in the adulteration of the Owlet Smart Sock … such as the commercial distribution of the device for the uses discussed above." 10(b) Compl. ¶ 143. Upon disclosure of the Warning Letter, Owlet's stock price fell 23%. *Id.* ¶ 145.

## DISCUSSION

## I. Legal Standard

Under Fed. R. Civ. P. ("Rule") 12(b)(6), a party may file a motion to dismiss a complaint for "failure to state a claim upon which relief can be granted." A district court properly dismisses a claim under Rule 12(b)(6) if the complaint fails to allege sufficient facts "to support a cognizable legal theory." *Caltex*, 824 F.3d at 1159. "To survive a motion to dismiss, a complaint must contain sufficient factual matter … to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

When evaluating a complaint under Rule 12(b)(6), the court "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Caltex*, 824 F.3d at 1159. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations and brackets omitted). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* (internal citations omitted). Legal conclusions, however, "are not entitled to the assumption of truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

## II. Section 10(b) Motion

Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") makes it unlawful "for any person … [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange … any manipulative

or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary[.]" 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements Section 10(b) and states in relevant part that it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made … not misleading." 17 C.F.R. § 240.10b-5.

To state a claim for violation of Section 10(b), a plaintiff must prove: (1) a material misrepresentation or omission by the defendant (*i.e.*, falsity); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).[6]

"At the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b-5 must … satisfy the heightened pleading requirements of both Rule 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Rule 9(b) "requires particularized allegations of the circumstances constituting fraud, including identifying the statements at issue and setting forth what is false or misleading ... about the statement[s] and why the statements were false or misleading at the time they were made." *Id.* The PSLRA also requires "plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." *Id.*

**A. Falsity**

A statement or omission is actionable under Section 10(b) if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). The Owlet Defendants argue the alleged misstatements identified by

---

[6] Defendants do not assert Plaintiff has failed to plead reliance, loss, and causation sufficiently. Accordingly, the court only considers whether the 10(b) Complaint pleads falsity and scienter adequately.

Plaintiff are not actionable because they represented accurately the regulatory status of the Smart Sock, or were only inactionable statements of opinion. Owlet 10(b) Mot. at 17–21. The court disagrees. The 10(b) Complaint identifies several actionable misstatements or misrepresentations.

First, in the "Regulatory Compliance" section of the Form S-4 filed with the SEC on March 31, 2021, Owlet certified that, since January 1, 2018, all products marketed and sold by Owlet were being sold "in compliance in all material respects with applicable FDA Laws"; Owlet held "all material Permits, including [] clearance or premarket approvals required by applicable FDA Laws"; "no Government Entity is considering … changing the marketing classification of the Company Products in any material respect"; Owlet had "not received any written notice or communication from any Governmental Entity … alleging or asserting material noncompliance with any applicable FDA Law, any warning or untitled letter … or similar written letter or notice alleging noncompliance," and "there are no facts or circumstances reasonably likely to cause … a termination, seizure or suspension of the marketing or distribution … of any such product[.]" 10(b) Compl. ¶ 159(a)–(e).

The 10(b) Complaint alleges sufficiently that these statements were materially false or misleading as Owlet had previously received notice from the FDA stating the "Smart Sock appears to meet the definition of a [medical] device," and that the FDA was "unable to identify any [FDA] clearance or approval number for the Owlet Smart Sock. We request that you provide us with the FDA clearance or approval number for the Owlet Smart Sock." Dkt. 90-4.[7] Accordingly, the 10(b) Complaint pleads

---

[7] The Owlet Defendants request the court incorporate by reference the 2016 FDA letter and several other exhibits. Dkt. 90-4. A document may be deemed incorporated by reference "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). The 10(b) Complaint relies on the 2016 FDA letter, and, thus, the court GRANTS the Owlet Defendants' request as to this exhibit. As the court does not rely

adequately that Owlet was sufficiently on notice that the FDA expected Owlet to obtain agency approval prior to the sale and distribution of the Smart Sock.

The Owlet Defendants' argument that the 2016 FDA letter was not definitive because it "invited Owlet to correspond with the FDA" (Owlet 10(b) Mot. at 18) regarding the classification of the Smart Sock is of no import. The Owlet Defendants do not offer evidence or argument that the FDA ever adopted Owlet's contrary position that the Smart Sock was a general wellness device. Rather, the 10(b) Complaint establishes adequately that, as a result of the FDA's 2016 letter, the FDA believed the Smart Sock should be classified as a medical device, thus requiring agency approval, and continued to so believe through 2021, when the FDA announced publicly its position that the Smart Sock qualified as a medical device and noted, "[s]ince 2016, the FDA has corresponded with Owlet that the [] Smart Sock meets the definition of a [medical] device[.]" 10(b) Compl. ¶ 204.

The 10(b) Complaint also adequately pleads the Owlet Defendants misrepresented they never received written communication from the FDA alleging non-compliance. That the registration form later qualified these statements by noting Owlet had communicated its belief "that the [] Smart Sock is not a medical device," but that the FDA "could require us to obtain marketing authorization … to continue to sell the product," is insufficient to negate falsity at this stage of the action, as these qualifications did not accompany the misleading statements, and, therefore, could give a reasonable investor an incorrect perception of Owlet's true state of affairs vis-à-vis the FDA. *Brody*, 280 F.3d at 1006.

Likewise, and for the same reasons, the 10(b) Complaint pleads adequately that the Owlet Defendants' statement that "the [] Smart Sock is a consumer product and

---

on the remaining exhibits, the requests for incorporation and/or judicial notice as to Exhibits 1, 3, 4, and 5 are DENIED as moot.

not a medical device" in the "Clinical Research Involving our Product" section of the Form S-4, constitutes a material misrepresentation. 10(b) Compl. ¶ 162.

**B. Scienter**

To plead scienter adequately in a Section 10(b) claim, a plaintiff must "state with particularity facts giving rise to a strong inference that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).

The 10(b) Complaint alleges that Workman admitted previously that a device with an alarm would likely qualify as a Class II medical device and, thus, require FDA clearance (10b Compl. ¶¶ 48–50, 187); Workman decided to sell a version of the Smart Sock without an alarm to avoid incurring regulatory and compliance-related fees (*id.* ¶¶ 51, 59); and Owlet announced an intent to market an FDA-approved Smart Sock with alarm and notification features (*id.* ¶¶ 51, 56), and began marketing the Smart Sock with the alarm feature as a wellness device shortly after the FDA issued guidance explaining general wellness devices would not require compliance with any regulatory scheme (*id.* ¶ 68).

Contrary to the Owlet Defendants' assertion that the 10(b) Complaint "has no account for why Owlet would continue selling a product it *knew* would eventually be subject to a Warning Letter from the FDA," (Owlet 10(b) Mot. at 26 (emphasis in original)), the 10(b) Complaint attributes Owlet's decision to market the Smart Sock as a wellness device to a lack of funding, as Owlet needed to "secure tens of millions of dollars in new funding from interested investors" to obtain FDA clearance, but had raised "only … $1.85 million" by April 2014. 10(b) Compl. ¶ 3. Accordingly, the 10(b) Complaint claims Owlet "could not secure the level of funding necessary to obtain FDA clearance without launching its flagship product to the public at large." *Id.*; *see also id.* ¶ 61 (alleging Owlet "needed to secure tens of millions of dollars in new funding in order to achieve the necessary FDA clearance for the Smart Sock with the alert feature by 2015").

These allegations, taken together, give rise to a strong inference that the Owlet Defendants knew the Smart Sock with the alarm feature would likely qualify as a medical device, but attempted improperly to market the Smart Sock as a wellness device to avoid incurring costs associated with obtaining FDA clearance and maintain profitability. Such allegations are sufficient to establish the Owlet Defendants acted intentionally, knowingly, or with deliberate recklessness. *See Berson*, 527 F.3d at 987.

The Owlet Defendants argue the need to raise capital is "common … for any for-profit business," and "does not establish scienter." Owlet 10(b) Mot. at 26. To the contrary, courts have held a "desire to raise company financing, combined with the 'red flags' of a company's financial condition, is sufficient to plead scienter." *Nguyen v. Radient Pharms. Corp.*, Case No. 5:11-cv-00406-DOC (MLGx), 2011 WL 13141630, at *6 (C.D. Cal. Oct. 26, 2011).

For example, in *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1060 (9th Cir. 2000), the plaintiff alleged the defendant corporation represented falsely it had achieved sufficient profitability to secure bank financing. The court held that the "demonstration of [defendant corporation's] possible motive, combined with the red flags of [its] financial condition" were sufficient to plead scienter. *Id.* at 1063. The court emphasized that the company's executives "recognized the company's cash flow … [was] potentially inadequate" to fund its business plan, and "in order for the company to meet it optimistic projections, additional funding needed to be raised." *Id.*

Similarly, here, scienter is pleaded adequately, as the 10(b) Complaint alleges Owlet was facing a "quintessential Catch-22" between raising funds required to secure FDA approval of its "flagship" product and selling the product without FDA regulation to raise the capital required to obtain FDA approval. 10(b) Compl. ¶ 62. Even if the court were to accept the Owlet Defendants' argument as equally plausible, "if two possible inferences—one fraudulent and the other nonfraudulent—are equally

compelling, a plaintiff has demonstrated a strong inference of scienter." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1032–33 (9th Cir. 2016).

Finally, it is irrelevant that the 10(b) Complaint "does not point to any internal company communications showing that Owlet intended to mislead the public" or "identify any whistleblowers … who speak to the company's understanding about the Smart Sock's regulatory status," as such allegations are not required to establish scienter. Owlet 10(b) Mot. at 25.

For the reasons stated, and because the 10(b) Complaint adequately alleges the Owlet Defendants received notice about the regulatory status of the Smart Sock from the FDA, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011).

Accordingly, the court DENIES the Owlet Defendants' Motion as to the 10(b) Complaint.[8]

## III. Section 14(a) Motions

### A. Owlet Defendants' Motion as to the 14(a) Complaint

To plead a claim under Section 14(a), a plaintiff must allege: (1) defendants made a material misrepresentation or omission in a proxy statement; (2) with the requisite state of mind; and (3) the proxy statement was the transactional cause of harm of which plaintiff complains. *Schulein v. Petroleum Development Corp.*, Case

---

[8] The 10(b) Complaint also asserts a cause of action against Workman for violation of Section 20(a) of the Securities Exchange Act ("Section 20(a)"), which provides for joint and several liability for individuals who aid and abet violators of the Securities Exchange Act. 15 U.S.C. § 78t; 10(a) Compl. ¶¶ 233–39. The Owlet Defendants' sole argument in support of dismissal of the Section 20(a) claim is that the 10(a) Complaint "fails to allege any plausibly misleading or false statements" to establish liability under Section 10(b), and, thus, the "Section 20(a) [claims] must fail as well." Owlet 10(b) Mot. at 28. Having found the 10(b) Complaint alleges plausibly false or misleading statements, the court declines to dismiss the Section 20(a) claim on this basis.

No. 5:11-cv-1891-AG (ANx), 2012 WL 12884851, at *4 (C.D. Cal. June 25, 2021) (citing *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 384 (1970)). Negligence is "sufficient to support a claim for a violation of Section 14(a)." *Paskowitz v. Pacific Capital Bancorp*, Case No. 09-cv-06449-ODW (JCx), 2009 WL 4911850, at *4 (C.D. Cal. Nov. 6, 2009); *see also In re McKesson HBOC, Inc. Securities Litigation*, 126 F. Supp. 2d 1248, 1263 (N.D. Cal. 2000); *Knollenberg v. Harmonic, Inc.*, 152 Fed. App'x. 674, 682–83 (9th Cir. 2005).

The 10(b) and 14(a) Complaints allege the proxy statements at issue incorporate the statements discussed above. 10(b) Compl. ¶ 178; 14(a) Compl. ¶¶ 96–103. Thus, for the reasons stated above, the 14(a) Complaint alleges sufficiently the proxy statements contain false or misleading statements, and that the Owlet Defendants acted with the requisite state of mind. Accordingly, the court DENIES the Owlet Defendants' Motion as to the 14(a) Complaint.

**B. Sandbridge Defendants' Motion as to the 14(a) Complaint**

The Sandbridge Defendants argue none of the challenged statements are attributable to them and that the 14(a) Complaint does not allege with particularity facts giving rise to a strong inference that any of the Sandbridge Defendants acted negligently. Sandbridge Mot. at 7–8, 11. The court agrees.

Although the 14(a) Complaint alleges the Sandbridge Defendants signed the proxy statements despite having access "to all of Owlet's due diligence documents," books, and records throughout the pre-merger process (14(a) Compl. ¶¶ 87–88), it is insufficient to allege merely that the Sandbridge Defendants should have known through due diligence alone that the challenged statements were false, and that the Sandbridge Defendants acted negligently in signing a statement containing false information. Notably, the 14(a) Complaint does not allege the Sandbridge Defendants had knowledge of the FDA's 2016 letter to Owlet—the basis for rendering the challenged statements false or misleading.

Having found no actionable violation against the Sandbridge Defendants based on the allegations in the 14(a) Complaint, the court need not analyze any potential liability under Section 20(a). Accordingly, the court GRANTS the Sandbridge Defendants' Motion.

**CONCLUSION**

For the foregoing reasons, the court DENIES the Owlet Defendants' Motions as to the 10(b) and 14(a) Complaints, GRANTS the Sandbridge Defendants' Motion as to the 14(a) Complaint, and DISMISSES the 14(a) Complaint as to the Sandbridge Defendants with fourteen (14) days' leave to amend. The Owlet Defendants are ORDERED to file an Answer to the 10(b) and 14(a) Complaints within fourteen (14) days of this Order.

IT IS SO ORDERED.

Dated: August 5, 2024

FERNANDO L. AENLLE-ROCHA
United States District Judge