# EXHIBIT 6

**Exhibit 6**
**Page 35**

Index to Financial Statements

**As filed with the Securities and Exchange Commission on August 19, 2021**

Registration No. 333-258506

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

---

# AMENDMENT NO. 1
# TO
# FORM S-1
# REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

---

# Owlet, Inc.
**(Exact name of registrant as specified in its charter)**

---

| | | |
|---|---|---|
| **Delaware** | **7370** | **85-1615012** |
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**2500 Executive Parkway, Ste. 500**
**Lehi, Utah 84043**
**(844) 334-5330**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

---

**Kurt Workman, Chief Executive Officer**
**2500 Executive Parkway, Ste. 500**
**Lehi, Utah 84043**
**(844) 334-5330**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

---

*Copies to:*
**Benjamin Potter**
**Ryan Maierson**
**Drew Capurro**
**Latham & Watkins LLP**
**140 Scott Drive**
**Menlo Park, California 94025**
**(650) 328-4600**

---

**Approximate date of commencement of proposed sale to the public:**
**As soon as practicable after the effective date of this Registration Statement.**

---

**Exhibit 6**
**Page 36**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | |
|---|---|---|
| Large accelerated filer ☐ | Accelerated filer | ☐ |
| Non-accelerated filer ☒ | Smaller reporting company | ☒ |
| | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

---

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered(1) | Proposed Maximum Offering Price Per Share | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| Common Stock, par value $0.0001 per share | 18,100,000(2) | $11.50(3) | $208,150,000 | $22,709.17 |
| Common Stock, par value $0.0001 per share | 71,851,010(4) | $9.01(5) | $647,377,600.10 | $70,628.90 |
| Common Stock, par value $0.0001 per share | 5,512,592(6) | $1.45(7) | $7,993,258.40 | $872.07 |
| Warrants to purchase Common Stock | 6,600,000 | — | — | —(8) |
| **Total** | | | $863,520,858.50 | $94,210.14(9) |

(1) Pursuant to Rule 416 under the Securities Act (as defined below), this registration statement also covers any additional number of shares of Common Stock (as defined below) issuable upon stock splits, stock dividends or other distribution, recapitalization or similar events with respect to the shares of Common Stock being registered pursuant to this registration statement.

(2) Consists of (a) 6,600,000 shares of Common Stock issuable upon the exercise of 6,600,000 Private Placement Warrants (as defined below) by the holders thereof and (b) 11,500,000 shares of Common Stock issuable upon the exercise of 11,500,000 Public Warrants (as defined below) by the holders thereof.

(3) The price per share is based upon the exercise price per Warrant (as defined below) of $11.50 per share.

(4) Represents the sum of (a) 58,883,010 shares of Common Stock issued in connection with the Merger described herein and (b) 12,968,000 shares of Common Stock issued to certain qualified institutional buyers and accredited investors in private placements consummated in connection with the Business Combination.

(5) Pursuant to Rule 457(c) under the Securities Act, and solely for the purpose of calculating the registration fee, the proposed maximum offering price per share is $9.01, which is the average of the high ($9.28) and low ($8.74) prices of the Common Stock on NYSE (as defined below) on August 17, 2021.

(6) Consists of 5,512,592 shares of common stock reserved for issuance upon the exercise of options to purchase Common Stock.

(7) Pursuant to Rule 457(h) under the Securities Act, and solely for the purpose of calculating the registration fee, the proposed maximum offering price per share is $1.45, which is the weighted average exercise price at which the options covered by this registration statement may be exercised.

(8) In accordance with Rule 457(g), the entire registration fee for the Warrants is allocated to the shares of Common Stock underlying the Warrants, and no separate fee is payable for the Warrants.

(9) Previously paid.

---

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

**Exhibit 6**
**Page 37**

**Background**

We were incorporated as Sandbridge Acquisition Corporation on June 23, 2020. On July 15, 2021, we closed the Business Combination with Old Owlet, as a result of which Old Owlet became a wholly-owned subsidiary of ours, and we changed our name to Owlet, Inc. While we are the legal acquirer of Old Owlet in the Business Combination, Old Owlet is deemed to be the accounting acquirer, and the historical consolidated financial statements of Old Owlet became the predecessor of the Company upon the Closing of the Transactions.

At the effective time of the Business Combination (the "Effective Time"), each share of Old Owlet preferred stock and common stock issued and outstanding immediately prior to the Effective Time converted into the right to receive approximately 2.053 shares of our Common Stock. In addition, each share of our Class B common stock, par value $0.0001 per share, issued and outstanding immediately prior to the Effective Time converted into one share of Common Stock (of which 2,807,500 shares are subject to certain vesting conditions).

On February 15, 2021, in connection with the execution of the Business Combination Agreement, SBG entered into subscription agreements (collectively, the "Subscription Agreements") with certain parties subscribing for shares of SBG's Class A common stock, par value $0.0001 per share ("SBG Class A Common Stock," and such parties, the "Subscribers"), pursuant to which the Subscribers agreed to purchase, and SBG agreed to sell to the Subscribers, an aggregate of 12,968,000 shares of SBG Class A Common Stock, for a purchase price of $10.00 per share and at an aggregate purchase price of $129,680,000. Immediately prior to the closing of the Business Combination, we issued and sold 12,968,000 shares of our Common Stock to the Subscribers for aggregate gross proceeds to us of $129,680,000 (the "PIPE Investment").

1

Table of Contents

Index to Financial Statements

The rights of holders of our Common Stock and Warrants are governed by our second amended and restated certificate of incorporation (the "certificate of incorporation"), our amended and restated bylaws (the "bylaws"), and the Delaware General Corporation Law (the "DGCL"), and, in the case of the Warrants, the Warrant Agreement, dated as of September 14, 2020, between the Company and Continental Stock Transfer & Trust Company (the "Warrant Agreement"). See the section titled " *Description of Our Securities* ."

**Risk Factors**

Our business is subject to a number of risks of which you should be aware before making an investment decision. These risks are discussed more fully in the "Risk Factors" section of this prospectus immediately following this prospectus summary. These risks include the following:

- We have a limited operating history and have grown significantly in a short period of time. We need to continue to increase the size of our organization and, if unable to manage our growth effectively, our business could be materially and adversely affected.

- We have a history of net losses and may not achieve or maintain profitability in the future.

- If the U.S. Food and Drug Administration (" FDA ") or any other governmental authority were to require marketing authorization or similar certification for the Owlet Smart Sock, or for any other product that we sell and which Owlet does not believe requires such marketing authorization or certification, we could be subject to regulatory enforcement action and/or required to cease selling or recall the product pending receipt of marketing authorization from the FDA or marketing authorization or similar certification from such other governmental authority, which can be a lengthy and time-consuming process, harm financial results and have long-term negative effects on our operations.

- We are required to obtain and maintain marketing authorizations from the FDA for any products intended to be and/or classified as medical device products in the United States, which can be a lengthy and time-consuming process, and a failure to do so on a timely basis, or at all, could severely harm our business.

- We currently rely on sales of our Owlet Smart Sock technologies and related products for the majority of our revenue and expect to continue to do so for the foreseeable future.

- A substantial portion of our sales comes through a limited number of channel partners and resellers.

- We currently rely on a single manufacturer for the assembly of the Owlet Smart Sock and a single manufacturer for the assembly of the Owlet Cam and expect to rely on limited manufacturers for future products. If we encounter manufacturing problems or delays, we may be unable to promptly transition to alternative manufacturers and our ability to generate revenue will be limited.

- If we are unable to obtain key materials and components from sole or limited source suppliers, we will not be able to deliver our products to customers.

- If we are unable to adequately protect our intellectual property rights, or if we are accused of infringing on the intellectual property rights of others, our competitive position could be harmed or we could be required to incur significant expenses to enforce or defend our rights or to pay damages.

**Exhibit 6**

**Page 38**

We are highly dependent on our senior management, other key officers, our engineers and field sales team, and may be increasingly dependent on sales representatives and clinical specialists for the sale of any medical devices we may market, if approved. We face significant competition for talent from other healthcare, technology and high-growth companies, which include both large enterprises and privately-held companies. To attract top talent, we have

6

Table of Contents

Index to Financial Statements

had to offer, and believe we will need to continue to offer, highly competitive compensation packages before we can validate the productivity of those employees. In addition, we may not be able to hire new employees quickly enough to meet our needs and fluctuations in the price of our common stock may make it more difficult or costly to use equity compensation to motivate, incentivize and retain our employees.

***We have a history of net losses, and we may not achieve or maintain profitability in the future.***

We have incurred net losses since inception. For the years ended December 31, 2019 and 2020, we incurred net losses of $17.9 million and $10.5 million, respectively, and in the six months ended June 30, 2020 and 2021, we incurred net losses of $3.2 million and $13.2 million, respectively. As a result of our ongoing losses, as of June 30, 2021, we had an accumulated deficit of $84.9 million. Since inception, we have spent significant funds on organizational and start-up activities, to recruit key managers and employees, to develop our products, services and connected nursery ecosystem, to develop our manufacturing know-how and customer support resources and for research and development. The net losses we incur may fluctuate significantly from quarter to quarter and may increase as a result of the COVID-19 pandemic, such as its impact on logistics and other supply chain costs.

We have encountered and will continue to encounter risks and difficulties frequently experienced by growing companies in rapidly changing industries, including increasing expenses as we continue to grow our business. We expect our operating expenses to increase significantly over the next several years as we continue to hire additional personnel, expand our operations and infrastructure, and continue to develop and expand our products and services. In addition to the expected costs to grow our business, we also expect to incur additional legal, accounting, and other expenses as a newly public company. These investments may be more costly than we expect, and if we do not achieve the benefits anticipated from these investments, or if the realization of these benefits is delayed, they may not result in increased revenue or growth in our business. If our growth rate were to decline significantly or become negative, it could adversely affect our financial condition and results of operations. If we are not able to achieve or maintain positive cash flow in the long term, we may require additional financing, which may not be available on favorable terms or at all or which would be dilutive to our stockholders. If we are unable to successfully address these risks and challenges as we encounter them, our business, results of operations, and financial condition would be adversely affected. Our failure to achieve or maintain profitability could negatively impact the value of our Common Stock and Warrants.

***We currently rely on sales of our Owlet Smart Sock technologies and related products for the majority of our revenue and expect to continue to do so for the foreseeable future.***

We are highly dependent upon the continued success and market acceptance of the Owlet Smart Sock and related technologies that serve as the basis of our primary product offerings. Continued market acceptance will depend upon our continuing to provide evidence that our products and services add value in care-giving activities. If caregivers do not prefer our Owlet Smart Sock over competing products and services, they may not buy our products and services in sufficient quantities to enable us to generate revenue growth from the sale of these products and services.

***If the FDA or any other governmental authority were to require marketing authorization or similar certification for the Owlet Smart Sock, or for any other product that we sell and which Owlet does not believe requires such marketing authorization or certification, we could be subject to regulatory enforcement action and/or required to cease selling or recall the product pending receipt of marketing authorization from the FDA or marketing authorization or similar certification from such other governmental authority, which can be a lengthy and time-consuming process, harm financial results and have long-term negative effects on our operations.***

We currently sell the Owlet Smart Sock, which we market for use by parents of healthy babies to provide peace of mind, and for which we have not sought or obtained any marketing authorization from the FDA or similar authorization, approval, or certification from any other governmental authority. In response to inquiries from the FDA and regulatory authorities in other jurisdictions regarding the marketing of the Owlet Smart Sock, we have communicated our belief that the Owlet Smart Sock is not a medical device and does not require marketing authorization from the FDA or similar marketing authorization or certification from such other regulatory authorities. However, the FDA and certain regulatory authorities have expressed they do not agree with that conclusion and could require us to obtain marketing authorization, such as a clearance or approval, or other

7

Table of Contents

Index to Financial Statements

Exhibit 6
Page 39

certification to continue to sell the product. For example, the Medicines and Healthcare products Regulatory Agency, the regulatory authority responsible for the UK medical device market, has asserted that the Owlet Smart Sock requires certification and subsequent registration as a medical device in the UK, but has indicated they it allow us to continue to market the Owlet Smart Sock until May 2022 without such certification or registration. Obtaining authorization to sell the Owlet Smart Sock as a medical device is a time-consuming and costly process and we may be precluded from selling the Owlet Smart Sock if we are required to obtain marketing authorization, such as a clearance or approval, or other certification. If granted, a marketing authorization could require conditions to sale, for example, a prescription requirement. If the FDA or other regulatory authorities require such marketing authorization, including clearance or approval, or other certification for the Owlet Smart Sock, or for any other product that we sell and which we do not believe requires such marketing authorization or certification, we could be subject to regulatory enforcement action and/or required to cease selling or recall the product in the corresponding jurisdiction pending receipt of such marketing authorization or certification, which can be a lengthy and time-consuming process. In addition, we may be required to modify the product's functionality or limit our marketing claims for the product, whether or not we obtain such marketing authorization or other required certification. In any such event, our business could be substantially harmed.

***We currently rely on a single manufacturer for the assembly of our Owlet Smart Sock and a single manufacturer for the assembly of our Owlet Cam. We will likely rely on single manufacturers for future products we may develop. If we encounter manufacturing problems or delays, we may be unable to promptly transition to alternative manufacturers and our ability to generate revenue will be limited.***

We have no manufacturing capabilities of our own. We currently rely on a single manufacturer located in Thailand, Benchmark, for the manufacture of our Owlet Smart Sock. Additionally, we currently rely on a separate single manufacturer located in China, Shenzhen Aoni Electronic, for the manufacture of our Owlet Cam. We expect to rely on limited manufacturers for future products we may develop. For example, we have relied upon and expect to continue to rely upon a single manufacturer for the supply of the Owlet Band, a product that we are developing and may commercially launch in the future. For us to be successful, our contract manufacturers must be able to provide us with products in substantial quantities, in compliance with regulatory requirements, in accordance with agreed upon specifications, at acceptable costs and on a timely basis. While our existing manufacturers have generally met our demand requirements on a timely basis in the past, their ability and willingness to continue to do so going forward may be limited for several reasons, including our relative importance as a customer of each manufacturer or their respective ability to provide assembly services to manufacture our products, which may be affected by the COVID-19 pandemic or other natural or man-made disasters. Earthquakes are of particular significance since our headquarters are located in an earthquake-prone area. We are also vulnerable to damage from other types of disasters, including power loss, attacks from extremist or terrorist organizations, epidemics, communication failures, fire, floods and similar events. Furthermore, our manufacturing agreements can be terminated by our contract manufacturers without cause by giving us prior notice of six months or less. The facilities and the manufacturing equipment used to produce our products would be difficult to replace and could require substantial time to repair if significant damage were to result from any of these occurrences. An interruption in our commercial operations could occur if we encounter delays or difficulties in securing these manufactured products for any reason and we cannot obtain an acceptable substitute.

Any transition to a new contract manufacturer, or any transition of products between existing manufacturers, could be time-consuming and expensive, may result in interruptions in our operations and product delivery, could affect the performance specifications of our products, could require that we modify the design of our products, or could require clearance or approval by the FDA depending on the nature of the product and the changes associated with the transition to the new manufacturer. If we are required to change a contract manufacturer, we will be required to verify that the new manufacturer maintains facilities, procedures and operations that comply with our quality standards and applicable regulatory requirements, which could further impede our ability to manufacture our products in a timely manner. We may not be able to identify and engage alternative contract manufacturers on similar terms or without delay. Furthermore, our contract manufacturers could require us to move to a different production facility. The occurrence of any of these events could harm our ability to meet the demand for our products in a timely and cost-effective manner, which could have a material adverse effect on our business, financial condition and results of operations.

8

Table of Contents

Index to Financial Statements

The manufacture of our products is complex and requires the integration of a number of components from several sources of supply. Our contract manufacturers must manufacture and assemble these complex products in commercial quantities in compliance with regulatory requirements and at an acceptable cost. Our products, in particular the Owlet Smart Sock, require significant expertise to manufacture, and our contract manufacturers may encounter difficulties in scaling up production of our products, including problems with quality control and assurance, component supply shortages, increased costs, shortages of qualified personnel, the long lead time required to develop additional facilities for purposes of testing our products or difficulties associated with compliance with local, state, federal and foreign regulatory requirements. Manufacturing or quality control problems may arise in connection with the scale-up of the manufacture of our products. If we are unable to obtain a sufficient supply of product, maintain control over product quality and cost or otherwise adapt to anticipated growth, or if we underestimate growth, we may not have the capability to satisfy market demand, and our business and reputation in the marketplace will suffer. Conversely, if demand for our products decreases, we may have excess inventory, which could result in inventory write-offs that would have a material adverse effect on our business, financial condition and results of operations. We may also encounter defects in materials or workmanship, which could lead to a failure to adhere to regulatory requirements. Any defects could delay operations at our contract manufacturers' facilities, lead to regulatory fines or halt or discontinue manufacturing indefinitely. Any of these outcomes could have a material adverse effect on our business, financial condition and results of operations.

***If we are unable to obtain key materials and components from sole or limited source suppliers, we will not be able to deliver our products to customers.***

**Exhibit 6**
**Page 40**

number of births will continue to increase, those trends could shift and the number of births could decrease. Furthermore, even if the birth rate increases as we expect, technological or medical advances could provide alternatives to our products and services and reduce demand. As a result, our estimates of the addressable market for our current or future products and services may prove to be incorrect. If the actual number of consumers who would benefit from our products and services, the price at which we can sell future products and services or the addressable market for our products and services is smaller than we estimate, it could have a material adverse effect on our business, financial condition and results of operations.

***We spend significant amounts on advertising and other marketing campaigns to acquire new customers, which may not be successful or cost effective.***

We market our products and services through a mix of digital and traditional marketing channels. These include paid search, digital display advertising, email marketing, affiliate marketing, and select print advertising. We also leverage our database of prospects and customers to further drive customer acquisition and referrals. We spend significant amounts on advertising and other marketing campaigns to acquire new customers, and we expect our marketing expenses to increase in the future as we continue to spend significant amounts to acquire new customers and increase awareness of our products and services. While we seek to structure our marketing campaigns in the manner that we believe is most likely to encourage consumers to use our products and services, we may fail to identify marketing opportunities that satisfy our anticipated return on marketing spend as we scale our investments in marketing, accurately predict customer acquisition, or fully understand or estimate the conditions and behaviors that drive consumer behavior. Further, state, federal and foreign laws and regulations governing the privacy and security of personal information are evolving rapidly and could impact our ability to identify and market to potential and existing customers. If federal, state, or local laws governing our marketing activities become more restrictive or are interpreted by governmental authorities to prohibit or limit these activities, our ability to attract new customers and retain customers would be affected and our business could be materially harmed. In addition, any failure, or perceived failure, by us, to comply with any federal, state, or foreign laws or regulations governing our marketing activities could adversely affect our reputation, brand, and business, and may result in claims, proceedings, or actions against us by governmental entities, consumers, suppliers or others or other liabilities or may require us to change our operations and/or cease using certain marketing strategies. If any of our marketing campaigns prove less successful than anticipated in attracting new customers, we may not be able to adequately recover our marketing spend, and our rate of customer acquisition may fail to meet market expectations, either of which could have a material adverse effect on our business, financial condition and results of operations. Our marketing efforts may not result in increased sales of our products and services.

Further, web and mobile browser developers, such as Apple, Microsoft or Google, have implemented and may continue to implement changes, including requiring additional user permissions, in their browser or device operating system that impair our ability to measure and improve the effectiveness of advertising of our products and services. Such changes include limiting the use of first-party and third-party cookies and related tracking technologies, such as mobile advertising identifiers, and other changes that limit our ability to collect information that allows us to attribute consumer actions on advertisers' websites to the effectiveness of advertising campaigns run by us. For example, Apple launched its Intelligent Tracking Prevention ("ITP") feature in its Safari browser. ITP blocks some or all third-party cookies by default on mobile and desktop and ITP has become increasingly restrictive over time. Apple's related Privacy-Preserving Ad Click attribution, intended to preserve some of the functionality lost with ITP, would limit cross-site and cross-device attribution, prevent measurement outside a narrowly-defined attribution window, and prevent ad re-targeting and optimization. Similarly, Google recently announced that it plans to stop supporting third-party cookies in its Google Chrome browser. Further, Apple announced certain changes, including introducing an AppTrackingTransparency framework that will limit the ability of mobile applications to request an iOS device's advertising identifier and may also affect our ability to track consumer actions.

In addition, we believe that building a strong brand and developing and achieving broad awareness of our brand is critical to achieving market success. If any of our brand-building activities prove less successful than anticipated in attracting new customers, we may not be able to recover our brand-building spend, and our rate of customer acquisition may fail to meet market expectations, either of which could have a material adverse effect on our business, financial condition and results of operations. There can be no assurance that our brand-building efforts will result in increased sales of our products and services.

12

Table of Contents

Index to Financial Statements

***If we are unable to continue to drive consumers to our website, it could adversely affect our revenue.***

Many consumers find our website by searching for baby products and services through internet search engines or from word-of-mouth and personal recommendations. A critical factor in attracting visitors to our website is how prominently we are displayed in response to search queries. Accordingly, we use search engine marketing as a means to provide a significant portion of our customer acquisition. Search engine marketing includes both paid website visitor acquisition on a cost-per-click basis and visitor acquisition on an unpaid basis, often referred to as organic or algorithmic search.

One method we employ to acquire visitors via organic search is commonly known as search engine optimization ("SEO"). SEO involves developing our website in a way that enables the website to rank high for search queries for which our website's content may be relevant. We also rely heavily on favorable recommendations from our existing customers to help drive traffic to our website. If our website is listed less prominently or fails to appear in search result listings for any reason, it is likely that we will attract fewer visitors to our website, which could adversely affect our revenue.

**Exhibit 6**
**Page 41**

- We did not design and maintain effective controls over IT general controls for information systems that are relevant to the preparation of our consolidated financial statements. Specifically, we did not design and maintain (i) program change management controls to ensure that IT program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately, (ii) user access controls to ensure appropriate segregation of duties and that adequately restrict user and privileged access to financial applications, programs, and data to appropriate Company personnel, (iii) computer operations controls to ensure that critical batch jobs are monitored, and data backups are authorized and monitored, and (iv) testing and approval controls for program development to ensure that new software development is aligned with business and IT requirements. This material weakness did not result in any adjustments to the consolidated financial statements.

22

Table of Contents

Index to Financial Statements

Additionally, each of the material weaknesses described above could result in a misstatement of one or more account balances or disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.

We have not begun an implementation plan to remediate these material weaknesses. Once we begin an implementation plan, the remediation measures will be ongoing, and although not all inclusive, we expect the remediation measures to include hiring additional accounting and financial reporting personnel and implementing additional policies, procedures and controls, all of which will result in future costs for the Company.

To address these material weaknesses, we plan to take actions to improve our IT general controls, segregation of duties controls, period-end financial reporting controls, and journal entry controls. However, the material weaknesses will not be considered remediated until our remediation plan has been fully implemented, the applicable controls operate for a sufficient period of time, and we have concluded, through testing, that the newly implemented and enhanced controls are operating effectively. At this time, we cannot predict the success of such efforts or the outcome of our assessment of the remediation efforts. Our efforts may not remediate these material weaknesses in our internal control over financial reporting, or that additional material weaknesses will not be identified in the future. Our failure to implement and maintain effective internal control over financial reporting could result in errors in our consolidated financial statements that could result in a restatement of our consolidated financial statements, and could cause us to fail to meet our reporting obligations, any of which could diminish investor confidence in us and cause a decline in the price of our common stock. Additionally, ineffective internal controls could expose us to an increased risk of financial reporting fraud and the misappropriation of assets and subject us to potential delisting from the stock exchange on which we list or to other regulatory investigations and civil or criminal sanctions.

Additionally, on April 12, 2021, the staff of the SEC issued a statement regarding the accounting and reporting considerations for Warrants issued by special purpose acquisition companies entitled "Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs")" (the "SEC Statement"). Following the issuance of the SEC Statement, SBG concluded that it was appropriate to restate its previously issued audited financial statements as of and for the period ended December 31, 2020, and as part of such process, SBG identified a material weakness in its internal control over financial reporting. SBG's management implemented changes in internal control over financial reporting during second quarter of 2021 designed to remediate a material weakness solely related to the presentation of the Company's warrants as equity instead of liability. We will continue to expend a substantial amount of effort and resources, to identify and appropriately apply applicable accounting requirements to better evaluate and understand the nuances of the complex accounting standards that apply to our financial statements. Our plans also include increasing communication among our personnel and third-party professionals with whom we consult regarding complex accounting applications. The elements of our remediation plan can only be accomplished over time, and we can offer no assurance that these initiatives will ultimately have the intended effects.

As a public company, we will be required pursuant to Section 404(a) of the Sarbanes-Oxley Act to furnish a report by management on, among other things, the effectiveness of our internal control over financial reporting for each annual report on Form 10-K to be filed with the SEC. This assessment will need to include disclosure of any material weaknesses identified by our management in internal control over financial reporting. Once we cease to be an emerging growth company, our independent registered public accounting firm will also be required, pursuant to Section 404(b) of the Sarbanes-Oxley Act, to attest to the effectiveness of our internal control over financial reporting in each annual report on Form 10-K to be filed with the SEC. We will be required to disclose material changes made in our internal control over financial reporting on a quarterly basis. Failure to comply with the Sarbanes-Oxley Act could potentially subject us to sanctions or investigations by the SEC, the stock exchange on which our securities are listed or other regulatory authorities, which would require additional financial and management resources. We have begun the costly and challenging process of compiling the system and processing documentation necessary to perform the evaluation needed to comply with Section 404, but we may not be able to complete our evaluation, testing and any required remediation in a timely fashion.

**Risks Related to Regulation of Our Industry and Products**

***We are required to obtain and maintain marketing authorizations from the FDA for medical device products in the U.S., which can be a lengthy and time-consuming process, and a failure to do so on a timely basis, or at all, could severely harm our business.***

We are developing certain products, including the Owlet BabySat and Owlet OTC Smart Sock, that we believe are regulated as medical devices. Certain other products we are developing, such as the Owlet Band, may also be regulated as medical devices depending on their intended use. We currently sell the Owlet Smart Sock, which we

**Exhibit 6**
**Page 42**

Table of Contents

Index to Financial Statements

market for use by parents of healthy babies to provide peace of mind, and for which we have not sought or obtained any marketing authorization from the FDA or similar marketing authorizations or certifications from any other governmental authority. In response to inquiries from the FDA and regulatory authorities in other jurisdictions regarding the marketing of the Owlet Smart Sock, we have communicated our belief that the Owlet Smart Sock is not a medical device and does not require marketing authorization from the FDA or similar clearance, approval, certification, or other authorization from such other regulatory authorities. However, the FDA and other regulatory authorities have expressed they do not agree with that conclusion and could require us to obtain such marketing authorization, clearance, approval, and/or certification to continue to sell the product.

Medical devices are subject to extensive regulation in the United States by local government, state government and the federal government, including by the FDA. The FDA regulates virtually all aspects of a medical device's design, development, testing, manufacturing, labeling, storage, record keeping, reporting, sale, promotion, distribution and shipping. In the United States, unless an exemption applies, any medical device that we seek to market in the U.S. must first undergo the FDA's premarket review pursuant to the Federal Food, Drug, and Cosmetic Act ("FDCA"), and must receive the FDA's marketing authorization either via clearance of a 510(k) premarket notification, *de novo* classification, or approval of a premarket approval (" PMA ") application, depending on the type of device. In the 510(k) clearance process, before a device may be marketed, the FDA must determine that a proposed device is "substantially equivalent" to a legally-marketed "predicate" device. To be "substantially equivalent," the proposed device must have the same intended use as the predicate device, and either have the same technological characteristics as the predicate device or have different technological characteristics and not raise different questions of safety or effectiveness than the predicate device. Clinical data are sometimes required to support substantial equivalence.

In the PMA process, the FDA must determine that a proposed device is safe and effective for its intended use based, in part, on extensive data, including, but not limited to, technical, pre-clinical, clinical trial, manufacturing and labeling data. The PMA process is typically required for devices that are deemed to pose the greatest risk, such as life-sustaining, life-supporting or implantable devices. However, some devices are automatically subject to the PMA pathway regardless of the level of risk they pose because they have not previously been classified into a lower risk class by the FDA. Manufacturers of these devices may request that the FDA review such devices in accordance with the *de novo* classification procedure, which allows a manufacturer whose novel device would otherwise require the submission and approval of a PMA prior to marketing to request down-classification of the device on the basis that the device presents low or moderate risk. If the FDA agrees with the down classification, the applicant will then receive authorization to market the device. This device can then be used as a predicate device for future 510(k) submissions.

Modifications to products that are approved through a PMA application may require FDA approval. Similarly, certain modifications made to products cleared through a 510(k) premarket notification or de novo classification may require a new 510(k) clearance. The PMA approval, de novo classification, and the 510(k) clearance process can be expensive, lengthy and uncertain. The FDA's 510(k) clearance process usually takes from three to 12 months, but can last longer. The process of obtaining a PMA is much more costly and uncertain than the 510(k) clearance process and generally takes from one to three years, or even longer, from the time the application is filed with the FDA. In addition, a PMA and *de novo* classification generally require the performance of one or more clinical trials, and a 510(k) clearance sometimes requires clinical data to support clearance. Despite the time, effort and cost, any particular device may not be authorized for marketing by the FDA. Any delay or failure to obtain necessary marketing authorizations could harm our business.

Even if marketing authorization is granted, such marketing authorization may be limited to only certain indications for use. Medical devices may be marketed only for the indications of use for which they are authorized. Additionally, the FDA might not grant marketing authorizations on a timely basis, if at all, for products or new uses of existing products that are regulated as medical devices and that are determined to require such marketing authorization. In addition, even if FDA marketing authorization is obtained, if safety or effectiveness problems are later identified with any medical device products, we may need to initiate a product recall.

To support any submissions to the FDA seeking marketing authorizations, we may be required to conduct clinical testing of our product candidates. Such clinical testing must be conducted in compliance with FDA requirements pertaining to research with human subjects. Among other requirements, we must obtain informed

Table of Contents

Index to Financial Statements

consent from study subjects and approval by institutional review boards ("IRB") before such studies may begin. We must also comply with other FDA requirements such as monitoring, record-keeping, reporting and the submission of information regarding certain clinical trials to a public database maintained by the National Institutes of Health. In addition, if the study involves a significant risk device, we are required to obtain the FDA's approval of the study under an Investigational Device Exemption ("IDE"). Compliance with these requirements can require significant time and resources. If the

Exhibit 6
Page 43

otherwise, he or she will be indemnified by us against all expenses (including attorneys' fees) actually and reasonably incurred in connection therewith. Expenses must be advanced to an Indemnitee under certain circumstances.

We have entered into indemnification agreements with each of our directors and officers. These indemnification agreements may require us, among other things, to indemnify our directors and officers for some expenses, including attorneys' fees, judgments, fines and settlement amounts incurred by a director or officer in any action or proceeding arising out of his or her service as one of our directors or officers, or any of our subsidiaries or any other company or enterprise to which the person provides services at our request.

We maintain a general liability insurance policy that covers certain liabilities of directors and officers of our corporation arising out of claims based on acts or omissions in their capacities as directors or officers.

In any underwriting agreement we enter into in connection with the sale of Common Stock being registered hereby, the underwriters will agree to indemnify, under certain conditions, us, our directors, our officers and persons who control us within the meaning of the Securities Act against certain liabilities.

**Item 15.        Recent Sales of Unregistered Securities.**

Set forth below is information regarding shares of capital stock issued by us within the past three years. Also included is the consideration received by us for such shares and information relating to the section of the Securities Act, or rule of the Securities and Exchange Commission, under which exemption from registration was claimed.

(a)    **Issuance of Capital Stock.**

In June 2020, the Sponsor purchased an aggregate of 5,750,000 shares of SBG's Class B common stock for an aggregate offering price of $25,000. These securities were issued pursuant to Section 4(a)(2) of the Securities Act.

On July 15, 2021, the Registrant issued 12,968,000 shares of Common Stock to new and existing investors for aggregate gross proceeds of $129,680,000. These securities were issued pursuant to Section 4(a)(2) of the Securities Act.

On July 15, 2021, the Registrant issued 53,133,010 shares of Common Stock to former equityholders of Owlet Baby Care Inc. as part of the consideration for the Business Combination. These securities were issued pursuant to Section 4(a)(2) of the Securities Act.

(b)    **Warrants.**

On September 17, 2020, the Registrant issued 6,600,000 Warrants to purchase shares of SBG's Class A common stock to Sandbridge Acquisition Holdings LLC for aggregate gross proceeds of $6,600,000. These securities were issued pursuant to Section 4(a)(2) of the Securities Act.

**Item 16.        Exhibits and Financial Statement Schedules.**

(a)    **Exhibits.**

II-2

---

**Table of Contents**

**Index to Financial Statements**

| Exhibit | | Incorporated by Reference | | |
| | | Form | Exhibit | Filing Date |
|---|---|---|---|---|
| 2.1† | Business Combination Agreement, dated as of February 15, 2021, by and among the Registrant, Project Olympus Merger Sub, Inc. and Owlet Baby Care Inc. (incorporated by reference to Exhibit 2.1 of the Registrant's Current Report on Form 8-K, filed with the SEC on February 16, 2021). | 8-K | 2.1 | 2/16/2021 |
| 3.1 | Second Amended and Restated Certificate of Incorporation of Owlet, Inc. | S-4 | 3.3 | 3/31/2021 |
| 3.2 | Amended and Restated Bylaws of Owlet, Inc. | S-4 | 3.4 | 3/31/2021 |
| 4.1 | Warrant Agreement, dated as of September 14, 2020, by and between the Company and Continental Stock Transfer & Trust Company, as Warrant agent. | 8-K | 4.1 | 9/18/2020 |
| 4.2 | Specimen Warrant Certificate. | S-1 | 4.3 | 9/1/2020 |
| 5.1 | Opinion of Latham & Watkins LLP. | | | * |
| 10.1 | Form of Indemnification Agreement. | S-4 | 10.16 | 5/28/2021 |
| 10.2† | Amended and Restated Registration Rights Agreement, by and among Owlet, Inc. and the holders party thereto. | 8-K | 10.2 | 7/21/2021 |

**Exhibit 6
Page 44**