KESSLER TOPAZ MELTZER
  & CHECK, LLP
JENNIFER L. JOOST (296164)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: 415/400-3000
415/400-3001 (fax)
jjoost@ktmc.com

Counsel for Lead Plaintiff Dr. Thomas E. Tweito
and Lead Counsel for the Section 10(b) Class

ROBBINS GELLER RUDMAN
  & DOWD LLP
ELLEN GUSIKOFF STEWART (144892)
DEBRA J. WYMAN (190812)
ASHLEY M. PRICE (281797)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
elleng@rgrdlaw.com
debraw@rgrdlaw.com
aprice@rgrdlaw.com

Additional Counsel for Lead Plaintiff Dr. Thomas E. Tweito
and for the Section 10(b) Class

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL J. BUTALA, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>  vs.<br><br>OWLET, INC., et al.,<br><br>          Defendants. | Case No. 2:21-cv-09016-FLA(SSCx)<br><br>Consolidated with Case No. 2:21-cv-09293-FLA (JEMx)<br><br><u>CLASS ACTION</u><br><br>DECLARATION OF JENNIFER L. JOOST IN SUPPORT OF (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF PROPOSED SECTION 10(b) CLASS SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES<br><br>Date:      February 6, 2026<br>Time:      1:30 p.m.<br>Judge: Hon. Fernando L. Aenlle-Rocha<br>Courtroom: 6B |

9401831.v6

# TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................................................................i

I.      PRELIMINARY STATEMENT.................................................................................2

II.     BACKGROUND OF THE ACTION...........................................................................5

        A.      Summary of the Settlement Class's Claims...........................................5

        B.      Commencement of the Action ...............................................................7

        C.      The Consolidated Complaint .................................................................8

        D.      Defendants' Motion to Dismiss the Complaint ....................................9

        E.      Defendants' Motion for Reconsideration ...........................................10

        F.      The Parties' Discovery Efforts............................................................11

        G.      The Settlement .....................................................................................11

III.    RISKS OF CONTINUED LITIGATION .................................................................13

        A.      Risks Concerning Liability ..................................................................14

        B.      Risks Concerning Loss Causation and Damages.................................16

        C.      Risks on Appeal ..................................................................................16

IV.     COMPLIANCE WITH PRELIMINARY APPROVAL ORDER AND
        REACTION OF SETTLEMENT CLASS TO DATE ...............................17

V.      THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND
        ADEQUATE ..............................................................................................19

VI.     LEAD COUNSEL'S FEE AND EXPENSE APPLICATION .....................23

        A.      Lead Counsel's Fee Request Is Fair and Reasonable and
                Warrants Approval...............................................................................24

                1.      The Favorable Settlement Achieved ........................................24

                2.      The Risks of Litigation and the Need to Ensure the
                        Availability of Competent Counsel in High-Risk
                        Contingent Securities Cases ....................................................24

                3.      The Work of Plaintiff's Counsel and the Lodestar Cross-
                        Check .......................................................................................26

                4.      The Quality of Plaintiff's Counsel's Representation ...............28

                5.      Lead Plaintiff's Support of the Fee and Expense Request .......29

        B.      Lead Counsel's Request for Expenses Warrants Approval................29

- i -

9401831.v6

1.    Lead Counsel Seeks Payment of Plaintiff's Counsel's Reasonable and Necessary Litigation Expenses from the Settlement Fund ........................................................................29

2.    Reimbursement to Lead Plaintiff Is Fair and Reasonable ........31

VII.    CONCLUSION ........................................................................32

9401831.v6

I, JENNIFER L. JOOST, declare as follows pursuant to 28 U.S.C. § 1746:

1.　　I, Jennifer L. Joost, am a partner of the law firm of Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz" or "Lead Counsel").[1] Kessler Topaz represents the Court-appointed Lead Plaintiff Dr. Thomas E. Tweito ("Dr. Tweito" or "Lead Plaintiff") in the above-captioned securities class action ("Action"). I have personal knowledge of the matters set forth herein based on my active supervision of and participation in the prosecution and resolution of the Action.

2.　　I respectfully submit this Declaration in support of Lead Plaintiff's motion pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("Federal Rule(s)" or "Rule(s)") for final approval of the proposed settlement ("Settlement" or "10(b) Class Settlement") with defendants Owlet, Inc. ("Owlet" or the "Company") and Kurt Workman (together, "Defendants"). If approved, the Settlement will resolve all claims asserted in the Action against Defendants pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), on behalf of all persons and entities who purchased or otherwise acquired securities of Owlet (i.e., common stock and warrants) ("Owlet Securities") between March 31, 2021 and October 4, 2021, both dates inclusive, and who were damaged thereby ("Section 10(b) Settlement Class" or "Settlement Class").[2] The Court preliminarily approved the Settlement by Order dated September 26, 2025 ("Preliminary Approval Order"). ECF 155.

---

[1] Capitalized terms not defined in this Declaration have the meanings ascribed to them in the Stipulation and Agreement of Settlement for the Section 10(b) Class dated as of January 31, 2025 ("Stipulation"). ECF 147.

[2] Excluded from the Settlement Class are Defendants, the officers and directors of Owlet, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest. Also excluded from the Settlement Class are any persons and entities who or which submit a request for exclusion from the Settlement Class that is accepted by the Court.

- 1 -

9401831.v6

3.    I also respectfully submit this Declaration in support of the proposed plan for allocating the net proceeds of the Settlement to eligible Settlement Class Members ("Plan of Allocation") and Lead Counsel's motion, on behalf of Plaintiff's Counsel,[3] for an award of attorneys' fees and Litigation Expenses ("Fee and Expense Application"), including Lead Plaintiff's request, in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), for reimbursement of his costs in connection with representing the Settlement Class in the Action.

4.    For the reasons discussed below and in the accompanying memoranda,[4] I, on behalf of Lead Counsel, respectfully submit that: (i) the terms of the Settlement are fair, reasonable, and adequate in all respects and should be approved by the Court; (ii) the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved by the Court; and (iii) the Fee and Expense Application is reasonable, supported by the facts and the law, and should be granted in all respects. Moreover, the Settlement, Plan of Allocation, and Lead Counsel's Fee and Expense Application have the support of Lead Plaintiff. *See* Declaration of Dr. Tweito ("Tweito Decl."), attached hereto as Exhibit 1.

## I.    PRELIMINARY STATEMENT

5.    Following three years of hard-fought litigation and arm's-length negotiations facilitated by an experienced mediator, Lead Plaintiff and his counsel have succeeded in obtaining a recovery of $3,500,000 in cash ("Settlement Amount") for the benefit of the Settlement Class.[5] As provided for in the Stipulation,

---

[3] Plaintiff's Counsel refers collectively to Kessler Topaz and additional counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and the Schall Law Firm. Stip., ¶ 1(gg).

[4] In addition to this Declaration, Lead Plaintiff and Lead Counsel are submitting: (i) the Memorandum of Points and Authorities in Support of Lead Plaintiff's Motion for Final Approval of Proposed Section 10(b) Class Settlement and Plan of Allocation ("Settlement Memorandum"); and (ii) the Memorandum of Points and Authorities in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses ("Fee Memorandum").

[5] The Settlement Amount was fully funded on October 24, 2025, and is currently being held in the interest-bearing Escrow Account.

- 2 -

9401831.v6

in exchange for this consideration, the Settlement resolves all claims asserted in the Action pursuant to Sections 10(b) and 20(a) of the Exchange Act (and related claims) by Lead Plaintiff and the Settlement Class against the Defendants' Releasees.[6]

6.    The Settlement is the result of extensive efforts by Lead Plaintiff and his counsel, which included, among other things: (i) conducting an extensive investigation into the Settlement Class's claims; (ii) researching and preparing the detailed Consolidated Complaint for Violations of the Federal Securities Laws (ECF 79) ("Complaint"); (iii) opposing and defeating Defendants' motion to dismiss the Complaint; (iv) opposing and defeating, in part, Defendants' motion for reconsideration of the Court's Order denying Defendants' motion to dismiss the Complaint; (v) obtaining documents from the Food & Drug Administration ("FDA") by making a request pursuant to the Freedom of Information Act; (vi) commencing discovery efforts; (vii) consulting with a damages expert; and (viii) preparing for and engaging in settlement negotiations with Defendants, including a full-day formal mediation session facilitated by David M. Murphy, Esq. of Phillips ADR Enterprises. *See infra* ¶¶ 20-33. As a result of these efforts, Lead Counsel had a deep understanding of the strengths and weaknesses of the Parties' respective positions at the time the Settlement was reached.

7.    In deciding to settle the Action, Lead Plaintiff and his counsel carefully considered the significant risks associated with advancing their case through the completion of fact discovery, expert discovery, class certification, summary judgment, trial, and, if victorious at trial, the inevitable post-trial appeals. Moreover,

---

[6] As defined in ¶ 1(q) of the Stipulation, "'Defendants' Releasees' means Defendants, Defendants' respective former, present or future parent companies, controlling shareholders, subsidiaries, divisions and affiliates and the respective present and former employees, members, managers, partners, principals, officers, directors, controlling shareholders, agents, attorneys, advisors, accountants, auditors, and insurers and reinsurers of each of them; and the predecessors, successors, estates, Immediate Family members, spouses, heirs, executors, trusts, trustees, administrators, agents, legal or personal representatives, assigns, and assignees of each of them.'"

9401831.v6

an adverse decision against Lead Plaintiff by the Court at the class certification or summary judgment stage, or by a jury at trial, could have precluded *any* recovery for the Settlement Class. *See infra* § III.

8. Had the Settlement not been reached, Defendants would have continued to aggressively assert defenses to Lead Plaintiff's claims. For example, Defendants raised numerous challenges disputing the falsity of their alleged misstatements and scienter. Specifically, Defendants contended that they had appropriately warned investors that the FDA "may" not agree with their assessment as to whether Owlet's Smart Sock—a baby monitor allowing parents to track an infant's oxygen levels, heart rate, and sleep trends in real time—qualified as a consumer product rather than a medical device. Defendants also argued that the alleged misstatements were inactionable opinions, and that their "corporate optimism" regarding the Smart Sock's classification as a wellness product did not amount to fraudulent intent. In addition, in ruling on Defendants' motion for reconsideration, the Court granted the motion as to statements made prior to the merger between Owlet and Sandbridge Acquisition Corporation ("Sandbridge"), essentially shortening the class period to less than two months (i.e., August 5, 2021 through October 4, 2021).

9. Lead Counsel believes that the Settlement, particularly when viewed in the context of the risks and uncertainties of continued litigation, is a favorable result for the Settlement Class. Indeed, the Settlement represents approximately 38% of the Settlement Class's total estimated recoverable damages for the claims remaining in the Action at the time of settlement, providing a significant recovery for Settlement Class Members.

10. Lead Counsel has worked with the Court-authorized Claims Administrator, Strategic Claims Services ("SCS"), to disseminate notice of the Settlement to the Settlement Class as directed in the Preliminary Approval Order. In this regard, SCS has mailed/emailed a total of 47,605 notices to potential Settlement

- 4 -

9401831.v6

Class Members.[7] Additionally, SCS has posted the Notice and Claim Form, along with other documents relevant to the Settlement, on the Settlement Website, https://www.strategicclaims.net/case/owlet, and has caused the Summary Notice to be published in *Investor's Business Daily* and transmitted over *GlobeNewswire*. Craig Decl., ¶¶ 11, 13.

11.    The reaction of the Settlement Class thus far has been positive. As ordered by the Court and stated in the notices, requests for exclusion from the Settlement Class and objections are due no later than January 16, 2026. To date, there have been no objections to any aspect of the Settlement, Plan of Allocation, or Lead Counsel's request for attorneys' fees and expenses, including the request for reimbursement of Lead Plaintiff's costs, and not a single request for exclusion from the Settlement Class has been received.[8]

## II.    BACKGROUND OF THE ACTION

### A.    Summary of the Settlement Class's Claims

12.    The Settlement Class's claims are fully set forth in the Complaint, filed November 21, 2023. ECF 79. The Complaint asserts: (i) claims under Section 10(b) of the Exchange Act against Owlet and Kurt Workman ("Workman"); and (ii) claims under Section 20(a) of the Exchange Act against Workman.

13.    Lead Plaintiff asserts that, during the Class Period, Defendants made materially false and misleading statements regarding Owlet's regulatory approval to market its flagship product, the Smart Sock—a baby monitor allowing parents to track an infant's oxygen levels, heart rate, and sleep trends in real time, in the United States. *Id*. ¶¶ 1-23, 25. Lead Plaintiff alleges that Defendants falsely claimed the

---

[7] *See* Declaration of Margery Craig Concerning: (A) Mailing/Emailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections Received to Date ("Craig Decl."), ¶ 9, attached as Exhibit 2 hereto.

[8] *See* Craig Decl., ¶ 14. Should any requests for exclusion or objections be received after the date of this submission, Lead Counsel will address them in its reply to be filed with the Court on January 23, 2026.

- 5 -

9401831.v6

Smart Sock was not a medical device and that Owlet was FDA-compliant. *Id.* ¶¶ 130-39. Lead Plaintiff further alleges that Defendants falsely certified Owlet: (i) sold "all" of its products in compliance with "applicable FDA laws;" (ii) held "all" necessary FDA approvals or clearances for the Smart Sock; and (iii) was aware of "no facts or circumstances reasonably likely" to require Owlet to stop selling the Smart Sock. *Id.* ¶ 159. Lead Plaintiff asserts that the prices of Owlet Securities were artificially inflated as a result of Defendants' allegedly false and misleading statements, and declined when Owlet revealed that it had received a warning letter from the FDA regarding the marketing of the Smart Sock as a medical device without FDA clearance ("Warning Letter"). *Id.* ¶ 24.

14.    As set forth in the Complaint, the Warning Letter asserted that, despite Owlet's assertions, the Smart Sock was a medical device "intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body" and "[p]roducts that measure blood oxygen saturation and pulse rate are devices when they are intended to identify (diagnose) desaturation and bradycardia and provide an alarm to notify users that measurements are outside preset values." *Id.* ¶ 140. The FDA confirmed that it had "determined" that the Smart Sock had been "offered for sale in the United States without marketing approval, clearance, or authorization from [the] FDA." *Id.* ¶ 141. The Warning Letter further stated that it "ha[d] corresponded with Owlet" "[s]ince 2016" that the Smart Sock "me[t] the definition of a device under the [Food, Drug, and Cosmetic Act ("FD&C")] and d[id] not fall under the compliance policy for low-risk products that promote a healthy lifestyle (General Wellness guidance)" and thus, that Owlet's decision to market the Smart Sock in the U.S. was "without marketing clearance or approval" and was "in violation of the [FD&C] Act." *Id.* ¶ 142. The FDA's Warning Letter concluded by requesting Owlet to "cease any activities that result in the adulteration of the Owlet

- 6 -

9401831.v6

Smart Sock (All versions and co-branded products), such as the commercial distribution of the device for the uses discussed above." *Id*. ¶ 143.

15. Lead Plaintiff alleges that, following this news, the price of Owlet common stock fell $1.29, or 23%, in a single trading day, dropping from a closing price of $5.48 per share on October 1, 2021, to a closing price of $4.19 per share on October 4, 2021. *Id*. ¶ 145.

**B.    Commencement of the Action**

16. On November 17, 2021, a class action complaint styled *Michael J. Butala v. Owlet, Inc. f/k/a Sandbridge Acquisition Corp., et al.*, Case No. 2:21-cv-09016-FLA-SSC, was filed in the United States District Court for the Central District of California ("Court"), asserting violations of the federal securities laws against Owlet and certain of its executives. ECF 1. A related action, *Jones Cherian v. Owlet, Inc. f/k/a Sandbridge Acquisition Corp., et al.*, No. 2:21-cv-09293 RGK (AGRx) (C.D. Cal.) ("*Cherian* Action"), was filed on November 30, 2021.

17. Following notice advising putative class members of the pendency of the Action and their right to move the Court to serve as lead plaintiff in accordance with the PSLRA, Dr. Tweito, along with three other putative class members, moved for appointment as lead plaintiff on January 18, 2022. ECFs 10, 13, 17, 21. These motions also sought consolidation of the related *Cherian* Action. ECFs 10, 13, 17, 21.

18. By Order dated September 29, 2022, the Court consolidated the *Cherian* Action with this Action and requested additional briefing on the motions seeking lead plaintiff appointment. ECF 55. Dr. Tweito, along with the three other putative class members seeking appointment, filed additional briefing on October 13, 2022. ECFs 56, 58-61.

- 7 -

9401831.v6

19.    By Order dated September 8, 2023, the Court appointed Dr. Tweito as Lead Plaintiff for the Section 10(b) class and appointed his selection of Kessler Topaz as Lead Counsel for the Section 10(b) class. ECF 63.[9]

### C.    The Consolidated Complaint

20.    Prior to filing the Complaint, Plaintiff's Counsel conducted a thorough investigation into the facts underlying the Action. As part of this investigation, Plaintiff's Counsel reviewed an extensive number of publicly available documents, including: (i) Owlet's United States Securities & Exchange Commission filings; (ii) wire and press releases published by Owlet; (iii) analyst reports and advisories about the Company; (iv) media reports concerning the Company; (v) FDA regulations and regulations and advisories concerning marketing for medical devices and general wellness products; (vi) judicial filings; and (vii) other publicly available information concerning Defendants.

21.    Plaintiff's Counsel also conducted extensive legal research before filing the Complaint to understand exactly which theories of liability Mr. Tweito could allege and how to allege them given the current state of the law. For instance, Plaintiff's Counsel comprehensively researched the law related to standards for pleading securities fraud in the Ninth Circuit.

22.    Based upon this investigation and research, Lead Plaintiff, on December 22, 2023, filed the Complaint on behalf of all persons and entities who purchased or otherwise acquired securities of Owlet between March 31, 2021 and October 4, 2021, both dates inclusive, and who were damaged thereby. ECF 79.[10]

---

[9] By the same Order, the Court appointed Drew Conant as lead plaintiff for the Section 14(a) class and approved his selection of Pomerantz LLP as lead counsel for the Section 14(a) class. *Id.* The portion of the case asserting Section 14(a) Exchange Act claims on behalf of the Section 14(a) class ("14(a) Class Settlement") also settled and received preliminary approval on September 15, 2025. ECF 153.

[10] Lead Plaintiff initially filed the Complaint on November 21, 2023. ECF 70. Lead Plaintiff subsequently refiled the Complaint on December 22, 2023, in compliance with the Court's November 29, 2023 briefing schedule. ECF 79.

- 8 -

9401831.v6

Lead Plaintiff asserted: (i) claims under Section 10(b) of the Exchange Act against Owlet and Kurt Workman; and (ii) claims under Section 20(a) of the Exchange Act against Workman. Lead Plaintiff alleged that, during the Class Period, Defendants made materially false and misleading statements regarding Owlet's regulatory approval to market the Smart Sock. Lead Plaintiff further alleged that the prices of Owlet Securities were artificially inflated as a result of Defendants' allegedly false and misleading statements, and declined when the truth was revealed.

### D. Defendants' Motion to Dismiss the Complaint

23. On February 9, 2024, Defendants moved to dismiss the Complaint. ECF 90. In their motion, Defendants argued that: (i) the challenged statements were not false or misleading; (ii) the Complaint did not meet the PSLRA's heightened requirement for pleading scienter; (iii) Lead Plaintiff did not have standing to sue under Section 10(b) because the alleged misstatements and omissions occurred prior to Owlet's merger with Sandbridge and a plaintiff must have purchased shares in the entity about which the misstatements were made; and (iv) the Complaint failed to adequately allege a Section 20(a) claim. *Id*. Defendants also filed a request for judicial notice in connection with their motion. ECF 91.

24. Lead Counsel reviewed and analyzed Defendants' briefing, exhibits, and the legal authority cited therein and conducted additional legal research into Defendants' arguments and the responses thereto. On March 22, 2024, Lead Plaintiff opposed Defendants' motion to dismiss the Complaint and responded to Defendants' request for judicial notice. ECFs 114-15. In his opposition, Lead Plaintiff vigorously defended his allegations, arguing that the Complaint adequately alleged all elements of Lead Plaintiff's claims under the Exchange Act. ECF 114. More specifically, Lead Plaintiff argued that: (i) the Complaint adequately alleged that Defendants made materially false and misleading statements during the Class Period regarding the Smart Sock, as well as Owlet's interactions with the FDA, regulatory compliance, and ability to sell the Smart Sock without FDA clearance; (ii)

- 9 -

Defendants' opinion statements were actionable; (iii) the Complaint alleged facts strongly inferring Defendants' scienter by demonstrating that they knew, or recklessly disregarded, that the Smart Sock was a medical device requiring FDA clearance; (iv) Defendants' standing argument was meritless; and (v) the Complaint established a primary violation under Section 10(b) and thus, Lead Plaintiff adequately alleged a Section 20(a) claim. *Id*.

25.    On May 10, 2024, Defendants filed replies in support of their motion to dismiss and request for judicial notice. ECFs 116-18.

26.    By Order dated August 5, 2024, the Court denied Defendants' motion to dismiss the Complaint in its entirety. ECF 124.

27.    Pursuant to the Court's August 5, 2024 Order, Defendants answered the Complaint on August 19, 2024. ECF 126.

### E.    Defendants' Motion for Reconsideration

28.    On the same day they answered the Complaint, Defendants filed a motion for reconsideration of the Court's August 5, 2024 ruling on Defendants' motion to dismiss the Complaint. ECF 127. In their motion, Defendants argued that the Ninth Circuit's intervening decision in *In re CCIV/Lucid Motors Sec. Litig.*, 2024 WL 3710186, at *3 (9th Cir. Aug. 8, 2024) ("*Lucid*") prohibited Lead Plaintiff from suing Defendants for any statements made by and about pre-merger Owlet (a different legal entity than post-merger Owlet) and requested the Court's reconsideration with respect to, and dismissal of, Lead Plaintiff's claims based on statements made prior to Owlet's merger with Sandbridge. ECF 127-1. Lead Plaintiff opposed Defendants' motion on August 30, 2024, asserting that the Ninth Circuit's decision in *Lucid* did not present a change in the law and that purchasers of Owlet common stock had standing to bring Section 10(b) claims based on misrepresentations about Owlet. ECF 132. Defendants filed a reply in support of their motion for reconsideration on September 6, 2024. ECF 133.

- 10 -

9401831.v6

29.     On September 26, 2024, the Court granted in part and denied in part Defendants' motion for reconsideration ("Reconsideration Order"). ECF 139. More specifically, the Court: (i) granted Defendants' motion as to the challenged pre-merger statements and dismissed without leave to amend claims based upon statements made prior to the merger between Owlet and Sandbridge; and (ii) denied Defendants' motion as to the challenged post-merger statements made by and about Owlet. *Id.*

### F.     The Parties' Discovery Efforts

30.     While Defendants' motion for reconsideration was pending, the Parties were in the initial stages of discovery. The Parties filed their Joint Report and Discovery Plan Pursuant to Federal Rule of Civil Procedure 26(f) on September 20, 2024. ECF 135.

31.     Lead Plaintiffs served their first requests for production of documents on Defendants on September 4, 2024, to which Defendants responded/objected on October 4, 2024. Defendants served their first set of requests for production on Lead Plaintiff on September 26, 2024, to which Lead Plaintiff was in the process of preparing a response at the time the Parties began mediation discussions.

32.     During this same time, Lead Plaintiff drafted agreements governing the Parties' production of confidential and electronically stored information.

### G.     The Settlement

33.     Following the Court's Reconsideration Order, the Parties agreed to participate in a private mediation before David M. Murphy, Esq. of Phillips ADR Enterprises. On November 15, 2024, the Parties exchanged detailed mediation statements and accompanying exhibits that were also submitted to Mr. Murphy. The Parties held a full-day, in-person mediation session with Mr. Murphy on November

- 11 -

9401831.v6

25, 2024.[11] During the mediation, the Parties engaged in vigorous settlement negotiations and ultimately agreed to resolve the Action for $3.5 million.

34.    On December 2, 2024, the Parties notified the Court of their agreement in principle to resolve the putative class's claims brought under §§ 10(b) and 20(a) of the Exchange Act. ECF 140. The Parties informed the Court that they would file a motion for preliminary approval of the Settlement ("Preliminary Approval Motion") by January 31, 2025. *Id*. The Parties also requested that the Court stay all case deadlines set forth in the Court's Scheduling and Trial Order (ECF 138). *Id*. By Order dated December 6, 2024, the Court vacated all deadlines governing the Action and ordered Lead Plaintiff to file his Preliminary Approval Motion by January 31, 2025. ECF 141.

35.    Thereafter, Plaintiff's Counsel began working on various documents to be submitted with Lead Plaintiff's Preliminary Approval Motion. Over the following weeks, counsel for the Parties negotiated the specific terms of the Settlement, including the Stipulation (and the exhibits thereto) as well as a confidential supplemental agreement regarding requests for exclusion ("Supplemental Agreement"),[12] and exchanged multiple drafts of these documents. During this time, Lead Counsel also worked closely with Lead Plaintiff's damages consultants at Peregrine Economics to develop the proposed Plan of Allocation.

36.    Lead Counsel, in coordination with counsel for the Section 14(a) Plaintiffs, also requested and reviewed detailed bids obtained from several

---

[11] Counsel for the Section 14(a) Plaintiffs also participated in the November 25, 2024 mediation with Mr. Murphy. ECF 144, at 4. Although the mediation did not result in a settlement of the Section 14(a) claims, the parties in that portion of the case agreed to a mediator's recommendation and ultimately settled their claims for $1.75 million. *Id*. On December 27, 2024, the parties notified the Court that they had reached an agreement to settle the Section 14(a) claims. ECF 142.

[12] The Supplemental Agreement sets forth the conditions under which Owlet can exercise a right to withdraw from the Settlement in the event that requests for exclusion from the Settlement Class exceed certain agreed-upon conditions. Pursuant to its terms, the Supplemental Agreement is not being made public but will be submitted to the Court in camera upon request.

- 12 -

9401831.v6

organizations specializing in class action notice and claims administration, and conducted follow-up communications with certain of these firms. As a result of this bidding process, SCS was selected to serve as the Claims Administrator for both this Settlement and the Section 14(a) Class Settlement. Relatedly, Lead Counsel and counsel for the Section 14(a) Plaintiffs developed and agreed on a procedure with respect to joint notice and administration of both Settlements, including a joint Postcard Notice, Summary Notice, Claim Form, and case website ("Settlement Website").

37.    On January 31, 2025, the Parties executed the Stipulation and the Supplemental Agreement setting forth their final and binding agreement to settle the Action. Also on January 31, 2025, Lead Plaintiff filed the Stipulation (and related exhibits) along with his Unopposed Motion for Preliminary Approval of Proposed 10(b) Class Settlement and supporting memorandum. ECFs 146, 147. On September 26, 2025, the Court entered the Preliminary Approval Order granting Lead Plaintiff's Preliminary Approval Motion and finding that "it will likely be able to approve the Settlement under Rule 23(e)(2) as being fair, reasonable, and adequate to the Settlement Class, subject to further consideration at the Settlement Hearing." ECF 155 ¶ 4. The Court set the Settlement Hearing for February 6, 2026, at 1:30 p.m. *Id.* ¶ 5.[13]

## III.    RISKS OF CONTINUED LITIGATION

38.    The Settlement provides a certain and near-term benefit to the Settlement Class in the form of a $3,500,000 cash payment. Lead Plaintiff and Lead Counsel believe that the proposed Settlement is a favorable result in light of the substantial risks that Lead Plaintiff would face in continuing to litigate the Action, and is in the best interests of the Settlement Class.

---

[13]    The Court preliminarily approved the 14(a) Class Settlement on September 15, 2025. ECF 153.

- 13 -

9401831.v6

39.    Notably, at the time of settlement, the Court had recently dismissed the alleged pre-merger misstatements made on March 31, 2021 and June 21, 2021. ECF 139. Accordingly, the Court's Reconsideration Order shortened the class period by roughly four months—from March 31, 2021 through October 4, 2021 to August 5, 2021 through October 4, 2021, and essentially eliminated recoverable damages for the dismissed period. Although Lead Plaintiff could have appealed this ruling, Lead Plaintiff and his counsel understood an appeal would have been risky, causing additional delay and expense to the Settlement Class.

40.    Lead Plaintiff also would have faced substantial hurdles to establishing liability and damages for the remaining claims. Defendants were likely prepared to mount aggressive defenses at summary judgment, and, if necessary, at trial. If successful, Defendants' anticipated summary judgment motion could have narrowed the Settlement Class's claims even further, leading to a recovery in the Action well below the Settlement Amount, or no recovery at all. Likewise, if a jury at trial ruled against Lead Plaintiff on any one of the elements required to establish an Exchange Act claim, a recovery for the Settlement Class would be foreclosed. And, even if Lead Plaintiff prevailed at summary judgment and trial, Defendants would have pursued opportunities for appeal, risking eventual loss for the Settlement Class, or at minimum, significant delay and additional costs. Had the Action continued, Lead Plaintiff would also face hurdles to obtaining class certification.

41.    Several of the most serious risks of an adverse outcome faced by the Settlement Class are discussed in the following paragraphs. These risks support the Settlement.

**A.    Risks Concerning Liability**

42.    Defendants raised numerous challenges to liability—in particular, the falsity of their alleged misstatements and their scienter.

43.    *First*, had the Action continued, Defendants would have forcefully asserted that the statements at issue in the Action were not materially false or

- 14 -

9401831.v6

misleading when made. Defendants would argue, as they did at the motion to dismiss stage, that they had appropriately warned investors that the FDA "may" not agree with their assessment as to whether the Smart Sock qualified as a consumer product rather than a medical device. Defendants would also argue that Owlet's risk disclosures accurately represented the regulatory status of the Smart Sock—e.g., that Owlet maintained ongoing dialogue with the FDA and the FDA lacked of a definitive position regarding the Smart Sock, and accordingly, the statements at issue were not actionable under the federal securities laws. *See* ECF 90, at 10-13. Defendants would further assert that the alleged misstatements were inactionable opinions, and that their "corporate optimism" regarding the Smart Sock's classification as a wellness product did not amount to fraudulent intent. *Id.* at 13-14, 19.

44.    *Second*, Defendants would likely have argued at summary judgment and trial, as they did at the motion to dismiss stage, that Lead Plaintiff could not establish that any of the alleged misstatements were made with the requisite scienter. To establish scienter, Lead Plaintiff would need to prove that Defendants acted intentionally or recklessly when making each of the statements at issue. Defendants would continue to argue that they did not make the alleged misstatements with the requisite intent to mislead Owlet investors. Defendants would point to, among other things, the lack of whistleblowers/confidential witnesses and/or insider sales to further support their position. *See* ECF 90, at 18-20. Defendants would also point to their ongoing dialogue with the FDA to show they believed the Smart Sock did not require marketing authorization. *Id.*

45.    Moreover, if Defendants were able to successfully convince the Court (at summary judgment) or a jury (at trial) that either Defendants' statements were factually true or that Defendants did not act with the requisite scienter, Lead Plaintiff's Section 20(a) claims against Workman would have been foreclosed as

- 15 -

9401831.v6

well, as these claims require Lead Plaintiff to prove a primary violation of the Exchange Act.

### B.    Risks Concerning Loss Causation and Damages

46.    Even if successful in establishing falsity and scienter, Lead Plaintiff still faced significant risks in establishing loss causation and damages. Lead Plaintiff would have the burden to prove at trial through complex expert testimony that the alleged disclosure of the fraud on October 4, 2021 proximately caused the substantial decline in the prices of Owlet Securities. Given the complexity of determining loss causation and measuring damages in the context of a securities fraud case, these issues would have resulted in a "battle of the experts" involving technical testimony by experts. If the Court or a jury accepted any of Defendants' anticipated challenges to loss causation and damages, the Settlement Class's damages could have been materially reduced, or in a worst-case scenario, eliminated altogether.

47.    Based on consultation with Lead Plaintiff's damages consultant, the Settlement represents approximately 38% of the Settlement Class's total estimated recoverable damages for the claims remaining in the case at the time of settlement and on which the proposed Plan of Allocation is based. This result strongly supports the Settlement.

### C.    Risks on Appeal

48.    If Lead Plaintiff was successful in proving liability and damages at summary judgment and trial, he would face inevitable post-trial appeals which, even if unsuccessful, would prove costly and time consuming. On appeal, Defendants would renew various arguments as to why Lead Plaintiff failed to establish liability, loss causation, and damages, thereby exposing Lead Plaintiff to the risk of having any favorable judgment reversed or reduced after years of litigation.

49.    Moreover, in order to obtain any recovery for the Settlement Class, Lead Plaintiff would have to prevail at class certification, summary judgment, trial, and on the appeals that would inevitably be brought after any trial verdict for Lead

- 16 -

9401831.v6

Plaintiff. In short, there were extremely serious risks attendant to the continued prosecution of the Action, and no guarantee that further litigation would have resulted in a higher recovery, or any recovery at all.

## IV.    COMPLIANCE WITH PRELIMINARY APPROVAL ORDER AND REACTION OF SETTLEMENT CLASS TO DATE

50.    By its Preliminary Approval Order, the Court authorized Lead Counsel to retain SCS as the Claims Administrator to supervise and administer the notice procedure for the Settlement, as well as the processing of Claims. ECF 155 ¶ 7. The Court also approved SCS as the administrator for the Section 14(a) Class Settlement. ECF 153 ¶ 9.

51.    In accordance with the Preliminary Approval Order, SCS, working in conjunction with Lead Counsel and counsel for the Section 14(a) Plaintiffs: (i) mailed/emailed the joint Postcard Notice to potential Settlement Class Members at the addresses set forth in the records provided by Defendants, or who otherwise were identified through further reasonable effort;[14] (ii) published/transmitted the joint Summary Notice in *Investor's Business Daily* and over *GlobeNewswire*; and (iii) developed the Settlement Website, www.strategicclaims.net/case/owlet, from which copies of the long-form Notice for this Settlement (and the long-form notice for the 14(a) Class Settlement) and joint Claim Form can be downloaded. Craig Decl., ¶¶ 5-11, 13. Copies of the Notice and Claim Form are also available on Lead Counsel's website, www.ktmc.com.

52.    The Postcard Notice mailed/emailed to potential Settlement Class Members contains important information concerning the Settlement and, along with the Summary Notice, directs recipients to the Settlement Website for additional information regarding the Settlement (and the Action), including the long-form

---

[14] The majority of the names and addresses of potential Settlement Class Members, as is the case in most securities class actions, were obtained from brokerage firms, banks, institutions, and other nominees ("Nominees") holding Owlet common stock in street name. Craig Decl., ¶ 4.

- 17 -

9401831.v6

Notice, which includes, among other things, the Plan of Allocation as Appendix A. The Postcard and Summary Notices also provide summary information regarding the 14(a) Class Settlement.

53.    Collectively, the notices provide the Settlement Class definition, a description of the Settlement, information regarding the claims asserted in the Action and information to enable Settlement Class Members to determine whether to: (i) participate in the Settlement by completing and submitting a Claim Form; (ii) object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application; or (iii) submit a request to be excluded from the Settlement Class. The Postcard Notice and Notice also inform Settlement Class Members of Lead Counsel's intent to: (i) apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund; and (ii) request Litigation Expenses in connection with the institution, prosecution, and resolution of the Action in an amount not to exceed $180,000, which amount may include a request for reimbursement of the reasonable costs incurred by Lead Plaintiff. *See* Craig Decl., Exs. A & C.

54.    SCS began mailing/emailing the Postcard Notice to potential Settlement Class Members on October 10, 2025. *Id.* ¶¶ 5-9.[15] To date, SCS has disseminated more than 47,600 notices to potential Settlement Class Members. *Id.* ¶ 9. In addition, SCS caused the Summary Notice to be published in *Investor's Business Daily* and transmitted over *GlobeNewswire* on October 27, 2025. *Id.* ¶ 11.[16]

55.    SCS also developed and currently maintains the website dedicated to the Settlement (and 14(a) Class Settlement), www.strategicclaims.net/case/owlet, in order to provide Settlement Class Members and other interested parties with information concerning the Settlement and important dates and deadlines in

---

[15] On October 8, 2025, SCS caused a letter to be sent to nominees advising of the Settlements. *See* Craig Decl., ¶ 4 & Ex. B.

[16] Defendants issued notice of the Settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715 on February 10, 2025. ECF 150.

- 18 -

9401831.v6

connection therewith, as well as downloadable copies of the Notice, Claim Form,[17] and Stipulation. Craig Decl., ¶ 13. Additionally, SCS maintains a toll-free telephone number to respond to inquiries regarding the Settlement. *Id.* ¶ 12. Settlement Class Members with questions regarding the Settlement can also contact SCS by sending an e-mail to info@StrategicClaims.net.

56.    As noted above and in the notices, the deadline for Settlement Class Members to request exclusion from the Settlement Class or to submit an objection to the Settlement, the Plan of Allocation, and/or or the Fee and Expense Application is January 16, 2026. To date, there have been no requests for exclusion (*see* Craig Decl., ¶ 14) and no objections of any kind. Should any requests for exclusion or objections be received after the date of this submission, Lead Counsel will address them in its reply to be filed on January 23, 2026.

## V.    THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE

57.    In accordance with the Preliminary Approval Order, and as explained in the Notice, Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund (i.e., the Settlement Fund less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court) must submit a valid Claim Form and all required supporting documentation to the Claims Administrator, SCS, postmarked (if mailed), or online through the Settlement Website, no later than January 17, 2026. As provided in the Notice, the Net Settlement Fund will be distributed to Authorized Claimants[18] in

---

[17] There is one Claim Form for the 10(b) and 14(a) Class Settlements, and Settlement Class Members need only complete and submit one Claim Form (by mail or via the Settlement Website) in order to be potentially eligible to receive a distribution from both Settlements.

[18] An "'Authorized Claimant' is a Settlement Class Member who submits a Claim to the Claims Administrator that is approved by the Court for payment from the Net Settlement Fund." Stip., ¶ 1(f). Once the claims-administration process is complete,

- 19 -

9401831.v6

accordance with the plan for allocating the Net Settlement Fund among Authorized Claimants approved by the Court. As noted above, Settlement Class Members only need to complete and submit one Claim Form in order to be potentially eligible to receive a distribution from both this Settlement and the 14(a) Class Settlement.[19]

58.    The Plan of Allocation (or, "Plan") proposed by Lead Plaintiff is attached as Appendix A to the Notice. *See* Craig Decl., Ex. A. The Plan is designed to achieve an equitable distribution of the Net Settlement Fund. However, the Plan is not a formal damages analysis and the calculations made pursuant to it are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after trial.

59.    Lead Counsel developed the Plan in consultation with Lead Plaintiff's damages consultants at Peregrine Economics. The Plan creates a framework for the equitable distribution of the Net Settlement Fund among Settlement Class Members who suffered economic losses as a result of Defendants' alleged violations of the federal securities laws set forth in the Complaint. To that end, Lead Plaintiff's damages consultants calculated the estimated amount of alleged artificial inflation in the per share price of Owlet common stock and the estimated amount of alleged artificial inflation in the per share warrant price of Owlet warrants over the course of the Class Period that was allegedly proximately caused by Defendants' materially false and misleading statements and omissions. The estimated alleged artificial inflation in Owlet Securities for the Class Period (as set forth in Table A of the Plan)

Lead Counsel will file a motion seeking the Court's approval of SCS's claim determinations and authorization to conduct a distribution.

[19] All Claims received for the Settlement will be calculated pursuant to the Plan of Allocation for the Settlement as well as the plan of allocation for the 14(a) Class Settlement based on claims asserted under Section 14(a) of the Exchange Act ("14(a) Plan of Allocation"). The 14(a) Plan of Allocation is contained in the long-form notice for the 14(a) Class Settlement available at www.strategicclaims.net/owlet.

- 20 -

9401831.v6

will be utilized in calculating Recognized Loss Amounts, and ultimately a Claimant's overall Recognized Claim.[20]

60.    As set forth in the Plan, a Claimant's Recognized Loss Amount will depend upon several factors, including the date(s) when the Claimant purchased or acquired his, her, or its Owlet Securities during the Class Period, and whether such securities were sold and if so, when and at what price. In order to have a Recognized Claim under the Plan, a Claimant must have suffered damages proximately caused by the disclosure of the relevant truth concealed by Defendants' alleged fraud. Specifically, Owlet Securities purchased or otherwise acquired during the Class Period (i.e., between March 31, 2021 and October 4, 2021, inclusive) must have been held through the alleged corrective disclosure on October 4, 2021 that removed the alleged artificial inflation related to that information.

61.    Recognized Loss Amounts also take into account the Court's Reconsideration Order, which dismissed with prejudice certain alleged misstatements in the Complaint prior to August 5, 2021. Accordingly, in order to account for the dismissed statements and the fact that it would be far less likely that Lead Plaintiff could have prevailed on these claims if the Action continued, Recognized Loss Amounts for purchases of Owlet Securities during the period from March 31, 2021 through August 4, 2021, inclusive, will be discounted by 90% (i.e., the Recognized Loss Amount will be multiplied by 0.10) to account for the unlikelihood of prevailing on an appeal of the dismissed statements.[21]

---

[20] Pursuant to ¶ 2 of the Plan, a "Recognized Loss Amount" will be calculated for each share of Owlet common stock purchased or otherwise acquired between March 31, 2021 and October 4, 2021, inclusive, and for each Owlet warrant purchased or otherwise acquired between March 31, 2021 and October 4, 2021, inclusive, that is listed in the Claim Form and for which adequate documentation is provided. The sum of a Claimant's Recognized Loss Amounts will be the Claimant's "Recognized Claim."

[21] Recognized Loss Amounts also take into account the PSLRA's statutory limitation on recoverable damages. *See* 15 U.S.C. § 78u-4(e)(1).

- 21 -

9401831.v6

62.    SCS, as the Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund by dividing the Authorized Claimant's Recognized Claim (i.e., the sum of the Claimant's Recognized Loss Amounts as calculated under the Plan) by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. Lead Plaintiff's losses will be calculated in the same manner.

63.    As noted in the Notice and Plan, Settlement Class Members are potentially eligible for additional compensation from the 14(a) Class Settlement based on claims asserted under Section 14(a) of the Exchange Act, and any Claim submitted for the 10(b) Class Settlement will also be processed under the 14(a) Plan of Allocation. Settlement Class Members will be entitled to additional compensation from the 14(a) Class Settlement if they held Sandbridge common stock as of June 1, 2021 and were eligible to vote at Sandbridge's special meeting on July 14, 2021.

64.    Once SCS has processed all Claims received and provided Claimants with an opportunity to cure any deficiencies in their Claims or challenge the rejection of their Claims, Lead Counsel will file with the Court, a motion for approval of SCS's determinations with respect to all Claims and authorization to distribute the Net Settlement Fund to Authorized Claimants. As set forth in the Plan, if nine months after the initial distribution, there is a balance remaining in the Net Settlement Fund (whether by reason of uncashed checks, or otherwise), and if it is cost-effective to do so, Lead Counsel will conduct a re-distribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement, including the costs for such re-distribution, to Authorized Claimants who have cashed their initial distribution checks and would receive at least $10.00 from such re-distribution. Re-distributions will be repeated until it is no longer cost effective to do so. Thereafter, any remaining balance will be contributed to non-sectarian, not-for-profit organization(s), to be recommended by Lead Counsel and approved by the Court. *See* Craig Decl., Ex. A (10(b) Class Notice), ¶ 12.

- 22 -

9401831.v6

65.    As discussed in the Settlement Memorandum, the structure of the Plan is similar to plans of allocation used to apportion settlement proceeds in numerous other securities class actions. To date, there have been no objections to the Plan. In sum, Lead Counsel believes that the Plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants, and respectfully submits that the Plan should be approved by the Court.

## VI.    LEAD COUNSEL'S FEE AND EXPENSE APPLICATION

66.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying for an award of attorneys' fees and payment of expenses incurred by Plaintiff's Counsel during the course of the Action. Specifically, Lead Counsel is applying for attorneys' fees in the amount of 33⅓% of the Settlement Fund and for Litigation Expenses in the total amount of $121,541.89. This amount *includes* a request for reimbursement of $5,000 to Lead Plaintiff for the costs he incurred in representing the Settlement Class in the Action, as permitted by 15 U.S.C. § 78u-4(a)(4). *See* Tweito Decl. ¶ 11. As noted above, Lead Counsel's Fee and Expense Application is consistent with the amounts set forth in the notices and has Lead Plaintiff's support. *Id*. ¶ 10. To date, there have been no objections to Lead Counsel's requests for fees and expenses.[22]

67.    Below is a summary of the primary factual bases for Lead Counsel's Fee and Expense Application. A full analysis of the factors considered by courts in the Ninth Circuit when evaluating requests for attorneys' fees and expenses from a common fund, as well as the supporting legal authority, is presented in the accompanying Fee Memorandum.[23]

---

[22] Lead Counsel will address objections, if any, in their reply to be filed on January 23, 2026.

[23] Courts in this Circuit consider the following factors when determining whether a fee percentage sought from a common fund is fair and reasonable: (1) the results achieved; (2) the risks of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee and financial burden carried by the plaintiffs; (5) awards made in similar cases; (6) the reaction of the class; and (7) the amount of a lodestar

- 23 -

9401831.v6

**A.     Lead Counsel's Fee Request Is Fair and Reasonable and Warrants Approval**

**1.     The Favorable Settlement Achieved**

68.     Courts have consistently recognized that the result achieved is a key factor to be considered in making a fee award. *See* Fee Memorandum, § II.C.2. As described above, when viewed in absolute terms, the $3.5 million Settlement—representing approximately 38% of the Settlement Class's total estimated recoverable damages for the claims remaining in the Action at the time of settlement, is a favorable result for the Settlement Class. Notably, this recovery percentage exceeds the median recovery in comparable cases.[24] This result is also significant when considered in view of the risks and obstacles to obtaining a larger recovery (or, any recovery) were the Action to continue. Here, as a result of the Settlement, numerous Settlement Class Members will benefit and receive compensation for their losses and avoid the substantial risks to recovery in the absence of settlement.

**2.     The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases**

69.     The risks faced by Plaintiff's Counsel in prosecuting this Action are highly relevant to the Court's consideration of an award of attorneys' fees, as well as its approval of the Settlement. Here, Defendants adamantly deny any wrongdoing and, if the Action had continued, would have aggressively litigated their defenses through discovery, class certification, summary judgment, trial, and appeals. As detailed in Section III above, Lead Plaintiff and his counsel faced significant risks

cross-check. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002). *See also* Fee Memorandum, § II(B).

[24] *See, e.g.*, Edward Flores & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review* at 26, NERA Economic Consulting (Jan. 22, 2025), https://www.nera.com/content/dam/nera/publications/2025/ PUB 2024_Full-Year Sec_Trends_0122.pdf (reporting between January 2015 and December 2024, the median settlement for securities class actions with less than $20 million in investor losses recovered approximately 24% of those losses).

- 24 -

9401831.v6

to proving the Defendants' liability and damages at trial. This risk was heightened following this Court's Reconsideration Order. ECF 139.

70.    These case-specific litigation risks are in addition to the risks accompanying securities litigation generally, such as the fact that this Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws, and was undertaken on a contingent-fee basis. From the outset, Plaintiff's Counsel understood that this would be a complex, expensive, and potentially lengthy litigation with no guarantee of ever being compensated for the investment of time and financial expenditures that vigorous prosecution of the case would require. In undertaking that responsibility, Plaintiff's Counsel were obligated to ensure that sufficient resources (in terms of attorney and support-staff time) were dedicated to prosecuting the Action, and that funds were available to cover the out-of-pocket costs that a case like this typically demands. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an hourly, ongoing basis.

71.    Here, Plaintiff's Counsel also fully bore the risk that no recovery would be achieved and are well aware that despite the most vigorous and competent efforts, a law firm's success in contingent litigation such as this is never guaranteed.[25] Moreover, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to persuade sophisticated defendants to engage in serious settlement negotiations at meaningful levels. Lead Counsel is aware of many hard-fought lawsuits in which, because of the discovery of facts unknown when the case commenced, or changes in the law during

---

[25] For example, there are many appellate decisions affirming summary judgment and directed verdicts for defendants showing that surviving a motion to dismiss is not a guarantee of recovery. *See, e.g., In re Oracle Corp., Secs. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon Graphics Inc. Secs. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 669 F.3d 68 (1st Cir. 2012); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Digi Int'l, Inc. Secs. Litig.*, 14 F. App'x 714 (8th Cir. 2001).

9401831.v6

the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts by plaintiff's counsel produced no fee for counsel. *See* Fee Memorandum, § II.C.4.

72. The United States Supreme Court and numerous other courts have repeatedly recognized that the public has a strong interest in having experienced and able counsel enforce the federal securities laws through private actions *See, e.g., Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions provide "'a most effective weapon in the enforcement' of the securities laws and are a 'necessary supplement to [SEC] action.'") (citation omitted). Vigorous private enforcement of the federal securities laws can only occur if private investors can obtain some parity in representation with that available to large corporate defendants. If this important public policy is to be carried out, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action as well as the economics involved.

73. Here, Plaintiff's Counsel's efforts in the face of substantial risks and uncertainties have resulted in a favorable and guaranteed recovery for the benefit of the Settlement Class. In these circumstances, and in consideration of Plaintiff's Counsel's efforts and the favorable result achieved, Lead Counsel submits that the requested fee of 33⅓% of the Settlement Fund should be approved.

**3. The Work of Plaintiff's Counsel and the Lodestar Cross-Check**

74. Plaintiff's Counsel have devoted significant efforts to the investigation, prosecution, and resolution of this Action. As more fully described above, counsel, *inter alia*: (i) conducted an extensive investigation into the Settlement Class's claims and prepared the Complaint based on this investigation; (ii) successfully opposed Defendants' motion to dismiss the Complaint; (iii) opposed and defeated, in part, Defendants' motion for reconsideration of the Court's Order denying Defendants'

- 26 -

9401831.v6

motion to dismiss the Complaint; (iv) obtained documents from the FDA through a Freedom of Information Act request; (v) commenced discovery efforts, including serving document requests and drafting agreements governing the Parties' production of confidential and electronically stored information; (vi) consulted with a damages expert; and (vii) prepared for and engaged in settlement negotiations with Defendants, including formal mediation. *See supra* ¶¶ 6, 20-33. At all times throughout the Action, Plaintiff's Counsel's efforts were driven and focused on advancing the litigation to achieve the most successful outcome for the Settlement Class.

75.    The time devoted to this Action by Plaintiff's Counsel is set forth in Plaintiff's Counsel's declarations ("Fee and Expense Declarations") attached hereto as Exhibits 3 and 4.[26] Included with the Fee and Expense Declarations are schedules that summarize the time expended by the attorneys and professional support staff at Kessler Topaz and Robbins Geller, as well as expenses ("Fee and Expense Schedules"). The Fee and Expense Schedules report the amount of time spent by each attorney and professional support staff employee at Kessler Topaz and Robbins Geller who worked on the Action and their resulting "lodestar," i.e., their hours multiplied by their hourly rates.

76.    The hourly rates of Plaintiff's Counsel here range from $805 per hour to $1,270 per hour for partners, $395 per hour to $750 per hour for other attorneys, $320 per hour to $435 per hour for paralegals and law clerks, and $370 per hour to

---

[26] The Fee and Expense Declarations consist of: (i) the Declaration of Jennifer L. Joost, on behalf of Kessler Topaz ("Kessler Topaz Fee and Expense Decl.") (Ex. 3) and (ii) the Declaration of Ashley M. Price, on behalf of Robbins Geller ("Robbins Geller Fee and Expense Decl.") (Ex. 4). These declarations set forth the names of the attorneys and professional support staff at Kessler Topaz and Robbins Geller who worked on the Action and their current hourly rates, the lodestar value of the time expended by such attorneys and professional support staff, the expenses incurred by Kessler Topaz and Robbins Geller, and the background and experience of the firms. The Fee and Expense Declarations also provide breakdowns of the time spent in the Action, by timekeeper, for various litigation categories, and indicates if the hourly rate for any individual timekeeper changed during the pendency of the Action.

- 27 -

9401831.v6

$660 per hour for in-house investigators. *See* Kessler Topaz Fee and Expense Decl., Ex. 3-A; and Robbins Geller Fee and Expense Decl., Ex. 4-C. These hourly rates are reasonable for this type of complex litigation. *See* Fee Memorandum, § II.D.2.

77.    In total, from the inception of this Action through December 23, 2025, Plaintiff's Counsel expended over 2,400 hours on the investigation, prosecution, and resolution of the claims against Defendants for a total lodestar of $1,789,623.00.[27] Thus, pursuant to a lodestar "cross-check," Plaintiff's Counsel's fee request of 33⅓% of the Settlement Fund (or $1,166,667), if awarded, would yield a significantly negative lodestar multiplier of approximately 0.65 on Plaintiff's Counsel's lodestar (as opposed to the positive multiplier typically applied to counsel's lodestar in these types of cases (*See* Fee Memorandum, § II.D.3)). As such, the requested fee represents a substantial discount on Plaintiff's Counsel's time devoted to the Action based on their current hourly rates. Moreover, the requested fee will result in an award of roughly 65% of the lodestar resulting from the over 2,400 hours that Plaintiff's Counsel devoted to litigating this case—or a 35% discount on Plaintiff's Counsel's time at their current hourly rates.

### 4.    The Quality of Plaintiff's Counsel's Representation

78.    The skill and diligence of Plaintiff's Counsel also supports the requested fee. In particular, as its résumé demonstrates, Lead Counsel Kessler Topaz is an experienced and skilled firm in the securities litigation field and has a successful track record in these actions throughout the country. *See* Kessler Topaz Fee and Expense Decl., Ex. 3-E. The additional Plaintiff's Counsel firms are also highly experienced in complex litigation and securities class actions. *See* Robbins

---

[27] Lead Counsel will continue to perform legal work on behalf of the Settlement Class should the Court approve the Settlement. Additional resources will be expended assisting Settlement Class Members with their Claims and related inquiries and working with SCS to ensure the smooth progression of claims processing. No additional legal fees will be sought for this work.

- 28 -

9401831.v6

Geller Fee and Expense Decl., Ex. 4-E. The favorable result achieved for the Settlement Class here reflects the quality of Plaintiff's Counsel's representation.

79. The quality of the work performed by Plaintiff's Counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel. Defendants in this case were represented by experienced counsel from the nationally prominent defense firm, Latham & Watkins LLP. This firm vigorously and ably defended the Action. In the face of this formidable defense, Plaintiff's Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the Action on terms that are favorable to the Settlement Class.

### 5. Lead Plaintiff's Support of the Fee and Expense Request

80. Lead Plaintiff closely supervised and monitored both the prosecution and the settlement of the Action. Lead Plaintiff has evaluated Lead Counsel's fee request and believes it to be fair and reasonable. As set forth in his accompanying declaration, Lead Plaintiff concluded that the requested fee has been earned based on the efforts of Plaintiff's Counsel and the favorable recovery obtained for the Settlement Class in a case that involved serious risk. *See* Tweito Decl. ¶ 10. Lead Plaintiff also supports Lead Counsel's request for payment of Litigation Expenses. *Id*. Accordingly, Lead Plaintiff's support for Lead Counsel's Fee and Expense Application further demonstrates its reasonableness and this support should be given meaningful weight in the Court's consideration of the fees and expenses requested.

### B. Lead Counsel's Request for Expenses Warrants Approval

#### 1. Lead Counsel Seeks Payment of Plaintiff's Counsel's Reasonable and Necessary Litigation Expenses from the Settlement Fund

81. Lead Counsel also seeks payment from the Settlement Fund of $116,541.89 for costs, charges and expenses that were reasonably and necessarily incurred by Plaintiff's Counsel in connection with the Action. The notices inform the Settlement Class that Lead Counsel will apply for Litigation Expenses in an

- 29 -

9401831.v6

amount not to exceed \$180,000, which amount may include a request for reimbursement of the reasonable costs incurred by Lead Plaintiff directly related to his representation of the Settlement Class in accordance with 15 U.S.C. §78u-4(a)(4). The amount of Litigation Expenses requested by Lead Counsel, along with the amount requested by Lead Plaintiff (i.e., \$5,000), is below this cap. To date, there have been no objections to these amounts.

82.    From the beginning of the Action, Plaintiff's Counsel were aware that they might not recover any of the expenses incurred in prosecuting the claims against Defendants and, at the very least, would not recover any of their out-of-pocket expenses until the Action was successfully resolved. Thus, Plaintiff's Counsel took steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

83.    Plaintiff's Counsel's expenses include charges for, among other things: (i) consultants in connection with various stages of the litigation; (ii) online factual and legal research; (iii) mediation; (iv) travel in connection with mediation; and (v) document reproduction.[28] Courts have consistently found that these kinds of expenses are payable from a fund recovered by counsel for the benefit of a class.

84.    The largest component of Plaintiff's Counsel's expenses (i.e., \$88,607.50, or approximately 76% of total expenses) was incurred for Lead Plaintiff's damages consultant. The retention of this consultant was necessary and reasonable in order to prove Lead Plaintiff's claims. This consultant also assisted in developing the proposed Plan of Allocation in connection with settlement. *See supra* ¶ 35.

---

[28] As set forth in the Fee and Expense Declarations attached as Exhibits 3 and 4 hereto, these expenses are reflected on the books and records maintained by the firms. These books and records are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred. Plaintiff's Counsel's expenses are listed in detail in their firm's respective declarations, each of which identifies the specific category of expense for which Plaintiff's Counsel seek reimbursement. These expense items are billed separately and are not duplicated in each firm's billing rates.

- 30 -

85.    Plaintiff's Counsel's second largest expense, $16,250.00, was for the mediation with Mr. Murphy.

86.    Plaintiff's Counsel's third largest expense, $6,490.41, was for research. This amount represents charges for computerized research services such as Lexis, Westlaw, and PACER. It is standard practice for attorneys to use online services to assist them in researching legal and factual issues, and indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class. Here, on-line research was necessary to prepare the detailed Complaint filed in the Action, research the law pertaining to the claims asserted, and oppose Defendants' motion to dismiss and motion for reconsideration.

87.    The other expenses for which Plaintiff's Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees; document reproduction costs; travel-related charges; and delivery expenses.

88.    All of the expenses incurred by Plaintiff's Counsel were reasonably necessary to the successful investigation, prosecution, and resolution of the Sections 10(b) and 20(a) Exchange Act claims asserted in the Action against Defendants, and have been approved by Lead Plaintiff.

### 2.    Reimbursement to Lead Plaintiff Is Fair and Reasonable

89.    The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). Accordingly, Lead Plaintiff seeks reimbursement of his reasonable costs incurred directly for his work representing the Settlement Class, based on the time he devoted to overseeing and participating in the Action. Specifically, Lead Plaintiff is seeking reimbursement of $5,000.

- 31 -

90.     The amount of time and effort devoted to this Action by Lead Plaintiff is detailed in his accompanying declaration, attached as Exhibit 1 hereto. As discussed in the Fee Memorandum and in his supporting declaration, Lead Plaintiff has been fully committed to pursuing the Settlement Class's claims since he became involved in the Action. Specifically, Lead Plaintiff has diligently fulfilled his obligations as the Court-appointed representative of the Settlement Class, providing valuable assistance to counsel during the prosecution and resolution of the Action. The efforts expended by Lead Plaintiff during the course of this Action included regular communications with counsel concerning significant developments in the litigation and case strategy, and reviewing pleadings and briefs filed with the Court. These are precisely the types of activities courts have found to support reimbursement to class representatives, and support this request for reimbursement.

## VII.   CONCLUSION

91.     For all the reasons set forth herein, Lead Counsel respectfully submit that the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submits that the requested fee in the amount of 33⅓% of the Settlement Fund should be approved as fair and reasonable, and the requests for Plaintiff's Counsel's Litigation Expenses in the total amount of $116,541.89 and Lead Plaintiff's costs in the amount of $5,000, should also be approved as fair and reasonable.

92.     I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct

Executed in San Francisco, California this 2nd day of January 2026.

_____
Jennifer L. Joost

- 32 -

9401831.v6